**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI-DADE DIVISION**
**www.flsb.uscourts.gov**

| | |
|---|---|
| In re: | Chapter 11 Case |
| Ivankovich Family LLC, | Jointly Administered |
| A&O Family LLC (Florida), | |
| A & O Family LLC (Illinois), | Case Nos. 24-15755-LMI |
| Atlas P2 Managing Member, LLC | 24-15762-LMI |
| | 24-15767-LMI |
| Debtors. | 24-15770-LMI |

**MOTION FOR DETERMINATION THAT AUTOMATIC STAY**
**DOES NOT APPLY TO STATE COURT DIVORCE PROCEEDING OR,**
**ALTERNATIVELY, FOR RELIEF FROM AUTOMATIC STAY TO**
**ALLOW STATE COURT DIVORCE PROCEEDING TO DETERMINE JEANETTE**
**IVANKOVICH'S DOMESTIC SUPPORT OBLIGATION CLAIM INCLUDING ANY**
**ATTORNEY FEES ASSESSED AND TO DETERMINE OWNERSHIP OF DEBTORS**

Creditor, Jeanette Ivankovich, by and through undersigned counsel, files this *Motion for Determination that Automatic Stay Does Not Apply to State Court Divorce Proceeding or, Alternatively, for Relief from Automatic Stay to Allow State Court Divorce Proceeding to Determine Jeanette Ivankovich's Domestic Support Obligation Claim Including Any Attorney Fees Assessed and to Determine Ownership of Debtors* (the "Motion"), and in support thereof, states as follows:

## INTRODUCTION

This consolidated bankruptcy case is Steven Ivankovich (Debtors' principal)'s[1] latest in a long line of failed attempts to litigate martial property disputes related to a pending divorce case in every court possible except the Illinois divorce court where the disputes arise. For the reasons

---

[1] Ivankovich Family LLC; A&O Family LLC (Florida); A & O Family LLC (Illinois); and Atlas P2 Managing Member, LLC shall sometimes be referred to collectively, as the "Debtors."

1

set forth below, before this bankruptcy can legitimately continue, the Court must send the Debtors back to the divorce court for the final adjudication of the marital estate, including the determination of the domestic support obligation claim and any attorney fees assessed (the "DSO claim") and to determine the ownership of all four Debtors. Until such determination is made, Debtors are doing nothing besides hiding in bankruptcy court while Steven evades court ordered support payments to Jeanette and their children who are surviving off government assistance and barely making ends meet.

Jeanette seeks a comfort order from the Court finding that continuation of the divorce proceeding with respect to the DSO claim and ownership of the Debtors is exempted from the automatic stay, or, alternatively, that there is good cause to grant relief from the automatic stay.

## JURISDICTION, VENUE, STATUTORY AND PROCEDURAL BASIS

1.      This Court has jurisdiction over the parties and subject matter pursuant to 28 U.S.C. §§ 157 and 1334.

2.      This is a core proceeding pursuant to 28 U.S.C § 157(b) (2).

3.      Venue is proper pursuant to sections 28 U.S.C §§ 1408 and 1409.

4.      The statutory basis for this Motion is 11 U.S.C. § 362, and the procedural predicate for the relief sought is Rule 4001 and Rule 9014 of the Federal Rules of Bankruptcy Procedure.

## BACKGROUND

In connection with an ongoing divorce proceeding in the State of Illinois brought by his estranged wife, Jeanette Ivankovich, the divorce court (the "Illinois Divorce Court") ordered Steven to pay Jeanette and their children retroactive and monthly maintenance and child support on or about November 6, 2023. Steven refused to pay or comply with the court orders in any manner. Instead, Steven took affirmative steps to deprive Jeanette and the children of all financial

resources necessary for basic living and doubled down by concealing, selling, or transferring marital assets.

On May 23, 2024[2], the Illinois Divorce Court entered a preliminary injunction against Steven finding, among other things, that Steven's companies, including the Debtors, are his alter ego and that Jeanette has a clear protectable right in any assets of the Debtors that constitute marital property. To preserve the martial property pending final adjudication and equitable distribution, the Illinois Divorce Court froze some of Debtors' investment accounts that were found to be marital property. The Debtors subsequently requested, and were denied, stays of relief at both the Illinois trial court and appellate court levels. One (1) day before their request for relief was denied, Debtors voluntarily initiated this bankruptcy seeking protection under Chapter 11 of Title 11 of the United States Code.

### *The Divorce Proceeding*

5.      Jeanette and Steven were married on April 29, 2006, in Cook County, Illinois. They have two minor children from the marriage.

6.      During the marriage, Steven acquired interests in numerous businesses, including but not limited to the Debtors—Ivankovich Family LLC, A&O Family LLC (Florida), A&O Family LLC (Illinois), and Atlas P2 Managing Member LLC (collectively, the "LLCs"). Steven manages the Debtors and LLCs in addition to other entities.

7.      On October 22, 2021, Jeanette filed her Petition for Dissolution of Marriage in Cook County, Illinois, which remains pending in *In re: Marriage of Jeanette Ivankovich, as Petitioner, and Steven Ivankovich, as Respondent*, Case No. 2021D009220, pending the Circuit

---

[2] Aforesaid Preliminary Injunction was circulated by the Circuit Court of Cook County on May 23, 2024 and was inadvertently stamped with the incorrect date of March 12, 2024. Pursuant to the Circuit Court of Cook County's May 23, 2024 Order, the Preliminary Injunction "shall be dated and is effective as of May 23, 2024."

Court of Cook County, Illinois (the "Divorce Proceeding")[3].

8.      On November 6, 2023, the divorce court (the "Illinois Divorce Court") entered judgments in favor of Jeanette and against Steven ordering Steven to pay Jeanette monthly child support and spousal support in the amount of $21,113.00 per month plus 9.00% interest, beginning November 1, 2023; in addition to the monthly support payments, the court ordered Steven to pay Jeanette a one-time payment of $506,712.00 plus 9.00% interest for retroactive support, effective November 6, 2023 (the "Support Judgments"[4]) (**Exhibit A**).

9.      As of October 7, 2024, **Steven owes Jeanette $808,527.33** in outstanding child support and maintenance arrears (including statutory interest). To date, Steven has paid Jeanette $0 in support.  He has refused to pay any of the support payments or comply with the court orders in any manner. Instead, Steven took affirmative steps to deprive Jeanette and the children of all financial resources necessary for basic living and doubled down by concealing, selling, or transferring marital assets; specifically, tens of millions of dollars in liquid marital assets arising from Steven's interest in his companies (which have been found to be his alter egos).

10.      Through responses to subpoenas, Jeanette discovered that Steven failed to disclose his interest in numerous companies during the course of the Divorce Proceeding (**as well as on his income tax returns**). Specifically, Steven concealed his interest in the LLCs and further failed to disclosure his interests in the investment accounts the LLCs held at Celadon Financial Group

---

[3] The divorce case is pending in the Circuit Court of Cook County, Illinois County Department, Domestic relations Division as *In re: Marriage of Jeanette Ivankovich (Petitioner) and Steven Ivankovich (Respondent)*, Case Number 2021-D-9220.

[4] Under Illinois law, each missed support payment is a new judgment, deemed entered as of the date the support payment was due, and a lien arises by operation of the law against the real and personal property of the obligor parent for each overdue support payment. *See* § 750 ILCS 5/505(d). Thus, as a result of Steven Ivankovich's refusal to pay the court ordered support payments to Ms. Ivankovich, Illinois law imposes additional child support and spousal support judgments against Steven Ivankovich for December 1, 2023, January 1, 2024, February 1, 2024, March 1, 2024, April 1, 2024, May 1, 2024, June 1, 2024, July 1, 2024, August 1, 2024, September 1, 2024, and October 1, 2024. All support judgments entered on or after November 1, 2023 until the judgments are satisfied are hereinafter collectively, the "Support Judgments".

4

("Celadon") which were comprised of various cash, bonds, and investment assets[5] (collectively, the "Celadon Accounts"). Additional discovery revealed that Steven transferred over $64 million out of the LLCs' Celadon Accounts during the pendency Divorce Proceeding and entirely unbeknownst to Jeanette and the Illinois Divorce Court.

11.     Jeanette filed an Emergency Petition for a Temporary Restraining Order and/or Preliminary Injunction and for Other Relief and Ex Parte Supplement (collectively, the "Emergency Petition for TRO") in the Divorce Proceeding to enjoin Steven from concealing, selling, or transferring the LLCs' assets. Jeanette argued that the Celadon Accounts were martial property and that she had cause to believe that unless enjoined from doing so, Steven will sell, assign, transfer, pledge, mortgage, hypothecate, conceal, sequester, squander, liquidate, dissipate or otherwise deal with or transact in the property or assets in his possession or under his control to such end that Jeanette will be irreparably harmed, damaged and prejudiced in that the marital property will, by the end of the Divorce Proceeding, no longer be available for equitable distribution to Jeanette and no adequate remedy at law will be available.

12.     The Illinois Divorce Court held extensive evidentiary hearings on the Emergency Petition for TRO in which Jeanette personally appeared and almost all other interested parties appeared and were represented by counsel, including Steven's parents, Olga and Anthony Ivankovich, and the LLCs—Steven was the only interested party who did not personally appear, despite being ordered by the Court to do so. The Illinois Divorce Court considered oral arguments, evidence in the record, and testimony including from Paul Waldman, the General Counsel of Celadon. The Illinois Divorce Court found that Jeanette has a clear protectable right in the LLCs' assets because said assets are martial property and a preliminary injunction was necessary to

---

[5]  A&O Family LLC (IL) holds Acct 1441; Ivankovich Family LLC holds Acct 1442; P2 Portfolio Managing Member LLC holds Acct 1443; and A & O Family LLC (FL) holds Acct 1444.

prevent further liquidation or diminution of the LLCs' assets under Steven's *exclusive* possession

and control for support, fees, and distribution upon the entry of final judgment. Some of the Illinois

Divorce Court's most notable findings of facts include:

  a. Steven had the ability to transfer assets in and out of the LLCs freely including for his own purpose (*See* Testimony of Steven Ivankovich in Case 20 CV 4985, Northern District of Illinois);

  b. In 2020, Steven had a net worth of approximately $55 million but between the years 2020—2022 (during the pendency of the marriage and the Divorce Proceeding), Steven used this money to pay obligations and expenses of the LLCs in which Steven had an interest (*See* Testimony of Steven Ivankovich in Case 20 CV 4985, Northern District of Illinois);

  c. Between August 1, 2022 and September 5, 2023, Steven transferred $64,008,739.58 out of the Celadon Accounts and each and every transfer was made during the pendency of the Divorce Proceeding;

  d. Steven was the only authorized principal to transfer assets in and out of the Celadon Accounts[6];

  e. The value of the Celadon Accounts as of August 31, 2023 was $25,624,601.33:

     i. A&O Family LLC (IL) (Acct 1441) = $2,288,571.90,
     ii. Ivankovich Family LLC (Acct 1442) = $2,259,001.80,
     iii. P2 Portfolio Managing Member LLC (Acct 1443) = $3,972,791.57, and
     iv. A & O Family LLC (FL) (Acct 1444) = $17,104,236.06;

  f. Olga and Anthony Ivankovich do not have the physical or mental capacity to operate any of the LLCs and Steven Ivankovich is controlling and operating all of the LLCs;

  g. The LLCs are Steven's alter ego; and

  h. Steven's interests in the LLCs are in the nature of personal property and are presumed to be marital property.

13.    On May 23, 2024[7], the Illinois Divorce Court entered a preliminary injunction

against Steven and his affiliates enjoining him from dissipating, destroying, transferring,

encumbering, concealing, or otherwise disposing of the assets of the LLCs held at Celadon (the

---

[6] Steven was the sole (100%) authorized principal to transfer assets in and out of accounts 1441, 1442, and 1443. Steven was also an authorized principal on account 1444 along with Anthony and Olga Ivankovich, but the Illinois Divorce Court found that both Anthony and Olga lacked capacity to actually effectuate any transfers in and out of account 1444 and thus Steven essentially enjoyed 100% of the authorization on account 1444 as well.

"Preliminary Injunction") (**Exhibit B**). Pursuant to the Preliminary Injunction, Celadon was ordered to pay Jeanette child support and spousal support from the Celadon Accounts in the amount of $651,446.38[8] in satisfaction of the unpaid Support Judgments. Celadon was also ordered to pay Jeanette's counsel, Schiller DuCanto & Fleck LLP, $400,000.00 for legal fees and $25,000.00 for the appointment of a forensic accounting expert. The Celadon Accounts were frozen in compliance with the Preliminary Injunction and in order to preserve the LLC's assets until the Illinois Divorce Court can determine what interests Jeanette has in the LLCs.

14.    In addition, the Illinois Divorce Court entered temporary restraining orders freezing the LLCs investment accounts at Wedbush Securities and all of the LLCs bank accounts at JP Morgan Chase on which Steven had signing authority, and the LLCs investment accounts at RBC Capital Markets were frozen due to a Citation to Discover Assets (which has since been stayed due to the pending bankruptcy) (**Exhibit C**).

15.    The LLCs filed emergency motions to stay the Preliminary Injunction in the Illinois Divorce Court and the Appellate Court of Illinois; both motions were denied.

16.    Steven appealed the Preliminary Injunction to the First Judicial District in and for the Appellate Court of Illinois, Appellate Case Number 1-24-1118 (the "Appeal"). However, the Appeal is currently stayed as a result of the Debtors' bankruptcy.

17.    On June 10, 2024, prior to the Debtors' emergency voluntary bankruptcy petition being filed, the Illinois Divorce Court held a hearing on Jeanette's Motion for Leave to Join Third Parties Ivankovich Family LLC, A&O Family LLC (Florida), A & O Family LLC (Illinois), Anthony Ivankovich, and Olga Ivankovich (the "Motion to Join")[9] and gave an oral ruling on the

---

[8] The $651,446.38 encompassed unpaid support payments, including the retroactive support payment, from November 1, 2024 up to and including April 1, 2024.
[9] The Motion for Leave to Join Third Parties also sought to join a number of Steven's other entities but, to the best of Jeanette's knowledge, those entities are not relevant to this Motion at this time.

record finding that Ivankovich Family LLC, A&O Family LLC (Florida), A & O Family LLC (Illinois), and Anthony Ivankovich are necessary parties to the Divorce Proceeding; the Illinois Divorce Court subsequently found Olga Ivankovich is also a necessary party to the Divorce Proceeding.[10]

18.    The Debtors filed for bankruptcy prior to a formal order being entered on the Motion to Join. However, because the Motion to Join also concerned other non-debtor entities, on June 14, 2024, the Illinois Divorce Court entered its order memorializing the findings of fact and conclusions of law made on the record at the June 10, 2024 hearing. In its order, the Illinois Divorce Court instructed Jeanette to file third-party complaints or other actions against the individual and/or entities joined as necessary parties within sixty (60) from its order, but specifically noted that, with respect to the Debtors, since the automatic stay prevents Jeanette from any further actions against those entities, the Illinois Divorce Court is mindful that the time limitations that apply to the Debtors are tolled and must be revisited once stay relief is obtained.[11]

### *Related Litigation*

19.    Steven has spent a considerable amount of time and money—at least some of which was the Debtors' money—filing frivolous lawsuits in state and federal courts alleging bogus claims on behalf of himself and his LLCs solely to frustrate Jeanette's legitimate efforts to collect on the Support Judgments and delay the Illinois Divorce Court's ability to make a final determination as to what extent Steven's interests in the LLCs constitute marital property.

20.    Three weeks after Jeanette filed the Divorce Proceeding in Illinois, Steven filed his own divorce petition in the Circuit Court for Miami-Dade County on November 12, 2021. After a

---

[10] *See* Order (RE Motion to Join), June 14, 2024; *see also* Order Submitted by Electronic Means, September 11, 2024, ¶ 7.

[11] *See* Order (RE Motion to Join), June 14, 2024, ¶ 4.

joint hearing between the Florida divorce court and the Illinois Divorce Court, both judges determined that the Illinois Divorce Court had jurisdiction over all issues relating to Steven and Jeanette's marital dissolution. The Florida divorce proceeding was dismissed with all pending matters transferred to the Illinois Divorce Court.

21.    Next, in the Divorce Proceeding, as previously stated, Steven chose not to personally appear at the evidentiary hearings on the Emergency Petition for TRO. The Illinois Divorce Court defaulted Steven for his failure to appear which barred him from putting on his case-in-chief but allowed him to cross examine witnesses and make opening and closing statements; he did not offer any testimony, witnesses, or evidence to refute to support his position. Instead, Steven waited until the last day of testimony in the evidentiary hearings on the Emergency Petition for TRO and as soon as those hearings concluded, on November 3, 2023, filed an action for declaratory judgment and injunctive relief on behalf of Ivankovich Family LLC, P2 Portfolio Managing Member, Atlas Apartment Homes LLC, and A&O Family LLC against Jeanette, Schiller DuCanto & Fleck LLP, Celadon Financial Group LLC, Stifel Nicolaus & Company Inc., and JP Morgan Chase. *See* Case Number 2023CH09243 in the Chancery Division of the Circuit Court of Cook County, Illinois. The complaint alleged that Steven transferred his membership interests in P2 Portfolio Managing Member LLC and Ivankovich Family LLC to Consilient Holdings LLC.[12]

22.    On November 13, 2023, Steven filed an action for declaratory relief against Jeanette and Schiller DuCanto & Fleck LLP in the Circuit Court of the 11th Judicial Circuit of Miami-Dade County, Florida, Case Number 2023-026371-CA-01 (**Exhibit D**); on December 26, 2023, the case

---

[12] A hearing was held on September 23, 2024 on Jeanette Ivankovich and Schiller DuCanto & Fleck's Motion to Dismiss. *See* Case Number 2023CH09243. The court did not rule on the motion with respect to the Debtors because of the bankruptcy but took the motion under advisement as to the sole plaintiff that is not in bankruptcy.

was removed to the United States District Court for the Southern District of Florida, Miami Division, Case Number 23-cv-24894-FAM. The complaint sought declaratory relief that assets of the LLCs were not assets of Steven and a declaration of rights of Jeanette, if any, of martial rights to membership interests in LLCs. The district court dismissed this case on July 1, 2024, finding that the Illinois Divorce Court is the proper court to determine whether Steven's interests in the LLCs constitute marital property and if so, to determine what interest Jeanette owns in those LLCs. Steven appealed the dismissal order on July 31, 2024 (USCA, 24-12480-F), but voluntarily dismissed the appeal on September 3, 2024.

23.     Steven's repeated losses throughout state and federal courts prompted him to file this Chapter 11 bankruptcy seeking the protection of the automatic stay.

### *The Debtors File for Bankruptcy*

24.     On June 10, 2024, the Debtors filed separate voluntarily petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"); the four bankruptcy cases were subsequently consolidated for joint administration.[13]

25.     Since that time, the Debtors have operated as a debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. Debtors are solvent companies.

26.     Debtors' schedules list Jeanette's claims related to the Divorce Proceeding and the Preliminary Injunction as contingent, unliquidated, disputed, and/or pending appeal.

27.     Jeanette filed two Proofs of Claim for Section 507(a) priority claims for the domestic support obligations stemming from the Divorce Proceeding: (1) a claim for $1,238,785.14[14] for the unpaid retroactive support payment plus the unpaid (and ongoing) monthly

---

[13] Ivankovich Family LLC, 24-15755-LMI; Atlas P 2 Managing Member LLC 24-15770-LMI; A&O Family LLC (Florida) 24-15762-LMI; and A&O Family LLC (Illinois) 24-15762-LMI.
[14] Amounts calculated through August 6, 2024. This claim is an ongoing obligation and will continue to accrue and collect interest. Under Illinois law, each missed support payment is a new judgment, deemed entered as of the date

alimony and child support payments[15], and (2) a claim for an unknown amount that is contingent on the Illinois Divorce Court determination of Jeanette's martial interest in the Debtors[16].

28.    Schiller DuCanto & Fleck LLP also filed a Proof of Claim for Section 507(a) priority claim for the domestic support obligations stemming from the Divorce Proceeding in the amount of $425,000.00 for the unpaid attorney fees and expert fees ordered to be paid to Schiller DuCanto & Fleck LLP from the Debtors' Celadon Accounts in the Preliminary Injunction[17].

