Exhibit 1

Electronically Received 10/02/2024 05.16 PM

1 | SKLAR KIRSH, LLP
Jerry L. Kay (SBN 53868)
2 | jkay@sklarkirsh.com
David M. Safvati (SBN 326605)
3 | dsafvati@sklarkirsh.com
1880 Century Park East, Suite 300
4 | Los Angeles, California 90067
Telephone: (310) 845-6416
5 | Facsimile: (310) 929-4469

6 | Attorneys for Plaintiffs Township Orlando LLC,
Township GP Fund II, LP, and Township Capital,
7 | LLC

**FILED**
Superior Court of California
County of Los Angeles

**10/02/2024**

David W. Slayton, Executive Officer / Clerk of Court

By: _____ R. Alva _____ Deputy

8

9 | **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

10 | **COUNTY OF LOS ANGELES, CENTRAL DISTRICT**

11 | TOWNSHIP ORLANDO LLC, a Delaware
limited liability company; TOWNSHIP
12 | CAPITAL, LLC, a Delaware limited
liability company; TOWNSHIP GP FUND
13 | II, LP, a Delaware limited partnership,

Plaintiffs,

14

15 | v.

16 | ATLAS HOLDINGS INVESTMENTS LLC, a
Delaware limited liability company;
17 | CONSILIENT HOLDINGS INVESTMENTS,
LLC, a Delaware limited liability company;
18 | ATLAS P2 MANAGING MEMBER, LLC, a
Delaware limited liability company; ATLAS
19 | APARTMENT HOMES, LLC dba ATLAS
RESIDENTIAL, LLC, an Illinois limited
20 | liability company; ANTHONY
IVANKOVICH, an individual; and STEVEN
21 | IVANKOVICH, an individual; and DOES 2-
10, inclusive,
22

23 | Defendants.

Case No. 19STCV00630

**SECOND AMENDED COMPLAINT FOR:**

1. **BREACH OF WRITTEN CONTRACT [ECONOMIC INTEREST AGREEMENT];**
2. **BREACH OF WRITTEN GUARANTY;**
3. **BREACH OF WRITTEN CONTRACT [FEE REIMBURSEMENT AGREEMENT];**
4. **BREACH OF WRITTEN CONTRACT [SETTLEMENT AGREEMENT];**
5. **CONVERSION;**
6. **BREACH OF FIDUCIARY DUTY;**
7. **ACCOUNTING;**
8. **FRAUD;**
9. **NEGLIGENT MISREPRESENTATION;**
10. **AIDING AND ABETTING FRAUD;**
11. **COMMON COUNT: MONEY HAD AND RECEIVED;**
12. **BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

Assigned for All Purposes to:
Hon. Maureen Duffy-Lewis, Dept. 38

Action Filed:    January 8, 2019
Trial Date:    April 21, 2025

24

25

26

27

28

SKLAR KIRSH, LLP
ATTORNEYS AT LAW

Case No. 19STCV00630

SECOND AMENDED COMPLAINT

1    Plaintiffs Township Capital, LLC ("Township"), Township GP Fund II, LP ("Township

2  Fund"), and Township Orlando LLC ("Township Orlando") (collectively, "Plaintiffs" or the

3  "Township Parties") hereby allege the following against defendants Atlas Holdings Investments

4  LLC ("Atlas" or the "Company"), Consilient Holdings Investments, LLC ("Consilient" or the

5  "Managing Member"), Atlas P2 Managing Member, LLC ("Atlas P2"), Atlas Apartment Homes,

6  LLC dba Atlas Residential, LLC ("Atlas Residential"), Anthony Ivankovich ("Anthony"), and

7  Steven Ivankovich ("Steven") (collectively, "Defendants" or the "Atlas Parties"):

8  **I.    INTRODUCTION**

9      1.    This lawsuit is a straightforward case that can best be summarized in the following

10  sentence: Plaintiffs invested $4,000,000 in two apartment projects, but have nothing to show for it,

11  as their money has virtually disappeared in the hands of Defendants, who have defrauded them.

12  First, Defendants breached their written agreement with Township Orlando when Defendants failed

13  to honor the contractual sale option that required Defendants to Purchase Plaintiffs' equity interest

14  for $4,500,000.  Defendant Steven Ivankovich, who is the managing member of all the named

15  defendant entities in this case, stated on multiple occasions including during his deposition that

16  while he would not honor the sale option, Plaintiffs would be entitled to their share of the proceeds

17  from the sale of the subject properties. However, since the sale of the properties, Steven Ivankovich

18  has fraudulently refused to distribute any of the proceeds to Plaintiffs, despite his numerous

19  representations under the penalty of perjury confirming Plaintiffs' investment, as more fully alleged

20  herein below.

21      2.    Next, Defendants violated a written agreement with Township, which required them

22  to reimburse Township for all legal fees and expenses incurred in connection with the above-

23  described transaction, by simply ignoring Township's repeated requests for reimbursement of more

24  than $148,000 in outstanding fees. This lawsuit followed.

25      3.    Following a mandatory settlement conference in this action, the parties entered into

26  a settlement agreement, which confirmed Plaintiffs' equity interest in the subject properties.

27  Defendants breached their obligations under the Settlement Agreement, after which the Court

28  granted a motion to enforce the settlement, and then reinstated the litigation.

4.    Subsequently, Plaintiffs learned that Defendants sold the real properties at issue in this matter for approximately $270 million, with subsidiaries of Defendants receiving approximately $54 million from the sale proceeds. The sale of the properties substantially changed the scope and subject matter of the parties' dispute, including pursuant to their settlement. In breach of the parties' agreements, Steven Ivankovich has refused to distribute to Plaintiffs their share of the proceeds and to provide an accounting of the transaction. What's more is that Steven Ivankovich has taken the position, without justification, that Plaintiffs are not entitled to the return of their initial $4,000,000 investment.

5.    To date, Defendants have not paid any portion of the sale proceeds to Plaintiffs.

## II.    THE PARTIES

6.    Plaintiff Township Orlando LLC is, and at all times relevant hereto was, a limited liability company organized under the laws of the State of Delaware, with its principal place of business located in Los Angeles County, California.

7.    Plaintiff Township Capital, LLC is, and at all times relevant hereto was, a limited liability company organized under the laws of the State of Delaware, with its principal place of business located in Los Angeles County, California.

8.    Plaintiff Township GP Fund II, LLC is, and at all times relevant hereto was, a limited partnership organized under the laws of the State of Delaware, with its principal place of business located in Los Angeles, California.

9.    Plaintiffs are informed and believe and on that basis allege that Defendant Steven Ivankovich is an individual residing in Chicago, Illinois.

10.    Plaintiffs are informed and believe and on that basis allege that Defendant Anthony Ivankovich is an individual residing in Chicago, Illinois, and is the father of Steven.

11.    Plaintiffs are informed and believe and on that basis allege that Defendant Atlas Holdings Investments LLC is, and at all times relevant hereto was, a limited liability company organized under the laws of the State of Delaware.

12.    Although Atlas Holdings Investments LLC was and is a limited liability company organized under the laws of the State of Delaware by name, Steven, acting in his individual

capacities, and capacity as managing member, acted as Atlas Holdings Investments, LLC de facto. In addition, Steven, acting in his individual capacity, and capacity as managing member, controlled Atlas Holdings Investments, LLC.

13.    Steven, acting in his individual capacity and managing member capacity, and acting through Atlas Holdings Investments, LLC, is liable in his individual capacity because he is personally at fault for the conduct alleged herein.

14.    Steven, at all times relevant hereto, was the alter ego of Atlas Holdings Investments, LLC, and there exists, a unity of interest and ownership between and among Steven, on the on hand, and Atlas Holdings Investments LLC, on the other hand, such that any individual and separateness between Steven and Atlas Holdings Investments, LLC has ceased to exist. Among other things, Plaintiffs allege that:

        a.    Steven controls, dominates, manages and operates, and at all times relevant hereto has controlled, dominated, and managed and operated Atlas Holdings Investments, LLC;

        b.    Steven is disregarding and has disregarded the legal formalities and separateness of Atlas Holdings Investments, LLC;

        c.    Steven and Atlas Holdings Investments, LLC have failed to maintain an arms' length relationship with on another; and

        d.    Steven has used his management and control of Atlas Holdings Investments LLC to act wrongfully and in bad faith toward Plaintiffs.

15.    Adherence to the fiction of the existence of Steven and Atlas Holdings Investments, LLC as individuals / entities separate and distinct from one another would permit abuse of corporate privilege and would sanction a fraud and promote injustice. Steven has taken over control of Atlas Holdings Investments, LLC and is acting as de facto owner and is using and has used the entity of Atlas Holdings Investments, LLC for the purpose of avoiding, hindering, and not adhering to the fiduciary obligations owed to Plaintiffs. Accordingly, Atlas Holdings' corporate identity should be disregarded, and all such defendants are therefore jointly and severally liable to Plaintiffs for the conduct and omissions alleged herein.

16.    Plaintiffs are informed and believe and on that basis allege that Defendant Consilient Holdings Investments, LLC is, and at all times relevant hereto was, a limited liability company organized under the laws of the State of Delaware. Plaintiffs are informed and believe and on that basis allege that Consilient is the only Member of Atlas.

17.    Although Consilient Holdings Investments, LLC was and is a limited liability company organized under the laws of the State of Delaware by name, Steven, acting in his individual capacities, and capacity as managing member, acted as Consilient Holdings Investments, LLC de facto. In addition, Steven, acting in his individual capacity, and capacity as managing member, controlled Consilient Holdings Investments, LLC.

18.    Steven, acting in his individual capacity and managing member capacity, and acting through Consilient Holdings Investments, LLC, is liable in his individual capacity because he is personally at fault for the conduct alleged herein.

19.    Steven, at all times relevant hereto, was the alter ego of Consilient Holdings Investments, LLC, and there exists, a unity of interest and ownership between and among Steven, on the on hand, and Consilient Holdings Investments, LLC, on the other hand, such that any individual and separateness between Ivankovich and Consilient Holdings Investments, LLC has ceased to exist. Among other things, Plaintiffs allege that:

    a.    Steven controls, dominates, manages and operates, and at all times relevant hereto has controlled, dominated, and managed and operated Consilient Holdings Investments, LLC;

    b.    Steven is disregarding and has disregarded the legal formalities and separateness of Consilient Holdings Investments, LLC;

    c.    Steven and Consilient Holdings Investments, LLC have failed to maintain an arms' length relationship with on another; and

    d.    Steven has used his management and control of Consilient Holdings Investments, LLC to act wrongfully and in bad faith toward Plaintiffs.

20.    Adherence to the fiction of the existence of Steven and Consilient Holdings Investments, LLC as individuals / entities separate and distinct from one another would permit abuse

1   of corporate privilege and would sanction a fraud and promote injustice. Steven has taken over

2   control of Consilient Holdings Investments, LLC and is acting as de facto owner and is using and

3   has used the entity of Consilient Holdings Investments, LLC for the purpose of avoiding, hindering,

4   and not adhering to the fiduciary obligations owed to Plaintiffs. Accordingly, Consilient Holdings

5   Investments, LLC corporate identity should be disregarded, and all such defendants are therefore

6   jointly and severally liable to Plaintiffs for the conduct and omissions alleged herein.

7         21.     Plaintiffs are informed and believe and on that basis allege that Defendant Atlas P2

8   Managing Member, LLC is, and at all times relevant hereto was, a limited liability company

9   organized under the laws of the State of Delaware.

10        22.     Although Atlas P2 Managing Member, LLC was and is a limited liability company

11  organized under the laws of the State of Delaware by name, Steven, acting in his individual

12  capacities, and capacity as managing member, acted as Atlas P2 Managing Member, LLC de facto.

13  In addition, Steven, acting in his individual capacity, and capacity as managing member, controlled

14  Atlas P2 Managing Member, LLC.

15        23.     Steven, acting in his individual capacity and managing member capacity, and acting

16  through Atlas P2 Managing Member, LLC, is liable in his individual capacity because he is

17  personally at fault for the conduct alleged herein.

18        24.     Steven, at all times relevant hereto, was the alter ego of Atlas P2 Managing Member,

19  LLC, and there exists, a unity of interest and ownership between and among Steven, on the on hand,

20  and Atlas P2 Managing Member, LLC, on the other hand, such that any individual and separateness

21  between Steven and Atlas P2 Managing Member, LLC has ceased to exist. Among other things,

22  Plaintiffs allege that:

23            a.     Steven controls, dominates, manages and operates, and at all times relevant

24                   hereto has controlled, dominated, and managed and operated Atlas P2

25                   Managing Member, LLC.

26            b.     Steven is disregarding and has disregarded the legal formalities and

27                   separateness of Atlas P2 Managing Member, LLC.

28            c.     Steven and Atlas P2 Managing Member, LLC have failed to maintain an

1     arms' length relationship with on another; and

2         d.    Steven has used his management and control of Atlas P2 Managing Member,

3             LLC to act wrongfully and in bad faith toward Plaintiffs.

4     25.    Adherence to the fiction of the existence of Steven and Atlas P2 Managing Member,

5  LLC as individuals / entities separate and distinct from one another would permit abuse of corporate

6  privilege and would sanction a fraud and promote injustice. Steven has taken over control of Atlas

7  P2 Managing Member, LLC and is acting as *de facto* owner and is using and has used the entity of

8  Atlas P2 Managing Member, LLC for the purpose of avoiding, hindering, and not adhering to the

9  fiduciary obligations owed to Plaintiffs. Accordingly, Atlas P2 Managing Member, LLC corporate

10  identity should be disregarded, and all such defendants are therefore jointly and severally liable to

11  Plaintiffs for the conduct and omissions alleged herein.

12     26.    Plaintiffs are informed and believe and on that basis allege that Defendant Atlas

13  Apartment Homes, LLC dba Atlas Residential, LLC ("Atlas Residential") is, and at all times

14  relevant hereto was, a limited liability company organized under the laws of the State of Illinois.

15     27.    Although Atlas Residential was and is a limited liability company organized under

16  the laws of the State of Illinois by name, Steven, acting in his individual capacities, and capacity as

17  managing member, acted as Atlas Residential de facto. In addition, Steven, acting in his individual

18  capacity, and capacity as managing member, controlled Atlas Residential.

19     28.    Steven, acting in his individual capacity and managing member capacity, and acting

20  through Atlas Residential, is liable in his individual capacity because he is personally at fault for the

21  conduct alleged herein.

22     29.    Steven, at all times relevant hereto, was the alter ego of Atlas Residential, and there

23  exists, a unity of interest and ownership between and among Steven, on the on hand, and Atlas

24  Residential, on the other hand, such that any individual and separateness between Steven and Atlas

25  Residential has ceased to exist. Among other things, Plaintiffs allege that:

26         a.    Steven controls, dominates, manages and operates, and at all times relevant

27             hereto has controlled, dominated, and managed and operated Atlas

28             Residential;

b.      Steven is disregarding and has disregarded the legal formalities and separateness of Atlas Residential;

c.      Steven and Atlas Residential have failed to maintain an arms' length relationship with on another; and

d.      Steven has used his management and control of Atlas Residential to act wrongfully and in bad faith toward Plaintiffs.

30.     Adherence to the fiction of the existence of Steven and Atlas Residential as individuals / entities separate and distinct from one another would permit abuse of corporate privilege and would sanction fraud and promote injustice. Steven has taken over control of Atlas Residential and is acting as *de facto* owner and is using and has used the entity of Atlas Residential for the purpose of avoiding, hindering, and not adhering to the fiduciary obligations owed to Plaintiffs. Accordingly, Atlas Residential corporate identity should be disregarded, and all such defendants are therefore jointly and severally liable to Plaintiffs for the conduct and omissions alleged herein.

31.     Plaintiffs are unaware of the true names and capacities of Defendants sued herein as Does 2 through 10, inclusive, and therefore sue such Defendants by such fictitious names. Plaintiffs are informed and believe and on that basis allege that each Defendant is responsible in some manner for the damages suffered by Plaintiffs as alleged in this Second Amended Complaint. Plaintiffs will amend this Second Amended Complaint to allege the true names and capacities of such fictitiously named Defendants when the same have been ascertained.

32.     Plaintiffs are informed and believe and on that basis allege, that each Defendant was the agent, employee, partner, or representative of the other Defendants, and in doing the things alleged in this Second Amended Complaint, was acting within the course and scope of such agency, employment, partnership or representation. Plaintiffs are further informed and believe, and on that basis allege, that each act of each Defendant was authorized or ratified by the other Defendants.

## III.      JURISDICTION AND VENUE

33.     This Court has jurisdiction over this action pursuant to California Code of Civil Procedure § 410.10 on the basis that the wrongful acts complained of in this Second Amended

1  Complaint harmed Plaintiffs in California within this judicial district.  Further, the amount in

2  controversy exceeds the jurisdictional minimum of this Court.

3      34.    Venue of this action in Los Angeles County is proper because the acts and omissions

4  alleged herein took place within Los Angeles County.

5  **IV.    FACTUAL ALLEGATIONS**

6      35.    Atlas, acting through various subsidiaries, owned two apartment projects (the

7  "Apartment Projects") located at 10469 Bastille Lane, Orlando, Florida and 5759 Crowntree Lane,

8  Orlando, Florida, until December of 2021, when they were sold.

9      36.    On September 12, 2016, pursuant to the terms of a binding written agreement

10  entitled, the "Grant of Economic Interest Agreement" (the "Economic Interest Agreement"),

11  Plaintiffs agreed to invest $4,000,000 in Atlas and thereby the Apartment Projects. A true and

12  correct copy of the Economic Interest Agreement is attached hereto as **Exhibit A**.

13      37.    In connection with the Economic Interest Agreement executed by the parties,

14  Defendant Atlas P2 and Defendant Atlas Residential also agreed to reimburse Township for all legal

15  fees and expenses incurred by Township in connection with the purchase of the Economic Interest

16  and the anticipated conversion of that Economic Interest into an equity investment. This agreement

17  was memorialized by a second written contract, the "Legal Services Fees Reimbursement

18  Agreement," also dated September 12, 2019 (the  "Fee Reimbursement Agreement"). A true and

19  correct copy of the Fee Reimbursement Agreement is attached hereto as **Exhibit B**.

20      38.    Section 5 of the Economic Interest Agreement provides that, within forty-five (45)

21  days of the Effective Date of the Agreement (the "Documentation Period"), Township Orlando's

22  $4,000,000 investment was to be converted into $4,000,000 worth of equity in a joint venture entity

23  that would own a one hundred percent (100%) direct equity interest in Atlas P2, which would

24  indirectly hold title to the Apartment Projects  (the  "Equity Conversion"). See Ex. A, ¶ 5. However,

25  Section 5 provided Township Orlando with an option to cause Atlas and/or Consilient to purchase

26  the Economic Interest obtained by Township Orlando under the Economic Interest Agreement for

27  $4,500,000 (the "Sale Option") within thirty (30) days following proper written notice by Township

28  Orlando. See id.

39.     Pursuant to Section 5 of the Economic Interest Agreement, Steven agreed to personally guarantee the payment obligation (the "Guaranty") on behalf of Consilient, as the "primary obligor," and in fact, executed the Agreement as a joinder party for this purpose. See id.

40.     On October 27, 2016, or forty-five (45) days after the Effective Date, the Documentation Period expired. At that time, the Equity Conversion had not yet occurred.

41.     Based on Defendants' failure to consummate the Equity Conversion, on or about November 30, 2018, Township Orlando exercised its Sale Option pursuant to Section 5 by sending written notice to Steven Ivankovich on behalf of Consilient (the "Notice"). See Ex. A, ¶ 5. This Notice was deemed received as of December 3, 2018. See id., ¶ 8(c).

42.     Pursuant to the Notice and the express terms of the Economic Interest Agreement, Atlas and/or Consilient were obligated to purchase Township Orlando's Economic Interest and provide payment in the amount of $4,500,000 within thirty (30) days of receiving the Notice, or by January 2, 2019. Defendants failed to do so. Additionally, due to Consilient's failure to make this payment upon the exercise of the Sale Option by Township Orlando, Steven was required to satisfy this obligation on its behalf, as the Guarantor. However, similar to Atlasand the Consilient, Steven also failed to comply with his contractual obligations.

43.     Similarly, pursuant to the Fee Reimbursement Agreement, Atlas P2 and Atlas Residential were required to reimburse Township, within five (5) business days of receiving an invoice, for all legal fees and expenses incurred by Township in connection with the above-mentioned transaction. The outstanding legal fees for which Township seeks reimbursement are currently at least $148,296.02. However, despite receiving several invoices, Atlas P2 and Atlas Residential failed to comply with their contractual obligations when they refused to make payment.

44.     To date, none of the Defendants have provided any payment whatsoever to Plaintiffs, in violation of their written agreements. On January 2 and 3, 2019, counsel for Plaintiffs sent written notice of the breaches to the Defendants and demanded payment, but to no avail.

45.     On or about January 8, 2019, Plaintiffs filed the Complaint initiating the above-captioned action, pleading the following claims: (1) Breach of Written Contract (Economic Interest Agreement) by Township Orlando against Atlas, Consilient and Doe Defendants; (2) Breach of

Written Guaranty by Township Orlando against Steven Ivankovich; and (3) Breach of Written Contract (Fee Reimbursement Agreement) By Township against Atlas P2. On or about May 23, 2019, Plaintiffs filed an amendment to the Complaint, adding Atlas Residential as a Doe Defendant to the third cause of action for Breach of Written Contract (Fee Reimbursement Agreement).

46.     On or about July 23, 2020, the parties entered into a binding settlement agreement ("Settlement Agreement"), a true and correct copy of which is attached hereto as **Exhibit C**, whereby Defendants expressly acknowledged and agreed in pertinent part that:

        a.     Township Orlando and Township GP Fund II, as of and since June 7, 2017 (the "Conversion Date"), do own and maintain a direct equity interest in Atlas P2, which Plaintiffs acquired under the terms of the Economic Interest Agreement.

        b.     Atlas P2 indirectly owns the Apartment Projects.

        c.     Defendants will provide all documentation necessary to demonstrate the existence and legitimacy of Plaintiffs' interest in the Apartment Projects.

        d.     Defendants have maintained fiduciary duties to Plaintiffs.

        e.     Defendants will not represent to any person or entity that Plaintiffs do not own the interest.

47.     The parties requested, and the Court agreed to, retention of jurisdiction over the Initial Settlement under Code of Civil Procedure § 664.6.

48.     Defendants ultimately breached both the Economic Interest Agreement and Settlement Agreement because they failed to execute an operating agreement for Atlas P2 which reflected that Township Orland and Township GP Fund II are members of Atlas P2 via a joint venture entity named Atlas Township Orlando LLC ("ATO").

49.     Steven falsely represented in a written agreement between Plaintiffs and Defendants entitled, the Contribution and Exchange Agreement, a correct and true copy of which is attached hereto as **Exhibit D**, that Steven contributed his entire 20% membership interest in Atlas P2, to ATO.

50.     Furthermore, Steven also falsely represented in the operating agreement for ATO,

between Steven and Plaintiffs, that pursuant to the Contribution and Exchange Agreement he contributed his 20% interest in Atlas P2 to ATO. A true and correct copy of the ATO operating agreement is attached hereto as **Exhibit E**.

51.    Despite the above-mentioned representations, Steven and all Defendants have failed to distribute any of the proceeds from the sale of the Projects to Plaintiffs.

52.    Despite the above-mentioned representations, Steven in response to written discovery in this case stated under the penalty of perjury that,

> **"The limited liability operating agreement of Atlas P2 Managing Member LLC states that it has two members: Atlas Holding Investments LLC and Steven Ivankovich. See ¶ 2. Steven Ivankovich is the Managing Member of Atlas P2 Managing Member. See ¶ 7. The Operating Agreement of the Company defined as Atlas P2 Managing Member LLC is only required to distribute cash or property proceeds it actually receives, allocated 80% to Atlas Holdings Investments LLC and 20% to Steven Ivankovich. [¶ 8.] No distributions were due to Township Orlando LLC."**

53.    As more fully described below, the above-mentioned facts were part of a scheme by Steven and Anthony to defraud Plaintiffs out of $4,000,000.

54.    Ultimately, on August 17, 2021, the Court held a hearing on an Order to Show Cause re: Defendants' compliance with the parties' Settlement Agreement. As noted in the Court's order thereon, counsel for Plaintiffs represented to the Court that Defendants had breached the Settlement Agreement, and the Court reinstated the litigation.

55.    On or about December 21, 2021—according to public records and documents Plaintiffs have received from third parties in response to subpoenas—the Projects were cumulatively sold for, approximately $270 million. The sale of the Projects substantially changed the scope and subject matter of the parties' dispute, including pursuant to the Settlement Agreement.

56.    Since learning of the sale, Plaintiffs have pursued further third-party discovery relating to the sale to investigate Plaintiffs' rights and entitlements to the sale proceeds based on their investment. Upon further investigation, Plaintiffs have learned that approximately $54 million was distributed from the sale proceeds to subsidiaries of Atlas P2 (which Plaintiffs are informed and believed indirectly owned the Projects at the time of the sale), and that approximately $73 million

was distributed to GRC 2016 Rally Orlando, LLC ("Galaxy," an entity that Plaintiffs are informed and believe invested $20 million in preferred equity in one of said subsidiaries).

57.    To date, Plaintiffs have not received *any* portion of the sale proceeds, despite their rights and equity confirmed in the Economic Interest Agreement and Settlement Agreement.

## FIRST CAUSE OF ACTION

**(For Breach of Written Contract [Economic Interest Agreement] By Township, Township Orlando, Township GP Fund II, Against Atlas, Consilient, Steven and Doe Defendants)**

58.    Plaintiffs hereby incorporate the foregoing allegations as though set forth in full.

59.    The Economic Interest Agreement constitutes a valid and enforceable written contract between Plaintiff Township Orlando and Defendants Atlas and Consilient.

60.    Township Orlando has at all times performed all duties and obligations required of it under the Economic Interest Agreement, other than those obligations that are legally excused.

61.    Defendants Steven, Atlas, and Consilient initially breached the Economic Interest Agreement by, among other things, failing to honor their obligation to purchase Township Orlando's Economic Interest for $4,500,000 following receiving proper written notice. See Ex. A, ¶ 5.

62.    Defendants Steven, Atlas and Consilient further breached the Economic Interest Agreement by, among other things, failing to distribute amounts due and owing to Township Orlando and Township GP Fund II from the approximately $270 million sale of the Projects (despite Defendants having affirmed Township Orlando and Township Fund's Interest in the Initial Settlement).

63.    As a direct, foreseeable, and proximate result of Defendants' breaches, as hereinabove alleged, Township, Township Orlando, and Township GP Fund II has been damaged in an amount to be proven at trial but in no event less than $8,424,000.

## SECOND CAUSE OF ACTION

**(For Breach of Written Guaranty By Township, Township Orlando, Township GP Fund II, Against Steven Ivankovich)**

64.    Plaintiffs hereby incorporate the foregoing allegations as though set forth in full.

65.    The Guaranty Agreement constitutes a valid and enforceable written guaranty

1 | between Plaintiff Township Orland and Defendant Steven Ivankovich.

2 | 66.    Township Orlando has at all times performed all duties and obligations required of

3 | it under the Guaranty Agreement, other than those obligations that are legally excused.

4 | 67.    Steven Ivankovich initially breached the Guaranty Agreement insofar as he has failed

5 | to pay Township Orlando the $4,500,000 purchase price due and owing following default by the

6 | Managing Member under Section 5 of the Economic Interest Agreement.

7 | 68.    As a direct, foreseeable, and proximate result of Guarantor's breaches of the

8 | Guaranty, Township Orlando has been damaged in an amount to be proven at trial.

9 | **THIRD CAUSE OF ACTION**

10 | **(For Breach of Written Contract [Fee Reimbursement Agreement] By Township, Township**

11 | **Orlando, Township GP Fund II,   Against Atlas P2, Atlas Residential and Doe Defendants)**

12 | 69.    Plaintiffs hereby incorporate the foregoing allegations as though set forth in full.

13 | 70.    The Fee Reimbursement Agreement constitutes a valid and enforceable written

14 | guaranty between Township and Atlas P2.

15 | 71.    Township has at all times performed all duties and obligations required of it under

16 | the Fee Reimbursement Agreement, other than those obligations that are legally excused.

17 | 72.    Atlas P2 and Atlas Residential breached the Fee Reimbursement Agreement by

18 | failing to reimburse Township for the legal fees it incurred in connection with the transaction

19 | underlying the Economic Interest Agreement.

20 | 73.    As a direct, foreseeable, and proximate result of Atlas P2's and Atlas Residential's

21 | breaches of the Fee Reimbursement Agreement, Township has been damaged in an amount to be

22 | proven at trial .

23 | **FOURTH CAUSE OF ACTION**

24 | **(For Breach of Written Contract [Settlement Agreement] By Township, Township Orlando,**

25 | **Township GP Fund II,  Against Atlas, Consilient, Atlas P2, Atlas Residential, and Steven**

26 | **and Doe Defendants)**

27 | 74.    Plaintiffs hereby incorporate the foregoing allegations as though set forth in full.

28 | 75.    The Settlement Agreement constitutes a valid and enforceable written contract

1 | between Plaintiffs and Defendants Atlas, Consilient, Atlas P2, Atlas Residential, and Steven
2 | Ivankovich.

3 | 76. Plaintiffs at all times performed all duties and obligations required of it under the
4 | Settlement Agreement, other than those obligations that are legally excused.

5 | 77. Defendants breached the Settlement Agreement by, among other things, failing to
6 | execute the required documents per the Settlement Agreement and to distribute the amounts due and
7 | owing to Township Orlando and Township GP Fund II from the approximately $270 million sale of
8 | the Apartment Projects (despite Defendants having affirmed Township Orlando and Township
9 | Fund's Interest in the Settlement Agreement).

10 | 78. As a direct, foreseeable, and proximate result of Defendants' breaches, as
11 | hereinabove alleged, Township Orlando has been damaged in an amount to be proven at trial but in
12 | no event less than $8,424,000.

13 | **FIFTH CAUSE OF ACTION**

14 | **(For Conversion By Township, Township Orlando, Township GP Fund II,  Against Atlas,**
15 | **Consilient, Atlas P2, Steven, Anthony, and Doe Defendants)**

16 | 79. Plaintiffs hereby incorporate the foregoing allegations as though set forth in full.

17 | 80. Pursuant to the terms of the Economic Interest Agreement, and the Settlement
18 | Agreement, Township Orlando is entitled to a share of the proceeds of the sale of the Projects.
19 | However, to date, no portion of the sale proceeds have been distributed to Township Orlando.

20 | 81. Township Orlando is informed and believes that Defendants Atlas, Consilient, Atlas
21 | P2 (including through its subsidiaries), Anthony, and Steven have exercised dominion over, taken,
22 | and/or made unauthorized claims to at least $54 million of the sale proceeds, and have failed to turn
23 | over to Township Orlando and Township GP Fund II the amounts due and owing to it.

24 | 82. Defendants Atlas, Consilient, Atlas P2, Anthony, and Steven did these acts
25 | knowingly and intentionally.

26 | 83. Defendants Atlas, Consilient, Atlas P2, Anthony, and Steven did not have ownership,
27 | title or interest in or to, or the contractual right to receive and retain the entire portion of sale
28 | proceeds without distributing to Township Orlando and Township GP Fund II the amounts due and

1  owing to it.

2     84.    As a direct and proximate result of Defendants' conversion, Plaintiffs have suffered

3  damages in an amount to be proven at trial, but in no event less than $8,424,000.

4     85.    Defendants Atlas, Consilient, Atlas P2, Anthony, and Steven, by engaging in the

5  conduct alleged herein, have acted intentionally, willfully and maliciously, and in conscious

6  disregard of Township Orlando and Township GP Fund II's rights and interests, and with the

7  purpose of injury and depriving Township Orlando and Township GP Fund II  of its rights. As a

8  result, Township Orlando and Township GP Fund II are entitled to an award of exemplary or

9  punitive damages, in an amount sufficient to punish Defendants and deter future misconduct.

10              **SIXTH CAUSE OF ACTION**

11  **(For Breach of Fiduciary Duty By Township, Township Orlando, and Township GP Fund II,**

12              **Against Atlas, Consilient, Atlas P2, Steven and Doe Defendants)**

13     86.    Plaintiffs hereby incorporate the foregoing allegations as though set forth in full.

14     87.    In the Settlement Agreement, Defendants acknowledged the fiduciary duties they

15  owe to Plaintiffs, including in connection with Township Orlando's equity Interest. See Ex. C at ¶¶

16  5-6.

17     88.    Defendants have breached their fiduciary duties to Plaintiffs by failing to honor

18  Plaintiffs' Interest, including without limitation by failing to distribute to Plaintiffs their rightful

19  share of the sale proceeds of the Apartment Projects. Instead, on information and belief, Defendants

20  (including through subsidiaries) have engaged in self-dealing and have failed to exercise care in

21  connection with their duties, by receiving and retaining amounts of at least $54 million without

22  paying any portion of said funds to Plaintiffs.