29.    According to Debtors' Case Management Summary (ECF 12), the Debtors' primary assets are the securities, bonds, other investments, and cash deposits in the Celadon Accounts; however, the Illinois Divorce Court already determined that Jeanette has an ownership interest in these accounts. Moreover, the Debtors admit that the main reason for filing for Chapter 11 was the orders of the Illinois Divorce Court freezing the Celadon Accounts. Debtors argue that the forced liquidation of the Celadon Accounts ordered in the Preliminary Injunction would cause "substantial harm" to the Debtors of approximately $1,000,000.[18]

30.    This case is about relitigating, not reorganizing, and the Debtors' bankruptcy estate cannot properly be determined until the Illinois Divorce Court overcomes the threshold issues related to what marital rights Steven and Jeanette have in the Debtors.

## **RELIEF REQUESTED**

31.    Jeanette respectfully requests that this Court enter an order finding that the

---

the support payment was due, and a lien arises by operation of the law against the real and personal property of the noncustodial parent for each overdue support payment. *See* § 750 ILCS 5/505.

[15] Ivankovich Family LLC, 24-15755-LMI, POC 5-1; Atlas P 2 Managing Member LLC 24-15770-LMI, POC 6-1; A&O Family LLC (Florida) 24-15762-LMI, POC 7-1; and A&O Family LLC (Illinois) 24-15762-LMI, POC 5-1.

[16] Ivankovich Family LLC, 24-15755-LMI, POC 6-1; Atlas P 2 Managing Member LLC 24-15770-LMI, POC 7-1; A&O Family LLC (Florida) 24-15762-LMI, POC 8-1; and A&O Family LLC (Illinois) 24-15762-LMI, POC 6-1.

[17] Ivankovich Family LLC, 24-15755-LMI, POC 7-1; Atlas P 2 Managing Member LLC 24-15770-LMI, POC 9-1; A&O Family LLC (Florida) 24-15762-LMI, POC 9-1; and A&O Family LLC (Illinois) 24-15762-LMI, POC 7-1.

[18] The $1,000,000.00 in estimated damages is a far cry from the ***undisclosed and untraceable*** $64,008,739.58 Steven transferred out of the Debtor's Celadon Accounts between August 1, 2022 and September 5, 2023 (at least some of which was found by the Illinois divorce court to fund Steven's lavish lifestyle and none of which was paid to Jeanette or their children pursuant to the Support Judgments).

automatic stay does not apply to the Divorce Proceeding as it pertains to Jeanette's claim and the issues surrounding the ownership interests in Steven's LLCs, including the Debtors, and Jeanette's corresponding equity interest. *See* 11 U.S.C. § 362(b)(2)(A).

32.     Alternatively, Jeanette requests that this Court grant Jeanette relief from stay, abstain from deciding matters related to the Divorce Proceeding, and direct all matters concerning the Divorce Proceeding be determined by the Illinois Divorce Court. *See* 11 U.S.C. § 362(d).

## **BASIS FOR RELIEF**

### *A.  The Divorce Proceeding, as it Concerns the Debtors' Ownership and Jeanette's Equity Interest, is Exempt from the Automatic Stay*

33.     "Upon the commencement of a bankruptcy case, the automatic stay goes into effect pursuant to 11 U.S.C. § 362(a)" and "bars the continuation of any litigation seeking a recovery from the debtor or asserting a claim against estate property until the case is disposed of by the court." *In re Golan*, 600 B.R. 697, 702 (Bankr. S.D. Fla. 2019).

34.     However, Section 362(b) of the Bankruptcy Code exempts certain domestic relations matters from the scope of the automatic stay, including the establishment of property rights in a divorce proceeding, and provides, in relevant part:

> **(b)**     The filing of a petition under section 301, 302, or 303 of this title, or of an application under section 5(a)(3) of the Securities Investor Protection Act of 1970, does not operate as a stay . . .
>
> **(2)**     under subsection (a) . . .
>
> **(A)**     of the commencement or continuation of a civil action or proceeding . . .
>
> **(ii)**     for the establishment or modification of an order for domestic support obligations; . . .
>
> **(iv)**     for the dissolution of a marriage, except to the extent that such proceeding seeks to determine the division of property that is property of the estate; or . . .

11 U.S.C. §§ 362(b)(2)(A).

35.    Continuation of a proceeding within the Divorce Proceedings is exempted from the automatic stay under Section 362(b)(2)(A) because it is a pending action for dissolution of a marriage and continuation of the Divorce Proceeding is necessary to establish domestic support obligations owed by Debtors' principal and to his estranged wife creditor.

36.    There is no hiding the fact that property of the bankruptcy estate will be impacted by continuation of the Divorce Proceeding, but this is the unfortunate consequence of the Debtors being Steven's alter ego and this case being improperly filed as an end run of the Illinois Divorce Court's finalization of the Divorce Proceeding. Continuation of the Divorce Proceedings to determine the proper equitable division of Steven and Jeanette's marital property will inevitably effect property of the bankruptcy estate as it presently stands because, at a minimum, the Illinois Divorce Court has already found that Jeanette has an interest in the Debtor's assets, specifically the Celadon Accounts which are the primary assets of the bankruptcy estate, and none of the Debtors' schedules or other filings account for any interest Jeanette may have in the Debtors' assets. Moreover, pursuant to the Preliminary Injunction and subsequent orders of the Illinois Divorce Court, payments to Jeanette and Schiller DuCanto & Fleck LLP in connection with the Divorce Proceeding were ordered to have taken place prior to the Petition Date and thus, had these payments been timely made, the bankruptcy estate would likely look much different than it currently does and the effects, if any, of division of martial assets on property of the bankruptcy estate would be lessened.

37.    The only issue with continuation of the Divorce Proceedings, insofar as it concerns running afoul of the Section 362(b)(2)(A) exemptions, is one of Debtors' creation and should not impact the fact that the Section 362(b)(2)(A) exemptions are valid here. The Divorce Proceeding,

as it pertains to the issues surrounding Jeanette's claim and the questions surrounding the ownership interests in Steven's LLCs, should still be exempted from the automatic stay under Section 362(b)(2)(A) because Jeanette should not be prejudiced by Steven's misuse of the Debtors' corporate form to stall the Divorce Proceeding, cloud the true nature of the bankruptcy estate, and allow him to regain access to certain assets of Debtors that the Illinois Court determined belong, at least in part, to Jeanette in satisfaction of the domestic support obligations owed by Steven.

38.     The marital estate and bankruptcy estate are so intertwined that one cannot fully be understood until the Illinois Divorce Court makes final determinations on what portion of Steven's companies, including the Debtors, constitutes marital property. Ownership of Debtors is a core aspect of the Divorce Proceeding, and thus Jeanette's equity interest in the Debtors relates directly to the division of marital property. A determination of such by the Illinois Divorce Court will not only impact the division of marital property in the Divorce Proceeding but will impact this bankruptcy by altering Debtors' corporate ownership and authority; reducing or otherwise affecting the Debtors' total assets, especially the actual value of the Celadon Accounts which are Debtors' primary assets[19]; reducing or increasing Debtors' liabilities; affecting Debtors' ability to file a feasible plan of reorganization. Furthermore, Jeanette is barred from filing the third-party complaints or pursuing other actions against the Debtors who were joined as necessary parties in the Divorce Proceeding until the Illinois Divorce Court is advised stay relief has been obtained. Therefore, the Divorce Proceeding cannot be finalized until Jeanette has determined and exercised her rights against the Debtors who are necessary parties.

39.     Accordingly, the Court should find that the Divorce Proceeding, as it pertains to

---

[19] The Illinois Divorce Court already made findings of facts and conclusions of law in the Preliminary Injunction regarding Jeanette's interest in the Debtors' Celadon Accounts in the Preliminary Injunction. There is no question that Jeanette has some interest in those accounts, but the lingering question is how much of those accounts is Jeanette entitled to.

Jeanette's claim and the questions surrounding her ownership interests in Debtors, is not exempted from the automatic stay under Section 362(b)(2)(A).

### B.  Under 11 U.S.C. § 362(d), Cause Exists for Relief from the Automatic Stay

40.    Alternatively, Jeanette requests relief from the automatic stay pursuant to 11 U.S.C. § 362(d), which provides in relevant part:

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under section (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—
>
> (1)    for cause, including the lack of adequate protection[20] of an interest in property of such party in interest;  and
> (2)    with respect to a stay of an act against property under subsection (a) of this section, if—
>     (A)    the debtor does not have equity in such property and
>     (B)    such property is not necessary to an effective reorganization . . . .

11 U.S.C. §§ 362(d)(1) and (2).

41.    "Cause" is not defined in the Bankruptcy Code, but Congress charged the courts with determining what constitutes "cause" to grant relief from the automatic stay. *Joyner Auto World v. George (In the Matter of George)*, 315 B.R. 624 (Bankr. S.D. Ga. 2004). "The courts have interpreted the language of § 362(d)(1) to include a broad set of circumstances constituting 'cause' for stay relief."  *In re Mack*, 347 B.R. 911, 915 (Bankr. M.D. Fla. 2006). Moreover, the decision to grant relief from the automatic stay is within the discretion of the courts. *See In re Dixie Broad., Inc.*, 871 F.2d 1023, 1026 (11th Cir. 1989). "Whether cause exists to grant stay relief must be determined on a case by case basis based upon the totality of the circumstances in each particular case. [citations omitted] The 'decision to lift the stay . . . may be reversed only upon a showing of abuse of discretion." *Mack*, 347 B.R. at 915.

---

[20] Bankruptcy Code § 361 provides examples of "adequate protection." *See* 11 U.S.C. § 361.

42.    In the event this Court concludes the automatic stay applies to the Divorce Proceeding, "cause" exists to under Section 362(d)(1) because Jeanette's interests in the Debtor are not adequately protected.

43.    According to the Limited Liability Agreement dated December 17, 2021, Ivankovich Family LLC was formed on December 17, 2021 with Steven having a 96% membership interest in it. On February 22, 2022, an Amended and Restated Limited Liability Company Agreement for Ivankovich Family LLC was executed which increased Steven's membership interest from 96% to 100% (**Exhibit E**). Pursuant to documents filed with the Illinois Secretary of State and Florida Secretary of State, A&O Family LLC (Florida) was organized in Illinois on March 13, 2008 and subsequently converted from an Illinois LLC to a Florida LLC on or about October 15, 2014 (**Exhibit F**). On or about December 27, 2021, a new A&O Family LLC (A&O Family LLC (Illinois)) was created (**Exhibit G**).  According to the Certificate of Formation filed on October 3, 2014, Atlas P2 Managing Member was formed during the parties' marriage (**Exhibit H**). Thus, Steven's membership interests in these entities are marital property, subject to valuation and allocation between Jeanette and Steven and are under the purview of the Illinois Divorce Court.

44.    The Illinois Divorce Court concluded that the Debtors' Celadon Accounts are some of the only liquid marital assets available for equitable distribution and that preservation of these accounts is necessary because, unless enjoined by court order, there is a great likelihood that Steven will transfer or otherwise dispose of marital assets that will disproportionately harm Jeanette. This was not conjecture, as Steven has a track record of engaging in such misconduct.

45.    In the November 3, 2023 complaint filed by Ivankovich Family LLC, P2 Portfolio Managing Member, Atlas Apartment Homes LLC, and A&O Family LLC against Jeanette

16

Ivankovich, Schiller DuCanto & Fleck LLP, and several financial institutions, the plaintiffs alleged that Steven transferred his membership interests in P2 Portfolio Managing Member LLC and Ivankovich Family LLC to Consilient Holdings LLC. However, Steven now claims that— during the Divorce Proceeding—he has transferred all membership interests in any LLCs, including Ivankovich Family LLC, A&O Family LLC (Florida), A&O Family (Illinois), and Atlas P2 Managing Member to North American Property Ventures Ltd for the benefit of his parents, Anthony and Olga Ivankovich (**Exhibit I**). Jeanette was not notified of any proposed transfer and certainly did not acquiesce to her marital property rights being transferred.

46.    This purported transfer was memorialized in a Contribution Pledge and Security Agreement dated December 7, 2022 (***See* Exhibit I**). According to the Contribution Pledge and Security Agreement, Steven pledged his: 100% of Ivankovich Family LLC, 100% of A&O Family LLC, 1.25% of A&O Family LLC, 100% of Atlas P2 Managing Member to North American Property Ventures. Yet, as of December 14, 2022 (a week after the Contribution Pledge and Security Agreement), documentation shows that Steven was named the sole shareholder and director of North American Property Ventures, Ltd (**Exhibit J**).

47.    Per the Debtors' schedules, North American Property Ventures, Ltd. is the 100% owner of Debtor Ivankovich Family LLC.

48.    *In re Platt* is on all fours. 656 B.R. 469 (Bankr. S.D. Fla. 2023). There, the court recognized that a state court is the appropriate forum to determine the respective interests of the parties in marital property, particularly when the non-debtor spouse has a substantial claim to such assets, and ultimately granted relief from the stay to allow the divorce proceeding to continue in state court to resolve these issues. *See also In re Perry*, 131 B.R. 763, 770–71 (Bankr. D. Mass. 1991) (holding that state Probate Court should adjudicate wife's property rights "as well as her

entitlement to periodic alimony and child support payments" and "modifying the automatic stay" in Chapter 13 action "to permit the Probate Court to proceed in accordance with the foregoing"); *Matter of Elrod*, 91 B.R. 187, 190 (Bankr. M.D. Ga. 1988) ("The value of Movant's interest in the property has not yet been determined. This determination will involve an application and interpretation under Georgia law of the doctrine of equitable division of property. A bankruptcy court is not the best forum for the resolution of domestic relations matters. Such matters should be litigated in state courts.").

49.     In Illinois, there is a statutory presumption that all property acquired during the marriage is marital property and therefore subject to equitable allocation by the court. 750 ILCS 5/503. *See also In re Marriage of Davis*, 215 Ill. App. 3d 763, 768 (1st Dist. 1991). "The court shall make specific factual findings as to its classification of assets as marital or non-marital property, values, and other factual findings supporting its property award." 750 ILCS 5/503. Doubts as to the classification of property as resolved in favor of finding that the property is marital. *In re Marriage of Didier*, 318 Ill. App. 3d 253, 258 (1st Dist. 2000). Membership interests in LLCs are personal property subject to valuation, characterization and eventual allocation between the spouses as part of the divorce. *In re Marriage of Schneider*, 343 Ill.App.3d 628, 634, 278 Ill.Dec. 485, 798 N.E.2d 1242 (2003) ("The business interest of a spouse acquired subsequent to marriage constitutes 'marital property' subject to equitable distribution upon dissolution.").

50.     Here, the Illinois Divorce Court already determined that Jeanette has a clear and protectable interest in the Debtors' assets that constitute marital property and the Preliminary Injunction enjoins Steven from dissipating or transferring these assets. Allowing the Illinois Divorce Court to proceed with determining Jeanette's equity interests in the Divorce Proceeding is crucial for resolving key issues in Debtors' bankruptcy case and will have a direct impact on the

bankruptcy estate's value and the amount to be distributed to creditors. Because Debtors are central to both the bankruptcy and the divorce, progress in the bankruptcy case hinges on the resolution of the ownership issue in the Divorce Proceeding.

51.    Accordingly, the Court should grant Jeanette limited relief from the automatic stay pursuant to 11 U.S.C. § 362(d) in order for Jeanette to obtain a determination of her ownership interests, whatever they may be, in the Debtors before Steven regains control over the Debtors' assets and causes irreparable harm to the value of Jeanette's equity interest in Debtors.

### C. Alternatively, Cause Exists under the Pro Football Test

52.    Several courts have determined that "cause" exists to grant stay relief to permit the prosecution of an action involving the debtor. *Mack*, 347 B.R. at 915 (granting Movant's motion for stay relief to allow litigation in Federal District Court in Kentucky against debtor to proceed); *In re Sunrise Indus. Dev. Corp.,* 121 B.R. 911, 913 (Bankr. S.D. Fla. 1990) (granting stay relief to proceed with a state court foreclosure action up through and including a final judgment of foreclosure); *In the Matter of Ritz Theaters, Inc.,* 68 B.R. 256 (Bankr. M.D. Fla. 1986) (modifying automatic stay to permit secured creditor to commence a foreclosure action against the debtor and proceed at least to the point of seeking and obtaining a summary final judgment with the provision that a foreclosure sale shall not be scheduled without obtaining further relief from the court).

53.    When determining whether relief from the automatic stay should be granted to permit the continuance of a pre-petition action against a debtor, courts often look to the three-part test enunciated in *In re Pro Football Weekly, Inc.*, 60 B.R. 824, 826 (Bankr. N.D. Ill. 1986):

> (a)    whether any great prejudice to either the bankrupt estate or the debtor will result from the continuation of a civil suit;
> (b)    the hardship to the non-debtor party resulting from the automatic stay considerably outweighs the hardship to the debtor; and
> (c)    the creditor has a probability of prevailing on the merits of

the case.

*Carlton Company v. Jenkins (In re Jenkins)*, No. 03-60548, 2004 WL 768574, at *4 (Bankr. S.D. Ga. March 30, 2004) (articulating the three part test set forth in *Pro Football Weekly*) ("Pro Football Test"); *In re Makarewicz*, 121 B.R. 262 (Bankr. S.D. Fla. 1990) (applying the Pro Football Test).

54.    Here, while the Divorce Proceeding is not against the Debtors directly, they are implicated in the Divorce Proceeding because Jeanette's ownership interest in Debtors is martial property. The findings of fact in the Preliminary Injunction are compelling for this Court to determine that the prejudice to Jeanette and the hardships suffered by her and the children far outweigh any prejudice to the Debtors or the bankruptcy estate.[21] Furthermore, because the findings of fact in the Preliminary Injunction conclude that Jeanette has some discernable interest in the Debtors, she has a high probability of prevailing on the merits in the Divorce Proceeding.

55.    It is worth noting that the Debtors are solvent companies that can afford to litigate the marital property issues outside bankruptcy. Debtors have appeared in the Divorce Proceeding and have at all times been represented by competent counsel. Additionally, paying Debtors' legal expenses clearly have not been an issue in the litigation brought by and for the benefit of the Debtors. This is evidenced by the fact that Debtors have not sought to stay the declaratory judgment and injunctive relief action that Debtors filed against Jeanette, Schiller DuCanto & Fleck LLP, and various financial institutions. *See* Case Number 2023CH09243 in the Chancery Division of the Circuit Court of Cook County, Illinois. *See* Case Number 2023CH09243. If the Debtors can afford to litigate the cases that benefit them at the continued expense of Jeanette, they can litigate the Divorce Proceeding for the limited purposes sought here.

---

[21] Currently, Jeanette and the children receive are on Supplemental Nutrition Assistance Program benefits (formerly known as food stamps).

56.     Accordingly, there is sufficient cause under the Pro Football Test for this Court to find that stay relief is proper to allow the Illinois Divorce Court may adjudicate Jeanette's interests in the Debtors.

### D. *Permissive abstention is also appropriate*

57.     The doctrine of permissive abstention is also appropriate here. Bankruptcy courts have broad discretion to abstain from hearing a proceeding "in the interest of justice, or in the interest of comity with State courts or respect for State law" the court finds it appropriate to abstain "from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11." 28 U.S.C. § 1334(c)(1).

58.     The Eleventh Circuit follows the *Pacor* "related to" jurisdiction test:

> The usual articulation of the test for determining whether a civil proceeding is related to bankruptcy is whether the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy. Thus, the proceeding need not necessarily be against the debtor or against that debtor's property. An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate.

*In re United Container LLC*, 284 B.R. 162,168-169 (Bankr. S.D. Fla. 2002) (quoting *Pacor v. Higgins*, 743 F.2d 984, 994 (3d Cir.1984); *see also In re Toledo*, 170 F.3d 1340, 1345 (11th Cir.1999) (citing *In re Lemco Gypsum, Inc.*, 910 F.2d 784, 788 (11th Cir.1990)).

59.     Federal courts generally abstain from deciding "cases involving divorce and alimony, child custody, visitations rights, establishment of paternity, child support, and enforcement of separation or divorce decrees still subject to state court modification." *Carver v. Carver*, 954 F.2d 1573, 1578 (11th Cir. 1992) (quoting *Ingram v. Hayes,* 866 F.2d 368, 369 (11th Cir.1988)); *see also Crouch v. Crouch,* 566 F.2d 486, 487 (5th Cir.1978) ("The reasons for federal

abstention in these cases are apparent: the strong state interest in domestic relations matters, the competence of state courts in settling family disputes, the possibility of incompatible federal and state court decrees in cases of continuing judicial supervision by the state, and the problem of congested dockets in federal courts."); *Martin v. Martin*, 618 B.R. 326, 329 (S.D. Fla. 2020) ("Neither the Automatic Stay nor any provision of the Bankruptcy Code or order of this Court prohibits the State Court from entering a Qualified Domestic Relations Order (QDRO) to provide for payments to Creditor under the Terms of the Final Judgment, and the Creditor has relief from the Automatic Stay to enforce the Final Judgment.").