23     89.    Defendants Steven Ivankovich and Atlas have further breached their fiduciary duties

24  by failing to provide Plaintiffs Township Orlando and Township GP Fund II with Schedule K-1 IRS

25  statements since 2020, despite acknowledging that Plaintiffs are entitled to them.

26     90.    As a result of Defendants' breaches of their fiduciary duties, Township Orlando and

27  Township GP Fund II has been damaged in an amount to be proven at trial but in no event less than

28  $8,424,000.

**SEVENTH CAUSE OF ACTION**

**(For Accounting By Township, Township Orlando,  Township GP Fund II,  Against Atlas,**

**Consilient, Atlas P2, Steven, Anthony, and Doe Defendants)**

91.     Plaintiffs hereby incorporate the foregoing allegations as though set forth in full.

92.     A relationship exists between Township Orlando, Township GP Fund II, and Defendants Atlas, Consilient, Atlas P2 and Steven that requires an accounting, namely, the Economic Interest Agreement and the Settlement Agreement by which Defendants affirmed Township Orlando and Township GP Fund II's equity Interest in Atlas P2, the entity that indirectly owned the Apartment Projects.

93.     As a result of the sale of the Apartment Projects and distribution of at least $54 million of sale proceeds to subsidiaries of Atlas P2, some balance is due to Township Orlando and Township GP Fund II, which can only be ascertained by an accounting.

94.     Defendants have failed to distribute any amount of the sale proceeds to Township Orlando, and Township GP Fund II, and have failed to provide Township Orlando and Township GP Fund II with any accounting of amounts Defendants have received or amounts owed to Township Orlando and Township GP Fund II. Therefore, Township Orlando and Township GF Fund II seek and are entitled to an accounting from Defendants.

**EIGHTH CAUSE OF ACTION**

**(Fraud – Intentional Misrepresentation) By Township, Township Orlando, and Township**

**GP Fund II  Against Atlas, Consilient, Atlas P2, Steven Ivankovich, and Doe Defendants)**

95.     Plaintiffs hereby incorporate the foregoing allegations as though set forth in full.

96.     Defendant Steven through a series of misrepresentations has stolen at a minimum $4,00,000 from Plaintiffs.

97.     By way of the Economic Interest Agreement, Steven misrepresented to Plaintiffs that in exchange for their investment of $4,000,000 they would have the option to receive one of the following economic benefits: 1) equity in the form of membership in Atlas P2 which indirectly held title to the Apartment Projects or 2) a sale option, exercisable by written notice to effectuate the repurchase of its interest for $4,500,000.

98.    Plaintiffs initially elected to effectuate the sale option and thereby receive $4,500,000.

99.    In response, Steven Ivankovich employed a series of deceptive excuses as to why he would not honor the sale option that he initially agreed in writing to personally guarantee.

100.    In denying Plaintiffs' right to exercise the sale option, Steven Ivankovich misrepresented under oath that Plaintiffs would instead be entitled to equity in the Apartment Projects, and specifically stated that Plaintiffs would receive proceeds from the sale of the Apartment Projects in accordance with the terms of the Economic Interest Agreement.

101.    Steven further misrepresented under the penalty of perjury to Plaintiffs in his declaration in support of Defendants Opposition to Plaintiffs' Motion for Summary Judgement, on May 4, 2020, that the equity conversion described in the Economic Interest Agreement took place in June of 2017. Steven at this time maintained this position to bolster the proposition that Plaintiffs were not entitled to exercise the $4,500,000 sale option, because instead they had received their equity in the Apartment Projects via Atlas P2.

102.    Finally, Steven further perpetuated this fraud by inducing Plaintiffs to enter into the binding Settlement Agreement with him and the other Atlas Parties on July 23, 2020, and thereby luring Plaintiffs into a false sense of security before Steven caused the sale of the Apartment Projects without informing Plaintiffs. Steven, a signatory of the Settlement Agreement, deceived Plaintiffs by misrepresenting that he would in pertinent part abide by the following terms:

    a.    That Township Orlando and Township GP Fund II, as of and since June 7, 2017 (the "Conversion Date"), owned and maintained a direct equity interest in Atlas P2 (which indirectly owned the Apartment Projects), which Plaintiffs acquired under the terms of the Economic Interest Agreement.

    b.    Defendants would provide all documentation necessary to demonstrate the existence and legitimacy of Plaintiffs' interest in the Apartment Projects.

    c.    Defendants have fiduciary duties to Plaintiffs.

    d.    Defendants will not represent to any person or entity that Plaintiffs do not own the interest.

103.    The above-mentioned representations by Steven Ivankovich in paragraph 97-102 were false. Defendants have failed to distribute any proceeds from the sale of the Apartment Projects to Plaintiffs despite the fact that the Apartment Projects were sold for a substantial profit. Defendants have stated in their written discovery responses under the penalty of perjury that, "Steven Ivankovic made the decision that no distribution of net sale proceeds was due or should be made to Township." Furthermore, Defendants in breach of the Settlement Agreement, do not acknowledge Plaintiffs interest in Atlas P2, and therefore indirectly the Apartment Projects.

104.    Steven Ivankovich knew that the above-mentioned representations in paragraph 97-102 were false when he made them.

105.    Steven Ivankovich made the above-mentioned representations in paragraph 97-102 recklessly and without regard for its truth.

106.    Steven Ivankovich intended that Plaintiffs rely on the above-mentioned representations in paragraphs 97-102.

107.    Plaintiffs reasonably relied on Steven Ivankovich's representations, mentioned above in paragraphs 97-102.

108.    Plaintiffs were harmed by Steven Ivankovich's representations mentioned above in paragraph 97-102, and Plaintiffs' reliance on those representations was a substantial factor in causing Plaintiffs' harm. As a result, Plaintiffs suffered damages in an amount to be proven at trial but in no event less than $8,424,000.

109.    Steven Ivankovich acted with malice, oppression, and fraud, therefore Plaintiffs are entitled to the maximum amount of punitive damages under the law against him.

## NINTH CAUSE OF ACTION

**(For Negligent Representation By Township Capital, LLC, Township Orlando, and Township GP Fund II  Against Atlas, Consilient, Atlas P2, Steven Ivankovich, and Doe Defendants)**

110.    Plaintiffs hereby incorporate the foregoing allegations as though set forth in full.

111.    Defendant Steven Ivankovich represented that the facts alleged in paragraphs 97-102 were true.

112.   As mentioned above, the representations made by Steven Ivankovich in paragraphs 97-102  above were not true.

113.   Although Steven Ivankovich may have honestly believed that the above-mentioned representations in paragraph 97-102 were true, he had no reasonable grounds for believe them to be true when he made them.

114.   Plaintiffs reasonably relied on the representations alleged in paragraphs 97-102 of this complaint, and as result of their reliance was harmed.

115.   Plaintiffs' reliance on the representations alleged in paragraphs 97-102 of this complaint were a substantial factor in causing Plaintiffs' harm. As a result, Plaintiffs suffered damages in an amount to be proven at trial but in no event less than $8,424,000.

## TENTH CAUSE OF ACTION

**(For Aiding and Abetting Fraud, Conversion, and Breach of Contract By Township Capital, LLC, Township Orlando, and Township GP Fund II Against Anthony Ivankovich and Doe Defendants)**

116.   Plaintiffs hereby incorporate the foregoing allegations as though set forth in full.

117.   Anthony Ivankovich, knew that fraud, conversion, and breach of contract was being committed by Steven Ivankovich against Plaintiffs.

118.   Anthony Ivankovich gave substantial assistance and encouragement to Steven Ivankovich to commit the wrongful and fraudulent acts mentioned in this complaint, with the specific intention to facilitate Steven Ivankovich's wrongful conduct because it benefited him financially. Defendant Consilient stated under the penalty of perjury in their written discovery responses in this case that, "the 100% membership ownership by Anthony Ivankovich alleges it is entitled to 100% of the net sales proceeds."

119.   Defendants have stated in their verified written discovery responses in this case that Anthony Ivankovich has knowledge on how the proceeds of the Apartment Projects were calculated and distributed and that he participated in the decision as to where to direct the proceeds from the sale of the Apartment Projects.

120.   Defendants have stated in their verified written discovery responses in this case that

1    Anthony Ivankovic is the beneficial owner of the bank account of Ivankovich Family LLC, which

2    is where the proceeds from the sale of the Apartment Projects is maintained.

3        121.    Anthony Ivankovich's conduct was a substantial factor in causing harm to Plaintiffs.

4    As a result, Plaintiffs suffered damages in an amount to be proven at trial but in no event less than

5    $8,424,000.

6        122.    Anthony Ivankovich in connection with assisting and encouraging Steven

7    Ivankovich's fraud has wrongfully taken millions of dollars that rightfully belong to Plaintiffs.

8                            **ELEVENTH CAUSE OF ACTION**

9        **(For Common Count: Money had and Received By Township Capital, LLC, Township**

10        **Orlando, and Township GP Fund II Against all Defendants and Doe Defendants)**

11        123.    Plaintiffs hereby incorporate the foregoing allegations as though set forth in full.

12        124.    Defendants received money in the amount of $4,000,000 that was intended to be used

13    for the benefit of Plaintiffs Township, Township Orlando, and Township GP Fund II.

14        125.    The money was not used for the benefit of Plaintiffs Township, Township Orlando,

15    and Township GP Fund II.

16        126.    Defendants refuse to return the $4,000,000 mentioned in the preceding paragraphs to

17    Plaintiffs Township, Township Orlando, and Township GP Fund II.

18                            **TWELFTH CAUSE OF ACTION**

19        **(For Breach of Implied Covenant of Good Faith and Fair Dealing By Township Capital,**

20        **LLC, Township Orlando, and Township GP Fund II Against Steven Ivankovich, Atlas,**

21                **Consilient, Atlas P2, Atlas Residential and Doe Defendants)**

22        127.    Plaintiffs hereby incorporate the foregoing allegations as though set forth in full.

23        128.    Plaintiffs and Defendants Steven Ivankovich, Atlas, Consilient, Atlas P2, and Atlas

24    Residential on or about July 12, 2020 entered into the binding Settlement Agreement.

25        129.    Plaintiffs did all, or substantially all of the significant things that the contract required

26    them to do except for those things that they were excused from having to do based on the conduct

27    of Defendants Steven Ivankovich, Atlas, Consilient, Atlas P2, and Atlas Residential.

28        130.    All conditions required for the performance of Defendants Steven Ivankovich, Atlas,

Consilient, Atlas P2, and Atlas Residential had occurred.

131.    Defendants Steven Ivankovich, Atlas, Consilient, Atlas P2, and Atlas Residential breached the implied covenant of good faith and fair dealing because they failed to adhere to the Settlement Agreement which required them amongst other things, to execute and provide to Plaintiffs the documentation necessary to demonstrate Plaintiffs' equity interest in Atlas P2, which indirectly owned the Apartment Projects.

132.    The Apartment Projects were sold in December of 2021, prior to Defendants Steven Ivankovich, Atlas, Consilient, Atlas P2, and Atlas Residential executing the documents mentioned above in paragraph 131.

133.    Steven Ivankovich, the managing member of all the aforementioned entities, wrongfully, fraudulently, and in bad faith failed to distribute any of the proceeds from the sale of the Apartment Projects to Plaintiffs, despite acknowledging in the Settlement Agreement that Plaintiffs acquired a direct equity interest in Atlas P2 pursuant to their investment of $4,000,000 under the terms of the Economic Interest Agreement.

134.    The conduct of Defendants Steven Ivankovich, Atlas, Consilient, Atlas P2, and Atlas Residential mentioned above in paragraphs 131-133 prevented plaintiff from receiving the benefits they bargained for under the Settlement Agreement, which includes their rightful share of the sale proceeds of the Apartment Projects and an accounting of the sale proceeds of the Apartment Projects.

135.    That by taking the actions mentioned above in paragraphs 131-133, Defendants Steven Ivankovich, Atlas, Consilient, Atlas P2, and Atlas Residential did not act fairly and in good faith.

136.    Plaintiffs were harmed by the conduct of Defendants Steven Ivankovich, Atlas, Consilient, Atlas P2, and Atlas Residential mentioned above in paragraphs 131-133. As a result, Plaintiffs suffered damages in an amount to be proven at trial but in no event less than $8,424.00.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

1.   For monetary damages according to proof at time of trial; but in no event less than $8,424,000;

2.   For punitive damages in the maximum amount permitted by law;

3.   For an accounting;

4.   For pre-judgment and post-judgment interest at the legal rate;

5.   For costs of suits;

6.   For attorneys' fees; and

7.   For all other and further relief that the Court deems just and proper.

DATED: June 20, 2024                    SKLAR KIRSH, LLP

By: _____
Jerry L. Kay
David M. Safvati
Attorneys for Plaintiffs Township Orlando LLC
Township GP Fund II, LP, and Township Capital, LLC

**EXHIBIT A**

EXECUTION VERSION

## GRANT OF ECONOMIC INTEREST AGREEMENT

This GRANT OF ECONOMIC INTEREST AGREEMENT (this "**Agreement**"), dated as of September **12**, 2016 (the "**Effective Date**"), is entered into by and among Atlas Holdings Investments LLC, a Delaware limited liability company (the "**Company**"), Consilient Holdings Investments, LLC, a Delaware limited liability company ("**Managing Member**"), and Township Orlando LLC, a Delaware limited liability company ("**Holder**"). The Company, Managing Member, Holder, Steven Ivankovich ("**Ivankovich**") (in his limited capacity as a joinder party hereto) and Atlas P2 Managing Member, LLC, a Delaware limited liability company ("**Atlas P2**") (in its limited capacity as a joinder party hereto) are each a "**Party**" and, collectively, the "**Parties**".

## RECITALS

A.     Managing Member is the only Member of the Company. Managing Member is the managing member of the Company.

B.     The Company, acting through the Subsidiaries, indirectly owns the two apartment projects set forth on <u>Schedule 1</u> (the "**Projects**"). Holder seeks to acquire an economic interest in the Company, but not become a member of the Company or a sponsor, owner, management agent, operator or participant of or in the Projects. The Managing Member is prepared to sell and grant such economic interest in the Company to Holder pursuant to this Agreement (such economic interest, as more fully described in this Agreement, being the "**Economic Interest**"), and the Company is prepared to agree to such sale and grant of the Economic Interest to Holder.

C.     The proceeds received by Managing Member from Holder in return for the sale and grant of the Economic Interest will be contributed to the Company and will constitute a portion of the capital of the Company. The Company will contribute the proceeds received from the sale and grant of the Economic Interest as a capital contribution to Atlas P2, which will contribute the proceeds to P2 Portfolio Managing Member, LLC, a Delaware limited liability company ("**P2 Portfolio**"), which will contribute the proceeds to P2 Portfolio Investor Member, LLC, a Delaware limited liability company ("**Holdco**"), which will contribute the proceeds to Premiere Orlando Portfolio Two, LLC, a Delaware limited liability company ("**Premiere**"), which will contribute the proceeds to AAPV Member, LLC, a Delaware limited liability company ("**AAPV Member**") and ACL Member, LLC, a Delaware limited liability company ("**ACL Member**"), which will contribute the proceeds to Atlas Alexandria & Parc Vue, LLC, a Delaware limited liability company ("**AAPV Owner**") and from ACL Member to Atlas Crowntree Lakes, LLC, a Delaware limited liability company ("**ACL Owner**"), as applicable.

D.     This Agreement and the sale and grant of the Economic Interest do not, under the law of the State of Delaware, including the Delaware Limited Liability Company Act, constitute the Holder as a member, partner or manager of the Company, constitute the Company as a partnership or constitute Holder and Managing Member as partners in the Company, but the Economic Interest does provide Holder with an interest in the capital, gains, profits, and losses of the Company as herein provided and the Parties agree that, solely for federal, state and local tax purposes, this Agreement and the Economic Interest provide Holder with an interest in the

capital, gains, profits, losses, deductions, and credits of the Company and constitute Holder and Managing Member as partners in the Company.

  E.  The Parties desire to memorialize the sale and grant of the Economic Interest to Holder in this Agreement and the manner in which distributions and tax allocations of the Company will be made to Managing Member and Holder.

<u>**AGREEMENT**</u>

  NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth (the receipt and sufficiency of which are hereby acknowledged by all Parties to this Agreement), the Parties to this Agreement hereby agree as follows (with the Recitals and <u>Exhibit A</u> being an integral part of this Agreement):

  1.  <u>**Definitions**</u>.

   "**Affiliate**" means, with respect to any Person, any other Person that directly or indirectly Controls, is Controlled by or is under common Control with the Person in question.

   "**Atlas P2 LLC Agreement**" means the limited liability company agreement of Atlas P2, as amended.

   "**Available Cash**" means all cash, cash equivalents, or deposits derived from the Projects or any of the Subsidiaries and held by the Company, less reasonable reserves as determined by the unanimous consent of Managing Member and Holder.

   "**Control**" means, with respect to any Person, having possession of the power to direct or cause the direction of the management and policies of that Person, whether through the ownership of voting securities, by contract, or otherwise.

   "**Guaranties**" means the guaranties (including the "bad boy" guaranty and the environmental indemnity agreement) delivered in connection with the Senior Loan.

   "**IRR**" means the internal rate of return calculated on the timing and amount of all capital contributions made by the Holder to the Company and the distributions received by the Holder from the Company (treating the proceeds of the purchase of the Economic Interest as a capital contribution by Holder to the Company on the date hereof). Such internal rate of return is the discount rate that makes the net present value of such cash flows equal to zero. In determining such internal rate of return, the following shall apply: (a) such internal rate of return calculation shall be applied to quarterly cash flow periods; and (b) such internal rate of return shall be calculated using the XIRR function of the Microsoft Excel program (or its functional equivalent).

   "**LLC Agreement**" means the limited liability company agreement of the Company, as amended.

   "**Loan Documents**" means the documents governing the terms of the Senior Loan.

"**Person**" means any individual, corporation, partnership, limited liability company, joint venture, trust, unincorporated organization or government or any agency or political subdivision thereof.

"**PropCos**" means AAPV Owner and ACL Owner.

"**Senior Loan**" means, individually and collectively, the first mortgage loans provided by several financial institutions to the PropCos, as amended, refinanced, superseded or replaced.

"**Sharing Percentages**" means 15.6388% with respect to Holder and 84.3612% with respect to Managing Member.

"**Subsidiaries**" means Atlas P2, P2 Portfolio, HoldCo, Premiere, AAPV Member, ACL Member, AAPV Owner and ACL Owner.

"**Tax Partner**" means each of Holder, the Company, and Ivankovich.

2.    **Sale and Grant of Economic Interest**.    Managing Member hereby sells and grants to Holder an undivided, beneficial, economic ownership interest in the capital, profits, gains and losses of the Company on the terms set forth in this Agreement (the "**Economic Interest**").    In consideration for the issuance, sale and grant of the Economic Interest to Holder by the Company, Holder agrees to pay to Managing Member on the Effective Date a purchase price of $4,000,000.00. The Company hereby consents to the issuance, sale and grant of the Economic Interest by the Company to Holder.

3.    **Distributions.**  (a)  Notwithstanding the Atlas P2 LLC Agreement, the Company and Ivankovich hereby agree that all Available Cash of Atlas P2 shall be distributed within three (3) business days of the receipt thereof by the Atlas P2 to the Company.  Atlas P2 has executed this Agreement as a joinder party for the purpose of acknowledging the foregoing sentence.

(b)    Notwithstanding the LLC Agreement, all Available Cash of the Company must be distributed within three (3) business days of the receipt thereof by the Company to Holder and Managing Member in the following order of priority:

(i)    First, to Holder and Managing Member in accordance with their Sharing Percentages until Holder has received a 8% IRR;

(ii)    Second, twenty-five percent (25%) to Holder and seventy-five percent (75%) to Holder and Managing Member in accordance with their Sharing Percentages until the Holder has received a 10% IRR;

(iii)    Third, thirty percent (30%) to Holder and seventy percent (70%) to Holder and Managing Member in accordance with their Sharing Percentages until the Holder has received a 15% IRR;

(iv)     Fourth, thirty-five percent (35%) to Holder and sixty-five percent (65%) to Holder and Managing Member in accordance with their Sharing Percentages until the Holder has received a 20% IRR;

(v)      Fifth, forty percent (40%) to Holder and sixty percent (60%) to Holder and Managing Member in accordance with their Sharing Percentages.

4.      **Tax Allocations**.  All of the provisions of <u>Exhibit A</u> are incorporated herein and shall constitute part of this Agreement.  <u>Exhibit A</u> provides, among other matters, for the establishment and maintenance of the capital accounts and the allocation of profits and losses in connection with Atlas P2.  The Parties intend Atlas P2 to be classified and treated as a partnership in which the Company, Ivankovich and the Holder are treated as partners solely for federal, state and local income tax purposes.  Notwithstanding the terms of the LLC Agreement, the Parties acknowledge and agree that, for Federal and state income tax purposes, Holder shall be allocated taxable income and loss and receive form K-1s from Atlas P2, with such tax allocations being made as provided in <u>Exhibit A</u>. To the extent of any conflict or inconsistency among the terms of <u>Exhibit A</u>, the Atlas P2 LLC Agreement, and the LLC Agreement, the provisions of <u>Exhibit A</u> control.

5.      **Conversion of Economic Interest**.  Within forty-five (45) days of the date hereof (the "**Documentation Period**"), the Economic Interest shall be converted into an equity investment in the amount of $4,000,000.00 in a to-be-formed joint venture entity (the "**Joint Venture**") that will own a one hundred percent (100%) direct equity interest in Atlas P2 (the "**Equity Conversion**").  The material terms of the Equity Conversion, which will be documented in the operating agreement of the Joint Venture, are set forth in that certain Letter of Intent for Joint Venture Investment attached hereto as <u>Exhibit B</u> (the "**Term Sheet**") and, to the extent not inconsistent with the Term Sheet, in this Agreement. Managing Member and Holder hereby agree to reasonably cooperate with each other to negotiate and document the Equity Conversion, including, without limitation, the operating agreement of the Joint Venture, in accordance with the Term Sheet.  Managing Member and Holder acknowledge and agree that the Joint Venture and the Equity Conversion shall be documented and structured in a manner that will comply with the requirements and restrictions (including, without limitation, the transfer restrictions) of the Senior Loan and/or any preferred equity investment in any Subsidiary.  In the event that the Equity Conversion is not consummated in a form acceptable to Holder prior to the expiration of the Documentation Period, so long as Holder has negotiated in good faith toward the consummation of the Equity Conversion, Holder will have the option, exercisable by written notice to the Managing Member, to sell (and upon the exercise of such option, the Company or the Managing Member shall purchase, within thirty (30) days after such notice of exercise is delivered) the Economic Interest to the Company or the Managing Member for an amount in immediately available funds equal to $4,500,000.00, and, upon such payment, this Agreement shall automatically and immediately terminate and shall be of no further force and effect. Ivankovich has executed this Agreement as a joinder party for the purpose of guarantying the payment of the payment obligation of Managing Member set forth in the immediately preceding sentence, as a primary obligor.

6. **Member, Ivankovich, and Company Covenants and Representations.** Managing Member, Ivankovich, and the Company agree as follows:

(a) None of Managing Member, Ivankovich, or the Company will, or will permit, any of the following with respect to any of the Company or any Subsidiary without the consent of the Holder:

(i) any amendment or change to the certificate of formation, limited liability company or operating agreement, or any other governing document of such entity;

(ii) the admission of any person as a member of such entity; and

(iii) the grant or issuance of any membership interest, economic interest, right to share in any profits or distributions, or any right, warrant, or option to acquire any of the foregoing in any such entity.

(b) None of Managing Member, Ivankovich, or the Company will, or will permit, any transfer of a direct or indirect interest in the Company without the consent of Holder.

(c) Any decision, consent, approval, or action that the Company, Ivankovich, or Managing Member may take or provide may only be taken or given with the prior written consent of the Holder.

(d) Each of Managing Member, Ivankovich, and the Company agrees to promptly provide Holder with a copy of any notice received with respect to or pursuant to any of the governing documents of any Subsidiary or the Company, any of the Loan Documents, or the Projects.

(e) Each of Managing Member, Ivankovich, and the Company will cause Holder to be copied as a notice party to the same extent as any of Managing Member, Ivankovich, the Company, or any of their Affiliates would be pursuant to any of the governing documents of any Subsidiary or the Company, any of the Loan Documents, or the Projects.

(f) Each of Managing Member, Ivankovich, and the Company will cause each and every Subsidiary to distribute any and all amounts permitted under the applicable governing documents of such entities and the Loan Documents in the maximum amount so permitted and at the earliest time so permitted, unless otherwise agreed in writing by Holder.

(g) Each of Managing Member, Ivankovich, and the Company agrees to indemnify, defend and hold harmless Holder from any losses incurred by Holder (i) in the event of any liability of a guarantor accrues under, or any recourse is sought from a guarantor pursuant to, the Guaranties or any of them, (ii) as a result of a breach, of or default under, any of the Loan Documents by any of the Company, Ivankovich, any Subsidiary, or any of their Affiliates, (iii) as a result of a breach of, or default under (including any event resulting in the reduction or termination of the Company's direct or indirect ownership interest or control rights in Premier), the governing documents of Premier by any of the Company, Ivankovich, any Subsidiary, or any of their Affiliates, or (iv) arising out of or related to any asset or activity of the Company,

Managing Member, or Ivankovich other than the investment in Project and Subsidiaries.

(h)     Each of Managing Member, Ivankovich, and the Company hereby makes, to and for the benefit of the Holder, all representations and warranties set forth in the Loan Documents and the governing documents of Premier (to the extent applicable to such Member, the Company and the Projects) as if such representations were set forth fully herein.

7.     **Membership.**  Holder acknowledges that the grant of the Economic Interest under this Agreement (i) does not constitute the Holder a member of the Company or give Holder any of the rights of a member of the Company, (ii) does not make the Holder a partner or joint venturer with the Company or the Managing Member and (iii) subject to the provisions of Section 7 below, does not grant the Holder any voting rights or other rights as a member under the LLC Agreement.  The Economic Interest granted hereunder is only a right to receive allocations and distributions as an assignee of an economic interest in the capital and future profits of the Company to the extent provided in this Agreement (but not as a member of the Company) and subject to the provisions of Section 7 below, shall under no circumstances be deemed to in any way confer on Holder any of the other rights of a member of, or any other interest as a holder of a partnership or creditor interest or any other interest in, the Company or any of its Affiliates, including voting rights, inspection rights, economic rights and the like under state law or otherwise.

8.     **Miscellaneous.**

(a)     **Coordination.** In the case of any conflict or inconsistency between the LLC Agreement and this Agreement, the terms of this Agreement will control.

(b)     **Information Rights.** Upon written request from Holder, the Company and Atlas P2 agree to promptly make all books and records of the Company and all Subsidiaries available to Holder and holder's advisors for review at a time and place reasonably accessible by Holder.

(c)     **Notices.**  All notices and demands required or permitted under this Agreement shall be in writing and shall be deemed given to a Party if and when done in any of the following manners: (i) when delivered by hand to such party, or (ii) on the third day after proper and timely deposit for immediate delivery, fees prepaid, with an internationally recognized delivery service providing air courier service to the location of the recipient.  All notices and demands to be sent to a Party shall be sent to the addresses indicated below:

If to Holder:

Benjamin Poirier
TownshipCapital
9229 W. Sunset Blvd
Suite 310
Los Angeles, CA 90069
Tel: (310) 742-2240
bpoirier@townshipinc.com

with a copy to:

Liner LLP
1100 Glendon Ave., 14th Floor
Los Angeles, CA 90024
Attn: Mitchell Regenstreif
Tel: (310) 500-3570
mregenstreif@linerlaw.com

If to the Company or Managing Member:

Atlas P2 Managing Member, LLC
55 East Monroe Street
Suite 3610
Chicago, IL 60603
Attention: Steven Ivankovich
Tel: (312) 315-4826
Fax: (312) 276-4172
E-mail: steven.ivankovich@atlasresidentialusa.com

with a copy to:

DLA Piper LLP (US)
1251 Avenue of the Americas
27th Floor
New York, New York 10020-1104
Attention: David Broderick
Tel: (212) 335-4505
Fax: (917) 778-8845
E-mail: David.Broderick@dlapiper.com

A Party may specify a different address, or fax number by notifying the other Parties in the manner provided in this Section 8(b).

(d)    **Waiver of Jury Trial; Governing Law and Venue.**

(i)    THE PARTIES HERETO WAIVE TO THE FULLEST EXTENT PERMITTED BY LAW ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT OR PROCEEDING BROUGHT TO ENFORCE OR DEFEND ANY RIGHTS OR REMEDIES UNDER THIS AGREEMENT OR ANY DOCUMENTS RELATED HERETO.

(ii)    THE PARTIES AGREE THAT THIS AGREEMENT WILL BE GOVERNED AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE WITHOUT GIVING EFFECT TO CHOICE OF LAW DOCTRINES.  ANY JUDICIAL PROCEEDING BROUGHT REGARDING ANY DISPUTE ARISING OUT OF THIS AGREEMENT OR ANY MATTER RELATED HERETO MAY BE BROUGHT IN THE

STATE OR FEDERAL COURTS LOCATED IN NEW CASTLE COUNTY, DELAWARE AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, THE PARTIES ACCEPT THE JURISDICTION OF SUCH COURTS.  THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY OBJECTION TO THE LAYING OF VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT AND ANY CLAIM THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(e) **No Right to Partition or Cause Dissolution.**  Holder, on behalf of itself and its successors and assigns, if any, hereby specifically renounces, waives and forfeits all rights, whether arising under contract or statute or by operation of law, to seek, bring or maintain any action in any court of law or equity for voluntary dissolution or for partition of the Company, or any of its assets, or any interest which is considered to be its property, regardless of the manner in which title to any such property may be held.

(f) **Entire Agreement.**  Holder and the Company hereby agree that this Agreement, together with the attached schedules and exhibits, contains the entire agreement and understanding between the Company and Holder with respect to the sale and grant of the Economic Interest to Holder and supersedes any prior or contemporaneous drafts, term sheets, written or oral agreements, representations and warranties between them respecting the subject matter hereof.

(g) **Amendment.**  This Agreement may be amended only by a writing signed by duly authorized representatives of each Party hereto.

(h) **Severability.**  If any term, provision, covenant or condition of this Agreement, or the application thereof to any Person, place or circumstance, shall be held to be invalid, unenforceable or void, the remainder of this Agreement and such term, provision, covenant or condition as applied to other Persons, places and circumstances shall remain in full force and effect.

(i) **Construction.**  Every covenant, term, and provision of this Agreement shall be construed simply according to its fair meaning and not strictly for or against any Party (notwithstanding any rule of law requiring an agreement to be strictly construed against the drafting Party), it being understood that the Parties to this Agreement are sophisticated and have had adequate opportunity and means to retain counsel to represent their interests.  Whenever the words "including", "include" or "includes" are used in this Agreement, they should be interpreted in a non-exclusive manner as though the words, "without limitation," immediately followed the same.  Whenever the word "or" is used in this Agreement, it shall be interpreted as non-exclusive in the same manner as "and/or."  Unless otherwise specified in this Agreement, all subsection and Section references in this Agreement refer to subsections and Sections of this Agreement.  Captions in this Agreement are for convenience only and should not be used in interpreting this Agreement.  No presumption shall operate against any Party by reason of this Agreement (or any provision herein) having been drafted under its direction by its attorney, it being understood that each Party has participated in the drafting of this Agreement.

(j) **Rights Cumulative.**  The rights and remedies provided by this Agreement

are cumulative, and the exercise of any right or remedy by any Party hereto (or by its successor), whether pursuant to this Agreement, to any other agreement, or to law, shall not preclude or waive its right to exercise any or all other rights and remedies. Any failure of Holder to take any action (or to refrain from taking any action) as specified herein, or any breach of any representation, covenant, warranty, acknowledgement, or waiver by Holder shall be deemed to be a material breach of this Agreement by Holder, and the Company shall be entitled to exercise any and all remedies available under this Agreement and at law and equity as a result thereof.

(k)    **Non-waiver.**  No failure or neglect of any Party hereto in any instance to exercise any right, power or privilege hereunder or under law shall constitute a waiver of any other right, power or privilege or of the same right, power or privilege in any other instance. All waivers by any Party hereto must be contained in a written instrument signed by the Party to be charged.

(l)    **Counterparts.**  This Agreement may be executed in any number of counterparts and all of such counterparts shall for all purposes constitute one Agreement binding on the Parties hereto, notwithstanding that all Parties are not signatory to the same counterpart. This Agreement, the agreements referred to herein, and each other agreement or instrument entered into in connection herewith or therewith or contemplated hereby or thereby, and any amendments hereto or thereto, to the extent signed and delivered by means of a facsimile machine or electronic transmission in portable document format, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.