60.    Although there is no exclusive list, courts have considered the following factors relevant in their analysis of permissive abstention:

> (1) the effect, or lack of effect, on the efficient administration of the bankruptcy estate if discretionary abstention is exercised, (2) the extent to which state law issues predominate over bankruptcy issues, (3) the difficulty or unsettled nature of the applicable state law, (4) the presence of related proceedings commenced in state court or other non-bankruptcy courts, (5) the jurisdictional basis, if any, other than § 1334, (6) the degree of relatedness or remoteness of the proceedings to the main bankruptcy case, (7) the substance rather than the form of an asserted "core" proceeding, (8) the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court, (9) the burden on the bankruptcy court's docket, (10) the likelihood that the commencement of the proceeding in bankruptcy court involves forum shopping by one of the parties, (11) the existence of a right to jury trial, (12) the presence in the proceeding of non-debtor parties, (13) comity, and (14) the possibility of prejudice to other parties in the action.

*Antol Restoration, Inc.*, 444 B.R. 481, 488 (Bankr. S.D. Fla. 2011); *In re United Container LLC*, 284 B.R. 162, 176 (Bankr. S.D. Fla. 2002). As the *Antol* Court has noted "this list, however, is non-exhaustive and no one factor is determinative." *Antol Restoration*, 444 B.R. at 488.

61.    Here, almost all of the 14 factors are present. As set forth above, the issues present

no real economic impact on this estate and the Court's retention of the issue will only create more judicial labor in this case regarding the administration of the estate (Factor 1). The issues are entirely governed by state law, predominate the bankruptcy issues, and are fully briefed before the Illinois Divorce Court (Factors 2 and 4). Resolution of the state law issues requires a level of expertise in family law matters in a complex, highly contentious divorce (Factor 3). There is no jurisdictional basis for this Court other than 1334 of title 28 (Factor 5). The issues in the Divorce Proceeding pertaining Jeanette's ownership interests in the Debtors are related to the issues in this Chapter 11 case (Factor 6). It would be no issue for the Court to abstain from the pending proceeding in the Illinois Divorce Court (Factor 8). Alternatively, requiring the parties to start the litigation anew in this Court would be a burden on the Court's docket, prejudice Jeanette and the other non-debtor parties who labored in the Illinois Divorce Court for several years, only to have the Debtors forum shop the dispute here (Factors 9, 10, 12, and 14). Again, the Debtors filed this case solely to frustrate Jeanette's legitimate efforts to collect on the Support Judgments and delay the finalization of the Divorce Proceeding (Factor 10). The overwhelming weight of the circumstances favors permissive abstention.

## CONCLUSION

62.     It would defy the policies underlying the Bankruptcy Code to allow Steven to slap "bankruptcy estate" across marital property that the Illinois Divorce Court already ordered to liquidated and frozen for the benefit of Jeannette and the children as a result of Steven's bad faith and misconduct in the Divorce Proceeding.

63.     Every court examining Steven's claims recognized that no action involving the LLCs can move forward unless and until the Illinois Division Court determines what portion of Steve's interest in the LLCs is marital property. Because the LLCs include the Debtors, this Court

must also find that this bankruptcy cannot continue until Jeanette's DSO claim and equity interest is fully adjudicated by the Illinois Divorce Court. However, unlike the other courts, this Court need not dismiss Debtors' bankruptcy but merely order that the continuation of the Divorce Proceeding does not violate the automatic stay.

## Local Rule 9073-1(D) Certification

In accordance with Local Rule 9073-1(D), the undersigned counsel contacted Debtors' counsel in an attempt to resolve the matters without a hearing.

**WHEREFORE**, Jeanette respectfully requests that this Court enter an order (i) finding that the Divorce Proceeding is exempt from the automatic stay under Section 362(b)(2)(A), or alternatively, (ii) finding that good cause exists to abstain from deciding matters related to the Divorce Proceeding, direct that all such matters be determined by the Illinois Divorce Court, and grant Jeanette relief from the automatic stay; and (iii) granting such other and further relief as the Court deems just and proper.

Dated: October 7, 2024                  Respectfully submitted,

                                         STEARNS WEAVER MILLER WEISSLER
                                         ALHADEFF & SITTERSON, P.A.
                                         Museum Tower, Suite 2200
                                         150 West Flagler Street
                                         Miami, Florida 33130
                                         Telephone: (305) 789-3200
                                         Facsimile: (305) 789-3395

                                         By: */s/ Patricia A. Redmond*
                                             PATRICIA A. REDMOND
                                             Florida Bar No. 303739
                                             predmond@stearnsweaver.com

                                         *Counsel for Jeanette Ivankovich*

## **CERTIFICATE OF SERVICE**

I CERTIFY that I caused this document to be filed electronically on October 7, 2024, via the Court's CM/ECF website. I further certify that the document is being furnished as it is entered on the Court docket, by transmission of Notices of Electronic Filing ("NEF") generated by CM/ECF upon those counsel or parties who are authorized to receive NEF in this case as indicated on the attached Service List.

By: */s/ Patricia A. Redmond*
Patricia Redmond, Esq.
Florida Bar No. 303739
predmond@stearnsweaver.com
**Stearns Weaver Miller Weissler**
**Alhadeff & Sitterson, P.A.**
Museum Tower, Suite 2200
150 West Flagler Street
Miami, FL 33130

## SERVICE LIST

### United States Bankruptcy Court, Southern District of Florida

The following parties are registered to receive NEF and will be served electronically through the Court's CM/ECF system:

- Eyal Berger
  - eyal.berger@akerman.com,
  - Jeanette .martinezgoldberg@akerman.com

- Gary A Goldstein
  - gagpa@aol.com,
  - michael@rglawfirm.us

- Office of the US Trustee
  - USTPRegion21.MM.ECF@usdoj.gov

- Amanda Klopp
  - amanda.klopp@akerman.com,
  - Jeanette .martinezgoldberg@akerman.com

26

# EXHIBIT A

Atty No. 26828

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, DOMESTIC RELATIONS DIVISION

IN RE: MARRIAGE OF )
)
JEANETTE IVANKOVICH, )
Petitioner, )
)
and )
)
STEVEN IVANKOVICH, )
Respondent. )

**ENTERED**

**NOV 06 2023**

No. 2021 D 9220
Cal. E

## ORDER

THIS CAUSE having come before this Court on March 15, 2023, April 13, 2023, May 17, and May 23, 2023 for evidentiary hearing and closing argument on the Petitioner, JEANETTE IVANKOVICH ("Jeanette")'s Emergency Petition for Temporary and Permanent Maintenance, Child Support, and for Other Relief filed on October 25, 2021 (and Supplement) and Second Emergency Petition for Child Support and Other Relief filed on November 29, 2022, against the Respondent, STEVEN IVANKOVICH ("Steven"), Jeanette appearing personally and through her counsel, SCHILLER DuCANTO & FLECK LLP, Steven appearing personally and through his counsel, BEERMANN LLP; the Court having reviewed all documents, laws, facts, and exhibits, having heard the closing argument of the parties, and the Court being fully advised in the premises, THE COURT FINDS:

A.    Jeanette and Steven have withdrawn all objections made during the Evidence Deposition of Paul Waldman taken on May 12, 2023. The Evidence Deposition of Paul Waldman taken on May 12, 2023 is hereby admitted as Petitioner's Exhibit 210.

B.    Jeanette has established through her testimony and her completed financial affidavit dated November 29, 2022 that she has monthly expenses of approximately $21,113.00, excluding car related expenses, health insurance, East Bank Club, and the children's private school tuition.

C.    The children primarily reside with Jeanette in Chicago, Illinois where they attend The British School of Chicago, South Loop.

D.    Since September 1, 2021, Jeanette and the children were residing at 920 W. George Street, Unit 3, Chicago Illinois and said lease expired on May 23, 2023. The monthly rent at said unit ranged from $5,000 to $9,000. The May 2023 rent remains unpaid by Steven. Jeanette and the children are currently residing at a temporary location of the coach house located at the marital residence at 235 W Menomonee Street, Chicago, Illinois. Said marital residence is part of a foreclosure proceeding.

E.    During the pendency of these proceedings, Jeanette's access to her longstanding United Visa credit card was terminated, and Jeanette went many months (from approximately July 2022 to December 2022) without access to a credit card or funds from Steven to pay her and the children's ongoing expenses. During this time, Steven also failed to pay rent or private school

tuition for the children. In January 2023, Steven paid the children's past due private school tuition, accrued and ongoing rent (although considerably late) and provided Jeanette with access to Land Rover automobile and a credit card with a $5,000 limit.

     F.     The parties maintained a lifestyle prior to Jeanette's filing of a Petition for Dissolution of Marriage which included living in a multi-million-dollar homes, private school for their children, use of a yacht, traveling first class to destinations within the USA, the Caribbean and abroad, and having unfettered access to a credit card to pay expenses.

     G.     Steven has sufficient access to assets[1] by which to pay Jeanette the necessary support and other relief in accordance with the lifestyle established by the parties during the marriage. During the pendency of these proceedings, Steven's access to funds is demonstrated by, among other things, his direct involvement in purchase of a condominium at Trump Tower with a purchase price of approximately $1.8 million, his borrowing and use of $1 million from Glencoe Family Dwelling LLC which he used in significant part to pay his attorney fees and other expenses, including guaranteeing the attorney fees of his friend, his luxurious travel, his readily available use of cash and other resources. Steven's own Exhibit number 9 contains a statement from federal Judge Sharon Johnson Coleman, stating that Steven is "far from destitute, but that his parents now support his lavish lifestyle."

     H.     Throughout the parties' fifteen and a half (15.5) year marriage, Jeanette has been a homemaker, primary caregiver for the parties' children and has been absent from the workforce.

     I.     Jeanette's testimony was credible, and she put many exhibits into evidence supporting her expenses, the parties' lifestyle and Steven's access to assets. The testimony of the third-party witnesses, Paul Waldman, Penny Bagherpour, Andrew Hahm, and Steven's own witness, Ian Van Buskirk support Jeanette's case and clearly show that Steve not only controls millions of dollars but has used and transferred millions of dollars during the pendency of this matter. Steven's testimony was not credible at times, for example contending he had nothing to do with the purchase of a condominium at 401 N. Wabash, despite touring the unit twice, signing the purchase contract as the buyer and supplying the proof of funds from a Celadon account of which he holds a 96% membership interest. Steven also failed to tender a completed 13.3.1 financial affidavit in violation of the rule. Steven supplied little to no documentation as exhibits supporting his defense of Jeanette's support petitions.

IT IS HEREBY ORDERED:

Based on the findings as set forth above, Steven shall:

     1.     Starting November 1, 2023 Steven shall pay child support in the amount of $6,933.00 per month and $14,180.00 per month as and for temporary maintenance.

---

[1] Including, but not limited to, the P2 Managing Member LLC account at Celadon Financial Group (Steven is a 20% member and holds principal authority of the account); Ivankovich Family LLC account at Celadon Financial Group (Steven is a 96% member and holds principal authority of the account); and A & O Family LLC at Celadon Financial Group (Steven is a 80% member and holds principal authority of the account), and funds/assets from Glencoe Family Dwelling LLC.

2.    Pay a lump sum amount of $506,712.00 for retroactive support to Jeanette within 21 days of the entry of this order for the period of October 25, 2021 (date of filing her support petition) through October 31, 2023 ($21,113.00 x 24 months to resolution).  Said amount shall be paid via wire transfer to an account selected by Jeanette.

3.    Timely pay all tuition and mandatory fees for both children's continued enrollment at the British School of Chicago.

4.    Maintain and timely pay for Jeanette's and the children's health insurance and pay 100% of the cost of uncovered medical expenses and health insurance deductibles.  If Jeanette pays out of pocket medical expenses, she shall submit documentation to Steven via email showing her payment of the expense to Steven who shall reimburse her for same within 7 days of Jeanette's submission.

5.    Maintain and timely pay for Jeanette and the children's membership at East Bank Club.

6.    Maintain Jeanette's access to the Land Rover car or similar vehicle. Steven shall also pay the automobile insurance and all reasonable expenses associated with the repair and maintenance of same.

7.    Timely pay the customary extracurricular expenses for the parties' minor children and any agreed-upon new extracurricular expenses.

8.    Steven shall be given credit for all rent payments made by him or on behalf of him and credit card payments ($5,000.00) per month and utility payments from October 25, 2023 to October 31, 2023.

9.    This order is entered without prejudice to the rights or claims of either party.

Dated: November 2, 2023

_____
J U D G E

**Order Prepared by:**
Schiller DuCanto & Fleck LLP
Attorneys for Petitioner
(312) 641-5560
Chicagoservice@sdflaw.com

Respondent's Attorneys:
ttfield@beermannlaw.com
MDElster@beermannlaw.com
JKrawetz@beermannlaw.com

6648918_1.docx

# EXHIBIT B

Atty No. 26828

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, DOMESTIC RELATIONS DIVISION

| | | |
|---|---|---|
| IN RE: MARRIAGE OF | ) | |
| | ) | |
| JEANETTE IVANKOVICH, | ) | |
| Petitioner, | ) | |
| | ) | |
| and | ) | No.  2021 D 9220 |
| | ) | Cal. E |
| STEVEN IVANKOVICH, | ) | |
| Respondent. | ) | |

### PRELIMINARY INJUNCTION

This cause coming before the Court for evidentiary hearing on Jeanette's Emergency Petition

for a Temporary Restraining Order and/or Preliminary Injunction and Other Relief and *Ex Parte*

Supplement thereto (collectively **"Emergency Petition for TRO"**), counsel for (i) Jeanette

Ivankovich; (ii) Steven Ivankovich; (iii) Anthony and Olga Ivankovich; (iv) Atlas Apartment Homes

LLC; and (v) P2 Portfolio Managing Member LLC, Ivankovich Family LLC, and A & O Family LLC

appearing, Steven Ivankovich failing to personally appear, Jeanette appearing personally (except for

the hearing date of November 3, 2023 where she was excused by the Court from appearing due to a

previous commitment), the Court considering all the evidence and testimony and having heard the

closing arguments, and being fully advised in the premises, THE COURT FINDS:


A.      That Jeanette has a clear protectable right in the assets held by P2 Portfolio Managing

Member LLC, Ivankovich Family LLC, and A&O Family LLC  (collectively "LLCs") at Celadon

Financial Group ("Celadon") as the parties' marital property; that she has just cause and reason to

believe that unless enjoined and restrained from so doing, Steven will sell, assign, transfer, pledge,

mortgage, hypothecate, conceal, sequester, squander, liquidate, dissipate or otherwise deal with or

transact in the property or assets in his possession or under his control to such end that Jeanette will be

irreparably harmed, damaged and prejudiced in that the marital property of the parties will, at the

1

conclusion of this litigation, no longer be available for equitable distribution to Jeanette by order of this Court and no adequate remedy at law will be available to her.

B.    That Jeanette has described precisely the injury that will occur if Steven is not enjoined from further liquidation and transfer of the assets held at Celadon by the LLCs.

C.    That Jeanette has shown that she has a great likelihood of success on the merits.

D.    That failure of this Court to act to preserve assets for support, fees, and distribution upon the entry of final judgment will cause disproportionately greater harm to Jeanette than an injunctive order would cause to Steven.

E.    That Jeanette lacks sufficient funds for the posting of a bond for the issuance of a preliminary injunction.

F.    That a preliminary injunction would preserve the Celadon assets under Steven's exclusive possession and control and prevent further liquidation or diminution of assets in which Jeanette has a claim or interest.

G.    Steven is a 20% member of P2 Portfolio Managing Member LLC (Exhibit 2 and Exhibit 4). Steven is an 80% member of A&O Family LLC (Exhibit 10a)[1]. Steven is the sole (100%) member of Ivankovich Family LLC (Exhibit 13 and Exhibit 17).

H.    Steven failed to disclose his interests in any of the LLCs holding accounts at Celadon to Jeanette or her counsel; Jeanette only learned of the Celadon accounts, the LLCs, and Steven's sole authority to transfer funds by receiving responses to subpoenas she issued (ROP 10/13/23, p. 66, 67). Steven also did not disclose his interests in these entities in his income tax returns (Exhibits 11 and 12).

I.    The LLCs have accounts at Celadon Financial Group comprised of various cash, bonds and investment assets (hereinafter collectively referred to as the "accounts"). The accounts are: x1441 (A&O), x1442 (Ivankovich Family), x1443 (P2), and x1444 (A&O) (Exhibits 5-9). Steven is the *only*

---

[1] However, according to documents produced by JP Morgan Chase Bank N.A., Steven Ivankovich is the sole (100%) member of A&O Family LLC.

authorized principal to transfer assets in and out of accounts x1441, x1442, and x1443 (Exhibit 5, 7, 9). Steven is an authorized principal to transfer assets in and out of account x1444, along with his parents, Anthony and Olga Ivankovich. (ROP 9/22/23, p. 12-15).

      J.     Steven has authorized every transfer of funds out of the accounts between August 1, 2022 and September 5, 2023 (Group Exhibit 16).

      K.     Between August 1, 2022 and September 5, 2023, a total of $64,008,739.58 has been transferred out of the accounts (Group Exhibit 16 and Exhibits 7-10).

      L.     The value of A&O account x1441 was $2,288,571.90 as of August 31, 2023 (Exhibit 7). The value of Ivankovich Family account x1442 was $2,259,001.80 as of August 31, 2023 (Exhibit 8). The value of P2 account x1443 was $3,972,791.57 as of August 31, 2023 (Exhibit 9). The value of A&O account x1444 was $17,104,236.06 as of August 31, 2023 (Exhibit 10).

      M.     Steven testified in Case Number 20 CV 4985 in the Northern District of Illinois that he has the ability to move money in and out of LLCs freely, including for his own purpose. Steven further testified that he could populate an entity with the signing of a pen and a phone call in a matter of minutes. (Exhibit 2, pages 2, 6 and 53).

      N.     On August 31, 2022, Steven testified in Case Number 20 CV 4985 in the Northern District of Illinois that his net worth of as of 2020 was $55 million dollars but was utilized between 2020-2022 (during the pendency of these proceedings) to pay obligations and expenses of LLCs in which Steven had an interest (Exhibit 1, pages 23 and 57).

      O.     Steven, or someone on Steven's behalf, tendered the Ivankovich Family LLC Amended and Restated Limited Liability Agreement dated February 22, 2022, A&O Family LLC Operating Agreement dated December 27, 2021, and the P2 Portfolio Managing Member LLC Operating Agreement dated October 10, 2014 to Celadon Financial Group in connection with the opening of the accounts. (ROP 10/13/23, 20-23).

      P.     Sections 5.01 and 5.02 of the Ivankovich Family LLC agreement dated February 22, 2022 states that 100% of profits, losses, income, and deductions shall be allocated to Steven.

Ivankovich Family LLC may make distributions to its members from time to time in its discretion. (Exhibit 13).

      Q.     Steven has never identified any business purpose for the LLCs. The stated purpose of the LLCs is "investing" per the account application filled out by Steven at Celadon. (Exhibit 5, Exhibit 7, and Exhibit 9).

      R.     Some of the only liquid marital assets known at this time are the LLCs' accounts at Celadon.

      S.     Steven called Celadon one day after the filing of Jeanette's *Ex-Parte* Emergency Supplement to Emergency Petition for a Temporary Restraining Order and/or Preliminary Injunction and for Other Relief and made a withdrawal in the amount of $250,000 from Ivankovich Family LLC's Celadon account. (Exhibit 6). Steven did not provide any tracing or business purpose for the transfer.

      T.     Anthony Ivankovich's counsel represented that Anthony suffers from aphasia and provided a letter which purported to be from a physician in support thereof. (ROP 9/22/23, p.8-10)

      U.     Anthony Ivankovich was unable to answer the questions posed by Jeanette's counsel and spoke almost exclusively in Yugoslavian. (ROP 11/3/23, p. 19). Anthony was not a credible witness.

      V.     Jeanette's testimony was credible.

      W.     Steven, or parties acting at Steven's direction, have taken affirmative steps to deprive Jeanette and the parties' children of all financial resources including their housing, transportation, food, credit card, and money for basic living expenses.