(m)    **No Consequential Damages.**  Notwithstanding anything herein to the contrary, in no event shall any Party be liable for special, consequential or punitive damages.

(n)    **No Third Party Beneficiaries.**  No Person is intended to be, or shall be, a third party beneficiary of this Agreement.  None of the provisions of this Agreement shall be for the benefit of or enforceable by any of the creditors of Holder, the Company or of the Managing Member.

(o)    **Brokers.**  Managing Member nor any of their respective Affiliates has dealt with any Person who is entitled to a broker's commission, finder's fee, investment banker's fee or similar payment from any Party for arranging the investment in the Economic Interest.


**[SIGNATURES ARE ON THE FOLLOWING PAGE]**

**IN WITNESS WHEREOF**, the parties hereto have duly executed this Grant of Economic Interest Agreement as of the date first above written.

**COMPANY:**

ATLAS HOLDINGS INVESTMENTS LLC,
a Delaware limited liability company

By: _____
Name: Steven Ivankovich
Title: Authorized Signatory

**HOLDER:**

TOWNSHIP ORLANDO LLC,
a Delaware limited liability company

By: _____
Name: **Matthew J. Gorelik**
Title: **Manager**

**MANAGING MEMBER:**

CONSILIENT HOLDINGS INVESTMENTS, LLC,
a Delaware limited liability company

By: _____
Name: Steven Ivankovich
Title: Manager

**JOINDER PARTY** (solely with respect to Sections 3(a), 5, 6 and 8 hereof):

_____
Steven Ivankovich

**IN WITNESS WHEREOF**, the parties hereto have duly executed this Grant of Economic Interest Agreement as of the date first above written.

**COMPANY**:

ATLAS HOLDINGS INVESTMENTS LLC,
a Delaware limited liability company

By: _____
Name: Steven Ivankovich
Title:  Authorized Signatory

**HOLDER**:

TOWNSHIP ORLANDO LLC,
a Delaware limited liability company

By: _____
    Name:
    Title:

**MANAGING MEMBER**:

CONSILIENT HOLDINGS INVESTMENTS, LLC,
a Delaware limited liability company

By: _____
Name: Steven Ivankovich
Title:  Manager

**JOINDER PARTY** (solely with respect to Sections 3(a), 5, 6 and 8 hereof):

Steven Ivankovich

**<u>JOINDER PARTY</u>** (solely with respect to Sections 3(a) hereof):

ATLAS HOLDINGS INVESTMENTS LLC,
a Delaware limited liability company

By: _____
Name: Steven Ivankovich
Title: Managing Member

**EXHIBIT A**

**TAX ALLOCATION PROVISIONS**

This Exhibit A sets forth the tax allocation provisions among the Tax Partners relating to the Agreement to which this Exhibit A is attached.

ARTICLE I
DEFINITIONS

1.1    <u>Definitions</u>.    Capitalized terms used in this Exhibit and not defined elsewhere herein have the following meanings:

"<u>Applicable Rate</u>" means 300 basis points in excess of the prime rate published from time to time in the Wall Street Journal.

"<u>Capital Account</u>" means, with respect to any Tax Partner, such Tax Partner's Capital Account determined in accordance with <u>Section 2.1</u> of this Exhibit.

"<u>Capital Contribution</u>" means, with respect to each Tax Partner, the aggregate amount of money and the initial Gross Asset Value of any property (other than money) contributed by such Tax Partner to Atlas P2.

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended.

"<u>Fiscal Year</u>" has the meaning set forth in <u>Section 3.2</u> of this Exhibit.

"<u>Gross Asset Value</u>" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(i)    the initial Gross Asset Value of any asset contributed by a Tax Partner to Atlas P2 will be the fair market value of such asset as determined by unanimous consent of the Tax Partners; provided, however, the Gross Asset Values of the assets of Atlas P2 (as determined for tax purposes) as of the date hereof are as set forth in <u>Tax Schedule I</u>;

(ii)    the Gross Asset Value of each Company asset will be adjusted to equal its respective gross fair market value as of the following times:  (1) the acquisition of an additional Interest in Atlas P2 by any new or existing Tax Partner in exchange for more than a de minimis Capital Contribution; (2) the distribution by Atlas P2 to a Tax Partner of more than a de minimis amount of Company assets as consideration for an Interest in Atlas P2; (3) the liquidation of Atlas P2 within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g); or (4) immediately prior to such other times as the Tax Partners by unanimous consent of the Tax Partners shall determine to be necessary or advisable in order to comply with Treasury Regulations Section 1.704-1(b) and 1.704-2, including upon the transfer or vesting of an interest in Atlas P2 granted in exchange for services as provided in the Treasury Regulations; *provided, however*, that adjustments pursuant to clauses (1) and (2) above will be made only if the Tax Partners by unanimous

- 1 -

consent determine that such adjustments are necessary or appropriate to reflect the relative economic interests of the Tax Partners in Atlas P2;

(iii)    the Gross Asset Value of any Company asset distributed to any Tax Partner will be the fair market value of such asset on the date of distribution as determined by the unanimous consent of the Tax Partners; and

(iv)    the Gross Asset Values of Company assets will be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m); *provided, however*, that Gross Asset Values will not be adjusted pursuant to this clause (iv) to the extent the Tax Partners determine by unanimous consent that an adjustment pursuant to clause (ii) hereof is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this clause (iv).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to clauses (i), (ii), or (iv) above, such Gross Asset Value will thereafter be adjusted by the depreciation or amortization deductions taken into account with respect to such asset for purposes of computing Atlas P2's taxable income.

"Interest" means a Tax Partner's economic rights as provided in this Exhibit.

"IRS" means the Internal Revenue Service.

"Profits" and "Losses" means for each Fiscal Year, an amount equal to Atlas P2's taxable income, gain or loss for such year or other period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be separately stated pursuant to Code Section 703(a)(1) will be included in taxable income or loss), with the following adjustments:

(i)    Any income of Atlas P2 that is exempt from federal income tax or otherwise described in Code Section 705(a)(1)(B) and not otherwise taken into account shall be added to such taxable income or loss;

(ii)    Any expenditure of Atlas P2 described in Code Section 705(a)(2)(B) and non-deductible syndication costs described in Code Section 709 and not otherwise taken into account shall be subtracted from such taxable income or loss;

(iii)    If the Gross Asset Value of any asset differs from its adjusted basis for federal income tax purposes at the beginning of such year, in lieu of depreciation, amortization and other cost recovery deductions, there shall be taken into account depreciation for such Fiscal Year or other period equal to the amount that bears the same ratio to the Gross Asset Value as the federal income tax depreciation, amortization or other cost recovery deduction bears to the beginning adjusted tax basis, and in lieu of a gain or loss resulting from disposition of Company property and taken into account in computing taxable income or loss, there shall be taken into account gain or loss computed

- 2 -

by reference to the Gross Asset Value of such Company property rather than its adjusted basis for federal income tax purposes;

   (iv) Items of income, gain, loss or deduction that are specifically allocated pursuant to <u>Section 2.3</u> of this Exhibit shall not be taken into account in calculating Profits and Losses; and

   (v) In the event the Gross Asset Value of any Company asset is adjusted in a manner described in the definition thereof, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits or Losses to the extent and in the manner required by Treasury Regulations.

   "<u>Target Final Balance</u>" has the meaning set forth in <u>Section 2.2</u> of this Exhibit.

   "<u>Tax Matters Member</u>" has the meaning set forth in <u>Section 3.3</u> of this Exhibit.

   "<u>Treasury Regulations</u>" means the federal income tax regulations promulgated by the U.S. Department of Treasury, or any amendment or successor provision to such regulations, pursuant to or in interpretation of the Code.

  1.2 <u>Other Definitions</u>.

   (a) As used in this Exhibit, accounting terms to the extent they are not defined in this Exhibit, have the respective meanings given to them under generally accepted accounting principles.

   (b) The words "below" and "above" and words of similar import when used in this Exhibit refer to this Exhibit as a whole and not to any particular provision of this Exhibit, unless otherwise specified.

ARTICLE II
ALLOCATION OF PROFITS AND LOSSES

  2.1 <u>Capital Accounts</u>.

   (a) A separate Capital Account will be maintained for each Tax Partner in accordance with the provisions of Treasury Regulations Section 1.704-1(b)(2)(iv). The initial Capital Account of each Tax Partner is as set forth on <u>Tax Schedule II</u>.

   (b) In connection with a Capital Contribution of money or other property (other than a de minimis amount) by a new or existing Tax Partner as consideration for an Interest, or in connection with the liquidation of Atlas P2 or a distribution of money or other property (other than a de minimis amount) by Atlas P2 to a withdrawing Tax Partner, the Capital Accounts of the Tax Partners will be adjusted to reflect a revaluation of Company property (including tangible assets) in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(f). If, under Treasury Regulations Section 1.704-1(b)(2)(iv)(f), Company property that has been revalued is properly reflected in the Capital Accounts and on the books of Atlas P2 at a book value that differs from the adjusted tax basis of such property, then depreciation, amortization

- 3 -

and gain or loss with respect to such property will be shared among the Tax Partners in a manner that takes account of the variation between the adjusted tax basis of such property and the book value, in the same manner as variations between the adjusted tax basis and fair market value of property contributed to Atlas P2 are taken into account in determining the Tax Partners' shares of tax items under Code Section 704(c).

(c)     In the event of a sale or exchange of any Interest, the Capital Account of the transferor will become the Capital Account of the transferee to the extent it relates to the transferred Interest in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv).

(d)     The manner in which Capital Accounts are to be maintained pursuant to this Section is intended to comply with the requirements of Code Section 704(b) and the Treasury Regulations promulgated thereunder, and this Exhibit will be interpreted in a manner consistent therewith.

2.2     General Allocation of Profits and Losses.

(a)     Subject to the special allocations set forth in Section 2.3 of this Exhibit, Profits and Losses (and, to the extent necessary, individual items of income, gain, loss, deduction or credit) of Atlas P2 will be allocated among the Tax Partners in a manner such that the Capital Account balance of each Tax Partner after giving effect to any amounts the Tax Partner is obligated to contribute or restore to Atlas P2 pursuant to the penultimate sentences of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), immediately after making such allocation, is, as nearly as possible equal (proportionately) to the distributions that would be made to such Tax Partner if Atlas P2 were dissolved, its affairs wound up and its assets sold for cash equal to their Gross Asset Values, all Company liabilities were satisfied (limited with respect to each non-recourse liability to the Gross Asset Value of the assets securing such liability) and the net assets of Atlas P2 were distributed to the Tax Partners in accordance with Section 3 of this Agreement.

(b)     If the Profits and Losses allocable to the Tax Partners pursuant to Section 2.2(a) of this Exhibit are insufficient to allow the Capital Account balance of each Tax Partner to equal such Tax Partner's share of Atlas P2's assets as set forth in this Exhibit, such Profits or Losses will be allocated among the Tax Partners in such a manner as to decrease the differences between the Tax Partners' respective Capital Account balances and their respective shares of Atlas P2's assets in proportion to such differences.

(c)     Notwithstanding the foregoing, the Tax Partners may by unanimous consent make any modifications and adjustments to the allocations that it believes are necessary to comply with applicable law and to ensure that the allocations achieve the results intended by the Parties hereunder.

(d)     For the avoidance of doubt, the allocation provisions of this Exhibit are intended to produce final Capital Account balances that are at levels ("Target Final Balance") in the year of liquidation of Atlas P2 that are equal in amount to the distributions that would occur if all such liquidating distributions were made to the Tax Partners in accordance with Section 3(b) of this Agreement.  To the extent that the allocation provisions of this Exhibit would not

- 4 -

*Exhibit A*

produce the Target Final Balance, the Tax Partners agree to take such actions as are necessary to amend such tax allocation provisions in the year of liquidation of Atlas P2 to produce such Target Final Balance.

2.3    <u>Special Allocations</u>.  Atlas P2 will make the following special allocations in the following order:

(a)    <u>Company Minimum Gain Chargeback</u>.  If there is a net decrease in Company Minimum Gain (as defined below) during a Fiscal Year so that an allocation is required by Treasury Regulations Section 1.704-2(f), then each Tax Partner will be specially allocated items of income and gain for such year (and, if necessary, subsequent Fiscal Years) equal to such Tax Partner's share of the net decrease in Company Minimum Gain as determined by Treasury Regulations Section 1.704-2(g).  Such allocations will be made in a manner and at a time that will satisfy the minimum gain chargeback requirements of Treasury Regulations Section 1.704-2(f) and this Section of the Exhibit will be interpreted consistently therewith.  The term "Company Minimum Gain" has the meaning given to the term "partnership minimum gain" in Treasury Regulations Sections 1.704-2(b)(2) and 1.704-2(d).

(b)    <u>Member Nonrecourse Minimum Gain Chargeback</u>.  If there is a net decrease in the Member Nonrecourse Debt Minimum Gain (as defined below) during any Fiscal Year, any Tax Partner who has a share of such Member Nonrecourse Debt Minimum Gain (as determined in the same manner as partner nonrecourse debt minimum gain under Treasury Regulations Section 1.704-2(i)(5)) will be specially allocated items of income or gain for such year (and, if necessary, subsequent Fiscal Years) equal to such Tax Partner's share of the net decrease in the Member Nonrecourse Debt Minimum Gain in the manner and to the extent required by Treasury Regulations Section 1.704-2(i)(4).  This Section of the Exhibit will be interpreted in a manner consistent with such Treasury Regulations.  The term "Member Nonrecourse Debt Minimum Gain" has the meaning given to the term "partner nonrecourse debt minimum gain" in Treasury Regulations Section 1.704-2(i)(3).

(c)    <u>Qualified Income Offset</u>.  If a Tax Partner unexpectedly receives an adjustment, allocation, or distribution described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) or (6), any of which causes or increases an "Adjusted Capital Account Deficit" in such Tax Partner's Capital Account, then such Tax Partner will be specially allocated items of income and gain in an amount and manner sufficient to eliminate such deficit balance created or increased by such adjustment, allocation, or distribution as quickly as possible; <u>provided</u>, <u>however,</u> an allocation pursuant to this Paragraph will be made if and only to the extent that such Tax Partner would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article II of this Exhibit have been tentatively made as if this Paragraph were not in this Exhibit.  The term "<u>Adjusted Capital Account Deficit</u>" means the Tax Partner has a deficit balance in its "Capital Account" after giving effect to any amounts the Tax Partner is obligated to contribute or restore to Atlas P2 pursuant to the penultimate sentences of Treasury Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5).

(d)    <u>Allocation of Nonrecourse Liability Deductions</u>.  Deductions attributable to any Company Nonrecourse Liability will be allocated among the Tax Partners in proportion to

- 5 -

*Exhibit A*

their respective Sharing Percentages. The term "Company Nonrecourse Liability" has the meaning given to the term "nonrecourse liability" in Treasury Regulations Section 1.704-2(b)(3).

      (e)     Member Nonrecourse Debt Deductions. Deductions attributable to any Member Nonrecourse Debt will be allocated to the Tax Partner who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Treasury Regulations Section 1.704-2(i)(1). The term "Member Nonrecourse Debt" has the meaning given to the term "partner nonrecourse debt" in Treasury Regulations Section 1.704-2(b)(4).

      (f)     Section 754 Election. To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(h) is required, pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts will be treated as an item of gain (if such gain or loss increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss will be specially allocated to the Tax Partners in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such Section of the Treasury Regulations. Atlas P2 will elect to make an election pursuant to Code Section 754 with respect to the Fiscal Year that includes the date hereof.

      (g)     Contributed Property. Income, gain, loss or deduction with respect to any property contributed by a Tax Partner will, solely for tax purposes, be allocated among the Tax Partners, to the extent required by Code Section 704(c) and the related Treasury Regulations under Code Sections 704(b) and 704(c), to take account of the variation between the adjusted tax basis of such property and its Gross Asset Value (as defined in the Code) at the time of its contribution to Atlas P2 using any method agreed by unanimous consent of the Tax Partners; provided, however, any such variation with respect to assets of Atlas P2 as of the date hereof will be taken into account using the "traditional method with curative allocations" described in Treasury Regulations Section 1.704-3(c) unless otherwise agreed by unanimous consent of the Tax Partners. If the Gross Asset Value of any Company property is adjusted as provided in Treasury Regulations Section 1.704-1(b)(2)(iv), then subsequent allocations of income, gain, loss and deduction and the gain asset value of such property will be adjusted as provided in Code Section 704(c) and the related Treasury Regulations. Allocations under this Paragraph are solely for purposes of federal, state and local taxes and will not affect, or in any way be taken into account in computing, any Tax Partner's Capital Account or share of Profits, Losses, or other items or distributions under any provision of this Exhibit.

      (h)     Share of Excess Nonrecourse Liabilities. For purposes of calculating a Tax Partner's share of "excess nonrecourse liabilities" of Atlas P2 (within the meaning of Treasury Regulations Section 1.752-3(a)(3)), the Tax Partners intend that they be considered as sharing profits of Atlas P2 in proportion to their respective Sharing Percentages.

    2.4     Allocation Rules.

      (a)     If Tax Partners are admitted to Atlas P2 on different dates, the Profits (or Losses) allocated to the Tax Partners for each Fiscal Year during which Tax Partners are so

admitted will be allocated among the Tax Partners in accordance with Code Section 706, using any convention permitted by law and agreed by the unanimous consent of the Tax Partners.

(b)     For purposes of determining the Profits and Losses and any other items allocable to any period, Profits and Losses and any such other items will be determined on a daily, monthly or other basis, as determined by unanimous consent of the Tax Partners using any method that is permissible under Code Section 706 and the Treasury Regulations thereunder.

(c)     Except as otherwise provided in this Exhibit, all items of Company income, gain, loss, deduction and any other allocations not otherwise provided for will be divided among the Tax Partners in the same proportions as they share Profits and Losses for the Fiscal Year in question.

(d)     The Parties are aware of the income tax consequences of the allocations made by this Article II of this Exhibit and hereby agree to be bound by the provisions of this Article II of this Exhibit in reporting their Company income and loss for income tax purposes.

2.5     Tax Withholding.

(a)     The Company shall at all times be entitled to make payments with respect to any Tax Partner in amounts required to discharge any obligation of the Company to withhold from a distribution or make payments to any governmental authority with respect to any foreign, federal, state or local tax liability of such Tax Partner arising as a result of such Tax Partner's Interest in the Company (a "**Withholding Payment**"). Any Withholding Payment made from funds withheld upon a distribution will be treated as (and deemed to have been) distributed to such Tax Partner for all purposes of this Agreement and then paid by the Company as the agent of such Tax Partner. Any other Withholding Payment will be deemed to be a recourse demand loan by the Company to the relevant Tax Partner. The amount of any Withholding Payment treated as a loan, plus interest thereon, compounded monthly, from the date of each such Withholding Payment until such amount is repaid to the Company at an annual interest rate per annum equal to the Applicable Rate, shall be repaid to the Company upon demand by the Company; *provided, however*, that in the Company's sole and absolute discretion, any such amount may be repaid by deduction from any distributions payable to such Tax Partner pursuant to this Agreement (with such deduction treated as an amount distributed to the Tax Partner) as determined by the Company in its sole and absolute discretion.

(b)     If the proceeds to the Company from an investment are reduced on account of taxes withheld at the source, and such taxes are imposed on one or more, but not all, of the Tax Partners in the Company, the amount of the reduction shall be borne by the relevant Tax Partners and treated as if it were paid by the Company as a Withholding Payment with respect to such Tax Partners pursuant to Section 2.5(a) of this Exhibit. If the proceeds to the Company from an investment are reduced on account of taxes withheld at the source, and such taxes are imposed on the Company, the amount of the reduction shall be treated as an expense of the Company.

- 7 -

## ARTICLE III
## ACCOUNTING, FISCAL YEAR AND
## TAX MATTERS MEMBER

3.1     _Tax Elections._ All tax elections of the Company must be made as, and only as, determined by unanimous consent of the Tax Partners.

3.2     _Accounting Method._  The Company will use the method of accounting selected by unanimous consent of the Tax Partners in preparation of its annual reports and for tax purposes and will keep its books and records accordingly.

3.3     _Fiscal Year._  The fiscal year of the Company (the **"Fiscal Year"**) will be the calendar year or such fiscal year as selected by unanimous consent of the Tax Partners that is permitted under the Code.

3.4     _Tax Matters Member._  Managing Member will serve as the Company's "Tax Matters Member," which term will have the meaning ascribed to the term "tax matters partner" in the Code. In such capacity, the Tax Matters Member is hereby authorized and empowered to act for and represent the Company and each of the Tax Partners before (i) the IRS in any audit or examination of any Company tax return, and (ii) any court selected by unanimous consent of the Tax Partners for judicial review of any adjustment assessed by the IRS.   The Tax Matters Member will act at, and only at, the direct of the unanimous consent of the Tax Partners. The Tax Partners specifically acknowledge, without limiting the general applicability of this Section of the Exhibit, that the Tax Matters Member will not be liable, responsible or accountable in damages or otherwise to the Company or any Tax Partner with respect to any action taken by it in its capacity as the Tax Matters Member, provided it used reasonable business judgment with respect to the action taken and complies with the terms of the Agreement and this Exhibit. All out-of-pocket expenses incurred by the Tax Matters Member in its capacity as the Tax Matters Member will be considered expenses of the Company for which the Tax Matters Member will be entitled to full reimbursement.  The Tax Matters Member shall keep Holder informed of all administrative and judicial proceedings relating to audits of the Company in the manner set forth in the Code and applicable Treasury Regulations. The Tax Matters Member shall not have the right to enter into any settlement on behalf of the Holder.

3.5     _Tax Filings._  Information required for Tax Partners to prepare their federal, state and local income tax returns will be delivered to each Tax Partner after the end of each taxable year of the Company.   Managing Member shall use reasonable efforts to furnish such information within ninety (90) days after the end of each taxable year.  Atlas P2 shall file its tax returns as a partnership and will reflect the Company, Ivankavich and Holder as partners therein for federal, state and local income and other tax purposes.  The tax returns of Atlas P2 will be filed as agreed by the unanimous consent of the Tax Partners.

3.6     _Company Tax Matters._ The Company will not (a) treat Holder as a partner of the Company for any tax purposes, (b) treat any income allocated by Atlas P2 to Holder as allocated to the Company, or (c) allocate any items of income, gain, loss, deduction or credit to Holder for any tax purposes.

- 8 -

EAST\129478723 4

*Exhibit A*

**TAX SCHEDULE I**
**INITIAL GROSS ASSET VALUES**

Asset                                                    Initial Gross Asset Value

Membership Interest in P2 Portfolio Investor Member, LLC       $21,557,353.00

- 1 -

*Exhibit A*

**TAX SCHEDULE II**
**INITIAL CAPITAL ACCOUNTS**

| Tax Partner | Initial Capital Account |
|---|---|
| Township Orlando, LLC | $4,000,000.00 |
| Atlas Holdings Investment LLC | $21,557,353.00 |
| Steven Ivankovich | $0.00 |

- 1 -

*Exhibit A*

**EXHIBIT B**

**TERM SHEET**

------------------------------------------------------------------------------------------------------------

## Letter of Intent for Joint Venture Investment

August 22, 2016

Atlas Apartments Acquisition, LLC
Attn. Mr. Steve Ivankovich
55 East Monroe Street, 36th Floor
Chicago, IL 60603

**Re: P2 Portfolio (Multifamily Acquisition and Recapitalization in Orlando, Florida)**

Steve,

On behalf of Township Capital, LLC ("Township"), I am pleased to present the general terms of our agreement regarding our desire to invest with Apartments Acquisition, LLC (together with its affiliates, "Atlas") in a new joint venture to recapitalize, reposition, manage and sell the portfolio of multifamily properties known as: Alexandria Apartments located at 10651 Demilo Place, Orlando, FL 32836, Parc Vue Apartments located at 10649 Bastille Lane, Orlando, FL 32836, and Crowntree Lakes Apartments located at 5759 Crowntree Lane, Orlando, FL 32836 (each, a "Property" and collectively, the "Properties")

This Letter of Intent is intended to describe the general terms and conditions under which we are willing to proceed with an investment in the owner of the Property   Except as specifically provided herein (including, but not limited to, provisions regarding costs incurred and/or intermediary services rendered), neither Township nor Atlas (collectively, the "Parties") will be under any legal obligation with respect to the transaction proposed herein unless and until a definitive operating agreement mutually satisfactory in all respects to the parties thereto, is executed and delivered, at which time the obligations of the Parties under this letter agreement will automatically terminate and be superseded by the provisions of such agreement

We look forward to working with you

Sincerely,

**Matthew J. Gorelik,** *Chief Executive Officer*

cc.    Ravi Malli

- 1 -

**Purpose:**  Atlas and Township desire to form an investment partnership to sponsor the recapitalization, repositioning, management and disposition of a portfolio of two existing apartment buildings in a new joint venture with one or more limited partner investors to be sourced by Atlas and Township jointly (the "Limited Partner")  The Sponsor or a wholly owned affiliate will be the managing member of the Owner   Atlas will be the managing member of the Sponsor and will manage the Properties and its associated functions on a day-to-day basis on behalf of and for the benefit of the Owner and its members

**Property:**  As defined above  Three (3) apartment buildings known as. Alexandria Apartments located at 10651 Demilo Place, Orlando, FL 32836, Parc Vue Apartments located at 10649 Bastille Lane, Orlando, FL 32836, and Crowntree Lakes Apartments located at 5759 Crowntree Lane, Orlando, FL 32836 as well as all leases, personal property, fixtures and other improvements currently located on or associated with the Property   No portions of the property are subject to ground leases

**Future Acquisitions:**  Atlas agrees to give Township the first right of first offer to be its sponsor equity partner on the acquisition of any and all properties acquired by Atlas for a period of one (1) year following the acquisition of the Property  Township will also receive a right of first offer on the mortgage banking assignments for projects in which they are co-investing under substantially similar terms as outlined in this agreement  Township shall in no way be required to be a sponsor equity partner for Atlas on future acquisitions, provided, that if Township declines to participate in three (3) opportunities presented by Atlas to Township then such right of first offer shall expire and be of no further force and effect

**Capital Structure:**  There will be new senior financing (the "Senior Loan") from Ares Management, L.P  with a contemplated loan amount of approximately $135,000,000, there is an existing Limited Partner Equity investment (the "JV Equity", "JV" or "LP") on the Property from Atlas Holdings Investments, LLC in the amount of $17,781,115, additionally, a new preferred equity investment (the "PE" or "Preferred Equity") on the Properties from Sterling Equities will be taken out at closing in the amount of $16,000,000  The closings of the Senior Loan and Preferred Equity shall occur simultaneously  The Property will be recapitalized via use of new Senior Loan, the new Preferred Equity, existing JV Equity and cash from Atlas and Township Co-General Partners

**Capital Advisory:**  Township will advise Atlas on the capital stack structuring for the recapitalization and construction of the Properties on terms consistent with the Project pro-forma

**Debt Engagement:**  Township will have the exclusive right to contact all financing sources, in cooperation with the Operating Partner, to procure senior bridge and

- 2 -

permanent debt for the identified properties that shall be acceptable to, and approved by, the Operating Partner.

**Capital Advisory Fees:**  Township's capital advisory fees on the project's financing facilities are outlined below  All fees will be payable to Township at closing  In the event that the Properties are not recapitalized via HUD financing, Township shall receive the equivalent fee to be divulged in further detail in the Joint Venture Agreement.

| Financing Description | Fee Payable at Closing | Estimated Closing Date | Estimated Township Fee |
|---|---|---|---|
| Ares Bridge Loan | 0 375% | 9/9/2016 | $506,250 |
| HUD Recap (CTL) | 0 375% | Q1 2017 | $206,087 |
| HUD Recap (APV) | 0.375% | Q4 2017 | $396,208 |

**Debt Guarantees:**  Atlas or its principals will provide any and all debt guarantees required by the lender(s) ("Lender")  Township will not be required to execute any recourse guarantees, environmental indemnifications or non-recourse carve-outs contained in any loan (i e , Township will not be a 'guarantor'), provided, that a credit worthy affiliate of Township and a credit worthy affiliate of Atlas will enter into a customary reimbursement agreement pursuant to which each such affiliate will be responsible for their pro-rata share of any non-bad acts arising out of any non-recourse or another guaranty

**Asset Management Fee:**  An ongoing monthly asset management fee equal to 50 basis points (0.50%) of the effective gross revenue (EGI) of the Properties shall be payable to Township

**Preferred Equity:**  Sterling Equities will contribute Preferred Equity in an amount equal to $16,000,000 at Closing

**Limited Partner Equity:**  The Limited Partner will contribute equity to the Owner in an amount equal to approximately $17,781,115 at Closing  The equity will come from a combination of existing equity and new a capital infusion if required

**LP Equity Replacement:**  Atlas and Township acknowledge that Atlas Holdings Investments, LLC plans to syndicate or recapitalize their LP Equity investment post-closing  The promoted interest (as outlined in the section titled *Owner Distributions* below) to the Sponsors, Atlas and Township, shall remain materially unchanged regardless of whether Atlas Holdings Investments, LLC syndicates a portion or all of their Limited Partner investment  Township shall have sole approval rights over a replacement Limited Partner

**Sponsor Equity:**  The Sponsor will contribute the remaining equity (the "Sponsor Equity") required to close and fund the transaction  It is anticipated that the

EAST\129478723 4

*Schedule 2*

Sponsor Equity will be approximately $5,000,000  Atlas will contribute 20 00% of the Sponsor Equity (estimated to be $1,000,000), and Township will contribute 80.00% of the Sponsor Equity (estimated to be roughly $4,000,000)  The Atlas portion of the equity will come from the internal finances of Atlas and its principals and not from any outside source of capital; equity will come from combination of existing equity and new a capital infusion if required  Neither Atlas nor Township will have any obligation to contribute any additional equity to the Sponsor

**Sponsor Equity Replacement:**  Township shall have the right, but not obligation to exercise any of the below sponsor equity recapitalization options·

1. Atlas shall have the obligation to recapitalize $1,500,000 of Township's GP investment once it has been replaced as the sole limited partner  Township has the right but not obligation to proceed with the recapitalization

2. Should Township elect not to accept the replacement capital in the P2 Portfolio immediately, Township shall reserve it's right, but not obligation, to accept the replacement capital until such time as Atlas and Township mutually agree to a new acquisition where the $1,500,000 replacement capital can be immediately reinvested in an Atlas project as a GP co-investment  If all or a portion of the Atlas LP equity is replaced (anything in excess of $1,500,000), then Steven Ivankovich will guarantee that $1,500,000 amount is available to replace the Township P2 equity should a suitable replacement investment be found and accepted by Township

3. Township shall have the option to refuse the recapitalization or reinvestment from Atlas and maintain their original $4,000,000 investment in the project as outlined in this Term Sheet

**Capital Sources & Uses:**  See **Exhibit A**

**Recapitalization Option:**  In the event that the properties are not sold within the initial sixty (60) months, Township shall have an option, wherein if exercised, its equity interest will be bought out by any of the below methods (or a combination) at Fair Market Value ("FMV")  FMV will be calculated using the mean of two (2) separate independent appraisal reports ordered each by Atlas and Township  The promoted interest will be calculated using the FMV (as outlined above) at the time of Township's exit from the investment

1. Atlas or its affiliates will have the option to buy out Township's equity interest as outlined above, and/or

2. Atlas can take out Township's equity interest via an equity recapitalization (i e  can replace Township with a new investor),

- 4 -

Township has the first right, but not obligation, to sell the asset to a newer vintage Township Fund should they choose, and /or

3. Atlas can take out Township's equity interest via a senior financing recapitalization

**Distributions:**

Operating net cash flow from the Property will be distributed on a current basis subject to normal and customary reserves.   Township expects to receive a five-year average distribution from the Property of not less than 8% per year throughout the term of this investment, which will be distributed monthly (no assurances can be made that such monthly distribution targets will be achieved)

**Reserves:**

Pending further due diligence, Township currently assumes that the investment budget provided by Atlas includes all reserves required for capital expenses and improvements as required for Atlas to execute its investment plan   Atlas will be responsible for managing the Property within the investment budget, which will be updated and approved by the Limited Partner or Preferred Equity from time to time.