      X.     The parties' marital residence, located at 235 West Menomonee and 234 West Willow, Chicago Illinois, is marital property titled in both parties' names. (ROP 10/13/23, p. 60).

      Y.     Jeanette and the children moved into the coach house at the marital residence on May 22, 2023. On May 25, 2023, Steven put bolts around the front gate of the coach house and then put Krazy Glue and drilled into the locks so that they could not be used. (ROP 10/13.23, p. 56, 57).

4

Z.      G2M LLC filed a lawsuit in the Chancery Division of the Circuit Court of Cook County, Illinois, alleging that Steven entered into a lease with G2M LLC for which G2M LLC paid Steven $50,0000. The manager of the LLC is Greg Menning who worked as security for the Ivankovich family and who is personally known to Jeanette. The G2M lawsuit sought to evict Jeanette and the children from the coach house. (Exhibit 69).

AA.      Steven did not disclose the alleged G2M LLC lease with Jeanette.

BB.      If Jeanette and the children are evicted from the coach house they will have nowhere to go and will have no money for housing. (ROP 10/13/23, p. 63).

CC.      Jeanette has received no benefit of any the $60,000,000+ funds transferred by Steven out of the Celadon accounts. (ROP 10/13/23, p. 67).

DD.      Steven has not accounted for any of the funds transferred from the Celadon accounts.

EE.      Someone acting on Olga Ivankovich's behalf removed the car Jeanette was using from her driveway on September 2, 2023 and it has not been returned to her. (ROP 10/13/23, p. 63-65; ROP 11/2/23 p. 46)

FF.      Paul Waldman credibly testified that:

       i.      Celadon never received documents showing a modification of Steven's membership in Ivankovich Family LLC, P2 Portfolio Managing Member LLC, and A&O Family LLC. (ROP 9/22/23, p.66; 10/13/23, p. 19).

       ii.      Other individuals who have taking authority do not have the authority to withdraw funds from the accounts. (ROP 9/22/23, p. 65,66).

       iii.      On October 2, 2023, Anthony Ivankovich transferred $6,000,000 from account x1444. Paul Waldman spoke to a man who identified himself as Anthony Ivankovich on the telephone to verify this transaction. (ROP 10/13/23, p.25, 26).

       iv.      The Ivankovich Family LLC statements are addressed to the attention of Steven Ivankovich. (ROP 9/22/23, p. 101).

       v.      On September 11, 2023, Anthony Ivankovich signed an account application for Consilient Holdings LLC as the account owner. (ROP 9/22/23, p. 105).

       vi.      Steven is Vice President and Secretary of Consilient Holdings LLC (ROP 9/22/23, p. 105).

       vii.      Once funds are transferred from Celadon, Celadon has no records of how they were used or spent. (ROP 9/22/23, p. 76).

       viii.      All transfer requests between August 2022 and September 2023 (when the Temporary Restraining Order was issued) were effectuated and requested by Steven. Celadon keeps records in the ordinary course of business verifying the transactions which were entered into evidence as Group Exhibit 16.

    ix.     According to Celadon's records, Steven is the sole managing member of Ivankovich Family LLC. Steven requested a transfer be made from the Ivankovich Family LLC account at Celadon for $250,000 on September 5, 2023. This was after Jeanette filed her Emergency Petition for TRO on August 28, 2023. (ROP 9/22/23, p. 75).

    x.     The $250,000 transfer from Ivankovich Family on September 5, 2023 was in cash. (ROP 9/22/23, p. 76).

GG.    Olga Ivankovich's testimony was not credible at times, for example contending that Steven did not receive any funds from the LLCs and was not employed by the LLCs. (ROP 11/3/23, p. 53,54).

HH.    Steven has many interests in various LLCs including but not limited to, Ivankovich Family LLC, A&O Family LLC, and P2 Portfolio Managing Member LLC. Steven claims that his parents own and operate the various businesses but based upon the testimony of Anthony Ivankovich and Olga Ivankovich, Anthony and Olga do not have the physical and/or mental capacity to operate any LLCs. Based upon the testimony of the witnesses, the LLCs are being controlled and operated by Steven Ivankovich and not his parents. After a thorough review of all of the evidence, this Court believes that Steven holds this purse strings to these LLCs (and will continue to do so) and has transferred various monies from the LLCs to allow Steven to fund his lavish lifestyle.

II.    Based upon the testimony from all the witnesses and the documentation from Celadon, the LLCs are Steven's alter ego. *People ex rel. Hartigan v. Organization Services Corp.*, 147 Ill. App. 3d 826, 831 (1st Dist. 1986).

JJ.    Steven did not disclose the $50,000 he was purportedly paid by G2M LLC for the fraudulent lease of the parties' marital residence located at 235 West Menomonee Street, Chicago, Illinois and 234 West Willow Street, Chicago Illinois nor did he provide Jeanette with any of the funds (ROP 10/13/23, p. 62).

KK.    Steven has failed and refused to adequately support Jeanette and the parties' minor children throughout this litigation. *See* Order entered November 6, 2023.

6

LL.    Steven's interests in the LLC are in the nature of personal property and is presumed to be marital property under the IMDMA, Section 503, and Steven has provided no evidence to support a position that these interests are non-marital.

MM.    Steven offered no testimony, evidence or witnesses to refute or contradict any of the witnesses, testimony or evidence presented in Jeanette's case.

NN.    On November 3, 2023, the LLCs submitted themselves to the Jurisdiction of Illinois by filing Case Number 2023 CH 09243 in the Chancery Division of the Circuit Court of Cook County, Illinois. The filing of this lawsuit is public record and occurred on the last day of testimony in this preliminary injunction matter, as soon as proofs closed. The LLCs filed an action against Jeanette, Schiller DuCanto & Fleck, Celadon, Chase and Stifel. Steven manages all of those Plaintiff LLCs.

OO.    The Illinois Marriage and Dissolution of Marriage Act, shall "be liberally construed and applied to promote its underlying purposes, which are to:

***

(4) ***mitigate the potential harm to spouses and their children*** caused by the process of an action brought under this Act, and protect children from exposure to conflict and violence;

***

(8) ***make reasonable provision for support during and after an underlying dissolution of marriage***, legal separation, parentage, or parental responsibility allocation action, including provision for timely advances of interim fees and costs to all attorneys, experts, and opinion witnesses including guardians ad litem and children's representatives, ***to achieve substantial parity in parties' access to funds for pre-judgment litigation costs*** in an action for dissolution of marriage or legal separation;

***

(10) ***make provision for the preservation and conservation of marital assets during the litigation***." 750 ILCS 5/102 (emphasis added)

PP.    Properties purchased after the marriage using the distributions from a spouse's interest in a corporation is marital property, as they are considered to be purchased with marital income. *In re Marriage of Schmitt*, 391 Ill. App. 3d 1010 (2d Dist. 2009).

QQ.    Per the court's September 29, 2023 Order Steven was defaulted for his failure to appear in-person for hearing on Jeanette's Emergency Petition for TRO in violation of the court orders entered on September 6, 2023 and September 14, 2023. Steven was barred from putting on his own case-in-

7

chief, and offered no testimony, witnesses, or evidence to refute any testimony or evidence presented by Jeanette.   Steven was permitted to cross examine witnesses and make opening and closing statements. The Court has considered all evidence, exhibits and opening and closing statements in this matter.

RR.   When appropriate, this court has drawn an adverse inference based on Steven's failure to testify in this proceeding. "In a civil proceeding, unlike a criminal proceeding, a party is required to testify or suffer the consequences; namely, that a trier of fact may draw adverse inference if a party refuses to testify. <u>Nasrallah v. Davilla, 326 Ill. App. 3d 1036, 1044 (2001)</u>. An unfavorable evidentiary presumption also arises if a party, without reasonable excuse, fails to produce evidence under his or her control. <u>In re Marriage of Leff, 148 Ill. App. 3d 792, 803 (1986); Dollison v. Chicago, Rock Island & Pacific Railroad Co., 42 Ill. App. 3d 267, 277 (1976)</u>."

SS.   Section 501 of the IMDMA states in relevant part as follows: In all proceedings under this Act, temporary relief shall be as follows:

(a) Either party may petition or move for:

(2) a temporary restraining order or preliminary injunction, accompanied by affidavit showing a factual basis for any of the following relief:

(i) restraining any person from transferring, encumbering, concealing or otherwise disposing of any property except in the usual course of business or for the necessities of life, and, if so restrained, requiring him to notify the moving party and his attorney of any proposed extraordinary expenditures made after the order is issued; *however, an order need not include an exception for transferring, encumbering, or otherwise disposing of property in the usual course of business or for the necessities of life if the court enters appropriate orders that enable the parties to pay their necessary personal and business expenses* including, but not limited to, appropriate professionals to assist the court pursuant to subsection (*l*) of Section 503 to administer the payment and accounting of such living and business expenses

...

(iv) providing other injunctive relief proper in the circumstances; or

(3) *other appropriate temporary relief including, in the discretion of the court, ordering the purchase or sale of assets and requiring that a party or parties borrow funds in the appropriate circumstances.*

8

750 ILCS 5/501 (emphasis added).

TT.     Illinois "law is clear that an injunction may be binding on a nonparty." *In re Marriage of Winter*, 387 Ill. App. 3d 21, 29 (1st Dist. 2008). Therefore, Celadon may be ordered to comply with this Court's preliminary injunction.

**IT IS HEREBY ORDERED:**

1.     A preliminary injunction is hereby entered against Steven Ivankovich, his officers, agents, employees, attorneys, family, business partners and anyone acting in active concert with him at his direction, enjoining him from dissipating, destroying, transferring, encumbering, concealing or otherwise disposing of the assets of P2 Portfolio Managing Member LLC, Ivankovich Family LLC, and A & O Family LLC ("Celadon Accounts") held at Celadon until further order.

2.     Steven has access to funds for his ordinary life and business purposes and therefore Steven, his officers, agents, employees, attorneys and anyone acting in concert with him is completely prohibited and enjoined from transferring any funds of P2 Portfolio Managing Member LLC, Ivankovich Family LLC, and A&O Family LLC held at Celadon, until further order of Court.

3.     Jeanette is not required to post bond, and bond is waived for good cause shown.

4.     Pursuant to Sections 501 and 508 of the Illinois Marriage and Dissolution of Marriage Act, the cash held in any combination of the Celadon Accounts shall be wired to Schiller DuCanto & Fleck for payment of Jeanette's interim attorneys' fees and experts' fees in the amount of $425,000 in accordance with this Court's May 18, 2023 Interim Fee Award ~~and in the amount of $1,529,280.17²~~ ~~pursuant to her pending Second Verified Petition for Interim and Prospective Attorneys' Fees and~~ ~~Costs filed on December 14, 2023.~~ Celadon shall release said funds directly to Schiller DuCanto & Fleck by wire transfer within two (2) days of entry of this Order.

---

² Interim attorneys' fees and costs in the amount of $1,029,280.17 and $500,000 in prospective attorneys' fees and costs.

9

5.      Pursuant to Sections 501, 504, and 505 of the Illinois Marriage and Dissolution of Marriage Act, the cash held in any combination of the Celadon Accounts shall be wired to Jeanette in the amount of $651,446.38 as and for the satisfaction of this Court's child support and spousal support judgments entered on November 1, 2023, November 6, 2023, December 1, 2023, January 1, 2024, February 1, 2024, March 1, 2024, and April 1, 2024. Celadon shall release said funds directly to Jeanette within two (2) days of entry of this Order.



6.      In the event the cash in the Celadon Accounts is insufficient to pay both obligations set forth in paragraphs 4 and 5 above, Celadon shall apply the cash available and continue to pay the cash as instructed above, as bonds in the Celadon Accounts mature, until both amounts ~~(totaling $2,605,726.55)~~ are fully transferred to Schiller DuCanto & Fleck and Jeanette.  The Court reserves jurisdiction to instruct Celadon to liquidate any investments (bonds or securities) pending further information as the cash availability of the accounts.

7.      Pursuant to Sections 102, 501, 503(g), 504, and 505, in addition to the obligations as set forth in paragraphs 4 and 5 above, Celadon shall release all available cash to Schiller DuCanto & Fleck LLP, as it becomes available,  by wire transfer within two (2) days of  its availability to be held in Schiller DuCanto & Fleck LLP's escrow account to be disbursed to either of the parties upon Court Order, including but not limited to Jeanette for ongoing monthly child support and maintenance and prospective attorney fees.

8.      Pursuant to Sections 501 and 503, the Court reserves the right to determine if the use of the cash funds from the Celadon Accounts account is considered a loan, employment income (as a member or officer) or membership distribution to Steven.

9.      Within 30 days of entry of this Order, Steven shall disclose the title and account number of all account(s) into which approximately $64,000,000 million in funds transferred from the Celadon accounts in 2022 and 2023 were placed. If said funds are no longer in the accounts, Steven shall provide a complete and full accounting of the subsequent transfer and/or use of all such funds.  Steven shall

provide all records substantiating the accounting, including but not limited to account statements, checks, and wire transfer confirmations.

10.     The Land Rover used by Jeanette shall be returned in working and good condition to the coach house driveway within two (2) days of entry of this Order. Steven shall also pay the automobile insurance and all reasonable expenses associated with the repair and maintenance of same.

11.     Steven, and any of his agents or anyone acting on his behalf, shall be prohibited and restrained from taking any action whatsoever to remove or interfere with Jeanette and the minor children from peacefully residing at 235 West Menomonee Street, Chicago, Illinois and 234 West Willow Street, Chicago, Illinois and shall cease and desist from any further actions to deprive Jeanette and their children from maintaining their housing.

12.     Jeanette shall be granted leave to file her Petition for Attorney Fees and Costs related to this injunctive matter and hearing on said request shall be non-evidentiary, in light of the substantial evidence already taken in this matter.  The Court shall consider applying the funds in the Celadon accounts toward said fees at the hearing.

13.     Within three business day of entry of this Order, Celadon shall send Jeanette's attorneys via email all account statements from September 1, 2023 to present and shall continue to do so each month as the account statements are issued for the LLC accounts.

14.     This order is entered without prejudice to the rights or claims of either party.

Dated: <u>March 12, 2024</u>

J U D G E

**Order Prepared by:**
Schiller DuCanto & Fleck LLP
Attorneys for Petitioner
(312) 641-5560
Chicagoservice@sdflaw.com

E N T E R E D
Judge Patrick Powers-2179
MAR 1 2 2024
IRIS Y. MARTINEZ
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL

11

**RETURN ORDER TO:**
ttfield@beermannlaw.com
jkrawetz@beermannlaw.com
mdelster@beermannlaw.com
chicagoservice@sdflaw.com
marcellus@childadvocatelawgroup.com
Jeffery.Heftman@sfbbg.com
CPorras@chuhak.com
rlehmanlaw@gmail.com
dmorriss@hinshawlaw.com

# EXHIBIT C

Atty No. 26828

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, DOMESTIC RELATIONS DIVISION

| | | |
|---|---|---|
| IN RE: MARRIAGE OF | ) | |
| | ) | |
| JEANETTE IVANKOVICH, | ) | |
| Petitioner, | ) | |
| | ) | |
| and | ) | No.  2021 D 9220 |
| | ) | Cal. E |
| STEVEN IVANKOVICH, | ) | |
| Respondent. | ) | |

## <u>ORDER (RE PRELIMINARY INJUNCTION CELADON)</u>

THIS CAUSE coming before the Court on May 23, 2024 for the presentment of Third Party

LLCs' Emergency Motion to Dismiss Citation, status on the pending Citations to Discover Assets

issued to RBC Capital Markets LLC ("RBC Capital Markets"), status on the pending Citation to

Discover Assets issued to Wedbush Securities, Inc. and the return date of the Summons After

Conditional Judgment issued to Celadon Financial Group LLC on April 30, 2024 and also coming ·

before the Court on June 5, 2024 for discussion and entry of May 23, 2024 Orders; Petitioner appearing

through counsel; non-parties Ivankovich Family LLC, P2 Portfolio Managing Member LLC, A&O

Family LLC, and Atlas Apartment Homes LLC appearing through counsel, Respondent appearing

through counsel, RBC Capital Markets appearing through counsel, Celadon Financial Group LLC

appearing through counsel, Wedbush Securities Inc. failing to appear, JP Morgan Chase Bank, N.A.

not appearing, and Overlook Managing Member LLC, Glencoe Family Dwelling LLC, North

American Condominium Solutions LLC, Old Town Property Ventures LLC appearing through counsel

the Court having jurisdiction over the parties and the subject matter, the Court being fully advised in

the premises;

**THE COURT HEREBY FINDS:**

#10291178v3

1

A.       Celadon Financial Group LLC has represented that they do not have custody of the funds and assets in the Celadon Accounts set forth in the Preliminary Injunction Order entered on May 23, 2024, and therefore cannot transfer the funds and assets themselves, and that the funds and assets are held by RBC Capital Markets and Wedbush Securities, Inc.

**IT IS HEREBY ORDERED:**

1.       Upon immediate entry of this Order, Celadon Financial Group LLC is hereby ordered to authorize and provide instruction to RBC Capital Markets and Wedbush Securities, Inc. who hold the LLC funds and assets that are the subject of the Preliminary Injunction Order to act in accordance with the obligations set forth in paragraphs 4, 5, 6, and 7 of the Preliminary Injunction Order entered on May 23, 2024.

2.       Celadon shall contemporaneously provide copies of their instructions and communications with RBC and Wedbush to counsel of record.

3.       Celadon, through RBC and Wedbush, shall release said funds directly to Schiller DuCanto & Fleck LLP and Jeanette Ivankovich, accordingly, within one (1) day of receiving Celadon's instruction.

Dated Nun Pro Tunc: May 23, 2024

ENTER:

_____
JUDGE

**Order Prepared by:**
SCHILLER DU CANTO & FLECK LLP
Attorney No. 26828
Attorneys for Petitioner
321 North Clark Street, Suite 1200
Chicago, Illinois 60654-4714
Telephone No. (312) 641-5560
Facsimile No. (312) 641-6361
Service by Facsimile Transmission Will Be Accepted
Service Preferred at: chicagoservice@sdflaw.com

ENTERED
Judge Patrick Powers-2179

MAY 23 2024

IRIS Y. MARTINEZ
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL

**RETURN SERVICE TO:**

2

#10291178v3

ttfield@beermannlaw.com
jkrawetz@beermannlaw.com
mdelster@beermannlaw.com
chicagoservice@sdflaw.com
marcellus@childadvocatelawgroup.com
Jeffery.Heftman@sfbbg.com
CPorras@chuhak.com
rlehmanlaw@gmail.com
blake.altman@gtlaw.com
hrosenburg@ksrlaw.com
jkopecky@krslaw.com

# EXHIBIT D

**IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA**

Steven Ivankovich

    Plaintiff

    V.

Jeanette Ivankovich
Schiller DuCanto & Fleck LLP

    Defendants

_____/

**COMPLAINT FOR DECLARATORY RELIEF THAT LIMITED LIABILITY
COMPANY ASSETS ARE NOT ASSETS OF STEVEN IVANKOVICH; DECLARATION
OF RIGHTS OF  JEANETTE IVANKOVICH IF ANY OF MARITAL RIGHTS TO
MEMBERSHIP INTERESTS IN LIMITED LIABILITY ENTITIES; AND
DECLARATION OF  PLAINTIFFS' OBLIGATION TO COMPLY WITH THE
CHARGING ORDER ENTERED BY THIS COURT ; PRELIMIARY AND
<u>PERMENANT INJUNCTION</u>**

NOW COMES,  Plaintiff,  Steven Ivankovich (hereinafter "Steven" or "Plaintiff" ) by

and through his undersigned attorney,  and sues Schiller DuCanto & Fleck LLC, (hereinafter

"Schiller") and  Jeanette Ivankovich (hereinafter "Jeanette") , on the following  supplemental

causes of action:

**Jurisdiction and Venue**

1.  The LLCs who have an interest in the issues set forth in the complaint, and who may

    wish to intervene as parties are  P2 Portfolio Managing Member LLC, ("P2"),

    Ivankovich Family LLC  ("Ivankovich Family"),  Atlas Apartment Homes LLC

    ("Atlas"), Alliance HTFL LLC ("Alliance"),  Pilgrim Windtree Owner LLC

    ("Windtree"), Pilgrim Warwick Owner LLC ("Warwick"), Pilgrim Coulter Owner

1

LLC ("Coulter"), Premier Orlando Portfolio Two LLC ( "Premier"), and A&O
Family LLC ("A&O"), collectively known as the ("LLCs")[1]

2. The LLCs are all limited liability companies organized under the laws of Delaware
   and/or Florida.

3. The LLCs were all served with a charging order requiring them to not make any
   distribution to Steven Ivankovich as a member or manager of any of the LLCs until
   the debt that Steven owes to the judgment debtor Pami Grand Too, LLC, has been
   satisfied.[2]

4. There are other creditors of Steven's holding judgments in excess of $7,000,000.00
   which have served the LLCs with citations or charging orders. The citations issued
   under Illinois law are alleged by those creditors to function as charging orders to the
   LLCs from the date when the LLCs were served with the citations.