**Investment Expenses:**

Atlas will endeavor for all costs incurred by Atlas and Township associated with the investment to be paid by and/or reimbursed by the Owner, including all due diligence, travel and lodging, accounting, reporting, audit, tax preparation, capital costs, commissions and legal expenses of the Owner and its members other than those costs otherwise specifically described herein

**Owner Distributions:**

It is presently anticipated that net cash flow after operating expenses and debt service of the Property (including the PE), or net excess proceeds from a refinance of the Senior Loan and/or the Preferred Equity during the holding period ("Distributable Cash") of the Owner will be distributed monthly as follows, subject to reasonable reserves

1. First, to the LP Equity and Sponsor Equity (collectively "The Partners") in proportion to their share of the Investor Equity, in the amount of their outstanding capital contributions,

2. Second, pro rata to the partners until everyone has received an 8% IRR on their invested capital,

3. Third, $1,000,000 of cash flow returned to Atlas for reimbursable legal costs associated with the project.

4. Fourth, 25% of cash flow to Township and Atlas (Collectively "The Sponsors" or "GP") and 75% of cash flow to the LP Equity up to a project level 10% IRR,

5. Fifth, 30% of cash flow to Township and Atlas (Collectively "The Sponsors") and 70% of cash flow to the LP Equity up to a project level 15% IRR,

6.  Sixth, 35% of cash flow to Township and Atlas (Collectively "The Sponsors") and 65% of cash flow to the LP Equity up to a project level 20% IRR,

7.  Seventh, 40% of cash flow to Township and Atlas (Collectively "The Sponsors") and 60% of cash flow to the LP Equity above a project level 20% IRR

**Sponsor Distributions:**    Distributable Cash of the Sponsor will be distributed as follows, subject to reasonable reserves.

1.  Atlas and Township will each receive 100% of their pro rata share of distributable cash based on their proportionate share of invested capital in Owner, and

2.  Atlas and Township will each receive 100% of their pro rata share of the promoted interest ("The Promote" or "Carried Interest") based on their proportionate share of invested capital in the Owner

**Allocations:**    Atlas, Township and the Limited Partner will share the tax benefits of depreciation and amortization in accordance with their membership interests in the Owner and the Sponsor  All other tax allocations of profit and loss will be shared based on actual distributions of profit and loss

**Risk of Loss:**    No partner will receive a prioritized return of or on its invested capital  In the event that Owner and/or Sponsor suffers a loss, any loss will be shared by the associated members pro rata based on their invested capital

**Fee Sharing:**    The Sponsor and/or affiliates of Atlas will be paid certain fees by the Owner, which fees might include acquisition fees, leasing commissions, property, development, construction and asset management fees, and disposition fees  All fees paid to the Sponsor or to Atlas or its affiliates will be shared as follows

|  | Atlas | Township |
|---|---|---|
| **Asset Management Fees** | 83 33% | 16 67% |
| **Construction Management Fees** | 100 00% | 0 00% |
| **Capital Advisory Fees** | 0 00% | 100 00% |

**Accounting:**    Atlas will be responsible for all entity-level accounting and tax return preparation for both the Owner and the Sponsor  Although Township reserves the right to audit the financial records of the Property, the Owner and the Sponsor will be required to do so once each year at its sole cost and expense.

**Tax Returns:**    Atlas will at the expense of the Owner cause the preparation of all tax returns, IRS Schedule K-1 and such additional information as will be

- 6 -

necessary for the preparation within forty-five (45) days after the end of each calendar year to be filed by the Owner pursuant to applicable tax laws and regulations and all other tax returns deemed necessary and required in each jurisdiction in which the Owner does business  Copies of such returns, or pertinent information there from, will be furnished to the Members within ninety (90) days after the end of the Owner's Fiscal Year.

**Reporting:**          Atlas will provide to the other members thorough reporting for all financial, property management, construction, capital improvements and leasing activities of the investment throughout the term of the investment in a form mutually acceptable to all of the members at least once per month  Township will be provided copies of all bank statements and other reports at least once per month  Township will have unlimited access to all documents, correspondence and other information associated with the investment at all times

**Legal:**          Prior to Closing, Atlas and Township will execute an operating agreement and any such other associated documents as may be required to organize and govern the partnership between Atlas and Township associated with this transaction (collectively, the "Partnership Agreement")  The Partnership Agreement will be drafted by Atlas' attorney and approved by both Atlas and Township  Additionally, Township will have the right to review and approve the operating agreement of the Owner, the loan documents and all other documents associated with the transaction as a condition of closing

**Insurance:**          Any insurance policies for the benefit of the Property or the ownership entities must be reviewed and approved by Township for adequacy of coverage and strength of carrier

**Management:**          Township acknowledges and agrees that the PE, Limited Partner and TPG approval of the transaction is based upon the investment and management expertise of Atlas and its principals.  Accordingly, neither the Limited Partner or PE will only agree to provide Township with limited voting or approval rights with respect to the governance of the Owner  Such limited rights, will include, by way of example, affiliate transactions with Atlas (examples that are not included would be changing the purpose of the Sponsor or the Owner and any decision which could result in recourse liability to Atlas or its principals)  Furthermore, the documents and instruments governing the joint venture relationship between the Sponsor, PE and the Limited Partner will grant Sponsor day-to-day control but the Limited Partner will retain significant control over so-called "major decisions" of Owner and therefore, Township' ability to control the outcome of its investment will be significantly limited  Finally, TPG will not approve Township as a replacement guarantor or property manager under the Senior Loan and the purchase and sale agreement for the Properties expressly prohibits

- 7 -

Atlas from seeking such approvals without the approval of the seller under such purchase and sale agreement

**Investment Committee:** The Township investment described herein is subject to the approval of the Township Investment Committee, which approval will be provided within fifteen (15) days from receipt of the Due Diligence checklist in its entirety  Township will be required to provide Atlas with an investment decision in writing during such time period

**Confidentiality:** The terms of the Letter of Intent are confidential and may not be distributed or shared with others without the express prior written consent of Township or Atlas

**Intent:** Other than the sections above entitled "Confidentiality" and the last sentence of the section below entitled "Due Diligence", which will be binding upon the parties, this Letter of Intent constitutes an expression of intent and will not constitute a binding agreement between the parties to consummate the transaction discussed herein  This Letter of Intent is merely a reflection of the parties understanding of some of the general terms of the proposed investment and upon which understanding the parties are willing to proceed with further discussions and negotiations for the investment   Dollar amounts included in this Letter of Intent are approximate and are subject to change prior to Closing.

**Property Due Diligence:** Township will have fifteen (15) days from the date that it receives all of the property information included in the attached **Exhibit B** to perform a financial audit, an environmental assessment, a property survey, a title examination, tenant interviews and any other investigation of the Property that Township deems necessary  Atlas shall allow Township to inspect the Property for the purpose of performing these investigations. During such (15) day period, Atlas agrees not to seek any other so-called general partner sponsorship capital from any third party source, provided, that Atlas shall have the sole and exclusive right to secure capital from any Limited Partner

**Operating Partner Review:** Township will conduct due diligence examinations of the Operating Partner ("Operating Partner Due Diligence"), including but not limited to a track record review and reference checks. Township's initial list of required information is outlined in **Exhibit C**, and additional information may be required at Township's sole discretion  Township shall have no obligation to proceed with the transaction outlined in this letter unless it is fully satisfied with the Operating Partner Due Diligence in its sole and absolute discretion

**Closing Conditions:** The transaction contemplated herein are subject to the following conditions that must be met prior to Township making an investment in the Property.

- 8 -

*Schedule 2*

1. Final approval of the Township Investment Committee,

2. Satisfactory completion of all Township Due Diligence,

3. Satisfactory background check on Atlas and its key principals,

4. Final approval of the Senior Loan and its associated terms and documentation by Township and Atlas, and

5. Final approval of the Preferred Equity and its associated terms and documentation by Township and Atlas

**Time of the Essence:**    Time is of the essence of this agreement   If we have not received an executed copy of this Letter of Intent on or before 5 00 pm CST on the date that is two (2) business days following the date of this Letter of Intent, this Letter of Intent will be deemed rejected by Atlas and rescinded by Township, and it will be of no further force and effect   If the transaction contemplated by this Letter of Intent has not closed within one hundred twenty (120) days following the date of this Letter of Intent without mutual consent of the parties, then Township will be under no further obligation to complete this transaction.

- 9 -

*Schedule 2*

*The terms and conditions of this Letter of Intent included herein are hereby accepted as follows:*

Name: **Steven Ivankovich**
Title: **Chief Executive Officer**
Company: **Atlas Apartments Acquisition, LLC**

Agreed to this _25ᵗʰ_ day of _August_ by:

Name: **Matthew J. Gorelik**
Title: **Chief Executive Officer**
Company: **Township Capital, LLC**

Agreed to this _26ᵗʰ_ day of _august_ by:

- 10 -

*Schedule 2*

## EXHIBIT A

### Sources and Uses

| P2 Portfolio | |
|---|---|
| Sources and Uses | |

| Estimated Project Sources | Total |
|---|---|
| Atlas GP Equity | $1,000,000 |
| Township GP Equity | $4,000,000 |
| Existing Renovation Reserve | $3,327,000 |
| Limited Partner Equity | $17,781,115 |
| Sterling Preferred Equity | $16,000,000 |
| Ares Senior Debt Financing | $135,000,000 |
| **Total Sources** | **$177,108,115** |

| Estimated Project Uses | Total |
|---|---|
| Purchase Price | $173,616,865 |
| Preferred Equity Reserve | $1,000,000 |
| Ares Loan Origination | $675,000 |
| Township Capital Advisory | $506,250 |
| Senior Rate Cap | $150,000 |
| Preferred Equity Origination | $160,000 |
| Closing Costs | $1,000,000 |
| **Total Uses** | **$177,108,115** |

| Purchase Price | Total |
|---|---|
| Payoff Starwood Senior | $105,000,000 |
| Payoff JLC Mezz | $20,000,000 |
| Payoff JLC Pref | $26,700,000 |
| JLC Accrual and Exit Fee | $3,820,377 |
| Starwood Transaction Cost | $26,000 |
| Working Capital | $347,323 |
| Existing Atlas Equity | $14,396,165 |
| **Total Uses** | **$173,616,865** |

- 11 -

**EXHIBIT B**

**Property Due Diligence List**

Financial Information

- ☐ Operating Statements – at least previous 3 years, by month
- ☐ YTD Operating Statement, by month
- ☐ Current Year and Projected Future Budgets
- ☐ Financial statements for the property
- ☐ Appraisals

Leasing & Marketing

- ☐ Rent Roll
- ☐ Income and other financial information for all existing Tenants
- ☐ All current Leases, including any and all amendments, modifications and/or extensions thereto
- ☐ Leasing activity (renewals and new leases)
- ☐ Market information

Construction/Physical

- ☐ Certificates of Occupancy
- ☐ Architectural and Engineering Plans (if available)
- ☐ As-built Drawings (if available)
- ☐ Engineering Reports
- ☐ Environmental Reports and Reliance Letters
- ☐ ALTA/Boundary/Topo Surveys
- ☐ Utility Availability Letters
- ☐ Code Violation/Compliance Notices (if applicable)
- ☐ Property Condition Reports

Property Management

- ☐ Maintenance Records
- ☐ Capital Expense Records
- ☐ HVAC "Hot/Cold Calls" Log
- ☐ HVAC Test and Balance Reports

Misc./Legal

- ☐ Property Tax Assessments/Invoices
- ☐ Property Tax Appeal Documentation
- ☐ Title Policy and Copies of Exceptions
- ☐ Easements/Encumbrances/Deed Restrictions
- ☐ Insurance Claims/Casualty Losses
- ☐ Association Notices, Dues, Special Assessments, Etc.

**Service Contracts**

- ☐ HVAC

- 12 -

*Schedule 2*

EAST\129478723 4

- ☐ Landscaping
- ☐ Cleaning/Janitorial
- ☐ Fire Protection/Life Safety (maintain/monitor)
- ☐ Elevator
- ☐ Generator/Ancillary Equipment
- ☐ Grease Traps
- ☐ Property Management
- ☐ Utilities (electricity, water, sewer, gas, data/cable, exterior lighting, etc.)
- ☐ Insurance
- ☐ Security
- ☐ Property Tax Consultant

## Debt and Equity

- ☐ Loan Documents for the Senior Loan
- ☐ Preferred Equity Terms and JV Agreement
- ☐ Limited Partner Terms and JV Agreement

- 13 -

*Schedule 2*

## EXHIBIT C

**Operating Partner Due Diligence**

General Information:

- ☐ Company Resume.
- ☐ Organizational Chart.

Detailed Track Record of all Deals Acquired in the Past 10 Years, including:

- ☐ Original Budget & Pro-forma.
- ☐ Actual Annual Results from Acquisition to Present.
- ☐ Sale Proceeds (if sold) or Current Valuation with Supporting Documentation.
- ☐ Total Project IRR and Investor IRR.

References:

- ☐ Investors
- ☐ Lenders

- 14 -

*Schedule 2*

**SCHEDULE 1**

**LIST OF PROJECTS**

**[TO BE INSERTED]**

*Schedule 2*

# EXHIBIT B

**Township**Capital, LLC

9229 W. Sunset Boulevard, Suite 310
Los Angeles, California 90069

September 12, 2016

**LEGAL SERVICES FEE
REIMBURSEMENT AGREEMENT**

THIS LEGAL SERVICES FEE REIMBURSEMENT ARRANGEMENT (the "**AGREEMENT**") is made as of September 9, 2016 by and between **TOWNSHIP CAPITAL, LLC** ("**COMPANY**") and their affiliates, employees, representatives, agents, successors and assignees, and **ATLAS P2 MANAGING MEMBER, LLC** ("**CLIENT**") and its officers, affiliates, employees, representatives, agents, successors and assignees ("**CLIENT**"; Company and Client are each individually a "**PARTY**" and collectively, the "**PARTIES**").

**R E C I T A L S**

WHEREAS, COMPANY has been introduced to CLIENT seeking an equity investment (the "**TRANSACTION**") for the Commercial Real Estate assets located at **10651 DEMILO PLACE, ORLANDO, FL 32836, 10649 BASTILLE LANE, ORLANDO, FL 32836, and 5759 CROWNTREE LANE, ORLANDO, FL 32836** (collectively the "**PROPERTY**" or "**PROPERTIES**").

WHEREAS, CLIENT has agreed to reimburse Company for its legal fees in connection with the TRANSACTION.

NOW, THEREFORE, for good and valuable consideration, the receipt of which is hereby acknowledged each Party agrees to abide by the following additional terms and conditions of this Agreement:

**A G R E E M E N T**

1. CLIENT agrees to reimburse COMPANY for all legal expenses incurred by COMPANY in relation to the Transaction. COMPANY acknowledges that COMPANY's sole legal representation is through Liner, LLP, with its primary place of business located at 1100 Glendon Avenue, 14th Floor, Los Angeles, CA 90024. COMPANY is investing into the Transaction via a Grant of Economic Interest (the "Economic Interest Agreement") which will be amended into a final Joint Venture Agreement ("the "]V Agreement"), including but not limited to, the amendments to the Atlas P2 Managing Member, LLC Operating Agreement, within thirty (30) days from the closing on September 9, 2016. As such, the COMPANY'S final legal invoice(s) will likely not be prepared before October 9, 2016 and cannot be part of the Final Closing Statement

1



EXHIBIT

2

5-379

or Sources and Uses of funds.  Accordingly, CLIENT agrees to reimburse COMPANY, in its entirety, for the all services related to the Transaction with five (5) business days from receiving an invoice from COMPANY.

2.  Miscellaneous:

i)  This Agreement constitutes the entire agreement between the Parties hereto with respect to the subject matter hereof and supersedes all prior understandings, written or oral, with respect thereto.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of California, without giving effect to the principles of conflicts of laws thereof.  Any provision of this Agreement, which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.  Any notice required or desired to be given to any Party hereto shall be in writing and shall be deemed given when (i) delivered personally and signed for by the recipient, (ii) when deposited in the United States mail, First Class postage prepaid, and addressed to such Party at the address set forth on the signature page hereto or to such other address as the receiving Party has given by notice hereunder to the notifying Party for purposes of receiving notices pursuant to this Agreement, followed by an electronic version or (iii) when transmitted by facsimile or other electronic transmission device then in commercial usage to the telephone number or by other transmission access means set forth herein or to such number or by such means as the receiving Party has given to the notifying Party either by notice to the notifying Party when followed by a printed version sent via courier or USPS.  This Agreement and the terms and conditions hereof shall be binding upon, inure to the benefit of, and be enforceable by and against the Parties hereto and their respective successors, assigns, heirs, executors, administrators and personal representatives.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument.  Notwithstanding any other provision contained in this Agreement or any other document with respect to any transaction entered into hereafter, the Parties shall have no duties, responsibilities or authority, except those expressly set forth herein or therein, or any fiduciary relationship with each other, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other document referred to herein or otherwise exist against the Parties.  The Parties and the individuals executing this Agreement below on behalf of the Parties represent and warrant to each other that such individual is duly authorized to execute and deliver this Agreement in the name and on behalf of the legal entity they represent.

ii) The Parties agree that they may amend, modify, and/or supplement this Agreement as they may mutually agree only in writing,

2

iii) CLIENT and COMPANY (each an "Indemnified Party") hereby agree that each shall indemnify the other, its officers, directors, agents, employees, representatives, affiliates, associated and controlling persons (individually or collectively "Indemnified Persons") of the other and hold them harmless from and against any and all claims actions, damages, consequential damages and liabilities and expenses incurred in connection with any legal action, including reasonable attorneys fees and expenses, arising in any way out of the Parties association pursuant to this Agreement, except to the extent of loss, cost or expense arising out of the gross negligence or willful misconduct of a Party. The Parties further agree that they will cooperate with each other in the defense of any claim or legal action asserted against the Parties at each other's request. Such cooperation may include but shall not be limited to conferring with each other or each other's Attorneys, providing each other with any documents in their possession or control that may be requested to be furnished and furnishing written affidavits or oral testimony as a witness in a deposition, a trial, an evidentiary hearing or an arbitration.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date set forth above.

**COMPANY**

Township Capital, LLC

By: _____

Matthew J. Gorelik
*Manager*

**CLIENT**

Atlas Apartment Homes, LLC DBA Atlas Residential, LLC

By: _____

Steven Ivankovich
*Manager*

4

# EXHIBIT C

## BINDING SETTLEMENT TERM SHEET

This settlement term sheet ("Binding Term Sheet"), dated as of July 23, 2020, by and between Atlas Holdings Investments LLC (the "Company"), Consilient Holdings Investments, LLC ("Managing Member"), Steven Ivankovich ("Ivankovich"), Atlas P2 Managing Member, LLC ("Atlas P2"), Atlas Apartment Homes, LLC dba Atlas Residential, LLC ("Atlas Apartment Homes," and together with the Company, Managing Member, Atlas P2, and Ivankovich, the "Atlas Parties"), Township Capital, LLC ("Township Capital"), Matthew J. Gorelik ("Gorelik"), Township Orlando LLC ("Township Orlando"), and Township GP Fund II ("Township Fund," and together with Gorelik, Township Capital, and Township Orlando, the "Township Parties"), is binding and enforceable as to the Atlas Parties and the Township Parties (each a "Party" and, collectively, the "Parties").

The Parties hereby agree as follows:

1.     Atlas P2 indirectly owns the real estate developments known as and located at Alexandria Parc Vue Apartments, 10649 Bastille Ln., Orlando, FL 32836 ("APV"), and Crowntree Lakes Apartments, 5759 Crowntree Ln., Orlando, FL 32829 ("Crowntree," and together with APV, the "Projects"). The Atlas Parties hereby acknowledge and agree that Township Orlando and Township Fund, as of and since June 7, 2017 (the "Conversion Date"), do own and maintain a direct equity interest in Atlas P2 (the "Interest"). Such Interest was acquired pursuant to an initial investment of USD $4,000,000 under the terms of the Grant of Economic Interest Agreement ("Grant Agreement") dated as of September 9, 2016 ("Investment Date"), which investment was subsequently converted into the Interest (on the Conversion Date) as more specifically defined in the underlying documents therefor, including those documents referred to in Paragraphs 3-4.

2.     The Atlas Parties represent and warrant that, other than as related to or arising out of the Grant Agreement, the organizational and ownership structure of the Projects has not materially changed since the Investment Date.

3.     The Atlas Parties hereby agree to provide to the Township Parties, within five (5) business days hereof, all documentation reasonably necessary to demonstrate the existence of and legitimacy of the Interest

4.     The Atlas Parties hereby agree to negotiate in good faith regarding and to execute any and all further documentation, if any, that the Township Parties deem as reasonable, necessary, and appropriate in order to confirm, acknowledge, and render indisputable the Interest.

5.     The Atlas Parties do not dispute and hereby acknowledge that they have maintained certain fiduciary, financial and other contractual obligations to the Township Parties since the Investment Date and the Conversion Date, respectively. The Atlas Parties do not dispute and hereby acknowledge the Township Parties' Interest and the fact that it has existed since the Conversion Date.

6.  The Atlas Parties will abide by, and continue to abide by, all of their fiduciary, financial and other obligations to the Township Parties in relation to and consistent with the Interest.  Among other things, neither the Atlas Parties nor any entity or person acting on their behalf or purporting to act on their behalf will represent to any entity or person that the Township Parties do not own the Interest.

7.  Upon the latter of receipt of the confirming documentation referred to in Paragraph 3 recognizing and confirming the Interest or the preparation and completion of the additional documentation referred to in Paragraph 4, the Township Parties will dismiss their lawsuit captioned *Township Orlando, LLC et al v Atlas Holdings Investments, LLC* et al., Case No. 19STCV00630, L.A.S.C. ("Action"), with prejudice.

8.  Prior to dismissal of the Action and within (2) business days from the date of this Binding Term Sheet, the Parties will enter into and file a stipulation pursuant to California Code of Civil Procedure § 664.6 allowing the court presiding over the Action to maintain jurisdiction thereof and the Township Parties shall cause the pending motion for summary judgment/summary adjudication to be taken off calendar.

9.  The Parties to bear their own fees and costs in connection with the Action.

10. Within two (2) business days of the receipt of the documentation referred to in Paragraph 3, the Township Parties will file a Notice of Conditional Settlement in the Action.

11. This Binding Term Sheet is binding and fully enforceable irrespective of whether any further documentation is contemplated or prepared.  Among other reasons, this Binding Term Sheet is admissible for purposes of enforcing this Binding Term Sheet and acknowledging and demonstrating the existence of the Interest.

*[Signature pages follow]*

IN WITNESS WHEREOF, each Party has caused this Binding Term Sheet to be executed as of the date set forth above.

**TOWNSHIP PARTIES:**

**TOWNSHIP ORLANDO, LLC**

By: _____
Name:  Matthew J. Gorelik
Title:  Manager


**TOWNSHIP GP FUND II, LP**

By: _____
Name:  Matthew J. Gorelik
Title:  Authorized Signatory


**TOWNSHIP CAPITAL, LLC**

By: _____
Name:  Matthew J. Gorelik
Title:  Manager


**MATTHEW J. GORELIK**

_____
Matthew J. Gorelik

**ATLAS PARTIES:**

**ATLAS HOLDINGS INVESTMENTS LLC**

By:
 Name:  Steven Ivankovich
 Title:   Authorized Signatory


**CONSILIENT HOLDINGS INVESTMENTS, LLC**

By:
 Name:  Steven Ivankovich
 Title:   Authorized Signatory


**ATLAS P2 MANAGING MEMBER, LLC**

By:
 Name:  Steven Ivankovich
 Title:   Authorized Signatory


**STEVEN IVANKOVICH**

Name:  Steven Ivankovich


**ATLAS APARTMENT HOMES, LLC**

By:
 Name:  Steven Ivankovich
 Title:   Authorized Signatory

# EXHIBIT D

## CONTRIBUTION AND EXCHANGE AGREEMENT

THIS CONTRIBUTION AND EXCHANGE AGREEMENT (this "Agreement"), dated as of _____ ___, 20___, is entered into by and among Atlas Township Orlando, LLC, a Delaware limited liability company ("Atlas Township Orlando"), Atlas Holdings Investments LLC, a Delaware limited liability company ("Atlas Holdings"), Atlas P2 Managing Member, LLC, a Delaware limited liability company ("Atlas P2"), Township Orlando, LLC, a Delaware limited liability company ("Township Orlando"), Township GP Fund II, LP, a Delaware limited partnership ("Township Fund"), and Stephen Ivankovich ("Ivankovich").

WHEREAS, Atlas Holdings and Ivankovich are members of Atlas P2;

WHEREAS, Atlas Holdings, Consilient Holdings Investments, LLC, Township Orlando, Atlas P2 and Ivankovich are parties to that certain Grant of Economic Interest Agreement, dated as of September 12, 2016 (the "Economic Interest Agreement"), pursuant to which Atlas Holdings granted Township Orlando the Economic Interest (as defined in the Economic Interest Agreement);

WHEREAS, pursuant to an Assignment and Assumption Agreement dated as of June 7, 2017, Township Orlando assigned to Township Fund fifty percent (50%) of the Economic Interest;

WHEREAS, Ivankovich, Township Orlando and Township Fund are members of Atlas Township Orlando; and

WHEREAS, the parties hereto desire to make certain contributions and exchanges of interests as described herein.

NOW, THEREFORE, in consideration of the mutual promises set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.     Atlas Township Orlando Contributions.  Ivankovich hereby contributes his entire membership interest in Atlas P2 to Atlas Township Orlando.  Each of Township Orlando and Township Fund hereby contributes its interest in the Economic Interest to Atlas Township Orlando.  In connection therewith, Ivankovich, Township Orlando and Township Fund will enter into that certain Amended and Restated Limited Liability Company Agreement of Atlas Township Orlando, in the form attached hereto as Exhibit A (the "Atlas Casa LLC Agreement").

2.     Exchange of Interests.  Immediately after the contributions described in Section 1, Atlas Township Orlando hereby transfers and assigns to Atlas Holdings, and Atlas Holdings hereby assumes, the Economic Interest.  In exchange for the Economic Interest, Atlas Holdings hereby transfers and assigns to Atlas Township Orlando, and Atlas Township Orlando hereby assumes, a portion of Atlas Holding's membership interest in Atlas P2, such that after the foregoing exchange, Atlas Holdings and Atlas Township Orlando have the membership interests in Atlas P2 as set forth in the Amended and Restated Limited Liability Company Agreement of Atlas P2, in the form attached hereto as Exhibit B.

3.    <u>Tax Treatment</u>.  Unless otherwise required pursuant to a final "determination" under Section 1313(a)(4) of the Internal Revenue Code of 1986, as amended (the "<u>Code</u>"), for all tax purposes, each party hereby agrees to treat the transactions described in <u>Section 2</u> as a contribution by each of Township Orlando, Township Fund and Ivankovich of its partnership interest in Atlas P2 to Atlas Township Orlando in exchange for a partnership interest in Atlas Township Orlando in a tax-free contribution described in Section 721 of the Code.

4.    <u>Further Assurances</u>.  Each party hereby agrees to execute and deliver to the other parties such other documents and to take all such other actions consistent herewith which the other party may reasonably request to effect the terms of this Agreement.

5.    <u>Governing Law</u>.  The terms of this Agreement shall be governed by, construed, interpreted and enforced in accordance with the laws of the State of Delaware without regard to its conflicts of law provisions.

6.    <u>Severability</u>.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

7.    <u>Binding Effect</u>.  This Agreement shall become effective upon execution by the parties hereto and thereafter shall be binding upon and inure to the benefit of such parties, their respective successors and permitted assigns.

8.    <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.   Delivery of an executed counterpart of this Agreement by facsimile, e-mail transmission via portable document format (.pdf) or other electronic means shall be equally as effective as delivery of a manually executed counterpart.

*[Remainder of page intentionally left blank; signature page follows]*

*[Signature Page to Contribution and Exchange Agreement]*

**IN WITNESS WHEREOF,** the undersigned have executed and delivered this Contribution and Exchange Agreement as of the date first above written.

ATLAS HOLDINGS INVESTMENTS LLC
a Delaware limited liability company

By: _____
Name: Steven Ivankovich
Title: Authorized Signatory


ATLAS TOWNSHIP ORLANDO, LLC
a Delaware limited liability company

By: _____
Name: Steven Ivankovich
Title: Authorized Signatory


ATLAS P2 MANAGING MEMBER, LLC
a Delaware limited liability company

By: _____
Name: Steven Ivankovich
Title: Authorized Signatory


_____
Steven Ivankovich


*[signature pages continue]*


*[Signature Page to Contribution and Exchange Agreement]*

TOWNSHIP ORLANDO, LLC
a Delaware limited liability company

By: Township Capital, LLC, its manager
By: _____
     Name:  Matthew J. Gorelik
     Title:  Manager

TOWNSHIP GP FUND II, LP
a Delaware limited partnership

By: _____
     Name:  Matthew J. Gorelik
     Title:  Authorized Signatory

*[Signature Page to Contribution and Exchange Agreement]*

# EXHIBIT E

**AMENDED AND RESTATED**

**LIMITED LIABILITY COMPANY AGREEMENT**

**OF**

**ATLAS TOWNSHIP ORLANDO, LLC**

**a Delaware limited liability company**

**Dated as of _____ ___, 20___**

THE INTERESTS OF THE MEMBERS HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES OR "BLUE SKY" LAWS OF CERTAIN STATES, ALTHOUGH THE COMPANY MAY APPLY FOR QUALIFICATION OF THE MEMBERS INTERESTS IN CERTAIN STATES.   THE TRANSFER OF THE INTERESTS MAY BE LIMITED BY THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY APPLICABLE STATE SECURITIES ACT OR "BLUE SKY" LAWS AND THE RESTRICTIONS ON TRANSFER CONTAINED IN THIS AGREEMENT.

TSORL_0009926

# TABLE OF CONTENTS

Article I DEFINED TERMS................................................................................................. 2
   1.01   Defined Terms ................................................................................................... 2
Article II ORGANIZATION .............................................................................................. 13
   2.01   Formation and Continuation ............................................................................ 13
   2.02   Name and Principal Place of Business.............................................................. 13
   2.03   Term.................................................................................................................. 14
   2.04   Registered Agent, Registered Office and Foreign Qualification ..................... 14
   2.05   Purposes ........................................................................................................... 14
   2.06   Powers.............................................................................................................. 14
   2.07   Subsidiaries ...................................................................................................... 14
Article III MEMBERS ....................................................................................................... 14
   3.01   Admission of Members..................................................................................... 14
   3.02   Limitation on Liability ..................................................................................... 15
   3.03   Rules of Construction Related to the Township Member. ................................ 15
Article IV CAPITAL .......................................................................................................... 15
   4.01   Initial Capital Contributions ............................................................................ 15
   4.02   Additional Funding and Capital Contributions................................................ 15
   4.03   Failure to Make Capital Contributions. ........................................................... 15
   4.04   Return of Capital .............................................................................................. 17
Article V CAPITAL ACCOUNTS ..................................................................................... 17
   5.01   Capital Accounts .............................................................................................. 17
   5.02   Adjustments ..................................................................................................... 17
   5.03   Negative Capital Accounts ............................................................................... 18
   5.04   Transfers .......................................................................................................... 18
   5.05   Capital Account Balance................................................................................... 18
Article VI ALLOCATIONS AND DISTRIBUTIONS ....................................................... 18
   6.01   Allocations of Net Profit and Net Loss............................................................ 18
   6.02   Regulatory Allocations and Special Allocations ............................................. 18
   6.03   Tax Allocations................................................................................................ 19
   6.04   Withholding ...................................................................................................... 20
   6.05   Tax Matters. ..................................................................................................... 20
   6.06   Distributions..................................................................................................... 22
   6.07   Fees .................................................................................................................. 23
Article VII MANAGEMENT .............................................................................................. 23
   7.01   Management...................................................................................................... 23
   7.02   Managing Member ........................................................................................... 29
   7.03   Intentionally Omitted ....................................................................................... 30
   7.04   Limited Power and Duties of the Members ...................................................... 30
   7.05   Delegation to Officers...................................................................................... 30
   7.06   Affiliate Agreements........................................................................................ 30
   7.07   Other Activities................................................................................................ 31
   7.08   Managing Member Event of Default . .............................................................. 31
   7.09   Approved Annual Budget ................................................................................. 33
   7.10   Insurance .......................................................................................................... 35
   7.11   Subordinate Financing ..................................................................................... 35

TSORL_0009927

Article VIII BOOKS AND RECORDS ................................................................ 35
8.01    Books and Records ...................................................................... 35
8.02    Accounting and Fiscal Year ........................................................ 35
8.03    Reports. ....................................................................................... 35
Article IX TRANSFER OF INTERESTS .......................................................... 36
9.01    No Transfer ................................................................................. 36
9.02    Permitted Transfers .................................................................... 37
9.03    Transferees ................................................................................. 38
9.04    Admission of Additional Members ............................................. 38
9.05    Put Right. .................................................................................... 38
Article X INDEMNIFICATION ........................................................................ 40
10.01    Indemnification .......................................................................... 40
10.02    Recourse Obligations ................................................................. 41
10.03    Exculpation/Member Indemnification ....................................... 41
Article XI DISSOLUTION AND TERMINATION ............................................ 41
11.01    Dissolution and Termination ...................................................... 41
11.02    Appointment of Liquidator ........................................................ 41
11.03    Duties and Obligations of Liquidator ........................................ 42
11.04    Liquidating Distributions ........................................................... 42
11.05    Articles of Dissolution ............................................................... 43
Article XII REPRESENTATIONS AND WARRANTIES .................................. 43
12.01    Representations and Warranties of the Members ....................... 43
Article XIII MISCELLANEOUS . ..................................................................... 45
13.01    No Fiduciary Duties .................................................................... 45
13.02    Notices ........................................................................................ 45
13.03    Further Assurances ..................................................................... 46
13.04    Captions ...................................................................................... 46
13.05    Pronouns ..................................................................................... 46
13.06    Successors and Assigns .............................................................. 46
13.07    Extension Not a Waiver .............................................................. 46
13.08    No Third Party Rights ................................................................. 46
13.09    Severability ................................................................................. 47
13.10    Entire Agreement ....................................................................... 47
13.11    Counterparts ............................................................................... 47
13.12    Survival ....................................................................................... 47
13.13    Confidentiality ........................................................................... 47
13.14    Governing Law ........................................................................... 48
13.15    Waiver of Jury. ........................................................................... 48
13.16    Amendments ............................................................................... 48
13.17    Brokerage .................................................................................... 48
13.18    Attorneys' Fees .......................................................................... 48
13.19    Grant Agreement ........................................................................ 48
13.20    Future Acquisitions .................................................................... 49
13.21    Equity Syndication ..................................................................... 49
13.22    Special Indemnification ............................................................. 50

TSORL_0009928

**SCHEDULES AND EXHIBITS**

EXHIBIT A                    Capital Contributions; Percentage Interests

SCHEDULE 7.09(a)-1           2016 Proposed Annual Operating Budget

SCHEDULE 7.09(a)-2           2016 Proposed Annual CapEx Budget

TSORL_0009929

## AMENDED AND RESTATED
## LIMITED LIABILITY COMPANY AGREEMENT
## OF
## ATLAS TOWNSHIP ORLANDO, LLC

THIS AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT of ATLAS TOWNSHIP ORLANDO, LLC, a Delaware limited liability company (the "Company"), dated as of _____ ___, 20___ ("Effective Date"), by and between STEVEN IVANKOVICH, an individual (together with his permitted successors and assigns, the "Atlas Member"), and TOWNSHIP ORLANDO LLC, a Delaware limited liability company ("Township Orlando"), and Township GP Fund II, LP, a Delaware limited partnership ("Township Fund," and together with Township Orlando and each of their respective permitted successors and assigns, the "Township Member"). The Atlas Member and the Township Member are referred to collectively herein as the "Members."