5. Steven Ivankovich is both the judgment debtor and the Plaintiff in this case and is a
   resident of Florida. He also is the Petitioner in a Dissolution of Marriage case, Case
   No.: 2021-23848-FC-04, pending in Miami-Dade County. Jeanette Ivankovich is the
   Respondent therein.

6. Defendant Schiller is a law firm located and doing business in Cook County, Illinois.
   It represents Defendant Jeanette a dissolution of marriage case pending in Cook
   County, Illinois. Schiller has filed the pleadings that if granted would require Steven
   to violate this courts charging order referenced herein. Schiller is a creditor of Steven
   and through his actions is seeking to circumvent this courts charging order.

---

[1] The Plaintiff will provide notice of the filing of the complaint to the "LLCs," and they will have the opportunity to intervene as Parties.

[2] Pami Grand Too, LLC v. Steven Ivankovich, Case No.: 2022-010735-CA-01

7. Schiller, through the lawyers in its firm, have issued summons in Miami Dade County, Florida. They have issued deposition subpoenas and document requests to Florida residents and Florida corporate entities. They have transmitted documents to Florida and have made untrue material statements to companies associated with the Plaintiffs, with whom Plaintiffs conduct a regular course of business in Florida. Schiller is as a creditor of Steven and as a creditor of Steven, is seeking to enforce its judgment against Steven in Miami Dade County, Florida. Schiller has engaged in a continuous substantial not isolated activity in Maimi Dade County and pursuant to Fl. Stat. § 48.193 (2), (9) (2)

8. The Defendant, Jeanette Ivankovich was a resident of Miami Dade County , Florida for more than six months prior to the dissolution of marriage action's commencement date. Jeanette is currently the Respondent in the Dissolution of Marriage case pending in Miami Dade County, Florida. Jeanette is engaged in substantial not isolated activity in Florida.

9. This court has jurisdiction to enforce its own orders (the Charging Orders).

**Facts Common To All Counts**

10. Steven Ivankovich and the defendant Jeanette Ivankovich are respectively Respondent and Petitioner in a Dissolution of Marriage proceeding pending in the Circuit Court for Cook County Illinois domestic division Case number 2021 D 009220, hereinafter referred to as the "domestic case".

11. In the domestic case Jeanette was and is represented by the defendant Schiller.

12. In the domestic case an order was entered requiring Steven, the charging order judgment debtor, to pay Schiller $425,000.00 to pay Jeanette's attorney's fees and to

retain a forensic accountant. A copy of the order is attached hereto as Exhibit A. The Illinois court also found judgment debtor Steven in indirect contempt and issued a body attachment order, attached hereto as Exhibit "B". The body attachment order set a cash bond that Steven ,once arrested, was required to post in the amount of $425,000.00. The order does not even allow Steven or a third party to post a bond to secure his release. The reason for this draconian provision of the order is to force Steven to violate his fiduciary duty to the LLCs and take their funds and pay Schiller.

13. Schiller, as a creditor of Steven, is attempting to require Steven to use LLC assets to pay Schiller the debt that Steven was ordered to pay Schiller.

14. Schiller is using its threat to have Steven arrested and held in custody by the Sherriffs office of Miami Dade, County, and then be extradited to Illinois unless Steven, as manager of the LLCs uses LLC funds to pay Schiller $425,000.00.

15. Jeanette, in the domestic case, is seeking to have the LLCs transfer any membership interest that Steven may have in the LLCs subject to the charging order entered by this court, free and clear of the claim of Pami Grand Too LLC, the judgment creditor who obtained the charging order. [3]

16. In the domestic case Jeanette, through Schiller, has alleged that the LLC's assets are marital property, and that as marital property Jeanette owns at least 50% of whatever membership interests Steve owns in the LLCs.

17. Jeanette is attempting to obtain any such marital property membership interests, free and clear of the LLCs obligations under the charging order.

---

[3] Pami Grand Too, LLC, the creditor who secured the charging order, will be notified of the filing of the complaint, and have the opportunity to intervene as a party.

18. Jeanette is attempting to secure any such marital property right in the LLCs free and clear of the citation judgment creditor claims.

19. Jeanette is attempting to secure any such marital property notwithstanding the limitations on such transfers contained in each of the LLCs operating agreements and limitations pursuant to applicable Delaware law.

20. Steven and the LLCs allege that any marital interest(s) that are determined in the Illinois divorce court that Jeanette may have in the LLCs, is subject to the operating agreements of the LLCs and Delaware law, and such interest if any is subordinate to the rights of Steven's creditors, and the rights of the other members of the LLCs.

21. The divorce court in Illinois has entered an order that it lacked jurisdiction over the LLCs.

22. The only court that could exercise jurisdiction to determine the rights of Steven, the LLCs Jeanette and Schiller (who is a creditor of Steven) is this court.

23. On July 29, 2022, the Circuit Court for Miami Dade County, Florida entered a charging order on Creditor Pami Grand Too, LLC's motion as judgment creditor of Steven, to a group of limited liability companies specifically, P2 Portfolio Managing Member LLC, ("P2 ") A&O Family LLC ("A&O") and Consilient Holdings LLC ( "Consilient"), attached hereto as Exhibit "C". The charging order imposed a lien on any membership interest of Steven. The Charging order directed the LLCs not to make any disbursement to Steven. Specifically,

> "The Companies are directed to pay to the Judgment Creditor all distributions to which the Judgment Debtor would have otherwise been entitled by virtue of his limited liability company interests until all amounts due under the Judgment against the Judgment Debtor and in favor of the Judgment Creditor have been satisfied."

5

24. The LLCs named in the charging order now face a real judiciable issue. This Court's order imposes a lien on any interest of Steven and ordered him and the LLCs not to make any distribution to the judgment debtor Steven.

25. Jeanette and Schiller (to collect its fees) are seeking, in the Illinois divorce case, an emergency injunctive order requiring Steven to violate the charging orders and use LLC funds to pay Steven's obligations to them. The entry of such an order will require Steven to violate the fiduciary duty he owes to the LLCs. Compliance with such an order by the LLCs would violate the charging order instructing the LLCs not to disburse any such funds until the Pami Grand Too judgment is satisfied.

26. Through the instant complaint, Steven seeks a declaratory judgment on his obligations under the charging order and the priority of the claims of Jeanette and Schiller to be paid from the LLCs any disbursements that otherwise would be paid to Steven, and to Palmi Grand Too LLC as a priority judgment creditor.

27. Through the instant complaint Steven requests a declaration of his individual obligations under the charging orders. Specifically, to avoid arrest by the Miami Dade County Sherriff at his home located in Key Biscayne, Florida and then extradited to Chicago Illinois is Steven authorized to violate the Circuit Court's charging order?

28. If Steven, in order to prevent his arrest, withdraws LLC funds in violation of his fiduciary duties under the operating agreement and Delaware law, will the actions be permitted, or would he face legal jeopardy for violation of those obligations?

29. Through this complaint Steven requests that the court issue an order declaring his obligations to the LLCs.

30. Through this complaint Steven requests a declaration of his, the LLCs, Schiller and
Jeanette's and Pami Grand Too, LLC's priorities in the receipt of any disbursements
to Steven from the LLCs.

31. Through this complaint Steven requests that this court declare if any membership
interest that Steven has in any of the LLCs is marital property. If the court declares
that Steven has a membership interest in any of the LLCs, and that said membership
interests are marital property, that the court enter an order declaring Jeanettes rights
and obligations to the LLCs, and the LLCs obligations to make distributions to
Jeanette.

### Count 1

### <u>DECLARATORY JUDGMENT [ All DEFENDENTS]</u>

32. The Plaintiff realleges and incorporates herein the allegations set forth in paragraphs
1-30.

33. This action for declaratory judgment judgement is brought as authorized by Florida
Civil Practice Code "Declaratory Judgments" Article 86.

34. The circuit and county courts have jurisdiction within their respective jurisdictional
amounts to declare rights, status, and other equitable or legal relations whether or not
further relief is or could be claimed.

35. The LLC are ordered by this court not to use their assets to pay or disburse funds to
Steven Ivankovich.

36. Jeanette and Schiller have also alleged in the domestic case that whatever interest that
Steven has in the membership interests of the Plaintiffs are marital property, and as

marital property Jeanette's marital property interest in the membership interests is superior to the judgment of Pami Grand Too LLC and other Steven creditors.

37. There is a bona fide dispute between the parties; Steven has a justiciable question as to his obligations to the LLC's under the terms of the Charging Order. Specifically: A) does Jeanette or Pami Grand Too LLC have a priority claim to any distribution that the LLCs make to Steven Ivankovich; B) does Jeanette have a marital interest in any Steven Ivankovich membership interests in the Plaintiffs; and C) if Jeanette does have a marital interest in Stevens membership interests, what are the priorities of LLC distributions to Jeanette, Pami Grand Too LLC, and Steven's other judgment and citation creditors?; D ) Is any membership interest that Steven has or previously owned in the LLCs marital property?; E) if it is determined that Steven has a membership interest that is marital property, what are Jeanettes rights in the LLCs if any; F) if it is determined that Jeanette has a marital property right to any Steven membership interest what are the LLCs legal obligations to Jeanette?; G) what is the priority of Steven's obligation to Schiller, Pami Grand Too LLC, and the citation LLC creditors?

38. It is necessary and proper for this Court to determine the rights and obligations of the LLCs in complying with the charging order.

39. It is also necessary and proper for this court to determine, if Jeanette has a marital interest in any membership interest that Steven owns in any of the Plaintiff LLC's; and if he does what are the LLCs obligations to pay distributions to Palmi Grand Too LLC or Jeanette.

Wherefore, the Plaintiff Steven Ivankovich request the following relief:

8

1. That a declaratory judgment be entered declaring:

   A) does Jeanette or Palmi Grand Too LLC have a priority claim to any distribution that the LLCs make to Steven Ivankovich; B) does Jeanette have a marital interest in any Steven Ivankovich's membership interests in the Plaintiffs; and C) if Jeanette does have a marital interest in Stevens membership interests, what are the priorities of LLC distributions to Jeanette and Pami Grand Too LLC? ; D ) Is any membership interest that Steven has or previously owned in the LLCs marital property?; E) if it is determined that Steven has a membership interest that is marital property, what are Jeanettes rights in the LLCs if any; F) is it is determined that Jeanette has a marital property right to any Steven membership interest what are the LLCs legal obligations to Jeanette?; G) what is the priority of Steven's obligation to Schiller, Pami Grand Too LLC, the citation LLC creditors?

2. Such other and further relief as the nature of this matter may require granting complete relief.

### Count 2
### Body Attachment Order For An Unsecured Debt

**Preliminary  and Permanent Injunction (Against Defendants Schiller & Jeanette, and law enforcement)**

40. The Plaintiff realleges and incorporates herein the allegations set forth in paragraphs 1-30.

41. The Plaintiff, pursuant to FRCP  1.610 (a)  requests that a temporary, preliminary, and permanent injunction.

42. The enforcement of the Illinois body attachment order in Florida by a Florida court is unconstitutional.

43. The Illinois body attachment order does not arise from a support order. The order was entered requiring Steven to pay Jeanette's counsel fees in the amount of $425,000.00 (inclusive of accounting fees not yet accrued). The obligation is simply an unsecured debt.

44. Florida Constitution Article I § 11 abolishes debtors prisons. *"There shall be no imprisonment for debt."*

45. The order by the Illinois court that orders a national body attachment of Steven, is not enforceable in Florida and not enforceable by Florida law enforcement.[4]

46. The order of the Illinois Court if enforced by law enforcement in Florida requires Steven in order to "purge" the body attachment to pay $425,000 to be released from prison.

47. Incredulously, the Illinois court that entered the body attachment order, has also opined that Steven does not have any available funds to pay the ordered counsel fees!

48. If the body attachment is enforced by Florida law enforcement Steven will remain in a Florida correction facility indefinitely.

49. Steven does not have an adequate remedy at law. Steven's only remedy from being illegally incarcerated is an injunction that enjoins Florida law enforcement from arresting Steven, and Schiller and Jeanette from enforcing the body attachment.

---

[4] The enforcement of the order which orders the incarceration of Steven, for not paying an unsecured legal fee, also violates the constitution of the United States.

50. Steven will suffer irreparable injury if no injunction is entered. He can be arrested at any time in Florida or for that matter anyplace in the United States. He will remain incarcerated indefinitely because as the Illinois court has opined Steven has no funds to pay the $425,000 the order requires to be paid "in cash" before he is released from prison.

51. Steven has a substantial likelihood of prevailing on the merits. Florida's constitution, and Florida case law are explicit that individuals shall not be imprisoned for failure to pay a debt. The body attachment order directs law enforcement to arrest Steven and keep him in jail until he pays Schiller $425,000.00 (a debt).

52. The Florida constitution and Florida case law clearly enunciate Florida public policy as being opposed to putting one in jail for failure to pay a lawyers fee. It is also in the best interest of public policy that orders entered in other states such as the Illinois order not be allowed to circumvent or " end around" Florida law. Public policy is in favor of preventing the use of Florida law enforcement to arrest a person for not paying a debt.

**WHEREFORE**, the Plaintiff on Count II of the Complaint request the following relief:

1) The entry of a Preliminary Temporary Injunction against Jeanette, Schiller and Florida Law Enforcement including the Sherriff of Miami Dade County, Florida from enforcing the Illinois body attachment order (Exhibit B).

2) The entry of a Permanent Injunction against Jeanette, Schiller and Florida Law Enforcement including the Sherriff of Miami Dade County, Florida from enforcing the Illinois body attachment order.

3) That the Injunction be binding upon third parties, including law enforcement

11

throughout the United States including posting the injunction in the LEADS system and including person (s) who receive notice of or who have notice of the Injunction.

4) For such other and further relief as this cause may require.

Dated: November 13, 2023

> Respectfully Submitted,
>
> ALLISON RUB-RODRIGUEZ, P.A.
> **Attorney for Plaintiff**
> 3301 Ponce de Leon Blvd., Suite 200
> Coral Gables, Florida 33134
> Tel: (305) 461-5757
> Email:Allison@repinespa.com
>
> By: /s/ Allison Rub-Rodriguez
>      Allison Rub-Rodriguez, Esq.
>      Fla. Bar 105529

# EXHIBIT A

4210 – Held In Contempt Of Court – Allowed
4437 – Law Enforcement Agency to Comply – Allowed
4676 – Party to Purge – Allowed
4309 – Bond Set At – Allowed
9203 – Stay Of Execution
4436 – Clerk's Office to Comply – Allowed

(Rev. 12/01/20) CCDR 0032 A

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, DOMESTIC RELATIONS DIVISION**

**E N T E R E D**
Judge Patrick Powers-2179

**SEP 05 2023**

IRIS Y. MARTINEZ
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL

IN RE:  THE MARRIAGE/CIVIL UNION OF

JEANETTE IVANKOVICH,

**PETITIONER**

AND

STEVEN IVANKOVICH,

**RESPONDENT**

NO: 2021 D 9220

CALENDAR: _____

**ORDER OF ADJUDICATION OF INDIRECT CIVIL CONTEMPT AND / OR**
**ORDER OF COMMITMENT**

This cause being heard this date pursuant to a rule to show cause directed to

Respondent, Steven Ivankovich, _____ (hereinafter "contemnor") to show cause, if any s/he has,
(name)

why s/he should not be found in indirect civil contempt and sanctioned forthwith, for failure to comply with the Court's
order entered on May 18, 2023 _____, directing contemnor to pay Schiller DuCanto and Fleck

$400,000 for attorneys' fees and costs and $25,000 for expert fees as an interim fee award within 45 days.

And the Petitioner/~~Respondent~~ appearing:
☑ in person and  ☑ with counsel, and the contemnor likewise appearing  ☐ in person and  ☑ with counsel;

And the Court, having heard the testimony of the parties and witnesses, together with all pleadings, exhibits, and
arguments of counsel, and being fully advised in the premises, hereby finds that:

1.  The Court has jurisdiction of the parties and subject matter;

2.  On the 18 ____ day of May _____, 2023 ____ this Court entered an order directing the
    contemnor to pay Schiller DuCanto and Fleck $400,000 for attorneys' fees and costs and $25,000 for expert fees as an interim fee award
    within 45 days.

3.  As of the 30 ____ day of August _____, 2023 ____, contemnor has failed to: pay
    Schiller DuCanto and Fleck $400,000 for attorneys' fees and costs and $25,000 for expert fees as an interim fee award.

**(OVER)**

**IRIS Y. MARTINEZ, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

(Rev. 12/01/20) CCDR 0032 B

4. The contemnor has not given any legally sufficient reasons for failure to comply with said order, even though s/he had, and still has, the means to comply with said order, and that contemnor's failure to comply with said order is willful and contumacious;

5. The conduct of the contemnor has defeated and impaired the rights and interests of the Petitioner/~~Respondent~~ and has further impeded and obstructed the Court in its administration of justice; and

IT IS THEREFORE ORDERED AND ADJUDGED that the contemnor:

4210 ☑ Is hereby found and declared to be in indirect civil contempt of Court for willful failure to obey the Court's order as herein stated;

4437 ☑ Is ordered committed to the Cook County Jail, there to remain until s/he shall have purged him/herself of contempt by:
posting an all cash bond of $425,000 with the Clerk of the Circuit Court of Cook County.

9203 ☐ Commitment is stayed until _____, _____ s/he purges the contempt by
4676
posting $ _____ with the Clerk of the Circuit Court.

4436 ☑ The Clerk of the Court is directed to prepare a certified copy of this Order and submit same to the Sheriff of Cook County.

☑ This order shall be entered into the LEADS system. Respondent's request for stay of commitment is denied.

ENTERED
Judge Patrick Powers-2179
SEP 05 2023
IRIS Y. MARTINEZ
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL

Atty. No.: 26828
Name: Schiller DuCanto & Fleck LLP
Atty. for: Petitioner                     Entered: September 5 , 2023
Address: 321 N. Clark Street, Suite 1200
City/State/Zip: Chicago, IL 60654
Telephone: 312-641-5560

Judge                          Judge's No.

**IRIS Y. MARTINEZ, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

# **EXHIBIT B**

Atty No. 26828

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, DOMESTIC RELATIONS DIVISION

IN RE: MARRIAGE OF           )
                             )
JEANETTE IVANKOVICH,         )
       Petitioner,           )
                             )
      and                    )     No. 2021 D 9220
                             )     Cal. E
STEVEN IVANKOVICH,           )
       Respondent.           )

> **ENTERED**
> Judge Patrick Powers-2179
> SEP 06 2023
> IRIS Y. MARTINEZ
> CLERK OF THE CIRCUIT COURT
> OF COOK COUNTY, IL

## BODY ATTACHMENT ORDER

**THIS MATTER** coming before the court on the issue of enforcement of the court's interim fee award order dated May 18, 2023.

**THE COURT HEREBY FINDS:**

A.    The Respondent, STEVEN IVANKOVICH, has failed to appear in court for hearing pursuant to a court order entered on July 14, 2023.

**WHEREFORE, THE COURT ORDERS:**

1.    The Sheriff of Cook County, the Sheriff of any County in Illinois, or any other duly deputized law enforcement agent, to seize and apprehend STEVEN IVANKOVICH, Respondent, for incarceration in the Cook County Jail:

Name: <u>STEVEN IVANKOVICH</u>  Date of Birth: ▇▇▇▇▇▇▇  Soc. Sec # ▇
▇

FLORIDA DL # ▇▇▇▇▇▇

Gender: <u>MALE</u>, Height: <u>6'03"</u>, Weight: <u>215 lbs.</u> Race: <u>White</u>

Distinguishing Marks or Features: <u>Bald.</u>

Last Known Homes Addresses in Illinois: 1) <u>401 North Wabash Ave., Unit 55A</u>
                                            <u>Chicago, Illinois 60611.</u>

                                        2) <u>1150 Michigan Avenue,</u>
                                           <u>Wilmette, Illinois 60091.</u>

1

Last Known Home Addresses in Florida: <u>791 Crandon Blvd, PH 6</u>
<u>Key Biscayne, Florida 33149.</u>

2.      If the Respondent, STEVEN IVANKOVICH, is taken into custody, the Sheriff/law enforcement agent shall immediately notify this Court and may release the Respondent only after he posts **the entire $425,000 bond in cash** (not 10%) and deposits same in escrow with the Sherriff or the Court pursuant to 750 ILCS 5/713(a).