### R E C I T A L S:

WHEREAS, the Company was formed on November 1, 2017, as a limited liability company pursuant to the provisions of the Delaware Limited Liability Company Act (6 Del. C. §18-101, et. seq.) (as amended from time to time, the "Act") by the filing of the Certificate of Formation of the Company (the "Certificate of Formation") in the office of the Secretary of State of the State of Delaware;

WHEREAS, the Members previously entered into that certain limited liability company agreement of the Company, dated as of _____ ___, 20___ (the "Original Agreement");

WHEREAS, as of the date hereof, the Company, acting through the Subsidiaries, indirectly owns an interest in the Property;

WHEREAS, on September 12, 2016 (the "Original Investment Date"), Atlas Holdings Investments LLC, a Delaware limited liability company ("Atlas Holdings"), Consilient Holdings Investments LLC, a Delaware limited liability company ("Consilient Holdings"), Atlas Member, Township Orlando, and Atlas P2 Managing Member, LLC, a Delaware limited liability company ("Atlas P2") (as a joinder party) entered into that certain Grant of Economic Interest Agreement (the "Grant Agreement"), pursuant to which certain economic interests (the "Economic Interest") in the Property were granted to Township Orlando;

WHEREAS, Township Orlando assigned fifty percent (50%) of its economic interest in the Property pursuant to the Grant Agreement to Township Fund pursuant to that certain Assignment and Assumption Agreement, dated as of June 7, 2017, by and among Township Orlando and Township Fund;

WHEREAS, pursuant to that certain Contribution and Exchange Agreement, dated as of the date hereof _____ ___, 20___, by and among the Company, Atlas Member, Atlas Holdings, Atlas P2, Township Orlando and Township Fund, (i) Atlas Member contributed his entire membership interest in Atlas P2 to the Company, (ii) Township Orlando and Township Fund contributed the Economic Interest to the Company, and (iii) the Company assigned the Economic Interest to Atlas Holdings in exchange for a membership interest in Atlas P2;

1

TSORL_0009930

**WHEREAS**, the parties hereto desire to amend and restate the Original Agreement and enter into this Agreement to provide for the respective rights, obligations and interests of the parties to each other and to the Company, and the terms and conditions on which the Company will conduct business in this Agreement.

**NOW, THEREFORE**, in consideration of the mutual covenants herein contained, and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree that the Original Agreement is amended and restated in its entirety as follows:

ARTICLE I
DEFINED TERMS

1.01    <u>Defined Terms</u>.  As used in this Agreement, the following terms have the meanings set forth below:

"<u>Act</u>" has the meaning set forth in the Recitals.

"<u>Adjusted Capital Account Deficit</u>" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, or portion thereof, after giving effect to the following adjustments:

(i)    Credit to such Capital Account any amounts which such Member is deemed to be obligated to restore pursuant to the penultimate sentences in Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations; and

(ii)    Debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) and 1.704-1(b)(2)(ii)(d)(6) of the Regulations.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Regulations and shall be interpreted consistently therewith.

"<u>Affiliate</u>" means, with respect to a specified Person, (a) a Person that, directly or indirectly through one or more intermediaries, owns ten percent (10%) or more of all equity interests in such Person, or Controls, is Controlled by or is under common Control with, the specified Person, (b) any Person that is an officer, director, partner, manager or trustee of, or serves in a similar capacity with respect to, the specified Person or of which the specified Person is an officer, partner, manager or trustee, or with respect to which the specified Person serves in a similar capacity, (c) the spouse, sibling, issue or parent of the specified Person, and (d) a trust whose beneficiaries include a spouse, sibling, issue or parent of the specified Person.  The Company shall not be deemed to be an Affiliate of any Member.

"<u>Affiliate Agreement</u>" means any agreement or contract between any of the Company, or any Subsidiary, on one hand, and the Sponsor, any other member of the Sponsor Group, the Atlas Member, and/or any Affiliate of any of the foregoing, on the other hand.

TSORL_0009931

"Agreement" means this Limited Liability Company Agreement, including any Exhibits or Schedules attached hereto, as the same may be amended or restated from time to time pursuant to the terms of this Agreement.

"Alexandria at Parc Vue Property" means that certain 672-units, 30 buildings, garden-style Class-A apartment community located on an approximately 38.8-acre site, which includes one (1) clubhouse, four (4) pools, two (2) fitness centers, two (2) tennis courts, one (1) business center, one (1) outdoor grill, one (1) playground and one (1) car care center, with a total of 1,342 parking spaces and 224 detached garages. The Alexandria at Parc Vue Property contains 216 one bedroom/one bathroom units, 121 two bedroom/one bathroom units, 263 two bedroom/two bathroom units and 72 three bedroom/two bathroom units, totaling approximately 736,529 square feet of net rentable space with an average unit size of approximately 1,096 square feet and all other improvements located on that certain real property having a common address of 10649 Bastille Lane and 10651 DeMilo Place, Orlando, Florida and located on the west side of Winter Garden Vineland Road in Orlando, Orange County, Florida.

"Atlas Member" has the meaning set forth in the Recitals.

"Annual Budget" means, for any calendar year or other period, the budget proposal prepared by the Managing Member in consultation with the Township Member and then submitted by the Managing Member to Township Member for its review and approval pursuant to Section 7.09 below.

"Approved Annual Budget" means, from time to time, either of (or, as the context requires, both of) the Approved Annual Operating Budget and the Approved Annual CapEx Budget.

"Approved Annual CapEx Budget" has the meaning set forth in Section 7.09.

"Approved Annual Operating Budget" has the meaning set forth in Section 7.09.

"Atlas Holdings" has the meaning set forth in the Recitals.

"Atlas Homes" has the meaning set forth in the definition of "Property Management Agreement".

"Atlas P2" has the meaning set forth in the Recitals.

"Atlas P2 Operating Agreement" shall mean that certain Amended and Restated Limited Liability Company Agreement of Atlas P2 Managing Member, LLC, dated as of _____ ___, 20___, by and between Atlas Holdings Investments LLC and Atlas Township Orlando, LLC.

"Bad Act" means, with respect to any Person, fraud, material and intentional misrepresentation, willful misconduct, willful and deceptive misapplication or misappropriation of funds, gross negligence, material breach of this Agreement or a Bankruptcy with respect to such Person or triggered by such Person or any other act or improper omission by such Person that triggers liability under the Recourse Obligation in question.

TSORL_0009932

"Bankruptcy" with respect to any Person, means (i) the making an assignment for the benefit of creditors, (ii) the filing a voluntary petition in bankruptcy, (iii) becoming the subject of an order for relief or being declared insolvent in any federal or state bankruptcy or insolvency proceeding (unless such order is dismissed within ninety (90) days following its entry), (iv) the filing a petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation, (v) the filing an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding similar in nature to those described in the preceding clauses, or otherwise failing to obtain dismissal of such petition within one hundred twenty (120) days following its filing or (vi) seeking, consenting to or acquiescing in, the appointment of a trustee, receiver or liquidator of all or any substantial part of its properties.

"Bankruptcy Code" means Title 11 of the U.S. Code as now constituted or hereafter amended.

"Book Value" means with respect to any asset, the asset's adjusted basis for U.S. federal income tax purposes, except as follows:

(i)    The initial Book Value of any asset contributed (or deemed contributed) to the Company shall be the gross fair market value of such asset at the time of such contribution;

(ii)    The Book Values of all of the Company's assets shall be adjusted to equal their respective gross fair market values (taking Code Section 7701(g) into account), as of the following times:  (A) the acquisition of an additional Interest in the Company by any new or existing Member in exchange for more than a de minimis capital contribution; (B) the distribution by the Company to a Member of more than a de minimis amount of Company property as consideration for an Interest in the Company; (C) the liquidation of the Company within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g); and (D) the grant of an interest in the Company (other than a de minimis interest) as consideration for the provision of services to or for the benefit of the Company by an existing Member acting in a partner capacity, or by a new Member acting in a partner capacity or in anticipation of becoming a Member; provided, however, that the adjustments pursuant to clauses (A), (B) and (D) above shall be made only if the Tax Matters Member determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company;

(iii)    The Book Value of any item of Company assets distributed (or deemed distributed) by the Company to any Member shall be adjusted immediately prior to such distribution to equal the gross fair market value (taking Code Section 7701(g) into account) of such asset as of the date of distribution; and

(iv)    The Book Values of Company assets shall take into account any adjustments to the adjusted basis of any asset of the Company pursuant to Section 734 or Section 743 of the Code in determining such asset's Book Value in a manner consistent with Regulations Section 1.704-1(b)(2)(iv)(m).

If the Book Value of an asset has been determined or adjusted pursuant to clause (i), (ii) or (iv) above, such Book Value shall thereafter be adjusted in the same manner as would the

TSORL_0009933

asset's adjusted basis for U.S. federal income tax purposes, except that Depreciation shall be computed based on the asset's Book Value as so determined, rather than on its adjusted tax basis.

"Business Day" means any day that is not a Saturday, Sunday or any other day on which commercial banks in the State of New York are generally closed for commercial banking business.

"CapEx Reserve Work" means certain deferred maintenance and upgrades set forth on Schedule 7.09(a)-2 together with certain capital improvements in the nature of replacing fixtures and other items at the Property as may be set forth in the then current Approved Annual CapEx Budget.

"Capital Account" means the separate account maintained for each Member pursuant to Section 5.01.

"Capital Call" has the meaning set forth in Section 4.02(a).

"Capital Contribution" means, with respect to any Member, the amount of cash and the gross value, as approved by the Township Member, of any property (reduced by any debt on the property) actually contributed to the capital of the Company made by such Member pursuant to this Agreement, but not including any funds paid pursuant to Section 10.02(b) by or in respect of Atlas Member.

"Certificate of Formation" has the meaning set forth in the Recitals.

"Code" means the Internal Revenue Code of 1986, as amended.

"Company" has the meaning set forth in the Preamble.

"Consilient Holdings" has the meaning set forth in the Recitals.

"Contributing Member" has the meaning set forth in Section 4.03(a).

"Control" means, with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person through the ownership of voting securities or similar ownership interests. The terms Controlled, Controlling and Common Control shall have correlative meanings.

"Coverage Contribution" has the meaning set forth in Section 4.03(a).

"Crowntree Property" means that certain 352-units, 21 buildings, garden-style Class-A apartment community located on an approximately 22.5-acre site, which includes one (1) clubhouse, one (1) pool, one (1) fitness center, one (1) game room, one (1) business center, one (1) theatre room, one (1) kitchen with grills, one (1) lakeside walking trail, one (1) dog park, one (1) outdoor grill, one (1) playground and one (1) car care center, with a total of 546 parking spaces including 111 detached garages. The Crowntree Property also includes 116 storage units. The Crowntree Property contains 152 one bedroom/one bathroom units, 152 two bedroom/two bathroom units and 48 three bedroom/two bathroom units, totaling approximately 382,344

TSORL_0009934

square feet of net rentable space with an average unit size of approximately 1,086 square feet and all other improvements located on that certain real property having a common address of 5759 Crowntree Lane, Orlando, Florida and located on the west side of Winter Garden Vineland Road in Orlando, Orange County, Florida.

"Defaulted Amount" has the meaning set forth in Section 4.03(a).

"Depreciation" means, for each Fiscal Year, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable for U.S. federal income tax purposes with respect to an asset for such Fiscal Year, except that (i) with respect to any asset the Book Value of which differs from its adjusted tax basis for U.S. federal income tax purposes at the beginning of such Fiscal Year and which difference is being eliminated by use of the "remedial method" as defined by Section 1.704-3(d) of the Regulations, Depreciation for such Fiscal Year shall be the amount of Book Value recovered for such Fiscal Year under the rules prescribed by Section 1.704-3(d)(2) of the Regulations, and (ii) with respect to any other asset the Book Value of which differs from its adjusted tax basis for U.S. federal income tax purposes at the beginning of such Fiscal Year, Depreciation shall be an amount which bears the same ratio to such beginning Book Value as the U.S. federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis; provided, that in the case of clause (ii) above, if the adjusted tax basis for U.S. federal income tax purposes of an asset at the beginning of such Fiscal Year is zero, Depreciation shall be determined with reference to such beginning Book Value using any method selected by the Tax Matters Member.

"Dispose" or "Disposition" means, with respect to all or part of any asset or property (including, without limitation, an Interest), a sale, assignment, transfer, exchange, conveyance, gift, pledge, encumbrance, exchange or other disposition of such asset, whether such disposition be voluntary, involuntary or by operation of law, including (without limitation) the following: (a) in the case of an asset or property owned by a natural person, a transfer of such asset or property upon the death of its owner, whether by will, intestate succession or otherwise; (b) in the case of an asset or property owned by an Entity, (i) a merger or consolidation of such Entity in which such Entity is not the survivor, (ii) a conversion of such Entity into another type of Entity, and (iii) a distribution of such asset in connection with the dissolution, liquidation, winding-up or termination of such Entity; and (c) a disposition in connection with, or in lieu of, a foreclosure of an encumbrance.

"Distribution" means each distribution by the Company pursuant to Section 6.06 of this Agreement.

"Effective Date" means the date set forth in the preamble of this Agreement.

"Entity" means any Person other than a natural person.

"Financial Need Date" has the meaning set forth in Section 4.02.

"Financing Amount" has the meaning set forth in Section 4.03(c).

"Fiscal Year" has the meaning set forth in Section 8.02.

TSORL_0009935

"GAAP" means U.S. generally accepted accounting principles, consistently applied.

"Governmental Authority" means any nation or government, any state or other political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"Grant Agreement" has the meaning set forth in the Recitals.

"Gross Receipts" means all cash receipts of the Company, and each of the Subsidiaries from any source whatsoever.  Tenant security deposits and other deposits received by the Company or any Subsidiary shall be excluded from the calculation of Gross Receipts unless and until such time as the Company or any Subsidiary is entitled to apply such amounts toward obligations that such deposits secure.

"Guarantor" has the meaning set forth in Section 10.02.

"Indemnified Person" has the meaning set forth in Section 10.01(a).

"Initial Capital Contributions" has the meaning set forth in Section 4.01.

"Initiation Notice" shall have the meaning set forth in Section 9.05(a).

"Interest" means, with respect to any Member at any time, the entire interest of such Member in the Company at such time, including the right of such Member to any and all of the benefits to which such Member may be entitled as provided in this Agreement, together with the obligations of such Member to comply with all of the terms and provisions of this Agreement.

"Leases" means all leases, licenses and other agreements or arrangements heretofore or hereafter entered into pursuant to which any Person is granted by the Property Owner (or Property Manager on its behalf) the right to use, enjoy or occupy any portion of the Property or any of the improvements thereon, including any guarantees, extensions, renewals, modifications or amendments thereof and all additional remainders, reversions and other rights and estates appurtenant thereto.

"Lender" means the lender with respect to any Secured Loan, including any successor or assign, and any replacement thereof as lender.

"Lien" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), preference, priority or other pledge agreement or preferential arrangement of any kind or nature whatsoever (including, without limitation, any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing and the filing of any financing statement under the Uniform Commercial Code or comparable law of any jurisdiction in respect of any of the foregoing), but excluding, however, liens for real estate taxes not yet delinquent.

"LP Investors" has the meaning set forth in Section 13.21(a).

"Major Decision" has the meaning set forth in Section 7.01(a).

TSORL_0009936

"Managing Member" means Atlas Member or, if applicable, any successor thereto by reason of the appointment of such successor following removal of the Atlas Member as permitted in this Agreement, or by reason of the transfer of Atlas Member's Interest permitted by Article IX.

"Managing Member Event of Default" means the occurrence of any of the following, unless the same has been specifically consented to in writing in advance by the Township Member:

(i)     the failure of the Company to make distributions to Members if and to the extent required pursuant to Section 6.06 of this Agreement;

(ii)     Managing Member effectuates any Major Decision without the Township Member's prior written consent;

(iii)     the occurrence of (I) any monetary or material non-monetary default (it being agreed that any non-monetary default as to which Lender sends a default notice or a reservation or rights notice shall, inter alia, be deemed material for all purposes hereof) under any Secured Loan Documents with respect to the Property (x) for which no grace period is provided under the applicable Secured Loan Documents or (y) that is not cured at least seven (7) days (in the case of non-monetary defaults) or at least three (3) days (in the case of monetary defaults) prior to the expiration of any grace period under such Secured Loan Documents with respect thereto; for the sake of clarity, it is agreed that if the Township Member is entitled to and does take action necessary to cure a default under such Secured Loan Documents, the occurrence of such event shall nevertheless constitute a Managing Member Event of Default under this clause or (II) any "Event of Default" (as defined in the Secured Loan Documents) has occurred and is continuing under the Secured Loan Documents;

(iv)     the Company and/or Managing Member breaches any material provision of this Agreement that is not the result of a Bad Act by the Company or the Managing Member, which breach (A) is not otherwise specifically covered under another clause of this definition of Managing Member Event of Default, and (B) is not cured within five (5) days (if such breach relates to the payment of money) or thirty (30) days (for any other breach) after the Township Member gives the Managing Member written notice of such breach (provided, however, that such 30-day cure period shall apply and be available only if and for so long as such breach is reasonably capable of being cured within the 30-day period and Managing Member is using diligent efforts to cure the breach in question);

(v)     the Company and/or the Managing Member or any other member of the Sponsor Group breaches any material provisions of this Agreement as a result of, or under circumstances involving, a Bad Act by the Managing Member or any Affiliate of any of them, or any officer, manager, member or other representative of any of the foregoing;

(vi)     any event that would give rise to any material liability under the Sponsor Guaranty;

(vii)     the occurrence of any Bankruptcy by or with respect to the Company, the Property Owner or any Subsidiary, or the Atlas Member;

TSORL_0009937

(viii)    the fraud, theft or other willful misconduct by, at the direction of, or with the consent of, the Managing Member or any member of the Sponsor Group, to the extent relating to the Company (including in its capacity as managing member, manager or equivalent of the Property Owner or any Subsidiary of either of them or of the Company) or the Property Owner or any Subsidiary or of the Company, in each case as determined by the Township Member; and/or

(ix)    any material representation or material warranty made by any Person in Section 12.01 of this Agreement or any other document, instrument or agreement delivered in connection with this Agreement (other than any representation or warranty made by the Township Member) fails to be true, correct and complete in all material respects as of the date made.

"Members" has the meaning in the introductory paragraph of this Agreement.

"Mortgage Brokerage Agreement" shall mean that certain Non-Circumvention, Non-Disclosure and Fee Arrangement Agreement, dated September 12, 2016, by and between Township Capital, LLC and Atlas P2.

"Net Cash Flow" means, for any period, any and all Gross Receipts of the Company and its Subsidiaries (without double counting), less all operating expenses, if any, of the Company and, without double counting, any outstanding expenses of any Subsidiary of the Company that have not already been reserved for or otherwise accounted for by the Company or that Subsidiary.

"Net Profits" and "Net Losses" means for any period the taxable income or loss, respectively, of the Company for such period, determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), but computed with the following adjustments:

(i)    items of income, gain, loss and deduction (including, without limitation, gain or loss on the disposition of any Company asset and Depreciation) shall be computed based upon the Book Value of the Company's assets rather than upon such assets' adjusted bases for U.S. federal income tax purposes;

(ii)    any income of the Company that is exempt from U.S. federal income tax and not otherwise taken into account in computing Net Profit or Net Loss pursuant to this definition shall be added to such taxable income or loss;

(iii)    any expenditure of the Company described in Section 705(a)(2)(B) of the Code (or treated as described therein pursuant to Regulations under Section 704(b) of the Code) and not otherwise taken into account in computing Net Profit or Net Loss pursuant to this definition shall be subtracted from such taxable income or loss;

(iv)    if the Book Value of any Company asset is adjusted pursuant to clauses (ii), (iii) or (iv) of the definition thereof, the amount of such adjustment shall be taken into account in the period of adjustment as gain or loss from the disposition or deemed disposition of such asset for purposes of computing Net Profits and Net Losses; and

TSORL_0009938

(v)     items of income, gain, loss, or deduction or credit allocated pursuant to Section 6.02 shall not be taken into account.

"Non-Contributing Member" has the meaning set forth in Section 4.03(a).

"Non-Defaulting Member" has the meaning set forth in Section 4.03(a).

"Ordinary Course Financing" means the following (but only to the extent permitted under the Secured Loan Documents and/or PE Investment Documents, to the extent applicable): (i) individual transactions in the ordinary course of business for insurance premium financing, equipment financing or equipment leasing to the extent the costs thereof are included in the then applicable Approved Annual Budget; and (ii) unsecured trade payables incurred by the Property Owner in the ordinary course of business relating to the ownership and operation of the Property.

"Original Investment Date" has the meaning set forth in the Recitals.

"Organizational Documents" shall mean collectively, as applicable, all organizational documents of any entity including, without limitation, all certificates of formation, certificates of limited partnership, articles of incorporation, limited liability company agreements, partnership agreements, bylaws and the like (and any amendments, modifications or supplements to any of the foregoing).

"PE Investor" means GRC 2016 Rally Orlando, LLC, a Delaware limited liability company.

"PE Investment" shall mean the preferred equity investment, in the amount of $16,000,000 made by PE Investor in Premiere.

"PE Investment Documents" shall mean the operating agreement of Premiere and all other agreements entered into in connection with the PE Investment, as each of the same may be amended, restated, replaced, supplemented or otherwise modified from time-to-time.

"Percentage Interest" means the interest listed for each Member on Exhibit A attached hereto, as the same may be adjusted as a result of any permitted Transfers and/or any adjustments arising out of the failure of a Member to fund capital when required by the terms of this Agreement.

"Person" means any individual, corporation, partnership, joint venture, limited liability company, limited liability partnership, association, joint stock company, trust, unincorporated organization, or other organization, whether or not a legal entity, and any Governmental Authority.

"Potential Equity Investor" has the meaning set forth in Section 13.20(a).

"Premiere" means Premiere Orlando Portfolio Two, LLC, a Delaware limited liability company.

TSORL_0009939

"<u>Prohibited Person</u>" means any Person identified on any of the U.S. Government Restricted Lists or any other Person with whom a U.S. Person may not conduct business or transactions by prohibition of Federal law or Executive Order of the President of the United States of America.

"<u>Property</u>" shall mean, collectively, (i) the Crowntree Property, and (ii) the Alexandria at Parc Vue Property.

"<u>Property Management Agreement</u>" means, the agreement entered into between each Property Owner, on the one hand, and Atlas Apartment Homes, LLC ("<u>Atlas Homes</u>"), or another third-party property manager approved in advance by the Township Member, on the other hand (the "<u>Property Manager</u>"), for the management and/or leasing of the Property. The Township Member acknowledges and agrees that Atlas Homes is an approved property manager and hereby consents and approves the appointment of Atlas Homes as the Property Manager of the Property, provided that it has approved the property management agreement to govern that relationship.

"<u>Property Manager</u>" has the meaning set forth in the definition of "Property Management Agreement".

"<u>Property Owner</u>" means each of (i) Atlas Alexandria & Parc Vue, LLC, a Delaware limited liability company, and (ii) Atlas Crowntree Lakes, LLC, a Delaware limited liability company.

"<u>Property Value</u>" means $178,400,000.00 ($59,400,000.00 with respect to the Crowntree Property and $119,000,000.00 with respect to the Alexandria at Parc Vue Property), as the value ascribed to the Property on the Original Investment Date.

"<u>Put Period</u>" shall have the meaning set forth in Section 9.05(a).

"<u>Put Right</u>" shall have the meaning set forth in Section 9.05(a).

"<u>Recourse Obligation</u>" has the meaning set forth in Section 10.02.

"<u>Regulations</u>" means the income tax regulations promulgated under the Code.

"<u>Regulatory Allocations</u>" has the meaning assigned to it in Section 6.02(e).

"<u>Required Capital Contributions</u>" has the meaning set forth in Section 4.03(a).

"<u>Secured Loan</u>" means the mortgage loans secured by the Property and any refinancing thereof that is entered into in accordance with this Agreement.

"<u>Secured Loan Documents</u>" means all agreements of indebtedness, now or hereafter evidencing, securing or delivered by any Property Owner to a lender (including the Lender) in connection with, any Secured Loan, as each of the same may be amended, restated, replaced, supplemented or otherwise modified from time-to-time, including a loan agreement, a promissory note, a mortgage, an assignment of leases and rents, a cash management agreement,

TSORL_0009940

an assignment of management agreement and subordination of management fees, UCC financing statements, guaranties and any and all other documents, instruments, certificates and other items executed in connection with such agreements or as otherwise may be related to an applicable Secured Loan, and all documents, agreements, certificates, or financing statements contemplated thereby or related thereto.

"Securities Act" has the meaning set forth in Section 12.01(a)(vi).

"Securities Laws" has the meaning set forth in Section 12.01(a)(vi).

"Selling Expenses" means transfer taxes, recording fees to clear title, documentary fees and taxes, if incurred and other closing costs customarily incurred by the seller for property that is the subject of this Agreement and apportioned to the seller in accordance with local customs, but excluding any and all legal, accounting or other similar fees and expenses incurred in connection with the sale.

"Sponsor" means Steven Ivankovich.

"Sponsor Group" means (i) the Sponsor; and (ii) any Affiliate of any of the foregoing Persons (but specifically excluding, for this purpose, the Company and any controlled Subsidiary thereof).

"Strike Price" shall have the meaning set forth in Section 9.05(a).

"Strike Value" shall have the meaning set forth in Section 9.05(a).

"Subsidiary" means: (i) Atlas P2, (ii) P2 Portfolio Managing Member, LLC, a Delaware limited liability company, (iii) P2 Portfolio Investor Member, LLC, a Delaware limited liability company, (iv) Premiere, (v) AAPV Member, LLC, a Delaware limited liability company, (vi) ACL Member, LLC, a Delaware limited liability company, and (vii) each Property Owner.

"Tax Matters Member" has the meaning set forth in Section 6.05(a).

"Tax Termination" has the meaning set forth in Section 9.01(c).

"Taxing Authority" has the meaning set forth in Section 6.04.

"Township Fund" has the meaning set forth in the Preamble.

"Township Member" has the meaning set forth in the Preamble.

"Township Orlando" has the meaning set forth in the Preamble.

"Transfer" has the meaning set forth in Section 9.01.

"U.S. Government Restricted Lists" means, (a) the two (2) lists maintained by the United States Department of Commerce (Denied Persons and Entities; the Denied Persons), (b) the list maintained by the United States Department of Treasury (Specially Designated Nationals and

TSORL_0009941

Blocked Persons), and (c) the list maintained by the United States Department of State (Terrorist Organizations and Debarred Parties).

1.02    Construction. Words used herein, regardless of the number or any gender used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine or neuter, as the context requires, and, as used herein, unless the context clearly requires otherwise, the words "hereof," "herein," and "hereunder" and words of similar import shall refer to this Agreement as a whole and not to any particular provisions hereof. References herein to any Article, Section, Schedule or Exhibit shall be to an Article, a Section, a Schedule or an Exhibit, as the case may be, hereof unless otherwise specifically provided. The use herein of the word "include" or "including", when following any general statement, term or matter, shall not be construed to limit such statement, term or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not non-limiting language (such as "without limitation" or "but not limited to" or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that fall within the broadest possible scope of such general statement, term or matter.

ARTICLE II
ORGANIZATION

2.01    Formation and Continuation. The Company was formed as a limited liability company under the laws of the State of Delaware by the filing of the Certificate of Formation on November 1, 2017 pursuant to the Act. The Managing Member shall file and record with the proper offices in the State of Delaware and any other state in which the Company does business, such further certificates and other filings as shall be required or advisable under the Act or applicable law. The rights, powers, duties, obligations and liabilities of the Members shall be determined pursuant to the Act and this Agreement. To the extent that the rights, powers, duties, obligations and liabilities of the Members are different by reason of any provision of this Agreement than they would be in the absence of such provision, this Agreement shall, to the extent permitted by the Act, control. The existence of the Company as a separate legal entity shall continue until cancellation of the Certificate of Formation as provided in the Act.

2.02    Name and Principal Place of Business.

(a)    The name of the Company is Atlas Township Orlando, LLC. All business of the Company shall be conducted under such name, and title to all assets of the Company shall be held in such name.

(b)    The principal place of business and office of the Company shall be initially located at c/o Atlas P2 Managing Member, LLC, 55 East Monroe Street, Suite 3610, Chicago, IL 60603. Such principal place of business and office of the Company may be changed from time to time by the Managing Member in its sole discretion, provided that it promptly provides notice of any such change to the Township Member.

TSORL_0009942

2.03    <u>Term</u>.  The term of the Company commenced on the date of the filing of the Certificate of Formation pursuant to the Act and shall continue in full force and effect until the dissolution and termination of the Company pursuant to Article XI.

2.04    <u>Registered Agent, Registered Office and Foreign Qualification</u>.  The address of the Company's registered office shall be at the offices of its registered agent, as set forth in the Certificate of Formation.  The address of the Company's registered office and registered agent of the Company may be changed from time to time by the Managing Member by filing the address of the new registered office and/or the name of the new registered agent with the Secretary of State pursuant to the Act.

2.05    <u>Purposes</u>.  Subject to the limitations set forth herein, the business and purpose of the Company shall be to own a direct or indirect interest in the Properties, to serve as the managing member of Atlas P2 and to engage in any and all activities not prohibited by the Act as are related or incidental to each of the foregoing.

2.06    <u>Powers</u>.  The Company shall have the power to do anything and everything not prohibited by the Act and necessary, suitable or proper for the accomplishment of or in furtherance of the purposes set forth above, and to do every other act or acts, thing or things, incidental or appurtenant to or arising from or connected with any of such purposes.  The powers of the Company shall be exercised by or under the authority of, and the business and affairs of the Company shall be managed by, the Managing Member as provided herein.