3.      If the Respondent is released pursuant to paragraph 2 above, the Sheriff shall then advise the Respondent that hearing on _____ is continued to 21 to 30 days from the date of release and the Respondent is required to appear at 9:30 a.m. at the Richard J. Daley Center, 50 West Washington Street, Chicago, Illinois 60602, Room <u>1603</u>.

Failure of STEVEN IVANKOVICH, Respondent, to appear after turning posting escrow shall result in another body attachment.

The conditions set forth below apply to this Order:

I informed the Respondent that his court date is _____, 2023, at the time and location set forth in paragraph 3, and informed his attendance is mandatory.  A copy of this Order was given to Respondent's counsel.

Date: _____     Sheriff: _____

Respondent: _____

·2

**CONDITIONS OF BODY ATTACHMENT ORDER:**

1.    A copy of this order is given by the Sheriff to Respondent.

2.    THE    CONTINUANCE    DATE    GIVEN    BY    THE    SHERIFF/LAW ENFORCEMENT AGENT TO THE RESPONDENT SHALL NOT BE LESS THAN 21 DAYS NOR MORE THAN 30 DAYS FROM THE DATE OF RELEASE, AND IF SUCH DATE FALLS ON A COURT HOLIDAY, THE HEARING WILL BE HELD ON THE NEXT REGULAR DAY THE COURT IS IN SESSION.

3.    The order is directed to any Sheriff of any County in Illinois or any duly deputized law enforcement agent.

4.    The Clerk shall notify Respondent, public officer or legal counsel whose name appears on this Order of the court date at which the Respondent is required to appear.

5.    This Order shall be entered into the LEADS system.

ENTER:

_____
JUDGE

ENTERED
Judge Patrick Powers-2179

SEP 06 2023

IRIS Y. MARTINEZ
CLERK OF THE CIRCUIT COURT
OF COOK COUNTY, IL

SCHILLER DU CANTO & FLECK LLP
Attorney No. 26828
Attorneys for Petitioner,
321 North Clark Street, Suite 1200
Chicago, Illinois 60654
Telephone No. (312) 609-5551
chicagoservice@sdflaw.com

RETURN ORDER TO:    Chicagoservice@sdflaw.com
ttfield@beermannlaw.com
mdelster@beermannlaw.com
marcellus@childadvocatelawgroup.com

3

# <u>EXHIBIT C</u>

**IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO: 2022-010735-CA-01
SECTION: CA10
JUDGE: Peter R. Lopez

**Pami Grand Too LLC**

Plaintiff(s)

vs.

**Ivankoivch, Steven**

Defendant(s)

_____/

## ORDER ON JUDGMENT CREDITOR, PAMI GRAND TOO LLC'S EX-PARTE MOTION FOR CHARGING ORDER IN ITS FAVOR AGAINST PAYMENTS FOR PROFITS AND DISTRIBUTIONS TO JUDGMENT DEBTOR, STEVEN IVANKOVICH

THIS CAUSE having come before the Court on Judgment Creditor, PAMI GRAND TOO LLC's Ex-Parte Motion for Charging Order in its Favor Against Payments for Profits and Distributions to Judgment Debtor, Steven Ivankovich (the "Motion"), and the Court having reviewed the Court's file and the Motion, reviewed and considered the applicable law, and being otherwise fully advised in the premises, it is hereby:

**ORDERED AND ADJUDGED** as follows:

1. PAMI GRAND TOO LLC's (the "Judgment Creditor") Motion is **GRANTED**.

2. The Court, pursuant to Fla. Stat. § 605.0503, hereby imposes a Charging Order in favor of the Judgment Creditor in the amount due under the Final Judgment on Guaranty domesticated in Florida and recorded in the Official Records of Miami-Dade County, Florida pursuant to Fla. Stat. §§ 55.503 and 55.505 at Book 33238/Page 712 (the "Judgment"), which currently exceeds $12.6 million USD, and against the interests of Judgment Debtor, Steven Ivankovich (the "Judgment Debtor"), in Overlook Managing Member, LLC, Ivankovich

Family LLC, P2 Portfolio Managing Member LLC, Tyler Atlas, LLC, Alliance HTTX LLC, Atlas Apartment Homes LLC, Atlas Apartment Holdings LLC, Atlas Birchwood LLC, Atlas Crowntree Lakes, LLC, Atlas Alexandria & Parc Vue, LLC, Premier Orlando Portfolio Two LLC, Atlas Multifamily Three, LLC, Atlas MF Mezzanine Borrower, LLC, and Atlas Apartments Acquisition LLC, including, but without limitation, his membership interests.

3. This Charging Order constitutes a lien against the transferable interests of the Judgment Debtor in and to Overlook Managing Member, LLC, Ivankovich Family LLC, P2 Portfolio Managing Member LLC, Tyler Atlas, LLC, Alliance HTTX LLC, Atlas Apartment Homes LLC, Atlas Apartment Holdings LLC, Atlas Birchwood LLC, Atlas Crowntree Lakes, LLC, Atlas Alexandria & Parc Vue, LLC, Premier Orlando Portfolio Two LLC, Atlas Multifamily Three, LLC, Atlas MF Mezzanine Borrower, LLC, and Atlas Apartments Acquisition LLC (collectively, the "Companies"), for payment of the unsatisfied amount of the Judgment, with interest.

4. The lien shall continue to encumber the property described until all amounts due under the Judgment have been satisfied or otherwise ordered by the Court.

5. The Companies are directed to pay to the Judgment Creditor all distributions to which the Judgment Debtor would have otherwise been entitled by virtue of his limited liability company interests until all amounts due under the Judgment against the Judgment Debtor and in favor of the Judgment Creditor have been satisfied.

6. Any such payments for distributions shall be made payable to PAMI Grand Too LLC, and sent to the attention of Judgment Creditor's counsel, Aaron A. Resnick, Law Offices of Aaron Resnick, P.A., 100 Biscayne Blvd., Suite 1607, Miami, Florida 33132.

7. The Judgment Debtor shall not attempt to transfer or encumber his membership interest in any of the Companies.

8. The Judgment Creditor shall personally serve a copy of this Order and the Motion on the

Companies, and such service will constitute notice of this lien on any interest of the Judgment Debtor as a member in the Companies.

9. The Court retains jurisdiction for the enforcement of this Order and the entry of further orders necessary to effectuate the purpose of this Order.

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this 29th day of July, 2022.

2022-010735-CA-01 07-29-2022 3:06 PM
Hon. Peter R. Lopez

**CIRCUIT COURT JUDGE**
Electronically Signed

---

No Further Judicial Action Required on **THIS MOTION**

CLERK TO **RECLOSE** CASE IF POST JUDGMENT

---

**Electronically Served:**
Aaron Resnick, efile@thefirmmiami.com
Aaron Resnick, aresnick@thefirmmiami.com
Aaron Resnick, nazarena@thefirmmiami.com

**Physically Served:**

# EXHIBIT E

**AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT**
**of**
**IVANKOVICH FAMILY LLC**

This Amended and Restated Limited Liability Company Agreement ("Agreement") of **IVANKOVICH FAMILY LLC**, a Delaware limited liability company ("Company"), is entered into as of the Effective Date by Steven V. Ivankovich as the sole member (the "Member"), for the purpose of setting forth the agreements between the Member and the Company. The terms of the Agreement are as follows.

**WHEREAS**, on December 17, 2021 the Company was formed as a Delaware limited liability company pursuant to the filing of a Certificate of Formation with the Office of the Secretary of State of the State of Delaware.

**WHEREAS**, the Company is governed by a Limited Liability Agreement dated December 21 2021 (the "Original Operating Agreement"), entered into by the Member.

**WHEREAS**, the Member desires to amend and restate the Original Operating Agreement in its entirety to reflect the terms and conditions stated herein.

**NOW, THEREFORE**, for good and valuable consideration, the Member shall herby amend and restate the Original Operating Agreement and hereby agrees that the Amended and Restated Limited Liability Agreement of the Company shall be as follows:

**ARTICLE I**
**Organizational Matters**

**Section 1.01. *Formation.*** The Company is formed as a limited liability company pursuant to the provisions of the Act. The rights and obligations of the Members, and the affairs of the Company, shall be governed first by the Mandatory Provisions of the Act, second by the Certificate, third by this Agreement, and fourth by the optional provisions of the Act. In the event of any conflict among the foregoing, the conflict shall be resolved in the order of priority set forth in the preceding sentence.

**Section 1.02. *Name.*** The name of the Company is **IVANKOVICH FAMILY LLC**.

**Section 1.03. *Registered Office and Registered Agent.*** The registered office of the Company in the State of Delaware is located at 3411 Silverside Road, Tatnall Building #104, Wilmington, DE 19810. The name of its registered agent at such address is Corporate Creations Network Inc. The Company may also maintain offices at such other place or places as the Member deems advisable.

**Section 1.04. *Principal Business Office.*** The principal business office of the Company shall be located at 791 Crandon Boulevard, Key Biscayne, Delaware 33149 or such other location as may hereafter be determined by the Member.

**Section 1.05. *Term.*** The Company began upon the filing of the Certificate with the Delaware Secretary of State, and shall continue through the dissolution and liquidation of the Company.

CFG 002767
IRMO: Ivankovich

**Section 1.06.** *Authorized Person.*  The Certificate was executed by Steven V. Ivankovich, as an authorized person of the Company for purposes of filing the Certificate.  Pursuant to Section 605-0301 of the Act, the Members or any Person designated by the Member shall be authorized persons of the Company from and after the date of filing of the Certificate for purposes of executing all certificates required to be filed with the Secretary of State.

## ARTICLE II
## Definitions

**Section 2.01.** *Definitions.*  For purposes of this Agreement, the following capitalized terms shall have the meanings ascribed to them.

**"Act"** means the Delaware Limited Liability Company Act, as amended from time to time (or any corresponding provisions of succeeding law).

**"Affiliate"** means, with respect to any Person (i) any individual, corporation, limited liability company, partnership, trust or other legal entity directly or indirectly controlling, controlled by or under common control with such Person, (ii) any officer, director, general partner, member or trustee of such Person or (iii) any individual who is an officer, director, general partner, member or trustee of any Person described in clauses (i) or (ii) of this sentence.  For purposes of this definition, the terms "controlling," "controlled by" or "under common control with" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise, or the power to elect at least 50% of the directors, general partners, members or persons exercising similar authority with respect to such Person.

**"Agreement"** means this Limited Liability Company Agreement of **IVANKOVIICH FAMILY LLC**, as amended from time to time, which shall constitute the limited liability company agreement of the Company for all purposes of the Act.  Words such as "herein," "hereinafter," "hereof," "hereto" and "hereunder" refer to this Agreement as a whole, unless the context otherwise requires.

**"Certificate"** means the Certificate of Formation, effective on the Effective Date and filed with the Secretary of State of the State of Delaware pursuant to the Act to form the Company, as originally executed and as amended, modified, supplemented or restated from time to time, as the context requires.

**"Company"** means the limited liability company known as **IVANKOVIICH FAMILY LLC**, a Delaware limited liability company, formed pursuant to this Agreement and the Certificate.

**"Effective Date"** means February 22, 2022.

**"Indemnified Person"** means the Member, additional members, any officer of the Company, the employees and agents of the Company, and their respective Affiliates.

**"Liquidator"** means any Person, including the Member, appointed by the Member acting in the capacity of liquidating trustee of the Company.

2

CFG 002768
IRMO: Ivankovich

**"Mandatory Provisions of the Act"** means those provisions of the Act which may not be waived by Members acting unanimously or otherwise.

**"Member"** means the initial member, Steven V. Ivankovich, and any Person admitted as a Member pursuant to the terms of this Agreement.  **"Members"** means all such Persons.

**"Person"** means any individual, partnership (whether general or limited), limited liability company, corporation, trust, estate, association, nominee or other entity.

**"Property"** means all real and personal property acquired by the Company, including cash, and any improvements thereto, and shall include both tangible and intangible property.

**"Unit"** means a Unit representing a membership interest in the Company.

## ARTICLE III
## Purpose

  **Section 3.01.  *Purpose of the Company.*** The Company is formed for the purpose of transacting any and all lawful business for which limited liability companies may be organized under the Act.

  **Section 3.02.  *Debt.*** The Company may enter into authorized debt transactions, including but  not limited to margin and other secured on unsecured debt instruments.

## ARTICLE IV
## CAPITAL CONTRIBUTIONS AND OTHER MATTERS

  **Section 4.01.  *Capital Contributions.*** On or about the Effective Date, the Member has made an initial capital contribution in cash to the Company, in the amount of $100.00.  In consideration of its initial capital contribution, the Member has received 100% of the membership interests in and all of the outstanding Units of the Company.  The Member may, but shall not be required to, make subsequent capital contributions to the Company.

  **Section 4.02.  *Title to Property.*** All Property owned by the Company shall be owned by the Company as an entity, and no Member shall have any ownership interest in such Property in its individual name, and each Member's interest in the Company shall be personal property for all purposes.

  **Section 4.03.  *Other Matters.*** The Member shall not be liable for the debts or any other obligations of the Company, nor shall the Member be required to guarantee any debts, liabilities, contracts or obligations of the Company.  The Member shall not be required to lend any funds to the Company.

CFG 002769
IRMO: Ivankovich

## ARTICLE V
## PROFIT, LOSS, INCOME AND DEDUCTIONS

**Section 5.01.  *Determination of Profit and Loss.*** The profit and loss of the Company shall be determined in accordance with the accounting methods provided for in this Agreement. An accounting shall be made for each taxable year by the Company as soon as possible after the close of each such taxable year to determine the profit or loss of the Company, which shall be credited or debited, as the case may be, to the Member.

Section 5.02.  *Allocation and Distribution of Profits, Losses, Income and Deductions.* One hundred percent (100%) of the profits, losses, income and deductions of the Company shall be allocated to the Member.  The Company may make distributions to the Member from time to time in its discretion**.**

## ARTICLE VI
## ADMISSION OF ADDITIONAL MEMBERS AND TRANSFER OF UNITS

**Section 6.01.  *Admission of Additional Members.*** The Member may admit additional members to the Company as Member deems appropriate in Member's sole discretion.  In the event the Member determines to admit additional members to the Company, such additional members shall be bound by this Agreement and shall have all rights and powers of a Member under this Agreement, unless otherwise provided or restricted by a Member in Member's sole discretion. Any of the provisions of this Agreement may be amended or modified to take into account such additional members as agreed by the Member and the additional members.

**Section 6.02.  *Permitted Transfers of Membership Units.*** The Member may transfer all or part of Member's Units as Member deems appropriate in the Member's sole discretion.  Any such transferee shall have all rights and powers of a Member under this Agreement, unless otherwise provided or restricted by Member in Member's sole discretion.

## ARTICLE VII
## MANAGEMENT, LIMITED LIABILITY OF MEMBER, AND INDEMNIFICATION

**Section 7.01.  *Management by the Member.*** The business of the Company shall be managed by Steven V. Ivankovich.  The management of the Company is hereby vested in the Manager.  Any third person dealing with the Company may rely absolutely upon the act, deed and/or signature of the Manager as being the act of the Company and no third person shall be obliged or privileged to inquire into or otherwise ascertain whether the act of the Manager has been duly authorized.

**Section 7.02.  *Limitation of Liability.*** Notwithstanding anything herein to the contrary, except as otherwise expressly agreed in writing, Manager or Member shall not be personally liable for any debts, liabilities, or obligations of the Company, whether to the Company, to any other Members, or to creditors of the Company if the Manager and Member acts in good faith, with the care an ordinary prudent person in a like position could exercise under similar circumstances, and in the manner Manger and Member reasonably believes to be in the best interests of the Company.

4

**Section 7.03.** *Indemnification.* The Company shall defend, indemnify, and save harmless each Indemnified Person for all loss, liability, damage, cost, or expense (including reasonable attorneys' fees) incurred by reason of any demands, claims, suits, actions, or proceedings arising out of (a) the Indemnified Person's relationship to the Company or (b) such Indemnified Person's capacity as a member, manger, or an officer. However, the Indemnified Person shall in no event be defended, indemnified, or saved harmless for such loss, liability, damage, cost, or expense as arises out of the theft, fraud, willful misconduct, or gross negligence by such Indemnified Person.

**A.** *Advancement of Expenses.* Expenses incurred by an Indemnified Person in defending any claim, demand, action, suit or proceeding subject to this Section 7.03 shall be paid by the Company in advance of the final disposition of such action, suit, claim, demand, or proceeding and not less often than monthly, upon receipt of an undertaking by and on behalf of the Indemnified Person. If it shall be ultimately determined that the Indemnified Person is not entitled to be indemnified as authorized in this Section 7.03, the Indemnified Person shall repay the Company all such amounts advanced by the Company.

**B.** *Non-Exclusivity.* The indemnification provided by this Section 7.03 shall be in addition to any other rights to which the Indemnified Person may be entitled under any agreement, vote of the members, as a matter of law or equity, or otherwise, and shall inure to the benefit of the successors, assignees, heirs, personal representatives and administrators of the Indemnified Person.

**C.** *Insurance.* The Company may purchase and maintain insurance, at the Company's expense, on behalf of any Indemnified Person against any liability that may be asserted against or expense that may be incurred by an Indemnified Person in connection with the activities of the Company regardless of whether the Company would have the power to indemnify such Indemnified Person against such liability under the provisions of this Agreement.

### ARTICLE VIII
### Books, Records, Accounting and Taxation

**Section 8.01.** *Books and Records.* Appropriate books and records with respect to the Company's business shall at all times be kept at the principal office of the Company or at such other places as determined by the Member. Any records maintained by the Company in the regular course of its business may be kept electronically or in any other form or information storage device, provided that the records so kept are convertible into clearly legible electronic or hard copy form within a reasonable period of time.

**Section 8.02.** *Accounting.* The books of the Company shall be maintained on a cash basis of accounting in accordance with the provisions of this Agreement, and to the extent not inconsistent therewith generally accepted accounting principles for cash basis accounting.

**Section 8.03.** *Fiscal and Tax Year.* The fiscal year and tax year of the Company shall be the calendar year, unless otherwise determined by the Member.

CFG 002771
IRMO: Ivankovich

## ARTICLE IX
## DISSOLUTION AND WINDING UP

**Section 9.01.  *Dissolution Events.*** The Company shall be dissolved and its affairs wound up upon the happening of any of the following:  (i) the sale or disposition of all or substantially all of the Company assets, and the distribution of the proceeds thereof to the Member; (ii) the decision by the Member to dissolve; (iii) the occurrence of an event of dissolution, as set forth in the Act, and failure by the Member to continue the Company; (iv) death, divorce, disability, incompetency, bankruptcy, or dissolution of Member; or (iv) the entry by a court of competent jurisdiction of a decree of judicial dissolution.

**Section 9.02.  *Winding Up.*** Upon dissolution under Section 9.01, no further business shall be conducted by the Company except for the taking of such action as shall be necessary for the winding-up of the affairs of the Company and the distribution of its assets to the Member pursuant to the provisions hereof, and thereupon the Member shall act as the Liquidator of the Company within the meaning of the Act and immediately proceed to wind up and terminate the business and affairs of the Company.

**Section 9.03.  *Sale of Company Assets.*** Upon dissolution, the Liquidator shall sell such of the Company assets as it deems necessary or appropriate.  Provided, upon ensuring the payment and discharge of or making of reasonable provisions for payment and discharge of all of the Company's debts and liabilities to creditors other than the Member, in lieu of the sale of any or all of the Company Property, the Liquidator may convey, distribute and assign all or any part of Company Property to the Member in such form of ownership as shall be determined by the Liquidator to be applicable to the jurisdiction where the Property is located.  A full accounting shall be made of the accounts of the Company and of the Company's assets, liabilities and income, from the date of the last accounting to the date of such dissolution.

**Section 9.04.  *Distribution of Assets.*** The Liquidator shall apply the proceeds from the liquidation and winding up in the following order of priority: (i) to creditors, including the Members if also a creditor, to the extent permitted by law, in satisfaction of liabilities of the Company; and (ii) the balance, to the Member.