2.07    <u>Subsidiaries</u>.  All of the provisions of this Agreement regarding the management and governance of the Company shall apply to the management and governance of each Subsidiary.  The Managing Member, in its capacity as such, shall perform, with no additional compensation, the same or substantially identical services for each Subsidiary referenced above as the Managing Member performs for the Company, subject to the terms, conditions, limitations and restrictions set forth in this Agreement.  The Managing Member agrees to perform such duties, and in such circumstances and with regard to such duties, the Managing Member shall be subject to the same standards of conduct and shall have the same duties and obligations in performing of such services on behalf of each Subsidiary as are set forth in this Agreement.  Without limiting the generality of the foregoing (and notwithstanding anything contained herein to the contrary), any action or decision to be taken or made by or on behalf of any Subsidiary of the Company that, if taken or made by or on behalf of the Company would constitute a Major Decision, will require the Township Member's prior written consent in accordance with this Agreement.

ARTICLE III
MEMBERS

3.01    <u>Admission of Members</u>.  The Atlas Member and the Township Member are the only Members of the Company as of the date hereof.  Except as expressly permitted by this Agreement and approved by the Township Member, no other Person shall be admitted as a member of the Company and no other Person has the right to take part in the ownership or management of the Company.

14

TSORL_0009943

3.02    Limitation on Liability.  Except as otherwise expressly provided in the Act or this Agreement, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member shall be obligated personally for any such debt, obligation or liability of the Company, solely by reason of being a Member of the Company.

3.03    Rules of Construction Related to the Township Member.  References herein to the approval, consent, determination, or other similar term of the Township Member mean the approval, consent or determination of Members holding a majority of the Percentage Interests held by the Township Member.  Subject to any consent or approval as required by the preceding sentence, each instance in which the Township Member is entitled to any payment or to participate in any other right or benefit under this Agreement, the Members comprising the Township Member will be entitled to participate in such payment or other right or benefit on a pro rata basis based on the Percentage Interests held by such Members.

ARTICLE IV
CAPITAL

4.01    Initial Capital Contributions.  As of the Effective Date in connection with the execution and delivery of this Agreement, each Member has made Capital Contributions of property with the values set forth opposite the Member's name as "Initial Capital Contributions" on Exhibit A (the "Initial Capital Contributions").

4.02    Additional Funding and Capital Contributions.  If the same has been approved by the Township Member as a Major Decision, the Managing Member shall give written notice to the other Members of the Company's need for additional funds (a "Capital Call").  Except as otherwise specifically provided in this Agreement or otherwise approved by the Township Member, no Member may contribute additional capital to the Company for any reason.  Each Capital Call shall specify the total amount of Capital Contributions being called and the amount to be funded by each Member, the reason(s) why such amount is being called, and the date such funds are required to be contributed to the Company, which date for each Member shall not in any event be earlier than the expiration of ten (10) days after the Capital Call is delivered to the Member in accordance with this Section 4.02 (the "Financial Need Date").  On or before the Financial Need Date, each Member shall contribute to the Company, as a Capital Contribution, an amount equal to the total amount specified in the Capital Call multiplied by its then Percentage Interest.

4.03    Failure to Make Capital Contributions.

(a)    In the event the Members are required to make a Capital Contribution pursuant to this Article IV (such Capital Contribution being referred to as a "Required Capital Contribution"), and a Member (a "Non-Contributing Member") has defaulted in its obligation to contribute all or a portion of its share of such Required Capital Contribution by the Financial Need Date (the portion of the Required Contribution that is not contributed, the "Defaulted Amount"), then each other Member that funded its share of the Required Capital Contribution and is not a Non-Contributing Member (each, a "Non-Defaulting Member" and, if a Non-Defaulting Member elects to fund any of the Defaulted Amount, such Member is referred to

TSORL_0009944

herein as a "Contributing Member") shall have the right to elect one of the remedies set forth below at Sections 4.03(b) and 4.03(c). If more than one Non-Defaulting Member elects to exercise remedies under this Section 4.03, those Non-Defaulting Members wishing to fund the Defaulted Amount shall share in the funding of the shortfall pro rata based on their respective Percentage Interests. If Members having Percentage Interests do not agree to fund 100% of the shortfall (including as a result of there being no Members other than Township Member and the Atlas Member), then the Atlas Member will have the right, but not the obligation, to fund the balance of the Defaulted Amount and, in such case, will become a Non-Defaulting Member and a Contributing Member in respect thereof (with all rights and remedies provided for herein). Any Non-Defaulting Member electing a remedy under this Section 4.03 must fund the Defaulted Amount within ten (10) days after the date on which the Required Capital Contribution giving rise to the Defaulted Amount was due.

(b)    The Contributing Member(s) shall have the right to lend the Defaulted Amount to the Non-Contributing Member, which loan shall bear interest at the rate equal to the lesser of (x) fifteen percent (15%) per annum, compounded monthly and (y) the maximum interest rate permitted by law, plus the costs of collection, from the date the loan is made until the date of repayment. If and to the extent not earlier repaid by the Non-Contributing Member, the repayment of any such loan to the Non-Contributing Member shall be effected by the Managing Member causing the Company to pay directly to the Contributing Member(s) all distributions otherwise payable to the Non-Contributing Member under this Agreement as and when payable, instead of making such distributions to the Non-Contributing Member (with such distributions being deemed for all purposes to have been made to the Non-Contributing Member and then paid by the Non-Contributing Member to the Contributing Member(s) or their Affiliates, as the case may be). In addition, a Contributing Member shall have full recourse against a Non-Contributing Member for any loan made to the Non-Contributing Member pursuant to this Section 4.03. Any distributions used to repay such loan shall be applied first to interest and then to principal.

(c)    Each Contributing Member shall have the right, by notice to the Non-Contributing Member given within two (2) Business Days after the funding of any Default Amount, to elect to treat the Default Amount as a Capital Contribution to the Company. In addition, if the Contributing Member(s) elects to proceed with a loan to the Defaulting Member as provided in Section 4.03(b), such Contributing Member(s), at any time thereafter, may elect, by written notice to the Non-Contributing Member, to convert the then-current balance of such loan, and all interest accrued thereon and not yet paid (the aggregate amount of such principal and accrued and unpaid interest, the "Financing Amount"), to a Capital Contribution to the Company. Upon such conversion, the loan shall be deemed repaid to the Contributing Member(s). In either case, if such election is made, the Percentage Interest of the Contributing Member shall be increased by a percentage equal to the quotient (rounded up to the nearest one hundredth of one percent) obtained when (x) the Default Amount funded by the Contributing Member (or, if applicable, the Financing Amount) multiplied by two (2.00) is divided by (y) the sum of all Members' Capital Contributions as of such date (including the Default Amount). The Percentage Interest of the Non-Contributing Member shall be decreased by the aggregate amount of the increase in the Percentage Interest of the Contributing Member(s) as a result of the failure of the Non-Contributing Member to fund the capital calls in question. After determining the adjusted Percentage Interest, each Member shall be deemed, as of any date, solely for purposes

TSORL_0009945

of further calculations and adjustments of each Member's Percentage Interest, to have made Capital Contributions equal to such Member's adjusted Percentage Interest multiplied by the total Capital Contributions made by all Members as of such date. The date of such Capital Contributions (or, if applicable, the conversion of the Financing Amount to equity) will be memorialized in writing by the Managing Member.

(d)    In the case of a failure to fund a Capital Call when required as provided in this Article, the Company and the Non-Defaulting Member(s) shall have all rights and remedies against the Non-Contributing Member as are available at law and in equity, which shall be in addition to the remedies specified in this Section 4.03.

4.04    <u>Return of Capital</u>.  Except as otherwise expressly provided herein, no Member shall have the right to demand or receive the return of all or any part of its Capital Contribution to the Company.

ARTICLE V
CAPITAL ACCOUNTS

5.01    <u>Capital Accounts</u>.  A capital account ("<u>Capital Account</u>") shall be maintained for each Member in accordance with Section 704(b) of the Code and Regulations Sections 1.704-1(b) and 1.704-2 and shall be interpreted and applied in a manner consistent with such Treasury Regulations.  The initial Capital Account of each Member is as set forth in Exhibit A.  If the Managing Member determines that it is necessary or prudent to modify the manner in which the Capital Accounts are maintained in order to comply with such Treasury Regulations, the Managing Member may make such modification, provided that, notwithstanding any other provision in this Agreement, such modification will not affect the amounts distributable to any Member and provided that the Managing Member shall not make any such modification without the consent of the Township Member, such consent not to be unreasonably withheld, delayed or conditioned.  If the rules of Treasury Regulations Section 1.704-1(b)(2)(iv) fail to provide guidance on how adjustments to the Capital Accounts should be made to reflect particular adjustments to the amount of Company capital reflected on the Company's balance sheet, as computed for book purposes, the Managing Member may make any adjustments in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(q), provided the Managing Member obtains the consent of the Township Member, such consent not to be unreasonably withheld, delayed or conditioned.

5.02    <u>Adjustments</u>.  The Capital Account of each Member shall be increased by (i) the amount of any cash contributed by such Member to the capital of the Company, (ii) the Book Value of any property contributed by such Member to the capital of the Company (net of liabilities that the Company is considered to assume, or take property subject to, under Section 752 of the Code), (iii) such Member's share of Net Profits (as determined in accordance with Section 6.01) and (iv) any income and gain allocated to such Member pursuant to Section 6.02. The Capital Account of each Member shall be decreased by (w) the amount of all cash distributions to such Member, (x) the Book Value of any property distributed to such Member by the Company (net of liabilities that the Member is considered to assume, or take property subject to, under Section 752 of the Code), (y) such Member's share of Net Losses (as determined in

TSORL_0009946

accordance with Section 6.01), and (z) any deductions and losses allocated to such Member pursuant to Section 6.02.

5.03    Negative Capital Accounts.  No Member shall be required to make up or otherwise be liable for a negative balance in its Capital Account.

5.04    Transfers.  If any Interest is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Interest.

5.05    Capital Account Balance.  Except as otherwise provided in this Agreement, whenever it is necessary to determine the Capital Account balance of any Member, the Capital Account balance of such Member shall be determined after giving effect to all allocations pursuant to Sections 6.01 and 6.02 and all contributions and distributions made prior to the time as of which such determination is to be made.

## ARTICLE VI
## ALLOCATIONS AND DISTRIBUTIONS

6.01    Allocations of Net Profit and Net Loss.  After the application of Section 6.02, Net Profit and Net Loss for any taxable year, or portion thereof, shall be allocated to the Members pro rata in proportion to their respective Percentage Interests.

6.02    Regulatory Allocations and Special Allocations.

(a)    Notwithstanding any other provision of this Agreement, (i) "partner nonrecourse deductions" (as defined in Regulations Section 1.704-2(i)(2)), if any, of the Company shall be allocated for each period to the Member that bears the economic risk of loss within the meaning of Regulations Section 1.704-2(i)(1) and (ii) "nonrecourse deductions" (as defined in Regulations Section 1.704-2(b)(1)) and "excess nonrecourse liabilities" (as defined in Regulations Section 1.752-3(a)(3)), if any, of the Company shall be allocated to the Members in proportion with their respective Percentage Interests.

(b)    This Agreement shall be deemed to include "qualified income offset," "minimum gain chargeback" and "partner nonrecourse debt minimum gain chargeback" provisions within the meaning of the Regulations under Section 704(b) of the Code. Accordingly, notwithstanding any other provision of this Agreement, items of gross income shall be allocated to the Members on a priority basis to the extent and in the manner required by such provisions.

(c)    To the extent that Net Loss or items of loss or deduction otherwise allocable to a Member hereunder would cause such Member to have an Adjusted Capital Account Deficit as of the end of the taxable year to which such Net Loss, or items of loss or deduction, relate (after taking into account the allocation of all items of income and gain for such taxable period), such Net Loss, or items of loss or deduction, shall not be allocated to such Member and instead shall be allocated to the Members in accordance with Section 6.01 as if such Member were not a Member.

TSORL_0009947

(d)    If any Member has an Adjusted Capital Account Deficit at the end of any taxable year that is in excess of the sum of the amount such Member is obligated to restore pursuant to the penultimate sentences of Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), each such Member shall be specially allocated items of income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section 6.02(d) shall be made only if and to the extent that such Member would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Article VI have been made as if Section 6.02(c) and this Section 6.02(d) were not in this Agreement.

(e)    Any allocations required to be made pursuant to Sections 6.02(a)-(d) (the "Regulatory Allocations") (other than allocations, the effects of which are likely to be offset in the future by other special allocations) shall be taken into account, to the extent permitted by the Regulations, in computing subsequent allocations of income, gain, loss or deduction pursuant to Section 6.01 so that the net amount of any items so allocated and all other items allocated to each Member shall, to the extent possible, be equal to the amount that would have been allocated to each Member pursuant to Section 6.01 had such Regulatory Allocations under this Section 6.02 not occurred.

(f)    It is intended that prior to a distribution of the proceeds from a liquidation of the Company pursuant to Section 11.04, the positive Capital Account balance of each Member shall be equal to the amount that such Member is entitled to receive pursuant to Section 11.04(b). Accordingly, notwithstanding anything to the contrary in this Article VI, to the extent permissible under Section 704(b) of the Code and the Regulations thereunder, Net Profit and Net Loss and, if necessary, items of gross income and gross deductions, of the Company for the year of liquidation of the Company (or, if earlier, the year in which all or substantially all of the Company's assets are sold, transferred or disposed of) shall be allocated among the Members so as to bring the positive Capital Account balance of each Member as close as possible to the amount that such Member would receive if the Company were liquidated and all the proceeds were distributed in accordance with Section 11.04(b).

6.03    Tax Allocations.

(a)    For U.S. federal income tax purposes, except as otherwise provided in this Section 6.03, each item of income, gain, loss and deduction shall be allocated among the Members in the same manner as its corresponding item of "book" income, gain, loss or deduction is allocated pursuant to Sections 6.01 and 6.02.

(b)    In accordance with Sections 704(b) and 704(c) of the Code and the Regulations thereunder, income, gain, loss and deduction with respect to any Company asset contributed (or deemed contributed) to the capital of the Company shall, solely for U.S. federal income tax purposes, be allocated among the Members so as to take into account any variation between the adjusted basis of such Company asset for U.S. federal income tax purposes and its Book Value upon its contribution (or deemed contribution), such allocation to be made using a method described in Section 1.704-3 of the Regulations as determined by the Tax Matters Member with the approval of the Township Member. If the Book Value of any Company asset is adjusted, subsequent allocations of taxable income, gain, loss and deduction with respect to such Company asset shall take account of any variation between the adjusted basis of such Company

19

TSORL_0009948

asset for U.S. federal income tax purposes and the Book Value of such Company asset in the same manner as under Code Section 704(c) and the Regulations thereunder.

(c)      If a Member acquires an Interest, redeems all or a portion of its Interest or transfers an Interest during a taxable year, the Net Profit or Net Loss (and other items referred to in Sections 6.01 and 6.02) attributable to any such Interest for such taxable year shall be allocated between the transferor and the transferee by closing the books of the Company as of the date of the transfer, or by any other method permitted under Section 706 of the Code and the Regulations thereunder that is selected by the Tax Matters Member with the approval of the Township Member.

(d)      The provisions of this Article VI (and other related provisions in this Agreement) pertaining to the allocation of items of Company income, gain, loss, deductions, and credits shall be interpreted consistently with the Regulations, and to the extent unintentionally inconsistent with such Regulations, shall be deemed to be modified to the extent necessary to make such provisions consistent with the Regulations.

6.04    Withholding. The Company will at all times be entitled to make payments with respect to each Member in amounts required to discharge any obligation of the Company to withhold or make payments to any U.S. federal, state, local or foreign taxing authority ("Taxing Authority") with respect to any distribution or allocation of income or gain to such Member and to withhold (or deduct) the same from distributions to such Member (any amounts paid by the Company with respect to a Member pursuant to Section 6221 of the Code shall be treated as a withheld amount for purposes of this Section 6.04). Any funds withheld from a distribution by reason of this Section 6.04 shall nonetheless be deemed distributed to the Member in question for all purposes under this Agreement. If the Company makes any payment to a Taxing Authority in respect of a Member hereunder that is not withheld from actual distributions to the Member, then the Member shall reimburse the Company for the amount of such payment, on demand. The amount of a Member's reimbursement obligation under this Section 6.04, to the extent not paid, shall be deducted from the distributions to such Member; any amounts so deducted shall constitute a repayment of such Member's obligation hereunder. Each Member's reimbursement obligation under this Section 6.04 shall continue after such Member transfers its interest in the Company or after a withdrawal by such Member. Each Member agrees to furnish the Company with any representations and forms as shall reasonably be requested by the Company to assist it in determining the extent of, and in fulfilling, any withholding obligations it may have. Each Member agrees to indemnify and hold harmless the Company and the other Member from and against any liability with respect to taxes, interest or penalties which may be asserted by reason of the failure to deduct and withhold tax on amounts distributable or allocable to such Member. Any amount payable as indemnity hereunder by a Member will be paid promptly to the Company, and if not so paid, the Company will be entitled to retain any distributions due to such Member for all such amounts.

6.05    Tax Matters.

(a)      Tax Matters Member. The Managing Member shall be the "Tax Matters Member" for the Company, and, as such, will have the same authority as a tax matters partner as defined in Section 6231(a)(7) of the Code and the "Partnership Representative" as defined in

TSORL_0009949

Section 6223 of the Code as amended by the Bipartisan Budget Act of 2015 and analogous provisions of state and local law and such other authority as provided in this Agreement  At Company expense, the Tax Matters Member shall furnish the Township Member with status reports regarding any negotiation between the Internal Revenue Service (or other taxing authority) and the Company promptly after any material new development, and the Township Member shall be given reasonable advance notice by the Tax Matters Member so it shall have the opportunity to participate, and permit its professional tax advisers to participate, in person in all of such negotiations.  Notwithstanding anything to the contrary contained herein, the Tax Matters Member will not, without the consent of the Township Member: (i) enter into any tax settlement agreement affecting the Company or the Holding Company or any Subsidiary of either of them or any tax return of the Company or the Holding Company or any Subsidiary of either of them; (ii) make any other material tax election with respect to the Company, the Holding Company or a Subsidiary of either of them (including any election that would result in any such entity being taxed as a corporation) or any tax election for any such entity that would have a material adverse effect on the Township Member; or (iii) make any other election that constitutes a Major Decision or would have an adverse effect on any Member. The Tax Matters Member shall be reimbursed by the Company for any reasonable out-of-pocket expenses incurred in its capacity as Tax Matters Member, provided that the same are accounted for in the then-applicable Approved Annual Budget.  The Managing Member shall not knowingly cause the Company to engage directly or indirectly in a transaction that, as of the date that the Company enters into a binding contract to engage in such transaction, is a "listed transaction" or a "prohibited reportable transaction" (each as defined in Code Section 4965(e)). If the Managing Member reasonably determines that the Company has engaged directly or indirectly in a transaction that is a listed transaction, a prohibited reportable transaction, or a "reportable transaction" as defined in Treasury Regulations Section 1.6011-4(b)(1), it shall timely notify the Members of such determination.

      (b)   <u>Tax Elections</u>.  Subject to the foregoing restrictions, the Tax Matters Member shall make all decisions with respect to the treatment of Company transactions in the Company's federal, state, local and foreign tax returns.  Except as otherwise provided herein (including as provided in Section 6.05(a)), all tax elections required or permitted to be made under the Code and any applicable state, local or foreign tax law, other than any election under Section 754 of the Code which shall be made at the request of any Member, shall be made in the discretion of the Tax Matters Member.  Each Member (and any permitted transferee of any Member) who requests any such Section 754 election shall bear all expenses incurred by the Company arising in connection with or as a result of such election as it relates to a Member interest transferred, including, without limitation, accounting and appraisal expenses, if any. Notwithstanding the foregoing, (i) it is intended that the Company be treated as a partnership for U.S. federal income tax purposes and neither the Company nor any Member shall make any election (for tax purposes or otherwise) inconsistent with such treatment and (ii) subject to the second and third sentences of this Section 6.05(b), any material tax elections required or permitted to be made under the Code and any applicable state, local or foreign tax law shall require the consent of the Township Member (including, with respect to tax years of the Company beginning after December 31, 2017,  the decision to make an election under Section 6226 of the Code as amended by the Bipartisan Budget Act of 2015, if applicable).

TSORL_0009950

(c)    Tax Information.  The Tax Matters Member shall cause to be prepared and filed at the Company's expense all necessary federal, state and local income tax returns for the Company on or before the due dates thereof and shall deliver a copy of each such tax return to the Members within one hundred twenty (120) days after the end of each Fiscal Year.  At least fifteen (15) Business Days prior to the date on which the Company files any United States tax return, the Tax Matters Member shall deliver such return to Township Member and obtain consent from Township Member regarding such return, which consent shall not be unreasonably withheld, delayed or conditioned, prior to finalizing the return.  In addition, the Tax Matters Member shall cause the Company to furnish each Member, by April 1 following the end of each Fiscal Year, a final Schedule K-1; provided, however, that at least fifteen (15) Business Days prior to the date on which the Company transmits the Schedules K-1 to the Members, the Tax Matters Member shall deliver the Schedules K-1 to Township Member and obtain the consent of Township Member regarding such Schedules K-1, which consent shall not be unreasonably withheld, delayed or conditioned, prior to finalizing the Schedules K-1.  On a timely basis to allow Members to pay estimated United States taxes, the Tax Matters Member shall cause the Company to furnish to each Member an estimate of the income, gain, loss or deduction allocated to such Member for U.S. federal income tax purposes.  The Tax Matters Member will use reasonable efforts to deliver or cause to be delivered as soon as reasonably practicable during each Fiscal Year, to each Member all information necessary for the preparation of such person's U.S. federal income tax returns and any state, local and foreign income tax returns that such Member is required to file as a result of the Company being engaged in a trade or business within such state, local or foreign jurisdiction, including a statement showing such Member's share of income, gains, losses, deductions and credits for such year for U.S. federal income tax purposes (and, if applicable, state, local or foreign income tax purposes) and the amount of any distributions made to or for the account of such Member.  Upon the written request of any Member made not later than thirty (30) calendar days after the end of each year and at the sole expense of such Member, the Tax Matters Member will use reasonable efforts to deliver or cause to be delivered any additional information necessary for the preparation of any state, local and non-US income tax returns that must be filed by such Member no later than March 31 of such year.

6.06    Distributions.  The Managing Member shall cause all Net Cash Flow that is distributed by Atlas P2 to the Company to be distributed, from time to time and at least on a monthly basis, to the Members in accordance with their Percentage Interests.  Notwithstanding the foregoing, upon receipt of the Special Distribution (as defined in the Atlas P2 Operating Agreement) from Atlas P2, the Special Distribution will be distributed to the Atlas Member. Further notwithstanding the foregoing, if any member of the Sponsor Group or its Affiliates (including any Subsidiary) is (a) in breach of any payment obligations under (i) that certain Non-Circumvention, Non-Disclosure and Fee Arrangement Agreement, dated September 12, 2016, between Township Capital LLC and Atlas Apartment Homes, LLC, (ii) that certain Legal Services Fee Reimbursement Agreement, dated as of September 12, 2016 between Township Capital LLC and Atlas P2 Managing Member LLC, or (iii) that certain Non-Circumvention, Non-Disclosure and Fee Arrangement Agreement, dated September 12, 2016, between Township Orlando LLC and Atlas P2 Managing Member, LLC, or (b) has any unpaid indemnification obligation pursuant to Section 13.22, no distributions may be made to the Atlas Member until such breach is cured or such indemnification obligation is satisfied.

TSORL_0009951

6.07    Fees. Any fees paid by either Property Owner to any individual or entity in the Sponsor Group shall be split between Atlas Member (or the applicable individual or entity in the Sponsor Group) and Township Member as follows (provided, that if such fees are not actually paid to the Company or a Subsidiary, the Atlas Member shall pay (or cause its applicable Affiliate or the applicable individual or entity in the Sponsor Group receiving such fee to pay) to Township Member the amount that Township Member would have received were such fees paid directly to the Company):

|  | Atlas Member (or applicable Sponsor Group entity or individual) | Township Member |
|---|---|---|
| Asset Management Fees | 83.33% | 16.67% |
| Construction Management Fees | 100.0% | 0% |
| Capital Advisory Fees | 0% | 100.0% |

ARTICLE VII
MANAGEMENT

7.01    Management.

(a)    The business and affairs of the Company shall be controlled by the Managing Member, provided however, that none of the actions or decisions set forth in Section 7.01(b) below (each, a "Major Decision") shall be taken or committed to, directly or indirectly, by the Company or by any Subsidiary, unless the same has been approved by the Managing Member and the Township Member, which consent may be granted or withheld by either such Member in its sole discretion (unless otherwise specifically set forth below). For the avoidance of doubt, the Township Member shall have the right to propose that Managing Member take any Major Decisions with respect to the Company, or any Subsidiary of any of the foregoing or the Property. Except as otherwise expressly provided in this Agreement (including in Section 7.02(c) and Section 7.08), no Member, other than the Managing Member, shall participate in the management or control of the Company or have any right to approve, vote on or otherwise consent to any matter relating to the business, affairs or assets of the Company or any Subsidiary.

(b)    The Major Decisions include all of the following and shall apply to any action or decision proposed to be taken by the Company for itself or as managing member of Atlas P2 or direct or indirect managing member, sole member, manager or equivalent of any Subsidiary, in each case whether or not so specified:

(i)    Except for Ordinary Course Financing, incur any indebtedness or exercise any consents or elections under any financing, including the granting of any mortgage, security interest or any other lien and otherwise borrow money or amend the terms and conditions of any financing or make elections with respect to interest periods,

TSORL_0009952

interest rates, prepayment or other material provisions under any financing, including in all events any and all documentation relating to any of the foregoing or become liable as an endorser, guarantor, surety or otherwise for any debt obligation or undertaking of any other party, except for endorsements for deposit or collection of checks, drafts and similar instruments received in the ordinary course of business;

(ii)    except for Ordinary Course Financing, grant any lien, mortgage, or pledge of, or hypothecate, Company assets to secure any indebtedness for borrowed money of the Company or prepay any indebtedness of the Company;

(iii)    modify the then-applicable Approved Annual Budget with respect to the Company, any Subsidiary or the Property. Notwithstanding the foregoing, the Company may make expenditures outside the then current Approved Annual Budget (a) in the case of the Approved Annual Operating Budget, to the extent not exceeding 5% with respect to any individual line item in any calendar year; or (b) in the case of the Approved Annual CapEx Budget, to the extent not exceeding 5% with respect to any individual line item in any calendar year;

(iv)    sell or otherwise Dispose of the Property or any direct or indirect interest in the Property or any material asset or group of related assets of the Company or any Subsidiary (other than personal property, including but not limited to, automobiles and non-fixtures (e.g., appliances) in the ordinary course of business), or purchasing any additional real property or interests therein or any other property or assets (other than the purchase, in the ordinary course of business, of equipment and personal property relating to the ownership and operation of the Property);

(v)    enter into any contract or subcontract or other agreement (A) that is less favorable to any of the Company, or any Subsidiary than would be available if the agreement were on customarily arms'-length terms, (B) with the Managing Member or any member of the Sponsor Group or any Affiliate of any of them, or (C) that (i) exceeds $100,000 in aggregate value of payments required of the Company and/or any Subsidiary and (ii) is not terminable by the Company or any Subsidiary, as applicable, upon thirty (30) (or fewer) days' prior notice without penalty or premium (except for laundry contracts, vending machine contracts, electronic security contracts, uniform rental agreements, equipment leases and operations and maintenance contracts, in each case to the extent such contract is such as arises in the ordinary course of the business of operating the Property and is of a type not customarily terminable upon thirty (30) (or fewer) days' prior written notice, in which case the terms thereof must be on customary market terms for a contract of that type);

(vi)    except as otherwise expressly permitted pursuant to this Agreement, sell or issue any additional (x) direct or indirect interests in the Company or (y) direct interest in any Subsidiary, admit any Member or other equity owner to the Company or any Subsidiary, or pledge, hypothecate or transfer any membership or partnership interest or shares or other equity interest of any Subsidiary, or the proceeds thereof or any other direct interest in any Subsidiary, or acquire a membership, stock, partnership or other ownership interest in any Person;

24

TSORL_0009953

(vii)    make any loan for borrowed money to any Person, including, without limitation, any purchase money financing in connection with the sale of all or any portion of the Property;

(viii)    construct any capital improvements, alterations or changes in, to or on the Property, or any part thereof, which are not contemplated by, or are not consistent with, the then current Approved Annual CapEx Budget for the Property, in each case unless the same is needed to address an emergency, for unanticipated repairs or constitutes other work and, in each case, is required by the Lender pursuant to the relevant Secured Loan Documents and/or PE Investment Documents or by applicable law;

(ix)    settle any casualty insurance or condemnation claim in excess of the greater of 1% of the Property Value and $50,000 or determine insurance policy coverages, deductibles and liability limits for any insurance coverage or (A) reduce the amount or type of insurance coverage maintained by or on behalf of the Company or any Subsidiary or (B) except as otherwise required by the Secured Loan Documents and/or PE Investment Documents, reinvest (for restoration) (i) insurance proceeds in excess of the greater of 1% of the Property Value and $50,000 from damage to or destruction of the Property or any portion thereof, or (ii) condemnation proceeds in excess of the greater of 1% of the Property Value and $50,000 from the taking or settlement in lieu of a threatened taking of all or any portion of the Property,

(x)    make any tax election or decision affecting the tax treatment of the Township Member in connection with its participation in the Company, including, but not limited to, (i) the changing of the Company's fiscal year and (ii) in its capacity as the "Tax Matters Member";

(xi)    commence any litigation by the Company or any Subsidiary or defend any litigation against the Company or any Subsidiary unless the underlying claim is fully covered by insurance in effect for such entity (other than the applicable deductible).    Managing Member may choose counsel in any litigation, provided Township Member has given its prior written consent to the proposed selection, which consent shall not be unreasonably withheld, conditioned or delayed by the Township Member;

(xii)    confess or cause or permit the Company or any Subsidiary to confess a judgment or settle any litigation involving a claim or amount in excess of $100,000; provided, however, that Managing Member shall not be permitted to settle any litigation involving or that arises from a Managing Member Event of Default or a claim of action that, if proven, would constitute a Managing Member Event of Default, in each case without the Township Member's written consent;

(xiii)    initiate or cause or permit to be initiated any proceeding, or file a petition, under the Bankruptcy Code or any similar law relating to the protection of creditors by, or consent to, or cooperate with (or fail to resist), the initiation and/or prosecution of any involuntary proceeding or filing against, the Company, any Subsidiary or any Affiliate of any of the foregoing under the Bankruptcy Code or any similar law

TSORL_0009954

relating to the protection of creditors or take any other action which would affect the Company or any Subsidiary or any Affiliate of any of the foregoing under the Bankruptcy Code; approve or disapprove of a creditors' plan, the filing of an involuntary petition of bankruptcy or the dismissal or discharge of a claim of bankruptcy in connection with bankruptcy proceedings involving any Person contracting with the Company or any Subsidiary;

(xiv)    engage the services of any legal counsel, investment banker, financial adviser, asset manager or other professional, consultant or other similar service provider, unless the engagement is contemplated in the then applicable Approved Annual Budget and the proposed counterparty has been approved by the Township Member, such approval not to be unreasonably withheld, conditioned or delayed;

(xv)    appoint any property manager or construction contractor for work to be performed at the Property or otherwise for the benefit of the Company or any Subsidiary, provided, that in each case, the consent of Township Member shall not be unreasonably withheld, conditioned or delayed (it being understood that if a particular professional, and the scope and cost of the related work, are set forth in the Approved Annual Budget, the professional will be considered to have been approved for purposes of this clause);

(xvi)    commingle the funds of the Company or any Subsidiary with those of any other Person;

(xvii)    enter into, or amend, modify or supplement, any agreement or other arrangement with, or otherwise engage, Managing Member or any Affiliate of Managing Member or of any other member of the Sponsor Group, or any other Person in which any of member of the Sponsor Group or any Affiliate thereof, has any economic interest, for the provision of any goods or services (including any construction management, property management, service contracts or other similar services) to the Company or any Subsidiary or for any other reason;

(xviii) merge, consolidate with or acquire any equity interest in any Person or form or create any direct or indirect subsidiary of the Company or any Subsidiary;

(xix)    issue any press releases or other public dissemination of material information regarding the Company, or any Subsidiary or any member or any affiliate any of the foregoing (other than the general dissemination of information publicly with respect to the Property Owner or any other Subsidiary to the extent arising in the ordinary course of business), in any form unless required by law; provided that without Township Member's prior written consent, which consent may be granted or withheld in its sole discretion, no such press releases or other public dissemination of information shall include any reference to the name or participation of the Township Member or any of its affiliates;

TSORL_0009955

(xx)    take any action that constitutes an event of default under or otherwise violates the requirements of this Agreement;

(xxi)    amend or modify or supplement any provision of this Agreement or the Organizational Documents of any Subsidiary or the Property Management Agreement, provided that if and to the extent any such amendment or modification or supplement is required by Lender to comply with special purpose provisions or, in the case of the Property Management Agreement, any other provisions of the Secured Loan Documents and/or PE Investment Documents, then Township Member shall not unreasonably withhold, condition or delay its approval of such amendment or modification;

(xxii)   make any distributions, other than in accordance with the terms of this Agreement or call for Members to make any additional Capital Contributions;

(xxiii)  dissolve, wind-up, terminate or liquidate the Company or any Subsidiary; amend, modify or supplement the limited liability company agreement (or any other Organizational Documents) of any Subsidiary; or otherwise take or permit or cause the Company or any other Subsidiary to take any action which would cause the Company or such Subsidiary to be or become an entity other than a Delaware limited liability company or to be or to become an entity taxed as a corporation;

(xxiv)   without limiting the generality of any other provision hereof, (A) incur, replace, renew, extend, substitute, supplement, amend, modify, increase, restructure or refinance any Secured Loan Documents or any of the terms of the Secured Loan or seek a waiver of any of the terms of any Secured Loan (or cause or permit the Property Owner or any other Subsidiary to do any of the foregoing), or (B) amend, modify or enter into any new PE Investment Documents or seek a waiver under any of the terms of the PE Investment Documents (other than any waiver that Managing Member is required to seek hereunder);

(xxv)    enter into any Lease, Lease renewal, or Lease amendment, other than a residential Lease, Lease renewal, or Lease amendment that, (i) when taken together with all other Leases at the Property, does not result in the leasing of more than three (3) residential units to the same tenant and/or to the knowledge of the Managing Member any Affiliates thereof, (ii) is permitted by the terms of any Secured Financing, (iii) does not contain any option to purchase, any right of first refusal to purchase, any right to terminate (except in the event of the destruction or condemnation of substantially all of the Property) or any rights of extension or expansion and (iv) is on the standard form residential lease then approved for use at the Property by the mortgage lender whose loan is secured by the Property (or, if there is no mortgage loan secured by the Property or the mortgage lender has not approved a particular form for use at the Property, the form approved for such purposes by the Township Member); provided that the Managing Member shall not need the Township Member's consent to enter into any commercial or retail lease in any portion of the Property so long as (a) the premises to be leased for commercial or retail uses was being leased for such use by the immediately preceding tenant thereof, (b) such retail or commercial lease is for a use permitted by applicable

TSORL_0009956

law, and (c) the requirements of the immediately preceding clauses (ii) and (iii) are satisfied;

(xxvi) except for the reserves expressly contemplated by this Agreement or required by the Secured Loan Documents and/or PE Investment Documents, establish or modify the amount of any reserves for the Company or any Subsidiary;

(xxvii) take any action that, pursuant to the terms of the Secured Loan Documents, requires the consent of the Lender or is prohibited by or would constitute a breach or default under the terms of any of the Secured Loan Documents or allows the Lender to exercise any remedy under the Secured Loan Documents;

(xxviii) take any action that, pursuant to the terms of the PE Investment Documents, requires the consent of PE Investor or is prohibited by or would constitute a breach or default under the terms of any of the PE Investment Documents, or allows the PE Investor to exercise any remedy under the PE Investment Documents;

(xxix) change, or submit any letter or other instrument proposing or consenting to change, the permitted uses or zoning of the Property; or convert, or submit any instrument proposing or consenting to the conversion of, the Property or part thereof to a condominium or cooperative form of ownership;

(xxx) except as required pursuant to Secured Loan Documents and/or PE Investment Documents or as specifically set forth in the Approved Annual Operating Budget, (a) amend or modify in any material respect, or terminate, any insurance coverage with respect to the Company or any Subsidiary or any part of the Property, or (b) renew any existing insurance policy, if the terms of such renewal policy sets forth any material exclusion from coverage that is not expressly excluded from the insurance policies in effect on the date of this Agreement;

(xxxi) change the nature of the business or affairs of the Company or any Subsidiary or the use of the Property;

(xxxii) accept Capital Contributions, or make Distributions, "in kind" (i.e., other than in U.S. dollars);

(xxxiii) with regard to any Subsidiary, take, make or approve any matter which if taken, made or approved by the Company would constitute a "Major Decision" under any other clause hereunder;

(xxxiv) cause any Subsidiary to be an employer or to have any employees; and

(xxxv) make any written commitment or agreement to do any of the foregoing.