## ARTICLE X
## MISCELLANEOUS

**Section 10.01.  *Amendments*.** This Agreement may be amended only in a writing signed by the Member.

**Section 10.02.  *Captions*.** All article and section captions in this Agreement are for convenience only.  They shall not be deemed part of this Agreement and in no way define, limit, extend or describe the scope or intent of any provisions hereof.  Except as specifically provided otherwise, references to "Articles" and "Sections" are to Articles and Sections of this Agreement.

**Section 10.03.  *Pronouns and Plurals*.** Whenever the context may require, any pronoun used in this Agreement shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns, pronouns and verbs shall include the plural and vice versa.

6

**Section 10.04.  *Further Actions*.**  The parties to this Agreement shall execute and deliver all documents, provide all information and take or refrain from taking action as may be necessary or appropriate to achieve the purposes of this Agreement.

**Section 10.05.  *Binding Effect*.**  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their successors, legal representatives and permitted assignees.

**Section 10.06.  *Integration*.**  This Agreement constitutes the entire agreement among the parties hereto pertaining to the subject matter hereof and supersedes all prior agreements and understandings pertaining thereto.

**Section 10.07.  *Waiver*.**  No failure by any party to insist upon the strict performance of any covenants, duty, agreement or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute waiver of any such breach or any other covenant, duty, agreement or condition.

**Section 10.08.  *Counterparts*.**  This Agreement may be executed in counterparts, all of which together shall constitute an agreement binding on all the parties hereto, notwithstanding that all such parties are not signatories to the original or the same counterpart.  Each party shall become bound by this Agreement immediately upon affixing its signature hereto, independently of the signature of any other party.

**Section 10.09.  *Applicable Law*.**  This Agreement shall be construed in accordance with and governed by the laws of the State of Delaware, without regard to its principles of conflicts of laws.

**Section 10.10.  *Invalidity of Provisions*.**  If any provision of this Agreement is or becomes invalid, illegal, or unenforceable in any respect, the validity, legality, an enforceability of the remaining provisions contained herein shall not be affected thereby.

*[Signature appears on following page]*

CFG 002773
IRMO: Ivankovich

IN WITNESS WHEREOF, the Manger and Member has executed this Agreement effective as of the Effective Date.

**MEMBER**:

**STEVEN V.  IVANKOVICH**

By: _____

Witnessed By: _____

Name:   CHRIS CALLAHAN

Date: FEBRUARY 22, 2022

[Signature Page to LLC Agreement]

CFG 002774
IRMO: Ivankovich

# EXHIBIT F

04/08/2008 17:07 FAX 847 582 1422          STRAUSS & MALK                              @008

## ARTICLES OF ORGANIZATION OF
## A & O FAMILY LLC

### ADDENDUM

**FILED**

MAR 1 3 2008

JESSE WHITE
SECRETARY OF STATE

0248 0743

First, pursuant to an Agreement of Conversion, A.D.I. Family Limited Partnership, an Illinois limited partnership having a Secretary of State file number S 010844, was converted into A & O Family LLC, an Illinois limited liability company

Second, the former name was A.D.I. Family Limited Partnership.  *S010844*

Third, the Certificate of Limited Partnership of The A.D.I. Family Limited Partnership shall be cancelled on the filing date hereof.

Fourth, the partners of the A.D.I. Family Limited Partnership have unanimously approved the conversion of The A.D.I. Family Limited Partnership to a limited liability company.

1015\00006\00063542.WPD\

SI021390

# EXHIBIT G

Form **LLC-5.25**
July 2017

**Secretary of State**
Department of Business Services
Limited Liability Division
501 S. Second St., Rm. 351
Springfield, IL 62756
217-524-8008
www.cyberdriveillinois.com

**Payment may be made by check payable to Secretary of State. If check is returned for any reason this filing will be void.**

Illinois
Limited Liability Company Act
**Articles of Amendment**

SUBMIT IN DUPLICATE
Type or print clearly.

Filing Fee: $50
Approved:

FILE #

This space for use by Secretary of State.

1. Limited Liability Company name: A & O FAMILY LLC

2. Articles of Amendment effective on:
   ☑ the file date
   ☐ a later date (not to exceed 30 days after the filing date) _____
   Month, Day, Year

3. Articles of organization are amended as follows (check applicable item(s) below):
   ☐ a) Admission of a new manager (give name and address below)*
   ☑ b) Withdrawal of a manager (give name below)
   ☐ c) Change in address of the records office/principal place of business as required by Sec. 1-40 of the Act. (Give new physical number and street address, a P.O. Box alone or C/O is unacceptable.)
   ☐ d) Change of registered agent and/or registered agent's office (Give new name and/or address below, address change to P.O. Box alone or C/O is unacceptable.)
   ☐ e) Change in the Limited Liability Company's name (give new name below)**
   ☐ f) Change in date of dissolution (state perpetual or date of dissolution below)
   ☐ g) Establish authority to issue series (fee $300, see NOTE)
   ☐ h) Other (give information in space below)*

\*    Only managers and any member with the authority of manager are required to be reported.

Additional information:

Articles are amended as follows: Remove - JEANETTE IVANKOVICH
                                          235 WEST MENOMONEE STREET
                                          CHICAGO, IL 60614

\*\*New name of LLC (as changed): _____
   A professional LLC registered with the Illinois Department of Financial and Professional regulations must contain the term Professional Limited Liability Company, PLLC or P.L.L.C. in its name. The specific professional service must also be stated in its purpose.

(continued)

Printed by authority of the State of Illinois. December 2019 — 1 — LLC 11.21

LLC-5.25

4. The amendment was approved in accordance with Section 5-25 of the Illinois Limited Liability Company Act.

5. I affirm, under penalties of perjury, having authority to sign hereto, that these Articles of Amendment are to the best of my knowledge and belief, true, correct and complete.



Dated: _____ December 27th _____, 2021
　　　　　　　　Month/Day　　　　　　　　Year

_____
Signature

Steven Ivankovich, Manager
Name and Title (type or print)

_____
If applicant is signing for a company or other entity,
state name of company or entity.

**NOTE:**

**The following paragraph is adopted when Item 3g is checked:**

The operating agreement provides for the establishment of one or more series. When the company has filed a Certificate of Designation for each series, which is to have limited liability pursuant to Section 37-40 of the Illinois Limited Liability Company Act, the debts, liabilities and obligations incurred, contracted for or otherwise existing with respect to a particular series shall be enforceable against the assets of such series only, and not against the assets of the Limited Liability Company generally or any other series thereof, and unless otherwise provided in the operating agreement, none of the debts, liabilities, obligations or expenses incurred, contracted for or otherwise existing with respect to this company generally or any other series thereof shall be enforceable against the assets of such series.

# EXHIBIT H



*Delaware*     **PAGE  1**

*The First State*

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED ARE TRUE AND CORRECT COPIES OF ALL DOCUMENTS ON FILE OF "ATLAS P2 MANAGING MEMBER, LLC" AS RECEIVED AND FILED IN THIS OFFICE.

THE FOLLOWING DOCUMENTS HAVE BEEN CERTIFIED:

CERTIFICATE OF FORMATION, FILED THE THIRD DAY OF OCTOBER, A.D. 2014, AT 12:25 O'CLOCK P.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE AFORESAID CERTIFICATES ARE THE ONLY CERTIFICATES ON RECORD OF THE AFORESAID LIMITED LIABILITY COMPANY, "ATLAS P2 MANAGING MEMBER, LLC".

5615148   8100H

150848033

You may verify this certificate online
at corp.delaware.gov/authver.shtml

Jeffrey W. Bullock, Secretary of State
AUTHENTICATION: 2422822

DATE: 06-01-15

SI046450

*State of Delaware*
*Secretary of State*
*Division of Corporations*
*Delivered 12:42 PM 10/03/2014*
*FILED 12:25 PM 10/03/2014*
*SRV 141254934 – 5615148 FILE*

CERTIFICATE OF FORMATION
OF
ATLAS P2 MANAGING MEMBER, LLC

This Certificate of Formation of Atlas P2 Managing Member, LLC (the "LLC"), dated as of October 3, 2014 is being duly executed and filed by George Lofaso, as an authorized person, to form a limited liability company under the Delaware Limited Liability Company Act (6 Del. C. §18-101, et.seq.).

FIRST: The name of the limited liability company formed hereby is Atlas P2 Managing Member, LLC.

SECOND: The address of the registered office of the LLC in the State of Delaware is c/o The Corporation Trust Company, 1209 Orange Street, in the City of Wilmington, County of New Castle, 19801.

THIRD: The name and address of the registered agent for service of process on the LLC in the State of Delaware is The Corporation Trust Company, 1209 Orange Street, in the City of Wilmington, County of New Castle, 19801.

IN WITNESS WHEREOF, the undersigned has executed this Certificate of Formation as of the date first above written.

/s/ George Lofaso
George Lofaso
Authorized Person

SI046451

# EXHIBIT I

## CONTRIBUTION PLEDGE AND SECURITY AGREEMENT

**THIS CONTRIBUTION PLEDGE AND SECURITY AGREEMENT** (as amended, supplemented or otherwise modified from time to time, this "**Agreement**"), dated as of December 7, 2022 made by **Steven Ivankovich** ("**Pledgor**" or "**Contributor**") who resides at 791 Crandon Blvd # PH 06 Key Biscayne FL. 33149, in favor of **North American Property Ventures LTD** of the Cayman Islands  having an address c/o Conyers Trust Company Limited, Cricket Square Hutchins Drive, PO Box 2681 Grand Cayman KY1-1111 Cayman Islands "**Lender" or "Beneficiary**").

RECITALS

WHEREAS,  Dr's Anthony  and Olga Ivankovich the parents of Steven Ivankovich have funded by way of loans and or capital contributions numerous limited liability companies, who primarily invested in multi-family housing apartment projects; and

WHEREAS The "LLCs" were part of a "Family Business" and as a result, the documentation of the loans and capital contributions made by Dr. Anthony Ivankovich, Dr. Olga Ivankovich and limited liability companies owned by them, to the limited liability companies and to Steven Ivankovich individually, were documented in varying ways. The documents supporting the loans and capital contributions were documented in promissory notes, loan agreements, contribution agreements, operating agreements, tax returns of the "LLC's" and through the books and records of the respective limited liability companies; and

WHEREAS The parties agree that Dr's Anthony and Olga Ivankovich and "LLCs" owned by them,  have loaned to Steven Ivankovich including capital contributions to LLC's  managed by Pledgor, the following principal loan amounts:

|   |   |
|---|---|
| A. P2 Managing Member LLC | $35,000,000 |
| B. Ivankovich Family LLC | $30,000,000 |
| C. Overlook Managing Member LLC | $22,000,000 |
| D. A&O Family LLC | $24,000,000 |
| E. Proptex Portfolio (numerous LLCs) | $10,000,000 |
| F. Bookview LLC | $17,000,000 |
| G. Steven Ivankovich individual loans | $17,875,000 |

WHEREAS  Dr. Anthony Ivankovich is the owner of 100 % of the membership interests in Consilient Holdings Investments LLC. "Consilient" was the beneficiary of the proceeds of sale of the two apartment projects owned by "P2" known as "Parc Vue" and "Crowntree.

WHEREAS There is pending litigation by third parties against Consilient that exposes Consilient to substantial contingent liability, and

WHEREAS Overlook Managing Members LLC the beneficial owner of the LLCs known as "Pilgrim" sold two apartment projects known as Forest Park and Caribbean Isle. The net proceeds of the sale were applied to the capital and loans made by Dr. Antony Ivankovich to Steven Ivankovich to fund  "P5" as documented in  loan agreements, promissory notes, operating agreements, and the  "Pilgrim" books and records; and

WHEREAS The Contributor through this Contribution and Pledge Agreement desires to contribute any membership interest that he now owns or ever owned, and all right to any distribution under the respective operating agreements of the limited liability companies to the Beneficiary; and

WHEREAS  The Contributor also agrees though this Contribution and Pledge Agreement to pledge and assign any limited liability membership interest or right to a membership distribution that he may in the future be entitled to  receive or does receive, to the Ivanko Trust, and

WHEREAS  The contribution of Steven Ivankovich's membership interests and any future right to a distribution from any named "LLC", is made for adequate and fair consideration, specifically, to secure the repayment by the "LLC's and Pledgor of all family loans and capital contributions, to Steven Ivankovich individually including loans and capital contributions to the LLC's identified in the Agreement; and

WHEREAS  The contribution is made by Steven Ivankovich to the Beneficiary  rather than to Dr. Anthony and Olga  Ivankovich for estate planning purposes; and

WHEREAS   The parties agree that the consideration for the transfers made pursuant to this Agreement are for fair and adequate consideration; and

WHEREAS Pledgor, has disclosed that are multiple charging orders, judgments, and citations by numerous creditors against Pledgor; and

WHEREAS,  In the event that any transfer of membership interests or the pledge of interests as security is determined to be a preference by a court of competent jurisdiction, then the indebtedness identified in this Agreement shall immediately become due and payable by Steven Ivankovich to Dr. Anthony Ivankovich, Dr Olga Ivankovich, or limited liability company owned by them; and

 WHEREAS This Contribution  Pledge and Security Agreement is given to secure Pledgor's  loan obligations under those certain loans and capital contributions  as described herein ; and

WHEREAS The Beneficiary shall hold the membership interests in Trust for Dr. Anthony Ivankovich and Dr. Olga Ivankovich and any estate planning or trusts created by them; and

WHEREAS, It is a condition precedent to the Beneficiary releasing Pledgors, obligation that Pledgor shall have executed and delivered this Agreement to Lender and have been satisfied by receiving distributions and return of loans and capital contributions of not less than $80,000,000.

WHEREAS  This Agreement contemplates that Pledgor may in the future invest "family funds" in acquiring other real property and other assets. In such an event the membership interest in those single purpose entities shall be assigned by the pledgor, to the beneficiary and held by the beneficiary for the benefit of Dr Anthony Ivankovich, Dr. Olga Ivankovich and their estate trusts and estates.

NOW, THEREFORE, in consideration of the premises and to induce Beneficiary to release the  loan pledgor's loan obligation, Pledgor hereby agrees with Beneficiary as follows:

1.  **Pledge; Grant of Security Interest**.  Pledgor hereby pledges and grants to Beneficiary the all membership interests that Steven Ivankovich now owns or ever did own in the limited liability companies known as A&O Family LLC, A&O Family 2 LLC Ivankovich Family LLC, P2 Managing Member LLC, Atlas P2 Managing Member LLC, Overlook Managing Member LLC Alliance HTFL Limited Partnership, Alliance HTFL LLC, Alliance HTTX Limited Partnership, Alliance HTTX LLC, Glencoe Family Dwelling LLC and any other LLC membership interested acquired by Steven Ivankovich subsequent to the Effective date of this Agreement hereinafter "Pledged Securities "in consideration for releasing Pledgor from the  loan obligations itemized in this Agreement. In the event this Agreement is set aside, than the Beneficiary shall hold such membership interests  as collateral security for the prompt and complete payment of the loans set forth in this Agreement which shall be due and payable on the date of any order of a court of competent jurisdictions setting aside the transfer of membership interests made pursuant to this Agreement.. Beneficiary shall have a first priority secured interest in :

(i)  all Pledged Securities.

(ii)  all securities, moneys or property representing dividends or interest on any of the Pledged Securities or representing a distribution in respect of the Pledged Securities, or resulting from a split-up, revision, reclassification or other like change of the Pledged Securities or otherwise received in exchange therefor, and any subscription warrants, rights or options issued to the holders of, or otherwise in respect of, the Pledged Securities.

(iii)  all right, title and interest of Pledgor in, to and under any policy of insurance payable by reason of loss or damage to the Pledged Securities and any other Collateral,

(iv)  all "accounts", "deposit accounts", "general intangibles", "instruments", "securities" and "investment property" (in each case as defined in the UCC) constituting or relating to the foregoing.

(v)  all rights to vote and give approvals, consents, decisions and directions and to exercise any other similar right or in respect of the Pledged Securities and/or the business or affairs of the "LLCs" and/or to otherwise participate in the operation and management of LLCs  and all rights of Pledgor under or in respect of Pledgor's limited liability company agreement and any other agreement relating to such Pledgor's ownership of equity in the Pledged Securities and

(vi)    all Proceeds of any of the foregoing (including, without limitation, any proceeds of insurance thereon).

(vii)    This Agreement shall not be interrupted to be in conflict with Pledgor Steven Ivankovich's obligations as a Manager of any LLC's that through Steven Ivankovich are pledging securities.

**2.    Certificates and Powers**.  Concurrently with the execution and delivery of this Agreement, Pledgor shall deliver to Lender each original certificate evidencing the Pledged Securities (which certificates shall constitute "security certificates" (as defined in the UCC)), if any, together with an undated limited liability company interest power, covering each such certificate duly executed in blank with, if Lender so requests, signature guaranteed.

**3.    Representations and Warranties**.  Pledgor represents and warrants as of the date hereof that:

(a)    no authorization, consent of or notice to any other Person (including, without limitation, any member, partner or creditor of Pledgor ) that has not been obtained, is required in connection with the execution, delivery, performance, validity or enforceability of this Agreement including, without limitation, the assignment and transfer by Pledgor of any of the Collateral to Lender or the subsequent transfer thereof by Lender pursuant to the terms hereof.

(b)    all the Pledged Securities have been duly and validly issued and are fully paid and nonassessable.

(c)    Pledgor is the record and beneficial owner of, and has title to, the Pledged Securities , in each case free of all Liens or options in favor of, or claims of, any other Person, except the Lien created by this Agreement, and the Pledged Securities have not previously been assigned, sold, transferred, pledged or encumbered (except pursuant to this Agreement).

(d)    upon the execution and delivery of this Agreement to Lender and Lender obtaining and maintaining possession of the certificates evidencing the Pledged Securities, if any, the Lien granted pursuant to this Agreement will constitute a valid, perfected first priority Lien on the Pledged Securities and related Proceeds, enforceable as such against all creditors of Pledgor and any Persons purporting to purchase any Pledged Securities and related proceeds from Pledgor.

(e)    the principal place of business and chief executive office of Pledgor is, and for the immediately preceding four (4) months, has been, located at 791 Crandon Blvd. # PH 06 Key Biscayne, FL. 33149

(f)    there currently exist no certificates, instruments or writings representing the Pledged Securities other than those certificates, if any, delivered to Beneficiary on the date hereof and set forth  and to the extent that in the future there exist any additional certificates, instruments or writings, Pledgor shall deliver all such certificates, instruments or writings to Beneficiary together with the undated stock powers or limited liability company interest powers, as applicable, executed in blank with, if Lender so requests, signature guaranteed; and

(g)    the Pledged Securities (i) are "securities" within the meaning of Sections 8-102(a)(15) and 8-103 of the UCC, (ii) are "financial assets" (within the meaning of Section 8-102(a)(9) of the UCC) and (iii) are not credited to a "securities account" (within the meaning of Section 8-501(a) of the UCC).  Each Operating Agreement and the certificates evidencing the Pledged Securities each state that the Pledged Securities are "securities" as such term is defined in Article 8 of the UCC as in effect in the state of Delaware.

        4.    **Covenants**.  Pledgor covenants and agrees with Beneficiary that, from and after the date of this Agreement until the Guaranteed Obligations are satisfied in full:

        (a)    Acknowledgements of Parties.  If Pledgor shall, as a result of its ownership of the Pledged Securities, become entitled to receive or shall receive any stock certificate or limited partnership or regular limited liability company certificate, as applicable (including, without limitation, any certificate representing a dividend or a distribution in connection with any reclassification, increase or reduction of capital or any certificate issued in connection with any reorganization), option or rights, whether in addition to, in substitution of, as a conversion of, or in exchange for any shares of the Pledged Securities, or otherwise in respect thereof, Pledgor shall accept the same as Lender's agent, hold the same in trust for Lender and deliver the same forthwith to Lender in the exact form received, duly endorsed by Pledgor to Lender, if required, together with an undated stock, regular limited liability company or limited partnership interest power covering such certificate duly executed in blank and with, if Lender so requests, signature guaranteed, to be held by Lender hereunder as additional security for the Guaranteed Obligations. Any sums paid upon or in respect of the Pledged Securities upon the liquidation or dissolution of Mortgage Borrower shall be paid over to Lender to be held by it hereunder as additional security for the Guaranteed Obligations, and in case any distribution of capital shall be made on or in respect of the Pledged Securities or any property shall be distributed upon or with respect to the Pledged Securities pursuant to the recapitalization or reclassification of the capital of Mortgage Borrower or pursuant to the reorganization thereof, the property so distributed shall be delivered to Lender to be held by it, subject to the terms hereof, as additional security for the Guaranteed Obligations.  Except to the extent otherwise permitted herein or in the Loan Agreement, following and during the continuance of a Guarantee Default, if any sums of money or property so paid or distributed in respect of the Pledged Securities shall be received by Pledgor, Pledgor shall, until such money or property is paid or delivered to Lender, hold such money or property in trust for Lender, segregated from other funds of Pledgor, as additional security for the Guaranteed Obligations.  Pledgor shall cause Mortgage Borrower by its signature to the Acknowledgment and Consent, a form of which is attached hereto as Exhibit A, to agree that it will notify Lender promptly of the occurrence of any of the events described in this Section 5(a).