(c)    Intentionally reserved.

TSORL_0009957

(d)    If the Atlas Member, or any Affiliate thereof, commits a Bad Act or takes or causes the Company or any Subsidiary to take any action prohibited by or otherwise in contravention of the terms of this Agreement, including, without limitation, any Major Decision without having obtained the requisite approval of the Township Member therefor, the same shall be a default by the Atlas Member, and the Atlas Member and Sponsor, jointly and severally, shall indemnify, defend and hold harmless the Township Member and its Affiliates, and the respective officers, directors, shareholders, partners, members, managers, employees, successors and assigns of any of them, from and against any and all claims, demands, losses, damages, liabilities, lawsuits and other proceedings, judgments and awards, and costs and expenses (including, but not limited to, reasonable attorneys' fees and expenses) arising directly or indirectly out of any such act.

7.02    <u>Managing Member</u>.

(a)    Subject to the provisions of Section 7.01, Section 7.08 and all other applicable provisions of this Agreement, the Atlas Member (or another Member designated by the Atlas Member with the approval of the Township Member) shall be the "Managing Member" of the Company in charge of the management of the Company, and shall be authorized and empowered on behalf and in the name of the Company to carry out any and all of the objects and purposes of the Company and to perform all acts and enter into and perform all contracts and other undertakings that it may, in its reasonable discretion, deem necessary or advisable or incidental thereto and consistent with its responsibilities hereunder as Managing Member. Third parties dealing with the Company can rely conclusively upon the Managing Member's certification that it is acting on behalf of the Company and that its acts are authorized, so long as such acts do not constitute Major Decisions. Subject to the terms and conditions hereof, the Managing Member shall have all of the rights and powers that may be possessed by a manager under the Act and otherwise as provided by law and this Agreement. The Managing Member is not entitled to compensation for serving as the Managing Member.

(b)    The Managing Member shall devote such time and effort to the business of the Company as may be necessary to (i) promote adequately the interests of the Company and the mutual interests of the Members, and (ii) cause the Company, the Subsidiaries and the Property to be managed substantially in accordance with the Approved Annual Budget; however, it is specifically understood and agreed that the Managing Member and its members, managing members, officers and directors and their Affiliates shall not be required to devote full time to the business of the Company and that the Managing Member and its Affiliates may at any time and from to time engage in and possess interests in other business ventures of any and every type and description, including, without limitation, the ownership, operation, financing and management of real estate, interests in real estate or real estate-related securities, independently or with others, provided that such other interests and activities are not in violation of Section 7.07(b) below.

(c)    In addition to all of its other rights and remedies hereunder, if the Managing Member shall fail to perform or comply with, or to cause the performance of or compliance with, any obligation or duty imposed on the Managing Member pursuant to this Agreement, the Township Member shall have the right (but not the obligation), after ten (10) Business Days' notice to the Managing Member, to perform or comply with, or cause the performance or compliance with, such obligation, as it deems appropriate, and any out-of-pocket

TSORL_0009958

cost or expense reasonably incurred by the Township Member in connection therewith will be reimbursed by the Company (or, if funds are available therefrom in accordance with the relevant governing documents and the relevant Secured Loan Documents and/or PE Investment Documents, the relevant Subsidiary), provided, however, that if the failure to perform or comply constitutes or arises from a Bad Act by the Atlas Member or any member of the Sponsor Group, or any Affiliate of any of them, the foregoing costs and expenses will be borne and paid by the Atlas Member (or reimbursed to the Company by the Atlas Member if such costs have already been paid by the Company).

     7.03    <u>Intentionally Omitted</u>.

     7.04    <u>Limited Power and Duties of the Members</u>.  The Members (other than the Managing Member) shall have no power to participate in the management of the Company except as otherwise provided in this Agreement or as expressly required by the Act.  Unless expressly and duly authorized in writing to do so by the Managing Member or otherwise expressly provided in this Agreement, no Member, in its capacity as such, shall have any power or authority to bind or act on behalf of the Company in any way, to pledge the Company's credit or to render the Company liable for any purpose.

     7.05    <u>Delegation to Officers</u>.  Subject to the provisions of Section 7.01, Section 7.08 and all other applicable provisions of this Agreement, the Managing Member shall be entitled to appoint persons to serve as officers of the Company, provided that each such person has been approved by the Township Member in advance, such approval not to be unreasonably withheld, with such powers, including the power to bind the Company, and subject to such limitations as the Managing Member may from time to time determine (it being understood, however, that no such officer shall have the power to make or take any Major Decision without the Township Member's prior written approval).  If any such officer is granted the power to bind the Company, such officer's execution of any agreement on behalf of the Company shall be sufficient to bind the Company for all purposes and execution by any such officer on behalf of the Company shall be conclusive evidence that such execution of such agreement has been duly authorized (subject to the receipt of the Township Member's prior written consent with respect to any Major Decision).  Notwithstanding the foregoing, any officer of the Company appointed pursuant to this Section 7.05 shall be:  (i) without compensation (and, for the avoidance of doubt, shall not be an employee of the Company); and (ii) terminable at will by the Managing Member.

     7.06    <u>Affiliate Agreements</u>.  Notwithstanding anything to the contrary in this Agreement, (i) the Company may not enter into any Affiliate Agreements without the consent of the Township Member and (ii) the Township Member has the sole and exclusive right to grant any consent or waiver under any Affiliate Agreement, declare any default or event of default under such Affiliate Agreement and cause the exercise of any remedies by the Company and each Subsidiary under such Affiliate Agreement.  Without limiting the generality of the foregoing, the Township Member shall have the exclusive right, power and authority, on behalf of the Company and each Subsidiary, to (A) cause the Company or such other entity to take any commercially reasonable action and/or make any commercially reasonable decision or election (including exercising any termination rights, taking any enforcement action, or the granting or withholding of any consents or waivers) with respect to any Affiliate Agreement (as if the Township Member, rather than the Company or such other entity, were the counterparty to such

TSORL_0009959

Affiliate Agreement), and (B) enforce any provisions of this Agreement that impose an obligation on the Atlas Member (whether in such Member's capacity as Managing Member or otherwise). Atlas Member shall not permit any Person under an Affiliate Agreement to make or take any decision or action that if made or taken by the Company would constitute a "Major Decision" hereunder unless that decision or action has been approved as required hereunder.

7.07    Other Activities.  Except as otherwise expressly provided herein, the Members recognize that each Member (including the Managing Member), and its respective members, partners, shareholders, officers, directors, employees, agents, representatives and Affiliates, have or may in the future have other business interests, activities and investments, some of which may be in conflict or competition with the business of the Company, and that the other Members, and their respective members, partners, shareholders, officers, directors, employees, agents, representatives and Affiliates, are entitled to carry on such other business interests, activities and investments.  Neither the Company, its Subsidiaries nor the other Members shall have any right, by virtue of this Agreement, in or to such activities, or the income or profits derived therefrom, and the pursuit of such activities, even if competitive with the business of the Company or any of the Subsidiaries, shall not be deemed wrongful or improper.  Nothing in this Section 7.07 shall be deemed to limit the obligation of any Member under any other agreement to offer the other Members a participating interest in any business, activity or investment opportunity.

7.08    Managing Member Event of Default.

(a)    After the occurrence and during the continuance of a Managing Member Event of Default (i.e., beyond the grace, notice and/or cure period, if any, provided in connection therewith in the definition of the term Managing Member Event of Default), the Township Member, subject to compliance with the Secured Loan Documents and/or PE Investment Documents, may (in addition to all of its other rights and remedies) by written notice to the Person then serving as Managing Member elect to remove that Person as the Managing Member of the Company and upon such notice Township Member (or any other Person then designated by Township Member for such purpose, which may be an Affiliate of Township Member) automatically shall become the sole Managing Member of the Company, provided that if such removal and replacement requires consent of the lender pursuant to any of the Secured Loan Documents and/or PE Investment Documents, the replacement will not be effective until Township Member has obtained the applicable consent and such Person being replaced must use commercially reasonable good faith efforts to obtain such applicable consent.  Upon such appointment of a replacement Managing Member, (1) the replacement managing member shall succeed to all the powers and obligations of the Person removed as Managing Member under this Agreement with respect to the Company and the Subsidiaries, including the exclusive right to appoint replacements for managers and/or managing members or equivalent for each Subsidiary, (2) the Person removed as Managing Member shall promptly turn over all books, records and other items requested by the replacement Managing Member so appointed to facilitate its future management of the Company and the Subsidiaries, (3) each Person appointed by the departing Managing Member as a signatory on any bank account with respect to the Company and/or any Subsidiary shall (x) be removed as an authorized signatory from all such bank accounts and (y) execute any documents reasonably requested by the replacement managing member to transfer signing authority and control to the replacement Managing Member and (4) shall otherwise reasonably cooperate with the replacement Managing Member in transitioning and transferring

DMSDB1\5170197 3

31

any such duties and responsibilities of the Managing Member with respect to the Company, each Subsidiary and the Property, including by executing any documents reasonably requested by the replacement Managing Member in connection therewith; all at the reasonable expense of the Company.

(b)    Notwithstanding anything to the contrary contained in this Agreement, upon the removal of the Atlas Member as Managing Member pursuant to Section 7.08(a) (1) the Atlas Member shall, except as otherwise expressly provided herein, have no right to participate in the management, voting or affairs of the Company, including any right to consent to any Major Decisions; provided, however, in no event shall the Members effect any merger or other business combination, or modify or amend this Agreement or the Certificate of Formation of the Company, in either case in a way that would materially and adversely affect the Atlas Member's economic rights without the prior written consent of the Atlas Member, which may be granted or withheld in the Atlas Member's sole discretion; and (2) if applicable, the Atlas Member shall retain its Capital Account, its Percentage Interest, and all its rights to allocations and distributions that are payable to it under this Agreement.

(c)    In addition to all of its other rights and remedies hereunder, subject to compliance with the Secured Loan Documents and/or PE Investment Documents, after the occurrence and during the continuance of a Managing Member Event of Default (i.e., beyond the grace, notice and/or cure period, if any, provided in connection therewith in the definition of the term Managing Member Event of Default), the Township Member shall have the unilateral right and full power and authority to do any or all of the following prior to the Township Member (or its designee) becoming the Managing Member (it being understood that after the Township Member (or its designee) becomes the Managing Member, then the provisions of Sections 7.01(a) and 7.02(a)) above, among other provisions, shall apply):

(1)    control all Gross Receipts and all bank accounts maintained by the Company and any Subsidiary, and, at Township Member's option, individuals appointed by Township Member (or Township Member's designee) shall become the sole signatories on all such accounts and the Atlas Member (and its Affiliates and designees), and any individuals designated by it for such purpose, shall be removed therefrom as authorized signatories. In furtherance of the foregoing, subject to compliance with the Secured Loan Documents, Township Member shall have the right to open one or more other accounts, in the name of the Company or any Subsidiary thereof over which accounts Township Member shall have sole dominion and control;

(2)    apply all Net Cash Flow distributed by Atlas P2 to the Company in the manner set forth in Section 6.06 above.

(3)    without having any obligation to do so, pay all or any part of any Secured Loan and/or the PE Investment and any other sums that are then due and payable, cause the Company, or to cause any Subsidiary, to perform any act or take any action as may be appropriate, to cure or, if the same is imminent, to prevent the occurrence of, any Secured Loan default

TSORL_0009961

or PE Investment default, including by obtaining any third party debt or equity financing necessary to do so; and all sums paid and out-of-pocket costs and expenses incurred by Township Member in exercising its rights under this Section 7.08 (including reasonable attorneys' fees and expenses) shall be paid by the Company (as determined by Township Member), and, if the circumstances leading to the incurrence thereof by the Township Member constituted or arose from any Bad Act by the Atlas Member or any member of the Sponsor Group, reimbursed by the Atlas Member. If a notice of a Secured Loan default or any "Event of Default" under and as defined in the Secured Loan Documents, or a PE Investment default or any "Breach" under and as defined in the PE Investment Documents, shall have been given by Lender or PE Investor, as applicable, such notice (or the failure, on the part of Township Member to have received any such notice) shall constitute full protection to the Township Member for any action taken or omitted to be taken by the Township Member in good faith in reliance thereon in accordance with the terms of this Agreement.

(d)     Following, and at any time during the continuance of, a Managing Member Event of Default, the Township Member may cause the Company, and any Subsidiary, to terminate any Affiliate Agreement, including with the Managing Member or any member of the Sponsor Group, or any Affiliate of any of them, upon written notice to the affiliate counterparty and without any fee or penalty.

7.09    Approved Annual Budget.

(a)     The Township Member (1) is in receipt of a draft annual operating budget for calendar year 2016 attached hereto as Schedule 7.09(a)-1 which, upon approval by the Township Member, shall constitute the Approved Annual Operating Budget for the remainder of calendar year 2016 and for all of calendar year 2017, and (2) is in receipt of a draft annual capital expense budget for the Property, for the remainder of calendar year 2016 and for all of calendar year 2017, a copy of which is attached hereto as Schedule 7.09(a)-2 and which includes the portion of the CapEx Reserve Work anticipated to be completed in 2016 and 2017, which upon approval by the Township Member, shall constitute the "Approved Annual CapEx Budget" for the remainder of calendar year 2016 and for all of calendar year 2017 (the foregoing "Approved Annual CapEx Budget" and "Approved Annual Operating Budget" for 2016 and 2017 shall constitute the "Approved Annual Budget" for the remainder of calendar year 2016 and for all of calendar year 2017).

(b)     For each calendar year after 2017, the Managing Member, on or prior to October 15 of the preceding year, shall consult actively with the Township Member in the preparation of a proposed operating budget for the Property, and then will deliver to the Township Member, for its review and approval, subject to Township Member's reasonable discretion, the proposed operating budget for the Property for the upcoming Fiscal Year, which shall show in reasonable detail, for such next Fiscal Year compared to the current Fiscal Year, the Managing Member's best estimate of (i) rental and other revenues and (ii) expenditures for debt service and all customary categories of operating expenses. Once any such proposed operating

TSORL_0009962

budget for any calendar year is approved by the Township Member, (x) such approved operating expense budget shall constitute the "Approved Annual Operating Budget" for such calendar year and (y) the Managing Member shall be authorized to make expenditures and disbursements in accordance with such Approved Annual Operating Budget and within the allowances described in Section 7.01(b) of this Agreement. If the Township Member fails to respond to a proposed operating budget within five (5) Business Days of its receipt of the same, and thereafter the Managing Member sends a subsequent request for approval, and which such request includes at the top in all caps "**THIS IS A REQUEST FOR THE TOWNSHIP MEMBER TO APPROVE AN OPERATING BUDGET PURSUANT TO SECTION 7.09 OF THE LIMITED LIABILITY COMPANY AGREEMENT OF ATLAS TOWNSHIP ORLANDO, LLC. YOUR FAILURE TO RESPOND TO THIS REQUEST WITHIN FIVE (5) BUSINESS DAYS OF RECEIPT SHALL BE DEEMED TO BE YOUR APPROVAL OF SUCH OPERATING BUDGET**", and the Township Member fails to respond to such subsequent request within five (5) Business Days of its receipt of that second notice, then such proposed operating budget shall be deemed approved and be the then-Approved Annual Operating Budget. If any Approved Annual Operating Budget is subsequently disapproved by a Lender or PE Investor with an approval right thereover, the Managing Member and the Township Member will work together in good faith with such Lender or PE Investor, as applicable, to modify the proposed budget for reconsideration and approval, it being understood that such revised budget as cooperatively reworked in good faith with the Township Member, in a manner acceptable to the Township Member, will be effective as an Approved Annual Operating Budget, as and when approved by the Lender and PE Investor.

(c)     For each calendar year after 2017, the Managing Member, on or prior to October 15th of the preceding year, shall consult actively with the Township Member in the preparation of a proposed capital expense budget for the Property, and then will deliver to the Township Member, for its review and approval, subject to Township Member's reasonable discretion, the proposed capital expense budget for the Property for the upcoming year which shall show in reasonable detail the capital expenditures that the Managing Member proposes the Property Owners to make in the upcoming Fiscal Year. Once such proposed capital expense budget is approved by the Township Member for any calendar year, (x) such approved capital expense budget shall constitute the "Approved Annual CapEx Budget" for such calendar year, and (y) assuming the budget also has obtained the requisite approvals of any Lender having a right of approval thereover, then the Managing Member shall be authorized to make expenditures and disbursements in accordance with such Approved Annual CapEx Budget and within the allowances described in Section 7.01(b). If the Township Member fails to respond to a proposed capital expense budget within five (5) Business Days of its receipt thereof, and the Managing Member sends a subsequent request for approval, and which such request includes at the top in all caps "**THIS IS A REQUEST FOR THE TOWNSHIP MEMBER TO APPROVE A CAPITAL EXPENSE BUDGET PURSUANT TO SECTION 7.09 OF THE LIMITED LIABILITY COMPANY AGREEMENT OF ATLAS TOWNSHIP ORLANDO, LLC. YOUR FAILURE TO RESPOND TO THIS REQUEST WITHIN FIVE (5) BUSINESS DAYS OF RECEIPT SHALL BE DEEMED TO BE YOUR APPROVAL OF SUCH CAPITAL EXPENSE BUDGET**", and Township Member fails to respond to such subsequent request within five (5) Business Days of its receipt of the second notice, then such capital expense budget shall be deemed approved and be the then-Approved Annual CapEx Budget. If any Approved Annual CapEx Budget is subsequently disapproved by a Lender or PE Investor

TSORL_0009963

with an approval right thereover, the Managing Member and the Township Member will work together in good faith with such Lender or PE Investor, as applicable, to modify the proposed budget for reconsideration and approval, it being understood that such revised budget as cooperatively reworked in good faith with the Township Member, in a manner acceptable to the Township Member, will be effective as an Approved Annual CapEx Budget, as and when approved by the Lender and PE Investor.

7.10    Insurance.  The Managing Member shall cause the Property Owners to obtain and maintain insurance coverage in a minimum amount as required by the Secured Loan Documents and as otherwise satisfactory to the Township Member, in its reasonable discretion.

7.11    Subordinate Financing.  Except for Ordinary Course Financing, the Managing Member shall not cause the Company or any Subsidiary to obtain any financing, including, without limitation, financing subordinate to the Secured Loan, unless the Township Member has provided its prior written consent to such financing, which consent may be granted or withheld in the Township Member's sole and absolute discretion.

ARTICLE VIII
BOOKS AND RECORDS

8.01    Books and Records.  The Managing Member shall maintain or cause to be maintained a comprehensive system of office records, books and accounts, in which each and every financial transaction with respect to the operations of the Company and each Subsidiary, shall be entered accurately, in a manner customary and consistent with prudent accounting principles, practices and procedures. The Managing Member shall maintain or cause to be maintained such books and accounts in a safe manner and separate from the records of the Members and their Affiliates. Such books and records of account shall be prepared and maintained by the Managing Member at the principal place of business of the Company or such other place or places as may from time to time be determined by the Managing Member (with prompt written notice thereof to the Township Member). Each Member or its duly authorized representative shall have the right to inspect, examine and copy such books and records of account at its own expense at the Company's office during reasonable business hours.

8.02    Accounting and Fiscal Year.  The books of the Company shall be kept in accordance with GAAP or such other accounting basis reasonably acceptable to Township Member and consistently applied, and otherwise in a manner consistent with the requirements of the Secured Loan Documents and the PE Investment Documents, and the Company shall report its operations for tax purposes on the accrual method.  The taxable year of the Company shall end on December 31 of each year (the "Fiscal Year"), unless a different taxable year shall be required by the Code.  Managing Member shall cause the financial statements of each Property Owner to be audited no less than once per year.

8.03    Reports.

(a)    Financial Reports.  Within forty-five (45) days after the end of each fiscal year of the Company, the Managing Member shall provide to each Member all information relating to the Company, the Subsidiaries and the Property that is necessary for the preparation of

TSORL_0009964

the Member's federal and state income tax returns (including without limitation Schedule K-1s, and other information necessary to report income/loss with respect to such Member's Interest) together with a draft of the Company's U.S. federal income tax return and, promptly following the filing thereof with the Internal Revenue Service, a final copy of such return as filed. Copies of such tax returns, or pertinent information therefrom, will be furnished to the Members within ninety (90) days after the each of each fiscal year of the Company.

(b)    <u>Member Reports</u>.

(i)    Concurrently with the delivery thereof to the intended recipient (or, in the case of a receipt, promptly following such receipt), the Managing Member shall provide a copy to the Township Member of each notice, certification, report, request for consent or approval or other written communication received or provided by the Managing Member, the Company, or any Subsidiary, on the one hand, from or to any Secured Lender, PE Investor or the Property Manager, on the other hand, and also will provide a copy of any correspondence to or from any of the foregoing Persons, on the one hand, and any governmental authority, on the other hand, if the same is of any material nature and relates to the Company, any Subsidiary, the Property Manager or any of the Property.

(ii)    With reasonable promptness, the Managing Member shall provide to the Township Members such other information and reports as the Township Member may reasonably request from time to time, in form reasonably satisfactory to the Township Member, provided that such request is not unduly burdensome.

(c)    The Managing Member agrees that it will provide Township Member with a copy of any notice delivered or received by it under any Secured Loan Documents relating to (i) the transfer restrictions contained in any Secured Loan Documents, (ii) prepayments under any Secured Loan Documents, (iii) the occurrence of any event of default under any Secured Loan Documents, or (iv) any other material event relating to any Secured Loan Documents (other than in the ordinary course of business).

(d)    The Atlas Member further agrees to send written notice pursuant to and in accordance with the terms and requirements of the Secured Loan Documents and the PE Investment Documents requesting that the Township Member be added as a copy party to the notice provisions.

ARTICLE IX<br>TRANSFER OF INTERESTS

9.01    <u>No Transfer</u>.

(a)    <u>General Prohibition on Transfer</u>.  No Member shall sell, assign, transfer, mortgage, charge or otherwise encumber, or permit or suffer any Affiliate or third party to sell, assign, transfer, pledge, mortgage, charge, or otherwise encumber, or contract to do or permit any of the foregoing, directly or indirectly and whether voluntarily or by operation by law (collectively referred to as a "<u>Transfer</u>") any part or all of its Interest (including any direct or

TSORL_0009965

indirect interest, whether legal or beneficial, in such Member) without the approval of the Atlas Member and the Township Member, except as provided in this Article IX.

(b)     No Member shall be permitted to Transfer any portion of its Interest in the Company in a manner, or take any other action, which would cause the Company to be (i) treated as a "publicly traded partnership" within the meaning of Code Section 7704 or (ii) classified as a corporation (or an association taxable as a corporation) within the meaning of Code Section 7701(a).

(c)     No Member shall be permitted to Transfer all or any portion of its Interest in the Company or to take any other action (including, in the case of any Member which is a corporation, limited liability company or limited partnership, a Transfer of any interest in such corporation, limited liability company or limited partnership, or in the shareholders, members or partners thereof) which would result in a termination of the Company as a partnership within the meaning of Code Section 708(b)(1)(B) (a "Tax Termination") unless the Township Member otherwise approves in writing.  In addition, the Managing Member shall not consent to or otherwise permit any transfer of any direct or indirect interest in Atlas P2 held by any Person other than the Company if such transfer would result in a Tax Termination of Atlas P2 unless Township Member has approved the same in writing.

(d)     No Member shall be permitted to Transfer all or any portion of its Interest in the Company to any Person, unless such Person is a "United States Person" as defined in Code Section 7701(a)(30) unless the Township Member otherwise approves in writing.

(e)     Any attempt to affect any of the foregoing prohibited actions shall be null and void *ab initio* and, in addition to other rights and remedies at law and in equity, the other Member or Members shall be entitled to injunctive relief enjoining the prohibited action.  The Members expressly acknowledge that damages at law would be an inadequate remedy for a breach or threatened breach of the provisions concerning Transfer set forth in this Agreement. The Members agree that each Member shall execute and shall take any actions necessary and/or required to confirm that any of the foregoing prohibited actions did not occur and to resolve any breaches or defaults under the Secured Loan Documents, the PE Investment Documents or any other agreement, contract or instrument resulting therefrom. The giving of consent or approval by a Member required under this Article IX in any one or more instances shall not limit or waive the need for such consent or approval in any other or subsequent instances.  Notwithstanding anything in this Article IX or this Agreement to the contrary, no Member shall have the right to effect any Transfer of its Interest (or any portion thereof) if the Transfer, in the opinion of counsel to the Company, constitutes a violation of any state or federal securities laws or other applicable laws, rules or regulations, or is otherwise in violation of the Secured Loan Documents or the PE Investment Documents.

9.02    Permitted Transfers.

(a)     Notwithstanding the general prohibition on transfer in Section 9.01(a) above, a Member, subject to compliance in all respects with the Secured Loan Documents and the PE Investment Documents, may Transfer all or a portion of its Interest to one or more Affiliates of such Member (provided that such Affiliate is directly or indirectly wholly-owned by

37

TSORL_0009966

the same Person(s) directly or indirectly owning such transferring Member) or to another Member without having to obtain the prior consent of any Person; provided in each case that (i) the transferee is not a Prohibited Person and (ii) such Transfer does not violate the prohibitions on Transfer in Sections 9.01(b)-(d) above. A transferee that takes title to an Interest (as opposed to a mere pledgee) pursuant to a Transfer permitted by this Section 9.02 may be admitted as a substitute Member in this Company without having to obtain the consent of any person.

(b)     If as a result of any Transfer (whether direct or indirect) by a Member of all or any portion of its Interest the Company incurs or is assessed any real estate or personal property transfer tax or any similar type of tax, then the transferring Member shall pay any such tax before such is due without penalty or, if paid by the Company, shall reimburse the Company therefor promptly after demand therefor by the Company or any other Member. The amount so paid or reimbursed by a Member shall not be deemed a Capital Contribution, loan or advance to the Company but, rather, shall be deemed a payment solely on account of the paying Member's own obligations.

9.03    Transferees. Notwithstanding anything to the contrary contained in this Agreement, no Transfer shall be permitted to the extent that such Transfer would violate any applicable law or any provision of any material agreement to which the Company, any Subsidiaries or its assets are bound, including, without limitation, any Secured Loan Documents or PE Investment Documents and no transferee of all or any portion of any Interest shall be admitted as a substitute Member unless (i) such Interest is transferred in compliance with the applicable provisions of this Agreement, any Secured Loan and the PE Investment and (ii) such transferee shall have executed and delivered to the Company such instruments as the Managing Member (or the Township Member, in the event of a Transfer by the Managing Member) reasonably deems necessary or desirable to effectuate the admission of such transferee as a Member and to confirm the agreement of such transferee to be bound by all the terms, conditions and provisions of this Agreement with respect to such Interest. As promptly as practicable after the admission of any Person as a Member, the books and records of the Company shall be changed to reflect such admission. All reasonable costs and expenses incurred by the Company in connection with any Transfer of any Interest and, if applicable, the admission of any transferee as a Member shall be paid by such transferee.

9.04    Admission of Additional Members. Any additional or substitute Member admitted to the Company in accordance with the terms hereof shall execute and deliver documentation in form reasonably satisfactory to the Managing Member accepting and agreeing to be bound by this Agreement.

9.05    Put Right.

(a)     Right to Initiate. For the purposes hereof, the term "Put Period" shall mean the period from and after the fifth (5th) anniversary of the Original Investment Date. During the Put Period, Township Member shall have the right to provide written notice (an "Initiation Notice") to Managing Member of Township Member's intention to elect to sell Township Member's entire Interest in the Company for the Strike Price (as herein defined) (the "Put Right"). Managing Member shall either (i) purchase Township Member's Interest in the Company, (ii) recapitalize Township Member's Interest in the Company by replacing Township

TSORL_0009967

Member with one or more third party equity investors, or (iii) refinance any Senior Loan or the PE Investment and cause the Company to utilize the proceeds to purchase Township Member's Interest; provided, however, that in the event Managing Member elects to recapitalize Township Member's Interest by replacing Township Member with one or more third party equity investors, Managing Member shall provide written notice of such election to Township Member and Township Member shall have ten (10) Business Days to elect, by written notice to Managing Member, to provide such equity recapitalization from one or more Affiliates of Township Member. For purposes of this Section 9.05, the term "Strike Price" shall mean the amount which would be distributed to Township Member under Section 6.06 if (i) the Property was sold by each Property Owner in a hypothetical sale for a net price determined in accordance with Section 9.05(b) below (the "Strike Value"), less Selling Expenses, (ii) all of the Company's (or the applicable Subsidiary's) liabilities were paid, in full, (iii) rents, taxes and other similar items with respect to the Property were pro-rated, (iv) the applicable Subsidiaries were liquidated in accordance with their operating agreements, and (v) the remaining proceeds were distributed in accordance with Section 6.06.

        (b)    <u>Initiation and Elections</u>.