        (b)    Negative Covenants.  Without the prior written consent of Beneficiary, Pledgor shall not, directly or indirectly (i) vote to enable, or take any other action to permit, Pledgor to issue any limited partnership or limited liability company interests or shares, as applicable, or to issue any other securities convertible into or granting the right to purchase or exchange for any limited partnership interests or limited liability company interests, as applicable, or (ii) to sell, assign, transfer, exchange or otherwise dispose of, or grant any option with respect to, the Collateral, or (iii) create, incur, authorize or permit to exist any Lien or option in favor of, or any claim of any Person with respect to, any of the Collateral, or any interest therein, except for the

Lien provided for by this Agreement. The Pledgor shall defend the right, title and interest of Beneficiary in and to the Collateral against the claims and demands of all Persons whomsoever.

        (c)    <u>Filing</u>. At any time and from time to time, upon the written request of , and at the sole expense of Pledgor, Pledgor shall promptly and duly give, execute, deliver, file and/or record such further instruments and documents and take such further actions as Beneficiary may reasonably request for the purposes of obtaining, creating, perfecting, validating or preserving the full benefits of this Agreement and of the rights and powers herein granted including, without limitation, filing UCC financing or continuation statements, provided that the amount of the Guaranteed Obligations shall not be increased thereby and provided that such instruments and documents shall not increase the obligations or decrease the rights of Pledgor hereunder. Pledgor hereby authorizes Lender to file any such financing statement or continuation statement without the signature of Pledgor to the extent permitted by law. If any amount payable under or in connection with any of the Collateral shall be or become evidenced by any promissory note, other instrument or chattel paper, such note, instrument or chattel paper shall be promptly delivered to Lender, duly endorsed in a manner satisfactory to Lender, to be held as Collateral pursuant to this Agreement.

        (d)    <u>Limitation on Liens</u>. Pledgor will not create, incur or permit to exist, will defend the Pledged Securities against, and will take all such other action as is necessary to remove, any Lien or claim on or to the Pledged Securities, other than the Liens created hereby, and will defend the right, title and interest of Lender in, to and under the Pledged Securities against the claims and demands of all Persons whomsoever.

        (e)    <u>Further Identification of Pledged Securities</u>. The Pledgor will furnish to Beneficiary from time-to-time statements and schedules further identifying and describing the Pledged Securities and such other reports in connection with the Pledged Securities as Lender may request, all in reasonable detail.

        (f)    <u>Changes in Location, Name, etc</u>. Pledgor will not, unless (i) it shall have given ten (10) days' prior written notice to such effect to Beneficiary and (ii) all action reasonably necessary, in Lender's reasonable opinion, to protect and perfect the Liens and security interests intended to be created hereunder with respect to the Pledged Securities shall have been taken, (A) change the location of its chief executive office or principal place of business from that specified in Section 4(g), or (B) change its name or status as a limited liability company, or (C) reorganize or reincorporate under the laws of another jurisdiction.

        (g)    <u>UCC Article 8</u>. The Pledged Securities (i) will continue to be "securities" within the meaning of Sections 8-102(a)(15) and 8-103 of the UCC, (ii) will continue to be "financial assets" (within the meaning of Section 8-102(a)(9) of the UCC) and (iii) will not be credited to a "securities account" (within the meaning of Section 8-501(a) of the UCC). The certificates evidencing the Pledged Securities each shall always state that the Pledged Securities are "securities" as such term is defined in Article 8 of the UCC as in effect in the state of Delaware.

5.      **Certain Understandings of Parties; Registration of Pledge; Control of Pledged Collateral, Etc**.

(a)      The parties acknowledge and agree that the Pledged Securities constitute "securities" (as defined in Section 8-102(a)(15) of the UCC, and Pledgor covenants and agrees that (i) the Pledged Securities are not and will not be dealt in or traded on securities exchanges or securities markets, (ii) the terms of the Pledged Securities are not and will not be "investment company securities" within the meaning of Section 8-103 of the UCC, and (iii) the Pledged Securities, if applicable, constitute "certificated securities" within the meaning of Section 8-102(a)(14) of the UCC (collectively, "**Certificated Securities**"). Pledgor has delivered to Lender all Certificated Securities constituting the Pledged Securities, duly indorsed in blank within the meaning of the UCC, and each of such Certificated Securities have been in the physical possession of Pledgor (or an agent or representative thereof) at all times prior to such delivery to Lender. Pledgor covenants and agrees that (i) it shall not permit Mortgage Borrower to convert existing equity interests, or issue new equity interests, other than as Certificated Securities, (ii) such Pledged Securities are and shall continue to be evidenced by one (1) certificate issued by each Mortgage Borrower to each Pledgor, (iii) each such certificate has been validly issued and is fully paid for, (iv) each such certificate represents and embodies all right, title and interest in and to the Pledged Securities, (v) each such certificate has not been modified or amended and remains in full force and effect, and (vi) that ownership of each such certificate is registered in the respective books and records of Mortgage Borrower in the name of Pledgor, subject only to the pledge thereof in favor of Lender.

(b)      Notwithstanding the foregoing, to better assure the perfection of the security interest of Lender in the Pledged Securities concurrently with the execution and delivery of this Agreement, Pledgor shall send written instructions in the form of Exhibit C hereto to each issuer thereof (individually and collectively, the "**Issuer**"), and shall cause the Issuer to, and the Issuer shall, deliver to Lender the Confirmation Statement and Control Agreement in the form of Exhibit D hereto pursuant to which the Issuer will confirm that it has registered the pledge effected by this Agreement on its books and agrees to comply with the instructions of Lender in respect of the Pledged Securities without further consent of Pledgor or any other Person. Notwithstanding anything in this paragraph, neither the written instructions nor the Confirmation Statement and Control Agreement shall be construed as expanding the rights of Lender to give instructions with respect to the Collateral beyond such rights set forth in this Agreement and in all events shall be subject to Section 9(e) hereof.

(c)      Concurrently with the execution and delivery of this Agreement, Pledgor shall deliver to Lender all the certificates evidencing the Pledged Securities, together with the undated stock powers and limited liability company interest powers, as applicable, executed in blank with, if Lender so requests, signature guaranteed. Upon the occurrence and during the continuance of a Guarantee Default, Lender shall have the right, at any time, in its discretion upon written notice to Pledgor, to transfer to or to register in the name of Lender or its nominee any or all the Collateral, provided that such transfer or registration shall not occur until Lender exercises the remedies and rights of a secured party under the Uniform Commercial Code as described herein.

(d)        Concurrently with the execution and delivery of this Agreement, Pledgor shall deliver to Lender an assignment of membership interest endorsed by Pledgor in blank (an "**Assignment of Interest**"), in the form set forth on <u>Exhibit B</u> hereto, for the Pledged Securities, transferring all such Pledged Securities in blank, duly executed by Pledgor and undated.  Lender shall have the right, at any time in its discretion upon the occurrence and during the continuance of a Guarantee Default and without notice to Pledgor, subject to the terms and provisions hereof (including Section 9(e)), to transfer to, and to designate on such Pledgor's Assignment of Interest, any Person to whom the Pledged Securities are sold in accordance with the provisions hereof.  In addition, Lender shall have the right at any time to exchange any Assignment of Interest representing or evidencing the Pledged Securities or any portion thereof for one or more additional or substitute Assignments of Interest representing or evidencing smaller or larger percentages of the Pledged Securities represented or evidenced thereby, subject to the terms thereof.

6.        **Cash Dividends; Voting Rights**.    Subject to the express terms and provisions of this Agreement and the other Loan Documents and unless a Guarantee Default shall have occurred and is continuing, Pledgor shall be permitted to receive (and further distribute) all general partnership, limited partnership and/or regular limited liability company interest distributions or cash dividends paid or distributed in the normal course of business of Mortgage Borrower with respect to the Pledged Securities and to exercise all voting and general partnership, limited partnership and/or regular membership interests or corporate rights with respect to the Pledged Securities; <u>provided</u> that no vote shall be cast or right exercised or other action taken which, in Lender's judgment, would materially adversely impair the Collateral or which would be inconsistent with or result in any violation of any provision of the Guaranty, the Loan Agreement, the Note, this Agreement or any other Loan Documents. Nothing in this Section 7 shall prohibit distributions of cash released to Mortgage Borrower by Lender.

7.        **Miscellaneous**.

(a)        <u>Severability</u>.    Any provision of this Agreement, which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

(b)        <u>Headings</u>.    The headings used in this Agreement are for convenience of reference only and are not to affect the construction hereof or be taken into consideration in the interpretation hereof.

(c)        <u>No Waiver; Cumulative Remedies</u>.    Lender shall not by any act (except by a written instrument pursuant to <u>Section 17(d)</u>), delay, indulgence, omission or otherwise be deemed to have waived any right or remedy hereunder or to have acquiesced in any default or in any breach of any of the terms and conditions hereof.  No failure to exercise, nor any delay in exercising, on the part of Lender, any right, power or privilege hereunder shall operate as a waiver thereof.  No single or partial exercise of any right, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  A waiver by Lender of any right or remedy hereunder on any one occasion shall not be construed as a bar to any right or remedy which Lender would otherwise have on any future occasion.  The rights,

remedies, powers and privileges provided herein are cumulative, may be exercised singly or concurrently and are not exclusive of any rights, remedies, powers or privileges provided by law.

(d)    <u>Waivers and Amendments; Successors and Assigns; Governing Law</u>.  None of the terms or provisions of this Agreement may be waived, amended, or otherwise modified except by a written instrument executed by the party against which enforcement of such waiver, amendment, or modification is sought.  This Agreement shall be binding upon and shall inure to the benefit of Pledgor and its successors and assigns and shall inure to the benefit of Lender and its successors and assigns; provided, no Pledgor shall have any right to assign its rights hereunder.  The rights of the Lender under this Agreement shall automatically be transferred to any permitted transferee to which Lender transfers the Note and Loan Agreement.  This Agreement shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York.

(e)    <u>Notices</u>.  Notices by Lender to Pledgor or Mortgage Borrower to be effective shall be in writing (including by facsimile transmission), addressed or transmitted to Pledgor or Mortgage Borrower at the address or facsimile number of Pledgor set forth in the Guaranty and the Loan Agreement, and shall be deemed to have been duly given or made (i) when delivered by hand, (ii) upon receipt or rejection, after being deposited in the postal system, certified mail and postage pre-paid, (iii) one (1) Business Day following timely delivery to a nationally recognized overnight courier service, or (iv) in the case of facsimile notices, when sent and electronically confirmed.  Pledgor or Mortgage Borrower may change addresses and transmission numbers by written notice to Lender.  Any communications by Pledgor to Lender may be given in any manner set forth in the immediately preceding sentence to the address or transmission number set forth in the Guaranty and the Loan Agreement.

(f)    <u>Agents</u>.  Lender may employ agents and attorneys-in-fact in connection herewith and shall not be responsible for their actions except for the gross negligence or willful misconduct of any such agents or attorneys-in-fact selected by it in good faith.

(g)    <u>Irrevocable Authorization and Instruction to Mortgage Borrower</u>.  Pledgor hereby authorizes and instructs Mortgage Borrower and any servicer of the Loan to comply with any instruction received by it from Lender in writing that (i) states that a Guarantee Default has occurred and is continuing and (ii) is otherwise in accordance with the terms of this Agreement, without any other or further instructions from Pledgor, and Pledgor agrees that Mortgage Borrower and any servicer shall be fully protected in so complying.

(h)    <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts and all the counterparts taken together shall be deemed to constitute one and the same instrument.

(i)    <u>Submission to Jurisdiction; Waivers</u>.  To the extent permitted by applicable law, Pledgor hereby irrevocably and unconditionally:

(i)    submits for itself and its property in any legal action or proceeding relating to this Agreement, or for recognition and enforcement of any judgment in respect thereof, to the non-exclusive general jurisdiction of the courts of the State of Florida the

courts of the United States of America for the Southern District of Florida, and appellate courts from any thereof.

         (ii)    consents that any such action or proceeding MUST be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same; and

         (iii)    agrees that nothing herein shall affect the right to affect service of process in any other manner permitted by law or shall limit the right to sue in any other jurisdiction.

         (j)    **<u>WAIVER OF JURY TRIAL, DAMAGES, JURISDICTION</u>. PLEDGOR AND LENDER EACH HEREBY AGREES TO WAIVE ITS RIGHTS TO A JURY TRIAL ON ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, OR ANY DEALINGS BETWEEN PLEDGOR AND LENDER. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. PLEDGOR AND LENDER EACH ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO LENDER TO ENTER INTO A BUSINESS RELATIONSHIP WITH PLEDGOR. PLEDGOR REPRESENTS AND WARRANTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT SUCH WAIVER IS KNOWINGLY AND VOLUNTARILY GIVEN FOLLOWING CONSULTATION WITH LEGAL COUNSEL. THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED, EITHER ORALLY OR IN WRITING, AND THE WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, REPLACEMENTS, REAFFIRMATIONS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT, AND ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.**

         **WITH RESPECT TO ANY ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT, PLEDGOR AND BENEFICIARY SHALL AND HEREBY DOES SUBMIT TO THE EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF FLORIDA AND THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA LOCATED IN THE STATE OF FLORIDA (AND ANY APPELLATE COURTS TAKING APPEALS THEREFROM). PLEDGOR AND BENEFIARY HEREBY WAIVE AND AGREE NOT TO ASSERT, AS A DEFENSE IN ANY ACTION, SUIT OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, (A) THAT IT IS NOT SUBJECT TO SUCH JURISDICTION OR THAT SUCH ACTION, SUIT OR PROCEEDING MAY NOT BE BROUGHT OR IS NOT MAINTAINABLE IN THOSE COURTS OR THAT THIS AGREEMENT OR ANY OF THE OTHER  DOCUMENTS**

**MAY NOT BE ENFORCED IN OR BY THOSE COURTS OR THAT IT IS EXEMPT OR IMMUNE FROM EXECUTION, (B) THAT THE ACTION, SUIT OR PROCEEDING IS BROUGHT IN AN INCONVENIENT FORUM OR (C) THAT THE VENUE OF THE ACTION, SUIT OR PROCEEDING IS IMPROPER.  IN THE EVENT ANY SUCH ACTION, SUIT, PROCEEDING OR LITIGATION IS COMMENCED, PLEDGOR AGREES THAT SERVICE OF PROCESS MAY BE MADE, AND PERSONAL JURISDICTION OVER PLEDGOR OBTAINED, BY SERVICE OF A COPY OF THE SUMMONS, COMPLAINT AND OTHER PLEADINGS REQUIRED TO COMMENCE SUCH LITIGATION UPON PLEDGOR AT THE ADDRESS OF PLEDGOR AND TO THE ATTENTION OF SUCH PERSON. THE FLORIDA COURT SHALL APPLY THE LAWS OF DELWARE IN ANY LITIGATION ARISING FROM OR IN ANY WAY RELATED TO THIS AGREEMENT, ITS VALIDITY AND OR RIGHT TO ENFORCE THE TERMS AND CONDITIONS.**

**[SIGNATURES COMMENCE ON THE FOLLOWING PAGE]**

IN WITNESS WHEREOF, the parties have caused this Agreement and by executing this Agreement assigns and contributes all pledgors membership interests and any right to distributions arising from said membership interests to Beneficiary.

**PLEDGOR:**

Name: Steven Ivankovich

Pledge Agr

## SCHEDULE 1

### DESCRIPTION OF PLEDGED SECURITIES

| Issuer | Owner | Percentage of Partnership/Membership Interests |
|---|---|---|
| Ivankovich Family LLC | Steven Ivankovich | 100% |
| A& O Family LLC | Steven Ivankovich | 1.25% |
| A&O Family 2LLC | Steven Ivankovich | 100% |
| Overlook Managing Member LLC | Steven Ivankovich | 93% |
| Alliance HTFL LLC | Pilgrim Forest Park LLC Pilgrim Caribbean Isle LLC | 100% |
| Township Orlando LLC | Steven Ivankovich | 20% |
| Alliance HTTX LLC | Pilgrim Owner Warwick LLC Pilgrim Owner Wind Tree LLC Pilgrim Owner Coulter LLC | 100% |
| P2 Portfolio Managing Member LLC | Atlas P2 Managing Member LLC | 100% |

SMRH:4813-1145-1544.10

Pledge Agr

# EXHIBIT J

DocuSign Envelope ID: 1AFCBD14-244D-4DBA-A897-E0BE1E55EA62

## ACTION BY THE SOME MEMBER OF
## OLD TOWN PROPERTY VENTURES, LLC

The undersigned, NORTH AMERICAN PROPERY VENTURES LTD., a Cayman Island company, being the sole member (the "Member") of OLD TOWN PROPERTY VENTURES, LLC, a Delaware limited liability company (the "Company"), does hereby adopt the following resolutions:

**WHEREAS**, Steven Ivankovich, entered into a Multi-Board Residential Real Estate Contract 7.0 accepted by the seller on September 6, 2022 (the "Contract"), under which he, or his assignee, agreed to purchase certain real property commonly known as 233 W. Menomonee, Chicago, Illinois 60614 (the "Property"); and

**WHEREAS**, Steven Ivankovich desired to assign all of his rights, interest and obligations as purchaser under the Contract to the Company and the Company desired to accept such assignment; and

**WHEREAS**, by Assignment of Contract Rights dated as of December 14, 2022, Steven Ivankovich assigned all of his rights, interest and obligations under the Contract to the Company and the Company accepted such assignment; and

**WHEREAS**, the Member has determined it is in the best interests of the Company to accept the assignment of the Contract, to authorize the performance of the Contract, and to complete the purchase of the Property.

**NOW, THEREFORE, BE IT RESOLVED**, the Member hereby authorizes, confirms and approves the execution, delivery and performance of the Contract and all documents and instruments deemed necessary to effectuate the purchase of the Property; and

**BE IT FURTHER RESOLVED** that Steven Ivankovich and Karen Osiecki Meehan (each an "Authorized Agent" for the Company), are empowered and directed to execute and deliver all documents in connection with the Contract and completing the purchase of the Property and to do all such things and acts and to make, execute, and deliver all such other instruments and documents as may be necessary and deemed appropriate to effectuate the purchase of the Property, to comply with the terms and provisions of the Contract, to close the purchase of the Property, and to carry out the intent and purposes of these resolutions, and all acts done or performed by an Authorized Agent which are consistent with the purpose and intent of these resolutions shall be and the same hereby are in all respects ratified, approved and confirmed; and

**BE IT FURTHER RESOLVED**, that any Authorized Agent, be and hereby is, authorized and directed to take such further actions and to execute, or cause to be executed, any and all documents and further instruments which any Authorized Agent may deem necessary or proper to carry out the effect and purpose of these resolutions, and

DocuSign Envelope ID: 1AFCBD14-244D-4DBA-A897-E0BE1E55EA62

**BE IT FURTHER RESOLVED**, the Member does hereby ratify, approve adopt and confirm all acts heretofore done or performed by any Authorized Agent in connection with the purchase of the Property.

**THE UNDERSIGNED CERTIFIES** that (1) there is no provision in the Articles of Organization or other constitutional documents of this Company limiting the power of the Member to pass the foregoing resolutions, and that the same are inconformity with the provisions of said Articles of Organization or other constitutional documents and are not in violation of any applicable laws, rules or regulations and (2) no event of dissolution has occurred.

**IN WITNESS WHEREOF**, the undersigned has subscribed his name as the sole shareholder of North American Property Ventures Ltd., a Cayman Island company, being the Member of the Company, hereto this 14th day of December, 2022.

**MEMBER**:

NORTH AMERICAN PROPERTY VENTURES LTD.,
a Cayman Island company

By: _____
          Steven Ivankovich, Sole Shareholder

4815-2603-4413, v. 1