        (i)    Upon Township Member's delivery of the Initiation Notice, each of Township Member and Atlas Member agrees that if the parties cannot agree on the Strike Value, then such Strike Value will be determined by an independent third party as follows: the Township Member and the Atlas Member will mutually select an appraiser (meeting the qualifications set forth in this Section 9.05(b)) to determine the Strike Value, and the conclusion of such appraiser will be final and binding on all parties. If the Township Member and the Atlas Member are unable to agree on the selection of an appraiser meeting the foregoing criteria within thirty (30) days after delivery of the Initiation Notice, each will select an appraiser within ten (10) days after the expiration of such 30-day period. The two appraisers will each independently determine the Strike Value. Provided that the difference in the two valuations does not exceed 10% of the lower of the two valuations, the Strike Value will be the average of the two valuations and will be binding on the parties. If either party fails to select an independent appraiser within the time required by this Section 9.05(b)(i), the Strike Value will be conclusively determined by the valuation of the independent appraiser timely selected by the other. If the difference between the two valuations referred to above exceeds 10% of the lower of the two valuations, the two selected appraisers will select a third appraiser who will also independently value the Strike Value. In this case, the Strike Value will be the average of the two valuations with the smallest difference between them. The determination of the Strike Value will be binding on the parties and not subject to judicial review. The appraisers will set forth their determination in writing together with their opinions and the considerations on which the opinions are based, with a signed counterpart to be delivered to each party within 60 days after commencing the valuations.

        (ii)    At any time the Members may unanimously agree on the Strike Value in which case the appraisal process shall be terminated (or not commenced).

        (iii)    Each appraiser must be a fully accredited MAI appraiser or successor thereof, shall have at least ten (10) years' experience in the appraisal of

TSORL_0009968

multifamily projects in Florida, and shall be disinterested and not an Affiliate of any Member. Each appraisal must be determined on the basis that the then current use of such property is the highest and best use unencumbered and without assuming such Property is sold by selling interests in a Subsidiary, and taking into account any concessions or inducements to residential tenants as determined appropriate by the appraiser. Each appraisal shall be conducted in accordance with then-current Uniform Standards of Professional Appraisal Practice and Appraisal Institute Standards. The fees and expenses conducted in accordance with this Section 9.05(b) shall be borne 50/50 by Township Member and Atlas Member.

(iv)    Notwithstanding anything to the contrary set forth in this Section 9.05, the Township Member may rescind, at the Township Member's discretion and upon written notice to the Managing Member no later than fifteen (15) days after the delivery of the appraiser's determination of the Strike Value, the Township Member's election made under the Initiation Notice to exercise the Put Right in the event the Township Member does not agree with such determination. In such event, the Township Member's election to exercise the Put Right will be deemed null and void, the Put Right shall be unavailable to the Township Member of a period of two (2) years, and the Township Member must bear the fees and expenses of the appraiser(s) appointed pursuant to Section 9.05(b).

(c)    Closing.    The closing of the sale or recapitalization of Township Member's Interest in the Company under this Section 9.05 shall be consummated on a date selected by Managing Member, which date shall be not less than thirty (30) days and not more than ninety (90) days following the determination of the Strike Value. The Township Member and the Atlas Member or Managing Member agree to execute such documents as are reasonably necessary to consummate the sale or recapitalization of the Township Member's Interest; provided, that the Township Member will only be required to make customary representations and warranties concerning the ownership of its Interest free and clear of all liens and other encumbrances, and will not be required to make any other representations or warranties, such as those concerning the status, condition, or activities of the Company, the Subsidiaries or the Property.

## ARTICLE X
## INDEMNIFICATION

10.01    Indemnification. The Company shall, to the fullest extent permitted by applicable law, indemnify, defend and hold harmless the Managing Member and each Member and officer of the Company (and each of their respective Affiliates and their respective officers, directors, shareholders, partners, members, employees and agents) (severally, the "Indemnified Person"), from and against any loss, damage, liability, cost or expense (including fees and expenses of counsel selected by the Indemnified Person) incurred by reason of (i) the fact that the Indemnified Person was a managing member, member, director or officer of the Company, except to the extent such loss, damage, liability, cost or expense is the result of the gross negligence, fraud, willful misconduct or material breach of this Agreement by the Indemnified Person or its Affiliates or (ii) any action actually or allegedly taken or omitted by the Indemnified Person in any such capacity, if with respect to the matter at issue he or she acted in

DMSDB1\5170197 3

40

TSORL_0009969

good faith and within the scope of authority conferred by this Agreement, and with respect to any criminal proceeding, had no reasonable cause to believe such conduct was unlawful; provided, in each case, that such loss, damage, liability, cost or expense does not result from a proceeding or claim initiated or asserted by the Company or any other Member against such Indemnified Person. However, the Indemnified Person shall not be entitled to indemnification with respect to any amount paid in settlement if the settlement was effected without the Company's prior written consent, which shall not be unreasonably withheld. The fees and expenses of counsel shall be paid by the Company as they are incurred upon receipt, in each case, of an undertaking by or on behalf of the Indemnified Person to repay such amounts if it is ultimately determined that such Indemnified Person is not entitled to indemnification with respect thereto. Nothing in this Agreement or the Certificate of Formation of the Company shall affect any rights to indemnification to which such Indemnified Person may be entitled by contract or otherwise under law.

10.02  Recourse Obligations.    Notwithstanding anything contained herein to the contrary, if any "bad boy" guaranty or environmental indemnity (an obligation under each such guaranty or indemnity and any other guaranty or indemnity relating to a Secured Loan, a "Recourse Obligation") is required in connection with any Secured Loan, to the extent the Atlas Member remains the Managing Member, Atlas Member or an Affiliate thereof that is acceptable to the applicable lenders (the "Guarantor") shall provide such guaranty or indemnity.

10.03  Exculpation/Member Indemnification.  No Member, simply by virtue of being a member of the Company, shall be liable to any other Member or the Company for (i) such Member's failure or refusal to perform any act, except those required by the terms of this Agreement or (ii) the negligence, dishonesty or bad faith of any agent, consultant or broker of the Company selected, engaged or retained in good faith, provided the same is not an officer, manager, managing member or equivalent of such Member or any Affiliate of such Member (including, in the case of the Atlas Member, any other member of the Sponsor Group).

## ARTICLE XI
## DISSOLUTION AND TERMINATION

11.01  Dissolution and Termination.

(a)    The Company shall be dissolved upon the first of the following events to occur:  (i) the consent in writing to dissolve and wind up the affairs of the Company by the Managing Member and the Township Member; (ii) the Certificate of Formation shall have been cancelled in the manner required by the Act; and (iii) the entry of a judicial dissolution under Section 18-804 of the Act.

(b)    Notwithstanding any other provision of this Agreement, the Bankruptcy of any Member shall not cause such Member to cease to be a member of the Company and, upon the occurrence of such an event, the Company shall continue without dissolution.

11.02  Appointment of Liquidator.  Upon dissolution of the Company, the Managing Member and the Township Member shall designate a Person (which may be a Member) to act as liquidator on such terms and conditions as are determined by the Managing Member and the

TSORL_0009970

Township Member at the time of such designation. The liquidator shall proceed diligently to wind up the affairs of the Company and make final distributions as provided in this Agreement and pursuant to the Act. The costs and expenses of liquidation shall be the costs and expenses of the Company. From the date of dissolution until the final distribution, the liquidator shall operate the Company with all requisite power and authority, subject to the power of the Members to remove and replace such liquidator.

11.03  Duties and Obligations of Liquidator. The matters to be accomplished by the liquidator are as follows:

(a)  As promptly as possible after dissolution and again after final liquidation, the liquidator shall cause a proper accounting to be made by a certified public accountant of the Company's assets, liabilities and operations through the last day of the calendar month in which the dissolution occurs or the final liquidation is completed (as applicable).

(b)  The liquidator shall pay, satisfy or discharge from Company funds all of the debts, liabilities and obligations of the Company (including, without limitation, all costs and expenses incurred in liquidation) or otherwise make adequate provision for payment and discharge of the same, including, without limitation, the establishment of a cash fund for contingent liabilities in such amount and for such term as the liquidator may reasonably determine or as other required under the Act.

(c)  The liquidator may sell any saleable assets of the Company in connection with such liquidation at a public or private sale and at such price and on such terms as the liquidator, in its sole discretion, deems necessary, appropriate or advisable. Any Member or its Affiliate may purchase any of the Company's assets at such sale.

(d)  The liquidator shall distribute all remaining Company assets to the Members in accordance with Section 11.04(b) (net of any reserves or holdbacks determined by the Managing Member and the Township Member to be appropriate to account for contingent liabilities) by the earlier of (i) the end of the taxable year of the Company during which the liquidation of the Company occurs, and (ii) ninety (90) days after the date of the liquidation.

11.04  Liquidating Distributions. Any distributions made in liquidation shall be applied and distributed as follows:

(a)  To the repayment of the debts, liabilities and obligations of the Company and payment of the costs and expenses of such liquidation;

(b)  The balance of any proceeds from such liquidation shall be distributed to the Members in the order and priority set forth in Section 6.06.

The liquidator shall cause only cash, evidences of indebtedness and publicly-traded securities to be distributed in any liquidation. The distribution of cash and other property to a Member in accordance with this Section 11.04 shall constitute a complete return to such Member of its Capital Contribution and a complete distribution to the Member of its Membership Interest in the Company and all the Company's property. To the extent that a Member returns funds to the Company, such Member shall have no claim against any other Member for such funds.

DMSDB1\5170197. 3

42

11.05  <u>Articles of Dissolution</u>.  Within ninety (90) days following the dissolution and the completion of the winding up of the Company, or at any time there are no Members by the liquidator, articles of dissolution, which shall set forth the information required by the Act, shall be filed in the Office of the Secretary of State of the State of Delaware in accordance with the Act.  Prior to winding up the Company, the Company shall prepay the cost of storing the books and records of the Company with a third party provider for at least six (6) years after the winding up is completed, or for as long as legally required.

ARTICLE XII

REPRESENTATIONS AND WARRANTIES

12.01  <u>Representations and Warranties of the Members</u>.

(a)    Each Member represents and warrants to the Company and to the other Member as follows:

(i)    Such Member has all the requisite power and authority to enter into this Agreement and to consummate the transactions contemplated hereby.  The execution and delivery of this Agreement by the Member, and the consummation of the transactions contemplated hereby, does not conflict with or contravene the provisions of its Organizational Documents or any agreement or instrument by which it or its properties are bound or any law, rule, regulation, order or decree to which it or its properties are subject.

(ii)    All acts and other proceedings required to be taken by such Member to authorize the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby have been duly and properly taken.

(iii)    This Agreement has been duly executed and delivered by such Member and constitutes the legal, valid and binding obligation of such Member, enforceable against such Member in accordance with its terms, except as may be limited by bankruptcy, insolvency and other similar laws and general equitable principles.

(iv)    Such Member has obtained all approvals and consents required to be obtained by it in connection with the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby from all Governmental Authorities having any approval rights with respect thereto, and all persons having consent rights.

(v)    Such Member is duly organized, validly existing and in good standing under the laws of its jurisdiction of formation with all requisite power and authority to enter into this Agreement and to conduct the business of the Company.

(vi)    Such Member is acquiring its interest in the Company for investment, solely for its own account, with the intention of holding such interest for investment and not with a view to, or for resale in connection with, any distribution or public offering or resale of any portion of such interest within the meaning of the

DMSDB1\5170197. 3

43

Securities Act of 1933 as amended from time to time (the "Securities Act") or any other applicable federal or state securities law, rule or regulation ("Securities Laws").

(vii)    Such Member is an "Accredited Investor," as such term is defined in Rule 501(a) under the Securities Act.

(viii)    Such Member acknowledges that it is aware that its interest in the Company has not been registered under the Securities Act or under any other Securities Law in reliance upon exemptions contained therein.  Such Member understands and acknowledges that its representations and warranties contained herein are being relied upon by the Company, the other Member and the constituent owners of such other Member as the basis for exemption of the issuance of interest in the Company from registration requirements of the Securities Act and other Securities Laws.  Each Member acknowledges that the Company will not and has no obligation to register any Interest in the Company under the Securities Act or other Securities Laws.

(ix)    The Member is in compliance with Executive Order 13224 (September 23, 2001), the rules and regulations of the Office of Foreign Assets Control, Department of Treasury, and any enabling legislation or other Executive Orders in respect thereof.

(x)    At all times, including after giving effect to any Transfers permitted pursuant to this Agreement, such Member is not a Prohibited Person, and will not be a Prohibited Person so long as such Member remains a Member.

(xi)    If applicable to such Member, the Member has implemented a corporate anti-money laundering plan that is reasonably designed to ensure compliance with applicable foreign and U.S. anti-money laundering law.

(xii)    The Member is familiar with the U.S. Government Restricted Lists maintained by applicable U.S. Federal agencies and neither it nor any of its investors, officers or directors are on the U.S. Government Blacklists.

(xiii)    Each Member acknowledges that "plan assets", within the meaning of the plan assets regulation promulgated by the U.S. Department of Labor (29 C.F.R. 2510.3-101 et seq.), will not be used for any transaction contemplated herein.

(xiv)    Such Member is a "United States Person" as defined in Section 7701(a)(30) of the Code.

(b)    Each Member agrees to indemnify and hold harmless the Company, the other Members and such other Members' Affiliates and their respective officers, directors, shareholders, partners, members, employees, successors and assigns and against any and all loss, damage, liability or expense (including costs and attorney's fees) which they may incur by reason of, or in connection with, any material breach of the foregoing representations and warranties by such Member, and all such representations and warranties shall survive the execution and delivery of this Agreement and the termination and dissolution of any such

TSORL_0009973

Member, and/or the Company.  This provision shall survive the expiration or earlier termination of this Agreement.

## ARTICLE XIII
## MISCELLANEOUS

13.01  <u>No Fiduciary Duties</u>.  To the fullest extent permitted by law no Member shall have fiduciary or other duties to any other Member or to the Company, and each Member waives any fiduciary or other duty or claim based thereon; provided, however, the foregoing shall not eliminate the implied contractual covenant of good faith and fair dealing.

13.02  <u>Notices</u>.  Unless otherwise provided herein, all notices, requests, demands, claims and other communications provided for under the terms of this Agreement shall be in writing. Any notice, request, demand, claim or other communication hereunder shall be sent by (i) personal delivery (including receipted courier service) or overnight delivery service, with confirmation of receipt, (ii) by electronic email transmission (pdf), (iii) reputable commercial overnight delivery service courier, with confirmation of receipt, or (iv) registered or certified mail, return receipt requested, postage prepaid and addressed to the intended recipient as set forth below:

| | |
|---|---|
| If to Atlas Member: | c/o Atlas P2 Managing Member, LLC<br>55 East Monroe Street<br>Suite 3610<br>Chicago, IL 60603<br>Attention:  Steven Ivankovich<br>Tel:  (312) 315-4826<br>Fax:  (312) 276-4172<br>Email:<br>steven.ivankovich@atlasresidentialusa.com |
| with a copy to: | DLA Piper LLP (US)<br>1251 Avenue of the Americas, 27th Floor<br>New York, New York 10020-1104<br>Attention:  David Broderick<br>Tel:  (212) 335-4505<br>Fax:  (917) 778-8845<br>Email:  David.Broderick@dlapiper.com |
| If to Township Member: | Benjamin Poirier<br>Township Capital<br>9229 W. Sunset Blvd<br>Suite 310<br>Los Angeles, CA 90069<br>Tel:  (310) 742-2240<br>Email: bpoirier@townshipinc.com |

TSORL_0009974

with a copy to:           DLA Piper LLP (US)
2000 Avenue of the Stars
Suite 400 North Tower
Los Angeles, CA 90067-4704
Attn: Afshin Beyzaee
Tel: (310) 595-3000
Email: afshin.beyzaee@dlapiper.com

All such notices, requests, consents and other communications shall be deemed to have been given when received. Either party may change its email address, or its address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other parties hereto notice in the manner then set forth.

13.03 <u>Further Assurances</u>. Each Member agrees to execute, acknowledge, deliver, file, record and publish such further instruments and documents, and do all such other acts and things as may be required by law, or as may be reasonably necessary to carry out the intent and purposes of this Agreement.

13.04 <u>Captions</u>. All titles or captions contained in this Agreement are inserted only as a matter of convenience and for reference and in no way define, limit, extend, or describe the scope of this Agreement or the intent of any provision in this Agreement.

13.05 <u>Pronouns</u>. All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, and neuter, singular and plural, as the identity of the party or parties may require.

13.06 <u>Successors and Assigns</u>. This Agreement shall be binding upon the parties hereto and their respective executors, administrators, legal representatives, heirs, successors and permitted assigns, and shall inure to the benefit of the parties hereto and, except as otherwise expressly provided in this Agreement, their respective executors, administrators, legal representatives, heirs, successors and permitted assigns.

13.07 <u>Extension Not a Waiver</u>. No delay or omission in the exercise of any power, remedy or right herein provided or otherwise available to a Member or the Company shall impair or affect the right of such Member or the Company thereafter to exercise the same. Any extension of time or other indulgence granted to a Member hereunder shall not otherwise alter or affect any power, remedy or right of any other Member or of the Company, or the obligations of the Member to whom such extension or indulgence is granted.

13.08 <u>No Third Party Rights</u>. Except as expressly provided herein or in the Act (including, without limitation, with respect to Indemnified Persons or other Person entitled to indemnification hereunder), this Agreement is for the sole benefit of the Members and their respective permitted successors and assigns, and shall not confer directly, indirectly, contingently, or otherwise, any rights or benefits on any Person or party other than the Members and their permitted successors and assigns.

DMSDB1\5170197 3

46

13.09  <u>Severability</u>.  In case any one or more of the provisions contained in this Agreement or any application thereof shall be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and other application thereof shall not in any way be affected or impaired thereby.

13.10  <u>Entire Agreement</u>.  This Agreement contains the entire agreement among the parties hereto, and supersedes all prior representations, agreements and understandings, both written and oral, among the parties hereto with respect to the subject matter hereof.

13.11  <u>Counterparts</u>.

(a)    This Agreement and any amendment hereto may be signed in any number of counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one agreement (or amendment, as applicable).

(b)    The exchange of counterparts of this Agreement among the parties by means of facsimile transmission or by electronic email transmission (pdf) which shall contain authentic reproductions shall constitute a valid exchange of this Agreement and shall be binding upon the parties hereto.

13.12  <u>Survival</u>.  It is the express intention and agreement of the Members that all covenants, agreements, statements, representations, warranties and indemnities made in this Agreement shall survive the execution and delivery of this Agreement.

13.13  <u>Confidentiality</u>.  Each of the Members agree that it will not disclose, via public announcements, press releases, public interviews or other similar types of disclosures to the public, the terms of this Agreement, any financial statements or financial information, any business, financial, or operational plans, any financial or other analysis, or any summaries, strategies, pro formas, valuations, agreements, plans, or projections of or pertaining to the Company or its business or any other proprietary information of the Company (defined to include all information not previously publicly disclosed by the Company) unless such Member first obtains the Managing Members' prior written consent which consent shall not unreasonably be withheld and except: (i) as may be required by applicable law or to satisfy the requests or requirements of any governmental or regulatory authority (including, <u>e.g.</u>, taxing or bank regulatory authorities or The New York Stock Exchange), (ii) as may be required in connection with an administrative, arbitration or judicial proceeding; or (iii) in connection with its performance of any of its duties or obligations, or exercise of any of its rights, hereunder. Notwithstanding anything to the contrary above in this <u>Section 13.13</u>, a Member may disclose (without the consent of any Member) the terms of this Agreement, any financial statements, or financial information, any business, financial, or operational plans, any financial or other analysis, or any summaries, strategies, pro formas, valuations, agreements, plans, or projections of or pertaining to the Company to: (y) Affiliates and employees, investors or potential investors, financing sources or potential financing sources, legal, accounting, financial, and business advisors, in each case of such Member or its Affiliates; or (z) any Person so long as such disclosure is for a *bona fide* business purpose of such Member or its Affiliates.

TSORL_0009976

13.14  <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware without giving effect to any principles of conflicts of laws.

13.15  <u>Waiver of Jury</u>.  EACH OF THE MEMBERS HEREBY WAIVES TRIAL BY JURY IN ANY ACTION ARISING OUT OF MATTERS RELATED TO THIS AGREEMENT AND COVENANTS NOT TO INSTITUTE ANY ACTION OR LITIGATION IN ANY COURT, OR COMMENCE ANY OTHER PROCEEDING, WITH RESPECT TO ANY DISPUTE HEREUNDER.

13.16  <u>Amendments</u>.  This Agreement may be not be amended, modified or terminated, nor may any provision hereof be waived, except by an instrument in writing executed by the Managing Member and the Township Member.

13.17  <u>Brokerage</u>.

(a)  Each Member represents to the Company and to the other Members that neither such Member nor any of its Affiliates has employed or incurred any liability to any broker, finder or agent for any brokerage fees, finder's fees, commissions or other amounts in connection with the formation of the Company between the Members and the joint venture relationship created hereunder.

(b)  Each Member agrees to indemnify and hold harmless the Company, the other Member, its Affiliates and each of their respective officers, directors, shareholders, partners, members, employees, successors and assigns from and against any and all loss, damage, liability or expense (including reasonable costs and attorneys' fees) which they may incur by reason of, or in connection with, any breach of such Member's representation, warranty or covenant in this <u>Section 13.17</u>.  This <u>Section 13.17</u> shall survive the expiration or earlier termination of this Agreement.

13.18  <u>Attorneys' Fees</u>.  To the fullest extent permitted by law, in the event of any litigation or other dispute arising as a result of or by reason of this Agreement, the prevailing party in any such litigation or other dispute shall be entitled to, in addition to any other damages assessed, its reasonable attorney fees, and all other costs and expenses incurred in connection with settling or resolving such dispute.  To the fullest extent permitted by law, the attorneys' fees which the prevailing party is entitled to recover shall include fees for prosecuting or defending any appeal and shall be awarded for any supplemental proceedings until the final judgment is satisfied in full.  To the fullest extent permitted by law, in addition to the foregoing award of attorneys' fees to the prevailing party, the prevailing party in any lawsuit or other proceeding on this Agreement shall be entitled to its reasonable attorneys' fees incurred in any post judgment proceedings to collect or enforce the judgment.  To the fullest extent permitted by law, this attorneys' fees provision is separate and several and shall survive the merger of this Agreement into any judgment.

13.19  <u>Grant Agreement</u>.  Effective as of the Effective Date, Township Member acknowledges and agrees that the economic interest granted to Township Member pursuant to the Grant Agreement has been converted into Township Member's Interest in the Company and

TSORL_0009977

accordingly the Grant Agreement is terminated and of no further force or effect.  In connection therewith, the Atlas Member represents and warrants that as of the Effective Date, Atlas Holdings, Consilient Holdings and Atlas Member are in compliance with and not in breach of Sections 6(a), (b), (c), (d) and (f) of the Grant Agreement. In addition, the Atlas Member hereby makes, to and for the benefit of the Township Member, all representations and warranties of the Atlas, each Subsidiary (or other Affiliate thereof), as applicable, as set forth in the Secured Loan Documents and PE Investment Documents (to the extent applicable to that Atlas Member, such Subsidiary or the Property) as if such representations were set forth fully herein.

13.20  <u>Future Acquisitions</u>. (a)    Until the first (1st) anniversary of the Effective Date, prior to any entity in the Sponsor Group consummating any acquisition of real property, to the extent such acquisition will be consummated using equity funds invested by one or more third party investors ("<u>Potential Equity Investors</u>"), the Atlas Member agrees to cause the applicable entity in the Sponsor Group to first provide written notice of such acquisition, together with such information as such applicable entity in the Sponsor Group intends to provide to any Potential Equity Investors, to Township Member and Township Member (or its designated Affiliate) shall have a right of first offer with respect to providing some or all of such equity funds on the substantially the same terms as the applicable entity in the Sponsor Group intends to offer to Potential Equity Investors.  Township Member shall have a period of ten (10) Business Days to elect in writing to make the equity investment on the terms offered.  If Township Member elects not to make the equity investment, or fails to timely provide written notice that it will make the equity investment, then the applicable entity in the Sponsor Group may make such equity investment offer to Potential Equity Investors and may consummate any such equity investment on substantially the same terms as were offered to Township Member.  In the event that the terms are modified in any material respect, the Atlas Member agrees to cause the applicable entity in the Sponsor Group to again offer such equity investment to Township Member and Township Member shall have a period of ten (10) Business Days to elect in writing to make the equity investment on the terms offered.  If the Township Member (or its designated Affiliate) declines to make three (3) equity investments offered pursuant to this Section 13.21, then the right of first offer set forth in this Section 13.21 shall terminate and be of no further force and effect. The right of the Township Member to participate in any investment under this Section 13.21 will apply with respect to any real property acquired or intended to be acquired or prior to such first anniversary or that is offered to investors prior to such first anniversary.

(b)    In connection with any future acquisition in which Township Member (or a designated Affiliate of Township Member) provides an equity investment pursuant to <u>Section 13.20(a)</u> above, the Atlas Member agrees to cause the applicable Sponsor Group entity to enter into a fee agreement substantially identical to the Mortgage Brokerage Agreement, provided that the fees payable will equal 50 – 100 basis points (0.50% - 1.00%) of the loan amount.

13.21  <u>Equity Syndication</u>. (a)    Atlas Holdings, or the direct or indirect members of Atlas Holdings, intend to seek one or more third party equity investors (the "LP Investors") to syndicate and recapitalize a portion of the equity investments of Atlas Holdings in Atlas P2 and, at the election of Township Member in accordance with Sections 13.21(b) and (c) below, Township Member in the Company.  In accordance with Section 7.01(b)(vi),  Atlas Member shall provide Township Member with written notice of any LP Investors identified by Atlas Holdings  (or its direct or indirect members), a description of the terms of investment offered to

TSORL_0009978

such LP Investors, and all other documentation concerning such LP Investors as Township Member may reasonably request. Provided that the Atlas Member has satisfied the foregoing requirements, Township Member shall have a period of five (5) Business Days in which to provide its consent to such LP Investors and the terms of the equity investment of such LP Investors (failure to timely respond shall be deemed consent).

(b)    In connection with any equity recapitalization, Township Member may elect to recapitalize $1,500,000 of Township Member's Interest in the Company. Township Member shall provide Atlas Member with written notice making the foregoing election prior to the consummation of the applicable equity recapitalization and in the event such election is made, the Company shall pay $1,500,000 to Township Member at the time of the closing of the applicable equity recapitalization and Township Member's Capital Account and the Percentage Interests shall be adjusted accordingly as determined by the Managing Member and the Township Member; provided, however, no such recapitalization will diminish, transfer, or otherwise limit Township Member's consent rights set forth in this Agreement.

(c)    If Township Member does not elect to recapitalize $1,500,000 pursuant to Section 13.20(b) above, Township Member shall reserve its right to such recapitalization until such time as any entity in the Sponsor Group consummates a new acquisition of real property in which such $1,500,000 can be immediately reinvested in accordance with Section 13.20(a) above.

13.22  Special Indemnification.  Sponsor, the Atlas Member, Atlas Holdings, and Consilient Holdings, jointly and severally, agree to indemnify and hold harmless the Township Member and its Affiliates, and their respective officers, directors, shareholders, partners, members, managers, employees, agents, representatives, successors and assigns, against (i) any and all tax liabilities and any related loss, damage, liability or expense (including costs and attorney's fees) they may incur by reason of, or in connection with, any transactions entered into by the Company or any of its subsidiaries on or before the Original Investment Date, (ii) any additional tax liabilities they may incur or tax benefits they may not receive and any related loss, damage, liability or expense (including costs and attorney's fees) they may incur as a result of the Property not having a tax basis equal to the Property Value on the Original Investment Date or any of the Company's direct and indirect subsidiaries not having a tax basis in each of that subsidiary's interests in its subsidiaries equal to the fair market value of that interest (in each case determined based on the Property Value), and (iii) any loss, damage, claim or other liability resulting from a breach or alleged breach of the Secured Loan Documents or the PE Investment Documents resulting from or relating to a direct or indirect transfer of an interest in the Township Member. This provision shall survive the expiration or earlier termination of this Agreement. Atlas Holdings and Consilient Holdings hereby agree that, without the prior consent of the Township Member, neither Atlas Holdings nor Consilient Holdings will cause or permit either entity to incur any indebtedness, admit additional members or accept additional capital contributions, or permit any direct or indirect transfer of any membership interest or other equity interest in either entity.

[SIGNATURES BEGIN ON NEXT PAGE]

DMSDB1\5170197 3

50

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date set forth in the introductory paragraph hereof.

<u>**ATLAS MEMBER**</u>:

Steven Ivankovich

<u>**TOWNSHIP MEMBER**</u>:

TOWNSHIP ORLANDO LLC, a Delaware limited liability company

By:  Township Capital, LLC, its manager

By:_____
       Name:  Matthew J. Gorelik
       Title:  Manager


TOWNSHIP GP FUND II, LP, a Delaware limited partnership


By:_____
       Name:  Matthew J. Gorelik
       Title:  Authorized Signatory



[signature pages continue]


*[Signature page to Amended and Restated Limited Liability Company Agreement of Atlas Township Orlando, LLC]*

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date set forth in the introductory paragraph hereof.

**ATLAS MEMBER:**

_____

Steven Ivankovich

~~**TOWNSHIP MEMBER:**~~

TOWNSHIP ORLANDO LLC, a Delaware limited liability company

By: Township Capital, LLC, its manager

By: _____
    Name: Matthew J. Gorelik
    Title: Manager


TOWNSHIP GP FUND II, LP, a Delaware limited partnership

By: _____
    Name: Matthew J. Gorelik
    Title: Authorized Signatory

[signature pages continue]

**ACCEPTED AND AGREED,** solely for purposes of <u>Sections 7.01(d)</u> and <u>13.22</u>:

Steven Ivankovich

**ACCEPTED AND AGREED,** solely for purposes of <u>Section 13.22</u>:

ATLAS HOLDINGS INVESTMENTS LLC

By:

    Name: Steven Ivankovich

    Title: Authorized Signatory

CONSILIENT HOLDINGS INVESTMENTS LLC

By:

    Name: Steven Ivankovich

    Title: Authorized Signatory

[*Signature page to Amended and Restated Limited Liability Company Agreement of Atlas Township Orlando, LLC*]

TSORL_0009982

## EXHIBIT A

### MEMBERS; CAPITAL CONTRIBUTIONS; PERCENTAGE INTERESTS

| Members | Initial Capital Contribution | Initial Capital Account | Percentage Interests |
|---|---|---|---|
| Township Orlando, LLC | $2,000,000 | $2,000,000 | 40% |
| Township GP Fund II, LP | $2,000,000 | $2,000,000 | 40% |
| Steven Ivankovich | $1,000,000 | $1,000,000 | 20% |
| TOTAL | $5,000,000 | $5,000,000 | 100% |

Exhibit A

TSORL_0009983

Schedule 7 09(a)-1

**2016-2017 Proposed Annual Operating Budget**

TSORL_0009984

Schedule 7.09(a)-2

**2016-2017 Proposed Annual CapEX Budget**

DMSDB1\5170197 3

TSORL_0009985

1

## PROOF OF SERVICE

2 **STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

3        At the time of service, I was over 18 years of age and not a party to this action.  I am employed in the County of Los Angeles, State of California.  My business address is 1880 Century
4 Park East, Suite 300, Los Angeles, CA 90067.

5        On October 2, 2024, I served true copies of the following document(s) described as **SECOND AMENDED COMPLAINT** on the interested parties in this action as follows:

6

| | |
|---|---|
| Gary A. Goldstein<br>111 South Calvert Street, 27th Floor<br>Baltimore, Maryland  21201<br>Email: gary@gagpa.com<br><br>Vonn R. Christenson<br>Jackie Thomas<br>CHRISTENSON LAW FIRM, LLP<br>472 West Putnam Avenue<br>Porterville, California  93257<br>Email: vrc@christensonlaw.com<br>          it@christensonlaw.com | Attorneys for Defendants ATLAS HOLDINGS INVESTMENTS LLC, a Delaware limited liability company;  CONSILIENT HOLDINGS INVESTMENTS, LLC, a Delaware limited liability company; ATLAS P2 MANAGING MEMBER, LLC, a Delaware limited liability company;  and STEVEN IVANKOVICH, an individual |

13        **BY ELECTRONIC SERVICE:**  I served the document(s) on the person listed in the Service List by submitting an electronic version of the document(s) to One Legal, LLC, through
14 the user interface at www.onelegal.com.

15        I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.
16

17        Executed on October 2, 2024, at Los Angeles, California.

18

19                                                    *Sarah Blasco*

20                                                    _____
                                                    Sarah Blasco
21

22

23

24

25

26

27

28