# **<u>EXHIBIT 4</u>**

**EXECUTION COPY**

# LOAN AGREEMENT

Dated as of May 2, 2017

between

**ALLIANCE HTTX LIMITED PARTNERSHIP**
and
**ALLIANCE HTFL LIMITED PARTNERSHIP,**
jointly and severally,
as Borrower

and

**WALKER & DUNLOP COMMERCIAL PROPERTY FUNDING, LLC**,
as Lender

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS; PRINCIPLES OF CONSTRUCTION ...............................................1

    Section 1.1    Definitions.................................................................................1

    Section 1.2    Principles of Construction.........................................................28

ARTICLE II GENERAL TERMS ..................................................................................................28

    Section 2.1    Loan Commitment; Disbursement to Borrower. .......................28

        2.1.1    Agreement to Lend and Borrow .................................28

        2.1.2    Single Disbursement to Borrower...............................28

        2.1.3    The Note, Security Instrument and Loan Documents................................28

        2.1.4    Use of Proceeds..........................................................29

    Section 2.2    Interest Rate. .............................................................................29

        2.2.1    Interest Rate ...............................................................29

        2.2.2    Interest Calculation.....................................................29

        2.2.3    Default Rate ................................................................29

        2.2.4    Usury Savings .............................................................29

        2.2.5    Breakage Indemnity ....................................................30

        2.2.6    Determination of Interest Rate....................................30

    Section 2.3    Debt Service Payments. ............................................................31

        2.3.1    Payments Generally ....................................................31

        2.3.2    Monthly Debt Service Payment ..................................31

        2.3.3    Payment on Maturity Date ..........................................31

        2.3.4    Late Payment Charge ..................................................31

        2.3.5    Method and Place of Payment .....................................32

        2.3.6    Exit Fee.......................................................................32

Continue

|  | 2.3.7 | Refinancing | 32 |
|  | 2.3.8 | Loan Administration Fee | 33 |
| Section 2.4 |  | Prepayments | 33 |
|  | 2.4.1 | Voluntary Prepayments | 33 |
|  | 2.4.2 | Mandatory Prepayments | 33 |
|  | 2.4.3 | Prepayments Made While an Event of Default Exists | 33 |
| Section 2.5 |  | Extension Option | 34 |
| Section 2.6 |  | Cash Management | 35 |
|  | 2.6.1 | Clearing Account | 35 |
|  | 2.6.2 | Cash Management Account | 36 |
|  | 2.6.3 | Payments Received Under the Cash Management Agreement | 38 |
| Section 2.7 |  | Interest Rate Cap Agreement | 38 |

**ARTICLE III EXCULPATION** ... 41

| Section 3.1 |  | Exculpation | 41 |

**ARTICLE IV REPRESENTATIONS AND WARRANTIES** ... 45

| Section 4.1 |  | Borrower Representations | 45 |
|  | 4.1.1 | Organization | 45 |
|  | 4.1.2 | Authorization, Execution, Delivery and Enforceability | 46 |
|  | 4.1.3 | No Conflicts | 46 |
|  | 4.1.4 | Litigation | 46 |
|  | 4.1.5 | Agreements | 46 |
|  | 4.1.6 | Consents | 47 |
|  | 4.1.7 | Title | 47 |
|  | 4.1.8 | Solvency | 47 |
|  | 4.1.9 | Full and Accurate Disclosure | 48 |

4.1.10  No Plan Assets ...........................................................................48

4.1.11  Compliance .............................................................................48

4.1.12  Financial Information ...............................................................49

4.1.13  Condemnation ........................................................................49

4.1.14  Federal Reserve Regulations..................................................49

4.1.15  Easements; Utilities and Public Access ..................................49

4.1.16  Not a Foreign Person ..............................................................50

4.1.17  Separate Lots..........................................................................50

4.1.18  Assessments ..........................................................................50

4.1.19  No Set-Off ...............................................................................50

4.1.20  Assignment of Leases and Rents ...........................................50

4.1.21  No Prior Assignment................................................................50

4.1.22  Insurance ................................................................................50

4.1.23  Use of Property .......................................................................51

4.1.24  Certificate of Occupancy; Licenses ........................................51

4.1.25  Flood Zone ..............................................................................51

4.1.26  Physical Condition ..................................................................51

4.1.27  Boundaries ..............................................................................51

4.1.28  Leases …………………………………………………………………51

4.1.29  Survey …………………………………………………………………52

4.1.30  Principal Place of Business; State of Organization...................52

4.1.31  Filing and Recording Taxes ....................................................52

4.1.32  Special Purpose Entity/Separateness. ....................................53

4.1.33  Management Agreement..........................................................53

4.1.34  Illegal Activity ..........................................................................53

4.1.35  No Change in Facts or Circumstances; Disclosure ..................................53

4.1.36  Investment Company Act ........................................................54

4.1.37  Embargoed Person ...............................................................54

4.1.38  Cash Management Account. .......................................................54

4.1.39  Filing of Returns; Payment of Taxes ............................................55

4.1.40  REA    ………………………………………………………………………………55

Section 4.2    Survival of Representations ..............................................56

ARTICLE V BORROWER COVENANTS ...........................................................56

Section 5.1    Affirmative Covenants ....................................................56

5.1.1  Existence; Compliance with Legal Requirements ...................................56

5.1.2  Taxes and Other Charges .........................................................57

5.1.3  Litigation .......................................................................58

5.1.4  Access to Property ...............................................................58

5.1.5  Notice of Default.................................................................58

5.1.6  Cooperate in Legal Proceedings ..................................................58

5.1.7  Perform Loan Documents ..........................................................58

5.1.8  Award and Insurance Benefits ....................................................58

5.1.9  Further Assurances...............................................................59

5.1.10  Mortgage Taxes .................................................................59

5.1.11  Financial Reporting.............................................................59

5.1.12  Business and Operations ........................................................62

5.1.13  Title to the Property ..........................................................62

5.1.14  Costs of Enforcement ...........................................................63

5.1.15  Estoppel Statement..............................................................63

5.1.16  Loan Proceeds ..................................................................63

5.1.17  Performance by Borrower ................................................................63

5.1.18  No Joint Assessment ...................................................................64

5.1.19  Leasing Matters ........................................................................64

5.1.20  Alterations .............................................................................65

5.1.21  Operation of Property. ..................................................................65

5.1.22  After Acquired Property ................................................................66

5.1.23  Changes in the Legal Requirements Regarding Taxation........................66

5.1.24  No Credits on Account of the Obligations ..........................................67

5.1.25  Personal Property .......................................................................67

5.1.26  Appraisals ..............................................................................67

5.1.27  REA    ...................................................................................67

5.1.28  O&M Programs ........................................................................68

5.1.29  Notices of Default .....................................................................69

5.1.30  Financing Statements ..................................................................69

5.1.31  Taxes on Security; Increased Costs .................................................69

Section 5.2    Negative Covenants ...............................................................70

5.2.1   Operation of Property. .................................................................70

5.2.2   Liens   ...................................................................................70

5.2.3   Dissolution .............................................................................70

5.2.4   Change in Business ....................................................................70

5.2.5   Debt Cancellation ......................................................................71

5.2.6   Affiliate Transactions ..................................................................71

5.2.7   Zoning...................................................................................71

5.2.8   Assets  ...................................................................................71

5.2.9   No Joint Assessment ...................................................................71

5.2.10  Principal Place of Business and Organization ...........................................71

5.2.11  ERISA. .....................................................................................................71

5.2.12  Transfers. .................................................................................................72

5.2.13  Embargoed Person; OFAC .......................................................................74

5.2.14  REA   .....................................................................................................75

5.2.15  Special Purpose Entity/Separateness. .......................................................75

5.2.16  Federal Reserve Regulations.....................................................................75

ARTICLE VI INSURANCE; CASUALTY; CONDEMNATION ...........................................76

Section 6.1    Insurance ....................................................................................76

Section 6.2    Casualty.......................................................................................80

Section 6.3    Condemnation ..............................................................................81

Section 6.4    Restoration ...................................................................................81

ARTICLE VII RESERVE FUNDS ...........................................................................86

Section 7.1    Required Repair Funds and Approved Renovations.................................86

7.1.1  Deposits.....................................................................................................86

7.1.2  Release of Required Repair Funds.................................................................86

7.1.3  Balance in Required Repair Account.............................................................88

7.1.4  Approved Renovations Completion Schedule .................................................88

Section 7.2    Tax and Insurance Escrow. .............................................................89

7.2.1  Tax and Insurance Escrow Funds .................................................................89

7.2.2  Disbursements from Tax and Insurance Escrow Funds............................89

7.2.3  Balance in the Tax and Insurance Escrow Account.................................89

Section 7.3    Excess Cash Reserve Funds, Approved Renovation Expenses and
               Letter of Credit...............................................................89

7.3.1  Excess Cash Reserve Funds.........................................................................90

7.3.2  Approved Renovation Expenses ....................................................................90

7.3.3    Cash Deposit, Letter of Credit and Securities ........................................... 91

Section 7.4    Intentionally Omitted ........................................................................... 92

Section 7.5    Intentionally Omitted. .......................................................................... 92

Section 7.6    Reserve Funds, Generally. .................................................................... 92

Section 7.7    Disbursements, Generally. .................................................................... 93

7.7.1    Conditions Precedent to All Disbursements ................................... 93

ARTICLE VIII DEFAULTS ................................................................................................... 93

Section 8.1    Event of Default. ................................................................................... 93

8.1.2    Remedies. ...................................................................................... 97

8.1.3    Remedies Cumulative; Waivers .................................................... 99

ARTICLE IX SPECIAL PROVISIONS ................................................................................... 99

Section 9.1    Transfer of Loan ................................................................................... 99

Section 9.2    Cooperation ........................................................................................ 100

Section 9.3    Servicer ............................................................................................... 100

Section 9.4    Restructuring of Loan. ........................................................................ 101

Section 9.5    Release of Property. ............................................................................. 102

9.5.1    Release of Property ...................................................................... 102

9.5.2    Partial Release of Release Property ............................................. 102

ARTICLE X MISCELLANEOUS ........................................................................................... 104

Section 10.1    Survival ............................................................................................... 104

Section 10.2    Lender's Discretion ............................................................................. 104

Section 10.3    Governing Law. .................................................................................. 104

Section 10.4    Modification, Waiver in Writing ......................................................... 106

Section 10.5    Delay Not a Waiver ............................................................................ 106

Section 10.6    Notices ................................................................................................ 106

Section 10.7    Trial by Jury ............................................................................................107

Section 10.8    Headings ..................................................................................................108

Section 10.9    Severability ..............................................................................................108

Section 10.10    Preferences .............................................................................................108

Section 10.11    Waiver of Notice .....................................................................................108

Section 10.12    Remedies of Borrower .............................................................................108

Section 10.13    Expenses; Indemnity. ..............................................................................108

Section 10.14    Schedules Incorporated ...........................................................................110

Section 10.15    Offsets, Counterclaims and Defenses ......................................................110

Section 10.16    No Joint Venture or Partnership; No Third Party Beneficiaries. ............110

Section 10.17    Publicity ..................................................................................................111

Section 10.18    Waiver of Marshalling of Assets .............................................................111

Section 10.19    Waiver of Counterclaim ...........................................................................111

Section 10.20    Conflict; Construction of Documents; Reliance ......................................111

Section 10.21    Brokers and Financial Advisors ...............................................................112

Section 10.22    Prior Agreements .....................................................................................112

Section 10.23    Cumulative Rights ...................................................................................112

Section 10.24    Counterparts ............................................................................................112

Section 10.25    Time is of the Essence .............................................................................112

Section 10.26    Consent of Holder ....................................................................................112

Section 10.27    Successor Laws ........................................................................................113

Section 10.28    Reliance on Third Parties .........................................................................113

Section 10.29    Note in Registered Form ..........................................................................113

## SCHEDULES

EXHIBIT A                Legal Description
SCHEDULE I               Rent Roll
SCHEDULE II              Borrower Organizational Chart
SCHEDULE III             Deposit Amounts
SCHEDULE IV              Required Repairs
SCHEDULE V               REA
SCHEDULE VI-1            O&M for Asbestos Containing Materials
SCHEDULE VI-2            O&M for Lead-Based Paint
SCHEDULE VII             Form of Tenant Direction Letter
SCHEDULE VIII            Allocated Loan Amounts
SCHEDULE IX              Approved Renovations
SCHEDULE X               Initial Annual Budget
SCHEDULE 4.1.4           Guarantor Litigation
SCHEDULE 4.1.12          Financial Information Exceptions
SCHEDULE 4.1.22          Insurance Claims
SCHEDULE 4.1.28          Exceptions to Lease Reps
SCHEDULE 7.7.3           Collateral Securities

# LOAN AGREEMENT

This LOAN AGREEMENT, dated as of May 2, 2017 (as amended, restated, replaced, supplemented or otherwise modified from time to time, this "**_Agreement_**"), between **WALKER & DUNLOP COMMERCIAL PROPERTY FUNDING, LLC**, a Delaware limited liability company, having an address at 535 Madison Avenue, 12th Floor, New York, New York 10022 ("**_Lender_**") and **ALLIANCE HTTX LIMITED PARTNERSHIP**, a Delaware limited partnership ("**_Texas Borrower_**") and **ALLIANCE HTFL LIMITED PARTNERSHIP**, a Delaware limited partnership ("**_Florida Borrower_**"), together with Texas Borrower, each individually, an "**_Individual Borrower_**", and together with their respective permitted successors and assigns, collectively, "**_Borrower_**"), each having an address at 55 E. Monroe, Suite 3610, Chicago, Illinois.

W I T N E S S E T H :

WHEREAS, Borrower desires to obtain a loan in an original principal amount of Eighty-Six Million and 00/100 Dollars ($86,000,000.00) from Lender pursuant to this Agreement (the "**_Loan_**"); and

WHEREAS, Lender is willing to make the Loan to Borrower, subject to and in accordance with the terms of this Agreement and the other Loan Documents (as hereinafter defined) and based upon the representations, warranties, covenants and undertakings of Borrower herein and therein contained, Lender is willing to make the Loan to Borrower on the terms and conditions set forth herein and therein);

NOW THEREFORE, in consideration of the making of the Loan by Lender and the covenants, agreements, representations and warranties set forth in this Agreement, the parties hereto hereby covenant, agree, represent and warrant as follows:

## ARTICLE I

## DEFINITIONS; PRINCIPLES OF CONSTRUCTION

Section 1.1    Definitions.    For all purposes of this Agreement, except as otherwise expressly required or unless the context clearly indicates a contrary intent:

"**_Acceptable Counterparty_**" means (a) any Counterparty to the Interest Rate Cap Agreement that has and shall maintain, until the expiration of the applicable Interest Rate Cap Agreement, credit ratings from the Rating Agencies at least equal to (i) a long term senior unsecured debt rating of "A3" or higher by Moody's; and (ii) a long-term senior unsecured debt rating of "A-" or higher by S&P (and, if such entity has a long term senior unsecured debt rating from Fitch, a long term senior unsecured debt rating of "A-" or higher by Fitch), in each case, which rating shall not include a "t" or otherwise reflect a termination risk; or (b) a counterparty to the Interest Rate Cap Agreement whose obligations thereunder are guaranteed by a bank or financial institution meeting the requirements set forth in clause (a) above.    Lender acknowledges that SMBC Capital Markets, Inc. is an Acceptable Counterparty.

"*Acknowledgment*" shall mean the Acknowledgment of Pledge, dated on or about the date hereof made by the Counterparty, or as applicable, an Acceptable Counterparty.

"*Additional Insolvency Opinion*" shall have the meaning set forth in <u>Section 5.2.15(a)</u> hereof.

"*Affiliate*" shall mean, as to any Person, any other Person that, directly or indirectly, is in Control of, is Controlled by or is under common Control with such Person or is a director or officer of such Person or of an Affiliate of such other Person.

"*Affiliated Manager*" shall mean any Manager in which Borrower, Guarantor, Sponsor or Principal has, directly or indirectly, any legal, beneficial or economic interest.

"*Agreement*" shall mean this Loan Agreement, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"*Allocated Loan Amount*" shall mean the portion of the Loan allocated to each Individual Property as set forth on **Schedule VIII**.

"*ALTA*" shall mean American Land Title Association or any successor thereto.

"*Annual Budget*" shall mean the operating budget, including all planned Renovation Expenditures, for the Property prepared and delivered by Borrower in accordance with <u>Section 5.1.11(e)</u> hereof for the applicable Fiscal Year or other period.  The initial Annual Budget is attached to this Agreement as <u>Schedule X</u>.

"*Approved Annual Budget*" shall have the meaning set forth in <u>Section 5.1.11(e)</u> hereof.

"*Approved Renovations*" shall have the meaning set forth in <u>Schedule IX</u>.

"*Approved Renovation Expenditures*" shall mean Renovation Expenditures incurred by Borrower and either (i) included in the Approved Annual Budget or (ii) approved by Lender for asset preservation and revenue enhancement or as contingency amounts in its reasonable discretion.

"*Asset Management Fee*" shall mean a fee in the amount, as of the date of its calculation, (i) during the period from the Closing Date through the Stated Maturity Date, or if the Loan has been extended, December 31, 2019 one-half of one percent (0.5%) of Gross Income from Operations for the most recently completed calendar month, and (ii) during the period from January 1, 2020 through the Extended Maturity Date one percent (1.0%) of Gross Income from Operations for the most recently completed calendar month, each of which shall be payable to Asset Manager subject to the terms of this Agreement.

"*Asset Manager*" shall mean Overlook Asset Management, LLC.

"*Assignment of Interest Rate Cap*" shall mean that certain Assignment of Interest Rate Cap Agreement dated on or about the date hereof, between Lender and Borrower, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

-2-

"***Assignments of Leases***" shall mean those certain first priority assignments of leases and rents, dated as of the date hereof, from each Individual Borrower, as assignor, to Lender, as assignee, assigning to Lender all of such Individual Borrower's interest in and to the Leases and Rents of the Property as security for the Loan, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time; and "***Assignment of Leases***" means any individual assignment of leases and rents included in the Assignments of Leases or all Assignments of Leases collectively, as the context may require.

"***Assignments of Management Agreement***" shall mean those certain Assignments of Management Agreement and Subordinations of Management Fees, dated as of the date hereof, among Lender, Borrower and Manager, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"***Award***" shall mean any compensation paid by any Governmental Authority in connection with a Condemnation in respect of all or part of the Property.

"***Bankruptcy Action***" shall mean with respect to any Person (a) such Person filing a voluntary petition under the Bankruptcy Code; (b) the filing of an involuntary petition against such Person under the Bankruptcy Code, or soliciting or causing to be solicited petitioning creditors for any involuntary petition against such Person; (c) such Person filing an answer consenting to or otherwise acquiescing in or joining in any involuntary petition filed against it, by any other Person under the Bankruptcy Code, or soliciting or causing to be solicited petitioning creditors for any involuntary petition from any Person; (d) such Person consenting to or acquiescing in or joining in an application for the appointment of a custodian, receiver, trustee, assignee, sequestrator (or similar official), liquidator, or examiner for such Person or any portion of the Property; (e) the filing of a petition against such Person seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under the Bankruptcy Code or any other applicable law; (f) under the provisions of any other law for the relief or aid of debtors, an action taken by any court of competent jurisdiction that allows such court to assume custody or Control of a Person or of the whole or any substantial part of its property or assets; or (g) such Person making an assignment for the benefit of creditors, or admitting, in writing or in any legal proceeding, its insolvency or inability to pay its debts as they become due.

"***Bankruptcy Code***" shall mean Title 11 of the United States Code, 11 U.S.C. § 101, et seq., as the same may be amended from time to time, and any successor statute or statutes and all rules and regulations from time to time promulgated thereunder, and any comparable foreign laws relating to bankruptcy, insolvency or creditors' rights or any other Federal or state bankruptcy or insolvency law.

"***Basic Carrying Costs***" shall mean, for any period, the sum of the following costs:  (a) Taxes, (b) Other Charges and (c) Insurance Premiums.

"***Borrower***" shall have the meaning set forth in the introductory paragraph hereto, together with its successors and permitted assigns.

"***Borrower's Recourse Liabilities***" shall have the meaning set forth in <u>Section 3.1(b)</u> hereof.

"***Breakage Costs***" shall have the meaning set forth in <u>Section 2.2.5</u> hereof.

"***Business Day***" shall mean any day other than a Saturday, Sunday or any other day on which any of the following institutions is not open for business:  (i) banks and savings and loan institutions in New York, New York, (ii) the financial institution that maintains any collection account for or on behalf of any Servicer or any Reserve Funds, (iii) the New York Stock Exchange or (iv) the Federal Reserve Bank of New York.

"***Caribbean Isle Property***" means that Individual Property commonly known as 3503 Bonaire Boulevard, Kissimmee, Florida 34741.

"***Cash Management Account***" shall have the meaning set forth in <u>Section 2.6.2(a)</u> hereof.

"***Cash Management Agreement***" shall mean that certain Cash Management Agreement, dated as of the date hereof, by and among Borrower, Manager, Deposit Bank and Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"***Casualty***" shall have the meaning set forth in <u>Section 6.2</u> hereof.

"***Casualty Consultant***" shall have the meaning set forth in <u>Section 6.4(b)(iii)</u> hereof.

"***Clearing Account***" shall have the meaning set forth in <u>Section 2.6.1(a)</u> hereof.

"***Clearing Account Agreement***" shall mean, collectively, those certain Deposit Account Control Agreements, dated the date hereof among Borrower, Lender and Clearing Bank, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, relating to funds deposited in the Clearing Account.

"***Clearing Bank***" shall mean Wells Fargo Bank, National Association, or any successor Eligible Institution acting as "Clearing Bank" under the Clearing Account Agreement.

"***Closing Date***" shall mean the date of the funding of the Loan.

"***Code***" shall mean the Internal Revenue Code of 1986, as amended, as it may be further amended from time to time, and any successor statutes thereto, and applicable U.S. Department of Treasury regulations issued pursuant thereto in temporary or final form.

"***Collateral***" shall have the meaning ascribed to such term in the Security Instrument.

"***Collateral Cash***" shall have the meaning set forth in <u>Section 7.3.3</u> hereof.

"***Collateral Letter of Credit***" shall have the meaning set forth in <u>Section 7.3.3</u> hereof.

"***Collateral Securities***" shall have the meaning set forth in <u>Section 7.3.3</u> hereof.

"**Condemnation**" shall mean a temporary or permanent taking by any Governmental Authority as the result or in lieu or in anticipation of the exercise of the right of condemnation or eminent domain, of all or any part of the Property, or any interest therein or right accruing thereto, including any right of access thereto or any change of grade affecting the Property or any part thereof.

"**Condemnation Proceeds**" shall have the meaning set forth in Section 6.4(b) hereof.

"**Construction Management Fee**" shall mean a fee in an amount equal to ten (10%) of any disbursement from the Required Repair Account or the Excess Cash Reserve Account payable to Borrower or Borrower's agents or Affiliates in connection with their supervision of the performance of any Required Repairs or Approved Renovations, as applicable.

"**Control**" shall mean, with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management, policies or activities of such Person, whether through ownership of voting securities, by contract or otherwise.  "Controlled" and "Controlling" shall have correlative meanings.

"**Coulter Landing Property**" means that Individual Property commonly known as 7208 SW 34th Avenue, Amarillo, Texas 79109.

"**Counterparty**" means, with respect to the Interest Rate Cap Agreement, Borrower's counterparty thereto which is a bank or other financial institution that is an Acceptable Counterparty.

"**Debt**" shall mean the Outstanding Principal Balance together with all interest accrued and unpaid thereon and all other sums (including any Yield Maintenance Premium, Breakage Costs and Exit Fee) and Other Obligations due to Lender in respect of the Loan under the Note, this Agreement, the Security Instrument or any other Loan Document (other than obligations under the Environmental Indemnity which survive repayment of the Loan).

"**Debt Service**" shall mean, with respect to any particular period of time, scheduled interest payments due under this Agreement and the Note.

"**Debt Service Coverage Ratio**" shall mean as of the date of its calculation, the ratio calculated by Lender of (i) the Net Operating Income for the twelve (12) month period ending with the most recently completed calendar month to (ii) the Debt Service for the most recently completed calendar month, annualized.  Lender's calculation of the Debt Service Coverage Ratio shall be conclusive and binding on Borrower absent manifest error.

"**Debt Yield**" shall mean as of the date of its calculation, (i) the Net Operating Income for the twelve (12) month period ending with the most recently completed calendar month, (ii) divided by the then Outstanding Principal Balance, expressed as a percentage.  Lender's calculation of the Debt Yield shall be conclusive and binding on Borrower absent manifest error.

"**Default**" shall mean the occurrence of any event hereunder or under any other Loan Document which, but for the giving of notice or passage of time, or both, would be an Event of Default.

"*Default Rate*" shall mean a rate per annum equal to the lesser of (a) the Maximum Legal Rate and (b) five percent (5.00%) above the Interest Rate.

"*Deposit Bank*" shall mean Wells Fargo Bank, National Association, or any successor Eligible Institution acting as "Deposit Bank" under the Cash Management Agreement.

"*Dollars*" and the sign "*$*" shall mean lawful money of the United States of America.

"*Easements*" shall have the meaning set forth in <u>Section 4.1.15</u> hereof.

"*Eligible Account*" shall mean a separate and identifiable account from all other funds held by the holding institution that is either (a) an account or accounts maintained with a Federal or state-chartered depository institution or trust company which complies with the definition of Eligible Institution or (b) a segregated trust account or accounts maintained with a Federal or state chartered depository institution or trust company acting in its fiduciary capacity that has a Moody's rating of at least "Baa3" and which, in the case of a state chartered depository institution or trust company, is subject to regulations substantially similar to 12 C.F.R. § 9.10(b), having in either case a combined capital and surplus of at least $50,000,000.00 and subject to supervision or examination by Federal and state authority, as applicable. An Eligible Account will not be evidenced by a certificate of deposit, passbook or other instrument.

"*Eligible Institution*" shall mean a depository institution or trust company insured by the Federal Deposit Insurance Corporation, the short-term unsecured debt obligations or commercial paper of which are rated at least "A-1+" by S&P and "P-1" by Moody's, in the case of accounts in which funds are held for thirty (30) days or less (or, in the case of accounts in which funds are held for more than thirty (30) days, the long-term unsecured debt obligations of which are rated at least "A+" by S&P and "Aa3" by Moody's).

"*Embargoed Person*" shall mean any person, entity or government subject to trade restrictions under U.S. law, including, but not limited to, The USA Patriot Act (including the anti-terrorism provisions thereof), the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701, et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Orders or regulations promulgated thereunder including those related to Specially Designated Nationals and Specially Designated Global Terrorists, with the result that the investment in Borrower, Principal or Guarantor, as applicable (whether directly or indirectly), is prohibited by law or the Loan made by the Lender is in violation of law.

"*Environmental Indemnity*" shall mean that certain Environmental Indemnity Agreement, dated as of the date hereof, executed by Borrower and Guarantor in connection with the Loan for the benefit of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"*Environmental Statutes*" shall mean any present and future Federal, state and local laws, statutes, ordinances, rules, regulations and the like, as well as common law, relating to protection of human health or the environment, relating to Hazardous Substances, and/or relating to liability for or costs of other actual or threatened danger to human health or the environment. The term "Environmental Statutes" includes, but is not limited to, the following statutes, as amended, any successor thereto, and any regulations promulgated pursuant thereto, and any state

or local statutes, ordinances, rules, regulations and the like addressing similar issues: the Comprehensive Environmental Response, Compensation and Liability Act; the Emergency Planning and Community Right-to-Know Act; the Hazardous Substances Transportation Act; the Resource Conservation and Recovery Act (including but not limited to Subtitle I relating to underground storage tanks); the Solid Waste Disposal Act; the Clean Water Act; the Clean Air Act; the Toxic Substances Control Act; the Safe Drinking Water Act; the Occupational Safety and Health Act; the Federal Water Pollution Control Act; the Federal Insecticide, Fungicide and Rodenticide Act; the Endangered Species Act; the National Environmental Policy Act; and the River and Harbors Appropriation Act.  The term "Environmental Statutes" also includes, but is not limited to, any present and future Federal, state and local laws, statutes, ordinances, rules, regulations, permits or authorizations and the like, as well as common law, that (a) condition transfer of property upon a negative declaration or other approval of a Governmental Authority of the environmental condition of the Property; (b) require notification or disclosure of releases of Hazardous Substances or other environmental condition of a property to any Governmental Authority or other Person, whether or not in connection with any transfer of title to or interest in such property; (c) impose conditions or requirements in connection with permits or other authorization for lawful activity relating to the use or storage or disposal of Hazardous Substances; (d) relate to nuisance, trespass or other causes of action related to the use, storage or disposal of Hazardous Substances on the Property; or (e) relate to wrongful death, personal injury, or property or other damage in connection with the use, storage or disposal of Hazardous Substances on the Property.

"*ERISA*" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and the rulings issued thereunder.

"*ERISA Affiliate*" shall mean each person (as defined in Section 3(9) of ERISA) that together with Borrower would be deemed to be a "single employer" within the meaning of Section 414(b), (c), (m) or (o) of the Code.

"*Event of Default*" shall have the meaning set forth in Section 8.1(a) hereof.

"*Excess Cash*" shall have the meaning set forth in Section 2.6.2(b)(vi) hereof.

"*Excess Cash Reserve Account*" shall have the meaning set forth in Section 7.3.1 hereof.

"*Excess Cash Reserve Funds*" shall have the meaning set forth in Section 7.3.1 hereof.

"*Exit Fee*" shall have the meaning set forth in Section 2.3.6.

"*Extended Maturity Date*" shall have the meaning set forth in Section 2.5 hereof.

"*Extension Term*" shall have the meaning set forth in Section 2.5 hereof.

"*Extraordinary Expense*" shall have the meaning set forth in Section 5.1.11(f) hereof.

"*Fee Payment Debt Yield*" shall mean as of the date of its calculation, (i) Net Operating Income, divided by (ii) the then Outstanding Principal Balance, expressed as a percentage.  For the purposes of this definition, "Net Operating Income" shall be deemed to mean the amount

obtained by subtracting Operating Expenses for the trailing twelve (12) month period ending with the most recently completed calendar month, less the underwritten replacement reserves of $250 per unit, from Gross Income from Operations for the three (3) month period ending with the most recently completed calendar month, annualized. Lender's calculation of the Fee Payment Debt Yield shall be conclusive and binding on Borrower absent manifest error.

"*First Payment Date*" shall have the meaning set forth in Section 2.3.2 hereof.

"*FHA*" shall mean the Federal Housing Administration.

"*Fiscal Year*" shall mean each twelve (12) month period commencing on January 1 and ending on December 31 during each year of the term of the Loan.

"*Fitch*" shall mean Fitch, Inc.

"*Florida Borrower*" shall have the meaning set forth in the introductory paragraph hereto, together with its successors and permitted assigns.

"*Florida Properties*" shall have the meaning set forth in Section 7.1.1.

"*Forest Park Property*" means that Individual Property commonly known as 2829 S. Oakland Forest Drive, Oakland Park, Florida 33309.

"*Full Replacement Cost*" shall have the meaning set forth in Section 6.1(a)(i).

"*GAAP*" shall mean generally accepted accounting principles in the United States of America as of the date of the applicable financial report.

"*Governmental Authority*" shall mean any court, board, agency, commission, office or other authority of any nature whatsoever for any governmental unit (Federal, state, county, district, municipal, city or otherwise whether now or hereafter in existence).

"*Gross Income from Operations*" shall mean, for any period, all income, computed in accordance with GAAP, derived from the ownership and operation of the Property from whatever source during such period, including, but not limited to, Rents from Tenants that are in occupancy and paying full contractual rent without right of offset or credit, utility charges, escalations, forfeited security deposits, interest (if any) on credit accounts and on Reserve Funds, business interruption or other loss of income or rental insurance proceeds, service fees or charges, license fees, parking fees, rent concessions or credits, and other pass-throughs or reimbursements paid by such Tenants under the Leases of any nature but excluding (i) Rents from month-to-month Tenants, from Tenants during a free rent period or from Tenants that are included in any Bankruptcy Action, (ii) sales, use and occupancy or other taxes on receipts required to be accounted for by Borrower to any Governmental Authority, (iii) refunds and uncollectible accounts, (iv) proceeds from the sale of furniture, fixtures and equipment, (v) Insurance Proceeds and Condemnation Proceeds (other than business interruption or other loss of income insurance), and (vi) any disbursements to Borrower from any of the Reserve Funds.

"*Guarantor*" shall mean Steven Ivankovich, a natural person.

"***Guaranty***" shall mean, collectively, that certain (i) Guaranty of Recourse Obligations, dated as of the date hereof, from Guarantor in favor of Lender, and (ii) Completion Guaranty, dated as of the date hereof, from Guarantor in favor of Lender, in each case, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"***Hazardous Substances***" shall include, but is not limited to, (a) any and all substances (whether solid, liquid or gas) defined, listed, or otherwise classified as pollutants, hazardous wastes, hazardous substances, hazardous materials, extremely hazardous wastes, or words of similar meaning or regulatory effect under any present or future Environmental Statutes or that may have a negative impact on human health or the environment, including, but not limited to, petroleum and petroleum products, asbestos and asbestos-containing materials, polychlorinated biphenyls, lead, radon, radioactive materials, flammables and explosives, but excluding substances of kinds and in amounts ordinarily and customarily used or stored in properties similar to the Property for the purposes of cleaning or other maintenance or operations and otherwise in compliance with all Environmental Statutes, and (b) mold, mycotoxins, microbial matter, and/or airborne pathogens (naturally occurring or otherwise) which pose a threat (imminent or otherwise) to human health or the environment or adversely affect the Property and are regulated by or under any present or future Environmental Statutes.

"***HUD***" shall mean the United States Department of Housing and Urban Development.

"***HUD Refinance***" shall mean a refinancing by the Borrower or any Affiliate thereof, of any or all or any portion of the Loan, which refinancing is insured by FHA and/or HUD.

"***Improvements***" shall have the meaning set forth in the granting clause of the Security Instrument.

"***Incentive Fee***" shall mean a fee in the amount, as of the date of its calculation, of one percent (1.0%) of Gross Income from Operations for the most recently completed calendar month, which shall be payable to Manager subject to the terms of this Agreement.

"***Indebtedness***" shall mean, for any Person, without duplication: (i) all indebtedness of such Person for borrowed money, for amounts drawn under a letter of credit, or for the deferred purchase price of property for which such Person or its assets is liable, (ii) all unfunded amounts under a loan agreement, letter of credit, or other credit facility for which such Person would be liable if such amounts were advanced thereunder, (iii) all amounts required to be paid by such Person as a guaranteed payment to partners or a preferred or special dividend, including any mandatory redemption of shares or interests, (iv) all indebtedness guaranteed by such Person, directly or indirectly, (v) all obligations under leases that constitute capital leases for which such Person is liable, (vi) all obligations of such Person under interest rate swaps, caps, floors, collars and other interest hedge agreements, in each case for which such Person is liable or its assets are liable, whether such Person (or its assets) is liable contingently or otherwise, as obligor, guarantor or otherwise, or in respect of which obligations such Person otherwise assures a creditor against loss, and (vii) obligations secured by any Liens, whether or not the obligations have been assumed (other than Permitted Encumbrances).

"***Indemnified Liabilities***" shall have the meaning set forth in <u>Section 10.13(b)</u> hereof.

"*Indemnified Parties*" shall mean any Person who is or will have been involved in the origination of the Loan, any Person who is or will have been involved in the servicing of the Loan, any Person in whose name the encumbrance created by the Security Instrument is or will have been recorded, any Person who may hold or acquire or will have held a full or partial interest in the Loan (including, but not limited to, custodians, trustees and other fiduciaries who hold or have held a full or partial interest in the Loan for the benefit of third parties) as well as the respective directors, officers, shareholders, partners, employees, agents, servants, representatives, contractors, subcontractors, Affiliates, subsidiaries, participants, successors and assigns of any and all of the foregoing (including, but not limited to, any other Person who holds or acquires or will have held a participation or other full or partial interest in the Loan, whether during the term of the Loan or as a part of or following a foreclosure of the Loan and including, but not limited to any successors by merger, consolidation or acquisition of all or a substantial portion of Lender's assets and business).

"*Indemnifying Person*" shall mean Borrower and Guarantor, on a joint and several basis.

"*Independent Director*" shall mean a natural person who (a) is not (at the time of initial appointment as director or manager, or at any time while serving as a director or manager), has never been, and will not be (at any time while serving as a director or manager):  (i) a stockholder, partner, member or other equity owner, director (with the exception of serving as the Independent Director of Principal), officer, employee, attorney or counsel of Borrower, Guarantor or any Affiliate of Borrower or Guarantor, (ii) a customer, supplier or other Person who derives any of its purchases or revenues from its activities with Borrower, Guarantor or any Affiliate of Borrower or Guarantor, (iii) a Person Controlling or under common Control with any such stockholder, partner, member or other equity owner, director, officer, customer, supplier or other Person, (iv) a member of the immediate family of any such stockholder, partner, member, equity owner, director, officer, employee, manager, customer, supplier or other Person, or (v) otherwise affiliated with Borrower, Guarantor or any stockholder, member, partner, director, officer, employee, attorney or counsel of Borrower or any Guarantor, and (b) has (i) prior experience as an independent director or independent manager for a corporation, a trust or a limited liability company whose charter documents required the unanimous consent of all independent directors or independent managers thereof before such corporation, trust or limited liability company could consent to the institution of bankruptcy or insolvency proceedings against it or could file a petition seeking relief under any applicable Federal or state law relating to bankruptcy and (ii) at least three (3) years of employment experience with one or more nationally-recognized professional service companies that provides, inter alia, professional independent directors or independent managers in the ordinary course of their respective business to issuers of securitization or structured finance instruments, agreements or securities or lenders originating commercial real estate loans for inclusion in securitization or structured finance instruments, agreements or securities and is at all times during his or her service as an Independent Director of Borrower an employee of such a company or companies.  A natural person who otherwise satisfies the foregoing definition other than subclause (a)(i) of this definition by reason of being the Independent Director of a Special Purpose Entity affiliated with Borrower shall not be disqualified from serving as an Independent Director of Borrower, provided that the fees that such individual earns from serving as Independent Director of affiliates of Borrower in any given year constitute in the aggregate less than five percent (5%) of such individual's annual income for that year.

As used in this definition and in the definition of "Special Purpose Entity," the term "nationally recognized professional service company" shall mean Corporation Services Company, CT Corporation, Stewart Management Corporation, National Registered Agents, Inc. and Independent Director Services, Inc. and any other Person approved in writing by Lender.

"*Individual Borrower*" shall have the meaning set forth in the introductory paragraph hereto, together with its successors and permitted assigns.

"*Initial Renovation Expenditure Deposit*" shall mean the amount set forth on **Schedule III**.

"*Initial Insurance Premiums Deposit*" shall mean the amount set forth on **Schedule III**.

"*Initial Required Repairs Deposit*" shall mean the amount set forth on **Schedule III**.

"*Initial Tax Deposit*" shall mean the amount set forth on **Schedule III**.

"*Insolvency Opinion*" shall mean that certain substantive non-consolidation opinion letter, dated the date hereof, in connection with the Loan.

"*Insurance Premiums*" shall have the meaning set forth in Section 6.1(b) hereof.

"*Insurance Premiums Monthly Deposit*" shall have the meaning set forth in Section 7.2.1 hereof.

"*Insurance Proceeds*" shall have the meaning set forth in Section 6.4(b) hereof.

"*Interest Period*" shall mean, with respect to any Payment Date, the period commencing on and including the tenth (10th) day of the calendar month preceding the calendar month in which such Payment Date occurs and ending on and including the ninth (9th) day of the calendar month in which such Payment Date occurs; *provided*, *however*, that (i) no Interest Period shall end later than the Maturity Date (other than for purposes of calculating interest at the Default Rate) and (ii) in the event the Closing Date is a date other than the tenth (10th) day of a calendar month, the initial Interest Period shall begin on and include the Closing Date and shall end on and include the ninth (9th) day of the month in which the Closing Date occurs.

"*Interest Rate*" shall mean, with respect to each Interest Period, interest on the Outstanding Principal Balance at a rate equal to the sum of the 30-day LIBOR as of the LIBOR Determination Date plus five and three quarters of one percent (5.75%) per annum, with a LIBOR floor of seven tenths of one percent (0.70%) for a minimum rate of six and forty-five hundredths of one percent (6.45%) per annum.

"*Interest Rate Cap Agreement*" shall mean the interest rate cap agreement(s) (together with any confirmation(s), schedule(s) and credit support annex(es) relating thereto and any amendments of, or supplements thereto), between an Acceptable Counterparty and Borrower obtained by Borrower and collaterally assigned on the Closing Date to Lender pursuant to the Assignment of Interest Rate Cap Agreement. The Interest Rate Cap Agreement shall satisfy the requirements specified in Section 2.7 hereof and shall provide for interest periods and

-11-

calculations consistent with the payment terms of this Agreement. The Interest Rate Cap Agreement (i) must not impose any material obligation on the beneficiary thereof (after payment of the acquisition cost), (ii) shall incorporate representations by the Counterparty that no withholding taxes shall apply to payments by the Counterparty, and provide for "gross up" payments by the Counterparty for any withholding tax, (iii) shall provide that the Counterparty agrees not to file or join in the filing of any petition against Borrower under the Bankruptcy Code, and (iv) shall incorporate, if the Interest Rate Cap Agreement contemplates collateral posting by the Counterparty, a credit support annex setting forth the mechanics for collateral to be calculated and posted that are consistent with Rating Agencies standards, requirements and criteria and (v) shall otherwise contain terms and conditions acceptable to the Rating Agencies and must have been approved by Lender's counsel. After delivery of a Replacement Interest Rate Cap Agreement to Lender, the term "Interest Rate Cap Agreement" shall be deemed to mean such Replacement Interest Rate Cap Agreement.

"*Investor*" shall have the meaning set forth in Section 9.1 hereof.

"*Lease*" shall mean any lease, sublease or sub-sublease, letting, license, concession or other agreement (whether written or oral and whether now or hereafter in effect) pursuant to which any Person is granted a possessory interest in, or right to use or occupy all or any portion of any space in the Property by or on behalf of Borrower, and (a) every modification, amendment or other agreement relating to such lease, sublease, sub-sublease, or other agreement entered into in connection with such lease, sublease, sub-sublease, or other agreement, and (b) every guarantee of the performance and observance of the covenants, conditions and agreements to be performed and observed by the other party thereto.

"*Legal Requirements*" shall mean all Federal, state, county, municipal and other governmental statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of Governmental Authorities applicable to Borrower or the Property or any part thereof, or the construction, use, alteration or operation of the Property, or any part thereof, whether now or hereafter enacted and in force, including, without limitation, any Environmental Statutes, the Americans with Disabilities Act of 1990, as amended, and all permits, licenses and authorizations and regulations relating thereto, and all covenants, agreements, restrictions and encumbrances contained in any instruments, either of record or known to Borrower, at any time in force affecting Borrower, the Property or any part thereof, including, without limitation, any which may (a) require repairs, modifications or alterations in or to the Property or any part thereof, or (b) in any way limit the use and enjoyment thereof.

"*Lender*" shall have the meaning set forth in the introductory paragraph hereto, together with its successors and assigns.

"*LIBOR*" shall mean, the rate (expressed as a percentage per annum and rounded up to the nearest whole multiple of one-one hundredth of one percent (0.01%)) for deposits in U.S. dollars, for a one-month period, that appears on Page BBAM 1 on the Bloomberg Service (or the successor thereto) as of 11:00 a.m., London time, on the related LIBOR Determination Date. If such rate does not appear on Page BBAM 1 on the Bloomberg Service (or the successor thereto) as of 11:00 a.m., London time, on such LIBOR Determination Date, LIBOR shall be the arithmetic mean of the offered rates (expressed as a percentage per annum) for deposits in U.S.

-12-

dollars for a one-month period that appear on the Reuters Screen Libor Page as of 11:00 a.m., London time, on such LIBOR Determination Date, if at least two (2) such offered rates appear. If fewer than two (2) such rates so appear, Lender shall request the principal London office of any four major reference banks in the London interbank market selected by Lender to provide such bank's offered quotation (expressed as a percentage per annum) to prime banks in the London interbank market for deposits in U.S. dollars for a one-month period as of 11:00 a.m., London time, on such LIBOR Determination Date for the amounts of not less than USD $1,000,000.00.  If at least two (2) such offered quotations are so provided, LIBOR shall be the arithmetic mean of such quotations.  If fewer than two (2) such quotations are so provided, Lender shall request any three (3) major banks in New York City selected by Lender to provide such bank's rate (expressed as a percentage per annum) for loans in U.S. dollars to leading European banks for a one-month period as of approximately 11:00 a.m., New York City time on the applicable LIBOR Determination Date for amounts of not less than USD $1,000,000.00.  If at least two (2) such rates are provided, LIBOR shall be the arithmetic mean of such rates.

"*LIBOR Determination Date*" shall mean the date that is two (2) London Business Days prior to the first day of each Interest Period.

"*Licenses*" shall have the meaning set forth in Section 4.1.24 hereof.

"*Lien*" shall mean any mortgage, deed of trust, deed to secure debt, indemnity deed of trust, lien (statutory or otherwise), pledge, hypothecation, easement, restrictive covenant, preference, assignment, security interest, or any other encumbrance, grant, charge or transfer of, or any agreement to enter into or create any of the foregoing, on or affecting Borrower, the Property, or any portion thereof or any interest therein, or any direct or indirect interest in Borrower, including, without limitation, any conditional sale or other title retention agreement, any financing or capital lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's, materialmen's and other similar liens and encumbrances.

"*Loan*" shall have the meaning set forth in the recitals hereof.

"*Loan Administration Fee*" shall have the meaning set forth in Section 2.3.8.

"*Loan Documents*" shall mean, collectively, this Agreement, the Note, the Security Instruments, the Assignments of Leases, the Environmental Indemnity, the Assignments of Management Agreement, the Guaranty, the Clearing Account Agreement, the Cash Management Agreement, the Assignment of Interest Rate Cap Agreement, the Recycled Entity Certificate for each Individual Borrower, and all other documents executed and/or delivered in connection with the Loan.

"*Loan to Value Ratio*" shall mean, as of the date of its calculation, the ratio of (i) the Outstanding Principal Balance as of such date to (ii) the appraised value of the Property determined pursuant to an appraisal reasonably satisfactory to Lender meeting the requirements of FIRREA and MAI prepared by an appraiser selected by Lender, dated no more than ninety (90) days prior to the date on which a determination based thereon is being made, and obtained at Borrower's sole cost and expense.

"***London Business Day***" shall mean any day other than a Saturday, Sunday or any other day on which commercial banks in London, England, are not open for business.

"***Major Lease***" shall mean (i) any non-residential Lease, (ii) any Lease with an Affiliate of Borrower, Manager, Guarantor or Principal, (iii) any Lease containing any purchase option, right of first refusal, or similar entitlement to acquire all or a material part of the Property, (iv) any "blanket" Lease with a single or affiliated Tenant that is for a number of units in a Property exceeding ten percent (10%) of the total units in such Property, (v) any Lease that does not substantially conform to the form of Lease approved by Lender, and (vi) any Lease entered into during the continuance of an Event of Default.

"***Management Agreement***" shall mean, collectively, those certain management agreements entered into by and between each Individual Borrower and Manager, pursuant to which Manager is to provide management and other services with respect to each Property, or, if the context requires, the Replacement Management Agreement.

"***Manager***" shall mean Atlas Apartment Homes LLC, d/b/a Atlas Residential, L.L.C., or, if the context requires, a Qualified Manager who is managing the Property in accordance with the terms and provisions of this Agreement pursuant to a Replacement Management Agreement.

"***Material Action***" shall mean, with respect to Borrower, to consolidate or merge Borrower with or into any Person, or sell all or substantially all of the assets of Borrower, or to institute a Bankruptcy Action or take action in furtherance of any such action, or, to the fullest extent permitted by law, to dissolve or liquidate Borrower.

"***Material Adverse Change***" shall mean the business, operations, prospects, property, assets, liabilities or financial condition of any applicable Person and each of their subsidiaries, taken as a whole, or the ability of any such Person to perform its obligations (whether economic or non-economic) under the Loan Documents has changed in a manner which could impair the value of Lender's security for the Loan or prevent timely repayment of the Loan or otherwise prevent the applicable Person or entity from timely performing any of its material obligations under the Loan Documents, as the case may be, as determined by Lender in its reasonable discretion.

"***Material Agreements***" shall mean (i) any brokerage agreement entered into by Borrower in connection with the management of the Property, and (ii) each contract and agreement relating to the ownership, management, development, construction, use, operation, leasing, maintenance, repair or improvement of the Property, other than the Management Agreement and the Leases, as to which either (a) there is an obligation of Borrower to pay more than $100,000.00 per annum, or (b) the term thereof extends beyond one year (unless cancelable on thirty (30) days or less notice without requiring the payment of termination fees or payments of any kind).

"***Maturity Date***" shall mean the Stated Maturity Date as the same may be extended to the Extended Maturity Date, or such other date on which the final payment of principal of the Note becomes due and payable as herein and therein or herein provided, whether at the Stated

-14-

Maturity Date or the Extended Maturity Date, by declaration of acceleration, extension or otherwise.

"***Maximum Legal Rate***" shall mean the maximum non-usurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the indebtedness evidenced by the Note and as provided for herein or the other Loan Documents, under the laws of such state or states whose laws are held by any court of competent jurisdiction to govern the interest rate provisions of the Loan.

"***Monthly Debt Service Payment Amount***" shall have the meaning set forth in <u>Section 2.3.2</u>.

"***Moody's***" shall mean Moody's Investors Service, Inc.

"***Multiemployer Plan***" shall mean a multiemployer plan, as defined in Section 4001(a)(3) of ERISA to which Borrower or any ERISA Affiliate is making or accruing an obligation to make contributions or has within any of the preceding three plan years made or accrued an obligation to make contributions.

"***Multiple Employer Plan***" shall mean an employee benefit plan, other than a Multiemployer Plan, to which Borrower or any ERISA Affiliate, and one or more employers other than Borrower or an ERISA Affiliate, is making or accruing an obligation to make contributions or, in the event that any such plan has been terminated, to which Borrower or an ERISA Affiliate made or accrued an obligation to make contributions during any of the five plan years preceding the date of termination of such plan.

"***Net Cash Flow***" shall mean, for any period, the amount obtained by subtracting (a) the sum of (i) Operating Expenses and (ii) Renovation Expenditures for such period from (b) Gross Income from Operations for such period.

"***Net Cash Flow Schedule***" shall have the meaning set forth in <u>Section 5.1.11(b)</u> hereof.

"***Net Operating Income***" shall mean, for any period, the amount obtained by subtracting Operating Expenses for such period from Gross Income from Operations for such period.

"***Net Proceeds***" shall have the meaning set forth in <u>Section 6.4(b)</u> hereof.

"***Net Proceeds Account***" shall have the meaning set forth in <u>Section 6.4(b)(ii)</u> hereof.

"***Net Proceeds Deficiency***" shall have the meaning set forth in <u>Section 6.4(b)(vi)</u> hereof.

"***Note***" shall mean that certain Promissory Note of even date herewith in the principal amount of Eighty-Six Million and 00/100 Dollars ($86,000,000.00), made by Borrower in favor of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"***Notice***" shall have the meaning set forth in <u>Section 10.6</u> hereof.

"**_O&M Programs_**" shall mean, collectively, (a) the asbestos containing materials operations and maintenance program described in that certain Asbestos Operations and Maintenance Program for the Property, attached hereto as **Schedule VI-1** and by this reference made a part hereof, and (b) and the water, moisture and mold operations and maintenance program described in that certain Operations and Maintenance Program for Water, Moisture and Mold for the Property, attached hereto as **Schedule VI-2** and by this reference made a part hereof, each as developed by Borrower or Lender's environmental consultant and approved by Lender as of the Closing Date, and each as the same may be amended, replaced, supplemented or otherwise modified from time to time.

"**_Obligations_**" shall mean, collectively, Borrower's obligations for the payment of the Debt and the performance of the Other Obligations.

"**_OFAC_**" shall mean the Office of Foreign Asset Control of the Department of the Treasury of the United States of America.

"**_Officer's Certificate_**" shall mean a certificate delivered to Lender by Borrower which is signed by an authorized officer of (i) the general partner or managing member of Borrower or (ii) Manager, provided Borrower agrees that such shall be deemed to be signed and bind Borrower.

"**_Operating Expenses_**" shall mean, for any period, the total of all expenditures, computed in accordance with GAAP, of whatever kind relating to the operation, maintenance and management of the Property, which expenditures are incurred on a regular monthly or other periodic basis, including without limitation, ground rent, utilities, ordinary repairs and maintenance, Insurance Premiums, license fees, Taxes, Other Charges, advertising expenses, management fees under the Management Agreement not to exceed the greater of: (i) actual management fees due under the Management Agreement and, (ii) three percent (3.0%) of Gross Income from Operations, payroll and related taxes, computer processing charges, operational equipment, and other similar costs, but excluding depreciation, debt service, Renovation Expenditures, and contributions to any of the Reserve Funds.

"**_Other Charges_**" shall mean all ground rents (but only such amounts as are in excess of ground rents computed as a portion of Operating Expenses), maintenance charges, impositions other than Taxes, and any other charges, including, without limitation, vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Property, now or hereafter levied or assessed or imposed against the Property or any part thereof.

"**_Other Obligations_**" shall mean (a) the performance of all obligations of Borrower (other than payment of the Debt) contained herein; (b) the performance of each obligation of Borrower or Guarantor contained in any other Loan Document; (c) the payment of all costs, expenses, legal fees and liabilities incurred by Lender in connection with the enforcement of any of Lender's rights or remedies under the Loan Documents, or any other instrument, agreement or document which evidences or secures any other Obligations or collateral therefor, whether now in effect or hereafter executed, and payable by Borrower; and (d) the payment, performance, discharge and satisfaction of all other liabilities and obligations of Borrower and/or Guarantor to Lender, whether now existing or hereafter arising, direct or indirect, absolute or contingent, and including, without limitation, each liability and obligation of Borrower and/or Guarantor under

any one or more of the Loan Documents and any amendment, extension, modification, replacement or recasting of any one or more of the instruments, agreements and documents referred to herein or therein or executed in connection with the transactions contemplated hereby or thereby.

"**_Outstanding Principal Balance_**" shall mean, as of any date, the outstanding principal balance of the Loan.

"**_Payment Date_**" shall mean the tenth (10th) day of each calendar month during the term of the Loan or, if such day is not a Business Day, the immediately preceding Business Day.

"**_Permitted Encumbrances_**" shall mean, collectively (a) the Liens and security interests created by the Loan Documents, (b) all Liens, encumbrances and other matters disclosed in "Schedule B-I" of the Title Insurance Policy together with the Survey, (c) Liens, if any, for Taxes imposed by any Governmental Authority which are not yet due or delinquent, (d) such other title and survey exceptions as Lender has approved or may approve in writing in Lender's sole discretion, which Permitted Encumbrances in the aggregate do not materially adversely affect the value or use of the Property or Borrower's ability to repay the Loan, and (e) inchoate mechanic's and materialmen's liens and other similar inchoate liens.

"**_Person_**" shall mean any individual, corporation, partnership, joint venture, limited liability company, estate, trust, unincorporated association, any Governmental Authority, and any fiduciary acting in such capacity on behalf of any of the foregoing.

"**_Personal Property_**" shall have the meaning set forth in the granting clause of the Security Instrument.

"**_Physical Conditions Report_**" shall mean a structural engineering report prepared by a company satisfactory to Lender regarding the physical condition of the Property, satisfactory in form and substance to Lender in its sole discretion, which report shall, among other things, (a) confirm that the Property and its use comply, in all material respects, with all applicable Legal Requirements (including zoning, subdivision and building codes and laws), and (b) include a copy of a certificate of occupancy with respect to all improvements.

"**_Policies_**" and "**_Policy_**" shall have the respective meaning specified in Section 6.1(b) hereof.

"**_Prepayment Date_**" shall have the meaning specified in Section 2.4.1(b) hereof.

"**_Prime Rate_**" shall mean the rate of interest published in The Wall Street Journal from time to time as the "Prime Rate." If more than one "Prime Rate" is published in The Wall Street Journal for a day, the average of such "Prime Rates" shall be used, and such average shall be rounded up to the nearest one hundredth of one percent (0.01%). If The Wall Street Journal ceases to publish the "Prime Rate," Lender shall select an equivalent publication that publishes such "Prime Rate," and if such "Prime Rates" are no longer generally published or are limited, regulated or administered by a governmental or quasigovernmental body, then Lender shall select a comparable interest rate index.

"***Prime Rate Loan***" shall mean the Loan at such time as interest thereon accrues at a rate of interest based upon the Prime Rate in accordance with the terms of this Agreement.

"***Prime Rate Spread***" shall mean the difference (expressed as the number of basis points) between (a) the Interest Rate on the date LIBOR was last applicable to the Loan and (b) the Prime Rate on the date that LIBOR was last applicable to the Loan; *provided*, *however*, in no event shall such difference be a negative number.

"***Principal***" shall mean (i) in the case of Texas Borrower, Alliance HTTX GP, L.L.C., a Delaware limited liability company, and (ii) in the case of Florida Borrower, Alliance HTFL GP, L.L.C., a Delaware limited liability company, each of which shall be a Special Purpose Entity.

"***Prohibited Transaction***" shall mean any action or transaction which would cause any obligation, or action taken or to be taken, hereunder (or the exercise by Lender of any of its rights under the Note, this Agreement or the other Loan Documents) to be a non-exempt (under a statutory or administrative class exemption) prohibited transaction under the ERISA or Section 4975 of the Code.

"***Properties***" shall mean the real property (including fixtures) described on <u>Exhibit A</u> hereof, the Improvements thereon and all Personal Property now or hereafter owned by Borrower with respect thereto and encumbered by a Security Instrument, together with all rights pertaining to such property and Improvements, as more particularly described in the granting clause of such Security Instrument; and "***Property***" shall mean an individual property included in the Properties or all Properties collectively, as the context may require.

"***<u>Property Condition Report</u>***" shall mean, collectively, (i) that certain Property Condition Report of Caribbean Isle by Velocity, Project Number PC-17-0128, Final Issue Date April 4, 2017, (ii) that certain Property Condition Report of Forest Park by Velocity, Project Number PC-17-0131, Final Issue Date April 4, 2017, (iii) that certain Property Condition Report of Coulter Landing by Velocity, Project Number PC-17-0134, Final Issue Date April 4, 2017, (iv) that certain Property Condition Report of Warwick Apartments by Velocity, Project Number PC-17-0137, Final Issue Date April 4, 2017, and (v) that certain Property Condition Report of Windtree by Velocity, Project Number PC-17-0140, Final Issue Date April 6, 2017.

"***<u>Qualified Letter of Credit</u>***" shall mean a clean, irrevocable, unconditional, transferable letter of credit in form reasonably satisfactory to Lender with respect to which Borrower has no reimbursement obligation to any party, including, without limitation, the issuing bank or (directly or indirectly) the applicant, payable on sight draft only, in favor of Lender and entitling Lender to draw thereon in New York, New York, issued by a domestic bank or the U.S. agency or branch of a foreign bank the long-term unsecured debt rating of which is not less than BBB (or the equivalent) from each of the Rating Agencies; <u>provided</u> that (1) a letter of credit shall cease to be a Qualified Letter of Credit if at any time the long-term unsecured debt rating of the issuing bank from any of the Rating Agencies shall fall below BBB (or the equivalent), and (2) at the time of the delivery of each Qualified Letter of Credit (if delivered subsequent to the Closing Date), Borrower shall deliver to Lender an opinion of counsel (either on the Closing Date or at the time the letter of credit is delivered), in form and substance reasonably satisfactory to Lender, to the effect that delivery of such Qualified Letter of Credit does not alter the conclusion reached

in the non-consolidation opinion delivered in connection with the Loan.  The following terms and conditions shall apply to each Qualified Letter of Credit:

(i)  Each such Qualified Letter of Credit shall expressly provide that partial draws are permitted thereunder;

(ii)  Each such Qualified Letter of Credit shall expressly provide that it is freely transferable to any successor or assign of Lender;

(iii)  Borrower shall not have any reimbursement obligations under such Qualified Letter of Credit;

(iv)  The applicant shall have no rights of subrogation against Borrower until at least ninety one (91) days after the Loan has been indefeasibly paid in full; and

(iv)  Lender will be entitled to draw on any Qualified Letter of Credit immediately and without further notice (a) upon the occurrence and during the continuance of any Event of Default, (b) if Borrower shall not have delivered to Lender, no less than thirty (30) days prior to the expiration date of such Qualified Letter of Credit (including any renewal or extension thereof), a renewal or extension of such Qualified Letter of Credit or a replacement Qualified Letter of Credit for a term of not less than one year (or through the date that is thirty (30) days beyond the Maturity Date, as the same may be extended, whichever is earlier), or (c) if the credit rating or financial condition of the issuing bank falls below the ratings set forth above in this definition.

Notwithstanding anything contained herein, to the extent Borrower and/or Guarantor is obligated hereunder or under any of the other Loan Documents to deliver an additional Qualified Letter of Credit, such obligation shall not be deemed satisfied by any Qualified Letter of Credit previously delivered to Lender.

"*Qualified Manager*" shall mean either (a) Manager or (b) in the judgment of Lender, a Person which is reputable and experienced in management organization (which may be an Affiliate of Borrower) possessing experience in managing properties similar in size, scope, use and value as the Property, provided, that such Person shall have entered into a Replacement Management Agreement and an assignment of management agreement in the same form and substance as the Assignment of Management Agreement.

"*Rating Agencies*" shall mean each of S&P, Moody's, and Fitch or any other nationally recognized statistical rating agency.

"*REA*" shall mean that certain agreement described on **Schedule V**.

"*Register*" shall have the meaning set forth in Section 10.29 hereof.

"*Release Amount*" shall have the meaning set forth in Section 9.5.2(e) hereof.

"*Release Date*" shall mean the date (which must be a Business Day) specified by Borrower in its written request for a Release Property Partial Release pursuant to Section 9.5.2 hereof, which date must be at least thirty (30) days but no more than ninety (90) days after such written request is delivered to Lender.

"**_Release Property_**" shall mean the Property to be released from the lien of the applicable Security Instrument as described in the notice provided by Borrower to Lender pursuant to Section 9.5.2 hereof; provided, however, that a Release Property must be all of (and not a portion of) an individual Property.

"**_Release Property Partial Release_**" shall have the meaning set forth in <u>Section 9.5.2</u> hereof.

"**_Remaining Property_**" shall mean, collectively, the Individual Properties remaining subject to the lien of the Security Instruments after the occurrence of a Release Property Partial Release with respect to a Release Property.

"**_Renovation Expenditures_**" shall mean, for any period, the amount expended for items capitalized under GAAP (including expenditures for building improvements or major repairs, leasing commissions and tenant improvements).

"**_Rents_**" shall mean all rents (including additional rents of any kind and percentage rents), rent equivalents, moneys payable as damages (including payments by reason of the rejection of a Lease in a Bankruptcy Action) or in lieu of rent or rent equivalents, royalties (including, without limitation, all oil and gas or other mineral royalties and bonuses), income, receivables, receipts, revenues, deposits (including security, utility and other deposits), accounts, cash, issues, profits, charges for services rendered, and other payments and consideration of whatever form or nature received by or paid to or for the account of or benefit of Borrower or any of its agents or employees from any and all sources arising from or attributable to the Property, and the Improvements, including charges for oil, gas, water, steam, heat, ventilation, air-conditioning, electricity, license fees, maintenance fees, charges for Taxes, operating expenses or other amounts payable to Borrower (or for the account of Borrower), revenues from parking, telephone services, laundry, vending, television and all receivables, customer obligations now existing or hereafter arising or created out of the sale, lease, sublease, license, concession or other grant of the right of the use and occupancy of the Property or rendering of services by Borrower, Manager, or any of their respective agents or employees and proceeds, if any, from business interruption or other loss of income insurance.

"**_Replacement Assignment of Interest Rate Cap Agreement_**" shall have the meaning set forth in <u>Section 2.7(d)</u> hereof.

"**_Replacement Management Agreement_**" shall mean, collectively, (a) either (i) a management agreement with a Qualified Manager substantially in the same form and substance as the Management Agreement, or (ii) a management agreement with a Qualified Manager which is acceptable to Lender in its sole discretion in form and substance; and (b) an assignment of management agreement and subordination of management fees substantially in the form then used by Lender (or of such other form and substance reasonably acceptable to Lender), executed and delivered to Lender by Borrower and such Qualified Manager at Borrower's expense.

"**_Replacement Interest Rate Cap Agreement_**" shall mean an interest rate cap agreement (together with any confirmation(s), schedule(s) and credit support annex(es) relating thereto)

between an Acceptable Counterparty and Borrower, and obtained by Borrower to replace a then existing or terminated Interest Rate Cap Agreement.

"**_Required Records_**" shall have the meaning set forth in Section 5.1.11(i) hereof.

"**_Required Repair Account_**" shall have the meaning set forth in Section 7.1.1 hereof.

"**_Required Repair Funds_**" shall have the meaning set forth in Section 7.1.1 hereof.

"**_Required Repairs_**" shall have the meaning set forth in Section 7.1.1 hereof.

"**_Reserve Accounts_**" shall mean, collectively, the Required Repair Account, Tax and Insurance Escrow Account, Excess Cash Reserve Account, the Net Proceeds Account, and any other escrow or reserve account established pursuant to the Loan Documents.

"**_Reserve Funds_**" shall mean, collectively, the Required Repair Funds, Tax and Insurance Escrow Funds, the Excess Cash Reserve Funds, the Net Proceeds and any other escrow or reserve fund established pursuant to the Loan Documents.

"**_Restoration_**" shall mean the repair and restoration of the Property or any portion thereof after a Casualty or Condemnation as nearly as possible to the condition the Property (or such portion thereof) was in immediately prior to such Casualty or Condemnation, with such alterations as may be reasonably approved by Lender.

"**_Restricted Party_**" shall mean, collectively (a) Borrower, Principal, Guarantor and Affiliated Manager, and (b) any shareholder, partner, member, non-member manager, direct or indirect legal or beneficial owner, Affiliate, agent or employee of, Borrower, Principal, Guarantor, any Affiliated Manager, or any non-member manager.

"**_Retention Amount_**" shall have the meaning set forth in Section 6.4(b)(iv) hereof.

"**_RICO_**" shall mean the Racketeer Influenced and Corrupt Organizations Act.

"**_S&P_**" shall mean Standard & Poor's Ratings Group, a division of the McGraw-Hill Companies.

"**_Sale or Pledge_**" shall mean a voluntary or involuntary sale, conveyance, assignment, transfer, encumbrance, pledge, hypothecation, grant of an option or other transfer or disposal of a legal or beneficial interest, whether direct or indirect.

"**_Security Instruments_**" shall mean those certain first priority mortgages or deeds of trust, as the case may be, dated the date hereof, executed and delivered by each Individual Borrower as security for the Obligations which encumber the Property, as the context may require, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time; and "**_Security Instrument_**" means any individual mortgage or deed of trust included in the Security Instruments or all Security Instruments collectively, as the context may require.

"**_Servicer_**" shall have the meaning set forth in Section 9.3 hereof.

"**_Servicing Agreement_**" shall have the meaning set forth in <u>Section 9.3</u> hereof.

"**_Severed Loan Documents_**" shall have the meaning set forth in <u>Section 8.1.2(c)</u> hereof.

"**_Special Purpose Entity_**" shall mean a corporation, limited partnership or limited liability company which at all times prior to, on and after the date hereof:

(a)    was, is and will be organized solely for the purpose of (i) in the case of Borrower, acquiring, developing, constructing, owning, holding, selling, leasing, transferring, exchanging, managing and operating the Property (and no other property), entering into this Agreement with Lender and performing its obligations under the Loan Documents, refinancing the Property in connection with a permitted repayment of the Loan, and transacting lawful business that is incident, necessary and appropriate to accomplish the foregoing, or (ii) in the case of Principal, acting as a general partner of the limited partnership that owns the Property or managing member of the limited liability company that owns the Property;

(b)    has not been, is not, and will not be engaged, in any business unrelated to (i) in the case of Borrower, the acquisition, development, construction, ownership, management or operation of the Property, and (ii) in the case of Principal, acting as general partner of the limited partnership that owns the Property, or acting as managing member of the limited liability company that owns the Property, as applicable;

(c)    has not had, does not have, and will not have, any assets other than (i) in the case of Borrower, those related to the Property or (ii) in the case of Principal, its partnership interest in the limited partnership or the membership interest in the limited liability company that owns the Property, as applicable;

(d)    has not engaged in, sought or consented to, and will not engage in, seek or consent to, any dissolution, winding up, liquidation, consolidation, merger, sale of all or substantially all of its assets, transfer of partnership or membership interests (if such entity is a general partner in a limited partnership or a member in a limited liability company) or amendment of its limited partnership agreement, articles of incorporation or bylaws, articles of organization, certificate of formation or operating agreement (as applicable) with respect to the matters set forth in this definition;

(e)    if such entity is a limited partnership, has, had, now has, and will have as its only general partners, Special Purpose Entities each of which (A) is a corporation or single-member Delaware limited liability company or multimember Delaware limited liability company treated as a single member limited liability company that complies with the requirements set forth in subsection (h) hereof, (B) has one (1) Independent Director, and (C) holds a direct interest as general partner in the limited partnership of not less than one-half-of-one percent (0.5%) (or one-tenth-of-one percent (0.1%), if the limited partnership is a Delaware entity);

(f)    if such entity is a corporation, has had, now has and will have at least one (1) Independent Director, will have bylaws setting forth the requirement of a Special Purpose Entity as defined herein, and has not caused or allowed, and will not cause or allow, the board of directors of such entity to take (x) any Material Action either with respect to itself or, if the corporation is the Principal, with respect to Borrower or (y) any other action requiring the

unanimous affirmative vote of one hundred percent (100%) of the members of its board of directors unless, in either case, all Independent Directors shall have participated in such vote and shall have voted in favor of such action;

(g)     if such entity is a limited liability company with more than one member, has had, now has and will have at least one member that is a Special Purpose Entity (A) that is a corporation or limited liability company, (B) that has at least one (1) Independent Director, and (C) that directly owns at least one-half-of-one percent (0.5%) of the equity of the limited liability company (or 0.1% if the limited liability company is a Delaware entity);

(h)     if such entity is a limited liability company with only one member, has been, now is, and will be a limited liability company organized in the State of Delaware that (A) has as its only member a non-managing member, (B) has at least one (1) Independent Director, (C) has not caused or allowed, and will not cause or allow the members or managers of such entity to take any Material Action, either with respect to itself or, if the company is a Principal, with respect to Borrower, in each case unless the one (1) Independent Director then serving as managers of the company shall have consented in writing to such action, (D) has and shall have either (1) a member which owns no economic interest in the company, has signed the company's limited liability company agreement and has no obligation to make capital contributions to the company, or (2) two natural persons or one entity that is not a member of the company, that has signed its limited liability company agreement and that, under the terms of such limited liability company agreement becomes a member of the company immediately prior to the withdrawal or dissolution of the last remaining member of the company;

(i)     has been, is and intends to remain solvent and has paid and shall pay its debts and liabilities from its then available assets (including a fairly-allocated portion of any personnel and overhead expenses that it shares with any Affiliate), without a requirement to contribute additional capital (except to the extent it has received distributions in violation of the Loan Documents), as the same shall become due, and has maintained and shall maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations;

(j)     has not failed, and will not fail, to correct any known misunderstanding regarding the separate identity of such entity and has not and shall not identify itself as a division of any other Person;

(k)     has maintained and will maintain its accounts, books and records separate from any other Person and has filed and will file its own tax returns, except to the extent that it has been or is required to file consolidated tax returns by law and, if it is a corporation, has not filed and shall not file a consolidated Federal income tax return with any other corporation, except to the extent that it is required by law to file consolidated tax returns;

(l)     has maintained and will maintain its own records, books, resolutions and agreements;

(m)    (i) has not commingled, and will not commingle, its funds or assets with those of any other Person and (ii) has not participated and will not participate in any cash management system with any other Person;

(n)    has held and will hold its assets in its own name;

(o)    has conducted and shall conduct its business in its name or in a name franchised or licensed to it by an entity other than an Affiliate of itself or of Borrower, except for business conducted on behalf of itself by another Person under a business management services agreement that is on commercially reasonable terms, so long as the manager, or equivalent thereof, under such business management services agreement holds itself out as an agent of Borrower;

(p)    has maintained and will maintain its books, bank accounts, balance sheets, financial statements, accounting records and other entity documents separate from any other Person and has not permitted, and will not permit, its assets to be listed as assets on the financial statement of any other entity except as required by GAAP; *provided*, *however*, that  appropriate notation shall be made on any such consolidated statements to indicate its separateness from such Affiliate and to indicate that its assets and credit are not available to satisfy the debt and other obligations of such Affiliate or any other Person and such assets shall be listed on its own separate balance sheet;

(q)    has paid and will pay its own liabilities and expenses, including the salaries of its own employees, out of its own funds and assets, and has maintained and will maintain a sufficient number of employees in light of its contemplated business operations;

(r)    has observed and will observe all partnership, corporate or limited liability company formalities, as applicable;

(s)    has had no and will have no Indebtedness (including loans, whether or not such loans are evidenced by a written agreement) other than (I) with respect to Borrower, (i) the Loan, (ii) unsecured trade and operational debt incurred in the ordinary course of business relating to the ownership and operation of the Property and the routine administration of Borrower, in amounts not to exceed $50,000.00, in the aggregate, and which liabilities are not more than sixty (60) days past the date incurred, are not evidenced by a note and are paid when due, and which amounts are normal and reasonable under the circumstances, and (iii) such other liabilities that are permitted pursuant to this Agreement and (II) with respect to Principal, unsecured trade and operational debt incurred in the ordinary course of business relating to the ownership of its interest in Borrower and the routine administration of such interest, in amounts not to exceed $25,000.00, in the aggregate, which liabilities are not more than sixty (60) days past the date incurred and, are not evidenced by a note and are paid when due, and which amounts are normal and reasonable under the circumstances; (t)  has not assumed or guaranteed or become obligated for, and will not assume or guarantee or become obligated for, the debts of any other Person and has not held out and will not hold out its credit as being available to satisfy the obligations of any other Person except as permitted pursuant to this Agreement;

(t)      has not acquired and will not acquire obligations or securities of its partners, members or shareholders or any other Affiliate;

(u)      has allocated and will allocate, fairly and reasonably, any overhead expenses that are shared with any Affiliate, including, but not limited to, paying for shared office space and services performed by any employee of an Affiliate;

(v)      has maintained and used, now maintains and uses, and will maintain and use, separate stationery, invoices and checks bearing its name, which stationery, invoices, and checks utilized by the Special Purpose Entity or utilized to collect its funds or pay its expenses have borne, shall bear its own name and have not borne and shall not bear the name of any other entity unless such entity is clearly designated as being the Special Purpose Entity's agent;

(w)      except pursuant to the Loan Documents, has not pledged and will not pledge its assets for the benefit of any other Person;

(x)      has held itself out and identified itself, and will hold itself out and identify itself, as a separate and distinct entity under its own name or in a name franchised or licensed to it by an entity other than an Affiliate of Borrower and not as a division or part of any other Person, except for services rendered under a business management services agreement with an Affiliate that complies with the terms contained in clauses (z) and (cc) of this definition, so long as the manager, or equivalent thereof, under such business management services agreement holds itself out as an agent of Borrower;

(y)      has maintained and will maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(z)      has not made and will not make loans to any Person or hold evidence of indebtedness issued by any other Person (other than cash and investment-grade securities issued by an entity that is not an Affiliate of or subject to common ownership with such entity);

(aa)      has not identified and will not identify its partners, members or shareholders, or any Affiliate of any of them, as a division or part of it, and has not identified itself, and shall not identify itself, as a division of any other Person;

(bb)      other than capital contributions and distributions permitted under the terms of its organizational documents, has not entered into or been a party to, and will not enter into or be a party to, any transaction with its partners, members, shareholders or Affiliates except (i) in the ordinary course of its business and on terms which are intrinsically fair, commercially reasonable and are no less favorable to it than would be obtained in a comparable arm's-length transaction with an unrelated third party, and (ii) in connection with this Agreement;

(cc)      has not had and shall not have any obligation to, and has not indemnified and shall not indemnify its partners, officers, directors or members, as the case may be, in each case unless such an obligation or indemnification is fully subordinated to the Debt and shall not constitute a claim against it in the event that its cash flow is insufficient to pay the Debt;

(dd)    does not and will not have any of its obligations guaranteed by any Affiliate except as provided in the Loan Documents;

(ee)    has complied and will comply with all of the terms and provisions contained in its organizational documents and cause statements of facts contained in its organizational documents to be and to remain true and correct; and

(ff)    has not permitted and shall not permit any Affiliate or constituent party independent access to its bank accounts except as permitted under the Loan Documents.

"*Sponsor*" shall mean, together, Steven Ivankovich, a natural person and Atlas Apartment Homes, LLC, an Illinois limited liability company, d/b/a Atlas Residential, L.L.C.

"*Sponsor Controlled Party*" shall mean an entity Controlled by Sponsor.

"*Springing Recourse Event*" shall have the meaning set forth in Section 3.1(c) hereof.

"*State*" shall mean the State or Commonwealth in which the Property or any part thereof is located.

"*Stated Maturity Date*" shall mean May 10, 2019.

"*Strike Rate*" shall mean two and one-half of one percent (2.50%).

"*Subaccounts*" shall have the meaning set forth in Section 2.6.2(a) hereof.

"*Survey*" shall mean a survey of the Property prepared by a surveyor licensed in the State and satisfactory to Lender and the Title Company, and containing a certification of such surveyor satisfactory to Lender.

"*Tax and Insurance Escrow Account*" shall have the meaning set forth in Section 7.2.1 hereof.

"*Tax and Insurance Escrow Funds*" shall have the meaning set forth in Section 7.2.1 hereof.

"*Taxes*" shall mean all taxes, assessments, water rates or sewer rents, now or hereafter levied or assessed or imposed against (a) the Property or part thereof, together with all interest and penalties thereon and (b) the rents, issues, income or profits thereof or upon the lien or estate hereby created, whether any or all of said taxes, assessments or charges be levied directly or indirectly or as excise taxes or ad valorem real estate or personal property taxes or as income taxes.

"*Tax Monthly Deposit*" shall have the meaning set forth in Section 7.2.1 hereof.

"*Tenant*" shall mean the lessee of a dwelling unit in a Property under a Lease.

"***Tenant Direction Letter***" shall mean a letter to each Tenant under a Lease instructing such Tenant to deliver all Rents directly to the Clearing Account, which letter shall be substantively identical to the form letter attached hereto as **Schedule VII**.

"***Texas Borrower***" shall have the meaning set forth in the introductory paragraph hereto, together with its successors and permitted assigns.

"***Texas Properties***" shall have the meaning set forth in Section 7.1.1.

"***The Warwick Property***" means that portion of the Property commonly known as 2400 Arrowhead Drive, Abilene, Texas 79606.

"***Threshold Amount***" shall have the meaning set forth in Section 5.1.20 hereof.

"***Title Company***" shall mean, together, Intracoastal Abstract Co., Inc., 31 Stewart Street, Floral Park, New York 11001, Attention: Terry Caccioppoli and New York Land Services, 630 Third Avenue, 5th Floor, New York, New York, Attention: Tony Della Salla.

"***Title Insurance Policy***" shall mean a lender's ALTA 2006 policy of title insurance in form and substance reasonably acceptable to Lender and insuring the lien of the Security Instrument encumbering the Property.

"***Transfer***" shall have the meaning set forth in Section 5.2.12(a) hereof.

"***Transferee***" shall mean any Person to which a Transfer of all or part of the Property has been made.

"***UCC***" shall mean the Uniform Commercial Code as in effect on the date hereof in the State in which the Property is located; *provided*, *however*, that if by reason of mandatory provisions of law, the perfection or the effect of perfection or non-perfection or priority of the security interest in any item or portion of the collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State in which the Property is located ("***Other UCC State***"), "***UCC***" means the Uniform Commercial Code as in effect in such Other UCC State for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection or priority.

"***WDCPF***" shall have the meaning set forth in Section 2.3.7 hereof.

"***Windtree Property***" means that portion of the Property commonly known as 3631 Brennan Boulevard, Amarillo, Texas 79121.

"***Yield Maintenance Expiration Date***" shall mean the Payment Date occurring on November 10, 2018.

"***Yield Maintenance Premium***" shall mean with respect to any prepayment made on or before the Yield Maintenance Expiration Date, an amount equal to the sum of (i) all interest which, but for such prepayment, would accrue on the Loan at the Interest Rate (such interest to be based upon the Interest Rate calculated as if the LIBOR Determination Date were the last day

of the week prior to the applicable prepayment) from the Prepayment Date through and including Yield Maintenance Expiration Date, plus (ii) all Loan Administration Fees which, but for such prepayment, would accrue on the Loan from the Prepayment Date through and including Yield Maintenance Expiration Date, it being expressly understood and agreed that the payment of the Yield Maintenance Premium (if and when required pursuant to the terms of this Agreement) shall be in addition to the payment of the Exit Fee applicable to any payment or prepayment of principal (or acceleration of the Loan).

Section 1.2    Principles of Construction.    All references to sections and schedules are to sections and schedules in or to this Agreement unless otherwise specified.  All uses of the word "including" shall mean "including, without limitation" unless the context shall indicate otherwise.  Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  Unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined.  References herein to the term "Property" shall mean "the Property (or any portion thereof)" unless the context shall indicate otherwise.  References to the term "Borrower" shall mean one or both Individual Borrowers, as the context requires.  References herein to the term "Principal" shall mean one or both Principals, as the context requires.  It is the intent of the parties hereto in making any determination under this Agreement, including, without limitation, in determining whether (a) a breach of a representation, warranty or a covenant has occurred, (b) there has occurred an Event of Default, or (c) an event has occurred which would create recourse obligations under Section 3.1 of this Agreement, that any such breach, occurrence or event with respect to either Individual Borrower or Principal shall be deemed to be such a breach, occurrence or event with respect to both Individual Borrowers or both Principals and that both Individual Borrowers or both Principals need not have been involved with such breach, occurrence or event in order for the same to be deemed such a breach, occurrence or event with respect to both Individual Borrowers or both Principals.

## ARTICLE II

## GENERAL TERMS

Section 2.1    Loan Commitment; Disbursement to Borrower.

2.1.1    Agreement to Lend and Borrow.  Subject to and upon the terms and conditions set forth herein, Lender hereby agrees to make, and Borrower hereby agrees to borrow, the Loan on the Closing Date.

2.1.2    Single Disbursement to Borrower.  Borrower may request and receive only one disbursement hereunder in respect of the Loan and any amount borrowed and repaid hereunder in respect of the Loan may not be re-borrowed.  Borrower acknowledges and agrees that the Loan has been fully funded as of the Closing Date.

2.1.3    The Note, Security Instrument and Loan Documents.  The Loan shall be evidenced by the Note and secured by the Security Instruments, the Assignments of Leases and the other Loan Documents.

2.1.4  Use of Proceeds.  Borrower shall use the proceeds of the Loan to (i) refinance the Property and/or repay and discharge any existing loans relating to the Property, (ii) pay all past-due Basic Carrying Costs, if any, with respect to the Property, (iii) recapitalize the equity ownership of the Property, (iv) make deposits into the Reserve Accounts on the Closing Date in the amounts provided herein, (v) pay third party fees and costs associated with the Loan and incurred by Borrower, including, without limitation, legal fees and expenses, costs related to title insurance, survey and inspections of the Property, including environmental inspections, and any fees and costs payable to Lender on the Closing Date, (vi) fund any working capital requirements of the Property, (vii) for such other uses as may be approved by Lender, and (viii) distribute the balance, if any, to Borrower for business purposes.

Section 2.2  Interest Rate.

2.2.1  Interest Rate.  Subject to Section 2.2.4, the Loan shall bear interest prior to the Maturity Date (whether by acceleration or otherwise) at a rate per annum equal to the Interest Rate for the applicable Interest Period.

2.2.2  Interest Calculation.  With respect to any applicable Interest Period, interest on the Outstanding Principal Balance shall be calculated by multiplying (a) the actual number of days elapsed in the Interest Period for which the calculation is being made by (b) a daily rate based on the Interest Rate (or the Default Rate, as applicable) and a three hundred sixty (360) day year by (c) the average Outstanding Principal Balance in effect for the applicable Interest Period as calculated by Lender.

2.2.3  Default Rate.  In the event that, and for so long as, any Event of Default shall have occurred and be continuing, the Outstanding Principal Balance and, to the extent permitted by law, all accrued and unpaid interest in respect thereof and any other amounts due pursuant to the Loan Documents, shall accrue interest at the Default Rate, calculated from the date such payment was due without regard to any grace or cure periods contained herein. Interest at the Default Rate shall be paid immediately upon demand, which demand may be made as frequently as Lender shall elect.

2.2.4  Usury Savings.  This Agreement, the Note and the other Loan Documents are subject to the express condition that at no time shall Borrower be obligated or required to pay interest on the Outstanding Principal Balance at a rate which could subject Lender to either civil or criminal liability as a result of being in excess of the Maximum Legal Rate.  If, by the terms of this Agreement or the other Loan Documents, Borrower is at any time required or obligated to pay interest on the Outstanding Principal Balance at a rate in excess of the Maximum Legal Rate, the Interest Rate or the Default Rate, as the case may be, shall be deemed to be automatically and immediately reduced to the Maximum Legal Rate and all previous payments in excess of the Maximum Legal Rate shall be deemed to have been payments in reduction of principal and not on account of the interest due hereunder.  All sums paid or agreed to be paid to Lender for the use, forbearance, or detention of the sums due under the Loan, shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan until payment in full so that the rate or amount of interest on account of the Loan does not exceed the Maximum Legal Rate of interest from time to time in effect and applicable to the Loan for so long as the Loan is outstanding.

2.2.5    <u>Breakage Indemnity</u>.  Borrower shall indemnify Lender against any loss or expense which Lender may actually sustain or incur in liquidating or redeploying deposits from third parties acquired to effect or maintain the Loan or any part thereof as a consequence of (a) any payment or prepayment of the Loan or any portion thereof made on a date other than a Payment Date and (b) any default in payment or prepayment of the Outstanding Principal Balance or any part thereof or interest accrued thereon, as and when due and payable (at the date thereof or otherwise, and whether by acceleration or otherwise) (collectively, "***Breakage Costs***").  Lender shall deliver to Borrower a statement for any such sums which it is entitled to receive pursuant to this <u>Section 2.2.5</u>, which statement shall be binding and conclusive absent manifest error.  Borrower's obligations under this <u>Section 2.2.5</u> are in addition to Borrower's obligations to pay any Yield Maintenance Premium applicable to a payment or prepayment of the Loan.

2.2.6    <u>Determination of Interest Rate</u>.

(a)    Any change in the rate of interest hereunder due to a change in the Interest Rate shall become effective as of the opening of business on the first day on which such change in the Interest Rate shall become effective.  Each determination by Lender of the Interest Rate shall be conclusive and binding for all purposes, absent manifest error.

(b)    In the event that Lender shall have determined (which determination shall be conclusive and binding upon Borrower absent manifest error) that by reason of circumstances affecting the interbank Eurodollar market, adequate and reasonable means do not exist for ascertaining LIBOR, then Lender shall forthwith give notice by telephone of such determination, confirmed in writing, to Borrower at least one (1) day prior to the last day of the related Interest Period.  If such notice is given, the related outstanding LIBOR Loan shall be converted, on the last day of the then current Interest Period, to a Prime Rate Loan bearing interest at the Prime Rate plus the Prime Rate Spread.

(c)    If, pursuant to the terms hereof, any portion of the Loan has been converted to a Prime Rate Loan and Lender shall determine (which determination shall be conclusive and binding upon Borrower absent manifest error) that the event(s) or circumstance(s) which resulted in such conversion shall no longer be applicable, Lender shall give notice by telephone of such determination, confirmed in writing, to Borrower at least one (1) day prior to the last day of the related Interest Period.  If such notice is given, the related outstanding Prime Rate Loan shall be converted to a LIBOR based loan on the last day of the then current Interest Period.

(d)    If any requirement of law or any change therein or in the interpretation or application thereof, shall hereafter make it unlawful for Lender to make or maintain a LIBOR based loan as contemplated hereunder (i) the obligation of Lender hereunder to make a LIBOR based loan or to convert a Prime Rate Loan to a LIBOR based loan shall be canceled forthwith and (ii) any outstanding LIBOR based loan shall be converted automatically to a Prime Rate Loan on the last day of the then current Interest Period or within such earlier period as required by law.  Borrower hereby agrees

to promptly pay to Lender, upon demand, any additional amounts necessary to compensate Lender for any costs incurred by Lender in making any conversion in accordance with this Agreement, including, without limitation, any interest or fees payable by Lender to lenders of funds obtained by it in order to make or maintain the LIBOR based loan hereunder.  Lender's notice of such costs, as certified to Borrower, shall be conclusive absent manifest error.

(e)     Borrower agrees to pay any Breakage Costs in connection with the conversion (for any reason whatsoever, whether voluntary or involuntary) of the interest rate hereunder from the Interest Rate to the Prime Rate with respect to any portion of the Outstanding Principal Balance then bearing interest at the Interest Rate on a date other than the last day of an Interest Period.  In connection with such conversion, Borrower and Lender shall enter into such documentation as may be reasonably required by Lender to reflect such changes and Borrower agrees to pay to Lender all costs incurred in connection with such documentation including, without limitation, reasonable attorneys' fees.

Section 2.3     Debt Service Payments.

2.3.1     Payments Generally.  For purposes of making payments hereunder, but not for purposes of calculating Interest Periods, if the day on which any such payment is due is not a Business Day, then amounts due on such date shall be due on the immediately preceding Business Day.  Lender shall have the right from time to time, in its discretion, upon not less than ten (10) days prior written notice to Borrower, to change the Payment Date to a different calendar day and, if requested by Lender, Borrower shall promptly execute an amendment to this Agreement to evidence such change; *provided*, *however*, that if Lender shall have elected to change the Payment Date as aforesaid, Lender shall have the option, but not the obligation, to adjust the Interest Period.  With respect to payments of principal due on the Maturity Date, interest shall be payable at the Interest Rate or the Default Rate, as the case may be, through and including the day immediately preceding such Maturity Date.  All amounts due pursuant to this Agreement and the other Loan Documents shall be payable without setoff, counterclaim, defense or any other deduction whatsoever.

2.3.2     Monthly Debt Service Payment.  Interest on the Outstanding Principal Balance only shall be payable in monthly installments beginning on June 10, 2017 (the "***First Payment Date***") and continuing thereafter on each Payment Date (the "***Monthly Debt Service Payment Amount***").

2.3.3     Payment on Maturity Date.  Borrower shall pay to Lender not later than 1:00 P.M., New York City time, on the Maturity Date (and any funds received by Lender after such time shall, for all purposes hereof, be deemed to have been paid on the next succeeding Business Day), the Outstanding Principal Balance, all accrued and unpaid interest and all other amounts and Other Obligations due hereunder and under the Note, the Security Instrument and the other Loan Documents (including the Exit Fee).

2.3.4     Late Payment Charge.  If any principal, interest or any other sums due under the Loan Documents, excluding the payment of principal due on the Maturity Date, is

not paid by Borrower on or prior to the date on which it is due, Borrower shall pay to Lender upon demand an amount equal to the lesser of (a) five percent (5.00%) of such unpaid sum, and (b) the Maximum Legal Rate, in order to defray the expense incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment.  Any such amount shall be secured by the Security Instrument and the other Loan Documents to the extent permitted by applicable law.

        2.3.5    <u>Method and Place of Payment</u>.  Except as otherwise specifically provided herein, all payments and prepayments under this Agreement and the Note shall be made to Lender not later than 3:00 P.M., New York City time, on the date when due and shall be made in Dollars in immediately available funds at Lender's office or as otherwise directed by Lender, and any funds received by Lender after such time shall, for all purposes hereof, be deemed to have been paid on the next succeeding Business Day.  Any payments required to be made hereunder or under the Cash Management Agreement by Lender or Servicer out of the Cash Management Account shall be deemed to have been timely made for purposes of this <u>Section 2.3.5</u>.

        2.3.6    <u>Exit Fee</u>.  If all or any part of the unpaid principal balance of the Loan is repaid at any time and for any reason, including (1) any regularly scheduled payment of the Loan, including payments made on the Maturity Date, (2) any payment of the Loan upon acceleration of the Loan following the occurrence of an Event of Default, (3) any optional prepayment of the Loan, or (4) any mandatory prepayment of the Loan, then, in each case, Borrower agrees to make a payment in an amount equal to one half of one percent (0.50%) of the Outstanding Principal Balance (or portion thereof) being repaid or prepaid (the "***Exit Fee***").  Borrower acknowledges that the Exit Fee is earned by Lender at the time of making the Loan is non-refundable and shall be paid in accordance with the terms and conditions set forth herein.

        2.3.7    <u>Refinancing</u>.  In the event Borrower intends to refinance the Loan, Borrower shall provide Walker & Dunlop Commercial Property Funding, LLC ("***WDCPF***"), prior written notice of such intent no less than sixty (60) days prior to the anticipated closing date of such refinancing.  WDCPF shall have the right, but not the obligation, to submit proposed terms for such refinancing within ten (10) Business Days of its receipt of such notice from Borrower.  Borrower shall have no obligation to accept such proposal and may reject such proposal by written notice to WDCPF.  Thereafter, Borrower may proceed to solicit refinancing of the Loan with another Person; provided, however, that in the event Borrower obtains a financing proposal from another Person, Borrower shall deliver to WDCPF the terms and conditions upon which such Person is willing to refinance the Loan and WDCPF shall have the right to send notice to Borrower within five (5) Business Days to accept the terms offered by such other Person.  If WDCPF accepts the terms offered by such other Person, Borrower agrees to refinance all or any portion of the Property with WDCPF under those terms.  If Borrower does not receive such notice from WDCPF within such five (5) Business Day period, Borrower may proceed to refinance the Loan with another Person, subject to the release provisions of <u>Section 9.5</u> hereof.  Additionally, until the Loan is repaid in full, including during any Extension Term, WDCPF, or an Affiliate thereof, shall have the exclusive right to provide a refinancing of all or any portion of the Property.  Notwithstanding <u>Section 2.3.6</u> hereof, to the extent that the Loan is repaid with the proceeds of a mortgage loan from WDCPF, the Exit Fee that would otherwise be

payable with respect to such repayment shall be waived, provided that WDCPF shall have no obligation to offer to provide such financing.

2.3.8    Loan Administration Fee.  Borrower shall pay to Walker & Dunlop Commercial Property Funding, LLC an annual loan administration fee in an amount equal to fifteen hundredths of one percent (0.15%) of the Outstanding Principal Balance, payable in equal monthly installments on each Payment Date ("***Loan Administration Fee***").

Section 2.4    Prepayments.

2.4.1    Voluntary Prepayments.

(a)    Except as otherwise provided herein, Borrower shall not have the right to prepay the Loan in whole or in part prior to the Maturity Date.

(b)    On any Payment Date so long as no Event of Default has occurred and is continuing, Borrower shall have the right to prepay in full, but not in part (subject to the last sentence of this Section 2.4.1(b)), the entire Outstanding Principal Balance on any Business Day (a "***Prepayment Date***") provided that Borrower gives Lender at least thirty (30) days' irrevocable prior written notice thereof and such prepayment is accompanied by (a) all accrued and unpaid interest on the Outstanding Principal Balance so prepaid from the date of tender through the end of the Interest Period related to the first Payment Date after the date of such tender, or if such tender occurs on a Payment Date, through and including the Interest Period related to such Payment Date, (b) the Yield Maintenance Premium (if any is due), (c) the Breakage Costs, if any are due, (d) the Exit Fee, and (e) all other amounts due under the Note, this Agreement, or any of the other Loan Documents.  A prepayment of the Loan made in connection with a Release Property Partial Release shall be subject to this Section 2.4.1(b).

2.4.2    Mandatory Prepayments.    Following any Casualty or Condemnation, on the next occurring Payment Date following the date on which Lender actually receives any Net Proceeds, if Lender is not obligated to make such Net Proceeds available to Borrower for Restoration, Borrower shall prepay, or authorize, or be deemed to have authorized, Lender to apply Net Proceeds as a prepayment of, the Outstanding Principal Balance (including the Exit Fee) in an amount equal to one hundred percent (100%) of such Net Proceeds; *provided*, *however*, if an Event of Default has occurred and is continuing, Lender may apply such Net Proceeds to the Debt (until paid in full) in any order or priority in its sole discretion. Additionally, so long as no Event of Default has occurred and is continuing, no Yield Maintenance Premium shall be due in connection with any prepayment made pursuant to this Section 2.4.2.

2.4.3    Prepayments Made While an Event of Default Exists.  If, following the occurrence and during the continuance of an Event of Default, payment of all or any part of the Debt is tendered by Borrower for any reason or otherwise recovered by Lender (including, without limitation, through acceleration or the application of any Reserve Funds or Net Proceeds), such tender or recovery shall include (a) accrued and unpaid interest at the Default Rate on the Outstanding Principal Balance from the date such Event of Default occurred through

the end of the Interest Period related to the Payment Date next occurring following the date of such tender or recovery, or if such tender or recovery occurs on a Payment Date, through and including the Interest Period related to such Payment Date, (b) an amount equal to the Yield Maintenance Premium, if any, (c) the Breakage Costs, if any, and (d) the Exit Fee.

Section 2.5    Extension Option.    Borrower shall have the right at its option to extend the term of this Agreement (the "***Extension Term***") from the Stated Maturity Date until the date that is twelve (12) months after the Stated Maturity Date (the "***Extended Maturity Date***") by giving written notice of such extension to Lender at least thirty (30) days prior to the Stated Maturity Date, provided that each of the following must be satisfied as a condition to such extension:

(a)    no Event of Default has occurred and is continuing at the time such request is made and on the Stated Maturity Date;

(b)    Borrower delivers to Lender an Officer's Certificate confirming the accuracy of the information contained in clause (a) above and clauses (e) and (f) below, at the time such request is made and on the Stated Maturity Date;

(c)    Borrower shall pay to Lender on or before the Stated Maturity Date, an extension fee in an amount equal to one half of one percent (0.50%) of the then Outstanding Principal Balance;

(d)    the Loan to Value Ratio, as determined by Lender in Lender's sole discretion, shall not exceed 80% at the time of such extension;

(e)    the Debt Yield, as determined by Lender in Lender's sole discretion, shall be no less 8.25%;

(f)    the Debt Service Coverage Ratio, as determined by Lender in Lender's sole discretion, shall be no less than 1.25 to 1.00;

(g)    any and all representations and warranties provided for in any and all of the Loan Documents are true and accurate in all material respects at the time of the delivery of the notice of extension and on the first day of the Extension Term (except for those representations and warranties which no longer can be true due to the passage of time);

(h)    Borrower delivers to Lender such title policy endorsements as Lender may require assuring that the Property is lien-free, the amount of which coverage shall not be less than the Outstanding Principal Balance;

(i)    Borrower pays in cash all reasonable costs and expenses, including legal fees, incurred by Lender or otherwise involved in extending the term of this Agreement;

(j)    Borrower shall deliver to Lender a replacement Rate Cap Agreement for the Extension Term at a 2.50% strike rate;

(k)    at Lender's option, the extension of the term of this Agreement shall be evidenced by an extension or renewal of or amendment to the Note and/or this Agreement or by the execution of a new note or such other documents as Lender may reasonably request in furtherance of such purpose;

(l)    Borrower shall have replenished all of the applicable Reserve Accounts as required by Lender; and

(m)    no Material Adverse Change with respect to the condition, financial or otherwise, business, operations, assets, liabilities or prospects of the Property, Borrower, Principal, Guarantor and/or Sponsor in the aggregate shall have occurred.

Section 2.6    <u>Cash Management</u>.

2.6.1    <u>Clearing Account</u>.

(a)    Pursuant to the Clearing Account Agreement, each Individual Borrower shall establish and maintain a segregated Eligible Account (the "***Clearing Account***") with the Clearing Bank in trust for the benefit of Lender, which Clearing Account shall be under the sole dominion and control of Lender.  The Clearing Account shall be entitled "Alliance HTTX Limited Partnership, as pledgor, for the benefit of Walker & Dunlop Commercial Property Funding, LLC, a secured party- Clearing Accounr" and "Alliance HTFL Limited Partnership, as pledgor, for the benefit of Walker & Dunlop Commercial Property Funding, LLC, as secured party – Clearing Account", or such other name as required by Lender from time to time.  Borrower (i) hereby grants to Lender a first priority security interest in the Clearing Account and all deposits at any time contained therein and the proceeds thereof, and (ii) will take all actions necessary to maintain in favor of Lender a perfected first priority security interest in the Clearing Account, including, without limitation, the execution of any account control agreement required by Lender.  Borrower will not in any way alter, modify or close the Clearing Account and will notify Lender of the account number thereof.  Except as may be expressly permitted in the Clearing Account Agreement, Lender and Servicer shall have the sole right to make withdrawals from the Clearing Account and all costs and expenses for establishing and maintaining the Clearing Account shall be paid by Borrower.  All monies now or hereafter deposited into the Clearing Account shall be deemed additional security for the Debt.

(b)    Each Individual Borrower shall, or shall cause Manager to, deliver a Tenant Direction Letter in the form of **<u>Schedule VII</u>**.  Borrower shall, and shall cause Manager to, deposit into the applicable Clearing Account within one (1) Business Day after receipt all amounts received by Borrower or Manager constituting Rents.  The Clearing Account Agreement and Clearing Account shall remain in effect until the Loan has been repaid in full.

(c)    Borrower shall cause the Clearing Bank to transfer to the Cash Management Account in immediately available funds by Federal wire transfer all amounts on deposit in the Clearing Account once every Business Day.

(d)     Upon the occurrence of an Event of Default, Lender may, in addition to any and all other rights and remedies available to Lender, direct Clearing Bank to immediately pay over all funds on deposit in the Clearing Account to Lender and to apply any such funds to the payment of the Debt in any order in its sole discretion.

(e)     Funds deposited into the Clearing Account shall not be commingled with other monies held by Borrower, Manager or Clearing Bank.

(f)     Borrower shall not further pledge, assign or grant any security interest in the Clearing Account or the monies deposited therein or permit any lien or encumbrance to attach thereto, or any levy to be made thereon, or any UCC-1 financing statements, except those naming Lender as the secured party, to be filed with respect thereto.

(g)     Borrower shall indemnify Lender and Clearing Bank and hold Lender and Clearing Bank harmless from and against any and all actions, suits, claims, demands, liabilities, losses, damages, obligations and costs and expenses (including litigation costs and reasonable attorneys' fees and expenses) arising from or in any way connected with the Clearing Account, the Clearing Account Agreement or the performance of the obligations for which the Clearing Account was established (unless arising from the gross negligence or willful misconduct of Lender or Clearing Bank, as applicable).

2.6.2   Cash Management Account.

(a)     Pursuant to the Cash Management Agreement, Lender shall establish and maintain a segregated Eligible Account (the "***Cash Management Account***") to be held by Deposit Bank in trust for the benefit of Lender, which Cash Management Account shall be under the sole dominion and control of Lender.  The Cash Management Account shall be entitled "Alliance HTTX Limited Partnership and Alliance HTFL Limited Partnership, as pledgor, for the benefit of Walker & Dunlop Commercial Property Funding, LLC, as secured party – Cash Management Account", or such other name as required by Lender from time to time.  Lender will also establish subaccounts of the Cash Management Account which shall at all times be Eligible Accounts (and may be ledger or book entry accounts and not actual accounts) (such subaccounts are referred to herein as "***Subaccounts***").  Borrower (i) hereby grants to Lender a first priority security interest in the Cash Management Account and the Subaccounts and all deposits at any time contained therein and the proceeds thereof, and (ii) will take all actions necessary to maintain in favor of Lender a perfected first priority security interest in the Cash Management Account and the Subaccounts, including, without limitation, filing or authorizing Lender to file UCC-1 financing statements and continuations thereof. Borrower will not in any way alter, modify or close the Cash Management Account and will notify Lender of the account number thereof.  Lender and Servicer shall have the sole right to make withdrawals from the Cash Management Account and the Subaccounts and all costs and expenses for establishing and maintaining the Cash Management Account and the Subaccounts shall be paid by Borrower.  All monies now or hereafter

deposited into the Cash Management Account and the Subaccounts shall be deemed additional security for the Debt.

(b)     Provided no Event of Default shall have occurred and be continuing, on each Payment Date (or, if such Payment Date is not a Business Day, on the immediately preceding Business Day) all funds on deposit in the Cash Management Account shall be applied by Lender (or by Deposit Bank at Lender's direction) to the payment of the following items in the order indicated:

(i)     First, payment to Lender (for deposit in the Tax and Insurance Escrow Account) in respect of the Tax and Insurance Escrow Funds in accordance with the terms and conditions of Section 7.2 hereof, to be disbursed as set forth in this Agreement;

(ii)     Second, payment to Deposit Bank of the fees and expenses of Deposit Bank then due and payable pursuant to the Cash Management Agreement;

(iii)     Third, payment to Lender of the Monthly Debt Service Payment Amount;

(iv)     Fourth, payment to Lender of any other amounts then due and payable under the Loan Documents (other than the Outstanding Principal Balance);

(v)     Fifth, payment to Borrower in an amount equal to the aggregate of (A) Operating Expenses due and payable by Borrower during the succeeding month as set forth in the Approved Annual Budget, and (B) Extraordinary Expenses, if any, approved by Lender;

(vi)     Sixth, to the extent there is cash remaining after payment of items (i) through (v) above, and the Fee Payment Debt Yield has been equal to or greater than eight percent (8%) for the immediately preceding month, to the Incentive Fee to the Manager;

(vii)     Seventh, to the extent there is cash remaining after payment of items (i) through (vi) above, and the Fee Payment Debt Yield has been equal to or greater than eight percent (8%) for the immediately preceding month, the Asset Management Fee to the Asset Manager; and

(viii)     Eighth, payment of all amounts then remaining after payment of items (i) through (vii) above (all amounts then remaining after payment of items (i) through (vii) above being hereinafter referred to as "*Excess Cash*") to Lender (for deposit in the Excess Cash Reserve Account) in respect of the Excess Cash Reserve Funds in accordance with Section 7.3.1 hereof.

(c)     The insufficiency of funds on deposit in the Cash Management Account shall not relieve Borrower of the obligation to make any payments, as and when

due pursuant to this Agreement and the other Loan Documents, and such obligations shall be separate and independent, and not conditioned on any event or circumstance whatsoever.

(d)     Notwithstanding Section 2.6.2(b) above, following the occurrence of an Event of Default and during the continuance thereof, all funds on deposit in the Cash Management Account may be applied by Lender in such order and priority as Lender shall determine in its sole discretion until the Debt has been paid in full.

(e)     Borrower hereby agrees to reasonably cooperate with Lender with respect to any requested modifications to the Cash Management Agreement for the purpose of establishing additional Subaccounts in connection with any payments otherwise required under this Agreement and the other Loan Documents.

(f)     Notwithstanding anything to the contrary in Section 2.6.2(b) above, for the Payment Date occurring on May 10, 2017, no Monthly Debt Service shall be payable, and, therefore, all funds on deposit in the Cash Management Account on such Payment Date shall be distributed in accordance with the provisions of Section 2.6.2(b), excluding the payment required under Section 2.6.2(b)(iii).

2.6.3    Payments Received Under the Cash Management Agreement. Notwithstanding anything to the contrary contained in this Agreement and the other Loan Documents, and provided no Event of Default has occurred and is continuing, Borrower's obligations with respect to the payment of the Monthly Debt Service Payment Amount and amounts required to be deposited into the Reserve Funds shall be deemed satisfied to the extent sufficient amounts are deposited in the Cash Management Account to satisfy such obligations on the dates each such payment is required, regardless of whether any of such amounts are so applied by Lender.

Section 2.7    Interest Rate Cap Agreement.

(a)     Prior to or contemporaneously with the Closing Date, Borrower shall obtain, or cause to be obtained, and shall thereafter maintain in effect, an Interest Rate Cap Agreement, which shall be coterminous with the Loan, governed by the laws of the State of New York, have a notional amount equal to the principal amount of the Loan, and which shall at all times have a strike rate equal to the Strike Rate and which shall not impose on Borrower any material obligation other than payment of the initial premium and shall be, in all material respects, reasonably satisfactory in form and substance to Lender.  Borrower shall endeavor to cause the Counterparty to re-size the Interest Rate Cap Agreement at the request of Lender if the amount of the Loan is re-allocated pursuant to Section 9.4 hereof.  The Counterparty shall be obligated under the Interest Rate Cap Agreement to make monthly payments to Borrower or to such account as may be specified by Borrower equal to the excess of one (1) month LIBOR over the Strike Rate, calculated on the notional amount of such Interest Rate Cap Agreement, which payments shall be made on a monthly basis in each case not later than (after giving effect to and assuming the passage of any cure period afforded to the Counterparty under the

Interest Rate Cap Agreement, which cure period shall not in any event be more than three (3) Business Days) each Payment Date.

(b)     Contemporaneously with the Closing Date, Borrower shall collaterally assign to Lender pursuant to an Assignment of Interest Rate Cap Agreement, all of its right, title and interest under the Interest Rate Cap Agreement (and any related guarantee, if any) (i) to any and all payments, and (ii) to any and all collateral posted by the Counterparty, in each case pursuant to the Interest Rate Cap Agreement.  Prior to or contemporaneously with the Closing Date, Borrower shall deliver to Lender an executed counterpart of such Interest Rate Cap Agreement and notify the Counterparty of such collateral assignment (either in such Interest Rate Cap Agreement or by separate instrument).  Borrower shall cause the Counterparty under the Interest Rate Cap Agreement to execute and deliver the Acknowledgment pursuant to which the Counterparty shall agree in writing to make all payments it is required to make under the Interest Rate Cap Agreement directly into such account as specified by Lender whether or not an Event of Default has occurred.  At such time as the Loan is repaid in full, all of Lender's right, title and interest in the Interest Rate Cap Agreement shall terminate and Lender shall promptly execute and deliver at Borrower's sole cost and expense, such documents as may be required to evidence Lender's release of Lender's security interest in the Interest Rate Cap Agreement and to notify the Counterparty of such release.

(c)     Borrower shall comply with all of its obligations under the terms and provisions of the Interest Rate Cap Agreement.  In addition to the obligations of Borrower contained in the Assignment of Interest Rate Cap, Borrower shall not, without the prior written consent of Lender, (i) waive or release any obligation of the Counterparty (or any successor or substitute party to the Interest Rate Cap Agreement) under the Interest Rate Cap Agreement, (ii) consent or agree to any act or omission to act on the part of the Counterparty (or any successor or substitute party to the Interest Rate Cap Agreement) which, without such consent or agreement, would constitute a default under the Interest Rate Cap Agreement, (iii) take or omit to take any action or suffer or permit any action to be omitted or taken, the taking or omission of which would result in any right of offset against sums payable under the Interest Rate Cap Agreement or any defense by the Counterparty (or any successor or substitute party to the Interest Rate Cap Agreement) to payment or (iv) fail to give prompt notice to Lender of any written notice of default given by or to Borrower under or with respect to the Interest Rate Cap Agreement, together with a complete copy of such notice.  All amounts paid by the Counterparty (or its credit support provider, if applicable) under the Interest Rate Cap Agreement shall be deposited immediately into such account as specified by Lender.  Borrower shall take all actions reasonably requested by Lender to enforce Borrower's rights under the Interest Rate Cap Agreement in the event of a default by the Counterparty thereunder and shall not waive, amend or otherwise modify any of its rights thereunder.

(d)     If any Rating Agency downgrades, withdraws or qualifies the rating of the Counterparty such that it ceases to be an Acceptable Counterparty and the Counterparty fails to comply with the requirements of Section 2.7(f) hereof, Borrower shall replace the Interest Rate Cap Agreement with a Replacement Interest Rate Cap

Agreement (and deliver a fully executed assignment of interest rate cap agreement in substantially the form of the Assignment of Interest Rate Cap with respect thereto (a "**Replacement Assignment of Interest Rate Cap Agreement**")) no later than ten (10) Business Days following such downgrade, withdrawal or qualification.  In addition, Borrower shall cause the Acceptable Counterparty under the Replacement Interest Rate Cap Agreement to execute and deliver a replacement acknowledgement in substantially the form of the Acknowledgment.

(e)     In the event that Borrower fails to purchase and deliver to Lender the Interest Rate Cap Agreement or any Replacement Interest Rate Cap Agreement as and when required hereunder, and such failure remains uncured for more than ten (10) days after notice from Lender, Lender may purchase such Interest Rate Cap Agreement or Replacement Interest Rate Cap Agreement and the cost incurred by Lender in purchasing such Interest Rate Cap Agreement or Replacement Interest Rate Cap Agreement shall be paid by Borrower to Lender with interest thereon at the Default Rate from the date such cost was incurred by Lender until such cost is paid by Borrower to Lender.

(f)     Each Interest Rate Cap Agreement shall expressly provide that in the event of any downgrade, withdrawal or qualification of the rating of the Counterparty (or its credit support provider, if applicable) such that it ceases to be an Acceptable Counterparty with respect to any of the Rating Agencies, the Counterparty shall, within ten (10) Business Days following such downgrade, withdrawal or qualification, (i) post collateral in an amount and on terms acceptable to Lender pursuant to the terms of the Interest Rate Cap Agreement, (ii) transfer the Interest Rate Cap Agreement to a replacement Acceptable Counterparty, or (iii) procure a guarantee on terms acceptable to Lender from an entity whose credit ratings from the Rating Agencies allow it to qualify as an Acceptable Counterparty.

(g)     In connection with an Interest Rate Cap Agreement, Borrower shall obtain and deliver to Lender an opinion of counsel from counsel for the Counterparty (upon which Lender and its successors and assigns may rely) under New York law and, if the Counterparty is a non-U.S. entity, the applicable foreign law, which shall provide, in relevant part, that:

(i)     the Counterparty is duly organized, validly existing, and in good standing under the laws of its jurisdiction of incorporation and has the organizational power and authority to execute and deliver, and to perform its obligations under, the Interest Rate Cap Agreement;

(ii)     the execution and delivery of the Interest Rate Cap Agreement by the Counterparty (and any guaranty thereof by a guarantor thereof), and any other agreement which the Counterparty (or such guarantor) has executed and delivered pursuant thereto, and the performance of its obligations thereunder have been and remain duly authorized by all necessary action and do not contravene any provision of its certificate of incorporation or by-laws (or

equivalent organizational documents) or any law, regulation or contractual restriction binding on or affecting it or its property;

(iii)    all consents, authorizations and approvals required for the execution and delivery by the Counterparty of the Interest Rate Cap Agreement (and any guaranty thereof by a guarantor thereof), and any other agreement which the Counterparty (or such guarantor) has executed and delivered pursuant thereto, and the performance of its obligations thereunder have been obtained and remain in full force and effect, all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with any governmental authority or regulatory body is required for such execution, delivery or performance; and

(iv)    the Interest Rate Cap Agreement (and any guaranty thereof), and any other agreement which the Counterparty (or such guarantor) has executed and delivered pursuant thereto, has been duly executed and delivered by the Counterparty (or such guarantor, as applicable) and constitutes the legal, valid and binding obligation of the Counterparty (or such guarantor, as applicable), enforceable against the Counterparty (or such guarantor, as applicable) in accordance with its terms, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

(h)    Borrower shall not sell, assign, or otherwise dispose of, or mortgage, pledge or grant a security interest in, the Interest Rate Cap Agreement or any Replacement Interest Rate Cap Agreement (other than pursuant to the Assignment of Interest Rate Cap or the Replacement Assignment of Interest Rate Cap Agreement), and any sale, assignment, mortgage, pledge or security interest whatsoever made in violation of this covenant shall be a nullity and of no force and effect, and upon demand of Lender, shall forthwith be cancelled or satisfied by an appropriate instrument in writing.

## ARTICLE III

## EXCULPATION

Section 3.1    Exculpation.

(a)    Subject to the qualifications below, Lender shall not enforce the liability and obligation of Borrower to perform and observe the obligations contained in the Note, this Agreement, the Security Instrument or the other Loan Documents by any action or proceeding wherein a money judgment shall be sought against Borrower, except that Lender may bring a foreclosure action, an action for specific performance or any other appropriate action or proceeding to enable Lender to enforce and realize upon its interest under the Note, this Agreement, the Security Instrument and the other Loan Documents, or in the Property, the Rents, or any other collateral given to Lender pursuant to the Loan Documents; *provided*, *however*, that, except as specifically provided herein, any judgment in any such action or proceeding shall be enforceable against Borrower

only to the extent of Borrower's interest in the Property, in the Rents and in any other collateral given to Lender, and Lender, by accepting the Note, this Agreement, the Security Instrument and the other Loan Documents, agrees that it shall not sue for, seek or demand any deficiency judgment against Borrower in any such action or proceeding under, or by reason of, or in connection with, the Note, this Agreement, the Security Instrument or the other Loan Documents.  The provisions of this Section 3.1 shall not, however, (a) constitute a waiver, release or impairment of any obligation evidenced or secured by any of the Loan Documents; (b) impair the right of Lender to name Borrower as a party defendant in any action or suit for foreclosure and sale under the Security Instrument if required by applicable law; (c) affect the validity or enforceability of any of the Loan Documents or any Guaranty made in connection with the Loan or any of the rights and remedies of Lender thereunder; (d) impair the right of Lender to obtain the appointment of a receiver; (e) impair the enforcement of the Assignment of Leases; or (f) constitute a prohibition against Lender seeking a deficiency judgment against Borrower if permitted by applicable law in order to fully realize the security granted by the Security Instrument or commencing any other appropriate action or proceeding in order for Lender to exercise its remedies against the Property.

(b)    Nothing contained herein shall in any manner or way release, affect or impair the right of Lender to recover, and Borrower shall be fully and personally liable and subject to legal action, for any actual losses, damages (excluding consequential, special or punitive damages), costs, expenses, liabilities (including, without limitation, strict liability), claims, obligations, settlement payments, penalties, fines, assessments, citations, litigation, demands, defenses, judgments, suits, proceedings or other expenses of any kind whatsoever incurred or suffered by Lender (including reasonable attorneys' fees and expenses and court costs) arising out of or in connection with the following (all such liability and obligation of Borrower for any or all of the following being referred to herein as "***Borrower's Recourse Liabilities***"):

(i)    fraud, gross negligence, willful misconduct, material misrepresentation or failure to disclose a fact known to be material by or on behalf of Borrower, Guarantor, or any Affiliate of any of them, or any of their respective officers, directors or members, in connection with the Loan or the Property, including by reason of any claim under RICO;

(ii)    breach of any representation, warranty, covenant or indemnification provision in the Environmental Indemnity, the Loan Agreement, the Security Instrument or any other Loan Document concerning Environmental Statutes or Hazardous Substances;

(iii)    voluntary or permissive material physical waste of the Property;

(iv)    wrongful removal or destruction of any portion of the Property by or damage to the Property caused by willful misconduct or gross negligence of, Borrower, Manager, Principal, Guarantor and/or any of their respective Affiliates;

(v)     breach of any Legal Requirement (including RICO) mandating the forfeiture by Borrower of the Property, or any portion thereof, because of the conduct or purported conduct of criminal activity by Borrower or any other Restricted Party (other than non-controlling indirect members of Borrower) or any of their respective agents or representatives in connection therewith;

(vi)     any material misrepresentation, misleading or incorrect certification or material breach of any representation, warranty or certification contained in this Agreement or any other Loan Document or in any document executed in connection therewith, pursuant to any of the Loan Documents or otherwise, to induce Lender to make the Loan, or any advance thereof, or to release monies from any account held by Lender (including any reserve or escrow) or to take other action with respect to the Collateral;

(vii)     misapplication, misappropriation or conversion by or on behalf of Borrower, Guarantor, Manager, or any Affiliate of any of them of (A) any Insurance Proceeds, (B) any Awards, (C) any Rents, (D) any Rents paid more than one (1) month in advance, or (E) any other monetary collateral for the Loan required under the Loan Documents;

(viii)     failure to pay charges for Taxes, Other Charges, labor or materials or judgments that can create Liens (other than Permitted Encumbrances) on any portion of the Property, unless (A) such charges are the subject of a bona fide dispute in which Borrower is contesting the amount or validity thereof in accordance with the terms of this Agreement, and/or (B) such failure to pay results from Borrower's inability to make the required payments because of insufficient Rents from the Property to make such payments (in each case, solely to the extent there exists sufficient cash flow from the Property to do so and if such funds are held by Lender, Lender has made such funds available to Borrower);

(ix)     failure to deliver to Lender any security deposits, advance deposits or any other deposits collected by or on behalf of Borrower with respect to the Property upon a foreclosure of the Property or action in lieu thereof, except to the extent any such security deposits were applied in accordance with the terms and conditions of any of the Leases prior to the occurrence of the Event of Default that gave rise to such foreclosure or action in lieu thereof;

(x)     failure by Borrower to obtain and to maintain, or to be covered by and have such coverage maintained, from time to time, the fully paid for the Policies in accordance with the terms hereof (solely to the extent there exists sufficient cash flow from the Property to do so and if such funds are held by Lender, Lender has made such funds available to Borrower);

(xi)     the failure to permit on-site inspections of the Property to the extent required by, and in accordance with, the terms and provisions of this

Agreement and the Security Instrument, in any event after Borrower has received written notice from Lender requesting the same;

(xii)    an act or omission of any of Borrower, Principal or Guarantor, or any Affiliate of any of them, in bad faith, which hinders, delays or interferes with Lender's enforcement of its rights under any Loan Document or the realization of the collateral, including the assertion in bad faith by any of Borrower, Principal or Guarantor, or any Affiliate of any of them, of defenses or counterclaims;

(xiii)    the amendment, modification or termination by Borrower or Manager of any Major Lease made without Lender's prior written consent;

(xiv)    Borrower, Guarantor or Principal failing to comply with any covenant to the extent required in Section 9.2 hereof;

(xv)    except as set forth in Section 3.1(c) below, Borrower or Principal failing to comply with any representation, warranty or covenant set forth in Section 4.1.32 hereof or failing to maintain its status as a Special Purpose Entity (unless such failure is de minimis and promptly cured), as required by, and in accordance with, the terms and provisions of this Agreement, the Security Instrument or any other Loan Document; provided, that, a failure to contribute additional capital shall not be deemed a violation of this Section 3.1(b)(xv); or

(xvi)    failure to complete the Required Repairs and the Approved Renovations as and when required pursuant to this Agreement; provided, however, that no Borrower Recourse Liability shall accrue under this subsection with respect to any portion of the Property released from the lien and encumbrance of the Loan Documents in accordance with the provisions of Section 9.5 of this Agreement.

(c)    Notwithstanding anything to the contrary in this Agreement, the Note or any of the Loan Documents, (i) Lender shall not be deemed to have waived any right which Lender may have under Section 506(a), 506(b), 1111(b) or any other provisions of the U.S. Bankruptcy Code to file a claim for the full amount of the Debt secured by the Security Instrument or to require that all collateral shall continue to secure all of the Obligations in accordance with the Loan Documents, and (ii) Borrower shall be personally liable for the payment of the entire amount of the Debt in the event of (each, a "***Springing Recourse Event***"): (A) Borrower, Principal or Guarantor filing a voluntary petition under the Bankruptcy Code unless Lender consents to such filing in writing; (B) the filing of an involuntary petition against Borrower, Principal or Guarantor or any Person owning an interest (directly or indirectly) in Borrower, Principal or Guarantor under the Bankruptcy Code, in which Borrower, Principal, Guarantor or any Person owning an interest (directly or indirectly) in Borrower, Principal or Guarantor causes such event or condition to occur (by way of example, but not limitation, such Person seeks the appointment of a receiver or files a bankruptcy petition), consents to, aids, solicits, supports, or otherwise cooperates or colludes to cause such condition or event;

(C) Borrower, Principal or Guarantor filing an answer consenting to or otherwise acquiescing or joining in any involuntary petition filed against Borrower, Principal or Guarantor, by any other Person under the Bankruptcy Code unless Lender consents to such in writing; (D) Borrower, Principal or Guarantor consenting to or otherwise acquiescing or joining in an application for the appointment of a custodian, receiver, trustee, or examiner for Borrower or any portion of the Property unless Lender consents to such in writing; (E) Borrower, Principal or Guarantor making an assignment for the benefit of creditors, or admitting, in writing or in any legal proceeding, its insolvency or inability to pay its debts as they become due; (F) Borrower or Principal failing to obtain Lender's prior written consent to any Indebtedness or voluntary Lien (other than a Permitted Encumbrance under clause (e) of the definition of Permitted Encumbrance) encumbering the Property as required by this Agreement or the Security Instrument; (G) Borrower or Principal failing to obtain Lender's prior written consent to any Transfer, as required by this Agreement, the Security Instrument or any other Loan Document; (H) Borrower or Principal failing to comply with (i) any representation, warranty or covenant set forth in clauses (a), (b), (c), and (d) of the definition of "Special Purpose Entity" or (ii) any representation, warranty, or covenant set forth in Section 4.1.32 hereof or failing to maintain its status as a "Special Purpose Entity", which breach or failure results in the substantive consolidation of the Borrower or Principal and any other Person pursuant to the Bankruptcy Code, in each case, as required by, and in accordance with, the terms and provisions of this Agreement, the Security Instrument or any other Loan Document, (I) Borrower, Principal or Guarantor, in connection with any enforcement action or exercise or assertion of any right or remedy by or on behalf of Lender under or in connection with the Guaranty, the Note, the Security Instrument or any other Loan Document, seeks in bad faith a defense, judicial intervention or injunctive or other equitable relief of any kind, or asserts in a pleading filed in connection with a judicial proceeding any defense against Lender or any right in connection with any security for the Loan; or (J) the first Monthly Debt Service Payment Amount is not paid when due.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES

Section 4.1    Borrower Representations.  Borrower represents and warrants as of the date hereof that:

4.1.1    Organization.  Borrower has been duly organized and is validly existing and in good standing with requisite power and authority to own its properties and to transact the business in which it is now engaged.  Borrower is duly qualified to do business and is in good standing in each jurisdiction where it is required to be so qualified in connection with its properties, businesses and operations.  Borrower possesses all rights, licenses, permits and authorizations, governmental or otherwise, necessary to entitle it to own its properties and to transact the businesses in which it is now engaged, and the sole business of Borrower is the ownership, management and operation of the Property.  The ownership interests of Borrower are as set forth on the organizational chart attached hereto as **Schedule II**.  Borrower (a) has complied in all material respects with its certificate of incorporation, bylaws, limited partnership agreement, articles of organization and limited liability company operating agreement, as

applicable; (b) has maintained complete books and records and bank accounts separate from those of its Affiliates; (c) has obeyed all formalities required to maintain its status as, and at all times has held itself out to the public as, a legal entity separate and distinct from any other entity (including, but not limited to, any Affiliate thereof); and (d) has all requisite power and authority to conduct its business and to own its property, as now conducted or owned, and as contemplated by this Agreement, including, without limitation, the power and authority to do business in the state in which the Property is located. The signatory hereto has all necessary power, authority and legal right to execute this Agreement, the Note and the other Loan Documents on Borrower's behalf to which Borrower is a party.

4.1.2    <u>Authorization, Execution, Delivery and Enforceability</u>. Borrower has taken all necessary limited liability company action to authorize the execution, delivery and performance of this Agreement and the other Loan Documents. This Agreement and the other Loan Documents have been duly executed and delivered by or on behalf of Borrower and constitute the legal, valid and binding obligations of Borrower enforceable by Lender (or any subsequent holder thereof) against Borrower in accordance with their respective terms, subject only to applicable bankruptcy, insolvency and similar laws affecting rights of creditors generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

4.1.3    <u>No Conflicts</u>. The execution, delivery and performance of this Agreement and the other Loan Documents by Borrower and/or Guarantor, as applicable, will not conflict with or result in a breach of any of the terms or provisions of, or constitute a default under, or result in the creation or imposition of any Lien, charge or encumbrance (other than pursuant to the Loan Documents) upon any of the property or assets of Borrower pursuant to the terms of any indenture, mortgage, deed of trust, loan agreement, partnership agreement, management agreement or other agreement or instrument to which Borrower is a party or by which any of Borrower's property or assets is subject, nor will such action result in any violation of the provisions of any Legal Requirements of any Governmental Authority having jurisdiction over Borrower or any of Borrower's properties or assets, and any consent, approval, authorization, order, registration or qualification of or with any court or any such Governmental Authority required for the execution, delivery and performance by Borrower and/or Guarantor, as applicable, of this Agreement or any other Loan Documents has been obtained and is in full force and effect.

4.1.4    <u>Litigation</u>. Except as set forth on **<u>Schedule 4.1.4</u>** attached hereto, there are no actions, suits or proceedings at law or in equity by or before any Governmental Authority or other agency now pending or to Borrower's knowledge threatened against or affecting Borrower Guarantor, Principal or the Property.

4.1.5    <u>Agreements</u>. Borrower is not a party to any agreement or instrument or subject to any restriction which might materially and adversely affect Borrower or the Property, or Borrower's business, properties or assets, operations or condition, financial or otherwise. Borrower is not in default in any material respect in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any agreement or instrument to which it is a party or by which Borrower or the Property are bound. Borrower has no material financial obligation under any indenture, mortgage, deed of trust, loan agreement or

other agreement or instrument to which Borrower is a party or by which Borrower or the Property is otherwise bound, other than (a) any obligations incurred in the ordinary course of the operation of the Property as permitted pursuant to clause (s) of the definition of "***Special Purpose Entity***" set forth in Section 1.1 hereof, and (b) the obligations under the Loan Documents.

4.1.6    Consents.  No consent, approval, authorization or order of any court or Governmental Authority is required for the execution, delivery and performance by Borrower of, or compliance by Borrower with, this Agreement or the other Loan Documents or the consummation of the transactions contemplated hereby, other than those which have been obtained by Borrower.

4.1.7    Title.  Borrower has good, marketable and insurable fee simple title to the real property comprising part of the Property and good title to the balance of the Property, free and clear of all Liens whatsoever except the Permitted Encumbrances, such other Liens as are permitted pursuant to the Loan Documents and the Liens created by the Loan Documents.  The Permitted Encumbrances in the aggregate do not materially and adversely affect the value, operation or use of the Property (as currently used) or Borrower's ability to repay the Loan.  The Security Instrument and the Assignment of Leases, when properly recorded in the appropriate records, together with any UCC-1 financing statements required to be filed in connection therewith, will create (a) a legal valid, perfected and enforceable first priority lien on the Property, subject only to Permitted Encumbrances and the Liens created by the Loan Documents, and (b) valid, perfected security interests in and to, and perfected collateral assignments of, all personalty (including the Leases), all in accordance with the terms thereof, in each case subject only to any applicable Permitted Encumbrances, such other Liens as are permitted pursuant to the Loan Documents and the Liens created by the Loan Documents.  There are no claims for payment for work, labor or materials affecting the Property which are or may become a Lien prior to, or of equal priority with, the Liens created by the Loan Documents.

4.1.8    Solvency.  Borrower has (a) not entered into the transaction contemplated by this Agreement or executed the Note, this Agreement or any other Loan Documents with the actual intent to hinder, delay or defraud any creditor and (b) received reasonably equivalent value in exchange for its obligations under such Loan Documents.  After giving effect to the Loan, the fair saleable value of Borrower's assets exceeds and will, immediately following the making of the Loan, exceed Borrower's total liabilities, including, without limitation, subordinated, unliquidated, disputed and contingent liabilities.  Borrower's assets do not and, immediately following the making of the Loan will not, constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted. Borrower does not intend to, and does not believe that it will, incur debts and liabilities (including contingent liabilities and other commitments) beyond its ability to pay such debts and liabilities as they mature (taking into account the timing and amounts of cash to be received by Borrower and the amounts to be payable on or in respect of the obligations of Borrower).  No Bankruptcy Action exists against Borrower, Principal or Guarantor, and none of Borrower, Principal or Guarantor has ever been a party to a Bankruptcy Action.  None of Borrower, Principal or Guarantor is contemplating either a Bankruptcy Action or the liquidation of all or a major portion of Borrower's assets or properties, and Borrower has no knowledge of any Person contemplating the filing of any petition against it, Principal or Guarantor.

4.1.9  Full and Accurate Disclosure.  No statement of fact made by or on behalf of Borrower in this Agreement or in any of the other Loan Documents contains any untrue statement of a material fact or omits to state any material fact necessary to make statements contained herein or therein not misleading.  There is no material fact presently known to Borrower which has not been disclosed to Lender which adversely affects, nor as far as Borrower can foresee, might adversely affect, the Property or the business, operations or condition (financial or otherwise) of Borrower or Guarantor.

4.1.10  No Plan Assets.  Borrower is not an "employee benefit plan," as defined in Section 3(3) of ERISA, subject to Title I of ERISA or Section 4975 of the Code, and none of the assets of Borrower constitutes or will constitute "plan assets" of one or more such plans within the meaning of 29 C.F.R. Section 2510.3-101.  Compliance by Borrower and Guarantor with the provisions hereof will not involve any Prohibited Transaction.  Neither Guarantor nor Borrower has any pension, profit sharing, stock option, insurance or other arrangement or plan for employees covered by Title IV of ERISA, and no "Reportable Event" as defined in ERISA has occurred and is now continuing with respect to any such plan.  The performance by Borrower of its obligations under the Loan Documents and Borrower's conducting of its operations do not violate any provisions of ERISA.  In addition, (a) Borrower is not a "governmental plan" within the meaning of Section 3(32) of ERISA, (b) transactions by or with Borrower are not subject to any state statute or regulation regulating investments of, or fiduciary obligations with respect to, governmental plans within the meaning of Section 3(32) of ERISA, in any case, which is similar to the provisions of Section 406 of ERISA or Section 4975 of the Code currently in effect, which prohibit or otherwise restrict the transactions contemplated by this Agreement, (c) none of Borrower, Guarantor or any ERISA Affiliate is at the date hereof, or has been at any time within the two years preceding the date hereof, an employer required to contribute to any Multiemployer Plan or Multiple Employer Plan, or a "contributing sponsor" (as such term is defined in Section 4001 of ERISA) in any Multiemployer Plan or Multiple Employer Plan; and (d) none of Borrower, Guarantor or any ERISA Affiliate has any contingent liability with respect to any post-retirement "welfare benefit plan" (as such term is defined in ERISA) except as disclosed to the Lender in writing.

4.1.11  Compliance.  Borrower and the Property (including, but not limited to, the Improvements) and the use thereof comply in all material respects with all applicable Legal Requirements, including, without limitation, parking, building and zoning and land use laws, ordinances, regulations, rules, covenants, restrictions and codes.  Borrower is not in default or violation of any order, writ, injunction, decree or demand of any Governmental Authority.  There has not been committed by Borrower, any Affiliate of Borrower, or to Borrower's actual knowledge, any Tenant or any other Person in occupancy of or involved with the operation or use of the Property, any act or omission affording any Governmental Authority the right of forfeiture as against the Property or any part thereof or any monies paid in performance of Borrower's obligations under any of the Loan Documents.  In the event that all or any part of the Improvements are destroyed or damaged, said Improvements can be legally reconstructed to their condition prior to such damage or destruction, and thereafter exist for the same use without violating any zoning or other ordinances applicable thereto and without the necessity of obtaining any variances or special permits.  Neither the Improvements as constructed, nor, to Borrower's knowledge, the use of the Property by Tenants under the Leases and the contemplated accessory uses, violates (a) any Legal Requirements (including

subdivision, zoning, building, environmental protection and wetland protection Legal Requirements), or (b) any building permits, restrictions or records, or agreements affecting the Property or any part thereof.  Neither the zoning authorizations, approvals or variances nor any other right to construct or to use the Property is to any extent dependent upon or related to any real estate other than the Property.  The use being made of the Property is in conformity with the certificate of occupancy issued for the Property and all other restrictions, covenants and conditions affecting the Property.

        4.1.12  <u>Financial Information</u>.  Except as set forth on **Schedule 4.1.12** attached hereto, all financial data with respect to the Property, Borrower, Principal and Guarantor, including, without limitation, the statements of cash flow and income and operating expenses, that have been delivered to Lender in connection with the Loan (a) are true, complete and correct in all material respects, (b) accurately represent the financial condition of the Property and Guarantor as of the date of such reports, and (c) to the extent prepared or reviewed by an independent certified public accounting firm, have been prepared in accordance with GAAP (or such other accounting basis acceptable to Lender) throughout the periods covered, except as disclosed therein.  Except for Permitted Encumbrances, Borrower does not have any contingent liabilities, liabilities for taxes, unusual forward or long-term commitments or unrealized or anticipated losses from any unfavorable commitments that are known to Borrower and reasonably likely to have a materially adverse effect on the Property or the operation thereof as multifamily residential dwellings, except as referred to or reflected in said financial statements.  Since the date of such financial statements, there has been no Material Adverse Change in the financial condition, operation or business of Borrower or Guarantor from that set forth in said financial statements.

        4.1.13  <u>Condemnation</u>.  No Condemnation or other similar proceeding has been commenced or, to Borrower's knowledge, is threatened or contemplated with respect to all or any portion of the Property or for the relocation of any roadway providing access to the Property.

        4.1.14  <u>Federal Reserve Regulations</u>.  No part of the proceeds of the Loan will be used for the purpose of purchasing or acquiring any "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or for any other purpose which would be inconsistent with such Regulation U or any other Regulations of such Board of Governors, or for any purposes prohibited by any Legal Requirements or by the terms and conditions of this Agreement or the other Loan Documents.

        4.1.15  <u>Easements; Utilities and Public Access</u>.  All easements, cross easements, licenses, air rights and rights-of-way or other similar property interests (collectively, "***Easements***"), if any, necessary for the full utilization of the Improvements for their intended purposes have been obtained, are recorded (if applicable) and described in the Title Insurance Policy and are in full force and effect without default thereunder.  The Property is located on or adjacent to a public road and has direct legal access to such road, or has access via an irrevocable recorded easement or irrevocable right of way permitting ingress and egress to and from a public road.  The Property is served by water, sewer, sanitary sewer and storm drain facilities and all required utilities, each of which is adequate to service the Property for its intended uses.  (i) All public utilities necessary or convenient to the full use and enjoyment of the Property are located

in the public right-of-way abutting the Property, and (ii) all such utilities are connected so as to serve the Property without passing over other property absent a valid irrevocable recorded easement. All roads necessary for the use of the Property for its current purpose have been completed and dedicated to public use and accepted by all Governmental Authorities. There is no on-site sewage disposal system and the Property is served by a sewer system maintained by a Governmental Authority or a property owners association.

4.1.16 <u>Not a Foreign Person</u>. Borrower is not a "foreign person" within the meaning of §1445(f)(3) of the Code.

4.1.17 <u>Separate Lots</u>. The Property is comprised of one (1) or more parcels which constitute a separate tax lot or lots and does not constitute a portion of any other tax lot not a part of the Property.

4.1.18 <u>Assessments</u>. There are no pending or proposed special or other assessments for public improvements or otherwise affecting the Property, nor to Borrower's knowledge are there any contemplated improvements to the Property that may result in such special or other assessments.

4.1.19 <u>No Set-Off</u>. The Loan Documents are not subject to any right of rescission, set-off, counterclaim or defense by Borrower or Guarantor, including the defense of usury, nor would the operation of any of the terms of the Loan Documents, or the exercise of any right thereunder, render the Loan Documents unenforceable (subject to principles of equity and bankruptcy, insolvency and other laws generally affecting creditors' rights and the enforcement of debtors' obligations), and Borrower and Guarantor have not asserted any right of rescission, set-off, counterclaim or defense with respect thereto.

4.1.20 <u>Assignment of Leases and Rents</u>. The Assignment of Leases creates a valid, first priority collateral assignment of, or a valid, first priority security interest in, Rents and certain rights under the Leases, subject only to a license granted to Borrower to exercise certain rights and to perform certain obligations of the lessor under the Leases, including the right to operate the Property. No Person other than Lender (and Borrower) has any interest in or assignment of the Leases or any portion of the Rents due and payable or to become due and payable thereunder

4.1.21 <u>No Prior Assignment</u>. There are no prior assignments of the Leases or any portion of the Rents due and payable or to become due and payable which are presently outstanding.

4.1.22 <u>Insurance</u>. Borrower has obtained (or is covered by) and has delivered to Lender certified copies of all Policies (or certificates of same), with all premiums paid thereunder, reflecting the insurance coverages, amounts and other requirements set forth in this Agreement. Except as set forth on **<u>Schedule 4.1.22</u>** attached hereto, no claims have been made or are currently pending, outstanding or otherwise remain unsatisfied under any such Policies, and no Person, including Borrower, has done, by act or omission, anything which would impair the coverage of any such Policies.

4.1.23  <u>Use of Property</u>.  The Property is used exclusively as multifamily residential dwellings and other appurtenant and related uses.

4.1.24  <u>Certificate of Occupancy; Licenses</u>.  All certifications, permits, licenses and approvals, including without limitation, certificates of completion and occupancy permits required for the legal use, occupancy and operation of the Property as multifamily residential dwellings (collectively, the "***Licenses***"), have been obtained and are in full force and effect.  Borrower shall keep and maintain all Licenses necessary for the operation of the Property as multifamily residential dwellings.  To Borrower's knowledge, the use being made of the Property is in conformity with the certificates of occupancy issued for the Property.

4.1.25  <u>Flood Zone</u>.  None of the Improvements on the Property are located in an area as identified by the Federal Emergency Management Agency as an area having special flood hazards or, if so located, the flood insurance required pursuant to <u>Section 6.1(a)(i)</u> hereof is in full force and effect with respect to the Property.

4.1.26  <u>Physical Condition</u>.  Except as disclosed in the Property Condition Report, the Property, including, without limitation, all buildings, Improvements, parking facilities, sidewalks, storm drainage systems, roofs, plumbing systems, HVAC systems, fire protection systems, electrical systems, equipment, elevators, exterior sidings and doors, landscaping, irrigation systems and all structural components are in good condition, order and repair in all material respects.  To Borrower's knowledge, there exists no structural or other material defects or damages in the Property, whether latent or otherwise, and Borrower has not received notice from any insurance company or bonding company of any defects or inadequacies in the Property, or any part thereof, which would adversely affect the insurability of the same or cause the imposition of extraordinary premiums or charges thereon or of any termination or threatened termination of any policy of insurance or bond.

4.1.27  <u>Boundaries</u>.  Except as disclosed in the Survey, all of the Improvements which were included in determining the appraised value of the Property lie wholly within the boundaries of the Property, and no improvements on adjoining properties encroach upon the Property, and no easements or other encumbrances upon the Property encroach upon any of the Improvements, so as to adversely affect the value or marketability of the Property except those easements or other encumbrances with respect to which the Title Insurance Policy insures against any losses resulting therefrom.  No Improvements encroach upon any easements except for encroachments the removal of which would not materially and adversely affect the value or current use of the Property.

4.1.28  <u>Leases</u>.  No portion of the Property is subject to any Leases other than the Leases described on the rent roll attached as **<u>Schedule I</u>**.  Borrower is the owner and holder of landlord's interest in the Leases.  No Person has any possessory interest in the Property or right to occupy the same through Borrower except under and pursuant to the provisions of the Leases.  Except as set forth in the rent roll attached as **<u>Schedule I</u>**, the current Leases are in full force and effect and there are no defaults thereunder by Borrower or to Borrower's knowledge any other party and there are no conditions that, with the passage of time or the giving of notice, or both, would constitute defaults thereunder.  The copies of the Leases and any related guaranty (including all amendments thereto) delivered to Lender are accurate, true and complete, and

there are no oral agreements with respect thereto.  No Rent has been paid more than one (1) month in advance of its due date.  Borrower has delivered to Lender a true, correct and complete list of all security deposits made by Tenants at the Property which have not been applied (including accrued interest thereon), all of which are held by Borrower in accordance with the terms of the applicable Lease and applicable Legal Requirements.  No Major Lease is currently in effect.  No Tenant under any Lease (or any sublease) is an Affiliate of Borrower.  The Tenants under the Leases are paying full, unabated rent as set forth in the rent roll delivered to Lender.  There are no brokerage fees or commissions due and payable in connection with the leasing of space at the Property, except as has been previously disclosed to Lender in writing, and no such fees or commissions will become due and payable in the future in connection with the current Leases, including by reason of any extension of such Lease or expansion of the space leased thereunder, except as has previously been disclosed to Lender in writing.  There has been no prior sale, transfer or assignment, hypothecation or pledge of any Lease or of the Rents received therein which is still in effect.  To Borrower's knowledge, no Tenant has assigned its Lease or sublet all or any portion of the premises demised thereby, no such Tenant holds its leased premises under assignment or sublease.  No Tenant under any Lease has a right or option pursuant to such Lease or otherwise to purchase all or any part of the Property of which the leased premises are a part.  No Tenant under any Lease has any right or option for additional space in the Improvements.

4.1.29  <u>Survey</u>.  The Survey for the Property delivered to Lender in connection with this Agreement has been prepared by a professional and properly licensed land surveyor in accordance with the "Minimum Standard Detail Requirements for ALTA/NSPS Land Title Surveys" (effective February 23, 2016) as adopted by ALTA and the National Society of Professional Surveyors.  The Survey reflects the same legal description contained in the Title Insurance Policy and includes, among other things, a metes and bounds description of the real property comprising part of the Property reasonably satisfactory to Lender.  The surveyor's seal is affixed to the Survey and the surveyor provided a certification for the Survey in form and substance acceptable to Lender and does not fail to reflect any material matter affecting the Property or the title thereto.

4.1.30  <u>Principal Place of Business; State of Organization</u>.  Borrower's principal place of business as of the date hereof is the address set forth in the introductory paragraph of this Agreement.  Each Individual Borrower is organized under the laws of the State of Delaware and each Individual Borrower's organizational identification number is set forth on the organizational chart attached hereto as Schedule II.

4.1.31  <u>Filing and Recording Taxes</u>.  All transfer taxes, deed stamps, intangible taxes or other amounts in the nature of transfer taxes required to be paid by any Person under applicable Legal Requirements currently in effect in connection with the transfer of the Property to Borrower have been paid.  All mortgage, mortgage recording, stamp, intangible or other similar tax required to be paid by any Person under applicable Legal Requirements currently in effect in connection with the execution, delivery, recordation, filing, registration, perfection or enforcement of any of the Loan Documents, including, without limitation, the Security Instrument, have been paid or are being paid simultaneously herewith.  All taxes and governmental assessments due and owing in respect of the Property have been paid, or an escrow

of funds in an amount sufficient to cover such payments has been established hereunder or are insured against by the Title Insurance Policy.

4.1.32  Special Purpose Entity/Separateness.

(a)     Until the Debt has been paid in full, each Individual Borrower hereby represents, warrants and covenants that (i) such Individual Borrower is, has been since the date of its formation, and shall continue to be a Special Purpose Entity and (ii) the related Principal is, has been since the date of its formation, and shall continue to be a Special Purpose Entity.

(b)     The representations, warranties and covenants set forth in Section 4.1.32 shall survive for so long as any amount remains payable to Lender under this Agreement or any other Loan Document.

(c)     Any and all of the stated facts and assumptions made in any Insolvency Opinion, including, but not limited to, any exhibits attached thereto, will have been and shall be true and correct in all respects, and Borrower and Principal will have complied and will comply with all of the stated facts and assumptions made with respect to it in any Insolvency Opinion.  Each entity other than Borrower and Principal with respect to which an assumption is made or a fact stated in any Insolvency Opinion will have complied and will comply with all of the assumptions made and facts stated with respect to it in any such Insolvency Opinion.  Borrower covenants that in connection with any Additional Insolvency Opinion delivered in connection with this Agreement it shall provide an updated certification regarding compliance with the facts and assumptions made therein.

(d)     Borrower covenants and agrees that Borrower shall provide Lender with thirty (30) days' prior written notice prior to the removal of an Independent Director of either of Borrower and/or Principal.  Borrower shall not permit or suffer to exist the removal of any Independent Director (or the appointment of any Independent Director) of either of Borrower and/or Principal without Lender's consent.

4.1.33  Management Agreement.  The Management Agreement is in full force and effect and there are no defaults thereunder by any party thereto and no event has occurred that, with the passage of time and/or the giving of notice would constitute a default thereunder.

4.1.34  Illegal Activity.  No portion of the Property has been or will be purchased with proceeds of any illegal activity.

4.1.35  No Change in Facts or Circumstances; Disclosure.  All information submitted by Borrower to Lender including, but not limited to, all financial statements, rent rolls, reports, certificates and other documents submitted in connection with the Loan or in satisfaction of the terms thereof and all statements of fact made by Borrower in this Agreement or in any other Loan Document, are accurate, complete and correct in all material respects.  There has been no Material Adverse Change in any condition, fact, circumstance or event that would make any such information inaccurate, incomplete or otherwise misleading in any material respect or

that otherwise materially and adversely affects or might materially and adversely affect the use, operation or value of the Property or the business operations and/or the financial condition of Borrower or Guarantor.  Borrower and Guarantor have disclosed to Lender all material facts and have not failed to disclose any material fact that could cause any information so provided or representation or warranty made herein to be materially misleading.

4.1.36  <u>Investment Company Act</u>.  Borrower is not (a) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended; (b) a "holding company" or a "subsidiary company" of a "holding company" or an "affiliate" of either a "holding company" or a "subsidiary company" within the meaning of the Public Utility Holding Company Act of 2005, as amended; or (c) subject to any other Federal or state law or regulation which purports to restrict or regulate its ability to borrow money.

4.1.37  <u>Embargoed Person</u>.  As of the date hereof and at all times throughout the term of the Loan, including after giving effect to any Transfers permitted pursuant to the Loan Documents, (a) none of the funds or other assets of Borrower, Principal or Guarantor constitute property of, or are beneficially owned, directly or indirectly, by any Embargoed Person; (b) no Embargoed Person has any interest of any nature whatsoever in Borrower, Principal, Sponsor or Guarantor, as applicable, with the result that the investment in Borrower, Principal, Sponsor or Guarantor, as applicable (whether directly or indirectly), is prohibited by law or the Loan is or would be in violation of law; and (c) none of the funds of Borrower, Principal, Sponsor or Guarantor, as applicable, have been derived from any unlawful activity with the result that the investment in Borrower, Principal or Guarantor, as applicable (whether directly or indirectly), is prohibited by law or the Loan is or would be in violation of law.

4.1.38  <u>Cash Management Account</u>.

(a)    This Agreement, together with the other Loan Documents, creates a valid and continuing security interest (as defined in the UCC) in the Clearing Account and Cash Management Account in favor of Lender, as and when each such account may be established, which security interest is prior to all other Liens, other than Permitted Encumbrances, and is enforceable as such against creditors of and purchasers from Borrower.  Other than in connection with the Loan Documents and except for Permitted Encumbrances, Borrower has not sold, pledged, transferred or otherwise conveyed its interest in the Clearing Account or the Cash Management Account;

(b)    Each of the Clearing Account and Cash Management Account shall constitute a "deposit account" within the meaning of the UCC;

(c)    Pursuant and subject to the terms hereof and of the other Loan Documents, Borrower agrees that the Clearing Bank shall comply with all instructions originated by Lender, without further consent by Borrower, directing disposition of the Clearing Account and all sums at any time held, deposited or invested therein, together with any interest or other earnings thereon, and all proceeds thereof (including proceeds

of sales and other dispositions), whether accounts, general intangibles, chattel paper, deposit accounts, instruments, documents or securities;

(d)     The Clearing Account and Cash Management Account shall not be held in the name of any Person other than Borrower, as pledgor, for the benefit of Lender, as secured party; and

(e)     No Property is subject to any cash management system (other than pursuant to the Loan Documents), and any and all existing tenant instruction letters issued in connection with any previous financing have been duly terminated prior to the date hereof.

4.1.39  <u>Filing of Returns; Payment of Taxes</u>.    Borrower, Principal, Sponsor and Guarantor have filed all Federal income tax returns and all other tax returns, domestic and foreign, required to be filed by it (or have filed all necessary extensions for filing) and have paid all taxes and assessments payable by it that have become due, other than those not yet delinquent and except for those being diligently contested in good faith.  All Taxes relating to the Property are current and are not delinquent.  Borrower and Guarantor have each established on its books such charges, accruals and reserves in respect of taxes, assessments, fees and other governmental charges for all fiscal periods as are required by sound accounting principles consistently applied.  None of Borrower, Principal, Sponsor or Guarantor knows of any proposed assessment for additional Federal, foreign or state taxes for any period, or of any basis therefor, that, individually or in the aggregate, taking into account such charges, accruals and reserves in respect thereof as such Person has made, would reasonably be expected to result in a Material Adverse Change with respect to Borrower, Guarantor or the Property.

4.1.40  <u>REA</u>.    Borrower hereby represents and warrants to Lender with respect to the REA:

(a)     Borrower is a party to the REA and the REA is in full force and effect and has not been amended or modified and Borrower's interest therein has not been assigned pursuant to any assignment which survives the Closing Date except the assignment to Lender pursuant to the Loan Documents.

(b)     Borrower is not in default under the REA (and no notice has been given or received with respect to an alleged or current default) and, to the best of Borrower's knowledge, no other party to the REA is in default thereunder and there is no existing condition which, but for the passage of time or the giving of notice or both, could result in a default under the REA.

(c)     The current address to which notices are to be sent to Borrower is correctly set forth in the REA.  Borrower has not received any notice of any change of address for any other party to the REA.

(d)     There are no set-offs, claims, counterclaims or defenses being asserted or capable of being asserted after giving the requisite notice, if any, required under the REA or otherwise known by Borrower or any other party to the REA for the enforcement of the obligations of any party under the REA.

(e)    There are no Liens capable of being asserted for amounts due under the provisions of the REA which, if unpaid, may be asserted as a Lien prior to the Lien of the Security Instrument.

(f)    All charges and other sums due from Borrower under the REA, if any, have been paid to the extent they are payable on or prior to the date hereof and no lien has attached on any part of the Property (or threat thereof been made) for failure to pay any of the foregoing.

Section 4.2    <u>Survival of Representations</u>.    Borrower agrees that all of the representations and warranties of Borrower set forth in <u>Section 4.1</u> and elsewhere in this Agreement and in the other Loan Documents shall survive for so long as any amount remains owing to Lender under this Agreement or any of the other Loan Documents by Borrower.  All representations, warranties, covenants and agreements made in this Agreement or in the other Loan Documents by Borrower shall be deemed to have been relied upon by Lender notwithstanding any investigation heretofore or hereafter made by Lender or on its behalf.

## ARTICLE V

## <u>BORROWER COVENANTS</u>

Section 5.1    <u>Affirmative Covenants</u>.  From the date hereof and until payment and performance in full of all Obligations, Borrower hereby covenants and agrees with Lender that:

5.1.1    <u>Existence; Compliance with Legal Requirements</u>.    Each of Borrower, Guarantor and Principal shall do or cause to be done all things necessary to preserve, renew and keep in full force and effect its existence, rights, licenses, permits and franchises. Each of Borrower, Guarantor and Principal shall do or cause to be done all things reasonably necessary to comply with all Legal Requirements applicable to Borrower and the Property. There shall never be committed by Borrower, and Borrower shall not permit any other Person in occupancy of or involved with the operation or use of the Property to commit, any act or omission affording any Governmental Authority the right of forfeiture against the Property or any part thereof or any monies paid in performance of Borrower's obligations under any of the Loan Documents.  Borrower hereby covenants and agrees not to commit, permit or suffer to exist any act or omission affording such right of forfeiture.  Borrower shall at all times maintain, preserve and protect all franchises and trade names, preserve all the remainder of its property used or useful in the conduct of its business, and shall keep the Property in good working order and repair, normal wear and tear and Casualty excepted, and from time to time make, or cause to be made, all reasonably necessary repairs, renewals, replacements, betterments and improvements thereto, all as more fully provided in the Security Instrument.  Borrower shall keep the Property insured at all times by financially sound and reputable insurers, to such extent and against such risks, and maintain liability and such other insurance, as is more fully provided in this Agreement.  After prior notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding promptly initiated and conducted in good faith and with due diligence, the validity of any Legal Requirement, the applicability of any Legal Requirement to Borrower or the Property or any alleged violation of any Legal Requirement, provided, that: (a)

no Event of Default has occurred and remains uncured; (b) such proceeding shall be permitted under, and be conducted in accordance with, the provisions of any instrument to which Borrower is subject and shall not constitute a default thereunder and such proceeding shall be conducted in accordance with all applicable statutes, laws and ordinances; (c) neither the Property nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, cancelled or lost; (d) Borrower shall, upon final determination thereof, promptly comply with any such Legal Requirement determined to be valid or applicable or cure any violation of any Legal Requirement; (e) such proceeding shall suspend the enforcement of the contested Legal Requirement against Borrower and the Property; and (f) Borrower shall furnish such security as may be required in the proceeding, to insure compliance with such Legal Requirement, together with all interest and penalties payable in connection therewith. Lender may apply any such security, as necessary to cause compliance with such Legal Requirement at any time when, in the reasonable discretion of Lender, the validity, applicability or violation of such Legal Requirement is finally established or the Property (or any part thereof or interest therein) shall be in danger of being sold, forfeited, terminated, cancelled or lost.

5.1.2 <u>Taxes and Other Charges</u>. Borrower shall pay, or shall cause its Tenants(s) to pay (to the extent any Tenant is obligated to make such payments under its Lease), all Taxes and Other Charges now or hereafter levied or assessed or imposed against the Property, or any part thereof, as the same become due and payable. Borrower will deliver to Lender receipts for payment or other evidence satisfactory to Lender that the Taxes and Other Charges have been so paid or are not then delinquent no later than ten (10) days prior to the date on which the Taxes and/or Other Charges would otherwise be delinquent if not paid. Borrower shall not suffer and shall promptly cause to be paid and discharged any Lien or charge whatsoever (other than Permitted Encumbrances) which may be or become a Lien or charge against the Property, and shall promptly pay for all utility services provided to the Property. After prior notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application in whole or in part of any Taxes or Other Charges, provided that (a) no Event of Default has occurred and remains uncured; (b) such proceeding shall be permitted under, and be conducted in accordance with, the provisions of any other instrument to which Borrower is subject and shall not constitute a default thereunder and such proceeding shall be conducted in accordance with all applicable statutes, laws and ordinances; (c) neither the Property nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, cancelled or lost; (d) Borrower shall promptly upon final determination thereof pay the amount of any such Taxes or Other Charges, together with all costs, interest and penalties which may be payable in connection therewith; (e) such proceeding shall suspend the collection of such contested Taxes or Other Charges from the Property (except that if such Taxes or Other Charges must be paid sooner in order to avoid being delinquent, then Borrower shall cause the same to be paid prior to delinquency, and upon making such payment prior to delinquency Borrower may continue such contest); (f) Borrower shall furnish such security as may be required in the proceeding, or deposit with Lender cash, or other security as may be approved by Lender, in an amount determined by Lender sufficient to insure the payment of any such Taxes or Other Charges, together with all interest and penalties thereon; (g) failure to pay such Taxes or Other Charges will not subject Lender to any civil or criminal liability; (h) such contest shall not affect the ownership, use or occupancy of the Property; and (i) Borrower shall, upon request by Lender, give Lender prompt notice of the status of such proceedings and/or confirmation of the continuing satisfaction of the

conditions set forth in clauses (a) – (h) of this <u>Section 5.1.2</u>.  Lender may pay over any such cash deposit or part thereof held by Lender to the claimant entitled thereto at any time when, in the judgment of Lender, the entitlement of such claimant is established or the Property (or part thereof or interest therein) shall be in danger of being sold, forfeited, terminated, cancelled or lost or there shall be any danger of the Lien of the Security Instrument being primed by any related Lien.

       5.1.3    <u>Litigation</u>.  Borrower shall give prompt notice to Lender of any litigation or proceedings by any Governmental Authority pending or, to its knowledge, threatened against Borrower, Principal, Sponsor and/or Guarantor which might materially adversely affect Borrower's, Principal's, Sponsor's or Guarantor's condition (financial or otherwise) or business (including Borrower's ability to perform its Obligations hereunder or under the other Loan Documents) or the Property.

       5.1.4    <u>Access to Property</u>.  Borrower shall permit agents, representatives, consultants and employees of Lender to inspect the Property or any part thereof at reasonable hours upon reasonable advance notice (which may be given by electronic mail).  Lender or its agents, representatives, consultants and employees as part of any inspection may take soil, air, water, building material and other samples from the Property, subject to the rights of Tenants under Leases.

       5.1.5    <u>Notice of Default</u>.  Borrower shall promptly advise Lender of any Material Adverse Change in Borrower's, Principal's, Sponsor's or Guarantor's condition, financial or otherwise, or of the occurrence of any Default or Event of Default of which Borrower has knowledge.

       5.1.6    <u>Cooperate in Legal Proceedings</u>.  Borrower shall cooperate fully with Lender with respect to any proceedings before any court, board or other Governmental Authority which may in any way affect the rights of Lender hereunder or any rights obtained by Lender under any of the other Loan Documents and, in connection therewith, permit Lender, at its election, to participate in any such proceedings.

       5.1.7    <u>Perform Loan Documents</u>.  Borrower shall observe, perform and satisfy all the terms, provisions, covenants and conditions of, and shall pay when due all costs, fees and expenses to the extent required under the Loan Documents executed and delivered by, or applicable to, Borrower.  Payment of the costs and expenses associated with any of the foregoing shall be in accordance with the terms and provisions of this Agreement, including, without limitation, the provisions of <u>Section 10.13</u> hereof.

       5.1.8    <u>Award and Insurance Benefits</u>.  Borrower shall cooperate with Lender in obtaining for Lender the benefits of any Awards or Insurance Proceeds lawfully or equitably payable in connection with the Property, and Lender shall be reimbursed for any expenses incurred in connection therewith (including attorneys' fees and disbursements, and the payment by Borrower of the expense of an appraisal on behalf of Lender in case of any Casualty or Condemnation affecting the Property or any part thereof) out of such Insurance Proceeds.

5.1.9   Further Assurances.  Borrower shall, at Borrower's sole cost and expense:

(a)   furnish to Lender all instruments, documents, boundary surveys, footing or foundation surveys, certificates, plans, designs and specifications, appraisals, title and other insurance reports and agreements, and each and every other document, certificate, agreement and instrument required to be furnished by Borrower pursuant to the terms of the Loan Documents or which are reasonably requested by Lender in connection therewith;

(b)   execute and deliver to Lender such documents, instruments, certificates, assignments and other writings, and do such other acts reasonably necessary to evidence, preserve and/or protect the collateral at any time securing or intended to secure the Obligations under the Loan Documents, as Lender may require; and

(c)   do and execute all and such further lawful and reasonable acts, conveyances and assurances for the better and more effective carrying out of the intents and purposes of this Agreement and the other Loan Documents, as Lender shall reasonably require from time to time.  In furtherance hereof, Borrower grants to Lender an irrevocable power of attorney coupled with an interest for the purpose of protecting, perfecting, preserving and realizing upon the interests granted pursuant to this Agreement and to effect the intent hereof, all as fully and effectually as Borrower might or could do; and Borrower hereby ratifies all that Lender shall lawfully do or cause to be done by virtue hereof.  Upon receipt of an affidavit of an officer of Lender as to the loss, theft, destruction or mutilation of the Note or any other Loan Document which is not of public record, and, in the case of any such mutilation, upon surrender and cancellation of such Note or other applicable Loan Document, Borrower will issue, in lieu thereof, a replacement Note or other applicable Loan Document, dated the date of such lost, stolen, destroyed or mutilated Note or other Loan Document in the same principal amount thereof and otherwise of like tenor.

5.1.10   Mortgage Taxes.  Borrower shall simultaneously herewith pay all state, county and municipal recording and all other taxes imposed upon the execution and recordation of the Security Instrument.

5.1.11   Financial Reporting.

(a)   Borrower will keep and maintain or will cause to be kept and maintained on a Fiscal Year basis in accordance with GAAP (or such other accounting basis selected by Borrower and reasonably acceptable to Lender), proper and accurate books, records and accounts reflecting all of the financial affairs of Borrower and all items of income and expense in connection with the operation of the Property.  Lender shall have the right from time to time at all times during normal business hours upon reasonable notice (which may be given by electronic mail) to examine such books, records and accounts at the office of Borrower or any other Person maintaining such books, records and accounts and to make such copies or extracts thereof as Lender shall desire.  After the occurrence of an Event of Default, Borrower shall pay any reasonable

costs and expenses incurred by Lender to examine Borrower's accounting records with respect to the Property, as Lender shall reasonably determine to be necessary or appropriate in the protection of Lender's interest. Upon Lender's reasonable request, Borrower shall furnish to Lender such other information reasonably necessary and sufficient to fairly represent the financial condition of Borrower and the Property.

(b)     Borrower will furnish to Lender annually, within ninety (90) days following the end of each Fiscal Year of Borrower, a complete copy of Borrower's annual financial statements certified as true and correct by the party providing such statement (or, upon request of Lender, made not later than thirty (30) days prior to the end of the then-current fiscal year, audited by a "Big Four" accounting firm or other independent certified public accountant acceptable to Lender) in accordance with GAAP (or such other accounting basis acceptable to Lender) and containing statements of profit and loss for Borrower and the Property and a balance sheet for Borrower. Such statements of Borrower shall set forth the financial condition and the results of operations for the Property for such Fiscal Year, and shall include, but not be limited to, amounts representing annual Net Cash Flow, Net Operating Income, Gross Income from Operations and Operating Expenses. Borrower's annual financial statements shall be accompanied by (i) a comparison of the budgeted income and expenses and the actual income and expenses for the prior Fiscal Year, (ii) a list of Tenants, if any, occupying more than twenty (20%) percent of the total floor area of the Improvements, (iii) a breakdown showing the year in which each Lease then in effect expires and the percentage of total floor area of the Improvements and the percentage of base rent with respect to which Leases shall expire in each such year, each such percentage to be expressed on both a per year and cumulative basis, (iv) a schedule reconciling Net Operating Income to Net Cash Flow (the "***Net Cash Flow Schedule***"), which shall itemize all adjustments made to Net Operating Income to arrive at Net Cash Flow deemed material by, and (v) an Officer's Certificate certifying that each annual financial statement fairly presents the financial condition and the results of operations of Borrower and the Property subject to such reporting, and that such financial statements have been prepared in accordance with GAAP and as of the date thereof whether there exists an event or circumstance which constitutes a Default or Event of Default under the Loan Documents executed and delivered by, or applicable to, Borrower, and if such Default or Event of Default exists, the nature thereof, the period of time it has existed and the action then being taken to remedy the same.

(c)     Borrower shall cause Guarantor to furnish to Lender annually, within ninety (90) days following the end of each calendar year, an annual personal financial statement in a form acceptable to Lender in its reasonable discretion. Guarantor's annual personal financial statement shall be accompanied by a certificate from Guarantor stating (i) that each such annual personal financial statement presents fairly the financial condition of Guarantor being reported upon and has been prepared in accordance with GAAP (or such other accounting basis acceptable to Lender) and (ii) as of the date thereof, whether there exists an event or circumstance which constitutes a Default or Event of Default under the Loan Documents executed and delivered by, or applicable to, Guarantor, and if such Default or an Event of Default exists, the nature

thereof, the period of time it has existed and the action then being taken to remedy the same.

(d)     Borrower will furnish, or cause to be furnished, to Lender on or before forty-five (45) days after the end of each calendar month and on or before forty-five (45) days after the end of each calendar quarter, the following items, accompanied by an Officer's Certificate stating that such items are true, correct, accurate, and complete in all material respects and fairly present the financial condition and results of the operations of Borrower and the Property (subject to normal year-end adjustments) as applicable: (i) a rent roll for the subject month or quarter; (ii) monthly, quarterly and year-to-date operating statements (including Renovation Expenditures) prepared for each calendar month or quarter, as applicable, noting Net Operating Income, Gross Income from Operations, and Operating Expenses and, upon Lender's request, other information necessary and sufficient to fairly represent the financial position and results of operation of the Property during such calendar month or quarter, as applicable, and containing a comparison of budgeted income and expenses and the actual income and expenses together with a detailed explanation of any variances of (x) five percent (5%) or more between the budgeted amounts for the categories (A) management fees, (B) administration and leasing, (C) repairs and maintenance, (D) payroll and benefits, and (E) utilities, and (y) ten percent (10%) or more between the budgeted amounts for the Required Repairs set forth on Schedule IV and the Approved Renovation set forth on Schedule IX, from the actual amounts for such periods, all in form satisfactory to Lender; (ii) a Net Cash Flow Schedule, and (iii) a calculation reflecting the annual Debt Service Coverage Ratio as of the last day of such month or quarter, as applicable. In addition, such Officer's Certificate shall also state that the representations and warranties of Borrower set forth in <u>Section 4.1.32</u> are true and correct as of the date of such certificate and that there are no trade payables outstanding for more than ninety (90) days.

(e)     At or prior to the Closing Date, Borrower shall submit to Lender an Annual Budget for the current Fiscal Year, and for each Fiscal Year thereafter, Borrower shall submit to Lender an Annual Budget not later than sixty (60) days prior to the commencement of such Fiscal Year in form reasonably satisfactory to Lender. The Annual Budget shall be subject to Lender's approval (each such Annual Budget, an "***Approved Annual Budget***"). In the event that Lender objects to a proposed Annual Budget submitted by Borrower which requires the approval of Lender hereunder, Lender shall advise Borrower of such objections within fifteen (15) days after receipt thereof (and deliver to Borrower a reasonably detailed description of such objections) and Borrower shall promptly revise such Annual Budget and resubmit the same to Lender. Lender shall advise Borrower of any objections to such revised Annual Budget within ten (10) days after receipt thereof (and deliver to Borrower a reasonably detailed description of such objections) and Borrower shall promptly revise the same in accordance with the process described in this subsection until Lender approves the Annual Budget. Until such time that Lender approves a proposed Annual Budget which requires the approval of Lender hereunder, the most recently Approved Annual Budget shall apply; provided that, such Approved Annual Budget shall be adjusted to reflect actual increases in Taxes, Insurance Premiums and Other Charges.

(f)       In the event that Borrower must incur an extraordinary Operating Expense or Renovation Expenditure not set forth in the Approved Annual Budget (each an "***Extraordinary Expense***"), then Borrower shall promptly deliver to Lender a reasonably detailed explanation of such proposed Extraordinary Expense for Lender's approval.

(g)       Borrower shall furnish to Lender, within ten (10) Business Days after request (or as soon thereafter as may be reasonably possible), such further detailed information with respect to the operation of the Property and the financial affairs of Borrower as may be reasonably requested by Lender.

(h)       Any reports, statements or other information required to be delivered under this Agreement shall, to the extent available, be delivered in electronic form.

(i)       If Borrower fails to provide to Lender or its designee any of the financial statements, certificates, reports or information (the "***Required Records***") required by this Section 5.1.11 within the applicable time periods set forth in this Section 5.1.11, Borrower shall pay to Lender, at Lender's option and in its discretion, an amount equal to Five Thousand and No/100 Dollars ($5,000.00) for each Required Record that is not delivered within fifteen (15) days after written notice thereof.  In addition, if Borrower fails to deliver any Required Records to Lender within the applicable time periods set forth in this Section 5.1.11, Lender shall have the option, upon fifteen (15) days' notice to Borrower, to gain access to Borrower's books and records and prepare or have prepared at Borrower's expense, any Required Records not delivered by Borrower. In addition, it shall be an Event of Default if any of the following shall occur: (i) any failure of Borrower to provide to Lender any of the Required Records within the applicable time periods set forth in this Section 5.1.11, if such failure continues for fifteen (15) days after written notice thereof, or (ii) in the event any Required Records shall be materially inaccurate or false, or (iii) in the event of the failure of Borrower to permit Lender or its representatives to inspect said books, records and accounts upon request of Lender as required by this Section 5.1.11.

(j)       Borrower shall furnish to Lender, within five (5) Business Days after Lender's request (or as soon thereafter as may be reasonably possible), copies of third party reports and plans with respect to the Property (or any portion thereof) in the possession or control of Borrower or Manager.

5.1.12  Business and Operations.  Borrower will continue to engage in the businesses presently conducted by it as and to the extent the same are necessary for the ownership, maintenance, management and operation of the Property.  Borrower will qualify to do business and will remain in good standing under the laws of each jurisdiction as and to the extent the same are required for the ownership, maintenance, management and operation of the Property.

5.1.13  Title to the Property.  Borrower will warrant and defend (a) the title to the Property and every part thereof, subject only to Permitted Encumbrances, and (b) the

validity and priority of the Lien of the Security Instrument and the Assignment of Leases, subject only to Permitted Encumbrances, in each case against the claims of all Persons whomsoever. Borrower shall reimburse Lender for any losses, costs, damages or expenses (including reasonable attorneys' fees and expenses, and court costs) incurred by Lender if an interest in the Property, other than as permitted hereunder, is claimed by another Person.

            5.1.14    <u>Costs of Enforcement</u>.  In the event (a) that the Security Instrument is foreclosed in whole or in part or that the Security Instrument is put into the hands of an attorney for collection, suit, action or foreclosure, (b) of the foreclosure of any mortgage prior to or subsequent to the Security Instrument in which proceeding Lender is made a party, or (c) of a Bankruptcy Action related to Borrower, Guarantor, Sponsor or any Principal or an assignment by Borrower, Guarantor, Sponsor or any Principal for the benefit of its creditors, or (d) an Event of Default occurs and Lender exercises any of its remedies under the Loan Documents, Borrower, on behalf of itself and its successors and assigns, agrees that it/they shall be chargeable with and shall pay all costs of collection and defense, including attorneys' fees and expenses, and court costs, incurred by Lender or Borrower in connection therewith and in connection with any appellate proceeding or post-judgment action involved therein, together with all required service or use taxes.

            5.1.15    <u>Estoppel Statement</u>.

            (a)    After request by Lender, Borrower shall within ten (10) Business Days furnish Lender with an Officer's Certificate, duly acknowledged and certified, setting forth (i) the original principal amount of the Loan, (ii) the Outstanding Principal Balance, (iii) the then current Interest Rate of the Loan, (iv) the date installments of interest and/or principal were last paid, (v) any offsets or defenses to the performance of the Obligations, if any, and (vi) that the Note, this Agreement, the Security Instrument and the other Loan Documents are valid, legal and binding obligations of Borrower and have not been modified or if modified, giving particulars of such modification.

            (b)    Borrower shall deliver to Lender upon request, tenant estoppel certificates from any commercial Tenant leasing space at the Property in form and substance reasonably satisfactory to Lender provided that Borrower shall not be required to deliver such certificates more frequently than two (2) times in any calendar year.

            (c)    Borrower shall deliver to Lender, upon request, estoppel certificates from each party under the REA; provided that such certificates may be in the form required under the REA.

            5.1.16    <u>Loan Proceeds</u>.  Borrower shall use the proceeds of the Loan received by it on the Closing Date only for the purposes set forth in <u>Section 2.1.4</u>.

            5.1.17    <u>Performance by Borrower</u>.  Borrower shall in a timely manner observe, perform and fulfill each and every covenant, term and provision of each Loan Document executed and delivered by, or applicable to, Borrower and shall not enter into or otherwise suffer or permit any amendment, waiver, supplement, termination or other

modification of any Loan Document executed and delivered by, or applicable to, Borrower without the prior written consent of Lender.

5.1.18  <u>No Joint Assessment</u>.  Borrower shall not suffer, permit or initiate the joint assessment of the Property (a) with any other real property constituting a tax lot separate from the Property, and (b) which constitutes real property with any portion of the Property which may be deemed to constitute personal property, or any other procedure whereby the lien of any taxes which may be levied against such personal property shall be assessed or levied or charged to such real property portion of the Property.

5.1.19  <u>Leasing Matters</u>.  Any Major Lease executed after the date hereof shall require the prior written consent of Lender, which consent shall not, so long as no Event of Default is continuing, be unreasonably withheld (provided, that Lender may grant or withhold its approval in its sole discretion with respect to any Major Lease for which the Tenant is an Affiliate of Borrower).  Upon request, Borrower shall furnish Lender with true, correct and complete executed copies of all Leases, amendments thereof and any related agreements.  All renewals of Leases and all proposed Leases shall (i) provide for economic and material terms, including rental rates and lease lengths, at least comparable to existing local market rates and terms for similar properties, (ii) be to Tenants that are creditworthy in the reasonable judgment of Borrower, and (iii) be written substantially in accordance with the standard form of Lease which shall have been approved by Lender (subject only to commercially reasonable changes, made in the course of negotiations with the applicable Tenant, which are consistent with prudent property management practices for properties similar in size and quality to the Property).  Borrower (a) shall observe and timely perform the obligations imposed upon the lessor under the Leases in a commercially reasonable manner; (b) shall enforce and may amend, modify or terminate the terms, covenants and conditions contained in the Leases upon the part of the Tenant thereunder to be observed or performed in a commercially reasonable manner and in a manner not to impair the value of the Property involved, except that (1) Borrower, without the prior written consent of Lender, shall not terminate or accept the surrender by a Tenant of, any Major Lease unless by reason of a Tenant default and then only in a commercially reasonable manner to preserve and protect the Property; and (2) no such amendment, modification, termination or acceptance of the surrender of any Major Lease will be permitted without the prior written consent of Lender and, in the case of a termination or surrender, unless such termination or surrender is specifically provided for in the Major Lease; (c) shall not collect any of the Rents more than one (1) month in advance (other than security deposits required pursuant to such Lease); (d) shall not execute any other assignment of lessor's interest in the Leases or the Rents (except as contemplated by the Loan Documents); (e) shall not alter, modify or change the terms of the Major Leases in a manner inconsistent with the provisions of the Loan Documents; and (f) shall execute and deliver at the request of Lender all such further assurances, confirmations and assignments in connection with the Leases as Lender shall from time to time reasonably require.  Borrower shall, upon Lender's request after the occurrence and during the continuance of an Event of Default, if permitted by applicable Legal Requirements, cause all such security deposits (and any interest theretofore earned thereon) to be transferred to Lender.  Notwithstanding anything to the contrary contained herein, Borrower shall not enter into a Lease of all or substantially all of the Property (or a ground lease of any portion of the Property) without Lender's prior written consent.  Notwithstanding anything to the contrary contained herein, all new Major Leases and all amendments, modifications, extensions, and renewals of existing Leases with Tenants that are

Affiliates of Borrower shall be subject to the prior written consent of Lender.  Lender shall have the right to require each new Tenant under a Major Lease to execute and deliver to Lender a subordination, non-disturbance of possession and attornment agreement in form, content and manner of execution reasonably acceptable to Lender.  Borrower shall not permit or consent to any assignment or sublease of any Major Lease without Lender's prior written approval.  Borrower shall promptly notify Lender, in writing, of any defaults by any tenant or lease guarantor after Borrower becomes aware of the same.

5.1.20  <u>Alterations</u>.  Borrower shall obtain Lender's prior written consent to any alterations to any Improvements, which consent shall not be unreasonably withheld except with respect to any alterations to any Improvements which may have a material adverse effect on Borrower's financial condition, the value of the Property or the Net Operating Income.  Notwithstanding the foregoing, Lender's consent shall not be required in connection with any alterations that will not have a material adverse effect on Borrower's financial condition, the value of the Property or the Net Operating Income, provided that (a) (i) such alterations are either work performed pursuant to the terms of any Lease approved or deemed approved in accordance with the terms hereof or in preparation for leasing of vacant space, or the costs for such alterations are adequately covered in the current Approved Annual Budget, (ii) such alterations do not adversely affect any structural component of any Improvements, any utility or HVAC system contained in any Improvements or the exterior of any building constituting a part of any Improvements and (iii) the aggregate costs of any alteration do not exceed the lesser of one percent (1%) of the Outstanding Principal Balance or Three Hundred Thousand and No/100 Dollars ($300,000.00), or the cost of such alteration is included in the Annual Budget approved by Lender, or (b) such alterations are performed in connection with Restoration after the occurrence of a Casualty in accordance with the terms and provisions of this Agreement.  If the total unpaid amounts due and payable with respect to alterations to the Improvements at the Property (other than such amounts to be paid or reimbursed by Tenants under the Leases or which are, and to the extent, being funded from Reserve Funds) shall at any time exceed the lesser of one percent (1%) of the Outstanding Principal Balance or Three Hundred Thousand and No/100 Dollars ($300,000.00) (the "***Threshold Amount***"), Borrower shall promptly deliver to Lender as security for the payment of such amounts and as additional security for the Obligations any of the following:  (i) cash or U.S. Obligations or (ii) a Qualified Letter of Credit.  Such security shall be in an amount equal to the excess of the total unpaid amounts with respect to alterations to the Improvements on the Property (other than such amounts to be paid or reimbursed by Tenants under the Leases) over the Threshold Amount and Lender may apply such security from time to time at the option of Lender to pay for such alterations.

5.1.21  <u>Operation of Property</u>.

(a)  Borrower shall cause the Property to be operated, in all material respects, in accordance with the Management Agreement or Replacement Management Agreement, as applicable.  In the event that the Management Agreement expires or is terminated (without limiting any obligation of Borrower to obtain Lender's consent to any termination or modification of the Management Agreement in accordance with the terms and provisions of this Agreement), Borrower shall promptly enter into a Replacement Management Agreement with Manager or another Qualified Manager, as applicable, and execute and cause Manager or another Qualified Manager to execute an

assignment of management agreement in substantially the form of the Assignment of Management Agreement with respect to such Replacement Management Agreement.

(b)    Borrower shall:  (i) promptly perform and/or observe in all material respects all of the covenants and agreements required to be performed and observed by it under the Management Agreement and do all things necessary to preserve and to keep unimpaired its material rights thereunder; (ii) promptly notify Lender of any material default under the Management Agreement of which it is aware; (iii) promptly deliver to Lender a copy of each financial statement, business plan, capital expenditures plan, notice, report and estimate received by it under the Management Agreement; and (iv) enforce the performance and observance of all of the covenants and agreements required to be performed and/or observed by Manager under the Management Agreement, in a commercially reasonable manner.

(c)    If (i) the Debt Service Coverage Ratio, calculated as of the end of the most recently completed calendar quarter, is less than 1.25 to 1.0, (ii) an Event of Default occurs and is continuing, (iii) the Manager shall be the subject of a Bankruptcy Action or become insolvent, (iv) a material default occurs under the Management Agreement beyond any applicable grace and cure periods, (v) Manager shall commit any fraud or willful misconduct with respect to the operation and management of the Property or is grossly negligent or misappropriates any funds from the Property, or (vi) fifty percent (50%) or more of the direct or indirect ownership interest in Manager has changed or Control of Manager has changed, in each event from what it was on the Closing Date, Borrower shall, at the request of Lender, terminate the Management Agreement and replace the Manager with a manager approved by Lender on terms and conditions satisfactory to Lender, it being understood and agreed that (x) the management fee for such replacement manager shall not exceed then prevailing market rates (and in any event shall not exceed three percent (3%) of Gross Income from Operations per annum, from time to time) and (y) Lender shall not be liable for or obligated to pay any termination fee or other penalty in connection with such termination.

(d)    Borrower shall not amend, modify, terminate, or assign the Management Agreement in any respect without the prior written consent of Lender.

(e)    All Material Agreements shall be subject to the prior review and approval, not to be unreasonably withheld, of Lender, and Borrower shall not amend, modify, terminate, or assign any Material Agreement in any respect without the prior written consent of Lender.

5.1.22  After Acquired Property.  Borrower will grant to Lender a first Lien security interest in and to all equipment and other personal property owned by Borrower, whether or not used in the construction, maintenance and/or operation of the Improvements, immediately upon acquisition of same or any part of same.

5.1.23  Changes in the Legal Requirements Regarding Taxation.  If any Legal Requirement or other law, order, requirement or regulation of any Governmental Authority is enacted or adopted or amended after the date the Loan is funded which imposes a tax, either

directly or indirectly, on the Obligations (other than any such tax based on income to Lender resulting from the Obligations) or Lender's interest in the Property, Borrower must pay such tax, with interest and penalties thereon, if any. If Lender is advised by counsel chosen by it that the payment of such tax or interest and penalties by Borrower would be unlawful or taxable to Lender or unenforceable or provide the basis for a defense of usury, then in any such event, Lender may, by written notice to Borrower of not less than ninety (90) days, declare the Obligations immediately due and payable.

5.1.24 <u>No Credits on Account of the Obligations</u>. Borrower will not claim or demand or be entitled to any credit or credits on account of the Obligations for any payment of Taxes assessed against the Property and no deduction shall otherwise be made or claimed from the assessed value of the Property for real estate tax purposes because of the Loan Documents or the Obligations. If Legal Requirements or other laws, orders, requirements or regulations require such claim, credit or deduction, Lender may, by written notice to Borrower of not less than ninety (90) days, declare the Obligations immediately due and payable.

5.1.25 <u>Personal Property</u>. Borrower shall cause all of its personal property, fixtures, attachments and equipment delivered upon, attached to or used in connection with the operation of the Property to always be located at the Property and shall be kept free and clear of all Liens, encumbrances and security interests, except Permitted Encumbrances.

5.1.26 <u>Appraisals</u>. Lender shall have the right to obtain a new or updated appraisal of the Property from time to time, *provided*, *however*, that so long as no Event of Default has occurred Lender shall do so not more often than once in any twelve (12) month period. Borrower shall cooperate with Lender in this regard. If the appraisal is obtained to comply with this Agreement or any applicable law or regulatory requirement, or bank policy promulgated to comply therewith, or if an Event of Default exists, Borrower shall pay for any such appraisal upon Lender's request.

5.1.27 <u>REA</u>. The Borrower hereby covenants and agrees with Lender with respect to the REA as follows:

(a)    Borrower shall pay all charges and other sums to be paid by Borrower pursuant to the terms of the REA as the same shall become due and payable and prior to the expiration of any applicable grace period therein provided. After prior notice to Lender, Borrower, at its own cost and expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application in whole or in part of any charges required to be paid by Borrower pursuant to the REA; provided that (i) no Default or Event of Default has occurred and remains outstanding; (ii) Borrower is permitted to do so under the provisions of any mortgage or deed of trust superior in lien to the Security Instrument; (iii) such proceeding shall be permitted under and be conducted in accordance with the provisions of the REA and any other instrument to which Borrower is subject or by which the Property is bound and shall not constitute a default thereunder and such proceeding shall be conducted in accordance with all applicable Legal Requirements; (iv) neither the Property nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, cancelled or lost; (v) the REA will not be in danger of being

terminated; (vi) Borrower shall promptly upon final determination thereof pay the amount of any such charges, together with all interest and penalties which may be payable in connection therewith; (vii) such proceeding shall suspend the collection of such charges from Borrower and the Property; (viii) Borrower shall furnish such cash or other security as may be required in the proceeding or as may be required by Lender to ensure the payment of any such charges, together with all interest and penalties thereon; and (ix) such contest by Borrower is not in violation of any Lease.  Lender may pay over, assign or transfer any such security or part thereof to the claimant entitled thereto at any time when, in the reasonable judgment of Lender, the entitlement of such claimant is established or the Property (or any part thereof or interest therein) shall be in danger of being sold, forfeited, terminated, canceled or lost or there shall be any danger of the Lien of the Security Instrument being primed by any related Lien.

(b)       Borrower shall perform and observe all of the terms, covenants and conditions required to be performed and observed by Borrower pursuant to terms of the REA.

(c)       Borrower shall take all actions as may be necessary from time to time to preserve and maintain the REA in accordance with all applicable Legal Requirements.

(d)       Borrower shall enforce, in a commercially reasonably manner, the terms, covenants and conditions to be performed and observed by the parties to the REA (other than Borrower).

(e)       Borrower shall promptly furnish to Lender any notice of default or other communication delivered in connection with the REA by any party to the REA or any third party (other than routine correspondences and invoices).

(f)       If Lender or its nominee, designee, successor, or assignee acquires title and/or rights of Borrower under the REA by reason of foreclosure of the Security Instrument, deed in lieu of foreclosure or otherwise, Lender or such other party shall (i) succeed to all of the rights of and benefits accruing to Borrower under the REA, and (ii) be entitled to exercise all of the rights and benefits accruing to Borrower under the REA.  At such time as Lender shall request, Borrower agrees to execute and deliver to Lender such documents as Lender and its counsel may require in order to ensure that the provisions of this Section 5.1.27(f) will be validly and legally enforceable and effective against Borrower and all parties claiming by, through, under or against Borrower.

5.1.28 O&M Programs.  Borrower shall establish, implement and comply with those certain O&M Programs prepared by Lender's environmental consultant with respect to the Property, in form and substance reasonably acceptable to Lender, which programs shall address any asbestos-containing materials and/or water, moisture and mold that may now or in the future be detected at or on the Property.  Without limiting the generality of the preceding sentence, Lender may require (a) periodic notices or reports to Lender in form, substance and at such intervals as Lender may reasonably specify, (b) an amendment to such O&M Programs to address changing circumstances, laws or other matters, (c) at Borrower's sole expense,

supplemental examination of the Property by consultants reasonably specified by Lender to ensure compliance with the O&M Programs, (d) access to the Property by Lender, its agents or servicer at all reasonable times with advance written notice to Borrower subject to the rights of Tenants under Leases, to review and assess the environmental condition of the Property and Borrower's compliance with the O&M Programs, and (e) variation of the O&M Programs in response to the reports provided by any such consultants.  Borrower's failure to comply with the terms and provisions set forth in the O&M Programs shall be an Event of Default hereunder. Lender's requirement that Borrower comply with the O&M Programs shall not be deemed to constitute a waiver or modification of any of Borrower's covenants and agreements with respect to Hazardous Materials or Environmental Statutes.

       5.1.29  <u>Notices of Default</u>.  Borrower shall promptly advise Lender of any Material Adverse Change in Borrower's, Principal's, Sponsor or Guarantor's condition, financial or otherwise, or of the occurrence of any Default or Event of Default of which Borrower has knowledge.

       5.1.30  <u>Financing Statements</u>.  Borrower, at its sole cost and expense, shall at all times cause the Security Instrument and the Assignment of Leases, together with any UCC-1 financing statements required to be filed in connection therewith, to be recorded, registered or filed in the appropriate public records, and any amendments or supplements hereto and thereto, and, if requested by Lender, any instruments of assignment hereof or thereof, to be recorded, registered and filed, as applicable, and to be kept recorded, registered and filed, in such manner and in such places, shall pay all recording, registration and filing fees and taxes and other charges, including any recording, transfer or intangible personal property tax or similar imposition, with respect thereto, and shall comply with all applicable Legal Requirements in order fully and effectively to establish, preserve, perfect and protect Lender's first priority security interest in the Property and the Collateral, subject only to Permitted Encumbrances and the Liens created by the Loan Documents.   Borrower hereby authorizes Lender to file all such UCC-1 financing and continuation statements with respect to the Property and the Collateral.

       5.1.31  <u>Taxes on Security; Increased Costs</u>.  Borrower shall pay all taxes, charges, filing, registration and recording fees, excises and levies payable with respect to the Note or the Liens created or secured by the Loan Documents, other than income, franchise and doing business taxes imposed on Lender.  If there shall be enacted any law, or as a result of any change in existing law, or Lender's compliance therewith has the effect of, (i) deducting the Loan from the value of the Property for the purpose of taxation, (ii) affecting any Lien on the Property, (iii) changing existing laws of taxation of mortgages, deeds of trust, security deeds, or debts secured by real property, or changing the manner of collecting any such taxes, (iv) imposing any reserve, special deposit or similar requirements relating to any extensions of credit or other assets of, or any deposits with or other liabilities, of Lender or any Person Controlling Lender or (v) any other condition affecting loans to borrowers subject to LIBOR-based interest rates is imposed on Lender or any Person Controlling Lender and Lender determines that, by reason thereof, the cost to Lender or any Person Controlling Lender of making, maintaining or extending the Loan to Borrower is increased, or any amount receivable by Lender or any Person Controlling Lender hereunder in respect of any portion of the Loan to Borrower is reduced, Borrower shall promptly pay to Lender, on demand, all taxes, costs and charges for which Lender (or any Person Controlling Lender) is or may be liable as a result thereof or such

additional amount or amounts as will compensate Lender or any Person Controlling Lender for such increased costs to the extent Lender determines that such increased costs are allocable to the Loan; *provided*, *however*, that if such payment would be prohibited by law or would render the Loan usurious, then instead of collecting such payment, Lender may declare all amounts owing under the Loan Documents to be immediately due and payable, without premium or penalty.

Section 5.2    <u>Negative Covenants</u>.    From the date hereof until payment and performance in full of the Obligations, Borrower covenants and agrees with Lender that it will not do, directly or indirectly, any of the following:

5.2.1    <u>Operation of Property</u>.

(a)    Borrower shall not, without Lender's prior consent (which consent shall not be unreasonably withheld):  (i) surrender, terminate or cancel the Management Agreement; provided, that Borrower may, without Lender's consent, replace the Manager so long as the replacement manager is a Qualified Manager pursuant to a Replacement Management Agreement; (ii) reduce or consent to the reduction of the term of the Management Agreement; (iii) increase or consent to the increase of the amount of any charges or fees under the Management Agreement; or (iv) otherwise modify, change, supplement, alter or amend, or waive or release any of its rights and remedies under, the Management Agreement in any material respect.

(b)    Following the occurrence and during the continuance of an Event of Default, Borrower shall not exercise any rights, make any decisions, grant any approvals or otherwise take any action under the Management Agreement without the prior written consent of Lender, which consent may be granted, conditioned or withheld in Lender's discretion.

5.2.2    <u>Liens</u>.  Borrower shall not create, incur, assume or suffer to exist any Lien on any direct or indirect interest in Borrower or Principal or any portion of the Property or permit any such action to be taken, except for Permitted Encumbrances.

5.2.3    <u>Dissolution</u>.  While the Loan is outstanding, Borrower shall not (a) engage in any dissolution, liquidation, consolidation or merger with or into any other business entity, (b) engage in any business activity not related to the ownership and operation of the Property, (c) transfer, lease or sell, in one transaction or any combination of transactions, all or substantially all of the properties or assets of Borrower except to the extent permitted by the Loan Documents, (d) modify, amend, waive or terminate its organizational documents or its qualification and good standing in any jurisdiction, or (e) cause, permit or suffer Sponsor or Principal to (i) dissolve, wind up or liquidate or take any action, or omit to take any action, as a result of which Sponsor or Principal, as applicable, would be dissolved, wound up or liquidated in whole or in part, or (ii) amend, modify, waive or terminate the organizational documents of Principal, in each case, without obtaining the prior consent of Lender.

5.2.4    <u>Change in Business</u>.  Borrower shall not enter into any line of business other than the ownership and operation of the Property, or make any material change in

the scope or nature of its business objectives, purposes or operations, or undertake or participate in activities other than the continuance of its present business.

5.2.5    Debt Cancellation.  Borrower shall not cancel or otherwise forgive or release any claim or debt (other than termination or modification of Leases in accordance herewith) owed to Borrower by any Person, except for adequate consideration and in the ordinary course of Borrower's business.

5.2.6    Affiliate Transactions.  Borrower shall not enter into, or be a party to, any transaction with an Affiliate of Borrower or any of the partners, members or shareholders, as applicable, of Borrower except for the Management Agreement and other transactions undertaken in the ordinary course of business and on terms which are fully disclosed to Lender in advance and are no less favorable to Borrower or such Affiliate than would be obtained in a comparable arm's-length transaction with an unrelated third party.

5.2.7    Zoning.  Borrower shall not initiate or consent to any zoning reclassification of any portion of the Property or seek any variance under any existing zoning ordinance, or use or permit the use of any portion of the Property in any manner that could result in such use becoming a non-conforming use under any zoning ordinance or any other applicable land use law, rule or regulation, in each case, without the prior written consent of Lender.

5.2.8    Assets.  Borrower shall not purchase or own any property other than the Property and any property necessary for or incidental to the operation of the Property.

5.2.9    No Joint Assessment.  Borrower shall not suffer, permit or initiate the joint assessment of all or any portion of the Property with (a) any other real property constituting a tax lot separate from the Property, or (b) any portion of the Property which may be deemed to constitute personal property, or any other procedure whereby the Lien of any taxes which may be levied against such personal property shall be assessed or levied or charged to the Property.

5.2.10    Principal Place of Business and Organization.  Borrower shall not change its principal place of business set forth in the introductory paragraph of this Agreement without first giving Lender at least thirty (30) days prior notice.  Borrower shall not change the place of its organization as set forth in Section 4.1.30 hereof without the consent of Lender, which consent shall not be unreasonably withheld.  Borrower shall execute and deliver to Lender, prior to or contemporaneously with the effective date of any such change, any financing statement or financing statement change required by Lender to establish or maintain the validity, perfection and priority of the security interest granted herein or in any other Loan Document.  At the request of Lender, Borrower shall execute a certificate in form satisfactory to Lender listing the trade names under which Borrower intends to operate the Property, and representing and warranting that Borrower does business under no other trade name with respect to the Property.

5.2.11    ERISA.

(a)    Borrower shall not engage in any transaction which would cause any obligation, or action taken or to be taken, hereunder (or the exercise by Lender of any

of its rights under the Note, this Agreement or the other Loan Documents) to be a Prohibited Transaction.

(b)     Borrower further covenants and agrees to deliver to Lender such certifications or other evidence from time to time throughout the term of the Loan, as requested by Lender in its sole discretion, that (i) Borrower is not an "employee benefit plan" as defined in Section 3(3) of ERISA, which is subject to Title I of ERISA, or a "governmental plan" within the meaning of Section 3(32) of ERISA; (ii) Borrower is not subject to any state statute regulating investments of, or fiduciary obligations with respect to, governmental plans; and (iii) one or more of the following circumstances is true:

(i)     Equity interests in Borrower are publicly offered securities, within the meaning of 29 C.F.R. §2510.3-101(b)(2);

(ii)     Less than twenty-five percent (25%) of each outstanding class of equity interests in Borrower is held by "benefit plan investors" within the meaning of 29 C.F.R. §2510.3-101(f)(2);

(iii)     Borrower qualifies as an "operating company" or a "real estate operating company" within the meaning of 29 C.F.R. §2510.3-101(c) or (e); or

(iv)     The assets of Borrower are not otherwise "plan assets" of one or more "employee benefit plans" (as defined in Section 3(3) of ERISA) subject to Title I of ERISA, within the meaning of 29 C.F.R. §2510.3-101; or

(v)     The Loan meets the requirements of PTE 95-60, 90-1, 84-14 or similar exemption.

5.2.12   Transfers.

(a)     Borrower acknowledges that Lender has examined and relied on the experience of Borrower and its general partners, members, principals and (if Borrower is a trust) beneficial owners, as applicable, in owning and operating properties such as the Property in agreeing to make the Loan, and will continue to rely on Borrower's ownership of the Property as a means of maintaining the value of the Property as security for repayment of the Debt and the performance of the Other Obligations. Borrower acknowledges that Lender has a valid interest in maintaining the value of the Property so as to ensure that, should Borrower default in the repayment of the Debt or the performance of the Other Obligations contained in the Loan Documents, Lender can recover the Debt by a sale of the Property. Without the prior written consent of Lender and except to the extent otherwise set forth in this Section 5.2.12, Borrower shall not, and shall not permit any Restricted Party to, (i) sell, convey, mortgage, grant, bargain, encumber, pledge, assign, grant options with respect to, or otherwise transfer or dispose of (in each case, directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record) the Property or any part thereof or any legal or beneficial interest therein (including, without limitation, any conversion of the Property or any portion thereof to a condominium form of

ownership), or (ii) permit a Sale or Pledge of any interest in any Restricted Party (any of the actions in the foregoing clauses (i) or (ii), a "***Transfer***"), other than pursuant to Leases of space in the Improvements to Tenants in accordance with the provisions of Section 5.1.19 hereof.

(b)    A Transfer shall include, but not be limited to, (i) an installment sales agreement wherein Borrower agrees to sell the Property, or any part thereof, for a price to be paid in installments; (ii) an agreement by Borrower leasing all or substantially all of the Property, for other than actual occupancy by a space tenant thereunder, or a sale, assignment or other transfer of, or the grant of a security interest in, Borrower's right, title and interest in and to any Leases or any Rents; (iii) if a Restricted Party is a corporation, any merger, consolidation or Sale or Pledge of such corporation's stock or the creation or issuance of new stock; (iv) if a Restricted Party is a limited or general partnership or joint venture, any merger or consolidation or the change, removal, resignation or addition of a general partner or the Sale or Pledge of the partnership interest of any general partner or any profits or proceeds relating to such partnership interest, or the Sale or Pledge of limited partnership interests or any profits or proceeds relating to such limited partnership interest or the creation or issuance of new limited partnership interests; (v) if a Restricted Party is a limited liability company, any merger or consolidation or the change, removal, resignation or addition of a managing member or non-member manager (or if no managing member, any member) or the Sale or Pledge of the membership interest of a managing member (or if no managing member, any member) or any profits or proceeds relating to such membership interest, or the Sale or Pledge of non-managing membership interests or the creation or issuance of new non-managing membership interests; (vi) if a Restricted Party is a trust or nominee trust, any merger, consolidation or the Sale or Pledge of the legal or beneficial interest in a Restricted Party or the creation or issuance of new legal or beneficial interests; or (vii) the removal or the resignation of the Manager (including, without limitation, an Affiliated Manager) other than in accordance with Section 5.1.21 hereof.

(c)    Notwithstanding the provisions of this Section 5.2.12 (including without limitation the provisions of Section 5.2.12(d)) Lender's consent shall not be required in connection with one or a series of Transfers of: (i) any transfer, directly as a result of the death of a natural person, of stock, membership interests, partnership interests or other ownership interests previously held by the decedent in question to the Person or Persons lawfully entitled thereto; (ii) any transfer, directly as a result of the legal incapacity of a natural person, of stock, membership interests, partnership interests or other ownership interests previously held by such natural person to the Person or Persons lawfully entitled thereto; (iii) intentionally omitted; (iv) direct or indirect interests in Borrower among any Sponsor Controlled Parties; (v) not more than forty-nine percent (49%) of the direct or indirect managing member interests or non-managing membership interests (as the case may be) in Borrower; (vi) the sale, transfer or issuance of stock in any Restricted Party so long as such stock is listed on the New York Stock Exchange or another nationally recognized stock exchange; or (vii) direct or indirect interests in Borrower for estate planning purposes by Sponsor to the spouse, child, parent, grandparent, grandchild, niece, nephew, aunt or uncle of Sponsor, or to a trust for the benefit of Sponsor or for the benefit of the spouse, child, parent, grandparent, grandchild,

niece, nephew, aunt or uncle of Sponsor; *provided*, *however*, (A) no such Transfer shall result in the change of Control in Borrower such that Sponsor does not Control Borrower or Principal (if applicable); (B) (x) Sponsor shall own at least a fifty-one percent (51%) direct or indirect equity ownership interest in each of Borrower and Principal (if applicable) and (y) Sponsor shall (1) Control Borrower and Principal (if applicable) and (2) control the day-to-day operation of the Property; (C) (x) Lender shall receive written notice of any Transfers pursuant to clauses (i) and (ii) above within ten (10) days of such Transfer and (y) Lender shall receive not less than thirty (30) days' prior notice of such proposed Transfer pursuant to clauses (iv), (v) and (vii); (D) such Transfers shall be conditioned upon Borrower's ability to, after giving effect to the equity transfer in question, (x) remake the representations contained herein relating to Special Purpose Entity, ERISA, OFAC and USA Patriot Act matters (and, upon Lender's request, Borrower shall deliver to Lender (1) an Officer's Certificate containing such updated representations effective as of the date of the consummation of the applicable equity transfer and (2) searches, acceptable to Lender, for any Person owning, directly or indirectly, twenty percent (20%) or more of the interests in Borrower as a result of such Transfer) and (y) continue to comply with the covenants contained herein relating to Special Purpose Entity, ERISA OFAC and USA Patriot Act matters; and (E) no Transfer shall result in a Delaware Statutory Trust, tenancy-in-common, or "crowd funded" entity having a direct or indirect interest in Borrower.  Upon request from Lender, Borrower shall promptly provide Lender a revised version of the organizational chart delivered to Lender in connection with the Loan reflecting any equity transfer consummated in accordance with this <u>Section 5.2.12</u>.  Notwithstanding anything to the contrary contained in this Agreement, no Transfer of any direct ownership interests in Borrower shall be permitted without Lender's prior written consent, in its sole discretion.

(d)     Lender shall not be required to demonstrate any actual impairment of its security or any increased risk of default hereunder in order to declare the Debt immediately due and payable upon a Transfer without Lender's consent.  This provision shall apply to every Transfer regardless of whether voluntary or not, or whether or not Lender has consented to any previous Transfer.

5.2.13  <u>Embargoed Person; OFAC</u>.  As of the date hereof and at all times throughout the term of the Loan, including after giving effect to any Transfers permitted pursuant to the Loan Documents, (a) none of the funds or other assets of Borrower, Principal or Guarantor constitute property of, or are beneficially owned, directly or indirectly, by any Embargoed Person; (b) no Embargoed Person has any interest of any nature whatsoever in Borrower, Principal or Guarantor, as applicable, with the result that the investment in Borrower, Principal or Guarantor, as applicable (whether directly or indirectly), is prohibited by law or the Loan is in violation of law; and (c) none of the funds of Borrower, Principal or Guarantor, as applicable, have been derived from any unlawful activity with the result that the investment in Borrower, Principal or Guarantor, as applicable (whether directly or indirectly), is prohibited by law or the Loan is in violation of law.  Neither Borrower, Principal nor Guarantor is (or will be) a Person with whom Lender is restricted from doing business under OFAC regulations (including those persons named on OFAC's Specially Designated and Blocked Persons list) or under any statute, executive order (including the September 24, 2001 #13224 Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to

Commit, or Support Terrorism), or other governmental action and is not and shall not engage in any dealings or transactions or otherwise be associated with such Persons. In addition, to help the US Government fight the funding of terrorism and money laundering activities, The USA Patriot Act (and the regulations thereunder) requires the Lender to obtain, verify and record information that identifies its customers. Borrower shall provide the Lender with any additional information that the Lender deems necessary from time to time in order to ensure compliance with The USA Patriot Act and any other applicable Legal Requirements concerning money laundering and similar activities.

5.2.14 <u>REA</u>. Borrower shall not, without the prior written consent of Lender, amend, modify or terminate the REA.

(a) Borrower shall not, without Lender's prior consent, modify, amend or supplement, or consent to or suffer any modification, amendment, or supplementation of the REA.

(b) Borrower shall not, without Lender's prior consent, otherwise modify, change, supplement, alter or amend, or waive or release any of its rights and remedies under the REA.

(c) Borrower shall not take (and hereby assigns to Lender any right it may have to take) any action to surrender, terminate, cancel, or accept any surrender, termination or cancellation of the REA.

(d) Borrower shall not assign (other than to Lender) or encumber (other than in favor of Lender as security for the Obligations) any of its rights under the REA.

5.2.15 <u>Special Purpose Entity/Separateness</u>.

(a) Each of Borrower and Principal is and shall continue to be a Special Purpose Entity.

(b) Borrower will comply with and Principal has complied and Borrower will cause Principal to comply with, all of the assumptions made with respect to Borrower in the Insolvency Opinion or any non-consolidation opinion required to be delivered in connection with the Loan Documents subsequent to the Insolvency Opinion (an "***Additional Insolvency Opinion***"). Each entity other than Borrower and Principal with respect to which an assumption shall be made in any Additional Insolvency Opinion will comply with all of the assumptions made with respect to it in any Additional Insolvency Opinion.

5.2.16 <u>Federal Reserve Regulations</u>. Borrower shall not use the proceeds of the Loan to purchase or carry any Margin Stock (as defined in Regulation U of the Board of Governors of the Federal Reserve System) or to extend credit for the purpose of purchasing or carrying any Margin Stock or in any other way that would violate the provisions of Regulation T, U or X of the Board of Governors of the Federal Reserve System.

## ARTICLE VI

## INSURANCE; CASUALTY; CONDEMNATION

Section 6.1    Insurance.

(a)    Borrower, at its sole cost and expense, shall obtain and maintain, or cause to be maintained, insurance for Borrower and the Property providing at least the following coverages:

(i)    comprehensive "All Risk" or "Special Form" insurance on the Improvements and the Personal Property (A) in an amount equal to one hundred percent (100%) of the "*Full Replacement Cost*," which for purposes of this Agreement shall mean actual replacement value (exclusive of costs of excavations) with no waiver of depreciation; (B) containing an agreed amount endorsement with respect to the Improvements and Personal Property waiving all co-insurance provisions, or confirmation that co-insurance does not apply; (C) containing an "Ordinance or Law Coverage" or "Enforcement" endorsement if any of the Improvements or the use of the Property shall at any time constitute legal non-conforming structures or uses, and compensating for loss of value or property resulting from operation of law and the cost of demolition and the increased cost of construction in amounts as required by Lender; and (D) providing for no deductible in excess of Twenty-Five Thousand and No/100 Dollars ($25,000.00) or one percent (1%) of building value subject to a maximum of Two Hundred and Fifty Thousand and No/100 Dollars ($250,000.00) for all such insurance coverage, with exceptions for the perils of earthquake and windstorm subject to Lender's approval.  In addition, Borrower shall obtain: (y) if any portion of the Improvements is currently, or at any time in the future, located in a Federally designated "special flood hazard area", flood hazard insurance in an amount equal to the Full Replacement Cost or such other amount as Lender shall require, and (z) earthquake insurance in an amount equal to one and one-half times (1.5x) the probable maximum loss of the Property as determined by Lender in its discretion and in form and substance satisfactory to Lender in the event the Property is located in an area with a high degree of seismic activity, provided that the insurance pursuant to clauses (y) and (z) hereof shall be on terms consistent with the comprehensive "All Risk" or "Special Form" insurance policy required under this subsection (i);

(ii)    commercial general liability insurance, including a broad form comprehensive general liability endorsement and coverage against claims for personal injury, bodily injury, death or property damage occurring upon, in or about the Property, such insurance (A) to be on the so-called "occurrence" form with a combined limit of not less than Two Million and No/100 Dollars ($2,000,000.00) in the aggregate and One Million and No/100 Dollars ($1,000,000.00) per occurrence (and, if on a blanket policy, containing an "Aggregate Per Location" endorsement); (B) to continue at not less than the aforesaid limit until required to be changed by Lender in writing by reason of

changed economic conditions making such protection inadequate; (C) to cover at least the following hazards: (1) premises and operations; (2) products and completed operations on an "if any" basis; (3) independent contractors; (4) blanket contractual liability for all legal contracts; and (5) contractual liability covering the indemnities contained in Section 10.13(c) hereof and Article 8 of the Security Instrument to the extent the same is available; and (D) provides for no deductible in excess of Twenty-Five Thousand and No/100 Dollars ($25,000.00) for all such insurance coverage;

(iii)    rental loss and/or business income interruption insurance (A) with loss payable to Lender; (B) covering all risks required to be covered by the insurance provided for in subsection (i) above; (C) containing an extended period of indemnity endorsement which provides that after the physical loss to the Improvements and Personal Property has been repaired, the continued loss of income will be insured until such income either returns to the same level it was at prior to the loss, or the expiration of twelve (12) months from the date that the Property is repaired or replaced and operations are resumed, whichever first occurs, and notwithstanding that the policy may expire prior to the end of such period; and (D) for loss of Rents in an amount equal to one hundred percent (100%) of the projected Gross Income from Operations for a period of eighteen (18) months from the date of such Casualty (assuming such Casualty had not occurred) and notwithstanding that the policy may expire at the end of such period. If the property is a hotel owned by Borrower, business income coverage is required to reimburse for loss net profit, continuing expenses and necessary payroll, while the Property is under restoration. The amount of such loss of Rents or business income insurance shall be determined prior to the date hereof and at least once each year thereafter based on Borrower's reasonable estimate from the Property for the succeeding eighteen (18) month period. Notwithstanding anything to the contrary hereof, all proceeds payable to Lender pursuant to this subsection shall be held by Lender and shall be applied at Lender's discretion to (I) the Debt, or (II) Operating Expenses approved by Lender in its discretion; *provided*, *however*, that nothing herein contained shall be deemed to relieve Borrower of its obligations to pay the Debt, except to the extent such amounts are actually paid out of the proceeds of such business income insurance;

(iv)    at all times during which structural construction, repairs or alterations are being made with respect to the Improvements, and only if the Property coverage forms do not otherwise apply, (A) general and excess/umbrella liability insurance covering claims not covered by or under the terms or provisions of the commercial general and excess/umbrella liability insurance policies in subsections (ii) and (viii) herein; and (B) the insurance provided for in subsection (i) above written in a so-called builder's risk completed value form (1) on a non-reporting basis, (2) against all risks insured against pursuant to subsection (i) above, (3) including permission to occupy the Property, and (4) with an agreed amount endorsement waiving co-insurance provision, or confirmation that co-insurance does not apply;

-77-

(v)     worker's compensation insurance is required and must be purchased for the state where the Property(ies) is located. Employers Liability coverage in a minimum amount of Five Hundred Thousand and No/100 Dollars ($500,000.00) for each accident and One Hundred Thousand and No/100 Dollars ($100,000.00) each disease;

(vi)     comprehensive boiler and machinery insurance, if applicable, in amounts as shall be reasonably required by Lender on terms consistent with the commercial property insurance policy required under subsection (i) above;

(vii)     motor vehicle liability coverage for all owned (if applicable) and non-owned vehicles, including rented and leased vehicles containing minimum limits per occurrence of not less than One Million and No/100 Dollars ($1,000,000.00);

(viii)     umbrella or excess liability insurance in an amount not less than Two Million and No/100 Dollars ($2,000,000.00) per occurrence on terms consistent with the commercial general liability insurance policy required under subsection (ii) above; *provided*, *however*, no deductible in excess of Ten Thousand and No/100 ($10,000.00) for all such insurance coverage;

(ix)     if the Property is or becomes a legal "non-conforming" use, ordinance or law coverage to compensate for the cost of demolition and rebuilding of the undamaged portion of the Property along with any increased cost of construction in amounts as requested by Lender;

(x)     in the event the Property is located in any coastal region, windstorm insurance in an amount equal to one hundred percent (100%) of the Full Replacement Cost of the Property, with a deductible acceptable to Lender;

(xi)     if not already included in the property insurance required under Section 6.1(a)(i) and Section 6.1(a)(iii), windstorm insurance in an amount equal to one hundred percent (100%) of the Full Replacement Cost of the Property, with a deductible acceptable to Lender;

(xii)     Fidelity bond/insurance is required of the Management Agent in the amount equal to two months' gross income, but no less than Fifty Thousand and No/100 Dollars ($50,000.00). The lender must be named as an additional loss payee.

(xiii)     the commercial property business income, general liability and umbrella or excess liability insurance required under Section 6.1(a)(i), Section 6.1(a)(ii), Section 6.1(a)(iii) and Section 6.1(a)(viii)) above shall cover perils of terrorism and acts of terrorism and Borrower shall maintain commercial property and business income insurance for loss resulting from perils and acts of terrorism on terms (including amounts) consistent with those required under Section 6.1(a)(i), Section 6.1(a)(ii), Section 6.1(a)(iii) and Section 6.1(a)(viii)

above at all times during the term of the Loan so long as Lender determines that either (I) prudent owners of real estate comparable to the Property are maintaining same or (II) prudent institutional lenders (including, without limitation, investment banks) to such owners are requiring that such owners maintain such insurance; and

(xiv) upon sixty (60) days' notice, such other reasonable insurance and in such reasonable amounts as Lender from time to time may reasonably request against such other insurable hazards which at the time are commonly insured against for properties similar to the Property located in or around the region in which the Property is located.

(b)     All insurance provided for in this Section 6.1 shall be obtained under valid and enforceable policies (collectively, the "**_Policies_**" or in the singular, the "**_Policy_**"), and shall be subject to the approval of Lender as to insurance companies, amounts, deductibles, loss payees and insureds.  The Policies be issued by financially sound and responsible insurance companies authorized to do business in the State and having a claims paying ability rating of "A-: VI" or better by A.M. Best Company. Prior to the expiration dates of the Policies theretofore furnished to Lender, certificates of insurance evidencing the Policies accompanied by evidence satisfactory to Lender of payment of the premiums due thereunder (the "**_Insurance Premiums_**"), shall be delivered by Borrower to Lender.

(c)     Any blanket insurance Policy shall specifically allocate to the Property the amount of coverage from time to time required hereunder and shall otherwise provide the same protection as would a separate Policy insuring only the Property in compliance with the provisions of Section 6.1(a).

(d)     All Policies provided for or contemplated by Section 6.1(a) hereof, except for the Policy referenced in Section 6.1(a)(v) hereof, shall name Borrower as the insured and Lender (and its successors and assigns) as Mortgagee, Lender's Loss Payable and Additional Insured on a primary and non-contributory basis, as its interests may appear, and in the case of property damage, boiler and machinery, flood and earthquake insurance, shall contain a standard non-contributing mortgagee clause in favor of Lender providing that the loss thereunder shall be payable to Lender. All policies required within this Section 6.1 shall include a waiver of subrogation in favor of Lender.

(e)     All Policies provided for in this Section 6.1 shall contain clauses or endorsements to the effect that: (i) no act or negligence of Borrower, or anyone acting for Borrower, or of any Tenant or other occupant, or failure to comply with the provisions of any Policy, which might otherwise result in a forfeiture of the insurance or any part thereof, shall in any way affect the validity or enforceability of the insurance insofar as Lender is concerned; (ii) the Policies shall not be canceled without at least thirty (30) days' notice to Lender other than for cancellation for non-payment of the applicable insurance premium which will require at least ten (10) days' notice to Lender; (iii) Lender shall not be liable for any Insurance Premiums thereon or subject to any

assessments thereunder; and (iv) the issuers thereof shall give notice to Lender if the Policies have not been renewed thirty (30) days prior to its expiration.

(f)     If at any time Lender is not in receipt of written evidence that all Policies are in full force and effect, Lender shall have the right, without notice to Borrower, to take such action as Lender deems necessary to protect its interest in the Property, including, without limitation, the obtaining of such insurance coverage as Lender in its discretion deems appropriate.   All premiums incurred by Lender in connection with such action or in obtaining such insurance and keeping it in effect (including, without limitation, reasonable attorneys' fees) shall be paid by Borrower to Lender upon demand and, until paid, shall be secured by the Security Instrument and shall bear interest at the Default Rate.

(g)     In the event of foreclosure of the Security Instrument or other transfer of title to the Property in extinguishment in whole or in part of the Obligations, all right, title and interest of Borrower in and to the Policies that are not blanket Policies then in force concerning the Property and all proceeds payable thereunder shall thereupon vest in the purchaser at such foreclosure or Lender or other transferee in the event of such other transfer of title.

Section 6.2     Casualty.  If any Property shall be damaged or destroyed, in whole or in part, by fire or other casualty (a "*Casualty*"), Borrower shall (a) give prompt notice of such damage to Lender, and (b) promptly commence and diligently prosecute the completion of Restoration so that such Property resembles, as nearly as possible, the condition that Property was in immediately prior to such Casualty, with such alterations as may be reasonably approved by Lender and otherwise in accordance with Section 6.4.  Borrower shall pay all costs of such Restoration whether or not such costs are covered by insurance.  Lender may, but shall not be obligated to make proof of loss if not made promptly by Borrower.  In addition, Borrower shall permit Lender to participate in (and have approval rights over) any settlement discussions with any insurance companies with respect to any Casualty in which the Net Proceeds or the costs of completing Restoration are equal to the lesser of one percent (1%) of the Outstanding Principal Balance or Three Hundred Thousand and 00/100 Dollars ($300,000.00) and Borrower shall deliver to Lender all instruments required by Lender to permit such participation.  Any Insurance Proceeds in connection with any Casualty (whether or not Lender elects to settle and adjust the claim or Borrower settles such claim) shall be due and payable solely to Lender and held by Lender in accordance with the terms of this Agreement.  In the event Borrower or any party other than Lender is a payee on any check representing Insurance Proceeds with respect to any Casualty, Borrower shall immediately endorse, and cause all such third parties to endorse, such check payable to the order of Lender.  Borrower hereby irrevocably appoints Lender as its attorney-in-fact, coupled with an interest, to endorse any such check payable to the order of Lender.  The expenses incurred by Lender in the adjustment and collection of Insurance Proceeds shall become part of the Obligations, shall be secured by the Loan Documents and shall be reimbursed by Borrower to Lender upon demand.  Borrower hereby releases Lender from any and all liability with respect to the settlement and adjustment by Lender of any claims in respect of any Casualty.

Section 6.3    Condemnation.  Borrower shall promptly give Lender notice of the actual or threatened commencement of any proceeding in respect of Condemnation, and shall deliver to Lender copies of any and all papers served in connection with such proceedings. Lender may participate in any such proceedings, and Borrower shall from time to time deliver to Lender all instruments requested by Lender to permit such participation.  Borrower shall, at its expense, diligently prosecute any such proceedings, and shall consult with Lender, its attorneys and experts, and cooperate with them in the carrying on or defense of any such proceedings. Notwithstanding any taking by any public or quasi-public authority through Condemnation or otherwise (including, but not limited to, any transfer made in lieu of or in anticipation of the exercise of such taking), Borrower shall continue to perform the Obligations at the time and in the manner provided in this Agreement and the other Loan Documents and the Outstanding Principal Balance shall not be reduced until any Award shall have been actually received and applied by Lender, after the deduction of expenses of collection, to the reduction or discharge of the Obligations.  Lender shall not be limited to the interest paid on the Award by the applicable Governmental Authority but shall be entitled to receive out of the Award interest at the rate or rates provided herein or in the Note.  If any Property or any portion of any Property is taken by a Governmental Authority, Borrower shall promptly commence and diligently prosecute Restoration and otherwise comply with the provisions of Section 6.4.  If any Property or any portion of any Property is sold, through foreclosure or otherwise, prior to the receipt by Lender of the Award, Lender shall have the right, whether or not a deficiency judgment on the Note shall have been sought, recovered or denied, to receive the Award, or a portion thereof sufficient to pay the Debt.

Section 6.4    Restoration.  The following provisions shall apply in connection with any Restoration:

(a)    If the Net Proceeds shall be less than one percent (1%) of the Allocated Loan Amount for the affected Property and the costs of completing Restoration shall be less than one percent (1%) of the Allocated Loan Amount for the affected Property, the Net Proceeds will be disbursed by Lender to Borrower upon receipt, provided that all of the conditions set forth in Section 6.4(b)(i) are met and Borrower delivers to Lender a written undertaking to expeditiously commence and to satisfactorily complete with due diligence Restoration in accordance with the terms of this Agreement.

(b)    If the Net Proceeds are equal to or greater than one percent (1%) of the Allocated Loan Amount for the affected Property or the costs of completing the Restoration is equal to or greater than one percent (1%) of the Allocated Loan Amount for the affected Property, the Net Proceeds will be held by Lender and Lender shall make the Net Proceeds available for Restoration in accordance with the provisions of this Section 6.4.  The term "*Net Proceeds*" for purposes of this Section 6.4 shall mean:  (i) the net amount of all insurance proceeds received by Lender pursuant to Section 6.1(a)(i), Section 6.1(a)(iv), Section 6.1(a)(vi), Section 6.1(a)(ix) and Section 6.1(a)(x) as a result of such damage or destruction, after deduction of Lender's reasonable costs and expenses (including, but not limited to, reasonable counsel costs and fees), if any, in collecting same ("*Insurance Proceeds*"), or (ii) the net amount of the Award, after deduction of Lender's reasonable costs and expenses (including, but not limited to, reasonable counsel

costs and fees), if any, in collecting same ("**Condemnation Proceeds**"), whichever the case may be.

(i)        The Net Proceeds shall be made available to Borrower for Restoration upon the approval of Lender in its sole discretion that the following conditions are met:

(A)        no Default shall have occurred and be continuing;

(B)        (1) in the event the Net Proceeds are Insurance Proceeds and less than twenty-five percent (25%) of the total floor area of the Improvements on the Property has been damaged, destroyed or rendered unusable as a result of such Casualty, or (2) in the event the Net Proceeds are Condemnation Proceeds and less than ten percent (10%) of the land constituting the Property is taken, and such land is located along the perimeter or periphery of the Property, and no portion of the Improvements is located on such land;

(C)        Leases demising in the aggregate a percentage amount equal to or greater than ninety percent (90%) of the total rentable space in the Property which has been demised under executed and delivered Leases in effect as of the date of the occurrence of such Casualty or Condemnation, whichever the case may be, shall remain in full force and effect during and after the completion of Restoration, notwithstanding the occurrence of any such Casualty or Condemnation, whichever the case may be;

(D)        Borrower shall commence Restoration as soon as reasonably practicable (but in no event later than sixty (60) days after such Casualty or Condemnation, whichever the case may be, occurs) and shall diligently pursue the same to satisfactory completion;

(E)        Lender shall be satisfied that any operating deficits, including all scheduled payments of principal and interest under the Note, which will be incurred with respect to the affected Property as a result of the occurrence of any such Casualty or Condemnation, whichever the case may be, will be covered out of (1) the Net Proceeds, (2) the insurance coverage referred to in Section 6.1(a)(iii) hereof, if applicable, or (3) by other funds of Borrower;

(F)        Lender shall be satisfied that Restoration will be completed on or before the earliest to occur of (1) six (6) months prior to the Stated Maturity Date, (2) such time as may be required under all applicable Legal Requirements in order to repair and restore the Property to the condition it was in immediately prior to such Casualty or to as nearly as possible the condition it was in immediately prior to such

Condemnation, as applicable, or (3) the expiration of the insurance coverage referred to in Section 6.1(a)(iii) hereof;

(G)    the affected Property and the use thereof after Restoration will be in compliance with and permitted under all applicable Legal Requirements;

(H)    Restoration shall be done and completed by Borrower in an expeditious and diligent fashion and in material compliance with all applicable Legal Requirements;

(I)    such Casualty or Condemnation, as applicable, does not result in the loss of access to the affected Property or the related Improvements;

(J)    the Debt Service Coverage Ratio for the affected Property, after giving effect to Restoration and using the Allocated Loan Amount, shall be equal to or greater than 1.25 to 1.0;

(K)    the Loan to Value Ratio after giving effect to Restoration, shall be equal to or less than eighty percent (80%);

(L)    Borrower shall deliver, or cause to be delivered, to Lender a signed detailed budget approved in writing by Borrower's architect or engineer stating the entire cost of completing Restoration, which budget shall be acceptable to Lender; and

(M)    the Net Proceeds together with any cash or cash equivalent deposited by Borrower with Lender are sufficient in Lender's discretion to cover the cost of Restoration.

(ii)    The Net Proceeds shall be paid directly to Lender for deposit in an interest-bearing account (the "***Net Proceeds Account***") and, until disbursed in accordance with the provisions of this Section 6.4(b), shall constitute additional security for the Debt and the Other Obligations. The Net Proceeds shall be disbursed by Lender to, or as directed by, Borrower from time to time during the course of Restoration pursuant to a customary construction disbursement arrangement, upon receipt of evidence satisfactory to Lender that (A) all materials installed and work and labor performed (except to the extent that they are to be paid for out of the requested disbursement) in connection with Restoration during the period covered by the preceding disbursement, if any, have been paid for in full, and (B) there exist no stop orders, recorded mechanic's or construction liens or notices of intention to file same, or any other liens or encumbrances of any nature whatsoever pertaining to the Restoration work on the affected Property which have not either been fully bonded to the satisfaction of Lender and discharged of record or in the alternative fully insured to the satisfaction of Lender by the Title Company.

(iii)    All plans and specifications required in connection with Restoration shall be subject to prior review and acceptance in all respects by Lender and by an independent consulting engineer selected by Lender (the "*Casualty Consultant*").  Lender shall have the use of the plans and specifications and all permits, licenses and approvals required or obtained in connection with Restoration.  The identity of the contractors, subcontractors and materialmen engaged in Restoration, as well as the contracts under which they have been engaged, shall be subject to prior review and acceptance by Lender and the Casualty Consultant.  All costs and expenses incurred by Lender in connection with making the Net Proceeds available for Restoration including, without limitation, reasonable counsel fees and disbursements and the Casualty Consultant's fees, shall be paid by Borrower.

(iv)    In no event shall Lender be obligated to make disbursements of the Net Proceeds in excess of an amount equal to the costs actually incurred from time to time for work in place as part of Restoration, as certified by the Casualty Consultant, minus the Retention Amount.  The term "*Retention Amount*" shall mean, as to each contractor, subcontractor or materialman engaged in Restoration, an amount equal to ten percent (10%) of the costs actually incurred for work in place as part of Restoration, as certified by the Casualty Consultant, until Restoration has been completed.  The Retention Amount shall in no event, and notwithstanding anything to the contrary set forth above in this Section 6.4(b), be less than the amount actually held back by Borrower from contractors, subcontractors and materialmen engaged in Restoration.  The Retention Amount shall not be released until the Casualty Consultant certifies to Lender that Restoration has been completed in accordance with the provisions of this Section 6.4(b) and that all approvals necessary for the re-occupancy and use of the affected Property have been obtained from all appropriate Governmental Authorities, and Lender receives evidence satisfactory to Lender that the costs of Restoration have been paid in full or will be paid in full out of the Retention Amount; *provided*, *however*, that Lender will release the portion of the Retention Amount being held with respect to any contractor, subcontractor or materialman engaged in Restoration as of the date upon which the Casualty Consultant certifies to Lender that the contractor, subcontractor or materialman has satisfactorily completed all work and has supplied all materials in accordance with the provisions of the contractor's, subcontractor's or materialman's contract, the contractor, subcontractor or materialman delivers the lien waivers and evidence of payment in full of all sums due to the contractor, subcontractor or materialman as may be reasonably requested by Lender or by the Title Company issuing the Title Insurance Policy, and Lender receives an endorsement to the Title Insurance Policy insuring the continued priority of the lien of the related Security Instrument and evidence of payment of any premium payable for such endorsement.  If required by Lender, the release of any such portion of the Retention Amount shall be approved by the surety company, if any, which has issued a payment or performance bond with respect to the contractor, subcontractor or materialman.

(v)     Lender shall not be obligated to make disbursements of the Net Proceeds more frequently than once every calendar month.

(vi)     If at any time the Net Proceeds or the undisbursed balance thereof shall not, in the opinion of Lender in consultation with the Casualty Consultant, be sufficient to pay in full the balance of the costs which are estimated by the Casualty Consultant to be incurred in connection with the completion of Restoration, Borrower shall deposit the deficiency (the "***Net Proceeds Deficiency***") with Lender before any further disbursement of the Net Proceeds shall be made. The Net Proceeds Deficiency deposited with Lender shall be held by Lender and shall be disbursed for costs actually incurred in connection with Restoration on the same conditions applicable to the disbursement of the Net Proceeds, and until so disbursed pursuant to this Section 6.4(b) shall constitute additional security for the Debt and the Other Obligations.

(vii)     The excess, if any, of the Net Proceeds and the remaining balance, if any, of the Net Proceeds Deficiency deposited with Lender after the Casualty Consultant certifies to Lender that Restoration has been completed in accordance with the provisions of this Section 6.4(b), and the receipt by Lender of evidence satisfactory to Lender that all costs incurred in connection with Restoration have been paid in full, shall be remitted by Lender to Borrower, provided no Event of Default shall have occurred and shall be continuing.

(c)     If Net Proceeds are (i) equal to or greater than twenty percent (20%) of the original principal amount of the Loan, (ii) not required to be made available for Restoration (due to Borrower's inability to satisfy the conditions set forth in Section 6.4(b)(i) or otherwise), or (iii) to be returned to Borrower as excess Net Proceeds pursuant to Section 6.4(b)(vii), then in any such event all Net Proceeds may be retained and applied by Lender in accordance with Section 2.4.2 hereof toward reduction of the Outstanding Principal Balance whether or not then due and payable in such order, priority and proportions as Lender in its sole discretion shall deem proper, or, in the sole discretion of Lender, the same may be paid, either in whole or in part, to Borrower for such purposes as Lender shall approve, in its sole discretion. Yield Maintenance Premiums shall be payable by Borrower by reason of a Casualty or Condemnation.

(d)     In the event of foreclosure of the Security Instrument, or other transfer of title to the Property in extinguishment in whole or in part of the Debt all right, title and interest of Borrower in and to the Policies that are not blanket Policies then in force concerning the Property and all proceeds payable thereunder shall thereupon vest in the purchaser at such foreclosure or Lender or other transferee in the event of such other transfer of title.

(e)     Notwithstanding anything to the contrary contained herein, if in connection with a Casualty any insurance company makes a payment under a property insurance Policy that Borrower proposes be treated as business or rental interruption insurance, then, notwithstanding any designation (or lack of designation) by the insurance company as to the purpose of such payment, as between Lender and Borrower, such

payment shall not be treated as business or rental interruption Insurance Proceeds unless Borrower has demonstrated to Lender's satisfaction that the remaining Net Proceeds that have been received from the property insurance companies are sufficient to pay one hundred percent (100%) of the cost of the Restoration or, if such Net Proceeds are to be applied to repay the Obligations in accordance with the terms hereof, that such remaining Net Proceeds will be sufficient to satisfy the Obligations in full.

## ARTICLE VII

## RESERVE FUNDS

Section 7.1     Required Repair Funds and Approved Renovations.

7.1.1   Deposits.   Borrower shall perform the repairs at the Property as more particularly set forth on **Schedule IV** hereto (such repairs hereinafter collectively referred to as "***Required Repairs***").   Borrower shall complete (a) the Required Repairs for the Caribbean Isle Property and the Forest Park Property (together, the "***Florida Properties***") as set forth on **Schedule IV** in all material respects within ninety (90) days of the date hereof, and (b) the Required Repairs for the Coulter Landing Property, the Windtree Property and the Warwick Property (collectively, the "***Texas Properties***") as set forth on **Schedule IV** in all material respects within one hundred twenty (120) days of the date hereof provided that if a Required Repair cannot be completed within such ninety (90) day or one hundred twenty (120) day period as applicable, Borrower may have such additional time as is reasonably needed to complete such Required Repair, but in all events, all Required Repairs for the Florida Properties shall be completed within one hundred twenty (120) days of the date hereof and all Required Repairs for the Texas Properties shall be completed within one hundred fifty (150) days of the date hereof. In addition to the foregoing, Borrower shall commence all Required Repairs within thirty (30) days of the date hereof.   In addition to the foregoing, in the event there are weather-related delays causing delay in the completion of the Required Repairs, as determined by Lender in its sole, but reasonable discretion, Borrower shall have an addition thirty (30) days to complete the Required Repairs at the affected Property.   It shall be an Event of Default if (a) Borrower does not complete the Required Repairs as provided herein, or (b) Borrower does not satisfy each condition contained in Section 7.1.2 hereof.   Upon the occurrence of such an Event of Default, Lender, at its option, may withdraw all Required Repair Funds from the Required Repair Account and Lender may apply such funds either to completion of the Required Repairs or toward reduction of the Outstanding Principal Balance in such order, proportion and priority as Lender may determine in its sole discretion.   Lender's right to withdraw and apply Required Repair Funds shall be in addition to all other rights and remedies provided to Lender under this Agreement and the other Loan Documents.   On the Closing Date, Borrower shall deposit with Lender the Initial Required Repairs Deposit for payment of the cost of the Required Repairs. Amounts so deposited with Lender shall be held by Lender in accordance with Section 7.7 hereof.   Amounts so deposited shall be referred to as Borrower's "***Required Repair Funds***" and the account in which such amounts are held shall be referred to as Borrower's "***Required Repair Account***".

7.1.2   Release of Required Repair Funds.

(a)      Lender shall disburse to Borrower the Required Repair Funds from the Required Repair Account from time to time, at any time during the sixty (60) day period following the Closing Date for mobilization expenses, not more frequently than twice in any thirty (30) day period between the 60th and 120th day following the Closing Date and once in any thirty (30) day period thereafter, upon satisfaction by Borrower of each of the following conditions with respect to each disbursement:  (i) Borrower shall submit a written request for payment to Lender (with a copy to the Title Company) at least seven (7) Business Days prior to the date on which Borrower requests such payment be made, which request specifies the Required Repairs to be paid, (ii) on the date such request is received by Lender and on the date such payment is to be made, no Default or Event of Default shall exist and remain uncured, (iii) Lender shall have received an Officer's Certificate (A) stating that all Required Repairs to be funded by the requested disbursement have been completed in a good and workmanlike manner and in material accordance with all applicable Federal, state and local laws, rules and regulations, such Officer's Certificate to be accompanied by a copy of any license, permit or other approval by any Governmental Authority required to commence and/or complete the Required Repairs, (B) identifying each Person that supplied materials or labor in connection with the Required Repairs to be funded by the requested disbursement, and (C) stating that each such Person has been paid in full or will be paid in full upon such disbursement, for work completed and/or materials furnished to date, such Officer's Certificate to be accompanied by lien waivers or other evidence of payment satisfactory to Lender, (iv) Lender shall have received a title search indicating that the Property is free from all liens, claims and other encumbrances not previously approved by Lender, and (v) Lender shall have received such other evidence as Lender shall reasonably request that the Required Repairs to be funded by the requested disbursement have been completed and are paid for or will be paid upon such disbursement to Borrower. Notwithstanding the foregoing, requests for disbursements for mobilization expenses shall require satisfaction of only the following conditions: (i) Borrower shall submit a written request for payment to Lender (with a copy of the contract for which the mobilization request is being made) at least seven (7) Business Days prior to the date on which Borrower requests such payment to be made, (ii) on the date such request is received by Lender and on the date such payment is made, no Default or Event of Default shall exist and remain uncured, and (iii) Borrower delivers a partial lien waiver or subordination from the contractor to which the mobilization payment will be made. Lender shall not be required to make disbursements from the Required Repair Account unless such requested disbursement is in an amount greater than $5,000 (or a lesser amount if the total amount in the Required Repair Account is less than $5,000, in which case only one disbursement of the amount remaining in the account shall be made) and such disbursement shall be made only upon satisfaction of each condition contained in this Section 7.1.2. In addition, provided the Fee Payment Debt Yield has been equal to or greater than eight percent (8%) for the immediately preceding month, Borrower may request payment of Construction Management Fees for supervision of the Required Repairs that are the subject of a disbursement request under this Section 7.1.2, which amount shall be payable out of the Excess Cash Reserve Account (i) upon Borrower's satisfaction of the conditions contained in this Section 7.1.2 with respect to the related disbursement request and (ii) solely to the extent funds are available to pay same in the

Excess Cash Reserve Account (as determined by Lender in its sole discretion) and notwithstanding anything to the contrary contained in the foregoing, Borrower shall have the right to request disbursements of funds categorized as "contingency" in the budget for such Required Repairs for use in making construction deposits for materials and other construction mobilization costs without satisfaction of subsections (iii)(A) and (C) above.

(b)     Nothing in this <u>Section 7.1.2</u> shall (i) make Lender responsible for performing or completing any Required Repairs; (ii) require Lender to expend funds in addition to the Required Repairs Funds to complete any Required Repairs; (iii) obligate Lender to proceed with any Required Repairs; or (iv) obligate Lender to demand from Borrower additional sums to complete any Required Repairs.

(c)     Borrower shall permit Lender and Lender's agents and representatives (including Lender's engineer, architect or inspector) or third parties to enter onto any of the Property during normal business hours (subject to the rights of Tenants under their Leases) to inspect the progress of any Required Repairs and all materials being used in connection therewith and to examine all plans and shop drawings relating to such Required Repairs.     Borrower shall cause all contractors and subcontractors to cooperate with Lender or Lender's representatives or such other Persons described above in connection with inspections described in this <u>Section 7.1.2(c)</u>.

(d)     If a disbursement will exceed $50,000.00 (excluding disbursements made for mobilization costs out of the "contingency" in the budget for the Required Repairs), Lender may require an inspection of the Property at Borrower's expense prior to making a disbursement of Required Repairs Funds in order to verify completion of the Required Repairs for which reimbursement is sought.  Lender may require that such inspection be conducted by an appropriate independent qualified professional selected by Lender and may require a certificate of completion by an independent qualified professional architect acceptable to Lender prior to the disbursement of Required Repairs Funds.  Borrower shall pay (i) the expense of the inspection (not to exceed $1,500.00 for each Property inspection) as required hereunder, whether such inspection is conducted by Lender or by an independent qualified professional architect and (ii) a draw review fee in the amount of $1,250.00 per draw. Lender agrees that such inspections shall be conducted within fifteen (15) days of Borrower's request for a disbursement. Lender shall give Borrower at least forty-eight (48) hours' notice of any required inspection of the interior of units so that Borrower can inform Tenants of such inspections.

7.1.3   <u>Balance in Required Repair Account</u>.  The insufficiency of any balance in the Required Repair Account shall not relieve Borrower from its obligation to perform the Required Repairs in a good and workmanlike manner and in accordance with all Legal Requirements.

7.1.4   <u>Approved Renovations Completion Schedule</u>.  Borrower shall commence the Approved Renovations within sixty (60) days following the Closing Date, obtain all contracts for the Approved Renovations relating to any exterior work within six (6) months

following the Closing Date and complete the Approved Renovations within twelve (12) months following the Closing Date.

Section 7.2    Tax and Insurance Escrow.

7.2.1    Tax and Insurance Escrow Funds.  On the date hereof, Borrower shall deposit with Lender the Initial Tax Deposit on account of the Taxes next coming due and the Initial Insurance Premiums Deposit on account of the Insurance Premiums next coming due. Additionally, Borrower shall pay to Lender on each Payment Date (a) one-twelfth of the Taxes that Lender estimates will be payable during the next ensuing twelve (12) months in order to accumulate with Lender sufficient funds to pay all such Taxes at least thirty (30) days prior to their respective due dates (the "***Tax Monthly Deposit***"), and (b) one-twelfth of the Insurance Premiums that Lender estimates will be payable for the renewal of the coverage afforded by the Policies upon the expiration thereof in order to accumulate with Lender sufficient funds to pay all such Insurance Premiums at least thirty (30) days prior to the expiration of the Policies (the "***Insurance Premiums Monthly Deposit***") (the foregoing amounts so deposited with Lender are hereinafter called the "***Tax and Insurance Escrow Funds***" and the account in which such amounts are held shall be referred to as the "***Tax and Insurance Escrow Account***").

7.2.2    Disbursements from Tax and Insurance Escrow Funds.  Provided no Default or Event of Default has occurred and is continuing, Lender will apply the Tax and Insurance Escrow Funds to payments of Taxes and Insurance Premiums required to be made by Borrower hereunder and under the Security Instrument.  In making any payment relating to the Tax and Insurance Escrow Funds, Lender may do so according to any bill, statement or estimate procured from the appropriate public office (with respect to Taxes) or insurer or agent (with respect to Insurance Premiums), without inquiry into the accuracy of such bill, statement or estimate or into the validity of any tax, assessment, sale, forfeiture, tax lien or title or claim thereof.  If the amount of the Tax and Insurance Escrow Funds shall exceed the amounts due for Taxes and Insurance Premiums pursuant to Section 5.1.2 hereof, Lender shall, in its sole discretion, return any excess to Borrower or credit such excess against future payments to be made to the Tax and Insurance Escrow Funds.  Any amount remaining in the Tax and Insurance Escrow Account after the Debt has been paid in full shall be returned to Borrower.  If at any time Lender reasonably determines that the Tax and Insurance Escrow Funds are not or will not be sufficient to pay Taxes and Insurance Premiums by the due dates thereof, Lender shall notify Borrower of such determination and Borrower shall increase its monthly payments to Lender by the amount that Lender estimates is sufficient to make up the deficiency at least thirty (30) days prior to the due date of the Taxes and/or thirty (30) days prior to expiration of the Policies, as the case may be.

7.2.3    Balance in the Tax and Insurance Escrow Account.  The insufficiency of any funds on deposit in the Tax and Insurance Escrow Account shall not relieve Borrower from the obligation to make any payments of Taxes of Insurance Premiums as and when due pursuant to the terms of this Agreement and the other Loan Documents.

Section 7.3    Excess Cash Reserve Funds, Approved Renovation Expenses and Letter of Credit.

7.3.1   <u>Excess Cash Reserve Funds</u>.  All Excess Cash shall be collected by Lender and all such amounts shall be held by Lender as additional security for the Obligations (amounts so held shall be referred to as the "***Excess Cash Reserve Funds***" and the account to which such amounts are held shall hereinafter be referred to as the "***Excess Cash Reserve Account***").  Notwithstanding anything to the contrary in this Agreement or any of the other Loan Documents, (a) in the event that Borrower incurs any Extraordinary Expenses that are approved by Lender in accordance with <u>Section 5.1.11(f)</u>, upon Borrower's compliance with the requirements for disbursements under <u>Section 7.1.2(i)</u> and <u>(ii)</u> above and to the extent sufficient funds are available in the Excess Cash Reserve Account to pay same (as determined by Lender in its sole and absolute discretion), Lender shall disburse funds from the Excess Cash Reserve Account to pay such Extraordinary Expenses, (b) in the event that Borrower incurs Approved Renovation Expenditures, upon Borrower's compliance with the requirements for disbursements under Section 7.3.2 below and to the extent sufficient funds are available in the Excess Cash Reserve Account to pay same (as determined by Lender in its sole and absolute discretion), Lender shall disburse funds from the Excess Cash Reserve Account to pay such Approved Renovation Expenditures, and (c) Lender shall disburse funds from the Excess Cash Reserve Account to pay Construction Management Fees subject to, and in accordance with, the terms and provisions of Sections 7.1.2 and 7.3.2 relating to the payment of same.  Lender shall provide Borrower a monthly statement of amounts held by Lender in the Excess Cash Reserve Account.

7.3.2   <u>Approved Renovation Expenses</u>.  Lender shall make disbursements from the Excess Cash Reserve Funds for the cost of Approved Renovation Expenditures incurred by Borrower upon satisfaction by Borrower of each of the following conditions with respect to each such disbursement: (a) Borrower shall submit Lender's standard form of draw request for payment to Lender at least ten (10) Business Days prior to the date on which Borrower requests such payment be made, which request shall specify the Approved Renovation Expenditures to be paid and shall be accompanied by copies of paid invoices for the amounts requested; (b) on the date such request is received by Lender and on the date such payment is to be made, no Default or Event of Default shall exist and remain uncured; (c) Borrower shall commence the work relating to the Approved Renovation Expenditures within sixty (60) days after the date hereof; and (d) Lender shall have received (i) an Officer's Certificate from Borrower (A) stating that the items to be funded by the requested disbursement are Approved Renovation Expenditures, and a description thereof, (B) stating that all Approved Renovation Expenditures to be funded by the requested disbursement have been completed in a good and workmanlike manner and in material accordance with all applicable Legal Requirements, (C) identifying each Person that supplied materials or labor in connection with the Approved Renovation Expenditures to be funded by the requested disbursement, (D) stating that each such Person has been paid in full or will be paid in full upon such disbursement, (E) stating that the Approved Renovation Expenditures to be funded have not been the subject of a previous disbursement, (F) stating that all previous disbursements of Excess Cash Reserve Funds for Approved Renovation Expenditures have been used to pay the previously identified Approved Renovation Expenditures, and (G) stating that all outstanding trade payables relating to the Approved Renovation Expenditures (other than those to be paid from the requested disbursement) have been paid in full, (ii) a copy of any license, permit or other approval by any Governmental Authority required in connection with the Approved Renovation Expenditures and not previously delivered to Lender, (iii) if required by Lender for requests in excess of Ten Thousand and No/100 Dollars ($10,000.00) for a single item, lien waivers or other evidence of payment satisfactory to Lender and releases from all

parties furnishing materials and/or services in connection with the requested payment, (iv) at Lender's option, a title search for the Property indicating that the Property is free from all Liens, claims and other encumbrances not previously approved by Lender, and (v) such other evidence as Lender shall reasonably request to demonstrate that the Approved Renovation Expenditures to be funded by the requested disbursement have been completed and are paid for or will be paid upon such disbursement to Borrower.  In addition, provided the Fee Payment Debt Yield has been equal to or greater than eight percent (8%) for the immediately preceding month, Borrower may request payment of Construction Management Fees for supervision of the Approved Renovations that are the subject of a disbursement request under this Section 7.3.2, which amount shall be payable out of the Excess Cash Reserve Account (i) upon Borrower's satisfaction of the conditions contained in this Section 7.3.2 with respect to the related disbursement and (ii) solely to the extent funds are available to pay same in the Excess Cash Reserve Account (as determined by Lender in its sole discretion).

           7.3.3    <u>Cash Deposit, Letter of Credit and Securities</u>.    .   On the date hereof, Borrower shall deposit with Lender cash in the amount of $2,536,000.00 (the "***Collateral Cash***").  Within thirty (30) days of the date hereof, Borrower may at Borrower's election, deposit with Lender (i) a Qualified Letter of Credit in an amount not less than $2,536,000.00 (the "***Collateral Letter of Credit***") as additional security for the Loan and, except as provided below, Borrower shall maintain the Collateral Letter of Credit as a Qualified Letter of Credit at all times that any portion of the Debt remains outstanding and (ii) the securities described on <u>Schedule 7.3.3</u> in an amount not less than Three Million and 00/100 Dollars ($3,000,000.00) (the "***Collateral Securities***") as additional security for the Loan.  The Collateral Securities shall be held in a segregated account under the control of Lender, pursuant to documentation in form and substance acceptable to Lender in its sole and absolute discretion, including, without limitation, a securities account control agreement, and the cost of negotiating such documentation shall be payable by Borrower upon demand.  Within five (5) Business Days of the delivery of the Collateral Letter of Credit and the Collateral Securities to Lender and the execution of the account documentation described in the preceding sentence, Lender shall return the Collateral Cash to Borrower.  Lender may draw all or a portion of the Collateral Cash, the Collateral Letter of Credit or require the securities intermediary under the security account control agreement to sell the Collateral Securities upon the occurrence of any Default hereunder and may apply amounts either to remedy such Default or toward reduction of the Debt in such order, proportion and priority as Lender may determine in its sole discretion.  Upon Lender drawing on the Collateral Letter of Credit, Borrower shall, within five (5) Business Days, provide a replacement Collateral Letter of Credit in an amount not less than $2,536,000.00.  Notwithstanding the foregoing, in the event that in any month during which Borrower is undertaking the completion of the Approved Renovations, there are not sufficient funds to pay the Approved Renovation Expenditures incurred during such month, after taking into account any disbursements to pay same from the Excess Cash Reserve Account, then and in such event, upon Borrower's compliance with the requirements for disbursement under <u>Section 7.3.2</u> above, Lender shall draw upon the Collateral Letter of Credit in an amount not to exceed $250,000.00 in such month and apply such amounts to the payment of such Approved Renovation Expenditures.  Upon a draw of the Collateral Letter of Credit pursuant to the foregoing sentence, the amount of the Collateral Letter of Credit required to be maintained hereunder shall be reduced by the amount of such draw.

Section 7.4    <u>Intentionally Omitted</u>.

Section 7.5    <u>Intentionally Omitted</u>.

Section 7.6    <u>Reserve Funds, Generally</u>.

(a)    Borrower (i) hereby grants to Lender a first priority security interest in all of the Reserve Funds and any and all monies now or hereafter deposited in each Reserve Account as additional security for payment and performance of the Obligations and (ii) will take all actions necessary to maintain in favor of Lender a perfected first priority security interest in the Reserve Funds, including, without limitation, filing or authorizing Lender to file UCC-1 financing statements and continuations thereof.  Until expended or applied in accordance herewith, the Reserve Funds shall constitute additional security for the Obligations.

(b)    Upon the occurrence and during the continuance of an Event of Default, Lender may, in addition to any and all other rights and remedies available to Lender, apply any sums then present in any or all of the Reserve Accounts to the reduction of the Outstanding Principal Balance in any order in its sole discretion.

(c)    Borrower shall not further pledge, assign or grant any security interest in any Reserve Accounts or the monies deposited therein or permit any lien or encumbrance to attach thereto, or any levy to be made thereon, or any UCC-1 financing statements, except those naming Lender as the secured party, to be filed with respect thereto.

(d)    The Reserve Funds shall not constitute trust funds and may be commingled with other monies held by Lender.  No earnings or interest on the Reserve Funds shall be payable to Borrower.  Neither Lender nor any Servicer that at any time holds or maintains the Reserve Accounts shall have any obligation to keep or maintain such Reserve Accounts or any funds deposited therein in interest bearing accounts.  If Lender or any Servicer elects in its sole and absolute discretion to keep or maintain any Reserve Accounts or any funds deposited therein in an interest bearing account, all interest earned or accrued thereon shall be for the account of and be retained by Lender or any Servicer.  Neither Lender nor any Servicer shall be responsible, and neither Lender nor any Servicer shall have any liability, for any losses incurred on the investment of any Reserve Funds.

(e)    Borrower shall indemnify Lender and hold Lender harmless from and against any and all actions, suits, claims, demands, liabilities, losses, damages, obligations and costs and expenses (including litigation costs and reasonable attorney's fees and expenses) arising from or in any way connected with the Reserve Funds or the performance of the obligations for which the Reserve Funds were established.  Borrower shall assign to Lender all rights and claims Borrower may have against all Persons supplying labor, materials or other services which are to be paid from or secured by the Reserve Funds; *provided*, *however*, that Lender may not pursue any such right or claim unless an Event of Default has occurred and remains uncured.

Section 7.7    Disbursements, Generally.

7.7.1    Conditions Precedent to All Disbursements.    Notwithstanding anything to the contrary contained in this Agreement, Lender shall have no obligation to make a disbursement from a Reserve Account unless:

(a)    both immediately prior to the making of such disbursement and also after giving effect thereto, no Default or Event of Default shall have occurred and be continuing;

(b)    no Material Adverse Change with respect to the condition, financial or otherwise, business, operations, assets, liabilities or prospects of the Property, Borrower, Principal, Guarantor and/or Sponsor in the aggregate shall have occurred;

(c)    the representations and warranties made by Borrower and Guarantor in this Agreement, the Guaranty and other Loan Documents shall be true and correct on and as of the date of the making of such disbursement with the same force and effect as if made on and as of such date to the extent such representations and warranties are not matters which by their nature can no longer be true and correct as a result of the passage of time; and

(d)    all fees, costs and expenses payable to Lender, to the extent then due and payable, shall have been (or contemporaneously are being) paid in full.

## ARTICLE VIII

## DEFAULTS

Section 8.1    Event of Default.

(a)    Each of the following events shall constitute an event of default hereunder (an "***Event of Default***"):

(i)    if any portion of the Debt is not paid when due (including, without limitation, the failure of Borrower to repay the entire Outstanding Principal Balance in full on the Maturity Date), or if any payment required to be made hereunder is not made on the applicable Payment Date;

(ii)    if any of the Taxes or Other Charges are not paid when the same are due and payable (unless Lender is paying such Taxes pursuant to Section 7.2 hereof);

(iii)    if the Policies are not kept in full force and effect, or if copies of the certificates evidencing the Policies (or certified copies of the Policies if requested by Lender) are not delivered to Lender within thirty (30) days after written request therefor, which period may be extended upon request of Borrower, provided Borrower is diligently pursuing such certificates (or certified

copies of the Policies, as the case may be), such additional period not to exceed ninety (90) days;

(iv)    if Borrower Transfers or otherwise encumbers any portion of the Property or the Collateral in violation of the provisions of this Agreement, or Article VI of the Security Instrument or any Transfer is made in violation of the provisions of <u>Section 5.2.12</u> hereof;

(v)    if any certification, representation or warranty made by Borrower, Principal or Guarantor herein or in any other Loan Document, or in any report, certificate, financial statement or other instrument, agreement or document furnished to Lender shall have been false or misleading in any material respect as of the date the representation or warranty was made or deemed remade;

(vi)    if Borrower, Principal or Guarantor shall (i) make an assignment for the benefit of creditors or (ii) generally not be paying its debts as they become due;

(vii)    if a receiver, liquidator or trustee shall be appointed for Borrower or Principal, or if Borrower or Principal shall be adjudicated bankrupt or insolvent, or if any petition for bankruptcy, reorganization or arrangement pursuant to Federal bankruptcy law, or any similar Federal or state law, shall be filed by or against, consented to, or acquiesced in by, Borrower or Principal, or if any proceeding for the dissolution or liquidation of Borrower or Principal shall be instituted; *provided*, *however*, if such appointment, adjudication, petition or proceeding was involuntary and not consented to by Borrower or Principal, as applicable, upon the same not being discharged, stayed or dismissed within thirty (30) days following its filing;

(viii)    if Guarantor or any guarantor or indemnitor under any guaranty or indemnity issued in connection with the Loan shall make an assignment for the benefit of creditors or if a receiver, liquidator or trustee shall be appointed for Guarantor or any guarantor or indemnitor under any guarantee or indemnity issued in connection with the Loan or if Guarantor or such other guarantor or indemnitor shall be adjudicated a bankrupt or insolvent, or if any petition for bankruptcy, reorganization or arrangement pursuant to Federal bankruptcy law, or any similar Federal or state law, shall be filed by or against, consented to, or acquiesced in by, Guarantor or such other guarantor or indemnitor, or if any proceeding for the dissolution or liquidation of Guarantor or such other guarantor or indemnitor shall be instituted; *provided*, *however*, if such appointment, adjudication, petition or proceeding was involuntary and not consented to by Guarantor or such other guarantor or indemnitor, upon the same not being discharged, stayed or dismissed within thirty (30) days following its filing; provided, further, however, it shall be at Lender's option to determine whether any of the foregoing shall be an Event of Default;

(ix)     if Borrower or any Guarantor attempts to assign or assigns its rights under this Agreement or any of the other Loan Documents or any interest herein or therein in contravention of the Loan Documents;

(x)     if Borrower breaches any representation, warranty or covenant contained in <u>Section 4.1.32</u> or any of its respective negative covenants contained in <u>Section 5.2</u> hereof or any covenant contained in <u>Section 5.1.11</u> or <u>Article IX</u> hereof;

(xi)     except as expressly permitted herein, the alteration, improvement, demolition or removal of any of the Improvements without the prior consent of Lender;

(xii)     if Borrower ceases to continuously operate the Property or any material portion thereof as multifamily residential dwellings for any reason whatsoever (other than temporary cessation in connection with any repair or renovation thereof undertaken with the consent of Lender or otherwise in accordance with the provisions of this Agreement);

(xiii)     except as expressly permitted pursuant to the Loan Documents, if Borrower grants any, or any other Person grants any enforceable easement, covenant or restriction (other than the Permitted Encumbrances) over the Property;

(xiv)     with respect to any term, covenant or provision set forth herein which specifically contains a notice requirement or grace period, if Borrower shall be in default under such term, covenant or condition after the giving of such notice or the expiration of such grace period;

(xv)     if any of the assumptions contained in the Insolvency Opinion delivered to Lender in connection with the Loan, or in any Additional Insolvency Opinion delivered subsequent to the closing of the Loan, is or shall become untrue in any material respect unless such matter is cured in a timely manner;

(xvi)     if a material default has occurred and continues beyond any applicable cure period under the Management Agreement (or any Replacement Management Agreement) and if such default permits the Manager thereunder to terminate or cancel the Management Agreement (or any Replacement Management Agreement) and Borrower fails to comply with <u>Section 5.1.21</u> hereof;

(xvii)     any breach of the covenants contained in <u>Section 5.1.27</u> hereof and the same is not cured within ten (10) days after Borrower becomes aware of such breach;

(xviii)     the failure by Borrower or Sponsor to comply with the covenant set forth in <u>Section 5.1.31</u>;

(xix)    if Borrower or Guarantor shall continue to be in Default under any of the other terms, covenants or conditions of this Agreement not specified in subsections (i) to (xviii) above, or (xx) to (xxiii) below, for ten (10) days after notice to Borrower or Guarantor, as applicable, from Lender, in the case of any Default which can be cured by the payment of a sum of money, or for thirty (30) days after notice from Lender in the case of any other Default; *provided*, *however*, that if such non-monetary Default is susceptible of cure but cannot reasonably be cured within such thirty (30) day period and provided further that Borrower or Guarantor, as applicable, shall have commenced to cure such Default within such thirty (30) day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30) day period shall be extended for such time as is reasonably necessary for Borrower or Guarantor, as applicable, in the exercise of due diligence to cure such Default, such additional period not to exceed ninety (90) days;

(xx)    if (i) the Interest Rate Cap Agreement is terminated for any reason by Borrower or the Counterparty and Borrower does not, within ten (10) Business Days of such termination replace the Interest Rate Cap Agreement with a Replacement Interest Rate Cap Agreement, or (ii) the Counterparty defaults in the performance of its monetary obligations under the Interest Rate Cap Agreement or (iii) the Counterparty fails to comply with the requirements of Section 2.7(f) hereof and Borrower does not (A) replace the Interest Rate Cap Agreement with a Replacement Interest Rate Cap Agreement in accordance with Section 2.7 hereof, and (B) deliver to Lender, in form and substance reasonably satisfactory to Lender (x) a Replacement Assignment of Interest Rate Cap Agreement, (y) a recognition letter from the Acceptable Counterparty thereto acknowledging the assignment of the Replacement Interest Rate Cap Agreement and (z) any other opinions or documents required pursuant to Section 2.7 hereof;

(xxi)    if there shall be default under any of the other Loan Documents beyond any applicable cure periods contained in such documents, whether as to Borrower, Guarantor or the Property, or if any other such event shall occur or condition shall exist, if the effect of such default, event or condition is to accelerate the maturity of any portion of the Debt or to permit Lender to accelerate the maturity of all or any portion of the Debt in accordance with the Loan Documents;

(xxii)    if there shall be default under any REA beyond any applicable cure periods contained in such documents; or

(xxiii)    if (i) any Qualified Letter of Credit delivered hereunder is terminated for any reason by the issuing bank, Borrower or Guarantor, as applicable or (ii) the issuing bank defaults in the performance of its monetary obligations under any Qualified Letter of Credit, and Borrower does not, within five (5) Business Days replace same with a Qualified Letter of Credit that meets the requirements set forth in this Agreement.

(b)     Upon the occurrence of an Event of Default (other than an Event of Default described in clauses (vi), (vii) or (viii) above) and at any time thereafter, in addition to any other rights or remedies available to it pursuant to this Agreement and the other Loan Documents or at law or in equity, Lender may take such action, without notice or demand, that Lender deems advisable to protect and enforce its rights against Borrower and in and to the Property, including, without limitation, declaring the Obligations to be immediately due and payable, and Lender may enforce or avail itself of any or all rights or remedies provided in the Loan Documents against Borrower and the Property, including, without limitation, all rights or remedies available at law or in equity; and upon any Event of Default described in clauses (vi), (vii) or (viii) above, the Debt and all Other Obligations of Borrower hereunder and under the other Loan Documents shall immediately and automatically become due and payable, without notice or demand, and Borrower hereby expressly waives any such notice or demand, anything contained herein or in any other Loan Document to the contrary notwithstanding.

8.1.2   Remedies.

(a)     Upon the occurrence of an Event of Default, all or any one or more of the rights, powers, privileges and other remedies available to Lender against Borrower under this Agreement, or any of the other Loan Documents executed and delivered by, or applicable to, Borrower or at law or in equity may be exercised by Lender at any time and from time to time, whether or not all or any of the Debt shall be declared due and payable, and whether or not Lender shall have commenced any foreclosure proceeding or other action for the enforcement of its rights and remedies under any of the Loan Documents.  Any such actions taken by Lender shall be cumulative and concurrent and may be pursued independently, singularly, successively, together or otherwise, at such time and in such order as Lender may determine in its sole discretion, to the fullest extent permitted by law, without impairing or otherwise affecting the other rights and remedies of Lender permitted by law, equity or contract or as set forth herein or in the other Loan Documents.  Without limiting the generality of the foregoing, Borrower agrees that if an Event of Default is continuing (i) Lender shall not be subject to any "one action" or "election of remedies" law or rule, and (ii) all liens and other rights, remedies or privileges provided to Lender shall remain in full force and effect until Lender has exhausted all of its remedies against the Property and the Security Instrument has been foreclosed, sold and/or otherwise realized upon in satisfaction of the Debt or the Obligations have been paid in full.

(b)     With respect to Borrower and the Property, nothing contained herein or in any other Loan Document shall be construed as requiring Lender to resort to the Property for the satisfaction of any of the Debt in any preference or priority, and Lender may seek satisfaction out of the Property, or any part thereof, in its absolute discretion in respect of the Debt.  In addition, Lender shall have the right from time to time to partially foreclose the Security Instrument in any manner and for any amounts secured by the Security Instrument then due and payable as determined by Lender in its sole discretion, including, without limitation, the following circumstances:  (i) in the event Borrower defaults beyond any applicable grace period in the payment of one or more Monthly Debt Service Payment Amounts, Lender may foreclose the Security

Instrument to recover such delinquent payments or (ii) in the event Lender elects to accelerate less than the entire Outstanding Principal Balance, Lender may foreclose the Security Instrument to recover so much of the principal balance of the Loan as Lender may accelerate and such other sums secured by the Security Instrument as Lender may elect.  Notwithstanding one or more partial foreclosures, the Property shall remain subject to the Security Instrument to secure payment of sums secured by the Security Instrument and not previously recovered.

(c)     Lender shall have the right from time to time to sever the Note and the other Loan Documents into one or more separate notes, mortgages and other security documents (the "***Severed Loan Documents***") in such denominations as Lender shall determine in its sole discretion for purposes of evidencing and enforcing its rights and remedies provided hereunder.  Borrower shall execute and deliver to Lender from time to time, promptly after the request of Lender, a severance agreement and such other documents as Lender shall request in order to effect the severance described in the preceding sentence, all in form and substance reasonably satisfactory to Lender. Borrower hereby absolutely and irrevocably appoints Lender as its true and lawful attorney, coupled with an interest, in its name and stead to make and execute all documents necessary or desirable to effect the aforesaid severance, Borrower ratifying all that its said attorney shall do by virtue thereof; *provided*, *however*, Lender shall not make or execute any such documents under such power until three (3) days after notice has been given to Borrower by Lender of Lender's intent to exercise its rights under such power.  Borrower shall not be obligated to pay any costs or expenses incurred in connection with the preparation, execution, recording or filing of the Severed Loan Documents, and the Severed Loan Documents shall not contain any representations, warranties or covenants not contained in the Loan Documents and any such representations and warranties contained in the Severed Loan Documents will be given by Borrower only as of the Closing Date.

(d)     Lender shall have the right from time to time, subject to the provisions of applicable law to partially foreclose the Security Instrument in any manner and for any amounts secured by the Security Instrument then due and payable as determined by Lender in its sole discretion, including the following circumstances: (i) in the event Borrower defaults beyond any applicable grace period in the payment of one or more scheduled payments of principal and/or interest, Lender may foreclose the Security Instrument to recover such delinquent payments, or (ii) in the event Lender elects to accelerate less than the entire Outstanding Principal Balance, Lender may foreclose the Security Instrument to recover so much of the Debt as Lender may accelerate and such other sums secured by the Security Instrument as Lender may elect.  Notwithstanding one or more partial foreclosures, the Property shall remain subject to the Security Instrument to secure payment of sums secured by the Security Instrument and not previously recovered.

(e)     Any amounts recovered from the Property or any other collateral for the Loan after an Event of Default may be applied by Lender toward the payment of any interest and/or principal of the Loan and/or any other amounts due under the Loan

Documents in such order, priority and proportions as Lender in its sole discretion shall determine.

(f)    If an Event of Default exists, Lender may (directly or by its agents, employees, contractors, engineers, architects, nominees, attorneys or other representatives), but without any obligation to do so and without notice to Borrower and without releasing Borrower from any obligation hereunder, cure the Event of Default in such manner and to such extent as Lender may deem necessary to protect the security hereof.  Lender (and its agents, employees, contractors, engineers, architects, nominees, attorneys or other representatives) are authorized to enter upon the Property to cure such Event of Default, and Lender is authorized to appear in, defend, or bring any action or proceeding reasonably necessary to maintain, secure or otherwise protect the Property or the priority of the Lien granted by the Security Instrument.

(g)    Lender may appear in and defend any action or proceeding brought with respect to the Property and may bring any action or proceeding, in the name and on behalf of Borrower, which Lender, in its sole discretion, decides should be brought to protect its interest in the Property.  Lender shall, at its option, be subrogated to the Lien of any mortgage or other security instrument discharged in whole or in part by the Obligations, and any such subrogation rights shall constitute additional security for the payment of the Obligations.

(h)    As used in this Section 8.1.2, a "foreclosure" shall include, without limitation, a power of sale.

8.1.3    Remedies Cumulative; Waivers.  The rights, powers and remedies of Lender under this Agreement shall be cumulative and not exclusive of any other right, power or remedy which Lender may have against Borrower pursuant to this Agreement or the other Loan Documents, or existing at law or in equity or otherwise.  Lender's rights, powers and remedies may be pursued singularly, concurrently or otherwise, at such time and in such order as Lender may determine in Lender's sole discretion.  No delay or omission to exercise any remedy, right or power accruing upon an Event of Default shall impair any such remedy, right or power or shall be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient.  A waiver of one Default or Event of Default with respect to Borrower shall not be construed to be a waiver of any subsequent Default or Event of Default by Borrower or to impair any remedy, right or power consequent thereon.

## ARTICLE IX

## SPECIAL PROVISIONS

Section 9.1    Transfer of Loan.  Lender may, at any time, (i) sell, transfer, pledge, encumber, assign or otherwise dispose of all or any portion of the Loan, this Agreement, the Note, the Security Instrument and the other Loan Documents, and any or all servicing rights with respect thereto, (ii) grant participations in the Loan or (iii) syndicate or all or any portion of the Loan.  Lender may forward to each purchaser, transferee, pledgee, assignee, servicer,

participant or investor in such participations or securities (collectively, the "*Investor*"), each prospective Investor, any Rating Agency rating such securities, and any organization maintaining databases on the underwriting and performance of commercial mortgage loans, all documents and information which Lender now has or may hereafter acquire relating to the Loan or to Borrower, Sponsor, Guarantor or the Property, whether furnished by Borrower, any Guarantor or otherwise, as Lender determines necessary or desirable in its sole discretion, including, without limitation, financial statements relating to Borrower, Guarantor or the Property.  Borrower irrevocably waives any and all rights it may have under law or in equity to prohibit a disclosure made in compliance with this Section 9.1, including but not limited to any right of privacy.

Section 9.2    Cooperation.    Borrower, Guarantor and Principal agree to cooperate with Lender (and agree to cause their respective officers and representatives to cooperate) in connection with any transfer made pursuant to this Article IX, including, without limitation, the taking, or refraining from taking, of such action as may be necessary to satisfy all of the conditions of any Investor, the delivery of a commercially reasonable estoppel certificate required in accordance with Section 5.1.15 hereof and such other documents as may be reasonably requested by Lender (including, without limitation, updated financial statements, budgets, third party reports, and new or updated opinions of counsel), and the execution of amendments to this Agreement, the Note, the Security Instrument and other Loan Documents and Borrower's organizational documents as reasonably requested by Lender; provided that the reasonable costs incurred for such cooperation (including Borrower's reasonable attorneys' fees) shall be paid by Lender (from Lender's funds and not from Excess Cash Reserve Funds) and no changes to the Loan Documents or Borrower's organizational documents shall be required which are adverse to Borrower's interests, as determined by Borrower in its reasonable discretion.

Section 9.3    Servicer.    At the option of Lender, the Loan may be serviced by a master servicer, primary servicer and/or special servicer (any such master servicer, primary servicer, and/or special servicer, together with its agents, nominees or designees, are collectively referred to as "*Servicer*") selected by Lender and Lender may delegate all or any portion of its responsibilities under this Agreement and the other Loan Documents to Servicer pursuant to a servicing agreement, special servicing agreement or other agreement providing for the servicing of one or more mortgage loans (collectively, the "*Servicing Agreement*") between Lender and Servicer, upon written notice to Borrower.  Following an Event of Default, Borrower shall be responsible for any reasonable set up fees or any other initial costs relating to or arising under the Servicing Agreement, but Borrower shall not be responsible for payment of the regular monthly servicing fee due to Servicer under the Servicing Agreement (except to the extent the same is included in the Loan Administration Fee payable by the Borrower under Section 2.3.8 hereof) or any fees or expenses required to be borne by, and not reimbursable to, Servicer. Notwithstanding the foregoing, Borrower shall promptly reimburse Lender on written demand for (a) interest payable on advances made by Servicer with respect to delinquent debt service payments (to the extent interest at the Default Rate actually paid by Borrower in respect of such payments are insufficient to pay the same) or expenses paid by Servicer or trustee in respect of the protection and preservation of the Property (including, without limitation, on account of Basic Carrying Costs), (b) all costs and expenses, liquidation fees, workout fees, special servicing fees, operating advisor fees or any other similar fees payable by Lender to Servicer which may be due and payable under the Servicing Agreement (whether on a periodic or a continuing basis) as a result of an Event of Default under the Loan, the Loan becoming specially

serviced, the commencement or continuance of any enforcement action of any kind with respect to the Loan or any of the Loan Documents, a refinancing or a restructuring of the credit arrangements provided under this Agreement in the nature of a "work-out" of the Loan Documents, or any Bankruptcy Action involving Borrower, Principal, Guarantor or any of their respective principals or Affiliates, (c) all costs and expenses of any Property inspections and/or appraisals (or any updates to any existing inspection or appraisal) that Servicer or the trustee may be required to obtain (other than the cost of regular annual inspections required to be borne by Servicer under the Servicing Agreement), and (d) all costs and expenses relating to or arising from any special requests made by Borrower or Guarantor during the term of the Loan including, without limitation, in connection with a prepayment, defeasance, assumption or modification of the Loan.

Section 9.4    Restructuring of Loan.

(a)    Lender, without in any way limiting Lender's other rights hereunder, in its sole and absolute discretion and at its sole cost, shall have the right at any time to require Borrower to restructure the Loan into additional multiple notes (which may include component notes, pari passu notes and/or senior and junior notes), to re-allocate principal among component notes and/or senior and junior notes and/or to create participation interests in the Loan, which restructuring may include the restructuring of a portion of the Loan into a mezzanine loan; provided that (i) the total principal amounts of the Loan (including any component, pari passu and/or senior and junior notes) and any newly structured mezzanine loan shall equal the total principal amount of the Loan immediately prior to the restructuring, and (ii) except in the case of an Event of Default, Casualty or Condemnation, the weighted average interest rate of the Loan and any newly structured mezzanine loan shall, in the aggregate, equal the Interest Rate.

(b)    Borrower, at the sole cost and expense of Lender, shall and shall cause Sponsor and Guarantor to cooperate with all reasonable requests of Lender in order to restructure the Note, and/or the Loan, if applicable, and shall, upon ten (10) Business Days written notice from Lender, which notice shall include the forms of documents for which Lender is requesting execution and delivery, (i) execute and deliver such documents, including, without limitation, to evidence the severance of this Agreement, the Security Instrument and the other Loan Documents, together with any new mezzanine loan documents, any amendments to Borrower's or Principal's organizational documents, or any organizational documents for any newly created borrower entities required in connection with a mezzanine loan and (ii) cause Borrower's counsel to deliver such legal opinions, all in form and substance reasonably satisfactory to Lender; *provided, however*, any such documents required by Lender shall not result in any economic or other Material Adverse Change in the transaction contemplated by this Agreement or the other Loan Documents.

(c)    In the event Borrower fails to execute and deliver such documents described in this Section 9.4 to Lender within ten (10) Business Days following such written notice by Lender, and Lender sends a second notice to Borrower with respect to the delivery of such documents containing a legend clearly marked in not less than

fourteen (14) point bold face type, underlined, in all capital letters "POWER OF ATTORNEY IN FAVOR OF LENDER DEEMED EFFECTIVE FOR EXECUTION AND DELIVERY OF DOCUMENTS IF NO RESPONSE WITHIN TEN BUSINESS DAYS", Borrower hereby absolutely and irrevocably appoints Lender as its true and lawful attorney, coupled with an interest, in its name and stead to make and execute all documents necessary or desirable to effect such transactions, Borrower ratifying all that such attorney shall do by virtue thereof, if Borrower fails to execute and deliver such documents within ten (10) Business Days of receipt of such second notice.  It shall be an Event of Default if Borrower fails to comply with any of the terms, covenants or conditions of this Section 9.4 after the expiration of ten (10) Business Days after the second notice thereof.

Section 9.5    Release of Property.

9.5.1    Release of Property.  Upon request by Borrower in connection with a HUD Refinance, Lender shall, upon the written request and at the expense of Borrower, upon payment in full that portion of the Debt allocable to the Property being released in accordance with Section 2.4 hereof and this Section 9.5, release or, if requested by Borrower, assign to Borrower's designee (without any representation or warranty by and without any recourse against Lender whatsoever) the Lien of the Loan Documents to the extent not theretofore released.

9.5.2    Partial Release of Release Property.  Subject to and in accordance with the terms and conditions set forth in Section 2.4 and this Section 9.5.2, Borrower may from time to time request that Lender release a Release Property from the Lien of the applicable Security Instrument (each such release, a "***Release Property Partial Release***") upon the satisfaction of all of the following conditions (such satisfaction and all calculations to be determined and/or made by Lender in its reasonable discretion):

(a)    Lender shall have received from Borrower at least thirty (30) but not more than ninety (90) days prior written notice requesting such a Release Property Partial Release on the Release Date specified in such written notice; such notice shall specify which Release Property shall be the subject of such Release Property Partial Release;

(b)    No Default or Event of Default shall have occurred and be continuing as of the date such noticed is received by Lender and as of the specified Release Date;

(c)    In connection with any prepayment made pursuant to Section 2.4.1, Borrower shall include an amount equal to the Yield Maintenance Premium applicable to the portion of the Outstanding Principal Balance being prepaid. To the extent that the Loan is repaid with the proceeds of  a mortgage loan from Walker & Dunlop Commercial Property Funding, LLC, the Exit Fee that would otherwise be payable with respect to such repayment shall be waived;

(d)    After giving effect to such Release Property Partial Release, including, without limitation, the application by Lender of the Release Amount to the Debt:

(i)    no Event of Default would exist as a result of such Release Property Partial Release;

(ii)    the Debt Service Coverage Ratio shall be equal to or greater than 1.30 to 1.00 following such Release Property Partial Release;

(iii)    the Loan to Value Ratio shall not exceed 70.0% following such Release Property Partial Release;

(iv)    the Debt Yield shall be equal to or greater than 9.0% following such Release Property Partial Release; and

(v)    All Subaccounts shall be fully funded in accordance with this Agreement.

(e)    Lender shall have received from Borrower an amount in connection with such Release Property Partial Release that is equal to the sum of: (a) one hundred fifteen percent (115%) of the Allocated Loan Amount for such Release Property and (b) without duplication of clause (c) above, the amount, if any, required to be prepaid to satisfy Section 2.4 hereof (the sum of (a) and (b), the "***Release Amount***"), (ii) all other amounts required under Section 2.4 hereof, if any, and (iii) reimbursement or payment of all costs and expenses incurred by Lender (including, without limitation, appraisal and title costs, reasonable attorney's fees and disbursements, servicing fees and rating agency fees) in connection with such Release Property Partial Release;

(f)    Lender shall have received from Borrower financial information relating to the Borrower and the Properties as reasonably requested by Lender, including statements of Net Operating Income, together with an Officers' Certificate certifying that (i) such information, statements and calculations are materially true, correct and accurate and complete and fairly present the financial condition and results of operations of Borrower and each of the Properties, and (ii) all conditions precedent to such Release Property Partial Release have been satisfied;

(g)    Borrower, at its sole cost and expense, shall have delivered to Lender one or more endorsements to the Title Insurance Policy insuring that, after giving effect to such Release Property Partial Release, (1) the Lien created by the Security Instruments and insured under the Title Insurance Policy is a first priority lien on the Remaining Property subject only to the Permitted Encumbrances, and (2) the Title Insurance Policy is in full force and effect showing no new encumbrances that were not otherwise approved by Lender and other similar materials as Lender may deem reasonably necessary at the time of such Release Property Partial Release;

(h)     Borrower shall deliver to Lender new appraisals of the Release Property and the Remaining Property, acceptable to Lender in its sole and absolute discretion;

(i)     No Release Property Partial Release granted by Lender shall, in any way, impair or affect the lien or priority of the Security Instruments relating to the Remaining Property;

(j)     Borrower shall have delivered to Lender such other instruments, legal opinions, certificates and other documents as Lender may reasonably request; and

(k)     Except as otherwise provided, all agreements, instruments and other documentation to be delivered to Lender pursuant to this Section 9.5.2 shall be in form and substance reasonably satisfactory to Lender.

## ARTICLE X

## MISCELLANEOUS

Section 10.1     Survival.     This Agreement and all covenants, agreements, representations and warranties made herein and in the certificates delivered pursuant hereto shall survive the making by Lender of the Loan and the execution and delivery to Lender of the Note, and shall continue in full force and effect so long as all or any of the Obligations are outstanding and unpaid unless a longer period is expressly set forth herein or in the other Loan Documents. Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the legal representatives, successors and assigns of such party.  All covenants, promises and agreements in this Agreement, by or on behalf of Borrower, shall inure to the benefit of the legal representatives, successors and assigns of Lender.

Section 10.2     Lender's Discretion.     Whenever pursuant to this Agreement, Lender exercises any right given to it to approve or disapprove, or any arrangement or term is to be satisfactory to Lender, the decision of Lender to approve or disapprove or to decide whether arrangements or terms are satisfactory or not satisfactory shall (except as is otherwise specifically herein provided) be in the sole discretion of Lender and shall be final and conclusive.

Section 10.3     Governing Law.

(a)     **THIS AGREEMENT WAS NEGOTIATED IN THE STATE OF NEW YORK, THE LOAN WAS MADE BY LENDER AND ACCEPTED BY BORROWER IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE LOAN DELIVERED PURSUANT HERETO WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS AND THE OBLIGATIONS ARISING HEREUNDER AND**

THEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA, EXCEPT THAT AT ALL TIMES THE PROVISIONS FOR THE ATTACHMENT, CREATION, PERFECTION, AND ENFORCEMENT OF THE LIENS AND SECURITY INTERESTS CREATED PURSUANT HERETO AND PURSUANT TO THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED ACCORDING TO THE LAW OF THE STATE IN WHICH THE PROPERTY IS LOCATED, IT BEING UNDERSTOOD THAT, TO THE FULLEST EXTENT PERMITTED BY THE LAW OF SUCH STATE, THE LAW OF THE STATE OF NEW YORK SHALL GOVERN THE CONSTRUCTION, VALIDITY AND ENFORCEABILITY OF ALL LOAN DOCUMENTS AND ALL OF THE OBLIGATIONS ARISING HEREUNDER OR THEREUNDER.   TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT, THE NOTE AND/OR THE OTHER LOAN DOCUMENTS, AND THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

(b)     ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER OR BORROWER ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS MAY AT LENDER'S OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE COUNTY OF NEW YORK, STATE OF NEW YORK, PURSUANT TO SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW AND BORROWER WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND BORROWER HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING. BORROWER DOES HEREBY DESIGNATE AND APPOINT:

CT CORPORATION SYSTEM
111 EIGHTH AVENUE
NEW YORK, NY  10011

AS ITS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN NEW YORK, NEW YORK, AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS AND NOTICE OF SAID SERVICE MAILED OR DELIVERED TO BORROWER IN THE MANNER PROVIDED HEREIN SHALL BE

**DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON BORROWER IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF NEW YORK.  BORROWER (I) SHALL GIVE PROMPT NOTICE TO LENDER OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (II) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN NEW YORK, NEW YORK (WHICH SUBSTITUTE AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON AND ADDRESS FOR SERVICE OF PROCESS), AND (III) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN NEW YORK, NEW YORK OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR.  NOTHING CONTAINED HEREIN SHALL AFFECT THE RIGHT OF LENDER TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST BORROWER IN ANY OTHER JURISDICTION.**

Section 10.4    <u>Modification, Waiver in Writing</u>.  No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement, or of the Note, or of any other Loan Document, nor consent to any departure by Borrower therefrom, shall in any event be effective unless the same shall be in a writing signed by the party against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given.  Except as otherwise expressly provided herein, no notice to, or demand on Borrower, shall entitle Borrower to any other or future notice or demand in the same, similar or other circumstances.

Section 10.5    <u>Delay Not a Waiver</u>.  Neither any failure nor any delay on the part of Lender in insisting upon strict performance of any term, condition, covenant or agreement, or exercising any right, power, remedy or privilege hereunder, or under the Note or under any other Loan Document, or any other instrument given as security therefor, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege.  In particular, and not by way of limitation, by accepting payment after the due date of any amount payable under this Agreement, the Note or any other Loan Document, Lender shall not be deemed to have waived any right either to require prompt payment when due of all other amounts due under this Agreement, the Note or the other Loan Documents, or to declare a default for failure to effect prompt payment of any such other amount.

Section 10.6    <u>Notices</u>.  All notices, demands, consents, approvals, requests or other communications (any of the foregoing, a "***Notice***") required or permitted hereunder or under any other Loan Document shall be given in writing and shall be effective for all purposes if hand delivered or sent by (a) certified or registered United States mail, postage prepaid, return receipt requested or (b) expedited prepaid delivery service, either commercial or United States Postal Service, with proof of attempted delivery, addressed as follows (or at such other address and Person as shall be designated from time to time by any party hereto, as the case may be, in a notice to the other parties hereto in the manner provided for in this <u>Section 10.6</u>):

If to Lender:        Walker & Dunlop Commercial Property Funding, LLC
                     535 Madison Avenue, 12th Floor

New York, New York  10022
Attention:    Geoff Smith
              Managing Director &
              Head of Originations

with a copy to:        Sheppard Mullin Richter & Hampton, LLP
                       2099 Pennsylvania Ave., N.W.
                       Suite 100
                       Washington, DC  20006
                       Attention:      Greg Grigorian, Esq.

If to Borrower:        Atlas Apartment Holdings, LLC
                       c/o Atlas Residential Management
                       55 E. Monroe, Suite 3610
                       Chicago, Illinois  60603
                       Attention:      Steven Ivankovich

with a copy to:        Morris, Manning & Martin LLP
                       1600 Atlanta Financial Center
                       3343 Peachtree Road, NE
                       Atlanta, Georgia  30326
                       Attention:      Robert W. Reardon

Any Notice given in accordance with the foregoing shall be deemed to have been given:  in the case of hand delivery, at the time of delivery if delivered during business hours on a Business Day (otherwise on the next Business Day); in the case of registered or certified mail, when delivered or the first attempted delivery on a Business Day; or in the case of expedited prepaid delivery, upon the first attempted delivery on a Business Day.  Any failure to deliver a Notice by reason of a change of address not given in accordance with this Section 10.6, or any refusal to accept a Notice, shall be deemed to have been given when delivery was attempted.  Any Notice required or permitted to be given by any party hereunder or under any other Loan Document may be given by its respective counsel.  Additionally, any Notice required or permitted to be given by Lender hereunder or under any other Loan Document may also be given by the Servicer.

Section 10.7   Trial by Jury.    BORROWER HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE.  LENDER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY BORROWER.

Section 10.8   Headings.  The Article and/or Section headings and the Table of Contents in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

Section 10.9   Severability.  Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

Section 10.10  Preferences.  Lender shall have the continuing and exclusive right to apply or reverse and reapply any and all payments by Borrower to any portion of the Debt.  To the extent Borrower makes a payment or payments to Lender, which payment or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, state or Federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the Obligations hereunder or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by Lender.

Section 10.11  Waiver of Notice.  Borrower hereby expressly waives, and shall not be entitled to any notices of any nature whatsoever from Lender except with respect to matters for which this Agreement or the other Loan Documents specifically and expressly provide for the giving of notice by Lender to Borrower and except with respect to matters for which Borrower is not, pursuant to applicable Legal Requirements, permitted to waive the giving of notice.

Section 10.12  Remedies of Borrower.  In the event that a claim or adjudication is made that Lender or its agents have acted unreasonably or unreasonably delayed acting in any case where by law or under this Agreement or the other Loan Documents, Lender or such agent, as the case may be, has an obligation to act reasonably or promptly, Borrower agrees that neither Lender nor its agents shall be liable for any monetary damages, and Borrower's sole remedies shall be limited to commencing an action seeking injunctive relief or declaratory judgment.  The parties hereto agree that any action or proceeding to determine whether Lender has acted reasonably shall be determined by an action seeking declaratory judgment.  Further, it is agreed Lender shall not be in default under this Agreement, or under any other Loan Document, unless a written notice specifically setting forth the claim of Borrower shall have been given to Lender within thirty (30) days after Borrower first had knowledge of the occurrence of the event which Borrower alleges gave rise to such claim and Lender does not remedy or cure the default, if any there be, promptly thereafter.  Failure to give such notice shall constitute a waiver of such claim.

Section 10.13  Expenses; Indemnity.

(a)     Borrower covenants and agrees to pay or, if Borrower fails to pay, to reimburse, Lender upon receipt of notice from Lender for all costs and expenses (including reasonable attorneys' fees and disbursements) incurred by Lender in connection with (i) the preparation, negotiation, execution and delivery of this Agreement

and the other Loan Documents and the consummation of the transactions contemplated hereby and thereby and all the costs of furnishing all opinions by counsel for Borrower (including without limitation any opinions requested by Lender as to any legal matters arising under this Agreement or the other Loan Documents with respect to the Property); (ii) Borrower's ongoing performance of and compliance with Borrower's respective agreements and covenants contained in this Agreement and the other Loan Documents on its part to be performed or complied with after the Closing Date, including, without limitation, confirming compliance with environmental and insurance requirements and Borrower's obligations under Article IX; (iii) Lender's ongoing performance and compliance with all agreements and conditions contained in this Agreement and the other Loan Documents on its part to be performed or complied with after the Closing Date; (iv) the negotiation, preparation, execution, delivery and administration of any consents, amendments, waivers or other modifications to this Agreement and the other Loan Documents and any other documents or matters requested by Lender; (v) securing Borrower's compliance with any requests made pursuant to the provisions of this Agreement; (vi) the filing and recording fees and expenses, title insurance and reasonable fees and expenses of counsel for providing to Lender all required legal opinions, and other similar expenses incurred in creating and perfecting the Liens in favor of Lender pursuant to this Agreement and the other Loan Documents; (vii) enforcing or preserving any rights, either in response to third party claims or in prosecuting or defending any action or proceeding or other litigation, in each case against, under or affecting Borrower, this Agreement, the other Loan Documents, the Property, or any other security given for the Loan other than in connection with claims where Borrower is the prevailing party; and (viii) enforcing any obligations of or collecting any payments due from Borrower or Guarantor under this Agreement, the other Loan Documents or with respect to the Property (including any fees and expenses reasonably incurred by or payable to Servicer or a trustee in connection with the transfer of the Loan to a special servicer upon Servicer's anticipation of a Default or Event of Default, liquidation fees, workout fees, special servicing fees, operating advisor fees or any other similar fees and interest payable on advances made by the Servicer with respect to delinquent debt service payments or expenses of curing Borrower's defaults under the Loan Documents), or in connection with any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a "work out" or of any insolvency or bankruptcy proceeding or any other amounts required under Section 9.3; *provided*, *however*, that Borrower shall not be liable for the payment of any such costs and expenses to the extent the same arise by reason of the gross negligence, illegal acts, fraud or willful misconduct of any of the Indemnified Parties. Any cost and expenses due and payable to Lender may be paid from any amounts in the Clearing Account or the Cash Management Account, as applicable.

(b)     Borrower shall indemnify, defend and hold harmless the Indemnified Parties from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature whatsoever (including, without limitation, the reasonable fees and disbursements of counsel for Lender in connection with any investigative, administrative or judicial proceeding commenced or threatened, whether or not Lender shall be designated a party thereto), that may be imposed on, incurred by, or asserted against any

Indemnified Party in any manner relating to or arising out of (i) this Agreement or any of the other Loan Documents, any breach by Borrower of its Obligations under, or any material misrepresentation by Borrower contained in, this Agreement or the other Loan Documents, or (ii) the use or intended use of the proceeds of the Loan (iii) claims for brokerage, leasing, finders or similar fees relating to the Property or Debt, (iv) Lender's exercise of any rights or remedies under the Loan Documents, or (v) any accident, fire or other casualty on or affecting the Property, any nuisance or any injury suffered on or in connection with the Property (the liabilities, losses, costs, expenses and other matters described in this subparagraph (b), collectively, the "***Indemnified Liabilities***"); *provided*, *however*, that Borrower shall not have any obligation to an Indemnified Party hereunder to the extent that such Indemnified Liabilities arise from the gross negligence, illegal acts, fraud or willful misconduct of such Indemnified Party. To the extent that the undertaking to indemnify, defend and hold harmless set forth in the preceding sentence may be unenforceable because it violates any law or public policy, Borrower shall pay the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by the Indemnified Parties.

(c)    Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature whatsoever (including, without limitation, the reasonable fees and disbursements of counsel) to which each such Indemnified Party may become subject in correcting any Prohibited Transaction or in the sale of a prohibited loan, and in obtaining any individual Prohibited Transaction exemption under ERISA that may be required, in Lender's sole discretion) that Indemnified Parties may incur, directly or indirectly, as a result of a default under Section 4.1.10 hereof or Section 5.2.11 hereof.

Section 10.14    <u>Schedules Incorporated</u>. The Schedules annexed hereto are hereby incorporated herein as a part of this Agreement with the same effect as if set forth in the body hereof.

Section 10.15    <u>Offsets, Counterclaims and Defenses</u>. Any assignee of all or any part of Lender's interest in and to this Agreement, the Note and the other Loan Documents shall take the same free and clear of all offsets, counterclaims or defenses which are unrelated to such documents which Borrower may otherwise have against any assignor of such documents, and no such unrelated counterclaim or defense shall be interposed or asserted by Borrower in any action or proceeding brought by any such assignee upon such documents and any such right to interpose or assert any such unrelated offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by Borrower.

Section 10.16    <u>No Joint Venture or Partnership; No Third Party Beneficiaries</u>.

(a)    Borrower and Lender intend that the relationships created hereunder and under the other Loan Documents be solely that of borrower and lender. Nothing herein or therein is intended to create a joint venture, partnership, tenancy-in-

common, or joint tenancy relationship between Borrower and Lender nor to grant Lender any interest in the Property other than that of mortgagee, beneficiary or lender.

(b)      This Agreement and the other Loan Documents are solely for the benefit of Lender and Borrower and nothing contained in this Agreement or the other Loan Documents shall be deemed to confer upon anyone other than Lender and Borrower any right to insist upon or to enforce the performance or observance of any of the Obligations contained herein or therein.  All conditions to the obligations of Lender to make the Loan hereunder are imposed solely and exclusively for the benefit of Lender and no other Person shall have standing to require satisfaction of such conditions in accordance with their terms or be entitled to assume that Lender will refuse to make the Loan in the absence of strict compliance with any or all thereof and no other Person shall under any circumstances be deemed to be a beneficiary of such conditions, any or all of which may be freely waived in whole or in part by Lender if, in Lender's sole discretion, Lender deems it advisable or desirable to do so.

Section 10.17  <u>Publicity</u>.  All news releases, publicity or advertising by Borrower or its Affiliates through any media intended to reach the general public which refers to the Loan Documents or the financing evidenced by the Loan Documents, to Lender or any of its Affiliates shall be subject to the prior approval of Lender.

Section 10.18  <u>Waiver of Marshalling of Assets</u>.  To the fullest extent permitted by law, Borrower, for itself and its successors and assigns, waives all rights to a marshalling of the assets of Borrower, Borrower's partners and others with interests in Borrower, and of the Property, or to a sale in inverse order of alienation in the event of foreclosure of the Security Instrument, and agrees not to assert any right under any laws pertaining to the marshalling of assets, the sale in inverse order of alienation, homestead exemption, the administration of estates of decedents, or any other matters whatsoever to defeat, reduce or affect the right of Lender under the Loan Documents to a sale of the Property for the collection of the Debt without any prior or different resort for collection or of the right of Lender to the payment of the Debt out of the net proceeds of the Property in preference to every other claimant whatsoever.

Section 10.19  <u>Waiver of Counterclaim</u>.  Borrower hereby waives the right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against it by Lender or its agents.

Section 10.20  <u>Conflict; Construction of Documents; Reliance</u>.  In the event of any conflict between the provisions of this Agreement and any of the other Loan Documents, the provisions of this Agreement shall control.  The parties hereto acknowledge that they were represented by competent counsel in connection with the negotiation, drafting and execution of the Loan Documents and that such Loan Documents shall not be subject to the principle of construing their meaning against the party which drafted same.  Borrower acknowledges that, with respect to the Loan, Borrower shall rely solely on its own judgment and advisors in entering into the Loan without relying in any manner on any statements, representations or recommendations of Lender or any Affiliate of Lender.  Lender shall not be subject to any limitation whatsoever in the exercise of any rights or remedies available to it under any of the Loan Documents or any other agreements or instruments which govern the Loan by virtue of the

ownership by it or any parent, subsidiary or Affiliate of Lender of any equity interest any of them may acquire in Borrower, and Borrower hereby irrevocably waives the right to raise any defense or take any action on the basis of the foregoing with respect to Lender's exercise of any such rights or remedies.  Borrower acknowledges that Lender engages in the business of real estate financings and other real estate transactions and investments which may be viewed as adverse to or competitive with the business of Borrower or its Affiliates.

Section 10.21  Brokers and Financial Advisors.  Borrower hereby represents that it has dealt with no financial advisors, brokers, underwriters, placement agents, agents or finders in connection with the transactions contemplated by this Agreement other than Lutz Financial Services.  Borrower hereby agrees to indemnify, defend and hold Lender harmless from and against any and all claims, liabilities, costs and expenses of any kind (including Lender's attorneys' fees and expenses) in any way relating to or arising from a claim by any Person that such Person acted on behalf of Borrower or Lender in connection with the transactions contemplated herein.  The provisions of this Section 10.21 shall survive the expiration and termination of this Agreement and the payment of the Debt.

Section 10.22  Prior Agreements.  This Agreement and the other Loan Documents contain the entire agreement of the parties hereto and thereto in respect of the transactions contemplated hereby and thereby, and all prior agreements among or between such parties, whether oral or written, including, without limitation, the Loan Application and Term Sheet dated January 18, 2017 between Borrower and Lender are superseded by the terms of this Agreement and the other Loan Documents.  In addition, Borrower hereby agrees that it is not relying on and has not relied on any representations, warranties or statements, whether written or oral, of the Lender, any Affiliate of the Lender or any other party in connection with its decision to enter into the transaction described in this Agreement and the related Loan Documents and that this Agreement and the related Loan Documents set forth the entire set of representations, warranties and understandings of Borrower with respect to the transaction described herein and in the Loan Documents.

Section 10.23  Cumulative Rights.  All of the rights of Lender under this Agreement hereunder and under each of the other Loan Documents and any other agreement now or hereafter executed in connection herewith or therewith, shall be cumulative and may be exercised singly, together, or in such combination as Lender may determine in its sole judgment.

Section 10.24  Counterparts.  This Agreement may be executed in several counterparts, each of which when executed and delivered is an original, but all of which together shall constitute one instrument.  In making proof of this Agreement, it shall not be necessary to produce or account for more than one such counterpart which is executed by the party against whom enforcement of this Agreement is sought.

Section 10.25  Time is of the Essence.  Time is of the essence of each provision of this Agreement and the other Loan Documents.

Section 10.26  Consent of Holder.  Wherever this Agreement refers to Lender's consent or discretion or other rights, such references to Lender shall be deemed to refer to any holder of the Loan.  The holder of the Loan may from time to time appoint a trustee or Servicer,

and Borrower shall be entitled to rely upon written instructions executed by a purported officer of the holder of the Loan as to the extent of authority delegated to any such trustee or Servicer from time to time and determinations made by such trustee or Servicer to the extent identified a within the delegated authority of such trustee or Servicer, unless and until such instructions are superseded by further written instructions from the holder of the Loan.

Section 10.27 <u>Successor Laws</u>.  Any reference in this Agreement to any statute or regulation shall be deemed to include any successor statute or regulation.

Section 10.28 <u>Reliance on Third Parties</u>.  Lender may perform any of its responsibilities hereunder through one or more agents, attorneys or independent contractors.  In addition, Lender may conclusively rely upon the advice or determinations of any such agents, attorneys or independent contractors in performing any discretionary function under the terms of this Agreement.

Section 10.29 <u>Note in Registered Form</u>.  Borrower hereby irrevocably appoints Lender as its agent for the registration and transfer of the Note in a manner that shall cause the Note to be considered to be in registered form for the purposes of Section 163(f) of the Code.  In connection therewith, Lender as a non-fiduciary agent of Borrower shall maintain a register (the "***Register***") for the recordation of the name and address of each Lender, assignee or participant and the principal amount (and interest) of the obligations owing to each Lender, assignee or participant.  The entries in the Register shall be conclusive, in the absence of manifest error, and the Borrower and Lender, assignee or participant shall treat each person whose name is recorded in the Register as the owner of the Note and the obligations recorded therein.

[THE REMAINDER OF THE PAGE IS INTENTIONALLY BLANK]

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

**BORROWER:**

**TEXAS BORROWER:**

**ALLIANCE HTTX LIMITED PARTNERSHIP,**
a Delaware limited partnership

By:    Alliance HTTX GP, LLC,
        a Delaware limited liability company
Its:    General Partner

        By:    _____
        Name:  Steven Ivankovich
        Title:  Manager


**FLORIDA BORROWER:**

**ALLIANCE HTFL LIMITED PARTNERSHIP,**
a Delaware limited partnership

By:    Alliance HTFL GP, LLC,
        a Delaware limited liability company
Its:    General Partner

        By:    _____
        Name:  Steven Ivankovich
        Title:  Manager

*(Signatures continue on following page)*

[W&D:  HT Atlas Portfolio – Signature Page to Loan Agreement]

**LENDER:**

**WALKER & DUNLOP COMMERCIAL PROPERTY FUNDING, LLC,** a Delaware limited liability company

By: _(signature)_
Name: Vlora Camaj
Title:  Closing Officer

*(End of signatures)*

[W&D:  HT Atlas Portfolio – Signature Page to Loan Agreement]

**<u>EXHIBIT A</u>**

**<u>LEGAL DESCRIPTION</u>**

Exhibit A

<u>CARIBBEAN ISLE</u>

(Legal Description)

A portion of Section 17, Township 25 South, Range 29 East, Osceola County, Florida. As a point of reference, commence at the Southeast corner of said Section 17; thence Northerly along the East line of said Section 17, a distance of 80.00 feet to a point on the Northerly right of way line of State Road 530; thence Westerly along said right of way line, a distance of 3935.00 feet to a point therein; thence departing said right of way line, run North 00°22'19" West a distance of 1274.19 feet to a point on the Northerly right of way line of Columbia Avenue (extended) (a 70.00 foot right of way); thence South 89° 46'42" West, a distance of 35.00 feet to a point, said point being the Westerly right of way of Dyer Boulevard and the Northerly right of way of Columbia Avenue; thence continue South 89° 46'42" West along the Northerly line of said Columbia Avenue, a distance of 344.06 feet to a point, said point being the P.C. of a curve concave Southwesterly, having a radius of 941.36 feet; thence along said curve and the Northerly right of way of said Columbia Avenue, through a delta angle of 00° 40'50", an arc distance of 11.18 feet, a chord distance of 11.18 feet, and a chord bearing of North 89° 52'56" West, to the Point of Beginning; thence continue along said curve and the Northerly right of way of said Columbia Avenue, through a delta angle of 23°02'09", an arc distance of 378.47 feet, a chord distance of 375.93 feet, a chord bearing of North 78° 01'23" West to the point of tangency; thence North 66° 30'17" West along the Northerly line of said Columbia Avenue, a distance of 200.29 feet to the P.C. of a curve concave Northeasterly, having a radius of 990.37 feet, a delta angle of 15° 55'59", a chord distance of 274.52 feet; thence Northwesterly along said curve, a distance of 275.41 feet, to a point therein; thence departing said curve, run North 00° 32'02" West, a distance of 1232.99 feet, to a point; thence North 89°51'33" East, a distance of 818.07 feet to a point; thence South 00° 21'56" East, a distance of 1466.33 feet to the Point of Beginning.

**THE ABOVE DESCRIBED PROPERTY BEING THE SAME** property conveyed to Alliance HTFL Limited Partnership, a Delaware limited partnership, by that Special Warranty recorded in Official Records Book 3519, Page 2903, Osceola County, Florida.

<u>FOREST PARK</u>

(Legal Description)

That portion of Tract "A", according to the Plat of Oakland Forest, as recorded in Plat Book 76, page 25,  of the public records of Broward County, Florida, described as follows:
Commencing at the Northwest corner of said Tract "A"; thence run South 89°57'30" East (on an assumed bearing) 1263.23 feet along the North boundary of said Tract "A"; thence run South 0°02'30" West 386.63 feet; thence run South 87°23' 23"  West 65.08 feet, to a point of curvature of a curve to the left; thence along the arc of said curve to the left having a radius of 815 feet and a central angle of 14°14'24", run Southwesterly 202.56 feet to the Point of Beginning; thence run South 29°56'20" East 402.97 feet; thence run South 52°39'15" West 15.13 feet; thence run South 51°31'49" West 50.56 feet; thence run South 76°14' West 52.06 feet; thence run South 68°01'51" West 50.49 feet; thence run South 59°29'18" West 50 feet; thence run South 46°41'59" West 54.40 feet; thence run South 20°58'55" East 83.96 feet; thence run South 23°05'45" East 50.36 feet; thence run South 34°30'45" East 50.16 feet; thence run South 37°20'44" East 50.42 feet; thence run South 24°13'41" East 50.25 feet; thence run South 22°31'54" East 50.42 feet; thence run South 39°16'28" East 32.50 feet; thence run South 46°30'10" East 22.69 feet; thence run South 44°17'50" East 51.92 feet; thence run South 62°48'07" East 50.06 feet; thence run South 57°38'56" East 50.04 feet; thence run North 52°31'52" East 41.33 feet; thence run South 67°52'24" East 126.91 feet; thence run North 79°27'46" East 86.94 feet; thence run South 17°12'13" West 231.23 feet; thence run North 72°47'47" West 153.32 feet to a point of curvature of a curve to the right; thence along the arc of said curve to the right, having a radius of 847.83 feet and a central angle of 20°34'25", run Northwesterly 304.43 feet to a point of tangency; thence run North 52°13'23" West 100 feet along the tangent extended to a point of curvature of a curve to the left; thence along the arc of said curve to the left having a radius of 335 feet and a central angle of 26°55'28", run Northwesterly 157.42 feet to a point of tangency; thence run North 79°08'51" West 124.91 feet along the tangent extend, to a point of curvature of a curve to the right; thence along the arc of said curve to the right having a radius of 270 feet and a central angle of 115°24'38", run Northwesterly and Northeasterly 543.86 feet to a point of tangency; thence run North 36°15'47" East 100 feet along the tangent extended, to a point of curvature of a curve to the right; thence along the arc of said curve to the right, having a radius of 815 feet and a central angle of 36°53'12", run Northeasterly 524.69 feet to the Point of Beginning.

**THE ABOVE DESCRIBED PROPERTY BEING THE SAME** property conveyed to Alliance HTFL Limited Partnership, a Delaware limited partnership, by that Special Warranty recorded in Official Records Book 44275, Page 1687, Broward County, Florida.

<u>WARWICK</u>

(Legal Description)

A survey of Lot 1, Block A, Continuation No. 1, Section 3, Buffalo Gap Road Estates Addition to the City of Abilene, Taylor County, Texas, as shown by plat recorded in Plat Cabinet 2, Slide 235-A, Plat Records, Taylor County, Texas.

THE ABOVE DESCRIBED PROPERTY BEING THE SAME property conveyed to Alliance HTTX Limited Partnership, a Delaware limited partnership, by that Special Warranty Deed from Coal Train II, L.P., a Texas limited partnership, recorded in Volume 3383, Page 608, Official Public Records, Taylor County, Texas.

## COULTER LANDING

(Legal Description)

A 4.872 acre tract of land out of the Southwest part of Section 27, Block 9, B.S.&F. Survey, Randall County, Texas, being part of Blocks 55, 56, 57, and a part of Holyoke Trail and the alley West of Block  56, Vacated by the City of Amarillo, Belmar Addition Unit No. 10, an addition to the City of Amarillo, and  described by metes and bounds as follows:

BEGINNING at a 1/2 inch rebar found in the North right-of-way line of Southwest 34th Avenue, the  Southwest corner of this tract and from whence the Southwest corner of said Section 27 bears S 00° 20'  00" E, 60.00 feet and N 89° 47' 00" W, 410.00 feet;

THENCE N 00° 20' 00" W, 500.00 feet to a 1/2 inch rebar;

THENCE N 65° 00' 00" E, 74.00 feet to a 1/2 inch rebar;

THENCE S 89° 47' 00" E, 164.54 feet to an "X" found in concrete;

THENCE N 56° 20' 00" E, 175.00 feet to a 1/2 inch rebar;

THENCE S 31° 15' 00" E, 14.90 feet to a 1/2 inch in the West line of the alley through said Block 55;

THENCE S 00° 28' 30" E, 616.40 feet along the West line of said alley to a 1/2 inch rebar in the North  right-of-way line of S.W. 34th Avenue;

THENCE N 89° 47' 00" W, along said right-of-way line, 387.19 feet to the PLACE OF BEGINNING.

**THE ABOVE DESCRIBED PROPERTY BEING THE SAME** property conveyed to Alliance HTTX Limited Partnership, a Delaware limited partnership, by that Special Warranty Deed from Coal Train III, L.P., a Texas limited partnership, recorded at Clerk's File No. 2007013408, Official Public Records, Randall County, Texas.

<u>WINDTREE</u>

(Legal Description)

Tract 1:

All of Lot 1, Block 22, Amended Sleepy Hollow Unit No. 9, an addition to the City of Amarillo in Randall County, Texas according to the map or plat thereof, recorded in Volume 684, Page 355 of the Deed Records of Randall County, Texas.

Tract 2:

All of Lot 13, Block 23, Sleepy Hollow Unit No. 17, an addition to the City of Amarillo in Randall County, Texas according to the map or plat thereof, recorded in Volume 714, Page 533 of the Deed Records of Randall County, Texas.

**THE ABOVE DESCRIBED PROPERTY BEING THE SAME** property conveyed to Alliance HTTX Limited Partnership, a Delaware limited partnership, by that Special Warranty Deed from Coal Train IV, L.P., a Texas limited partnership, recorded at Clerk's File No. 2007013407, Official Public Records, Randall County, Texas.

**SCHEDULE I**

**RENT ROLL**

Schedule I

## CERTIFICATION OF RENT ROLLS

Borrower hereby certifies that the Rent Rolls which are attached hereto as **Exhibit "A"**, and incorporated herein by specific reference thereto, are true, accurate and complete rental schedules with respect to the above-referenced Property as of the dates of such rent rolls.

This Certification of Rent Rolls (hereinafter referred to as this "Certification") is dated and is and shall be effective as of April 27, 2017.

BORROWER:

**ALLIANCE HTFL LIMITED PARTNERSHIP**,
a Delaware limited partnership

By:     Alliance HTFL GP, LLC,
        a Delaware limited liability company
Its:    General Partner

        By: _____
        Name: Steven Iyankovich
        Title: Manager

[1728400/2]

**EXHIBIT "A"**
**RENT ROLLS**

(attached)

OneSite Rents v3.0

03/29/2017  8:31:50PM

**Atlas Apartment Holdings, LLC - Caribbean Isle**

## RENT ROLL DETAIL

As of 03/29/2017

Page 1 of 40

mgt-521-003

**Parameters:** Properties - ALL;Show All Unit Designations or Filter by - ALL;Subjournals - ALL;Exclude Formers? - Yes;Sort by - Unit;Report Type - Details + Summary;Show Unit Rent as - Market + Addl.;

Details

| Unit | Floorpla | Unit Designation | SQ | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|------|----------|------------------|-----|-------------------|------|------------------|-------------|-----------|----------------|------------|------------|------------------------|---------------|-------------|---------|
| 0101 | 2X2E | N/A | 998 | Occupied | Ater, Jessica | 05/19/2011 | 08/25/2016 | 07/24/2017 | 972.00 | GARAGE | 0.00 | 65.00 | 1,061.00 | 250.00 | 72.04 |
| | | | | | | | | | | PEST | 0.00 | 3.00 | | | |
| | | | | | | | | | | RENT | 993.00 | 0.00 | | | |
| 0102 | 2X2F LR | N/A | 1010 | Occupied | Hilliard, Derrall | 09/22/2014 | 10/13/2016 | 10/13/2017 | 982.00 | PEST | 0.00 | 3.00 | 1,027.00 | 750.00 | (982.47) |
| | | | | | | | | | | RENT | 999.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 25.00 | | | |
| 0103 | 1X1A | N/A | 500 | Occupied | Rekiec, Peggy | 03/01/2002 | 06/14/2016 | 06/16/2017 | 703.00 | RENT | 787.00 | 0.00 | 787.00 | 649.00 | 31.26 |
| 0104 | 1X1A | N/A | 500 | Occupied | Bonfim, Rita | 07/07/2009 | 11/14/2016 | 11/17/2017 | 703.00 | PEST | 0.00 | 3.00 | 771.00 | 755.00 | 41.19 |
| | | | | | | | | | | RENT | 768.00 | 0.00 | | | |
| 0105 | 1X1A | N/A | 500 | Occupied | Valentin, Robert | 07/24/2009 | 06/03/2016 | 06/02/2017 | 703.00 | GARAGE | 0.00 | 75.00 | 785.00 | 300.00 | 41.19 |
| | | | | | | | | | | PEST | 0.00 | 3.00 | | | |
| | | | | | | | | | | RENT | 707.00 | 0.00 | | | |
| 0106 | 1X1A | N/A | 500 | Occupied | Mejia Estevez, Johann | 10/14/2016 | 10/14/2016 | 10/13/2017 | 703.00 | PEST | 0.00 | 3.00 | 833.00 | 0.00 | 43.19 |
| | | | | | | | | | | RENT | 830.00 | 0.00 | | | |
| 0107 | 2X2E LR | N/A | 998 | Occupied | Ruiz, Luis | 12/08/2016 | 12/08/2016 | 12/07/2017 | 972.00 | PEST | 0.00 | 3.00 | 947.00 | 0.00 | 44.26 |
| | | | | | | | | | | RENT | 919.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 25.00 | | | |
| 0108 | 2X2F LR | N/A | 1010 | Occupied | Carrasquillo Rios, Noel | 11/24/2015 | 12/17/2016 | 12/15/2017 | 982.00 | PEST | 0.00 | 3.00 | 1,020.00 | 0.00 | 74.30 |
| | | | | | | | | | | RENT | 992.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 25.00 | | | |
| 0109 | 2X2E R | N/A | 998 | Occupied | Fernandez Ramos, Pedro | 09/09/2016 | 09/09/2016 | 09/08/2017 | 972.00 | PEST | 0.00 | 3.00 | 1,188.00 | 0.00 | 64.11 |
| | | | | | | | | | | RENT | 1,065.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 120.00 | | | |
| 0110 | 2X2F | N/A | 1010 | Occupied | Pena, Joseph | 05/08/2015 | 06/01/2016 | 06/02/2017 | 982.00 | PEST | 0.00 | 3.00 | 1,074.00 | 505.00 | 64.38 |
| | | | | | | | | | | RENT | 1,071.00 | 0.00 | | | |
| 0111 | 1X1A | N/A | 500 | Occupied | Rosado-Rodriguez, | 07/27/2016 | 07/27/2016 | 07/14/2017 | 703.00 | PEST | 0.00 | 3.00 | 765.00 | 0.00 | 43.19 |
| | | | | | | | | | | RENT | 762.00 | 0.00 | | | |
| 0112 | 1X1A | N/A | 500 | Occupied | Fernandez, Rommel | 10/02/2015 | 12/01/2016 | 12/01/2017 | 703.00 | PEST | 0.00 | 3.00 | 824.00 | 0.00 | (824.00) |
| | | | | | | | | | | RENT | 821.00 | 0.00 | | | |
| 0113 | 1X1A LR | N/A | 500 | Occupied | Toro Ocasio, Zulma | 03/14/2016 | 03/14/2016 | 03/10/2017 | 703.00 | PEST | 0.00 | 3.00 | 834.00 | 275.00 | 43.19 |

Details

Other

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | RENT | 731.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 100.00 | | | |
| | | N/A | | Pending renewal | Toro Ocasio, Zulma | 03/14/2016 | 04/01/2017 | 03/30/2018 | | PEST | 0.00 * | 3.00 * | 842.00 * | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 739.00 * | 0.00 * | | | |
| | | | | | | | | | | UPGRADE | 0.00 * | 100.00 * | | | |
| 0114 | 1X1A | N/A | 500 | Occupied | Casiano Montanez, Jose | 02/27/2016 | 02/27/2017 | 03/24/2017 | 703.00 | MTOM | 0.00 | 300.00 | 1,053.00 | 275.00 | (830.00) |
| | | | | | | | | | | PEST | 0.00 | 3.00 | | | |
| | | | | | | | | | | RENT | 750.00 | 0.00 | | | |
| | | N/A | | Pending renewal | Casiano Montanez, Jose | 02/27/2016 | 04/01/2017 | 03/30/2018 | | PEST | 0.00 * | 3.00 * | 764.00 * | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 761.00 * | 0.00 * | | | |
| 0115 | 2X2E | N/A | 998 | Occupied | Santiago, Edith | 08/07/2014 | 07/29/2016 | 07/28/2017 | 972.00 | PEST | 0.00 | 3.00 | 988.00 | 750.00 | 64.11 |
| | | | | | | | | | | RENT | 985.00 | 0.00 | | | |
| 0116 | 2X2F | N/A | 1010 | Occupied | Olmo, Henry | 08/18/2016 | 08/18/2016 | 08/18/2017 | 982.00 | RENT | 1,090.00 | 0.00 | 1,090.00 | 0.00 | (45.54) |
| 0201 | 2X2E | N/A | 998 | Occupied | Strong-McPhee, Patricia | 06/03/2016 | 06/03/2016 | 06/02/2017 | 972.00 | PEST | 0.00 | 3.00 | 1,062.00 | 0.00 | 1,275.43 |
| | | | | | | | | | | RENT | 1,059.00 | 0.00 | | | |
| 0202 | 2X2F LR | N/A | 1010 | Occupied | Encarnacion, David | 10/01/2016 | 10/01/2016 | 09/29/2017 | 982.00 | PEST | 0.00 | 3.00 | 1,113.00 | 0.00 | 74.30 |
| | | | | | | | | | | RENT | 1,085.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 25.00 | | | |
| 0203 | 2X2E | N/A | 998 | Occupied | Roman, Gregorio | 05/01/2012 | 05/17/2016 | 05/19/2017 | 972.00 | PEST | 0.00 | 3.00 | 961.00 | 0.00 | 44.26 |
| | | | | | | | | | | RENT | 958.00 | 0.00 | | | |
| 0204 | 2X2F | N/A | 1010 | Occupied | Harvey, Takeila | 07/31/2012 | 08/09/2016 | 07/07/2017 | 982.00 | PEST | 0.00 | 3.00 | 926.00 | 0.00 | 54.46 |
| | | | | | | | | | | RENT | 923.00 | 0.00 | | | |
| 0205 | 2X2E | N/A | 998 | Occupied | Carrion Velez, Isamara | 10/29/2016 | 10/29/2016 | 10/27/2017 | 972.00 | PEST | 0.00 | 3.00 | 1,093.00 | 0.00 | 74.04 |
| | | | | | | | | | | RENT | 1,090.00 | 0.00 | | | |
| 0206 | 2X2F | N/A | 1010 | Occupied | Hmimi, Mostafa | 01/30/2017 | 01/30/2017 | 02/23/2018 | 982.00 | PEST | 0.00 | 3.00 | 957.00 | 0.00 | 54.46 |
| | | | | | | | | | | RENT | 954.00 | 0.00 | | | |
| 0207 | 2X2E | N/A | 998 | Occupied | Christie, Dawnette | 03/08/2016 | 03/08/2016 | 03/31/2017 | 972.00 | PEST | 0.00 | 3.00 | 978.00 | 0.00 | 54.18 |
| | | | | | | | | | | RENT | 975.00 | 0.00 | | | |
| | | N/A | | Pending renewal | Christie, Dawnette | 03/08/2016 | 04/01/2017 | 03/23/2018 | | PEST | 0.00 * | 3.00 * | 987.00 * | 0.00 | 0.00 |

**Details**

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | RENT | 984.00 * | 0.00 * | | | |
| 0208 | 2X2F | N/A | 1010 | Occupied | Matias, Luis | 10/13/2012 | 08/27/2016 | 07/28/2017 | 982.00 | GARAGE | 0.00 | 75.00 | 948.00 | 0.00 | 64.38 |
| | | | | | | | | | | PEST | 0.00 | 3.00 | | | |
| | | | | | | | | | | REFERRAL | 0.00 | (50.00) | | | |
| | | | | | | | | | | RENT | 920.00 | 0.00 | | | |

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0301 | 2X2E | N/A | 998 | Occupied | Rojas Contreras, Maria | 12/01/2016 | 12/01/2016 | 12/31/2017 | 972.00 | PEST | 0.00 | 3.00 | 967.00 | 0.00 | 64.11 |
| | | | | | | | | | | RENT | 964.00 | 0.00 | | | |
| 0302 | 2X2F LR | N/A | 1010 | Occupied | Thomas, Christopher | 12/06/2013 | 01/21/2017 | 01/19/2018 | 982.00 | PEST | 0.00 | 3.00 | 860.00 | 250.00 | 64.38 |
| | | | | | | | | | | RENT | 832.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 25.00 | | | |
| 0303 | 1X1B | N/A | 742 | Occupied | Caraballo, Danny | 08/29/2012 | 08/12/2016 | 07/14/2017 | 790.00 | PEST | 0.00 | 3.00 | 834.00 | 0.00 | 38.60 |
| | | | | | | | | | | RENT | 831.00 | 0.00 | | | |
| 0304 | 1X1C R | N/A | 763 | Occupied | Vazquez, Jorge | 10/11/2016 | 10/11/2016 | 10/13/2017 | 800.00 | PEST | 0.00 | 3.00 | 978.00 | 0.00 | 39.07 |
| | | | | | | | | | | RENT | 880.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 95.00 | | | |
| 0305 | 1X1B | N/A | 742 | Occupied | Drouin, Jeannine | 06/11/2007 | 08/09/2016 | 08/11/2017 | 790.00 | PEST | 0.00 | 3.00 | 920.00 | 200.00 | 36.60 |
| | | | | | | | | | | RENT | 917.00 | 0.00 | | | |
| 0306 | 1X1C | N/A | 763 | Occupied | Sanchez, Jorge | 08/26/2010 | 10/01/2016 | 09/29/2017 | 800.00 | PEST | 0.00 | 3.00 | 832.00 | 150.00 | 47.00 |
| | | | | | | | | | | RENT | 829.00 | 0.00 | | | |
| 0307 | 2X2E LR | N/A | 998 | Occupied | Espinoza Rincon, Antonio | 10/11/2016 | 10/11/2016 | 10/13/2017 | 972.00 | PEST | 0.00 | 3.00 | 1,108.00 | 0.00 | 64.11 |
| | | | | | | | | | | RENT | 1,080.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 25.00 | | | |
| 0308 | 2X2F | N/A | 1010 | Occupied | Azurin, Cesar | 10/14/2015 | 11/12/2016 | 11/10/2017 | 982.00 | PEST | 0.00 | 3.00 | 1,062.00 | 0.00 | 54.46 |
| | | | | | | | | | | RENT | 1,059.00 | 0.00 | | | |
| 0309 | 2X2E | N/A | 998 | Occupied | Resto, Libby | 10/10/2013 | 07/01/2016 | 06/30/2017 | 972.00 | PEST | 0.00 | 3.00 | 991.00 | 0.00 | 54.18 |
| | | | | | | | | | | RENT | 988.00 | 0.00 | | | |
| 0310 | 2X2F | N/A | 1010 | Occupied | Jacques, Pierre | 07/01/2016 | 07/01/2016 | 06/30/2017 | 982.00 | PEST | 0.00 | 3.00 | 1,072.00 | 0.00 | 74.30 |
| | | | | | | | | | | RENT | 1,069.00 | 0.00 | | | |
| 0311 | 1X1B | N/A | 742 | Occupied-NTV | Grisinger, William | 12/28/2010 04/07/2017 | 03/11/2016 | 04/07/2017 | 790.00 | PEST | 0.00 | 3.00 | 715.00 | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 712.00 | 0.00 | | | |
| 0312 | 1X1C | N/A | 763 | Occupied | Pereira Mafla, Joaquin | 08/27/2016 | 08/27/2016 | 08/25/2017 | 800.00 | RENT | 870.00 | 0.00 | 870.00 | 0.00 | 49.00 |

**Details**

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0313 | 1X1B | N/A | 742 | Occupied | Brown, Anthony | 02/09/2016 | 03/11/2017 | 03/09/2018 | 790.00 | PEST | 0.00 | 3.00 | 875.00 | 275.00 | 38.60 |
| | | | | | | | | | | RENT | 872.00 | 0.00 | | | |
| 0314 | 1X1C | N/A | 763 | Occupied | Moreno, Ivan | 07/09/2015 | 08/03/2016 | 08/04/2017 | 800.00 | PEST | 0.00 | 3.00 | 898.00 | 700.00 | 49.00 |
| | | | | | | | | | | PETFEE | 0.00 | 25.00 | | | |
| | | | | | | | | | | RENT | 870.00 | 0.00 | | | |
| 0315 | 2X2E | N/A | 998 | Occupied | Galvez, Yomeida | 02/11/2010 | 04/24/2016 | 04/21/2017 | 972.00 | PEST | 0.00 | 3.00 | 947.00 | 150.00 | 52.18 |
| | | | | | | | | | | RENT | 944.00 | 0.00 | | | |
| | | N/A | | Pending renewal | Galvez, Yomeida | 02/11/2010 | 04/22/2017 | 11/17/2017 | | PEST | 0.00 * | 3.00 * | 990.00 * | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 987.00 * | 0.00 * | | | |
| 0316 | 1X1C LR | N/A | 763 | Occupied | Trujillo, Heladio | 08/27/2016 | 08/27/2016 | 08/18/2017 | 800.00 | PEST | 0.00 | 3.00 | 1,071.00 | 0.00 | 54.46 |
| | | | | | | | | | | RENT | 993.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 75.00 | | | |

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0401 | 2X2E | N/A | 998 | Occupied | Gamboa Figueroa, Ivan | 12/18/2015 | 01/21/2017 | 01/19/2018 | 972.00 | GARAGE | 0.00 | 85.00 | 1,080.00 | 450.00 | 74.04 |
| | | | | | | | | | | PEST | 0.00 | 3.00 | | | |
| | | | | | | | | | | RENT | 992.00 | 0.00 | | | |
| 0402 | 2X2F | N/A | 1010 | Occupied | Florence, Beatriz | 10/01/2009 | 02/04/2017 | 02/02/2018 | 982.00 | PEST | 0.00 | 3.00 | 910.00 | 0.00 | 52.46 |
| | | | | | | | | | | RENT | 907.00 | 0.00 | | | |
| 0403 | 1X1B | N/A | 742 | Occupied | Wang, Weizhou | 09/09/2016 | 09/09/2016 | 09/08/2017 | 790.00 | PEST | 0.00 | 3.00 | 853.00 | 1,750.00 | 48.53 |
| | | | | | | | | | | RENT | 850.00 | 0.00 | | | |
| 0404 | 1X1C | N/A | 763 | Occupied | Ruiz Rivera, Juan | 01/13/2017 | 01/13/2017 | 01/12/2018 | 800.00 | PEST | 0.00 | 3.00 | 800.00 | 0.00 | 49.00 |
| | | | | | | | | | | RENT | 797.00 | 0.00 | | | |
| 0405 | 1X1B | N/A | 742 | Occupied | Gil, Adriana | 12/19/2016 | 12/19/2016 | 12/22/2017 | 790.00 | PEST | 0.00 | 3.00 | 790.00 | 0.00 | 48.53 |
| | | | | | | | | | | RENT | 787.00 | 0.00 | | | |
| 0406 | 1X1C R | N/A | 763 | Occupied | Zacour, Alfonso | 07/18/2015 | 08/12/2016 | 07/14/2017 | 800.00 | PEST | 0.00 | 3.00 | 940.00 | 0.00 | 39.07 |
| | | | | | | | | | | RENT | 842.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 95.00 | | | |
| 0407 | 2X2E | N/A | 998 | Occupied | Albarran, Jeannette | 08/19/2016 | 08/19/2016 | 08/18/2017 | 972.00 | RENT | 1,080.00 | 0.00 | 1,080.00 | 0.00 | 54.18 |
| 0408 | 2X2F | N/A | 1010 | Occupied | Benjamaa, Saloua | 08/21/2015 | 09/15/2016 | 09/15/2017 | 982.00 | PEST | 0.00 | 3.00 | 1,193.00 | 450.00 | 54.46 |
| | | | | | | | | | | RENT | 1,190.00 | 0.00 | | | |
| 0409 | 2X2E | N/A | 998 | Occupied | Marrero, Maritza | 08/18/2008 | 11/24/2016 | 11/24/2017 | 972.00 | EMPLCRED | 0.00 | ###### | 945.00 | 0.00 | 62.11 |
| | | | | | | | | | | GARAGE | 0.00 | 140.00 | | | |
| | | | | | | | | | | PEST | 0.00 | 3.00 | | | |

**Details**

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | RENT | 1,003.00 | 0.00 | | | |
| 0410 | 2X2F LR | N/A | 1010 | Occupied | Guanipa, Francisco | 07/29/2016 | 07/29/2016 | 08/04/2017 | 982.00 | PEST | 0.00 | 3.00 | 1,372.00 | 0.00 | 74.09 |
| | | | | | | | | | | RENT | 1,119.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 250.00 | | | |
| 0411 | 1X1B | N/A | 742 | Occupied | Silva, Alberto | 02/03/2017 | 02/03/2017 | 02/02/2018 | 790.00 | PEST | 0.00 | 3.00 | 790.00 | 0.00 | 36.73 |
| | | | | | | | | | | RENT | 787.00 | 0.00 | | | |
| 0412 | 1X1C | N/A | 763 | Occupied | Silva Vazquez, Waldemar | 01/06/2017 | 01/06/2017 | 01/05/2018 | 800.00 | PEST | 0.00 | 3.00 | 800.00 | 0.00 | 49.00 |
| | | | | | | | | | | RENT | 797.00 | 0.00 | | | |
| 0413 | 1X1B R | N/A | 742 | Occupied | Matthews, Rebena | 05/16/2016 | 05/16/2016 | 05/19/2017 | 790.00 | PEST | 0.00 | 3.00 | 976.00 | 0.00 | 48.53 |
| | | | | | | | | | | RENT | 898.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 75.00 | | | |
| | | N/A | | Pending renewal | Matthews, Rebena | 05/16/2016 | 05/20/2017 | 05/18/2018 | | PEST | 0.00 * | 3.00 * | 995.00 * | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 917.00 * | 0.00 * | | | |
| | | | | | | | | | | UPGRADE | 0.00 * | 75.00 * | | | |
| 0414 | 1X1C | N/A | 763 | Occupied | Rivera, Shannon | 11/16/2016 | 11/16/2016 | 11/17/2017 | 800.00 | PEST | 0.00 | 3.00 | 780.00 | 0.00 | 39.07 |
| | | | | | | | | | | RENT | 777.00 | 0.00 | | | |
| 0415 | 2X2E | N/A | 998 | Occupied | Roc, Jim | 08/26/2013 | 08/01/2016 | 06/30/2017 | 972.00 | PEST | 0.00 | 3.00 | 1,025.00 | 250.00 | 74.04 |

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | RENT | 1,022.00 | 0.00 | | | |
| 0416 | 2X2F LR | N/A | 1010 | Occupied | Gonzalez, Nicholas | 10/04/2014 | 10/25/2016 | 10/27/2017 | 982.00 | GARAGE | 0.00 | 50.00 | 1,023.00 | 750.00 | 74.30 |
| | | | | | | | | | | PEST | 0.00 | 3.00 | | | |
| | | | | | | | | | | RENT | 945.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 25.00 | | | |
| 0501 | 2X2E | N/A | 998 | Occupied | Rosario, Juan | 11/02/2010 | 02/04/2017 | 02/02/2018 | 972.00 | PEST | 0.00 | 3.00 | 936.00 | 0.00 | 52.18 |
| | | | | | | | | | | RENT | 933.00 | | | | |
| 0502 | 2X2F | N/A | 1010 | Occupied | Reyes Abreu, Yosvany | 03/06/2017 | 03/06/2017 | 03/09/2018 | 982.00 | PEST | 0.00 | 3.00 | 982.00 | 0.00 | 10.00 |
| | | | | | | | | | | RENT | 979.00 | 0.00 | | | |
| 0503 | 1X1B R | N/A | 742 | Occupied | Padilla, Matthew | 11/10/2016 | 11/10/2016 | 11/03/2017 | 790.00 | PEST | 0.00 | 3.00 | 869.00 | 0.00 | 38.60 |
| | | | | | | | | | | RENT | 771.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 95.00 | | | |
| 0504 | 1X1C | N/A | 763 | Occupied-NTVL | Arango-Mafiol, Andres | 04/19/2016 04/21/2017 | 04/19/2016 | 04/21/2017 | 800.00 | PEST | 0.00 | 3.00 | 891.00 | 700.00 | 49.00 |

**Details**

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | RENT | 888.00 | 0.00 | | | |
| | | N/A | | Applicant | Nava, Daniel | 05/09/2017 | 05/09/2017 | 05/08/2018 | | PEST | 0.00 * | 3.00 * | 800.00 * | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 797.00 * | 0.00 * | | | |
| 0505 | 1X1B LR | N/A | 742 | Occupied | Bailey, Shirley | 02/01/2017 | 02/01/2017 | 02/16/2018 | 790.00 | PEST | 0.00 | 3.00 | 815.00 | 0.00 | 38.60 |
| | | | | | | | | | | RENT | 787.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 25.00 | | | |
| 0506 | 1X1C | N/A | 763 | Occupied | Alibana, Saleema | 11/04/2011 | 02/11/2017 | 02/09/2018 | 800.00 | PEST | 0.00 | 3.00 | 719.00 | 100.00 | 49.00 |
| | | | | | | | | | | RENT | 716.00 | 0.00 | | | |
| 0507 | 2X2E R | N/A | 998 | Occupied | Doris, Daryl | 02/17/2016 | 03/18/2017 | 03/16/2018 | 972.00 | EMPLCRED | 0.00 | ###### | 908.00 | 275.00 | 74.04 |
| | | | | | | | | | | PEST | 0.00 | 3.00 | | | |
| | | | | | | | | | | RENT | 1,011.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 120.00 | | | |
| 0508 | 2X2F | N/A | 1010 | Occupied | Garcia, Damiana | 03/03/2017 | 03/03/2017 | 03/02/2018 | 982.00 | PEST | 0.00 | 3.00 | 982.00 | 0.00 | 7.00 |
| | | | | | | | | | | RENT | 979.00 | 0.00 | | | |
| 0509 | 2X2E | N/A | 998 | Admin/Down | VACANT | | | | 987.00 | | 0.00 * | 3.00 * | | | |
| 0510 | 2X2F | N/A | 1010 | Occupied | Mercado, Yuissa | 03/24/2017 | 03/24/2017 | 03/23/2018 | 997.00 | RENT | 999.00 | 0.00 | 999.00 | 0.00 | (1,001.84) |
| 0511 | 1X1B | N/A | 742 | Occupied | Shenouda, Ramy | 09/25/2009 | 02/05/2016 | 03/03/2017 | 805.00 | GARAGE | 0.00 | 50.00 | 1,198.40 | 675.00 | 36.60 |
| | | | | | | | | | | MTOM | 0.00 | 316.40 | | | |
| | | | | | | | | | | RENT | 832.00 | 0.00 | | | |
| 0512 | 1X1C | N/A | 763 | Occupied | Lovera, Steffany | 12/16/2016 | 12/16/2016 | 12/15/2017 | 815.00 | PEST | 0.00 | 3.00 | 830.00 | 0.00 | 73.81 |
| | | | | | | | | | | RENT | 827.00 | 0.00 | | | |
| 0513 | 1X1B R | N/A | 742 | Admin/Down | VACANT | | | | 790.00 | | 0.00 * | 3.00 * | | | |
| 0514 | 1X1C LR | N/A | 763 | Occupied | Gerard, Avery | 12/22/2014 | 01/14/2017 | 01/12/2018 | 815.00 | PEST | 0.00 | 3.00 | 796.00 | 750.00 | 39.07 |
| | | | | | | | | | | RENT | 768.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 25.00 | | | |
| 0515 | 2X2E LR | N/A | 998 | Occupied | Mohan, Bruce | 07/11/2012 | 05/25/2016 | 05/26/2017 | 972.00 | GARAGE | 0.00 | 85.00 | 1,075.00 | 0.00 | 44.26 |
| | | | | | | | | | | PEST | 0.00 | 3.00 | | | |

| Unit | Floorpla | Unit Designation | SQ | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | RENT | 962.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 25.00 | | | |
| 0516 | 2X2F LR | N/A | 1010 | Occupied | Salcedo Valladares, Domingo | 01/09/2017 | 01/09/2017 | 01/12/2018 | 1,087.00 | PEST | 0.00 | 3.00 | 1,052.00 | 0.00 | 54.46 |
| | | | | | | | | | | RENT | 974.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 75.00 | | | |
| 0601 | 1X1B R | N/A | 742 | Occupied | Correa, Marjorie | 04/03/2010 | 11/08/2016 | 11/03/2017 | 790.00 | PEST | 0.00 | 3.00 | 843.00 | 0.00 | 46.53 |
| | | | | | | | | | | RENT | 765.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 75.00 | | | |
| 0602 | 1X1C R | N/A | 763 | Occupied | Hull, Megan | 06/04/2013 | 07/20/2016 | 07/21/2017 | 800.00 | PEST | 0.00 | 3.00 | 849.00 | 0.00 | 39.07 |
| | | | | | | | | | | RENT | 771.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 75.00 | | | |
| 0603 | 1X1A R | N/A | 500 | Occupied | Rodriguez, David | 12/04/2014 | 11/25/2016 | 11/24/2017 | 703.00 | PEST | 0.00 | 3.00 | 782.00 | 0.00 | 33.26 |
| | | | | | | | | | | RENT | 704.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 75.00 | | | |
| 0604 | 1X1.5D R | N/A | 991 | Occupied | Vazquez, Zuleika | 03/15/2013 | 03/25/2017 | 03/23/2018 | 978.00 | PEST | 0.00 | 3.00 | 861.00 | 500.00 | 54.03 |
| | | | | | | | | | | RENT | 783.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 75.00 | | | |
| 0605 | 1X1A R | N/A | 500 | Occupied | Martins, Paulo | 10/12/2016 | 10/12/2016 | 10/13/2017 | 778.00 | PEST | 0.00 | 3.00 | 908.00 | 0.00 | 1,133.14 |
| | | | | | | | | | | RENT | 830.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 75.00 | | | |
| 0606 | 1X1.5D R | N/A | 991 | Occupied | Cortes Montalvo, Marymar | 06/01/2015 | 06/26/2016 | 06/23/2017 | 978.00 | PEST | 0.00 | 3.00 | 972.00 | 275.00 | 54.03 |
| | | | | | | | | | | PETFEE | 0.00 | 25.00 | | | |
| | | | | | | | | | | RENT | 869.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 75.00 | | | |
| 0607 | 1X1B R | N/A | 742 | Occupied | Fuster, John | 04/30/2016 | 04/30/2016 | 04/29/2017 | 790.00 | PEST | 0.00 | 3.00 | 966.00 | 450.00 | 38.59 |
| | | | | | | | | | | RENT | 888.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 75.00 | | | |
| 0608 | 1X1.5D R | N/A | 991 | Occupied | Ramos, Melany | 10/17/2014 | 11/07/2016 | 11/03/2017 | 978.00 | PEST | 0.00 | 3.00 | 868.00 | 0.00 | 39.07 |
| | | | | | | | | | | RENT | 790.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 75.00 | | | |
| 0609 | 1X1C R | N/A | 763 | Occupied | Tiburcio Osorio, Mayreliz | 07/22/2016 | 07/22/2016 | 07/21/2017 | 815.00 | PEST | 0.00 | 3.00 | 992.00 | 0.00 | 48.53 |
| | | | | | | | | | | RENT | 889.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 100.00 | | | |
| 0610 | 1X1.5D R | N/A | 991 | Occupied | Fecher Junior, Luis | 08/27/2016 | 08/27/2016 | 08/25/2017 | 993.00 | PEST | 0.00 | 3.00 | 898.00 | 0.00 | (723.69) |
| | | | | | | | | | | RENT | 820.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 75.00 | | | |
| 0611 | 1X1A R | N/A | 500 | Occupied | Cruz, Jonathan | 01/10/2017 | 01/10/2017 | 01/12/2018 | 718.00 | PEST | 0.00 | 3.00 | 798.00 | 0.00 | 43.19 |
| | | | | | | | | | | RENT | 720.00 | 0.00 | | | |

Details

**Details**

| Unit | Floorpla | Unit Designation | SQ | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0612 | 1X1.5D R | N/A | 991 | Occupied-NTV | Garcia, Christian | 05/26/2016 05/26/2017 | 05/26/2016 | 05/26/2017 | 993.00 | UPGRADE | 0.00 | 75.00 | | | |
| | | | | | | | | | | PEST | 0.00 | 3.00 | 1,093.00 | 275.00 | 54.03 |
| | | | | | | | | | | RENT | 1,015.00 | 0.00 | | | |
| 0613 | 1X1A R | N/A | 500 | Occupied | Reyes Carrasquillo, Corayma | 11/19/2016 | 11/19/2016 | 11/17/2017 | 718.00 | UPGRADE | 0.00 | 75.00 | | | |
| | | | | | | | | | | PEST | 0.00 | 3.00 | 798.00 | 0.00 | 33.26 |
| | | | | | | | | | | RENT | 720.00 | 0.00 | | | |
| 0614 | 1X1.5D R | N/A | 991 | Occupied | Anstadt, Nicole | 09/30/2016 | 09/30/2016 | 09/22/2017 | 993.00 | UPGRADE | 0.00 | 75.00 | | | |
| | | | | | | | | | | PEST | 0.00 | 3.00 | 1,048.00 | 0.00 | 44.10 |
| | | | | | | | | | | RENT | 970.00 | 0.00 | | | |
| 0615 | 1X1B R | N/A | 742 | Occupied | Molina, Joseph | 08/13/2014 | 08/04/2016 | 07/07/2017 | 805.00 | UPGRADE | 0.00 | 75.00 | | | |
| | | | | | | | | | | PEST | 0.00 | 3.00 | 780.00 | 0.00 | 48.53 |
| | | | | | | | | | | RENT | 702.00 | 0.00 | | | |
| 0616 | 1X1C R | N/A | 763 | Occupied | Beil, Donald | 08/24/2012 | 10/06/2016 | 10/06/2017 | 815.00 | UPGRADE | 0.00 | 75.00 | | | |
| | | | | | | | | | | PEST | 0.00 | 3.00 | 883.00 | 0.00 | 39.07 |
| | | | | | | | | | | RENT | 805.00 | 0.00 | | | |
| 0701 | 2X2E LR | N/A | 998 | Occupied | Nava Quintero, Heberto | 11/23/2016 | 11/23/2016 | 11/17/2017 | 972.00 | UPGRADE | 0.00 | 25.00 | | | |
| | | | | | | | | | | PEST | 0.00 | 3.00 | 982.00 | 0.00 | 54.18 |
| | | | | | | | | | | RENT | 954.00 | 0.00 | | | |
| 0702 | 2X2F LR | N/A | 1010 | Occupied | Hernandez, Daniel | 09/09/2016 | 09/09/2016 | 09/15/2017 | 1,057.00 | UPGRADE | 0.00 | 25.00 | | | |
| | | | | | | | | | | PEST | 0.00 | 3.00 | 1,153.00 | 0.00 | 74.30 |
| | | | | | | | | | | RENT | 1,125.00 | 0.00 | | | |
| 0703 | 1X1A | N/A | 500 | Occupied | Johnson, Gerald | 10/19/2012 | 08/03/2016 | 06/30/2017 | 703.00 | PEST | 0.00 | 3.00 | 719.00 | 500.00 | 43.19 |
| | | | | | | | | | | RENT | 716.00 | 0.00 | | | |
| 0704 | 1X1A | N/A | 500 | Occupied | Waddy, Sierra | 01/21/2017 | 01/21/2017 | 01/26/2018 | 703.00 | PEST | 0.00 | 3.00 | 703.00 | 0.00 | 33.26 |
| | | | | | | | | | | RENT | 700.00 | 0.00 | | | |
| 0705 | 1X1A | N/A | 500 | Occupied | Sainvil, Virginie | 01/10/2017 | 01/10/2017 | 01/12/2018 | 703.00 | PEST | 0.00 | 3.00 | 703.00 | 0.00 | 43.19 |
| | | | | | | | | | | RENT | 700.00 | 0.00 | | | |
| 0706 | 1X1A | N/A | 500 | Occupied | Rojas, Adolfo | 04/21/2011 | 08/26/2016 | 07/28/2017 | 703.00 | PEST | 0.00 | 3.00 | 762.00 | 250.00 | 31.26 |
| | | | | | | | | | | RENT | 759.00 | 0.00 | | | |

**Details**

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0707 | 2X2E | N/A | 998 | Occupied-NTV | Mena, Maybelline | 10/01/2014 04/21/2017 | 10/22/2016 | 04/21/2017 | 972.00 | PEST | 0.00 | 3.00 | 1,003.00 | 0.00 | 64.11 |
| | | | | | | | | | | RENT | 1,000.00 | 0.00 | | | |
| 0708 | 2X2F | N/A | 1010 | Occupied | Caicedo, Maria | 08/09/2014 | 08/30/2016 | 07/28/2017 | 982.00 | PEST | 0.00 | 3.00 | 908.00 | 750.00 | 54.46 |
| | | | | | | | | | | RENT | 905.00 | 0.00 | | | |

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0709 | 2X2E | N/A | 998 | Occupied | Velazquez Colon, Ashley | 07/30/2016 | 07/30/2016 | 08/04/2017 | 972.00 | PEST | 0.00 | 3.00 | 1,072.00 | 0.00 | (1,072.00) |
| | | | | | | | | | | RENT | 1,069.00 | 0.00 | | | |
| 0710 | 2X2F | N/A | 1010 | Occupied | COVENANT HOUSE FLORIDA INC, * | 09/16/2015 | 10/11/2016 | 10/13/2017 | 982.00 | PEST | 0.00 | 3.00 | 1,064.00 | 450.00 | 54.46 |
| | | | | | | | | | | RENT | 1,061.00 | 0.00 | | | |
| 0711 | 1X1A | N/A | 500 | Occupied | Roman Velez, Steve | 11/17/2016 | 11/17/2016 | 11/17/2017 | 703.00 | PEST | 0.00 | 3.00 | 713.00 | 0.00 | 43.19 |
| | | | | | | | | | | RENT | 710.00 | 0.00 | | | |
| 0712 | 1X1A | N/A | 500 | Occupied | Palma, Cristin | 02/18/2017 | 02/18/2017 | 02/16/2018 | 703.00 | PEST | 0.00 | 3.00 | 703.00 | 0.00 | 34.44 |
| | | | | | | | | | | RENT | 700.00 | 0.00 | | | |
| 0713 | 1X1A R | N/A | 500 | Occupied | Braun, Gregory | 05/03/2016 | 05/03/2016 | 05/05/2017 | 703.00 | PEST | 0.00 | 3.00 | 832.00 | 0.00 | 33.26 |
| | | | | | | | | | | RENT | 754.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 75.00 | | | |
| | | N/A | | Pending renewal | Braun, Gregory | 05/03/2016 | 05/06/2017 | 05/04/2018 | | PEST | 0.00 * | 3.00 * | 844.00 * | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 766.00 * | 0.00 * | | | |
| | | | | | | | | | | UPGRADE | 0.00 * | 75.00 * | | | |
| 0714 | 1X1A | N/A | 500 | Occupied | Rolon, Alfredo | 02/07/2015 | 02/25/2017 | 02/23/2018 | 703.00 | PEST | 0.00 | 3.00 | 693.00 | 500.00 | 31.32 |
| | | | | | | | | | | RENT | 690.00 | 0.00 | | | |
| 0715 | 2X2E | N/A | 998 | Occupied | Perez, Roxanne | 01/05/2017 | 01/05/2017 | 01/05/2018 | 972.00 | PEST | 0.00 | 3.00 | 947.00 | 0.00 | 54.18 |
| | | | | | | | | | | RENT | 944.00 | 0.00 | | | |
| 0716 | 2X2F | N/A | 1010 | Occupied | Bahamundi, Alida | 10/10/2015 | 11/11/2016 | 11/10/2017 | 982.00 | PEST | 0.00 | 3.00 | 1,050.00 | 275.00 | 64.38 |
| | | | | | | | | | | RENT | 1,047.00 | 0.00 | | | |
| 0801 | 1X1B LR | N/A | 742 | Occupied | Suarez Diaz, Walter | 02/24/2017 | 02/24/2017 | 02/23/2018 | 790.00 | PEST | 0.00 | 3.00 | 885.00 | 0.00 | 28.77 |
| | | | | | | | | | | RENT | 787.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 95.00 | | | |
| 0802 | 1X1C | N/A | 763 | Occupied | Gobin, Sarada | 11/16/2016 | 11/16/2016 | 11/17/2017 | 800.00 | GARAGE | 0.00 | 85.00 | 855.00 | 0.00 | 49.00 |
| | | | | | | | | | | PEST | 0.00 | 3.00 | | | |
| | | | | | | | | | | RENT | 767.00 | 0.00 | | | |

**Details**

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0803 | 1X1A | N/A | 500 | Occupied | Carpenter, Monica | 08/26/2011 | 08/09/2016 | 08/08/2017 | 703.00 | PEST | 0.00 | 3.00 | 735.00 | 100.00 | 21.36 |
| | | | | | | | | | | RENT | 732.00 | 0.00 | | | |
| 0804 | 1X1D | N/A | 991 | Occupied | Miranda, Fernando | 11/04/2016 | 11/04/2016 | 11/03/2017 | 978.00 | PEST | 0.00 | 3.00 | 983.00 | 0.00 | 54.03 |
| | | | | | | | | | | RENT | 980.00 | 0.00 | | | |
| 0805 | 1X1A | N/A | 500 | Occupied-NTVL | Mercado Pacheco, Estefany | 04/09/2016 04/07/2017 | 04/09/2016 | 04/07/2017 | 703.00 | GARAGE | 0.00 | 85.00 | 897.00 | 700.00 | 0.00 |
| | | | | | | | | | | PEST | 0.00 | 3.00 | | | |
| | | | | | | | | | | RENT | 809.00 | 0.00 | | | |
| | | N/A | | Applicant | Bonczek, Michael | 04/25/2017 | 04/25/2017 | 05/04/2018 | | PEST | 0.00 * | 3.00 * | 703.00 * | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 700.00 * | 0.00 * | | | |
| 0806 | 1X1.5D-LR | N/A | 991 | Occupied | Abou Ghannam, | 10/11/2016 | 10/11/2016 | 10/13/2017 | 978.00 | PEST | 0.00 | 3.00 | 988.00 | 0.00 | 54.03 |

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Rihoun | | | | | RENT | 960.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 25.00 | | | |
| 0807 | 1X1B LR | N/A | 742 | Occupied | Ledoux, Debra | 06/20/2015 | 07/15/2016 | 07/14/2017 | 790.00 | PEST | 0.00 | 3.00 | 937.00 | 0.00 | 38.60 |
| | | | | | | | | | | PETFEE | 0.00 | 25.00 | | | |
| | | | | | | | | | | RENT | 884.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 25.00 | | | |
| 0808 | 1X1C | N/A | 763 | Occupied | Onachilla, John | 12/30/2013 | 02/18/2017 | 02/16/2018 | 800.00 | PEST | 0.00 | 3.00 | 733.00 | 0.00 | 39.07 |
| | | | | | | | | | | RENT | 730.00 | 0.00 | | | |
| 0809 | 1X1B | N/A | 742 | Occupied-NTV | Dzija, Jonathan | 04/19/2016 04/14/2017 | 04/19/2016 | 04/14/2017 | 805.00 | PEST | 0.00 | 3.00 | 926.00 | 750.00 | 48.53 |
| | | | | | | | | | | PETFEE | 0.00 | 25.00 | | | |
| | | | | | | | | | | RENT | 898.00 | 0.00 | | | |
| 0810 | 1X1C | Conventional | 763 | Occupied | Morgan, Nicole | 11/18/2015 | 12/17/2016 | 12/15/2017 | 815.00 | PEST | 0.00 | 3.00 | 716.00 | 0.00 | 39.07 |
| | | | | | | | | | | RENT | 713.00 | 0.00 | | | |
| 0811 | 1X1A | N/A | 500 | Occupied | Antigua Amparo, Fatima | 05/19/2016 | 05/19/2016 | 05/19/2017 | 733.00 | PEST | 0.00 | 3.00 | 785.00 | 275.00 | 34.07 |
| | | | | | | | | | | RENT | 782.00 | 0.00 | | | |
| 0812 | 1X1D | N/A | 991 | Occupied | De Vargas, Jean | 02/03/2016 | 03/04/2017 | 03/02/2018 | 993.00 | PEST | 0.00 | 3.00 | 885.00 | 450.00 | 54.03 |
| | | | | | | | | | | RENT | 882.00 | 0.00 | | | |
| 0813 | 1X1A LR | N/A | 500 | Occupied | Casillas, Ramona | 12/05/2014 | 10/29/2016 | 10/27/2017 | 718.00 | PEST | 0.00 | 3.00 | 789.00 | 500.00 | 33.26 |
| | | | | | | | | | | RENT | 761.00 | 0.00 | | | |

**Details**

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | UPGRADE | 0.00 | 25.00 | | | |
| 0814 | 1X1D | N/A | 991 | Occupied | Bussey, Autumn | 05/31/2014 | 07/21/2016 | 07/21/2017 | 993.00 | GARAGE | 0.00 | 75.00 | 916.00 | 250.00 | 44.10 |
| | | | | | | | | | | PEST | 0.00 | 3.00 | | | |
| | | | | | | | | | | RENT | 838.00 | 0.00 | | | |
| 0815 | 1X1B | N/A | 742 | Occupied-NTVL | Perez, Emilio | 11/11/2014 03/31/2017 | 11/02/2016 | 03/31/2017 | 805.00 | PEST | 0.00 | 3.00 | 868.00 | 750.00 | 0.00 |
| | | | | | | | | | | RENT | 865.00 | 0.00 | | | |
| | | N/A | | Applicant | Cruz, Jordan | 04/14/2017 | 04/14/2017 | 04/13/2018 | | APPFEE | 0.00 * | 30.00 * | 840.00 * | 0.00 | 0.00 |
| | | | | | | | | | | PEST | 0.00 * | 3.00 * | | | |
| | | | | | | | | | | RENT | 807.00 * | 0.00 * | | | |
| 0816 | 1X1C | N/A | 763 | Occupied | Vega, Israel | 02/18/2015 | 03/11/2017 | 03/09/2018 | 815.00 | PEST | 0.00 | 3.00 | 769.00 | 0.00 | 39.07 |
| | | | | | | | | | | RENT | 766.00 | 0.00 | | | |
| 0901 | 1X1B | N/A | 742 | Occupied | Gonzalez, Katerine | 03/15/2016 | 03/15/2017 | 09/15/2017 | 790.00 | PEST | 0.00 | 3.00 | 862.00 | 700.00 | 48.53 |
| | | | | | | | | | | RENT | 859.00 | 0.00 | | | |
| 0902 | 1X1C | N/A | 763 | Occupied | Dobbs, Dianne | 01/02/2017 | 01/02/2017 | 01/05/2018 | 800.00 | PEST | 0.00 | 3.00 | 790.00 | 0.00 | 39.07 |
| | | | | | | | | | | RENT | 787.00 | 0.00 | | | |
| 0903 | 1X1A LR | N/A | 500 | Occupied | Trow, Danielle | 09/06/2013 | 08/28/2016 | 05/26/2017 | 703.00 | PEST | 0.00 | 3.00 | 994.00 | 834.00 | 33.26 |
| | | | | | | | | | | PETFEE | 0.00 | 40.00 | | | |
| | | | | | | | | | | RENT | 851.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 100.00 | | | |

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0904 | 1X1.5D R | N/A | 991 | Occupied | Monroe, Taryn | 01/15/2014 | 03/04/2017 | 03/02/2018 | 978.00 | PEST | 0.00 | 3.00 | 854.00 | 0.00 | 44.10 |
| | | | | | | | | | | RENT | 776.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 75.00 | | | |
| 0905 | 1X1A | N/A | 500 | Occupied | Petty, Jeffrey | 05/27/1997 | 07/11/2016 | 07/07/2017 | 703.00 | PEST | 0.00 | 3.00 | 774.00 | 150.00 | 31.26 |
| | | | | | | | | | | RENT | 771.00 | 0.00 | | | |
| 0906 | 1X1.5D R | N/A | 991 | Occupied | Ayala, Evelyn | 11/01/2014 | 11/22/2016 | 11/24/2017 | 978.00 | PEST | 0.00 | 3.00 | 931.00 | 750.00 | 44.10 |
| | | | | | | | | | | RENT | 853.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 75.00 | | | |
| 0907 | 1X1B LR | N/A | 742 | Occupied | Emiliano, Steven | 02/13/2017 | 02/13/2017 | 02/09/2018 | 790.00 | PEST | 0.00 | 3.00 | 865.00 | 0.00 | 27.33 |
| | | | | | | | | | | RENT | 787.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 75.00 | | | |
| 0908 | 1X1C | N/A | 763 | Occupied | Bueno, Lidia | 05/05/2016 | 05/05/2016 | 05/05/2017 | 800.00 | PEST | 0.00 | 3.00 | 881.00 | 0.00 | 39.07 |
| | | | | | | | | | | RENT | 878.00 | 0.00 | | | |
| | | N/A | | Pending renewal | Bueno, Lidia | 05/05/2016 | 05/06/2017 | 05/04/2018 | | PEST | 0.00 * | 3.00 * | 898.00 * | 0.00 | 0.00 |

**Details**

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | RENT | 895.00 * | 0.00 * | | | |
| 0909 | 1X1B | N/A | 742 | Occupied | Garcia, Cynthia | 04/04/2015 | 04/29/2016 | 05/26/2017 | 790.00 | PEST | 0.00 | 3.00 | 894.00 | 420.50 | 48.44 |
| | | | | | | | | | | RENT | 891.00 | 0.00 | | | |
| 0910 | 1X1C LR | N/A | 763 | Occupied | Lopez, Marienelli | 01/24/2017 | 01/24/2017 | 02/02/2018 | 800.00 | PEST | 0.00 | 3.00 | 825.00 | 0.00 | 49.00 |
| | | | | | | | | | | RENT | 797.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 25.00 | | | |
| 0911 | 1X1A | N/A | 500 | Occupied | Umah, Sydney | 01/14/2017 | 01/14/2017 | 01/12/2018 | 703.00 | RENT | 700.00 | 0.00 | 700.00 | 0.00 | 67.72 |
| 0912 | 1X1D | N/A | 991 | Occupied | Marcinkewicz, Andrea | 02/01/2014 | 03/25/2017 | 03/30/2018 | 978.00 | PEST | 0.00 | 3.00 | 815.00 | 0.00 | 44.10 |
| | | | | | | | | | | RENT | 812.00 | 0.00 | | | |
| 0913 | 1X1A LR | N/A | 500 | Occupied | President, Miriam | 05/21/2013 | 06/05/2016 | 06/02/2017 | 703.00 | PEST | 0.00 | 3.00 | 738.00 | 0.00 | 33.26 |
| | | | | | | | | | | RENT | 710.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 25.00 | | | |
| 0914 | 1X1.5D R | N/A | 991 | Occupied | Garcia, Peter | 07/08/2013 | 08/20/2016 | 07/21/2017 | 978.00 | GARAGE | 0.00 | 85.00 | 1,013.00 | 250.00 | 44.10 |
| | | | | | | | | | | PEST | 0.00 | 3.00 | | | |
| | | | | | | | | | | RENT | 850.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 75.00 | | | |
| 0915 | 1X1B | N/A | 742 | Occupied | Richards, Shannon | 07/20/2015 | 08/14/2016 | 07/14/2017 | 790.00 | PEST | 0.00 | 3.00 | 894.00 | 275.00 | 48.53 |
| | | | | | | | | | | PETFEE | 0.00 | 40.00 | | | |
| | | | | | | | | | | RENT | 851.00 | 0.00 | | | |
| 0916 | 1X1C LR | N/A | 763 | Occupied | Rodriguez Sanchez, Jose | 11/21/2016 | 11/21/2016 | 11/24/2017 | 800.00 | PEST | 0.00 | 3.00 | 903.00 | 225.00 | (641.00) |
| | | | | | | | | | | PETRENT | 0.00 | 40.00 | | | |
| | | | | | | | | | | RENT | 810.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 50.00 | | | |
| 1001 | 2X2E | N/A | 998 | Occupied | Medina, Flor | 03/07/2017 | 03/07/2017 | 03/09/2018 | 972.00 | GARAGE | 0.00 | 85.00 | 1,082.00 | 0.00 | (82.00) |
| | | | | | | | | | | PEST | 0.00 | 3.00 | | | |
| | | | | | | | | | | PETFEE | 0.00 | 25.00 | | | |

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|------|-----------|------------------|-----|-------------------|------|------------------|-------------|-----------|----------------|------------|------------|------------------------|---------------|-------------|---------|
| | | | | | | | | | | RENT | 969.00 | 0.00 | | | |
| 1002 | 2X2F | N/A | 1010 | Occupied | Del Rosario, Pura | 07/29/2015 | 11/01/2016 | 09/30/2017 | 982.00 | PEST | 0.00 | 3.00 | 963.00 | 0.00 | 54.46 |
| | | | | | | | | | | RENT | 960.00 | 0.00 | | | |
| 1003 | 1X1A | N/A | 500 | Occupied | Feliciano, Johanna | 02/15/2010 | 04/28/2016 | 05/26/2017 | 703.00 | PEST | 0.00 | 3.00 | 702.00 | 150.00 | 31.26 |
| | | | | | | | | | | PETFEE | 0.00 | 15.00 | | | |

**Details**

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|------|-----------|------------------|-----|-------------------|------|------------------|-------------|-----------|----------------|------------|------------|------------------------|---------------|-------------|---------|
| | | | | | | | | | | RENT | 684.00 | 0.00 | | | |
| 1004 | 1X1A | N/A | 500 | Occupied | Jones, Robert | 01/14/2016 | 02/11/2017 | 02/09/2018 | 703.00 | PEST | 0.00 | 3.00 | 791.00 | 450.00 | 43.19 |
| | | | | | | | | | | RENT | 788.00 | 0.00 | | | |
| 1005 | 1X1A LR | N/A | 500 | Occupied | Aguayo, Frank | 12/29/2016 | 12/29/2016 | 12/29/2017 | 703.00 | PEST | 0.00 | 3.00 | 758.00 | 0.00 | 33.26 |
| | | | | | | | | | | RENT | 745.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 10.00 | | | |
| 1006 | 1X1A | N/A | 500 | Occupied | Skyers, Renee | 06/24/2016 | 06/24/2016 | 05/23/2017 | 703.00 | PEST | 0.00 | 3.00 | 785.00 | 0.00 | 43.19 |
| | | | | | | | | | | RENT | 782.00 | 0.00 | | | |
| 1007 | 2X2E LR | N/A | 998 | Occupied | Bess, Dion | 03/15/2016 | 03/11/2017 | 03/09/2018 | 972.00 | PEST | 0.00 | 3.00 | 1,125.00 | 450.00 | 54.18 |
| | | | | | | | | | | RENT | 1,097.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 25.00 | | | |
| 1008 | 2X2F | N/A | 1010 | Occupied-NTV | De La Rosa Pacheco, Ariela | 06/30/2016 05/29/2017 | 06/30/2016 | 05/29/2017 | 982.00 | PEST | 0.00 | 3.00 | 1,092.00 | 450.00 | 64.38 |
| | | | | | | | | | | RENT | 1,089.00 | 0.00 | | | |
| 1009 | 2X2E | N/A | 998 | Occupied | Graterol, Ana | 09/30/2015 | 10/25/2016 | 10/24/2017 | 972.00 | PEST | 0.00 | 3.00 | 1,077.00 | 700.00 | 54.18 |
| | | | | | | | | | | RENT | 1,074.00 | 0.00 | | | |
| 1010 | 2X2F | N/A | 1010 | Occupied | Jaramillo, Hector | 09/10/2015 | 09/05/2016 | 08/04/2017 | 982.00 | GARAGE | 0.00 | 85.00 | 1,105.00 | 700.00 | 74.30 |
| | | | | | | | | | | PEST | 0.00 | 3.00 | | | |
| | | | | | | | | | | RENT | 1,017.00 | 0.00 | | | |
| 1011 | 1X1A | N/A | 500 | Occupied | Roberts, Moivee | 02/25/2017 | 02/25/2017 | 02/23/2018 | 703.00 | PEST | 0.00 | 3.00 | 703.00 | 0.00 | 25.29 |
| | | | | | | | | | | RENT | 700.00 | 0.00 | | | |
| 1012 | 1X1A | N/A | 500 | Occupied | Orosco, Samantha | 03/14/2016 | 03/11/2017 | 03/09/2018 | 703.00 | PEST | 0.00 | 3.00 | 803.00 | 450.00 | 43.19 |
| | | | | | | | | | | RENT | 800.00 | 0.00 | | | |
| 1013 | 1X1A | N/A | 500 | Occupied | Peralta-Quezada, Yunio | 06/24/2016 | 06/24/2016 | 05/26/2017 | 703.00 | PEST | 0.00 | 3.00 | 765.00 | 450.00 | 43.19 |
| | | | | | | | | | | RENT | 762.00 | 0.00 | | | |
| | | N/A | | Pending renewal | Peralta-Quezada, Yunio | 06/24/2016 | 05/27/2017 | 05/25/2018 | | PEST | 0.00 * | 3.00 * | 776.00 * | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 773.00 * | 0.00 * | | | |
| 1014 | 1X1A | N/A | 500 | Occupied | Garvin, Reginald | 12/02/2013 | 01/21/2017 | 01/19/2018 | 703.00 | PEST | 0.00 | 3.00 | 687.00 | 500.00 | 33.26 |
| | | | | | | | | | | RENT | 684.00 | 0.00 | | | |
| 1015 | 2X2E | N/A | 998 | Occupied | Mendoza, Mirian | 05/12/2014 | 06/02/2016 | 06/02/2017 | 972.00 | PEST | 0.00 | 3.00 | 935.00 | 750.00 | 54.18 |
| | | | | | | | | | | RENT | 932.00 | 0.00 | | | |
| 1016 | 2X2F | N/A | 1010 | Occupied | Interiano, Eric | 01/30/2014 | 02/18/2017 | 02/16/2018 | 982.00 | PEST | 0.00 | 3.00 | 906.00 | 0.00 | 64.38 |
| | | | | | | | | | | PETFEE | 0.00 | 25.00 | | | |

**Details**

| Unit | Floorpla | Unit Designation | SQ | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|------|----------|------------------|-----|-------------------|------|------------------|-------------|-----------|----------------|------------|------------|------------------------|---------------|-------------|---------|
| | | | | | | | | | | RENT | 878.00 | 0.00 | | | |
| 1101 | 1X1B | N/A | 742 | Occupied | Perez, Luisaura | 12/09/2015 | 01/07/2017 | 01/05/2018 | 790.00 | PEST | 0.00 | 3.00 | 751.00 | 450.00 | 48.53 |
| | | | | | | | | | | RENT | 748.00 | 0.00 | | | |
| 1102 | 1X1C | N/A | 763 | Occupied | Nieves, Angelica | 03/01/2017 | 03/01/2017 | 03/02/2018 | 800.00 | PEST | 0.00 | 3.00 | 800.00 | 0.00 | (800.00) |
| | | | | | | | | | | RENT | 797.00 | 0.00 | | | |
| 1103 | 1X1A | N/A | 500 | Occupied | Rivera, Iban | 05/23/2014 | 09/02/2016 | 09/01/2017 | 703.00 | GARAGE | 0.00 | 65.00 | 847.00 | 250.00 | 43.19 |
| | | | | | | | | | | PEST | 0.00 | 3.00 | | | |
| | | | | | | | | | | RENT | 779.00 | 0.00 | | | |
| 1104 | 1X1D | N/A | 991 | Occupied | Capdevielle, Alejandro | 09/28/2016 | 09/28/2016 | 09/29/2017 | 978.00 | PEST | 0.00 | 3.00 | 963.00 | 0.00 | 44.10 |
| | | | | | | | | | | RENT | 960.00 | 0.00 | | | |
| 1105 | 1X1A | N/A | 500 | Occupied | Fernandez Lantigua, Daryl | 03/04/2017 | 03/04/2017 | 03/02/2018 | 703.00 | RENT | 700.00 | 0.00 | 700.00 | 0.00 | (16.00) |
| 1106 | 1X1D | N/A | 991 | Occupied-NTV | Martinez, Jose | 04/12/2013 04/25/2017 | 03/30/2016 | 04/21/2017 | 978.00 | GARAGE | 0.00 | 50.00 | 928.00 | 0.00 | 44.10 |
| | | | | | | | | | | PEST | 0.00 | 3.00 | | | |
| | | | | | | | | | | PETFEE | 0.00 | 25.00 | | | |
| | | | | | | | | | | RENT | 850.00 | 0.00 | | | |
| 1107 | 1X1B LR | N/A | 742 | Occupied | Rodriguez, Jessika | 12/15/2016 | 12/15/2016 | 12/15/2017 | 790.00 | PEST | 0.00 | 3.00 | 815.00 | 0.00 | 38.60 |
| | | | | | | | | | | RENT | 787.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 25.00 | | | |
| 1108 | 1X1C R | N/A | 763 | Occupied | Barner, Curtis | 08/13/2016 | 08/13/2016 | 08/11/2017 | 800.00 | RENT | 870.00 | 0.00 | 965.00 | 0.00 | 39.07 |
| | | | | | | | | | | UPGRADE | 0.00 | 95.00 | | | |
| 1109 | 1X1B | N/A | 742 | Occupied | Griffith, Steve | 04/22/2016 | 04/22/2016 | 04/21/2017 | 790.00 | PEST | 0.00 | 3.00 | 827.00 | 0.00 | 38.60 |
| | | | | | | | | | | RENT | 824.00 | 0.00 | | | |
| 1110 | 1X1C | N/A | 763 | Occupied | Hogle, Lindsey | 05/24/2016 | 05/24/2016 | 05/23/2017 | 800.00 | RENT | 868.00 | 0.00 | 868.00 | 0.00 | 39.07 |
| 1111 | 1X1A | N/A | 500 | Occupied | Hollings, Ernest | 05/09/1994 | 07/11/2016 | 07/07/2017 | 703.00 | PEST | 0.00 | 3.00 | 801.00 | 200.00 | 31.26 |
| | | | | | | | | | | RENT | 798.00 | 0.00 | | | |
| 1112 | 1X1.5D-LR | N/A | 991 | Occupied | Gortman, Travis | 01/26/2017 | 01/26/2017 | 01/26/2018 | 978.00 | PEST | 0.00 | 3.00 | 948.00 | 0.00 | 16.10 |
| | | | | | | | | | | PETFEE | 0.00 | 25.00 | | | |
| | | | | | | | | | | RENT | 895.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 25.00 | | | |
| 1113 | 1X1A | N/A | 500 | Occupied | Santiago, Anibal | 10/15/2014 | 11/05/2016 | 11/03/2017 | 703.00 | PEST | 0.00 | 3.00 | 753.00 | 0.00 | 33.26 |
| | | | | | | | | | | RENT | 750.00 | 0.00 | | | |
| 1114 Details | 1X1D | N/A | 991 | Occupied | DiMarco, Thomas | 01/15/2014 | 04/01/2016 | 03/31/2017 | 978.00 | PETFEE | 0.00 | 25.00 | 798.00 | 0.00 | 44.07 |

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|------|-----------|------------------|-----|-------------------|------|------------------|-------------|-----------|----------------|------------|------------|------------------------|---------------|-------------|---------|
| | | | | | | | | | | RENT | 773.00 | 0.00 | | | |
| | | N/A | | Pending renewal | DiMarco, Thomas | 01/15/2014 | 04/01/2017 | 03/30/2018 | | PEST | 0.00 * | 3.00 * | 813.00 * | 0.00 | 0.00 |
| | | | | | | | | | | PETFEE | 0.00 * | 25.00 * | | | |
| | | | | | | | | | | RENT | 785.00 * | 0.00 * | | | |

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1115 | 1X1B | N/A | 742 | Occupied-NTV | Frederick, Eric | 05/27/2012 05/12/2017 | 05/13/2016 | 05/12/2017 | 706.00 | PEST | 0.00 | 3.00 | 764.00 | 0.00 | 38.60 |
| | | | | | | | | | | RENT | 761.00 | 0.00 | | | |
| 1116 | 1X1C | N/A | 763 | Occupied | Czul, Emil | 04/01/1990 | 08/08/2016 | 08/04/2017 | 800.00 | PEST | 0.00 | 3.00 | 872.00 | 100.00 | 37.07 |
| | | | | | | | | | | RENT | 869.00 | 0.00 | | | |
| 1201 | 2X2E | N/A | 998 | Occupied | Amaya, Luis | 07/21/2002 | 12/01/2016 | 11/30/2017 | 972.00 | GARAGE | 0.00 | 85.00 | 1,145.00 | 100.00 | 42.26 |
| | | | | | | | | | | RENT | 1,060.00 | 0.00 | | | |
| 1202 | 2X2F | N/A | 1010 | Occupied | Oquendo, Nilo | 07/30/2016 | 07/30/2016 | 07/21/2017 | 982.00 | RENT | 1,060.00 | 0.00 | 1,060.00 | 0.00 | 64.38 |
| 1203 | 1X1A | N/A | 500 | Occupied | Roman, Ashley | 01/16/2017 | 01/16/2017 | 01/19/2018 | 703.00 | PEST | 0.00 | 3.00 | 733.00 | 0.00 | 33.26 |
| | | | | | | | | | | RENT | 730.00 | 0.00 | | | |
| 1204 | 1X1A | N/A | 500 | Occupied | Santiago, Lucia | 12/17/2015 | 01/14/2017 | 01/12/2018 | 703.00 | PEST | 0.00 | 3.00 | 722.00 | 0.00 | 33.26 |
| | | | | | | | | | | RENT | 719.00 | 0.00 | | | |
| 1205 | 1X1A | N/A | 500 | Occupied | Nevot, Estephanie | 02/10/2017 | 02/10/2017 | 02/09/2018 | 703.00 | PEST | 0.00 | 3.00 | 703.00 | 0.00 | (703.00) |
| | | | | | | | | | | RENT | 700.00 | 0.00 | | | |
| 1206 | 1X1A LR | N/A | 500 | Occupied | Doyle, Elizabeth | 06/02/2016 | 06/02/2016 | 06/02/2017 | 703.00 | PEST | 0.00 | 3.00 | 800.00 | 450.00 | 33.26 |
| | | | | | | | | | | RENT | 772.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 25.00 | | | |
| 1207 | 2X2E LR | N/A | 998 | Occupied | Zaragoza, Jorge | 04/29/2016 | 04/29/2016 | 04/28/2017 | 972.00 | PEST | 0.00 | 3.00 | 1,097.00 | 0.00 | 54.18 |
| | | | | | | | | | | RENT | 1,069.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 25.00 | | | |
| 1208 | 2X2F | N/A | 1010 | Occupied | Dominguez, Alfredo | 11/03/2012 | 10/15/2016 | 04/14/2017 | 982.00 | PEST | 0.00 | 3.00 | 995.00 | 0.00 | 54.46 |
| | | | | | | | | | | RENT | 992.00 | 0.00 | | | |
| | | N/A | | Pending renewal | Dominguez, Alfredo | 11/03/2012 | 04/15/2017 | 04/13/2018 | | PEST | 0.00 * | 3.00 * | 1,025.00 * | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 1,022.00 * | 0.00 * | | | |
| 1209 | 2X2E | N/A | 998 | Occupied | Rivera Colon, Miguel | 07/25/2016 | 07/25/2016 | 07/07/2017 | 972.00 | PEST | 0.00 | 3.00 | 1,062.00 | 0.00 | 44.26 |
| | | | | | | | | | | RENT | 1,059.00 | 0.00 | | | |
| 1210 | 2X2F LR | N/A | 1010 | Occupied | Rodriguez, Yoraisa | 03/01/2017 | 03/01/2017 | 03/02/2018 | 982.00 | PEST | 0.00 | 3.00 | 1,010.00 | 0.00 | 10.00 |

**Details**

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | RENT | 982.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 25.00 | | | |
| 1211 | 1X1A | N/A | 500 | Vacant-Leased | VACANT | | | | 703.00 | | 0.00 * | 3.00 * | | | |
| | | N/A | | Applicant | Bonilla, Eddie | 03/31/2017 | 03/31/2017 | 04/06/2018 | | PEST | 0.00 * | 3.00 * | 703.00 * | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 700.00 * | 0.00 * | | | |
| 1212 | 1X1A | N/A | 500 | Occupied | Reed, Michael | 12/26/2013 | 02/11/2017 | 02/09/2018 | 703.00 | PEST | 0.00 | 3.00 | 773.00 | 250.00 | (739.74) |
| | | | | | | | | | | RENT | 770.00 | 0.00 | | | |
| 1213 | 1X1A | N/A | 500 | Occupied | Clements, Dale | 10/31/2016 | 10/31/2016 | 10/27/2017 | 703.00 | PEST | 0.00 | 3.00 | 728.00 | 0.00 | 33.26 |
| | | | | | | | | | | RENT | 725.00 | 0.00 | | | |
| 1214 | 1X1A | N/A | 500 | Occupied | Goodwin, Christopher | 10/05/2004 | 02/11/2017 | 02/09/2018 | 703.00 | PEST | 0.00 | 3.00 | 683.00 | 0.00 | 41.19 |
| | | | | | | | | | | RENT | 680.00 | 0.00 | | | |

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1215 | 2X2E LR | N/A | 998 | Occupied | Villarreal de Ordonez, Mayory | 12/03/2016 | 12/05/2016 | 12/08/2017 | 972.00 | PEST | 0.00 | 3.00 | 1,022.00 | 0.00 | 64.11 |
|  |  |  |  |  |  |  |  |  |  | RENT | 944.00 | 0.00 |  |  |  |
|  |  |  |  |  |  |  |  |  |  | UPGRADE | 0.00 | 75.00 |  |  |  |
| 1216 | 2X2F | N/A | 1010 | Occupied | Otanez, Kevin | 11/11/2015 | 11/06/2016 | 11/03/2017 | 982.00 | PEST | 0.00 | 3.00 | 1,038.00 | 0.00 | 54.46 |
|  |  |  |  |  |  |  |  |  |  | RENT | 1,035.00 | 0.00 |  |  |  |
| 1301 | 2X2E | N/A | 998 | Occupied | Alicea, Maria | 01/20/2012 | 12/31/2016 | 12/29/2017 | 972.00 | GARAGE | 0.00 | 65.00 | 1,021.00 | 500.00 | 54.18 |
|  |  |  |  |  |  |  |  |  |  | PEST | 0.00 | 3.00 |  |  |  |
|  |  |  |  |  |  |  |  |  |  | RENT | 953.00 | 0.00 |  |  |  |
| 1302 | 2X2F | N/A | 1010 | Occupied | Baez Munoz, Joan | 01/03/2017 | 01/03/2017 | 01/05/2018 | 982.00 | PEST | 0.00 | 3.00 | 957.00 | 0.00 | 74.30 |
|  |  |  |  |  |  |  |  |  |  | RENT | 954.00 | 0.00 |  |  |  |
| 1303 | 1X1A | N/A | 500 | Occupied | Mallon, Timothy | 01/06/2017 | 01/06/2017 | 01/05/2018 | 703.00 | PEST | 0.00 | 3.00 | 703.00 | 0.00 | 33.26 |
|  |  |  |  |  |  |  |  |  |  | RENT | 700.00 | 0.00 |  |  |  |
| 1304 | 1X1A | N/A | 500 | Occupied | Lopez Ruiz, Joel | 09/21/2010 | 08/30/2016 | 07/28/2017 | 703.00 | PEST | 0.00 | 3.00 | 732.00 | 0.00 | 31.26 |
|  |  |  |  |  |  |  |  |  |  | RENT | 729.00 | 0.00 |  |  |  |
| 1305 | 1X1A | N/A | 500 | Occupied | Persaud, Anupama | 01/28/2017 | 01/28/2017 | 02/02/2018 | 703.00 | PEST | 0.00 | 3.00 | 703.00 | 0.00 | 43.19 |
|  |  |  |  |  |  |  |  |  |  | RENT | 700.00 | 0.00 |  |  |  |
| 1306 | 1X1A | N/A | 500 | Occupied | Doric, Ivan | 01/01/1995 | 10/07/2016 | 10/06/2017 | 703.00 | PEST | 0.00 | 3.00 | 751.00 | 200.00 | 31.26 |
|  |  |  |  |  |  |  |  |  |  | RENT | 748.00 | 0.00 |  |  |  |
| 1307 | 2X2E LR | N/A | 998 | Occupied | Olvera, Jesus | 02/15/2013 | 02/25/2017 | 02/23/2018 | 972.00 | GARAGE | 0.00 | 50.00 | 1,022.00 | 500.00 | 54.18 |
|  |  |  |  |  |  |  |  |  |  | PEST | 0.00 | 3.00 |  |  |  |
|  |  |  |  |  |  |  |  |  |  | RENT | 919.00 | 0.00 |  |  |  |

**Details**

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |  |  | UPGRADE | 0.00 | 50.00 |  |  |  |
| 1308 | 2X2F | N/A | 1010 | Occupied | Kelley, Dorothy | 09/24/2014 | 10/15/2016 | 10/13/2017 | 982.00 | PEST | 0.00 | 3.00 | 1,029.00 | 250.00 | 44.53 |
|  |  |  |  |  |  |  |  |  |  | RENT | 1,026.00 | 0.00 |  |  |  |
| 1309 | 2X2E R | N/A | 998 | Occupied | Gil de Aguilar, Wendy | 11/01/2016 | 11/01/2016 | 10/27/2017 | 972.00 | PEST | 0.00 | 3.00 | 1,142.00 | 0.00 | (1,142.00) |
|  |  |  |  |  |  |  |  |  |  | RENT | 994.00 | 0.00 |  |  |  |
|  |  |  |  |  |  |  |  |  |  | UPGRADE | 0.00 | 145.00 |  |  |  |
| 1310 | 2X2F LR | N/A | 1010 | Occupied | Wise, Kristina | 07/25/2015 | 08/19/2016 | 07/21/2017 | 982.00 | PEST | 0.00 | 3.00 | 1,243.00 | 275.00 | 64.38 |
|  |  |  |  |  |  |  |  |  |  | PETFEE | 0.00 | 40.00 |  |  |  |
|  |  |  |  |  |  |  |  |  |  | RENT | 1,100.00 | 0.00 |  |  |  |
|  |  |  |  |  |  |  |  |  |  | UPGRADE | 0.00 | 100.00 |  |  |  |
| 1311 | 1X1A | N/A | 500 | Occupied | Cocuzzo, Toni | 02/01/2017 | 02/01/2017 | 02/02/2018 | 703.00 | PEST | 0.00 | 3.00 | 703.00 | 0.00 | 43.19 |
|  |  |  |  |  |  |  |  |  |  | RENT | 700.00 | 0.00 |  |  |  |
| 1312 | 1X1A | N/A | 500 | Occupied | Diaz, Juan | 03/31/2016 | 03/31/2016 | 03/31/2017 | 703.00 | PEST | 0.00 | 3.00 | 815.00 | 0.00 | 33.26 |
|  |  |  |  |  |  |  |  |  |  | RENT | 812.00 | 0.00 |  |  |  |
|  |  | N/A |  | Pending renewal | Diaz, Juan | 03/31/2016 | 04/01/2017 | 04/06/2018 |  | PEST | 0.00 * | 3.00 * | 823.00 * | 0.00 |  |
|  |  |  |  |  |  |  |  |  |  | RENT | 820.00 * | 0.00 * |  |  |  |
| 1313 | 1X1A | N/A | 500 | Occupied | Manning, Antwaun | 01/13/2017 | 01/13/2017 | 01/12/2018 | 703.00 | PEST | 0.00 | 3.00 | 703.00 | 0.00 | 33.26 |
|  |  |  |  |  |  |  |  |  |  | RENT | 700.00 | 0.00 |  |  |  |

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1314 | 1X1A | N/A | 500 | Occupied | Sanchez, Sandra | 11/23/2011 | 10/29/2016 | 10/27/2017 | 703.00 | PEST | 0.00 | 3.00 | 716.00 | 250.00 | (17.74) |
| | | | | | | | | | | RENT | 713.00 | 0.00 | | | |
| 1315 | 2X2E R | N/A | 998 | Occupied | Anthony, Corey | 10/28/2015 | 09/23/2016 | 09/22/2017 | 972.00 | OFCRCRED | 0.00 | ###### | 608.00 | 0.00 | 44.26 |
| | | | | | | | | | | PEST | 0.00 | 3.00 | | | |
| | | | | | | | | | | RENT | 1,090.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 120.00 | | | |
| 1316 | 2X2F LR | N/A | 1010 | Occupied | Rivera Rivera, Carla | 02/01/2017 | 02/01/2017 | 02/02/2018 | 982.00 | PEST | 0.00 | 3.00 | 992.00 | 0.00 | 54.46 |
| | | | | | | | | | | RENT | 954.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 35.00 | | | |
| 1401 | 1X1B | N/A | 742 | Occupied | Palmer, Terry | 10/09/2000 | 02/11/2017 | 02/09/2018 | 790.00 | PEST | 0.00 | 3.00 | 735.00 | 125.00 | 36.60 |
| | | | | | | | | | | RENT | 732.00 | 0.00 | | | |
| 1402 | 1X1C | N/A | 763 | Occupied | Perez Baez, Michell | 01/21/2016 | 02/25/2017 | 02/23/2018 | 800.00 | PEST | 0.00 | 3.00 | 781.00 | 450.00 | 39.07 |
| | | | | | | | | | | RENT | 778.00 | 0.00 | | | |

**Details**

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1403 | 1X1A | N/A | 500 | Occupied | Van Guilder, Jeffrey | 09/02/2016 | 09/02/2016 | 09/01/2017 | 703.00 | PEST | 0.00 | 3.00 | 803.00 | 0.00 | 33.26 |
| | | | | | | | | | | RENT | 800.00 | 0.00 | | | |
| 1404 | 1X1D | N/A | 991 | Occupied | Lutchman, Maria | 10/14/2013 | 06/05/2016 | 06/02/2017 | 978.00 | PEST | 0.00 | 3.00 | 843.00 | 500.00 | 44.10 |
| | | | | | | | | | | PETFEE | 0.00 | 25.00 | | | |
| | | | | | | | | | | RENT | 815.00 | 0.00 | | | |
| 1405 | 1X1A | N/A | 500 | Occupied | Fildes, Natalie | 12/31/2014 | 01/21/2017 | 01/19/2018 | 703.00 | PEST | 0.00 | 3.00 | 688.00 | 750.00 | (800.00) |
| | | | | | | | | | | RENT | 685.00 | 0.00 | | | |
| 1406 | 1X1.5D-LR | N/A | 991 | Occupied | Stamp, Derek | 03/11/2017 | 03/11/2017 | 03/16/2018 | 978.00 | PEST | 0.00 | 3.00 | 918.00 | 0.00 | 10.00 |
| | | | | | | | | | | RENT | 840.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 75.00 | | | |
| 1407 | 1X1B | N/A | 742 | Occupied-NTVL | Ayari, Rojene | 09/30/2010 04/07/2017 | 03/12/2016 | 04/07/2017 | 790.00 | RENT | 784.00 | 0.00 | 784.00 | 0.00 | (0.09) |
| | | N/A | | Applicant | Crespo, Jusiris | 04/19/2017 | 04/19/2017 | 04/27/2018 | | PEST | 0.00 * | 3.00 * | 790.00 * | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 787.00 * | 0.00 * | | | |
| 1408 | 1X1C R | N/A | 763 | Occupied | Smith, Dallas | 11/28/2015 | 10/29/2016 | 10/27/2017 | 825.00 | PEST | 0.00 | 3.00 | 985.00 | 0.00 | (985.00) |
| | | | | | | | | | | RENT | 862.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 120.00 | | | |
| 1409 | 1X1B | N/A | 742 | Occupied | Donado Guerra, Eder | 06/13/2016 | 06/13/2016 | 06/16/2017 | 805.00 | PEST | 0.00 | 3.00 | 901.00 | 700.00 | 58.46 |
| | | | | | | | | | | RENT | 898.00 | 0.00 | | | |
| 1410 | 1X1C | N/A | 763 | Occupied | Afolorunsho, Amos | 05/02/2016 | 05/02/2016 | 05/05/2017 | 815.00 | PEST | 0.00 | 3.00 | 931.00 | 0.00 | 39.07 |
| | | | | | | | | | | RENT | 928.00 | 0.00 | | | |
| 1411 | 1X1A | N/A | 500 | Occupied | Morris, Carrie | 06/17/2006 | 10/30/2016 | 10/27/2017 | 718.00 | PEST | 0.00 | 3.00 | 802.00 | 200.00 | 31.26 |
| | | | | | | | | | | PETFEE | 0.00 | 25.00 | | | |
| | | | | | | | | | | RENT | 774.00 | 0.00 | | | |
| 1412 | 1X1D | N/A | 991 | Occupied | McClurg, Joshua | 10/14/2013 | 06/05/2016 | 06/30/2017 | 993.00 | PEST | 0.00 | 3.00 | 875.00 | 500.00 | 54.03 |
| | | | | | | | | | | PETFEE | 0.00 | 40.00 | | | |

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |  |  | RENT | 832.00 | 0.00 |  |  |  |
| 1413 | 1X1A LR | Conventional | 500 | Occupied | Santiago, Cynthia | 12/16/2016 | 12/16/2016 | 12/15/2017 | 718.00 | PEST | 0.00 | 3.00 | 748.00 | 0.00 | (748.00) |
|  |  |  |  |  |  |  |  |  |  | RENT | 735.00 | 0.00 |  |  |  |
|  |  |  |  |  |  |  |  |  |  | UPGRADE | 0.00 | 10.00 |  |  |  |
| 1414 | 1X1D | N/A | 991 | Occupied | Engel, Steven | 03/26/2015 | 04/20/2016 | 05/12/2017 | 993.00 | PEST | 0.00 | 3.00 | 921.00 | 0.00 | 54.03 |
|  |  |  |  |  |  |  |  |  |  | RENT | 918.00 | 0.00 |  |  |  |

**Details**

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  |  | N/A |  | Pending renewal | Engel, Steven | 03/26/2015 | 05/13/2017 | 05/11/2018 |  | PEST | 0.00 * | 3.00 * | 921.00 * | 0.00 | 0.00 |
|  |  |  |  |  |  |  |  |  |  | RENT | 918.00 * | 0.00 * |  |  |  |
| 1415 | 1X1B | N/A | 742 | Occupied | Eckstein, Steven | 02/13/2015 | 03/10/2016 | 03/31/2017 | 805.00 | GARAGE | 0.00 | 85.00 | 962.00 | 0.00 | 38.60 |
|  |  |  |  |  |  |  |  |  |  | PEST | 0.00 | 3.00 |  |  |  |
|  |  |  |  |  |  |  |  |  |  | PETFEE | 0.00 | 25.00 |  |  |  |
|  |  |  |  |  |  |  |  |  |  | RENT | 849.00 | 0.00 |  |  |  |
|  |  | N/A |  | Pending renewal | Eckstein, Steven | 02/13/2015 | 04/01/2017 | 03/30/2018 |  | GARAGE | 0.00 * | 85.00 * | 979.00 * | 0.00 | 0.00 |
|  |  |  |  |  |  |  |  |  |  | PEST | 0.00 * | 3.00 * |  |  |  |
|  |  |  |  |  |  |  |  |  |  | PETFEE | 0.00 * | 25.00 * |  |  |  |
|  |  |  |  |  |  |  |  |  |  | RENT | 866.00 * | 0.00 * |  |  |  |
| 1416 | 1X1C LR | N/A | 763 | Occupied | Gell-Rodriguez, Raquel | 12/08/2015 | 01/07/2017 | 01/05/2018 | 815.00 | PEST | 0.00 | 3.00 | 741.00 | 0.00 | 49.00 |
|  |  |  |  |  |  |  |  |  |  | RENT | 703.00 | 0.00 |  |  |  |
|  |  |  |  |  |  |  |  |  |  | UPGRADE | 0.00 | 35.00 |  |  |  |
| 1501 | 2X2E R | N/A | 998 | Occupied | Hidalgo, Juan | 03/14/2017 | 03/14/2017 | 03/16/2018 | 972.00 | PEST | 0.00 | 3.00 | 1,097.00 | 0.00 | (130.00) |
|  |  |  |  |  |  |  |  |  |  | RENT | 969.00 | 0.00 |  |  |  |
|  |  |  |  |  |  |  |  |  |  | UPGRADE | 0.00 | 125.00 |  |  |  |
| 1502 | 2X2F | N/A | 1010 | Occupied | Sparling, Alicia | 03/29/2017 | 03/29/2017 | 03/30/2018 | 982.00 | PEST | 0.00 | 3.00 | 982.00 | 0.00 | 323.00 |
|  |  |  |  |  |  |  |  |  |  | RENT | 979.00 | 0.00 |  |  |  |
| 1503 | 1X1A | N/A | 500 | Occupied | Pineda, Michelle | 11/15/2016 | 11/15/2016 | 11/10/2017 | 703.00 | PEST | 0.00 | 3.00 | 713.00 | 0.00 | 33.26 |
|  |  |  |  |  |  |  |  |  |  | RENT | 710.00 | 0.00 |  |  |  |
| 1504 | 1X1A | N/A | 500 | Occupied | Olmeda, Pedro | 12/16/2015 | 01/07/2017 | 01/05/2018 | 703.00 | PEST | 0.00 | 3.00 | 789.00 | 275.00 | 33.26 |
|  |  |  |  |  |  |  |  |  |  | RENT | 786.00 | 0.00 |  |  |  |
| 1505 | 1X1A | N/A | 500 | Occupied | Marrero, Maritza | 08/09/2014 | 07/31/2016 | 07/28/2017 | 703.00 | PEST | 0.00 | 3.00 | 693.00 | 0.00 | 43.19 |
|  |  |  |  |  |  |  |  |  |  | RENT | 690.00 | 0.00 |  |  |  |
| 1506 | 1X1A | N/A | 500 | Occupied | Switlak, Krzysztof | 05/11/2012 | 06/23/2016 | 06/23/2017 | 703.00 | PEST | 0.00 | 3.00 | 729.00 | 0.00 | 33.26 |
|  |  |  |  |  |  |  |  |  |  | RENT | 726.00 | 0.00 |  |  |  |
| 1507 | 2X2E R | N/A | 998 | Occupied | Bousquet, Ramon | 08/09/2014 | 07/01/2016 | 06/30/2017 | 972.00 | GARAGE | 0.00 | 85.00 | 1,001.00 | 750.00 | 64.11 |
|  |  |  |  |  |  |  |  |  |  | PEST | 0.00 | 3.00 |  |  |  |
|  |  |  |  |  |  |  |  |  |  | PETFEE | 0.00 | 25.00 |  |  |  |
|  |  |  |  |  |  |  |  |  |  | RENT | 813.00 | 0.00 |  |  |  |
|  |  |  |  |  |  |  |  |  |  | UPGRADE | 0.00 | 75.00 |  |  |  |
| 1508 | 2X2F | N/A | 1010 | Occupied | Durand Acosta, Alexander | 11/18/2016 | 11/18/2016 | 11/17/2017 | 982.00 | PEST | 0.00 | 3.00 | 977.00 | 0.00 | 74.30 |

**Details**

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | RENT | 974.00 | 0.00 | | | |
| 1509 | 2X2E | N/A | 998 | Occupied-NTVL | Maldonado, Saul | 12/11/2013 03/31/2017 | 01/28/2017 | 08/25/2017 | 987.00 | PEST | 0.00 | 3.00 | 932.00 | 0.00 | 1,912.18 |
| | | | | | | | | | | RENT | 929.00 | 0.00 | | | |
| | | N/A | | Applicant | Cardenas, Elsa | 04/17/2017 | 04/17/2017 | 04/13/2018 | | PEST | 0.00 * | 3.00 * | 992.00 * | 0.00 | 200.00 |
| | | | | | | | | | | RENT | 989.00 * | 0.00 * | | | |
| 1510 | 2X2F | N/A | 1010 | Occupied | Tolliver, Chistopher | 07/22/2015 | 08/16/2016 | 08/11/2017 | 997.00 | PEST | 0.00 | 3.00 | 909.00 | 0.00 | 54.46 |
| | | | | | | | | | | RENT | 906.00 | 0.00 | | | |
| 1511 | 1X1A | N/A | 500 | Occupied | Quinones, Noelia | 03/08/2017 | 03/08/2017 | 03/09/2018 | 718.00 | PEST | 0.00 | 3.00 | 723.00 | 0.00 | (723.00) |
| | | | | | | | | | | RENT | 720.00 | 0.00 | | | |
| 1512 | 1X1A | N/A | 500 | Occupied | Hart, Katrina | 11/22/2016 | 11/22/2016 | 11/17/2017 | 718.00 | PEST | 0.00 | 3.00 | 713.00 | 0.00 | 43.19 |
| | | | | | | | | | | RENT | 710.00 | 0.00 | | | |
| 1513 | 1X1A | N/A | 500 | Occupied | Perez De Jesus, Saudi | 12/13/2016 | 12/13/2016 | 12/15/2017 | 733.00 | PEST | 0.00 | 3.00 | 748.00 | 0.00 | 43.19 |
| | | | | | | | | | | RENT | 730.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 15.00 | | | |
| 1514 | 1X1A | N/A | 500 | Occupied | Hankerson-Wright, Ryan | 06/17/2016 | 06/17/2016 | 06/16/2017 | 718.00 | RENT | 792.00 | 0.00 | 792.00 | 0.00 | 33.26 |
| 1515 | 2X2E R | N/A | 998 | Occupied | Portillo Hernandez, Jesus | 12/06/2016 | 12/06/2016 | 12/01/2017 | 987.00 | PEST | 0.00 | 3.00 | 1,092.00 | 0.00 | 74.04 |
| | | | | | | | | | | RENT | 969.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 120.00 | | | |
| 1516 | 2X2F | N/A | 1010 | Occupied | Vaca, Mauricio | 11/13/2015 | 02/01/2017 | 01/31/2018 | 997.00 | PEST | 0.00 | 3.00 | 1,073.00 | 275.00 | 54.46 |
| | | | | | | | | | | RENT | 1,070.00 | 0.00 | | | |
| 1601 | 2X2E | N/A | 998 | Occupied | Perez Gonzalez, Angel | 12/27/2016 | 12/27/2016 | 12/29/2017 | 972.00 | PEST | 0.00 | 3.00 | 947.00 | 0.00 | 54.18 |
| | | | | | | | | | | RENT | 944.00 | 0.00 | | | |
| 1602 | 2X2F | N/A | 1010 | Occupied | Rosado Pena, Jessica | 11/05/2016 | 11/05/2016 | 11/03/2017 | 982.00 | PEST | 0.00 | 3.00 | 997.00 | 0.00 | 54.46 |
| | | | | | | | | | | RENT | 994.00 | 0.00 | | | |
| 1603 | 1X1B | N/A | 742 | Occupied | Chesser, Joel | 06/23/2016 | 06/23/2016 | 06/23/2017 | 790.00 | RENT | 878.00 | 0.00 | 878.00 | 0.00 | 48.53 |
| 1604 | 1X1C | N/A | 763 | Occupied | Mcmillan, Felicia | 08/28/2013 | 08/15/2016 | 08/11/2017 | 800.00 | PEST | 0.00 | 3.00 | 799.00 | 250.00 | 39.07 |
| | | | | | | | | | | RENT | 796.00 | 0.00 | | | |
| 1605 | 1X1B | N/A | 742 | Occupied | Morales, Enoel | 03/24/2017 | 03/24/2017 | 03/23/2018 | 790.00 | PEST | 0.00 | 3.00 | 800.00 | 0.00 | (800.00) |
| | | | | | | | | | | RENT | 797.00 | 0.00 | | | |

**Details**

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1606 | 1X1C | N/A | 763 | Occupied | Pellot, Nachalis | 09/16/2016 | 09/16/2016 | 09/22/2017 | 800.00 | PEST | 0.00 | 3.00 | 873.00 | 0.00 | 39.07 |
| | | | | | | | | | | RENT | 870.00 | 0.00 | | | |
| 1607 | 2X2E | N/A | 998 | Occupied | Ruiz, Christian | 07/31/2014 | 06/22/2016 | 06/21/2017 | 972.00 | PEST | 0.00 | 3.00 | 1,038.00 | 0.00 | 64.11 |

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | RENT | 1,035.00 | 0.00 | | | |
| 1608 | 2X2F | N/A | 1010 | Occupied | Torres, Zoilo | 02/27/2016 | 02/27/2016 | 03/24/2017 | 982.00 | MTOM | 0.00 | 374.00 | 1,386.00 | 275.00 | 64.38 |
| | | | | | | | | | | PEST | 0.00 | 3.00 | | | |
| | | | | | | | | | | RENT | 1,009.00 | 0.00 | | | |
| | | N/A | | Pending renewal | Torres, Zoilo | 02/27/2016 | 04/01/2017 | 03/30/2018 | | PEST | 0.00 * | 3.00 * | 952.00 * | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 949.00 * | 0.00 * | | | |
| 1609 | 2X2E LR | N/A | 998 | Occupied | Martinez Falcon, Fabio | 01/09/2017 | 01/09/2017 | 01/05/2018 | 972.00 | PEST | 0.00 | 3.00 | 982.00 | 0.00 | 64.11 |
| | | | | | | | | | | RENT | 954.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 25.00 | | | |
| 1610 | 2X2F | N/A | 1010 | Occupied | Marcano Torres, Luisa | 11/25/2016 | 11/25/2016 | 11/24/2017 | 982.00 | PEST | 0.00 | 3.00 | 977.00 | 0.00 | 64.38 |
| | | | | | | | | | | RENT | 974.00 | 0.00 | | | |
| 1611 | 1X1B | N/A | 742 | Occupied | Minino, Jeremy | 01/25/2017 | 01/25/2017 | 02/09/2018 | 790.00 | PEST | 0.00 | 3.00 | 790.00 | 0.00 | 38.60 |
| | | | | | | | | | | RENT | 787.00 | 0.00 | | | |
| 1612 | 1X1C | N/A | 763 | Occupied-NTV | Kolodziej, Anthony | 02/18/2015 06/07/2017 | 03/15/2016 | 04/07/2017 | 800.00 | PEST | 0.00 | 3.00 | 811.00 | 0.00 | 49.00 |
| | | | | | | | | | | RENT | 808.00 | 0.00 | | | |
| 1613 | 1X1B | N/A | 742 | Occupied | Bishoff, Joshua | 02/22/2013 | 03/04/2017 | 03/02/2018 | 790.00 | GARAGE | 0.00 | 60.00 | 821.00 | 0.00 | (821.00) |
| | | | | | | | | | | PEST | 0.00 | 3.00 | | | |
| | | | | | | | | | | RENT | 758.00 | 0.00 | | | |
| 1614 | 1X1C | N/A | 763 | Occupied | Martinez, Maireliz | 09/19/2016 | 09/19/2016 | 09/22/2017 | 800.00 | PEST | 0.00 | 3.00 | 873.00 | 0.00 | 49.00 |
| | | | | | | | | | | RENT | 870.00 | 0.00 | | | |
| 1615 | 2X2E | N/A | 998 | Occupied | Winstead, Jadrien | 11/07/2014 | 11/21/2016 | 11/24/2017 | 972.00 | EMPLCRED | 0.00 | ###### | 0.00 | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 1,060.00 | 0.00 | | | |
| 1616 | 2X2F LR | N/A | 1010 | Occupied | Wolfe, Sherri | 10/31/2015 | 11/30/2016 | 12/01/2017 | 982.00 | PEST | 0.00 | 3.00 | 1,121.00 | 275.00 | 54.46 |
| | | | | | | | | | | RENT | 1,083.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 35.00 | | | |
| 1701 | 1X1B | N/A | 742 | Occupied | Hessler, Richard | 12/16/2003 | 03/14/2017 | 04/07/2017 | 790.00 | RENT | 770.00 | 0.00 | 770.00 | 0.00 | 36.60 |
| | | N/A | | Pending renewal | Hessler, Richard | 12/16/2003 | 04/08/2017 | 04/13/2018 | | PEST | 0.00 * | 3.00 * | 788.00 * | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 785.00 * | 0.00 * | | | |
| 1702 | 1X1C | N/A | 763 | Occupied | Lucena, Jose | 10/15/2016 | 10/15/2016 | 10/13/2017 | 800.00 | PEST | 0.00 | 3.00 | 968.00 | 0.00 | 49.00 |

Details

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | RENT | 965.00 | 0.00 | | | |
| 1703 | 1X1A | N/A | 500 | Occupied | Saavedra, Emma | 01/28/2017 | 01/28/2017 | 02/16/2018 | 703.00 | PEST | 0.00 | 3.00 | 703.00 | 0.00 | (669.74) |
| | | | | | | | | | | RENT | 700.00 | 0.00 | | | |
| 1704 | 1X1D | N/A | 991 | Occupied | Marengo, Elba | 07/24/2015 | 09/01/2016 | 07/28/2017 | 978.00 | PEST | 0.00 | 3.00 | 862.00 | 0.00 | (862.00) |
| | | | | | | | | | | PETFEE | 0.00 | 25.00 | | | |
| | | | | | | | | | | RENT | 834.00 | 0.00 | | | |
| 1705 | 1X1A LR | N/A | 500 | Occupied | Lindo, Rebecca | 02/25/2015 | 03/22/2016 | 04/14/2017 | 703.00 | RENT | 722.00 | 0.00 | 732.00 | 699.00 | 42.95 |
| | | | | | | | | | | UPGRADE | 0.00 | 10.00 | | | |
| | | N/A | | Pending renewal | Lindo, Rebecca | 02/25/2015 | 04/15/2017 | 04/19/2018 | | PEST | 0.00 * | 3.00 * | 756.00 * | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 743.00 * | 0.00 * | | | |

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | ONGRADE | 0.00 * | 10.00 * | | | |
| 1706 | 1X1D | N/A | 991 | Occupied | Rodriguez, Pablo | 01/09/2016 | 02/04/2017 | 02/02/2018 | 978.00 | PEST | 0.00 | 3.00 | 877.00 | 450.00 | 54.03 |
| | | | | | | | | | | RENT | 874.00 | 0.00 | | | |
| 1707 | 1X1B | N/A | 742 | Occupied | Vizcarrondo, Luis | 07/22/2013 | 08/08/2016 | 07/07/2017 | 790.00 | PEST | 0.00 | 3.00 | 800.00 | 0.00 | 48.53 |
| | | | | | | | | | | RENT | 797.00 | 0.00 | | | |
| 1708 | 1X1C | N/A | 763 | Occupied | Valenzuela, Gracie | 02/14/2015 | 02/04/2017 | 02/09/2018 | 800.00 | PEST | 0.00 | 3.00 | 755.00 | 0.00 | (755.00) |
| | | | | | | | | | | RENT | 752.00 | 0.00 | | | |
| 1709 | 1X1B | N/A | 742 | Occupied | Jenkins, Dorotha | 09/01/2010 | 03/13/2016 | 04/07/2017 | 790.00 | RENT | 741.00 | 0.00 | 741.00 | 0.00 | 36.60 |
| | | N/A | | Pending renewal | Jenkins, Dorotha | 09/01/2010 | 04/08/2017 | 04/06/2018 | | PEST | 0.00 * | 3.00 * | 754.00 * | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 751.00 * | 0.00 * | | | |
| 1710 | 1X1C | N/A | 763 | Occupied | Saez Baez, Mirta | 02/21/2015 | 03/18/2017 | 03/16/2018 | 800.00 | PEST | 0.00 | 3.00 | 754.00 | 0.00 | 49.00 |
| | | | | | | | | | | RENT | 751.00 | 0.00 | | | |
| 1711 | 1X1A | N/A | 500 | Occupied | Rosa, Benjamin | 01/02/2015 | 01/28/2017 | 01/26/2018 | 703.00 | EMPLCRED | 0.00 | ###### | 596.00 | 750.00 | 33.26 |
| | | | | | | | | | | PEST | 0.00 | 3.00 | | | |
| | | | | | | | | | | RENT | 741.00 | 0.00 | | | |
| 1712 | 1X1.5D R | N/A | 991 | Occupied | Febo Acevedo, Yetzabel | 06/19/2013 | 07/06/2016 | 07/07/2017 | 978.00 | PEST | 0.00 | 3.00 | 945.00 | 0.00 | 54.03 |
| | | | | | | | | | | RENT | 867.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 75.00 | | | |
| 1713 | 1X1A | N/A | 500 | Occupied | Branch, Gregory | 12/02/2016 | 12/02/2016 | 12/01/2017 | 703.00 | PEST | 0.00 | 3.00 | 723.00 | 0.00 | 43.19 |
| | | | | | | | | | | RENT | 720.00 | 0.00 | | | |
| 1714 | 1X1D | N/A | 991 | Occupied | Laureano, Iris | 05/14/2014 | 06/04/2016 | 06/02/2017 | 978.00 | PEST | 0.00 | 3.00 | 888.00 | 250.00 | 44.10 |
| | | | | | | | | | | PETFEE | 0.00 | 25.00 | | | |
| | | | | | | | | | | RENT | 860.00 | 0.00 | | | |

**Details**

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1715 | 1X1B | N/A | 742 | Occupied | Robinson, Douglas | 12/10/2009 | 08/18/2016 | 07/14/2017 | 790.00 | PEST | 0.00 | 3.00 | 813.00 | 0.00 | 36.60 |
| | | | | | | | | | | RENT | 810.00 | 0.00 | | | |
| 1716 | 1X1C | N/A | 763 | Occupied | Pavlat, Danielle | 02/01/2017 | 02/01/2017 | 02/02/2018 | 800.00 | RENT | 797.00 | 0.00 | 797.00 | 0.00 | 49.00 |
| 1801 | 1X1B | N/A | 742 | Occupied | Almeida, Hebera | 11/14/2016 | 11/14/2016 | 11/10/2017 | 790.00 | PEST | 0.00 | 3.00 | 760.00 | 0.00 | 48.53 |
| | | | | | | | | | | RENT | 757.00 | 0.00 | | | |
| 1802 | 1X1C | N/A | 763 | Occupied | Da Silva, Cleide | 07/15/2016 | 07/15/2016 | 07/14/2017 | 800.00 | PEST | 0.00 | 3.00 | 871.00 | 0.00 | 49.00 |
| | | | | | | | | | | RENT | 868.00 | 0.00 | | | |
| 1803 | 1X1A | N/A | 500 | Occupied | Mesa, Olga | 04/05/2014 | 04/26/2016 | 05/19/2017 | 703.00 | PEST | 0.00 | 3.00 | 688.00 | 500.00 | 33.26 |
| | | | | | | | | | | RENT | 685.00 | 0.00 | | | |
| | | N/A | | Pending renewal | Mesa, Olga | 04/05/2014 | 05/20/2017 | 05/18/2018 | | PEST | 0.00 * | 3.00 * | 701.00 * | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 698.00 * | 0.00 * | | | |
| 1804 | 1X1D | N/A | 991 | Occupied-NTV | Quintana, Eusebio | 08/01/2012 05/22/2017 | 04/16/2016 | 05/12/2017 | 978.00 | GARAGE | 0.00 | 75.00 | 947.00 | 500.00 | 44.10 |
| | | | | | | | | | | PEST | 0.00 | 3.00 | | | |
| | | | | | | | | | | RENT | 869.00 | 0.00 | | | |
| 1805 | 1X1A | N/A | 500 | Occupied | Ricciardone Tamayo, Amanda | 11/06/2015 | 10/29/2017 | 10/27/2017 | 703.00 | PEST | 0.00 | 3.00 | 772.00 | 700.00 | 43.19 |

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | RENT | 769.00 | 0.00 | | | |
| 1806 | 1X1D | N/A | 991 | Occupied | Vazquez Mas, Catherine | 12/30/2016 | 12/30/2016 | 12/29/2017 | 978.00 | PEST | 0.00 | 3.00 | 928.00 | 0.00 | 54.03 |
| | | | | | | | | | | RENT | 925.00 | 0.00 | | | |
| 1807 | 1X1B | N/A | 742 | Occupied | Sierra, Bethania | 07/11/2016 | 07/11/2016 | 07/07/2017 | 790.00 | PEST | 0.00 | 3.00 | 861.00 | 0.00 | 38.60 |
| | | | | | | | | | | RENT | 858.00 | 0.00 | | | |
| 1808 | 1X1C | N/A | 763 | Occupied | Lopez, Jose | 02/16/2016 | 03/11/2017 | 03/16/2018 | 800.00 | PEST | 0.00 | 3.00 | 939.00 | 0.00 | 39.07 |
| | | | | | | | | | | RENT | 936.00 | 0.00 | | | |
| 1809 | 1X1B | N/A | 742 | Occupied | Mirandi, Mackenzie | 08/19/2016 | 08/19/2016 | 08/18/2017 | 790.00 | RENT | 840.00 | 0.00 | 840.00 | 0.00 | 38.60 |
| 1810 | 1X1C | N/A | 763 | Occupied | Osorio Quinones, Sherrie | 03/17/2017 | 03/17/2017 | 03/16/2018 | 800.00 | PEST | 0.00 | 3.00 | 825.00 | 0.00 | 0.00 |
| | | | | | | | | | | PETFEE | 0.00 | 25.00 | | | |
| | | | | | | | | | | RENT | 797.00 | 0.00 | | | |
| 1811 | 1X1A | N/A | 500 | Occupied | Ramos Quintero, Jorge | 07/08/2016 | 07/08/2016 | 07/07/2017 | 703.00 | PEST | 0.00 | 3.00 | 765.00 | 700.00 | 43.19 |
| | | | | | | | | | | RENT | 762.00 | 0.00 | | | |
| 1812 | 1X1.5D R | N/A | 991 | Occupied | DeLorenzo, Matthew | 08/01/2015 | 07/27/2016 | 07/28/2017 | 978.00 | PEST | 0.00 | 3.00 | 978.00 | 0.00 | 54.03 |

**Details**

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | RENT | 900.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 75.00 | | | |
| 1813 | 1X1A | N/A | 500 | Occupied | Wilson, Andrew | 08/13/2014 | 03/18/2017 | 03/23/2018 | 703.00 | PEST | 0.00 | 3.00 | 817.00 | 0.00 | 33.26 |
| | | | | | | | | | | PETFEE | 0.00 | 25.00 | | | |
| | | | | | | | | | | RENT | 789.00 | 0.00 | | | |
| 1814 | 1X1D | N/A | 991 | Occupied | Alicea, Emily | 08/30/2013 | 08/17/2016 | 08/18/2017 | 978.00 | GARAGE | 0.00 | 85.00 | 956.00 | 500.00 | 43.98 |
| | | | | | | | | | | PEST | 0.00 | 3.00 | | | |
| | | | | | | | | | | RENT | 868.00 | 0.00 | | | |
| 1815 | 1X1A LR | N/A | 500 | Vacant | VACANT | | | | 703.00 | | 0.00 * | 3.00 * | | | |
| 1816 | 1X1C LR | N/A | 763 | Occupied | Duprey, Barbara | 12/11/2013 | 01/07/2017 | 01/05/2018 | 800.00 | GARAGE | 0.00 | 80.00 | 851.00 | 0.00 | 49.00 |
| | | | | | | | | | | PEST | 0.00 | 3.00 | | | |
| | | | | | | | | | | RENT | 718.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 50.00 | | | |
| 1901 | 2X2E | N/A | 998 | Occupied | Perez Mercedes, Raquel | 03/19/2016 | 03/18/2017 | 03/16/2018 | 972.00 | PEST | 0.00 | 3.00 | 1,084.00 | 275.00 | 54.18 |
| | | | | | | | | | | RENT | 1,081.00 | 0.00 | | | |
| 1902 | 2X2F R | N/A | 1010 | Occupied | Zabala Silva, Jenifer | 08/10/2016 | 08/10/2016 | 08/11/2017 | 982.00 | RENT | 1,075.00 | 0.00 | 1,195.00 | 0.00 | 54.46 |
| | | | | | | | | | | UPGRADE | 0.00 | 120.00 | | | |
| 1903 | 1X1A | N/A | 500 | Occupied | Negrette, Jose | 12/29/2016 | 12/29/2016 | 12/29/2017 | 703.00 | PEST | 0.00 | 3.00 | 703.00 | 0.00 | 33.26 |
| | | | | | | | | | | RENT | 700.00 | 0.00 | | | |
| 1904 | 1X1A | N/A | 500 | Occupied | Perez Lima, Marlon | 02/27/2016 | 01/27/2017 | 01/26/2018 | 703.00 | PEST | 0.00 | 3.00 | 775.00 | 0.00 | 33.26 |
| | | | | | | | | | | RENT | 772.00 | 0.00 | | | |
| 1905 | 1X1A | N/A | 500 | Occupied-NTVL | Largo, Myriam | 10/01/2009 04/07/2017 | 03/14/2016 | 04/07/2017 | 703.00 | PEST | 0.00 | 3.00 | 694.00 | 0.00 | 0.00 |

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | RENT | 691.00 | 0.00 | | | |
| | | N/A | | Applicant | Pineda Ocando, Yunhy | 04/17/2017 | 04/17/2017 | 04/20/2018 | | PEST | 0.00 * | 3.00 * | 703.00 * | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 700.00 * | 0.00 * | | | |
| 1906 | 1X1A | N/A | 500 | Occupied | Moore, Brian | 06/30/2015 | 12/01/2016 | 11/30/2017 | 703.00 | GARAGE | 0.00 | 85.00 | 903.00 | 0.00 | 33.26 |
| | | | | | | | | | | PEST | 0.00 | 3.00 | | | |
| | | | | | | | | | | RENT | 815.00 | 0.00 | | | |
| 1907 | 2X2E | N/A | 998 | Occupied-NTVL | Quidgley, Zorimar | 05/13/2016 05/12/2017 | 05/13/2017 | 05/12/2017 | 972.00 | PEST | 0.00 | 3.00 | 1,073.00 | 0.00 | (1,018.82) |
| | | | | | | | | | | RENT | 1,070.00 | 0.00 | | | |

**Details**

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | N/A | | Applicant | Hernandez Anez, Sergio | 05/24/2017 | 05/24/2017 | 05/25/2018 | | PEST | 0.00 * | 3.00 * | 972.00 * | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 969.00 * | 0.00 * | | | |
| | | | | | | | | | | UPGRADE | 0.00 * | 0.00 * | | | |
| 1908 | 2X2F | N/A | 1010 | Occupied | Steita, Mohammed | 09/19/2015 | 09/16/2016 | 09/15/2017 | 982.00 | PEST | 0.00 | 3.00 | 1,011.00 | 450.00 | 64.38 |
| | | | | | | | | | | RENT | 1,008.00 | 0.00 | | | |
| 1909 | 2X2E | N/A | 998 | Occupied | Vazquez, Nereida | 06/01/2010 | 08/10/2016 | 07/07/2017 | 987.00 | PEST | 0.00 | 3.00 | 1,056.00 | 815.00 | 42.26 |
| | | | | | | | | | | RENT | 1,053.00 | 0.00 | | | |
| 1910 | 2X2F | N/A | 1010 | Occupied | Santana, Bethany | 09/17/2014 | 09/12/2016 | 09/08/2017 | 997.00 | PEST | 0.00 | 3.00 | 1,018.00 | 750.00 | 64.38 |
| | | | | | | | | | | RENT | 1,015.00 | 0.00 | | | |
| 1911 | 1X1A | N/A | 500 | Occupied | Brown, Cynthia | 01/13/2017 | 01/13/2017 | 01/12/2018 | 718.00 | PEST | 0.00 | 3.00 | 723.00 | 0.00 | 33.26 |
| | | | | | | | | | | RENT | 720.00 | 0.00 | | | |
| 1912 | 1X1A | N/A | 500 | Occupied | Aguinaga, Dahiana | 09/07/2016 | 09/07/2016 | 09/15/2017 | 718.00 | PEST | 0.00 | 3.00 | 833.00 | 0.00 | 33.26 |
| | | | | | | | | | | RENT | 830.00 | 0.00 | | | |
| 1913 | 1X1A | N/A | 500 | Occupied | Lilavois, Michael | 08/22/2008 | 08/31/2016 | 07/28/2017 | 718.00 | PEST | 0.00 | 3.00 | 829.00 | 735.00 | 31.26 |
| | | | | | | | | | | RENT | 826.00 | 0.00 | | | |
| 1914 | 1X1A | N/A | 500 | Occupied | Robinson, Krista | 03/24/2017 | 03/24/2017 | 03/16/2018 | 718.00 | PEST | 0.00 | 3.00 | 733.00 | 0.00 | (733.00) |
| | | | | | | | | | | RENT | 730.00 | 0.00 | | | |
| 1915 | 2X2E | N/A | 998 | Occupied | Glotfelty, John | 04/01/2012 | 04/10/2016 | 04/07/2017 | 987.00 | GARAGE | 0.00 | 150.00 | 1,164.00 | 0.00 | 54.18 |
| | | | | | | | | | | RENT | 1,014.00 | 0.00 | | | |
| 1916 | 2X2F R | N/A | 1010 | Occupied | Meskini, Adil | 01/25/2017 | 01/25/2017 | 02/02/2018 | 997.00 | PEST | 0.00 | 3.00 | 1,062.00 | 0.00 | 54.46 |
| | | | | | | | | | | RENT | 984.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 75.00 | | | |
| 2001 | 2X2E | N/A | 998 | Occupied | Albuerne, Lina | 08/08/2012 | 08/21/2016 | 07/21/2017 | 972.00 | GARAGE | 0.00 | 85.00 | 1,013.00 | 500.00 | 54.18 |
| | | | | | | | | | | PEST | 0.00 | 3.00 | | | |
| | | | | | | | | | | RENT | 925.00 | 0.00 | | | |
| 2002 | 2X2F | N/A | 1010 | Occupied | Devoe, Yesenia | 08/16/2014 | 08/07/2016 | 08/04/2017 | 982.00 | PEST | 0.00 | 3.00 | 914.00 | 0.00 | 44.53 |
| | | | | | | | | | | RENT | 911.00 | 0.00 | | | |
| 2003 | 1X1B | N/A | 742 | Occupied | Delgado, Eliezer | 01/23/2013 | 02/04/2017 | 02/09/2018 | 790.00 | PEST | 0.00 | 3.00 | 724.00 | 0.00 | 38.60 |
| | | | | | | | | | | RENT | 721.00 | 0.00 | | | |
| 2004 | 1X1C | N/A | 763 | Occupied | Joseph, Alma | 01/08/2010 | 09/16/2016 | 08/11/2017 | 800.00 | PEST | 0.00 | 3.00 | 822.00 | 0.00 | 37.07 |

**Details**

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|------|-----------|------------------|-----|-------------------|------|------------------|-------------|-----------|----------------|------------|------------|------------------------|---------------|-------------|---------|
| 2005 | 1X1B LR | N/A | 742 | Occupied-NTV | Johnson, Barbara | 05/24/2016 05/26/2017 | 05/24/2016 | 05/26/2017 | 790.00 | PEST | 0.00 | 3.00 | 906.00 | 0.00 | 38.60 |
| | | | | | | | | | | RENT | 878.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 25.00 | | | |
| 2006 | 1X1C LR | N/A | 763 | Occupied | Fickens, Evangeline | 02/22/2012 | 02/25/2017 | 02/23/2018 | 800.00 | PEST | 0.00 | 3.00 | 795.00 | 100.00 | 39.07 |
| | | | | | | | | | | RENT | 767.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 25.00 | | | |
| 2007 | 2X2E | N/A | 998 | Vacant-Leased | VACANT | | | | 972.00 | | 0.00 * | 3.00 * | | | |
| | | N/A | | | Applicant | 04/06/2017 | 04/06/2017 | 04/06/2018 | | PEST | 0.00 * | 3.00 * | 972.00 * | 0.00 | 0.00 |
| | | | | | Dac-Hash, Maher | | | | | RENT | 969.00 * | 0.00 * | | | |
| 2008 | 2X2F | N/A | 1010 | Occupied | Santana, Evaristo | 01/13/2017 | 01/13/2017 | 01/12/2018 | 982.00 | PEST | 0.00 | 3.00 | 962.00 | 0.00 | 54.46 |
| | | | | | | | | | | RENT | 959.00 | 0.00 | | | |
| 2009 | 2X2E | N/A | 998 | Occupied | Herrera Ruiz, Juan | 01/12/2017 | 01/12/2017 | 01/12/2018 | 972.00 | PEST | 0.00 | 3.00 | 957.00 | 0.00 | 54.18 |
| | | | | | | | | | | RENT | 954.00 | 0.00 | | | |
| 2010 | 2X2F | N/A | 1010 | Occupied | Cosma, Jenny | 04/09/2015 | 05/04/2016 | 05/27/2017 | 982.00 | PEST | 0.00 | 3.00 | 984.00 | 0.00 | 64.38 |
| | | | | | | | | | | RENT | 981.00 | 0.00 | | | |
| | | N/A | | Pending renewal | Cosma, Jenny | 04/09/2015 | 05/28/2017 | 06/01/2018 | | PEST | 0.00 * | 3.00 * | 998.00 * | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 995.00 * | 0.00 * | | | |
| 2011 | 1X1B | N/A | 742 | Occupied | Kuchkarov, Mavlonbek | 11/01/2016 | 11/01/2016 | 05/19/2017 | 790.00 | PEST | 0.00 | 3.00 | 845.00 | 0.00 | 38.60 |
| | | | | | | | | | | RENT | 842.00 | 0.00 | | | |
| 2012 | 1X1C LR | N/A | 763 | Occupied-NTV | Frometa Victoria, Isaura | 07/25/2015 07/24/2016 | 09/01/2016 | 08/31/2017 | 800.00 | PEST | 0.00 | 3.00 | 874.00 | 0.00 | 49.00 |
| | | | | | | | | | | RENT | 796.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 75.00 | | | |
| 2013 | 1X1B | N/A | 742 | Occupied | Watts, Kenethia | 06/01/2011 | 08/08/2016 | 08/07/2017 | 790.00 | PEST | 0.00 | 3.00 | 792.00 | 100.00 | 36.60 |
| | | | | | | | | | | RENT | 789.00 | 0.00 | | | |
| 2014 | 1X1C | N/A | 763 | Occupied | Echevarria, Carlos | 03/05/2009 | 04/19/2016 | 05/12/2017 | 800.00 | PEST | 0.00 | 3.00 | 828.00 | 500.00 | 37.07 |
| | | | | | | | | | | RENT | 825.00 | 0.00 | | | |
| | | N/A | | Pending renewal | Echevarria, Carlos | 03/05/2009 | 05/13/2017 | 05/11/2018 | | PEST | 0.00 * | 3.00 * | 844.00 * | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 841.00 * | 0.00 * | | | |
| 2015 | 2X2E | N/A | 998 | Occupied | Rubio, Pablo | 03/13/2015 | 04/07/2016 | 04/07/2017 | 972.00 | PETFEE | 0.00 | 3.00 | 1,043.00 | 982.00 | 44.26 |

**Details**

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|------|-----------|------------------|-----|-------------------|------|------------------|-------------|-----------|----------------|------------|------------|------------------------|---------------|-------------|---------|
| | | | | | | | | | | RENT | 1,040.00 | 0.00 | | | |
| | | N/A | | Pending renewal | Rubio, Pablo | 03/13/2015 | 04/08/2017 | 04/13/2018 | | PEST | 0.00 * | 3.00 * | 1,059.00 * | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 1,056.00 * | 0.00 * | | | |

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2016 | 2X2F LR | N/A | 1010 | Occupied | Sonera, Ada | 06/08/2016 | 06/08/2016 | 06/07/2017 | 982.00 | GARAGE | 0.00 | 85.00 | 1,262.00 | 0.00 | 54.46 |
| | | | | | | | | | | PEST | 0.00 | 3.00 | | | |
| | | | | | | | | | | RENT | 1,124.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 50.00 | | | |
| 2101 | 2X2E | N/A | 998 | Occupied | Pendergast, Ashleigh | 07/21/2015 | 06/16/2016 | 06/16/2017 | 972.00 | PEST | 0.00 | 3.00 | 1,073.00 | 450.00 | 74.04 |
| | | | | | | | | | | RENT | 1,070.00 | 0.00 | | | |
| 2102 | 2X2F | N/A | 1010 | Occupied | Leger, Maria | 03/08/2017 | 03/08/2017 | 03/09/2018 | 982.00 | PEST | 0.00 | 3.00 | 982.00 | 0.00 | 10.00 |
| | | | | | | | | | | RENT | 979.00 | 0.00 | | | |
| 2103 | 1X1B | N/A | 742 | Vacant-Leased | VACANT | | | | 790.00 | | 0.00 * | 3.00 * | | | |
| | | N/A | | | Applicant | Clapp, Cheryln | 03/30/2017 | 03/30/2017 | 03/30/2018 | RENT | 787.00 * | 0.00 * | 787.00 * | 0.00 | 0.00 |
| 2104 | 1X1C | N/A | 763 | Occupied | Abbott, Sherry | 02/28/1997 | 08/06/2016 | 07/07/2017 | 800.00 | PEST | 0.00 | 3.00 | 868.00 | 200.00 | 37.07 |
| | | | | | | | | | | RENT | 865.00 | 0.00 | | | |
| 2105 | 1X1B | N/A | 742 | Occupied | Irizarry, Bryan | 01/06/2017 | 01/06/2017 | 01/05/2018 | 790.00 | PEST | 0.00 | 3.00 | 815.00 | 0.00 | 48.53 |
| | | | | | | | | | | RENT | 812.00 | 0.00 | | | |
| 2106 | 1X1C | N/A | 763 | Occupied | Silva, Melba | 07/22/2015 | 08/16/2016 | 07/14/2017 | 800.00 | PEST | 0.00 | 3.00 | 849.00 | 0.00 | 39.07 |
| | | | | | | | | | | RENT | 846.00 | 0.00 | | | |
| 2107 | 2X2E | N/A | 998 | Occupied | Cercone, Samantha | 10/10/2016 | 10/10/2016 | 10/13/2017 | 972.00 | PEST | 0.00 | 3.00 | 1,108.00 | 0.00 | 64.11 |
| | | | | | | | | | | PETFEE | 0.00 | 25.00 | | | |
| | | | | | | | | | | RENT | 1,080.00 | 0.00 | | | |
| 2108 | 2X2F | N/A | 1010 | Occupied | Palma Castillo, Alfonso | 05/13/2016 | 05/13/2016 | 05/12/2017 | 982.00 | PEST | 0.00 | 3.00 | 1,072.00 | 700.00 | 74.30 |
| | | | | | | | | | | RENT | 1,069.00 | 0.00 | | | |
| 2109 | 2X2E LR | N/A | 998 | Occupied | Freytes, Raul | 08/31/2016 | 08/31/2016 | 09/01/2017 | 1,002.00 | RENT | 1,085.00 | 0.00 | 1,110.00 | 0.00 | 44.26 |
| | | | | | | | | | | UPGRADE | 0.00 | 25.00 | | | |
| 2110 | 2X2F LR | N/A | 1010 | Occupied | Velez, Edgardo | 01/16/2017 | 01/16/2017 | 01/19/2018 | 997.00 | GARAGE | 0.00 | 85.00 | 1,097.00 | 0.00 | (1,052.47) |
| | | | | | | | | | | PEST | 0.00 | 3.00 | | | |
| | | | | | | | | | | RENT | 934.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 75.00 | | | |
| 2111 | 1X1B | N/A | 742 | Occupied-NTVL | Chamberlin, Randy | 01/04/2014 04/21/2017 | 09/24/2016 | 04/21/2017 | 805.00 | PEST | 0.00 | 3.00 | 868.00 | 0.00 | (608.00) |
| | | | | | | | | | | RENT | 865.00 | 0.00 | | | |

**Details**

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | N/A | | | Applicant | Dominguez, Justiniano | 05/15/2017 | 05/15/2017 | 05/18/2018 | PEST | 0.00 * | 3.00 * | 810.00 * | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 807.00 * | 0.00 * | | | |
| 2112 | 1X1C | N/A | 763 | Occupied | Vila, Israel | 01/28/2015 | 02/18/2017 | 02/16/2018 | 815.00 | PEST | 0.00 | 3.00 | 783.00 | 0.00 | 49.00 |
| | | | | | | | | | | RENT | 780.00 | 0.00 | | | |
| 2113 | 1X1B | N/A | 742 | Occupied | Wagar, Christopher | 01/10/2017 | 01/10/2017 | 01/12/2018 | 805.00 | PEST | 0.00 | 3.00 | 810.00 | 0.00 | 38.60 |
| | | | | | | | | | | RENT | 807.00 | 0.00 | | | |
| 2114 | 1X1C | N/A | 763 | Occupied | Calle, Claudia | 01/09/2017 | 01/09/2017 | 01/12/2018 | 815.00 | PEST | 0.00 | 3.00 | 830.00 | 0.00 | 49.00 |
| | | | | | | | | | | RENT | 827.00 | 0.00 | | | |
| 2115 | 2X2E | N/A | 998 | Occupied | Echajari, Brenda | 05/30/2013 | 07/16/2016 | 07/14/2017 | 987.00 | PEST | 0.00 | 3.00 | 908.00 | 0.00 | 44.26 |

| Unit | Floorpla | Unit Designation | SQ | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | REFEE | 0.00 | 25.00 | | | |
| | | | | | | | | | | RENT | 880.00 | 0.00 | | | |
| 2116 | 2X2F R | N/A | 1010 | Occupied-NTV | Rodriguez, Edwin | 09/26/2015 05/19/2017 | 07/23/2016 | 05/19/2017 | 997.00 | PEST | 0.00 | 3.00 | 1,151.00 | 275.00 | 64.38 |
| | | | | | | | | | | RENT | 1,028.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 120.00 | | | |
| 2201 | 1X1B | N/A | 742 | Occupied | Hall, Collie | 09/30/2013 | 07/21/2016 | 07/21/2017 | 790.00 | PEST | 0.00 | 3.00 | 815.00 | 250.00 | 48.53 |
| | | | | | | | | | | RENT | 812.00 | 0.00 | | | |
| 2202 | 1X1C | N/A | 763 | Occupied | Rouzies, Elsa Monica | 03/20/2009 | 08/15/2016 | 08/11/2017 | 800.00 | PEST | 0.00 | 3.00 | 820.00 | 300.00 | 37.07 |
| | | | | | | | | | | RENT | 817.00 | 0.00 | | | |
| 2203 | 1X1A | N/A | 500 | Occupied | Vazquez-Berrios, Hector | 07/08/2014 | 06/01/2016 | 05/26/2017 | 703.00 | PEST | 0.00 | 3.00 | 687.00 | 750.00 | 33.26 |
| | | | | | | | | | | RENT | 684.00 | 0.00 | | | |
| | | N/A | | Pending renewal | Vazquez-Berrios, Hector | 07/08/2014 | 05/27/2017 | 06/01/2018 | | PEST | 0.00 * | 3.00 * | 697.00 * | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 694.00 * | 0.00 * | | | |
| 2204 | 1X1D | N/A | 991 | Occupied | Mcintosh, Dennis | 10/12/2015 | 11/06/2016 | 11/03/2017 | 978.00 | PEST | 0.00 | 3.00 | 901.00 | 450.00 | (102.90) |
| | | | | | | | | | | RENT | 898.00 | 0.00 | | | |
| 2205 | 1X1A | N/A | 500 | Occupied | Nagano, Miki | 01/16/1996 | 03/11/2017 | 03/09/2018 | 703.00 | PEST | 0.00 | 3.00 | 772.00 | 150.00 | 31.26 |
| | | | | | | | | | | RENT | 769.00 | 0.00 | | | |
| 2206 | 1X1.5D R | N/A | 991 | Occupied | Robles, Stefen | 11/22/2016 | 11/22/2016 | 11/24/2017 | 978.00 | GARAGE | 0.00 | 85.00 | 608.00 | 0.00 | (563.90) |
| | | | | | | | | | | OFCRCRED | 0.00 | ###### | | | |
| | | | | | | | | | | PEST | 0.00 | 3.00 | | | |
| | | | | | | | | | | RENT | 945.00 | 0.00 | | | |

**Details**

| Unit | Floorpla | Unit Designation | SQ | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | UPGRADE | 0.00 | 95.00 | | | |
| 2207 | 1X1B | N/A | 742 | Occupied | Jimenez Jimenez, Jorge | 12/13/2016 | 12/13/2016 | 07/14/2017 | 790.00 | PEST | 0.00 | 3.00 | 875.00 | 0.00 | 48.53 |
| | | | | | | | | | | RENT | 872.00 | 0.00 | | | |
| 2208 | 1X1C | N/A | 763 | Occupied | Hernandez Zeledon, Sadie | 12/12/2016 | 12/12/2016 | 12/15/2017 | 800.00 | PEST | 0.00 | 3.00 | 800.00 | 0.00 | 49.00 |
| | | | | | | | | | | RENT | 797.00 | 0.00 | | | |
| 2209 | 1X1B | N/A | 742 | Occupied | Archilla, Michael | 12/05/2016 | 12/05/2016 | 12/08/2017 | 805.00 | PEST | 0.00 | 3.00 | 810.00 | 0.00 | 48.53 |
| | | | | | | | | | | RENT | 807.00 | 0.00 | | | |
| 2210 | 1X1C | N/A | 763 | Occupied | Sanchez, Jose | 02/15/2010 | 04/28/2016 | 05/26/2017 | 815.00 | PEST | 0.00 | 3.00 | 775.00 | 150.00 | 47.00 |
| | | | | | | | | | | RENT | 772.00 | 0.00 | | | |
| 2211 | 1X1A | N/A | 500 | Occupied | Rivera Rodriguez, Marieliz | 08/05/2016 | 08/05/2016 | 08/04/2017 | 718.00 | RENT | 787.00 | 0.00 | 787.00 | 0.00 | 33.26 |
| 2212 | 1X1D | N/A | 991 | Occupied | Figueroa-Rivera, Pedro | 10/13/2012 | 09/23/2016 | 09/22/2017 | 993.00 | PEST | 0.00 | 3.00 | 930.00 | 0.00 | 54.03 |
| | | | | | | | | | | RENT | 927.00 | 0.00 | | | |
| 2213 | 1X1A | N/A | 500 | Occupied | Perez, Khryzttian | 02/01/2017 | 02/01/2017 | 02/02/2018 | 718.00 | PEST | 0.00 | 3.00 | 723.00 | 0.00 | 33.26 |
| | | | | | | | | | | RENT | 720.00 | 0.00 | | | |
| 2214 | 1X1.5D R | N/A | 991 | Occupied | Doris Sr, Daryl | 08/03/2016 | 08/03/2016 | 08/04/2017 | 993.00 | RENT | 945.00 | 0.00 | 1,040.00 | 0.00 | 54.03 |

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | UPGRADE | 0.00 | 95.00 | | | |
| 2215 | 1X1B | N/A | 742 | Occupied | Cespedes Velozo, Miguel | 11/18/2016 | 11/18/2016 | 11/17/2017 | 805.00 | PEST | 0.00 | 3.00 | 790.00 | 0.00 | 48.53 |
| | | | | | | | | | | RENT | 787.00 | 0.00 | | | |
| 2216 | 1X1C | N/A | 763 | Occupied | Salazar, Manuel | 10/18/2012 | 02/11/2017 | 02/09/2018 | 815.00 | PEST | 0.00 | 3.00 | 803.00 | 0.00 | (763.93) |
| | | | | | | | | | | RENT | 800.00 | 0.00 | | | |
| 2301 | 2X2E | N/A | 998 | Occupied | Dominguez, Shasta | 10/25/2012 | 08/09/2016 | 08/08/2017 | 972.00 | PEST | 0.00 | 3.00 | 996.00 | 0.00 | 54.18 |
| | | | | | | | | | | RENT | 993.00 | 0.00 | | | |
| 2302 | 2X2F | N/A | 1010 | Occupied | Shive, Stephanie | 04/15/2014 | 05/06/2016 | 05/12/2017 | 982.00 | PEST | 0.00 | 3.00 | 1,010.00 | 0.00 | 54.46 |
| | | | | | | | | | | PETFEE | 0.00 | 25.00 | | | |
| | | | | | | | | | | RENT | 982.00 | 0.00 | | | |
| 2303 | 1X1A | N/A | 500 | Occupied | Perez Vazquez, Rolando | 06/01/2016 | 06/01/2016 | 06/02/2017 | 703.00 | PEST | 0.00 | 3.00 | 765.00 | 0.00 | 33.26 |
| | | | | | | | | | | RENT | 762.00 | 0.00 | | | |
| 2304 | 1X1A | N/A | 500 | Occupied | Rodriguez, Claudia | 08/27/2016 | 08/27/2016 | 08/25/2017 | 703.00 | RENT | 790.00 | 0.00 | 790.00 | 0.00 | 33.26 |

**Details**

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2305 | 1X1A | N/A | 500 | Occupied | Coburn, Christopher | 01/22/2014 | 03/18/2017 | 03/16/2018 | 703.00 | PEST | 0.00 | 3.00 | 753.00 | 500.00 | 43.19 |
| | | | | | | | | | | RENT | 750.00 | 0.00 | | | |
| 2306 | 1X1A | N/A | 500 | Occupied | De Souza, Lucas | 06/01/2015 | 06/26/2016 | 06/23/2017 | 703.00 | PEST | 0.00 | 3.00 | 753.00 | 700.00 | 33.26 |
| | | | | | | | | | | RENT | 750.00 | 0.00 | | | |
| 2307 | 2X2E | N/A | 998 | Occupied-NTVL | Ramos, Alexandra | 03/14/2016 04/07/2017 | 03/14/2016 | 04/07/2017 | 972.00 | GARAGE | 0.00 | 85.00 | 1,197.00 | 0.00 | 0.00 |
| | | | | | | | | | | PEST | 0.00 | 3.00 | | | |
| | | | | | | | | | | PETFEE | 0.00 | 40.00 | | | |
| | | | | | | | | | | RENT | 1,069.00 | 0.00 | | | |
| | | N/A | | Applicant | Seijas Pulido, Alberto | 04/19/2017 | 04/19/2017 | 04/13/2018 | | PEST | 0.00 * | 3.00 * | 972.00 * | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 969.00 * | 0.00 * | | | |
| 2308 | 2X2F | N/A | 1010 | Occupied | Guillen, Susana | 01/30/2013 | 01/07/2017 | 01/05/2018 | 982.00 | GARAGE | 0.00 | 85.00 | 1,003.00 | 0.00 | 64.38 |
| | | | | | | | | | | PEST | 0.00 | 3.00 | | | |
| | | | | | | | | | | RENT | 915.00 | 0.00 | | | |
| 2309 | 2X2E R | N/A | 998 | Occupied | Torres Raices, Sonia | 12/16/2016 | 12/16/2016 | 12/15/2017 | 972.00 | PEST | 0.00 | 3.00 | 1,072.00 | 750.00 | 54.18 |
| | | | | | | | | | | RENT | 949.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 120.00 | | | |
| 2310 | 2X2F R | N/A | 1010 | Occupied | Cruz, Aaron | 06/18/2016 | 06/18/2016 | 06/16/2017 | 982.00 | GARAGE | 0.00 | 85.00 | 1,156.00 | 450.00 | 54.46 |
| | | | | | | | | | | PEST | 0.00 | 3.00 | | | |
| | | | | | | | | | | RENT | 993.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 75.00 | | | |
| 2311 | 1X1A R | N/A | 500 | Occupied | Perez, Stephanie | 07/05/2014 | 08/18/2016 | 07/14/2017 | 703.00 | PEST | 0.00 | 3.00 | 726.00 | 500.00 | 43.19 |
| | | | | | | | | | | RENT | 648.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 75.00 | | | |
| 2312 | 1X1A R | N/A | 500 | Occupied | Pike, Dennis | 08/24/2013 | 02/01/2017 | 12/29/2017 | 703.00 | PEST | 0.00 | 3.00 | 834.00 | 250.00 | 33.26 |

| Unit | Floorpla | Unit Designation | SQ | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|------|----------|------------------|----|-------------------|------|------------------|-------------|-----------|---------------|------------|------------|------------------------|---------------|-------------|---------|
| | | | | | | | | | | RENT | 756.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 75.00 | | | |
| 2313 | 1X1A | N/A | 500 | Occupied | Roman Rodriguez, Leslie | 04/10/2015 | 12/01/2016 | 11/30/2017 | 703.00 | PEST | 0.00 | 3.00 | 773.00 | 770.00 | 43.19 |
| | | | | | | | | | | RENT | 770.00 | 0.00 | | | |
| 2314 | 1X1A R | N/A | 500 | Occupied | Barbosa, Juan | 11/23/2016 | 11/23/2016 | 11/24/2017 | 703.00 | PEST | 0.00 | 3.00 | 833.00 | 0.00 | 43.19 |
| | | | | | | | | | | RENT | 735.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 95.00 | | | |

**Details**

| Unit | Floorpla | Unit Designation | SQ | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|------|----------|------------------|----|-------------------|------|------------------|-------------|-----------|---------------|------------|------------|------------------------|---------------|-------------|---------|
| 2315 | 2X2E | N/A | 998 | Occupied | Aviles, Joshua | 01/03/2015 | 01/21/2017 | 01/19/2018 | 972.00 | PEST | 0.00 | 3.00 | 964.00 | 250.00 | 54.18 |
| | | | | | | | | | | RENT | 961.00 | 0.00 | | | |
| 2316 | 2X2F LR | N/A | 1010 | Occupied | Hernandez, Juan | 03/12/2016 | 03/11/2017 | 03/16/2018 | 982.00 | PEST | 0.00 | 3.00 | 1,185.00 | 0.00 | 54.46 |
| | | | | | | | | | | RENT | 1,082.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 100.00 | | | |
| 2401 | 2X2E | N/A | 998 | Occupied | Barbaran, Charles | 12/05/2015 | 12/31/2016 | 12/29/2017 | 972.00 | PEST | 0.00 | 3.00 | 976.00 | 0.00 | 44.26 |
| | | | | | | | | | | RENT | 973.00 | 0.00 | | | |
| 2402 | 2X2F | N/A | 1010 | Occupied | House, Covenant | 04/01/2016 | 04/01/2016 | 03/31/2017 | 982.00 | RENT | 1,080.00 | 0.00 | 1,080.00 | 450.00 | 44.53 |
| 2403 | 1X1A LR | N/A | 500 | Occupied | Garcia Trevino, Pedro | 01/27/2017 | 01/27/2017 | 02/16/2018 | 703.00 | PEST | 0.00 | 3.00 | 758.00 | 0.00 | (758.00) |
| | | | | | | | | | | PETFEE | 0.00 | 25.00 | | | |
| | | | | | | | | | | RENT | 705.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 25.00 | | | |
| 2404 | 1X1A | N/A | 500 | Occupied | Figueroa Berrios, Waldemar | 08/27/2016 | 08/27/2016 | 08/25/2017 | 703.00 | RENT | 792.00 | 0.00 | 792.00 | 0.00 | 33.26 |
| 2405 | 1X1A | N/A | 500 | Occupied | Velez, Jorge | 09/24/2014 | 10/15/2016 | 10/13/2017 | 703.00 | PEST | 0.00 | 3.00 | 745.00 | 250.00 | 33.26 |
| | | | | | | | | | | RENT | 742.00 | 0.00 | | | |
| 2406 | 1X1A | N/A | 500 | Occupied | Uribe, Adriana | 07/11/2014 | 08/05/2016 | 08/04/2017 | 703.00 | PEST | 0.00 | 3.00 | 767.00 | 750.00 | 33.26 |
| | | | | | | | | | | RENT | 764.00 | 0.00 | | | |
| 2407 | 2X2E | N/A | 998 | Occupied | Winiecki, Kathleen | 10/13/2004 | 02/11/2017 | 02/09/2018 | 972.00 | PEST | 0.00 | 3.00 | 999.00 | 785.00 | 62.11 |
| | | | | | | | | | | PETFEE | 0.00 | 10.00 | | | |
| | | | | | | | | | | RENT | 986.00 | 0.00 | | | |
| 2408 | 2X2F | N/A | 1010 | Occupied | Warriner, Julie | 03/01/2016 | 03/01/2016 | 03/24/2017 | 982.00 | PEST | 0.00 | 3.00 | 1,045.00 | 450.00 | 54.46 |
| | | | | | | | | | | RENT | 1,042.00 | 0.00 | | | |
| 2409 | 2X2E | N/A | 998 | Occupied | Cotto, Leodasky | 03/14/2017 | 03/14/2017 | 04/06/2018 | 987.00 | PEST | 0.00 | 3.00 | 1,038.00 | 0.00 | 9.99 |
| | | | | | | | | | | RENT | 1,035.00 | 0.00 | | | |
| 2410 | 2X2F | N/A | 1010 | Occupied | Mao, Donglan | 06/16/2014 | 02/03/2017 | 02/02/2018 | 1,037.00 | PEST | 0.00 | 3.00 | 1,239.00 | 750.00 | 54.46 |
| | | | | | | | | | | RENT | 1,196.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 40.00 | | | |
| 2411 | 1X1A | N/A | 500 | Occupied | Baez, Ramon | 01/24/2009 | 12/03/2016 | 12/01/2017 | 718.00 | PEST | 0.00 | 3.00 | 688.00 | 300.00 | 41.11 |
| | | | | | | | | | | RENT | 685.00 | 0.00 | | | |
| 2412 | 1X1A | N/A | 500 | Occupied | Rolle, Kadeejah | 05/13/2016 | 05/13/2016 | 05/12/2017 | 718.00 | PEST | 0.00 | 3.00 | 805.00 | 0.00 | 33.26 |
| | | | | | | | | | | RENT | 802.00 | 0.00 | | | |

**Details**

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/Credits | Total Billing | Dep On Hand | Balance |
|------|-----------|------------------|-----|-------------------|------|------------------|-------------|-----------|----------------|------------|------------|-----------------------|---------------|-------------|---------|
| | | N/A | | Pending renewal | Rolle, Kadeejah | 05/13/2016 | 05/13/2017 | 05/11/2018 | | PEST | 0.00 * | 3.00 * | 817.00 * | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 814.00 * | 0.00 * | | | |
| 2413 | 1X1A | N/A | 500 | Occupied | Saad, Abdallah | 01/14/2017 | 01/14/2017 | 01/12/2018 | 718.00 | PEST | 0.00 | 3.00 | 723.00 | 0.00 | 43.19 |
| | | | | | | | | | | RENT | 720.00 | 0.00 | | | |
| 2414 | 1X1A | N/A | 500 | Occupied | Garcia, Luis | 02/16/2016 | 03/18/2017 | 03/16/2018 | 718.00 | PEST | 0.00 | 3.00 | 759.00 | 0.00 | 33.26 |
| | | | | | | | | | | RENT | 756.00 | 0.00 | | | |
| 2415 | 2X2E LR | N/A | 998 | Occupied | Ortiz, Carmen | 07/16/2015 | 09/01/2016 | 08/04/2017 | 987.00 | GARAGE | 0.00 | 85.00 | 1,154.00 | 275.00 | 54.18 |
| | | | | | | | | | | PEST | 0.00 | 3.00 | | | |
| | | | | | | | | | | RENT | 1,016.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 50.00 | | | |
| 2416 | 2X2F | N/A | 1010 | Occupied-NTV | Bean, Charlotte | 10/08/2014 04/28/2017 | 10/29/2016 | 04/28/2017 | 997.00 | PEST | 0.00 | 3.00 | 1,103.00 | 0.00 | 1,154.46 |
| | | | | | | 04/28/2017 | | | | RENT | 1,100.00 | 0.00 | | | |
| 2501 | 1X1B | N/A | 742 | Occupied | Shelton, Shatasia | 12/20/2016 | 12/20/2016 | 12/22/2017 | 790.00 | PEST | 0.00 | 3.00 | 790.00 | 0.00 | 38.60 |
| | | | | | | | | | | RENT | 787.00 | 0.00 | | | |
| 2502 | 1X1C | N/A | 763 | Occupied | Arnaud, Angelica | 08/02/2016 | 08/02/2016 | 08/01/2017 | 800.00 | RENT | 888.00 | 0.00 | 888.00 | 0.00 | 48.59 |
| 2503 | 1X1A | N/A | 500 | Occupied | Robertson, Seneca | 06/30/2006 | 08/09/2016 | 07/07/2017 | 703.00 | GARAGE | 0.00 | 75.00 | 912.00 | 200.00 | 31.26 |
| | | | | | | | | | | PEST | 0.00 | 3.00 | | | |
| | | | | | | | | | | RENT | 834.00 | 0.00 | | | |
| 2504 | 1X1.5D R | N/A | 991 | Occupied | Navarro, Nicole | 06/10/2016 | 06/10/2016 | 06/09/2017 | 978.00 | PEST | 0.00 | 3.00 | 1,003.00 | 0.00 | 54.03 |
| | | | | | | | | | | RENT | 925.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 75.00 | | | |
| 2505 | 1X1A | N/A | 500 | Occupied | Romero, Edith | 05/12/2015 | 06/06/2016 | 06/02/2017 | 703.00 | PEST | 0.00 | 3.00 | 831.00 | 750.00 | 33.26 |
| | | | | | | | | | | RENT | 828.00 | 0.00 | | | |
| 2506 | 1X1D | N/A | 991 | Occupied | Latorre Cortes, Keila | 02/01/2017 | 02/01/2017 | 02/02/2018 | 978.00 | PEST | 0.00 | 3.00 | 893.00 | 0.00 | 94.81 |
| | | | | | | | | | | RENT | 890.00 | 0.00 | | | |
| 2507 | 1X1B | N/A | 742 | Occupied | Bush, Brittany | 12/19/2016 | 12/19/2016 | 12/15/2017 | 790.00 | PEST | 0.00 | 3.00 | 790.00 | 0.00 | 48.53 |
| | | | | | | | | | | RENT | 787.00 | 0.00 | | | |
| 2508 | 1X1C LR | N/A | 763 | Occupied | Samuel, Adam | 03/12/2016 | 03/12/2016 | 04/07/2017 | 800.00 | GARAGE | 0.00 | 85.00 | 1,001.00 | 275.00 | 227.07 |
| | | | | | | | | | | PEST | 0.00 | 3.00 | | | |
| | | | | | | | | | | RENT | 888.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 25.00 | | | |
| | | N/A | | Pending renewal | Samuel, Adam | 03/12/2016 | 04/08/2017 | 04/06/2018 | | GARAGE | 0.00 * | 85.00 * | 1,019.00 * | 0.00 | 0.00 |

**Details**

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/Credits | Total Billing | Dep On Hand | Balance |
|------|-----------|------------------|-----|-------------------|------|------------------|-------------|-----------|----------------|------------|------------|-----------------------|---------------|-------------|---------|
| | | | | | | | | | | PEST | 0.00 * | 3.00 * | | | |
| | | | | | | | | | | RENT | 906.00 * | 0.00 * | | | |
| | | | | | | | | | | UPGRADE | 0.00 * | 25.00 * | | | |

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2509 | 1X1B | N/A | 742 | Occupied | Bento, Vilmary | 08/01/2016 | 08/01/2016 | 08/04/2017 | 796.00 | RENT | 888.00 | 0.00 | 888.00 | 0.00 | 38.60 |
| 2510 | 1X1C | N/A | 763 | Occupied | Kilper, Lisa | 08/10/2016 | 08/10/2016 | 08/11/2017 | 800.00 | RENT | 850.00 | 0.00 | 850.00 | 0.00 | 39.07 |
| 2511 | 1X1A | N/A | 500 | Occupied | Noguera Barrios, Iverlinne | 01/28/2016 | 02/25/2017 | 02/23/2018 | 703.00 | PEST | 0.00 | 3.00 | 791.00 | 700.00 | (106.81) |
|  |  |  |  |  |  |  |  |  |  | RENT | 788.00 | 0.00 |  |  |  |
| 2512 | 1X1.5D R | N/A | 991 | Occupied | Rosario, Orlando | 07/21/2011 | 08/28/2016 | 07/28/2017 | 978.00 | PEST | 0.00 | 3.00 | 935.00 | 250.00 | (935.00) |
|  |  |  |  |  |  |  |  |  |  | RENT | 857.00 | 0.00 |  |  |  |
|  |  |  |  |  |  |  |  |  |  | UPGRADE | 0.00 | 75.00 |  |  |  |
| 2513 | 1X1A | N/A | 500 | Occupied | Melek, Heba | 02/18/2011 | 01/28/2017 | 01/26/2018 | 703.00 | PEST | 0.00 | 3.00 | 726.00 | 250.00 | 31.26 |
|  |  |  |  |  |  |  |  |  |  | RENT | 723.00 | 0.00 |  |  |  |
| 2514 | 1X1.5D R | N/A | 991 | Occupied | Lameier, Jordan | 02/20/2017 | 02/20/2017 | 03/02/2018 | 978.00 | PEST | 0.00 | 3.00 | 968.00 | 0.00 | 32.53 |
|  |  |  |  |  |  |  |  |  |  | RENT | 890.00 | 0.00 |  |  |  |
|  |  |  |  |  |  |  |  |  |  | UPGRADE | 0.00 | 75.00 |  |  |  |
| 2515 | 1X1B | N/A | 742 | Occupied | Glistin, Yuriy | 08/01/2010 | 07/11/2016 | 07/07/2017 | 790.00 | PEST | 0.00 | 3.00 | 891.00 | 300.00 | 46.53 |
|  |  |  |  |  |  |  |  |  |  | RENT | 888.00 | 0.00 |  |  |  |
| 2516 | 1X1C | N/A | 763 | Occupied | Luna, Antonio | 02/28/2009 | 05/06/2016 | 06/02/2017 | 800.00 | GARAGE | 0.00 | 65.00 | 824.00 | 975.00 | 37.07 |
|  |  |  |  |  |  |  |  |  |  | PEST | 0.00 | 3.00 |  |  |  |
|  |  |  |  |  |  |  |  |  |  | RENT | 756.00 | 0.00 |  |  |  |
| 2601 | 2X2E | N/A | 998 | Occupied | Doumbouya Sylla, Aissa | 11/15/2016 | 11/15/2016 | 11/17/2017 | 972.00 | PEST | 0.00 | 3.00 | 982.00 | 0.00 | 44.26 |
|  |  |  |  |  |  |  |  |  |  | PETFEE | 0.00 | 25.00 |  |  |  |
|  |  |  |  |  |  |  |  |  |  | RENT | 954.00 | 0.00 |  |  |  |
| 2602 | 2X2F | N/A | 1010 | Occupied | Abreu, Leslie | 02/24/2017 | 02/24/2017 | 02/23/2018 | 982.00 | PEST | 0.00 | 3.00 | 982.00 | 0.00 | 29.82 |
|  |  |  |  |  |  |  |  |  |  | RENT | 979.00 | 0.00 |  |  |  |
| 2603 | 1X1A | N/A | 500 | Occupied | Castro Arce, Francheska | 01/05/2017 | 01/05/2017 | 02/02/2018 | 703.00 | PEST | 0.00 | 3.00 | 703.00 | 0.00 | 33.26 |
|  |  |  |  |  |  |  |  |  |  | RENT | 700.00 | 0.00 |  |  |  |
| 2604 | 1X1A | N/A | 500 | Occupied | Schueman, Stephanie | 09/22/2015 | 10/17/2016 | 10/13/2017 | 703.00 | PEST | 0.00 | 3.00 | 869.00 | 0.00 | 43.19 |
|  |  |  |  |  |  |  |  |  |  | PETFEE | 0.00 | 25.00 |  |  |  |
|  |  |  |  |  |  |  |  |  |  | RENT | 841.00 | 0.00 |  |  |  |
| 2605 | 1X1A | N/A | 500 | Occupied | Munoz, Hector | 10/20/2016 | 10/20/2016 | 10/27/2017 | 703.00 | GARAGE | 0.00 | 85.00 | 918.00 | 0.00 | 33.26 |
|  |  |  |  |  |  |  |  |  |  | PEST | 0.00 | 3.00 |  |  |  |

**Details**

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |  |  | RENT | 830.00 | 0.00 |  |  |  |
| 2606 | 1X1A | N/A | 500 | Occupied | Dunwell, Monica | 12/22/2004 | 03/15/2016 | 04/07/2017 | 703.00 | PEST | 0.00 | 3.00 | 747.00 | 350.00 | 31.26 |
|  |  |  |  |  |  |  |  |  |  | RENT | 744.00 | 0.00 |  |  |  |
|  |  | N/A |  | Pending renewal | Dunwell, Monica | 12/22/2004 | 04/08/2017 | 04/13/2018 |  | PEST | 0.00 * | 3.00 * | 764.00 * | 0.00 | 0.00 |
|  |  |  |  |  |  |  |  |  |  | RENT | 761.00 * | 0.00 * |  |  |  |
| 2607 | 2X2E R | N/A | 998 | Occupied | Bechara, Stephanie | 10/05/2015 | 11/12/2016 | 11/10/2017 | 972.00 | PEST | 0.00 | 3.00 | 1,116.00 | 0.00 | 44.26 |
|  |  |  |  |  |  |  |  |  |  | RENT | 993.00 | 0.00 |  |  |  |
|  |  |  |  |  |  |  |  |  |  | UPGRADE | 0.00 | 120.00 |  |  |  |
| 2608 | 2X2F | N/A | 1010 | Occupied | Vega Soto, Jose | 06/10/2016 | 06/10/2016 | 06/09/2017 | 982.00 | PEST | 0.00 | 3.00 | 1,092.00 | 0.00 | 44.53 |

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |  |  | RENT | 1,089.00 | 0.00 |  |  |  |
| 2609 | 2X2E LR | N/A | 998 | Occupied | Camacho, William | 09/01/2011 | 07/10/2016 | 07/07/2017 | 972.00 | PEST | 0.00 | 3.00 | 1,032.00 | 250.00 | 72.04 |
|  |  |  |  |  |  |  |  |  |  | RENT | 1,004.00 | 0.00 |  |  |  |
|  |  |  |  |  |  |  |  |  |  | UPGRADE | 0.00 | 25.00 |  |  |  |
| 2610 | 2X2F | N/A | 1010 | Occupied | Torres Antuna, Martin | 10/17/2016 | 10/17/2016 | 10/27/2017 | 982.00 | RENT | 1,095.00 | 0.00 | 1,095.00 | 0.00 | 1,447.23 |
| 2611 | 1X1A | N/A | 500 | Occupied | Rodriguez, William | 02/22/2016 | 01/14/2017 | 01/12/2018 | 703.00 | PEST | 0.00 | 3.00 | 757.00 | 0.00 | (757.00) |
|  |  |  |  |  |  |  |  |  |  | RENT | 754.00 | 0.00 |  |  |  |
| 2612 | 1X1A | N/A | 500 | Occupied | Mendez III Rodriguez, Jose | 04/08/2016 | 04/08/2016 | 04/07/2017 | 703.00 | GARAGE | 0.00 | 85.00 | 897.00 | 275.00 | 43.11 |
|  |  |  |  |  |  |  |  |  |  | PEST | 0.00 | 3.00 |  |  |  |
|  |  |  |  |  |  |  |  |  |  | RENT | 809.00 | 0.00 |  |  |  |
|  |  | N/A |  | Pending renewal | Mendez III Rodriguez, Jose | 04/08/2016 | 04/08/2016 | 04/06/2018 |  | GARAGE | 0.00 * | 85.00 * | 909.00 * | 0.00 | 0.00 |
|  |  |  |  |  |  |  |  |  |  | PEST | 0.00 * | 3.00 * |  |  |  |
|  |  |  |  |  |  |  |  |  |  | RENT | 821.00 * | 0.00 * |  |  |  |
| 2613 | 1X1A | N/A | 500 | Occupied | Colombani-Robles, Jonathan | 05/27/2016 | 05/27/2016 | 05/26/2017 | 703.00 | PEST | 0.00 | 3.00 | 810.00 | 0.00 | 33.26 |
|  |  |  |  |  |  |  |  |  |  | RENT | 807.00 | 0.00 |  |  |  |
|  |  | N/A |  | Pending renewal | Colombani-Robles, Jonathan | 05/27/2016 | 05/27/2017 | 05/25/2018 |  | PEST | 0.00 * | 3.00 * | 822.00 * | 0.00 | 0.00 |
|  |  |  |  |  |  |  |  |  |  | RENT | 819.00 * | 0.00 * |  |  |  |
| 2614 | 1X1A | N/A | 500 | Occupied | Solomon, Kishan | 08/09/2014 | 03/03/2016 | 12/30/2016 | 703.00 | MTOM | 0.00 | 316.40 | 1,135.40 | 750.00 | 43.19 |
|  |  |  |  |  |  |  |  |  |  | PEST | 0.00 | 3.00 |  |  |  |
|  |  |  |  |  |  |  |  |  |  | PETFEE | 0.00 | 25.00 |  |  |  |

**Details**

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |  |  | RENT | 791.00 | 0.00 |  |  |  |
| 2615 | 2X2E | N/A | 998 | Occupied | Ramos Carrasco, Genesis | 07/19/2016 | 07/19/2016 | 07/21/2017 | 972.00 | RENT | 1,059.00 | 0.00 | 1,059.00 | 0.00 | 54.18 |
| 2616 | 2X2F | N/A | 1010 | Occupied | Delgrosso, Thomas | 03/22/2014 | 04/12/2016 | 05/05/2017 | 982.00 | PEST | 0.00 | 3.00 | 945.00 | 0.00 | 74.30 |
|  |  |  |  |  |  |  |  |  |  | RENT | 942.00 | 0.00 |  |  |  |
|  |  | N/A |  | Pending renewal | Delgrosso, Thomas | 03/22/2014 | 05/06/2017 | 05/04/2018 |  | PEST | 0.00 * | 3.00 * | 959.00 * | 0.00 | 0.00 |
|  |  |  |  |  |  |  |  |  |  | RENT | 956.00 * | 0.00 * |  |  |  |
| 2701 | 2X2E | N/A | 998 | Occupied | Pena, Natasha | 03/13/2013 | 03/25/2017 | 03/23/2018 | 972.00 | PEST | 0.00 | 3.00 | 868.00 | 0.00 | 54.18 |
|  |  |  |  |  |  |  |  |  |  | RENT | 865.00 | 0.00 |  |  |  |
| 2702 | 2X2F | N/A | 1010 | Occupied | Caravasi, Georgina | 03/01/2013 | 11/12/2016 | 11/11/2017 | 982.00 | PEST | 0.00 | 3.00 | 1,007.00 | 0.00 | 74.30 |
|  |  |  |  |  |  |  |  |  |  | RENT | 1,004.00 | 0.00 |  |  |  |
| 2703 | 2X2E | N/A | 998 | Occupied | Jackson, Anthony | 06/15/2001 | 11/08/2016 | 11/11/2017 | 972.00 | GARAGE | 0.00 | 85.00 | 1,105.00 | 450.00 | 62.11 |
|  |  |  |  |  |  |  |  |  |  | PEST | 0.00 | 3.00 |  |  |  |
|  |  |  |  |  |  |  |  |  |  | RENT | 1,017.00 | 0.00 |  |  |  |
| 2704 | 2X2F | N/A | 1010 | Occupied | Marcon Alequin, | 12/12/2016 | 12/12/2016 | 12/15/2017 | 982.00 | PEST | 0.00 | 3.00 | 957.00 | 0.00 | 74.30 |

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Lennis | | | | | RENT | 954.00 | 0.00 | | | |
| 2705 | 2X2E R | N/A | 998 | Occupied | Ramirez Castro, Robert | 11/01/2016 | 11/01/2016 | 10/27/2017 | 972.00 | PEST | 0.00 | 3.00 | 1,102.00 | 0.00 | 74.04 |
| | | | | | | | | | | RENT | 979.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 120.00 | | | |
| 2706 | 2X2F | N/A | 1010 | Occupied-NTV | Borrero, Ricardo | 04/18/2015 05/29/2017 | 06/01/2016 | 05/26/2017 | 982.00 | PEST | 0.00 | 3.00 | 1,005.00 | 150.00 | 54.46 |
| | | | | | | | | | | PETFEE | 0.00 | 25.00 | | | |
| | | | | | | | | | | RENT | 977.00 | 0.00 | | | |
| 2707 | 2X2E | N/A | 998 | Occupied-NTV | Borrero, Pedro | 02/06/2014 05/05/2017 | 04/06/2016 | 05/05/2017 | 972.00 | GARAGE | 0.00 | 85.00 | 1,053.00 | 0.00 | 44.26 |
| | | | | | | | | | | PEST | 0.00 | 3.00 | | | |
| | | | | | | | | | | RENT | 965.00 | 0.00 | | | |
| 2708 | 2X2F LR | N/A | 1010 | Occupied-NTVL | Jolin, Charles | 04/22/2016 04/21/2017 | 04/22/2016 | 04/21/2017 | 982.00 | GARAGE | 0.00 | 85.00 | 1,202.00 | 0.00 | 44.53 |
| | | | | | | | | | | PEST | 0.00 | 3.00 | | | |
| | | | | | | | | | | RENT | 1,089.00 | 0.00 | | | |

**Details**

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | N/A | | Applicant | Cubero Garcia, Esther | 04/22/2017 | 04/22/2017 | 04/20/2018 | | UPGRADE | 0.00 | 25.00 | | | |
| | | | | | | | | | | PEST | 0.00 * | 3.00 * | 1,007.00 * | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 1,004.00 * | 0.00 * | | | |
| 2801 | 2X2E | N/A | 998 | Occupied | Tavarez, Dannia | 07/01/2016 | 07/01/2016 | 06/30/2017 | 972.00 | PEST | 0.00 | 3.00 | 1,107.00 | 275.00 | 64.11 |
| | | | | | | | | | | RENT | 1,104.00 | 0.00 | | | |
| 2802 | 2X2F | N/A | 1010 | Occupied | Elmasry, Sandy | 02/06/2016 | 02/04/2017 | 02/03/2018 | 982.00 | GARAGE | 0.00 | 85.00 | 1,057.00 | 275.00 | 74.30 |
| | | | | | | | | | | PEST | 0.00 | 3.00 | | | |
| | | | | | | | | | | RENT | 969.00 | 0.00 | | | |
| 2803 | 1X1B | N/A | 742 | Occupied | El Ouafi, Saadia | 01/04/2017 | 01/04/2017 | 01/05/2018 | 790.00 | PEST | 0.00 | 3.00 | 790.00 | 0.00 | 38.60 |
| | | | | | | | | | | RENT | 787.00 | 0.00 | | | |
| 2804 | 1X1C | N/A | 763 | Occupied | Baez Carrasquillo, Pablo | 08/24/2016 | 08/24/2016 | 08/25/2017 | 800.00 | RENT | 860.00 | 0.00 | 860.00 | 0.00 | (860.00) |
| 2805 | 1X1B | N/A | 742 | Occupied | Pena, Milagros | 04/02/2014 | 04/23/2016 | 05/19/2017 | 790.00 | PEST | 0.00 | 3.00 | 752.00 | 300.00 | 48.53 |
| | | | | | | | | | | RENT | 749.00 | 0.00 | | | |
| | | N/A | | Pending renewal | Pena, Milagros | 04/02/2014 | 05/20/2017 | 05/18/2018 | | PEST | 0.00 * | 3.00 * | 767.00 * | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 764.00 * | 0.00 * | | | |
| 2806 | 1X1C | N/A | 763 | Occupied | Margarella, Laurence | 02/10/2017 | 02/10/2017 | 02/09/2018 | 800.00 | PEST | 0.00 | 3.00 | 800.00 | 0.00 | 30.47 |
| | | | | | | | | | | RENT | 797.00 | 0.00 | | | |
| 2807 | 2X2E | N/A | 998 | Occupied | Fonseca Conde, Edson | 01/28/2017 | 01/28/2017 | 02/02/2018 | 972.00 | GARAGE | 0.00 | 85.00 | 1,032.00 | 0.00 | 54.18 |
| | | | | | | | | | | PEST | 0.00 | 3.00 | | | |
| | | | | | | | | | | RENT | 944.00 | 0.00 | | | |
| 2808 | 2X2F | N/A | 1010 | Occupied | Rodrigue, Cathy | 08/16/2005 | 10/09/2016 | 10/06/2017 | 982.00 | GARAGE | 0.00 | 75.00 | 1,153.00 | 1,065.00 | 62.38 |
| | | | | | | | | | | PEST | 0.00 | 3.00 | | | |

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | PSTFEE | 0.00 | 40.00 | | | |
| | | | | | | | | | | RENT | 1,035.00 | 0.00 | | | |
| 2809 | 2X2E LR | N/A | 998 | Occupied | Castro Cotto, Maria | 01/02/2015 | 01/21/2017 | 01/19/2018 | 972.00 | PEST | 0.00 | 3.00 | 1,014.00 | 0.00 | 54.18 |
| | | | | | | | | | | RENT | 936.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 75.00 | | | |
| 2810 | 2X2F | N/A | 1010 | Occupied | Delgado Romero, Xiomara | 12/19/2016 | 12/19/2016 | 12/22/2017 | 982.00 | PEST | 0.00 | 3.00 | 957.00 | 0.00 | 64.38 |
| | | | | | | | | | | RENT | 954.00 | 0.00 | | | |
| 2811 | 1X1B | N/A | 742 | Occupied | Marin, Luis | 06/24/2016 | 06/24/2016 | 05/19/2017 | 790.00 | PEST | 0.00 | 3.00 | 871.00 | 0.00 | 38.60 |
| | | | | | | | | | | RENT | 868.00 | 0.00 | | | |
| 2812 | 1X1C | N/A | 763 | Occupied | Sanchez, Victor | 08/20/2009 | 01/28/2017 | 01/26/2018 | 800.00 | PEST | 0.00 | 3.00 | 770.00 | 150.00 | 87.07 |
| | | | | | | | | | | RENT | 767.00 | 0.00 | | | |
| 2813 | 1X1B | N/A | 742 | Occupied | Kiburu, Ann | 08/25/2015 | 10/01/2016 | 09/30/2017 | 790.00 | PEST | 0.00 | 3.00 | 898.00 | 0.00 | 48.53 |
| | | | | | | | | | | RENT | 895.00 | 0.00 | | | |
| 2814 | 1X1C | N/A | 763 | Occupied | Silva, Hector | 02/24/2017 | 02/24/2017 | 03/02/2018 | 800.00 | PEST | 0.00 | 3.00 | 800.00 | 0.00 | 27.08 |
| | | | | | | | | | | RENT | 797.00 | 0.00 | | | |
| 2815 | 2X2E | N/A | 998 | Occupied | Ortiz Volcan, Mauricio | 07/05/2016 | 07/05/2016 | 07/07/2017 | 972.00 | PEST | 0.00 | 3.00 | 1,062.00 | 700.00 | 54.18 |
| | | | | | | | | | | RENT | 1,059.00 | 0.00 | | | |
| 2816 | 2X2F | N/A | 1010 | Vacant-Leased | VACANT | | | | 982.00 | | 0.00 * | 3.00 * | | | |
| | | N/A | | Applicant | Pineiro Berrios, Christopher | 03/30/2017 | 03/30/2017 | 03/30/2018 | | RENT | 979.00 * | 0.00 * | 979.00 * | 0.00 | 0.00 |
| 2901 | 1X1B | N/A | 742 | Occupied-NTVL | Velez Garcia, Rey | 03/31/2016 03/31/2017 | 03/31/2016 | 03/31/2017 | 790.00 | PEST | 0.00 | 3.00 | 901.00 | 275.00 | 54.18 |
| | | | | | | | | | | RENT | 898.00 | 0.00 | | | |
| | | N/A | | Applicant | Chatelain, Jonathan | 04/10/2017 | 04/10/2017 | 02/09/2018 | | RENT | 787.00 * | 0.00 * | 787.00 * | 0.00 | 0.00 |
| 2902 | 1X1C | N/A | 763 | Occupied | Vargas, Eduardo | 05/18/2013 | 06/01/2016 | 05/26/2017 | 800.00 | PEST | 0.00 | 3.00 | 796.00 | 0.00 | (796.00) |
| | | | | | | | | | | RENT | 793.00 | 0.00 | | | |
| 2903 | 1X1A | N/A | 500 | Vacant | VACANT | | | | 703.00 | | 0.00 * | 3.00 * | | | |
| 2904 | 1X1D | N/A | 991 | Vacant-Leased | VACANT | | | | 978.00 | | 0.00 * | 3.00 * | | | |
| | | N/A | | Applicant | Evans, Reid | 04/07/2017 | 04/07/2017 | 04/06/2018 | | PEST | 0.00 * | 3.00 * | 893.00 * | 0.00 | (50.00) |
| | | | | | | | | | | RENT | 890.00 * | 0.00 * | | | |
| 2905 | 1X1A | N/A | 500 | Occupied | Houmair, Abdelhadi | 01/30/2015 | 02/18/2017 | 02/16/2018 | 703.00 | PEST | 0.00 | 3.00 | 696.00 | 750.00 | 43.19 |
| | | | | | | | | | | RENT | 693.00 | 0.00 | | | |
| 2906 | 1X1D | N/A | 991 | Occupied | Jurasin, Ryan | 01/28/2015 | 01/14/2017 | 01/12/2018 | 978.00 | PEST | 0.00 | 3.00 | 894.00 | 250.00 | 54.03 |
| | | | | | | | | | | RENT | 891.00 | 0.00 | | | |
| 2907 | 1X1B | N/A | 742 | Occupied | Llerena, Adriana | 07/13/2012 | 07/26/2016 | 07/21/2017 | 790.00 | PEST | 0.00 | 3.00 | 766.00 | 0.00 | 38.60 |
| | | | | | | | | | | PETFEE | 0.00 | 25.00 | | | |
| | | | | | | | | | | RENT | 738.00 | 0.00 | | | |
| 2908 | 1X1C | N/A | 763 | Occupied | Heilesen, Andrew | 09/23/2016 | 09/23/2016 | 09/22/2017 | 800.00 | PEST | 0.00 | 3.00 | 863.00 | 0.00 | 39.07 |
| | | | | | | | | | | RENT | 860.00 | 0.00 | | | |

Details

| 2909 | 1X1B | N/A | 742 | Occupied | Añibas, Marisol | 11/29/2016 | 11/25/2016 | 11/17/2017 | 796.00 | PEST | 0.00 | 3.00 | 780.00 | 0.00 | 38.60 |
| | | | | | | | | | | RENT | 777.00 | 0.00 | | | |

**Details**

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|------|-----------|------------------|-----|-------------------|------|------------------|-------------|-----------|----------------|------------|------------|------------------------|---------------|-------------|---------|
| 2910 | 1X1C LR | N/A | 763 | Occupied | Maduro, Jeffrey | 11/06/2015 | 10/29/2016 | 10/27/2017 | 800.00 | PEST | 0.00 | 3.00 | 891.00 | 0.00 | 39.07 |
| | | | | | | | | | | RENT | 813.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 75.00 | | | |
| 2911 | 1X1A | N/A | 500 | Occupied | Estrada Tyner, Itzel | 02/06/2017 | 02/06/2017 | 02/02/2018 | 703.00 | PEST | 0.00 | 3.00 | 703.00 | 0.00 | 29.52 |
| | | | | | | | | | | RENT | 700.00 | 0.00 | | | |
| 2912 | 1X1D | N/A | 991 | Vacant | VACANT | | | | 978.00 | | 0.00 * | 3.00 * | | | |
| 2913 | 1X1A | N/A | 500 | Occupied | Strong, Joseph | 02/02/2016 | 01/28/2017 | 01/26/2018 | 703.00 | PEST | 0.00 | 3.00 | 748.00 | 0.00 | 33.26 |
| | | | | | | | | | | RENT | 745.00 | 0.00 | | | |
| 2914 | 1X1.5D R | N/A | 991 | Occupied | Barreiros, Guadalupe | 01/28/2017 | 01/28/2017 | 02/16/2018 | 978.00 | PEST | 0.00 | 3.00 | 968.00 | 0.00 | 44.10 |
| | | | | | | | | | | RENT | 890.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 75.00 | | | |
| 2915 | 1X1B | N/A | 742 | Occupied | Diaz, Ramon | 07/21/2016 | 07/21/2016 | 07/21/2017 | 790.00 | PEST | 0.00 | 3.00 | 861.00 | 0.00 | 38.60 |
| | | | | | | | | | | RENT | 858.00 | 0.00 | | | |
| 2916 | 1X1C | N/A | 763 | Occupied | Rodriguez, Greyling | 12/19/2016 | 12/19/2016 | 12/22/2017 | 800.00 | PEST | 0.00 | 3.00 | 820.00 | 0.00 | 49.00 |
| | | | | | | | | | | RENT | 817.00 | 0.00 | | | |

**Totals:**                                                                                      381,601.00          380,101.00   11,572.80   391,673.80   70,214.50

Amt / SQFT: Market = 354,576 SQFT; Leased = 346,604 SQFT;

| Floorplan | # Units | Average SQFT | Average Market + Addl. | Market Amt / SQFT | Average Leased | Leased Amt / SQFT | Units Occupied | Occupancy % | Units Available |
|-----------|---------|--------------|------------------------|-------------------|----------------|-------------------|----------------|-------------|-----------------|
| 1X1.5D R | 17 | 991 | 981.53 | 0.99 | 879.12 | 0.89 | 17 | 100.00 | 1 |
| 1X1.5D-LR | 3 | 991 | 978.00 | 0.99 | 898.33 | 0.91 | 3 | 100.00 | 0 |
| 1X1A | 103 | 500 | 705.62 | 1.41 | 748.02 | 1.50 | 101 | 98.06 | 1 |
| 1X1A LR | 10 | 500 | 706.00 | 1.41 | 748.00 | 1.50 | 9 | 90.00 | 1 |
| 1X1A R | 8 | 500 | 716.13 | 1.43 | 733.38 | 1.47 | 8 | 100.00 | 0 |
| 1X1B | 54 | 742 | 792.50 | 1.07 | 818.40 | 1.10 | 53 | 98.15 | 3 |
| 1X1B LR | 6 | 742 | 790.00 | 1.06 | 818.33 | 1.10 | 6 | 100.00 | 1 |
| 1X1B R | 6 | 742 | 792.50 | 1.07 | 804.80 | 1.08 | 5 | 83.33 | 0 |
| 1X1C | 51 | 763 | 802.35 | 1.05 | 819.51 | 1.07 | 51 | 100.00 | 1 |
| 1X1C LR | 10 | 763 | 803.00 | 1.05 | 805.30 | 1.06 | 10 | 100.00 | 1 |
| 1X1C R | 7 | 763 | 807.86 | 1.06 | 845.57 | 1.11 | 7 | 100.00 | 0 |
| 1X1D | 22 | 991 | 981.41 | 0.99 | 874.80 | 0.88 | 20 | 90.91 | 3 |
| 2X2E | 53 | 998 | 973.70 | 0.98 | 1,003.24 | 1.01 | 51 | 96.23 | 2 |
| 2X2E LR | 13 | 998 | 975.46 | 0.98 | 995.31 | 1.00 | 13 | 100.00 | 0 |
| 2X2E R | 10 | 998 | 973.50 | 0.98 | 983.20 | 0.99 | 10 | 100.00 | 0 |
| 2X2F | 55 | 1,010 | 984.36 | 0.97 | 1,005.65 | 1.00 | 54 | 98.18 | 3 |
| 2X2F LR | 16 | 1,010 | 994.19 | 0.98 | 1,026.19 | 1.02 | 16 | 100.00 | 0 |
| 2X2F R | 4 | 1,010 | 989.50 | 0.98 | 1,020.00 | 1.01 | 4 | 100.00 | 1 |

**Occupancy and Rents Summary for Current Date**

| Unit Status | Market + Addl. | # Units | Potential Rent |
|---|---|---|---|
| Occupied, no NTV | 350,080.00 | 412 | 356,398.00 |
| Occupied, NTV | 13,626.00 | 15 | 13,746.00 |
| Occupied NTV Leased | 9,309.00 | 11 | 9,957.00 |
| Vacant Leased | 4,425.00 | 5 | 4,425.00 |
| Admin/Down | 1,777.00 | 2 | 1,777.00 |
| Vacant Not Leased | 2,384.00 | 3 | 2,384.00 |
| **Totals:** | **381,601.00** | **448** | **388,687.00** |

**Summary Billing by Transaction Code for Current Date**

| Code | Amount |
|---|---|
| PETFEE | 918.00 |
| REFERRAL | (50.00) |
| GARAGE | 3,720.00 |
| PETRENT | 40.00 |
| RENT | 380,101.00 |
| PEST | 1,203.00 |
| EMPLCRED | (1,635.00) |
| OFCRCRED | (1,125.00) |
| MTOM | 1,306.80 |
| UPGRADE | 7,195.00 |
| **Total:** | **391,673.80** |

OneSite Rents v3.0        **Atlas Apartment Holdings, LLC - Forest Park**        Page 1 of 21

03/29/2017  8:31:51PM        **RENT ROLL DETAIL**        mgt-521-003

As of 03/29/2017

**Parameters:** Properties - ALL;Show All Unit Designations or Filter by - ALL;Subjournals - ALL;Exclude Formers? - Yes;Sort by - Unit;Report Type - Details + Summary;Show Unit Rent as - Market + Addl.;

**Details**

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 01-101 | 2X2C | N/A | 1140 | Occupied | frost, jackie | 10/01/2008 | 02/18/2016 | 05/13/2017 | 1,340.00 | ALARM | 0.00 | 45.00 | 1,297.00 | 0.00 | 74.99 |
| | | | | | | | | | | PARKING | 0.00 | 20.00 | | | |
| | | | | | | | | | | RENT | 1,232.00 | 0.00 | | | |
| | | N/A | | Pending renewal | frost, jackie | 10/01/2008 | 05/14/2017 | 05/13/2018 | | ALARM | 0.00 * | 45.00 * | 1,323.00 * | 0.00 | 0.00 |
| | | | | | | | | | | PARKING | 0.00 * | 20.00 * | | | |
| | | | | | | | | | | PEST | 0.00 * | 2.00 * | | | |
| | | | | | | | | | | RENT | 1,256.00 * | 0.00 * | | | |
| 01-102 | 2X2C | N/A | 1140 | Occupied | Scalegnio, Diane | 07/15/2014 | 07/10/2016 | 08/09/2017 | 1,340.00 | ALARM | 0.00 | 45.00 | 1,541.00 | 0.00 | 44.99 |
| | | | | | | | | | | PETFEE | 0.00 | 35.00 | | | |
| | | | | | | | | | | RENT | 1,461.00 | 0.00 | | | |
| 01-103 | 2X2C | N/A | 1140 | Occupied | Nicholson, Lewis | 12/01/2014 | 12/09/2016 | 12/09/2017 | 1,365.00 | ALARM | 0.00 | 45.00 | 1,419.00 | 0.00 | 54.99 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,372.00 | 0.00 | | | |
| 01-104 | 2X2C | N/A | 1140 | Occupied | Stalling, Tara | 06/04/2013 | 07/15/2016 | 08/14/2017 | 1,365.00 | ALARM | 0.00 | 45.00 | 1,300.00 | 250.00 | 54.99 |
| | | | | | | | | | | RENT | 1,255.00 | 0.00 | | | |
| 01-201 | 2X2C | N/A | 1140 | Occupied | Hunter, Katherine | 10/30/2009 | 03/13/2016 | 06/06/2017 | 1,415.00 | ALARM | 0.00 | 45.00 | 1,234.00 | 300.00 | 54.99 |
| | | | | | | | | | | PARKING | 0.00 | 25.00 | | | |
| | | | | | | | | | | RENT | 1,164.00 | 0.00 | | | |
| 01-202 | 2X2C | N/A | 1140 | Occupied | Sylk, Jonathan | 04/05/2001 | 05/15/2016 | 08/08/2017 | 1,340.00 | ALARM | 0.00 | 45.00 | 1,418.00 | 650.68 | 54.99 |
| | | | | | | | | | | PARKING | 0.00 | 60.00 | | | |
| | | | | | | | | | | RENT | 1,313.00 | 0.00 | | | |
| 01-203 | 2X2C | N/A | 1140 | Occupied | Parlatore, Angela | 10/13/2012 | 11/25/2016 | 12/24/2017 | 1,365.00 | ALARM | 0.00 | 45.00 | 1,299.00 | 0.00 | 74.99 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | PETFEE | 0.00 | 25.00 | | | |
| | | | | | | | | | | RENT | 1,207.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 20.00 | | | |
| 01-204 | 2X2C | N/A | 1140 | Occupied | Dela, Shinquila | 04/11/2016 | 04/18/2016 | 04/13/2017 | 1,385.00 | ALARM | 0.00 | 45.00 | 1,292.00 | 250.00 | 54.99 |
| | | | | | | | | | | RENT | 1,247.00 | 0.00 | | | |
| | | N/A | | Pending renewal | Dela, Shinquila | 04/11/2014 | 04/14/2017 | 04/13/2018 | | ALARM | 0.00 * | 45.00 * | 1,331.00 * | 0.00 | 0.00 |
| | | | | | | | | | | PEST | 0.00 * | 2.00 * | | | |
| | | | | | | | | | | RENT | 1,284.00 * | 0.00 * | | | |
| 01-301 | 2X2D | N/A | 1250 | Occupied | Pope, Charletha | 08/03/2016 | 08/03/2016 | 07/31/2017 | 1,547.00 | ALARM | 0.00 | 45.00 | 1,465.00 | 0.00 | 54.99 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,418.00 | 0.00 | | | |

**Details**

Other

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Charges/ Credits | Total Billing | Dep On Hand | Balance |
|------|-----------|------------------|-----|-------------------|------|------------------|-------------|-----------|----------------|------------|-----------|------------------|---------------|-------------|---------|
| 01-302 | 2X2D | N/A | 1250 | Occupied | Norris, Chelsea | 02/09/2017 | 02/09/2017 | 03/08/2018 | 1,547.00 | ALARM | 0.00 | 45.00 | 1,522.00 | 0.00 | 105.65 |
| | | | | | | | | | | PARKING | 0.00 | 45.00 | | | |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,430.00 | 0.00 | | | |
| 01-303 | 2X2D | N/A | 1250 | Occupied | Macaione, Joseph | 07/01/2009 | 11/14/2016 | 12/14/2017 | 1,572.00 | ALARM | 0.00 | 45.00 | 1,413.00 | 300.00 | 54.99 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,346.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 20.00 | | | |
| 01-304 | 2X2D | N/A | 1250 | Occupied | Parker, James | 08/08/2014 | 07/30/2016 | 08/29/2017 | 1,572.00 | ALARM | 0.00 | 45.00 | 1,537.00 | 0.00 | 41.47 |
| | | | | | | | | | | RENT | 1,472.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 20.00 | | | |
| 02-101 | 2X2C | N/A | 1140 | Occupied | Jackson, Torie | 05/01/2016 | 05/01/2016 | 05/31/2017 | 1,340.00 | ALARM | 0.00 | 45.00 | 1,363.00 | 250.00 | 84.99 |
| | | | | | | | | | | RENT | 1,318.00 | 0.00 | | | |
| 02-102 | 2X2C | N/A | 1140 | Occupied | Bradley, Janice | 04/18/2013 | 05/22/2016 | 08/15/2017 | 1,340.00 | ALARM | 0.00 | 45.00 | 1,179.00 | 0.00 | 44.99 |
| | | | | | | | | | | DISCOUNT | 0.00 | (36.00) | | | |
| | | | | | | | | | | RENT | 1,170.00 | 0.00 | | | |
| 02-103 | 2X2C | N/A | 1140 | Occupied | Nocento, Joyce | 10/01/2010 | 02/18/2016 | 05/13/2017 | 1,365.00 | ALARM | 0.00 | 35.00 | 1,356.00 | 0.00 | 44.99 |
| | | | | | | | | | | PARKING | 0.00 | 20.00 | | | |
| | | | | | | | | | | RENT | 1,301.00 | 0.00 | | | |
| 02-104 | 2X2C | N/A | 1140 | Occupied | Holliday, Eniecea | 03/20/2017 | 03/20/2017 | 03/19/2018 | 1,365.00 | ALARM | 0.00 | 45.00 | 1,412.00 | 0.00 | 0.00 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,340.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 25.00 | | | |
| 02-201 | 2X2C | N/A | 1140 | Vacant-Leased | VACANT | | | | 1,340.00 | | 0.00 * | 0.00 * | | | |
| | | N/A | | Applicant | DaSilva, Newton | 03/31/2017 | 03/31/2017 | 03/30/2018 | | ALARM | 0.00 * | 45.00 * | 1,387.00 * | 0.00 | 0.00 |
| | | | | | | | | | | PEST | 0.00 * | 2.00 * | | | |
| | | | | | | | | | | RENT | 1,340.00 * | 0.00 * | | | |
| 02-202 | 2X2C | N/A | 1140 | Occupied | Snell, Cristal | 07/05/2013 | 07/22/2016 | 08/21/2017 | 1,340.00 | ALARM | 0.00 | 45.00 | 1,266.00 | 250.00 | (1,249.14) |
| | | | | | | | | | | PARKING | 0.00 | 20.00 | | | |
| | | | | | | | | | | RENT | 1,201.00 | 0.00 | | | |
| 02-203 | 2X2C | N/A | 1140 | Occupied | Gaines, Johnnie | 12/07/2012 | 11/20/2016 | 12/20/2017 | 1,365.00 | ALARM | 0.00 | 45.00 | 1,272.00 | 0.00 | 54.97 |
| | | | | | | | | | | DISCOUNT | 0.00 | (41.00) | | | |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |

**Details**

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|------|-----------|------------------|-----|-------------------|------|------------------|-------------|-----------|----------------|------------|-----------|------------------------|---------------|-------------|---------|
| | | | | | | | | | | RENT | 1,248.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 18.00 | | | |
| 02-204 | 2X2C | N/A | 1140 | Occupied | Casteel-neal, Chymere | 11/18/2016 | 11/18/2016 | 12/17/2017 | 1,365.00 | ALARM | 0.00 | 45.00 | 1,432.00 | 0.00 | 54.99 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,360.00 | 0.00 | | | |

UPGRADE 0.00 25.00

| Unit | Floorpla | Unit Designation | SQ | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 02-301 | 2X2D | N/A | 1250 | Occupied | Altidor, Jessica | 03/20/2017 | 03/20/2017 | 03/19/2018 | 1,547.00 | ALARM | 0.00 | 45.00 | 1,477.00 | 0.00 | 0.00 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,430.00 | 0.00 | | | |
| 02-302 | 2X2D | N/A | 1250 | Occupied | Santiago, lucecita | 08/15/2014 | 08/18/2016 | 07/15/2017 | 1,547.00 | ALARM | 0.00 | 45.00 | 1,494.00 | 0.00 | 74.99 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,447.00 | 0.00 | | | |
| 02-303 | 2X2D | N/A | 1250 | Occupied | Ortiz, Kristen | 03/23/2014 | 05/05/2016 | 06/29/2017 | 1,572.00 | ALARM | 0.00 | 45.00 | 1,495.00 | 0.00 | (1,495.00) |
| | | | | | | | | | | PARKING | 0.00 | 35.00 | | | |
| | | | | | | | | | | RENT | 1,395.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 20.00 | | | |
| | | N/A | | Pending renewal | Ortiz, Kristen | 03/23/2014 | 06/30/2017 | 06/29/2018 | | ALARM | 0.00 * | 45.00 * | 1,515.00 * | 0.00 | 0.00 |
| | | | | | | | | | | PARKING | 0.00 * | 35.00 * | | | |
| | | | | | | | | | | PEST | 0.00 * | 2.00 * | | | |
| | | | | | | | | | | RENT | 1,413.00 * | 0.00 * | | | |
| | | | | | | | | | | UPGRADE | 0.00 * | 20.00 * | | | |
| 02-304 | 2X2D | N/A | 1250 | Occupied | Delphin, Johanna | 12/15/2016 | 12/15/2016 | 01/14/2018 | 1,572.00 | ALARM | 0.00 | 45.00 | 1,502.00 | 0.00 | 74.99 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,430.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 25.00 | | | |
| 03-101 | 2X2C | N/A | 1140 | Occupied | Wedderburn, Paulette | 10/01/2012 | 09/22/2016 | 10/21/2017 | 1,340.00 | ALARM | 0.00 | 45.00 | 1,323.00 | 0.00 | 54.99 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,276.00 | 0.00 | | | |
| 03-102 | 2X2C | N/A | 1140 | Occupied | Bray, Randell | 09/17/2013 | 01/01/2017 | 12/31/2017 | 1,340.00 | ALARM | 0.00 | 45.00 | 1,264.00 | 250.00 | 74.99 |
| | | | | | | | | | | PARKING | 0.00 | 35.00 | | | |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,182.00 | 0.00 | | | |

**Details**

| Unit | Floorpla | Unit Designation | SQ | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 03-103 | 2X2C | N/A | 1140 | Occupied-NTV | Dias, Pamela | 02/09/2015 04/30/2017 | 02/05/2017 | 04/30/2017 | 1,365.00 | ALARM | 0.00 | 45.00 | 1,346.00 | 0.00 | 54.99 |
| | | | | | | | | | | RENT | 1,301.00 | 0.00 | | | |
| 03-104 | 2X2C | N/A | 1140 | Occupied | Rivas, Ana | 02/16/2017 | 02/16/2017 | 03/15/2018 | 1,365.00 | ALARM | 0.00 | 45.00 | 1,432.00 | 0.00 | 0.00 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,360.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 25.00 | | | |
| 03-201 | 2X2C | N/A | 1140 | Occupied | Mathis, Angela | 11/15/2016 | 11/15/2016 | 12/14/2017 | 1,340.00 | ALARM | 0.00 | 45.00 | 1,407.00 | 0.00 | 54.99 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,360.00 | 0.00 | | | |
| 03-202 | 2X2C | N/A | 1140 | Occupied | Walwyn, Tiffaney | 05/15/2016 | 05/15/2016 | 06/14/2017 | 1,340.00 | ALARM | 0.00 | 45.00 | 1,363.00 | 250.00 | 84.99 |
| | | | | | | | | | | RENT | 1,318.00 | 0.00 | | | |
| 03-203 | 2X2C | N/A | 1140 | Occupied | Williams, Wayne | 09/01/2015 | 09/17/2016 | 10/16/2017 | 1,365.00 | ALARM | 0.00 | 45.00 | 1,417.00 | 250.00 | 44.29 |

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,350.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 20.00 | | | |
| 03-204 | 2X2C | N/A | 1140 | Occupied | Girard, Harry | 08/05/2015 | 08/30/2016 | 09/29/2017 | 1,365.00 | ALARM | 0.00 | 45.00 | 1,387.00 | 0.00 | 84.99 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,320.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 20.00 | | | |
| 03-301 | 2X2D | N/A | 1250 | Occupied | Gunter, Marsha | 02/23/2017 | 02/23/2017 | 02/22/2018 | 1,475.00 | ALARM | 0.00 | 45.00 | 1,477.00 | 0.00 | (1,430.46) |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,430.00 | 0.00 | | | |
| 03-302 | 2X2D | N/A | 1250 | Occupied | Spence, Kaydian | 04/08/2014 | 06/28/2016 | 07/27/2017 | 1,475.00 | ALARM | 0.00 | 45.00 | 1,450.00 | 0.00 | 74.89 |
| | | | | | | | | | | RENT | 1,405.00 | 0.00 | | | |
| 03-303 | 2X2D | N/A | 1250 | Occupied | Jenkins, Christopher | 07/01/2013 | 09/02/2016 | 10/01/2017 | 1,500.00 | ALARM | 0.00 | 45.00 | 1,225.00 | 150.00 | 74.99 |
| | | | | | | | | | | DISCOUNT | 0.00 | (62.00) | | | |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,240.00 | 0.00 | | | |
| 03-304 | 2X2D | N/A | 1250 | Occupied | Phillips, Yolanda | 02/20/2017 | 02/20/2017 | 02/19/2018 | 1,500.00 | ALARM | 0.00 | 45.00 | 1,502.00 | 0.00 | 54.32 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,455.00 | 0.00 | | | |

**Details**

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 04-101 | 2X2C | N/A | 1140 | Occupied | Gamble Robinson, Latonia | 07/15/2015 | 08/09/2016 | 09/08/2017 | 1,340.00 | ALARM | 0.00 | 45.00 | 1,507.00 | 200.00 | 54.99 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,460.00 | 0.00 | | | |
| 04-102 | 2X2C | N/A | 1140 | Occupied | Boothe, Cornelius | 01/09/2016 | 03/16/2017 | 03/15/2018 | 1,340.00 | ALARM | 0.00 | 45.00 | 1,307.00 | 0.00 | 54.99 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,260.00 | 0.00 | | | |
| 04-103 | 2X2C | N/A | 1140 | Occupied | Pierre, Diane | 11/12/2013 | 03/28/2017 | 03/27/2018 | 1,365.00 | ALARM | 0.00 | 45.00 | 1,206.00 | 250.00 | 54.99 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,159.00 | 0.00 | | | |
| 04-104 | 2X2C | N/A | 1140 | Occupied | Branch, Debra | 10/05/2013 | 11/11/2016 | 12/11/2017 | 1,365.00 | ALARM | 0.00 | 45.00 | 1,341.00 | 250.00 | 54.99 |
| | | | | | | | | | | PARKING | 0.00 | 33.00 | | | |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,261.00 | 0.00 | | | |
| 04-201 | 2X2C | N/A | 1140 | Occupied | Hjortensjo, Fredrick | 11/18/2014 | 01/01/2017 | 12/31/2017 | 1,340.00 | ALARM | 0.00 | 45.00 | 1,395.00 | 250.00 | 54.42 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,348.00 | 0.00 | | | |
| 04-202 | 2X2C | N/A | 1140 | Occupied | Jackson, Jason | 03/30/2010 | 05/14/2016 | 08/07/2017 | 1,340.00 | ALARM | 0.00 | 45.00 | 1,316.00 | 300.00 | 54.99 |
| | | | | | | | | | | RENT | 1,271.00 | 0.00 | | | |
| 04-203 | 2X2C | N/A | 1140 | Occupied | Sebastian, Kelly | 11/30/2011 | 11/22/2016 | 12/22/2017 | 1,365.00 | ALARM | 0.00 | 45.00 | 1,257.00 | 0.00 | 44.99 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |

| Unit | Floorpla | Unit Designation | SQ | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | RENT | 1,210.00 | 0.00 | | | |
| 04-204 | 2X2C | N/A | 1140 | Occupied | Perez, Cartriese | 04/01/2016 | 04/01/2016 | 03/31/2017 | 1,365.00 | ALARM | 0.00 | 45.00 | 1,280.00 | 0.00 | 44.99 |
| | | | | | | | | | | RENT | 1,235.00 | 0.00 | | | |
| | | N/A | | Pending renewal | Perez, Cartriese | 04/01/2016 | 04/01/2017 | 03/31/2018 | | ALARM | 0.00 * | 45.00 * | 1,319.00 * | 0.00 | 0.00 |
| | | | | | | | | | | PEST | 0.00 * | 2.00 * | | | |
| | | | | | | | | | | RENT | 1,272.00 * | 0.00 * | | | |
| 04-301 | 2X2D | N/A | 1250 | Occupied | Sterling, Carmelita | 09/10/2016 | 09/10/2016 | 10/09/2017 | 1,547.00 | ALARM | 0.00 | 45.00 | 1,370.00 | 0.00 | 44.99 |
| | | | | | | | | | | CONC/SPECL | 0.00 | (70.00) | | | |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,393.00 | 0.00 | | | |

**Details**

| Unit | Floorpla | Unit Designation | SQ | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 04-302 | 2X2D | N/A | 1250 | Occupied | Cameron, Natania | 08/17/2014 | 09/07/2016 | 10/06/2017 | 1,547.00 | ALARM | 0.00 | 45.00 | 1,545.00 | 500.00 | 74.99 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,498.00 | 0.00 | | | |
| 04-303 | 2X2D | N/A | 1250 | Occupied | Donovan, Charles | 08/15/2000 | 05/13/2016 | 08/06/2017 | 1,572.00 | ALARM | 0.00 | 45.00 | 1,399.00 | 450.00 | 54.99 |
| | | | | | | | | | | RENT | 1,334.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 20.00 | | | |
| 04-304 | 2X2D | N/A | 1250 | Occupied | Robinson, Marjorie | 07/06/2012 | 07/22/2016 | 08/21/2017 | 1,592.00 | ALARM | 0.00 | 45.00 | 1,401.00 | 0.00 | 54.99 |
| | | | | | | | | | | RENT | 1,336.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 20.00 | | | |
| 05-101 | 2X2C | N/A | 1140 | Occupied | Johnson, Georgia | 06/15/2010 | 09/15/2016 | 10/14/2017 | 1,340.00 | ALARM | 0.00 | 45.00 | 1,408.00 | 0.00 | 54.99 |
| | | | | | | | | | | PARKING | 0.00 | 20.00 | | | |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,341.00 | 0.00 | | | |
| 05-102 | 2X2C | N/A | 1140 | Occupied | Mckenzie, Arlene | 10/15/2016 | 10/15/2016 | 11/14/2017 | 1,340.00 | ALARM | 0.00 | 45.00 | 1,409.00 | 0.00 | 54.99 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,362.00 | 0.00 | | | |
| 05-103 | 2X2C | N/A | 1140 | Occupied | Prine, Brian | 11/12/2015 | 11/04/2016 | 11/30/2017 | 1,365.00 | ALARM | 0.00 | 45.00 | 1,393.00 | 0.00 | 7.98 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,346.00 | 0.00 | | | |
| 05-104 | 2X2C | N/A | 1140 | Occupied | Temkin, Elizabeth | 02/01/2014 | 03/11/2016 | 06/04/2017 | 1,365.00 | ALARM | 0.00 | 45.00 | 1,294.00 | 0.00 | 54.99 |
| | | | | | | | | | | RENT | 1,249.00 | 0.00 | | | |
| 05-201 | 2X2C | N/A | 1140 | Occupied | Chambers, Carlene | 02/01/2014 | 02/15/2016 | 05/10/2017 | 1,340.00 | ALARM | 0.00 | 45.00 | 1,172.00 | 250.00 | 54.99 |
| | | | | | | | | | | RENT | 1,127.00 | 0.00 | | | |
| 05-202 | 2X2C | N/A | 1140 | Occupied | Lee, Rudolph | 03/08/2013 | 03/25/2016 | 06/18/2017 | 1,340.00 | ALARM | 0.00 | 45.00 | 1,258.00 | 500.00 | 53.89 |
| | | | | | | | | | | RENT | 1,213.00 | 0.00 | | | |
| 05-203 | 2X2C | N/A | 1140 | Occupied | Miller, Rosezza | 09/17/2012 | 09/30/2016 | 09/30/2017 | 1,365.00 | ALARM | 0.00 | 45.00 | 1,365.00 | 0.00 | 54.98 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,318.00 | 0.00 | | | |

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|------|-----------|------------------|-----|-------------------|------|------------------|-------------|-----------|----------------|------------|------------|------------------------|---------------|-------------|---------|
| 05-204 | 2X2C | N/A | 1140 | Occupied | Atkinson, Inez | 12/08/2015 | 01/18/2017 | 01/17/2018 | 1,365.00 | ALARM | 0.00 | 45.00 | 1,244.00 | 0.00 | 74.99 |
| | | | | | | | | | | RENT | 1,199.00 | 0.00 | | | |
| 05-301 | 2X2D | N/A | 1250 | Occupied | Clark, Royleane | 10/18/2013 | 12/08/2016 | 12/07/2017 | 1,547.00 | ALARM | 0.00 | 45.00 | 1,485.00 | 250.00 | 74.99 |
| | | | | | | | | | | PARKING | 0.00 | 35.00 | | | |

**Details**

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|------|-----------|------------------|-----|-------------------|------|------------------|-------------|-----------|----------------|------------|------------|------------------------|---------------|-------------|---------|
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,403.00 | 0.00 | | | |
| 05-302 | 2X2D | N/A | 1250 | Occupied | Dabriel, Wendy | 05/31/2016 | 05/31/2016 | 06/29/2017 | 1,547.00 | ALARM | 0.00 | 45.00 | 1,445.00 | 250.00 | 84.99 |
| | | | | | | | | | | RENT | 1,400.00 | 0.00 | | | |
| 05-303 | 2X2D | N/A | 1250 | Occupied | Myles, Nadralee | 03/18/2017 | 03/18/2017 | 03/17/2018 | 1,572.00 | ALARM | 0.00 | 45.00 | 1,502.00 | 0.00 | 0.00 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,430.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 25.00 | | | |
| 05-304 | 2X2D | N/A | 1250 | Occupied | Corredor, Ivette | 07/01/2011 | 09/01/2016 | 09/30/2017 | 1,572.00 | ALARM | 0.00 | 45.00 | 1,433.00 | 500.00 | 54.99 |
| | | | | | | | | | | CONC/SPECL | 0.00 | (45.00) | | | |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,431.00 | 0.00 | | | |
| 06-101 | 2X2C | N/A | 1140 | Occupied-NTV | Jeune, Annabelle | 01/08/2015 04/14/2017 | 01/20/2016 | 04/14/2017 | 1,340.00 | ALARM | 0.00 | 45.00 | 1,543.00 | 250.00 | 44.99 |
| | | | | | | | | | | MTOM | 0.00 | 200.00 | | | |
| | | | | | | | | | | RENT | 1,298.00 | 0.00 | | | |
| 06-102 | 2X2C | N/A | 1140 | Occupied | Thompson, Maurice | 06/25/2011 | 10/01/2016 | 10/31/2017 | 1,340.00 | ALARM | 0.00 | 45.00 | 1,405.00 | 250.00 | 54.99 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,358.00 | 0.00 | | | |
| 06-103 | 2X2C | N/A | 1140 | Vacant-Leased | VACANT | | | | 1,365.00 | | 0.00 * | 0.00 * | | | |
| | | N/A | | Applicant | Daout, zendayah | 03/31/2017 | 03/31/2017 | 03/30/2018 | | ALARM | 0.00 * | 45.00 * | 1,387.00 * | 0.00 | 2.00 |
| | | | | | | | | | | PEST | 0.00 * | 2.00 * | | | |
| | | | | | | | | | | RENT | 1,340.00 * | 0.00 * | | | |
| 06-104 | 2X2C | N/A | 1140 | Occupied | Russell, Tyrell | 08/08/2016 | 08/08/2016 | 08/07/2017 | 1,385.00 | ALARM | 0.00 | 45.00 | 1,417.00 | 0.00 | 35.93 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,350.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 20.00 | | | |
| 06-201 | 2X2C | N/A | 1140 | Occupied | Ragin, Erika | 07/22/2011 | 11/13/2016 | 12/12/2017 | 1,340.00 | ALARM | 0.00 | 45.00 | 1,385.00 | 250.00 | 44.89 |
| | | | | | | | | | | RENT | 1,340.00 | 0.00 | | | |
| 06-202 | 2X2C | N/A | 1140 | Occupied | Navarro, Jesus | 02/24/2017 | 02/24/2017 | 02/23/2018 | 1,340.00 | ALARM | 0.00 | 45.00 | 1,357.00 | 0.00 | 35.85 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,310.00 | 0.00 | | | |
| 06-203 | 2X2C | N/A | 1140 | Occupied | Scott, Shakima | 06/01/2016 | 06/01/2016 | 06/30/2017 | 1,365.00 | ALARM | 0.00 | 45.00 | 1,405.00 | 250.00 | 54.99 |
| | | | | | | | | | | RENT | 1,360.00 | 0.00 | | | |

**Details**

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|------|-----------|------------------|-----|-------------------|------|------------------|-------------|-----------|----------------|------------|------------|------------------------|---------------|-------------|---------|

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 06-204 | 2X2C | N/A | 1140 | Occupied | Brown, Victoria | 04/01/2016 | 04/01/2016 | 04/30/2017 | 1,365.00 | ALARM | 0.00 | 45.00 | 1,340.00 | 0.00 | (1,340.00) |
| | | | | | | | | | | RENT | 1,295.00 | 0.00 | | | |
| | | N/A | | Pending renewal | Brown, Victoria | 04/01/2016 | 05/01/2017 | 04/30/2018 | | ALARM | 0.00 * | 45.00 * | 1,382.00 * | 0.00 | 0.00 |
| | | | | | | | | | | PEST | 0.00 * | 2.00 * | | | |
| | | | | | | | | | | RENT | 1,335.00 * | 0.00 * | | | |
| 06-301 | 2X2D | N/A | 1250 | Occupied | Smith, Lashawn | 11/20/2009 | 03/01/2016 | 05/06/2017 | 1,547.00 | ALARM | 0.00 | 45.00 | 1,302.00 | 0.00 | 54.99 |
| | | | | | | | | | | RENT | 1,257.00 | 0.00 | | | |
| 06-302 | 2X2D | N/A | 1250 | Occupied-NTV | Donaldson, Minke | 01/07/2012 05/25/2017 | 02/24/2016 | 05/25/2017 | 1,547.00 | ALARM | 0.00 | 45.00 | 1,238.00 | 250.00 | 44.99 |
| | | | | | | | | | | RENT | 1,193.00 | 0.00 | | | |
| 06-303 | 2X2D | N/A | 1250 | Occupied | Reid Sinclair, Sandra | 01/25/2013 | 01/13/2016 | 04/07/2017 | 1,572.00 | ALARM | 0.00 | 45.00 | 1,340.00 | 0.00 | 44.99 |
| | | | | | | | | | | DISCOUNT | 0.00 | (40.00) | | | |
| | | | | | | | | | | RENT | 1,335.00 | 0.00 | | | |
| | | N/A | | Pending renewal | Reid Sinclair, Sandra | 01/25/2013 | 04/08/2017 | 04/07/2018 | | ALARM | 0.00 * | 45.00 * | 1,420.00 * | 0.00 | 0.00 |
| | | | | | | | | | | PEST | 0.00 * | 2.00 * | | | |
| | | | | | | | | | | RENT | 1,373.00 * | 0.00 * | | | |
| 06-304 | 2X2D | N/A | 1250 | Occupied | Strachan, James | 08/29/2009 | 08/15/2016 | 09/15/2017 | 1,572.00 | ALARM | 0.00 | 45.00 | 1,482.00 | 300.00 | 82.96 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,415.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 20.00 | | | |
| 07-101 | 2X2C | N/A | 1140 | Occupied | Barnes, Valerie | 07/03/2015 | 07/28/2016 | 08/27/2017 | 1,340.00 | ALARM | 0.00 | 45.00 | 1,434.00 | 0.00 | 44.98 |
| | | | | | | | | | | RENT | 1,389.00 | 0.00 | | | |
| 07-102 | 2X2C | N/A | 1140 | Occupied | Scott, Michaela | 06/15/2016 | 06/15/2016 | 07/14/2017 | 1,340.00 | ALARM | 0.00 | 45.00 | 1,415.00 | 250.00 | 44.99 |
| | | | | | | | | | | RENT | 1,370.00 | 0.00 | | | |
| 07-103 | 2X2C | N/A | 1140 | Occupied | Serrano, Maria | 03/17/2011 | 07/16/2016 | 08/15/2017 | 1,365.00 | ALARM | 0.00 | 45.00 | 1,339.00 | 250.00 | 74.99 |
| | | | | | | | | | | RENT | 1,274.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 20.00 | | | |
| 07-104 | 2X2C | N/A | 1140 | Occupied | Mugnano, Jason | 03/30/2013 | 07/15/2016 | 08/14/2017 | 1,365.00 | ALARM | 0.00 | 45.00 | 1,354.00 | 0.00 | 44.99 |
| | | | | | | | | | | RENT | 1,309.00 | 0.00 | | | |
| 07-201 | 2X2C | N/A | 1140 | Occupied | Roker, Thomas | 02/04/2012 | 02/24/2016 | 05/19/2017 | 1,340.00 | ALARM | 0.00 | 45.00 | 1,327.00 | 250.00 | 54.99 |
| | | | | | | | | | | RENT | 1,282.00 | 0.00 | | | |
| 07-202 | 2X2C | N/A | 1140 | Occupied | Raley, Angela | 01/29/2015 | 01/25/2016 | 03/20/2017 | 1,340.00 | ALARM | 0.00 | 45.00 | 1,538.00 | 250.00 | 54.99 |
| | | | | | | | | | | MTOM | 0.00 | 200.00 | | | |

**Details**

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | RENT | 1,293.00 | 0.00 | | | |
| 07-203 | 2X2C | N/A | 1140 | Occupied | Williams, Stephanie | 02/24/2017 | 02/24/2017 | 02/23/2018 | 1,365.00 | ALARM | 0.00 | 45.00 | 1,432.00 | 0.00 | 46.71 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,360.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 25.00 | | | |
| 07-204 | 2X2C | N/A | 1140 | Occupied | Oneill, John | 05/07/2013 | 08/22/2016 | 09/21/2017 | 1,365.00 | ALARM | 0.00 | 45.00 | 1,346.00 | 250.00 | 44.99 |

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | est | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,279.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 20.00 | | | |
| 07-301 | 2X2D | N/A | 1250 | Occupied | Morant, Lamar | 06/02/2016 | 06/02/2016 | 06/30/2017 | 1,547.00 | ALARM | 0.00 | 45.00 | 1,465.00 | 306.00 | 54.99 |
| | | | | | | | | | | RENT | 1,420.00 | 0.00 | | | |
| 07-302 | 2X2D | N/A | 1250 | Occupied | Dolan, James | 05/20/2009 | 07/14/2016 | 08/13/2017 | 1,547.00 | ALARM | 0.00 | 45.00 | 1,428.00 | 300.00 | 54.99 |
| | | | | | | | | | | RENT | 1,383.00 | 0.00 | | | |
| 07-303 | 2X2D | N/A | 1250 | Occupied | Perez, Sandra | 07/31/2013 | 08/13/2016 | 09/12/2017 | 1,572.00 | ALARM | 0.00 | 45.00 | 1,306.00 | 0.00 | 40.97 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,259.00 | 0.00 | | | |
| 07-304 | 2X2D | N/A | 1250 | Occupied | Stitt, Alexis | 01/13/2017 | 01/13/2017 | 02/12/2018 | 1,572.00 | ALARM | 0.00 | 45.00 | 1,502.00 | 0.00 | 74.99 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,430.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 25.00 | | | |
| 08-101 | 2X2C | N/A | 1140 | Occupied | Jones, Johnnie | 11/21/2014 | 11/12/2016 | 12/12/2017 | 1,340.00 | ALARM | 0.00 | 45.00 | 1,430.00 | 250.00 | 74.95 |
| | | | | | | | | | | PARKING | 0.00 | 45.00 | | | |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,338.00 | 0.00 | | | |
| 08-102 | 2X2C | N/A | 1140 | Vacant-Leased | VACANT | | | | 1,340.00 | | 0.00 * | 0.00 * | | | |
| | | N/A | | Applicant | Douglas, Brian | 03/31/2017 | 03/31/2017 | 03/30/2018 | | RENT | 1,312.00 * | 0.00 * | 1,312.00 * | 0.00 | (1,357.00) |
| 08-103 | 2X2C | N/A | 1140 | Occupied | Voltaire, Ginet | 11/01/2015 | 11/25/2016 | 10/31/2017 | 1,365.00 | ALARM | 0.00 | 45.00 | 1,415.00 | 0.00 | 54.97 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,368.00 | 0.00 | | | |
| 08-104 | 2X2C | N/A | 1140 | Occupied | Buford, Jenise | 11/08/2013 | 12/25/2016 | 01/24/2018 | 1,365.00 | ALARM | 0.00 | 45.00 | 1,194.00 | 250.00 | 54.99 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,147.00 | 0.00 | | | |
| 08-201 **Details** | 2X2C | N/A | 1140 | Vacant-Leased | VACANT | | | | 1,290.00 | | 0.00 * | 0.00 * | | | |
| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
| | | N/A | | Applicant | Doctor, Antione | 03/31/2017 | 03/31/2017 | 03/30/2018 | | ALARM | 0.00 * | 45.00 * | 1,402.00 * | 0.00 | 0.00 |
| | | | | | | | | | | PARKING | 0.00 * | 45.00 * | | | |
| | | | | | | | | | | PEST | 0.00 * | 2.00 * | | | |
| | | | | | | | | | | RENT | 1,310.00 * | 0.00 * | | | |
| 08-202 | 2X2C | N/A | 1140 | Occupied | Lynch, Cynthia | 12/16/2011 | 11/24/2016 | 12/24/2017 | 1,340.00 | ALARM | 0.00 | 45.00 | 1,310.00 | 250.00 | 54.99 |
| | | | | | | | | | | PARKING | 0.00 | 23.00 | | | |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,240.00 | 0.00 | | | |
| 08-203 | 2X2C | N/A | 1140 | Occupied | Williams, Everett | 09/12/2015 | 10/20/2016 | 11/19/2017 | 1,365.00 | ALARM | 0.00 | 45.00 | 1,141.00 | 450.00 | 54.99 |
| | | | | | | | | | | DISCOUNT | 0.00 | ###### | | | |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,378.00 | 0.00 | | | |
| 08-204 | 2X2C | N/A | 1140 | Occupied | Walker, Jackie | 11/01/2013 | 11/18/2016 | 12/18/2017 | 1,365.00 | ALARM | 0.00 | 45.00 | 1,324.00 | 0.00 | 54.99 |
| | | | | | | | | | | PARKING | 0.00 | 20.00 | | | |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|------|-----------|------------------|-----|-------------------|------|------------------|-------------|-----------|----------------|------------|-----------|------------------------|---------------|-------------|---------|
| | | | | | | | | | | RENT | 1,237.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 20.00 | | | |
| 08-301 | 2X2D | N/A | 1250 | Occupied | Warren, Tiffany | 06/30/2011 | 03/07/2017 | 03/06/2018 | 1,547.00 | ALARM | 0.00 | 45.00 | 1,542.00 | 250.00 | (39.01) |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,495.00 | 0.00 | | | |
| 08-302 | 2X2D | N/A | 1250 | Occupied | Jackson-bell, Arlene | 08/01/2016 | 08/01/2016 | 08/31/2017 | 1,547.00 | ALARM | 0.00 | 45.00 | 1,467.00 | 0.00 | 84.99 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,420.00 | 0.00 | | | |
| 08-303 | 2X2D | N/A | 1250 | Occupied | Dewar, Ronald | 06/23/2012 | 09/04/2016 | 10/02/2017 | 1,572.00 | ALARM | 0.00 | 45.00 | 1,422.00 | 0.00 | 44.99 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,375.00 | 0.00 | | | |
| 08-304 | 2X2D | N/A | 1250 | Occupied | kellerhals, Jerome | 04/01/2016 | 04/01/2016 | 04/30/2017 | 1,572.00 | ALARM | 0.00 | 45.00 | 1,435.00 | 0.00 | 54.99 |
| | | | | | | | | | | RENT | 1,390.00 | 0.00 | | | |
| | | N/A | | Pending renewal | kellerhals, Jerome | 04/01/2016 | 05/01/2017 | 04/30/2018 | | ALARM | 0.00 * | 45.00 * | 1,478.00 * | 0.00 | 0.00 |
| | | | | | | | | | | PEST | 0.00 * | 2.00 * | | | |
| | | | | | | | | | | RENT | 1,431.00 * | 0.00 * | | | |
| 09-101 | 2X2C | N/A | 1140 | Vacant-Leased | VACANT | | | | 1,340.00 | | 0.00 * | 0.00 * | | | |

**Details**

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|------|-----------|------------------|-----|-------------------|------|------------------|-------------|-----------|----------------|------------|-----------|------------------------|---------------|-------------|---------|
| | | N/A | | Applicant | Hawkins, Chris | 04/07/2017 | 04/07/2017 | 04/06/2018 | | ALARM | 0.00 * | 45.00 * | 1,412.00 * | 0.00 | 0.00 |
| | | | | | | | | | | PEST | 0.00 * | 2.00 * | | | |
| | | | | | | | | | | PETFEE | 0.00 * | 25.00 * | | | |
| | | | | | | | | | | RENT | 1,340.00 * | 0.00 * | | | |
| 09-102 | 2X2C | N/A | 1140 | Occupied | Bartley, Tia | 10/10/2016 | 10/10/2016 | 11/09/2017 | 1,340.00 | ALARM | 0.00 | 45.00 | 1,429.00 | 0.00 | 54.99 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,382.00 | 0.00 | | | |
| 09-103 | 2X2C | N/A | 1140 | Occupied | Frederique, Guy | 11/30/2004 | 01/13/2016 | 04/07/2017 | 1,365.00 | ALARM | 0.00 | 45.00 | 1,381.00 | 199.00 | 54.99 |
| | | | | | | | | | | RENT | 1,316.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 20.00 | | | |
| | | N/A | | Pending renewal | Frederique, Guy | 11/30/2004 | 04/08/2017 | 04/07/2018 | | ALARM | 0.00 * | 45.00 * | 1,423.00 * | 0.00 | 0.00 |
| | | | | | | | | | | PEST | 0.00 * | 2.00 * | | | |
| | | | | | | | | | | RENT | 1,356.00 * | 0.00 * | | | |
| | | | | | | | | | | UPGRADE | 0.00 * | 20.00 * | | | |
| 09-104 | 2X2C | N/A | 1140 | Occupied | Shaw, Jeremy | 09/30/2016 | 09/30/2016 | 10/29/2017 | 1,365.00 | ALARM | 0.00 | 45.00 | 1,434.00 | 0.00 | 74.99 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,387.00 | 0.00 | | | |
| 09-201 | 2X2C | N/A | 1140 | Occupied | Curtis, Barbara | 01/04/2008 | 03/14/2016 | 06/07/2017 | 1,340.00 | ALARM | 0.00 | 45.00 | 1,332.00 | 1,000.00 | 45.05 |
| | | | | | | | | | | PARKING | 0.00 | 20.00 | | | |
| | | | | | | | | | | RENT | 1,267.00 | 0.00 | | | |
| 09-202 | 2X2C | N/A | 1140 | Occupied | Alfaro, Alberto | 10/12/2011 | 03/29/2016 | 06/22/2017 | 1,340.00 | ALARM | 0.00 | 45.00 | 905.00 | 0.00 | 44.99 |
| | | | | | | | | | | EMPLCRED | 0.00 | ###### | | | |
| | | | | | | | | | | RENT | 1,100.00 | 0.00 | | | |

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 09-203 | 2X2C | N/A | 1140 | Occupied | Donald, Hyron | 09/30/2011 | 02/17/2016 | 05/12/2017 | 1,365.00 | ALARM | 0.00 | 45.00 | 1,400.00 | 0.00 | 54.21 |
| | | | | | | | | | | PARKING | 0.00 | 45.00 | | | |
| | | | | | | | | | | RENT | 1,310.00 | 0.00 | | | |
| 09-204 | 2X2C | N/A | 1140 | Occupied | allen-Desormot, Georgette | 09/01/2016 | 09/01/2016 | 09/30/2017 | 1,365.00 | ALARM | 0.00 | 45.00 | 1,457.00 | 250.00 | 54.99 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,410.00 | 0.00 | | | |
| 09-301 | 2X2D | N/A | 1250 | Occupied | Seymour, Nancy | 01/05/2014 | 02/21/2016 | 05/16/2017 | 1,547.00 | ALARM | 0.00 | 45.00 | 1,283.00 | 250.00 | 74.91 |
| | | | | | | | | | | RENT | 1,238.00 | 0.00 | | | |
| | | N/A | | Pending renewal | Seymour, Nancy | 01/05/2014 | 05/17/2017 | 05/16/2018 | | ALARM | 0.00 * | 45.00 * | 1,334.00 * | 0.00 | 0.00 |
| | | | | | | | | | | PEST | 0.00 * | 2.00 * | | | |

**Details**

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | RENT | 1,287.00 * | 0.00 * | | | |
| 09-302 | 2X2D | N/A | 1250 | Occupied | Joseph, Frantz | 05/10/2014 | 06/30/2016 | 07/29/2017 | 1,547.00 | ALARM | 0.00 | 45.00 | 1,470.00 | 250.00 | 54.99 |
| | | | | | | | | | | RENT | 1,425.00 | 0.00 | | | |
| 09-303 | 2X2D | N/A | 1250 | Occupied | Joseph, Merin | 03/01/2017 | 03/01/2017 | 02/28/2018 | 1,572.00 | ALARM | 0.00 | 45.00 | 1,502.00 | 0.00 | 10.00 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,430.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 25.00 | | | |
| 09-304 | 2X2D | N/A | 1250 | Occupied | Boston, Michael | 11/06/2015 | 10/22/2016 | 11/21/2017 | 1,572.00 | ALARM | 0.00 | 45.00 | 1,405.00 | 250.00 | 44.99 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,358.00 | 0.00 | | | |
| 10-101 | 2X2C | N/A | 1140 | Admin/Down | VACANT | | | | 1,340.00 | | 0.00 * | 0.00 * | | | |
| 10-102 | 2X1A | N/A | 1140 | Occupied | Moise, Widney | 11/15/2015 | 12/30/2016 | 12/29/2017 | 1,340.00 | ALARM | 0.00 | 45.00 | 1,294.00 | 250.00 | 65.19 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | PETRENT | 0.00 | 25.00 | | | |
| | | | | | | | | | | RENT | 1,222.00 | 0.00 | | | |
| 10-103 | 2X2C | N/A | 1140 | Occupied | Maine, Shawndra | 07/09/2016 | 07/09/2016 | 08/08/2017 | 1,340.00 | ALARM | 0.00 | 45.00 | 1,415.00 | 1,415.00 | 54.99 |
| | | | | | | | | | | RENT | 1,370.00 | 0.00 | | | |
| 10-104 | 2X2C | N/A | 1140 | Occupied | Mejia, Luis | 06/01/2014 | 06/28/2016 | 06/27/2017 | 1,340.00 | ALARM | 0.00 | 45.00 | 1,358.00 | 0.00 | 54.99 |
| | | | | | | | | | | RENT | 1,313.00 | 0.00 | | | |
| 10-201 | 2X1A | N/A | 1140 | Occupied | Forman, Vickey | 05/20/2010 | 02/01/2016 | 01/28/2018 | 1,412.00 | ALARM | 0.00 | 45.00 | 67.00 | 0.00 | 74.99 |
| | | | | | | | | | | PARKING | 0.00 | 20.00 | | | |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| 10-202 | 2X1A | N/A | 1140 | Occupied | Urbina, Luis | 06/01/2016 | 06/01/2016 | 06/30/2017 | 1,412.00 | ALARM | 0.00 | 45.00 | 1,363.00 | 0.00 | 55.98 |
| | | | | | | | | | | RENT | 1,318.00 | 0.00 | | | |
| 10-203 | 2X1A | N/A | 1140 | Occupied | Miller, Otis | 01/12/2016 | 03/18/2017 | 03/17/2018 | 1,412.00 | ALARM | 0.00 | 45.00 | 1,356.00 | 0.00 | 74.99 |
| | | | | | | | | | | PARKING | 0.00 | 35.00 | | | |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,274.00 | 0.00 | | | |
| 10-204 | 2X2D | N/A | 1250 | Occupied | Ramos, Jacira | 06/08/2012 | 07/21/2016 | 08/20/2017 | 2,897.00 | ALARM | 0.00 | 45.00 | 1,483.00 | 0.00 | 74.99 |
| | | | | | | | | | | PARKING | 0.00 | 25.00 | | | |
| | | | | | | | | | | RENT | 1,413.00 | 0.00 | | | |

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11-101 | 3X2E | N/A | 1200 | Occupied | Tovar, Sarah | 07/01/2015 07/06/2016 | | 08/05/2017 | 1,525.00 | ALARM | 0.00 | 45.00 | 1,647.00 | 250.00 | 44.98 |
| | | | | | | | | | | DISCOUNT | 0.00 | (50.00) | | | |
| | | | | | | | | | | RENT | 1,652.00 | 0.00 | | | |

**Details**

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11-102 | 3X2E | N/A | 1200 | Occupied | Brown, Marcia | 06/01/2016 | 06/01/2016 | 06/30/2017 | 1,525.00 | ALARM | 0.00 | 45.00 | 1,583.00 | 450.00 | 74.99 |
| | | | | | | | | | | RENT | 1,538.00 | 0.00 | | | |
| 11-103 | 3X2E | N/A | 1200 | Occupied | Ortega, Mariano | 06/16/2014 | 07/09/2016 | 08/08/2017 | 1,525.00 | ALARM | 0.00 | 45.00 | 1,534.00 | 250.00 | 74.99 |
| | | | | | | | | | | RENT | 1,489.00 | 0.00 | | | |
| 11-104 | 3X2E | N/A | 1200 | Occupied | Bradley, Jacaronda | 01/10/2015 | 09/01/2016 | 08/31/2017 | 1,525.00 | ALARM | 0.00 | 45.00 | 1,560.00 | 250.00 | 64.97 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,513.00 | 0.00 | | | |
| 11-201 | 3X2F | N/A | 1450 | Occupied-NTVL | Eckenrode, Brad | 12/14/2013 05/31/2017 | 02/04/2016 | 04/29/2017 | 1,747.00 | ALARM | 0.00 | 45.00 | 1,522.00 | 250.00 | 54.99 |
| | | | | | | | | | | PARKING | 0.00 | 20.00 | | | |
| | | | | | | | | | | RENT | 1,457.00 | 0.00 | | | |
| | | N/A | | Applicant | LittleJohn, Anthony | 06/07/2017 | 06/07/2017 | 06/06/2018 | | ALARM | 0.00 * | 45.00 * | 1,697.00 * | 0.00 | 0.00 |
| | | | | | | | | | | DISCOUNT | 0.00 * | (50.00) * | | | |
| | | | | | | | | | | PEST | 0.00 * | 2.00 * | | | |
| | | | | | | | | | | PETFEE | 0.00 * | 25.00 * | | | |
| | | | | | | | | | | RENT | 1,675.00 * | 0.00 * | | | |
| 11-202 | 3X2F | N/A | 1450 | Occupied | Mcfarlane, Ian | 04/01/2013 | 04/16/2016 | 07/10/2017 | 1,747.00 | ALARM | 0.00 | 45.00 | 1,546.00 | 0.00 | 84.99 |
| | | | | | | | | | | RENT | 1,501.00 | 0.00 | | | |
| 11-203 | 3X2F | N/A | 1450 | Occupied | Steward, Morica | 12/15/2016 | 12/15/2016 | 12/14/2017 | 1,747.00 | ALARM | 0.00 | 45.00 | 1,672.00 | 0.00 | 53.87 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,625.00 | 0.00 | | | |
| 11-204 | 3X2F | N/A | 1450 | Occupied | Diaz, Kenia | 03/04/2017 | 03/04/2017 | 10/04/2017 | 1,747.00 | ALARM | 0.00 | 45.00 | 1,772.00 | 0.00 | 0.00 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,725.00 | 0.00 | | | |
| 12-101 | 3X2E | N/A | 1200 | Occupied | James, Corine | 10/29/2015 | 11/23/2016 | 12/23/2017 | 1,525.00 | ALARM | 0.00 | 45.00 | 1,523.00 | 250.00 | 54.99 |
| | | | | | | | | | | PARKING | 0.00 | 43.00 | | | |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,433.00 | 0.00 | | | |
| 12-102 | 3X2E | N/A | 1200 | Occupied | McQueen, Lolita | 12/01/2016 | 12/01/2016 | 11/30/2017 | 1,525.00 | ALARM | 0.00 | 45.00 | 1,547.00 | 1,700.00 | 54.99 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,500.00 | 0.00 | | | |
| 12-103 | 3X2E | N/A | 1200 | Occupied | Phillips, Taniesha | 09/20/2016 | 09/20/2016 | 10/19/2017 | 1,525.00 | ALARM | 0.00 | 45.00 | 1,604.00 | 0.00 | 74.99 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |

**Details**

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| Unit | Floorplan | Unit Designation | SQ | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|------|-----------|------------------|----|-------------------|------|-----------------|-------------|-----------|----------------|------------|------------|------------------------|---------------|-------------|---------|
| | | | | | | | | | | RENT | 1,557.00 | 0.00 | | | |
| 12-104 | 3X2E | N/A | 1200 | Occupied | Ragin, Sherria | 11/01/2015 | 10/27/2016 | 11/26/2017 | 1,525.00 | ALARM | 0.00 | 45.00 | 1,487.00 | 250.00 | 54.99 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,440.00 | 0.00 | | | |
| 12-201 | 3X2F | N/A | 1450 | Admin/Down | VACANT | | | | 1,747.00 | | 0.00 * | 0.00 * | | | |
| 12-202 | 3X2F | N/A | 1450 | Occupied | Atkinson-Beal, Jennifer | 10/23/2015 | 11/17/2016 | 12/23/2017 | 1,747.00 | ALARM | 0.00 | 45.00 | 1,745.00 | 250.00 | 44.99 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,698.00 | 0.00 | | | |
| 12-203 | 3X2F | N/A | 1450 | Occupied-NTV | Donejour, Adeline | 02/20/2014 05/25/2017 | 03/01/2016 | 05/25/2017 | 1,747.00 | ALARM | 0.00 | 45.00 | 1,634.00 | 250.00 | 74.99 |
| | | | | | | | | | | RENT | 1,589.00 | 0.00 | | | |
| 12-204 | 3X2F | N/A | 1450 | Occupied | Johnson, Larry | 07/01/2016 | 07/01/2016 | 07/31/2017 | 1,747.00 | ALARM | 0.00 | 45.00 | 1,765.00 | 250.00 | 54.99 |
| | | | | | | | | | | RENT | 1,720.00 | 0.00 | | | |
| 13-101 | 3X2E | N/A | 1200 | Occupied | Johnson, Tshombe | 07/16/2011 | 10/24/2016 | 10/23/2017 | 1,525.00 | ALARM | 0.00 | 45.00 | 1,512.00 | 0.00 | (95.01) |
| | | | | | | | | | | DISCOUNT | 0.00 | (45.00) | | | |
| | | | | | | | | | | GARAGE | 0.00 | 20.00 | | | |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,490.00 | 0.00 | | | |
| 13-102 | 3X2E | N/A | 1200 | Occupied | Spence, David | 08/21/2016 | 08/21/2016 | 09/20/2017 | 1,525.00 | ALARM | 0.00 | 45.00 | 1,604.00 | 0.00 | 74.99 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,557.00 | 0.00 | | | |
| 13-103 | 3X2E | N/A | 1200 | Occupied | Ally, Sheik | 03/20/2014 | 05/19/2016 | 08/12/2017 | 1,525.00 | ALARM | 0.00 | 45.00 | 1,553.00 | 500.00 | 74.99 |
| | | | | | | | | | | PARKING | 0.00 | 35.00 | | | |
| | | | | | | | | | | RENT | 1,473.00 | 0.00 | | | |
| 13-104 | 3X2E | N/A | 1200 | Occupied | Gonzague, Wilfredo | 03/01/2016 | 03/01/2016 | 04/15/2017 | 1,525.00 | ALARM | 0.00 | 45.00 | 1,018.00 | 0.00 | 54.99 |
| | | | | | | | | | | EMPLCRED | 0.00 | ###### | | | |
| | | | | | | | | | | RENT | 1,438.00 | 0.00 | | | |
| | | N/A | | Pending renewal | Gonzague, Wilfredo | 03/01/2016 | 04/16/2017 | 04/15/2018 | | ALARM | 0.00 * | 45.00 * | 1,084.00 * | 0.00 | 0.00 |
| | | | | | | | | | | EMPLCRED | 0.00 * | ###### * | | | |
| | | | | | | | | | | PEST | 0.00 * | 2.00 * | | | |
| | | | | | | | | | | RENT | 1,481.00 * | 0.00 * | | | |
| 13-201 **Details** | 3X2F | N/A | 1450 | Occupied | Beckford, Tyrone | 08/14/2016 | 08/14/2016 | 09/13/2017 | 1,747.00 | ALARM | 0.00 | 45.00 | 1,647.00 | 0.00 | 84.99 |
| Unit | Floorpla | Unit Designation | SQ | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,600.00 | 0.00 | | | |
| 13-202 | 3X2F | N/A | 1450 | Occupied | Spence, Charmaine | 03/15/2006 | 03/15/2016 | 05/09/2017 | 1,747.00 | ALARM | 0.00 | 45.00 | 1,643.00 | 500.00 | 74.99 |
| | | | | | | | | | | RENT | 1,598.00 | 0.00 | | | |
| 13-203 | 3X2F | N/A | 1450 | Occupied | Francis, Henrietta | 09/09/2011 | 11/14/2016 | 12/13/2017 | 1,747.00 | ALARM | 0.00 | 45.00 | 1,708.00 | 0.00 | 84.99 |
| | | | | | | | | | | DISCOUNT | 0.00 | (51.00) | | | |

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | ALARM | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,712.00 | 0.00 | | | |
| 13-204 | 3X2F | N/A | 1450 | Occupied | Bennett, Jessica | 08/05/2013 | 09/21/2016 | 10/20/2017 | 1,747.00 | ALARM | 0.00 | 45.00 | 1,595.00 | 250.00 | 84.99 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,548.00 | 0.00 | | | |
| 14-101 | 3X2E | N/A | 1200 | Occupied | Darby, Thomas | 08/01/2014 | 07/02/2016 | 08/01/2017 | 1,525.00 | ALARM | 0.00 | 45.00 | 1,574.00 | 0.00 | 73.90 |
| | | | | | | | | | | RENT | 1,529.00 | 0.00 | | | |
| 14-102 | 3X2E | N/A | 1200 | Occupied | Bowden, Reginal | 03/14/2017 | 03/14/2017 | 03/13/2018 | 1,525.00 | ALARM | 0.00 | 45.00 | 1,527.00 | 0.00 | 10.00 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | PETFEE | 0.00 | 25.00 | | | |
| | | | | | | | | | | RENT | 1,455.00 | 0.00 | | | |
| 14-103 | 3X2E | N/A | 1200 | Occupied | Hatcher, Mario | 03/01/2017 | 03/01/2017 | 03/31/2018 | 1,525.00 | ALARM | 0.00 | 45.00 | 1,502.00 | 0.00 | 10.00 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,455.00 | 0.00 | | | |
| 14-104 | 3X2E | N/A | 1200 | Occupied | Williams, Anecia | 11/01/2014 | 11/24/2016 | 12/24/2017 | 1,525.00 | ALARM | 0.00 | 45.00 | 1,588.00 | 250.00 | 84.99 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,541.00 | 0.00 | | | |
| 14-201 | 3X2F | N/A | 1450 | Occupied | Lockett, Benjamin | 02/01/2012 | 03/16/2016 | 06/09/2017 | 1,747.00 | ALARM | 0.00 | 45.00 | 1,634.00 | 500.00 | 74.99 |
| | | | | | | | | | | RENT | 1,589.00 | 0.00 | | | |
| 14-202 | 3X2F | N/A | 1450 | Occupied | Philippe, Jonas | 09/27/2015 | 10/22/2016 | 10/31/2017 | 1,747.00 | ALARM | 0.00 | 45.00 | 1,745.00 | 250.00 | 44.98 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,698.00 | 0.00 | | | |
| 14-203 | 3X2F | N/A | 1450 | Occupied | Casano, Donna | 09/01/2013 | 08/18/2016 | 09/17/2017 | 1,747.00 | ALARM | 0.00 | 45.00 | 1,517.00 | 0.00 | 1,726.98 |
| | | | | | | | | | | DISCOUNT | 0.00 | (46.00) | | | |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,516.00 | 0.00 | | | |

**Details**

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 14-204 | 3X2F | N/A | 1450 | Occupied | Williams, Marion | 08/15/2008 | 01/22/2016 | 04/16/2017 | 1,747.00 | ALARM | 0.00 | 45.00 | 1,607.00 | 0.00 | 84.99 |
| | | | | | | | | | | RENT | 1,562.00 | 0.00 | | | |
| 15-101 | 3X2E | N/A | 1200 | Occupied | Gray, Daniel | 11/06/2015 | 11/17/2016 | 12/16/2017 | 1,525.00 | ALARM | 0.00 | 45.00 | 1,477.00 | 250.00 | 44.99 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,430.00 | 0.00 | | | |
| 15-102 | 3X2E | N/A | 1200 | Occupied | Obrien, Shannon | 03/27/2016 | 03/27/2016 | 06/13/2017 | 1,525.00 | ALARM | 0.00 | 45.00 | 1,442.00 | 0.00 | 44.99 |
| | | | | | | | | | | RENT | 1,397.00 | 0.00 | | | |
| 15-103 | 3X2E | N/A | 1200 | Occupied | Scott, Alexandra | 10/02/2015 | 08/28/2016 | 09/27/2017 | 1,525.00 | ALARM | 0.00 | 45.00 | 1,494.00 | 250.00 | 74.99 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,447.00 | 0.00 | | | |
| 15-104 | 3X2E | N/A | 1200 | Occupied | Walker, Grelette | 03/11/2016 | 03/11/2016 | 04/10/2017 | 1,525.00 | ALARM | 0.00 | 45.00 | 1,436.00 | 250.00 | 74.99 |
| | | | | | | | | | | RENT | 1,391.00 | 0.00 | | | |
| | | N/A | | Pending renewal | Walker, Grelette | 03/11/2016 | 04/11/2017 | 04/10/2018 | | ALARM | 0.00 * | 45.00 * | 1,477.00 * | 0.00 | 0.00 |
| | | | | | | | | | | PEST | 0.00 * | 2.00 * | | | |
| | | | | | | | | | | RENT | 1,430.00 * | 0.00 * | | | |

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 15-201 | 3X2F | N/A | 1450 | Occupied | Dorsett, Douglas | 08/01/2007 | 02/13/2017 | 02/12/2018 | 1,747.00 | ALARM | 0.00 | 45.00 | 1,675.00 | 75.19 | 94.99 |
| | | | | | | | | | | PARKING | 0.00 | 30.00 | | | |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,598.00 | 0.00 | | | |
| 15-202 | 3X2F | N/A | 1450 | Occupied | Sewell, Hope | 11/23/2013 | 01/09/2017 | 01/08/2018 | 1,747.00 | ALARM | 0.00 | 45.00 | 1,525.00 | 250.00 | 84.99 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,478.00 | 0.00 | | | |
| 15-203 | 3X2F | N/A | 1450 | Occupied-NTV | Leger, Beatrice | 02/01/2016 06/08/2017 | 02/01/2016 | 04/26/2017 | 1,747.00 | ALARM | 0.00 | 45.00 | 1,623.00 | 0.00 | 44.96 |
| | | | | | | | | | | RENT | 1,578.00 | 0.00 | | | |
| 15-204 | 3X2F | N/A | 1450 | Occupied | Williams, Latoya | 09/01/2015 | 08/08/2016 | 09/07/2017 | 1,747.00 | ALARM | 0.00 | 45.00 | 1,896.00 | 200.00 | 74.99 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,849.00 | 0.00 | | | |
| 16-101 | 3X2E | N/A | 1200 | Occupied | Owens, Carol | 05/14/2016 | 05/14/2016 | 06/13/2017 | 1,525.00 | ALARM | 0.00 | 45.00 | 1,583.00 | 250.00 | 44.99 |
| | | | | | | | | | | RENT | 1,538.00 | 0.00 | | | |
| 16-102 | 3X2E | N/A | 1200 | Occupied | Phillips, Cedrick | 01/11/2017 | 01/11/2017 | 01/10/2018 | 1,525.00 | ALARM | 0.00 | 45.00 | 1,502.00 | 0.00 | 50.94 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,455.00 | 0.00 | | | |
| 16-103 Details | 3X2E | N/A | 1200 | Occupied | Williams, Joann | 03/31/2008 | 03/19/2016 | 06/13/2017 | 1,525.00 | ALARM | 0.00 | 45.00 | 1,493.00 | 0.00 | 54.99 |
| | | | | | | | | | | RENT | 1,448.00 | 0.00 | | | |
| 16-104 | 3X2E | N/A | 1200 | Occupied-NTVL | Wilson, Terry | 09/30/2009 05/31/2017 | 11/08/2016 | 12/08/2017 | 1,525.00 | ALARM | 0.00 | 45.00 | 1,519.00 | 150.00 | 54.95 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,472.00 | 0.00 | | | |
| | | N/A | | Applicant | Dias, Pamela | 06/01/2017 | 06/01/2017 | 05/31/2018 | | ALARM | 0.00 * | 45.00 * | 1,502.00 * | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 1,457.00 * | 0.00 * | | | |
| 16-201 | 3X2F | N/A | 1450 | Occupied | Gray-Bromfield, Charlene | 08/19/2016 | 08/19/2016 | 09/18/2017 | 1,747.00 | ALARM | 0.00 | 45.00 | 1,700.00 | 0.00 | 94.99 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,653.00 | 0.00 | | | |
| 16-202 | 3X2F | N/A | 1450 | Occupied | Plummer, Jonathan | 12/07/2012 | 11/30/2016 | 12/29/2017 | 1,747.00 | ALARM | 0.00 | 45.00 | 1,612.00 | 1,442.00 | 54.99 |
| | | | | | | | | | | DISCOUNT | 0.00 | (48.00) | | | |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,613.00 | 0.00 | | | |
| 16-203 | 3X2F | N/A | 1450 | Occupied | Montinaro, Andrea | 10/01/2016 | 10/01/2016 | 04/30/2017 | 1,747.00 | ALARM | 0.00 | 45.00 | 1,805.00 | 0.00 | 54.95 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,758.00 | 0.00 | | | |
| 16-204 | 3X2F | N/A | 1450 | Occupied | Simpson, Rupert | 11/23/2013 | 03/09/2017 | 03/08/2018 | 1,747.00 | ALARM | 0.00 | 45.00 | 1,549.00 | 250.00 | 52.39 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,502.00 | 0.00 | | | |
| 17-101 | 3X2E | N/A | 1200 | Occupied | Hooke, Arrill | 07/15/2010 | 11/07/2016 | 12/07/2017 | 1,525.00 | ALARM | 0.00 | 45.00 | 1,558.00 | 150.00 | 74.99 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | RENT | 1,511.00 | 0.00 | | | |
| 17-102 | 3X2E | N/A | 1200 | Occupied | Charles, Natacha | 12/03/2013 | 02/15/2017 | 02/14/2018 | 1,525.00 | ALARM | 0.00 | 45.00 | 1,471.00 | 0.00 | 84.99 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,424.00 | 0.00 | | | |
| 17-103 | 3X2E | N/A | 1200 | Occupied | Escobar, Elin | 08/08/2016 | 08/08/2016 | 08/07/2017 | 1,525.00 | ALARM | 0.00 | 45.00 | 1,602.00 | 0.00 | 44.99 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,555.00 | 0.00 | | | |
| 17-104 | 3X2E | N/A | 1200 | Occupied | Edwards, Trudiann | 09/22/2015 | 10/17/2016 | 11/16/2017 | 1,525.00 | ALARM | 0.00 | 45.00 | 1,515.00 | 250.00 | 54.89 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,468.00 | 0.00 | | | |

**Details**

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 17-201 | 3X2F | N/A | 1450 | Occupied | Smith, Robert | 02/24/2016 | 03/24/2017 | 03/23/2018 | 1,747.00 | | 0.00 | 0.00 | 0.00 | 0.00 | 54.99 |
| 17-202 | 3X2F | N/A | 1450 | Occupied | Bar, Hagay | 12/31/2015 | 12/31/2015 | 03/30/2017 | 1,747.00 | ALARM | 0.00 | 45.00 | 1,652.00 | 1,652.00 | 87.96 |
| | | | | | | | | | | RENT | 1,607.00 | 0.00 | | | |
| | | N/A | | Pending renewal | Bar, Hagay | 12/31/2015 | 03/31/2017 | 03/30/2018 | | ALARM | 0.00 * | 45.00 * | 1,686.00 * | 0.00 | 0.00 |
| | | | | | | | | | | PEST | 0.00 * | 2.00 * | | | |
| | | | | | | | | | | RENT | 1,639.00 * | 0.00 * | | | |
| 17-203 | 3X2F | N/A | 1450 | Occupied | Larose, Evans | 12/03/2016 | 12/03/2016 | 01/02/2018 | 1,747.00 | ALARM | 0.00 | 45.00 | 1,647.00 | 0.00 | 74.99 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,600.00 | 0.00 | | | |
| 17-204 | 3X2F | N/A | 1450 | Occupied | Toledo, Jose | 03/22/2015 | 04/22/2016 | 04/17/2017 | 1,747.00 | ALARM | 0.00 | 45.00 | 1,837.00 | 0.00 | 44.99 |
| | | | | | | | | | | RENT | 1,792.00 | 0.00 | | | |
| 18-101 | 3X2E | N/A | 1200 | Occupied | Diaz, Patricia | 11/14/2008 | 02/12/2016 | 05/07/2017 | 1,525.00 | ALARM | 0.00 | 45.00 | 1,466.00 | 0.00 | 71.68 |
| | | | | | | | | | | RENT | 1,421.00 | 0.00 | | | |
| 18-102 | 3X2E | N/A | 1200 | Occupied | Gordon, Andrew | 10/06/2012 | 09/19/2016 | 10/18/2017 | 1,525.00 | ALARM | 0.00 | 45.00 | 1,461.00 | 0.00 | 84.99 |
| | | | | | | | | | | DISCOUNT | 0.00 | (44.00) | | | |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,458.00 | 0.00 | | | |
| | | N/A | | Pending renewal | Gordon, Andrew | 10/06/2012 | 10/19/2017 | 10/18/2018 | | ALARM | 0.00 * | 45.00 * | 1,505.00 * | 0.00 | 0.00 |
| | | | | | | | | | | PEST | 0.00 * | 2.00 * | | | |
| | | | | | | | | | | RENT | 1,458.00 * | 0.00 * | | | |
| 18-103 | 3X2E | N/A | 1200 | Occupied | Williams, James | 11/30/2009 | 04/02/2016 | 06/26/2017 | 1,525.00 | ALARM | 0.00 | 45.00 | 1,407.00 | 300.00 | 42.94 |
| | | | | | | | | | | RENT | 1,362.00 | 0.00 | | | |
| 18-104 | 3X2E | N/A | 1200 | Occupied | Warren, Latoya | 05/05/2016 | 05/05/2016 | 06/04/2017 | 1,525.00 | ALARM | 0.00 | 45.00 | 1,547.00 | 250.00 | 74.94 |
| | | | | | | | | | | RENT | 1,502.00 | 0.00 | | | |
| 18-201 | 3X2F | N/A | 1450 | Occupied | Campbell, Curletha | 02/13/2016 | 02/13/2016 | 05/08/2017 | 1,822.00 | ALARM | 0.00 | 45.00 | 1,789.00 | 250.00 | 54.99 |
| | | | | | | | | | | RENT | 1,669.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 75.00 | | | |
| 18-202 | 3X2F | N/A | 1450 | Occupied | Rivera, Cheryl | 05/03/2013 | 07/17/2016 | 08/16/2017 | 1,747.00 | ALARM | 0.00 | 45.00 | 1,652.00 | 0.00 | 54.93 |
| | | | | | | | | | | RENT | 1,607.00 | 0.00 | | | |
| 18-203 | 3X2F | N/A | 1450 | Occupied | Johnson, Erica | 11/15/2016 | 11/15/2016 | 12/14/2017 | 1,747.00 | ALARM | 0.00 | 45.00 | 1,672.00 | 0.00 | 84.99 |

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,625.00 | 0.00 | | | |
| 18-204 | 3X2F | N/A | 1450 | Occupied | Bennett-whitener, Mitzie | 08/01/2016 | 08/01/2016 | 08/31/2017 | 1,747.00 | ALARM | 0.00 | 45.00 | 1,848.00 | 0.00 | 94.99 |

**Details**

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,801.00 | 0.00 | | | |
| 19-101 | 3X2E | N/A | 1200 | Occupied | Ruffin, Lakeshia | 09/17/2016 | 09/17/2016 | 10/16/2017 | 1,525.00 | ALARM | 0.00 | 45.00 | 1,584.00 | 0.00 | 54.98 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,497.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 40.00 | | | |
| 19-102 | 3X2E | N/A | 1200 | Vacant-Leased | VACANT | | | | 1,525.00 | | 0.00 * | 0.00 * | | | |
| | | N/A | | Applicant | Wilson, Claudeen | 04/30/2017 | 04/30/2017 | 04/29/2018 | | ALARM | 0.00 * | 45.00 * | 1,572.00 * | 0.00 | 0.00 |
| | | | | | | | | | | PEST | 0.00 * | 2.00 * | | | |
| | | | | | | | | | | RENT | 1,525.00 * | 0.00 * | | | |
| 19-103 | 3X2E | N/A | 1200 | Occupied | Lubin, John | 12/12/2016 | 12/12/2016 | 01/11/2018 | 1,525.00 | ALARM | 0.00 | 45.00 | 1,502.00 | 0.00 | 74.97 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,455.00 | 0.00 | | | |
| 19-104 | 3X2E | N/A | 1200 | Occupied | Kintchen, Tyrone | 10/01/2016 | 10/01/2016 | 10/31/2017 | 1,525.00 | ALARM | 0.00 | 45.00 | 1,604.00 | 0.00 | 74.99 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,557.00 | 0.00 | | | |
| 19-201 | 3X2F | N/A | 1450 | Occupied | Stitt, Angela | 09/01/2000 | 09/09/2016 | 10/08/2017 | 1,747.00 | ALARM | 0.00 | 45.00 | 1,744.00 | 1,250.00 | 74.99 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,697.00 | 0.00 | | | |
| 19-202 | 3X2F | N/A | 1450 | Occupied | Hassanali, Ian | 11/12/2016 | 11/12/2016 | 12/11/2017 | 1,747.00 | ALARM | 0.00 | 45.00 | 1,647.00 | 0.00 | 74.98 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,600.00 | 0.00 | | | |
| 19-203 | 3X2F | N/A | 1450 | Occupied | Matthew, Kimona | 05/12/2012 | 06/16/2016 | 07/15/2017 | 1,747.00 | ALARM | 0.00 | 45.00 | 1,578.00 | 0.00 | 84.99 |
| | | | | | | | | | | RENT | 1,533.00 | 0.00 | | | |
| 19-204 | 3X2F | N/A | 1450 | Occupied | Sheffield, Joan | 10/02/2016 | 10/02/2016 | 11/01/2017 | 1,747.00 | ALARM | 0.00 | 45.00 | 1,709.00 | 0.00 | 73.98 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,662.00 | 0.00 | | | |
| **Totals:** | | | | | | | | | **283,679.00** | | **251,826.00** | **8,536.00** | **260,362.00** | **29,939.87** | |

Amt / SQFT: Market = 231,710 SQFT; Leased = 222,220 SQFT;

| Floorplan | # Units | Average SQFT | Average Market + Addl. | Market Amt / SQFT | Average Leased | Leased Amt / SQFT | Units Occupied | Occupancy % | Units Available |
|---|---|---|---|---|---|---|---|---|---|
| 2X1A | 4 | 1,140 | 1,394.00 | 1.22 | 953.50 | 0.84 | 4 | 100.00 | 0 |
| 2X2C | 75 | 1,140 | 1,352.87 | 1.19 | 1,296.30 | 1.14 | 69 | 92.00 | 2 |
| 2X2D | 37 | 1,250 | 1,588.41 | 1.27 | 1,388.08 | 1.11 | 37 | 100.00 | 1 |
| 3X2E | 36 | 1,200 | 1,525.00 | 1.27 | 1,481.37 | 1.23 | 35 | 97.22 | 0 |
| 3X2F | 36 | 1,450 | 1,749.08 | 1.21 | 1,581.71 | 1.09 | 35 | 97.22 | 2 |
| **Totals / Averages:** | **188** | **1,233** | **1,508.93** | **1.22** | **1,399.03** | **1.14** | **180** | **95.74** | **5** |

**Occupancy and Rents Summary for Current Date**

| Unit Status | Market + Addl. | # Units | Potential Rent |
|---|---|---|---|
| Occupied, no NTV | 261,374.00 | 173 | 241,938.00 |
| Occupied, NTV | 7,746.00 | 5 | 6,959.00 |
| Occupied NTV Leased | 3,272.00 | 2 | 2,929.00 |
| Vacant Leased | 8,200.00 | 6 | 8,200.00 |
| Admin/Down | 3,087.00 | 2 | 3,087.00 |
| Vacant Not Leased | - | 0 | - |
| **Totals:** | **283,679.00** | **188** | **263,113.00** |

**Summary Billing by Transaction Code for Current Date**

| Code | Amount |
|---|---|
| ALARM | 8,045.00 |
| CONC/SPECL | (115.00) |
| DISCOUNT | (747.00) |
| EMPLCRED | (705.00) |
| GARAGE | 20.00 |
| MTOM | 400.00 |
| PARKING | 709.00 |
| PEST | 206.00 |
| PETFEE | 85.00 |
| PETRENT | 25.00 |
| RENT | 251,826.00 |
| UPGRADE | 613.00 |
| **Total:** | **260,362.00** |

## CERTIFICATION OF RENT ROLLS

Borrower hereby certifies that the Rent Rolls which are attached hereto as **Exhibit "A"**, and incorporated herein by specific reference thereto, are true, accurate and complete rental schedules with respect to the above-referenced Property as of the dates of such rent rolls.

This Certification of Rent Rolls (hereinafter referred to as this "Certification") is dated and is and shall be effective as of April 27, 2017.

**BORROWER:**

**ALLIANCE HTTX LIMITED PARTNERSHIP**,
a Delaware limited partnership

By:    Alliance HTTX GP, LLC,
       a Delaware limited liability company
Its:    General Partner,

       By:    _____
       Name: Steven Ivankovich
       Title: Manager

[1728400/2]

EXHIBIT "A"
RENT ROLLS

(attached)

OneSite Rents v3.0

**Atlas Apartment Holdings, LLC - The Warwick**

Page 1 of 21

03/29/2017   8:31:52PM

**RENT ROLL DETAIL**

mgt-521-003

As of 03/29/2017

**Parameters:** Properties - ALL;Show All Unit Designations or Filter by - ALL;Subjournals - ALL;Exclude Formers? - Yes;Sort by - Unit;Report Type - Details + Summary;Show Unit Rent as - Market + Addl.;

**Details**

| Unit | Floorpla | Unit Designation | SQ | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|------|----------|------------------|-----|-------------------|------|------------------|-------------|-----------|----------------|------------|-----------|-------------------------|---------------|-------------|---------|
| 101 | 2X2B | N/A | 951 | Occupied | Doggett, Katrina | 12/10/2016 | 12/10/2016 | 01/09/2018 | 730.00 | CABLE | 0.00 | 20.00 | 606.00 | 0.00 | 29.52 |
| | | | | | | | | | | DISCOUNT | 0.00 | ###### | | | |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 730.00 | 0.00 | | | |
| 102 | 2X2B | N/A | 951 | Occupied | Castille, Roosevelt | 08/10/2016 | 08/10/2016 | 09/09/2017 | 730.00 | CABLE | 0.00 | 20.00 | 757.00 | 1,232.00 | 29.78 |
| | | | | | | | | | | DISCOUNT | 0.00 | (25.00) | | | |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 760.00 | 0.00 | | | |
| 103 | 2X2B R | N/A | 951 | Occupied | Lilly, Whitney | 06/03/2016 | 06/03/2016 | 06/02/2017 | 798.00 | CABLE | 0.00 | 20.00 | 897.00 | 100.00 | 29.78 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 740.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 135.00 | | | |
| 104 | 2X2B | N/A | 951 | Occupied | Hernandez, Franciso | 07/01/2011 | 02/04/2017 | 03/03/2018 | 730.00 | CABLE | 0.00 | 20.00 | 797.00 | 0.00 | (797.00) |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 775.00 | 0.00 | | | |
| 105 | 2X2B | N/A | 951 | Occupied | Whalen, Tracy | 05/01/2013 | 06/17/2016 | 07/16/2017 | 730.00 | CABLE | 0.00 | 20.00 | 807.00 | 0.00 | 29.78 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | PETRENT | 0.00 | 10.00 | | | |
| | | | | | | | | | | RENT | 775.00 | 0.00 | | | |
| 106 | 2X2B | N/A | 951 | Occupied | Himmelstein, Athan | 10/24/2016 | 10/24/2016 | 11/23/2017 | 730.00 | CABLE | 0.00 | 20.00 | 782.00 | 0.00 | 35.83 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 760.00 | 0.00 | | | |
| 107 | 2X2B | N/A | 951 | Occupied | Knecht, Evelyn | 12/12/2016 | 12/12/2016 | 01/11/2018 | 730.00 | CABLE | 0.00 | 20.00 | 727.00 | 750.00 | 29.78 |
| | | | | | | | | | | DISCOUNT | 0.00 | (25.00) | | | |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 730.00 | 0.00 | | | |
| 108 | 2X2B | N/A | 951 | Occupied | Leverton, Anthony | 08/19/2016 | 08/19/2016 | 09/20/2017 | 730.00 | CABLE | 0.00 | 20.00 | 782.00 | 0.00 | 29.78 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 760.00 | 0.00 | | | |
| 109 | 2X2C | Affordable | 963 | Occupied | Murphy, Audrey | 03/23/2017 | 03/23/2017 | 04/22/2018 | 750.00 | CABLE | 0.00 | 20.00 | 747.00 | 0.00 | 0.00 |
| | | | | | | | | | | DISCOUNT | 0.00 | (25.00) | | | |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |

**Details**

Other

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | PETRENT | 0.00 | 10.00 | | | |
| | | | | | | | | | | RENT | 740.00 | 0.00 | | | |
| 110 | 2X2C | Affordable | 963 | Occupied | McCutchen, Billyjack | 03/28/2015 | 03/25/2017 | 03/24/2018 | 740.00 | CABLE | 0.00 | 20.00 | 634.00 | 0.00 | 12.43 |
| | | | | | | | | | | DISCOUNT | 0.00 | ###### | | | |
| | | | | | | | | | | PETRENT | 0.00 | 10.00 | | | |
| | | | | | | | | | | RENT | 754.00 | 0.00 | | | |
| 111 | 2X2C | N/A | 963 | Occupied | Dennis, Robert | 06/10/2016 | 06/10/2016 | 07/15/2017 | 740.00 | CABLE | 0.00 | 20.00 | 827.00 | 100.00 | 35.83 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | PETRENT | 0.00 | 10.00 | | | |
| | | | | | | | | | | RENT | 795.00 | 0.00 | | | |
| 112 | 2X2C | N/A | 963 | Occupied-NTVL | Fryar, Lindsey | 05/13/2016 03/31/2017 | 05/13/2016 | 06/12/2017 | 740.00 | CABLE | 0.00 | 20.00 | 797.00 | 100.00 | 29.78 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | PETRENT | 0.00 | 10.00 | | | |
| | | | | | | | | | | RENT | 765.00 | 0.00 | | | |
| | | N/A | | Applicant | Gibbs, Samuel | 04/25/2017 | 04/25/2017 | 05/24/2018 | | RENT | 730.00 * | 0.00 * | 730.00 * | 0.00 | 0.00 |
| 113 | 1X1A | N/A | 823 | Occupied | Aguirre-choate, Silvia | 12/01/2012 03/22/2016 | | 04/16/2017 | 695.00 | CABLE | 0.00 | 20.00 | 686.00 | 0.00 | 25.92 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 664.00 | 0.00 | | | |
| | | N/A | | Pending renewal | Aguirre-choate, Silvia | 12/01/2012 | 04/17/2017 | 05/16/2018 | | CABLE | 0.00 * | 20.00 * | 709.00 * | 0.00 | 0.00 |
| | | | | | | | | | | PEST | 0.00 * | 2.00 * | | | |
| | | | | | | | | | | RENT | 687.00 * | 0.00 * | | | |
| 114 | 1X1A | N/A | 823 | Occupied | Clark, Kenneth | 08/06/2016 | 08/06/2016 | 09/05/2017 | 695.00 | CABLE | 0.00 | 20.00 | 713.00 | 0.00 | 25.36 |
| | | | | | | | | | | DISCOUNT | 0.00 | (25.00) | | | |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 716.00 | 0.00 | | | |
| 115 | 1X1A R | N/A | 823 | Occupied | Warren, Sandra | 03/07/2015 | 02/26/2017 | 03/27/2018 | 712.00 | CABLE | 0.00 | 20.00 | 889.00 | 0.00 | 25.92 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 712.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 155.00 | | | |
| 116 | 1X1A | Affordable | 823 | Occupied | Walls, Michael | 01/31/2015 | 01/30/2017 | 07/30/2017 | 695.00 | CABLE | 0.00 | 20.00 | 578.00 | 0.00 | 25.92 |
| | | | | | | | | | | DISCOUNT | 0.00 | ###### | | | |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |

**Details**

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | PETRENT | 0.00 | 20.00 | | | |
| | | | | | | | | | | RENT | 716.00 | 0.00 | | | |
| 117 | 2X2B | N/A | 951 | Occupied | Keene, Keitha | 07/30/2016 | 07/30/2016 | 08/29/2017 | 730.00 | CABLE | 0.00 | 20.00 | 757.00 | 0.00 | 29.78 |
| | | | | | | | | | | DISCOUNT | 0.00 | (25.00) | | | |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | RENT | 760.00 | 0.00 | | | |
| 118 | 2X2B | N/A | 951 | Occupied | Abel, Samuel | 07/25/2015 | 08/19/2016 | 09/18/2017 | 730.00 | CABLE | 0.00 | 20.00 | 797.00 | 100.00 | 41.89 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | PETRENT | 0.00 | 10.00 | | | |
| | | | | | | | | | | RENT | 765.00 | 0.00 | | | |
| 119 | 2X2B | N/A | 951 | Occupied | Barnhill, James | 10/03/2014 | 11/23/2016 | 12/22/2017 | 730.00 | CABLE | 0.00 | 20.00 | 715.00 | 0.00 | 35.83 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 693.00 | 0.00 | | | |
| 120 | 2X2B | N/A | 951 | Occupied | Thompson, Doug | 11/19/2016 | 11/19/2016 | 12/18/2017 | 730.00 | CABLE | 0.00 | 20.00 | 757.00 | 0.00 | 35.83 |
| | | | | | | | | | | DISCOUNT | 0.00 | (25.00) | | | |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 760.00 | 0.00 | | | |
| 121 | 2X2C | N/A | 963 | Occupied | Watts, Marlene | 09/13/2013 | 10/30/2016 | 11/29/2017 | 740.00 | CABLE | 0.00 | 20.00 | 761.00 | 150.00 | 35.83 |
| | | | | | | | | | | DISCOUNT | 0.00 | (25.00) | | | |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | PETRENT | 0.00 | 10.00 | | | |
| | | | | | | | | | | RENT | 754.00 | 0.00 | | | |
| 122 | 2X2C | N/A | 963 | Occupied | Talasek, Clarissa | 12/27/2013 | 05/18/2016 | 06/17/2017 | 740.00 | CABLE | 0.00 | 20.00 | 742.00 | 0.00 | 35.83 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 720.00 | 0.00 | | | |
| 123 | 2X2C | N/A | 963 | Occupied | Gonzales, Lupe | 04/18/2016 | 04/18/2016 | 05/19/2017 | 740.00 | CABLE | 0.00 | 20.00 | 791.00 | 0.00 | 35.83 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | PETRENT | 0.00 | 10.00 | | | |
| | | | | | | | | | | RENT | 759.00 | 0.00 | | | |
| | | N/A | | Pending renewal | Gonzales, Lupe | 04/18/2016 | 05/20/2017 | 06/19/2018 | | CABLE | 0.00 * | 20.00 * | 791.00 * | 0.00 | 0.00 |
| | | | | | | | | | | DISCOUNT | 0.00 * | (25.00) * | | | |
| | | | | | | | | | | PEST | 0.00 * | 2.00 * | | | |
| | | | | | | | | | | PETRENT | 0.00 * | 10.00 * | | | |
| | | | | | | | | | | RENT | 784.00 * | 0.00 * | | | |

**Details**

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 124 | 2X2C | N/A | 963 | Occupied | Parker, Keagan | 11/12/2016 | 11/12/2016 | 12/11/2017 | 740.00 | CABLE | 0.00 | 20.00 | 802.00 | 0.00 | 47.93 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 780.00 | 0.00 | | | |
| 125 | 1X1A | N/A | 823 | Occupied | Hewitt, Christopher | 10/31/2008 | 10/27/2016 | 10/26/2017 | 695.00 | CABLE | 0.00 | 20.00 | 556.00 | 200.00 | 40.89 |
| | | | | | | | | | | DISCOUNT | 0.00 | ###### | | | |
| | | | | | | | | | | RENT | 723.00 | 0.00 | | | |
| 126 | 1X1A | N/A | 823 | Occupied | Manley, Justin | 06/01/2016 | 06/01/2016 | 06/30/2017 | 695.00 | CABLE | 0.00 | 20.00 | 753.00 | 100.00 | 27.34 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 731.00 | 0.00 | | | |
| 127 | 1X1A | N/A | 823 | Occupied-NTVL | Wang, Yu | 09/11/2015 03/30/2017 | 09/11/2015 | 10/05/2016 | 695.00 | CABLE | 0.00 | 20.00 | 900.00 | 100.00 | 25.92 |
| | | | | | | | | | | MTOM | 0.00 | 100.00 | | | |
| | | | | | | | | | | RENT | 780.00 | 0.00 | | | |

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  |  | N/A |  | Applicant | Henley, Kenneth | 04/14/2017 | 04/14/2017 | 05/13/2018 |  | RENT | 695.00 * | 0.00 * | 695.00 * | 0.00 | 0.00 |
| 128 | 1X1A | N/A | 823 | Occupied | Kelso, Shirley | 03/24/2017 | 03/24/2017 | 04/23/2018 | 695.00 | CABLE | 0.00 | 20.00 | 692.00 | 0.00 | (692.00) |
|  |  |  |  |  |  |  |  |  |  | DISCOUNT | 0.00 | (25.00) |  |  |  |
|  |  |  |  |  |  |  |  |  |  | PEST | 0.00 | 2.00 |  |  |  |
|  |  |  |  |  |  |  |  |  |  | RENT | 695.00 | 0.00 |  |  |  |
| 129 | 2X2C | N/A | 963 | Occupied | Caffey, Joshua | 06/10/2014 | 07/01/2016 | 07/31/2017 | 740.00 | CABLE | 0.00 | 20.00 | 827.00 | 0.00 | 41.89 |
|  |  |  |  |  |  |  |  |  |  | PEST | 0.00 | 2.00 |  |  |  |
|  |  |  |  |  |  |  |  |  |  | RENT | 805.00 | 0.00 |  |  |  |
| 130 | 2X2C | Affordable | 963 | Occupied | Smalley, Brenda | 07/15/2016 | 07/15/2016 | 08/13/2017 | 740.00 | CABLE | 0.00 | 20.00 | 792.00 | 0.00 | 29.78 |
|  |  |  |  |  |  |  |  |  |  | DISCOUNT | 0.00 | (25.00) |  |  |  |
|  |  |  |  |  |  |  |  |  |  | PEST | 0.00 | 2.00 |  |  |  |
|  |  |  |  |  |  |  |  |  |  | RENT | 795.00 | 0.00 |  |  |  |
| 131 | 2X2C | N/A | 963 | Occupied | Guzinski, Jill | 11/01/2014 | 12/22/2016 | 01/21/2018 | 740.00 | CABLE | 0.00 | 20.00 | 747.00 | 0.00 | 29.78 |
|  |  |  |  |  |  |  |  |  |  | PEST | 0.00 | 2.00 |  |  |  |
|  |  |  |  |  |  |  |  |  |  | RENT | 725.00 | 0.00 |  |  |  |
| 132 | 2X2C | N/A | 963 | Occupied | Welch, Laura | 01/16/2016 | 01/16/2016 | 02/15/2018 | 740.00 | CABLE | 0.00 | 20.00 | 714.00 | 0.00 | 29.78 |
|  |  |  |  |  |  |  |  |  |  | DISCOUNT | 0.00 | (25.00) |  |  |  |
|  |  |  |  |  |  |  |  |  |  | PEST | 0.00 | 2.00 |  |  |  |
|  |  |  |  |  |  |  |  |  |  | RENT | 717.00 | 0.00 |  |  |  |
| 133 | 1X1A | N/A | 823 | Occupied | Clark, Patrick | 07/08/2016 | 07/08/2016 | 08/07/2017 | 695.00 | CABLE | 0.00 | 20.00 | 713.00 | 100.00 | 31.97 |
|  |  |  |  |  |  |  |  |  |  | DISCOUNT | 0.00 | (25.00) |  |  |  |

**Details**

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |  |  | PEST | 0.00 | 2.00 |  |  |  |
|  |  |  |  |  |  |  |  |  |  | RENT | 716.00 | 0.00 |  |  |  |
| 134 | 1X1A | N/A | 823 | Occupied | Beck, Ciara | 07/09/2015 | 08/03/2016 | 06/02/2017 | 705.00 | CABLE | 0.00 | 20.00 | 842.00 | 250.00 | (842.00) |
|  |  |  |  |  |  |  |  |  |  | PEST | 0.00 | 2.00 |  |  |  |
|  |  |  |  |  |  |  |  |  |  | PETRENT | 0.00 | 10.00 |  |  |  |
|  |  |  |  |  |  |  |  |  |  | RENT | 810.00 | 0.00 |  |  |  |
| 135 | 1X1A | N/A | 823 | Occupied | Lara, Gerardo | 04/02/2016 | 10/01/2016 | 03/31/2017 | 695.00 | CABLE | 0.00 | 20.00 | 927.00 | 100.00 | 25.92 |
|  |  |  |  |  |  |  |  |  |  | PEST | 0.00 | 2.00 |  |  |  |
|  |  |  |  |  |  |  |  |  |  | RENT | 905.00 | 0.00 |  |  |  |
|  |  | N/A |  | Pending renewal | Lara, Gerardo | 04/02/2016 | 04/01/2017 | 04/30/2018 |  | CABLE | 0.00 * | 20.00 * | 717.00 * | 0.00 | 0.00 |
|  |  |  |  |  |  |  |  |  |  | PEST | 0.00 * | 2.00 * |  |  |  |
|  |  |  |  |  |  |  |  |  |  | RENT | 695.00 * | 0.00 * |  |  |  |
| 136 | 1X1A | Affordable | 823 | Occupied | Sustache, Jose | 01/05/2017 | 01/05/2017 | 01/04/2018 | 695.00 | CABLE | 0.00 | 20.00 | 558.00 | 0.00 | 21.80 |
|  |  |  |  |  |  |  |  |  |  | DISCOUNT | 0.00 | ###### |  |  |  |
|  |  |  |  |  |  |  |  |  |  | PEST | 0.00 | 2.00 |  |  |  |
|  |  |  |  |  |  |  |  |  |  | RENT | 695.00 | 0.00 |  |  |  |
| 137 | 2X2B | N/A | 951 | Occupied | Elgera, Norma | 09/03/2014 | 10/25/2016 | 11/24/2017 | 730.00 | CABLE | 0.00 | 20.00 | 707.00 | 0.00 | 53.98 |
|  |  |  |  |  |  |  |  |  |  | DISCOUNT | 0.00 | (25.00) |  |  |  |
|  |  |  |  |  |  |  |  |  |  | PEST | 0.00 | 2.00 |  |  |  |
|  |  |  |  |  |  |  |  |  |  | RENT | 710.00 | 0.00 |  |  |  |

| Unit | Floorpla | Unit Designation | SQ | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 138 | 2X2B | N/A | 951 | Occupied | Ambrose, Eric | 08/09/2016 | 02/05/2017 | 02/04/2018 | 736.00 | CABLE | 0.00 | 20.00 | 763.00 | 100.00 | 35.83 |
|  |  |  |  |  |  |  |  |  |  | PEST | 0.00 | 2.00 |  |  |  |
|  |  |  |  |  |  |  |  |  |  | RENT | 741.00 | 0.00 |  |  |  |
| 139 | 2X2B | N/A | 951 | Occupied-NTV | Sooter, Cassidy | 04/24/2015 06/18/2017 | 05/19/2016 | 06/18/2017 | 730.00 | CABLE | 0.00 | 20.00 | 737.00 | 300.00 | 33.10 |
|  |  |  |  |  |  |  |  |  |  | PEST | 0.00 | 2.00 |  |  |  |
|  |  |  |  |  |  |  |  |  |  | RENT | 715.00 | 0.00 |  |  |  |
| 140 | 2X2B | Affordable | 951 | Occupied | Ellis, Sharon | 10/08/2014 | 11/01/2016 | 10/28/2017 | 730.00 | CABLE | 0.00 | 20.00 | 624.00 | 0.00 | (624.00) |
|  |  |  |  |  |  |  |  |  |  | DISCOUNT | 0.00 | ###### |  |  |  |
|  |  |  |  |  |  |  |  |  |  | RENT | 741.00 | 0.00 |  |  |  |
| 141 | 2X2C | N/A | 963 | Occupied-NTV | Bucy, Joy | 03/22/2017 06/23/2017 | 03/22/2017 | 09/21/2017 | 740.00 | CABLE | 0.00 | 20.00 | 911.00 | 0.00 | 0.00 |
|  |  |  |  |  |  |  |  |  |  | DISCOUNT | 0.00 | (25.00) |  |  |  |
|  |  |  |  |  |  |  |  |  |  | PEST | 0.00 | 2.00 |  |  |  |
|  |  |  |  |  |  |  |  |  |  | PETRENT | 0.00 | 20.00 |  |  |  |

**Details**

| Unit | Floorpla | Unit Designation | SQ | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |  |  | RENT | 894.00 |  |  |  |  |
| 142 | 2X2C | N/A | 963 | Occupied | Wilson, Bridget | 07/16/2016 | 07/16/2016 | 08/14/2017 | 740.00 | CABLE | 0.00 | 20.00 | 827.00 | 100.00 | 35.83 |
|  |  |  |  |  |  |  |  |  |  | PEST | 0.00 | 2.00 |  |  |  |
|  |  |  |  |  |  |  |  |  |  | PETRENT | 0.00 | 10.00 |  |  |  |
|  |  |  |  |  |  |  |  |  |  | RENT | 795.00 | 0.00 |  |  |  |
| 143 | 2X2C | N/A | 963 | Occupied | New, Thomas | 11/01/2007 | 10/27/2016 | 11/26/2017 | 740.00 | CABLE | 0.00 | 20.00 | 812.00 | 0.00 | 41.89 |
|  |  |  |  |  |  |  |  |  |  | PEST | 0.00 | 2.00 |  |  |  |
|  |  |  |  |  |  |  |  |  |  | RENT | 790.00 | 0.00 |  |  |  |
| 144 | 2X2C | N/A | 963 | Occupied | Allred, Myrna | 06/09/2005 | 01/08/2017 | 02/07/2018 | 740.00 | CABLE | 0.00 | 20.00 | 746.00 | 250.00 | 29.78 |
|  |  |  |  |  |  |  |  |  |  | DISCOUNT | 0.00 | (25.00) |  |  |  |
|  |  |  |  |  |  |  |  |  |  | PEST | 0.00 | 2.00 |  |  |  |
|  |  |  |  |  |  |  |  |  |  | PETRENT | 0.00 | 10.00 |  |  |  |
|  |  |  |  |  |  |  |  |  |  | RENT | 739.00 | 0.00 |  |  |  |
| 145 | 2X2C | Affordable | 963 | Occupied | Chance, Amber | 10/08/2015 | 10/05/2016 | 10/04/2017 | 740.00 | CABLE | 0.00 | 20.00 | 626.00 | 0.00 | 44.81 |
|  |  |  |  |  |  |  |  |  |  | DISCOUNT | 0.00 | ###### |  |  |  |
|  |  |  |  |  |  |  |  |  |  | PEST | 0.00 | 2.00 |  |  |  |
|  |  |  |  |  |  |  |  |  |  | RENT | 754.00 | 0.00 |  |  |  |
| 146 | 2X2C | N/A | 963 | Occupied-NTV | Jennings, Meagan | 08/13/2016 06/12/2017 | 08/13/2016 | 06/12/2017 | 740.00 | CABLE | 0.00 | 20.00 | 872.00 | 0.00 | (872.17) |
|  |  |  |  |  |  |  |  |  |  | PEST | 0.00 | 2.00 |  |  |  |
|  |  |  |  |  |  |  |  |  |  | RENT | 850.00 | 0.00 |  |  |  |
| 147 | 2X2C | N/A | 963 | Occupied | Swafford, Chastin | 12/04/2015 | 12/29/2016 | 01/28/2018 | 740.00 | CABLE | 0.00 | 20.00 | 714.00 | 100.00 | 35.83 |
|  |  |  |  |  |  |  |  |  |  | DISCOUNT | 0.00 | (25.00) |  |  |  |
|  |  |  |  |  |  |  |  |  |  | PEST | 0.00 | 2.00 |  |  |  |
|  |  |  |  |  |  |  |  |  |  | RENT | 717.00 | 0.00 |  |  |  |
| 148 | 2X2C | Affordable | 963 | Occupied | McGowan, Gabrielle | 02/15/2017 | 02/15/2017 | 03/14/2018 | 740.00 | CABLE | 0.00 | 20.00 | 782.00 | 0.00 | 0.00 |
|  |  |  |  |  |  |  |  |  |  | PEST | 0.00 | 2.00 |  |  |  |

| Unit | Floorpla | Unit Designation | SQ | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | RENT | 0.00 | 20.00 | | | |
| | | | | | | | | | | RENT | 740.00 | 0.00 | | | |
| 149 | 3X2D | N/A | 1171 | Occupied-NTV | Campos, Julian | 03/11/2016 05/17/2017 | 03/11/2016 | 04/10/2017 | 875.00 | CABLE | 0.00 | 20.00 | 909.00 | 100.00 | 53.98 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 887.00 | 0.00 | | | |

**Details**

| Unit | Floorpla | Unit Designation | SQ | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 150 | 3X2D | N/A | 1171 | Occupied | ALABAMA FARMERS COOPERATIVE, I, * | 01/11/2017 | 01/11/2017 | 02/10/2018 | 875.00 | CABLE | 0.00 | 20.00 | 897.00 | 0.00 | 47.93 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 875.00 | 0.00 | | | |
| 151 | 3X2D | N/A | 1171 | Occupied | Hymel, Leah | 05/20/2016 | 05/20/2016 | 06/19/2017 | 875.00 | CABLE | 0.00 | 20.00 | 929.00 | 100.00 | 41.62 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | PETRENT | 0.00 | 20.00 | | | |
| | | | | | | | | | | RENT | 887.00 | 0.00 | | | |
| 152 | 3X2D | N/A | 1171 | Occupied | Bonnie Plants, * | 01/01/2013 | 10/24/2016 | 11/23/2017 | 875.00 | CABLE | 0.00 | 20.00 | 927.00 | 0.00 | 41.89 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 905.00 | 0.00 | | | |
| 153 | 3X2D | N/A | 1171 | Occupied | Luna, Scott | 09/09/2016 | 09/09/2016 | 09/10/2017 | 875.00 | CABLE | 0.00 | 20.00 | 753.00 | 0.00 | 35.83 |
| | | | | | | | | | | EMPLCRED | 0.00 | ###### | | | |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | PETRENT | 0.00 | 10.00 | | | |
| | | | | | | | | | | RENT | 901.00 | 0.00 | | | |
| 154 | 3X2D | N/A | 1171 | Occupied | Prince, Alleen | 07/01/2016 | 07/01/2016 | 08/04/2017 | 875.00 | CABLE | 0.00 | 20.00 | 920.00 | 0.00 | 53.98 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 898.00 | 0.00 | | | |
| 155 | 3X2D | N/A | 1171 | Occupied | Waldrum, Jessica | 01/23/2017 | 01/23/2017 | 02/22/2018 | 875.00 | CABLE | 0.00 | 20.00 | 897.00 | 0.00 | 41.17 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 875.00 | 0.00 | | | |
| 156 | 3X2D | N/A | 1171 | Occupied | Cina, Brenda | 03/16/2017 | 03/16/2017 | 04/15/2018 | 875.00 | PEST | 0.00 | 2.00 | 897.00 | 0.00 | (7.00) |
| | | | | | | | | | | PETRENT | 0.00 | 20.00 | | | |
| | | | | | | | | | | RENT | 875.00 | 0.00 | | | |
| 157 | 3X2D | N/A | 1171 | Occupied | Lavender, Delmer | 09/02/2016 | 09/02/2016 | 10/03/2017 | 875.00 | CABLE | 0.00 | 20.00 | 937.00 | 0.00 | 41.89 |
| | | | | | | | | | | DISCOUNT | 0.00 | (25.00) | | | |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 940.00 | 0.00 | | | |
| 158 | 3X2D R | N/A | 1171 | Occupied | Johnson, Andrea | 03/24/2017 | 03/24/2017 | 04/23/2018 | 943.00 | DISCOUNT | 0.00 | (25.00) | 997.00 | 0.00 | 0.00 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | PETRENT | 0.00 | 20.00 | | | |

**Details**

Other

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|------|-----------|------------------|-----|-------------------|------|------------------|-------------|-----------|----------------|------------|------------|-----------------------|---------------|-------------|---------|
| | | | | | | | | | | RENT | 1,000.00 | 0.00 | | | |
| 159 | 3X2D | N/A | 1171 | Occupied | Lawson, Phillip | 07/26/2016 | 07/26/2016 | 07/31/2017 | 875.00 | CABLE | 0.00 | 20.00 | 972.00 | 100.00 | (980.31) |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 950.00 | 0.00 | | | |
| 160 | 3X2D R | N/A | 1171 | Occupied | Dolan, Dana | 02/24/2017 | 02/24/2017 | 03/23/2018 | 943.00 | CABLE | 0.00 | 20.00 | 997.00 | 0.00 | 0.00 |
| | | | | | | | | | | DISCOUNT | 0.00 | (25.00) | | | |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 1,000.00 | 0.00 | | | |
| 161 | 1X1A | N/A | 823 | Occupied | Lovell, John | 08/25/2012 | 09/07/2016 | 10/06/2017 | 695.00 | CABLE | 0.00 | 20.00 | 755.00 | 0.00 | 25.92 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 733.00 | 0.00 | | | |
| 162 | 1X1A | N/A | 823 | Vacant-Leased | VACANT | | | | 695.00 | | 0.00 * | 0.00 * | | | |
| | | N/A | | Applicant | Wheeler, Eric | 04/04/2017 | 04/04/2017 | 05/03/2018 | | RENT | 730.00 * | 0.00 * | 730.00 * | 0.00 | 200.00 |
| 163 | 1X1A | N/A | 823 | Occupied | Johnson, Kimberly | 11/14/2014 | 12/05/2016 | 01/04/2018 | 695.00 | CABLE | 0.00 | 20.00 | 748.00 | 0.00 | 25.92 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 726.00 | 0.00 | | | |
| 164 | 1X1A | N/A | 823 | Occupied | Brewer, Andrew | 06/18/2014 | 06/18/2014 | 07/13/2015 | 695.00 | CABLE | 0.00 | 15.00 | 796.00 | 0.00 | 25.92 |
| | | | | | | | | | | MTOM | 0.00 | 100.00 | | | |
| | | | | | | | | | | RENT | 681.00 | 0.00 | | | |
| 165 | 2X2B | N/A | 951 | Occupied | Davis, Sakiah | 05/11/2016 | 05/11/2016 | 05/10/2017 | 730.00 | CABLE | 0.00 | 20.00 | 757.00 | 100.00 | 34.73 |
| | | | | | | | | | | DISCOUNT | 0.00 | (25.00) | | | |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | PETRENT | 0.00 | 10.00 | | | |
| | | | | | | | | | | RENT | 750.00 | 0.00 | | | |
| | | N/A | | Pending renewal | Davis, Sakiah | 05/11/2016 | 05/11/2016 | 06/10/2018 | | CABLE | 0.00 * | 20.00 * | 772.00 * | 0.00 | 0.00 |
| | | | | | | | | | | DISCOUNT | 0.00 * | (25.00) * | | | |
| | | | | | | | | | | PEST | 0.00 * | 2.00 * | | | |
| | | | | | | | | | | PETRENT | 0.00 * | 10.00 * | | | |
| | | | | | | | | | | RENT | 765.00 * | 0.00 * | | | |
| 166 | 2X2B R | N/A | 951 | Occupied | Sanchez, Albert | 12/27/2016 | 12/27/2016 | 07/26/2017 | 798.00 | DISCOUNT | 0.00 | (25.00) | 825.00 | 0.00 | (825.00) |
| | | | | | | | | | | RENT | 730.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 120.00 | | | |
| 167 Details | 2X2B | N/A | 951 | Occupied | Gregory, Emma | 03/29/2017 | 03/29/2017 | 04/28/2018 | 730.00 | CABLE | 0.00 | 20.00 | 762.00 | 0.00 | 0.00 |

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|------|-----------|------------------|-----|-------------------|------|------------------|-------------|-----------|----------------|------------|------------|-----------------------|---------------|-------------|---------|
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | PETRENT | 0.00 | 10.00 | | | |
| | | | | | | | | | | RENT | 730.00 | 0.00 | | | |
| 168 | 2X2B | N/A | 951 | Occupied | Cutler, Joshua | 01/02/2016 | 01/27/2017 | 02/26/2018 | 730.00 | CABLE | 0.00 | 20.00 | 749.00 | 100.00 | 35.83 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 727.00 | 0.00 | | | |

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 169 | 1X1A | N/A | 823 | Occupied | Babin, Elizabeth | 10/15/2016 10/15/2016 | 11/14/2017 | | 695.00 | CABLE | 0.00 | 20.00 | 747.00 | 0.00 | 31.97 |
| | | | | | | | | | | DISCOUNT | 0.00 | (25.00) | | | |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | PETRENT | 0.00 | 20.00 | | | |
| | | | | | | | | | | RENT | 730.00 | 0.00 | | | |
| 170 | 1X1A | N/A | 823 | Occupied | Gregory, Wanda | 01/19/2017 01/19/2017 | 02/18/2018 | | 695.00 | CABLE | 0.00 | 20.00 | 692.00 | 0.00 | 10.54 |
| | | | | | | | | | | DISCOUNT | 0.00 | (25.00) | | | |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 695.00 | 0.00 | | | |
| 171 | 1X1A | N/A | 823 | Occupied | Sanchez, Yolanda | 07/28/2016 07/28/2016 | 08/29/2017 | | 695.00 | CABLE | 0.00 | 20.00 | 738.00 | 0.00 | (738.00) |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 716.00 | 0.00 | | | |
| 172 | 1X1A | N/A | 823 | Occupied | Hall, Thomas | 11/07/2015 12/02/2016 | 01/01/2018 | | 695.00 | CABLE | 0.00 | 20.00 | 742.00 | 100.00 | 25.92 |
| | | | | | | | | | | DISCOUNT | 0.00 | (25.00) | | | |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 745.00 | 0.00 | | | |
| 173 | 2X2C | N/A | 963 | Occupied | Western, Jameson | 09/30/2016 09/30/2016 | 09/29/2017 | | 740.00 | CABLE | 0.00 | 20.00 | 787.00 | 0.00 | (787.07) |
| | | | | | | | | | | DISCOUNT | 0.00 | (25.00) | | | |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | PETRENT | 0.00 | 10.00 | | | |
| | | | | | | | | | | RENT | 780.00 | 0.00 | | | |
| 174 | 2X2C R | N/A | 963 | Vacant | VACANT | | | | 900.00 | | 0.00 * | 0.00 * | | | |
| 175 | 2X2C | N/A | 963 | Occupied | Brooks, Alton | 08/01/2011 03/11/2016 | 04/05/2017 | | 740.00 | CABLE | 0.00 | 20.00 | 761.00 | 100.00 | 35.83 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 739.00 | 0.00 | | | |
| | | N/A | | Pending renewal | Brooks, Alton | 08/01/2011 04/06/2017 | 04/30/2018 | | | CABLE | 0.00 * | 20.00 * | 761.00 * | 0.00 | 0.00 |
| | | | | | | | | | | DISCOUNT | 0.00 * | (25.00) * | | | |

**Details**

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | PEST | 0.00 * | 2.00 * | | | |
| | | | | | | | | | | RENT | 764.00 * | 0.00 * | | | |
| 176 | 2X2C | N/A | 963 | Occupied | Aguirre, Kashala | 07/09/2016 07/09/2016 | 08/08/2017 | | 740.00 | CABLE | 0.00 | 20.00 | 787.00 | 100.00 | 47.93 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 765.00 | 0.00 | | | |
| 201 | 2X2B R | N/A | 951 | Occupied-NTV | Inman, Kaley | 02/11/2017 05/11/2017 | 02/11/2017 | 05/11/2017 | 798.00 | CABLE | 0.00 | 20.00 | 932.00 | 1,250.00 | 15.56 |
| | | | | | | | | | | DISCOUNT | 0.00 | (25.00) | | | |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | PETRENT | 0.00 | 10.00 | | | |
| | | | | | | | | | | RENT | 925.00 | 0.00 | | | |
| 202 | 2X2B | N/A | 951 | Occupied | Lochridge, Jacklyn | 12/13/2016 12/13/2016 | 01/12/2018 | | 730.00 | CABLE | 0.00 | 20.00 | 752.00 | 0.00 | 29.78 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | RENT | 730.00 | 0.00 | | | |
| 203 | 2X2B | N/A | 951 | Occupied | Perdue, Crystal | 10/23/2015 | 11/17/2016 | 12/16/2017 | 730.00 | CABLE | 0.00 | 20.00 | 747.00 | 100.00 | (747.00) |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | PETRENT | 0.00 | 20.00 | | | |
| | | | | | | | | | | RENT | 705.00 | 0.00 | | | |
| 204 | 2X2B | N/A | 951 | Occupied | Cunningham, Nicholas | 07/01/2016 | 07/01/2016 | 06/21/2017 | 730.00 | CABLE | 0.00 | 20.00 | 780.00 | 100.00 | 35.83 |
| | | | | | | | | | | DISCOUNT | 0.00 | (25.00) | | | |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 783.00 | 0.00 | | | |
| 205 | 2X2B | N/A | 951 | Occupied | Bondoc, Mary Jane | 08/10/2016 | 08/10/2016 | 09/09/2017 | 730.00 | CABLE | 0.00 | 20.00 | 757.00 | 1,250.00 | 47.93 |
| | | | | | | | | | | DISCOUNT | 0.00 | (25.00) | | | |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 760.00 | 0.00 | | | |
| 206 | 2X2B | N/A | 951 | Occupied | Lewis, Cecil | 09/09/2015 | 09/03/2016 | 07/02/2017 | 730.00 | CABLE | 0.00 | 20.00 | 852.00 | 100.00 | (852.00) |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 830.00 | 0.00 | | | |
| 207 | 2X2B | N/A | 951 | Occupied-NTVL | Short, Andrew | 10/01/2013 04/17/2017 | 09/01/2016 | 09/30/2017 | 730.00 | CABLE | 0.00 | 20.00 | 742.00 | 150.00 | (95.22) |
| | | | | | | | | | | DISCOUNT | 0.00 | (25.00) | | | |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |

**Details**

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | PETRENT | 0.00 | 10.00 | | | |
| | | | | | | | | | | RENT | 735.00 | 0.00 | | | |
| | | N/A | | Applicant | Chapman, Julia | 04/28/2017 | 04/28/2017 | 05/27/2018 | | RENT | 730.00 * | 0.00 * | 730.00 * | 0.00 | 125.00 |
| 208 | 2X2B | Affordable | 951 | Vacant-Leased | VACANT | | | | 730.00 | | 0.00 * | 0.00 * | | | |
| | | Affordable | | Applicant | Peronaci, Marco | 04/05/2017 | 04/05/2017 | 05/04/2018 | | CABLE | 0.00 * | 20.00 * | 752.00 * | 0.00 | 0.00 |
| | | | | | | | | | | PEST | 0.00 * | 2.00 * | | | |
| | | | | | | | | | | RENT | 730.00 * | 0.00 * | | | |
| 209 | 2X2C | N/A | 963 | Occupied | Rohus, Charles | 12/10/2016 | 12/10/2016 | 01/09/2018 | 750.00 | CABLE | 0.00 | 20.00 | 772.00 | 0.00 | 35.83 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | PETRENT | 0.00 | 10.00 | | | |
| | | | | | | | | | | RENT | 740.00 | 0.00 | | | |
| 210 | 2X2C | N/A | 963 | Occupied | Crowley, Phil | 08/31/2016 | 08/31/2016 | 09/29/2017 | 740.00 | CABLE | 0.00 | 20.00 | 782.00 | 0.00 | 29.78 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 760.00 | 0.00 | | | |
| 211 | 2X2C | N/A | 963 | Occupied | Franklin, Fred | 12/23/2015 | 12/23/2016 | 01/22/2018 | 750.00 | CABLE | 0.00 | 20.00 | 769.00 | 0.00 | 39.33 |
| | | | | | | | | | | LAUNDRYCARD | 0.00 | 50.00 | | | |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 697.00 | 0.00 | | | |
| 212 | 2X2C | N/A | 963 | Occupied | Alexander, Jonathan | 01/13/2017 | 01/13/2017 | 02/14/2018 | 740.00 | CABLE | 0.00 | 20.00 | 737.00 | 0.00 | 29.78 |
| | | | | | | | | | | DISCOUNT | 0.00 | (25.00) | | | |

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 740.00 | 0.00 | | | |
| 213 | 1X1A | N/A | 823 | Occupied | Lackey, Diana | 09/18/2014 | 10/09/2016 | 11/08/2017 | 695.00 | CABLE | 0.00 | 20.00 | 717.00 | 0.00 | (717.00) |
| | | | | | | | | | | DISCOUNT | 0.00 | (25.00) | | | |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 720.00 | 0.00 | | | |
| 214 | 1X1A | N/A | 823 | Occupied | Corbett, Mackenzie | 06/23/2016 | 06/23/2016 | 06/22/2017 | 695.00 | CABLE | 0.00 | 20.00 | 738.00 | 100.00 | 25.92 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 716.00 | 0.00 | | | |
| 215 | 1X1A | N/A | 823 | Occupied | French, Katelynn | 07/05/2016 | 07/05/2016 | 08/14/2017 | 695.00 | CABLE | 0.00 | 20.00 | 748.00 | 100.00 | 25.92 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | PETRENT | 0.00 | 10.00 | | | |
| | | | | | | | | | | RENT | 716.00 | 0.00 | | | |

**Details**

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 216 | 1X1A | N/A | 823 | Occupied | Bailey, Zachery | 10/05/2016 | 10/05/2016 | 11/04/2017 | 695.00 | CABLE | 0.00 | 20.00 | 752.00 | 0.00 | 25.92 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 730.00 | 0.00 | | | |
| 217 | 2X2B | N/A | 951 | Occupied | Wathen, Clay | 04/19/2016 | 04/19/2016 | 05/18/2017 | 730.00 | CABLE | 0.00 | 20.00 | 755.00 | 100.00 | 35.83 |
| | | | | | | | | | | DISCOUNT | 0.00 | (25.00) | | | |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | PETRENT | 0.00 | 20.00 | | | |
| | | | | | | | | | | RENT | 738.00 | 0.00 | | | |
| | | N/A | | Pending renewal | Wathen, Clay | 04/19/2016 | 05/19/2017 | 11/30/2017 | | CABLE | 0.00 * | 20.00 * | 785.00 * | 0.00 | 0.00 |
| | | | | | | | | | | DISCOUNT | 0.00 * | (25.00) * | | | |
| | | | | | | | | | | PEST | 0.00 * | 2.00 * | | | |
| | | | | | | | | | | PETRENT | 0.00 * | 20.00 * | | | |
| | | | | | | | | | | RENT | 768.00 * | 0.00 * | | | |
| 218 | 2X2B | N/A | 951 | Occupied | Anderson, David | 12/06/2016 | 12/06/2016 | 01/05/2018 | 730.00 | CABLE | 0.00 | 20.00 | 727.00 | 600.00 | (727.00) |
| | | | | | | | | | | DISCOUNT | 0.00 | (25.00) | | | |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 730.00 | 0.00 | | | |
| 219 | 2X2B | N/A | 951 | Occupied | Huling, Todd | 11/01/2006 | 06/02/2016 | 07/01/2017 | 730.00 | CABLE | 0.00 | 20.00 | 727.00 | 75.00 | 35.83 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 705.00 | 0.00 | | | |
| 220 | 2X2B | N/A | 951 | Occupied | Amerson, Kyle | 02/06/2016 | 03/03/2017 | 04/02/2018 | 730.00 | CABLE | 0.00 | 20.00 | 735.00 | 0.00 | 35.83 |
| | | | | | | | | | | DISCOUNT | 0.00 | (25.00) | | | |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 738.00 | 0.00 | | | |
| 221 | 2X2C | N/A | 963 | Occupied | KC, Yog | 04/23/2012 | 12/02/2016 | 01/01/2018 | 740.00 | CABLE | 0.00 | 20.00 | 642.00 | 250.00 | 47.93 |
| | | | | | | | | | | DISCOUNT | 0.00 | (25.00) | | | |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 645.00 | 0.00 | | | |

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 222 | 2X2C | N/A | 963 | Occupied | Barber, Bethany | 03/14/2016 | 11/01/2016 | 12/15/2017 | 740.00 | CABLE | 0.00 | 20.00 | 807.00 | 0.00 | 35.83 |
| | | | | | | | | | | DISCOUNT | 0.00 | (25.00) | | | |
| | | | | | | | | | | ELECTRIC | 0.00 | 2.00 | | | |
| | | | | | | | | | | PETRENT | 0.00 | 20.00 | | | |
| | | | | | | | | | | RENT | 790.00 | 0.00 | | | |
| 223 Details | 2X2C | N/A | 963 | Occupied | Moser, Jason | 12/12/2014 | 02/01/2017 | 03/01/2018 | 740.00 | CABLE | 0.00 | 20.00 | 726.00 | 0.00 | 29.78 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 704.00 | 0.00 | | | |
| 224 | 2X2C | Affordable | 963 | Occupied | * Smith, Daniel | 03/01/2006 | 02/08/2017 | 02/07/2018 | 740.00 | CABLE | 0.00 | 20.00 | 642.00 | 100.00 | 35.83 |
| | | | | | | | | | | DISCOUNT | 0.00 | ###### | | | |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 759.00 | 0.00 | | | |
| 225 | 1X1A | N/A | 823 | Occupied | Monson, Kaylin | 06/01/2016 | 06/01/2016 | 06/30/2017 | 695.00 | CABLE | 0.00 | 20.00 | 758.00 | 199.00 | 31.34 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | PETRENT | 0.00 | 20.00 | | | |
| | | | | | | | | | | RENT | 716.00 | 0.00 | | | |
| 226 | 1X1A | N/A | 823 | Occupied | Pancho, Mae | 03/25/2017 | 03/25/2017 | 02/28/2018 | 695.00 | CABLE | 0.00 | 20.00 | 692.00 | 0.00 | 0.00 |
| | | | | | | | | | | DISCOUNT | 0.00 | (25.00) | | | |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 695.00 | 0.00 | | | |
| 227 | 1X1A | N/A | 823 | Occupied | Faulks, Natalie | 08/22/2016 | 08/22/2016 | 09/22/2017 | 695.00 | CABLE | 0.00 | 20.00 | 748.00 | 100.00 | 31.97 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | PETRENT | 0.00 | 10.00 | | | |
| | | | | | | | | | | RENT | 716.00 | 0.00 | | | |
| 228 | 1X1A | N/A | 823 | Occupied | Simmons, Sandra | 11/07/2016 | 11/07/2016 | 12/06/2017 | 695.00 | CABLE | 0.00 | 20.00 | 752.00 | 0.00 | 31.97 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 730.00 | 0.00 | | | |
| 229 | 2X2C | N/A | 963 | Occupied | Stone, Brady | 09/27/2016 | 09/27/2016 | 10/26/2017 | 740.00 | CABLE | 0.00 | 20.00 | 777.00 | 0.00 | 35.83 |
| | | | | | | | | | | DISCOUNT | 0.00 | (25.00) | | | |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 780.00 | 0.00 | | | |
| 230 | 2X2C R | N/A | 963 | Vacant-Leased | VACANT | | | | 900.00 | | 0.00 * | 0.00 * | | | |
| | | N/A | | Applicant | Laughton, Shanna | 03/31/2017 | 03/31/2017 | 04/01/2018 | | PEST | 0.00 * | 2.00 * | 902.00 * | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 900.00 * | 0.00 * | | | |
| 231 | 2X2C | N/A | 963 | Occupied | CAZADORES CONSTRUCTION, LLC, * | 03/01/2017 | 03/01/2017 | 03/31/2018 | 740.00 | CABLE | 0.00 | 20.00 | 762.00 | 0.00 | 0.00 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 740.00 | 0.00 | | | |

Details

Other

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Charges/ Credits | Total Billing | Dep On Hand | Balance |
|------|-----------|------------------|-----|-------------------|------|------------------|-------------|-----------|----------------|-----------|-----------|------------------|---------------|-------------|---------|
| 232 | 2X2C | N/A | 963 | Occupied | Brown, Avery | 12/16/2016 | 12/16/2016 | 01/15/2018 | 740.00 | CABLE | 0.00 | 20.00 | 737.00 | 0.00 | 29.78 |
| | | | | | | | | | | DISCOUNT | 0.00 | (25.00) | | | |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 740.00 | 0.00 | | | |
| 233 | 1X1A | N/A | 823 | Occupied | Palmer, Lindsay | 01/28/2017 | 01/28/2017 | 02/27/2018 | 695.00 | CABLE | 0.00 | 20.00 | 717.00 | 0.00 | (727.00) |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 695.00 | 0.00 | | | |
| 234 | 1X1A | N/A | 823 | Occupied | Makuta, Michael | 03/19/2016 | 03/19/2016 | 04/18/2017 | 705.00 | CABLE | 0.00 | 20.00 | 718.00 | 100.00 | 37.29 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 696.00 | 0.00 | | | |
| | | N/A | | Pending renewal | Makuta, Michael | 03/19/2016 | 04/19/2017 | 05/18/2018 | | CABLE | 0.00 * | 20.00 * | 725.00 * | 0.00 | 0.00 |
| | | | | | | | | | | PEST | 0.00 * | 2.00 * | | | |
| | | | | | | | | | | RENT | 703.00 * | 0.00 * | | | |
| 235 | 1X1A | N/A | 823 | Occupied | Watts, Chelsea | 01/15/2016 | 01/15/2016 | 02/14/2017 | 695.00 | CABLE | 0.00 | 20.00 | 825.00 | 100.00 | 25.92 |
| | | | | | | | | | | DISCOUNT | 0.00 | (25.00) | | | |
| | | | | | | | | | | MTOM | 0.00 | 100.00 | | | |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 728.00 | 0.00 | | | |
| 236 | 1X1A | N/A | 823 | Occupied | Frazier, Carl | 01/25/2014 | 03/27/2017 | 04/26/2018 | 695.00 | CABLE | 0.00 | 20.00 | 718.00 | 0.00 | 28.92 |
| | | | | | | | | | | DISCOUNT | 0.00 | (25.00) | | | |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 721.00 | 0.00 | | | |
| 237 | 2X2B | N/A | 951 | Occupied | Whan, Elizabeth | 02/24/2017 | 02/24/2017 | 03/23/2018 | 730.00 | CABLE | 0.00 | 20.00 | 772.00 | 0.00 | (772.00) |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | PETRENT | 0.00 | 20.00 | | | |
| | | | | | | | | | | RENT | 730.00 | 0.00 | | | |
| 238 | 2X2B | N/A | 951 | Occupied | McIntosh, Marcus | 03/01/2017 | 03/01/2017 | 02/28/2018 | 730.00 | CABLE | 0.00 | 20.00 | 606.00 | 0.00 | 96.00 |
| | | | | | | | | | | EMPLCRED | 0.00 | ###### | | | |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 730.00 | 0.00 | | | |
| 239 | 2X2B | N/A | 951 | Occupied | Mordente, Alicia | 02/18/2017 | 02/18/2017 | 03/17/2018 | 730.00 | CABLE | 0.00 | 20.00 | 737.00 | 0.00 | (737.00) |
| | | | | | | | | | | DISCOUNT | 0.00 | (25.00) | | | |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |

**Details**

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|------|-----------|------------------|-----|-------------------|------|------------------|-------------|-----------|----------------|-----------|-----------|------------------------|---------------|-------------|---------|
| | | | | | | | | | | PETRENT | 0.00 | 10.00 | | | |
| | | | | | | | | | | RENT | 730.00 | 0.00 | | | |
| 240 | 2X2B | N/A | 951 | Vacant-Leased | VACANT | | | | 730.00 | | 0.00 * | 0.00 * | | | |
| | | N/A | | Applicant | Sylvia, Richard | 04/12/2017 | 04/12/2017 | 05/11/2018 | | RENT | 730.00 * | 0.00 * | 730.00 * | 0.00 | 0.00 |
| 241 | 2X2C | N/A | 963 | Occupied | Carrigan, Christopher | 02/16/2017 | 02/16/2017 | 03/15/2018 | 740.00 | CABLE | 0.00 | 20.00 | 772.00 | 0.00 | 0.00 |

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | PETRENT | 0.00 | 10.00 | | | |
| | | | | | | | | | | RENT | 740.00 | 0.00 | | | |
| 242 | 2X2C | N/A | 963 | Occupied | Boggs, Gary | 02/15/2017 | 02/15/2017 | 03/14/2018 | 740.00 | CABLE | 0.00 | 20.00 | 737.00 | 0.00 | 0.00 |
| | | | | | | | | | | DISCOUNT | 0.00 | (25.00) | | | |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 740.00 | 0.00 | | | |
| 243 | 2X2C | N/A | 963 | Occupied | Gjerstad, Matthew | 02/04/2017 | 02/04/2017 | 03/03/2018 | 740.00 | DISCOUNT | 0.00 | (25.00) | 717.00 | 0.00 | 20.15 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 740.00 | 0.00 | | | |
| 244 | 2X2C | N/A | 963 | Occupied | Moran, Jacob | 12/27/2013 | 02/12/2017 | 03/11/2018 | 740.00 | CABLE | 0.00 | 20.00 | 746.00 | 0.00 | 29.78 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 724.00 | 0.00 | | | |
| 245 | 2X2C | N/A | 963 | Vacant-Leased | VACANT | | | | 740.00 | | 0.00 * | 0.00 * | | | |
| | | N/A | | Applicant | Hildebrand, Michael | 04/14/2017 | 04/14/2017 | 05/13/2018 | | CABLE | 0.00 * | 20.00 * | 737.00 * | 0.00 | 0.00 |
| | | | | | | | | | | DISCOUNT | 0.00 * | (25.00) * | | | |
| | | | | | | | | | | PEST | 0.00 * | 2.00 * | | | |
| | | | | | | | | | | RENT | 740.00 * | 0.00 * | | | |
| 246 | 2X2C | N/A | 963 | Occupied | King, Christafer | 01/07/2017 | 01/07/2017 | 02/06/2018 | 740.00 | CABLE | 0.00 | 20.00 | 737.00 | 0.00 | 41.89 |
| | | | | | | | | | | DISCOUNT | 0.00 | (25.00) | | | |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 740.00 | 0.00 | | | |
| 247 | 2X2C | N/A | 963 | Occupied | Maurer, Lauren | 03/28/2016 | 03/28/2016 | 04/27/2017 | 740.00 | CABLE | 0.00 | 20.00 | 781.00 | 100.00 | (791.00) |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 759.00 | 0.00 | | | |
| 248 | 2X2C | N/A | 963 | Occupied | Strong, Alexandra | 11/23/2015 | 12/18/2016 | 01/17/2018 | 740.00 | CABLE | 0.00 | 20.00 | 716.00 | 100.00 | (202.00) |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |

**Details**

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | RENT | 694.00 | 0.00 | | | |
| 249 | 3X2D | N/A | 1171 | Occupied | Caron, Stephen | 06/20/2016 | 06/20/2016 | 07/17/2017 | 875.00 | CABLE | 0.00 | 20.00 | 987.00 | 0.00 | 41.12 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 965.00 | 0.00 | | | |
| 250 | 3X2D R | N/A | 1171 | Occupied | Rice, Angela | 09/18/2015 | 09/27/2016 | 10/26/2017 | 943.00 | CABLE | 0.00 | 20.00 | 1,077.00 | 0.00 | 29.78 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | PETRENT | 0.00 | 20.00 | | | |
| | | | | | | | | | | RENT | 1,035.00 | 0.00 | | | |
| 251 | 3X2D | N/A | 1171 | Occupied | Hardy, Ashley | 12/05/2014 | 12/26/2016 | 01/25/2018 | 875.00 | CABLE | 0.00 | 20.00 | 801.00 | 0.00 | (801.00) |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 779.00 | 0.00 | | | |
| 252 | 3X2D | N/A | 1171 | Occupied | Pittman, Shayline | 01/30/2017 | 01/30/2017 | 02/28/2018 | 875.00 | CABLE | 0.00 | 20.00 | 882.00 | 0.00 | (88.72) |

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | DISCOUNT | 0.00 | (25.00) | | | |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | PETRENT | 0.00 | 10.00 | | | |
| | | | | | | | | | | RENT | 875.00 | 0.00 | | | |
| 253 | 3X2D | N/A | 1171 | Occupied | Kerr, Gregory | 11/28/2016 | 11/28/2016 | 12/27/2017 | 875.00 | CABLE | 0.00 | 20.00 | 937.00 | 0.00 | 47.93 |
| | | | | | | | | | | DISCOUNT | 0.00 | (25.00) | | | |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 940.00 | 0.00 | | | |
| 254 | 3X2D | N/A | 1171 | Occupied | Price, Daniel | 04/03/2015 | 04/28/2017 | 05/23/2017 | 875.00 | CABLE | 0.00 | 20.00 | 837.00 | 0.00 | 35.83 |
| | | | | | | | | | | DISCOUNT | 0.00 | (25.00) | | | |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | PETRENT | 0.00 | 10.00 | | | |
| | | | | | | | | | | RENT | 830.00 | 0.00 | | | |
| 255 | 3X2D | N/A | 1171 | Occupied-NTV | Sanchez, Mario | 03/26/2016 04/20/2017 | 03/26/2016 | 03/25/2017 | 875.00 | CABLE | 0.00 | 20.00 | 1,028.00 | 100.00 | 379.73 |
| | | | | | | | | | | MTOM | 0.00 | 100.00 | | | |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 906.00 | 0.00 | | | |
| 256 | 3X2D | N/A | 1171 | Vacant | VACANT | | | | 875.00 | | 0.00 * | 0.00 * | | | |
| 257 | 3X2D | N/A | 1171 | Occupied | Campbell, Karen | 06/05/2015 | 06/30/2016 | 07/29/2017 | 875.00 | CABLE | 0.00 | 20.00 | 849.00 | 0.00 | 41.89 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | PETRENT | 0.00 | 10.00 | | | |

**Details**

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | RENT | 817.00 | 0.00 | | | |
| 258 | 3X2D | N/A | 1171 | Occupied | Harlow, Heather | 06/01/2016 | 06/01/2016 | 06/30/2017 | 875.00 | CABLE | 0.00 | 20.00 | 972.00 | 100.00 | (564.39) |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 950.00 | 0.00 | | | |
| 259 | 3X2D | Affordable | 1171 | Occupied | Baldoza, Bianca | 10/08/2016 | 10/08/2016 | 11/07/2017 | 875.00 | CABLE | 0.00 | 20.00 | 972.00 | 0.00 | 47.93 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | PETRENT | 0.00 | 10.00 | | | |
| | | | | | | | | | | RENT | 940.00 | 0.00 | | | |
| 260 | 3X2D | N/A | 1171 | Occupied | Mciver, Amber | 12/16/2016 | 12/16/2016 | 01/15/2018 | 875.00 | CABLE | 0.00 | 20.00 | 892.00 | 0.00 | 35.83 |
| | | | | | | | | | | DISCOUNT | 0.00 | (25.00) | | | |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | PETRENT | 0.00 | 20.00 | | | |
| | | | | | | | | | | RENT | 875.00 | 0.00 | | | |
| 261 | 1X1A | N/A | 823 | Occupied | Altimont, Thomas | 11/06/2015 | 10/29/2016 | 06/28/2017 | 695.00 | CABLE | 0.00 | 20.00 | 787.00 | 0.00 | 25.92 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 765.00 | 0.00 | | | |
| 262 | 1X1A | Affordable | 823 | Occupied | Reeder, Eugena | 02/23/2017 | 02/23/2017 | 03/22/2018 | 695.00 | CABLE | 0.00 | 20.00 | 717.00 | 0.00 | 2.00 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 695.00 | 0.00 | | | |
| 263 | 1X1A | Affordable | 823 | Occupied | Hampton, Chanese | 08/05/2014 | 01/29/2017 | 07/28/2017 | 695.00 | CABLE | 0.00 | 20.00 | 568.00 | 0.00 | (2,242.29) |

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | DISCOUNT | 0.00 | ##### | | | |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | PETRENT | 0.00 | 10.00 | | | |
| | | | | | | | | | | RENT | 730.00 | 0.00 | | | |
| 264 | 1X1A | N/A | 823 | Occupied | Olson, Sherron | 07/16/2014 08/06/2016 | | 09/05/2017 | 695.00 | CABLE | 0.00 | 20.00 | 713.00 | 0.00 | 25.92 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 691.00 | 0.00 | | | |
| 265 | 2X2B | N/A | 951 | Occupied-NTV | Gardenhire, Tiffannie | 04/30/2016 04/29/2017 | 04/30/2016 | 04/29/2017 | 730.00 | CABLE | 0.00 | 20.00 | 736.00 | 100.00 | 41.89 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 714.00 | 0.00 | | | |
| 266 | 2X2B | N/A | 951 | Vacant-Leased | VACANT | | | | 730.00 | | 0.00 * | 0.00 * | | | |
| | | N/A | | Applicant | Ruiz, Melissa | 04/01/2017 | 04/01/2017 | 04/30/2018 | | CABLE | 0.00 * | 20.00 * | 752.00 * | 0.00 | 100.00 |
| | | | | | | | | | | PEST | 0.00 * | 2.00 * | | | |

**Details**

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | RENT | 730.00 * | 0.00 * | | | |
| 267 | 2X2B | N/A | 951 | Occupied | Rauschenburg, William | 04/06/2012 | 08/17/2016 | 09/16/2017 | 730.00 | CABLE | 0.00 | 20.00 | 652.00 | 0.00 | 29.03 |
| | | | | | | | | | | DISCOUNT | 0.00 | (25.00) | | | |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 655.00 | 0.00 | | | |
| 268 | 2X2B | N/A | 951 | Occupied | Giffin, Jim | 01/27/2016 | 01/22/2017 | 02/21/2018 | 730.00 | CABLE | 0.00 | 20.00 | 739.00 | 100.00 | 29.78 |
| | | | | | | | | | | DISCOUNT | 0.00 | (25.00) | | | |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 742.00 | 0.00 | | | |
| 269 | 1X1A | N/A | 823 | Occupied | Strong, Kenesha | 10/28/2016 | 10/28/2016 | 11/27/2017 | 695.00 | CABLE | 0.00 | 20.00 | 727.00 | 0.00 | 25.92 |
| | | | | | | | | | | DISCOUNT | 0.00 | (25.00) | | | |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 730.00 | 0.00 | | | |
| 270 | 1X1A | N/A | 823 | Occupied | Horth, Yannie | 04/24/2015 | 05/19/2016 | 06/13/2017 | 695.00 | CABLE | 0.00 | 20.00 | 747.00 | 0.00 | (721.08) |
| | | | | | | | | | | DISCOUNT | 0.00 | (25.00) | | | |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 750.00 | 0.00 | | | |
| | | N/A | | Pending renewal | Horth, Yannie | 04/24/2015 | 06/14/2017 | 07/13/2018 | | CABLE | 0.00 * | 20.00 * | 757.00 * | 0.00 | 0.00 |
| | | | | | | | | | | DISCOUNT | 0.00 * | (25.00) * | | | |
| | | | | | | | | | | PEST | 0.00 * | 2.00 * | | | |
| | | | | | | | | | | RENT | 760.00 * | 0.00 * | | | |
| 271 | 1X1A | N/A | 823 | Occupied | Hernandez, Enrique | 03/04/2017 | 03/04/2017 | 04/03/2018 | 695.00 | CABLE | 0.00 | 20.00 | 692.00 | 0.00 | 0.00 |
| | | | | | | | | | | DISCOUNT | 0.00 | (25.00) | | | |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 695.00 | 0.00 | | | |
| 272 | 1X1A | N/A | 823 | Occupied | Brown, Zoei | 06/04/2016 | 06/04/2016 | 07/02/2017 | 695.00 | CABLE | 0.00 | 20.00 | 723.00 | 0.00 | 31.97 |
| | | | | | | | | | | DISCOUNT | 0.00 | (25.00) | | | |

| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | PETRENT | 0.00 | 20.00 | | | |
| | | | | | | | | | | RENT | 706.00 | 0.00 | | | |
| 273 | 2X2C | N/A | 963 | Occupied | Burgos Ortiz, Alexander | 11/25/2015 | 12/20/2016 | 01/19/2018 | 740.00 | CABLE | 0.00 | 20.00 | 704.00 | 0.00 | 29.78 |
| | | | | | | | | | | DISCOUNT | 0.00 | (25.00) | | | |

**Details**

| Unit | Floorpla | Unit Designation | SQ | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|------|----------|------------------|-----|-------------------|------|------------------|-------------|-----------|----------------|------------|------------|------------------------|---------------|-------------|---------|
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 707.00 | 0.00 | | | |
| 274 | 2X2C | N/A | 963 | Occupied | Delgadillo, Monica | 06/27/2014 | 08/21/2016 | 09/20/2017 | 740.00 | CABLE | 0.00 | 20.00 | 862.00 | 0.00 | 47.93 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | PETRENT | 0.00 | 10.00 | | | |
| | | | | | | | | | | RENT | 830.00 | 0.00 | | | |
| 275 | 2X2C | N/A | 963 | Occupied | Lujan, Steven | 03/29/2017 | 03/29/2017 | 04/28/2018 | 740.00 | CABLE | 0.00 | 20.00 | 762.00 | 0.00 | 74.00 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 740.00 | 0.00 | | | |
| 276 | 2X2C | N/A | 963 | Occupied | Barton, Michael | 02/17/2016 | 03/14/2017 | 04/13/2018 | 740.00 | CABLE | 0.00 | 20.00 | 742.00 | 100.00 | 40.69 |
| | | | | | | | | | | DISCOUNT | 0.00 | (25.00) | | | |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 745.00 | 0.00 | | | |
| **Totals:** | | | | | | | | | **114,315.00** | | **110,593.00** | **1,343.00** | **111,936.00** | **10,506.00** | |

Amt / SQFT: Market = 145,288 SQFT; Leased = 137,552 SQFT;

| Floorplan | # Units | Average SQFT | Average Market + Addl. | Market Amt / SQFT | Average Leased | Leased Amt / SQFT | Units Occupied | Occupancy % | Units Available |
|-----------|---------|--------------|------------------------|-------------------|----------------|-------------------|----------------|-------------|-----------------|
| 1X1A | 39 | 823 | 695.51 | 0.85 | 724.16 | 0.88 | 38 | 97.44 | 0 |
| 1X1A R | 1 | 823 | 712.00 | 0.87 | 712.00 | 0.87 | 1 | 100.00 | 0 |
| 2X2B | 37 | 951 | 730.00 | 0.77 | 739.32 | 0.78 | 34 | 91.89 | 2 |
| 2X2B R | 3 | 951 | 798.00 | 0.84 | 798.33 | 0.84 | 3 | 100.00 | 1 |
| 2X2C | 46 | 963 | 740.65 | 0.77 | 753.91 | 0.78 | 45 | 97.83 | 2 |
| 2X2C R | 2 | 963 | 900.00 | 0.93 | 0.00 | 0.00 | | 0.00 | 1 |
| 3X2D | 21 | 1,171 | 875.00 | 0.75 | 893.50 | 0.76 | 20 | 95.24 | 3 |
| 3X2D R | 3 | 1,171 | 943.00 | 0.81 | 1,011.67 | 0.86 | 3 | 100.00 | 0 |
| **Totals / Averages:** | **152** | **956** | **752.07** | **0.79** | **768.01** | **0.80** | **144** | **94.74** | **9** |

**Occupancy and Rents Summary for Current Date**

| Unit Status | Market + Addl. | # Units | Potential Rent |
|-------------|----------------|---------|----------------|
| Occupied, no NTV | 100,362.00 | 134 | 102,422.00 |
| Occupied, NTV | 5,488.00 | 7 | 5,891.00 |
| Occupied NTV Leased | 2,165.00 | 3 | 2,280.00 |

| | | | |
|---|---|---|---|
| Vacant Leased | 4,525.00 | 6 | 4,525.00 |
| Admin/Down | - | 0 | - |
| Vacant Not Leased | 1,775.00 | 2 | 1,775.00 |
| **Totals:** | **114,315.00** | **152** | **116,893.00** |

**Summary Billing by Transaction Code for Current Date**

| Code | Amount |
|---|---|
| CABLE | 2,795.00 |
| DISCOUNT | (2,842.00) |
| ELECTRIC | 2.00 |
| EMPLCRED | (326.00) |
| LAUNDRYCARD | 50.00 |
| MTOM | 400.00 |
| PEST | 274.00 |
| PETRENT | 580.00 |
| RENT | 110,593.00 |

**Summary Billing by Transaction Code for Current Date**

| Code | Amount |
|---|---|
| UPGRADE | 410.00 |
| **Total:** | **111,936.00** |

OneSite Rents v3.0

03/29/2017  8:31:49PM

**Atlas Apartment Holdings, LLC - Coulter Landing**

## RENT ROLL DETAIL

As of 03/29/2017

Page 1 of 9

mgt-521-003

**Parameters:** Properties - ALL;Show All Unit Designations or Filter by - ALL;Subjournals - ALL;Exclude Formers? - Yes;Sort by - Unit;Report Type - Details + Summary;Show Unit Rent as - Market + Addl.;

**Details**

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|------|-----------|------------------|-----|-------------------|------|------------------|-------------|-----------|----------------|------------|------------|------------------------|---------------|-------------|---------|
| 101 | 2X1B | N/A | 900 | Occupied | Diaz, Victoria | 12/01/2016 | 12/01/2016 | 12/31/2017 | 575.00 | DISCOUNT | 0.00 | (32.50) | 617.50 | 0.00 | 41.85 |
| | | | | | | | | | | RENT | 650.00 | 0.00 | | | |
| 102 | 1X1A | N/A | 662 | Occupied | Benavidez, Augusta | 02/19/2016 | 02/14/2016 | 02/13/2018 | 475.00 | DISCOUNT | 0.00 | (25.00) | 476.00 | 200.00 | 41.85 |
| | | | | | | | | | | RENT | 501.00 | 0.00 | | | |
| 103 | 2X1B | N/A | 900 | Occupied | Chiantaretto, Zane | 11/17/2016 | 11/17/2016 | 12/16/2017 | 575.00 | RENT | 650.00 | 0.00 | 650.00 | 0.00 | 28.05 |
| 104 | 1X1A | N/A | 662 | Occupied | Norman, Mitchell | 09/17/2016 | 09/17/2016 | 10/16/2017 | 475.00 | RENT | 575.00 | 0.00 | 575.00 | 510.00 | 28.05 |
| 105 | 2x1B LR | N/A | 900 | Occupied | Villarreal, Matthew | 07/05/2016 | 07/05/2016 | 07/18/2017 | 586.00 | DISCOUNT | 0.00 | (33.00) | 642.00 | 0.00 | 41.80 |
| | | | | | | | | | | RENT | 650.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 25.00 | | | |
| 106 | 1X1A | N/A | 662 | Occupied | Kamali, Maaryam | 06/04/2010 | 10/24/2016 | 07/23/2017 | 486.00 | RENT | 505.00 | 0.00 | 505.00 | 150.00 | 28.05 |
| 107 | 2X1B | N/A | 900 | Occupied | Gilbert, Stephen | 09/15/2012 | 11/26/2016 | 12/24/2017 | 586.00 | PETFEE | 0.00 | 50.00 | 700.00 | 200.00 | 28.05 |
| | | | | | | | | | | RENT | 650.00 | 0.00 | | | |
| 108 | 1x1A LR | N/A | 662 | Occupied | Adams, Stephan | 11/03/2016 | 11/03/2016 | 12/02/2017 | 486.00 | RENT | 580.00 | 0.00 | 605.00 | 250.00 | 28.05 |
| | | | | | | | | | | UPGRADE | 0.00 | 25.00 | | | |
| 109 | 2X1B | N/A | 900 | Occupied | Calhoun, Mikayla | 09/02/2016 | 09/02/2016 | 09/30/2017 | 586.00 | DISCOUNT | 0.00 | (33.00) | 617.00 | 0.00 | (617.00) |
| | | | | | | | | | | RENT | 650.00 | 0.00 | | | |
| 110 | 1X1A | N/A | 662 | Occupied | Kaplan, Michelle | 02/26/2016 | 03/26/2017 | 04/25/2018 | 486.00 | RENT | 495.00 | 0.00 | 495.00 | 0.00 | 25.41 |
| 111 | 2X1B | N/A | 900 | Vacant-Leased | VACANT | | | | 586.00 | | 0.00 * | 0.00 * | | | |
| | | N/A | | Applicant | Felton, Kimberly | 04/14/2017 | 04/14/2017 | 04/13/2018 | | RENT | 585.00 * | 0.00 * | 585.00 * | | 99.00 |
| 112 | 1X1A | N/A | 662 | Occupied | Seydel, James | 10/12/2007 | 11/08/2016 | 11/30/2017 | 486.00 | RENT | 586.00 | 0.00 | 586.00 | 200.00 | 28.05 |
| 113 | 1X1A | N/A | 662 | Occupied | Celestin, Elijah | 02/11/2016 | 08/09/2016 | 08/08/2017 | 475.00 | RENT | 540.00 | 0.00 | 540.00 | 0.00 | 28.33 |
| 114 | 2x1B LR | N/A | 900 | Occupied | Gavina, Kinzey | 03/24/2017 | 03/24/2017 | 09/23/2018 | 575.00 | RENT | 575.00 | 0.00 | 600.00 | 0.00 | (1.00) |
| | | | | | | | | | | UPGRADE | 0.00 | 25.00 | | | |
| 115 | 1X1A | N/A | 662 | Occupied-NTV | Nunez, Angela | 04/06/2016 05/20/2017 | 04/06/2016 | 05/05/2017 | 475.00 | RENT | 550.00 | 0.00 | 550.00 | 0.00 | 41.85 |
| 116 | 2X1B | N/A | 900 | Vacant | VACANT | | | | 575.00 | | 0.00 * | 0.00 * | | | |
| 117 | 1X1A | N/A | 662 | Occupied | Downs, Miranda | 02/17/2017 | 02/17/2017 | 03/16/2018 | 486.00 | RENT | 450.00 | 0.00 | 450.00 | 0.00 | 22.63 |
| 118 | 2x1B LR | N/A | 900 | Occupied | Fernandez, Aubrey | 03/03/2017 | 03/03/2017 | 09/01/2017 | 586.00 | | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 119 | 1X1A | N/A | 662 | Occupied | Brandes, Holly | 03/16/2013 | 03/03/2016 | 04/02/2017 | 496.00 | MTOM | 0.00 | 100.00 | 664.00 | 0.00 | 17.33 |
| | | | | | | | | | | RENT | 564.00 | 0.00 | | | |
| | | N/A | | Pending renewal | Brandes, Holly | 03/16/2013 | 04/03/2017 | 05/02/2018 | | RENT | 549.00 * | 0.00 * | 549.00 * | | 0.00 |
| 120 | 2x1B LR | N/A | 900 | Occupied | Cook, Tracy | 02/24/2017 | 02/24/2017 | 03/23/2018 | 596.00 | | 0.00 | 0.00 | 0.00 | 0.00 | (5.61) |

**Details**

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|------|-----------|------------------|-----|-------------------|------|------------------|-------------|-----------|----------------|------------|------------|------------------------|---------------|-------------|---------|
| 121 | 1x1A LR | N/A | 662 | Occupied | Akhtar, Muhammad | 08/08/2016 | 08/08/2016 | 08/07/2017 | 486.00 | DISCOUNT | 0.00 | (31.25) | 593.75 | 0.00 | 21.05 |
| | | | | | | | | | | RENT | 600.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 25.00 | | | |
| 122 | 2X1B | N/A | 900 | Occupied | Sharpee, Elizabeth | 01/25/2016 | 02/23/2017 | 02/22/2018 | 586.00 | RENT | 586.00 | 0.00 | 586.00 | 0.00 | (92.95) |
| 123 | 1X1A | N/A | 662 | Admin/Down | VACANT | | | | 496.00 | | 0.00 * | 0.00 * | | | |
| 124 | 2x1B LR | N/A | 900 | Occupied | Tellez, Bianca | 01/31/2017 | 01/31/2017 | 02/27/2018 | 596.00 | RENT | 575.00 | 0.00 | 575.00 | 0.00 | 38.36 |
| 201 | 2X1B | N/A | 900 | Occupied | Watson, Chasity | 01/27/2017 | 01/27/2017 | 01/26/2018 | 575.00 | RENT | 550.00 | 0.00 | 550.00 | 0.00 | 42.10 |
| 202 | 1X1A | N/A | 662 | Occupied | Rush, Linda | 02/28/2017 | 02/28/2017 | 03/27/2018 | 475.00 | RENT | 450.00 | 0.00 | 450.00 | 0.00 | 0.00 |
| 203 | 2x1B LR | N/A | 900 | Occupied | Hernandez, Ivan | 02/17/2017 | 02/17/2017 | 03/19/2018 | 575.00 | CONC/SPECL | 0.00 | ###### | 0.00 | 0.00 | (46.94) |
| | | | | | | | | | | RENT | 650.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 25.00 | | | |
| 204 | 1X1A | N/A | 662 | Occupied | Foreman, Christopher | 07/10/2015 | 08/05/2016 | 08/04/2017 | 475.00 | PETFEE | 0.00 | 25.00 | 568.00 | 150.00 | 28.05 |
| | | | | | | | | | | RENT | 543.00 | | | | |
| 205 | 2X1B | N/A | 900 | Occupied | Flagler, DaVaughn | 09/28/2009 | 08/10/2016 | 08/09/2017 | 586.00 | RENT | 429.00 | 0.00 | 429.00 | 0.00 | (437.60) |
| 206 | 1x1A LR | N/A | 662 | Occupied | Selder, Ki`Airra | 05/27/2016 | 05/27/2016 | 06/25/2017 | 486.00 | RENT | 540.00 | 0.00 | 565.00 | 200.00 | 72.76 |
| | | | | | | | | | | UPGRADE | 0.00 | 25.00 | | | |
| 207 | 2x1B LR | N/A | 900 | Occupied | Henderson, Caleb | 07/01/2016 | 07/05/2016 | 07/31/2017 | 586.00 | RENT | 640.00 | 0.00 | 665.00 | 0.00 | 34.85 |
| | | | | | | | | | | UPGRADE | 0.00 | 25.00 | | | |
| 208 | 1X1A | N/A | 662 | Occupied | Campa, Adriana | 07/06/2015 | 07/01/2016 | 07/31/2017 | 486.00 | PETFEE | 0.00 | 25.00 | 579.00 | 200.00 | 27.53 |
| | | | | | | | | | | RENT | 554.00 | 0.00 | | | |
| 209 | 2X1B | N/A | 900 | Occupied | Grazier, Tommy | 10/24/2014 | 10/15/2016 | 11/14/2017 | 586.00 | RENT | 643.00 | 0.00 | 643.00 | 0.00 | 28.05 |
| 210 | 1x1A LR | N/A | 662 | Occupied | Hammons, David | 01/12/2017 | 01/12/2017 | 02/11/2018 | 486.00 | DISCOUNT | 0.00 | (30.00) | 575.00 | 250.00 | (4.85) |
| | | | | | | | | | | RENT | 580.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 25.00 | | | |
| 211 | 2X1B | N/A | 900 | Occupied | Ong, Michael | 08/31/2014 | 04/23/2016 | 04/22/2017 | 586.00 | RENT | 589.00 | 0.00 | 589.00 | 0.00 | (249.00) |
| 212 | 1X1A | N/A | 662 | Occupied | Shannon, Jasmine | 02/16/2017 | 02/16/2017 | 03/15/2018 | 486.00 | PETRENT | 0.00 | 25.00 | 475.00 | 0.00 | 21.82 |
| | | | | | | | | | | RENT | 450.00 | 0.00 | | | |
| 213 | 1x1A LR | N/A | 662 | Occupied | Penaloza, Jackeline | 02/17/2017 | 02/17/2017 | 03/16/2018 | 475.00 | RENT | 450.00 | 0.00 | 475.00 | 0.00 | 19.19 |
| | | | | | | | | | | UPGRADE | 0.00 | 25.00 | | | |

**Details**

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|------|-----------|------------------|-----|-------------------|------|------------------|-------------|-----------|----------------|------------|------------|------------------------|---------------|-------------|---------|
| 214 | 2X1B | N/A | 900 | Vacant | VACANT | | | | 575.00 | | 0.00 * | 0.00 * | | | |
| 215 | 1X1A | N/A | 662 | Occupied | Savage, James | 02/28/2017 | 02/28/2017 | 02/27/2018 | 475.00 | RENT | 450.00 | 0.00 | 450.00 | 0.00 | (0.07) |
| 216 | 2X1B | N/A | 900 | Occupied | Mapendo, Olga | 01/06/2017 | 01/06/2017 | 02/05/2018 | 575.00 | RENT | 650.00 | 0.00 | 650.00 | 0.00 | 72.82 |
| 217 | 1X1A | N/A | 662 | Occupied | Perez, Myranda | 06/06/2016 | 06/06/2016 | 07/09/2017 | 486.00 | PETRENT | 0.00 | 25.00 | 590.00 | 200.00 | (590.00) |

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | RENT | 565.00 | 0.00 | | | |
| 218 | 2X1B | N/A | 900 | Occupied | Young, Carolyn | 08/07/2009 | 08/02/2016 | 08/01/2017 | 586.00 | RENT | 654.00 | 0.00 | 654.00 | 150.00 | 42.56 |
| 219 | 1X1A | N/A | 662 | Vacant-Leased | VACANT | | | | 496.00 | | 0.00 * | 0.00 * | | | |
| | | N/A | | Applicant | Vargas, Maria | 04/07/2017 | 04/07/2017 | 05/06/2018 | | RENT | 500.00 * | 0.00 * | 500.00 * | 0.00 | 0.00 |
| 220 | 2X1B | N/A | 900 | Occupied | Khamisi, Hani | 02/27/2015 | 02/18/2017 | 02/17/2018 | 596.00 | RENT | 640.00 | 0.00 | 640.00 | 0.00 | 28.05 |
| 221 | 1X1A | N/A | 662 | Occupied | Larsen, Virginia | 06/24/2011 | 12/29/2016 | 12/28/2017 | 486.00 | RENT | 568.00 | 0.00 | 568.00 | 0.00 | 28.05 |
| 222 | 2X1B | N/A | 900 | Occupied | Ma, Suqin | 01/16/2016 | 02/10/2017 | 08/09/2017 | 586.00 | RENT | 600.00 | 0.00 | 600.00 | 0.00 | 28.05 |
| 223 | 1X1A | N/A | 662 | Vacant-Leased | VACANT | | | | 496.00 | | 0.00 * | 0.00 * | | | |
| | | N/A | | Applicant | Platt, Hannah | 04/07/2017 | 04/07/2017 | 05/06/2018 | | RENT | 500.00 * | 0.00 * | 500.00 * | 0.00 | 0.00 |
| 224 | 2X1B | N/A | 900 | Vacant-Leased | VACANT | | | | 596.00 | | 0.00 * | 0.00 * | | | |
| | | N/A | | Applicant | Gupton, Kaileh | 04/14/2017 | 04/14/2017 | 12/13/2017 | | RENT | 575.00 * | 0.00 * | 575.00 * | 0.00 | 0.00 |
| 301 | 2X1B | N/A | 900 | Occupied | Kiehl, Larry | 08/03/2015 | 07/29/2016 | 08/28/2017 | 575.00 | RENT | 715.00 | 0.00 | 725.00 | 0.00 | 40.88 |
| | | | | | | | | | | TRASH | 0.00 | 10.00 | | | |
| 302 | 1X1A | N/A | 662 | Occupied | Malka, Taylor | 12/11/2015 | 01/05/2017 | 01/04/2018 | 475.00 | RENT | 525.00 | 0.00 | 525.00 | 0.00 | 28.05 |
| 303 | 2X1B | N/A | 900 | Occupied | Vigil, Sydney | 02/11/2016 | 03/07/2017 | 09/06/2017 | 575.00 | RENT | 565.00 | 0.00 | 565.00 | 500.00 | 66.85 |
| 304 | 1X1A | N/A | 662 | Admin/Down | VACANT | | | | 475.00 | | 0.00 * | 0.00 * | | | |
| 305 | 2X1B | N/A | 900 | Vacant | VACANT | | | | 586.00 | | 0.00 * | 0.00 * | | | |
| 306 | 1X1A | N/A | 662 | Vacant-Leased | VACANT | | | | 486.00 | | 0.00 * | 0.00 * | | | |
| | | N/A | | Applicant | Treadway, Matthew | 03/31/2017 | 03/31/2017 | 03/30/2018 | | RENT | 500.00 * | 0.00 * | 500.00 * | 0.00 | 0.00 |
| 307 | 2X1B | N/A | 900 | Occupied | Dickson, Dedrick | 11/17/2015 | 12/12/2016 | 01/11/2018 | 586.00 | RENT | 672.00 | 0.00 | 672.00 | 0.00 | 28.05 |
| 308 | 1X1A | N/A | 662 | Vacant-Leased | VACANT | | | | 486.00 | | 0.00 * | 0.00 * | | | |
| | | N/A | | Applicant | Davis, Abagal | 03/31/2017 | 03/31/2017 | 03/30/2018 | | RENT | 500.00 * | 0.00 * | 500.00 * | 0.00 | 0.00 |
| 309 | 2x1B LR | N/A | 900 | Occupied | Villalobos, Martha | 02/10/2017 | 02/10/2017 | 03/09/2018 | 586.00 | RENT | 550.00 | 0.00 | 575.00 | 0.00 | 30.74 |
| | | | | | | | | | | UPGRADE | 0.00 | 25.00 | | | |
| 310 | 1X1A | N/A | 662 | Occupied | Kalfic-Franjkic, Jozepka | 02/28/2009 | 08/11/2016 | 08/10/2017 | 486.00 | RENT | 533.00 | 0.00 | 533.00 | 0.00 | 41.85 |
| 311 | 2x1B LR | N/A | 900 | Occupied | Blackburn, Jennifer | 06/09/2016 | 06/09/2016 | 06/30/2017 | 586.00 | RENT | 640.00 | 0.00 | 665.00 | 550.00 | 21.05 |
| | | | | | | | | | | UPGRADE | 0.00 | 25.00 | | | |
| 312 | 1X1A | N/A | 662 | Occupied | Pickens, Tori | 08/01/2016 | 08/01/2016 | 08/31/2017 | 486.00 | RENT | 550.00 | 0.00 | 550.00 | 0.00 | 25.94 |
| 313 | 1x1A LR | N/A | 662 | Occupied | York, Kayden | 01/27/2017 | 01/27/2017 | 02/26/2018 | 475.00 | | 0.00 | 0.00 | 0.00 | 0.00 | 29.93 |
| 314 | 2x1B LR | N/A | 900 | Occupied | Wingate, Holly | 01/20/2017 | 01/20/2017 | 02/19/2018 | 575.00 | RENT | 550.00 | 0.00 | 575.00 | 0.00 | 40.98 |
| | | | | | | | | | | UPGRADE | 0.00 | 25.00 | | | |
| 315 | 1X1A | N/A | 662 | Vacant-Leased | VACANT | | | | 475.00 | | 0.00 * | 0.00 * | | | |
| | | N/A | | Applicant | Perales, Payton | 03/31/2017 | 03/31/2017 | 03/30/2018 | | RENT | 500.00 * | 0.00 * | 500.00 * | 0.00 | 0.00 |
| 316 | 2x1B LR | N/A | 900 | Occupied | Lemons, Tori | 03/20/2017 | 03/20/2017 | 03/19/2018 | 575.00 | RENT | 600.00 | 0.00 | 600.00 | 0.00 | 0.00 |
| 317 | 1X1A | N/A | 662 | Occupied-NTV | Philip, Tiffany | 07/31/2015 05/31/2017 | 08/26/2016 | 05/31/2017 | 486.00 | RENT | 589.00 | 0.00 | 589.00 | 0.00 | 28.05 |
| 318 | 2X1B | N/A | 900 | Occupied | Williams, Kenesha | 12/15/2016 | 12/15/2016 | 01/14/2018 | 586.00 | RENT | 675.00 | 0.00 | 675.00 | 0.00 | 41.85 |
| 319 | 1X1A | N/A | 662 | Occupied | Apodaca, Erika | 03/11/2016 | 03/07/2017 | 03/11/2018 | 496.00 | PETRENT | 0.00 | 25.00 | 553.00 | 450.00 | 28.05 |
| | | | | | | | | | | RENT | 528.00 | 0.00 | | | |

Details

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 320 | 2X1B | N/A | 900 | Occupied | Petmecky, Rachel | 07/15/2016 | 07/15/2016 | 07/14/2017 | 596.00 | RENT | 650.00 | 0.00 | 650.00 | 450.00 | 28.05 |
| 321 | 1X1A | N/A | 662 | Occupied | Carpenter, Ashley | 03/30/2013 | 03/17/2016 | 04/11/2017 | 486.00 | RENT | 536.00 | 0.00 | 536.00 | 0.00 | 41.85 |
|  |  | N/A |  | Pending renewal | Carpenter, Ashley | 03/30/2013 | 04/12/2017 | 04/11/2018 |  | RENT | 536.00 * | 0.00 * | 536.00 * | 0.00 | 0.00 |
| 322 | 2X1B | N/A | 900 | Occupied | Williams, Tommy | 01/01/2016 | 01/26/2017 | 01/25/2018 | 586.00 | RENT | 600.00 | 0.00 | 600.00 | 0.00 | 35.85 |
| 323 | 1x1A LR | N/A | 662 | Occupied | Silvertooth, Shelby | 02/17/2017 | 02/17/2017 | 03/16/2018 | 496.00 | RENT | 450.00 | 0.00 | 475.00 | 0.00 | (475.00) |
|  |  |  |  |  |  |  |  |  |  | UPGRADE | 0.00 | 25.00 |  |  |  |
| 324 | 2X1B | N/A | 900 | Occupied | Hunt, Aaron | 02/26/2005 | 08/15/2016 | 08/14/2017 | 596.00 | RENT | 661.00 | 0.00 | 661.00 | 200.00 | 28.05 |
| 401 | 2X1B | N/A | 900 | Occupied | Bednorz, Christopher | 02/01/2016 | 02/02/2017 | 02/01/2018 | 575.00 | RENT | 576.00 | 0.00 | 576.00 | 0.00 | 26.52 |
| 402 | 1X1A | N/A | 662 | Occupied | Martin, Shuntae | 03/01/2017 | 03/01/2016 | 03/31/2018 | 475.00 | RENT | 450.00 | 0.00 | 450.00 | 0.00 | 0.00 |
| 403 | 2X1B | N/A | 900 | Vacant-Leased | VACANT |  |  |  | 575.00 |  | 0.00 * | 0.00 * |  |  |  |
|  |  | N/A |  | Applicant | Bishop, Luke | 04/21/2017 | 04/21/2017 | 05/20/2018 |  | RENT | 600.00 * | 0.00 * | 600.00 * | 0.00 | 149.00 |
| 404 | 1X1A | N/A | 662 | Occupied | Oliver, Michael | 01/07/2004 | 10/12/2016 | 11/11/2017 | 475.00 | RENT | 555.00 | 0.00 | 555.00 | 150.00 | 28.05 |
| 405 | 2X1B | N/A | 900 | Occupied | Opdyke, Lisa | 09/16/2011 | 12/23/2016 | 01/22/2018 | 586.00 | PETFEE | 0.00 | 25.00 | 693.00 | 0.00 | 28.05 |
|  |  |  |  |  |  |  |  |  |  | RENT | 668.00 | 0.00 |  |  |  |
| 406 | 1X1A | N/A | 662 | Occupied | Arazil, Maryam | 09/07/2016 | 09/07/2016 | 10/06/2017 | 486.00 | RENT | 575.00 | 0.00 | 575.00 | 0.00 | 28.05 |
| 407 | 2X1B | N/A | 900 | Occupied | Duran, Elsa | 04/17/2015 | 05/12/2016 | 06/11/2017 | 586.00 | RENT | 591.00 | 0.00 | 591.00 | 0.00 | 41.85 |
| 408 | 1X1A | N/A | 662 | Occupied | Deleon, Linda | 10/19/2013 | 12/05/2016 | 01/04/2018 | 486.00 | RENT | 561.00 | 0.00 | 561.00 | 0.00 | (561.95) |
| 409 | 2X1B | N/A | 900 | Occupied | Perez, Alexandria | 12/31/2014 | 08/03/2016 | 07/31/2017 | 586.00 | RENT | 687.00 | 0.00 | 687.00 | 0.00 | 41.84 |
| 410 | 1X1A | N/A | 662 | Occupied-NTVL | Willson, Allison | 08/17/2015 03/31/2017 | 08/10/2016 | 08/09/2017 | 486.00 | RENT | 551.00 | 0.00 | 551.00 | 0.00 | 28.05 |

**Details**

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  |  | N/A |  | Applicant | Allen, Landon | 04/07/2017 | 04/07/2017 | 04/06/2018 |  | RENT | 475.00 * | 0.00 * | 475.00 * | 0.00 | 0.00 |
| 411 | 2X1B | N/A | 900 | Occupied | Sauceda, Melissa | 12/11/2015 | 12/06/2016 | 05/05/2017 | 586.00 | RENT | 633.00 | 0.00 | 633.00 | 0.00 | 41.62 |
| 412 | 1X1A | N/A | 662 | Occupied | Miller, Jim | 01/15/1998 | 03/17/2017 | 09/30/2017 | 486.00 | RENT | 595.00 | 0.00 | 595.00 | 120.00 | 28.05 |
| 413 | 1x1A LR | N/A | 662 | Occupied | Whipkey, Lacy | 05/06/2016 | 05/06/2016 | 06/05/2017 | 475.00 | DISCOUNT | 0.00 | (55.00) | 495.00 | 350.00 | 28.05 |
|  |  |  |  |  |  |  |  |  |  | RENT | 525.00 | 0.00 |  |  |  |
|  |  |  |  |  |  |  |  |  |  | UPGRADE | 0.00 | 25.00 |  |  |  |
| 414 | 2X1B | N/A | 900 | Occupied | Pinkerton, Robert | 10/20/2000 | 07/14/2016 | 07/13/2017 | 575.00 | RENT | 635.00 | 0.00 | 635.00 | 200.00 | 28.05 |
| 415 | 1X1A | N/A | 662 | Occupied | Austin, Shanta | 03/24/2017 | 03/24/2017 | 06/23/2017 | 475.00 | RENT | 575.00 | 0.00 | 575.00 | 0.00 | (1,591.00) |
| 416 | 2x1B LR | N/A | 900 | Vacant | VACANT |  |  |  | 575.00 |  | 0.00 * | 0.00 * |  |  |  |
| 417 | 1X1A | N/A | 662 | Occupied | Mathis, Katelyn | 10/31/2014 | 10/22/2016 | 11/21/2017 | 486.00 | RENT | 520.00 | 0.00 | 520.00 | 0.00 | 21.52 |
| 418 | 2X1B | N/A | 900 | Vacant | VACANT |  |  |  | 586.00 |  | 0.00 * | 0.00 * |  |  |  |
| 419 | 1x1A LR | N/A | 662 | Occupied | Webb, Justin | 06/03/2016 | 06/03/2016 | 07/02/2017 | 496.00 | DISCOUNT | 0.00 | (28.25) | 536.75 | 0.00 | 28.05 |
|  |  |  |  |  |  |  |  |  |  | RENT | 540.00 | 0.00 |  |  |  |
|  |  |  |  |  |  |  |  |  |  | UPGRADE | 0.00 | 25.00 |  |  |  |
| 420 | 2X1B | N/A | 900 | Occupied | Mann, Andrew | 01/09/2016 | 02/08/2017 | 02/07/2018 | 596.00 | RENT | 588.00 | 0.00 | 588.00 | 500.00 | 94.07 |
| 421 | 1X1A | N/A | 662 | Occupied | Zarate-Sifuentes, Jose | 08/04/2015 | 07/29/2016 | 07/28/2017 | 486.00 | RENT | 555.00 | 0.00 | 565.00 | 0.00 | 28.05 |
|  |  |  |  |  |  |  |  |  |  | TRASH | 0.00 | 10.00 |  |  |  |

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 422 | 2X1B | N/A | 900 | Occupied-NTV | Vizcarra, Jose | 02/07/2014 03/30/2017 | 02/23/2016 | 09/22/2017 | 586.00 | MTOM | | 100.00 | 739.00 | 0.00 | 17.85 |
| | | | | | | | | | | RENT | 639.00 | 0.00 | | | |
| 423 | 1X1A | N/A | 662 | Occupied | Kappes, Karina | 01/23/2015 | 03/17/2017 | 09/16/2017 | 496.00 | RENT | 659.00 | 0.00 | 659.00 | 0.00 | (19.95) |
| 424 | 2X1B | N/A | 900 | Occupied | Martinez, Adelaida | 02/22/2017 | 03/16/2017 | 04/15/2018 | 596.00 | RENT | 578.00 | 0.00 | 578.00 | 0.00 | 28.05 |
| 501 | 2X1B | N/A | 900 | Occupied | Kual, Anni | 03/01/2017 | 03/01/2017 | 03/31/2018 | 575.00 | RENT | 575.00 | 0.00 | 575.00 | 0.00 | 0.00 |
| 502 | 1X1A | N/A | 662 | Occupied | Carter, Kenzie | 01/26/2013 | 09/02/2016 | 06/01/2017 | 475.00 | RENT | 574.00 | 0.00 | 574.00 | 0.00 | 28.05 |
| 503 | 2x1B LR | N/A | 900 | Occupied | Click, Lauren | 06/13/2016 | 06/13/2016 | 07/29/2017 | 575.00 | RENT | 625.00 | 0.00 | 650.00 | 300.00 | 45.44 |
| | | | | | | | | | | UPGRADE | 0.00 | 25.00 | | | |
| 504 | 1X1A | N/A | 662 | Occupied | Ortega, Sylvia | 09/07/2010 | 03/15/2016 | 03/10/2017 | 475.00 | MTOM | | 100.00 | 643.00 | 0.00 | (643.00) |
| | | | | | | | | | | RENT | 543.00 | 0.00 | | | |
| 505 | 2X1B | N/A | 900 | Occupied-NTV | Aragon, Lee | 06/26/2015 05/20/2017 | 07/21/2016 | 05/20/2017 | 586.00 | RENT | 625.00 | 0.00 | 625.00 | 0.00 | 28.05 |
| 506 | 1x1A LR | N/A | 662 | Occupied | Needham, Joshua | 07/08/2016 | 07/08/2016 | 07/31/2017 | 486.00 | RENT | 540.00 | 0.00 | 565.00 | 250.00 | 21.05 |
| | | | | | | | | | | UPGRADE | 0.00 | 25.00 | | | |
| 507 | 2X1B | N/A | 900 | Occupied | Zadegan, Elham | 12/27/2016 | 12/27/2016 | 01/26/2018 | 586.00 | RENT | 650.00 | 0.00 | 650.00 | 0.00 | 55.64 |

**Details**

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 508 | 2x1B LR | N/A | 900 | Occupied | O'Brien, Blayke | 03/24/2017 | 03/24/2017 | 04/23/2018 | 586.00 | RENT | 450.00 | 0.00 | 475.00 | 0.00 | 0.00 |
| | | | | | | | | | | UPGRADE | 0.00 | 25.00 | | | |
| 509 | 2x1B LR | N/A | 900 | Occupied-NTV | Allen, Jonathan | 07/08/2016 03/31/2017 | 07/08/2016 | 07/07/2017 | 586.00 | RENT | 640.00 | 0.00 | 665.00 | 0.00 | (517.79) |
| | | | | | | | | | | UPGRADE | 0.00 | 25.00 | | | |
| 510 | 1x1A LR | N/A | 662 | Occupied | Casimiro, Pauline | 01/26/2017 | 01/26/2017 | 02/25/2018 | 486.00 | | 0.00 | 0.00 | 0.00 | 0.00 | 68.67 |
| 511 | 2x1B LR | N/A | 900 | Occupied | Richardson, Rebecca | 03/10/2017 | 03/10/2017 | 03/09/2018 | 586.00 | RENT | 575.00 | 0.00 | 600.00 | 0.00 | 0.00 |
| | | | | | | | | | | UPGRADE | 0.00 | 25.00 | | | |
| 512 | 1x1A LR | N/A | 662 | Occupied | Martinez, Marcus | 07/27/2016 | 07/27/2016 | 07/26/2017 | 486.00 | RENT | 528.00 | 0.00 | 553.00 | 0.00 | 32.80 |
| | | | | | | | | | | UPGRADE | 0.00 | 25.00 | | | |
| 513 | 1X1A | N/A | 662 | Occupied | Coil, Kaylene | 09/29/2015 | 10/23/2017 | 11/22/2017 | 475.00 | PETFEE | 0.00 | 25.00 | 562.00 | 700.00 | 28.05 |
| | | | | | | | | | | RENT | 537.00 | 0.00 | | | |
| 514 | 2x1B LR | N/A | 900 | Occupied | Rains, Jaylee | 10/04/2016 | 10/04/2016 | 11/03/2017 | 575.00 | PETRENT | 0.00 | 25.00 | 700.00 | 250.00 | 41.85 |
| | | | | | | | | | | RENT | 650.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 25.00 | | | |
| 515 | 1X1A | N/A | 662 | Vacant-Leased | VACANT | | | | 475.00 | | 0.00 * | 0.00 * | | | |
| | | N/A | | Applicant | Harlan, Robert | 03/30/2017 | 03/30/2017 | 04/29/2018 | | RENT | 450.00 * | 0.00 * | 450.00 * | 0.00 | (1.00) |
| 516 | 2X1B | N/A | 900 | Occupied | Branson, Stephen | 07/14/2011 | 10/14/2016 | 11/13/2017 | 575.00 | RENT | 696.00 | 0.00 | 696.00 | 0.00 | 51.44 |
| 517 | 1X1A | N/A | 662 | Admin/Down | VACANT | | | | 486.00 | | 0.00 * | 0.00 * | | | |
| 518 | 2x1B LR | N/A | 900 | Occupied | Blankenship, Jeannine | 03/04/2016 | 03/04/2016 | 04/03/2018 | 586.00 | RENT | 543.00 | 0.00 | 568.00 | 0.00 | 34.85 |
| | | | | | | | | | | UPGRADE | 0.00 | 25.00 | | | |
| 519 | 1x1A LR | N/A | 662 | Occupied | Flood, Cole | 08/25/2016 | 08/25/2016 | 08/31/2017 | 496.00 | PETRENT | 0.00 | 25.00 | 625.00 | 250.00 | 41.85 |
| | | | | | | | | | | RENT | 575.00 | 0.00 | | | |

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | UPGRADE | 0.00 | 25.00 | | | |
| 520 | 2X1B | N/A | 900 | Occupied | York, Diana | 07/17/2009 12/08/2016 | 01/07/2018 | | 596.00 | RENT | 674.00 | 0.00 | 674.00 | 0.00 | 28.05 |
| 521 | 1X1A | N/A | 662 | Occupied | Smith, Morgan | 11/01/2014 05/25/2016 | 05/24/2017 | | 486.00 | RENT | 582.00 | 0.00 | 582.00 | 0.00 | 86.98 |
| 522 | 2X1B LR | N/A | 900 | Occupied | Pierce, Rheannon | 03/17/2017 03/17/2017 | 04/16/2018 | | 586.00 | RENT | 600.00 | 0.00 | 600.00 | 0.00 | 0.00 |
| 523 | 1X1A | N/A | 662 | Occupied | Lane, Coby | 01/26/2017 01/26/2017 | 02/25/2018 | | 496.00 | RENT | 450.00 | 0.00 | 450.00 | 0.00 | 39.67 |
| 524 | 2x1B LR | N/A | 900 | Vacant | VACANT | | | | 596.00 | | 0.00 * | 0.00 * | | | |
| 601 | 2X1B | N/A | 900 | Admin/Down | VACANT | | | | 575.00 | | 0.00 * | 0.00 * | | | |
| 602 | 1X1A | N/A | 662 | Admin/Down | VACANT | | | | 475.00 | | 0.00 * | 0.00 * | | | |
| 603 | 2X1B | N/A | 900 | Occupied | Owens, Newton | 12/31/1997 03/13/2016 | 04/07/2017 | | 575.00 | RENT | 680.00 | 0.00 | 680.00 | 150.00 | 28.05 |

**Details**

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 604 | 1X1A | N/A | 662 | Occupied | Carr-Marshall, Trevor | 03/08/2017 | 03/08/2017 | 03/07/2018 | 475.00 | RENT | 475.00 | 0.00 | 475.00 | 0.00 | 0.00 |
| 605 | 2X1B | N/A | 900 | Vacant | VACANT | | | | 586.00 | | 0.00 * | 0.00 * | | | |
| 606 | 1X1A | N/A | 662 | Occupied | Tinucci, Laura | 11/17/2016 | 11/17/2016 | 12/16/2017 | 486.00 | DISCOUNT | 0.00 | (58.00) | 517.00 | 0.00 | 28.05 |
| | | | | | | | | | | RENT | 575.00 | 0.00 | | | |
| 607 | 2x1B LR | N/A | 900 | Occupied | McWest, Malea | 07/16/2016 | 07/16/2016 | 07/15/2017 | 586.00 | PETRENT | 0.00 | 25.00 | 690.00 | 200.00 | 41.85 |
| | | | | | | | | | | RENT | 640.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 25.00 | | | |
| 608 | 1x1A LR | N/A | 662 | Occupied | Mosier, Glenda | 06/15/2016 | 06/15/2016 | 05/14/2017 | 486.00 | RENT | 540.00 | 0.00 | 565.00 | 0.00 | 21.05 |
| | | | | | | | | | | UPGRADE | 0.00 | 25.00 | | | |
| | | N/A | | Pending renewal | Mosier, Glenda | 06/15/2016 | 05/15/2017 | 11/14/2017 | | RENT | 565.00 * | 0.00 * | 590.00 * | 0.00 | 0.00 |
| | | | | | | | | | | UPGRADE | 0.00 * | 25.00 * | | | |
| 609 | 2X1B | N/A | 900 | Occupied-NTV | Velo-Limas, Abigail | 09/26/2014 04/16/2017 | 10/17/2016 | 04/16/2017 | 586.00 | RENT | 661.00 | 0.00 | 661.00 | 0.00 | 41.85 |
| 610 | 1x1A LR | N/A | 662 | Occupied | Hunt, Karina | 02/01/2017 | 02/01/2017 | 02/28/2018 | 486.00 | RENT | 450.00 | 0.00 | 475.00 | 0.00 | 27.90 |
| | | | | | | | | | | UPGRADE | 0.00 | 25.00 | | | |
| 611 | 2X1B | N/A | 900 | Vacant-Leased | VACANT | | | | 586.00 | | 0.00 * | 0.00 * | | | |
| | | N/A | | Applicant | Butera, Rea | 04/05/2017 | 04/05/2017 | 04/04/2018 | | RENT | 575.00 * | 0.00 * | 575.00 * | 0.00 | 0.00 |
| 612 | 1X1A | N/A | 662 | Occupied | Rodriguez, Christian | 10/15/2011 | 07/25/2016 | 07/24/2017 | 486.00 | RENT | 565.00 | 0.00 | 565.00 | 0.00 | 28.05 |
| 613 | 1X1A | N/A | 662 | Occupied | Charles, Wilmer | 02/15/2017 | 02/15/2017 | 07/14/2017 | 475.00 | RENT | 450.00 | 0.00 | 450.00 | 0.00 | 24.23 |
| 614 | 2x1B LR | N/A | 900 | Occupied | Narr, Jerica | 03/07/2017 | 03/08/2017 | 03/07/2018 | 575.00 | | 0.00 | 0.00 | 0.00 | 0.00 | (34.17) |
| 615 | 1X1A | N/A | 662 | Occupied | Patterson, Akaisha | 02/24/2017 | 02/24/2017 | 03/26/2018 | 475.00 | RENT | 450.00 | 0.00 | 450.00 | 0.00 | (13.36) |
| 616 | 2x1B LR | N/A | 900 | Occupied | Cameron, Marc | 06/13/2016 | 06/13/2016 | 06/13/2017 | 575.00 | RENT | 640.00 | 0.00 | 665.00 | 250.00 | 42.07 |
| | | | | | | | | | | UPGRADE | 0.00 | 25.00 | | | |
| 617 | 1x1A LR | N/A | 662 | Occupied | DeLeon, Alyson | 03/10/2017 | 03/10/2017 | 03/09/2018 | 486.00 | RENT | 450.00 | 0.00 | 475.00 | 0.00 | 0.00 |
| | | | | | | | | | | UPGRADE | 0.00 | 25.00 | | | |
| 618 | 2x1B LR | N/A | 900 | Occupied | Rogacki, Stephan | 12/02/2016 | 12/02/2016 | 01/02/2018 | 586.00 | DISCOUNT | 0.00 | (33.75) | 641.25 | 0.00 | 48.64 |
| | | | | | | | | | | RENT | 650.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 25.00 | | | |
| 619 | 1X1A | N/A | 662 | Occupied | Khamisi, Bahman | 07/03/2014 | 05/26/2016 | 05/25/2017 | 496.00 | RENT | 536.00 | 0.00 | 536.00 | 0.00 | 35.80 |

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 620 | 2X1B | N/A | 900 | Occupied | Pelfrey, John | 04/01/2016 | 08/12/2016 | 08/11/2017 | 596.00 | RENT | 636.00 | 0.00 | 636.00 | 0.00 | 28.05 |
| 621 | 1X1A | N/A | 662 | Occupied | Glavin, Walker | 10/24/2016 | 10/24/2016 | 11/23/2017 | 486.00 | RENT | 585.00 | 0.00 | 585.00 | 0.00 | 28.05 |

**Details**

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 622 | 2X1B | N/A | 900 | Occupied | Camacho, Lysette | 03/03/2016 | 03/01/2017 | 05/31/2017 | 586.00 | RENT | 581.00 | 0.00 | 581.00 | 0.00 | 46.00 |
| 623 | 1x1A LR | N/A | 662 | Occupied | Damadzadeh, Omid | 11/02/2015 | 10/10/2016 | 10/09/2017 | 496.00 | RENT | 525.00 | 0.00 | 550.00 | 0.00 | (550.00) |
|  |  |  |  |  |  |  |  |  |  | UPGRADE | 0.00 | 25.00 |  |  |  |
| 624 | 2X1B | N/A | 900 | Vacant | VACANT |  |  |  | 596.00 |  | 0.00 * | 0.00 * |  |  |  |
| **Totals:** |  |  |  |  |  |  |  |  | **76,996.00** |  | **66,693.00** | **360.25** | **67,053.25** | **8,480.00** |  |

Amt / SQFT: Market = 112,702 SQFT; Leased = 94,382 SQFT;

| Floorplan | # Units | Average SQFT | Average Market + Addl. | Market Amt / SQFT | Average Leased | Leased Amt / SQFT | Units Occupied | Occupancy % | Units Available |
|---|---|---|---|---|---|---|---|---|---|
| 1X1A | 54 | 662 | 483.20 | 0.73 | 534.66 | 0.81 | 44 | 81.48 | 2 |
| 1x1A LR | 17 | 662 | 486.41 | 0.73 | 463.12 | 0.70 | 17 | 100.00 | 0 |
| 2X1B | 49 | 900 | 584.47 | 0.65 | 627.68 | 0.70 | 38 | 77.55 | 9 |
| 2x1B LR | 24 | 900 | 583.13 | 0.65 | 520.14 | 0.58 | 22 | 91.67 | 3 |
| **Totals / Averages:** | **144** | **783** | **534.69** | **0.68** | **551.18** | **0.70** | **121** | **84.03** | **14** |

**Occupancy and Rents Summary for Current Date**

| Unit Status | Market + Addl. | # Units | Potential Rent |
|---|---|---|---|
| Occupied, no NTV | 60,766.00 | 114 | 62,438.00 |
| Occupied, NTV | 3,305.00 | 6 | 3,704.00 |
| Occupied NTV Leased | 486.00 | 1 | 551.00 |
| Vacant Leased | 5,257.00 | 10 | 5,257.00 |
| Admin/Down | 2,507.00 | 5 | 2,507.00 |
| Vacant Not Leased | 4,675.00 | 8 | 4,675.00 |
| **Totals:** | **76,996.00** | **144** | **79,132.00** |

**Summary Billing by Transaction Code for Current Date**

| Code | Amount |
|---|---|
| CONC/SPECL | (675.00) |
| DISCOUNT | (359.75) |
| MTOM | 300.00 |
| PETFEE | 150.00 |
| PETRENT | 150.00 |
| RENT | 66,693.00 |
| TRASH | 20.00 |
| UPGRADE | 775.00 |

**Total:**                    67,053.25

OneSite Rents v3.0

Atlas Apartment Holdings, LLC - Wind Tree

Page 1 of 17

03/29/2017  8:31:53PM

**RENT ROLL DETAIL**

mgt-521-003

As of 03/29/2017

**Parameters:** Properties - ALL;Show All Unit Designations or Filter by - ALL;Subjournals - ALL;Exclude Formers? - Yes;Sort by - Unit;Report Type - Details + Summary;Show Unit Rent as - Market + Addl.;

**Details**

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|------|-----------|------------------|-----|-------------------|------|------------------|-------------|-----------|----------------|------------|------------|------------------------|---------------|-------------|---------|
| 1A | 1X1A | N/A | 665 | Admin/Down | VACANT | | | | 492.00 | | 0.00 * | 0.00 * | | | |
| 1B | 1X1A | N/A | 665 | Occupied | Petty, Ashley | 03/05/2016 | 03/05/2016 | 03/30/2017 | 492.00 | CONC/SPECL | 0.00 | (87.00) | 477.00 | 0.00 | 45.59 |
| | | | | | | | | | | RENT | 564.00 | 0.00 | | | |
| | | N/A | | Pending renewal | Petty, Ashley | 03/05/2016 | 03/31/2017 | 03/30/2018 | | RENT | 564.00 * | 0.00 * | 564.00 * | 0.00 | 0.00 |
| 1C | 1X1A | N/A | 665 | Occupied-NTV | Pena, Mellisa | 01/23/2016 04/21/2017 | 02/17/2017 | 05/16/2017 | 492.00 | RENT | 584.00 | 0.00 | 584.00 | 200.00 | 0.00 |
| 1D | 1X1A | N/A | 665 | Occupied-NTV | Zagal, Robert | 07/21/2012 03/31/2017 | 07/04/2016 | 03/19/2017 | 492.00 | PETRENT | 0.00 | 25.00 | 621.00 | 200.00 | 26.81 |
| | | | | | | | | | | RENT | 596.00 | 0.00 | | | |
| 1E | 1X1A | N/A | 665 | Occupied | Guereca, Jessica | 06/30/2015 | 07/25/2016 | 07/24/2017 | 492.00 | CONC/SPECL | 0.00 | (29.00) | 570.00 | 200.00 | 49.59 |
| | | | | | | | | | | PETRENT | 0.00 | 20.00 | | | |
| | | | | | | | | | | RENT | 579.00 | 0.00 | | | |
| 1F | 1X1A | N/A | 665 | Occupied | Bashir, Mohsen | 12/13/2014 | 12/04/2016 | 12/03/2017 | 492.00 | PEST | 0.00 | 2.00 | 597.00 | 0.00 | 49.59 |
| | | | | | | | | | | RENT | 595.00 | 0.00 | | | |
| 1G | 1X1A | N/A | 665 | Occupied-NTV | Munoz, Michael | 02/25/2014 05/17/2017 | 02/25/2017 | 02/24/2018 | 492.00 | PEST | 0.00 | 2.00 | 494.00 | 0.00 | 52.78 |
| | | | | | | | | | | RENT | 492.00 | 0.00 | | | |
| 1H | 1X1A | N/A | 665 | Occupied | Larkan, Texas | 09/30/2016 | 09/30/2016 | 09/29/2017 | 492.00 | CONC/SPECL | 0.00 | (28.00) | 548.00 | 0.00 | 49.59 |
| | | | | | | | | | | RENT | 576.00 | 0.00 | | | |
| 3A | 1X1A | N/A | 665 | Occupied | Barrera, Crystal | 03/03/2017 | 03/03/2017 | 03/02/2018 | 492.00 | RENT | 492.00 | | 492.00 | 250.00 | 56.21 |
| 3B | 1X1A | N/A | 665 | Occupied | Aguayo, Jonas | 07/05/2009 | 05/14/2016 | 06/08/2017 | 492.00 | RENT | 592.00 | | 592.00 | 0.00 | (592.00) |
| 3C | 1X1A | N/A | 665 | Occupied | Dobbe, (Virginia) Jennie | 09/07/2013 | 12/23/2016 | 01/22/2018 | 492.00 | PEST | 0.00 | 2.00 | 563.00 | 0.00 | 49.59 |
| | | | | | | | | | | RENT | 561.00 | 0.00 | | | |
| 3D | 1X1A | N/A | 665 | Vacant | VACANT | | | | 492.00 | | 0.00 * | 0.00 * | | | |
| 3E | 1X1A | N/A | 665 | Occupied | Morales, Vanessa | 05/20/2016 | 05/20/2016 | 05/19/2017 | 492.00 | CONC/SPECL | 0.00 | (29.00) | 543.00 | 0.00 | (543.21) |
| | | | | | | | | | | RENT | 572.00 | 0.00 | | | |
| 3F | 1X1A | N/A | 665 | Vacant-Leased | VACANT | | | | 492.00 | | 0.00 * | 0.00 * | | | |
| | | N/A | | Applicant | Salas, Savannah | 06/17/2017 | 06/17/2017 | 06/16/2018 | | RENT | 492.00 * | 0.00 * | 492.00 * | 0.00 | 0.00 |
| 3G | 1X1A | N/A | 665 | Occupied | Foos, Brandi | 03/18/2017 | 03/18/2017 | 03/17/2018 | 492.00 | RENT | 492.00 | | 492.00 | 0.00 | 0.00 |
| 3H | 1X1A | N/A | 665 | Occupied | Flores, Jose | 06/15/2016 | 06/15/2016 | 06/14/2017 | 492.00 | RENT | 575.00 | | 575.00 | 200.00 | 49.75 |
| 4A | 1X1A | N/A | 665 | Vacant-Leased | VACANT | | | | 492.00 | | 0.00 * | 0.00 * | | | |
| | | N/A | | Applicant | Law, Brooklynn | 04/08/2017 | 04/08/2017 | 04/07/2018 | | RENT | 492.00 * | 0.00 * | 492.00 * | 0.00 | 0.00 |
| 4B | 1X1A | N/A | 665 | Occupied | Gibbs, Reginal | 08/10/2016 | 08/10/2016 | 08/09/2017 | 492.00 | RENT | 576.00 | | 576.00 | 250.00 | (526.41) |
| 4C | 1X1A | N/A | 665 | Occupied | Pearson, Bradley | 02/06/2010 | 11/10/2016 | 11/09/2017 | 492.00 | RENT | 551.00 | | 551.00 | 150.00 | 49.59 |
| 4D | 1X1A | N/A | 665 | Vacant | VACANT | | | | 492.00 | | 0.00 * | 0.00 * | | | |

**Details**

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4E | 1X1A | N/A | 665 | Occupied | Lemelle, Sheryl | 07/25/2015 | 07/20/2016 | 07/19/2017 | 492.00 | RENT | 572.00 | 0.00 | 572.00 | 0.00 | 49.59 |
| 4F | 1X1A | N/A | 665 | Occupied | Mendoza, Cinthia | 01/22/2016 | 02/16/2017 | 02/15/2018 | 492.00 | CONC/SPECL | 0.00 | (50.00) | 529.00 | 0.00 | (529.00) |
| | | | | | | | | | | RENT | 579.00 | 0.00 | | | |
| 4G | 1X1A | N/A | 665 | Vacant | VACANT | | | | 492.00 | | 0.00 * | 0.00 * | | | |
| 4H | 1X1A | N/A | 665 | Occupied | Smith, Kimberly | 02/15/2017 | 02/15/2017 | 02/14/2018 | 492.00 | CONC/SPECL | 0.00 | (24.00) | 468.00 | 0.00 | (460.91) |
| | | | | | | | | | | RENT | 492.00 | 0.00 | | | |
| 4I | 1X1A | N/A | 665 | Occupied | Hampton, David | 09/14/2016 | 09/14/2016 | 09/13/2017 | 492.00 | CONC/SPECL | 0.00 | (28.00) | 549.00 | 0.00 | 49.59 |
| | | | | | | | | | | RENT | 577.00 | 0.00 | | | |
| 4J | 1X1A | N/A | 665 | Vacant | VACANT | | | | 492.00 | | 0.00 * | 0.00 * | | | |
| 4K | 1X1A | N/A | 665 | Occupied | Lloyd, Jason | 04/12/2016 | 04/12/2016 | 04/11/2017 | 492.00 | RENT | 572.00 | 0.00 | 572.00 | 250.00 | 65.81 |
| 4L | 1X1A | N/A | 665 | Occupied | Hall, Zakary | 07/08/2016 | 07/08/2016 | 07/07/2017 | 492.00 | RENT | 576.00 | 0.00 | 576.00 | 0.00 | 49.59 |
| 5A | 1X1A | N/A | 665 | Occupied | Kabetzke, Colton | 07/16/2016 | 07/16/2016 | 07/15/2017 | 492.00 | CONC/SPECL | 0.00 | (29.00) | 566.00 | 450.00 | 65.81 |
| | | | | | | | | | | PETRENT | 0.00 | 20.00 | | | |
| | | | | | | | | | | RENT | 575.00 | 0.00 | | | |
| 5B | 1X1A | N/A | 665 | Occupied | Neuberger, Michael | 12/02/2016 | 12/02/2016 | 12/01/2017 | 492.00 | RENT | 615.00 | 0.00 | 615.00 | 0.00 | 270.86 |
| 5C | 1X1A | N/A | 665 | Occupied | Jackson, Phyllis | 09/24/2005 | 04/11/2016 | 04/06/2017 | 492.00 | RENT | 563.00 | 0.00 | 563.00 | 200.00 | 49.59 |
| | | N/A | | Pending renewal | Jackson, Phyllis | 09/24/2005 | 04/07/2017 | 10/06/2017 | | RENT | 563.00 * | 0.00 * | 563.00 * | 0.00 | 0.00 |
| 5D | 1X1A | N/A | 665 | Occupied | Beminio, Ronald | 07/03/2015 | 07/28/2016 | 07/27/2017 | 492.00 | PETRENT | 0.00 | 20.00 | 604.00 | 600.00 | 49.59 |
| | | | | | | | | | | RENT | 584.00 | 0.00 | | | |
| 5E | 1X1A | N/A | 665 | Occupied | Christy, Jennifer | 02/14/2014 | 03/04/2017 | 04/03/2018 | 492.00 | PETRENT | 0.00 | 25.00 | 625.00 | 200.00 | (250.41) |
| | | | | | | | | | | RENT | 600.00 | 0.00 | | | |
| 5F | 1X1A | N/A | 665 | Occupied-NTV | Chairez, Edward | 09/01/2012 06/10/2017 | 10/13/2016 | 02/12/2017 | 492.00 | MTOM | 0.00 | 100.00 | 895.00 | 0.00 | 49.59 |
| | | | | | | | | | | RENT | 795.00 | 0.00 | | | |
| 5G | 1X1A | N/A | 665 | Occupied | Roedel, Marilyn | 06/09/2014 | 05/31/2016 | 06/25/2017 | 492.00 | PETRENT | 0.00 | 25.00 | 595.00 | 400.00 | 65.81 |
| | | | | | | | | | | RENT | 570.00 | 0.00 | | | |
| 5H | 1X1A | N/A | 665 | Occupied-NTV | Isham, Michael | 02/04/2017 05/31/2017 | 02/04/2017 | 05/03/2017 | 492.00 | CONC/SPECL | 0.00 | (29.00) | 533.00 | 0.00 | 114.35 |
| | | | | | | | | | | RENT | 562.00 | 0.00 | | | |
| 5I | 1X1A | N/A | 665 | Occupied-NTV | Sigala, Matthew | 06/07/2014 05/31/2017 | 08/28/2016 | 02/27/2017 | 492.00 | MTOM | 0.00 | 100.00 | 756.00 | 250.00 | 49.59 |
| | | | | | | | | | | RENT | 656.00 | 0.00 | | | |
| 5J | 1X1A | N/A | 665 | Occupied-NTV | Webster, Shanelle | 04/25/2015 04/23/2017 | 04/20/2016 | 04/15/2017 | 492.00 | RENT | 566.00 | 0.00 | 566.00 | 0.00 | 49.59 |
| 5K | 1X1A | N/A | 665 | Occupied | Karr, Dennis | 06/02/2008 | 01/05/2017 | 02/04/2018 | 492.00 | RENT | 585.00 | 0.00 | 585.00 | 150.00 | 49.59 |

**Details**

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5L | 1X1A | N/A | 665 | Occupied-NTV | Jurugo, Judith | 08/03/2015 05/19/2017 | 08/11/2016 | 05/10/2017 | 492.00 | CONC/SPECL | 0.00 | (29.00) | 561.00 | 0.00 | 49.59 |
| | | | | | | | | | | RENT | 590.00 | 0.00 | | | |
| 6A | 1X1A | N/A | 665 | Vacant | VACANT | | | | 492.00 | | 0.00 * | 0.00 * | | | |

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 6B | 1X1A | N/A | 665 | Occupied-NTV | Duran, Eduardo | 05/28/2016 05/27/2017 | 05/28/2016 | 05/27/2017 | 492.00 | CONC/SPECL | 0.00 | (29.00) | 543.00 | 0.00 | 49.59 |
| | | | | | | | | | | RENT | 572.00 | 0.00 | | | |
| 6C | 1X1A | N/A | 665 | Occupied | Hutson, Brandon | 09/26/2016 | 09/26/2016 | 09/25/2017 | 492.00 | RENT | 577.00 | 0.00 | 577.00 | 250.00 | 65.81 |
| 6D | 1X1A | N/A | 665 | Occupied | Dockins, Elray | 01/20/2017 | 01/20/2017 | 01/19/2018 | 492.00 | PEST | 0.00 | 2.00 | 617.00 | 0.00 | 46.51 |
| | | | | | | | | | | RENT | 615.00 | 0.00 | | | |
| 6E | 1X1A | N/A | 665 | Occupied | Barton, Jerod | 03/06/2017 | 03/06/2017 | 03/05/2018 | 492.00 | RENT | 492.00 | 0.00 | 492.00 | 0.00 | 39.98 |
| 6F | 1X1A | N/A | 665 | Occupied | Tillmon, Rogers | 02/10/2017 | 02/10/2017 | 02/09/2018 | 492.00 | PEST | 0.00 | 2.00 | 494.00 | 0.00 | 34.63 |
| | | | | | | | | | | RENT | 492.00 | 0.00 | | | |
| 6G | 1X1A | N/A | 665 | Occupied | White, Maci | 05/28/2016 | 05/28/2016 | 05/27/2017 | 492.00 | CONC/SPECL | 0.00 | (29.00) | 543.00 | 250.00 | 65.81 |
| | | | | | | | | | | RENT | 572.00 | 0.00 | | | |
| 6H | 1X1A | N/A | 665 | Vacant-Leased | VACANT | | | | 492.00 | | 0.00 * | 0.00 * | | | |
| | | N/A | | Applicant | Owens-Thomas, Fretasha | 03/29/2017 | 03/29/2017 | 03/28/2018 | | RENT | 492.00 * | 0.00 * | 492.00 * | 0.00 | 0.00 |
| 6I | 1X1A | N/A | 665 | Occupied | Olmos, Jamie | 04/01/2016 | 04/01/2016 | 03/31/2017 | 492.00 | CONC/SPECL | 0.00 | ###### | 440.00 | 200.00 | 49.59 |
| | | | | | | | | | | RENT | 562.00 | 0.00 | | | |
| | | N/A | | Pending renewal | Olmos, Jamie | 04/01/2016 | 04/01/2016 | 03/31/2018 | | CONC/SPECL | 0.00 * | ###### * | 255.00 * | 0.00 | 0.00 |
| | | | | | | | | | | PEST | 0.00 * | 2.00 * | | | |
| | | | | | | | | | | RENT | 562.00 * | 0.00 * | | | |
| 6J | 1X1A | N/A | 665 | Occupied | Cano, Bryce | 08/31/2016 | 08/31/2016 | 08/30/2017 | 492.00 | CONC/SPECL | 0.00 | (29.00) | 547.00 | 0.00 | 49.59 |
| | | | | | | | | | | RENT | 576.00 | 0.00 | | | |
| 6K | 1X1A | N/A | 665 | Occupied | Pommier, Hollie | 06/01/2016 | 06/01/2016 | 05/31/2017 | 492.00 | CONC/SPECL | 0.00 | (29.00) | 543.00 | 0.00 | 65.81 |
| | | | | | | | | | | RENT | 572.00 | 0.00 | | | |
| 6L | 1X1A | N/A | 665 | Occupied | Pinson, Steven | 05/02/2015 | 05/27/2016 | 05/26/2017 | 492.00 | RENT | 574.00 | 0.00 | 574.00 | 500.00 | 49.59 |
| 7A | 1X1A | N/A | 665 | Occupied | Morey, Marianne | 07/30/2016 | 07/30/2016 | 07/29/2017 | 492.00 | RENT | 575.00 | 0.00 | 575.00 | 500.00 | 49.59 |
| 7B | 1X1A | N/A | 665 | Occupied | Hernandez, Damon | 08/07/2015 | 09/01/2016 | 08/31/2017 | 492.00 | RENT | 572.00 | 0.00 | 572.00 | 0.00 | 49.59 |
| 7C | 1X1A | N/A | 665 | Vacant | VACANT | | | | 492.00 | | 0.00 * | 0.00 * | | | |
| 7D | 1X1A | N/A | 665 | Occupied-NTV | Elders, Bradley | 11/28/2015 05/01/2017 | 12/23/2016 | 06/22/2017 | 492.00 | PETRENT | 0.00 | 20.00 | 597.00 | 200.00 | 49.55 |
| | | | | | | | | | | RENT | 577.00 | 0.00 | | | |

**Details**

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 7E | 1X1A | N/A | 665 | Occupied | Santander Bernal, Maria | 03/04/2017 | 03/04/2017 | 12/03/2017 | 492.00 | RENT | 492.00 | 0.00 | 492.00 | 0.00 | 41.59 |
| 7F | 1X1A | N/A | 665 | Vacant | VACANT | | | | 492.00 | | 0.00 * | 0.00 * | | | |
| 7G | 1X1A | N/A | 665 | Occupied | Amaya, Victori | 06/13/2016 | 06/13/2016 | 06/12/2017 | 492.00 | CONC/SPECL | 0.00 | (95.00) | 477.00 | 0.00 | 49.59 |
| | | | | | | | | | | RENT | 572.00 | 0.00 | | | |
| 7H | 1X1A | N/A | 665 | Vacant | VACANT | | | | 492.00 | | 0.00 * | 0.00 * | | | |
| 8A | 2X2E | N/A | 950 | Occupied | Nabahiga, Christine | 12/14/2015 | 12/14/2016 | 12/13/2017 | 697.00 | PEST | 0.00 | 2.00 | 642.00 | 0.00 | 75.17 |
| | | | | | | | | | | RENT | 640.00 | 0.00 | | | |
| 8B | 2X2E | N/A | 950 | Admin/Down | VACANT | | | | 697.00 | | 0.00 * | 0.00 * | | | |
| 8C | 2X2E | N/A | 950 | Vacant | VACANT | | | | 697.00 | | 0.00 * | 0.00 * | | | |
| 8D | 2X2E | N/A | 950 | Vacant | VACANT | | | | 697.00 | | 0.00 * | 0.00 * | | | |
| 8E | 2X2E | N/A | 950 | Occupied | Calvani, Alexis | 02/12/2016 | 02/12/2016 | 03/08/2017 | 697.00 | MTOM | 0.00 | 100.00 | 811.00 | 0.00 | 121.92 |

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | RENT | 711.00 | 0.00 | | | |
| 8F | 2X2E | N/A | 950 | Occupied | Cable, Christine | 06/01/2016 | 06/01/2016 | 05/31/2017 | 697.00 | CONC/SPECL | 0.00 | (35.00) | 667.00 | 0.00 | 75.17 |
| | | | | | | | | | | RENT | 702.00 | 0.00 | | | |
| 8G | 2X2E | N/A | 950 | Vacant-Leased | VACANT | | | | 697.00 | | 0.00 * | 0.00 * | | | |
| | | N/A | | Applicant | Romero, Nichole | 05/06/2017 | 05/06/2017 | 05/05/2018 | | RENT | 697.00 * | 0.00 * | 697.00 * | 0.00 | 0.00 |
| 8H | 2X2E | N/A | 950 | Occupied | Zuniga, Alvaro | 01/03/2015 | 12/25/2016 | 12/24/2017 | 743.00 | RENT | 743.00 | 0.00 | 743.00 | 0.00 | 271.87 |
| 9A | 2X1C | N/A | 960 | Occupied | Castleman, Grace | 03/04/2017 | 03/04/2017 | 03/03/2018 | 630.00 | RENT | 630.00 | 0.00 | 630.00 | 0.00 | 53.99 |
| 9B | 2X1C | N/A | 960 | Occupied | Wilson, Keely | 08/18/2015 | 10/21/2016 | 10/20/2017 | 630.00 | RENT | 690.00 | 0.00 | 690.00 | 0.00 | 65.32 |
| 9C | 2X1C | N/A | 960 | Occupied | Pena, Michael | 07/31/2012 | 10/17/2016 | 10/16/2017 | 630.00 | RENT | 658.00 | 0.00 | 658.00 | 0.00 | 247.69 |
| 9D | 2X1C | N/A | 960 | Occupied-NTV | Donaldson, Jessica | 12/01/2012 03/31/2017 | 09/15/2016 | 03/14/2017 | 630.00 | MTOM | 0.00 | 100.00 | 838.00 | 0.00 | 150.00 |
| | | | | | | | | | | RENT | 738.00 | 0.00 | | | |
| 9E | 2X1C | N/A | 960 | Occupied | Trejo, Jeronimo | 06/16/2013 | 03/01/2017 | 08/31/2017 | 630.00 | RENT | 843.00 | 0.00 | 843.00 | 0.00 | 613.07 |
| 9F | 2X1C | N/A | 960 | Occupied | The Church Of Jesus Christ, * | 06/09/2014 | 12/04/2016 | 12/03/2017 | 630.00 | PEST | 0.00 | 2.00 | 701.00 | 0.00 | (2.00) |
| | | | | | | | | | | RENT | 699.00 | 0.00 | | | |
| 9G | 2X1C | N/A | 960 | Occupied | Smith, Carly | 08/22/2015 | 09/16/2016 | 10/15/2017 | 630.00 | RENT | 680.00 | 0.00 | 680.00 | 0.00 | 43.21 |
| 9H | 2X1C | N/A | 960 | Occupied | Acosta, Daniel | 08/15/2014 | 01/13/2017 | 07/12/2017 | 630.00 | PEST | 0.00 | 2.00 | 719.00 | 0.00 | 65.32 |
| | | | | | | | | | | RENT | 717.00 | 0.00 | | | |
| 10A | 2X1C | N/A | 960 | Occupied | Adams, Baylee | 03/15/2017 | 03/15/2017 | 03/14/2018 | 630.00 | RENT | 630.00 | 0.00 | 630.00 | 0.00 | 0.00 |
| 10B | 2X1C | N/A | 960 | Occupied-NTV | Barnett, Amanda | 05/27/2016 06/30/2017 | 05/27/2016 | 05/26/2017 | 630.00 | CONC/SPECL | 0.00 | ###### | 575.00 | 100.00 | 49.10 |

**Details**

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | PETRENT | 0.00 | 20.00 | | | |
| | | | | | | | | | | RENT | 678.00 | 0.00 | | | |
| 10C | 2X1C | N/A | 960 | Occupied | Futch, Naomi | 09/04/2015 | 11/07/2016 | 11/06/2017 | 630.00 | PEST | 0.00 | 2.00 | 692.00 | 200.00 | 35.97 |
| | | | | | | | | | | RENT | 690.00 | 0.00 | | | |
| 10D | 2X1C | N/A | 960 | Occupied | Cook, Tommy | 01/21/2016 | 02/21/2017 | 03/20/2018 | 630.00 | RENT | 672.00 | 0.00 | 672.00 | 0.00 | 49.10 |
| 10E | 2X1C | N/A | 960 | Occupied | Ybarra, Noah | 02/17/2017 | 02/17/2017 | 02/16/2018 | 630.00 | RENT | 630.00 | 0.00 | 630.00 | 0.00 | 85.06 |
| 10F | 2X1C | N/A | 960 | Occupied | ngirumuvugizi, mbananayo | 03/03/2017 | 03/03/2017 | 03/02/2018 | 630.00 | RENT | 630.00 | 0.00 | 630.00 | 0.00 | 64.85 |
| 10G | 2X1C | N/A | 960 | Admin/Down | VACANT | | | | 630.00 | | 0.00 * | 0.00 * | | | |
| 10H | 2X1C | N/A | 960 | Occupied | Lopez, Alexandria | 02/17/2017 | 02/17/2017 | 02/16/2018 | 630.00 | PEST | 0.00 | 2.00 | 632.00 | 0.00 | 85.06 |
| | | | | | | | | | | RENT | 630.00 | 0.00 | | | |
| 10I | 2X1C | N/A | 960 | Occupied | McKinney, Matthew | 07/15/2013 | 09/30/2016 | 03/29/2017 | 630.00 | RENT | 726.00 | 0.00 | 726.00 | 250.00 | 81.37 |
| 10J | 2X1C | N/A | 960 | Vacant | VACANT | | | | 630.00 | | 0.00 * | 0.00 * | | | |
| 10K | 2X1C | N/A | 960 | Vacant | VACANT | | | | 630.00 | | 0.00 * | 0.00 * | | | |
| 10L | 2X1C | N/A | 960 | Occupied | Stefanski, Pawel | 05/05/2003 | 02/26/2013 | 02/21/2014 | 630.00 | MTOM | 0.00 | 100.00 | 766.00 | 200.00 | (766.00) |
| | | | | | | | | | | RENT | 666.00 | 0.00 | | | |
| 11A | 2X2E | N/A | 950 | Occupied | Ray, Sean | 03/18/2017 | 03/18/2017 | 09/17/2017 | 697.00 | RENT | 680.00 | 0.00 | 680.00 | 0.00 | 99.00 |
| 11B | 2X2E | N/A | 950 | Occupied | Yarbrough, Danny | 01/02/2015 | 11/24/2016 | 11/23/2017 | 697.00 | PEST | 0.00 | 2.00 | 727.00 | 0.00 | 91.40 |
| | | | | | | | | | | RENT | 725.00 | 0.00 | | | |

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11C | 2X2E | N/A | 950 | Occupied | Harrell, Angela | 03/21/2015 | 09/18/2015 | 03/16/2016 | 697.00 | MTOM | 0.00 | 100.00 | 898.00 | 0.00 | 75.17 |
| | | | | | | | | | | RENT | 798.00 | 0.00 | | | |
| 11D | 2X2E | N/A | 950 | Vacant | VACANT | | | | 697.00 | | 0.00 * | 0.00 * | | | |
| 11E | 2X2E | N/A | 950 | Vacant | VACANT | | | | 697.00 | | 0.00 * | 0.00 * | | | |
| 11F | 2X2E | N/A | 950 | Occupied | Banks, Jean | 12/12/2013 | 12/29/2016 | 12/28/2017 | 697.00 | PEST | 0.00 | 2.00 | 752.00 | 200.00 | 58.95 |
| | | | | | | | | | | RENT | 750.00 | 0.00 | | | |
| 11G | 2X2E | N/A | 950 | Occupied | Porras, Luis | 02/10/2016 | 02/05/2017 | 02/04/2018 | 697.00 | RENT | 671.00 | 0.00 | 671.00 | 0.00 | 91.40 |
| 11H | 2X2E | N/A | 950 | Occupied | Shelton, Joshua | 02/22/2017 | 02/22/2017 | 02/21/2018 | 697.00 | EMPLCRED | 0.00 | ###### | 580.00 | 0.00 | 0.67 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | PETRENT | 0.00 | 20.00 | | | |
| | | | | | | | | | | RENT | 697.00 | 0.00 | | | |
| 12A | 1X1A | N/A | 665 | Occupied | Bagby, Julie | 02/17/2017 | 02/17/2017 | 02/16/2018 | 492.00 | PEST | 0.00 | 2.00 | 494.00 | 125.00 | 53.09 |
| | | | | | | | | | | RENT | 492.00 | 0.00 | | | |
| 12B | 1X1A | N/A | 665 | Vacant | VACANT | | | | 492.00 | | 0.00 * | 0.00 * | | | |

**Details**

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 12C | 1X1A | N/A | 665 | Occupied | Crist, Brandon | 02/18/2017 | 02/18/2017 | 02/17/2018 | 492.00 | PEST | 0.00 | 2.00 | 494.00 | 0.00 | 55.09 |
| | | | | | | | | | | RENT | 492.00 | 0.00 | | | |
| 12D | 1X1A | N/A | 665 | Occupied | Owens, Cassie | 12/05/2014 | 10/27/2016 | 11/26/2017 | 492.00 | PEST | 0.00 | 2.00 | 609.00 | 200.00 | 49.59 |
| | | | | | | | | | | PETRENT | 0.00 | 25.00 | | | |
| | | | | | | | | | | RENT | 582.00 | 0.00 | | | |
| 12E | 1X1A | N/A | 665 | Vacant-Leased | VACANT | | | | 492.00 | | 0.00 * | 0.00 * | | | |
| | | N/A | | | Applicant | Hendrix - Robinson, Kai | 04/22/2017 | 04/22/2017 | 10/21/2017 | RENT | 492.00 * | 0.00 * | 492.00 * | 0.00 | 0.00 |
| 12F | 1X1A | N/A | 665 | Occupied | Flowers, Stephany | 09/02/2016 | 09/02/2016 | 09/01/2017 | 492.00 | RENT | 576.00 | | 576.00 | 0.00 | 84.59 |
| 12G | 1X1A | N/A | 665 | Occupied | Martinez, Michael | 01/31/2017 | 01/31/2017 | 07/30/2017 | 492.00 | PEST | 0.00 | 2.00 | 544.00 | 0.00 | 7.67 |
| | | | | | | | | | | RENT | 542.00 | 0.00 | | | |
| 12H | 1X1A | N/A | 665 | Vacant | VACANT | | | | 492.00 | | 0.00 * | 0.00 * | | | |
| 12I | 1X1A | N/A | 665 | Occupied | Wolfe, Christopher | 02/01/2017 | 02/01/2017 | 01/31/2018 | 492.00 | RENT | 492.00 | | 492.00 | 0.00 | (49.41) |
| 12J | 1X1A | N/A | 665 | Vacant-Leased | VACANT | | | | 492.00 | | 0.00 * | 0.00 * | | | |
| | | N/A | | | Applicant | Lopez, Rodolfo | 03/29/2017 | 03/29/2017 | 03/28/2018 | RENT | 492.00 * | 0.00 * | 492.00 * | 0.00 | 99.00 |
| 12K | 1X1A | N/A | 665 | Occupied | Moore, Autumn | 06/21/2014 | 06/12/2016 | 06/11/2017 | 492.00 | RENT | 572.00 | 0.00 | 572.00 | 0.00 | 49.59 |
| 12L | 1X1A | N/A | 665 | Occupied | Sellers, Kaycee | 12/30/2015 | 01/24/2017 | 02/23/2018 | 492.00 | PETRENT | 0.00 | 20.00 | 578.00 | 200.00 | 49.59 |
| | | | | | | | | | | RENT | 558.00 | 0.00 | | | |
| 13A | 2X1C | N/A | 960 | Occupied | Romero, Nichole | 05/26/2012 | 04/10/2016 | 05/05/2017 | 630.00 | RENT | 707.00 | 0.00 | 707.00 | 0.00 | 81.56 |
| 13B | 2X1C | N/A | 960 | Occupied | Young, Monica | 08/01/2016 | 08/01/2016 | 08/31/2017 | 630.00 | CONC/SPECL | 0.00 | (34.00) | 646.00 | 0.00 | 81.56 |
| | | | | | | | | | | RENT | 680.00 | 0.00 | | | |
| 13C | 2X1C | N/A | 960 | Occupied-NTV | Rodriguez, Crystal | 07/26/2014 04/16/2017 | 07/17/2016 | 04/16/2017 | 630.00 | RENT | 678.00 | 0.00 | 678.00 | 0.00 | 65.38 |
| 13D | 2X1C | N/A | 960 | Occupied | Laugesen, Mads | 03/02/2016 | 03/02/2017 | 03/01/2018 | 630.00 | RENT | 673.00 | 0.00 | 673.00 | 250.00 | 81.56 |
| 13E | 2X1C | N/A | 960 | Occupied | Board, Jennifer | 12/08/2014 | 11/27/2016 | 11/26/2017 | 630.00 | PETRENT | 0.00 | 25.00 | 785.00 | 400.00 | (785.00) |
| | | | | | | | | | | RENT | 760.00 | 0.00 | | | |

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 13F | 2X1C | N/A | 960 | Occupied | Vo, Nga | 08/03/2016 | 08/05/2016 | 08/04/2017 | 630.00 | CONC/SPECL | 0.00 | (34.00) | 649.00 | 0.00 | 60.32 |
| | | | | | | | | | | RENT | 683.00 | 0.00 | | | |
| 13G | 2X1C | N/A | 960 | Occupied | Flores, Hortencia | 08/13/2016 | 08/13/2016 | 08/12/2017 | 630.00 | RENT | 683.00 | 0.00 | 683.00 | 0.00 | 65.32 |
| 13H | 2X1C | N/A | 960 | Occupied | Vaidya, Bhuvaneshwar | 08/25/2016 | 08/25/2016 | 08/24/2017 | 630.00 | CONC/SPECL | 0.00 | (34.00) | 649.00 | 0.00 | 49.10 |
| | | | | | | | | | | RENT | 683.00 | 0.00 | | | |
| 14A | 1X1A | N/A | 665 | Occupied | Viscera, Carluccio | 03/31/2013 | 02/11/2017 | 08/10/2017 | 492.00 | CONC/SPECL | 0.00 | ###### | 385.50 | 200.00 | (65.50) |

**Details**

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | PETRENT | 0.00 | 25.00 | | | |
| | | | | | | | | | | RENT | 721.00 | 0.00 | | | |
| 14B | 1X1A | N/A | 665 | Occupied | Ifediora, Rose | 01/06/2016 | 01/06/2017 | 07/05/2017 | 492.00 | CONC/SPECL | 0.00 | (50.00) | 526.00 | 0.00 | 49.59 |
| | | | | | | | | | | RENT | 576.00 | 0.00 | | | |
| 14C | 1X1A | N/A | 665 | Occupied | Salazar, Timothy | 09/13/2016 | 09/13/2016 | 09/12/2017 | 492.00 | CONC/SPECL | 0.00 | (29.00) | 548.00 | 0.00 | (548.00) |
| | | | | | | | | | | RENT | 577.00 | 0.00 | | | |
| 14D | 1X1A | N/A | 665 | Occupied | naghditar, narimah | 07/30/2016 | 07/30/2016 | 07/29/2017 | 492.00 | RENT | 576.00 | 0.00 | 576.00 | 0.00 | 65.81 |
| 14E | 1X1A | N/A | 665 | Occupied | Warren, Willis | 04/15/2006 | 12/19/2016 | 06/18/2017 | 492.00 | RENT | 577.00 | 0.00 | 577.00 | 200.00 | 36.58 |
| 14F | 1X1A | N/A | 665 | Occupied | Lindquist, Alex | 08/11/2012 | 10/29/2015 | 10/23/2016 | 492.00 | MTOM | 0.00 | 100.00 | 728.00 | 200.00 | 49.59 |
| | | | | | | | | | | PETRENT | 0.00 | 20.00 | | | |
| | | | | | | | | | | RENT | 608.00 | 0.00 | | | |
| 14G | 1X1A | N/A | 665 | Occupied | Vizcarra, Doroteo | 02/19/2016 | 03/16/2017 | 09/15/2017 | 492.00 | RENT | 562.00 | 0.00 | 562.00 | 0.00 | 59.89 |
| 14H | 1X1A | N/A | 665 | Occupied | Blakemore, Damon | 03/01/2014 | 12/18/2016 | 06/17/2017 | 492.00 | RENT | 610.00 | 0.00 | 610.00 | 0.00 | 65.81 |
| 14I | 1X1A | N/A | 665 | Occupied | Ferrall, Colin | 01/14/2017 | 01/14/2017 | 01/13/2018 | 492.00 | PEST | 0.00 | 2.00 | 494.00 | 0.00 | 49.59 |
| | | | | | | | | | | RENT | 492.00 | 0.00 | | | |
| 14J | 1X1A | N/A | 665 | Occupied | Pulley, Gregory | 07/11/2016 | 07/11/2016 | 07/10/2017 | 492.00 | CONC/SPECL | 0.00 | (29.00) | 547.00 | 0.00 | 49.59 |
| | | | | | | | | | | RENT | 576.00 | 0.00 | | | |
| 14K | 1X1A | N/A | 665 | Occupied | Moreno, Rodolfo | 11/29/2013 | 10/16/2016 | 11/15/2017 | 492.00 | RENT | 573.00 | 0.00 | 573.00 | 0.00 | 49.59 |
| 14L | 1X1A | N/A | 665 | Occupied | Moore, Lisa | 12/28/2015 | 01/26/2017 | 05/25/2017 | 492.00 | PETRENT | 0.00 | 20.00 | 685.00 | 400.00 | 49.59 |
| | | | | | | | | | | RENT | 665.00 | 0.00 | | | |
| 15A | 1X1A | N/A | 665 | Vacant | VACANT | | | | 492.00 | | 0.00 * | 0.00 * | | | |
| 15B | 1X1A | N/A | 665 | Occupied | Enns, Ronny | 04/15/2016 | 04/15/2016 | 04/14/2017 | 492.00 | CONC/SPECL | 0.00 | (95.00) | 477.00 | 0.00 | (530.00) |
| | | | | | | | | | | RENT | 572.00 | 0.00 | | | |
| 15C | 1X1A | N/A | 665 | Occupied | Morales, Nayeli | 09/23/2016 | 09/23/2016 | 09/22/2017 | 492.00 | RENT | 576.00 | 0.00 | 576.00 | 0.00 | (576.00) |
| 15D | 1X1A | N/A | 665 | Occupied-NTV | Daniels, Brittany | 02/23/2015 03/31/2017 | 02/19/2017 | 03/15/2017 | 492.00 | MTOM | 0.00 | 100.00 | 697.00 | 200.00 | 58.83 |
| | | | | | | | | | | PETRENT | 0.00 | 20.00 | | | |
| | | | | | | | | | | RENT | 577.00 | 0.00 | | | |
| 15E | 1X1A | N/A | 665 | Vacant-Leased | VACANT | | | | 492.00 | | 0.00 * | 0.00 * | | | |
| | | N/A | | Applicant | Chapman, Erin | 04/22/2017 | 04/22/2017 | 04/21/2018 | | RENT | 544.00 * | 0.00 * | 544.00 * | | 0.00 |
| 15F | 1X1A | N/A | 665 | Occupied | Nelson, Julia | 02/28/2016 | 03/21/2017 | 03/20/2018 | 492.00 | RENT | 559.00 | 0.00 | 559.00 | 0.00 | 49.59 |
| 15G | 1X1A | N/A | 665 | Occupied | Mccall, Kelly | 08/08/2015 | 08/03/2016 | 08/02/2017 | 492.00 | RENT | 572.00 | 0.00 | 572.00 | 0.00 | (572.00) |
| 15H | 1X1A | N/A | 665 | Occupied | Fazzone, anthony | 06/03/2016 | 06/03/2016 | 06/02/2017 | 492.00 | RENT | 572.00 | 0.00 | 572.00 | 0.00 | 49.59 |

**Details**

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 16A | 1X1A | N/A | 665 | Occupied | Marquez, Omar | 11/28/2016 | 11/28/2016 | 11/27/2017 | 492.00 | PEST | 0.00 | 2.00 | 617.00 | 0.00 | 48.95 |
| | | | | | | | | | | RENT | 615.00 | 0.00 | | | |
| 16B | 1X1A | N/A | 665 | Occupied | Byrd, Mitchell | 01/01/2007 | 08/10/2016 | 08/09/2017 | 492.00 | RENT | 572.00 | 0.00 | 572.00 | 200.00 | 49.59 |
| 16C | 1X1A | N/A | 665 | Occupied | Janssen, Christopher | 03/11/2016 | 03/11/2016 | 04/10/2017 | 492.00 | CONC/SPECL | 0.00 | (28.00) | 550.00 | 200.00 | 49.59 |
| | | | | | | | | | | PETRENT | 0.00 | 20.00 | | | |
| | | | | | | | | | | RENT | 558.00 | 0.00 | | | |
| | | N/A | | Pending renewal | Janssen, Christopher | 03/11/2016 | 04/11/2017 | 04/10/2018 | | PETRENT | 0.00 * | 20.00 * | 578.00 * | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 558.00 * | 0.00 * | | | |
| 16D | 1X1A | N/A | 665 | Occupied-NTV | Caylor, Camrye | 10/31/2016 06/01/2017 | 10/31/2016 | 10/30/2017 | 492.00 | CONC/SPECL | 0.00 | (31.00) | 586.00 | 0.00 | 65.81 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 615.00 | 0.00 | | | |
| 16E | 1X1A | N/A | 665 | Vacant | VACANT | | | | 492.00 | | 0.00 * | 0.00 * | | | |
| 16F | 1X1A | N/A | 665 | Occupied | Houchins, Jennifer | 03/11/2015 | 04/05/2016 | 04/30/2017 | 492.00 | RENT | 559.00 | 0.00 | 559.00 | 0.00 | 49.59 |
| | | N/A | | Pending renewal | Houchins, Jennifer | 03/11/2015 | 05/01/2017 | 04/30/2018 | | PEST | 0.00 * | 2.00 * | 561.00 * | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 559.00 * | 0.00 * | | | |
| 16G | 1X1A | N/A | 665 | Occupied | Valdivia Rosario, Angel | 02/24/2014 | 03/04/2016 | 04/03/2017 | 492.00 | RENT | 550.00 | 0.00 | 550.00 | 0.00 | 49.59 |
| 16H | 1X1A | N/A | 665 | Occupied | Ferguson, Nathan | 07/17/2015 | 01/12/2016 | 07/11/2017 | 492.00 | RENT | 625.00 | 0.00 | 625.00 | 0.00 | 49.59 |
| 16I | 1X1A | N/A | 665 | Occupied | Jackson, Joshua | 07/01/2011 | 10/08/2016 | 11/07/2017 | 492.00 | RENT | 542.00 | 0.00 | 542.00 | 0.00 | 49.59 |
| 16J | 1X1A | N/A | 665 | Occupied | Hidaglo, Ariana | 07/30/2016 | 07/30/2016 | 07/29/2017 | 492.00 | RENT | 606.00 | 0.00 | 606.00 | 0.00 | 49.59 |
| 16K | 1X1A | N/A | 665 | Vacant | VACANT | | | | 492.00 | | 0.00 * | 0.00 * | | | |
| 16L | 1X1A | N/A | 665 | Vacant | VACANT | | | | 492.00 | | 0.00 * | 0.00 * | | | |
| 18A | 1X1B | N/A | 703 | Occupied | McGuire, Lacy | 08/20/2016 | 08/20/2016 | 08/19/2017 | 554.00 | CONC/SPECL | 0.00 | (31.00) | 595.00 | 0.00 | 37.41 |
| | | | | | | | | | | RENT | 626.00 | 0.00 | | | |
| 18B | 1X1B | N/A | 703 | Occupied | Holt, Lisa | 03/18/2017 | 03/18/2017 | 06/17/2018 | 554.00 | PETRENT | 0.00 | 20.00 | 20.00 | 0.00 | (0.53) |
| 18C | 1X1B | N/A | 703 | Occupied | Alexander, Debra | 06/22/2013 | 08/08/2016 | 05/07/2017 | 554.00 | RENT | 625.00 | 0.00 | 625.00 | 0.00 | 38.17 |
| 18D | 1X1B | N/A | 703 | Occupied | Kenemore, Canida | 06/11/2016 | 06/11/2016 | 06/10/2017 | 554.00 | RENT | 628.00 | 0.00 | 628.00 | 0.00 | 5.41 |
| 18E | 1X1B | N/A | 703 | Occupied | Chavira, Sara | 06/16/2016 | 06/16/2016 | 06/15/2017 | 554.00 | CONC/SPECL | 0.00 | (31.00) | 597.00 | 0.00 | 37.41 |
| | | | | | | | | | | RENT | 628.00 | 0.00 | | | |
| 18F | 1X1B | N/A | 703 | Occupied | Kenner, William | 03/26/2014 | 04/21/2016 | 04/16/2017 | 554.00 | PETRENT | 0.00 | 25.00 | 635.00 | 250.00 | 41.62 |

**Details**

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | RENT | 610.00 | 0.00 | | | |
| | | N/A | | Pending renewal | Kenner, William | 03/26/2014 | 04/17/2017 | 05/16/2018 | | PETRENT | 0.00 * | 25.00 * | 635.00 * | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 610.00 * | 0.00 * | | | |

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 18G | 1X1B | N/A | 703 | Occupied | Fung, Charlie | 09/01/2015 | 09/26/2016 | 09/25/2017 | 554.00 | RENT | 628.00 | 0.00 | 628.00 | 0.00 | 48.63 |
| 18H | 1X1B | N/A | 703 | Occupied | WINGO, MATTHEW | 02/11/2017 | 02/11/2017 | 02/10/2018 | 554.00 | RENT | 544.00 | 0.00 | 544.00 | 0.00 | 65.41 |
| 18I | 1X1B | N/A | 703 | Occupied | Gonzalez-Lujano, Sergio | 02/03/2017 | 02/03/2017 | 08/02/2017 | 554.00 | RENT | 584.00 | 0.00 | 584.00 | 0.00 | 48.63 |
| 18J | 1X1B | N/A | 703 | Occupied | Leigh, Kaitlyn | 07/27/2016 | 07/27/2016 | 07/26/2017 | 554.00 | CONC/SPECL | 0.00 | (31.00) | 617.00 | 450.00 | 37.53 |
| | | | | | | | | | | PETRENT | 0.00 | 20.00 | | | |
| | | | | | | | | | | RENT | 628.00 | 0.00 | | | |
| 18K | 1X1B | N/A | 703 | Occupied | Preston, Tod | 04/10/2015 | 02/08/2017 | 08/07/2017 | 554.00 | CONC/SPECL | 0.00 | ###### | 291.50 | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 604.00 | 0.00 | | | |
| 18L | 1X1B | N/A | 703 | Occupied | Stewart, Christina | 03/28/2015 | 04/22/2016 | 04/17/2017 | 554.00 | CONC/SPECL | 0.00 | ###### | 323.00 | 200.00 | (254.37) |
| | | | | | | | | | | PETRENT | 0.00 | 20.00 | | | |
| | | | | | | | | | | RENT | 606.00 | 0.00 | | | |
| | | N/A | | Pending renewal | Stewart, Christina | 03/28/2015 | 04/18/2017 | 04/17/2018 | | PETRENT | 0.00 * | 20.00 * | 626.00 * | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 606.00 * | 0.00 * | | | |
| 19A | 1X1B | N/A | 703 | Occupied | Heugatter, Shelby | 12/03/2016 | 12/03/2016 | 12/02/2017 | 554.00 | CONC/SPECL | 0.00 | (34.00) | 646.00 | 0.00 | 37.41 |
| | | | | | | | | | | RENT | 680.00 | 0.00 | | | |
| 19B | 1X1B | N/A | 703 | Occupied | Irvine, Rebecca (Becky) | 10/27/2015 | 10/27/2016 | 11/26/2017 | 554.00 | RENT | 613.00 | 0.00 | 613.00 | 200.00 | 37.41 |
| 19C | 1X1B | N/A | 703 | Occupied-NTV | Nolan, Jacob | 05/16/2016 05/29/2017 | 05/16/2016 | 05/13/2017 | 554.00 | CONC/SPECL | 0.00 | (31.00) | 594.00 | 0.00 | 45.51 |
| | | | | | | | | | | RENT | 625.00 | 0.00 | | | |
| 19D | 1X1B | N/A | 703 | Occupied | Collins, Elizabeth | 12/16/2016 | 12/16/2016 | 12/15/2017 | 554.00 | RENT | 634.00 | 0.00 | 634.00 | 0.00 | 50.83 |
| 19E | 1X1B | N/A | 703 | Occupied | Pitts, Mitchell | 05/17/2016 | 05/17/2016 | 05/16/2017 | 554.00 | RENT | 625.00 | 0.00 | 625.00 | 250.00 | 37.41 |
| 19F | 1X1B | N/A | 703 | Occupied | Gallagher, Samantha | 07/01/2016 | 07/01/2016 | 06/30/2017 | 554.00 | RENT | 628.00 | 0.00 | 628.00 | 0.00 | 37.41 |
| 19G | 1X1B | N/A | 703 | Occupied | McBryde, Vicki | 12/11/2015 | 01/05/2017 | 02/04/2018 | 554.00 | PETRENT | 0.00 | 20.00 | 608.00 | 250.00 | 37.41 |
| | | | | | | | | | | RENT | 588.00 | 0.00 | | | |
| 19H | 1x1B LR | N/A | 703 | Occupied | McGregor, Brett | 12/13/2010 | 03/10/2017 | 04/09/2018 | 554.00 | RENT | 589.00 | 0.00 | 614.00 | 150.00 | (614.00) |
| | | | | | | | | | | UPGRADE | 0.00 | 25.00 | | | |
| 20A | 1X1B | N/A | 703 | Occupied | Quarles, Charles | 12/26/2015 | 01/20/2017 | 02/19/2018 | 554.00 | CONC/SPECL | 0.00 | (29.40) | 558.60 | 0.00 | 37.41 |

**Details**

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | RENT | 588.00 | 0.00 | | | |
| 20B | 1X1B | N/A | 703 | Occupied | Peace, Brady | 10/01/2016 | 10/01/2016 | 09/30/2017 | 554.00 | RENT | 626.00 | 0.00 | 626.00 | 0.00 | 37.41 |
| 20C | 1X1B | N/A | 703 | Occupied | Ford, Kaden | 02/25/2017 | 02/25/2017 | 02/24/2018 | 554.00 | PETRENT | 0.00 | 20.00 | 564.00 | 0.00 | 50.83 |
| | | | | | | | | | | RENT | 544.00 | 0.00 | | | |
| 20D | 1X1B | N/A | 703 | Occupied | Hernandez, Lauren | 03/17/2017 | 03/17/2017 | 03/16/2018 | 554.00 | PETRENT | 0.00 | 20.00 | 564.00 | 0.00 | (10.00) |
| | | | | | | | | | | RENT | 544.00 | 0.00 | | | |
| 20E | 1X1B | N/A | 703 | Occupied | Jeffers, Michaelee | 02/08/2017 | 02/08/2017 | 02/07/2018 | 554.00 | RENT | 544.00 | 0.00 | 544.00 | 0.00 | 37.41 |
| 20F | 1X1B | N/A | 703 | Admin/Down | VACANT | | | | 554.00 | | 0.00 * | 0.00 * | | | |
| 20G | 1X1B | N/A | 703 | Occupied | Boone, David | 06/28/2014 | 06/19/2016 | 07/18/2017 | 554.00 | RENT | 625.00 | 0.00 | 625.00 | 0.00 | 37.41 |

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 20H | 1X1B | N/A | 703 | Occupied | Randell, Darrik | 11/25/2015 | 12/20/2016 | 06/19/2017 | 554.00 | CONC/SPECL | 0.00 | (80.00) | 527.00 | 0.00 | 37.41 |
| | | | | | | | | | | RENT | 607.00 | 0.00 | | | |
| 21A | 2X1D | N/A | 996 | Occupied | Ackley, Lucille | 01/16/2012 | 05/28/2016 | 05/23/2017 | 658.00 | PETRENT | 0.00 | 25.00 | 729.00 | 0.00 | 55.07 |
| | | | | | | | | | | RENT | 704.00 | 0.00 | | | |
| 21B | 2X1D | N/A | 996 | Occupied | Smith, Samantha | 08/29/2015 | 09/23/2016 | 09/22/2017 | 658.00 | PETRENT | 0.00 | 20.00 | 748.00 | 200.00 | 55.07 |
| | | | | | | | | | | RENT | 728.00 | 0.00 | | | |
| 21C | 2X1D | N/A | 996 | Occupied-NTV | Johnson, Vicki | 12/05/2015 05/29/2017 | 11/30/2016 | 05/29/2017 | 658.00 | RENT | 732.00 | 0.00 | 732.00 | 0.00 | 36.25 |
| 21D | 2X1D | N/A | 996 | Occupied | Patton, Albert | 01/09/2010 | 08/13/2016 | 09/12/2017 | 658.00 | RENT | 681.00 | 0.00 | 681.00 | 0.00 | 43.86 |
| 21E | 2X1D | N/A | 996 | Occupied | Singer, Crista | 01/28/2017 | 01/28/2017 | 01/27/2018 | 658.00 | RENT | 644.00 | 0.00 | 644.00 | 0.00 | 54.65 |
| 21F | 2X1D | N/A | 996 | Occupied | Kamala, Noyafova | 02/02/2013 | 10/30/2016 | 10/29/2017 | 658.00 | RENT | 776.00 | 0.00 | 776.00 | 0.00 | 43.86 |
| 21G | 2X1D | N/A | 996 | Vacant-Leased | VACANT | | | | 658.00 | | 0.00 * | 0.00 * | | | |
| | | N/A | | Applicant | Boyd, Saibree | 04/01/2017 | 04/01/2017 | 03/31/2018 | | RENT | 644.00 * | 0.00 * | 644.00 * | 0.00 | 0.00 |
| 21H | 2X1D | N/A | 996 | Occupied | Mayfield, Richard | 10/15/2016 | 10/15/2016 | 10/14/2017 | 658.00 | RENT | 715.00 | 0.00 | 715.00 | 0.00 | 43.86 |
| 22A | 2X1D | N/A | 996 | Occupied | Ortiz, Anna | 11/04/2016 | 11/04/2016 | 11/03/2017 | 658.00 | RENT | 715.00 | 0.00 | 715.00 | 250.00 | 55.03 |
| 22B | 2X1D R | N/A | 996 | Occupied | Hudgens, Ashley | 12/31/2016 | 12/31/2016 | 12/30/2017 | 658.00 | CONC/SPECL | 0.00 | (42.00) | 800.00 | 0.00 | (800.00) |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 715.00 | 0.00 | | | |
| | | | | | | | | | | UPGRADE | 0.00 | 125.00 | | | |
| 22C | 2X1D | N/A | 996 | Occupied | Duke, Theresa | 08/17/2016 | 08/17/2016 | 08/16/2017 | 658.00 | RENT | 759.00 | 0.00 | 759.00 | 0.00 | 53.10 |
| 22D | 2X1D | N/A | 996 | Occupied | Nesbitt, Courtnay | 06/30/2016 | 06/30/2016 | 06/29/2017 | 658.00 | RENT | 722.00 | 0.00 | 722.00 | 0.00 | (722.00) |
| 22E | 2X1D | N/A | 996 | Occupied | D´Arcy, Yvonne | 06/03/2014 | 06/01/2016 | 05/31/2017 | 658.00 | RENT | 705.00 | 0.00 | 705.00 | 200.00 | 43.86 |

**Details**

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 22F | 2X1D | N/A | 996 | Occupied | Ocampo, Alex | 11/16/2007 | 03/13/2016 | 04/07/2017 | 658.00 | RENT | 766.00 | 0.00 | 766.00 | 150.00 | 55.07 |
| | | N/A | | Pending renewal | Ocampo, Alex | 11/16/2007 | 04/08/2017 | 04/07/2018 | | RENT | 766.00 * | 0.00 * | 766.00 * | 0.00 | 0.00 |
| 22G | 2X1D | N/A | 996 | Occupied-NTV | Lopez, Dennis | 07/23/2016 05/07/2017 | 07/23/2016 | 07/22/2017 | 658.00 | CONC/SPECL | 0.00 | (36.00) | 692.00 | 0.00 | 55.07 |
| | | | | | | | | | | RENT | 728.00 | 0.00 | | | |
| 22H | 2X1D | N/A | 996 | Vacant | VACANT | | | | 658.00 | | 0.00 * | 0.00 * | | | |
| 23A | 2X2F | N/A | 1079 | Occupied | Clark, Robin | 02/25/2017 | 02/25/2017 | 02/24/2018 | 775.00 | PETRENT | 0.00 | 20.00 | 785.00 | 0.00 | 58.81 |
| | | | | | | | | | | RENT | 765.00 | 0.00 | | | |
| 23B | 2X2F | N/A | 1079 | Occupied | LeBaron, Nefi | 03/16/2017 | 03/16/2017 | 06/15/2017 | 775.00 | RENT | 865.00 | 0.00 | 865.00 | 0.00 | 0.00 |
| 23C | 2X2F | N/A | 1079 | Occupied | Harrison, Betty | 04/10/2009 | 05/14/2016 | 05/09/2017 | 775.00 | PETRENT | 0.00 | 25.00 | 765.00 | 200.00 | 45.68 |
| | | | | | | | | | | RENT | 740.00 | 0.00 | | | |
| 23D | 2X2F | N/A | 1079 | Vacant-Leased | VACANT | | | | 775.00 | | 0.00 * | 0.00 * | | | |
| | | N/A | | Applicant | Shah, Kaushik | 04/10/2017 | 04/10/2017 | 04/09/2018 | | RENT | 765.00 * | 0.00 * | 765.00 * | 0.00 | 50.00 |
| 23E | 2X2F | N/A | 1079 | Occupied | Trinh, Minh | 03/12/2016 | 03/12/2016 | 04/11/2017 | 775.00 | RENT | 746.00 | 0.00 | 746.00 | 250.00 | 6.21 |
| | | N/A | | Pending renewal | Trinh, Minh | 03/12/2016 | 04/12/2016 | 04/11/2018 | | RENT | 746.00 * | 0.00 * | 746.00 * | 0.00 | 0.00 |
| 23F | 2X2F | N/A | 1079 | Occupied | Sanchez, Moses | 01/09/2015 | 12/31/2016 | 06/30/2017 | 775.00 | RENT | 791.00 | 0.00 | 791.00 | 0.00 | 68.10 |
| 23G | 2X2F | N/A | 1079 | Occupied | Oxley, Lacie | 04/01/2016 | 04/01/2016 | 03/31/2017 | 775.00 | RENT | 746.00 | 0.00 | 746.00 | 250.00 | 56.89 |
| | | N/A | | Pending renewal | Oxley, Lacie | 04/01/2016 | 04/01/2017 | 09/30/2017 | | RENT | 746.00 * | 0.00 * | 746.00 * | 0.00 | 0.00 |

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 23H | 2X2F | N/A | 1079 | Occupied | Elder, Benjamin | 08/06/2015 | 08/06/2016 | 08/05/2017 | 775.00 | RENT | 782.00 | 0.00 | 782.00 | 0.00 | 56.89 |
| 23I | 2X2F | N/A | 1079 | Occupied | Taylor, Tristan | 09/30/2016 | 09/30/2016 | 09/29/2017 | 775.00 | PEST | 0.00 | 2.00 | 817.00 | 0.00 | 56.89 |
| | | | | | | | | | | RENT | 815.00 | 0.00 | | | |
| 23J | 2X2F | N/A | 1079 | Vacant-Leased | VACANT | | | | 775.00 | | 0.00 * | 0.00 * | | | |
| | | N/A | | Applicant | Anderson, Monica | 04/24/2017 | 04/24/2017 | 04/23/2018 | | RENT | 765.00 * | 0.00 * | 765.00 * | 0.00 | 0.00 |
| 23K | 2X2F | N/A | 1079 | Occupied | Bagcioglu, Stacy | 10/23/2015 | 10/18/2016 | 04/17/2017 | 775.00 | RENT | 781.00 | 0.00 | 781.00 | 0.00 | 56.89 |
| 23L | 2X2F | N/A | 1079 | Occupied | Barraza, Janet | 01/08/2013 | 12/22/2016 | 06/21/2017 | 775.00 | RENT | 796.00 | 0.00 | 796.00 | 0.00 | 56.89 |
| 24A | 2X1D | N/A | 996 | Occupied-NTV | Bell, Elroy | 03/05/2016 03/30/2017 | 03/05/2016 | 03/30/2017 | 658.00 | CONC/SPECL | 0.00 | ###### | 632.00 | 0.00 | 25.00 |
| | | | | | | | | | | RENT | 747.00 | 0.00 | | | |
| 24B | 2X1D | N/A | 996 | Occupied | London, Nichole | 10/31/2016 | 10/31/2016 | 10/30/2017 | 658.00 | PETRENT | 0.00 | 20.00 | 735.00 | 100.00 | 55.07 |
| | | | | | | | | | | RENT | 715.00 | 0.00 | | | |
| 24C | 2X1D | N/A | 996 | Occupied | Davis, Cade | 09/30/2016 | 10/01/2016 | 09/30/2017 | 658.00 | RENT | 728.00 | 0.00 | 728.00 | 0.00 | 43.86 |
| 24D | 2X1D | N/A | 996 | Occupied | Romack, Ray | 11/17/2005 | 11/06/2016 | 12/05/2017 | 658.00 | RENT | 752.00 | 0.00 | 752.00 | 200.00 | (34.93) |
| 24E | 2X1D | N/A | 996 | Vacant | VACANT | | | | 658.00 | | 0.00 * | 0.00 * | | | |
| 24F | 2X1D | N/A | 996 | Occupied | Guthrie, James | 11/25/2006 | 11/09/2016 | 12/08/2017 | 658.00 | RENT | 785.00 | 0.00 | 785.00 | 880.00 | 43.86 |

**Details**

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 24G | 2X1D | N/A | 996 | Occupied | Davis, Michelle | 03/20/2017 | 03/20/2017 | 03/19/2018 | 658.00 | RENT | 644.00 | 0.00 | 644.00 | 0.00 | 36.00 |
| 24H | 2X1D | N/A | 996 | Occupied-NTVL | Thompson, Wayne | 07/17/2015 04/01/2017 | 07/17/2015 | 07/11/2016 | 658.00 | MTOM | 0.00 | 100.00 | 838.00 | 400.00 | 0.00 |
| | | | | | | | | | | PETRENT | 0.00 | 40.00 | | | |
| | | | | | | | | | | RENT | 698.00 | 0.00 | | | |
| | | N/A | | Applicant | Neusch, Joseph | 05/06/2017 | 05/06/2017 | 05/05/2018 | | RENT | 644.00 * | 0.00 * | 644.00 * | 0.00 | 0.00 |
| 25A | 1X1B | N/A | 703 | Vacant-Leased | VACANT | | | | 554.00 | | 0.00 * | 0.00 * | | | |
| | | N/A | | Applicant | Johnson, Alexis | 05/27/2017 | 05/27/2017 | 05/26/2018 | | RENT | 544.00 * | 0.00 * | 544.00 * | 0.00 | 50.00 |
| 25B | 1X1B | N/A | 703 | Occupied | Skinner, Juanita | 05/18/2007 | 06/12/2016 | 07/11/2017 | 554.00 | RENT | 608.00 | 0.00 | 608.00 | 200.00 | (608.00) |
| 25C | 1X1B | N/A | 703 | Occupied | Harmel, Joanna | 02/16/2009 | 10/08/2016 | 11/07/2017 | 554.00 | PETRENT | 0.00 | 50.00 | 695.00 | 200.00 | 37.41 |
| | | | | | | | | | | RENT | 645.00 | 0.00 | | | |
| 25D | 1X1B | N/A | 703 | Occupied | Chavez, David | 10/07/2016 | 10/07/2016 | 10/07/2017 | 554.00 | RENT | 680.00 | 0.00 | 680.00 | 0.00 | 37.41 |
| 25E | 1X1B | N/A | 703 | Vacant-Leased | VACANT | | | | 554.00 | | 0.00 * | 0.00 * | | | |
| | | N/A | | Applicant | Smith, Michaella | 05/12/2017 | 05/12/2017 | 05/11/2018 | | PETRENT | 0.00 * | 20.00 * | 564.00 * | 0.00 | 50.00 |
| | | | | | | | | | | RENT | 544.00 * | 0.00 * | | | |
| 25F | 1X1B | N/A | 703 | Occupied | Martinez, Cassandra | 02/04/2015 | 01/30/2017 | 07/29/2017 | 554.00 | RENT | 649.00 | 0.00 | 649.00 | 250.00 | 37.41 |
| 25G | 1X1B | N/A | 703 | Occupied | Johnson, Tessa | 04/01/2016 | 04/01/2016 | 03/31/2017 | 554.00 | CONC/SPECL | 0.00 | (31.00) | 589.00 | 0.00 | 37.41 |
| | | | | | | | | | | RENT | 620.00 | 0.00 | | | |
| | | N/A | | Pending renewal | Johnson, Tessa | 04/01/2016 | 04/01/2017 | 09/30/2017 | | CONC/SPECL | 0.00 * | ###### * | 281.00 * | 0.00 | 0.00 |
| | | | | | | | | | | PEST | 0.00 * | 2.00 * | | | |
| | | | | | | | | | | RENT | 620.00 * | 0.00 * | | | |
| 25H | 1X1B | N/A | 703 | Vacant-Leased | VACANT | | | | 554.00 | | 0.00 * | 0.00 * | | | |
| | | N/A | | Applicant | Espino, Miguel | 05/13/2017 | 05/13/2017 | 05/12/2018 | | RENT | 544.00 * | 0.00 * | 544.00 * | 0.00 | 50.00 |
| 25I | 1X1B | N/A | 703 | Occupied | Cameron, Katy | 03/15/2013 | 05/31/2016 | 06/25/2017 | 554.00 | RENT | 579.00 | 0.00 | 579.00 | 0.00 | 37.41 |

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 25J | 1X1B | N/A | 703 | Occupied | Munoz, Brandy | 12/23/2015 | 12/18/2016 | 12/17/2017 | 554.00 | RENT | 612.00 | 0.00 | 612.00 | 0.00 | 37.41 |
| 25K | 1X1B | N/A | 703 | Vacant-Leased | VACANT | | | | 554.00 | | 0.00 * | 0.00 * | | | |
| | | N/A | | Applicant | Fannin, Travis | 04/01/2017 | 04/01/2017 | 03/31/2018 | | PETRENT | 0.00 * | 20.00 * | 700.00 * | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 680.00 * | 0.00 * | | | |
| 25L | 1X1B | N/A | 703 | Occupied | Smith, Hayley | 05/31/2016 | 05/31/2016 | 05/30/2017 | 554.00 | CONC/SPECL | 0.00 | (31.00) | 594.00 | 0.00 | 36.17 |
| | | | | | | | | | | RENT | 625.00 | 0.00 | | | |
| 26A | 2X2F | N/A | 1079 | Occupied | Fenn, Joseph | 03/20/2013 | 07/02/2016 | 07/01/2017 | 775.00 | PEST | 0.00 | 2.00 | 763.00 | 200.00 | 78.63 |
| | | | | | | | | | | RENT | 761.00 | 0.00 | | | |
| 26B | 2X2F | N/A | 1079 | Occupied | Chandler, Janice | 05/11/2009 | 08/11/2016 | 08/10/2017 | 775.00 | RENT | 738.00 | 0.00 | 738.00 | 150.00 | 45.68 |
| 26C | 2X2F | N/A | 1079 | Occupied | Ford, Sherry | 06/13/2015 | 07/08/2016 | 08/07/2017 | 775.00 | RENT | 728.00 | 0.00 | 728.00 | 0.00 | 45.68 |

**Details**

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 26D | 2X2F | N/A | 1079 | Occupied | Riley, James | 07/28/2012 | 07/11/2016 | 07/10/2017 | 775.00 | PETRENT | 0.00 | 20.00 | 780.00 | 200.00 | 56.89 |
| | | | | | | | | | | RENT | 760.00 | 0.00 | | | |
| 26E | 2X2F | N/A | 1079 | Occupied | Venhaus, Skyla | 10/30/2015 | 02/01/2017 | 04/24/2017 | 775.00 | RENT | 781.00 | 0.00 | 781.00 | 0.00 | 68.10 |
| 26F | 2X2F | N/A | 1079 | Occupied | Parrish, Delta | 11/21/2016 | 11/21/2016 | 11/20/2017 | 775.00 | PEST | 0.00 | 2.00 | 852.00 | 0.00 | (852.00) |
| | | | | | | | | | | RENT | 850.00 | 0.00 | | | |
| 26G | 2X2F | N/A | 1079 | Occupied | Nyiramwiza, Aimee | 08/13/2016 | 08/13/2016 | 08/12/2017 | 775.00 | RENT | 774.00 | 0.00 | 774.00 | 0.00 | 68.10 |
| 26H | 2X2F | N/A | 1079 | Occupied | Larimore, Sharon | 05/06/2015 | 05/31/2016 | 05/26/2017 | 775.00 | PETRENT | 0.00 | 20.00 | 760.00 | 200.00 | 56.89 |
| | | | | | | | | | | RENT | 740.00 | 0.00 | | | |
| 27A | 1X1B | N/A | 703 | Occupied | Hedger, Rick | 01/03/2012 | 07/14/2016 | 08/13/2017 | 554.00 | RENT | 647.00 | 0.00 | 647.00 | 0.00 | 37.41 |
| 27B | 1X1B | N/A | 703 | Occupied | Parr, Twylia | 03/31/2014 | 03/27/2015 | 03/21/2016 | 554.00 | MTOM | 0.00 | 100.00 | 770.00 | 400.00 | (770.00) |
| | | | | | | | | | | PETRENT | 0.00 | 50.00 | | | |
| | | | | | | | | | | RENT | 620.00 | 0.00 | | | |
| 27C | 1X1B | N/A | 703 | Occupied | Shoemaker, Robyn | 07/11/2015 | 08/05/2016 | 09/04/2017 | 554.00 | RENT | 625.00 | 0.00 | 625.00 | 0.00 | (625.00) |
| 27D | 1X1B | N/A | 703 | Occupied | Romero, Isreal | 02/15/2017 | 02/15/2017 | 02/14/2018 | 554.00 | CONC/SPECL | 0.00 | (27.00) | 519.00 | 0.00 | 40.91 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 544.00 | 0.00 | | | |
| 27E | 1X1B | N/A | 703 | Vacant-Leased | VACANT | | | | 554.00 | | 0.00 * | 0.00 * | | | |
| | | N/A | | Applicant | Rosario, Angel | 05/01/2017 | 05/01/2017 | 04/30/2018 | | RENT | 544.00 * | 0.00 * | 544.00 * | 0.00 | (25.00) |
| 27F | 1X1B | N/A | 703 | Occupied-NTV | Neusch, Joseph | 09/25/2015 04/21/2017 | 10/20/2016 | 10/19/2017 | 554.00 | RENT | 607.00 | 0.00 | 607.00 | 200.00 | 37.17 |
| 27G | 1x1B R | N/A | 703 | Occupied | Spencer, Jennifer | 02/13/2017 | 02/13/2017 | 08/12/2017 | 554.00 | PEST | 0.00 | 2.00 | 646.00 | 250.00 | (7.36) |
| | | | | | | | | | | RENT | 644.00 | 0.00 | | | |
| 27H | 1X1B | N/A | 703 | Occupied | Lanier, Carmen | 05/21/2012 | 10/01/2016 | 03/31/2017 | 554.00 | PETRENT | 0.00 | 25.00 | 653.00 | 200.00 | 37.41 |
| | | | | | | | | | | RENT | 628.00 | 0.00 | | | |
| 28A | 2X1D | N/A | 996 | Occupied | Chadwick, Jordan | 12/13/2016 | 12/13/2016 | 12/12/2017 | 658.00 | CONC/SPECL | 0.00 | (36.00) | 719.00 | 0.00 | 42.21 |
| | | | | | | | | | | PETRENT | 0.00 | 40.00 | | | |
| | | | | | | | | | | RENT | 715.00 | 0.00 | | | |
| 28B | 2X1D | N/A | 996 | Occupied | Herron, Allan | 05/28/2016 | 05/28/2016 | 05/27/2017 | 658.00 | CONC/SPECL | 0.00 | ###### | 622.00 | 0.00 | 66.28 |
| | | | | | | | | | | PETRENT | 0.00 | 20.00 | | | |

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|------|-----------|------------------|-----|-------------------|------|------------------|-------------|-----------|----------------|------------|------------|------------------------|---------------|-------------|---------|
| | | | | | | | | | | RENT | 722.00 | 0.00 | | | |
| 28C | 2X1D | N/A | 996 | Occupied | Hinkley, Patricia | 09/02/2012 | 12/14/2016 | 12/13/2017 | 658.00 | PEST | 0.00 | 2.00 | 739.00 | 0.00 | 43.86 |
| | | | | | | | | | | RENT | 737.00 | 0.00 | | | |

**Details**

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|------|-----------|------------------|-----|-------------------|------|------------------|-------------|-----------|----------------|------------|------------|------------------------|---------------|-------------|---------|
| 28D | 2X1D | N/A | 996 | Vacant-Leased | VACANT | | | | 658.00 | | 0.00 * | 0.00 * | | | |
| | | N/A | | Applicant | McNeill, Elisabeth | 05/20/2017 | 05/20/2017 | 05/19/2018 | | RENT | 644.00 * | 0.00 * | 644.00 * | 0.00 | 0.00 |
| 28E | 2X1D | N/A | 996 | Occupied | Slaton, Angela | 05/15/2015 | 05/10/2016 | 05/05/2017 | 658.00 | RENT | 687.00 | 0.00 | 687.00 | 0.00 | 43.86 |
| 28F | 2X1D | N/A | 996 | Vacant-Leased | VACANT | | | | 658.00 | | 0.00 * | 0.00 * | | | |
| | | N/A | | Applicant | HUDSON, CHRISTIAN | 04/01/2017 | 04/01/2017 | 03/31/2018 | | PETRENT | 0.00 * | 20.00 * | 664.00 * | 0.00 | 0.00 |
| | | | | | | | | | | RENT | 644.00 * | 0.00 * | | | |
| 28G | 2X1D | N/A | 996 | Occupied | Howard, Diane | 07/20/2006 | 11/11/2016 | 11/10/2017 | 658.00 | RENT | 727.00 | 0.00 | 727.00 | 200.00 | 43.78 |
| 28H | 2X1D | N/A | 996 | Occupied | Detten, Heather | 03/13/2016 | 03/13/2017 | 03/12/2018 | 658.00 | RENT | 644.00 | 0.00 | 644.00 | 0.00 | 130.31 |
| 29A | 1X1B | N/A | 703 | Occupied | Gildea, Joe | 06/01/2009 | 10/07/2016 | 11/06/2017 | 554.00 | RENT | 614.00 | 0.00 | 614.00 | 0.00 | 37.41 |
| 29B | 1X1B | N/A | 703 | Occupied | Lively, Mark | 07/25/2015 | 05/25/2016 | 05/20/2017 | 554.00 | RENT | 612.00 | 0.00 | 612.00 | 0.00 | 37.41 |
| 29C | 1X1B | N/A | 703 | Occupied | Moore, Elizabeth | 08/21/2015 | 09/21/2016 | 09/20/2017 | 554.00 | RENT | 628.00 | 0.00 | 628.00 | 200.00 | 37.41 |
| 29D | 1X1B | N/A | 703 | Occupied | Theriot, Katherine | 02/18/2017 | 02/18/2017 | 02/17/2018 | 554.00 | CONC/SPECL | 0.00 | (27.00) | 519.00 | 0.00 | (478.09) |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 544.00 | 0.00 | | | |
| 29E | 1X1B | N/A | 703 | Vacant-Leased | VACANT | | | | 554.00 | | 0.00 * | 0.00 * | | | |
| | | N/A | | Applicant | Solano, Sylvia | 04/01/2017 | 04/01/2017 | 03/31/2018 | | RENT | 544.00 * | 0.00 * | 544.00 * | 0.00 | (0.99) |
| 29F | 1X1B | N/A | 703 | Vacant-Leased | VACANT | | | | 554.00 | | 0.00 * | 0.00 * | | | |
| | | N/A | | Applicant | Boone, Juanita | 06/27/2017 | 06/27/2017 | 06/26/2018 | | RENT | 544.00 * | 0.00 * | 544.00 * | 0.00 | 0.00 |
| 29G | 1X1B | N/A | 703 | Occupied | Richards, Stephen | 07/11/2015 | 01/06/2017 | 07/05/2017 | 554.00 | RENT | 633.00 | 0.00 | 633.00 | 200.00 | 48.63 |
| 29H | 1X1B | N/A | 703 | Occupied | Tenorio, Agneda | 02/07/2005 | 11/10/2016 | 12/09/2017 | 554.00 | RENT | 625.00 | 0.00 | 625.00 | 200.00 | 37.42 |
| 30A | 1X1B | N/A | 703 | Occupied | Munoz, Jessica | 09/30/2016 | 09/30/2016 | 09/29/2017 | 554.00 | CONC/SPECL | 0.00 | (31.00) | 601.00 | 0.00 | 37.41 |
| | | | | | | | | | | PEST | 0.00 | 2.00 | | | |
| | | | | | | | | | | RENT | 630.00 | 0.00 | | | |
| 30B | 1X1B | N/A | 703 | Vacant-Leased | VACANT | | | | 554.00 | | 0.00 * | 0.00 * | | | |
| | | N/A | | Applicant | Mchugh, Doug | 06/24/2017 | 06/24/2017 | 06/23/2018 | | RENT | 544.00 * | 0.00 * | 544.00 * | 0.00 | (50.00) |
| 30C | 1X1B | N/A | 703 | Occupied | Leivo, Sean | 07/01/2016 | 07/01/2016 | 06/30/2017 | 554.00 | RENT | 626.00 | 0.00 | 626.00 | 250.00 | (626.00) |
| 30D | 1X1B | N/A | 703 | Occupied | Castaneda, Jacob | 03/15/2016 | 03/15/2017 | 09/14/2017 | 554.00 | RENT | 620.00 | 0.00 | 620.00 | 250.00 | 30.17 |
| 30E | 1X1B | N/A | 703 | Vacant-Leased | VACANT | | | | 554.00 | | 0.00 * | 0.00 * | | | |
| | | N/A | | Applicant | Lopez, Areail | 03/30/2017 | 03/30/2017 | 03/29/2018 | | RENT | 544.00 * | 0.00 * | 544.00 * | 0.00 | 0.00 |
| 30F | 1X1B | N/A | 703 | Vacant-Leased | VACANT | | | | 554.00 | | 0.00 * | 0.00 * | | | |
| | | N/A | | Applicant | Shukur, Yass | 04/28/2017 | 04/28/2017 | 04/27/2018 | | RENT | 544.00 * | 0.00 * | 544.00 * | 0.00 | 0.00 |

**Details**

| Unit | Floorplan | Unit Designation | SQF | Unit/Lease Status | Name | Move-In Move-Out | Lease Start | Lease End | Market + Addl. | Trans Code | Lease Rent | Other Charges/ Credits | Total Billing | Dep On Hand | Balance |
|------|-----------|------------------|-----|-------------------|------|------------------|-------------|-----------|----------------|------------|------------|------------------------|---------------|-------------|---------|

| Unit | Type | | SqFt | Status | Name | | | | Market | Charge | | | Total | Deposit | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 30G | 1X1B | N/A | 703 | Occupied | Shoemaker, Charles | 08/28/2015 | 09/22/2016 | 09/21/2017 | 554.00 | RENT | 654.00 | 0.00 | 654.00 | 200.00 | 48.63 |
| 30H | 1X1B | N/A | 703 | Occupied-NTV | Lorta, Trent | 03/24/2014 04/09/2017 | 04/14/2016 | 04/09/2017 | 554.00 | RENT | 619.00 | 0.00 | 619.00 | 200.00 | 48.63 |
| 31A | 2X2F | N/A | 1079 | Occupied | Owens, Sally | 03/21/2015 | 03/12/2016 | 03/11/2018 | 775.00 | PETRENT | 0.00 | 25.00 | 782.00 | 200.00 | 56.89 |
|  |  |  |  |  |  |  |  |  |  | RENT | 757.00 | 0.00 |  |  |  |
| 31B | 2X2F | N/A | 1079 | Occupied | Dockins, Chase | 03/23/2015 | 03/14/2016 | 03/13/2018 | 775.00 | PETRENT | 0.00 | 20.00 | 916.00 | 200.00 | 56.89 |
|  |  |  |  |  |  |  |  |  |  | RENT | 896.00 | 0.00 |  |  |  |
| 31C | 2X2F | N/A | 1079 | Vacant | VACANT |  |  |  | 775.00 |  | 0.00 * | 0.00 * |  |  |  |
| 31D | 2X2F | N/A | 1079 | Vacant-Leased | VACANT |  |  |  | 775.00 |  | 0.00 * | 0.00 * |  |  |  |
|  |  | N/A |  | Applicant | Foard, Alexandria | 04/01/2017 | 04/01/2017 | 03/31/2018 |  | RENT | 765.00 * | 0.00 * | 765.00 * | 0.00 | 0.00 |
| 31E | 2X2F | N/A | 1079 | Occupied | Pacheco, Ashlee | 01/17/2015 | 02/07/2014 | 03/06/2018 | 775.00 | RENT | 798.00 | 0.00 | 798.00 | 0.00 | 68.10 |
| 31F | 2X2F | N/A | 1079 | Vacant | VACANT |  |  |  | 775.00 |  | 0.00 * | 0.00 * |  |  |  |
| 31G | 2X2F | N/A | 1079 | Occupied | Vallejo, Cassandra | 03/17/2017 | 03/17/2017 | 03/16/2018 | 775.00 | RENT | 765.00 | 0.00 | 765.00 |  | 99.00 |
| 31H | 2X2F | N/A | 1079 | Occupied | Frank, Don | 10/08/2004 | 05/13/2016 | 05/08/2017 | 775.00 | RENT | 778.00 | 0.00 | 778.00 | 200.00 | 45.68 |
| 31I | 2X2F | N/A | 1079 | Vacant-Leased | VACANT |  |  |  | 775.00 |  | 0.00 * | 0.00 * |  |  |  |
|  |  | N/A |  | Applicant | Velo, Abigail | 04/15/2017 | 04/15/2017 | 04/14/2018 |  | RENT | 765.00 * | 0.00 * | 765.00 * | 0.00 | 0.00 |
| 31J | 2X2F | N/A | 1079 | Occupied | Beane, Heather | 11/25/2014 | 11/16/2016 | 05/15/2017 | 775.00 | RENT | 788.00 | 0.00 | 788.00 | 0.00 | (788.00) |
| 31K | 2X2F | N/A | 1079 | Occupied | Quintero, Christina | 02/13/2016 | 02/08/2017 | 08/07/2017 | 775.00 | CONC/SPECL | 0.00 | ###### | 373.00 | 0.00 | 68.10 |
|  |  |  |  |  |  |  |  |  |  | RENT | 746.00 | 0.00 |  |  |  |
| 31L | 2X2F | N/A | 1079 | Vacant-Leased | VACANT |  |  |  | 775.00 |  | 0.00 * | 0.00 * |  |  |  |
|  |  | N/A |  | Applicant | Bagcioglu, Stacy | 05/13/2017 | 05/13/2017 | 05/12/2018 |  | RENT | 765.00 * | 0.00 * | 765.00 * | 0.00 | 0.00 |
| **Totals:** |  |  |  |  |  |  |  |  | **161,272.00** |  | **142,565.00** | **(1,325.40)** | **141,239.60** | **19,155.00** | |

Amt / SQFT: Market = 222,632 SQFT; Leased = 179,821 SQFT;

| Floorplan | # Units | Average SQFT | Average Market + Addl. | Market Amt / SQFT | Average Leased | Leased Amt / SQFT | Units Occupied | Occupancy % | Units Available |
|---|---|---|---|---|---|---|---|---|---|
| 1X1A | 104 | 665 | 492.00 | 0.74 | 572.37 | 0.86 | 83 | 79.81 | 26 |
| 1X1B | 62 | 703 | 554.00 | 0.79 | 601.49 | 0.86 | 51 | 82.26 | 3 |
| 1x1B LR | 1 | 703 | 554.00 | 0.79 | 589.00 | 0.84 | 1 | 100.00 | 0 |
| 1x1B R | 1 | 703 | 554.00 | 0.79 | 644.00 | 0.92 | 1 | 100.00 | 0 |
| 2X1C | 28 | 960 | 630.00 | 0.66 | 686.16 | 0.71 | 25 | 89.29 | 5 |
| 2X1D | 31 | 996 | 658.00 | 0.66 | 718.31 | 0.72 | 26 | 83.87 | 5 |
| 2X1D R | 1 | 996 | 658.00 | 0.66 | 715.00 | 0.72 | 1 | 100.00 | 0 |
| 2X2E | 16 | 950 | 697.00 | 0.73 | 711.70 | 0.75 | 10 | 62.50 | 4 |
| 2X2F | 32 | 1,079 | 775.00 | 0.72 | 779.48 | 0.72 | 25 | 78.13 | 2 |
| **Totals / Averages:** | **276** | **807** | **584.32** | **0.72** | **639.30** | **0.79** | **223** | **80.80** | **45** |

### Occupancy and Rents Summary for Current Date

| Unit Status | Market + Addl. | # Units | Potential Rent |
|---|---|---|---|
| Occupied, no NTV | 117,971.00 | 201 | 128,533.00 |
| Occupied, NTV | 11,430.00 | 21 | 13,334.00 |
| Occupied NTV Leased | 658.00 | 1 | 698.00 |

| | | | |
|---|---|---|---|
| Vacant Leased | 15,038.00 | 25 | 15,038.00 |
| Admin/Down | 2,373.00 | 4 | 2,373.00 |
| Vacant Not Leased | 13,802.00 | 24 | 13,802.00 |
| **Totals:** | **161,272.00** | **276** | **173,778.00** |

**Summary Billing by Transaction Code for Current Date**

| Code | Amount |
|---|---|
| CONC/SPECL | (3,329.40) |
| EMPLCRED | (139.00) |
| MTOM | 1,000.00 |
| PEST | 58.00 |
| PETRENT | 935.00 |
| RENT | 142,565.00 |
| UPGRADE | 150.00 |
| **Total:** | **141,239.60** |

## SCHEDULE II

## BORROWER ORGANIZATIONAL CHART



**<u>SCHEDULE III</u>**

**<u>DEPOSIT AMOUNTS</u>**

| | |
|---|---|
| Initial Required Repair Deposit | $5,700,398.00 |
| Initial Tax Deposit: | $743,302.00 |
| Tax Monthly Deposit: | $124,322.00 |
| Initial Insurance Premiums Deposit: | $41,017.00 |
| Insurance Premiums Monthly Deposit: | $41,017.00 |
| Collateral Cash | $2,536,000.00 |

# SCHEDULE IV

# REQUIRED REPAIRS

| | Portfolio | Caribbean | Forest Park | Warwick | Wind Tree | Coulter |
|---|---|---|---|---|---|---|
| **Required Repairs** | | | | | | |
| Signage | 7,000 | - | - | - | - | 7,000 |
| Landscaping / Property Visibility | 269,700 | 100,000 | 6,200 | 103,500 | 25,000 | 35,000 |
| Leasing Office | 180,000 | 80,000 | 19,000 | 7,500 | 57,000 | 16,500 |
| Clubhouse | 677,750 | 50,250 | 19,500 | 150,000 | 436,000 | 22,000 |
| Outdoor Amenities | 480,500 | 166,000 | 32,500 | 92,500 | 117,500 | 72,000 |
| Model Apartments | 22,000 | 7,500 | 6,000 | - | 8,500 | - |
| Apt. Unit Interior Deferred Maintenance | 1,219,454 | 197,408 | 81,258 | 233,244 | 550,206 | 157,338 |
| Building Construction (Ext. Paint, Roofs, Hallways, Stairs, etc) | 1,178,620 | 336,000 | 188,780 | 464,200 | 129,640 | 60,000 |
| Property Features (Parking Lots, Sidewalks, Curbs, Landscaping, etc) | 810,750 | 192,000 | 55,600 | 104,500 | 330,775 | 127,875 |
| Misc. (Electrical, Drainage, Irrigation) | 583,690 | 175,850 | 21,900 | 207,100 | 20,740 | 158,100 |
| Contingency | 271,473 | 65,250 | 21,537 | 68,127 | 83,768 | 32,791 |
| **Subtotal - Before Construction Mgmt. Fees** | **5,700,938** | **1,370,258** | **452,275** | **1,430,671** | **1,759,129** | **688,604** |
| | | | | | | |
| Construction Mgmt. Fees | 570,094 | 137,026 | 45,228 | 143,067 | 175,913 | 68,860 |
| Total Required Repairs | 6,271,031 | 1,507,284 | 497,503 | 1,573,738 | 1,935,042 | 757,464 |

## SCHEDULE V

## REA

That certain Declaration of Covenants and Restrictions of Oakland Forest, dated August 10, 1981, recorded  in Official Records Book 9761 at Page 815 of the Public Records of Broward County, Florida; as amended by that certain Termination of Declarant's Control dated February 6, 1992, recorded in Official Records Book 19177 at Page 0756 in the aforesaid Public Records; as further amended by that certain Certificate of Amendment to the By-Laws of Oakland Forest Property Owners Association, Inc., dated September 10, 2010 and recorded in Official Records Book 47359 at Page 1380 in the aforesaid Public Records, as the same may be further amended, restated, assigned or otherwise modified from time to time.

## **SCHEDULE VI-1**

## **O&M FOR ASBESTOS CONTAINING MATERIALS**

# ASBESTOS
# OPERATIONS AND MAINTENANCE
# PROGRAM
### FOR
# COULTER LANDING
# 7208 SOUTHWEST 34TH AVENUE
# AMARILLO, TEXAS 79109

**Date:** February 27, 2017

# **Table of Contents**

| Section | Page No. |
|---|---|
| 1.0 PURPOSE OF OPERATIONS AND MAINTENANCE PROGRAM | 3 |
| 2.0 ASBESTOS OPERATIONS AND MAINTENANCE MANAGER | 5 |
| 3.0 NOTIFICATION | 6 |
| 4.0 SURVEILLANCE | 7 |
| 5.0 CONTROLS | 8 |
| 6.0 WORK PRACTICES/WORKER PROTECTION | 9 |
| 7.0 WORKER TRAINING | 14 |
| 8.0 RECORD KEEPING | 15 |

**Appendices:**

| Appendix A | Operation & Maintenance Forms |
|---|---|
| Appendix B | Reference Rules and Regulations |
| Appendix C | USEPA Guidance Document |

# 1.0    PURPOSE OF OPERATIONS AND MAINTENANCE PROGRAM

The principal objective of the asbestos O&M Program is to minimize exposure of building occupants and workers to asbestos fibers.

The O&M Program is a "best management practices" plan.  The O&M Program is not a regulatory compliance program and is not meant to imply compliance with Federal worker protection regulations, such as Occupational Safety and Health Administration (OSHA); Federal regulations regarding the release of asbestos fibers, such as National Emission Standards for Hazardous Air Pollutant (NESHAP); or other State or local regulations.

A Phase I Environmental Site Assessment (ESA) completed by Velocity Consulting, Inc. and dated February 23, 2017 identified the following Suspect ACMs (SACMs).

| Material | Location | Amount/ Condition/ Friability |
|---|---|---|
| "Popcorn" ceiling texture | Apartments | Not quantified/ good/friable |
| Wallboard | Throughout the property | Not quantified/ good/non-friable |
| Vinyl floor tile and mastic | Apartments and laundry rooms | Not quantified/ good/non-friable |
| Roofing materials | Roofs | Not quantified/ good/non-friable |

The above-listed materials were identified in a limited asbestos survey conducted as part of Velocity Consulting Inc.'s Phase I ESA.  The limited asbestos survey was only meant to identify readily accessible ACMs and SACMs in representative areas only.  The limited asbestos survey is not a full or comprehensive asbestos survey nor does it render a property asbestos-free.  The limited asbestos survey is not meant to comply with Asbestos Hazard Emergency Response Act (AHERA), 40 Code of Federal Regulations (CFR) Part 763, National Emission Standards for Hazardous Air Pollutants (NESHAP) 40 CFR 61, Occupational Safety and Health (OSHA) 29 CFR Part 1926.1101, or other local, state, or federal regulations.

For the purposes of this O&M Program, all SACM will be referred to as ACM.  This O&M Program will be maintained until all ACM is removed from the subject property.

The O&M Program will in no way substitute for proper asbestos training.  All building personnel, at a minimum, will read this program and be familiar with the basics of the O&M Program.

Additional information and guidance on establishing an asbestos O&M Program can be found in the United States Environmental Protection Agency (USEPA) guidance document titled "Managing Asbestos In-Place, A Building Owner's Guide to Operations and Maintenance

Programs for Asbestos-Containing Materials."  This guidance document is also known as "the Green Book" and is provided in Appendix C.

## 2.0    ASBESTOS OPERATIONS AND MAINTENANCE MANAGER

An essential component of the asbestos O&M program is the appointment of an O&M manager (OMM).  The OMM is usually a building engineer, superintendent or facilities manager.  This person should be properly qualified, through training and experience, and be actively involved in all asbestos-related activities at the property, including inspections, O&M activities and removal and repair of ACM.

The position of Operations and Maintenance Manager (OMM) for the subject property is held by:

| Name | |
|------|---|
| Address | |
| Telephone | |

# 3.0    NOTIFICATION

A program should be implemented to inform workers, tenants, and building occupants of the physical location of ACM and stress the need to avoid disturbing or damaging existing ACMs.  All persons affected should be properly informed.

The purpose of the notification is to avoid the accidental disturbance of ACM and the subsequent  release of asbestos fibers.  Informed persons are less likely to unknowingly disturb the material and cause fibers to be released into the air.

The method of notification should be tailored to the type, condition, and location of the ACMs present.

# 4.0   SURVEILLANCE

All identified ACM and materials suspected to contain asbestos should be inspected annually.

The inspections will include identifying and recording changes in the condition of the ACM, including damage and deterioration, and changes in the use and activity of spaces containing ACM.  Special attention will be given to friable ACM and ACM located in high activity areas that are susceptible to damage and subsequent deterioration.

The annual inspections can be conducted by the OMM or an outside consultant.  If the annual inspections are conducted by an outside consultant, the OMM should accompany the consultant during the inspections.  All annual inspection documentation and reports should be maintained by the OMM.  The Periodical Surveillance Form included in Appendix A can be used to document the inspections.

In addition, building personnel should report all damage and changes in the condition of ACM and suspect ACM to the OMM immediately

# 5.0    CONTROLS

A system should be put in place to control all activities that might disturb the ACM.

The OMM should determine if any planned work will disturb any ACMs.  If the work is to disturb a SACM, then a prudent measure is to sample the SACM at that time to determine its asbestos content.  The asbestos samples should be analyzed by an accredited laboratory for asbestos content.

All work that can potentially damage ACM should be controlled/managed in such a way as to minimize disturbance of ACMs and the release of asbestos fibers.

One way to achieve this goal is to use a permitting system consisting of the use of three forms.  Examples of these three forms are included in Appendix A.  The forms can and should be modified to suit the individual parameters of the site, the management team, and the types of ACMs present.  The three example forms are as follows:

> Maintenance Work Location Form: This form describes the proposed maintenance work and must be submitted to the OMM before any maintenance work is begun
> Maintenance Work Authorization Form: This form must be approved by the OMM before any maintenance work is begun and dictates the work practices and personal protective equipment/clothing to be used during the maintenance work.
> Asbestos Maintenance Closure Form: This form will document the methods undertaken to minimize the disturbance of ACM and the release of asbestos fibers (i.e. control methods, protective equipment, etc.)

Copies of all Maintenance Work Location Forms, Maintenance Work Authorization Forms, Asbestos Maintenance Closure Forms and laboratory asbestos sample results should be kept on file for future reference.

Implementation of this O&M program should address work conducted by outside contractors. Proposals and work orders from outside contractors should be thoroughly reviewed to ensure that appropriate work practices are followed as related to ACMs.

All work that will result in the disturbance of ACM should be conducted in accordance with applicable USEPA, Occupational Safety and Health Administration (OSHA), and/or state and local regulations.

# 6.0   WORK PRACTICES/WORKER PROTECTION

This section describes work practices that are designed to avoid or minimize the chances of fiber release.

**The work practices and worker protection procedures described in this section (6.0 through 6.4) are only necessary if a known ACM is to be disturbed. If the asbestos content of a material to be disturbed is unknown, then samples should taken prior to the commencement of work and analyzed for asbestos content by an accredited laboratory.**

The following lists the ACMs found on-site and the special practices that need to be taken for that material.

| FRIABLE SUSPECT ASBESTOS-CONTAINING POPCORN TEXTURED CEILING TILES | |
|---|---|
| Initial and Periodic Cleaning | None required |
| Periodic Surveillance: | Annual |
| Labeling | None required |
| Restricted Activities | Any activities that may result in the damage or disturbance of the friable suspect asbestos-containing popcorn textured ceiling tiles |
| | Avoid hanging objects from the friable suspect asbestos- containing popcorn textured ceiling tiles |

| NON-FRIABLE SUSPECT ASBESTOS-CONTAINING WALLBOARD ASSEMBLIES | |
|---|---|
| Initial and Periodic Cleaning | As needed |
| Periodic Surveillance: | Annual |
| Labeling | None required |
| Restricted Activities | Any activities that may result in the damage or disturbance of the non-friable suspect asbestos-containing wallboard assemblies |
| | Avoid sanding or scraping the non-friable suspect asbestos-containing wallboard assemblies, drywall, sheetrock or plaster |

| NON-FRIABLE SUSPECT ASBESTOS-CONTAINING ROOFING MATERIALS | |
|---|---|
| Initial and Periodic Cleaning | As needed |
| Periodic Surveillance: | As needed |
| Labeling | None required |
| Restricted Activities | Any activities that may result in the damage or disturbance of the non-friable suspect asbestos-containing roofing materials |
| | Avoid sanding or scraping the non-friable suspect asbestos-containing roofing materials |

| NON-FRIABLE SUSPECT ASBESTOS-CONTAINING VINYL FLOOR TILES AND MASTIC | |
|---|---|
| Initial and Periodic Cleaning | As needed |
| Periodic Surveillance: | Annual |
| Labeling | None required |
| Restricted Activities | Any activities that may result in the damage or disturbance of the non-friable suspect asbestos-containing vinyl floor tiles and mastic |
| | Avoid sanding or scraping the non-friable suspect asbestos-containing vinyl floor tiles and mastic |

The O&M Program focuses on a special set of work practices for the custodial, maintenance, and construction staff. The nature and extent of any special work practices will be tailored to the likelihood that the ACM will be disturbed and that fibers will be released. In general, four broad categories of O&M work practices are recognized. These categories are listed below and are discussed in sub-sections 6.1 through 6.4.

> Worker Protection Programs: These work practices help ensure custodial and maintenance staff are adequately protected from asbestos exposure.
> Basic O&M Procedures: These are basic procedures used to perform routine custodial and maintenance tasks that may involve ACM.
> Special O&M Cleaning Techniques: These are special techniques to clean up asbestos fibers on a routine basis.
> Procedures for Asbestos Fiber Release Episodes: These are procedures used to address the hazards involving the disturbance of moderate to relatively large amounts of ACM.

## 6.1    WORKER PROTECTION PROGRAM

The Worker Protection Program is only necessary if a known ACM is to be disturbed. If the asbestos content of a material to be disturbed is unknown, then samples should taken prior to the commencement of work and analyzed for asbestos content by an accredited laboratory.

The Worker Protection Program includes engineering controls, personal exposure monitoring, medical surveillance, and personal protection. While engineering controls are the preferred method of worker protection, there are few engineering control options available for O&M work. There are two key aspects of personal protection: the use of respiratory protection and the use of protective clothing for workers. These two key aspects are detailed in subsections 6.1.1 and 6.1.2 below.

### 6.1.1    RESPIRATORY PROTECTION/WORKER PROTECTION PROGRAMS

OSHA regulations require a written respiratory protection program whenever an O&M Program specifies that service workers wear respirators, or where employees are exposed, or are likely to be exposed, to fiber levels above OSHA's "permissible exposure limits" (0.2 fibers per cubic centimeter (f/cc) of air based on an 8-hour time-weighted average sampling period) or the 30-minute "excursion limit" (1.0 f/cc as averaged over a sampling period of 30 minutes).

Proper respiratory protection is an integral part of all custodial and maintenance activities involving potential exposure to asbestos. When in doubt about exposure during a certain work operation, building owners will provide respiratory protection to custodial and maintenance workers. OSHA specifies general types of respirators for protection against airborne asbestos during "construction" activities, which include abatement, renovation, maintenance, repair, and remodeling.

When adequate care is taken to prevent or minimize and control fiber release, routine small-scale/short-duration maintenance or custodial tasks are not likely to generate high levels of airborne asbestos compared to large asbestos removal projects. Therefore, respirators that

filter breathing air may be used in these instances. OSHA, EPA, and NIOSH do not recommend single use, disposable paper dust masks for use against asbestos; in fact, OSHA has disallowed their use against airborne asbestos fibers.

The options that may be used include: a half- or full-face, negative pressure, air-purifying respirator with replaceable high-efficiency filters; or a half- or full-face powered air-purifying respirator (PAPR) with replaceable high-efficiency filters. This has a battery-powered pump that assists breathing and provides positive pressure in the face piece.

Currently, only respirators approved by NIOSH and the Mine Safety and Health Administration (MSHA) are permitted for use. If they are air purifying respirators, the filtration device(s) must be rated as "high-efficiency."

### 6.1.2   PROTECTIVE CLOTHING/WORKER PROTECTION PROGRAMS

In addition to respirators, some O&M procedures may require workers to wear protective clothing. Most often, protective clothing is disposable and consists of coveralls, a head cover, and foot covers made of a synthetic fabric that does not allow asbestos fibers to pass through. This type of clothing prevents workers' regular clothing from becoming contaminated with asbestos fibers. Contaminated clothing could unknowingly be taken home, creating a possible risk to the worker's family members.

OSHA and EPA regulations require workers to wear protective clothing whenever they are exposed, or likely to be exposed, to fiber levels above OSHA's permissible levels. It is important that workers be properly trained in the use, removal, and disposal of protective clothing after use. All O&M activities may not require the use of protective clothing. It is important for the OMM to assess this need on a case-by-case basis.

## 6.2   BASIC O&M PROCEDURES

These procedures are only necessary if a known ACM is to be disturbed. If the asbestos content of a material to be disturbed is unknown, then samples should taken prior to the commencement of work and analyzed for asbestos content by an accredited laboratory.

Basic O&M procedures to minimize and/or contain asbestos fibers include wet methods, use of mini-enclosures, use of portable power tools equipped with special local ventilation attachments, and avoidance of certain activities, such as sawing, sanding, and drilling ACM.

Special work practices such as wet wiping, area isolation, HEPA vacuuming, and the use of personal protective equipment such as respirators and protective clothing, may be needed where disturbance of ACM is likely. The need for these practices varies with the situation. These work practices and procedures are intended to ensure that disturbances of any ACM during O&M activities are minimized, or carried out under controlled conditions when the disturbance is required by the nature of a specific O&M task.

## 6.3    O&M CLEANING PRACTICES

These procedures are only necessary if a known ACM is to be or has been disturbed and the resulting debris must be cleaned up.  If the asbestos content of a material to be disturbed is unknown, then samples should taken prior to the commencement of work and analyzed for asbestos content by an accredited laboratory.

Building owners and custodial and maintenance staff will ensure that special O&M cleaning is done correctly.  Proper cleaning is important for the following two reasons:

1) The use of improper techniques to clean up asbestos debris caused by previous deterioration or damage may result in widespread contamination, and potentially increase air-borne asbestos fiber levels in the building.
2) Improper cleaning may cause damage to the ACM, thus releasing more airborne asbestos fibers.

Proper O&M cleaning practices will involve the use of wet cleaning or wet-wiping practices to pick up asbestos fibers.  Dry sweeping or dusting can result in asbestos fibers being recirculated into the building's air and therefore will not be used.  Once wet clothes, rags, or mops have been used to pick up asbestos fibers, they will be properly discarded as asbestos waste, while still wet.  They will not be allowed to dry out, since the collected fibers might be released later when disturbed.  The use of special vacuum cleaners, commonly referred to as HEPA vacuums, may be preferable to wet cleaning in certain situations.  These vacuums are equipped with filters designed to remove very small particles or fibers (such as asbestos) by filtering those particles from the air passing through the vacuum.  Since the exhaust air from an ordinary vacuum cleaner is not filtered sufficiently, it is possible for tiny asbestos fibers to pass through the filter into the building air.


## 6.4    PROCEDURES FOR ASBESTOS FIBER RELEASE EPISODES

These procedures are only necessary if a known ACM has been disturbed.  If the asbestos content of a material that was disturbed is unknown, then samples should be taken and analyzed for asbestos content by an accredited laboratory.

Special procedures are generally needed to minimize the spread of fibers throughout the building after asbestos fiber releases occur, such as the partial collapse of an ACM ceiling.  These procedures are needed whether the ACM disturbance is intentional or unintentional.  EPA regulations for schools define a "major fiber release" as one involving more than three square or linear feet of ACM.  Depending on the severity of the episode, asbestos abatement consultants and contractors may be needed to develop a strategy for the cleanup operations.

In general, for major fiber releases, the area will be isolated by closing doors and/or erecting temporary barriers to restrict airflow as well as access to the site.  Signs will be posted, as necessary, adjacent to the fiber release site to prevent personnel involved in the cleanup

operation from inadvertently entering the area. If asbestos fibers could enter the HVAC system, the system will be modified to prevent fiber entry, or will be shut down and sealed off. The final step will be to employ thorough cleanup procedures to properly control the ACM, careful visual inspection, and final clearance air monitoring to verify satisfactory cleanup.

It is important to recognize that different levels of training are needed for workers involved with fiber release episodes. A major release will generally require "asbestos abatement worker training", rather than the degree of training considered adequate for O&M workers.

# 7.0   WORKER TRAINING

Training is the primary means of educating the maintenance staff in handling the ACM in the building and minimizing potential fiber release during routine maintenance, repair or renovation work in the building.  Training of the building staff that may come into contact with ACM can include AHERA Asbestos Inspector certification, AHERA Management Planner certification, general awareness training, maintenance worker training, asbestos abatement training, or other applicable training as dictated by site conditions.

# 8.0   RECORD KEEPING

Documentation regarding any asbestos-related activities conducted on-site must be maintained.  Examples of applicable documentation are below.

Work records documenting asbestos-related activities

Medical, training, and personal air sampling records of employees

Notification of ACM and other asbestos-related documents and correspondences with tenants, building personnel, contractors, and consultants

Asbestos survey reports, updates, and addendum that reflect the changing condition and amount of ACM on-site

A completed original asbestos waste manifest for any disposed ACM

The written O&M Program shall be maintained indefinitely.

## APPENDIX  A

The following example forms can be utilized under this O&M Program:

- Maintenance Work Location Form
- Maintenance Work Authorization Form
- Asbestos Maintenance Closure Form
- Periodic Surveillance Form

# EXAMPLE

| MAINTENANCE WORK LOCATION FORM | |
|---|---|
| **Building:** | **Floor/Area:** |
| **Project Start Date:** | **Completion Date:** |
| **Description Of Work:** | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| **Field Sketch Of Affected Area** | |
| | |

Prior to commencement of maintenance work, this form should be submitted to the OMM and an approved Maintenance Work Authorization Form should be obtained.

# EXAMPLE

## MAINTENANCE WORK AUTHORIZATION FORM

Authorization is given to proceed with the following maintenance work:


_____          Asbestos-containing materials are not present in the vicinity of the
                maintenance work.

_____          ACM is present, but its disturbance is not anticipated.  However, if conditions
                change, the Operations and Maintenance Manager will re-evaluate the work
                request prior to proceeding.

_____          ACM is present and may be disturbed.


<u>If ACM is present,</u> the following work practices shall be employed to avoid or minimize
disturbing asbestos:


<u>If ACM is present,</u> the following equipment/clothes shall be used/worn to protect workers:


Special practices and/or equipment required:


Authorized by:


_____          _____
  (Operations & Maintenance Manager)                    (Date)

# EXAMPLE

| ASBESTOS MAINTENANCE CLOSURE FORM | |
|---|---|
| **Building:** | **Area Involved:** |
| **Project Start Date & Time:** | **Completion Date & Time:** |
| **Description Of Work:** | |
| **Amount Of Asbestos Disturbed Or Removed (Linear/Square Feet):** | |
| **ASBESTOS CONTROL METHODS:** | |
| **Wet Methods** | **HEPA Vacuum** |
| **Poly Sheeting** | **Glove Bags** |
| **Area Sealed** | **HVAC Shut Off** |
| **Warning Signs** | **HEPA Neg Air Units** |
| **Persons Performing Work (List By Name):** | |
| **TYPE OF EQUIPMENT WORN** | |
| **Tyvek** | **Respirators** |
| **Name And Location Of Waste Disposal Site:** | |
| **Air Sampling:** | |
| **THE FOLLOWING ITEMS ARE TO BE ATTACHED (check those that apply)** | |
| **Permit To Perform Work** | **Air Sampling Results** |
| **Landfill Receipts** | **Other Info. (I.E. Photos)** |

| Signature Of Abatement Supervisor Or Industrial Hygienist | Date |
|---|---|
| | |
| **Signature Of Operations And Maintenance  Manager** | **Date** |
| | |

# EXAMPLE

| PERIODIC SURVEILLANCE FORM | | | |
|---|---|---|---|
| Name: | | | |
| Material: | Condition: | Location and use | Differences from previous inspection |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

# APPENDIX B

List of applicable rules and regulations

Code of Federal Regulations - Title 29
- Part 1910, Section 134, (respiratory protection).
- Part 1926, Section 58 (Occupational Exposure to Asbestos, Tremolite, Anthopyllic and Actinolite Final Rule).
- Part 1910, Section 2 (Access to Employee Medial Records).
- Part 1910, Section 1200n (Hazardous Communication).
- Part 1910 Section 145 (Specification for Accident Prevention Signs and Tags)

Code of Federal Regulations - Title 40
- Part 61, Subpart M, (National Emissions Standards for Asbestos).
- Part 61, (National Emission Standards for Hazardous Air Pollutant; Asbestos NESHAP Revision).
- Part 763, Subpart F (Friable Asbestos-Containing Materials in Schools).
  Appendix A - Interim Method of the Determination of Asbestos in Bulk Insulation Samples.

Local and State Regulations

# APPENDIX C

United States Environmental Protection Agency (USEPA) guidance document
"Managing Asbestos In-Place, A Building Owner's Guide to Operations and Maintenance
Programs for Asbestos-Containing Materials."

United States
Environmental Protection
Agency

Pesticides and Toxic Substances
(TS-799)

20T-2003
July 1990

⬆EPA

# Managing Asbestos In Place

## A Building Owner's Guide to Operations and Maintenance Programs for Asbestos-Containing Materials



♻ Printed on Recycled Paper

# Managing Asbestos In Place

## A Building Owner's Guide to Operations and Maintenance Programs for Asbestos-Containing Materials



# Contents

ACKNOWLEDGEMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

FOREWORD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

## 1. WHY IS ASBESTOS A PROBLEM?

Introduction and Overview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
- ●Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
- ●Chapter Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

## 2. WHAT IS AN O&M PROGRAM?

Purpose and Scope of an Operations and Maintenance program . . . . . . . . . . . . . . . . . . . . . . 5
- ●Purpose of O&M Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
- ●Scope of an O&M Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
- ●Chapter Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

## 3. HOW DOES THE PROGRAM START?

Laying the Foundation for an Effective O&M Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
- ●The Asbestos Program Manager . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
- ●BuildingInspectionandAssessment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
- ●Developing an O&M Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
- ●IrnplementingandManaging an O&M
  Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
- ●Cost Considerations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9
- ●Selectingandhnplementing Alternative Abatement Actions . . . . . . . . . . . . . . . . . . . . . . . 9
- ●Chapter Summary. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

## 4. WHAT DOES AN O&M PROGRAM INCLUDE?

O&M Program Elements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12
- ●Informing Building Workers, Tenants, and Other Occupants . . . . . . . . . . . . . . . . . . . . . .12
- ●ACMSurveiUance-Reirwectionand Periodic Surveillance . . . . . . . . . . . . . . . . . . . . . . . .14
- ●Supplement to Visual/Physical Evaluation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14
- ●WorkControl/Permit System . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
- ●O&M Work Practices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16
  - –Worker protection programs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17
  - –Basic O&M Procedures. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
  - –O&M Cleaning Practices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
  - –Procedures for Asbestos Fiber Release Episodes . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
- ●Recordkeeping . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
- ●Chapter Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

## 5. WHAT O&M TRAINING IS NECESSARY?

Types of Training . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2 3
- ●Chapter Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .25

## 6. WHAT REGULATIONS AFFECT ASBESTOS MANAGEMENT PROGRAMS IN BUILDINGS, ESPECIALLY O&M PROGRAMS?

Federal, State, and Local Regulations Affecting O&M Programs. . . . . . . . . . . . . . . . . . . . . . . . . . 26
- OSHA Regulations &EPA Worker Protection Rule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
  – Small-scale, Short-duration Projects . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
- EPA National Emission Standards for Hazardous Air Pollutants (NESHAP) Regulations. . . .27
  – Notification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
  – Emissions Control and Waste Disposal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
- Resource Conservation and Recovery Act (RCRA); Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA, or "Superfund") . . . . . . . . . . . . . . . . . . . . . . . . . 28
- Asbestos Hazard Emergency Response  Act (AHERA) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
- Asbestos Ban and Phaseout Rule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28
- Chapter Summary  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

## APPENDIX  A.
Glossary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

## APPENDIX B.
Sample Recordkeeping Forms  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

## APPENDIX C.
Illustrative Organzation Charts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

## APPENDIX D.
Additional Assistance (EPA, NESW, OSHA; Training ) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

## APPENDIX E.
Respiratory Protection Recommendations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

## APPENDIX F.
Existing EPA Guidance For ACM Control . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

## APPENDIX G.
Sample List: Suspect Asbestos-Containing Materials . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  40

## APPENDIX H.
References . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .40

**DISCLAIMER**

This document was prepared under contract to an agency of the United States Government. Neither the United States Government nor any of their employees makes any warranty, expressed or implied, or assume any legal liability for any third party's use of or the results of such use of any information, product, or process discussed in this document. Mention or illustration of company or trade names, or of commercial products does not constitute endorsement by the U.S. Environmental Protection Agency.

# Acknowledgements

**The time and effort** that many individual contributed to the development of this document is gratefully acknowledged by the U.S. Environmental Protection Agency (EPA). The material in this publication represents EPA's approximately 11 years of experience in considering public input and fine tuning policies on managing asbestos-containing materials in buildings. This document incorporates views expressed by safety and health professionals, property owners and managers, public officials, general industry representatives, workers, and the general public.

The primary EPA developer and coordinator of the final document was Dr. Robert Jordan of the Technical Assistance Section, Environmental Assistance Division, Office of Toxic Substances. Without Bob's constant oversight, combined with his technical knowledge and concern that the document be representative of state-of-the-art asbestos management, this document would not have reached the public.

Joe Schechter, Chief of the Technical Assistance Section, managed the project and helped clarify and edit the Guide. Bob McNally Chief of the Assistance Programs Development Branch, was instrumental in the formative period of the Guide's development and also devoted long hours to its review Other important contributions within the Environmental Assistance Division came from Tom Tom and Dave Kling. Sylvia Thomas provided necessary assistance in revisions of the early drafts. Esther Tepper and Jane Gurin helped review the Guide in its final revisions, to make sure the document was written in easy-to-understand language.

The original work which provided the foundation for the project was performed under a contract with Battelle Memorial Institute (No. 68-02-4294) by Dr. Dale Keyes and Dr. Jean Chesson, under the direction of Edie Sterrett and Cindy Stroup of the EPA Exposure Evaluation Division. They prepared the first drafts of the document and were instrumental in establishing its final format.

EPA staff also gratefully acknowledge the work of staff from the Georgia Tech Research Institute (GTRI). Through a cooperative agreement with EPA they served as the overall project coordinator and provided thoughtful technical guidance throughout this entire process. The GTRI team also developed several key sections of the Guide.

This publication was refined through a peer review meeting held in October 1988 in Washington, DC, and by a series of comment periods provided through May 1990. The following individuals gave their time and provided comments:

John Biechman, *Safe Buildings Alliance*
Wolfgang Brandner, *U.S. EPA Region VII*
Frank Bull, *Bull, Brown & Kilgo Architects*
Eva Clay *The Environmental Institute*
William Cobbs, *U.S. General Services Administration*
Mark Demyanek, *Georgia Tech Research Institute*
Michael Duffy, *Service Employees International Union*
Paul Fidducia, *Winston and Strawn*
Eugene Fisher, *Association of Wall and Ceiling Industries*
Douglas Greenaway *Consultant (formerly, Building Owners and Managers Association International)*
David Harris, *National Institute of Building Sciences*
Steve Hays, *Gobbell Hays Partners*
Joseph Hopkins, *U.S. Department of Energy*
David Mayer, *Georgia Tech Research Institute*
Richard Mendes, *New York City Department of Environmental Protection*
Michael Miles, *Tishman Spyer Properties*
Roger Morse, *ENTEK Environmental and Technical Services, Inc.*
Robert Navratil, *RREEF Funds, Construction and Engineering*
Anthony Restaino, *U.S. EPA Region V*
Richard Roth, *Social Security Administration*
Sims Roy, *U.S. EPA, Office of Air Quality Planning and Standards*

Scott Schneider, *Workers' Institute for Occupational Safety and Health*
Henry Singer, *U.S. General Services Administration*
Thomas Warren, *Rose Associates, Inc.*

In addition to these individuals, the EPA acknowledges the contribution of the Policy Dialogue Group on Asbestos in Public and Commercial Buildings, which met several times during 1989–1990. The purpose of *this* multidisciplinary group was to identify the problems associated with asbestos in public and commercial buildings and to develop policy recommendations for solving these problems. Many comments raised by the Dialogue Group in the area of asbestos management were incorporated into this document.

# Foreword

**In February 1988, the** Administrator of the Environmental Protection Agency (EPA) recommended to Congress that the Agency work during the next three years to enhance the nation's technical capability in asbestos by helping building owners better select and apply appropriate asbestos control and abatement actions in their buildings. The publication of this guidance document is EPA's most extensive effort to date to carry out that recommendation. In fact, *Managing Asbestos In Place* is the most comprehensive asbestos guide published by EPA since the Agency expanded and updated *Guidance for Controlling Asbetos-Containing Materials in Buildings (also known as the* Purple Book) in June 1985. Based on the insights and recommendations of nationally recognized asbestos experts, this new guide, along with a new operations and maintenance work practices manual expected to be available in 1991, provides "state-of-the-art" instruction to building owners to help them successfully manage asbestos-containing materials in place.

*Managing Asbestos in Place* does not supplant the 1985 Purple Book as EPA's principal asbestos guidance document. Rather, based on our experience since 1985, it expands and refines the Purple Book's guidance for a special operations and maintenance (O&M) program. In particular, the guide more strongly emphasizes the importance of in-place management. The guide's purpose is two-fold. First, it offers building owners the more detailed and up-to-date instruction they need to carry out a successful O&M program. Second, it informs building owners, lenders, and insurers that a properly conducted O&M program can in many cases be as appropriate an asbestos control strategy as removal. Furthermore, in some cases, an O&M program is more appropriate than other asbestos control strategies, including removal.

Emphasizing the importance and effectiveness of a good O&M program is a critical element of EPA's broader effort to put the potential hazard and risk of asbestos exposure in proper perspective. That effort centers around communicating the following jive *facts,* which EPA hopes will help calm the unwarranted fears that a number of people seem to have about the mere presence of asbestos in their buildings and discourage the spontaneous decisions by some building owners to remove all asbestos-containing material regardless of its condition.

**FACT ONE:** Although asbestos is hazardous, the risk of asbestos-related disease depends upon exposure to airborne asbestos fibers.

In other words, an individual must breathe asbestos fibers in order to incur any chance of developing an asbestos-related disease. How many fibers a person must breathe to develop disease is uncertain. However, at very low exposure levels, the risk maybe negligible or zero.

**FACT TWO:** Based upon available data, the average airborne asbestos levels in buildings seem to be very low.  Accordingly, the health risk to most building occupants also appears to be very low.

A 1987 EPA study found asbestos air levels in a small segment of Federal buildings to be essentially the same as levels outside these buildings. Based on that limited data, most building occupants (i.e., those unlikely to disturb asbestos-containing building materials) appear to face only a very slight risk, if any, of developing an asbestos-related disease.

**FACT THREE:** Removal is often not a building owner's best course of action to reduce asbestos exposure. In fact, an improper removal can create a dangerous situation where none previously existed.

By their nature, asbestos removals tend to elevate the airborne level of asbestos fibers. Unless all safeguards are properly applied, a removal operation can actually increase rather than decrease the risk of asbestos-related disease.

**FACT FOUR:** EPA *only* requires asbestos removal in order to prevent significant public exposure to airborne asbestos fibers during building demolition or renovation activities.

Asbestos removal before the wrecking ball swings into action is appropriate to protect public health. At other times, EPA believes that asbestos removal projects, unless well-designed and properly performed, can actually increase health risk.

**FACT FIVE:** EPA *does* recommend a pro-active, in-place management program whenever asbestos-containing material is discovered.

As this guide will explain in some detail, in-place management does *not* mean "do nothing." It means having a program to ensure that the day-to-day management of the building is carried out in a manner that minimizes release of asbestos fibers into the air, and ensures that when asbestos fibers are released, either accidentally or intentionally proper control and cleanup procedures are implemented. As such, it may be all that is necessary to control the release of asbestos fibers, until the asbestos-containing material in a building is scheduled to be disturbed by renovation or demolition activities.



MANAGING ASBESTOS IN PLACE

# 1

# Why Is Asbestos a Problem?

## Introduction: Asbestos in Buildings

**This U.S. Environmental Protection Agency (EPA)** guide is primarily directed to owners and managers of office buildings, shopping centers, apartment buildings, hospitals, and similar facilities which may contain asbestos materials. Managers of industrial plants and other types of structures may need to supplement this information with additional specialized guidance. This document gives building owners, managers, workers, and other key building staff basic information on how to develop and carry out high-quality operations and maintenance programs for managing asbestos in place to safeguard the health of all building occupants. An operations and maintenance (O&M) program can be defined as a formulated plan of training, cleaning, work practices, and surveillance to maintain asbestos-containing materials (ACM) in good condition.

In this document you will find the following information:

The objectives of an O&M program, and an indication of the scope of O&M activities (Chapter 2);

Basic steps to take before starting an O&M program, including an initial survey and evaluation of ACM (Chapter 3);

How to implement and manage the program, including some basic cost considerations (Chapter 3);

O&M work practices that protect both workers and the general building environment (Chapter 4);

Recordkeeping suggestions and requirements (a section of Chapter 4);

Training recommendations and requirements for workers performing O&M activities (Chapter 5); and

An overview of federal regulations, including those affecting O&M programs (Chapter 6).

In addition, the Appendices provide other useful information, including a glossary of useful terms, and contacts for additional assistance.

**How O&M Fits In**

There are steps which a building owner can take to prevent asbestos fiber releases or resuspension of already-released fibers, or control fiber releases quickly and safely if they occur. O&M programs are designed to achieve both these goals. This guide's purpose, therefore, is to inform building owners about how to develop, implement and manage effective O&M programs, and to encourage their use.

EPA recommends a pro-active, in-place management program whenever asbestos is discovered. In many buildings, a well-run O&M program may be all that is necessary to control the release of asbestos fibers until the ACM in the building is abated through renovation or demolition activities. Also, an emergency repair to equipment or building services, or an unexpected incident such as ACM falling from a surface could necessitate a different control strategy However, barring such events, if ACM is properly managed, release of asbestos fibers into the air is minimized. The exposure to asbestos fibers, and therefore the risk of asbestos-related disease, can be reduced to a negligible level for all building occupants.

An O&M program may also provide an effective, less costly alternative to wholesale removal operations. Some additional cost-related considerations are discussed in Chapter 3.

The EPA National Emission Standards for Hazardous

**An O&M program can be defined as a formulated plan of training, cleaning, work practices, and surveillance to maintain asbestos-containing materials in good condition.**

Air Pollutants (NESHAP) regulations on asbestos may require ACM removal prior to renovation and/or demolition projects, to prevent significant asbestos releases into the air (see Chapter 6). Additionally removal of some ACM in a building will be necessary if the material has been damaged beyond repair. *However*, at other times, removal is often *not* a building owner's best course of action to reduce asbestos exposure. (Extraneous factors –for example, difficulty in obtaining insurance, or obtaining financing relative to a real estate transaction-may actually represent the driving forces in a decision to remove all ACM, rather than a health-based need for removal.) In fact, unless all safeguards are properly applied by trained, experienced individuals, removing ACM can actually increase building occupants' risk of asbestos-related disease.

# Background

### The Asbestos Issue

Asbestos fibers can cause serious health problems. If inhaled. they can cause diseases which disrupt the normal functioning of the lungs. Three specific diseases–asbestosis (a fibrous scarring of the lungs), lung cancer, and mesothelioma (a cancer of the lining of the chest or abdominal Cavity) -have been linked to asbestos exposure. These diseases do not develop immediately after inhalation of asbestos fibers; it may be 20 years or more before symptoms appear.

In general, as with cigarette smoking and the inhalation of tobacco smoke, the more asbestos fibers a person inhales, the greater the risk of developing an asbestos-related disease. Most of the cases of severe health problems resulting from asbestos exposure have been experienced by workers who held jobs in industries such as shipbuilding, mining, milling, and fabricating, where they were exposed to very high levels of asbestos in the air, without benefit of the worker protections now afforded by law Many of these same workers were also smokers. These employees worked directly with asbestos materials on a regular basis and, generally for long periods of time as part of their jobs. Additionally there is an increasing concern for the health and safety of construction, renovation, and building maintenance personnel, because of possible periodic exposure to elevated levels of asbestos fibers while performing their jobs.

Whenever we discuss the risk posed by asbestos, we must keep in mind that asbestos fibers can be found nearly everywhere in our environment (usually at very low levels). There is, at this time, insufficient information concerning health effects resulting from low-level asbestos exposure, either from exposures in buildings or from our environment. This makes it difficult to accurately assess the magnitude of cancer risk for building occupants, tenants, and building maintenance and custodial workers. Although in general the risk is

likely to be negligible for occupants, health concerns remain, particularly for the building's custodial and maintenance workers. Their jobs are likely to bring them into close proximity to ACM, and may sometimes require them to disturb the ACM in the performance of maintenance activities. For these workers in particular, a complete and effective O&M program can greatly reduce asbestos exposure. This kind of O&M program can also minimize asbestos exposures for other building occupants as well.

### What is Asbestos?

The term "asbestos" describes six naturally occurring fibrous minerals found in certain types of rock formations. Of that general group, the minerals chrysotile, amosite, and crocidolite have been most commonly used in building products. When mined and processed, asbestos is typically separated into very thin fibers. When these fibers are present in the air, they are normally invisible to the naked eye. Asbestos fibers are commonly mixed during processing with a material which binds them together so that they can be used in many different products. Because these fibers are so small and light, they may remain in the air for many hours if they are released from ACM in a building. When fibers are released into the air they may be inhaled by people in the building.

Asbestos became a popular commercial product because it is strong, won't burn, resists corrosion, and insulates well. In the United States, its commercial use began in the early 1900's and peaked in the period from World War II into the 1970's. Under the Clean Air Act of 1970 the EPA has been regulating many asbestos-containing materials which, by EPA definition, are materials with more than 1 percent asbestos. The Occupational Safety and Health Administration's (OSHA) asbestos construction standard in section K, "Communication of hazards to employees," specifies labeling many materials containing 0.1% or more asbestos. In the mid-1970's several major kinds of asbestos materials, such as spray-applied insulation, fireproofing, and acoustical surfacing material, were banned by EPA because of growing concern about health effects, particularly cancer, associated with exposures to such materials.

In July 1989, EPA promulgated the Asbestos Ban and Phasedown Rule. The rule applies to new product manufacture, importation, and processing, and essentially bans almost all asbestos-containing products in the United States by 1997. This rule does *not* require removal of ACM currently in place in buildings.

### Where is Asbestos Likely to be Found in Buildings?

In February 1988, the EPA released a report titled *EPA Study of Asbestos-Containing Materials in Public Buildings: A Report to Congress.* EPA found that "friable" (easily crumbled) ACM can be

found in an estimated 700,000 public and commercial buildings. About 500,000 of those buildings are believed to contain at least some damaged asbestos, and some areas of significantly damaged ACM can be found in over half of them.

According to the EPA study significantly damaged ACM is found primarily in building areas not generally accessible to the public, such as boiler and machinery rooms, where asbestos exposures generally would be limited to service and maintenance workers. Friable ACM, if present in air plenums, can lead to distribution of the material throughout the building, thereby possibly exposing building occupants. ACM can also be found in other building locations.

Asbestos in buildings has been commonly used for thermal insulation, fireproofing, and in various building materials, such as floor coverings and ceiling tile, cement pipe and sheeting, granular and corrugated paper pipe wrap, and acoustical and decorative treatment for ceilings and walls. Typically it is found in pipe and boiler insulation and in spray-applied uses such as fireproofing or sound-deadening applications.



ACM which is in poor physical condition. Under a proper operations and maintenance program, corrective action would normally prevent deterioration of the insulation.

The amount of asbestos in these products varies widely (from approximately 1 percent to nearly 100 percent). The precise amount of asbestos in a product cannot always be accurately determined from labels or by asking the manufacturer. Nor can positive identification of asbestos be ascertained merely by visual examination. Instead, a qualified laboratory must analyze representative samples of the suspect material. Appendix G contains a sample list of some suspect materials.

### When is Asbestos a Problem?

The mere presence of asbestos in a building does not mean that the health of building occupants is endan-

Intact and undisturbed asbestos materials do not Dose a health risk.

gered. ACM which is in good condition, and is not somehow damaged or disturbed, is not likely to release asbestos fibers into the air. When ACM is properly managed, release of asbestos fibers into the air is prevented or minimized, and the risk of asbestos-related disease can be reduced to a negligible level.

However, asbestos materials can become hazardous when, due to damage, disturbance, or deterioration over time, they release fibers into building air. Under these conditions, when ACM *is* damaged or disturbed– for example, by maintenance repairs conducted without proper controls — elevated airborne asbestos concentrations can create a potential hazard for workers and other building occupants.



ACM with sound structural integrity on the exterior of a domestic hot water tank. Note that the insulation jacketing is intact and there is no evidence of disturbance.

3

# Chapter Summary

This document, directed to owners and managers of office buildings and similar facilities, should help lay the ground work for developing and implementing effective operations and maintenance programs. Major highlights in this section have focused on background information concerning asbestos and have touched on the current asbestos-in-buildings situation. Important points to remember are the following:

● Inhalation of asbestos fibers has been shown to cause asbestosis, lung cancer and meso-thelioma. Much of our knowledge of these health effects has come primarily from studies of workers exposed routinely to very high levels of asbestos in their jobs,

● Information health effects of low-level asbestos exposure is less certain; custodial/maintenance workers who sometimes disturb asbestos as part of their job would benefit from properly executed O&M programs.

● Three of the six naturally occurring asbestos minerals, chrysotile, amosite, and crocidolite, have been most commonly used in building products.

● Asbestos became a popular commercial product because of its strength, heat resistance, corrosion resistance, and thermal insulation properties.

● Asbestos-containing materials (ACM) are reg-ulated by EPA, OSHA, and the Consumer Product Safety Cornmission (CPSC), and indi-vidual state and local agencies.

● Friable ACM can be found in about 700,000 public and commercial buildings. Many areas where asbestos is found are not accessible to the general public.

● Some common uses of asbestos have included pipe/boiler insulation, spray-applied fireproof-ing, floor and ceiling tile. cement pipe/sheeting and paper pipe wrap.

● Positive identification of asbestos requires laboratory analysis; information on labels or visual examination only is not sufficient.

● Intact, undisturbed materials generally do not pose a health risk; they may become hazardous when damaged, disturbed, or deteriorated over time and release fibers into building air.

4



MANAGING ASBESTOS IN PLACE

# 2

# What Is an O&M Program?

## Purpose and Scope of an Operations and Maintenance Program

## Purpose of O&M

**The principal objective of an O&M program** is to minimize exposure of all building occupants to asbestos fibers. To accomplish this objective, an O&M program includes work practices to (1) maintain ACM in good condition, (2) ensure proper cleanup of asbestos fibers previously released, (3) prevent further release of asbestos fibers, and (4) monitor the condition of ACM.

## Scope of an O&M Program

An effective O&M program should address all types of ACM present in a building. ACM that maybe managed as part of an O&M program in buildings can be classified in one of the following categories:

**1** **Surfacing Material:** Examples include ACM sprayed or troweled onto surfaces, such as decorative plaster on ceilings or acoustical ACM on the underside of concrete slabs or decking, or fireproofing materials on structural members.

**2** **Thermal System Insulation (TSI):** Examples include ACM applied to pipes, boilers, tanks, and ducts to prevent heat loss or gain, or condensation.

**3** **Miscellaneous ACM:** Examples include asbestos-containing ceiling or floor tiles, textiles, and other components such as asbestos-cement panels, asbestos siding and roofing materials.

The O&M program, when developed and implemented in a particular facility should include specific direction on how to deal with each of these general categories of ACM. Specified O&M work practices and procedures should be employed by trained personnel during building cleaning, maintenance, renovation, and general operational activities that may involve surfacing, thermal, or miscellaneous ACM. Some elaboration of O&M work practices and procedures is found in Chapter 4.

The O&M program can be divided into three types of projects

● those which are unlikely to involve any direct contact with ACM;

● those which may cause accidental disturbance of ACM;

● those which involve relatively small disturbances of ACM.

The first type may involve routine cleaning of shelves and counter tops or other surfaces in a building (provided ACM debris is not present). Generally such



An example of spray-applied surfacing ACM on a metal deck above a suspended ceiling.

An example of as-bestos-containing thermal system insulation on pipes in a building's mechanical room.

activities would not be expected to disturb ACM. The second type of project could include maintenance work above a suspended ceiling in an area that may have surfacing ACM overhead. The third type of project—small-scale, shor-duration maintenance, repair, or installation projects involving minor disturbances of ACM – includes activities such as installation of new light fixtures on or in an ACM ceiling. A single glovebag operation to remove a small amount of ACM to repair a pipe in a boiler room is another example of intentional small-scale, short-duration disturbance.



Larger projects involving more complex procedures for the intentional removal of ACM are considered asbestos abatement projects. These require asbestos control and abatement procedures that are outside the scope of an O&M program. Before taking action, building owners should consult qualified professionals for advice and alternative solutions. Guidance for building owners on the management of abatement projects is included in EPA's "Guidance for Controlling Asbestos-Containing Materials in Buildings" June 1985, also known as the "Purple Book."

An example of an asbestos-containing cement sheet product (miscellaneous ACM).



## Chapter-Summary

The purpose of an operations and Maintenance Program is to minimize exposure of all building occupants to asbestos fibers. Through super-vised work practices, ACM can be managed in place. Important points to remember are:

ACM can be classified into three categories:

● Surfacing   Material

● Thermal  System  Insulation  (TSI)

● Miscellaneous   Material

O&M Programs can be divided into three types of project%

● Unlikely to involve direct contact with ACM.

● Accidental disturbance of ACM.

● Small-scale,  short-duration  maintenance  or repair activity which may involve intentional disturbance of ACM.



MANAGING ASBESTOS IN PLACE

**3**

# How Does the Program Start?

### Laying the Foundation for an Effective O&M Program

**A comprehensive asbestos control program** for a building should include these basic steps:

- Appoint an Asbestos Program Manager and develop an organizational policy

- Conduct a physical and visual inspection of the building and take bulk samples of suspect materials to determine if ACM is present, establish an ACM inventory and assess the ACM's condition and potential for disturbance.

- If ACM is located, develop an O&M program, based on the inspection and assessment data.

- Implement and manage the O&M program conscientiously

- Select and implement abatement actions other than O&M when necessary

This chapter provides information about each of these basic steps. In addition, see Appendix F for a chart of references outlining existing EPA guidance for each of these steps.

## The Asbestos Program Manager

The position of Asbestos Program Manager (APM) is frequently held by the building engineer, superintendent, facilities manager, or safety and health director. In a small organization, the building owner may have this role. Regardless of who holds this position, EPA stresses the need for the Asbestos Program Manager to be properly qualified, through training and experience, and to be *actively involved* in all asbestos-control activities. EPA accreditation under the Asbestos Hazard Emergency Response Act (AHERA) or state certification as a Building Inspector/Management Planner would be typical of the requisite training.

If the person selected is not adequately prepared, he or she should receive the training necessary to develop and manage an asbestos control program prior to beginning

the job. If for some reason this is not possible, the building owner should strongly consider hiring a properly trained, experienced, and credentialed outside consultant or firm to provide direction to the owner or the Asbestos Program Manager.

In general, the Asbestos Program Manager should have the authority to oversee all asbestos-related activities in the building, including inspections, O&M activities, and other abatement actions. The Asbestos Program Manager will either train building workers in O&M techniques or ensure that such worker training takes place. In addition, he or she should oversee the custodial and maintenance staffs, contractors, and outside service vendors with regard to all asbestos-related activities.

## Building Inspection and Assessment

To determine whether an asbestos control and management program should be implemented, the owner should have an initial building inspection performed to locate and assess the condition of all ACM in the building. A trained, experienced and qualified inspector, who is able to perform the sampling of suspect ACM for laboratory analysis, should conduct the inspection. If an inspection is not performed, then certain suspect materials should be assumed to contain asbestos, and treated accordingly (Refer to Appendix G for a sample list of suspect ACM.)

EPA guidance on how to take "bulk" samples of suspect ACM is contained in several publications (see Appendix H) and from EPA Regional Asbestos Coordinators (listed in Appendix D).

The building inspection by a qualified professional serves as the basis for establishing an effective overall plan for dealing with the asbestos in the building. The inspector should advise the owner and the Asbestos

**To determine whether an asbestos control and management program should be implemented, the owner should have an initial building inspection performed to locate and assess the condition of all ACM in the building.**



A properly trained and protected building inspector collecting a bulk sample of suspected asbestos-containing thermal system insulation.

ant should develop the O&M program. The written O&M program should state clearly the O&M policies and procedures for that building, identify and describe the administrative line of authority for that building, and should clearly define the responsibilities of key participants, such as the Asbestos Program Manager and custodial and maintenance supervisors and staff. The written O&M program should be available and understood by all participants involved in the management and operations of the building.

In general, the O&M program developed for a particular building should include the O&M program elements discussed in the next chapter. However, the building owner should make sure that the O&M program developed is site-specific and tailored for the building. The O&M program should take into account use, function, and design characteristics of a particular building.

## Implementing and Managing an W&M Program

A well-developed O&M program is ineffective unless the building owner is committed to implementing it properly The building owner should convey this commitment to key personnel involved in a building's management and operations — particularly the Asbestos program Manager and custodial and maintenance supervisors and staff. The O&M program's success is contingent upon key personnel understanding the O&M program and committing themselves to implementing it effectively

To the greatest extent possible, the building owner should incorporate the O&M program into the existing system for managing a building's operations. Each building owner, therefore, will determine the appropriate organizational structure on a case-by-case basis. Two possible arrangements are suggested in Figures 1 and 2 in Appendix C.

When managing an O&M program, the Asbestos Program Manager should oversee all asbestos-related activities. In instances where a building owner hires a contractor to perform custodial and maintenance work, the Asbestos Program Manager should ensure that the contractor is qualified to conduct work that may involve ACM. Before hiring a contractor, the Asbestos Program Manager should investigate to determine whether the contractor's staff is qualified, trained and equipped to deal with O&M asbestos activities. Thoroughly checking the references of a contractor is a good recommended practice.

The Asbestos Program Manager should also monitor the work performed in the building by other contractors, such as electricians and plumbers, who might inadvertently disturb ACM. Instituting a work permit system, as discussed in the next chapter, may prevent accidental disturbances of ACM. Under this system, a

program Manager of inspection findings. Of course, the inspection may show that ACM is *not* present and that an asbestos-control program is not required.

If ACM *is* found, the material's characteristics, condition, quantity and location within the building, as well as building use, will affect how the building owner should deal with the ACM. For example, operations and maintenance procedures may be appropriate and sufficient in a particular building for ACM in good condition. But O&M procedures alone are not sufficient for ACM that the inspector determines is significantly damaged, and may not be sufficient for some types of ACM situated in highly accessible areas; in these instances, some form of full scale abatement — repair, encapsulation, enclosure, encasement, or removal – will be necessary Removal of the ACM may also be appropriate when performed in conjunction with major building renovations, or as part of long-term building management policies (such as staged removal in conjunction with renovation over the life of the building, as covered by the EPA NESHAP requirements for removal before demolition or renovation).

## Developing an O&M Program

If ACM is found, the building owner should have an O&M program developed as soon as possible. Either the Asbestos Program Manager or a qualified consult-

contractor must receive a work permit from the Asbestos Program Manager before commencing work. At that time, the Asbestos Program Manager will inform the contractor whether the project could disturb ACM and provide any special instructions to make sure the work is done properly *Communication between the Asbestos Program Manager and tenants occupying the building is essential to prevent activities that might compromise the O&M program.*

In addition, the Asbestos Program Manager should routinely and frequently check the work being per-formed in the building by contractors and custodial and maintenance staff to see if their work is disturbing ACM. By maintaining close surveillance over these activities, the Asbestos Program Manager can help ensure that work which may disturb ACM is being done safely Tenants should be required (by legal agreement or understanding) to notify the building owner or the Asbestos Program Manager before conducting even small planned renovations. This would help prevent building tenants from unknowingly disturbing ACM. For both the work permit system and the renovation notification requirement, clear and effective communi-cations to workers and tenants are crucial to the success of the O&M management program.

The Asbestos Program Manager should periodically review the written O&M plan to determine whether it should be updated. For example, if all ACM were removed from some areas of the building during a recent renovation, or if some ACM was damaged, the O&M program should be revised accordingly The O&M program should remain in effect as long as there is ACM present in the building.

### Cost Considerations

The costs associated with implementing and manag-ing an O&M program may vary significantly depending on the types-of ACM, building-specific factors, actual O&M procedures adopted, types of equipment used, and the useful life of the building. Owners may find it more cost-effective to continue a well-supervised and managed O&M pro-gram than to incur the costs of immediate, large-scale removal. In addition to the direct costs of removal, other costs related to ACM removal include moving building occupants, arranging alternative space for building occupants during the removal work, and restoring the building after the removal is completed.

Clearly many factors enter into the decision. Only by conducting a cost-effectiveness analysis of the long-term options (e.g., comparing (a) immediate removal with (b) phased removal plus O&M with (c) removal just before demolition plus lifetime O&M) will owners be truly able to determine which option is most cost-effective for their buildings. The prudent owner may need to consult one or more qualified consultants or firms for advice, if such expertise does not exist within the owner's organization,

# Selecting and Implementing Alternative Abatement Actions

In some instances, due to the condition of ACM or upcoming building renovations, a building owner may decide to take other abatement actions to deal with ACM in the building. These response actions could include encapsulation (covering the ACM with a sealant to prevent fiber release), enclosure (placing an air-tight barrier around the ACM), encasement (covering the ACM with a hard-setting sealing material), repair, or removal of the ACM. Qualified, trained, and experi-enced contractors should be used for any of these actions. EPA's Purple Book discusses most of these alternatives in some detail. In general, repair, encap-sulation, enclosure, and encasement, are intended to help prevent the release of asbestos fibers. As aspects of O&M, these techniques manage ACM in place. See Appendix F of this document for additional federal reference sources on asbestos response actions.

When determining which response alternative to select, the building owner and Asbestos Program Manager may consider seeking advice from qualified, independ-ent consultants with specific training and experience in asbestos management.

Asbestos consultants should have a background in engineering, architecture, industrial hygiene, safety, or a similar field. Experts who are Registered and/or with Board Certified backgrounds are recommended. *To help ensure that no "conflict of interest" exists, consultants should not be affiliated with the abatement contractors who may be used on a recommended ACM control project, nor with analytical laboratories which perform sample analyses.* As with other similar busi-ness decisions, building owners should interview sev-eral consultants and check references.

Renovations (including remodeling or redecorating) of buildings or replacement of utility system increases the potential for disturbing ACM. Before conducting any renovation or remodeling work, the building owner should have the Asbestos Program Manager review asbestos inspection and assessment records to deter-mine where ACM may be located, visually reinspect the area, and evaluate the likelihood that ACM will be disturbed. Any suspect or assumed ACM that could be disturbed during the renovation work should either be sampled and analyzed to determine whether it contains asbestos, or the work should be carried out as if the materials did contain asbestos. The Asbestos Program Manager should also ensure that no new ACM is introduced into the building as part of the renovation work.

Removal of the ACM before renovation begins maybe necessary in some instances. Removal is required by the Asbestos NESHAP regulations for projects which would break up more than a specified minimum amount of ACM; specifically at least 160 square feet of surfacing

**Renovations (including remodeling or redecorating) of buildings or replacement of utility systems increase the potential for disturbing ACM.**



Asbestos-containing thermal system insulation which has sustained significant damage in a mechanical/boiler room of a building.

or miscellaneous material or at least 260 linear feet of thermal system insulation (40 CFR 61.145-147). Building owners and managers are encouraged to contact their state or local health or environmental department for further clarification of these requirements (also, see Chapter 6 of this document). It is important to ensure that new materials placed in the building do not contain asbestos in order to comply with the recent EPA Asbestos Ban and Phase Out rule (see Chapter 6).

In general, building owners should thoroughly consider any decision to remove ACM. *O&M, encapsulation, encasement, enclosure, or repair may be viable alternatives to removal.* Building owners should assess these in-place management techniques carefully before deciding to remove undamaged ACM.

Under certain circumstances, however, such as when some ACM must be removed during building renovations, when the ACM has sustained a great deal of damage, or ACM disturbance will be difficult to manage properly the building owner may decide to remove ACM in parts of the building.

When removal must occur, only qualified, trained and experienced project designers and contractors should be permitted to design and perform the work. Building owners might consider contacting local, state, and federal asbestos regulatory agencies to see if prospective contractors have received citations for violating asbestos regulations in the past. In addition, if the building owner and Asbestos Program Manager are not properly qualified themselves, they should retain a qualified and independent project designer and a project monitor with training and experience in asbestos abatement to oversee and ensure that the asbestos abatement work is done safely. When these precautions are taken, asbestos removal is more likely to proceed safely and effectively

Proper completion of the ACM removal is best evaluated by means of the analytical procedures using transmission electron microscopy (TEM). (These are described in 40 CFR Part 763, Appendix A to Subpart E.) Clearance protocols for statistically comparing asbestos fiber levels inside the work area with outside levels are available. If the measured levels inside are not statistically higher than the average airborne asbestos concentration measured outside the abatement area, the cleanup is considered successful, and the space is judged ready for reoccupancy (For reference, see Appendix H, U.S. EPA "Guidelines for Conducting the AHERA TEM Clearance Test . . . .")

# Chapter Summary

Laying the foundation for a comprehensive asbestos control program for a building includes some basic steps. Important points contained in this discussion are the following

An Asbestos Program Manager needs to be properly qualified through training and experience, and be actively involved in all asbestos control and disturbance activities.

An Asbestos program Manager should have authority to oversee and to direct custodial/maintenance staff and contractors with regard to all asbestos-related activities.

An initial building inspection should be performed by a trained, qualified, experienced inspector to locate and assess the condition of all ACM in the building.

The inspection results serve as the basis for establishing an O&M program. O&M procedures may not be sufficient for certain ACM that is significantly damaged or in highly accessible areas.

An Asbestos Program Manager or qualified consultant should develop the written O&M program that is site-specific and tailored for individual buildings. The O&M program should take into account use, function and design characteristics of a building.

The success of any O&M program lies in the commitment by the building owner to implement it properly

When outside contractors are used for asbestos-related activities, their references and training should be thoroughly checked and their subsequent work monitored.

Periodically review written O&M programs.

Alternatives or control options that may be implemented under an O&M program include:

- repair
- encapsulation
- enclosure
- encasement
- removal (minor)

Removal of ACM before renovations may be necessary in some instances. (See NESHAP and State/Local regulations discussion in Chapter 6.)

**The success of any O&M program depends on the building owner's commitment to implement it properly.**



MANAGING ASBESTOS IN PLACE

# 4

# What Does an O&M Program Include?

### O&M Program Elements

**To achieve its objectives,** an O&M program should include seven elements. Although these should appear in any O&M program, the extent of each will vary from program to program depending on the building type, the type of ACM present, and the ACM's location and physical condition. For example, if only nonfriable ACM is present, minimal notification might be needed, and custodial or maintenance staff would most likely have fewer work practices to be followed. If friable ACM is present, a more detailed O&M program should be prepared and followed. Each of the first six elements listed below is described in this chapter to provide an illustration of a basic O&M program. The seventh program element, training of the Asbestos Program Manager and custodial and maintenance staff, is very important. If staff are not adequately trained, the O&M program will not be effective. Chapter 5 is devoted exclusively to O&M training topics.

A successful O&M program should include the following elements:

- **Notification:** A program to tell workers, tenants, and building occupants where ACM is located, and how and why to avoid disturbing the ACM. All persons affected should be properly informed.

- **Surveillance:** Regular ACM surveillance to note, assess, and document any changes in the ACM's condition.

- **Controls:** Work control/permit system to control activities which might disturb ACM.

- **Work Practices:** O&M work practices to avoid or minimize fiber release during activities affecting ACM.

- **Recordkeeping:** To document O&M activities.

- **Worker Protection:** Medical and respiratory protection programs, as applicable.

- **Training:** Asbestos Program Manager, and custodial and maintenance staff training.

**If staff are not adequately trained, the O&M program will not be effective.**

## Informing Building Workers, Tenants, and Other Occupants

Building owners should inform building workers, occupants, and tenants about the location and physical condition of the ACM that they might disturb, and stress the need to avoid disturbing the material. Occupants should be notified for two reasons: (1) building occupants should be informed of any potential hazard in their vicinity; and (2) informed persons are less likely to unknowingly disturb the material and cause fibers to be released into the air.

Building owners can inform occupants about the presence of ACM by distributing written notices, posting signs or labels in a central location where affected occupants can see them, and holding awareness or information sessions. The methods used may depend on the type and location of the ACM, and on the number of people affected. Some states and localities have "right-to-know" laws which may require that all occupants, workers, and visitors in buildings with ACM be informed that asbestos is present.

In service and maintenance areas (such as boiler rooms), signs such as "Caution — Asbestos — Do Not Disturb" placed directly adjacent to thermal system insulation ACM will alert and remind maintenance

workers not to inadvertently disturb the ACM. In most cases, all boilers, pipes, and other equipment with ACM in service areas where damage may occur should have prominent warning signs placed next to the ACM. As an alternative, color coding can be used to identify the ACM in certain situations provided that all potentially involved parties understand the coding system.

Information sessions reinforce and clarify written notices and signs, and provide an opportunity to answer questions. All employees and tenants or tenant representatives likely to disturb ACM should be included in the notification program on a continuing basis. Building owners should inform new employees about the presence of ACM before they begin work. Owners should provide additional signs and information sessions in languages other than English where a significant number of workers, occupants, or visitors do not speak English. It maybe necessary to make special provisions for illiterate workers, such as providing clear verbal information or signs, about potential hazards of disturbing ACM. and showing them where ACM is located.

The specific information given to types of building occupants will vary For example, since service workers carry out certain tasks that office workers or tenants do not perform, they should receive additional information. Most important, O&M workers should receive the training necessary for them to perform their tasks safely

Whatever its form, the information given to building occupants and workers should contain the following points to the extent they reflect building conditions:

- ACM has been found in the building and is located in areas where the material could be disturbed.

- The condition of the ACM, and the response which is appropriate for that condition.

- Asbestos only presents a health hazard when fibers become airborne and are inhaled. The mere presence of ACM does not represent a health hazard.

- The ACM is found in the following locations (e.g., ceilings in Rooms 101 and G-323, walls in the lobby, above suspended ceilings in the first floor corridor, on columns in the main entry on pipes in the boiler room).

- Do not disturb the ACM (e.g., do not push furniture against the ACM, do not damage T S I ) .

- Report any evidence of disturbance or damage of ACM to (name, location, and phone number of Asbestos Program Manager).



Routine maintenance activities can cause disturbance of ACM if workers are not properly trained in operations and maintenance procedures. Here, a worker carelessly contacts ACM, possibly damaging it.

- Report any dust or debris that might come from the ACM or suspect ACM, any change in the condition of the ACM, or any improper action (relative to ACM) of building personnel to (name, location, and phone number of Asbestos Program Manager).

- Cleaning and maintenance personnel are taking special precautions during their work to properly clean up any asbestos debris and to guard against disturbing ACM.

- All ACM is inspected periodically and additional measures will be taken if needed to protect the health of building occupants.



It is important to undertake an honest and open approach to the ACM notification procedure. Owners should strive to establish clear lines of communication with all building occupants regarding asbestos issues. People who are informed of the presence, location and condition of ACM in a building where they work or live, who understand that the mere presence of ACM is not necessarily hazardous to them, and who accept that ACM can often be managed effectively in place, can be

An example of an asbestos caution sign placed directly on a section of asbestos-containing duct insulation. Signs such as this help to ensure that workers will not inadvertently disturb ACM.

13

very helpful to the owner in eliminating or reducing hysteria on the part of other less informed building occupants. On the other hand, if occupants suspect the building owner is not being honest about asbestos activities in the building, that owner's credibility maybe questioned and the situation can become far more difficult to manage. *If and when asbestos incidents occur, it is especially important for the building owner to deal with occupants and contractors openly and honestly, for that is the best way to maintain occupant/ tenant confidence in both the owner and the building's asbestos program.*

## ACM Surveillance

Visual reinspections of asbestos materials at regular intervals can detect changes in material condition. Here, surfacing ACM has delaminated from a ceiling in a building O&M routines can keep small problems from becoming big problems.

### Reinspection and Periodic Surveillance

A visual reinspection of all ACM should be conducted at regular intervals as part of the O&M program. Combined with ongoing reports of changes in the condition of the ACM made by service workers, the reinspection should help ensure that any ACM damage or deterioration will be detected and corrective action taken.



According to recent EPA regulations covering schools (the Asbestos Hazard Emergency Response Act, "AHERA"), an accredited inspector must reinspect school buildings at least once every three years to reassess the condition of ACM. The AHERA regulations for schools also require a routine surveillance check of ACM every six months to monitor the ACM's condition. The AHERA Rule permits this surveillance to be conducted by a trained school custodian or maintenance worker. While these intervals are mentioned here as a guide, they may also be appropriate for other buildings. The Asbestos Program Manager should establish appropriate intervals, based on consultation with the building owner and any other qualified professionals involved in the O&M program.

EPA recommends a visual and physical evaluation of ACM during the reinspection to note the ACM's current condition and physical characteristics. Through this reinspection, it is possible to determine both the relative degree of damage and assess the likelihood of future fiber release. Maintenance of a set of visual records (photos or videotape) of the ACM overtime can be of great value during reinspection.

Some asbestos consultants recommend examining settled dust for accumulations of asbestos fibers as another surveillance tool in an O&M program. While no universally accepted standardized protocols currently exist for sampling and analysis of settled dust, positive results (i.e., ACM is present in the dust) may indicate the need for special cleaning of the affected area, or other action. Because the results of this testing are difficult to interpret and evaluate at this time, building owners should carefully consider the appropriateness of this testing to their situation.

### Supplement to Visual/Physical Evacuation

As part of an O&M program, a carefully designed air monitoring program to detect airborne asbestos fibers in the building may provide useful supplemental information when conducted along with a comprehensive visual and physical ACM inspection and reinspection program. If the ACM is currently in good condition, increases in airborne asbestos fiber levels at some later time may provide an early warning of deterioration or disturbance of the material. In that way, supplemental air monitoring can be a useful management tool. If an owner chooses to use air monitoring in an "early warning" context, a knowledgeable and experienced individual should be consulted to design a proper sampling strategy Appendix H contains a reference to a useful guide to monitoring airborne asbestos, which can be consulted for further discussion of this subject.

If supplemental air monitoring is done, a baseline airborne asbestos fiber level should be established soon after the O&M program is initiated Representative, multiple air samples should be collected throughout the building during periods of normal building operation. This should be done over along enough period of time to be representative of existing conditions, in order to adequately characterize prevailing fiber levels in the building. *This air monitoring should supplement, not replace, physical and visual inspection.* Visual inspection can recognize situations and anticipate future exposure (e.g., worsening water damage), whereas air monitoring can only detect a problem after it has occurred, and fibers have been released.

Note that the collection of air samples for supplementary evaluation *should not* use aggressive air sampling methods. Aggressive sampling methods, in which air is deliberately disturbed or agitated by use of a leaf blower or fans, should be used at the completion of an asbestos removal project when the building or area is unoc-

cupied, not for routine monitoring.

The most accurate and preferred method of analysis of air samples collected under an O&M program would require the use of transmission electron microscopy (TEM). Phase contrast microscopy (PCM), which is commonly used for personal air sample analysis and as a screening tool for area air monitoring, cannot distinguish between asbestos fibers and other kinds of fibers which may be present in the air. PCM analysis also cannot detect thin asbestos fibers, and does not count short fibers. TEM analysis is approximately ten times more expensive than PCM analysis. However, the more accurate information on actual levels of airborne asbestos fibers should be more beneficial to the building owner who elects to use supplemental air monitoring in the asbestos management program. TEM analysis is most reliably performed by laboratories accredited by the National Institute for Standards and Technology (NIST; see Appendix D for telephone number), and who follow EPA's quality assurance guidelines. (Appendix H, U.S. EPA, Dec. 1989, "Transmission Electron Microscopy Asbestos Laboratories: Quality Assurance Guidelines.")

Selection of a reliable and experienced air monitoring firm and analytical laboratory is important, if the building owner elects to conduct supplemental air monitoring under the O&M program. A consultant knowledgeable in air sampling and analysis protocols can be contacted for recommendations if the building owner or Asbestos Program Manager has limited knowledge in this area.

Periodic air monitoring, conducted simultaneously with the visual reinspection or surveillance, would then be used to see if asbestos levels have changed relative to the baseline. Some building owners may wish to present current air monitoring results to building occupants in addition to information regarding the physical reinspections. Although this supplemental use of air monitoring as part of an O&M program may provide useful information, it is likely to be very expensive, particularly if the more accurate and recommended TEM analysis is used. Use of only a small number of measurements or measurements taken only at one time maybe misleading (i.e., overestimate or underestimate of fiber levels), and can lead to inappropriate decisions.

It should be noted that some of the exposures of persons to airborne asbestos fibers in buildings may result from episodic events, such as repair work or the accidental disturbance of the ACM or of ACM debris by maintenance activities inside the building. Air monitoring may not be done frequently enough to include such episodic events; this can lead to a misleading interpretation of air sampling results. In particular, air sampling may underestimate the exposure of O&M workers and building occupants. A good reference sourcebook for additional information on air sampling and analysis for asbestos fibers is "A Guide to Monitoring Airborne Asbestos in Buildings" (see Appendix H).

# Work Control/Permit System

The O&M program should include a system to control all work that could disturb ACM. Some building owners have had success using a "work permit" program, which requires the person requesting the work to submit a Job Request Form to the Asbestos program Manager (Appendix B, Form 2) before any maintenance work is begun. The form gives the time and location of the requested work, the type of maintenance needed, and available information about any ACM in the vicinity of the requested work. The contractor or other person authorized to perform the work should be identified on the work request.



An example of a maintenance worker conducting activities near a friable asbestos-containing ceiling. Under a proper permitting system, the building Asbestos Program Manager would evaluate and authorize projects such as this prior to beginning work.

Upon receiving a pre-work Job Request Form, the Asbestos Program Manager should take the following steps:

**1** Refer to written records, building plans and specifications, and any building ACM inspection reports to determine whether ACM is present in the area where work will occur. If ACM is present, but it is not anticipated that the material will be disturbed, the Asbestos Program Manager should note the presence of the ACM on the permit form and provide additional instruction on the importance of not disturbing the ACM.

**2** If ACM is both present and likely to be disturbed, the Asbestos Program Manager or a designated supervisor qualified by training or experience, should visit the site and determine what work practices should be instituted to minimize the release of asbestos fibers during the maintenance activity

**3** This determination should be recorded on the Maintenance Work Authorization Form (see example in Appendix B, Form 3), which *is* then sent to the in-house maintenance supervisor or to the maintenance contractor to authorize the work.

**4** The Asbestos Program Manager should make sure that a copy of both the request and the authorization forms (if granted) are placed in the permanent file.

**5** Where the task is not covered by previously approved standard work practices, the Asbestos Program Manager should make sure that the appropriate work practices and protective measures are used for the job.

**6** For all jobs where contact with ACM is likely the Asbestos Program Manager or a designated supervisor qualified by training or experience should visit the work site when the work begins to see that the job is being performed properly For lengthy jobs where disturbance of ACM is intended or likely, periodic inspections should be made for the duration of the project.

**7** The Asbestos Program Manager's observations should be provided on an *Evaluation of Work Form* (see Appendix B, Form 4). Any deviation from standard and approved work practices should be recorded immediately on this form and the practices should be immediately corrected *and reported to the Asbestos Program Manager.*

**8** Upon completion of the work, a copy of the evaluation form should be placed in the permanent asbestos file for the building.

Building owners should consider using asbestos O&M work control forms similar to those which already may be in use for non-ACM work in their facilities, or expanding the existing forms to include the content of the request, approval, and evaluation forms illustrated in Appendix B.

**It is important to undertake an honest and open approach in ACM notification.**

The O&M management system should also address work conducted by outside contractors. Many building owners contract for at least some custodial and maintenance services. A building's asbestos work control/permit system, as described above, should also cover contract work.

At a minimum, contracts with service trades or abatement companies should include the following provisions to ensure that the service or abatement workers can and will follow appropriate work practices:

● Proof that the contractor's workers have been properly notified about ACM in the owner's building and that they are properly trained and accredited (if necessary) to work with ACM.

● Copies of respiratory protection, medical surveillance, and worker training documentation as required by OSHA, EPA and/or state regulatory agencies.

● Notification to building tenants and visitors that abatement activity is underway (performed by owner).

● Written work practices must be submitted by the vendor or contractor for approval or modification by the Asbestos Program Manager. The vendor or contractor should then agree to abide by the work practices as finally accepted by the Asbestos Program Manager.

● Assurance that the contractor will use proper work area isolation techniques, proper equipment, and sound waste disposal practices.

● Historical air monitoring data for representative examples of the contractor's previous projects, with emphasis on projects similar to those likely to be encountered in the building.

● Provisions for inspections of the area by the owner's representative to ensure that the area is acceptable for re-entry of occupants/tenants.

● A resume for each abatement contractor/supervisor or maintenance crew chief, known as the "competent person" in the OSHA standard and EPA Worker Protection Rule.

● Criteria to be used for determining successful completion of the work (i.e., visual inspections and air monitoring).

● Any other information deemed necessary by the owner's legal counsel.

Notification to EPA (and other appropriate agencies) if the abatement project is large enough (see Chapter 6).

## O&M Work Practices

● The O&M program focuses on a special set of work practices for the custodial, maintenance, and construction staff. The nature and extent of any special work practices should be tailored to the likelihood that the ACM will be disturbed and that fibers will be released. In general, four broad categories of O&M work practices are recognized

**1** **Worker Protection Programs –** These work practices help ensure custodial and maintenance staff are adequately protected from asbestos exposure.

**2** **Basic O&M Procedures –** Basic procedures are used to perform routine custodial and maintenance tasks that may involve ACM.

**3** **Special O&M Cleaning Techniques –** Special techniques to cleanup asbestos fibers on a routine basis.

**4**  **Procedures for Asbestos Fiber Release Episodes –** If moderate to relatively large amounts of ACM are disturbed, the building owner should use these procedures to address the hazard.

A brief synopsis of worker protection and O&M work practices follows. *(Note: A more detailed, technically oriented O&M "work practices" manual specifically addressing topics such as work practices, worker protection, and specific information on how to carry out O&M plans, is being developed, with publication expected in 1991.)*

**Worker Protection Programs**  A worker protection program includes engineering controls, personal exposure monitoring, medical surveillance, and personal protection. While engineering controls are the preferred method of worker protection, there are few engineering control options available for O&M work. This section discusses two key aspects of personal protection: use of respiratory protection and protective clothing for workers in an asbestos O&M program. According to OSHA regulations (see Chapter 6), a written respiratory protection program is necessary whenever an O&M program specifies that service workers wear respirators, or where respirators are made available to employees. OSHA regulations also require a respirator program whenever workers are exposed, or are likely to be exposed, to fiber levels above OSHA'S "permissible exposure limits" such as the 8-hour time weighted average (TWA) limit or the 30-minute "excursion limit" (EL). The 8-hour TWA limit and the EL are described in more detail in Chapter 6. In addition, OSHA requires workers to wear special protective clothing under the same circumstances.

**Respiratory Protection/Worker Protection Programs**  The selection of approved respirators, suitable for the hazards to which the worker is exposed, is only one aspect of a complete respiratory protection program. Other elements include written operating procedures for respirator use; outlining personnel responsibilities for respirator cleaning, storage, and repair; medical examination of workers for respirator use; training in proper respirator use and limitations; respirator fit testing respirator cleaning and care; and work-site supervision. All of these are described in detail in the OSHA respirator standard, 29 CFR 1910.134. The O&M respirator program can be administered by the facility safety and health manager or the Asbestos Program Manager, if properly qualified.

Proper respiratory protection is an integral part of all custodial and maintenance activities involving potential exposure to asbestos. When in doubt about exposure during a certain work operation, building owners should provide respiratory protection to custodial and maintenance workers. OSHA specifies general types of respirators for protection against airborne asbestos during "construction" activities, which include abatement, renovation, maintenance, repair, and remodeling.

Personal air sampling is not the same as area air monitoring. Personal air sampling (required by OSHA) is designed to measure an individual worker's exposure to fibers while the worker is conducting tasks that may disturb ACM. The sampling device is worn by the worker and positioned so that it samples air in the worker's breathing zone. In contrast, area (or ambient) air sampling is conducted to get an estimate of the numbers of airborne asbestos fibers present in a building. It is used as an assessment tool in evaluating the potential hazard posed by asbestos to all building occupants. (See the previous discussion of area air monitoring on page 14.)

When adequate care is taken to prevent or minimize and control fiber release, routine, small-scale/short-duration maintenance or custodial tasks are not likely to generate high levels of airborne asbestos compared to large asbestos removal projects; and respirators which filter breathing air may be used. **OSHA, EPA, and NIOSH are on record as** *not* **recommending single use, disposable paper dust masks for use against asbestos; in fact, OSHA has** *disallowed their use* **against airborne asbestos fibers.**

The options that may be used include:

● A half-face or full facepiece, negative pressure, air-purifying respirator with replaceable high-efficiency filters.

Pictured below are different examples of air-purifying, negative pressure respirators equipped with high-efficiency cartridges which can be used to protect workers against asbestos exposure. On the left are examples of half-mask facepieces equipped with high-efficiency cartridges, and on the right are examples of full facepiece, high-efficiency masks.



● A half or full facepiece powered air-purifying respirator (PAPR) with replaceable high-efficiency filters. This has a battery powered pump which assists breathing and provides positive pressure in the facepiece.



Pictured above are two different types of powered air-purifying respirators (PAPR's) equipped with high-efficiency filters. On the left is an example of a tight fitting, full facepiece PAPR, and on the right is an example of a loose-fitting helmet style PAPR.

Under the OSHA standards for asbestos, any employee required to wear a negative pressure respirator can request a powered air-purifying respirator, and the employer is required to provide a fully functional and approved unit, provided it will afford the worker at least equal protection.

Currently only respirators approved by NIOSH and the Mine Safety and Health Adminstration (MSHA) are permitted for use. If they are air-purifying respirators, the filtration device(s) must be rated as "high-efficiency"

Selecting the most appropriate respirator for each O&M task requires knowledge of the levels of airborne asbestos fibers and other possible air contaminants generated by the task or likely to be present where the task is performed. This knowledge is best gained through personal air monitoring conducted during worker performance of the actual task. (Obviously the workers must have respiratory protection while this initial personal air sampling is carried out.) In fact, OSHA and EPA require air monitoring under certain circumstances (see Chapter 6). To learn more about the different types of respirators available and the degree of protection they provide, see Appendix E. Owners may also wish to contact the nearest OSHA office, a local trained and qualified industrial hygienist (preferably Certified), or an occupational health professional for more information on respirators. The expertise of these specialists should be used to ensure proper selection, fit testing, and training of workers in respirator use.

Building owners and other facility managers may not be familiar with some of the terms used in discussions of respirators, airborne fiber levels, and related topics.

Appendix E contains more information on these topics, and gives the minimum EPA-recommended levels of respiratory protection to be provided during typical O&M tasks.

For additional information on respirator programs, respirator types, and respirator use, the building owner or Asbestos Program Manager may want to use the following references

● "Respiratory Protection An Employer's Manual," NIOSH, October 1978;

● "A Guide to Respirator Protection for the Asbestos Abatement Industry" EPA/NIOSH, 1986;

● OSHA respirator standard (29 CFR 1910.134);

● OSHA asbestos regulations (29 CFR 1910.1001 and 1926.58);

● "Occupational Exposure Sampling Strategy Manual; NIOSH #77-173, January 1977.

● "Respirator Decision Logic," NIOSH, May 1987; and

● "NIOSH Guide to Industrial Respiratory Protection" September 1, 1987.

**Protective Clothing/Worker Protection Programs** In addition to the use of respirators, some O&M procedures may require workers to wear protective clothing. Most often, protective clothing is disposable and consists of coveralls, a head cover, and foot covers made of a synthetic fabric which does not allow asbestos fibers to pass through. This type of clothing prevents workers' regular clothing from becoming contaminated with asbestos fibers. Contaminated clothing could be taken home, creating a possible risk to the worker's family members.

OSHA and EPA regulations require workers to wear protective clothing whenever they are exposed, or likely to be exposed, to fiber levels above OSHA's permissible levels (see Chapter 6). It is important that workers be properly trained in the use, removal and disposal of protective clothing after use. All O&M activities may not require the use of protective clothing. It is important for the Asbestos Program Manager to assess this need on a case-by-case basis.

**Basic O&M Procedures** Basic O&M procedures to minimize and/or contain asbestos fibers may include wet methods, use of mini-enclosures, use of portable power tools equipped with special local ventilation attachments, and avoidance of certain activities, such as sawing, sanding,

and drilling ACM. Maintenance activities can be divided into three categories with regard to their potential for disturbing ACM:

**1** Those which are unlikely to involve any direct disturbance of ACM; for example, cleaning shelves or counter tops with a damp cloth.

**2** Those which may cause accidental disturbance of ACM; for example, working on a fixture near a ceiling with surfacing ACM.

**3** Those which involve intentional small-scale manipulation or disturbance of ACM; for example, removing a small segment of TSI ACM to repair a pipe leak.

The O&M program should include work practices for each type of ACM that is present in the building (surfacing, TSI, and miscellaneous) as well as for each type and category of maintenance activity performed (e.g., general cleaning, electrical work, plumbing).

Special work practices such as wet wiping, area isolation, and HEPA vacuuming, and the use of personal protective equipment such as respirators and protective clothing, may be needed where disturbance of ACM is likely. The need for these practices varies with the situation. For example, removing light fixtures located near surfacing ACM may disturb the material and might involve the use of special cleaning, possibly area isolation, and respiratory protection. Periodic emptying of a trash can near heavily encapsulated asbestos-containing plaster may not disturb the material at all, so no special work practices would generally be necessary These work practices and procedures are intended to ensure that disturbance of any ACM during O&M activities should be minimized, or carried out under controlled conditions when the disturbance is required by the nature of a specific O&M task.

In addition, ACM may readily release asbestos fibers into the air when certain mechanical operations are performed directly on it. For example, fiber releases can occur when workers are drilling, cutting, sanding, breaking, or sawing vinyl asbestos floor tile.

The *action* of drilling, cutting, abrading, sanding, chipping, breaking, or sawing is the critical factor here, since it is likely to cause a release of fibers. Maintenance or repair operations involving those actions should be eliminated or carefully controlled with basic O&M procedures in order to prevent or minimize asbestos fiber release.

Certain activities that occur in the vicinity of ACM can also cause damage which may result in asbestos fiber release. For example, maintenance and custodial stroll may damage ACM accidentally with broom handles, ladders, and fork lifts while performing other tasks. Activities performed in the vicinity of ACM should always be performed cautiously to prevent fiber release.

To summarize, if in doubt about the possibility of disturbing ACM during maintenance activities, adequate precautions should be taken to minimize fiber release; these will protect workers as well as the building environment. Basic O&M procedures, including use of wet methods and specially equipped tools, should be used to protect building occupants.

### O&M Cleaning Practices

Special cleaning practices **are** appropriate for a building with exposed surfacing or thermal system insulation ACM, especially if the ACM is friable. If gradual deterioration or damage of ACM has occurred or is occurring, asbestos-containing dust or debris could be present. If the building inspection has determined that asbestos-containing dust or debris is present in some areas, then the O&M program should include special cleaning practices to collect residual asbestos dust. Routinely cleaning floors using wet methods is an example of one such practice. Custodial and maintenance workers in the course of normal work can also identify and report areas which are in need of special cleaning or repair. *Special cleaning techniques should supplement, not replace, repair or abatement actions for damaged, friable ACM.* The cleaning program should include an initial cleaning followed, as needed, by subsequent periodic or episodic cleanings.

Building owners and custodial and maintenance staff should ensure that special O&M cleaning is done correctly Proper cleaning is important for two reasons:

● The use of improper techniques to clean up asbestos debris caused by previous deterioration or damage may result in widespread contamination, and potentially increase airborne asbestos fiber levels in the building.

● Improper cleaning may cause damage to the ACM, thus releasing more airborne asbestos fibers.

O&M cleaning will involve the use of wet cleaning or wet-wiping practices to pick up asbestos fibers. Dry sweeping or dusting can result in asbestos fibers being re-suspended into the building's air and therefore should not be used. Once wet cloths, rags, or mops have been used to pickup asbestos fibers, they should be properly discarded as asbestos waste while still wet. They should not be allowed to dry out, since the collected fibers might be released at some later time when disturbed. The use of special vacuum cleaners, commonly referred to as HEPA vacuums, may be preferable to wet cleaning in certain situations. These vacuums are equipped with filters designed to remove very small particles or fibers — such as asbestos — by filtering those particles from the air passing through the vacuum. Since the exhaust air from an ordinary vacuum cleaner is not filtered sufficiently it is possible for tiny asbestos fibers to pass through the filter and back into the building air.

> If in doubt about the possibility of disturbing ACM during maintenance activities, adequate precautions should be taken to minimize fiber release.

**1 9**

**Special procedures are generally needed to minimize the spread of fibers in the building after asbestos fiber release occurs.**

It is important for O&M workers to use caution when emptying HEPA vacuums and changing the filters. Exposures could result from such activities. Workers should move the HEPA vacuum to a physically isolated area of the facility and put on proper personal protective equipment before emptying the dust and debris into properly labeled, sealed, and leak-tight containers for disposal as asbestos-containing waste. When custodial workers do not work with ACM, trained maintenance workers can be used to empty the HEPA vacuums and change their filters. Decisions regarding special cleaning practices should be based on the building inspection and ACM assessment data, including the potential for ACM disturbance. In general, the building would not need special O&M cleaning when the building contains only nonfriable (not easily crumbled) ACM; ACM which has been encapsulated, encased, or enclosed behind air-tight barriers; or ACM known to be undamaged/undisturbed since the last special cleaning. Furthermore, where ACM is confined to a single room or area, special cleaning of just that area rather than other parts of the building may be sufficient.

**Here, a worker uses a HEPA vacuum (backpack type) to clean ACM debris from one of several carpeted areas in a room where surfacing material had fallen.**

If ACM has been released onto a carpeted area of a building, it may not always be possible to adequately clean the carpeted area. "Steam" cleaning and HEPA vacuuming methods are sometimes employed for this purpose. A preliminary study carried out by EPA in 1989 showed that hot water vacuums were more effective in carpet cleaning than HEPA vacuums, under the test conditions. Further field studies are planned to confirm these findings.



For carpets, successful cleaning will likely depend on factors such as the amount of ACM released onto the carpet, how long the situation has existed, traffic over the area, as well as the structure and composition of the carpet itself. It is prudent to evaluate individual situations on a case-by-case basis. The Asbestos program Manager should consider the need for workers engaged in cleaning asbestos fiber-contaminated carpets to wear proper respiratory protection. It may also be prudent to arrange for this type of cleaning to be done after normal working hours or when the facility is less occupied. Additionally it maybe more cost effective to properly dispose of contaminated carpets and other fabrics as asbestos-containing waste if a permanent asbestos control option is being undertaken in the building.

Where the ACM is damaged and located in an "air plenum" – where fibers can be transported by the heating, ventilation, or air conditioning (HVAC) system throughout the building – special cleaning practices may be extended to the entire building, including the HVAC system itself.

**Procedures for Asbestos Fiber Release Episodes**

Special procedures are generally needed to minimize the spread of fibers throughout the building after asbestos fiber releases occur, such as the partial collapse of an ACM ceiling or wall. These procedures are needed whether the ACM disturbance is intentional or unintentional To provide building owners with some guidance, under EPA regulations for schools a "major fiber release" is defined as one involving more than three square or linear feet of ACM. The procedures to be followed will vary according to the site of the major release episode, the amount of ACM affected, the extent of fiber release from the ACM, the relationship of the release area to the air handling systems, and whether the release site is accessible to building occupants. Depending on the severity of the episode, asbestos abatement consultants and contractors may be needed to develop a strategy for conducting the clean-up operations.

In general, for major fiber releases, the area should be isolated by closing doors and/or erecting temporary barriers to restrict airflow as well as access to the site. Signs should be posted as necessary immediately outside the fiber release site to prevent persons not involved in the cleanup operation from inadvertently entering the area. If asbestos fibers could enter the HVAC system, the system should be modified to prevent fiber entry, or should be shut down and sealed off. The final step should be to employ thorough cleanup procedures to properly control the ACM, a careful visual inspection, and final clearance air monitoring to verify satisfactory cleanup.

Similar procedures can be used for much smaller fiber release events: where the amount of ACM is on the

2 0

order of three square or linear feet or less. The HEPA vacuuming, wet wiping, and worker protection procedures outlined in this guidance document, as well as wetting ACM wastes and properly placing them in an appropriate leak-tight container (such as a properly labeled, 6-mil-thick plastic bag), are examples of some of the procedures which could be used for both major and minor fiber releases.

It is important to recognize that different levels of training are needed for workers involved with fiber release episodes. A major release will generally require "asbestos abatement worker training," rather than the degree of training considered adequate for O&M workers.

EPA suggests that building owners and Asbestos Program Managers consult with state and local regulatory officials before establishing formal training procedures for each type of situation.

The following table should be useful in determining when to apply certain O&M work practices in buildings. The table illustrates the O&M work practices that should be used by custodial and maintenance staff, depending on the likelihood of ACM disturbance.

## Summary of When to Apply Key O&M Work Practices

| | Likelihood of ACM Disturbance | | |
| | Contact Unlikely | Accidental Disturbance Possible | Disturbance Intended or Likely |
|---|---|---|---|
| **Management Responsibilities** | | | |
| Need Pre-Work Approval from Asbestos Program Manager | Review by Program Manager | Yes | Yes |
| Special Scheduling or Access Control | No | Yes | Yes |
| Supervision Needed | No | Initial, At Least | YES |
| HVAC System Modification | None | As Needed[1] | Shut Down[1] |
| Area Containment | None | Drop cloths, Mini-enclosures | Yes[2] |
| **Personal Protection** | | | |
| Respiratory Protection | Available For Use | Yes | Yes |
| Protective Clothing | None | Review by Asbestos Program Manager | Yes |
| **Work Practices** | | | |
| Use of Wet Methods | No | As Needed | Yes |
| Use of HEPA Vacuum | Available For Use | Available For Use | As Needed |

1) In the area where work takes place
2) Type of containment may vary. For example, small-scale, short-duration tasks may not require full containment.

2 1

## Recordkeeping

**EPA recommends that building owners make available all written elements of the O&M program to the building's O&M staff as well as to tenants and other building occupants.**

All the building asbestos management documents discussed in this Guide (inspection and assessment reports, O&M program plan, work practices and procedures, respirator use procedures, fiber release reports, application for maintenance work and work approval forms, evaluations of work affecting ACM, and reinspections/surveillance of ACM) should be stored in permanent files. In addition, for employees engaged in asbestos-related work, federal regulations (see Chapter 6) require that employers retain:

● personal air sampling records, for at least 30 years. Personal air samples are those collected in the worker's breathing zone during performance of work involving asbestos exposures.

● objective data used to qualify for exemptions from OSHA's initial monitoring requirements for the duration of the exemption.

● medical records for each employee subject to the medical surveillance program for the duration of their employment plus 30 years.

● all employee training records for one year beyond the last date of each worker's employment.

In addition, OSHA requires that employers provide to each employee their record of exposure and medical surveillance under the Records Access Standard (29 CFR 1910.20) and the Hazard Communication Standard (29 CFR 1910.1200). See the OSHA Construction Rule (29 CFR 1926.58) or the EPA Worker Protection Rule (40 CFR 763 Subpart G) for more details of recordkeeping requirements.

EPA recommends that building owners make available all written elements of the O&M program to the building's O&M staff as well as to tenants and other building occupants, if applicable. Building owners are also encouraged to consult with their legal counsel concerning appropriate recordkeeping strategies as a standard part of their O&M programs. Additionally state and local regulations may also require additional recordkeeping procedures.

---

## Chapter Summary

Although the elements discussed in this chapter should appear in any O&M program, the extent to which each applies will vary depending on the building type, the type of ACM present, and the ACM's location and physical condition. To achieve its objectives an O&M program should include the following:

A notification program to inform building occupants, workers, and tenants about the location of ACM and how to avoid disturbing ACM.

Periodic surveillance and reinspection of ACM at regular intervals by trained workers or properly trained inspectors. Air monitoring to detect airborne asbestos fibers in the building may provide useful supplemental information when conducted along with a comprehensive visual and physical ACM inspection/ reinspection program. Air samples are most accurately analyzed using transmission electron microscopy (TEM).

A "work Control/permit" system, which some building owners have used successfully to control work that could disturb ACM. This system requires the person requesting work to submit a Job Request Form to the Asbestos Program Manager before any work is begun.

O&M work practices to avoid or minimize fiber release during activities affecting ACM.

Recordkeeping. OSHA and EPA have specific requirements for workers exposed to asbestos.



# 5 What O&M Training Is Necessary?

### Types of Training

**Training of custodial and maintenance workers** is one of the keys to a successful O&M program. If building owners do not emphasize the importance of well-trained custodial and maintenance personnel, asbestos O&M tasks may not be performed properly This could result in higher levels of asbestos fibers in the building air and an increased risk faced by both building workers and occupants.

OSHA and EPA require a worker training program for all employees exposed to fiber levels (either measured or anticipated) at or above the action level (0.1 f/cc, 8-hour *time-weighted average*– the TWA) and/or the excursion limit (1.0 f/cc, 30-minute TWA—see Chapter 6). According to the EPA regulations governing schools, all school stall custodial and maintenance workers who conduct any activities that will result in the disturbance of ACM must receive 16 hours of O&M training. Some states and municipalities may also have specific training requirements for workers who may be exposed to asbestos, or who work in a building with ACM present.

With proper training, custodial and maintenance staff can successfully deal with ACM in place, and greatly reduce the release of asbestos fibers. Training sessions should provide basic information on how to deal with all types of maintenance activities involving ACM. However, building owners should also recognize that O&M workers in the field often encounter unusual, "non-textbook" situations. As a result, training should provide key concepts of asbestos hazard control. If these concepts are clearly understood by workers and their supervisors, workers can develop techniques to address a specific problem in the field. Building owners who need to provide O&M training to their custodial and maintenance staff should contact an EPA environmental assistance center (see Appendix D) or equally qualified training organization for more information.

At least three levels of maintenance worker training can be identified

**LEVEL 1: AWARENESS TRAINING. For custodians involved in cleaning and simple maintenance tasks where ACM may be accidentally disturbed.**

For example, fixing a light fixture in a ceiling covered with surfacing ACM. Such training may range from two to eight hours, and may include such topics as:

- Background information on asbestos.
- Health effects of asbestos.
- Worker protection programs.
- Locations of ACM in the building.
- Recognition of ACM damage and deterioration.
- The O&M program for that building.
- Proper response to fiber release episodes.

*Training of custodial and maintenance workers is one of the keys to a successful O&M program.*

2 3



A properly protected and trained worker conducts a glovebag removal job on a section of thermal system insulation. Under a proper operations and maintenance program, any worker involved in such activities would have Level 1 and 2 training.

### LEVEL 2: SPECIAL O&M TRAINING. For maintenance workers involved in general maintenance and asbestos material repair tasks.

For example, a repair or removal of a small section of damaged TSI, or the installation of electrical conduit in an air plenum containing ACM or ACM debris. Such training generally involves at least 16 hours. This level of training usually involves more detailed discussions of the topics included in Level 1 training as well as:

- Federal, state, and local asbestos regulations.
- Proper asbestos-related work practices.
- Descriptions of the proper methods of handling ACM, including waste handling and disposal.
- Respirator use, care, and fit-testing.
- Protective clothing donning, use, and handling.
- Hands-on exercises for techniques such as glovebag work and HEPA vacuum use and maintenance.
- Appropriate and proper worker decontamination

This is an example of a large-scale asbestos removal project (note missing scaffold safety rails). Such projects are well beyond the scope of an O&M program. The EPA NESHAP regulations require that asbestos materials be removed from buildings prior to demolition or renovation when the asbestos will be disturbed.



### LEVEL 3: ABATEMENT WORKER TRAINING. For workers who may conduct asbestos abatement.

For example, conducting a removal job, constructing an enclosure, or encapsulating a surface containing ACM. This work involves direct, intentional contact with ACM. The recognized "abatement worker" training courses approved by EPA or states, under the EPA AHERA model accreditation plan for schools, which involve 24 to 32 hours of training, would fulfill this level of training.

If this level of training is provided to in-house staff, it may save time and money in the long run to use these individuals to perform such activities. This level of training is much more involved than Levels 1 and 2, although it should include some of the same elements (e.g., health effects of asbestos). It will typically include a variety of specialized topics, such as:

- Pre-asbestos abatement work activities.
- Work area preparation.
- Establishing decontamination units.
- Personal protection, including respirator selection, use, fit-testing, and protective clothing.
- Worker decontamination procedures.
- Safety considerations in the abatement work area.
- A series of practical hands-on exercises.
- Proper handling and disposal of ACM wastes.

The Asbestos Program Manager should consider conducting the training program for Levels 1 and 2 if he or she has sufficient specific asbestos knowledge and training. If the Asbestos Program Manager does not conduct the training, the building owner should hire an outside consultant or send workers to an appropriate O&M training course. A trained (preferably Certified) industrial hygienist or equally qualified safety and health professional should conduct the training on respirator use and fit-testing. A health professional should conduct the training on health effects.

OSHA or EPA Regional Offices, as well as state and local agencies and professional associations, may be able to suggest courses or direct you to listings of training providers for each of the three levels. Appendix D provides the addresses and/or phone numbers for OSHA, EPA, and EPA-sponsored training providers.

Where custodial and maintenance services are performed by a service company under contract, or where some installation or repairs are performed by employees of trade or craft contractors and subcontractors, those workers may need to have training at level 1, 2, or 3 as appropriate for their work. The Asbestos Program Manager or building owner should verify that these employees receive appropriate training before they begin any work.

In summary, good training is crucial to the success of an O&M program. Strong support for O&M training by the building owner should convince custodial and maintenance workers that following the appropriate work procedures is critical to protecting their own health as well as the health of other building occupants.

---

## Chapter Summary

Properly trained custodial and maintenance workers are critical to a successful O&M program. The following items are highlighted training requirements:

● OSHA and EPA require worker training program for all employees exposed to fiber levels at or above the action level (0.1 f/cc, 8-hr. TWA) and/or the excursion limit (1.0 f/cc, 30-minute TWA – see Chapter 6).

● Some states and municipalities may have specific worker training requirements.

● At least three levels of maintenance worker training can be identified:

**Level 1 Awareness training** for workers involved in activities where ACM may be accidentally disturbed. May range from 2-8 hours.

**Level 2 Special O&M training** for maintenance workers involved in general maintenance and incidental ACM repair tasks. At least 16 hours.

**Level 3 Abatement worker training** for workers who may conduct asbestos abatement. This work involves direct, intentional contact with ACM. "Abatement worker" training courses that involve 24 to 32 hours of training fulfill this level of training.

Strong support by the building owner can convince workers that following appropriate procedures is critical to protecting their own health as well as the health of other building occupants.

**2 5**



# What Regulations Affect Asbestos Management Programs in Buildings, Especially O&M Programs?

## Federal, State, and Local Regulations Affecting O&M Programs

**Building owners are governed** by a variety of federal, state, and local regulations which influence the way they must deal with ACM in their facilities. Some of these regulations, particularly at the state and local level, may change frequently Building owners should contact their state and local government agencies, in addition to organizations such as the National Conference of State Legislatures (NCSL), the National Institute of Building Sciences (NIBS), or EPA environmental assistance centers, for updated information on these requirements. (Appendix D lists phone numbers for these organizations.)

**Building owners are governed by a variety of federal, state, and local regulations which influence the way they must deal with ACM in their facilities.**

### OSHA Regulations and the U.S. EPA Worker Protection Rule

There are several important Occupational Safety and Health Administration (OSHA) and EPA regulations that are designed to protect workers. They are summarized here, as guidance. OSHA has specific requirements concerning worker protection and procedures used to control ACM. These include the OSHA construction industry standard for asbestos (29 CFR 1926.58), which applies to O&M work, and the general industry asbestos standard (29 CFR 1910.1001). State-delegated OSHA plans, as well as local jurisdictions, may impose additional requirements.

For most operations and maintenance activities in building areas where only non-friable ACM is present or where friable ACM is in good condition, applicable OSHA permissible exposure limits are not likely to be exceeded. However, it is possible that some O&M activities will disturb ACM to such an extent that the OSHA limits are exceeded, unless good work practices are followed.

The OSHA standards generally cover private sector workers, and public sector employees in states which have an OSHA state plan. Public sector employees, such as city or county government employees, or certain school employees, who are not already subject to a state OSHA plan are covered by the EPA "Worker Protection Rule" (Federal Register: February 25, 1987; 40 CFR 763 Subpart G, Asbestos Abatement Projects; Worker Protection, Final Rule). *Note: As this document goes to press, OSHA is considering a substantial number of changes to its regulations.*

The OSHA standards and the EPA Worker Protection Rule require employers to address a number of items which are triggered by exposure of employees to asbestos fibers. Exposure is discussed in terms of fibers per cubic centimeter (cc) of air. A cc is a volume approximately equivalent to that of a sugar cube.

Two main provisions of the regulations fall into the general category of "Permissible Exposure Limits (PELs)" to airborne asbestos fibers. They are:

**1** **8-Hour Time-weighted average limit (TWA)–** 0.2 fiber per cubic centimeter (f/cc) of air based on an 8-hour time-weighted average (TWA) sampling period. This is the maximum level of airborne asbestos, on average, that any employee may be exposed to over an 8-hour period (normal work shift).

**2** **Excursion limit (EL) –** 1.0 f/cc as averaged over a sampling period of 30 minutes.

These levels trigger mandatory requirements, which include the use of respirators and protective clothing, the establishment of "regulated areas," the posting of danger signs as well as the use of engineering controls and specific work practices.

OSHA regulations also establish an *"Action Level":* 0.1 f/cc for an 8-hour TWA. Employee training is required once the action level of 0.1 f/cc and/or the "Excursion Limit" is reached. This training must include topics specified by the OSHA rules. If an employee is exposed at or above the action level for a period of 30 days or more in a calendar year, medical surveillance is required according to the OSHA construction industry asbestos standard.

OSHA also requires medical examinations under its "General Industry Standard" for any employee exposed to fiber levels in the air at or above the OSHA "action level" (0.1 f/cc) and/or the "excursion limit" (1. Of/cc). In both cases – the action level and excursion limit – the OSHA medical examination requirement applies if the exposure occurs for at least one day per year.

The OSHA "Construction Industry Standard" (29 CFR 1926.58) for asbestos, is generally applicable for the workers who carry out the kinds of work discussed in this O&M guidance document. The OSHA construction industry asbestos standard applies to demolition and asbestos removal or encapsulation projects, as well as to repair, maintenance, alteration, or renovation if ACM is involved. ACM spills or emergency clean-up actions are also covered by this regulation.

According to those regulations, participation in a medical surveillance program is required for any employee who is required to wear a negative pressure, air-purifying respirator. Preplacement, annual, and termination physical exams are also required for these employees. However, a termination exam is only necessary under the construction industry standard (which applies to custodial and maintenance employees) if a physician recommends it. While not mandatory EPA and NIOSH recommend physical examinations, including cardiac and pulmonary tests, for any employee required to wear a respirator by the building owner. These tests determine whether workers will be unduly stressed or uncomfortable when using a respirator.

Additional requirements of the OSHA asbestos standards, such as the use of air filtration systems and hygiene facilities, involve procedures which are most applicable to large-scale asbestos abatement projects. However, these rules also include a number of recommendations for procedures which might be appropriate for a variety of O&M programs for buildings.

### Small-scale, Short-duration Projects

"Appendix G" which is specified as a non-mandatory section to the OSHA regulation 29 CFR 1926.58, may become mandatory under certain circumstances where "small-scale, short-duration" asbestos projects are conducted. These projects are not precisely defined in terms of either size or duration, although their nature and scope are illustrated by examples presented in the text of the regulation. Properly trained maintenance workers may conduct these projects. Examples may include removing small sections of pipe insulation or covering for pipe repair, replacing valves, installing electrical conduits, or patching or removing small sections of drywall. OSHA issued a clarification of the definition of a "small-scale, short-duration" (SS/SD) project in a September 1987 asbestos directive. The directive focuses on intent, stating that in SS/SD projects, the removal of ACM is not the primary goal of the job. If the purpose of a small-scale, short-duration project is maintenance, repair, or renovation of the equipment or surface behind the ACM—not abatement of ACM—then the appendix provisions may apply If the intent of the work is abatement of the ACM, then the full-scale abatement control requirements apply

In any event, this appendix section of the OSHA construction standard outlines requirements for the use of certain engineering and work practice controls such as glovebags, mini-enclosures, and special vacuuming techniques. Similar information on these procedures may be found in the EPA's AHERA regulations for schools. (See final AHERA rule, Appendix B, for SS/SD projects.)

### U.S. EPA National Emission Standards for Hazardous Air Pollutants (NESHAP) (40 CFR 61 Subpart M)

EPA's rules concerning the application, removal, and disposal of ACM, as well as manufacturing, spraying and fabricating of ACM, were issued under the asbestos NESHAP. The asbestos NESHAP regulation governs asbestos demolition and renovation projects in all facilities. The NESHAP rule usually requires owners or operators to have all friable ACM removed before a building is demolished, and may require its removal before a renovation. For renovation projects where friable ACM will be disturbed, the NESHAP rule may require appropriate work practices or procedures for the control of emissions. It is prudent to note that any ACM which may become friable poses a potential hazard that should be addressed. The building owner should consider that in many instances, the removal of friable ACM prior to demolition could be less expensive than removals while the building is still occupied and being used. *Some revisions to the current. NESHAP rule are anticipated by the end of 1.990.*

**In general applicable OSHA permissible exposure limits are not likely to be exceeded for most O&M activities in building areas where only non-friable ACM is present or where friable ACM is in good condition.**

## Notification

EPA or the state (if the state has been delegated authority under NESHAP) must be notified before a building is demolished or renovated. The following information is required on the NESHAP notice:

**1** Name and address of the building owner or manager;

**2** Description and location of the building;

**3** Estimate of the approximate amount of friable ACM present in the facility;

**4** Scheduled starting and completion dates of ACM removal;

**5** Nature of planned demolition or renovation and method(s) to be used;

**6** Procedures to be used to comply with the requirements of the regulation; and

**7** Name, address, and location of the disposal site where the friable asbestos waste material will be deposited.

**Depending on project size, EPA or the state must be notified before a building is demolished or renovated.**

The notification requirements do not apply if a building owner plans renovation projects which will disturb less than the NESHAP limits of 160 square feet of friable ACM on facility components or 260 linear feet of friable ACM on pipes (quantities involved over a one-year period). For renovation operations in which the amount of ACM equals or exceeds the NESHAP limits, notification is required as soon as possible.

## Emissions Control and Waste Disposal

The NESHAP asbestos rule prohibits visible emissions to the outside air by requiring emission control procedures and appropriate work practices during collection, packaging, transportation or disposal of friable ACM waste. All ACM must be kept wet until sealed in a leak-tight container that includes the appropriate label. The following table provides a simplified reference for building owners regarding the key existing NESHAP requirements.

**Resource Conservation and Recovery Act Regulations (RCRA); and Comprehensive Environmental Response, Compensation, and Liability Act Regulations (CERCLA, or "Superfund")**

Under expanded authority of RCRA, a few states have classified asbestos-containing waste as a hazardous waste, and require stringent handling, manifesting, and disposal procedures. In those cases, the state hazardous

waste agency should be contacted before disposing of asbestos for approved disposal methods and recordkeeping requirements, and for a list of approved disposal sites.

Friable asbestos is also included as a hazardous substance under EPA's CERCLA regulations. The owner or manager of a facility (e.g., building, installation, vessel, landfill) may have some reporting requirements. Check with your EPA Regional Office for further information. (See Appendix D for telephone numbers.)

**The Asbestos Hazard Emergency Response Act Regulations (AHERA)**

In October 1987, EPA issued final regulations to carry out the Asbestos Hazard Emergency Response Act of 1986 (AHERA). The AHERA regulatory requirements deal *only with public and private elementary and secondary school buildings.* The regulations require schools to conduct inspections, develop comprehensive asbestos management plans, and select asbestos response actions to deal with asbestos hazards. The AHERA rules *do not* require schools to remove ACM.

A key element of the AHERA regulations requires schools to develop an O&M program if friable ACM is present. The AHERA O&M requirements also cover non-friable ACM which is about to become friable. For example, drilling through an ACM wall will likely result in friable ACM. Under the AHERA O&M provisions, schools must carry out specific O&M procedures which provide for the clean-up of any ACM releases and help ensure the general safety of school maintenance and custodial workers, as well as all other school building occupants. The AHERA regulation's O&M requirements mandate that schools employ specific work practices including wet wiping, HEPA vacuuming, proper waste disposal procedures, and specific training for custodial and maintenance employees who work in buildings with ACM.

**U.S. EPA Asbestos Ban and Phaseout Rule**

Bans on some uses and applications of asbestos under the Clean Air Act were briefly described in Chapter 1. In July 1989, under the Toxic Substances Control Act (TSCA), EPA promulgated an Asbestos Ban and Phaseout Rule. The complete rule was published in the *Federal Register* on July 12,1989.

Beginning in 1990 and taking effect in three stages, the rule prohibits the importation, manufacture, and processing of 94 percent of all remaining asbestos products in the United States over a period of seven years.

# Existing  NESHAP  Requirements  Summary*

|  | Demolition | | Renovation | |
|---|---|---|---|---|
| **AMOUNT*** (in 1 yr.) | > 260 ln. ft. or > 160 sq. ft. | <260  ln.  ft. or <160  sq.  ft. | > 260 ln. ft. or > 160 sq. ft. | <260  ln.  ft. or > 160 sq. ft. |
| **NOTIFICATION** | YES | YES | Y E S | NOT REQUIRED |
| **HOW FAR IN ADVANCE*** | 10 DAYS | 20 DAYS | AS  SOON AS POSSIBLE | NOT  REQUIRED |
| **EMISSION  CONTROLS** (Work  Practices) | YES | NOT REQUIRED | YES | NOT REQUIRED |
| **DISPOSAL STANDARD** | Y E S | NOT REQUIRED | Y E S | NOT REQUIRED |

*May be changed on promulgation of Revised NESHAP Rule in 1990

# Chapter  Summary

A variety of federal, state, and local regulations govern the way building owners must deal with ACM in their facilities. State and local regulations maybe more stringent than federal standards and often change rapidly Building owners should periodically check with the appropriate Federal, State, and local authorities to determine whether any new asbestos regulations have been developed or whether current regulations have been amended. Specific federal regulations that may affect asbestos-related tasks and/or workers are highlighted here:

● OSHA Construction Industry Standard for Asbestos (29 CFR 1926.58).

● OSHA General Industry Standard for Asbestos (29 CFR 1910.1001).

● OSHA Respiratory Protection Standard (29 CFR 1910.134).

● EPA Worker Protection Rule (40 CFR 763 Subpart, G).

● EPA National Emission Standards for Hazardous Air Pollutants (NESHAP) (40 CFR 61 Subpart M).

● EPA Asbestos Hazard Emergency Response Act (AHERA) Regulations (40 CFR 763 Subpart E),

● EPA Asbestos Ban and Phaseout Rule (40 CFR 763 Subpart I).

Appendix A.

## Glossary of Terms

| | |
|---|---|
| **ACM** | Asbestos-Containing Material. Any material containing more than one percent asbestos. |
| **Asbestos Program Manager** | A building owner or designated representative who supervises all aspects of the facility asbestos management and control program. |
| **Air Plenum** | Any space used to convey air in a building or structure. The space above a suspended ceiling is often used as an air plenum. |
| **Asbestos Abatement** | Procedures to control fiber release from asbestos-containing materials in a building or to remove it entirely These may involve removal, encapsulation, repair, enclosure, encasement, and operations and maintenance programs. |
| **Delamination** | Separation of one layer from another. |
| **EPA** | U.S. Environmental Protection Agency |
| **Friable Asbestos** | Any materials that contain greater than one percent asbestos, and which can be crumbled, pulverized, or reduced to powder by hand pressure. This may also include previously non-friable material which becomes broken or damaged by mechanical force. |
| **Glovebag** | A polyethylene or polyvinyl chloride bag-like enclosure affixed around an asbestos-containing source (most often, TSI) so that the material maybe removed while minimizing release of airborne fibers to the surrounding atmosphere. |
| **HEPA Filter** | High-Efficiency Particulate Air Filter. Such filters are rated to trap at least 99.97% of all particles 0.3 microns in diameter or larger. |
| **Industrial Hygienist** | A professional qualified by education, training, and experience to anticipate, recognize. evaluate and develop controls for occupational health hazards. |
| **Medical Surveillance** | Aperiodic comprehensive review of a worker's health status. The required elements of an acceptable medical surveillance program are listed in the Occupational Safety and Health Administration standards for asbestos. |
| **Miscellaneous ACM** | Interior asbestos-containing building material on structural components, structural members or fixtures, such as floor and ceiling tiles; does not include surfacing material or thermal system insulation. |
| **NESHAP** | National Emission Standard for Hazardous Air Pollutants-EPA Rules under the Clean Air Act. |
| **NIOSH** | The National Institute for occupational Safety and Health, which was established by the Occupational Safety and Health Act of 1970. Primary functions of NIOSH are to conduct research, issue technical information, and test and certify respirators. |
| **Personal Air Samples** | An air sample taken with a sampling pump directly attached to the worker with the collecting filter and cassette placed in the worker's breathing zone. These samples are required by the OSHA asbestos standards and the EPA Worker Protection Rule. |
| **Prevalent Level Samples** | Air samples taken under normal conditions (also known as ambient background samples). |
| **Surfacing ACM** | Asbestos-containing material that is sprayed-on, troweled-on or otherwise applied to surfaces, such as acoustical plaster on ceilings and fireproofing materials on structural members, or other materials on surfaces for acoustical, fireproofing, or other purposes. |
| **TSI** | Thermal system insulation – asbestos-containing material applied to pipes, fittings, boilers, breeding, tanks, ducts or other interior structural components to prevent heat loss or gain or water condensation. |
| **TWA** | Time-weighted Average. In air sampling, this refers to the average air concentration of contaminants during a particular sampling period. |

**Appendix B.**

# Sample Recordkeeping Form:

**Form 1.** A sample form for recording information during ACM reassessment.

## Reinspection of Asbestos-Containing Materials

Location of asbestos-containing material (address, building, room, or general description]

_____

_____

_____

_____

**Type of asbestos-containing material(s):**

1. Sprayed-or troweled-on ceilings or walls
2. Sprayed-or troweled-on structural members
3. Insulation on pipes, tanks, or boiler
4. Other (describe)

_____

_____

**Abatement Status:**

1. The material has been encapsulated_____ , enclosed _____ , neither _____ , removed _____ .

**Assessment:**

1. Evidence of physical damage _____

_____

2. Evidence of water damage: _____

_____

3. Evidence of delamination or other damage: _____

_____

4. Degree of accessibility of the material: _____

_____

5. Degree of activity near the material: _____

_____

6. Location in an air plenum, air shaft, or airstream: _____

_____

7. Other observations (including the condition of the encapsulant or enclosure, if any): _____

_____

**\*Recommended Action:** _____

_____

Signed:_____  Date: _____
                (evaluator)

**Form 2.** A sample application form for maintenance work approval.

## Job Request Form for Maintenance Work

Name: _____    Date: _____

Telephone No. _____    Job Request No. _____

Requested starting date: _____    Anticipated finish date: _____

Address, building, and room number(s) (or description of area) where work is to be performed:

_____

_____

_____

_____

Description of work

_____

_____

_____

_____

_____

Description of any asbestos-containing material that might be affected, if known (include location and type):

_____

_____

_____

_____

_____

Name and telephone number of requestor:

_____

Name and telephone number of supervisor

_____

Submit this application to

_____

(The Asbestos Program Manager)

NOTE An application must be submitted for all maintenance work whether or not asbestos-containing material might be affected. An authorization must then be received before any work can proceed.

_____ Granted (Job Request No. _____)
_____ With conditions*
_____ Denied

*Conditions _____

_____

**Form 3.** A sample maintenance work authorization form.

## Maintenance Work Authorization Form                    No._____

**AUTHORIZATION**

Authorization is given to proceed with the following maintenance work:

_____

_____

_____

_____

_____

_____

_____

_____

**PRESENCE OF ASBESTOS-CONTAINING MATERIALS**

_____ Asbestos-containing materials are not present in the vicinity of the maintenance work.

_____ ACM is present, but its disturbance is not anticipated however, if conditions change, the Asbestos Program Manager will re-evaluate the work request prior to proceeding.

_____ ACM is present, and maybe disturbed.

**Work Practices if Asbestos-Containing Materials Are Present**

The following work practices shall be employed to avoid or minimum disturbing asbestos:*

_____

_____

_____

_____

_____

**Personal Protection if Asbestos-Containing Materials Are Present\*\***

The following equipment/clothes shall be used/worn during the work to protect workers:

_____

_____

_____

_____

(manuals on personal protection can be referenced)

**Special Practices and/or Equipment Required:**

_____

_____

Signed:_____ Date:_____
              (Asbestos Program Manager)

33

**Form 4.** A sample work evaluation form

This evaluation covers the following maintenance work:

Location of work (address, building, room number(s), or general description):

_____

_____

_____

_____

Date(s) of work _____

Description of work _____

Work approval form number: _____

Evaluation of work practices employed to minimize disturbance of asbestos:

_____

_____

_____

_____

_____

Evaluation of work practices employed to contain released fibers and to clean up the work area:

_____

_____

_____

_____

_____

Evaluation of equipment and procedures used to protect workers:

_____

_____

_____

_____

_____

Personal air monitoring results; (i-house worker or contract?)

Worker name_____Results: _____

Worker name_____Results: _____

Handling or storage of ACM waste: _____

signed _____Date: _____
          (Asbestos Program Manager)

34

Appendix C

## Illustrative Organization Chart



**Figure 1.** A *sample* organization for a building owner with a large in-house management staff. Shaded boxes indicate outside assistance.

## Owners and Managers Who Employ an Extensive In-house Management Staff

**IN-HOUSE STAFF (FIGURE 1)**

**Asbestos Program Manager:** Has authority and overall responsibility for the asbestos control program. May develop the O&M program. Coordinates all activities. May also administer the respiratory protection program.

**Physical Plant Manager:** (may also be the Asbestos Program Manager) Participates in establishing work practices for cleaning and maintenance activities, and in training custodial and maintenance staff to use them. Assists in implementing the O&M program and in conducting periodic reinspection of the ACM. Ensures that outside contractors follow O&M procedures.

**Communications Person:** (Public Affairs Officer, Nurse, Physician, Industrial Hygienist) Assists in preparation and distribution of information about ACM in the building. Person should be a good speaker and communicator.

**Recordkeeping Person:** (Executive Assistant, Secretary) Responsible for maintaining records.

**OUTSIDE ASSISTANCE**

**EPA Regional Asbestos Coordinator, NESHAP Coordinator and State/Local Government Advisors:** Provide getter-id guidance and answer specific questions.

**OSHA Regional Office:** May he helpful in answering questions about existing regulations, and providing guidance for worker protection.

**Asbestos Consultant(s)\*:** (Industrial Hygienists, Health Professionals, Architects, Engineers, and others) May assist in various aspects of the asbestos O&M program, including its development and implementation. May also conduct material inspections and provide work practice recommendations.

**Lawyer:** Provides advice on legal requirements (such as laws and statutes) and liability aspects of the program.

**Asbestos Contractor\*:** May provide services for ACM abatement and for building decontamination following a fiber release episode.

\*It is important for owners and Asbestos Program Manager's to consider potential "conflict of interest" issues pertaining to those persons or firms used to sample, inspect, assess, analyze, recommend response actions, design response actions, and conduct asbestos response actions.

35



**Figure 2.** A *sample* organization for owners of buildings where services are provided by contract. Shaded boxes indicate outside assistance.

## Owners and Managers Who Contract For Services

**IN-HOUSE STAFF (FIGURE 2)**

**Asbestos Program Manager:** Has overall responsibility for the asbestos control program. May develop and implement the O&M program. Establishes training and experience requirements for contractor's workers. Supervises and enforces work practices with assistance of work crew supervisors. Conducts periodic reinspection and responsible for recordkeeping. This person should be properly trained in O&M program development and implementation (see Chapter 5).

**OUTSIDE ASSISTANCE**

**EPA Regional Asbestos Coordinator and State/Local Government Advisors:** Provide general guidance and answer specific questions,

**OSHA Regional Office:** May be helpful in answering questions about existing regulations and providing guidance for worker protection.

**Asbestos Consultant(s)*:** (Industrial Hygienists, Health Professionals, Architects, Engineers, and others) May assist Asbestos Program Manager in various aspects of the asbestos O&M program, including development and implementation. May also conduct the inspection and provide work practices recommendations.

**Lawyer:** Provides advice on legal requirements (laws and statutes) and liability aspects of the program.

**Asbestos Contractor*:** May provide services for ACM abatement and building decontamination following a fiber release episode.

*It is important for owners and Asbestos Program Manager's to consider potential "conflict of interest" issues pertaining to those persons or firms used to sample, inspect, assess, analyze, recommend response actions, design response actions, and conduct asbestos response actions.

**APPENDIX D.**

# Additional Assistance and Training

### EPA REGIONAL CONTACTS

Additional assistance can be obtained from your U.S. EPA Regional Asbestos Coordinators, NESHAP Regional Coordinators, and OSHA Regional Offices. Their telephone numbers are listed below

**EPA Region 1:** (CT,ME,MA,NH,RI,VT)

    Asbestos Coordinator (617) 565-3835
    NESHAP Coordinator (617) 565-3265

**EPA Region II:** (NJ,NY,PR,VI)

    Asbestos Coordinator (201) 321-6671
    NESHAP Coordinator (212) 264-6770

**EPA Region III:** (DE,DC,MD,PA,VA,WV)

    Asbestos Coordinator (215) 597-3160
    NESHAP Coordinator (215) 597-6550

**EPA Region IV:** (AL,FL,GA,KY,MS,NC,SC,TN)

    Asbestos Coordinator (404) 347-5014
    NESHAP Coordinator (404) 347-2904

**EPA Region V:** (IL,IN,MI,MN,OH,WI)

    Asbestos Coordinator (312) 886-6003
    NESHAP Coordinator (312) 353-2088

**EPA Region VI:** (AR,LA,NM,OK,TX)

    Asbestos Coordinator (214) 655-7244
    NESHAP Coordinator (214) 655-7229

**EPA Region VII:** (IA,KS,MO,NE)

    Asbestos Coordinator (913) 551-7020
    NESHAP Coordinator (913) 551-7020

**EPA Region VIII:** (CO,MT,ND,SD,UT,WY)

    Asbestos Coordinator (303) 293-1442
    NESHAP Coordinator (303) 294-7685

**EPA Region IX:** (AZ,CA,HI,NV,AS,GU)

    Asbestos Coordinator (415) 556-5406
    NESHAP Coordinator (415) 556-5526

**EPA Region X:** (AK,ID,OR,WA)

    Asbestos Coordinator (206) 442-4762
    NESHAP Coordinator (206) 442-1757

### OSHA REGIONAL OFFICES

**Region I –** Boston, MA:(617) 223-6710
**Region II –** New York, NY: (212) 944-3432
**Region III –** Philadelphia, PA (215) 596-1201
**Region IV –** Atlanta, GA (404) 347-3573
**Region V –** Chicago, IL: (312) 353-2220
**Region VI –** Dallas, TX: (214) 7674731

**Region VII –** Kansas City, MO (816) 374-5861
**Region VIII –** Denver, CO: (303) 844-3061
**Region IX –** San Francisco, CA: (415) 995-5672
**Region X –** Seattle, WA (206) 442-5930

## Toxic Substances Control Act (TSCA) Assistance Hotline

Copies of the EPA Guidance Documents, Technical Bulletins, and other publications cited here can be obtained by calling the TSCA Assistance Hotline, in Washington, D.C., at: (202) 554-1404.

## Approved Training Centers

Certain training centers and satellite centers were initially funded by EPA to develop asbestos training courses. They and other training providers approved by EPA or states, offer courses for professionals such as asbestos inspectors and management planners involved with ACM detection and control, for asbestos abatement project designers, project supervisors and abatement workers, and others. In general, qualified professionals trained as inspectors and asbestos management planners would be good choices to design an O&M plan. Original training centers are located at the following sites:

Georgia Institute of Technology
GTRI/EDL/ESTD
29 O'Keefe Building
Atlanta, GA 30332
(404) 894-3806

University of Kansas
Asbestos Training Center
6600 College Blvd. Suite 315
Overland Park, KS 66211
(913) 491-0181

Pacific Asbestos
Information Center
University CA/Extension
2223 Fulton St.
Berkeley, CA 94720
(415) 643-7143

Tufts University
Curtis Hall
Asbestos Information Center
474 Boston Avenue
Medford, MA 02155
(617) 381-3531

University of Illinois at Chicago
Midwest Asbestos Information Center
BOX 6998
Chicago, IL 60680
(312) 996-6904

Additional training providers are listed in the *Federal Register* on a regular basis. Call (202) 554-1404 for information. In addition, information on how to receive a copy of an O&M Course produced by an EPA contractor maybe obtained at the same number.

### OTHER ORGANIZATIONS

National Conference of State Legislatures (NCSL)
    Denver, CO – (303) 623-7800
National Institute of Building Sciences (NIBS),
    Washington, D.C. – (202) 289-7800
American Board of Industrial Hygiene (ABIH),
    Lansing, MI – (517) 321-2638
National Institute for Standards and Technology (NIST),
    Gaithersburg, MD – (contact for lab accreditation) –
    (301) 975-4016

37

**APPENDIX E:**

# Respiratory Protection Recommendations

EPA recommends that the following guidelines be followed for respiratory protection during various custodial and maintenance tasks. These guidelines are issued to cover tasks that do not always create routine fiber levels high enough to trigger OSHA respiratory protection requirements. Therefore, building owners should note they go beyond OSHA requirements.

- ● **Routine maintenance where contact with ACM is unlikely.** No respiratory protection required. (Air-purifying respirator with high-efficiency filters should be available if needed: half-face or full facepiece).

- ● **Routine maintenance where there is reasonable likelihood of ACM disturbance.** Air-purifying respirator with high-efficiency filters (half-face or full facepiece).

- ● **Maintenance or repair involving intentional small-scale disturbance of ACM.** Powered air-purifying respirator with high-efficiency filters, or air-purifying respirator with high-efficiency filters (half-face or full facepiece). If glove bags are used to contain the ACM during disturbance, either half-face or full facepiece air-purifying respirators with high-efficiency filters may be used.

- ● **Any O&M activity requiring sawing, cutting, drilling, abrading, grinding, or sanding ACM.** (NOTE: specially equipped tools with local exhaust ventilation should be used for these activities. See 29 CFR 1910.) Powered air-purifying respirator with high-efficiency filters, or full facepiece, air-purifying respirator equipped with high-efficiency filters should be used.

- ● **Cleanup after a minor asbestos fiber release.** Air-purifying respirator with high-efficiency filters (half-face or full facepiece).

- ● **Cleanup after a major asbestos fiber release.** Air-supplied respirators, either the "Type C" airline respirator equipped with a backup high-efficiency filter or SCBA (Self-Contained Breathing Apparatus).

The U.S. EPA, in collaboration with NIOSH, has issued a guidance document, "A Guide to Respiratory Protection for the Asbestos Abatement Industry" which recommends levels of respiratory protection for those engaged in large-scale asbestos abatement projects that are beyond routine O&M procedures. Air-supplied self-contained, and "type C" airline respirators are the focus of the EPA/NIOSH document. These respirators allow workers to breathe fresh air supplied through hoses and face masks, and are generally used only by asbestos abatement workers engaged in large-scale asbestos removal projects. They are usually not considered either practical or necessary for most custodial and maintenance jobs.

An industrial hygienist or environmental/occupational health professional should assist workers with respirator selection and fitting, and train them in respirator use. Fit-testing (which means determining whether a particular brand and size of respirator properly fits an individual worker) is essential, since respirators which leak at the face seal provide significantly less protection. OSHA requires fit-testing initially and every six months for employees required to wear a negative pressure respirator for protection against asbestos, or for individuals exposed at or above the OSHA-specified limits.

A respirator's effectiveness is also influenced by how it is handled, cleaned, and stored. Custodial and maintenance staff should clean their respirators after each use, and disinfect their respirators at the end of a day's use. This improves comfort, and also reduces the chances of skin irritation or infection. After cleaning the respirator, custodial and maintenance staff should place the respirator (with the worker's name) in a clean and sanitary location and store the unit in a secure place for future use. Respirators should be visually inspected by the user before and after each use, during cleaning and at least monthly when not in use. Inspection records should be maintained accordingly When the respirator's high-efficiency filters are discarded, they should be disposed of as asbestos waste.

3 8

**APPENDIX F**

## Existing EPA Guidance for Each Step That a Building Owner May Take to Conrol ACM

| Action | Existing EPA Guidance/Regulations* |
|---|---|
| Appoint Asbestos Program Manager and Develop an Organizational Policy. | "Guidance for Controlling Asbestos-Containing Materials in Buildings" ("Purple Book") EPA publication number: 560/5-85-024 |
| Inspect the facility to determine if ACM is present. Take bulk samples of suspect ACM and assess the material's condition. | "Guidance for Controlling Asbestos-Containing Materials in Buildings" ("Purple Book", chapter 2) EPA publication number 560/5-85-024<br><br>"Simplified Sampling Scheme for Surfacing Materials" ("Pink Book") EPA publication number: 560/5-85-030a<br><br>"Asbestos-Containing Materials in Schools; Final Rule and Notice" (Asbestos Hazard Emergency Response Act, or AHERA). *Federal Register*– October 30, 1987. (sections 763.85 to 763.88)<br><br>Model training course materials for accrediting asbestos building inspectors in accordance with AHERA (inspection/assessment materials). |
| Establish an O&M program. | "Purple Book, Chapter 3<br><br>AHERA regulations, sections 763.91 and 763.92<br><br>EPA Guidance for Service and Maintenance Personnel. EPA publication number 560/5-85-018 |
| Implement and Conscientiously Manage the O&M Program; Assess the Potential for Exposure to Asbestos and Select Response Actions. | "Purple Book", Chapter 4<br><br>Model training course materials for accrediting asbestos management planners in accordance with AHERA (assessment materials).<br><br>AHERA regulations, section 763.88 and 793.92 |
| Select and Implement Abatement Actions Other Than O&M When Necessary | "Purple Book", Chapter 6<br><br>AHERA regulations, section 763.93 (including 763.85 through 763.92)<br><br>AHERA regulation, appendix A Determining Completion of Response Actions-Methods.<br><br>"Abatement of Asbestos-Containing Pipe Insulation" U.S. EPA Asbestos-ii-Buildings Technical Bulletin 1986-2.<br><br>U.S. EPA National Emission Standards for Hazardous Air Pollutants (NESHAP) Regulations (40 CFR 61)<br><br>Model training course materials for accrediting asbestos management planners in accordance with AHERA (assessment materials). |

*Most of these guidance materials are available through EPA's TSCA Assistance Hotline, at (202) 554-1404.

**APPENDIX G:**

- Cement Pipes
- Cement Wallboard
- Cement Siding
- Asphalt Floor Tile
- Vinyl Floor Tile
- Vinyl Sheet Flooring
- Flooring Backing
- Construction Mastics (floor tile, carpet, ceiling tile, etc.)
- Acoustical Plaster
- Decorative Plaster
- Textured Paints/Coatings
- Ceiling Tiles and Lay-in Panels
- Spray-Applied Insulation
- Blown-in Insulation
- Fireproofing Materials
- Taping Compounds (thermal)
- Packing Materials (for wall/floor penetrations)
- High Temperature Gaskets
- Laboratory Hoods/Table Tops
- Laboratory Gloves
- Fire Blankets
- Fire Curtains
- Elevator Equipment Panels

- Elevator Brake Shoes
- HVAC Duct Insulation
- Boiler Insulation
- Breeching Insulation
- Ductwork Flexible Fabric Connections
- Cooling Towers
- Pipe Insulation (corrugated air-cell, block, etc.)
- Heating and Electrical Ducts
- Electrical Panel Partitions
- Electrical Cloth
- Electric Wiring Insulation
- Chalkboards
- Roofing Shingles
- Roofing Felt
- Base Flashing
- Thermal Paper Products
- Fire Doors
- Caulking/Putties
- Adhesives
- Wallboard
- Joint Compounds
- Vinyl Wall Coverings
- Spackling Compounds

**NOTE:** This list does not include every product/material that may contain asbestos. It is intended as a general guide to show which types of materials may contain asbestos.

**APPENDIX H:**

USEPA. 1984. U.S. Environmental Protection Agency *National Emission Standards for Hazardous Air Pollutants.* 40 CFR 61. April 5, 1984.

USEPA. 1985. U.S. Environmental Protection Agency *Measuring airborne asbestos following an abatement action.* Washington DC: USEPA. EPA 600/4-85-049. ("Silver Book")

USEPA. 1985. U.S. Environmental Protection Agency *Asbestos in buildings: Simplified sampling scheme for surfacing materials.* Washington DC: USEPA. EPA 560/5-85-030A. ("Pink Book)

USEPA. 1985. U.S. Environmental Protection Agency *Guidance for controlling asbesdos-containing materials in buildings.* Washington DC EPA 560/5-85-024. ("Purple Book")

USEPA. 1985. U.S. Environmental Protection Agency *Asbestos in buildings: Guidance for service and maintenance personnel.* Washington DC: EPA 560/5-85-018. ("Custodial Pamphlet")

USEPA. 1986. U.S. Environmental Protection Agency *Abatement of asbestos-containing pipe insulation.* Washington DC: Technical Bulletin No. 1986-2.

USEPA. 1986. U.S. Environmental Protection Agency *A guide to respiratory protection for the asbestos abatement industry.* Washington DC: EPA 560/OPTS-86-00l.

USEPA. 1987. Asbestos *Abatement Projects; Worker Protection, Final Rule. 40* CFR 763. February 1987.

USEPA. 1987. U.S. Environmental Protection Agency *Asbestos-Containing Materials in Schools; Final Rule and Notice.* 40 CFR 763. *Federal Register,* October 30, 1987.

USEPA. 1988. *EPA Study of Asbestos-Containing Materials in Public Buildings: A Report to Congress.* February 1988.

USEPA. 1989. *Asbestos Ban and Phaseout Rule.* 40 CFR 763.160 to 763.179. *Federal Register* July 12, 1989.

USEPA. 1989. *Guidelines for Conducting the HERA TEM Clearance Test to Determine Completion of an Asbestos Abatement Project.* Washington DC: EPA 560/5-89-001.

USEPA. 1989. *Transmission Electron Microscopy Asbestos Laboratories: Quality Assurance Guidelines.* Washington DC: EPA 560/5-90-002.

U.S. Department of Labor: OSHA Regulations. 29 CFR 1910.1001 – *General Industry Asbestos Standard* and 29 CFR 1926.58 – *Construction Industry Asbestos Standard.* June 1986; Amended, September, 1988.

U.S. Department of Labor: OSHA Regulations. 29 CFR 1910.134 – *Respiratory Protection Standard.* June, 1974.

Keyes, Dale L. and Chesson, Jean. 1989. *A Guide to Monitoring Airborne Asbestos in Buildings.* Environmental Sciences, Inc., 105 E. Speedway Blvd., Tucson, Arizona 85705.

**ASBESTOS**
**OPERATIONS AND MAINTENANCE**
**PROGRAM**
**FOR**
**THE WARWICK**
**2400 ARROWHEAD DRIVE**
**ABILENE, TEXAS 79606**

**Date:** February 27, 2017

# __Table of Contents__

| __Section__ | | __Page No.__ |
|---|---|---|
| 1.0 | PURPOSE OF OPERATIONS AND MAINTENANCE PROGRAM | 3 |
| 2.0 | ASBESTOS OPERATIONS AND MAINTENANCE MANAGER | 4 |
| 3.0 | NOTIFICATION | 5 |
| 4.0 | SURVEILLANCE | 6 |
| 5.0 | CONTROLS | 7 |
| 6.0 | WORK PRACTICES/WORKER PROTECTION | 8 |
| 7.0 | WORKER TRAINING | 12 |
| 8.0 | RECORD KEEPING | 13 |

__Appendices__:

| Appendix A | Operation & Maintenance Forms |
|---|---|
| Appendix B | Reference Rules and Regulations |
| Appendix C | USEPA Guidance Document |

# 1.0   PURPOSE OF OPERATIONS AND MAINTENANCE PROGRAM

The principal objective of the asbestos O&M Program is to minimize exposure of building occupants and workers to asbestos fibers.

The O&M Program is a "best management practices" plan.   The O&M Program is not a regulatory compliance program and is not meant to imply compliance with Federal worker protection regulations, such as Occupational Safety and Health Administration (OSHA); Federal regulations regarding the release of asbestos fibers, such as National Emission Standards for Hazardous Air Pollutant (NESHAP); or other State or local regulations.

A Phase I Environmental Site Assessment (ESA) completed by Velocity Consulting, Inc. and dated February 23, 2017 identified the following Suspect ACMs (SACMs).

| Material | Location | Amount/ Condition/ Friability |
|---|---|---|
| "Popcorn" ceiling texture | Apartments | Not quantified/ good/friable |
| Vinyl floor tile and mastic | Some apartments | Not quantified/ good/non-friable |
| Roofing materials | Roofs | Not quantified/ good/non-friable |

The above-listed materials were identified in a limited asbestos survey conducted as part of Velocity Consulting Inc.'s Phase I ESA.   The limited asbestos survey was only meant to identify readily accessible ACMs and SACMs in representative areas only.   The limited asbestos survey is not a full or comprehensive asbestos survey nor does it render a property asbestos-free.   The limited asbestos survey is not meant to comply with Asbestos Hazard Emergency Response Act (AHERA), 40 Code of Federal Regulations (CFR) Part 763, National Emission Standards for Hazardous Air Pollutants (NESHAP) 40 CFR 61, Occupational Safety and Health (OSHA) 29 CFR Part 1926.1101, or other local, state, or federal regulations.

For the purposes of this O&M Program, all SACM will be referred to as ACM.   This O&M Program will be maintained until all ACM is removed from the subject property.

The O&M Program will in no way substitute for proper asbestos training.   All building personnel, at a minimum, will read this program and be familiar with the basics of the O&M Program.

Additional information and guidance on establishing an asbestos O&M Program can be found in the United States Environmental Protection Agency (USEPA) guidance document titled "Managing Asbestos In-Place, A Building Owner's Guide to Operations and Maintenance Programs for Asbestos-Containing Materials."   This guidance document is also known as "the Green Book" and is provided in Appendix C.

## 2.0   ASBESTOS OPERATIONS AND MAINTENANCE MANAGER

An essential component of the asbestos O&M program is the appointment of an O&M manager (OMM).  The OMM is usually a building engineer, superintendent or facilities manager.  This person should be properly qualified, through training and experience, and be actively involved in all asbestos-related activities at the property, including inspections, O&M activities and removal and repair of ACM.

The position of Operations and Maintenance Manager (OMM) for the subject property is held by:

| | |
|---|---|
| **Name** | |
| **Address** | |
| **Telephone** | |

# 3.0   NOTIFICATION

A program should be implemented to inform workers, tenants, and building occupants of the physical location of ACM and stress the need to avoid disturbing or damaging existing ACMs.  All persons affected should be properly informed.

The purpose of the notification is to avoid the accidental disturbance of ACM and the subsequent release of asbestos fibers.  Informed persons are less likely to unknowingly disturb the material and cause fibers to be released into the air.

The method of notification should be tailored to the type, condition, and location of the ACMs present.

# 4.0   SURVEILLANCE

All identified ACM and materials suspected to contain asbestos should be inspected annually.

The inspections will include identifying and recording changes in the condition of the ACM, including damage and deterioration, and changes in the use and activity of spaces containing ACM. Special attention will be given to friable ACM and ACM located in high activity areas that are susceptible to damage and subsequent deterioration.

The annual inspections can be conducted by the OMM or an outside consultant. If the annual inspections are conducted by an outside consultant, the OMM should accompany the consultant during the inspections. All annual inspection documentation and reports should be maintained by the OMM. The Periodical Surveillance Form included in Appendix A can be used to document the inspections.

In addition, building personnel should report all damage and changes in the condition of ACM and suspect ACM to the OMM immediately

# 5.0   CONTROLS

A system should be put in place to control all activities that might disturb the ACM.

The OMM should determine if any planned work will disturb any ACMs.  If the work is to disturb a SACM, then a prudent measure is to sample the SACM at that time to determine its asbestos content.  The asbestos samples should be analyzed by an accredited laboratory for asbestos content.

All work that can potentially damage ACM should be controlled/managed in such a way as to minimize disturbance of ACMs and the release of asbestos fibers.

One way to achieve this goal is to use a permitting system consisting of the use of three forms.  Examples of these three forms are included in Appendix A.  The forms can and should be modified to suit the individual parameters of the site, the management team, and the types of ACMs present.  The three example forms are as follows:

> Maintenance Work Location Form: This form describes the proposed maintenance work and must be submitted to the OMM before any maintenance work is begun
> Maintenance Work Authorization Form: This form must be approved by the OMM before any maintenance work is begun and dictates the work practices and personal protective equipment/clothing to be used during the maintenance work.
> Asbestos Maintenance Closure Form: This form will document the methods undertaken to minimize the disturbance of ACM and the release of asbestos fibers (i.e. control methods, protective equipment, etc.)

Copies of all Maintenance Work Location Forms, Maintenance Work Authorization Forms, Asbestos Maintenance Closure Forms and laboratory asbestos sample results should be kept on file for future reference.

Implementation of this O&M program should address work conducted by outside contractors. Proposals and work orders from outside contractors should be thoroughly reviewed to ensure that appropriate work practices are followed as related to ACMs.

All work that will result in the disturbance of ACM should be conducted in accordance with applicable USEPA, Occupational Safety and Health Administration (OSHA), and/or state and local regulations.

# 6.0    WORK PRACTICES/WORKER PROTECTION

This section describes work practices that are designed to avoid or minimize the chances of fiber release.

**The work practices and worker protection procedures described in this section (6.0 through 6.4) are only necessary if a known ACM is to be disturbed. If the asbestos content of a material to be disturbed is unknown, then samples should taken prior to the commencement of work and analyzed for asbestos content by an accredited laboratory.**

The following lists the ACMs found on-site and the special practices that need to be taken for that material.

| FRIABLE SUSPECT ASBESTOS-CONTAINING POPCORN TEXTURED CEILING TILES | |
|---|---|
| Initial and Periodic Cleaning | None required |
| Periodic Surveillance: | Annual |
| Labeling | None required |
| Restricted Activities | Any activities that may result in the damage or disturbance of the friable suspect asbestos-containing popcorn textured ceiling tiles |
| | Avoid hanging objects from the friable suspect asbestos- containing popcorn textured ceiling tiles |

| NON-FRIABLE SUSPECT ASBESTOS-CONTAINING ROOFING MATERIALS | |
|---|---|
| Initial and Periodic Cleaning | As needed |
| Periodic Surveillance: | As needed |
| Labeling | None required |
| Restricted Activities | Any activities that may result in the damage or disturbance of the non-friable suspect asbestos-containing roofing materials |
| | Avoid sanding or scraping the non-friable suspect asbestos-containing roofing materials |

| NON-FRIABLE SUSPECT ASBESTOS-CONTAINING VINYL FLOOR TILES AND MASTIC | |
|---|---|
| Initial and Periodic Cleaning | As needed |
| Periodic Surveillance: | Annual |
| Labeling | None required |
| Restricted Activities | Any activities that may result in the damage or disturbance of the non-friable suspect asbestos-containing vinyl floor tiles and mastic |
| | Avoid sanding or scraping the non-friable suspect asbestos-containing vinyl floor tiles and mastic |

The O&M Program focuses on a special set of work practices for the custodial, maintenance, and construction staff. The nature and extent of any special work practices will be tailored to the likelihood that the ACM will be disturbed and that fibers will be released. In general, four broad categories of O&M work practices are recognized. These categories are listed below and are discussed in sub-sections 6.1 through 6.4.

Worker Protection Programs: These work practices help ensure custodial and maintenance staff are adequately protected from asbestos exposure.
Basic O&M Procedures: These are basic procedures used to perform routine custodial and maintenance tasks that may involve ACM.

<u>Special O&M Cleaning Techniques:</u> These are special techniques to clean up asbestos fibers on a routine basis.

<u>Procedures for Asbestos Fiber Release Episodes:</u> These are procedures used to address the hazards involving the disturbance of moderate to relatively large amounts of ACM.

# 6.1    WORKER PROTECTION PROGRAM

The Worker Protection Program is only necessary if a known ACM is to be disturbed.  If the asbestos content of a material to be disturbed is unknown, then samples should taken prior to the commencement of work and analyzed for asbestos content by an accredited laboratory.

The Worker Protection Program includes engineering controls, personal exposure monitoring, medical surveillance, and personal protection.  While engineering controls are the preferred method of worker protection, there are few engineering control options available for O&M work.  There are two key aspects of personal protection: the use of respiratory protection and the use of protective clothing for workers.  These two key aspects are detailed in subsections 6.1.1 and 6.1.2 below.

## 6.1.1    RESPIRATORY PROTECTION/WORKER PROTECTION PROGRAMS

OSHA regulations require a written respiratory protection program whenever an O&M Program specifies that service workers wear respirators, or where employees are exposed, or are likely to be exposed, to fiber levels above OSHA's "permissible exposure limits" (0.2 fibers per cubic centimeter (f/cc) of air based on an 8-hour time-weighted average sampling period) or the 30-minute "excursion limit" (1.0 f/cc as averaged over a sampling period of 30 minutes).

Proper respiratory protection is an integral part of all custodial and maintenance activities involving potential exposure to asbestos.  When in doubt about exposure during a certain work operation, building owners will provide respiratory protection to custodial and maintenance workers.  OSHA specifies general types of respirators for protection against airborne asbestos during "construction" activities, which include abatement, renovation, maintenance, repair, and remodeling.

When adequate care is taken to prevent or minimize and control fiber release, routine small-scale/short-duration maintenance or custodial tasks are not likely to generate high levels of airborne asbestos compared to large asbestos removal projects.  Therefore, respirators that filter breathing air may be used in these instances.  OSHA, EPA, and NIOSH do not recommend single use, disposable paper dust masks for use against asbestos; in fact, OSHA has disallowed their use against airborne asbestos fibers.

The options that may be used include: a half- or full-face, negative pressure, air-purifying respirator with replaceable high-efficiency filters; or a half- or full-face powered air-purifying respirator (PAPR) with replaceable high-efficiency filters.  This has a battery-powered pump that assists breathing and provides positive pressure in the face piece.

Currently, only respirators approved by NIOSH and the Mine Safety and Health Administration (MSHA) are permitted for use. If they are air purifying respirators, the filtration device(s) must be rated as "high-efficiency."

### 6.1.2 PROTECTIVE CLOTHING/WORKER PROTECTION PROGRAMS

In addition to respirators, some O&M procedures may require workers to wear protective clothing. Most often, protective clothing is disposable and consists of coveralls, a head cover, and foot covers made of a synthetic fabric that does not allow asbestos fibers to pass through. This type of clothing prevents workers' regular clothing from becoming contaminated with asbestos fibers. Contaminated clothing could unknowingly be taken home, creating a possible risk to the worker's family members.

OSHA and EPA regulations require workers to wear protective clothing whenever they are exposed, or likely to be exposed, to fiber levels above OSHA's permissible levels. It is important that workers be properly trained in the use, removal, and disposal of protective clothing after use. All O&M activities may not require the use of protective clothing. It is important for the OMM to assess this need on a case-by-case basis.

## 6.2    BASIC O&M PROCEDURES

These procedures are only necessary if a known ACM is to be disturbed. If the asbestos content of a material to be disturbed is unknown, then samples should taken prior to the commencement of work and analyzed for asbestos content by an accredited laboratory.

Basic O&M procedures to minimize and/or contain asbestos fibers include wet methods, use of mini-enclosures, use of portable power tools equipped with special local ventilation attachments, and avoidance of certain activities, such as sawing, sanding, and drilling ACM.

Special work practices such as wet wiping, area isolation, HEPA vacuuming, and the use of personal protective equipment such as respirators and protective clothing, may be needed where disturbance of ACM is likely. The need for these practices varies with the situation. These work practices and procedures are intended to ensure that disturbances of any ACM during O&M activities are minimized, or carried out under controlled conditions when the disturbance is required by the nature of a specific O&M task.

## 6.3    O&M CLEANING PRACTICES

These procedures are only necessary if a known ACM is to be or has been disturbed and the resulting debris must be cleaned up. If the asbestos content of a material to be disturbed is unknown, then samples should taken prior to the commencement of work and analyzed for asbestos content by an accredited laboratory.

Building owners and custodial and maintenance staff will ensure that special O&M cleaning is done correctly. Proper cleaning is important for the following two reasons:

1) The use of improper techniques to clean up asbestos debris caused by previous deterioration or damage may result in widespread contamination, and potentially increase air-borne asbestos fiber levels in the building.

2) Improper cleaning may cause damage to the ACM, thus releasing more airborne asbestos fibers.

Proper O&M cleaning practices will involve the use of wet cleaning or wet-wiping practices to pick up asbestos fibers. Dry sweeping or dusting can result in asbestos fibers being recirculated into the building's air and therefore will not be used. Once wet clothes, rags, or mops have been used to pick up asbestos fibers, they will be properly discarded as asbestos waste, while still wet. They will not be allowed to dry out, since the collected fibers might be released later when disturbed. The use of special vacuum cleaners, commonly referred to as HEPA vacuums, may be preferable to wet cleaning in certain situations. These vacuums are equipped with filters designed to remove very small particles or fibers (such as asbestos) by filtering those particles from the air passing through the vacuum. Since the exhaust air from an ordinary vacuum cleaner is not filtered sufficiently, it is possible for tiny asbestos fibers to pass through the filter into the building air.

## 6.4    PROCEDURES FOR ASBESTOS FIBER RELEASE EPISODES

These procedures are only necessary if a known ACM has been disturbed. If the asbestos content of a material that was disturbed is unknown, then samples should be taken and analyzed for asbestos content by an accredited laboratory.

Special procedures are generally needed to minimize the spread of fibers throughout the building after asbestos fiber releases occur, such as the partial collapse of an ACM ceiling. These procedures are needed whether the ACM disturbance is intentional or unintentional. EPA regulations for schools define a "major fiber release" as one involving more than three square or linear feet of ACM. Depending on the severity of the episode, asbestos abatement consultants and contractors may be needed to develop a strategy for the cleanup operations.

In general, for major fiber releases, the area will be isolated by closing doors and/or erecting temporary barriers to restrict airflow as well as access to the site. Signs will be posted, as necessary, adjacent to the fiber release site to prevent personnel involved in the cleanup operation from inadvertently entering the area. If asbestos fibers could enter the HVAC system, the system will be modified to prevent fiber entry, or will be shut down and sealed off. The final step will be to employ thorough cleanup procedures to properly control the ACM, careful visual inspection, and final clearance air monitoring to verify satisfactory cleanup.

It is important to recognize that different levels of training are needed for workers involved with fiber release episodes. A major release will generally require "asbestos abatement worker training", rather than the degree of training considered adequate for O&M workers.

# 7.0   WORKER TRAINING

Training is the primary means of educating the maintenance staff in handling the ACM in the building and minimizing potential fiber release during routine maintenance, repair or renovation work in the building.  Training of the building staff that may come into contact with ACM can include AHERA Asbestos Inspector certification, AHERA Management Planner certification, general awareness training, maintenance worker training, asbestos abatement training, or other applicable training as dictated by site conditions.

# 8.0   RECORD KEEPING

Documentation regarding any asbestos-related activities conducted on-site must be maintained.  Examples of applicable documentation are below.

Work records documenting asbestos-related activities

Medical, training, and personal air sampling records of employees

Notification of ACM and other asbestos-related documents and correspondences with tenants, building personnel, contractors, and consultants

Asbestos survey reports, updates, and addendum that reflect the changing condition and amount of ACM on-site

A completed original asbestos waste manifest for any disposed ACM

The written O&M Program shall be maintained indefinitely.

# APPENDIX A

The following example forms can be utilized under this O&M Program:

- Maintenance Work Location Form
- Maintenance Work Authorization Form
- Asbestos Maintenance Closure Form
- Periodic Surveillance Form

# EXAMPLE

| MAINTENANCE WORK LOCATION FORM | |
|---|---|
| **Building:** | **Floor/Area:** |
| **Project Start Date:** | **Completion Date:** |
| **Description Of Work:** | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| **Field Sketch Of Affected Area** | |
| | |

Prior to commencement of maintenance work, this form should be submitted to the OMM and an approved Maintenance Work Authorization Form should be obtained.

# EXAMPLE

## MAINTENANCE WORK AUTHORIZATION FORM

Authorization is given to proceed with the following maintenance work:

_____        Asbestos-containing materials are not present in the vicinity of the
            maintenance work.

_____        ACM is present, but its disturbance is not anticipated.  However, if conditions
            change, the Operations and Maintenance Manager will re-evaluate the work
            request prior to proceeding.

_____        ACM is present and may be disturbed.


If ACM is present, the following work practices shall be employed to avoid or minimize
disturbing asbestos:




If ACM is present, the following equipment/clothes shall be used/worn to protect workers:




Special practices and/or equipment required:




Authorized by:


_____        _____
   (Operations & Maintenance Manager)                  (Date)

# EXAMPLE

| ASBESTOS MAINTENANCE CLOSURE FORM | |
|---|---|
| **Building:** | **Area Involved:** |
| **Project Start Date & Time:** | **Completion Date & Time:** |
| **Description Of Work:** | |
| **Amount Of Asbestos Disturbed Or Removed (Linear/Square Feet):** | |
| **ASBESTOS CONTROL METHODS:** | |
| **Wet Methods** | **HEPA Vacuum** |
| **Poly Sheeting** | **Glove Bags** |
| **Area Sealed** | **HVAC Shut Off** |
| **Warning Signs** | **HEPA Neg Air Units** |
| **Persons Performing Work (List By Name):** | |
| **TYPE OF EQUIPMENT WORN** | |
| **Tyvek** | **Respirators** |
| **Name And Location Of Waste Disposal Site:** | |
| **Air Sampling:** | |
| **THE FOLLOWING ITEMS ARE TO BE ATTACHED (check those that apply)** | |
| **Permit To Perform Work** | **Air Sampling Results** |
| **Landfill Receipts** | **Other Info. (I.E. Photos)** |

| Signature Of Abatement Supervisor Or Industrial Hygienist | Date |
|---|---|
| **Signature Of Operations And Maintenance  Manager** | **Date** |

# EXAMPLE

| PERIODIC SURVEILLANCE FORM | | | |
|---|---|---|---|
| **Name:** | | | |
| **Material:** | **Condition:** | **Location and use** | **Differences from previous inspection** |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

# APPENDIX B

List of applicable rules and regulations

Code of Federal Regulations - Title 29
- Part 1910, Section 134, (respiratory protection).
- Part 1926, Section 58 (Occupational Exposure to Asbestos, Tremolite, Anthopyllic and Actinolite Final Rule).
- Part 1910, Section 2 (Access to Employee Medial Records).
- Part 1910, Section 1200n (Hazardous Communication).
- Part 1910 Section 145 (Specification for Accident Prevention Signs and Tags)

Code of Federal Regulations - Title 40
- Part 61, Subpart M, (National Emissions Standards for Asbestos).
- Part 61, (National Emission Standards for Hazardous Air Pollutant; Asbestos NESHAP Revision).
- Part 763, Subpart F (Friable Asbestos-Containing Materials in Schools).
  Appendix A - Interim Method of the Determination of Asbestos in Bulk Insulation Samples.

Local and State Regulations

# APPENDIX C

United States Environmental Protection Agency (USEPA) guidance document
"Managing Asbestos In-Place, A Building Owner's Guide to Operations and Maintenance
Programs for Asbestos-Containing Materials."

United States
Environmental Protection
Agency

Pesticides and Toxic Substances
(TS-799)

20T-2003
July 1990

**♣EPA**

# Managing Asbestos In Place

## A Building Owner's Guide to Operations and Maintenance Programs for Asbestos-Containing Materials



Printed on Recycled Paper

# Managing Asbestos In Place

A Building Owner's Guide to
Operations and Maintenance Programs
for Asbestos-Containing Materials



# Contents

ACKNOWLEDGEMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .v

FOREWORD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

1. WHY IS ASBESTOS A PROBLEM?

Introduction and Overview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    ● Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    ● Chapter Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

2. WHAT IS AN O&M PROGRAM?

Purpose and Scope of an Operations and Maintenance program . . . . . . . . . . . . . . . . . . . . . . . . 5
    ● Purpose of O&M Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    ● Scope of an O&M Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    ● Chapter Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

3. HOW DOES THE PROGRAM START?

Laying the Foundation for an Effective O&M Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    ● The Asbestos Program Manager . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    ● BuildingInspectionandAssessment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    ● Developing an O&M Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    ● IrnplementingandManaging an O&M
      Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    ● Cost Considerations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9
    ● Selectingandhnplementing Alternative Abatement Actions . . . . . . . . . . . . . . . . . . . . . . . . 9
    ● Chapter Summary. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

4. WHAT DOES AN O&M PROGRAM INCLUDE?

O&M Program Elements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12
    ● Informing Building Workers, Tenants, and Other Occupants . . . . . . . . . . . . . . . . . . . . . . . .12
    ● ACMSurveiUance-Reirwectionand Periodic Surveillance . . . . . . . . . . . . . . . . . . . . . . . .14
    ● Supplement to Visual/Physical Evaluation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14
    ● WorkControl/Permit System . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
    ● O&M Work Practices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16
        –Worker protection programs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17
        –Basic O&M Procedures. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
        –O&M Cleaning Practices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
        –Procedures for Asbestos Fiber Release Episodes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
    ● Recordkeeping . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
    ● Chapter Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

5. WHAT O&M TRAINING IS NECESSARY?

Types of Training . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2 3
    ● Chapter Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .25

## 6. WHAT REGULATIONS AFFECT ASBESTOS MANAGEMENT PROGRAMS IN BUILDINGS, ESPECIALLY O&M PROGRAMS?

Federal, State, and Local Regulations Affecting O&M Programs. . . . . . . . . . . . . . . . . . . . . . . . . . . 26
- OSHA Regulations &EPA Worker Protection Rule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
  – Small-scale, Short-duration Projects . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
- EPA National Emission Standards for Hazardous Air Pollutants (NESHAP) Regulations. . . .27
  – Notification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
  – Emissions Control and Waste Disposal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
- Resource Conservation and Recovery Act (RCRA); Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA, or "Superfund") . . . . . . . . . . . . . . . . . . . . . . . . . . 28
- Asbestos Hazard Emergency Response Act (AHERA) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
- Asbestos Ban and Phaseout Rule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
- Chapter Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

## APPENDIX A.
Glossary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

## APPENDIX B.
Sample Recordkeeping Forms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

## APPENDIX C.
Illustrative Organzation Charts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

## APPENDIX D.
Additional Assistance (EPA, NESW, OSHA; Training ) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

## APPENDIX E.
Respiratory Protection Recommendations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .38

## APPENDIX F.
Existing EPA Guidance For ACM Control . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .39

## APPENDIX G.
Sample List: Suspect Asbestos-Containing Materials . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

## APPENDIX H.
References . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .40

**DISCLAIMER**

This document was prepared under contract to an agency of the United States Government. Neither the United States Government nor any of their employees makes any warranty, expressed or implied, or assume any legal liability for any third party's use of or the results of such use of any information, product, or process discussed in this document. Mention or illustration of company or trade names, or of commercial products does not constitute endorsement by the U.S. Environmental Protection Agency.

# Acknowledgements

**The time and effort** that many individual contributed to the development of this document is gratefully acknowledged by the U.S. Environmental Protection Agency (EPA). The material in this publication represents EPA's approximately 11 years of experience in considering public input and fine tuning policies on managing asbestos-containing materials in buildings. This document incorporates views expressed by safety and health professionals, property owners and managers, public officials, general industry representatives, workers, and the general public.

The primary EPA developer and coordinator of the final document was Dr. Robert Jordan of the Technical Assistance Section, Environmental Assistance Division, Office of Toxic Substances. Without Bob's constant oversight, combined with his technical knowledge and concern that the document be representative of state-of-the-art asbestos management, this document would not have reached the public.

Joe Schechter, Chief of the Technical Assistance Section, managed the project and helped clarify and edit the Guide. Bob McNally Chief of the Assistance Programs Development Branch, was instrumental in the formative period of the Guide's development and also devoted long hours to its review Other important contributions within the Environmental Assistance Division came from Tom Tom and Dave Kling. Sylvia Thomas provided necessary assistance in revisions of the early drafts. Esther Tepper and Jane Gurin helped review the Guide in its final revisions, to make sure the document was written in easy-to-understand language.

The original work which provided the foundation for the project was performed under a contract with Battelle Memorial Institute (No. 68-02-4294) by Dr. Dale Keyes and Dr. Jean Chesson, under the direction of Edie Sterrett and Cindy Stroup of the EPA Exposure Evaluation Division. They prepared the first drafts of the document and were instrumental in establishing its final format.

EPA staff also gratefully acknowledge the work of staff from the Georgia Tech Research Institute (GTRI). Through a cooperative agreement with EPA they served as the overall project coordinator and provided thoughtful technical guidance throughout this entire process. The GTRI team also developed several key sections of the Guide.

This publication was refined through a peer review meeting held in October 1988 in Washington, DC, and by a series of comment periods provided through May 1990. The following individuals gave their time and provided comments:

> John Biechman, *Safe Buildings Alliance*
> Wolfgang Brandner, *U.S. EPA Region VII*
> Frank Bull, *Bull, Brown & Kilgo Architects*
> Eva Clay *The Environmental Institute*
> William Cobbs, *U.S. General Services Administration*
> Mark Demyanek, *Georgia Tech Research Institute*
> Michael Duffy, *Service Employees International Union*
> Paul Fidducia, *Winston and Strawn*
> Eugene Fisher, *Association of Wall and Ceiling Industries*
> Douglas Greenaway *Consultant (formerly, Building Owners and Managers Association International)*
> David Harris, *National Institute of Building Sciences*
> Steve Hays, *Gobbell Hays Partners*
> Joseph Hopkins, *U.S. Department of Energy*
> David Mayer, *Georgia Tech Research Institute*
> Richard Mendes, *New York City Department of Environmental Protection*
> Michael Miles, *Tishman Spyer Properties*
> Roger Morse, *ENTEK Environmental and Technical Services, Inc.*
> Robert Navratil, *RREEF Funds, Construction and Engineering*
> Anthony Restaino, *U.S. EPA Region V*
> Richard Roth, *Social Security Administration*
> Sims Roy, *U.S. EPA, Office of Air Quality Planning and Standards*

Scott Schneider, *Workers' Institute for Occupational Safety and Health*
Henry Singer, *U.S. General Services Administration*
Thomas Warren, *Rose Associates, Inc.*

In addition to these individuals, the EPA acknowledges the contribution of the Policy Dialogue Group on Asbestos in Public and Commercial Buildings, which met several times during 1989–1990. The purpose of *this* multidisciplinary group was to identify the problems associated with asbestos in public and commercial buildings and to develop policy recommendations for solving these problems. Many comments raised by the Dialogue Group in the area of asbestos management were incorporated into this document.

# Foreword

**In February 1988, the** Administrator of the Environmental Protection Agency (EPA) recommended to Congress that the Agency work during the next three years to enhance the nation's technical capability in asbestos by helping building owners better select and apply appropriate asbestos control and abatement actions in their buildings. The publication of this guidance document is EPA's most extensive effort to date to carry out that recommendation. In fact, *Managing Asbestos In Place* is the most comprehensive asbestos guide published by EPA since the Agency expanded and updated *Guidance for Controlling Asbetos-Containing Materials in Buildings (also known as the* Purple Book) in June 1985. Based on the insights and recommendations of nationally recognized asbestos experts, this new guide, along with a new operations and maintenance work practices manual expected to be available in 1991, provides "state-of-the-art" instruction to building owners to help them successfully manage asbestos-containing materials in place.

*Managing Asbestos in Place* does not supplant the 1985 Purple Book as EPA's principal asbestos guidance document. Rather, based on our experience since 1985, it expands and refines the Purple Book's guidance for a special operations and maintenance (O&M) program. In particular, the guide more strongly emphasizes the importance of in-place management. The guide's purpose is two-fold. First, it offers building owners the more detailed and up-to-date instruction they need to carry out a successful O&M program. Second, it informs building owners, lenders, and insurers that a properly conducted O&M program can in many cases be as appropriate an asbestos control strategy as removal. Furthermore, in some cases, an O&M program is more appropriate than other asbestos control strategies, including removal.

Emphasizing the importance and effectiveness of a good O&M program is a critical element of EPA's broader effort to put the potential hazard and risk of asbestos exposure in proper perspective. That effort centers around communicating the following five *facts,* which EPA hopes will help calm the unwarranted fears that a number of people seem to have about the mere presence of asbestos in their buildings and discourage the spontaneous decisions by some building owners to remove all asbestos-containing material regardless of its condition.

**FACT ONE: Although asbestos is hazardous, the risk of asbestos-related disease depends upon exposure to airborne asbestos fibers.**

In other words, an individual must breathe asbestos fibers in order to incur any chance of developing an asbestos-related disease. How many fibers a person must breathe to develop disease is uncertain. However, at very low exposure levels, the risk maybe negligible or zero.

**FACT TWO: Based upon available data, the average airborne asbestos levels in buildings seem to be very low. Accordingly, the health risk to most building occupants also appears to be very low.**

A 1987 EPA study found asbestos air levels in a small segment of Federal buildings to be essentially the same as levels outside these buildings. Based on that limited data, most building occupants (i.e., those unlikely to disturb asbestos-containing building materials) appear to face only a very slight risk, if any, of developing an asbestos-related disease.

**FACT THREE:** Removal is often not a building owner's best course of action to reduce asbestos exposure.  In fact, an improper removal can create a dangerous situation where none previously existed.

By their nature, asbestos removals tend to elevate the airborne level of asbestos fibers. Unless all safeguards are properly applied, a removal operation can actually increase rather than decrease the risk of asbestos-related disease.

**FACT FOUR:** EPA *only* requires asbestos removal in order to prevent significant public exposure to airborne asbestos fibers during building demolition or renovation activities.

Asbestos removal before the wrecking ball swings into action is appropriate to protect public health. At other times, EPA believes that asbestos removal projects, unless well-designed and properly performed, can actually increase health risk.

**FACT FIVE:** EPA *does* recommend a pro-active, in-place management program whenever asbestos-containing material is discovered.

As this guide will explain in some detail, in-place management does *not* mean "do nothing." It means having a program to ensure that the day-to-day management of the building is carried out in a manner that minimizes release of asbestos fibers into the air, and ensures that when asbestos fibers are released, either accidentally or intentionally proper control and cleanup procedures are implemented. As such, it may be all that is necessary to control the release of asbestos fibers, until the asbestos-containing material in a building is scheduled to be disturbed by renovation or demolition activities.



MANAGING ASBESTOS IN PLACE

# 1

# Why Is Asbestos a Problem?

## Introduction: Asbestos in Buildings

**This U.S. Environmental Protection Agency (EPA)** guide is primarily directed to owners and managers of office buildings, shopping centers, apartment buildings, hospitals, and similar facilities which may contain asbestos materials. Managers of industrial plants and other types of structures may need to supplement this information with additional specialized guidance. This document gives building owners, managers, workers, and other key building staff basic information on how to develop and carry out high-quality operations and maintenance programs for managing asbestos in place to safeguard the health of all building occupants. An operations and maintenance (O&M) program can be defined as a formulated plan of training, cleaning, work practices, and surveillance to maintain asbestos-containing materials (ACM) in good condition.

In this document you will find the following information:

The objectives of an O&M program, and an indication of the scope of O&M activities (Chapter 2);

Basic steps to take before starting an O&M program, including an initial survey and evaluation of ACM (Chapter 3);

How to implement and manage the program, including some basic cost considerations (Chapter 3);

O&M work practices that protect both workers and the general building environment (Chapter 4);

Recordkeeping suggestions and requirements (a section of Chapter 4);

Training recommendations and requirements for workers performing O&M activities (Chapter 5); and

An overview of federal regulations, including those affecting O&M programs (Chapter 6).

In addition, the Appendices provide other useful information, including a glossary of useful terms, and contacts for additional assistance.

### How O&M Fits In

There are steps which a building owner can take to prevent asbestos fiber releases or resuspension of already-released fibers, or control fiber releases quickly and safely if they occur. O&M programs are designed to achieve both these goals. This guide's purpose, therefore, is to inform building owners about how to develop, implement and manage effective O&M programs, and to encourage their use.

EPA recommends a pro-active, in-place management program whenever asbestos is discovered. In many buildings, a well-run O&M program may be all that is necessary to control the release of asbestos fibers until the ACM in the building is abated through renovation or demolition activities. Also, an emergency repair to equipment or building services, or an unexpected incident such as ACM falling from a surface could necessitate a different control strategy However, barring such events, if ACM is properly managed, release of asbestos fibers into the air is minimized. The exposure to asbestos fibers, and therefore the risk of asbestos-related disease, can be reduced to a negligible level for all building occupants.

An O&M program may also provide an effective, less costly alternative to wholesale removal operations. Some additional cost-related considerations are discussed in Chapter 3.

The EPA National Emission Standards for Hazardous

> An O&M program can be defined as a formulated plan of training, cleaning, work practices, and surveillance to maintain asbestos-containing materials in good condition.

Air Pollutants (NESHAP) regulations on asbestos may require ACM removal prior to renovation and/or demolition projects, to prevent significant asbestos releases into the air (see Chapter 6). Additionally removal of some ACM in a building will be necessary if the material has been damaged beyond repair. *However*, at other times, removal is often *not* a building owner's best course of action to reduce asbestos exposure. (Extraneous factors –for example, difficulty in obtaining insurance, or obtaining financing relative to a real estate transaction-may actually represent the driving forces in a decision to remove all ACM, rather than a health-based need for removal.) In fact, unless all safeguards are properly applied by trained, experienced individuals, removing ACM can actually increase building occupants' risk of asbestos-related disease.

# Background

### The Asbestos Issue

Asbestos fibers can cause serious health problems. If inhaled. they can cause diseases which disrupt the normal functioning of the lungs. Three specific diseases–asbestosis (a fibrous scarring of the lungs), lung cancer, and mesothelioma (a cancer of the lining of the chest or abdominal Cavity) -have been linked to asbestos exposure. These diseases do not develop immediately after inhalation of asbestos fibers; it may be 20 years or more before symptoms appear.

In general, as with cigarette smoking and the inhalation of tobacco smoke, the more asbestos fibers a person inhales, the greater the risk of developing an asbestos-related disease. Most of the cases of severe health problems resulting from asbestos exposure have been experienced by workers who held jobs in industries such as shipbuilding, mining, milling, and fabricating, where they were exposed to very high levels of asbestos in the air, without benefit of the worker protections now afforded by law Many of these same workers were also smokers. These employees worked directly with asbestos materials on a regular basis and, generally for long periods of time as part of their jobs. Additionally there is an increasing concern for the health and safety of construction, renovation, and building maintenance personnel, because of possible periodic exposure to elevated levels of asbestos fibers while performing their jobs.

Whenever we discuss the risk posed by asbestos, we must keep in mind that asbestos fibers can be found nearly everywhere in our environment (usually at very low levels). There is, at this time, insufficient information concerning health effects resulting from low-level asbestos exposure, either from exposures in buildings or from our environment. This makes it difficult to accurately assess the magnitude of cancer risk for building occupants, tenants, and building maintenance and custodial workers. Although in general the risk is

likely to be negligible for occupants, health concerns remain, particularly for the building's custodial and maintenance workers. Their jobs are likely to bring them into close proximity to ACM, and may sometimes require them to disturb the ACM in the performance of maintenance activities. For these workers in particular, a complete and effective O&M program can greatly reduce asbestos exposure. This kind of O&M program can also minimize asbestos exposures for other building occupants as well.

### What is Asbestos?

The term "asbestos" describes six naturally occurring fibrous minerals found in certain types of rock formations. Of that general group, the minerals chrysotile, amosite, and crocidolite have been most commonly used in building products. When mined and processed, asbestos is typically separated into very thin fibers. When these fibers are present in the air, they are normally invisible to the naked eye. Asbestos fibers are commonly mixed during processing with a material which binds them together so that they can be used in many different products. Because these fibers are so small and light, they may remain in the air for many hours if they are released from ACM in a building. When fibers are released into the air they may be inhaled by people in the building.

Asbestos became a popular commercial product because it is strong, won't burn, resists corrosion, and insulates well. In the United States, its commercial use began in the early 1900's and peaked in the period from World War II into the 1970's. Under the Clean Air Act of 1970 the EPA has been regulating many asbestos-containing materials which, by EPA definition, are materials with more than 1 percent asbestos. The Occupational Safety and Health Administration's (OSHA) asbestos construction standard in section K, "Communication of hazards to employees," specifies labeling many materials containing 0.1% or more asbestos. In the mid-1970's several major kinds of asbestos materials, such as spray-applied insulation, fireproofing, and acoustical surfacing material, were banned by EPA because of growing concern about health effects, particularly cancer, associated with exposures to such materials.

In July 1989, EPA promulgated the Asbestos Ban and Phasedown Rule. The rule applies to new product manufacture, importation, and processing, and essentially bans almost all asbestos-containing products in the United States by 1997. This rule does *not* require removal of ACM currently in place in buildings.

### Where is Asbestos Likely to be Found in Buildings?

In February 1988, the EPA released a report titled *EPA Study of Asbestos-Containing Materials in Public Buildings: A Report to Congress.* EPA found that "friable" (easily crumbled) ACM can be

**2**

found in an estimated 700,000 public and commercial buildings. About 500,000 of those buildings are believed to contain at least some damaged asbestos, and some areas of significantly damaged ACM can be found in over half of them.

According to the EPA study significantly damaged ACM is found primarily in building areas not generally accessible to the public, such as boiler and machinery rooms, where asbestos exposures generally would be limited to service and maintenance workers. Friable ACM, if present in air plenums, can lead to distribution of the material throughout the building, thereby possibly exposing building occupants. ACM can also be found in other building locations.

Asbestos in buildings has been commonly used for thermal insulation, fireproofing, and in various building materials, such as floor coverings and ceiling tile, cement pipe and sheeting, granular and corrugated paper pipe wrap, and acoustical and decorative treatment for ceilings and walls. Typically it is found in pipe and boiler insulation and in spray-applied uses such as fireproofing or sound-deadening applications.

The amount of asbestos in these products varies widely (from approximately 1 percent to nearly 100 percent). The precise amount of asbestos in a product cannot always be accurately determined from labels or by asking the manufacturer. Nor can positive identification of asbestos be ascertained merely by visual examination. Instead, a qualified laboratory must analyze representative samples of the suspect material. Appendix G contains a sample list of some suspect materials.



ACM which is in poor physical condition. Under a proper operations and maintenance program, corrective action would normally prevent deterioration of the insulation.

### When is Asbestos a Problem?

Intact and undisturbed asbestos materials do not Dose a health risk. The mere presence of asbestos in a building does not mean that the health of building occupants is endangered. ACM which is in good condition, and is not somehow damaged or disturbed, is not likely to release asbestos fibers into the air. When ACM is properly managed, release of asbestos fibers into the air is prevented or minimized, and the risk of asbestos-related disease can be reduced to a negligible level.

However, asbestos materials can become hazardous when, due to damage, disturbance, or deterioration over time, they release fibers into building air. Under these conditions, when ACM *is* damaged or disturbed–for example, by maintenance repairs conducted without proper controls — elevated airborne asbestos concentrations can create a potential hazard for workers and other building occupants.



ACM with sound structural integrity on the exterior of a domestic hot water tank. Note that the insulation jacketing is intact and there is no evidence of disturbance.

3

# Chapter Summary

This document, directed to owners and managers of office buildings and similar facilities, should help lay the ground work for developing and implementing effective operations and maintenance programs. Major highlights in this section have focused on background information concerning asbestos and have touched on the current asbestos-in-buildings situation. Important points to remember are the following:

- Inhalation of asbestos fibers has been shown to cause asbestosis, lung cancer and meso-thelioma. Much of our knowledge of these health effects has come primarily from studies of workers exposed routinely to very high levels of asbestos in their jobs,

- Information health effects of low-level asbestos exposure is less certain; custodial/maintenance workers who sometimes disturb asbestos as part of their job would benefit from properly executed O&M programs.

- Three of the six naturally occurring asbestos minerals, chrysotile, amosite, and crocidolite, have been most commonly used in building products.

- Asbestos became a popular commercial product because of its strength, heat resistance, corrosion resistance, and thermal insulation properties.

- Asbestos-containing materials (ACM) are regulated by EPA, OSHA, and the Consumer Product Safety Cornmission (CPSC), and individual state and local agencies.

- Friable ACM can be found in about 700,000 public and commercial buildings. Many areas where asbestos is found are not accessible to the general public.

- Some common uses of asbestos have included pipe/boiler insulation, spray-applied fireproofing, floor and ceiling tile. cement pipe/sheeting and paper pipe wrap.

- Positive identification of asbestos requires laboratory analysis; information on labels or visual examination only is not sufficient.

- Intact, undisturbed materials generally do not pose a health risk; they may become hazardous when damaged, disturbed, or deteriorated over time and release fibers into building air.

4



MANAGING ASBESTOS IN PLACE

# 2 What Is an O&M Program?

### Purpose and Scope of an Operations and Maintenance Program

## Purpose of O&M

**The principal objective of an O&M program** is to minimize exposure of all building occupants to asbestos fibers. To accomplish this objective, an O&M program includes work practices to (1) maintain ACM in good condition, (2) ensure proper cleanup of asbestos fibers previously released, (3) prevent further release of asbestos fibers, and (4) monitor the condition of ACM.

## Scope of an O&M Program

An effective O&M program should address all types of ACM present in a building. ACM that maybe managed as part of an O&M program in buildings can be classified in one of the following categories:

**1** **Surfacing Material:** Examples include ACM sprayed or troweled onto surfaces, such as decorative plaster on ceilings or acoustical ACM on the underside of concrete slabs or decking, or fireproofing materials on structural members.

**2** **Thermal System Insulation (TSI):** Examples include ACM applied to pipes, boilers, tanks, and ducts to prevent heat loss or gain, or condensation.

**3** **Miscellaneous ACM:** Examples include asbestos-containing ceiling or floor tiles, textiles, and other components such as asbestos-cement panels, asbestos siding and roofing materials.

The O&M program, when developed and implemented in a particular facility should include specific direction on how to deal with each of these general categories of ACM. Specified O&M work practices and procedures should be employed by trained personnel during building cleaning, maintenance, renovation, and general operational activities that may involve surfacing, thermal, or miscellaneous ACM. Some elaboration of O&M work practices and procedures is found in Chapter 4.

The O&M program can be divided into three types of projects

● those which are unlikely to involve any direct contact with ACM;

● those which may cause accidental disturbance of ACM;

● those which involve relatively small disturbances of ACM.

The first type may involve routine cleaning of shelves and counter tops or other surfaces in a building (provided ACM debris is not present). Generally such



An example of spray-applied surfacing ACM on a metal deck above a suspended ceiling.

An example of as-
bestos-containing
thermal system insu-
lation on pipes in a
building's mechanical
room.

activities would not be expected to disturb ACM. The second type of project could include maintenance work above a suspended ceiling in an area that may have surfacing ACM overhead. The third type of project— small-scale, shor-duration maintenance, repair, or installation projects involving minor disturbances of ACM – includes activities such as installation of new light fixtures on or in an ACM ceiling. A single glovebag operation to remove a small amount of ACM to repair a pipe in a boiler room is another example of intentional small-scale, short-duration disturbance.



Larger projects involving more complex procedures for the intentional removal of ACM are considered asbestos abatement projects. These require asbestos control and abatement procedures that are outside the scope of an O&M program. Before taking action, building owners should consult qualified professionals for advice and alternative solutions. Guidance for building owners on the management of abatement projects is included in EPA's "Guidance for Controlling Asbestos-Containing Materials in Buildings" June 1985, also known as the "Purple Book."

An example of an
asbestos-containing
cement sheet product
(miscellaneous  ACM).



## Chapter-Summary

The purpose of an operations and Maintenance Program is to minimize exposure of all building occupants to asbestos fibers. Through super-vised work practices, ACM can be managed in place. Important points to remember are:

ACM can be classified into three categories:

● Surfacing   Material

● Thermal  System  Insulation  (TSI)

● Miscellaneous   Material

O&M Programs can be divided into three types of project%

● Unlikely to involve direct contact with ACM.

● Accidental disturbance of ACM.

● Small-scale,  short-duration  maintenance  or repair activity which may involve intentional disturbance of ACM.



MANAGING ASBESTOS IN PLACE

# 3

# How Does the Program Start?

### Laying the Foundation for an Effective O&M Program

**A comprehensive asbestos control program** for a building should include these basic steps:

- Appoint an Asbestos Program Manager and develop an organizational policy

- Conduct a physical and visual inspection of the building and take bulk samples of suspect materials to determine if ACM is present, establish an ACM inventory and assess the ACM's condition and potential for disturbance.

- If ACM is located, develop an O&M program, based on the inspection and assessment data.

- Implement and manage the O&M program conscientiously

- Select and implement abatement actions other than O&M when necessary

This chapter provides information about each of these basic steps. In addition, see Appendix F for a chart of references outlining existing EPA guidance for each of these steps.

## The Asbestos Program Manager

The position of Asbestos Program Manager (APM) is frequently held by the building engineer, superintendent, facilities manager, or safety and health director. In a small organization, the building owner may have this role. Regardless of who holds this position, EPA stresses the need for the Asbestos Program Manager to be properly qualified, through training and experience, and to be *actively involved* in all asbestos-control activities. EPA accreditation under the Asbestos Hazard Emergency Response Act (AHERA) or state certification as a Building Inspector/Management Planner would be typical of the requisite training.

If the person selected is not adequately prepared, he or she should receive the training necessary to develop and manage an asbestos control program prior to beginning

the job. If for some reason this is not possible, the building owner should strongly consider hiring a properly trained, experienced, and credentialed outside consultant or firm to provide direction to the owner or the Asbestos Program Manager.

In general, the Asbestos Program Manager should have the authority to oversee all asbestos-related activities in the building, including inspections, O&M activities, and other abatement actions. The Asbestos Program Manager will either train building workers in O&M techniques or ensure that such worker training takes place. In addition, he or she should oversee the custodial and maintenance staffs, contractors, and outside service vendors with regard to all asbestos-related activities.

## Building Inspection and Assessment

To determine whether an asbestos control and management program should be implemented, the owner should have an initial building inspection performed to locate and assess the condition of all ACM in the building. A trained, experienced and qualified inspector, who is able to perform the sampling of suspect ACM for laboratory analysis, should conduct the inspection. If an inspection is not performed, then certain suspect materials should be assumed to contain asbestos, and treated accordingly (Refer to Appendix G for a sample list of suspect ACM.)

EPA guidance on how to take "bulk" samples of suspect ACM is contained in several publications (see Appendix H) and from EPA Regional Asbestos Coordinators (listed in Appendix D).

The building inspection by a qualified professional serves as the basis for establishing an effective overall plan for dealing with the asbestos in the building. The inspector should advise the owner and the Asbestos

**To determine whether an asbestos control and management program should be implemented, the owner should have an initial building inspection performed to locate and assess the condition of all ACM in the building.**



A properly trained and protected building inspector collecting a bulk sample of suspected asbestos-containing thermal system insulation.

ant should develop the O&M program. The written O&M program should state clearly the O&M policies and procedures for that building, identify and describe the administrative line of authority for that building, and should clearly define the responsibilities of key participants, such as the Asbestos Program Manager and custodial and maintenance supervisors and staff. The written O&M program should be available and understood by all participants involved in the management and operations of the building.

In general, the O&M program developed for a particular building should include the O&M program elements discussed in the next chapter. However, the building owner should make sure that the O&M program developed is site-specific and tailored for the building. The O&M program should take into account use, function, and design characteristics of a particular building.

## Implementing and Managing an W&M Program

A well-developed O&M program is ineffective unless the building owner is committed to implementing it properly The building owner should convey this commitment to key personnel involved in a building's management and operations — particularly the Asbestos program Manager and custodial and maintenance supervisors and staff. The O&M program's success is contingent upon key personnel understanding the O&M program and committing themselves to implementing it effectively

To the greatest extent possible, the building owner should incorporate the O&M program into the existing system for managing a building's operations. Each building owner, therefore, will determine the appropriate organizational structure on a case-by-case basis. Two possible arrangements are suggested in Figures 1 and 2 in Appendix C.

When managing an O&M program, the Asbestos Program Manager should oversee all asbestos-related activities. In instances where a building owner hires a contractor to perform custodial and maintenance work, the Asbestos Program Manager should ensure that the contractor is qualified to conduct work that may involve ACM. Before hiring a contractor, the Asbestos Program Manager should investigate to determine whether the contractor's staff is qualified, trained and equipped to deal with O&M asbestos activities. Thoroughly checking the references of a contractor is a good recommended practice.

The Asbestos Program Manager should also monitor the work performed in the building by other contractors, such as electricians and plumbers, who might inadvertently disturb ACM. Instituting a work permit system, as discussed in the next chapter, may prevent accidental disturbances of ACM. Under this system, a

program Manager of inspection findings. Of course, the inspection may show that ACM is *not* present and that an asbestos-control program is not required.

If ACM *is* found, the material's characteristics, condition, quantity and location within the building, as well as building use, will affect how the building owner should deal with the ACM. For example, operations and maintenance procedures may be appropriate and sufficient in a particular building for ACM in good condition. But O&M procedures alone are not sufficient for ACM that the inspector determines is significantly damaged, and may not be sufficient for some types of ACM situated in highly accessible areas; in these instances, some form of full scale abatement — repair, encapsulation, enclosure, encasement, or removal – will be necessary Removal of the ACM may also be appropriate when performed in conjunction with major building renovations, or as part of long-term building management policies (such as staged removal in conjunction with renovation over the life of the building, as covered by the EPA NESHAP requirements for removal before demolition or renovation).

## Developing an O&M Program

If ACM is found, the building owner should have an O&M program developed as soon as possible. Either the Asbestos Program Manager or a qualified consult-

8

contractor must receive a work permit from the Asbestos Program Manager before commencing work. At that time, the Asbestos Program Manager will inform the contractor whether the project could disturb ACM and provide any special instructions to make sure the work is done properly *Communication between the Asbestos Program Manager and tenants occupying the building is essential to prevent activities that might compromise the O&M program.*

In addition, the Asbestos Program Manager should routinely and frequently check the work being performed in the building by contractors and custodial and maintenance staff to see if their work is disturbing ACM. By maintaining close surveillance over these activities, the Asbestos Program Manager can help ensure that work which may disturb ACM is being done safely Tenants should be required (by legal agreement or understanding) to notify the building owner or the Asbestos Program Manager before conducting even small planned renovations. This would help prevent building tenants from unknowingly disturbing ACM. For both the work permit system and the renovation notification requirement, clear and effective communications to workers and tenants are crucial to the success of the O&M management program.

The Asbestos Program Manager should periodically review the written O&M plan to determine whether it should be updated. For example, if all ACM were removed from some areas of the building during a recent renovation, or if some ACM was damaged, the O&M program should be revised accordingly The O&M program should remain in effect as long as there is ACM present in the building.

**Cost Considerations** The costs associated with implementing and managing an O&M program may vary significantly depending on the types-of ACM, building-specific factors, actual O&M procedures adopted, types of equipment used, and the useful life of the building. Owners may find it more cost-effective to continue a well-supervised and managed O&M program than to incur the costs of immediate, large-scale removal. In addition to the direct costs of removal, other costs related to ACM removal include moving building occupants, arranging alternative space for building occupants during the removal work, and restoring the building after the removal is completed.

Clearly many factors enter into the decision. Only by conducting a cost-effectiveness analysis of the long-term options (e.g., comparing (a) immediate removal with (b) phased removal plus O&M with (c) removal just before demolition plus lifetime O&M) will owners be truly able to determine which option is most cost-effective for their buildings. The prudent owner may need to consult one or more qualified consultants or firms for advice, if such expertise does not exist within the owner's organization,

# Selecting and Implementing Alternative Abatement Actions

In some instances, due to the condition of ACM or upcoming building renovations, a building owner may decide to take other abatement actions to deal with ACM in the building. These response actions could include encapsulation (covering the ACM with a sealant to prevent fiber release), enclosure (placing an air-tight barrier around the ACM), encasement (covering the ACM with a hard-setting sealing material), repair, or removal of the ACM. Qualified, trained, and experienced contractors should be used for any of these actions. EPA's Purple Book discusses most of these alternatives in some detail. In general, repair, encapsulation, enclosure, and encasement, are intended to help prevent the release of asbestos fibers. As aspects of O&M, these techniques manage ACM in place. See Appendix F of this document for additional federal reference sources on asbestos response actions.

When determining which response alternative to select, the building owner and Asbestos Program Manager may consider seeking advice from qualified, independent consultants with specific training and experience in asbestos management.

Asbestos consultants should have a background in engineering, architecture, industrial hygiene, safety, or a similar field. Experts who are Registered and/or with Board Certified backgrounds are recommended. *To help ensure that no "conflict of interest" exists, consultants should not be affiliated with the abatement contractors who may be used on a recommended ACM control project, nor with analytical laboratories which perform sample analyses.* As with other similar business decisions, building owners should interview several consultants and check references.

Renovations (including remodeling or redecorating) of buildings or replacement of utility system increases the potential for disturbing ACM. Before conducting any renovation or remodeling work, the building owner should have the Asbestos Program Manager review asbestos inspection and assessment records to determine where ACM may be located, visually reinspect the area, and evaluate the likelihood that ACM will be disturbed. Any suspect or assumed ACM that could be disturbed during the renovation work should either be sampled and analyzed to determine whether it contains asbestos, or the work be carried out as if the materials did contain asbestos. The Asbestos Program Manager should also ensure that no new ACM is introduced into the building as part of the renovation work.

Removal of the ACM before renovation begins maybe necessary in some instances. Removal is required by the Asbestos NESHAP regulations for projects which would break up more than a specified minimum amount of ACM; specifically at least 160 square feet of surfacing

**Renovations (including remodeling or redecorating) of buildings or replacement of utility systems increase the potential for disturbing ACM.**



Asbestos-containing thermal system insulation which has sustained significant damage in a mechanical/boiler room of a building.

or miscellaneous material or at least 260 linear feet of thermal system insulation (40 CFR 61.145-147). Building owners and managers are encouraged to contact their state or local health or environmental department for further clarification of these requirements (also, see Chapter 6 of this document). It is important to ensure that new materials placed in the building do not contain asbestos in order to comply with the recent EPA Asbestos Ban and Phase Out rule (see Chapter 6).

In general, building owners should thoroughly consider any decision to remove ACM. *O&M, encapsulation, encasement, enclosure, or repair may be viable alternatives to removal.* Building owners should assess these in-place management techniques carefully before deciding to remove undamaged ACM.

Under certain circumstances, however, such as when some ACM must be removed during building renovations, when the ACM has sustained a great deal of damage, or ACM disturbance will be difficult to manage properly the building owner may decide to remove ACM in parts of the building.

When removal must occur, only qualified, trained and experienced project designers and contractors should be permitted to design and perform the work. Building owners might consider contacting local, state, and federal asbestos regulatory agencies to see if prospective contractors have received citations for violating asbestos regulations in the past. In addition, if the building owner and Asbestos Program Manager are not properly qualified themselves, they should retain a qualified and independent project designer and a project monitor with training and experience in asbestos abatement to oversee and ensure that the asbestos abatement work is done safely. When these precautions are taken, asbestos removal is more likely to proceed safely and effectively

Proper completion of the ACM removal is best evaluated by means of the analytical procedures using transmission electron microscopy (TEM). (These are described in 40 CFR Part 763, Appendix A to Subpart E.) Clearance protocols for statistically comparing asbestos fiber levels inside the work area with outside levels are available. If the measured levels inside are not statistically higher than the average airborne asbestos concentration measured outside the abatement area, the cleanup is considered successful, and the space is judged ready for reoccupancy (For reference, see Appendix H, U.S. EPA "Guidelines for Conducting the AHERA TEM Clearance Test . . . .")

# Chapter Summary

Laying the foundation for a comprehensive asbestos control program for a building includes some basic steps. Important points contained in this discussion are the following

An Asbestos Program Manager needs to be properly qualified through training and experience, and be actively involved in all asbestos control and disturbance activities.

An Asbestos program Manager should have authority to oversee and to direct custodial/maintenance staff and contractors with regard to all asbestos-related activities.

An initial building inspection should be performed by a trained, qualified, experienced inspector to locate and assess the condition of all ACM in the building.

The inspection results serve as the basis for establishing an O&M program. O&M procedures may not be sufficient for certain ACM that is significantly damaged or in highly accessible areas.

An Asbestos Program Manager or qualified consultant should develop the written O&M program that is site-specific and tailored for individual buildings. The O&M program should take into account use, function and design characteristics of a building.

The success of any O&M program lies in the commitment by the building owner to implement it properly

When outside contractors are used for asbestos-related activities, their references and training should be thoroughly checked and their subsequent work monitored.

Periodically review written O&M programs.

Alternatives or control options that may be implemented under an O&M program include:

- repair
- encapsulation
- enclosure
- encasement
- removal (minor)

Removal of ACM before renovations may be necessary in some instances. (See NESHAP and State/Local regulations discussion in Chapter 6.)

**The success of any O&M program depends on the building owner's commitment to implement it properly.**



MANAGING ASBESTOS IN PLACE

# What Does an O&M Program Include?

### O&M Program Elements

**To achieve its objectives,** an O&M program should include seven elements. Although these should appear in any O&M program, the extent of each will vary from program to program depending on the building type, the type of ACM present, and the ACM's location and physical condition. For example, if only nonfriable ACM is present, minimal notification might be needed, and custodial or maintenance staff would most likely have fewer work practices to be followed. If friable ACM is present, a more detailed O&M program should be prepared and followed. Each of the first six elements listed below is described in this chapter to provide an illustration of a basic O&M program. The seventh program element, training of the Asbestos Program Manager and custodial and maintenance staff, is very important. If staff are not adequately trained, the O&M program will not be effective. Chapter 5 is devoted exclusively to O&M training topics.

A successful O&M program should include the following elements:

- **Notification:** A program to tell workers, tenants, and building occupants where ACM is located, and how and why to avoid disturbing the ACM. All persons affected should be properly informed.

- **Surveillance:** Regular ACM surveillance to note, assess, and document any changes in the ACM's condition.

- **Controls:** Work control/permit system to control activities which might disturb ACM.

- **Work Practices:** O&M work practices to avoid or minimize fiber release during activities affecting ACM.

- **Recordkeeping:** To document O&M activities.

- **Worker Protection:** Medical and respiratory protection programs, as applicable.

- **Training:** Asbestos Program Manager, and custodial and maintenance staff training.

**If staff are not adequately trained, the O&M program will not be effective.**

## Informing Building Workers, Tenants, and Other Occupants

Building owners should inform building workers, occupants, and tenants about the location and physical condition of the ACM that they might disturb, and stress the need to avoid disturbing the material. Occupants should be notified for two reasons: (1) building occupants should be informed of any potential hazard in their vicinity; and (2) informed persons are less likely to unknowingly disturb the material and cause fibers to be released into the air.

Building owners can inform occupants about the presence of ACM by distributing written notices, posting signs or labels in a central location where affected occupants can see them, and holding awareness or information sessions. The methods used may depend on the type and location of the ACM, and on the number of people affected. Some states and localities have "right-to-know" laws which may require that all occupants, workers, and visitors in buildings with ACM be informed that asbestos is present.

In service and maintenance areas (such as boiler rooms), signs such as "Caution — Asbestos — Do Not Disturb" placed directly adjacent to thermal system insulation ACM will alert and remind maintenance

workers not to inadvertently disturb the ACM. In most cases, all boilers, pipes, and other equipment with ACM in service areas where damage may occur should have prominent warning signs placed next to the ACM. As an alternative, color coding can be used to identify the ACM in certain situations provided that all potentially involved parties understand the coding system.

Information sessions reinforce and clarify written notices and signs, and provide an opportunity to answer questions. All employees and tenants or tenant representatives likely to disturb ACM should be included in the notification program on a continuing basis. Building owners should inform new employees about the presence of ACM before they begin work. Owners should provide additional signs and information sessions in languages other than English where a significant number of workers, occupants, or visitors do not speak English. It maybe necessary to make special provisions for illiterate workers, such as providing clear verbal information or signs, about potential hazards of disturbing ACM. and showing them where ACM is located.

The specific information given to types of building occupants will vary For example, since service workers carry out certain tasks that office workers or tenants do not perform, they should receive additional information. Most important, O&M workers should receive the training necessary for them to perform their tasks safely

Whatever its form, the information given to building occupants and workers should contain the following points to the extent they reflect building conditions:

- ACM has been found in the building and is located in areas where the material could be disturbed.

- The condition of the ACM, and the response which is appropriate for that condition.

- Asbestos only presents a health hazard when fibers become airborne and are inhaled. The mere presence of ACM does not represent a health hazard.

- The ACM is found in the following locations (e.g., ceilings in Rooms 101 and G-323, walls in the lobby, above suspended ceilings in the first floor corridor, on columns in the main entry on pipes in the boiler room).

- Do not disturb the ACM (e.g., do not push furniture against the ACM, do not damage T S I ) .

- Report any evidence of disturbance or damage of ACM to (name, location, and phone number of Asbestos Program Manager).



Routine maintenance activities can cause disturbance of ACM if workers are not properly trained in operations and maintenance procedures. Here, a worker carelessly contacts ACM, possibly damaging it.

- Report any dust or debris that might come from the ACM or suspect ACM, any change in the condition of the ACM, or any improper action (relative to ACM) of building personnel to (name, location, and phone number of Asbestos Program Manager).

- Cleaning and maintenance personnel are taking special precautions during their work to properly clean up any asbestos debris and to guard against disturbing ACM.

- All ACM is inspected periodically and additional measures will be taken if needed to protect the health of building occupants.



It is important to undertake an honest and open approach to the ACM notification procedure. Owners should strive to establish clear lines of communication with all building occupants regarding asbestos issues. People who are informed of the presence, location and condition of ACM in a building where they work or live, who understand that the mere presence of ACM is not necessarily hazardous to them, and who accept that ACM can often be managed effectively in place, can be

An example of an asbestos caution sign placed directly on a section of asbestos-containing duct insulation. Signs such as this help to ensure that workers will not inadvertently disturb ACM.

13

very helpful to the owner in eliminating or reducing hysteria on the part of other less informed building occupants. On the other hand, if occupants suspect the building owner is not being honest about asbestos activities in the building, that owner's credibility maybe questioned and the situation can become far more difficult to manage. *If and when asbestos incidents occur, it is especially important for the building owner to deal with occupants and contractors openly and honestly, for that is the best way to maintain occupant/tenant confidence in both the owner and the building's asbestos program.*

## ACM Surveillance

**Reinspection and Periodic Surveillance**

A visual reinspection of all ACM should be conducted at regular intervals as part of the O&M program. Combined with ongoing reports of changes in the condition of the ACM made by service workers, the reinspection should help ensure that any ACM damage or deterioration will be detected and corrective action taken.

Visual reinspections of asbestos materials at regular intervals can detect changes in material condition. Here, surfacing ACM has delaminated from a ceiling in a building O&M routines can keep small problems from becoming big problems.



According to recent EPA regulations covering schools (the Asbestos Hazard Emergency Response Act, "AHERA"), an accredited inspector must reinspect school buildings at least once every three years to reassess the condition of ACM. The AHERA regulations for schools also require a routine surveillance check of ACM every six months to monitor the ACM's condition. The AHERA Rule permits this surveillance to be conducted by a trained school custodian or maintenance worker. While these intervals are mentioned here as a guide, they may also be appropriate for other buildings. The Asbestos Program Manager should establish appropriate intervals, based on consultation with the building owner and any other qualified professionals involved in the O&M program.

EPA recommends a visual and physical evaluation of ACM during the reinspection to note the ACM's current condition and physical characteristics. Through this reinspection, it is possible to determine both the relative degree of damage and assess the likelihood of future fiber release. Maintenance of a set of visual records (photos or videotape) of the ACM overtime can be of great value during reinspection.

Some asbestos consultants recommend examining settled dust for accumulations of asbestos fibers as another surveillance tool in an O&M program. While no universally accepted standardized protocols currently exist for sampling and analysis of settled dust, positive results (i.e., ACM is present in the dust) may indicate the need for special cleaning of the affected area, or other action. Because the results of this testing are difficult to interpret and evaluate at this time, building owners should carefully consider the appropriateness of this testing to their situation.

**Supplement to Visual/Physical Evacuation**

As part of an O&M program, a carefully designed air monitoring program to detect airborne asbestos fibers in the building may provide useful supplemental information when conducted along with a comprehensive visual and physical ACM inspection and reinspection program. If the ACM is currently in good condition, increases in airborne asbestos fiber levels at some later time may provide an early warning of deterioration or disturbance of the material. In that way, supplemental air monitoring can be a useful management tool. If an owner chooses to use air monitoring in an "early warning" context, a knowledgeable and experienced individual should be consulted to design a proper sampling strategy Appendix H contains a reference to a useful guide to monitoring airborne asbestos, which can be consulted for further discussion of this subject.

If supplemental air monitoring is done, a baseline airborne asbestos fiber level should be established soon after the O&M program is initiated Representative, multiple air samples should be collected throughout the building during periods of normal building operation. This should be done over along enough period of time to be representative of existing conditions, in order to adequately characterize prevailing fiber levels in the building. *This air monitoring should supplement, not replace, physical and visual inspection.* Visual inspection can recognize situations and anticipate future exposure (e.g., worsening water damage), whereas air monitoring can only detect a problem after it has occurred, and fibers have been released.

Note that the collection of air samples for supplementary evaluation *should not* use aggressive air sampling methods. Aggressive sampling methods, in which air is deliberately disturbed or agitated by use of a leaf blower or fans, should be used at the completion of an asbestos removal project when the building or area is unoc-

cupied, not for routine monitoring.

The most accurate and preferred method of analysis of air samples collected under an O&M program would require the use of transmission electron microscopy (TEM). Phase contrast microscopy (PCM), which is commonly used for personal air sample analysis and as a screening tool for area air monitoring, cannot distinguish between asbestos fibers and other kinds of fibers which may be present in the air. PCM analysis also cannot detect thin asbestos fibers, and does not count short fibers. TEM analysis is approximately ten times more expensive than PCM analysis. However, the more accurate information on actual levels of airborne asbestos fibers should be more beneficial to the building owner who elects to use supplemental air monitoring in the asbestos management program. TEM analysis is most reliably performed by laboratories accredited by the National Institute for Standards and Technology (NIST; see Appendix D for telephone number), and who follow EPA's quality assurance guidelines. (Appendix H, U.S. EPA, Dec. 1989, "Transmission Electron Microscopy Asbestos Laboratories: Quality Assurance Guidelines.")

Selection of a reliable and experienced air monitoring firm and analytical laboratory is important, if the building owner elects to conduct supplemental air monitoring under the O&M program. A consultant knowledgeable in air sampling and analysis protocols can be contacted for recommendations if the building owner or Asbestos Program Manager has limited knowledge in this area.

Periodic air monitoring, conducted simultaneously with the visual reinspection or surveillance, would then be used to see if asbestos levels have changed relative to the baseline. Some building owners may wish to present current air monitoring results to building occupants in addition to information regarding the physical reinspections. Although this supplemental use of air monitoring as part of an O&M program may provide useful information, it is likely to be very expensive, particularly if the more accurate and recommended TEM analysis is used. Use of only a small number of measurements or measurements taken only at one time maybe misleading (i.e., overestimate or underestimate of fiber levels), and can lead to inappropriate decisions.

It should be noted that some of the exposures of persons to airborne asbestos fibers in buildings may result from episodic events, such as repair work or the accidental disturbance of the ACM or of ACM debris by maintenance activities inside the building. Air monitoring may not be done frequently enough to include such episodic events; this can lead to a misleading interpretation of air sampling results. In particular, air sampling may underestimate the exposure of O&M workers and building occupants. A good reference sourcebook for additional information on air sampling and analysis for asbestos fibers is "A Guide to Monitoring Airborne Asbestos in Buildings" (see Appendix H).

# Work Control/Permit System

The O&M program should include a system to control all work that could disturb ACM. Some building owners have had success using a "work permit" program, which requires the person requesting the work to submit a Job Request Form to the Asbestos program Manager (Appendix B, Form 2) before any maintenance work is begun. The form gives the time and location of the requested work, the type of maintenance needed, and available information about any ACM in the vicinity of the requested work. The contractor or other person authorized to perform the work should be identified on the work request.



An example of a maintenance worker conducting activities near a friable asbestos-containing ceiling. Under a proper permitting system, the building Asbestos Program Manager would evaluate and authorize projects such as this prior to beginning work.

Upon receiving a pre-work Job Request Form, the Asbestos Program Manager should take the following steps:

**1** Refer to written records, building plans and specifications, and any building ACM inspection reports to determine whether ACM is present in the area where work will occur. If ACM is present, but it is not anticipated that the material will be disturbed, the Asbestos Program Manager should note the presence of the ACM on the permit form and provide additional instruction on the importance of not disturbing the ACM.

**2** If ACM is both present and likely to be disturbed, the Asbestos Program Manager or a designated supervisor qualified by training or experience, should visit the site and determine what work practices should be instituted to minimize the release of asbestos fibers during the maintenance activity

**3** This determination should be recorded on the Maintenance Work Authorization Form (see example in Appendix B, Form 3), which *is* then sent to the in-house maintenance supervisor or to the maintenance contractor to authorize the work.

**4** The Asbestos Program Manager should make sure that a copy of both the request and the authorization forms (if granted) are placed in the permanent file.

1 5

**5** Where the task is not covered by previously approved standard work practices, the Asbestos Program Manager should make sure that the appropriate work practices and protective measures are used for the job.

**6** For all jobs where contact with ACM is likely the Asbestos Program Manager or a designated supervisor qualified by training or experience should visit the work site when the work begins to see that the job is being performed properly For lengthy jobs where disturbance of ACM is intended or likely, periodic inspections should be made for the duration of the project.

**7** The Asbestos Program Manager's observations should be provided on an *Evaluation of Work Form* (see Appendix B, Form 4). Any deviation from standard and approved work practices should be recorded immediately on this form and the practices should be immediately corrected *and reported to the Asbestos Program Manager.*

**8** Upon completion of the work, a copy of the evaluation form should be placed in the permanent asbestos file for the building.

Building owners should consider using asbestos O&M work control forms similar to those which already may be in use for non-ACM work in their facilities, or expanding the existing forms to include the content of the request, approval, and evaluation forms illustrated in Appendix B.

The O&M management system should also address work conducted by outside contractors. Many building owners contract for at least some custodial and maintenance services. A building's asbestos work control/permit system, as described above, should also cover contract work.

**It is important to undertake an honest and open approach in ACM notification.**

At a minimum, contracts with service trades or abatement companies should include the following provisions to ensure that the service or abatement workers can and will follow appropriate work practices:

● Proof that the contractor's workers have been properly notified about ACM in the owner's building and that they are properly trained and accredited (if necessary) to work with ACM.

● Copies of respiratory protection, medical surveillance, and worker training documentation as required by OSHA, EPA and/or state regulatory agencies.

● Notification to building tenants and visitors that abatement activity is underway (performed by owner).

● Written work practices must be submitted by the vendor or contractor for approval or modification by the Asbestos Program Manager. The vendor or contractor should then agree to abide by the work practices as finally accepted by the Asbestos Program Manager.

● Assurance that the contractor will use proper work area isolation techniques, proper equipment, and sound waste disposal practices.

● Historical air monitoring data for representative examples of the contractor's previous projects, with emphasis on projects similar to those likely to be encountered in the building.

● Provisions for inspections of the area by the owner's representative to ensure that the area is acceptable for re-entry of occupants/tenants.

● A resume for each abatement contractor/supervisor or maintenance crew chief, known as the "competent person" in the OSHA standard and EPA Worker Protection Rule.

● Criteria to be used for determining successful completion of the work (i.e., visual inspections and air monitoring).

● Any other information deemed necessary by the owner's legal counsel.

Notification to EPA (and other appropriate agencies) if the abatement project is large enough (see Chapter 6).

## O&M Work Practices

● The O&M program focuses on a special set of work practices for the custodial, maintenance, and construction staff. The nature and extent of any special work practices should be tailored to the likelihood that the ACM will be disturbed and that fibers will be released. In general, four broad categories of O&M work practices are recognized

**1** **Worker Protection Programs –** These work practices help ensure custodial and maintenance staff are adequately protected from asbestos exposure.

**2** **Basic O&M Procedures –** Basic procedures are used to perform routine custodial and maintenance tasks that may involve ACM.

**3** **Special O&M Cleaning Techniques –** Special techniques to cleanup asbestos fibers on a routine basis.

**4**  **Procedures for Asbestos Fiber Release Episodes –** If moderate to relatively large amounts of ACM are disturbed, the building owner should use these procedures to address the hazard.

A brief synopsis of worker protection and O&M work practices follows. *(Note: A more detailed, technically oriented O&M "work practices" manual specifically addressing topics such as work practices, worker protection, and specific information on how to carry out O&M plans, is being developed, with publication expected in 1991.)*

### Worker Protection Programs

A worker protection program includes engineering controls, personal exposure monitoring, medical surveillance, and personal protection. While engineering controls are the preferred method of worker protection, there are few engineering control options available for O&M work. This section discusses two key aspects of personal protection: use of respiratory protection and protective clothing for workers in an asbestos O&M program. According to OSHA regulations (see Chapter 6), a written respiratory protection program is necessary whenever an O&M program specifies that service workers wear respirators, or where respirators are made available to employees. OSHA regulations also require a respirator program whenever workers are exposed, or are likely to be exposed, to fiber levels above OSHA'S "permissible exposure limits" such as the 8-hour time weighted average (TWA) limit or the 30-minute "excursion limit" (EL). The 8-hour TWA limit and the EL are described in more detail in Chapter 6. In addition, OSHA requires workers to wear special protective clothing under the same circumstances.

### Respiratory Protection/Worker Protection Programs

The selection of approved respirators, suitable for the hazards to which the worker is exposed, is only one aspect of a complete respiratory protection program. Other elements include written operating procedures for respirator use; outlining personnel responsibilities for respirator cleaning, storage, and repair; medical examination of workers for respirator use; training in proper respirator use and limitations; respirator fit testing respirator cleaning and care; and work-site supervision. All of these are described in detail in the OSHA respirator standard, 29 CFR 1910.134. The O&M respirator program can be administered by the facility safety and health manager or the Asbestos Program Manager, if properly qualified.

Proper respiratory protection is an integral part of all custodial and maintenance activities involving potential exposure to asbestos. When in doubt about exposure during a certain work operation, building owners should provide respiratory protection to custodial and maintenance workers. OSHA specifies general types of respirators for protection against airborne asbestos during "construction" activities, which include abatement, renovation, maintenance, repair, and remodeling.

Personal air sampling is not the same as area air monitoring. Personal air sampling (required by OSHA) is designed to measure an individual worker's exposure to fibers while the worker is conducting tasks that may disturb ACM. The sampling device is worn by the worker and positioned so that it samples air in the worker's breathing zone. In contrast, area (or ambient) air sampling is conducted to get an estimate of the numbers of airborne asbestos fibers present in a building. It is used as an assessment tool in evaluating the potential hazard posed by asbestos to all building occupants. (See the previous discussion of area air monitoring on page 14.)

When adequate care is taken to prevent or minimize and control fiber release, routine, small-scale/short-duration maintenance or custodial tasks are not likely to generate high levels of airborne asbestos compared to large asbestos removal projects; and respirators which filter breathing air may be used. **OSHA, EPA, and NIOSH are on record as** *not* **recommending single use, disposable paper dust masks for use against asbestos; in fact, OSHA has** *disallowed their use* **against airborne asbestos fibers.**

The options that may be used include:

● A half-face or full facepiece, negative pressure, air-purifying respirator with replaceable high-efficiency filters.

Pictured below are different examples of air-purifying, negative pressure respirators equipped with high-efficiency cartridges which can be used to protect workers against asbestos exposure. On the left are examples of half-mask facepieces equipped with high-efficiency cartridges, and on the right are examples of full facepiece, high-efficiency masks.



● A half or full facepiece powered air-purifying respirator (PAPR) with replaceable high-efficiency filters. This has a battery powered pump which assists breathing and provides positive pressure in the facepiece.



Pictured above are two different types of powered air-purifying respirators (PAPR's) equipped with high-efficiency filters. On the left is an example of a tight fitting, full facepiece PAPR, and on the right is an example of a loose-fitting helmet style PAPR.

Under the OSHA standards for asbestos, any employee required to wear a negative pressure respirator can request a powered air-purifying respirator, and the employer is required to provide a fully functional and approved unit, provided it will afford the worker at least equal protection.

Currently only respirators approved by NIOSH and the Mine Safety and Health Adminstration (MSHA) are permitted for use. If they are air-purifying respirators, the filtration device(s) must be rated as "high-efficiency"

Selecting the most appropriate respirator for each O&M task requires knowledge of the levels of airborne asbestos fibers and other possible air contaminants generated by the task or likely to be present where the task is performed. This knowledge is best gained through personal air monitoring conducted during worker performance of the actual task. (Obviously the workers must have respiratory protection while this initial personal air sampling is carried out.) In fact, OSHA and EPA require air monitoring under certain circumstances (see Chapter 6). To learn more about the different types of respirators available and the degree of protection they provide, see Appendix E. Owners may also wish to contact the nearest OSHA office, a local trained and qualified industrial hygienist (preferably Certified), or an occupational health professional for more information on respirators. The expertise of these specialists should be used to ensure proper selection, fit testing, and training of workers in respirator use.

Building owners and other facility managers may not be familiar with some of the terms used in discussions of respirators, airborne fiber levels, and related topics.

Appendix E contains more information on these topics, and gives the minimum EPA-recommended levels of respiratory protection to be provided during typical O&M tasks.

For additional information on respirator programs, respirator types, and respirator use, the building owner or Asbestos Program Manager may want to use the following references

● "Respiratory Protection An Employer's Manual," NIOSH, October 1978;

● "A Guide to Respirator Protection for the Asbestos Abatement Industry" EPA/NIOSH, 1986;

● OSHA respirator standard (29 CFR 1910.134);

● OSHA asbestos regulations (29 CFR 1910.1001 and 1926.58);

● "Occupational Exposure Sampling Strategy Manual; NIOSH #77-173, January 1977.

● "Respirator Decision Logic," NIOSH, May 1987; and

● "NIOSH Guide to Industrial Respiratory Protection" September 1, 1987.

**Protective Clothing/Worker Protection Programs** In addition to the use of respirators, some O&M procedures may require workers to wear protective clothing. Most often, protective clothing is disposable and consists of coveralls, a head cover, and foot covers made of a synthetic fabric which does not allow asbestos fibers to pass through. This type of clothing prevents workers' regular clothing from becoming contaminated with asbestos fibers. Contaminated clothing could be taken home, creating a possible risk to the worker's family members.

OSHA and EPA regulations require workers to wear protective clothing whenever they are exposed, or likely to be exposed, to fiber levels above OSHA's permissible levels (see Chapter 6). It is important that workers be properly trained in the use, removal and disposal of protective clothing after use. All O&M activities may not require the use of protective clothing. It is important for the Asbestos Program Manager to assess this need on a case-by-case basis.

**Basic O&M Procedures** Basic O&M procedures to minimize and/or contain asbestos fibers may include wet methods, use of mini-enclosures, use of portable power tools equipped with special local ventilation attachments, and avoidance of certain activities, such as sawing, sanding,

and drilling ACM. Maintenance activities can be divided into three categories with regard to their potential for disturbing ACM:

**1** Those which are unlikely to involve any direct disturbance of ACM; for example, cleaning shelves or counter tops with a damp cloth.

**2** Those which may cause accidental disturbance of ACM; for example, working on a fixture near a ceiling with surfacing ACM.

**3** Those which involve intentional small-scale manipulation or disturbance of ACM; for example, removing a small segment of TSI ACM to repair a pipe leak.

The O&M program should include work practices for each type of ACM that is present in the building (surfacing, TSI, and miscellaneous) as well as for each type and category of maintenance activity performed (e.g., general cleaning, electrical work, plumbing).

Special work practices such as wet wiping, area isolation, and HEPA vacuuming, and the use of personal protective equipment such as respirators and protective clothing, may be needed where disturbance of ACM is likely. The need for these practices varies with the situation. For example, removing light fixtures located near surfacing ACM may disturb the material and might involve the use of special cleaning, possibly area isolation, and respiratory protection. Periodic emptying of a trash can near heavily encapsulated asbestos-containing plaster may not disturb the material at all, so no special work practices would generally be necessary These work practices and procedures are intended to ensure that disturbance of any ACM during O&M activities should be minimized, or carried out under controlled conditions when the disturbance is required by the nature of a specific O&M task.

In addition, ACM may readily release asbestos fibers into the air when certain mechanical operations are performed directly on it. For example, fiber releases can occur when workers are drilling, cutting, sanding, breaking, or sawing vinyl asbestos floor tile.

The *action* of drilling, cutting, abrading, sanding, chipping, breaking, or sawing is the critical factor here, since it is likely to cause a release of fibers. Maintenance or repair operations involving those actions should be eliminated or carefully controlled with basic O&M procedures in order to prevent or minimize asbestos fiber release.

Certain activities that occur in the vicinity of ACM can also cause damage which may result in asbestos fiber release. For example, maintenance and custodial stroll may damage ACM accidentally with broom handles, ladders, and fork lifts while performing other tasks. Activities performed in the vicinity of ACM should always be performed cautiously to prevent fiber release.

To summarize, if in doubt about the possibility of disturbing ACM during maintenance activities, adequate precautions should be taken to minimize fiber release; these will protect workers as well as the building environment. Basic O&M procedures, including use of wet methods and specially equipped tools, should be used to protect building occupants.

### O&M Cleaning Practices

Special cleaning practices **are** appropriate for a building with exposed surfacing or thermal system insulation ACM, especially if the ACM is friable. If gradual deterioration or damage of ACM has occurred or is occurring, asbestos-containing dust or debris could be present. If the building inspection has determined that asbestos-containing dust or debris is present in some areas, then the O&M program should include special cleaning practices to collect residual asbestos dust. Routinely cleaning floors using wet methods is an example of one such practice. Custodial and maintenance workers in the course of normal work can also identify and report areas which are in need of special cleaning or repair. *Special cleaning techniques should supplement, not replace, repair or abatement actions for damaged, friable ACM.* The cleaning program should include an initial cleaning followed, as needed, by subsequent periodic or episodic cleanings.

Building owners and custodial and maintenance staff should ensure that special O&M cleaning is done correctly Proper cleaning is important for two reasons:

● The use of improper techniques to clean up asbestos debris caused by previous deterioration or damage may result in widespread contamination, and potentially increase airborne asbestos fiber levels in the building.

● Improper cleaning may cause damage to the ACM, thus releasing more airborne asbestos fibers.

O&M cleaning will involve the use of wet cleaning or wet-wiping practices to pick up asbestos fibers. Dry sweeping or dusting can result in asbestos fibers being re-suspended into the building's air and therefore should not be used. Once wet cloths, rags, or mops have been used to pickup asbestos fibers, they should be properly discarded as asbestos waste while still wet. They should not be allowed to dry out, since the collected fibers might be released at some later time when disturbed. The use of special vacuum cleaners, commonly referred to as HEPA vacuums, may be preferable to wet cleaning in certain situations. These vacuums are equipped with filters designed to remove very small particles or fibers — such as asbestos — by filtering those particles from the air passing through the vacuum. Since the exhaust air from an ordinary vacuum cleaner is not filtered sufficiently it is possible for tiny asbestos fibers to pass through the filter and back into the building air.

If in doubt about the possibility of disturbing ACM during maintenance activities, adequate precautions should be taken to minimize fiber release.

**1 9**

**Special procedures are generally needed to minimize the spread of fibers in the building after asbestos fiber release occurs.**

It is important for O&M workers to use caution when emptying HEPA vacuums and changing the filters. Exposures could result from such activities. Workers should move the HEPA vacuum to a physically isolated area of the facility and put on proper personal protective equipment before emptying the dust and debris into properly labeled, sealed, and leak-tight containers for disposal as asbestos-containing waste. When custodial workers do not work with ACM, trained maintenance workers can be used to empty the HEPA vacuums and change their filters. Decisions regarding special cleaning practices should be based on the building inspection and ACM assessment data, including the potential for ACM disturbance. In general, the building would not need special O&M cleaning when the building contains only nonfriable (not easily crumbled) ACM; ACM which has been encapsulated, encased, or enclosed behind air-tight barriers; or ACM known to be undamaged/undisturbed since the last special cleaning. Furthermore, where ACM is confined to a single room or area, special cleaning of just that area rather than other parts of the building may be sufficient.

**Here, a worker uses a HEPA vacuum (backpack type) to clean ACM debris from one of several carpeted areas in a room where surfacing material had fallen.**

If ACM has been released onto a carpeted area of a building, it may not always be possible to adequately clean the carpeted area. "Steam" cleaning and HEPA vacuuming methods are sometimes employed for this purpose. A preliminary study carried out by EPA in 1989 showed that hot water vacuums were more effective in carpet cleaning than HEPA vacuums, under the test conditions. Further field studies are planned to confirm these findings.



For carpets, successful cleaning will likely depend on factors such as the amount of ACM released onto the carpet, how long the situation has existed, traffic over the area, as well as the structure and composition of the carpet itself. It is prudent to evaluate individual situations on a case-by-case basis. The Asbestos program Manager should consider the need for workers engaged in cleaning asbestos fiber-contaminated carpets to wear proper respiratory protection. It may also be prudent to arrange for this type of cleaning to be done after normal working hours or when the facility is less occupied. Additionally it maybe more cost effective to properly dispose of contaminated carpets and other fabrics as asbestos-containing waste if a permanent asbestos control option is being undertaken in the building.

Where the ACM is damaged and located in an "air plenum" – where fibers can be transported by the heating, ventilation, or air conditioning (HVAC) system throughout the building – special cleaning practices may be extended to the entire building, including the HVAC system itself.

**Procedures for Asbestos Fiber Release Episodes**

Special procedures are generally needed to minimize the spread of fibers throughout the building after asbestos fiber releases occur, such as the partial collapse of an ACM ceiling or wall. These procedures are needed whether the ACM disturbance is intentional or unintentional To provide building owners with some guidance, under EPA regulations for schools a "major fiber release" is defined as one involving more than three square or linear feet of ACM. The procedures to be followed will vary according to the site of the major release episode, the amount of ACM affected, the extent of fiber release from the ACM, the relationship of the release area to the air handling systems, and whether the release site is accessible to building occupants. Depending on the severity of the episode, asbestos abatement consultants and contractors may be needed to develop a strategy for conducting the cleanup operations.

In general, for major fiber releases, the area should be isolated by closing doors and/or erecting temporary barriers to restrict airflow as well as access to the site. Signs should be posted as necessary immediately outside the fiber release site to prevent persons not involved in the cleanup operation from inadvertently entering the area. If asbestos fibers could enter the HVAC system, the system should be modified to prevent fiber entry, or should be shut down and sealed off. The final step should be to employ thorough cleanup procedures to properly control the ACM, a careful visual inspection, and final clearance air monitoring to verify satisfactory cleanup.

Similar procedures can be used for much smaller fiber release events: where the amount of ACM is on the

20

order of three square or linear feet or less. The HEPA vacuuming, wet wiping, and worker protection procedures outlined in this guidance document, as well as wetting ACM wastes and properly placing them in an appropriate leak-tight container (such as a properly labeled, 6-mil-thick plastic bag), are examples of some of the procedures which could be used for both major and minor fiber releases.

It is important to recognize that different levels of training are needed for workers involved with fiber release episodes. A major release will generally require "asbestos abatement worker training," rather than the degree of training considered adequate for O&M workers.

EPA suggests that building owners and Asbestos Program Managers consult with state and local regulatory officials before establishing formal training procedures for each type of situation.

The following table should be useful in determining when to apply certain O&M work practices in buildings. The table illustrates the O&M work practices that should be used by custodial and maintenance staff, depending on the likelihood of ACM disturbance.

## Summary of When to Apply Key O&M Work Practices

| | Likelihood of ACM Disturbance | | |
| --- | --- | --- | --- |
| | Contact Unlikely | Accidental Disturbance Possible | Disturbance Intended or Likely |
| **Management Responsibilities** | | | |
| Need Pre-Work Approval from Asbestos Program Manager | Review by Program Manager | Yes | Yes |
| Special Scheduling or Access Control | No | Yes | Yes |
| Supervision Needed | No | Initial, At Least | YES |
| HVAC System Modification | None | As Needed[1] | Shut Down[1] |
| Area Containment | None | Drop cloths, Mini-enclosures | Yes[2] |
| **Personal Protection** | | | |
| Respiratory Protection | Available For Use | Yes | Yes |
| Protective Clothing | None | Review by Asbestos Program Manager | Yes |
| **Work Practices** | | | |
| Use of Wet Methods | No | As Needed | Yes |
| Use of HEPA Vacuum | Available For Use | Available For Use | As Needed |

1) In the area where work takes place
2) Type of containment may vary. For example, small-scale, short-duration tasks may not require full containment.

## Recordkeeping

EPA recommends that building owners make available all written elements of the O&M program to the building's O&M staff as well as to tenants and other building occupants.

All the building asbestos management documents discussed in this Guide (inspection and assessment reports, O&M program plan, work practices and procedures, respirator use procedures, fiber release reports, application for maintenance work and work approval forms, evaluations of work affecting ACM, and reinspections/surveillance of ACM) should be stored in permanent files. In addition, for employees engaged in asbestos-related work, federal regulations (see Chapter 6) require that employers retain:

● personal air sampling records, for at least 30 years. Personal air samples are those collected in the worker's breathing zone during performance of work involving asbestos exposures.

● objective data used to qualify for exemptions from OSHA's initial monitoring requirements for the duration of the exemption.

● medical records for each employee subject to the medical surveillance program for the duration of their employment plus 30 years.

● all employee training records for one year beyond the last date of each worker's employment.

In addition, OSHA requires that employers provide to each employee their record of exposure and medical surveillance under the Records Access Standard (29 CFR 1910.20) and the Hazard Communication Standard (29 CFR 1910.1200). Seethe OSHA Construction Rule (29 CFR 1926.58) or the EPA Worker Protection Rule (40 CFR 763 Subpart G) for more details of recordkeeping requirements.

EPA recommends that building owners make available all written elements of the O&M program to the building's O&M staff as well as to tenants and other building occupants, if applicable. Building owners are also encouraged to consult with their legal counsel concerning appropriate recordkeeping strategies as a standard part of their O&M programs. Additionally state and local regulations may also require additional recordkeeping procedures.

---

## Chapter Summary

Although the elements discussed in this chapter should appear in any O&M program, the extent to which each applies will vary depending on the building type, the type of ACM present, and the ACM's location and physical condition. To achieve its objectives an O&M program should include the following:

A notification program to inform building occupants, workers, and tenants about the location of ACM and how to avoid disturbing ACM.

Periodic surveillance and reinspection of ACM at regular intervals by trained workers or properly trained inspectors. Air monitoring to detect airborne asbestos fibers in the building may provide useful supplemental information when conducted along with a comprehensive visual and physical ACM inspection/ reinspection program. Air samples are most accurately analyzed using transmission electron microscopy (TEM).

A "work Control/permit" system, which some building owners have used successfully to control work that could disturb ACM. This system requires the person requesting work to submit a Job Request Form to the Asbestos Program Manager before any work is begun.

O&M work practices to avoid or minimize fiber release during activities affecting ACM.

Recordkeeping. OSHA and EPA have specific requirements for workers exposed to asbestos.



MANAGING ASBESTOS IN PLACE

# 5

# What O&M Training Is Necessary?

## Types of Training

**Training of custodial and maintenance workers** is one of the keys to a successful O&M program. If building owners do not emphasize the importance of well-trained custodial and maintenance personnel, asbestos O&M tasks may not be performed properly This could result in higher levels of asbestos fibers in the building air and an increased risk faced by both building workers and occupants.

OSHA and EPA require a worker training program for all employees exposed to fiber levels (either measured or anticipated) at or above the action level (0.1 f/cc, 8-hour *time-weighted average*– the TWA) and/or the excursion limit (1.0 f/cc, 30-minute TWA—see Chapter 6). According to the EPA regulations governing schools, all school stall custodial and maintenance workers who conduct any activities that will result in the disturbance of ACM must receive 16 hours of O&M training. Some states and municipalities may also have specific training requirements for workers who may be exposed to asbestos, or who work in a building with ACM present.

With proper training, custodial and maintenance staff can successfully deal with ACM in place, and greatly reduce the release of asbestos fibers. Training sessions should provide basic information on how to deal with all types of maintenance activities involving ACM. However, building owners should also recognize that O&M workers in the field often encounter unusual, "non-textbook" situations. As a result, training should provide key concepts of asbestos hazard control. If these concepts are clearly understood by workers and their supervisors, workers can develop techniques to address a specific problem in the field. Building owners who need to provide O&M training to their custodial and maintenance staff should contact an EPA environmental assistance center (see Appendix D) or equally qualified training organization for more information.

At least three levels of maintenance worker training can be identified

**LEVEL 1: AWARENESS TRAINING. For custodians involved in cleaning and simple maintenance tasks where ACM may be accidentally disturbed.**

For example, fixing a light fixture in a ceiling covered with surfacing ACM. Such training may range from two to eight hours, and may include such topics as:

- Background information on asbestos.
- Health effects of asbestos.
- Worker protection programs.
- Locations of ACM in the building.
- Recognition of ACM damage and deterioration.
- The O&M program for that building.
- Proper response to fiber release episodes.

**Training of custodial and maintenance workers is one of the keys to a successful O&M program.**



A properly protected and trained worker conducts a glovebag removal job on a section of thermal system insulation. Under a proper operations and maintenance program, any worker involved in such activities would have Level 1 and 2 training.

## LEVEL 2: SPECIAL O&M TRAINING. For maintenance workers involved in general maintenance and asbestos material repair tasks.

For example, a repair or removal of a small section of damaged TSI, or the installation of electrical conduit in an air plenum containing ACM or ACM debris. Such training generally involves at least 16 hours. This level of training usually involves more detailed discussions of the topics included in Level 1 training as well as:

- Federal, state, and local asbestos regulations.
- Proper asbestos-related work practices.
- Descriptions of the proper methods of handling ACM, including waste handling and disposal.
- Respirator use, care, and fit-testing.
- Protective clothing donning, use, and handling.
- Hands-on exercises for techniques such as glovebag work and HEPA vacuum use and maintenance.
- Appropriate and proper worker decontamination

This is an example of a large-scale asbestos removal project (note missing scaffold safety rails). Such projects are well beyond the scope of an O&M program. The EPA NESHAP regulations require that asbestos materials be removed from buildings prior to demolition or renovation when the asbestos will be disturbed.



## LEVEL 3: ABATEMENT WORKER TRAINING. For workers who may conduct asbestos abatement.

For example, conducting a removal job, constructing an enclosure, or encapsulating a surface containing ACM. This work involves direct, intentional contact with ACM. The recognized "abatement worker" training courses approved by EPA or states, under the EPA AHERA model accreditation plan for schools, which involve 24 to 32 hours of training, would fulfill this level of training.

If this level of training is provided to in-house staff, it may save time and money in the long run to use these individuals to perform such activities. This level of training is much more involved than Levels 1 and 2, although it should include some of the same elements (e.g., health effects of asbestos). It will typically include a variety of specialized topics, such as:

- Pre-asbestos abatement work activities.
- Work area preparation.
- Establishing decontamination units.
- Personal protection, including respirator selection, use, fit-testing, and protective clothing.
- Worker decontamination procedures.
- Safety considerations in the abatement work area.
- A series of practical hands-on exercises.
- Proper handling and disposal of ACM wastes.

The Asbestos Program Manager should consider conducting the training program for Levels 1 and 2 if he or she has sufficient specific asbestos knowledge and training. If the Asbestos Program Manager does not conduct the training, the building owner should hire an outside consultant or send workers to an appropriate O&M training course. A trained (preferably Certified) industrial hygienist or equally qualified safety and health professional should conduct the training on respirator use and fit-testing. A health professional should conduct the training on health effects.

OSHA or EPA Regional Offices, as well as state and local agencies and professional associations, may be able to suggest courses or direct you to listings of training providers for each of the three levels. Appendix D provides the addresses and/or phone numbers for OSHA, EPA, and EPA-sponsored training providers.

Where custodial and maintenance services are performed by a service company under contract, or where some installation or repairs are performed by employees of trade or craft contractors and subcontractors, those workers may need to have training at level 1, 2, or 3 as appropriate for their work. The Asbestos Program Manager or building owner should verify that these employees receive appropriate training before they begin any work.

In summary, good training is crucial to the success of an O&M program. Strong support for O&M training by the building owner should convince custodial and maintenance workers that following the appropriate work procedures is critical to protecting their own health as well as the health of other building occupants.

---

## Chapter Summary

Properly trained custodial and maintenance workers are critical to a successful O&M program. The following items are highlighted training requirements:

● OSHA and EPA require worker training program for all employees exposed to fiber levels at or above the action level (0.1 f/cc, 8-hr. TWA) and/or the excursion limit (1.0 f/cc, 30-minute TWA – see Chapter 6).

● Some states and municipalities may have specific worker training requirements.

● At least three levels of maintenance worker training can be identified:

**Level 1 Awareness training** for workers involved in activities where ACM may be accidentally disturbed. May range from 2-8 hours.

**Level 2 Special O&M training** for maintenance workers involved in general maintenance and incidental ACM repair tasks. At least 16 hours.

**Level 3 Abatement worker training** for workers who may conduct asbestos abatement. This work involves direct, intentional contact with ACM. "Abatement worker" training courses that involve 24 to 32 hours of training fulfill this level of training.

**Strong support by the building owner can convince workers that following appropriate procedures is critical to protecting their own health as well as the health of other building occupants.**



MANAGING ASBESTOS IN PLACE

**6**

# What Regulations Affect Asbestos Management Programs in Buildings, Especially O&M Programs?

## Federal, State, and Local Regulations Affecting O&M Programs

**Building owners are governed** by a variety of federal, state, and local regulations which influence the way they must deal with ACM in their facilities. Some of these regulations, particularly at the state and local level, may change frequently Building owners should contact their state and local government agencies, in addition to organizations such as the National Conference of State Legislatures (NCSL), the National Institute of Building Sciences (NIBS), or EPA environmental assistance centers, for updated information on these requirements. (Appendix D lists phone numbers for these organizations.)

**Building owners are governed by a variety of federal, state, and local regulations which influence the way they must deal with ACM in their facilities.**

### OSHA Regulations and the U.S. EPA Worker Protection Rule

There are several important Occupational Safety and Health Administration (OSHA) and EPA regulations that are designed to protect workers. They are summarized here, as guidance. OSHA has specific requirements concerning worker protection and procedures used to control ACM. These include the OSHA construction industry standard for asbestos (29 CFR 1926.58), which applies to O&M work, and the general industry asbestos standard (29 CFR 1910.1001). State-delegated OSHA plans, as well as local jurisdictions, may impose additional requirements.

For most operations and maintenance activities in building areas where only non-friable ACM is present or where friable ACM is in good condition, applicable OSHA permissible exposure limits are not likely to be exceeded. However, it is possible that some O&M activities will disturb ACM to such an extent that the OSHA limits are exceeded, unless good work practices are followed.

The OSHA standards generally cover private sector workers, and public sector employees in states which have an OSHA state plan. Public sector employees, such as city or county government employees, or certain school employees, who are not already subject to a state OSHA plan are covered by the EPA "Worker Protection Rule" (Federal Register: February 25, 1987; 40 CFR 763 Subpart G, Asbestos Abatement Projects; Worker Protection, Final Rule). *Note: As this document goes to press, OSHA is considering a substantial number of changes to its regulations.*

The OSHA standards and the EPA Worker Protection Rule require employers to address a number of items which are triggered by exposure of employees to asbestos fibers. Exposure is discussed in terms of fibers per cubic centimeter (cc) of air. A cc is a volume approximately equivalent to that of a sugar cube.

Two main provisions of the regulations fall into the general category of "Permissible Exposure Limits (PELs)" to airborne asbestos fibers. They are:

**1** **8-Hour Time-weighted average limit (TWA)–** 0.2 fiber per cubic centimeter (f/cc) of air based on an 8-hour time-weighted average (TWA) sampling period. This is the maximum level of airborne asbestos, on average, that any employee may be exposed to over an 8-hour period (normal work shift).

**2** **Excursion limit (EL) –** 1.0 f/cc as averaged over a sampling period of 30 minutes.

These levels trigger mandatory requirements, which include the use of respirators and protective clothing, the establishment of "regulated areas," the posting of danger signs as well as the use of engineering controls and specific work practices.

OSHA regulations also establish an *"Action Level":* 0.1 f/cc for an 8-hour TWA. Employee training is required once the action level of 0.1 f/cc and/or the "Excursion Limit" is reached. This training must include topics specified by the OSHA rules. If an employee is exposed at or above the action level for a period of 30 days or more in a calendar year, medical surveillance is required according to the OSHA construction industry asbestos standard.

OSHA also requires medical examinations under its "General Industry Standard" for any employee exposed to fiber levels in the air at or above the OSHA "action level" (0.1 f/cc) and/or the "excursion limit" (1. Of/cc). In both cases – the action level and excursion limit – the OSHA medical examination requirement applies if the exposure occurs for at least one day per year.

The OSHA "Construction Industry Standard" (29 CFR 1926.58) for asbestos, is generally applicable for the workers who carry out the kinds of work discussed in this O&M guidance document. The OSHA construction industry asbestos standard applies to demolition and asbestos removal or encapsulation projects, as well as to repair, maintenance, alteration, or renovation if ACM is involved. ACM spills or emergency clean-up actions are also covered by this regulation.

According to those regulations, participation in a medical surveillance program is required for any employee who is required to wear a negative pressure, air-purifying respirator. Preplacement, annual, and termination physical exams are also required for these employees. However, a termination exam is only necessary under the construction industry standard (which applies to custodial and maintenance employees) if a physician recommends it. While not mandatory EPA and NIOSH recommend physical examinations, including cardiac and pulmonary tests, for any employee required to wear a respirator by the building owner. These tests determine whether workers will be unduly stressed or uncomfortable when using a respirator.

Additional requirements of the OSHA asbestos standards, such as the use of air filtration systems and hygiene facilities, involve procedures which are most applicable to large-scale asbestos abatement projects. However, these rules also include a number of recommendations for procedures which might be appropriate for a variety of O&M programs for buildings.

**Small-scale, Short-duration Projects**

"Appendix G" which is specified as a non-mandatory section to the OSHA regulation 29 CFR 1926.58, may become mandatory under certain circumstances where "small-scale, short-duration" asbestos projects are conducted. These projects are not precisely defined in terms of either size or duration, although their nature and scope are illustrated by examples presented in the text of the regulation. Properly trained maintenance workers may conduct these projects. Examples may include removing small sections of pipe insulation or covering for pipe repair, replacing valves, installing electrical conduits, or patching or removing small sections of drywall. OSHA issued a clarification of the definition of a "small-scale, short-duration" (SS/SD) project in a September 1987 asbestos directive. The directive focuses on intent, stating that in SS/SD projects, the removal of ACM is not the primary goal of the job. If the purpose of a small-scale, short-duration project is maintenance, repair, or renovation of the equipment or surface behind the ACM—not abatement of ACM—then the appendix provisions may apply If the intent of the work is abatement of the ACM, then the full-scale abatement control requirements apply

In any event, this appendix section of the OSHA construction standard outlines requirements for the use of certain engineering and work practice controls such as glovebags, mini-enclosures, and special vacuuming techniques. Similar information on these procedures may be found in the EPA's AHERA regulations for schools. (See final AHERA rule, Appendix B, for SS/SD projects.)

**U.S. EPA National Emission Standards for Hazardous Air Pollutants (NESHAP) (40 CFR 61 Subpart M)**

EPA's rules concerning the application, removal, and disposal of ACM, as well as manufacturing, spraying and fabricating of ACM, were issued under the asbestos NESHAP. The asbestos NESHAP regulation governs asbestos demolition and renovation projects in all facilities. The NESHAP rule usually requires owners or operators to have all friable ACM removed before a building is demolished, and may require its removal before a renovation. For renovation projects where friable ACM will be disturbed, the NESHAP rule may require appropriate work practices or procedures for the control of emissions. It is prudent to note that any ACM which may become friable poses a potential hazard that should be addressed. The building owner should consider that in many instances, the removal of friable ACM prior to demolition could be less expensive than removals while the building is still occupied and being used. *Some revisions to the current. NESHAP rule are anticipated by the end of 1.990.*

**In general applicable OSHA permissible exposure limits are not likely to be exceeded for most O&M activities in building areas where only non-friable ACM is present or where friable ACM is in good condition.**

## Notification

EPA or the state (if the state has been delegated authority under NESHAP) must be notified before a building is demolished or renovated. The following information is required on the NESHAP notice:

**1** Name and address of the building owner or manager;

**2** Description and location of the building;

**3** Estimate of the approximate amount of friable ACM present in the facility;

**4** Scheduled starting and completion dates of ACM removal;

**5** Nature of planned demolition or renovation and method(s) to be used;

**6** Procedures to be used to comply with the requirements of the regulation; and

**7** Name, address, and location of the disposal site where the friable asbestos waste material will be deposited.

**Depending on project size, EPA or the state must be notified before a building is demolished or renovated.**

The notification requirements do not apply if a building owner plans renovation projects which will disturb less than the NESHAP limits of 160 square feet of friable ACM on facility components or 260 linear feet of friable ACM on pipes (quantities involved over a one-year period). For renovation operations in which the amount of ACM equals or exceeds the NESHAP limits, notification is required as soon as possible.

## Emissions Control and Waste Disposal

The NESHAP asbestos rule prohibits visible emissions to the outside air by requiring emission control procedures and appropriate work practices during collection, packaging, transportation or disposal of friable ACM waste. All ACM must be kept wet until sealed in a leak-tight container that includes the appropriate label. The following table provides a simplified reference for building owners regarding the key existing NESHAP requirements.

**Resource Conservation and Recovery Act Regulations (RCRA); and Comprehensive Environmental Response, Compensation, and Liability Act Regulations (CERCLA, or "Superfund")** Under expanded authority of RCRA, a few states have classified asbestos-containing waste as a hazardous waste, and require stringent handling, manifesting, and disposal procedures. In those cases, the state hazardous waste agency should be contacted before disposing of asbestos for approved disposal methods and recordkeeping requirements, and for a list of approved disposal sites.

Friable asbestos is also included as a hazardous substance under EPA's CERCLA regulations. The owner or manager of a facility (e.g., building, installation, vessel, landfill) may have some reporting requirements. Check with your EPA Regional Office for further information. (See Appendix D for telephone numbers.)

**The Asbestos Hazard Emergency Response Act Regulations (AHERA)** In October 1987, EPA issued final regulations to carry out the Asbestos Hazard Emergency Response Act of 1986 (AHERA). The AHERA regulatory requirements deal *only with public and private elementary and secondary school buildings.* The regulations require schools to conduct inspections, develop comprehensive asbestos management plans, and select asbestos response actions to deal with asbestos hazards. The AHERA rules *do not* require schools to remove ACM.

A key element of the AHERA regulations requires schools to develop an O&M program if friable ACM is present. The AHERA O&M requirements also cover non-friable ACM which is about to become friable. For example, drilling through an ACM wall will likely result in friable ACM. Under the AHERA O&M provisions, schools must carry out specific O&M procedures which provide for the clean-up of any ACM releases and help ensure the general safety of school maintenance and custodial workers, as well as all other school building occupants. The AHERA regulation's O&M requirements mandate that schools employ specific work practices including wet wiping, HEPA vacuuming, proper waste disposal procedures, and specific training for custodial and maintenance employees who work in buildings with ACM.

**U.S. EPA Asbestos Ban and Phaseout Rule** Bans on some uses and applications of asbestos under the Clean Air Act were briefly described in Chapter 1. In July 1989, under the Toxic Substances Control Act (TSCA), EPA promulgated an Asbestos Ban and Phaseout Rule. The complete rule was published in the *Federal Register* on July 12,1989.

Beginning in 1990 and taking effect in three stages, the rule prohibits the importation, manufacture, and processing of 94 percent of all remaining asbestos products in the United States over a period of seven years.

## Existing NESHAP Requirements Summary*

| | Demolition | | Renovation | |
|---|---|---|---|---|
| **AMOUNT*** (in 1 yr.) | > 260 ln. ft. or > 160 sq. ft. | <260 ln. ft. or <160 sq. ft. | > 260 ln. ft. or > 160 sq. ft. | <260 ln. ft. or > 160 sq. ft. |
| **NOTIFICATION** | YES | YES | Y E S | NOT REQUIRED |
| **HOW FAR IN ADVANCE*** | 10 DAYS | 20 DAYS | AS SOON AS POSSIBLE | NOT REQUIRED |
| **EMISSION CONTROLS** (Work Practices) | YES | NOT REQUIRED | YES | NOT REQUIRED |
| **DISPOSAL STANDARD** | Y E S | NOT REQUIRED | Y E S | NOT REQUIRED |

*May be changed on promulgation of Revised NESHAP Rule in 1990

## Chapter Summary

A variety of federal, state, and local regulations govern the way building owners must deal with ACM in their facilities. State and local regulations maybe more stringent than federal standards and often change rapidly Building owners should periodically check with the appropriate Federal, State, and local authorities to determine whether any new asbestos regulations have been developed or whether current regulations have been amended. Specific federal regulations that may affect asbestos-related tasks and/or workers are highlighted here:

- OSHA Construction Industry Standard for Asbestos (29 CFR 1926.58).

- OSHA General Industry Standard for Asbestos (29 CFR 1910.1001).

- OSHA Respiratory Protection Standard (29 CFR 1910.134).

- EPA Worker Protection Rule (40 CFR 763 Subpart, G).

- EPA National Emission Standards for Hazardous Air Pollutants (NESHAP) (40 CFR 61 Subpart M).

- EPA Asbestos Hazard Emergency Response Act (AHERA) Regulations (40 CFR 763 Subpart E),

- EPA Asbestos Ban and Phaseout Rule (40 CFR 763 Subpart I).

**Appendix A.**

## Glossary of Terms

| | |
|---|---|
| **ACM** | Asbestos-Containing Material. Any material containing more than one percent asbestos. |
| **Asbestos Program Manager** | A building owner or designated representative who supervises all aspects of the facility asbestos management and control program. |
| **Air Plenum** | Any space used to convey air in a building or structure. The space above a suspended ceiling is often used as an air plenum. |
| **Asbestos Abatement** | Procedures to control fiber release from asbestos-containing materials in a building or to remove it entirely These may involve removal, encapsulation, repair, enclosure, encasement, and operations and maintenance programs. |
| **Delamination** | Separation of one layer from another. |
| **EPA** | U.S. Environmental Protection Agency |
| **Friable Asbestos** | Any materials that contain greater than one percent asbestos, and which can be crumbled, pulverized, or reduced to powder by hand pressure. This may also include previously non-friable material which becomes broken or damaged by mechanical force. |
| **Glovebag** | A polyethylene or polyvinyl chloride bag-like enclosure affixed around an asbestos-containing source (most often, TSI) so that the material maybe removed while minimizing release of airborne fibers to the surrounding atmosphere. |
| **HEPA Filter** | High-Efficiency Particulate Air Filter. Such filters are rated to trap at least 99.97% of all particles 0.3 microns in diameter or larger. |
| **Industrial Hygienist** | A professional qualified by education, training, and experience to anticipate, recognize, evaluate and develop controls for occupational health hazards. |
| **Medical Surveillance** | Aperiodic comprehensive review of a worker's health status. The required elements of an acceptable medical surveillance program are listed in the Occupational Safety and Health Administration standards for asbestos. |
| **Miscellaneous ACM** | Interior asbestos-containing building material on structural components, structural members or fixtures, such as floor and ceiling tiles; does not include surfacing material or thermal system insulation. |
| **NESHAP** | National Emission Standard for Hazardous Air Pollutants-EPA Rules under the Clean Air Act. |
| **NIOSH** | The National Institute for occupational Safety and Health, which was established by the Occupational Safety and Health Act of 1970. Primary functions of NIOSH are to conduct research, issue technical information, and test and certify respirators. |
| **Personal Air Samples** | An air sample taken with a sampling pump directly attached to the worker with the collecting filter and cassette placed in the worker's breathing zone. These samples are required by the OSHA asbestos standards and the EPA Worker Protection Rule. |
| **Prevalent Level Samples** | Air samples taken under normal conditions (also known as ambient background samples). |
| **Surfacing ACM** | Asbestos-containing material that is sprayed-on, troweled-on or otherwise applied to surfaces, such as acoustical plaster on ceilings and fireproofing materials on structural members, or other materials on surfaces for acoustical, fireproofing, or other purposes. |
| **TSI** | Thermal system insulation – asbestos-containing material applied to pipes, fittings, boilers, breeding, tanks, ducts or other interior structural components to prevent heat loss or gain or water condensation. |
| **TWA** | Time-weighted Average. In air sampling, this refers to the average air concentration of contaminants during a particular sampling period. |

**Appendix B.**

# Sample Recordkeeping Form:

**Form 1.** A sample form for recording information during ACM reassessment.

## Reinspection of Asbestos-Containing Materials

Location of asbestos-containing material (address, building, room, or general description]

_____

_____

_____

_____

**Type of asbestos-containing material(s):**

1. Sprayed-or troweled-on ceilings or walls
2. Sprayed-or troweled-on structural members
3. Insulation on pipes, tanks, or boiler
4. Other (describe)

_____

_____

**Abatement Status:**

1. The material has been encapsulated _____ , enclosed _____ , neither _____ , removed _____ .

**Assessment:**

1. Evidence of physical damage _____

_____

2. Evidence of water damage: _____

_____

3. Evidence of delamination or other damage: _____

_____

4. Degree of accessibility of the material: _____

_____

5. Degree of activity near the material: _____

_____

6. Location in an air plenum, air shaft, or airstream: _____

_____

7. Other observations (including the condition of the encapsulant or enclosure, if any): _____

_____

**\*Recommended Action:** _____

_____

Signed: _____      Date: _____
                    (evaluator)

3 1

**Form 2.** A sample application form for maintenance work approval.

## Job Request Form for Maintenance Work

Name: _____    Date: _____

Telephone No. _____    Job Request No. _____

Requested starting date: _____    Anticipated finish date: _____

Address, building, and room number(s) (or description of area) where work is to be performed:

_____

_____

_____

_____

Description of work

_____

_____

_____

_____

_____

Description of any asbestos-containing material that might be affected, if known (include location and type):

_____

_____

_____

_____

Name and telephone number of requestor:

_____

Name and telephone number of supervisor

_____

Submit this application to

_____

(The Asbestos Program Manager)

NOTE An application must be submitted for all maintenance work whether or not asbestos-containing material might be affected. An authorization must then be received before any work can proceed.

_____ Granted (Job Request No._____)
_____ With conditions*
_____ Denied

*Conditions _____

_____

3 2

**Form 3.** A sample maintenance work authorization form.

## Maintenance Work Authorization Form            No._____

**AUTHORIZATION**

Authorization is given to proceed with the following maintenance work:

_____

_____

_____

_____

_____

_____

_____

_____

**PRESENCE OF ASBESTOS-CONTAINING MATERIALS**

_____ Asbestos-containing materials are not present in the vicinity of the maintenance work.

_____ ACM is present, but its disturbance is not anticipated however, if conditions change, the Asbestos Program Manager will re-evaluate the work request prior to proceeding.

_____ ACM is present, and maybe disturbed.

**Work Practices if Asbestos-Containing Materials Are Present**

The following work practices shall be employed to avoid or minimum disturbing asbestos:*

_____

_____

_____

_____

_____

**Personal Protection if Asbestos-Containing Materials Are Present****

The following equipment/clothes shall be used/worn during the work to protect workers:

_____

_____

_____

_____

(manuals on personal protection can be referenced)

**Special Practices and/or Equipment Required:**

_____

_____

Signed:_____ Date:_____
              (Asbestos Program Manager)

33

**Form 4.** A sample work evaluation form

This evaluation covers the following maintenance work:

Location of work (address, building, room number(s), or general description):

_____

_____

_____

_____

Date(s) of work _____

Description of work _____

Work approval form number: _____

Evaluation of work practices employed to minimize disturbance of asbestos:

_____

_____

_____

_____

_____

Evaluation of work practices employed to contain released fibers and to clean up the work area:

_____

_____

_____

_____

_____

Evaluation of equipment and procedures used to protect workers:

_____

_____

_____

_____

_____

Personal air monitoring results; (i-house worker or contract?)

Worker name_____Results: _____

Worker name_____Results: _____

Handling or storage of ACM waste: _____

signed _____Date: _____
    (Asbestos Program Manager)

**Appendix C**

## Illustrative Organization Chart



**Figure 1.** A *sample* organization for a building owner with
a large in-house management staff. Shaded boxes indicate
outside assistance.

## Owners and Managers Who Employ an Extensive In-house Management Staff

**IN-HOUSE STAFF (FIGURE 1)**

**Asbestos Program Manager:** Has authority and overall
responsibility for the asbestos control program. May develop
the O&M program. Coordinates all activities. May also
administer the respiratory protection program.

**Physical Plant Manager:** (may also be the Asbestos
Program Manager) Participates in establishing work practices
for cleaning and maintenance activities, and in training
custodial and maintenance staff to use them. Assists in
implementing the O&M program and in conducting periodic
reinspection of the ACM. Ensures that outside contractors
follow O&M procedures.

**Communications Person:** (Public Affairs Officer, Nurse,
Physician, Industrial Hygienist) Assists in preparation and
distribution of information about ACM in the building. Person
should be a good speaker and communicator.

**Recordkeeping Person:** (Executive Assistant, Secretary)
Responsible for maintaining records.

**OUTSIDE ASSISTANCE**

**EPA Regional Asbestos Coordinator, NESHAP Coor-
dinator and State/Local Government Advisors:** Pro-
vide getter-id guidance and answer specific questions.

**OSHA Regional Office:** May he helpful in answering
questions about existing regulations, and providing guidance
for worker protection.

**Asbestos Consultant(s)*:** (Industrial Hygienists, Health
Professionals, Architects, Engineers, and others) May assist in
various aspects of the asbestos O&M program, including its
development and implementation. May also conduct material
inspections and provide work practice recommendations.

**Lawyer:** Provides advice on legal requirements (such as laws
and statutes) and liability aspects of the program.

**Asbestos Contractor*:** May provide services for ACM
abatement and for building decontamination following a fiber
release episode.

*It is important for owners and Asbestos Program Manager's to
consider potential "conflict of interest" issues pertaining to those
persons or firms used to sample, inspect, assess, analyze, recom-
mend response actions, design response actions, and conduct
asbestos response actions.

35



**Figure 2.** A *sample* organization for owners of buildings where services are provided by contract. Shaded boxes indicate outside assistance.

## Owners and Managers Who Contract For Services

**IN-HOUSE STAFF (FIGURE 2)**

**Asbestos Program Manager:** Has overall responsibility for the asbestos control program. May develop and implement the O&M program. Establishes training and experience requirements for contractor's workers. Supervises and enforces work practices with assistance of work crew supervisors. Conducts periodic reinspection and responsible for record-keeping. This person should be properly trained in O&M program development and implementation (see Chapter 5).

**OUTSIDE ASSISTANCE**

**EPA Regional Asbestos Coordinator and State/Local Government Advisors:** Provide general guidance and answer specific questions,

**OSHA Regional Office:** May be helpful in answering questions about existing regulations and providing guidance for worker protection.

**Asbestos Consultant(s)*:** (Industrial Hygienists, Health Professionals, Architects, Engineers, and others) May assist Asbestos Program Manager in various aspects of the asbestos O&M program, including development and implementation. May also conduct the inspection and provide work practices recommendations.

**Lawyer:** Provides advice on legal requirements (laws and statutes) and liability aspects of the program.

**Asbestos Contractor*:** May provide services for ACM abatement and building decontamination following a fiber release episode.

*It is important for owners and Asbestos Program Manager's to consider potential "conflict of interest" issues pertaining to those persons or firms used to sample, inspect, assess, analyze, recommend response actions, design response actions, and conduct asbestos response actions.

**APPENDIX D.**

## Additional Assistance and Training

### EPA REGIONAL CONTACTS

Additional assistance can be obtained from your U.S. EPA Regional Asbestos Coordinators, NESHAP Regional Coordinators, and OSHA Regional Offices. Their telephone numbers are listed below

**EPA Region 1:** (CT,ME,MA,NH,RI,VT)

    Asbestos Coordinator (617) 565-3835
    NESHAP Coordinator (617) 565-3265

**EPA Region II:** (NJ,NY,PR,VI)

    Asbestos Coordinator (201) 321-6671
    NESHAP Coordinator (212) 264-6770

**EPA Region III:** (DE,DC,MD,PA,VA,WV)

    Asbestos Coordinator (215) 597-3160
    NESHAP Coordinator (215) 597-6550

**EPA Region IV:** (AL,FL,GA,KY,MS,NC,SC,TN)

    Asbestos Coordinator (404) 347-5014
    NESHAP Coordinator (404) 347-2904

**EPA Region V:** (IL,IN,MI,MN,OH,WI)

    Asbestos Coordinator (312) 886-6003
    NESHAP Coordinator (312) 353-2088

**EPA Region VI:** (AR,LA,NM,OK,TX)

    Asbestos Coordinator (214) 655-7244
    NESHAP Coordinator (214) 655-7229

**EPA Region VII:** (IA,KS,MO,NE)

    Asbestos Coordinator (913) 551-7020
    NESHAP Coordinator (913) 551-7020

**EPA Region VIII:** (CO,MT,ND,SD,UT,WY)

    Asbestos Coordinator (303) 293-1442
    NESHAP Coordinator (303) 294-7685

**EPA Region IX:** (AZ,CA,HI,NV,AS,GU)

    Asbestos Coordinator (415) 556-5406
    NESHAP Coordinator (415) 556-5526

**EPA Region X:** (AK,ID,OR,WA)

    Asbestos Coordinator (206) 442-4762
    NESHAP Coordinator (206) 442-1757

### OSHA REGIONAL OFFICES

**Region I –** Boston, MA:(617) 223-6710
**Region II –** New York, NY: (212) 944-3432
**Region III –** Philadelphia, PA (215) 596-1201
**Region IV –** Atlanta, GA (404) 347-3573
**Region V –** Chicago, IL: (312) 353-2220
**Region VI –** Dallas, TX: (214) 7674731

**Region VII –** Kansas City, MO (816) 374-5861
**Region VIII –** Denver, CO: (303) 844-3061
**Region IX –** San Francisco, CA: (415) 995-5672
**Region X –** Seattle, WA (206) 442-5930

### Toxic Substances Control Act (TSCA) Assistance Hotline

Copies of the EPA Guidance Documents, Technical Bulletins, and other publications cited here can be obtained by calling the TSCA Assistance Hotline, in Washington, D.C., at: (202) 554-1404.

### Approved Training Centers

Certain training centers and satellite centers were initially funded by EPA to develop asbestos training courses. They and other training providers approved by EPA or states, offer courses for professionals such as asbestos inspectors and management planners involved with ACM detection and control, for asbestos abatement project designers, project supervisors and abatement workers, and others. In general, qualified professionals trained as inspectors and asbestos management planners would be good choices to design an O&M plan. Original training centers are located at the following sites:

Georgia Institute of Technology
GTRI/EDL/ESTD
29 O'Keefe Building
Atlanta, GA 30332
(404) 894-3806

University of Kansas
Asbestos Training Center
6600 College Blvd. Suite 315
Overland Park, KS 66211
(913) 491-0181

Pacific Asbestos
Information Center
University CA/Extension
2223 Fulton St.
Berkeley, CA 94720
(415) 643-7143

Tufts University
Curtis Hall
Asbestos Information Center
474 Boston Avenue
Medford, MA 02155
(617) 381-3531

University of Illinois at Chicago
Midwest Asbestos Information Center
BOX 6998
Chicago, IL 60680
(312) 996-6904

Additional training providers are listed in the *Federal Register* on a regular basis. Call (202) 554-1404 for information. In addition, information on how to receive a copy of an O&M Course produced by an EPA contractor maybe obtained at the same number.

### OTHER ORGANIZATIONS

National Conference of State Legislatures (NCSL)
    Denver, CO – (303) 623-7800
National Institute of Building Sciences (NIBS),
    Washington, D.C. – (202) 289-7800
American Board of Industrial Hygiene (ABIH),
    Lansing, MI – (517) 321-2638
National Institute for Standards and Technology (NIST),
    Gaithersburg, MD – (contact for lab accreditation) –
    (301) 975-4016

37

**APPENDIX E:**

# Respiratory Protection Recommendations

EPA recommends that the following guidelines be followed for respiratory protection during various custodial and maintenance tasks. These guidelines are issued to cover tasks that do not always create routine fiber levels high enough to trigger OSHA respiratory protection requirements. Therefore, building owners should note they go beyond OSHA requirements.

● **Routine maintenance where contact with ACM is unlikely.** No respiratory protection required. (Air-purifying respirator with high-efficiency filters should be available if needed: half-face or full facepiece).

● **Routine maintenance where there is reasonable likelihood of ACM disturbance.** Air-purifying respirator with high-efficiency filters (half-face or full facepiece).

● **Maintenance or repair involving intentional small-scale disturbance of ACM.** Powered air-purifying respirator with high-efficiency filters, or air-purifying respirator with high-efficiency filters (half-face or full facepiece). If glove bags are used to contain the ACM during disturbance, either half-face or full facepiece air-purifying respirators with high-efficiency filters may be used.

● **Any O&M activity requiring sawing, cutting, drilling, abrading, grinding, or sanding ACM.** (NOTE: specially equipped tools with local exhaust ventilation should be used for these activities. See 29 CFR 1910.) Powered air-purifying respirator with high-efficiency filters, or full facepiece, air-purifying respirator equipped with high-efficiency filters should be used.

● **Cleanup after a minor asbestos fiber release.** Air-purifying respirator with high-efficiency filters (half-face or full facepiece).

● **Cleanup after a major asbestos fiber release.** Air-supplied respirators, either the "Type C" airline respirator equipped with a backup high-efficiency filter or SCBA (Self-Contained Breathing Apparatus).

The U.S. EPA, in collaboration with NIOSH, has issued a guidance document, "A Guide to Respiratory Protection for the Asbestos Abatement Industry" which recommends levels of respiratory protection for those engaged in large-scale asbestos abatement projects that are beyond routine O&M procedures. Air-supplied self-contained, and "type C" airline respirators are the focus of the EPA/NIOSH document. These respirators allow workers to breathe fresh air supplied through hoses and face masks, and are generally used only by asbestos abatement workers engaged in large-scale asbestos removal projects. They are usually not considered either practical or necessary for most custodial and maintenance jobs.

An industrial hygienist or environmental/occupational health professional should assist workers with respirator selection and fitting, and train them in respirator use. Fit-testing (which means determining whether a particular brand and size of respirator properly fits an individual worker) is essential, since respirators which leak at the face seal provide significantly less protection. OSHA requires fit-testing initially and every six months for employees required to wear a negative pressure respirator for protection against asbestos, or for individuals exposed at or above the OSHA-specified limits.

A respirator's effectiveness is also influenced by how it is handled, cleaned, and stored. Custodial and maintenance staff should clean their respirators after each use, and disinfect their respirators at the end of a day's use. This improves comfort, and also reduces the chances of skin irritation or infection. After cleaning the respirator, custodial and maintenance staff should place the respirator (with the worker's name) in a clean and sanitary location and store the unit in a secure place for future use. Respirators should be visually inspected by the user before and after each use, during cleaning and at least monthly when not in use. Inspection records should be maintained accordingly When the respirator's high-efficiency filters are discarded, they should be disposed of as asbestos waste.

APPENDIX F

# Existing EPA Guidance for Each Step That a Building Owner May Take to Conrol ACM

| Action | Existing EPA Guidance/Regulations* |
|---|---|
| Appoint Asbestos Program Manager and Develop an Organizational Policy. | "Guidance for Controlling Asbestos-Containing Materials in Buildings" ("Purple Book") EPA publication number: 560/5-85-024 |
| Inspect the facility to determine if ACM is present. Take bulk samples of suspect ACM and assess the material's condition. | "Guidance for Controlling Asbestos-Containing Materials in Buildings" ("Purple Book", chapter 2) EPA publication number 560/5-85-024 |
| | "Simplified Sampling Scheme for Surfacing Materials" ("Pink Book") EPA publication number: 560/5-85-030a |
| | "Asbestos-Containing Materials in Schools; Final Rule and Notice" (Asbestos Hazard Emergency Response Act, or AHERA). *Federal Register*– October 30, 1987. (sections 763.85 to 763.88) |
| | Model training course materials for accrediting asbestos building inspectors in accordance with AHERA (inspection/assessment materials). |
| Establish an O&M program. | "Purple Book, Chapter 3 |
| | AHERA regulations, sections 763.91 and 763.92 |
| | EPA Guidance for Service and Maintenance Personnel. EPA publication number 560/5-85-018 |
| Implement and Conscientiously Manage the O&M Program; Assess the Potential for Exposure to Asbestos and Select Response Actions. | "Purple Book", Chapter 4 |
| | Model training course materials for accrediting asbestos management planners in accordance with AHERA (assessment materials). |
| | AHERA regulations, section 763.88 and 793.92 |
| Select and Implement Abatement Actions Other Than O&M When Necessary | "Purple Book", Chapter 6 |
| | AHERA regulations, section 763.93 (including 763.85 through 763.92) |
| | AHERA regulation, appendix A Determining Completion of Response Actions-Methods. |
| | "Abatement of Asbestos-Containing Pipe Insulation" U.S. EPA Asbestos-ii-Buildings Technical Bulletin 1986-2. |
| | U.S. EPA National Emission Standards for Hazardous Air Pollutants (NESHAP) Regulations (40 CFR 61) |
| | Model training course materials for accrediting asbestos management planners in accordance with AHERA (assessment materials). |

*Most of these guidance materials are available through EPA's TSCA Assistance Hotline, at (202) 554-1404.

**APPENDIX G:**

- Cement Pipes
- Cement Wallboard
- Cement Siding
- Asphalt Floor Tile
- Vinyl Floor Tile
- Vinyl Sheet Flooring
- Flooring Backing
- Construction Mastics (floor tile, carpet, ceiling tile, etc.)
- Acoustical Plaster
- Decorative Plaster
- Textured  Paints/Coatings
- Ceiling Tiles and Lay-in Panels
- Spray-Applied Insulation
- Blown-in Insulation
- Fireproofing Materials
- Taping Compounds (thermal)
- Packing Materials (for wall/floor penetrations)
- High Temperature Gaskets
- Laboratory Hoods/Table Tops
- Laboratory Gloves
- Fire Blankets
- Fire Curtains
- Elevator Equipment Panels

- Elevator Brake Shoes
- HVAC Duct Insulation
- Boiler Insulation
- Breeching Insulation
- Ductwork Flexible Fabric Connections
- Cooling  Towers
- Pipe Insulation (corrugated air-cell, block, etc.)
- Heating and Electrical Ducts
- Electrical Panel Partitions
- Electrical Cloth
- Electric Wiring Insulation
- Chalkboards
- Roofing Shingles
- Roofing Felt
- Base Flashing
- Thermal Paper Products
- Fire  Doors
- Caulking/Putties
- Adhesives
- Wallboard
- Joint Compounds
- Vinyl Wall Coverings
- Spackling Compounds

**NOTE:** This list does not include every product/material that may contain asbestos. It is intended as a general guide to show which types of materials may contain asbestos.

**APPENDIX H:**

USEPA. 1984. U.S. Environmental Protection Agency *National Emission Standards for Hazardous Air Pollutants.* 40 CFR 61. April 5, 1984.

USEPA. 1985. U.S. Environmental Protection Agency *Measuring airborne asbestos following an abatement action.* Washington DC: USEPA. EPA 600/4-85-049. ("Silver Book")

USEPA. 1985. U.S. Environmental Protection Agency *Asbestos in buildings: Simplified sampling scheme for surfacing materials.* Washington DC: USEPA. EPA 560/5-85-030A. ("Pink  Book)

USEPA. 1985. U.S. Environmental Protection Agency *Guidance for controlling asbesdos-containing materials in buildings.* Washington DC EPA 560/5-85-024. ("Purple Book")

USEPA. 1985. U.S. Environmental Protection Agency *Asbestos in buildings: Guidance for service and maintenance personnel.* Washington DC: EPA  560/5-85-018. ("Custodial Pamphlet")

USEPA. 1986. U.S. Environmental Protection Agency *Abatement of asbestos-containing pipe insulation.* Washington DC: Technical Bulletin No. 1986-2.

USEPA. 1986. U.S. Environmental Protection Agency *A guide to respiratory protection for the asbestos abatement industry.* Washington DC: EPA  560/OPTS-86-00l.

USEPA. 1987. Asbestos *Abatement Projects; Worker Protection, Final Rule. 40* CFR 763. February 1987.

USEPA. 1987. U.S. Environmental Protection Agency *Asbestos-Containing Materials in Schools; Final Rule and Notice.* 40 CFR 763. *Federal Register,* October 30, 1987.

USEPA. 1988. *EPA Study of Asbestos-Containing Materials in Public Buildings: A Report to Congress.* February 1988.

USEPA. 1989. *Asbestos Ban and Phaseout Rule.* 40 CFR 763.160 to 763.179. *Federal Register* July 12, 1989.

USEPA. 1989. *Guidelines for Conducting the HERA TEM Clearance Test to Determine Completion of an Asbestos Abatement Project.* Washington DC: EPA 560/5-89-001.

USEPA. 1989. *Transmission Electron Microscopy Asbestos Laboratories: Quality Assurance Guidelines.* Washington DC: EPA  560/5-90-002.

U.S. Department of Labor: OSHA Regulations. 29 CFR 1910.1001 – *General Industry Asbestos Standard* and 29 CFR 1926.58 – *Construction Industry Asbestos Standard.* June 1986; Amended, September, 1988.

U.S. Department of Labor: OSHA Regulations. 29 CFR 1910.134 – *Respiratory  Protection  Standard.* June, 1974.

Keyes, Dale L. and Chesson, Jean. 1989. *A Guide to Monitoring Airborne Asbestos in Buildings.* Environmental Sciences, Inc., 105 E. Speedway Blvd., Tucson, Arizona 85705.

**ASBESTOS
OPERATIONS AND MAINTENANCE
PROGRAM
FOR
WINDTREE
3631 BRENNAN BOULEVARD
AMARILLO, TEXAS 79121**

**Date:** February 27, 2017

# **Table of Contents**

**Section**                                                              **Page No.**

1.0     PURPOSE OF OPERATIONS AND MAINTENANCE PROGRAM          3

2.0     ASBESTOS OPERATIONS AND MAINTENANCE MANAGER            4

3.0     NOTIFICATION                                           5

4.0     SURVEILLANCE                                           6

5.0     CONTROLS                                               7

6.0     WORK PRACTICES/WORKER PROTECTION                       8

7.0     WORKER TRAINING                                        12

8.0     RECORD KEEPING                                         13

**Appendices:**

Appendix A                    Operation & Maintenance Forms
Appendix B                    Reference Rules and Regulations
Appendix C                    USEPA Guidance Document

# 1.0   PURPOSE OF OPERATIONS AND MAINTENANCE PROGRAM

The principal objective of the asbestos O&M Program is to minimize exposure of building occupants and workers to asbestos fibers.

The O&M Program is a "best management practices" plan.  The O&M Program is not a regulatory compliance program and is not meant to imply compliance with Federal worker protection regulations, such as Occupational Safety and Health Administration (OSHA); Federal regulations regarding the release of asbestos fibers, such as National Emission Standards for Hazardous Air Pollutant (NESHAP); or other State or local regulations.

A Phase I Environmental Site Assessment (ESA) completed by Velocity Consulting, Inc. and dated February 22, 2017 identified the following Suspect ACMs (SACMs).

| Material | Location | Amount/ Condition/ Friability |
|---|---|---|
| "Popcorn-textured" ceiling material | Apartments | Not quantified/ good/friable |
| Vinyl floor tile and mastic | Some apartments and laundry rooms | Not quantified/ good/non-friable |
| Roofing materials | Roofs | Not quantified/ good/non-friable |

The above-listed materials were identified in a limited asbestos survey conducted as part of Velocity Consulting Inc.'s Phase I ESA.  The limited asbestos survey was only meant to identify readily accessible ACMs and SACMs in representative areas only.  The limited asbestos survey is not a full or comprehensive asbestos survey nor does it render a property asbestos-free.  The limited asbestos survey is not meant to comply with Asbestos Hazard Emergency Response Act (AHERA), 40 Code of Federal Regulations (CFR) Part 763, National Emission Standards for Hazardous Air Pollutants (NESHAP) 40 CFR 61, Occupational Safety and Health (OSHA) 29 CFR Part 1926.1101, or other local, state, or federal regulations.

For the purposes of this O&M Program, all SACM will be referred to as ACM.  This O&M Program will be maintained until all ACM is removed from the subject property.

The O&M Program will in no way substitute for proper asbestos training.  All building personnel, at a minimum, will read this program and be familiar with the basics of the O&M Program.

Additional information and guidance on establishing an asbestos O&M Program can be found in the United States Environmental Protection Agency (USEPA) guidance document titled "Managing Asbestos In-Place, A Building Owner's Guide to Operations and Maintenance Programs for Asbestos-Containing Materials."  This guidance document is also known as "the Green Book" and is provided in Appendix C.

## 2.0    ASBESTOS OPERATIONS AND MAINTENANCE MANAGER

An essential component of the asbestos O&M program is the appointment of an O&M manager (OMM).  The OMM is usually a building engineer, superintendent or facilities manager.  This person should be properly qualified, through training and experience, and be actively involved in all asbestos-related activities at the property, including inspections, O&M activities and removal and repair of ACM.

The position of Operations and Maintenance Manager (OMM) for the subject property is held by:

| | |
|---|---|
| **Name** | |
| **Address** | |
| **Telephone** | |

# 3.0   NOTIFICATION

A program should be implemented to inform workers, tenants, and building occupants of the physical location of ACM and stress the need to avoid disturbing or damaging existing ACMs.  All persons affected should be properly informed.

The purpose of the notification is to avoid the accidental disturbance of ACM and the subsequent release of asbestos fibers.  Informed persons are less likely to unknowingly disturb the material and cause fibers to be released into the air.

The method of notification should be tailored to the type, condition, and location of the ACMs present.

# 4.0   SURVEILLANCE

All identified ACM and materials suspected to contain asbestos should be inspected annually.

The inspections will include identifying and recording changes in the condition of the ACM, including damage and deterioration, and changes in the use and activity of spaces containing ACM. Special attention will be given to friable ACM and ACM located in high activity areas that are susceptible to damage and subsequent deterioration.

The annual inspections can be conducted by the OMM or an outside consultant. If the annual inspections are conducted by an outside consultant, the OMM should accompany the consultant during the inspections. All annual inspection documentation and reports should be maintained by the OMM. The Periodical Surveillance Form included in Appendix A can be used to document the inspections.

In addition, building personnel should report all damage and changes in the condition of ACM and suspect ACM to the OMM immediately

# 5.0   CONTROLS

A system should be put in place to control all activities that might disturb the ACM.

The OMM should determine if any planned work will disturb any ACMs.  If the work is to disturb a SACM, then a prudent measure is to sample the SACM at that time to determine its asbestos content.  The asbestos samples should be analyzed by an accredited laboratory for asbestos content.

All work that can potentially damage ACM should be controlled/managed in such a way as to minimize disturbance of ACMs and the release of asbestos fibers.

One way to achieve this goal is to use a permitting system consisting of the use of three forms.  Examples of these three forms are included in Appendix A.  The forms can and should be modified to suit the individual parameters of the site, the management team, and the types of ACMs present.  The three example forms are as follows:

> Maintenance Work Location Form: This form describes the proposed maintenance work and must be submitted to the OMM before any maintenance work is begun
> Maintenance Work Authorization Form: This form must be approved by the OMM before any maintenance work is begun and dictates the work practices and personal protective equipment/clothing to be used during the maintenance work.
> Asbestos Maintenance Closure Form: This form will document the methods undertaken to minimize the disturbance of ACM and the release of asbestos fibers (i.e. control methods, protective equipment, etc.)

Copies of all Maintenance Work Location Forms, Maintenance Work Authorization Forms, Asbestos Maintenance Closure Forms and laboratory asbestos sample results should be kept on file for future reference.

Implementation of this O&M program should address work conducted by outside contractors. Proposals and work orders from outside contractors should be thoroughly reviewed to ensure that appropriate work practices are followed as related to ACMs.

All work that will result in the disturbance of ACM should be conducted in accordance with applicable USEPA, Occupational Safety and Health Administration (OSHA), and/or state and local regulations.

# 6.0    WORK PRACTICES/WORKER PROTECTION

This section describes work practices that are designed to avoid or minimize the chances of fiber release.

**The work practices and worker protection procedures described in this section (6.0 through 6.4) are only necessary if a known ACM is to be disturbed. If the asbestos content of a material to be disturbed is unknown, then samples should taken prior to the commencement of work and analyzed for asbestos content by an accredited laboratory.**

The following lists the ACMs found on-site and the special practices that need to be taken for that material.

| FRIABLE SUSPECT ASBESTOS-CONTAINING POPCORN TEXTURED CEILING TILES | |
|---|---|
| Initial and Periodic Cleaning | None required |
| Periodic Surveillance: | Annual |
| Labeling | None required |
| Restricted Activities | Any activities that may result in the damage or disturbance of the friable suspect asbestos-containing popcorn textured ceiling tiles |
| | Avoid hanging objects from the friable suspect asbestos- containing popcorn textured ceiling tiles |

| NON-FRIABLE SUSPECT ASBESTOS-CONTAINING ROOFING MATERIALS | |
|---|---|
| Initial and Periodic Cleaning | As needed |
| Periodic Surveillance: | As needed |
| Labeling | None required |
| Restricted Activities | Any activities that may result in the damage or disturbance of the non-friable suspect asbestos-containing roofing materials |
| | Avoid sanding or scraping the non-friable suspect asbestos-containing roofing materials |

| NON-FRIABLE SUSPECT ASBESTOS-CONTAINING VINYL FLOOR TILES AND MASTIC | |
|---|---|
| Initial and Periodic Cleaning | As needed |
| Periodic Surveillance: | Annual |
| Labeling | None required |
| Restricted Activities | Any activities that may result in the damage or disturbance of the non-friable suspect asbestos-containing vinyl floor tiles and mastic |
| | Avoid sanding or scraping the non-friable suspect asbestos-containing vinyl floor tiles and mastic |

The O&M Program focuses on a special set of work practices for the custodial, maintenance, and construction staff. The nature and extent of any special work practices will be tailored to the likelihood that the ACM will be disturbed and that fibers will be released. In general, four broad categories of O&M work practices are recognized. These categories are listed below and are discussed in sub-sections 6.1 through 6.4.

Worker Protection Programs: These work practices help ensure custodial and maintenance staff are adequately protected from asbestos exposure.
Basic O&M Procedures: These are basic procedures used to perform routine custodial and maintenance tasks that may involve ACM.

Special O&M Cleaning Techniques: These are special techniques to clean up asbestos fibers on a routine basis.
Procedures for Asbestos Fiber Release Episodes: These are procedures used to address the hazards involving the disturbance of moderate to relatively large amounts of ACM.

## 6.1    WORKER PROTECTION PROGRAM

The Worker Protection Program is only necessary if a known ACM is to be disturbed.  If the asbestos content of a material to be disturbed is unknown, then samples should taken prior to the commencement of work and analyzed for asbestos content by an accredited laboratory.

The Worker Protection Program includes engineering controls, personal exposure monitoring, medical surveillance, and personal protection.  While engineering controls are the preferred method of worker protection, there are few engineering control options available for O&M work.  There are two key aspects of personal protection: the use of respiratory protection and the use of protective clothing for workers.  These two key aspects are detailed in subsections 6.1.1 and 6.1.2 below.

### 6.1.1    RESPIRATORY PROTECTION/WORKER PROTECTION PROGRAMS

OSHA regulations require a written respiratory protection program whenever an O&M Program specifies that service workers wear respirators, or where employees are exposed, or are likely to be exposed, to fiber levels above OSHA's "permissible exposure limits" (0.2 fibers per cubic centimeter (f/cc) of air based on an 8-hour time-weighted average sampling period) or the 30-minute "excursion limit" (1.0 f/cc as averaged over a sampling period of 30 minutes).

Proper respiratory protection is an integral part of all custodial and maintenance activities involving potential exposure to asbestos.  When in doubt about exposure during a certain work operation, building owners will provide respiratory protection to custodial and maintenance workers.  OSHA specifies general types of respirators for protection against airborne asbestos during "construction" activities, which include abatement, renovation, maintenance, repair, and remodeling.

When adequate care is taken to prevent or minimize and control fiber release, routine small-scale/short-duration maintenance or custodial tasks are not likely to generate high levels of airborne asbestos compared to large asbestos removal projects.  Therefore, respirators that filter breathing air may be used in these instances.  OSHA, EPA, and NIOSH do not recommend single use, disposable paper dust masks for use against asbestos; in fact, OSHA has disallowed their use against airborne asbestos fibers.

The options that may be used include: a half- or full-face, negative pressure, air-purifying respirator with replaceable high-efficiency filters; or a half- or full-face powered air-purifying respirator (PAPR) with replaceable high-efficiency filters.  This has a battery-powered pump that assists breathing and provides positive pressure in the face piece.

Currently, only respirators approved by NIOSH and the Mine Safety and Health Administration (MSHA) are permitted for use. If they are air purifying respirators, the filtration device(s) must be rated as "high-efficiency."

### 6.1.2 PROTECTIVE CLOTHING/WORKER PROTECTION PROGRAMS

In addition to respirators, some O&M procedures may require workers to wear protective clothing. Most often, protective clothing is disposable and consists of coveralls, a head cover, and foot covers made of a synthetic fabric that does not allow asbestos fibers to pass through. This type of clothing prevents workers' regular clothing from becoming contaminated with asbestos fibers. Contaminated clothing could unknowingly be taken home, creating a possible risk to the worker's family members.

OSHA and EPA regulations require workers to wear protective clothing whenever they are exposed, or likely to be exposed, to fiber levels above OSHA's permissible levels. It is important that workers be properly trained in the use, removal, and disposal of protective clothing after use. All O&M activities may not require the use of protective clothing. It is important for the OMM to assess this need on a case-by-case basis.

## 6.2    BASIC O&M PROCEDURES

These procedures are only necessary if a known ACM is to be disturbed. If the asbestos content of a material to be disturbed is unknown, then samples should taken prior to the commencement of work and analyzed for asbestos content by an accredited laboratory.

Basic O&M procedures to minimize and/or contain asbestos fibers include wet methods, use of mini-enclosures, use of portable power tools equipped with special local ventilation attachments, and avoidance of certain activities, such as sawing, sanding, and drilling ACM.

Special work practices such as wet wiping, area isolation, HEPA vacuuming, and the use of personal protective equipment such as respirators and protective clothing, may be needed where disturbance of ACM is likely. The need for these practices varies with the situation. These work practices and procedures are intended to ensure that disturbances of any ACM during O&M activities are minimized, or carried out under controlled conditions when the disturbance is required by the nature of a specific O&M task.

## 6.3    O&M CLEANING PRACTICES

These procedures are only necessary if a known ACM is to be or has been disturbed and the resulting debris must be cleaned up. If the asbestos content of a material to be disturbed is unknown, then samples should taken prior to the commencement of work and analyzed for asbestos content by an accredited laboratory.

Building owners and custodial and maintenance staff will ensure that special O&M cleaning is done correctly. Proper cleaning is important for the following two reasons:

1) The use of improper techniques to clean up asbestos debris caused by previous deterioration or damage may result in widespread contamination, and potentially increase air-borne asbestos fiber levels in the building.
2) Improper cleaning may cause damage to the ACM, thus releasing more airborne asbestos fibers.

Proper O&M cleaning practices will involve the use of wet cleaning or wet-wiping practices to pick up asbestos fibers. Dry sweeping or dusting can result in asbestos fibers being recirculated into the building's air and therefore will not be used. Once wet clothes, rags, or mops have been used to pick up asbestos fibers, they will be properly discarded as asbestos waste, while still wet. They will not be allowed to dry out, since the collected fibers might be released later when disturbed. The use of special vacuum cleaners, commonly referred to as HEPA vacuums, may be preferable to wet cleaning in certain situations. These vacuums are equipped with filters designed to remove very small particles or fibers (such as asbestos) by filtering those particles from the air passing through the vacuum. Since the exhaust air from an ordinary vacuum cleaner is not filtered sufficiently, it is possible for tiny asbestos fibers to pass through the filter into the building air.

## 6.4    PROCEDURES FOR ASBESTOS FIBER RELEASE EPISODES

These procedures are only necessary if a known ACM has been disturbed. If the asbestos content of a material that was disturbed is unknown, then samples should be taken and analyzed for asbestos content by an accredited laboratory.

Special procedures are generally needed to minimize the spread of fibers throughout the building after asbestos fiber releases occur, such as the partial collapse of an ACM ceiling. These procedures are needed whether the ACM disturbance is intentional or unintentional. EPA regulations for schools define a "major fiber release" as one involving more than three square or linear feet of ACM. Depending on the severity of the episode, asbestos abatement consultants and contractors may be needed to develop a strategy for the cleanup operations.

In general, for major fiber releases, the area will be isolated by closing doors and/or erecting temporary barriers to restrict airflow as well as access to the site. Signs will be posted, as necessary, adjacent to the fiber release site to prevent personnel involved in the cleanup operation from inadvertently entering the area. If asbestos fibers could enter the HVAC system, the system will be modified to prevent fiber entry, or will be shut down and sealed off. The final step will be to employ thorough cleanup procedures to properly control the ACM, careful visual inspection, and final clearance air monitoring to verify satisfactory cleanup.

It is important to recognize that different levels of training are needed for workers involved with fiber release episodes. A major release will generally require "asbestos abatement worker training", rather than the degree of training considered adequate for O&M workers.

# 7.0   WORKER TRAINING

Training is the primary means of educating the maintenance staff in handling the ACM in the building and minimizing potential fiber release during routine maintenance, repair or renovation work in the building.  Training of the building staff that may come into contact with ACM can include AHERA Asbestos Inspector certification, AHERA Management Planner certification, general awareness training, maintenance worker training, asbestos abatement training, or other applicable training as dictated by site conditions.

# 8.0  RECORD KEEPING

Documentation regarding any asbestos-related activities conducted on-site must be maintained.  Examples of applicable documentation are below.

Work records documenting asbestos-related activities

Medical, training, and personal air sampling records of employees

Notification of ACM and other asbestos-related documents and correspondences with tenants, building personnel, contractors, and consultants

Asbestos survey reports, updates, and addendum that reflect the changing condition and amount of ACM on-site

A completed original asbestos waste manifest for any disposed ACM

The written O&M Program shall be maintained indefinitely.

# APPENDIX A

The following example forms can be utilized under this O&M Program:

- Maintenance Work Location Form
- Maintenance Work Authorization Form
- Asbestos Maintenance Closure Form
- Periodic Surveillance Form

# EXAMPLE

| MAINTENANCE WORK LOCATION FORM | |
|---|---|
| **Building:** | **Floor/Area:** |
| **Project Start Date:** | **Completion Date:** |
| **Description Of Work:** | |

| **Field Sketch Of Affected Area** |
|---|
| |

Prior to commencement of maintenance work, this form should be submitted to the OMM and an approved Maintenance Work Authorization Form should be obtained.

# EXAMPLE

## MAINTENANCE WORK AUTHORIZATION FORM

Authorization is given to proceed with the following maintenance work:

_____          Asbestos-containing materials are not present in the vicinity of the
                maintenance work.

_____          ACM is present, but its disturbance is not anticipated.  However, if conditions
                change, the Operations and Maintenance Manager will re-evaluate the work
                request prior to proceeding.

_____          ACM is present and may be disturbed.

<u>If ACM is present,</u> the following work practices shall be employed to avoid or minimize
disturbing asbestos:

<u>If ACM is present,</u> the following equipment/clothes shall be used/worn to protect workers:

Special practices and/or equipment required:

Authorized by:

_____          _____

(Operations & Maintenance Manager)                                        (Date)

# EXAMPLE

| ASBESTOS MAINTENANCE CLOSURE FORM | |
|---|---|
| Building: | Area Involved: |
| Project Start Date & Time: | Completion Date & Time: |
| Description Of Work: | |
| Amount Of Asbestos Disturbed Or Removed (Linear/Square Feet): | |
| ASBESTOS CONTROL METHODS: | |
| Wet Methods | HEPA Vacuum |
| Poly Sheeting | Glove Bags |
| Area Sealed | HVAC Shut Off |
| Warning Signs | HEPA Neg Air Units |
| Persons Performing Work (List By Name): | |
| TYPE OF EQUIPMENT WORN | |
| Tyvek | Respirators |
| Name And Location Of Waste Disposal Site: | |
| Air Sampling: | |
| THE FOLLOWING ITEMS ARE TO BE ATTACHED (check those that apply) | |
| Permit To Perform Work | Air Sampling Results |
| Landfill Receipts | Other Info. (I.E. Photos) |

| Signature Of Abatement Supervisor Or Industrial Hygienist | Date |
|---|---|
| Signature Of Operations And Maintenance  Manager | Date |

# EXAMPLE

| PERIODIC SURVEILLANCE FORM | | | |
|---|---|---|---|
| Name: | | | |
| **Material:** | **Condition:** | **Location and use** | **Differences from previous inspection** |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

# APPENDIX B

List of applicable rules and regulations

Code of Federal Regulations - Title 29
- Part 1910, Section 134, (respiratory protection).
- Part 1926, Section 58 (Occupational Exposure to Asbestos, Tremolite, Anthopyllic and Actinolite Final Rule).
- Part 1910, Section 2 (Access to Employee Medial Records).
- Part 1910, Section 1200n (Hazardous Communication).
- Part 1910 Section 145 (Specification for Accident Prevention Signs and Tags)

Code of Federal Regulations - Title 40
- Part 61, Subpart M, (National Emissions Standards for Asbestos).
- Part 61, (National Emission Standards for Hazardous Air Pollutant; Asbestos NESHAP Revision).
- Part 763, Subpart F (Friable Asbestos-Containing Materials in Schools).
  Appendix A - Interim Method of the Determination of Asbestos in Bulk Insulation Samples.

Local and State Regulations

# APPENDIX C

United States Environmental Protection Agency (USEPA) guidance document "Managing Asbestos In-Place, A Building Owner's Guide to Operations and Maintenance Programs for Asbestos-Containing Materials."

United States    Pesticides and Toxic Substances    20T-2003
Environmental Protection    (TS-799)    July 1990
Agency



☆EPA

# Managing Asbestos In Place

A Building Owner's Guide to Operations and Maintenance Programs for Asbestos-Containing Materials

♲ Printed on Recycled Paper

# Managing Asbestos In Place

A Building Owner's Guide to
Operations and Maintenance Programs
for Asbestos-Containing Materials



# Contents

ACKNOWLEDGEMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

FOREWORD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

### 1. WHY IS ASBESTOS A PROBLEM?

Introduction and Overview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
- Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
- Chapter Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

### 2. WHAT IS AN O&M PROGRAM?

Purpose and Scope of an Operations and Maintenance program . . . . . . . . . . . . . . . . . . . . . . . 5
- Purpose of O&M Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
- Scope of an O&M Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
- Chapter Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

### 3. HOW DOES THE PROGRAM START?

Laying the Foundation for an Effective O&M Program . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
- The Asbestos Program Manager . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
- BuildingInspectionandAssessment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
- Developing an O&M Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
- IrnplementingandManaging an O&M
  Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
- Cost Considerations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9
- Selectingandhnplementing Alternative Abatement Actions . . . . . . . . . . . . . . . . . . . . . . . 9
- Chapter Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

### 4. WHAT DOES AN O&M PROGRAM INCLUDE?

O&M Program Elements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12
- Informing Building Workers, Tenants, and Other Occupants . . . . . . . . . . . . . . . . . . . . . . .12
- ACMSurveiUance-Reirwectionand Periodic Surveillance . . . . . . . . . . . . . . . . . . . . . . . .14
- Supplement to Visual/Physical Evaluation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14
- WorkControl/Permit System . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
- O&M Work Practices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16
  - Worker protection programs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17
  - Basic O&M Procedures. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
  - O&M Cleaning Practices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
  - Procedures for Asbestos Fiber Release Episodes . . . . . . . . . . . . . . . . . . . . . . . . . . 20
- Recordkeeping . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
- Chapter Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

### 5. WHAT O&M TRAINING IS NECESSARY?

Types of Training . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2 3
- Chapter Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .25

## 6. WHAT REGULATIONS AFFECT ASBESTOS MANAGEMENT PROGRAMS IN BUILDINGS, ESPECIALLY O&M PROGRAMS?

Federal, State, and Local Regulations Affecting O&M Programs. . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
- OSHA Regulations &EPA Worker Protection Rule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
   –Small-scale, Short-duration Projects . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
- EPA National Emission Standards for Hazardous Air Pollutants (NESHAP) Regulations. . . . 27
   –Notification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
   –Emissions Control and Waste Disposal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
- Resource Conservation and Recovery Act (RCRA); Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA, or "Superfund") . . . . . . . . . . . . . . . . . . . . . . . . . 28
- Asbestos Hazard Emergency Response  Act (AHERA) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
- Asbestos Ban and Phaseout Rule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
- Chapter Summary  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

## APPENDIX  A.
Glossary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

## APPENDIX B.
Sample Recordkeeping Forms  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

## APPENDIX C.
Illustrative Organzation Charts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

## APPENDIX D.
Additional Assistance (EPA, NESW, OSHA; Training ) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

## APPENDIX E.
Respiratory Protection Recommendations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

## APPENDIX F.
Existing EPA Guidance For ACM Control . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

## APPENDIX G.
Sample List: Suspect Asbestos-Containing Materials. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

## APPENDIX H.
References . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .40

**DISCLAIMER**

This document was prepared under contract to an agency of the United States Government. Neither the United States Government nor any of their employees makes any warranty, expressed or implied, or assume any legal liability for any third party's use of or the results of such use of any information, product, or process discussed in this document. Mention or illustration of company or trade names, or of commercial products does not constitute endorsement by the U.S. Environmental Protection Agency.

# Acknowledgements

**The time and effort** that many individual contributed to the development of this document is gratefully acknowledged by the U.S. Environmental Protection Agency (EPA). The material in this publication represents EPA's approximately 11 years of experience in considering public input and fine tuning policies on managing asbestos-containing materials in buildings. This document incorporates views expressed by safety and health professionals, property owners and managers, public officials, general industry representatives, workers, and the general public.

The primary EPA developer and coordinator of the final document was Dr. Robert Jordan of the Technical Assistance Section, Environmental Assistance Division, Office of Toxic Substances. Without Bob's constant oversight, combined with his technical knowledge and concern that the document be representative of state-of-the-art asbestos management, this document would not have reached the public.

Joe Schechter, Chief of the Technical Assistance Section, managed the project and helped clarify and edit the Guide. Bob McNally Chief of the Assistance Programs Development Branch, was instrumental in the formative period of the Guide's development and also devoted long hours to its review Other important contributions within the Environmental Assistance Division came from Tom Tom and Dave Kling. Sylvia Thomas provided necessary assistance in revisions of the early drafts. Esther Tepper and Jane Gurin helped review the Guide in its final revisions, to make sure the document was written in easy-to-understand language.

The original work which provided the foundation for the project was performed under a contract with Battelle Memorial Institute (No. 68-02-4294) by Dr. Dale Keyes and Dr. Jean Chesson, under the direction of Edie Sterrett and Cindy Stroup of the EPA Exposure Evaluation Division. They prepared the first drafts of the document and were instrumental in establishing its final format.

EPA staff also gratefully acknowledge the work of staff from the Georgia Tech Research Institute (GTRI). Through a cooperative agreement with EPA they served as the overall project coordinator and provided thoughtful technical guidance throughout this entire process. The GTRI team also developed several key sections of the Guide.

This publication was refined through a peer review meeting held in October 1988 in Washington, DC, and by a series of comment periods provided through May 1990. The following individuals gave their time and provided comments:

John Biechman, *Safe Buildings Alliance*
Wolfgang Brandner, *U.S. EPA Region VII*
Frank Bull, *Bull, Brown & Kilgo Architects*
Eva Clay *The Environmental Institute*
William Cobbs, *U.S. General Services Administration*
Mark Demyanek, *Georgia Tech Research Institute*
Michael Duffy, *Service Employees International Union*
Paul Fidducia, *Winston and Strawn*
Eugene Fisher, *Association of Wall and Ceiling Industries*
Douglas Greenaway *Consultant (formerly, Building Owners and Managers Association International)*
David Harris, *National Institute of Building Sciences*
Steve Hays, *Gobbell Hays Partners*
Joseph Hopkins, *U.S. Department of Energy*
David Mayer, *Georgia Tech Research Institute*
Richard Mendes, *New York City Department of Environmental Protection*
Michael Miles, *Tishman Spyer Properties*
Roger Morse, *ENTEK Environmental and Technical Services, Inc.*
Robert Navratil, *RREEF Funds, Construction and Engineering*
Anthony Restaino, *U.S. EPA Region V*
Richard Roth, *Social Security Administration*
Sims Roy, *U.S. EPA, Office of Air Quality Planning and Standards*

Scott Schneider, *Workers' Institute for Occupational Safety and Health*
Henry Singer, *U.S. General Services Administration*
Thomas Warren, *Rose Associates, Inc.*

In addition to these individuals, the EPA acknowledges the contribution of the Policy Dialogue Group on Asbestos in Public and Commercial Buildings, which met several times during 1989–1990. The purpose of *this* multidisciplinary group was to identify the problems associated with asbestos in public and commercial buildings and to develop policy recommendations for solving these problems. Many comments raised by the Dialogue Group in the area of asbestos management were incorporated into this document.

# Foreword

**In February 1988, the** Administrator of the Environmental Protection Agency (EPA) recommended to Congress that the Agency work during the next three years to enhance the nation's technical capability in asbestos by helping building owners better select and apply appropriate asbestos control and abatement actions in their buildings. The publication of this guidance document is EPA's most extensive effort to date to carry out that recommendation. In fact, *Managing Asbestos In Place* is the most comprehensive asbestos guide published by EPA since the Agency expanded and updated *Guidance for Controlling Asbetos-Containing Materials in Buildings (also known as the* Purple Book) in June 1985. Based on the insights and recommendations of nationally recognized asbestos experts, this new guide, along with a new operations and maintenance work practices manual expected to be available in 1991, provides "state-of-the-art" instruction to building owners to help them successfully manage asbestos-containing materials in place.

*Managing Asbestos in Place* does not supplant the 1985 Purple Book as EPA's principal asbestos guidance document. Rather, based on our experience since 1985, it expands and refines the Purple Book's guidance for a special operations and maintenance (O&M) program. In particular, the guide more strongly emphasizes the importance of in-place management. The guide's purpose is two-fold. First, it offers building owners the more detailed and up-to-date instruction they need to carry out a successful O&M program. Second, it informs building owners, lenders, and insurers that a properly conducted O&M program can in many cases be as appropriate an asbestos control strategy as removal. Furthermore, in some cases, an O&M program is more appropriate than other asbestos control strategies, including removal.

Emphasizing the importance and effectiveness of a good O&M program is a critical element of EPA's broader effort to put the potential hazard and risk of asbestos exposure in proper perspective. That effort centers around communicating the following jive *facts,* which EPA hopes will help calm the unwarranted fears that a number of people seem to have about the mere presence of asbestos in their buildings and discourage the spontaneous decisions by some building owners to remove all asbestos-containing material regardless of its condition.

**FACT ONE: Although asbestos is hazardous, the risk of asbestos-related disease depends upon exposure to airborne asbestos fibers.**

In other words, an individual must breathe asbestos fibers in order to incur any chance of developing an asbestos-related disease. How many fibers a person must breathe to develop disease is uncertain. However, at very low exposure levels, the risk maybe negligible or zero.

**FACT TWO: Based upon available data, the average airborne asbestos levels in buildings seem to be very low. Accordingly, the health risk to most building occupants also appears to be very low.**

A 1987 EPA study found asbestos air levels in a small segment of Federal buildings to be essentially the same as levels outside these buildings. Based on that limited data, most building occupants (i.e., those unlikely to disturb asbestos-containing building materials) appear to face only a very slight risk, if any, of developing an asbestos-related disease.

**FACT THREE:** Removal is often not a building owner's best course of action to reduce asbestos exposure. In fact, an improper removal can create a dangerous situation where none previously existed.

By their nature, asbestos removals tend to elevate the airborne level of asbestos fibers. Unless all safeguards are properly applied, a removal operation can actually increase rather than decrease the risk of asbestos-related disease.

**FACT FOUR:** EPA *only* requires asbestos removal in order to prevent significant public exposure to airborne asbestos fibers during building demolition or renovation activities.

Asbestos removal before the wrecking ball swings into action is appropriate to protect public health. At other times, EPA believes that asbestos removal projects, unless well-designed and properly performed, can actually increase health risk.

**FACT FIVE:** EPA *does* recommend a pro-active, in-place management program whenever asbestos-containing material is discovered.

As this guide will explain in some detail, in-place management does *not* mean "do nothing." It means having a program to ensure that the day-to-day management of the building is carried out in a manner that minimizes release of asbestos fibers into the air, and ensures that when asbestos fibers are released, either accidentally or intentionally proper control and cleanup procedures are implemented. As such, it may be all that is necessary to control the release of asbestos fibers, until the asbestos-containing material in a building is scheduled to be disturbed by renovation or demolition activities.



MANAGING ASBESTOS IN PLACE

# 1

# Why Is Asbestos a Problem?

**Introduction: Asbestos in Buildings**

**This U.S. Environmental Protection Agency (EPA)** guide is primarily directed to owners and managers of office buildings, shopping centers, apartment buildings, hospitals, and similar facilities which may contain asbestos materials. Managers of industrial plants and other types of structures may need to supplement this information with additional specialized guidance. This document gives building owners, managers, workers, and other key building staff basic information on how to develop and carry out high-quality operations and maintenance programs for managing asbestos in place to safeguard the health of all building occupants. An operations and maintenance (O&M) program can be defined as a formulated plan of training, cleaning, work practices, and surveillance to maintain asbestos-containing materials (ACM) in good condition.

In this document you will find the following information:

The objectives of an O&M program, and an indication of the scope of O&M activities (Chapter 2);

Basic steps to take before starting an O&M program, including an initial survey and evaluation of ACM (Chapter 3);

How to implement and manage the program, including some basic cost considerations (Chapter 3);

O&M work practices that protect both workers and the general building environment (Chapter 4);

Recordkeeping suggestions and requirements (a section of Chapter 4);

Training recommendations and requirements for workers performing O&M activities (Chapter 5); and

An overview of federal regulations, including those affecting O&M programs (Chapter 6).

In addition, the Appendices provide other useful information, including a glossary of useful terms, and contacts for additional assistance.

**How O&M Fits In**

There are steps which a building owner can take to prevent asbestos fiber releases or resuspension of already-released fibers, or control fiber releases quickly and safely if they occur. O&M programs are designed to achieve both these goals. This guide's purpose, therefore, is to inform building owners about how to develop, implement and manage effective O&M programs, and to encourage their use.

EPA recommends a pro-active, in-place management program whenever asbestos is discovered. In many buildings, a well-run O&M program may be all that is necessary to control the release of asbestos fibers until the ACM in the building is abated through renovation or demolition activities. Also, an emergency repair to equipment or building services, or an unexpected incident such as ACM falling from a surface could necessitate a different control strategy However, barring such events, if ACM is properly managed, release of asbestos fibers into the air is minimized. The exposure to asbestos fibers, and therefore the risk of asbestos-related disease, can be reduced to a negligible level for all building occupants.

An O&M program may also provide an effective, less costly alternative to wholesale removal operations. Some additional cost-related considerations are discussed in Chapter 3.

The EPA National Emission Standards for Hazardous

*An O&M program can be defined as a formulated plan of training, cleaning, work practices, and surveillance to maintain asbestos-containing materials in good condition.*

1

Air Pollutants (NESHAP) regulations on asbestos may require ACM removal prior to renovation and/or demolition projects, to prevent significant asbestos releases into the air (see Chapter 6). Additionally removal of some ACM in a building will be necessary if the material has been damaged beyond repair. *However,* at other times, removal is often *not* a building owner's best course of action to reduce asbestos exposure. (Extraneous factors –for example, difficulty in obtaining insurance, or obtaining financing relative to a real estate transaction-may actually represent the driving forces in a decision to remove all ACM, rather than a health-based need for removal.) In fact, unless all safeguards are properly applied by trained, experienced individuals, removing ACM can actually increase building occupants' risk of asbestos-related disease.

# Background

### The Asbestos Issue

Asbestos fibers can cause serious health problems. If inhaled. they can cause diseases which disrupt the normal functioning of the lungs. Three specific diseases–asbestosis (a fibrous scarring of the lungs), lung cancer, and mesothelioma (a cancer of the lining of the chest or abdominal Cavity) -have been linked to asbestos exposure. These diseases do not develop immediately after inhalation of asbestos fibers; it may be 20 years or more before symptoms appear.

In general, as with cigarette smoking and the inhalation of tobacco smoke, the more asbestos fibers a person inhales, the greater the risk of developing an asbestos-related disease. Most of the cases of severe health problems resulting from asbestos exposure have been experienced by workers who held jobs in industries such as shipbuilding, mining, milling, and fabricating, where they were exposed to very high levels of asbestos in the air, without benefit of the worker protections now afforded by law Many of these same workers were also smokers. These employees worked directly with asbestos materials on a regular basis and, generally for long periods of time as part of their jobs. Additionally there is an increasing concern for the health and safety of construction, renovation, and building maintenance personnel, because of possible periodic exposure to elevated levels of asbestos fibers while performing their jobs.

Whenever we discuss the risk posed by asbestos, we must keep in mind that asbestos fibers can be found nearly everywhere in our environment (usually at very low levels). There is, at this time, insufficient information concerning health effects resulting from low-level asbestos exposure, either from exposures in buildings or from our environment. This makes it difficult to accurately assess the magnitude of cancer risk for building occupants, tenants, and building maintenance and custodial workers. Although in general the risk is

likely to be negligible for occupants, health concerns remain, particularly for the building's custodial and maintenance workers. Their jobs are likely to bring them into close proximity to ACM, and may sometimes require them to disturb the ACM in the performance of maintenance activities. For these workers in particular, a complete and effective O&M program can greatly reduce asbestos exposure. This kind of O&M program can also minimize asbestos exposures for other building occupants as well.

### What is Asbestos?

The term "asbestos" describes six naturally occurring fibrous minerals found in certain types of rock formations. Of that general group, the minerals chrysotile, amosite, and crocidolite have been most commonly used in building products. When mined and processed, asbestos is typically separated into very thin fibers. When these fibers are present in the air, they are normally invisible to the naked eye. Asbestos fibers are commonly mixed during processing with a material which binds them together so that they can be used in many different products. Because these fibers are so small and light, they may remain in the air for many hours if they are released from ACM in a building. When fibers are released into the air they may be inhaled by people in the building.

Asbestos became a popular commercial product because it is strong, won't burn, resists corrosion, and insulates well. In the United States, its commercial use began in the early 1900's and peaked in the period from World War II into the 1970's. Under the Clean Air Act of 1970 the EPA has been regulating many asbestos-containing materials which, by EPA definition, are materials with more than 1 percent asbestos. The Occupational Safety and Health Administration's (OSHA) asbestos construction standard in section K, "Communication of hazards to employees," specifies labeling many materials containing 0.1% or more asbestos. In the mid-1970's several major kinds of asbestos materials, such as spray-applied insulation, fireproofing, and acoustical surfacing material, were banned by EPA because of growing concern about health effects, particularly cancer, associated with exposures to such materials.

In July 1989, EPA promulgated the Asbestos Ban and Phasedown Rule. The rule applies to new product manufacture, importation, and processing, and essentially bans almost all asbestos-containing products in the United States by 1997. This rule does *not* require removal of ACM currently in place in buildings.

### Where is Asbestos Likely to be Found in Buildings?

In February 1988, the EPA released a report titled *EPA Study of Asbestos-Containing Materials in Public Buildings: A Report to Congress.* EPA found that "friable" (easily crumbled) ACM can be

found in an estimated 700,000 public and commercial buildings. About 500,000 of those buildings are believed to contain at least some damaged asbestos, and some areas of significantly damaged ACM can be found in over half of them.

According to the EPA study significantly damaged ACM is found primarily in building areas not generally accessible to the public, such as boiler and machinery rooms, where asbestos exposures generally would be limited to service and maintenance workers. Friable ACM, if present in air plenums, can lead to distribution of the material throughout the building, thereby possibly exposing building occupants. ACM can also be found in other building locations.

Asbestos in buildings has been commonly used for thermal insulation, fireproofing, and in various building materials, such as floor coverings and ceiling tile, cement pipe and sheeting, granular and corrugated paper pipe wrap, and acoustical and decorative treatment for ceilings and walls. Typically it is found in pipe and boiler insulation and in spray-applied uses such as fireproofing or sound-deadening applications.

The amount of asbestos in these products varies widely (from approximately 1 percent to nearly 100 percent). The precise amount of asbestos in a product cannot always be accurately determined from labels or by asking the manufacturer. Nor can positive identification of asbestos be ascertained merely by visual examination. Instead, a qualified laboratory must analyze representative samples of the suspect material. Appendix G contains a sample list of some suspect materials.

### When is Asbestos a Problem?

The mere presence of asbestos in a building does not mean that the health of building occupants is endan-



ACM which is in poor physical condition. Under a proper operations and maintenance program, corrective action would normally prevent deterioration of the insulation.

Intact and undisturbed asbestos materials do not pose a health risk.

gered. ACM which is in good condition, and is not somehow damaged or disturbed, is not likely to release asbestos fibers into the air. When ACM is properly managed, release of asbestos fibers into the air is prevented or minimized, and the risk of asbestos-related disease can be reduced to a negligible level.

However, asbestos materials can become hazardous when, due to damage, disturbance, or deterioration over time, they release fibers into building air. Under these conditions, when ACM *is* damaged or disturbed–for example, by maintenance repairs conducted without proper controls — elevated airborne asbestos concentrations can create a potential hazard for workers and other building occupants.



ACM with sound structural integrity on the exterior of a domestic hot water tank. Note that the insulation jacketing is intact and there is no evidence of disturbance.

3

# Chapter Summary

This document, directed to owners and managers of office buildings and similar facilities, should help lay the ground work for developing and implementing effective operations and maintenance programs. Major highlights in this section have focused on background information concerning asbestos and have touched on the current asbestos-in-buildings situation. Important points to remember are the following:

● Inhalation of asbestos fibers has been shown to cause asbestosis, lung cancer and meso-thelioma. Much of our knowledge of these health effects has come primarily from studies of workers exposed routinely to very high levels of asbestos in their jobs,

● Information health effects of low-level asbestos exposure is less certain; custodial/maintenance workers who sometimes disturb asbestos as part of their job would benefit from properly executed O&M programs.

● Three of the six naturally occurring asbestos minerals, chrysotile, amosite, and crocidolite, have been most commonly used in building products.

● Asbestos became a popular commercial product because of its strength, heat resistance, corrosion resistance, and thermal insulation properties.

● Asbestos-containing materials (ACM) are regulated by EPA, OSHA, and the Consumer Product Safety Cornmission (CPSC), and individual state and local agencies.

● Friable ACM can be found in about 700,000 public and commercial buildings. Many areas where asbestos is found are not accessible to the general public.

● Some common uses of asbestos have included pipe/boiler insulation, spray-applied fireproofing, floor and ceiling tile. cement pipe/sheeting and paper pipe wrap.

● Positive identification of asbestos requires laboratory analysis; information on labels or visual examination only is not sufficient.

● Intact, undisturbed materials generally do not pose a health risk; they may become hazardous when damaged, disturbed, or deteriorated over time and release fibers into building air.

4



MANAGING ASBESTOS IN PLACE

# 2 What Is an O&M Program?

## Purpose and Scope of an Operations and Maintenance Program

## Purpose of O&M

**The principal objective of an O&M program** is to minimize exposure of all building occupants to asbestos fibers. To accomplish this objective, an O&M program includes work practices to (1) maintain ACM in good condition, (2) ensure proper cleanup of asbestos fibers previously released, (3) prevent further release of asbestos fibers, and (4) monitor the condition of ACM.

## Scope of an O&M Program

An effective O&M program should address all types of ACM present in a building. ACM that maybe managed as part of an O&M program in buildings can be classified in one of the following categories:

1 **Surfacing Material:** Examples include ACM sprayed or troweled onto surfaces, such as decorative plaster on ceilings or acoustical ACM on the underside of concrete slabs or decking, or fireproofing materials on structural members.

2 **Thermal System Insulation (TSI):** Examples include ACM applied to pipes, boilers, tanks, and ducts to prevent heat loss or gain, or condensation.

3 **Miscellaneous ACM:** Examples include asbestos-containing ceiling or floor tiles, textiles, and other components such as asbestos-cement panels, asbestos siding and roofing materials.

The O&M program, when developed and implemented in a particular facility should include specific direction on how to deal with each of these general categories of ACM. Specified O&M work practices and procedures should be employed by trained personnel during building cleaning, maintenance, renovation, and general operational activities that may involve surfacing, thermal, or miscellaneous ACM. Some elaboration of O&M work practices and procedures is found in Chapter 4.

The O&M program can be divided into three types of projects

- those which are unlikely to involve any direct contact with ACM;

- those which may cause accidental disturbance of ACM;

- those which involve relatively small disturbances of ACM.

The first type may involve routine cleaning of shelves and counter tops or other surfaces in a building (provided ACM debris is not present). Generally such

An example of spray-applied surfacing ACM on a metal deck above a suspended ceiling.



An example of as-bestos-containing thermal system insulation on pipes in a building's mechanical room.

activities would not be expected to disturb ACM. The second type of project could include maintenance work above a suspended ceiling in an area that may have surfacing ACM overhead. The third type of project—small-scale, shor-duration maintenance, repair, or installation projects involving minor disturbances of ACM – includes activities such as installation of new light fixtures on or in an ACM ceiling. A single glovebag operation to remove a small amount of ACM to repair a pipe in a boiler room is another example of intentional small-scale, short-duration disturbance.



Larger projects involving more complex procedures for the intentional removal of ACM are considered asbestos abatement projects. These require asbestos control and abatement procedures that are outside the scope of an O&M program. Before taking action, building owners should consult qualified professionals for advice and alternative solutions. Guidance for building owners on the management of abatement projects is included in EPA's "Guidance for Controlling Asbestos-Containing Materials in Buildings" June 1985, also known as the "Purple Book."

An example of an asbestos-containing cement sheet product (miscellaneous ACM).



## Chapter-Summary

The purpose of an operations and Maintenance Program is to minimize exposure of all building occupants to asbestos fibers. Through supervised work practices, ACM can be managed in place. Important points to remember are:

ACM can be classified into three categories:

● Surfacing   Material

● Thermal  System  Insulation  (TSI)

● Miscellaneous   Material

O&M Programs can be divided into three types of project%

● Unlikely to involve direct contact with ACM.

● Accidental disturbance of ACM.

● Small-scale,  short-duration  maintenance  or repair activity which may involve intentional disturbance of ACM.



MANAGING ASBESTOS IN PLACE

# 3

# How Does the Program Start?

## Laying the Foundation for an Effective O&M Program

**A comprehensive asbestos control program** for a building should include these basic steps:

- Appoint an Asbestos Program Manager and develop an organizational policy

- Conduct a physical and visual inspection of the building and take bulk samples of suspect materials to determine if ACM is present, establish an ACM inventory and assess the ACM's condition and potential for disturbance.

- If ACM is located, develop an O&M program, based on the inspection and assessment data.

- Implement and manage the O&M program conscientiously

- Select and implement abatement actions other than O&M when necessary

This chapter provides information about each of these basic steps. In addition, see Appendix F for a chart of references outlining existing EPA guidance for each of these steps.

## The Asbestos Program Manager

The position of Asbestos Program Manager (APM) is frequently held by the building engineer, superintendent, facilities manager, or safety and health director. In a small organization, the building owner may have this role. Regardless of who holds this position, EPA stresses the need for the Asbestos Program Manager to be properly qualified, through training and experience, and to be *actively involved* in all asbestos-control activities. EPA accreditation under the Asbestos Hazard Emergency Response Act (AHERA) or state certification as a Building Inspector/Management Planner would be typical of the requisite training.

If the person selected is not adequately prepared, he or she should receive the training necessary to develop and manage an asbestos control program prior to beginning

the job. If for some reason this is not possible, the building owner should strongly consider hiring a properly trained, experienced, and credentialed outside consultant or firm to provide direction to the owner or the Asbestos Program Manager.

In general, the Asbestos Program Manager should have the authority to oversee all asbestos-related activities in the building, including inspections, O&M activities, and other abatement actions. The Asbestos Program Manager will either train building workers in O&M techniques or ensure that such worker training takes place. In addition, he or she should oversee the custodial and maintenance staffs, contractors, and outside service vendors with regard to all asbestos-related activities.

## Building Inspection and Assessment

To determine whether an asbestos control and management program should be implemented, the owner should have an initial building inspection performed to locate and assess the condition of all ACM in the building. A trained, experienced and qualified inspector, who is able to perform the sampling of suspect ACM for laboratory analysis, should conduct the inspection. If an inspection is not performed, then certain suspect materials should be assumed to contain asbestos, and treated accordingly (Refer to Appendix G for a sample list of suspect ACM.)

EPA guidance on how to take "bulk" samples of suspect ACM is contained in several publications (see Appendix H) and from EPA Regional Asbestos Coordinators (listed in Appendix D).

The building inspection by a qualified professional serves as the basis for establishing an effective overall plan for dealing with the asbestos in the building. The inspector should advise the owner and the Asbestos

**To determine whether an asbestos control and management program should be implemented, the owner should have an initial building inspection performed to locate and assess the condition of all ACM in the building.**



A properly trained and protected building inspector collecting a bulk sample of suspected asbestos-containing thermal system insulation.

ant should develop the O&M program. The written O&M program should state clearly the O&M policies and procedures for that building, identify and describe the administrative line of authority for that building, and should clearly define the responsibilities of key participants, such as the Asbestos Program Manager and custodial and maintenance supervisors and staff. The written O&M program should be available and understood by all participants involved in the management and operations of the building.

In general, the O&M program developed for a particular building should include the O&M program elements discussed in the next chapter. However, the building owner should make sure that the O&M program developed is site-specific and tailored for the building. The O&M program should take into account use, function, and design characteristics of a particular building.

## Implementing and Managing an W&M Program

A well-developed O&M program is ineffective unless the building owner is committed to implementing it properly The building owner should convey this commitment to key personnel involved in a building's management and operations — particularly the Asbestos program Manager and custodial and maintenance supervisors and staff. The O&M program's success is contingent upon key personnel understanding the O&M program and committing themselves to implementing it effectively

To the greatest extent possible, the building owner should incorporate the O&M program into the existing system for managing a building's operations. Each building owner, therefore, will determine the appropriate organizational structure on a case-by-case basis. Two possible arrangements are suggested in Figures 1 and 2 in Appendix C.

When managing an O&M program, the Asbestos Program Manager should oversee all asbestos-related activities. In instances where a building owner hires a contractor to perform custodial and maintenance work, the Asbestos Program Manager should ensure that the contractor is qualified to conduct work that may involve ACM. Before hiring a contractor, the Asbestos Program Manager should investigate to determine whether the contractor's staff is qualified, trained and equipped to deal with O&M asbestos activities. Thoroughly checking the references of a contractor is a good recommended practice.

The Asbestos Program Manager should also monitor the work performed in the building by other contractors, such as electricians and plumbers, who might inadvertently disturb ACM. Instituting a work permit system, as discussed in the next chapter, may prevent accidental disturbances of ACM. Under this system, a

program Manager of inspection findings. Of course, the inspection may show that ACM is *not* present and that an asbestos-control program is not required.

If ACM *is* found, the material's characteristics, condition, quantity and location within the building, as well as building use, will affect how the building owner should deal with the ACM. For example, operations and maintenance procedures may be appropriate and sufficient in a particular building for ACM in good condition. But O&M procedures alone are not sufficient for ACM that the inspector determines is significantly damaged, and may not be sufficient for some types of ACM situated in highly accessible areas; in these instances, some form of full scale abatement — repair, encapsulation, enclosure, encasement, or removal – will be necessary Removal of the ACM may also be appropriate when performed in conjunction with major building renovations, or as part of long-term building management policies (such as staged removal in conjunction with renovation over the life of the building, as covered by the EPA NESHAP requirements for removal before demolition or renovation).

## Developing an O&M Program

If ACM is found, the building owner should have an O&M program developed as soon as possible. Either the Asbestos Program Manager or a qualified consult-

contractor must receive a work permit from the Asbestos Program Manager before commencing work. At that time, the Asbestos Program Manager will inform the contractor whether the project could disturb ACM and provide any special instructions to make sure the work is done properly *Communication between the Asbestos Program Manager and tenants occupying the building is essential to prevent activities that might compromise the O&M program.*

In addition, the Asbestos Program Manager should routinely and frequently check the work being performed in the building by contractors and custodial and maintenance staff to see if their work is disturbing ACM. By maintaining close surveillance over these activities, the Asbestos Program Manager can help ensure that work which may disturb ACM is being done safely Tenants should be required (by legal agreement or understanding) to notify the building owner or the Asbestos Program Manager before conducting even small planned renovations. This would help prevent building tenants from unknowingly disturbing ACM. For both the work permit system and the renovation notification requirement, clear and effective communications to workers and tenants are crucial to the success of the O&M management program.

The Asbestos Program Manager should periodically review the written O&M plan to determine whether it should be updated. For example, if all ACM were removed from some areas of the building during a recent renovation, or if some ACM was damaged, the O&M program should be revised accordingly The O&M program should remain in effect as long as there is ACM present in the building.

**Cost Considerations** The costs associated with implementing and managing an O&M program may vary significantly depending on the types-of ACM, building-specific factors, actual O&M procedures adopted, types of equipment used, and the useful life of the building. Owners may find it more cost-effective to continue a well-supervised and managed O&M program than to incur the costs of immediate, large-scale removal. In addition to the direct costs of removal, other costs related to ACM removal include moving building occupants, arranging alternative space for building occupants during the removal work, and restoring the building after the removal is completed.

Clearly many factors enter into the decision. Only by conducting a cost-effectiveness analysis of the long-term options (e.g., comparing (a) immediate removal with (b) phased removal plus O&M with (c) removal just before demolition plus lifetime O&M) will owners be truly able to determine which option is most cost-effective for their buildings. The prudent owner may need to consult one or more qualified consultants or firms for advice, if such expertise does not exist within the owner's organization,

# Selecting and Implementing Alternative Abatement Actions

In some instances, due to the condition of ACM or upcoming building renovations, a building owner may decide to take other abatement actions to deal with ACM in the building. These response actions could include encapsulation (covering the ACM with a sealant to prevent fiber release), enclosure (placing an air-tight barrier around the ACM), encasement (covering the ACM with a hard-setting sealing material), repair, or removal of the ACM. Qualified, trained, and experienced contractors should be used for any of these actions. EPA's Purple Book discusses most of these alternatives in some detail. In general, repair, encapsulation, enclosure, and encasement, are intended to help prevent the release of asbestos fibers. As aspects of O&M, these techniques manage ACM in place. See Appendix F of this document for additional federal reference sources on asbestos response actions.

When determining which response alternative to select, the building owner and Asbestos Program Manager may consider seeking advice from qualified, independent consultants with specific training and experience in asbestos management.

Asbestos consultants should have a background in engineering, architecture, industrial hygiene, safety, or a similar field. Experts who are Registered and/or with Board Certified backgrounds are recommended. *To help ensure that no "conflict of interest" exists, consultants should not be affiliated with the abatement contractors who may be used on a recommended ACM control project, nor with analytical laboratories which perform sample analyses.* As with other similar business decisions, building owners should interview several consultants and check references.

Renovations (including remodeling or redecorating) of buildings or replacement of utility system increases the potential for disturbing ACM. Before conducting any renovation or remodeling work, the building owner should have the Asbestos Program Manager review asbestos inspection and assessment records to determine where ACM may be located, visually reinspect the area, and evaluate the likelihood that ACM will be disturbed. Any suspect or assumed ACM that could be disturbed during the renovation work should either be sampled and analyzed to determine whether it contains asbestos, or the work be carried out as if the materials did contain asbestos. The Asbestos Program Manager should also ensure that no new ACM is introduced into the building as part of the renovation work.

Removal of the ACM before renovation begins maybe necessary in some instances. Removal is required by the Asbestos NESHAP regulations for projects which would break up more than a specified minimum amount of ACM; specifically at least 160 square feet of surfacing

**Renovations (including remodeling or redecorating) of buildings or replacement of utility systems increase the potential for disturbing ACM.**



Asbestos-containing thermal system insulation which has sustained significant damage in a mechanical/boiler room of a building.

or miscellaneous material or at least 260 linear feet of thermal system insulation (40 CFR 61.145-147). Building owners and managers are encouraged to contact their state or local health or environmental department for further clarification of these requirements (also, see Chapter 6 of this document). It is important to ensure that new materials placed in the building do not contain asbestos in order to comply with the recent EPA Asbestos Ban and Phase Out rule (see Chapter 6).

In general, building owners should thoroughly consider any decision to remove ACM. *O&M, encapsulation, encasement, enclosure, or repair may be viable alternatives to removal.* Building owners should assess these in-place management techniques carefully before deciding to remove undamaged ACM.

Under certain circumstances, however, such as when some ACM must be removed during building renovations, when the ACM has sustained a great deal of damage, or ACM disturbance will be difficult to manage properly the building owner may decide to remove ACM in parts of the building.

When removal must occur, only qualified, trained and experienced project designers and contractors should be permitted to design and perform the work. Building owners might consider contacting local, state, and federal asbestos regulatory agencies to see if prospective contractors have received citations for violating asbestos regulations in the past. In addition, if the building owner and Asbestos Program Manager are not properly qualified themselves, they should retain a qualified and independent project designer and a project monitor with training and experience in asbestos abatement to oversee and ensure that the asbestos abatement work is done safely. When these precautions are taken, asbestos removal is more likely to proceed safely and effectively

Proper completion of the ACM removal is best evaluated by means of the analytical procedures using transmission electron microscopy (TEM). (These are described in 40 CFR Part 763, Appendix A to Subpart E.) Clearance protocols for statistically comparing asbestos fiber levels inside the work area with outside levels are available. If the measured levels inside are not statistically higher than the average airborne asbestos concentration measured outside the abatement area, the cleanup is considered successful, and the space is judged ready for reoccupancy (For reference, see Appendix H, U.S. EPA "Guidelines for Conducting the AHERA TEM Clearance Test . . . .")

# Chapter Summary

Laying the foundation for a comprehensive asbestos control program for a building includes some basic steps. Important points contained in this discussion are the following

An Asbestos Program Manager needs to be properly qualified through training and experience, and be actively involved in all asbestos control and disturbance activities.

An Asbestos program Manager should have authority to oversee and to direct custodial/maintenance staff and contractors with regard to all asbestos-related activities.

An initial building inspection should be performed by a trained, qualified, experienced inspector to locate and assess the condition of all ACM in the building.

The inspection results serve as the basis for establishing an O&M program. O&M procedures may not be sufficient for certain ACM that is significantly damaged or in highly accessible areas.

An Asbestos Program Manager or qualified consultant should develop the written O&M program that is site-specific and tailored for individual buildings. The O&M program should take into account use, function and design characteristics of a building.

The success of any O&M program lies in the commitment by the building owner to implement it properly

When outside contractors are used for asbestos-related activities, their references and training should be thoroughly checked and their subsequent work monitored.

Periodically review written O&M programs.

Alternatives or control options that may be implemented under an O&M program include:

- repair
- encapsulation
- enclosure
- encasement
- removal (minor)

Removal of ACM before renovations may be necessary in some instances. (See NESHAP and State/Local regulations discussion in Chapter 6.)

**The success of any O&M program depends on the building owner's commitment to implement it properly.**



# What Does an O&M Program Include?

## O&M Program Elements

**To achieve its objectives,** an O&M program should include seven elements. Although these should appear in any O&M program, the extent of each will vary from program to program depending on the building type, the type of ACM present, and the ACM's location and physical condition. For example, if only nonfriable ACM is present, minimal notification might be needed, and custodial or maintenance staff would most likely have fewer work practices to be followed. If friable ACM is present, a more detailed O&M program should be prepared and followed. Each of the first six elements listed below is described in this chapter to provide an illustration of a basic O&M program. The seventh program element, training of the Asbestos Program Manager and custodial and maintenance staff, is very important. If staff are not adequately trained, the O&M program will not be effective. Chapter 5 is devoted exclusively to O&M training topics.

A successful O&M program should include the following elements:

- **Notification:** A program to tell workers, tenants, and building occupants where ACM is located, and how and why to avoid disturbing the ACM. All persons affected should be properly informed.

- **Surveillance:** Regular ACM surveillance to note, assess, and document any changes in the ACM's condition.

- **Controls:** Work control/permit system to control activities which might disturb ACM.

- **Work Practices:** O&M work practices to avoid or minimize fiber release during activities affecting ACM.

- **Recordkeeping:** To document O&M activities.

- **Worker Protection:** Medical and respiratory protection programs, as applicable.

- **Training:** Asbestos Program Manager, and custodial and maintenance staff training.

**If staff are not adequately trained, the O&M program will not be effective.**

## Informing Building Workers, Tenants, and Other Occupants

Building owners should inform building workers, occupants, and tenants about the location and physical condition of the ACM that they might disturb, and stress the need to avoid disturbing the material. Occupants should be notified for two reasons: (1) building occupants should be informed of any potential hazard in their vicinity; and (2) informed persons are less likely to unknowingly disturb the material and cause fibers to be released into the air.

Building owners can inform occupants about the presence of ACM by distributing written notices, posting signs or labels in a central location where affected occupants can see them, and holding awareness or information sessions. The methods used may depend on the type and location of the ACM, and on the number of people affected. Some states and localities have "right-to-know" laws which may require that all occupants, workers, and visitors in buildings with ACM be informed that asbestos is present.

In service and maintenance areas (such as boiler rooms), signs such as "Caution — Asbestos — Do Not Disturb" placed directly adjacent to thermal system insulation ACM will alert and remind maintenance

12

workers not to inadvertently disturb the ACM. In most cases, all boilers, pipes, and other equipment with ACM in service areas where damage may occur should have prominent warning signs placed next to the ACM. As an alternative, color coding can be used to identify the ACM in certain situations provided that all potentially involved parties understand the coding system.

Information sessions reinforce and clarify written notices and signs, and provide an opportunity to answer questions. All employees and tenants or tenant representatives likely to disturb ACM should be included in the notification program on a continuing basis. Building owners should inform new employees about the presence of ACM before they begin work. Owners should provide additional signs and information sessions in languages other than English where a significant number of workers, occupants, or visitors do not speak English. It maybe necessary to make special provisions for illiterate workers, such as providing clear verbal information or signs, about potential hazards of disturbing ACM. and showing them where ACM is located.

The specific information given to types of building occupants will vary For example, since service workers carry out certain tasks that office workers or tenants do not perform, they should receive additional information. Most important, O&M workers should receive the training necessary for them to perform their tasks safely

Whatever its form, the information given to building occupants and workers should contain the following points to the extent they reflect building conditions:

- ACM has been found in the building and is located in areas where the material could be disturbed.

- The condition of the ACM, and the response which is appropriate for that condition.

- Asbestos only presents a health hazard when fibers become airborne and are inhaled. The mere presence of ACM does not represent a health hazard.

- The ACM is found in the following locations (e.g., ceilings in Rooms 101 and G-323, walls in the lobby, above suspended ceilings in the first floor corridor, on columns in the main entry on pipes in the boiler room).

- Do not disturb the ACM (e.g., do not push furniture against the ACM, do not damage T S I ) .

- Report any evidence of disturbance or damage of ACM to (name, location, and phone number of Asbestos Program Manager).



Routine maintenance activities can cause disturbance of ACM if workers are not properly trained in operations and maintenance procedures. Here, a worker carelessly contacts ACM, possibly damaging it.

- Report any dust or debris that might come from the ACM or suspect ACM, any change in the condition of the ACM, or any improper action (relative to ACM) of building personnel to (name, location, and phone number of Asbestos Program Manager).

- Cleaning and maintenance personnel are taking special precautions during their work to properly clean up any asbestos debris and to guard against disturbing ACM.

- All ACM is inspected periodically and additional measures will be taken if needed to protect the health of building occupants.



It is important to undertake an honest and open approach to the ACM notification procedure. Owners should strive to establish clear lines of communication with all building occupants regarding asbestos issues. People who are informed of the presence, location and condition of ACM in a building where they work or live, who understand that the mere presence of ACM is not necessarily hazardous to them, and who accept that ACM can often be managed effectively in place, can be

An example of an asbestos caution sign placed directly on a section of asbestos-containing duct insulation. Signs such as this help to ensure that workers will not inadvertently disturb ACM.

13

very helpful to the owner in eliminating or reducing hysteria on the part of other less informed building occupants. On the other hand, if occupants suspect the building owner is not being honest about asbestos activities in the building, that owner's credibility maybe questioned and the situation can become far more difficult to manage. *If and when asbestos incidents occur, it is especially important for the building owner to deal with occupants and contractors openly and honestly, for that is the best way to maintain occupant/ tenant confidence in both the owner and the building's asbestos program.*

## ACM Surveillance

### Reinspection and Periodic Surveillance

A visual reinspection of all ACM should be conducted at regular intervals as part of the O&M program. Combined with ongoing reports of changes in the condition of the ACM made by service workers, the reinspection should help ensure that any ACM damage or deterioration will be detected and corrective action taken.

Visual reinspections of asbestos materials at regular intervals can detect changes in material condition. Here, surfacing ACM has delaminated from a ceiling in a building O&M routines can keep small problems from becoming big problems.



According to recent EPA regulations covering schools (the Asbestos Hazard Emergency Response Act, "AHERA"), an accredited inspector must reinspect school buildings at least once every three years to reassess the condition of ACM. The AHERA regulations for schools also require a routine surveillance check of ACM every six months to monitor the ACM's condition. The AHERA Rule permits this surveillance to be conducted by a trained school custodian or maintenance worker. While these intervals are mentioned here as a guide, they may also be appropriate for other buildings. The Asbestos Program Manager should establish appropriate intervals, based on consultation with the building owner and any other qualified professionals involved in the O&M program.

EPA recommends a visual and physical evaluation of ACM during the reinspection to note the ACM's current condition and physical characteristics. Through this reinspection, it is possible to determine both the relative degree of damage and assess the likelihood of future fiber release. Maintenance of a set of visual records (photos or videotape) of the ACM overtime can be of great value during reinspection.

Some asbestos consultants recommend examining settled dust for accumulations of asbestos fibers as another surveillance tool in an O&M program. While no universally accepted standardized protocols currently exist for sampling and analysis of settled dust, positive results (i.e., ACM is present in the dust) may indicate the need for special cleaning of the affected area, or other action. Because the results of this testing are difficult to interpret and evaluate at this time, building owners should carefully consider the appropriateness of this testing to their situation.

### Supplement to Visual/Physical Evacuation

As part of an O&M program, a carefully designed air monitoring program to detect airborne asbestos fibers in the building may provide useful supplemental information when conducted along with a comprehensive visual and physical ACM inspection and reinspection program. If the ACM is currently in good condition, increases in airborne asbestos fiber levels at some later time may provide an early warning of deterioration or disturbance of the material. In that way, supplemental air monitoring can be a useful management tool. If an owner chooses to use air monitoring in an "early warning" context, a knowledgeable and experienced individual should be consulted to design a proper sampling strategy Appendix H contains a reference to a useful guide to monitoring airborne asbestos, which can be consulted for further discussion of this subject.

If supplemental air monitoring is done, a baseline airborne asbestos fiber level should be established soon after the O&M program is initiated Representative, multiple air samples should be collected throughout the building during periods of normal building operation. This should be done over along enough period of time to be representative of existing conditions, in order to adequately characterize prevailing fiber levels in the building. *This air monitoring should supplement, not replace, physical and visual inspection.* Visual inspection can recognize situations and anticipate future exposure (e.g., worsening water damage), whereas air monitoring can only detect a problem after it has occurred, and fibers have been released.

Note that the collection of air samples for supplementary evaluation *should not* use aggressive air sampling methods. Aggressive sampling methods, in which air is deliberately disturbed or agitated by use of a leaf blower or fans, should be used at the completion of an asbestos removal project when the building or area is unoc-

cupied, not for routine monitoring.

The most accurate and preferred method of analysis of air samples collected under an O&M program would require the use of transmission electron microscopy (TEM). Phase contrast microscopy (PCM), which is commonly used for personal air sample analysis and as a screening tool for area air monitoring, cannot distinguish between asbestos fibers and other kinds of fibers which may be present in the air. PCM analysis also cannot detect thin asbestos fibers, and does not count short fibers. TEM analysis is approximately ten times more expensive than PCM analysis. However, the more accurate information on actual levels of airborne asbestos fibers should be more beneficial to the building owner who elects to use supplemental air monitoring in the asbestos management program. TEM analysis is most reliably performed by laboratories accredited by the National Institute for Standards and Technology (NIST; see Appendix D for telephone number), and who follow EPA's quality assurance guidelines. (Appendix H, U.S. EPA, Dec. 1989, "Transmission Electron Microscopy Asbestos Laboratories: Quality Assurance Guidelines.")

Selection of a reliable and experienced air monitoring firm and analytical laboratory is important, if the building owner elects to conduct supplemental air monitoring under the O&M program. A consultant knowledgeable in air sampling and analysis protocols can be contacted for recommendations if the building owner or Asbestos Program Manager has limited knowledge in this area.

Periodic air monitoring, conducted simultaneously with the visual reinspection or surveillance, would then be used to see if asbestos levels have changed relative to the baseline. Some building owners may wish to present current air monitoring results to building occupants in addition to information regarding the physical reinspections. Although this supplemental use of air monitoring as part of an O&M program may provide useful information, it is likely to be very expensive, particularly if the more accurate and recommended TEM analysis is used. Use of only a small number of measurements or measurements taken only at one time maybe misleading (i.e., overestimate or underestimate of fiber levels), and can lead to inappropriate decisions.

It should be noted that some of the exposures of persons to airborne asbestos fibers in buildings may result from episodic events, such as repair work or the accidental disturbance of the ACM or of ACM debris by maintenance activities inside the building. Air monitoring may not be done frequently enough to include such episodic events; this can lead to a misleading interpretation of air sampling results. In particular, air sampling may underestimate the exposure of O&M workers and building occupants. A good reference sourcebook for additional information on air sampling and analysis for asbestos fibers is "A Guide to Monitoring Airborne Asbestos in Buildings" (see Appendix H).

## Work Control/Permit System

The O&M program should include a system to control all work that could disturb ACM. Some building owners have had success using a "work permit" program, which requires the person requesting the work to submit a Job Request Form to the Asbestos program Manager (Appendix B, Form 2) before any maintenance work is begun. The form gives the time and location of the requested work, the type of maintenance needed, and available information about any ACM in the vicinity of the requested work. The contractor or other person authorized to perform the work should be identified on the work request.



An example of a maintenance worker conducting activities near a friable asbestos-containing ceiling. Under a proper permitting system, the building Asbestos Program Manager would evaluate and authorize projects such as this prior to beginning work.

Upon receiving a pre-work Job Request Form, the Asbestos Program Manager should take the following steps:

**1** Refer to written records, building plans and specifications, and any building ACM inspection reports to determine whether ACM is present in the area where work will occur. If ACM is present, but it is not anticipated that the material will be disturbed, the Asbestos Program Manager should note the presence of the ACM on the permit form and provide additional instruction on the importance of not disturbing the ACM.

**2** If ACM is both present and likely to be disturbed, the Asbestos Program Manager or a designated supervisor qualified by training or experience, should visit the site and determine what work practices should be instituted to minimize the release of asbestos fibers during the maintenance activity

**3** This determination should be recorded on the Maintenance Work Authorization Form (see example in Appendix B, Form 3), which *is* then sent to the in-house maintenance supervisor or to the maintenance contractor to authorize the work.

**4** The Asbestos Program Manager should make sure that a copy of both the request and the authorization forms (if granted) are placed in the permanent file.

**5** Where the task is not covered by previously approved standard work practices, the Asbestos Program Manager should make sure that the appropriate work practices and protective measures are used for the job.

**6** For all jobs where contact with ACM is likely the Asbestos Program Manager or a designated supervisor qualified by training or experience should visit the work site when the work begins to see that the job is being performed properly For lengthy jobs where disturbance of ACM is intended or likely, periodic inspections should be made for the duration of the project.

**7** The Asbestos Program Manager's observations should be provided on an *Evaluation of Work Form* (see Appendix B, Form 4). Any deviation from standard and approved work practices should be recorded immediately on this form and the practices should be immediately corrected *and reported to the Asbestos Program Manager.*

**8** Upon completion of the work, a copy of the evaluation form should be placed in the permanent asbestos file for the building.

Building owners should consider using asbestos O&M work control forms similar to those which already may be in use for non-ACM work in their facilities, or expanding the existing forms to include the content of the request, approval, and evaluation forms illustrated in Appendix B.

**It is important to undertake an honest and open approach in ACM notification.**

The O&M management system should also address work conducted by outside contractors. Many building owners contract for at least some custodial and maintenance services. A building's asbestos work control/permit system, as described above, should also cover contract work.

At a minimum, contracts with service trades or abatement companies should include the following provisions to ensure that the service or abatement workers can and will follow appropriate work practices:

● Proof that the contractor's workers have been properly notified about ACM in the owner's building and that they are properly trained and accredited (if necessary) to work with ACM.

● Copies of respiratory protection, medical surveillance, and worker training documentation as required by OSHA, EPA and/or state regulatory agencies.

● Notification to building tenants and visitors that abatement activity is underway (performed by owner).

● Written work practices must be submitted by the vendor or contractor for approval or modification by the Asbestos Program Manager. The vendor or contractor should then agree to abide by the work practices as finally accepted by the Asbestos Program Manager.

● Assurance that the contractor will use proper work area isolation techniques, proper equipment, and sound waste disposal practices.

● Historical air monitoring data for representative examples of the contractor's previous projects, with emphasis on projects similar to those likely to be encountered in the building.

● Provisions for inspections of the area by the owner's representative to ensure that the area is acceptable for re-entry of occupants/tenants.

● A resume for each abatement contractor/supervisor or maintenance crew chief, known as the "competent person" in the OSHA standard and EPA Worker Protection Rule.

● Criteria to be used for determining successful completion of the work (i.e., visual inspections and air monitoring).

● Any other information deemed necessary by the owner's legal counsel.

Notification to EPA (and other appropriate agencies) if the abatement project is large enough (see Chapter 6).

## O&M Work Practices

● The O&M program focuses on a special set of work practices for the custodial, maintenance, and construction staff. The nature and extent of any special work practices should be tailored to the likelihood that the ACM will be disturbed and that fibers will be released. In general, four broad categories of O&M work practices are recognized

**1** **Worker Protection Programs –** These work practices help ensure custodial and maintenance staff are adequately protected from asbestos exposure.

**2** **Basic O&M Procedures –** Basic procedures are used to perform routine custodial and maintenance tasks that may involve ACM.

**3** **Special O&M Cleaning Techniques –** Special techniques to cleanup asbestos fibers on a routine basis.

1 6

**4**  **Procedures for Asbestos Fiber Release Episodes –** If moderate to relatively large amounts of ACM are disturbed, the building owner should use these procedures to address the hazard.

A brief synopsis of worker protection and O&M work practices follows. *(Note: A more detailed, technically oriented O&M "work practices" manual specifically addressing topics such as work practices, worker protection, and specific information on how to carry out O&M plans, is being developed, with publication expected in 1991.)*

**Worker Protection Programs**  A worker protection program includes engineering controls, personal exposure monitoring, medical surveillance, and personal protection. While engineering controls are the preferred method of worker protection, there are few engineering control options available for O&M work. This section discusses two key aspects of personal protection: use of respiratory protection and protective clothing for workers in an asbestos O&M program. According to OSHA regulations (see Chapter 6), a written respiratory protection program is necessary whenever an O&M program specifies that service workers wear respirators, or where respirators are made available to employees. OSHA regulations also require a respirator program whenever workers are exposed, or are likely to be exposed, to fiber levels above OSHA'S "permissible exposure limits" such as the 8-hour time weighted average (TWA) limit or the 30-minute "excursion limit" (EL). The 8-hour TWA limit and the EL are described in more detail in Chapter 6. In addition, OSHA requires workers to wear special protective clothing under the same circumstances.

**Respiratory Protection/Worker Protection Programs**  The selection of approved respirators, suitable for the hazards to which the worker is exposed, is only one aspect of a complete respiratory protection program. Other elements include written operating procedures for respirator use; outlining personnel responsibilities for respirator cleaning, storage, and repair; medical examination of workers for respirator use; training in proper respirator use and limitations; respirator fit testing respirator cleaning and care; and work-site supervision. All of these are described in detail in the OSHA respirator standard, 29 CFR 1910.134. The O&M respirator program can be administered by the facility safety and health manager or the Asbestos Program Manager, if properly qualified.

Proper respiratory protection is an integral part of all custodial and maintenance activities involving potential exposure to asbestos. When in doubt about exposure during a certain work operation, building owners should provide respiratory protection to custodial and maintenance workers. OSHA specifies general types of respirators for protection against airborne asbestos during "construction" activities, which include abatement, renovation, maintenance, repair, and remodeling.

Personal air sampling is not the same as area air monitoring. Personal air sampling (required by OSHA) is designed to measure an individual worker's exposure to fibers while the worker is conducting tasks that may disturb ACM. The sampling device is worn by the worker and positioned so that it samples air in the worker's breathing zone. In contrast, area (or ambient) air sampling is conducted to get an estimate of the numbers of airborne asbestos fibers present in a building. It is used as an assessment tool in evaluating the potential hazard posed by asbestos to all building occupants. (See the previous discussion of area air monitoring on page 14.)

When adequate care is taken to prevent or minimize and control fiber release, routine, small-scale/short-duration maintenance or custodial tasks are not likely to generate high levels of airborne asbestos compared to large asbestos removal projects; and respirators which filter breathing air may be used. **OSHA, EPA, and NIOSH are on record as *not* recommending single use, disposable paper dust masks for use against asbestos; in fact, OSHA has *disallowed their use* against airborne asbestos fibers.**

The options that may be used include:

● A half-face or full facepiece, negative pressure, air-purifying respirator with replaceable high-efficiency filters.

Pictured below are different examples of air-purifying, negative pressure respirators equipped with high-efficiency cartridges which can be used to protect workers against asbestos exposure. On the left are examples of half-mask facepieces equipped with high-efficiency cartridges, and on the right are examples of full facepiece, high-efficiency masks.



● A half or full facepiece powered air-purifying respirator (PAPR) with replaceable high-efficiency filters. This has a battery powered pump which assists breathing and provides positive pressure in the facepiece.



Pictured above are two different types of powered air-purifying respirators (PAPR's) equipped with high-efficiency filters. On the left is an example of a tight fitting, full facepiece PAPR, and on the right is an example of a loose-fitting helmet style PAPR.

Under the OSHA standards for asbestos, any employee required to wear a negative pressure respirator can request a powered air-purifying respirator, and the employer is required to provide a fully functional and approved unit, provided it will afford the worker at least equal protection.

Currently only respirators approved by NIOSH and the Mine Safety and Health Adminstration (MSHA) are permitted for use. If they are air-purifying respirators, the filtration device(s) must be rated as "high-efficiency"

Selecting the most appropriate respirator for each O&M task requires knowledge of the levels of airborne asbestos fibers and other possible air contaminants generated by the task or likely to be present where the task is performed. This knowledge is best gained through personal air monitoring conducted during worker performance of the actual task. (Obviously the workers must have respiratory protection while this initial personal air sampling is carried out.) In fact, OSHA and EPA require air monitoring under certain circumstances (see Chapter 6). To learn more about the different types of respirators available and the degree of protection they provide, see Appendix E. Owners may also wish to contact the nearest OSHA office, a local trained and qualified industrial hygienist (preferably Certified), or an occupational health professional for more information on respirators. The expertise of these specialists should be used to ensure proper selection, fit testing, and training of workers in respirator use.

Building owners and other facility managers may not be familiar with some of the terms used in discussions of respirators, airborne fiber levels, and related topics.

Appendix E contains more information on these topics, and gives the minimum EPA-recommended levels of respiratory protection to be provided during typical O&M tasks.

For additional information on respirator programs, respirator types, and respirator use, the building owner or Asbestos Program Manager may want to use the following references

● "Respiratory Protection An Employer's Manual," NIOSH, October 1978;

● "A Guide to Respirator Protection for the Asbestos Abatement Industry" EPA/NIOSH, 1986;

● OSHA respirator standard (29 CFR 1910.134);

● OSHA asbestos regulations (29 CFR 1910.1001 and 1926.58);

● "Occupational Exposure Sampling Strategy Manual; NIOSH #77-173, January 1977.

● "Respirator Decision Logic," NIOSH, May 1987; and

● "NIOSH Guide to Industrial Respiratory Protection" September 1, 1987.

**Protective Clothing/Worker Protection Programs** In addition to the use of respirators, some O&M procedures may require workers to wear protective clothing. Most often, protective clothing is disposable and consists of coveralls, a head cover, and foot covers made of a synthetic fabric which does not allow asbestos fibers to pass through. This type of clothing prevents workers' regular clothing from becoming contaminated with asbestos fibers. Contaminated clothing could be taken home, creating a possible risk to the worker's family members.

OSHA and EPA regulations require workers to wear protective clothing whenever they are exposed, or likely to be exposed, to fiber levels above OSHA's permissible levels (see Chapter 6). It is important that workers be properly trained in the use, removal and disposal of protective clothing after use. All O&M activities may not require the use of protective clothing. It is important for the Asbestos Program Manager to assess this need on a case-by-case basis.

**Basic O&M Procedures** Basic O&M procedures to minimize and/or contain asbestos fibers may include wet methods, use of mini-enclosures, use of portable power tools equipped with special local ventilation attachments, and avoidance of certain activities, such as sawing, sanding,

and drilling ACM. Maintenance activities can be divided into three categories with regard to their potential for disturbing ACM:

**1** Those which are unlikely to involve any direct disturbance of ACM; for example, cleaning shelves or counter tops with a damp cloth.

**2** Those which may cause accidental disturbance of ACM; for example, working on a fixture near a ceiling with surfacing ACM.

**3** Those which involve intentional small-scale manipulation or disturbance of ACM; for example, removing a small segment of TSI ACM to repair a pipe leak.

The O&M program should include work practices for each type of ACM that is present in the building (surfacing, TSI, and miscellaneous) as well as for each type and category of maintenance activity performed (e.g., general cleaning, electrical work, plumbing).

Special work practices such as wet wiping, area isolation, and HEPA vacuuming, and the use of personal protective equipment such as respirators and protective clothing, may be needed where disturbance of ACM is likely. The need for these practices varies with the situation. For example, removing light fixtures located near surfacing ACM may disturb the material and might involve the use of special cleaning, possibly area isolation, and respiratory protection. Periodic emptying of a trash can near heavily encapsulated asbestos-containing plaster may not disturb the material at all, so no special work practices would generally be necessary These work practices and procedures are intended to ensure that disturbance of any ACM during O&M activities should be minimized, or carried out under controlled conditions when the disturbance is required by the nature of a specific O&M task.

In addition, ACM may readily release asbestos fibers into the air when certain mechanical operations are performed directly on it. For example, fiber releases can occur when workers are drilling, cutting, sanding, breaking, or sawing vinyl asbestos floor tile.

The *action* of drilling, cutting, abrading, sanding, chipping, breaking, or sawing is the critical factor here, since it is likely to cause a release of fibers. Maintenance or repair operations involving those actions should be eliminated or carefully controlled with basic O&M procedures in order to prevent or minimize asbestos fiber release.

Certain activities that occur in the vicinity of ACM can also cause damage which may result in asbestos fiber release. For example, maintenance and custodial stroll may damage ACM accidentally with broom handles, ladders, and fork lifts while performing other tasks. Activities performed in the vicinity of ACM should always be performed cautiously to prevent fiber release.

To summarize, if in doubt about the possibility of disturbing ACM during maintenance activities, adequate precautions should be taken to minimize fiber release; these will protect workers as well as the building environment. Basic O&M procedures, including use of wet methods and specially equipped tools, should be used to protect building occupants.

### O&M Cleaning Practices

Special cleaning practices **are** appropriate for a building with exposed surfacing or thermal system insulation ACM, especially if the ACM is friable. If gradual deterioration or damage of ACM has occurred or is occurring, asbestos-containing dust or debris could be present. If the building inspection has determined that asbestos-containing dust or debris is present in some areas, then the O&M program should include special cleaning practices to collect residual asbestos dust. Routinely cleaning floors using wet methods is an example of one such practice. Custodial and maintenance workers in the course of normal work can also identify and report areas which are in need of special cleaning or repair. *Special cleaning techniques should supplement, not replace, repair or abatement actions for damaged, friable ACM.* The cleaning program should include an initial cleaning followed, as needed, by subsequent periodic or episodic cleanings.

Building owners and custodial and maintenance staff should ensure that special O&M cleaning is done correctly Proper cleaning is important for two reasons:

● The use of improper techniques to clean up asbestos debris caused by previous deterioration or damage may result in widespread contamination, and potentially increase airborne asbestos fiber levels in the building.

● Improper cleaning may cause damage to the ACM, thus releasing more airborne asbestos fibers.

O&M cleaning will involve the use of wet cleaning or wet-wiping practices to pick up asbestos fibers. Dry sweeping or dusting can result in asbestos fibers being re-suspended into the building's air and therefore should not be used. Once wet cloths, rags, or mops have been used to pickup asbestos fibers, they should be properly discarded as asbestos waste while still wet. They should not be allowed to dry out, since the collected fibers might be released at some later time when disturbed. The use of special vacuum cleaners, commonly referred to as HEPA vacuums, may be preferable to wet cleaning in certain situations. These vacuums are equipped with filters designed to remove very small particles or fibers — such as asbestos — by filtering those particles from the air passing through the vacuum. Since the exhaust air from an ordinary vacuum cleaner is not filtered sufficiently it is possible for tiny asbestos fibers to pass through the filter and back into the building air.

> If in doubt about the possibility of disturbing ACM during maintenance activities, adequate precautions should be taken to minimize fiber release.

**1 9**

**Special procedures are generally needed to minimize the spread of fibers in the building after asbestos fiber release occurs.**

It is important for O&M workers to use caution when emptying HEPA vacuums and changing the filters. Exposures could result from such activities. Workers should move the HEPA vacuum to a physically isolated area of the facility and put on proper personal protective equipment before emptying the dust and debris into properly labeled, sealed, and leak-tight containers for disposal as asbestos-containing waste. When custodial workers do not work with ACM, trained maintenance workers can be used to empty the HEPA vacuums and change their filters. Decisions regarding special cleaning practices should be based on the building inspection and ACM assessment data, including the potential for ACM disturbance. In general, the building would not need special O&M cleaning when the building contains only nonfriable (not easily crumbled) ACM; ACM which has been encapsulated, encased, or enclosed behind air-tight barriers; or ACM known to be undamaged/undisturbed since the last special cleaning. Furthermore, where ACM is confined to a single room or area, special cleaning of just that area rather than other parts of the building may be sufficient.

**Here, a worker uses a HEPA vacuum (backpack type) to clean ACM debris from one of several carpeted areas in a room where surfacing material had fallen.**

If ACM has been released onto a carpeted area of a building, it may not always be possible to adequately clean the carpeted area. "Steam" cleaning and HEPA vacuuming methods are sometimes employed for this purpose. A preliminary study carried out by EPA in 1989 showed that hot water vacuums were more effective in carpet cleaning than HEPA vacuums, under the test conditions. Further field studies are planned to confirm these findings.



For carpets, successful cleaning will likely depend on factors such as the amount of ACM released onto the carpet, how long the situation has existed, traffic over the area, as well as the structure and composition of the carpet itself. It is prudent to evaluate individual situations on a case-by-case basis. The Asbestos program Manager should consider the need for workers engaged in cleaning asbestos fiber-contaminated carpets to wear proper respiratory protection. It may also be prudent to arrange for this type of cleaning to be done after normal working hours or when the facility is less occupied. Additionally it maybe more cost effective to properly dispose of contaminated carpets and other fabrics as asbestos-containing waste if a permanent asbestos control option is being undertaken in the building.

Where the ACM is damaged and located in an "air plenum" – where fibers can be transported by the heating, ventilation, or air conditioning (HVAC) system throughout the building – special cleaning practices may be extended to the entire building, including the HVAC system itself.

**Procedures for Asbestos Fiber Release Episodes**

Special procedures are generally needed to minimize the spread of fibers throughout the building after asbestos fiber releases occur, such as the partial collapse of an ACM ceiling or wall. These procedures are needed whether the ACM disturbance is intentional or unintentional To provide building owners with some guidance, under EPA regulations for schools a "major fiber release" is defined as one involving more than three square or linear feet of ACM. The procedures to be followed will vary according to the site of the major release episode, the amount of ACM affected, the extent of fiber release from the ACM, the relationship of the release area to the air handling systems, and whether the release site is accessible to building occupants. Depending on the severity of the episode, asbestos abatement consultants and contractors may be needed to develop a strategy for conducting the clean-up operations.

In general, for major fiber releases, the area should be isolated by closing doors and/or erecting temporary barriers to restrict airflow as well as access to the site. Signs should be posted as necessary immediately outside the fiber release site to prevent persons not involved in the cleanup operation from inadvertently entering the area. If asbestos fibers could enter the HVAC system, the system should be modified to prevent fiber entry, or should be shut down and sealed off. The final step should be to employ thorough cleanup procedures to properly control the ACM, a careful visual inspection, and final clearance air monitoring to verify satisfactory cleanup.

Similar procedures can be used for much smaller fiber release events: where the amount of ACM is on the

order of three square or linear feet or less. The HEPA vacuuming, wet wiping, and worker protection procedures outlined in this guidance document, as well as wetting ACM wastes and properly placing them in an appropriate leak-tight container (such as a properly labeled, 6-mil-thick plastic bag), are examples of some of the procedures which could be used for both major and minor fiber releases.

It is important to recognize that different levels of training are needed for workers involved with fiber release episodes. A major release will generally require "asbestos abatement worker training," rather than the degree of training considered adequate for O&M workers.

EPA suggests that building owners and Asbestos Program Managers consult with state and local regulatory officials before establishing formal training procedures for each type of situation.

The following table should be useful in determining when to apply certain O&M work practices in buildings. The table illustrates the O&M work practices that should be used by custodial and maintenance staff, depending on the likelihood of ACM disturbance.

## Summary of When to Apply Key O&M Work Practices

| | Likelihood of ACM Disturbance | | |
| --- | --- | --- | --- |
| | Contact Unlikely | Accidental Disturbance Possible | Disturbance Intended or Likely |
| **Management Responsibilities** | | | |
| Need Pre-Work Approval from Asbestos Program Manager | Review by Program Manager | Yes | Yes |
| Special Scheduling or Access Control | No | Yes | Yes |
| Supervision Needed | No | Initial, At Least | YES |
| HVAC System Modification | None | As Needed[1] | Shut Down[1] |
| Area Containment | None | Drop cloths, Mini-enclosures | Yes[2] |
| **Personal Protection** | | | |
| Respiratory Protection | Available For Use | Yes | Yes |
| Protective Clothing | None | Review by Asbestos Program Manager | Yes |
| **Work Practices** | | | |
| Use of Wet Methods | No | As Needed | Yes |
| Use of HEPA Vacuum | Available For Use | Available For Use | As Needed |

1) In the area where work takes place
2) Type of containment may vary. For example, small-scale, short-duration tasks may not require full containment.

## Recordkeeping

**EPA recommends that building owners make available all written elements of the O&M program to the building's O&M staff as well as to tenants and other building occupants.**

All the building asbestos management documents discussed in this Guide (inspection and assessment reports, O&M program plan, work practices and procedures, respirator use procedures, fiber release reports, application for maintenance work and work approval forms, evaluations of work affecting ACM, and reinspections/surveillance of ACM) should be stored in permanent files. In addition, for employees engaged in asbestos-related work, federal regulations (see Chapter 6) require that employers retain:

- personal air sampling records, for at least 30 years. Personal air samples are those collected in the worker's breathing zone during performance of work involving asbestos exposures.

- objective data used to qualify for exemptions from OSHA's initial monitoring requirements for the duration of the exemption.

- medical records for each employee subject to the medical surveillance program for the duration of their employment plus 30 years.

- all employee training records for one year beyond the last date of each worker's employment.

In addition, OSHA requires that employers provide to each employee their record of exposure and medical surveillance under the Records Access Standard (29 CFR 1910.20) and the Hazard Communication Standard (29 CFR 1910.1200). Seethe OSHA Construction Rule (29 CFR 1926.58) or the EPA Worker Protection Rule (40 CFR 763 Subpart G) for more details of recordkeeping requirements.

EPA recommends that building owners make available all written elements of the O&M program to the building's O&M staff as well as to tenants and other building occupants, if applicable. Building owners are also encouraged to consult with their legal counsel concerning appropriate recordkeeping strategies as a standard part of their O&M programs. Additionally state and local regulations may also require additional recordkeeping procedures.

---

## Chapter Summary

Although the elements discussed in this chapter should appear in any O&M program, the extent to which each applies will vary depending on the building type, the type of ACM present, and the ACM's location and physical condition. To achieve its objectives an O&M program should include the following:

A notification program to inform building occupants, workers, and tenants about the location of ACM and how to avoid disturbing ACM.

Periodic surveillance and reinspection of ACM at regular intervals by trained workers or properly trained inspectors. Air monitoring to detect airborne asbestos fibers in the building may provide useful supplemental information when conducted along with a comprehensive visual and physical ACM inspection/ reinspection program. Air samples are most accurately analyzed using transmission electron microscopy (TEM).

A "work Control/permit" system, which some building owners have used successfully to control work that could disturb ACM. This system requires the person requesting work to submit a Job Request Form to the Asbestos Program Manager before any work is begun.

O&M work practices to avoid or minimize fiber release during activities affecting ACM.

Recordkeeping. OSHA and EPA have specific requirements for workers exposed to asbestos.



MANAGING ASBESTOS IN PLACE

# 5

# What O&M Training Is Necessary?

## Types of Training

**Training of custodial and maintenance workers** is one of the keys to a successful O&M program. If building owners do not emphasize the importance of well-trained custodial and maintenance personnel, asbestos O&M tasks may not be performed properly This could result in higher levels of asbestos fibers in the building air and an increased risk faced by both building workers and occupants.

OSHA and EPA require a worker training program for all employees exposed to fiber levels (either measured or anticipated) at or above the action level (0.1 f/cc, 8-hour *time-weighted average*– the TWA) and/or the excursion limit (1.0 f/cc, 30-minute TWA—see Chapter 6). According to the EPA regulations governing schools, all school stall custodial and maintenance workers who conduct any activities that will result in the disturbance of ACM must receive 16 hours of O&M training. Some states and municipalities may also have specific training requirements for workers who may be exposed to asbestos, or who work in a building with ACM present.

With proper training, custodial and maintenance staff can successfully deal with ACM in place, and greatly reduce the release of asbestos fibers. Training sessions should provide basic information on how to deal with all types of maintenance activities involving ACM. However, building owners should also recognize that O&M workers in the field often encounter unusual, "non-textbook" situations. As a result, training should provide key concepts of asbestos hazard control. If these concepts are clearly understood by workers and their supervisors, workers can develop techniques to address

a specific problem in the field. Building owners who need to provide O&M training to their custodial and maintenance staff should contact an EPA environmental assistance center (see Appendix D) or equally qualified training organization for more information.

At least three levels of maintenance worker training can be identified

**LEVEL 1: AWARENESS TRAINING. For custodians involved in cleaning and simple maintenance tasks where ACM may be accidentally disturbed.**

For example, fixing a light fixture in a ceiling covered with surfacing ACM. Such training may range from two to eight hours, and may include such topics as:

- Background information on asbestos.
- Health effects of asbestos.
- Worker protection programs.
- Locations of ACM in the building.
- Recognition of ACM damage and deterioration.
- The O&M program for that building.
- Proper response to fiber release episodes.

*Training of custodial and maintenance workers is one of the keys to a successful O&M program.*

2 3



A properly protected and trained worker conducts a glovebag removal job on a section of thermal system insulation. Under a proper operations and maintenance program, any worker involved in such activities would have Level 1 and 2 training.

## LEVEL 2: SPECIAL O&M TRAINING.
For maintenance workers involved in general maintenance and asbestos material repair tasks.

For example, a repair or removal of a small section of damaged TSI, or the installation of electrical conduit in an air plenum containing ACM or ACM debris. Such training generally involves at least 16 hours. This level of training usually involves more detailed discussions of the topics included in Level 1 training as well as:

- Federal, state, and local asbestos regulations.
- Proper asbestos-related work practices.
- Descriptions of the proper methods of handling ACM, including waste handling and disposal.
- Respirator use, care, and fit-testing.
- Protective clothing donning, use, and handling.
- Hands-on exercises for techniques such as glovebag work and HEPA vacuum use and maintenance.
- Appropriate and proper worker decontamination

This is an example of a large-scale asbestos removal project (note missing scaffold safety rails). Such projects are well beyond the scope of an O&M program. The EPA NESHAP regulations require that asbestos materials be removed from buildings prior to demolition or renovation when the asbestos will be disturbed.



## LEVEL 3: ABATEMENT WORKER TRAINING.
For workers who may conduct asbestos abatement.

For example, conducting a removal job, constructing an enclosure, or encapsulating a surface containing ACM. This work involves direct, intentional contact with ACM. The recognized "abatement worker" training courses approved by EPA or states, under the EPA AHERA model accreditation plan for schools, which involve 24 to 32 hours of training, would fulfill this level of training.

If this level of training is provided to in-house staff, it may save time and money in the long run to use these individuals to perform such activities. This level of training is much more involved than Levels 1 and 2, although it should include some of the same elements (e.g., health effects of asbestos). It will typically include a variety of specialized topics, such as:

- Pre-asbestos abatement work activities.
- Work area preparation.
- Establishing decontamination units.
- Personal protection, including respirator selection, use, fit-testing, and protective clothing.
- Worker decontamination procedures.
- Safety considerations in the abatement work area.
- A series of practical hands-on exercises.
- Proper handling and disposal of ACM wastes.

The Asbestos Program Manager should consider conducting the training program for Levels 1 and 2 if he or she has sufficient specific asbestos knowledge and training. If the Asbestos Program Manager does not conduct the training, the building owner should hire an outside consultant or send workers to an appropriate O&M training course. A trained (preferably Certified) industrial hygienist or equally qualified safety and health professional should conduct the training on respirator use and fit-testing. A health professional should conduct the training on health effects.

OSHA or EPA Regional Offices, as well as state and local agencies and professional associations, may be able to suggest courses or direct you to listings of training providers for each of the three levels. Appendix D provides the addresses and/or phone numbers for OSHA, EPA, and EPA-sponsored training providers.

Where custodial and maintenance services are performed by a service company under contract, or where some installation or repairs are performed by employees of trade or craft contractors and subcontractors, those workers may need to have training at level 1, 2, or 3 as appropriate for their work. The Asbestos Program Manager or building owner should verify that these employees receive appropriate training before they begin any work.

In summary, good training is crucial to the success of an O&M program. Strong support for O&M training by the building owner should convince custodial and maintenance workers that following the appropriate work procedures is critical to protecting their own health as well as the health of other building occupants.

---

## Chapter Summary

Properly trained custodial and maintenance workers are critical to a successful O&M program. The following items are highlighted training requirements:

● OSHA and EPA require worker training program for all employees exposed to fiber levels at or above the action level (0.1 f/cc, 8-hr. TWA) and/or the excursion limit (1.0 f/cc, 30-minute TWA – see Chapter 6).

● Some states and municipalities may have specific worker training requirements.

● At least three levels of maintenance worker training can be identified:

**Level 1 Awareness training** for workers involved in activities where ACM may be accidentally disturbed. May range from 2-8 hours.

**Level 2 Special O&M training** for maintenance workers involved in general maintenance and incidental ACM repair tasks. At least 16 hours.

**Level 3 Abatement worker training** for workers who may conduct asbestos abatement. This work involves direct, intentional contact with ACM. "Abatement worker" training courses that involve 24 to 32 hours of training fulfill this level of training.

---

**Strong support by the building owner can convince workers that following appropriate procedures is critical to protecting their own health as well as the health of other building occupants.**



MANAGING ASBESTOS IN PLACE

6

# What Regulations Affect Asbestos Management Programs in Buildings, Especially O&M Programs?

## Federal, State, and Local Regulations Affecting O&M Programs

**Building owners are governed** by a variety of federal, state, and local regulations which influence the way they must deal with ACM in their facilities. Some of these regulations, particularly at the state and local level, may change frequently Building owners should contact their state and local government agencies, in addition to organizations such as the National Conference of State Legislatures (NCSL), the National Institute of Building Sciences (NIBS), or EPA environmental assistance centers, for updated information on these requirements. (Appendix D lists phone numbers for these organizations.)

**Building owners are governed by a variety of federal, state, and local regulations which influence the way they must deal with ACM in their facilities.**

### OSHA Regulations and the U.S. EPA Worker Protection Rule

There are several important Occupational Safety and Health Administration (OSHA) and EPA regulations that are designed to protect workers. They are summarized here, as guidance. OSHA has specific requirements concerning worker protection and procedures used to control ACM. These include the OSHA construction industry standard for asbestos (29 CFR 1926.58), which applies to O&M work, and the general industry asbestos standard (29 CFR 1910.1001). State-delegated OSHA plans, as well as local jurisdictions, may impose additional requirements.

For most operations and maintenance activities in building areas where only non-friable ACM is present or where friable ACM is in good condition, applicable OSHA permissible exposure limits are not likely to be exceeded. However, it is possible that some O&M activities will disturb ACM to such an extent that the OSHA limits are exceeded, unless good work practices are followed.

The OSHA standards generally cover private sector workers, and public sector employees in states which have an OSHA state plan. Public sector employees, such as city or county government employees, or certain school employees, who are not already subject to a state OSHA plan are covered by the EPA "Worker Protection Rule" (Federal Register: February 25, 1987; 40 CFR 763 Subpart G, Asbestos Abatement Projects; Worker Protection, Final Rule). *Note: As this document goes to press, OSHA is considering a substantial number of changes to its regulations.*

The OSHA standards and the EPA Worker Protection Rule require employers to address a number of items which are triggered by exposure of employees to asbestos fibers. Exposure is discussed in terms of fibers per cubic centimeter (cc) of air. A cc is a volume approximately equivalent to that of a sugar cube.

Two main provisions of the regulations fall into the general category of "Permissible Exposure Limits (PELs)" to airborne asbestos fibers. They are:

**1** **8-Hour Time-weighted average limit (TWA)–** 0.2 fiber per cubic centimeter (f/cc) of air based on an 8-hour time-weighted average (TWA) sampling period. This is the maximum level of airborne asbestos, on average, that any employee may be exposed to over an 8-hour period (normal work shift).

**2** **Excursion limit (EL) –** 1.0 f/cc as averaged over a sampling period of 30 minutes.

These levels trigger mandatory requirements, which include the use of respirators and protective clothing, the establishment of "regulated areas," the posting of danger signs as well as the use of engineering controls and specific work practices.

OSHA regulations also establish an *"Action Level":* 0.1 f/cc for an 8-hour TWA. Employee training is required once the action level of 0.1 f/cc and/or the "Excursion Limit" is reached. This training must include topics specified by the OSHA rules. If an employee is exposed at or above the action level for a period of 30 days or more in a calendar year, medical surveillance is required according to the OSHA construction industry asbestos standard.

OSHA also requires medical examinations under its "General Industry Standard" for any employee exposed to fiber levels in the air at or above the OSHA "action level" (0.1 f/cc) and/or the "excursion limit" (1. Of/cc). In both cases – the action level and excursion limit – the OSHA medical examination requirement applies if the exposure occurs for at least one day per year.

The OSHA "Construction Industry Standard" (29 CFR 1926.58) for asbestos, is generally applicable for the workers who carry out the kinds of work discussed in this O&M guidance document. The OSHA construction industry asbestos standard applies to demolition and asbestos removal or encapsulation projects, as well as to repair, maintenance, alteration, or renovation if ACM is involved. ACM spills or emergency clean-up actions are also covered by this regulation.

According to those regulations, participation in a medical surveillance program is required for any employee who is required to wear a negative pressure, air-purifying respirator. Preplacement, annual, and termination physical exams are also required for these employees. However, a termination exam is only necessary under the construction industry standard (which applies to custodial and maintenance employees) if a physician recommends it. While not mandatory EPA and NIOSH recommend physical examinations, including cardiac and pulmonary tests, for any employee required to wear a respirator by the building owner. These tests determine whether workers will be unduly stressed or uncomfortable when using a respirator.

Additional requirements of the OSHA asbestos standards, such as the use of air filtration systems and hygiene facilities, involve procedures which are most applicable to large-scale asbestos abatement projects. However, these rules also include a number of recommendations for procedures which might be appropriate for a variety of O&M programs for buildings.

### Small-scale, Short-duration Projects

"Appendix G" which is specified as a non-mandatory section to the OSHA regulation 29 CFR 1926.58, may become mandatory under certain circumstances where "small-scale, short-duration" asbestos projects are conducted. These projects are not precisely defined in terms of either size or duration, although their nature and scope are illustrated by examples presented in the text of the regulation. Properly trained maintenance workers may conduct these projects. Examples may include removing small sections of pipe insulation or covering for pipe repair, replacing valves, installing electrical conduits, or patching or removing small sections of drywall. OSHA issued a clarification of the definition of a "small-scale, short-duration" (SS/SD) project in a September 1987 asbestos directive. The directive focuses on intent, stating that in SS/SD projects, the removal of ACM is not the primary goal of the job. If the purpose of a small-scale, short-duration project is maintenance, repair, or renovation of the equipment or surface behind the ACM—not abatement of ACM—then the appendix provisions may apply If the intent of the work is abatement of the ACM, then the full-scale abatement control requirements apply

In any event, this appendix section of the OSHA construction standard outlines requirements for the use of certain engineering and work practice controls such as glovebags, mini-enclosures, and special vacuuming techniques. Similar information on these procedures may be found in the EPA's AHERA regulations for schools. (See final AHERA rule, Appendix B, for SS/SD projects.)

### U.S. EPA National Emission Standards for Hazardous Air Pollutants (NESHAP) (40 CFR 61 Subpart M)

EPA's rules concerning the application, removal, and disposal of ACM, as well as manufacturing, spraying and fabricating of ACM, were issued under the asbestos NESHAP. The asbestos NESHAP regulation governs asbestos demolition and renovation projects in all facilities. The NESHAP rule usually requires owners or operators to have all friable ACM removed before a building is demolished, and may require its removal before a renovation. For renovation projects where friable ACM will be disturbed, the NESHAP rule may require appropriate work practices or procedures for the control of emissions. It is prudent to note that any ACM which may become friable poses a potential hazard that should be addressed. The building owner should consider that in many instances, the removal of friable ACM prior to demolition could be less expensive than removals while the building is still occupied and being used. *Some revisions to the current. NESHAP rule are anticipated by the end of 1.990.*

**In general applicable OSHA permissible exposure limits are not likely to be exceeded for most O&M activities in building areas where only non-friable ACM is present or where friable ACM is in good condition.**

## Notification

EPA or the state (if the state has been delegated authority under NESHAP) must be notified before a building is demolished or renovated. The following information is required on the NESHAP notice:

**1** Name and address of the building owner or manager;

**2** Description and location of the building;

**3** Estimate of the approximate amount of friable ACM present in the facility;

**4** Scheduled starting and completion dates of ACM removal;

**5** Nature of planned demolition or renovation and method(s) to be used;

**6** Procedures to be used to comply with the requirements of the regulation; and

**7** Name, address, and location of the disposal site where the friable asbestos waste material will be deposited.

**Depending on project size, EPA or the state must be notified before a building is demolished or renovated.**

The notification requirements do not apply if a building owner plans renovation projects which will disturb less than the NESHAP limits of 160 square feet of friable ACM on facility components or 260 linear feet of friable ACM on pipes (quantities involved over a one-year period). For renovation operations in which the amount of ACM equals or exceeds the NESHAP limits, notification is required as soon as possible.

## Emissions Control and Waste Disposal

The NESHAP asbestos rule prohibits visible emissions to the outside air by requiring emission control procedures and appropriate work practices during collection, packaging, transportation or disposal of friable ACM waste. All ACM must be kept wet until sealed in a leak-tight container that includes the appropriate label. The following table provides a simplified reference for building owners regarding the key existing NESHAP requirements.

**Resource Conservation and Recovery Act Regulations (RCRA); and Comprehensive Environmental Response, Compensation, and Liability Act Regulations (CERCLA, or "Superfund")**

Under expanded authority of RCRA, a few states have classified asbestos-containing waste as a hazardous waste, and require stringent handling, manifesting, and disposal procedures. In those cases, the state hazardous waste agency should be contacted before disposing of asbestos for approved disposal methods and recordkeeping requirements, and for a list of approved disposal sites.

Friable asbestos is also included as a hazardous substance under EPA's CERCLA regulations. The owner or manager of a facility (e.g., building, installation, vessel, landfill) may have some reporting requirements. Check with your EPA Regional Office for further information. (See Appendix D for telephone numbers.)

**The Asbestos Hazard Emergency Response Act Regulations (AHERA)**

In October 1987, EPA issued final regulations to carry out the Asbestos Hazard Emergency Response Act of 1986 (AHERA). The AHERA regulatory requirements deal *only with public and private elementary and secondary school buildings*. The regulations require schools to conduct inspections, develop comprehensive asbestos management plans, and select asbestos response actions to deal with asbestos hazards. The AHERA rules *do not* require schools to remove ACM.

A key element of the AHERA regulations requires schools to develop an O&M program if friable ACM is present. The AHERA O&M requirements also cover non-friable ACM which is about to become friable. For example, drilling through an ACM wall will likely result in friable ACM. Under the AHERA O&M provisions, schools must carry out specific O&M procedures which provide for the clean-up of any ACM releases and help ensure the general safety of school maintenance and custodial workers, as well as all other school building occupants. The AHERA regulation's O&M requirements mandate that schools employ specific work practices including wet wiping, HEPA vacuuming, proper waste disposal procedures, and specific training for custodial and maintenance employees who work in buildings with ACM.

**U.S. EPA Asbestos Ban and Phaseout Rule**

Bans on some uses and applications of asbestos under the Clean Air Act were briefly described in Chapter 1. In July 1989, under the Toxic Substances Control Act (TSCA), EPA promulgated an Asbestos Ban and Phaseout Rule. The complete rule was published in the *Federal Register* on July 12,1989.

Beginning in 1990 and taking effect in three stages, the rule prohibits the importation, manufacture, and processing of 94 percent of all remaining asbestos products in the United States over a period of seven years.

## Existing NESHAP Requirements Summary*

|  | Demolition | | Renovation | |
|---|---|---|---|---|
| **AMOUNT*** (in 1 yr.) | > 260 ln. ft. or > 160 sq. ft. | <260 ln. ft. or <160 sq. ft. | > 260 ln. ft. or > 160 sq. ft. | <260 ln. ft. or > 160 sq. ft. |
| **NOTIFICATION** | YES | YES | Y E S | NOT REQUIRED |
| **HOW FAR IN ADVANCE*** | 10 DAYS | 20 DAYS | AS SOON AS POSSIBLE | NOT REQUIRED |
| **EMISSION CONTROLS** (Work Practices) | YES | NOT REQUIRED | YES | NOT REQUIRED |
| **DISPOSAL STANDARD** | Y E S | NOT REQUIRED | Y E S | NOT REQUIRED |

*May be changed on promulgation of Revised NESHAP Rule in 1990

## Chapter Summary

A variety of federal, state, and local regulations govern the way building owners must deal with ACM in their facilities. State and local regulations maybe more stringent than federal standards and often change rapidly Building owners should periodically check with the appropriate Federal, State, and local authorities to determine whether any new asbestos regulations have been developed or whether current regulations have been amended. Specific federal regulations that may affect asbestos-related tasks and/or workers are highlighted here:

- OSHA Construction Industry Standard for Asbestos (29 CFR 1926.58).

- OSHA General Industry Standard for Asbestos (29 CFR 1910.1001).

- OSHA Respiratory Protection Standard (29 CFR 1910.134).

- EPA Worker Protection Rule (40 CFR 763 Subpart, G).

- EPA National Emission Standards for Hazardous Air Pollutants (NESHAP) (40 CFR 61 Subpart M).

- EPA Asbestos Hazard Emergency Response Act (AHERA) Regulations (40 CFR 763 Subpart E),

- EPA Asbestos Ban and Phaseout Rule (40 CFR 763 Subpart I).

2 9

Appendix A.

# Glossary of Terms

| | |
|---|---|
| **ACM** | Asbestos-Containing Material. Any material containing more than one percent asbestos. |
| **Asbestos Program Manager** | A building owner or designated representative who supervises all aspects of the facility asbestos management and control program. |
| **Air Plenum** | Any space used to convey air in a building or structure. The space above a suspended ceiling is often used as an air plenum. |
| **Asbestos Abatement** | Procedures to control fiber release from asbestos-containing materials in a building or to remove it entirely These may involve removal, encapsulation, repair, enclosure, encasement, and operations and maintenance programs. |
| **Delamination** | Separation of one layer from another. |
| **EPA** | U.S. Environmental Protection Agency |
| **Friable Asbestos** | Any materials that contain greater than one percent asbestos, and which can be crumbled, pulverized, or reduced to powder by hand pressure. This may also include previously non-friable material which becomes broken or damaged by mechanical force. |
| **Glovebag** | A polyethylene or polyvinyl chloride bag-like enclosure affixed around an asbestos-containing source (most often, TSI) so that the material maybe removed while minimizing release of airborne fibers to the surrounding atmosphere. |
| **HEPA Filter** | High-Efficiency Particulate Air Filter. Such filters are rated to trap at least 99.97% of all particles 0.3 microns in diameter or larger. |
| **Industrial Hygienist** | A professional qualified by education, training, and experience to anticipate, recognize. evaluate and develop controls for occupational health hazards. |
| **Medical Surveillance** | Aperiodic comprehensive review of a worker's health status. The required elements of an acceptable medical surveillance program are listed in the Occupational Safety and Health Administration standards for asbestos. |
| **Miscellaneous ACM** | Interior asbestos-containing building material on structural components, structural members or fixtures, such as floor and ceiling tiles; does not include surfacing material or thermal system insulation. |
| **NESHAP** | National Emission Standard for Hazardous Air Pollutants-EPA Rules under the Clean Air Act. |
| **NIOSH** | The National Institute for occupational Safety and Health, which was established by the Occupational Safety and Health Act of 1970. Primary functions of NIOSH are to conduct research, issue technical information, and test and certify respirators. |
| **Personal Air Samples** | An air sample taken with a sampling pump directly attached to the worker with the collecting filter and cassette placed in the worker's breathing zone. These samples are required by the OSHA asbestos standards and the EPA Worker Protection Rule. |
| **Prevalent Level Samples** | Air samples taken under normal conditions (also known as ambient background samples). |
| **Surfacing ACM** | Asbestos-containing material that is sprayed-on, troweled-on or otherwise applied to surfaces, such as acoustical plaster on ceilings and fireproofing materials on structural members, or other materials on surfaces for acoustical, fireproofing, or other purposes. |
| **TSI** | Thermal system insulation – asbestos-containing material applied to pipes, fittings, boilers, breeding, tanks, ducts or other interior structural components to prevent heat loss or gain or water condensation. |
| **TWA** | Time-weighted Average. In air sampling, this refers to the average air concentration of contaminants during a particular sampling period. |

**Appendix B.**

# Sample Recordkeeping Form:

**Form 1.** A sample form for recording information during ACM reassessment.

## Reinspection of Asbestos-Containing Materials

Location of asbestos-containing material (address, building, room, or general description]

_____

_____

_____

_____

**Type of asbestos-containing material(s):**

1. Sprayed-or troweled-on ceilings or walls
2. Sprayed-or troweled-on structural members
3. Insulation on pipes, tanks, or boiler
4. Other (describe)

_____

_____

**Abatement Status:**

1. The material has been encapsulated\_\_\_\_ , enclosed \_\_\_\_ , neither \_\_\_\_ , removed \_\_\_\_ .

**Assessment:**

1. Evidence of physical damage _____

_____

2. Evidence of water damage: _____

_____

3. Evidence of delamination or other damage: _____

_____

4. Degree of accessibility of the material: _____

_____

5. Degree of activity near the material: _____

_____

6. Location in an air plenum, air shaft, or airstream: _____

_____

7. Other observations (including the condition of the encapsulant or enclosure, if any): _____

_____

**\*Recommended Action:** _____

_____

Signed:_____  Date: _____
                    (evaluator)

3 1

**Form 2.** A sample application form for maintenance work approval.

## Job Request Form for Maintenance Work

Name: _____    Date: _____

Telephone No. _____    Job Request No. _____

Requested  starting  date: _____    Anticipated  finish  date: _____

Address, building, and room number(s) (or description of area) where work is to be performed:

_____

_____

_____

_____

Description of work

_____

_____

_____

_____

_____

Description of any asbestos-containing material that might be affected, if known (include location and type):

_____

_____

_____

_____

_____

Name and telephone number of requestor:

_____

Name and telephone number of supervisor

_____

Submit this application to

_____

(The Asbestos Program Manager)

NOTE An application must be submitted for all maintenance work whether or not asbestos-containing material might be affected. An authorization must then be received before any work can proceed.

_____ Granted (Job Request No._____)
_____ With conditions*
_____ Denied

*Conditions _____

_____

3 2

**Form 3.** A sample maintenance work authorization form.

## Maintenance Work Authorization Form

No._____

**AUTHORIZATION**

Authorization is given to proceed with the following maintenance work:

_____

_____

_____

_____

_____

_____

_____

_____

**PRESENCE OF ASBESTOS-CONTAINING MATERIALS**

_____ Asbestos-containing materials are not present in the vicinity of the maintenance work.

_____ ACM is present, but its disturbance is not anticipated however, if conditions change, the Asbestos Program Manager will re-evaluate the work request prior to proceeding.

_____ ACM is present, and maybe disturbed.

**Work Practices if Asbestos-Containing Materials Are Present**

The following work practices shall be employed to avoid or minimum disturbing asbestos:*

_____

_____

_____

_____

_____

**Personal Protection if Asbestos-Containing Materials Are Present****

The following equipment/clothes shall be used/worn during the work to protect workers:

_____

_____

_____

_____

(manuals on personal protection can be referenced)

**Special Practices and/or Equipment Required:**

_____

_____

Signed:_____ Date:_____
            (Asbestos Program Manager)

33

**Form 4.** A sample work evaluation form

This evaluation covers the following maintenance work:

Location of work (address, building, room number(s), or general description):

_____

_____

_____

_____

Date(s) of work _____

Description of work _____

Work approval form number: _____

Evaluation of work practices employed to minimize disturbance of asbestos:

_____

_____

_____

_____

_____

Evaluation of work practices employed to contain released fibers and to clean up the work area:

_____

_____

_____

_____

_____

Evaluation of equipment and procedures used to protect workers:

_____

_____

_____

_____

_____

Personal air monitoring results; (i-house worker or contract?)

Worker name _____ Results: _____

Worker name _____ Results: _____

Handling or storage of ACM waste: _____

signed _____ Date: _____
   (Asbestos Program Manager)

34

Appendix C

## Illustrative Organization Chart



**Figure 1.** A *sample* organization for a building owner with a large in-house management staff. Shaded boxes indicate outside assistance.

## Owners and Managers Who Employ an Extensive In-house Management Staff

**IN-HOUSE STAFF (FIGURE 1)**

**Asbestos Program Manager:** Has authority and overall responsibility for the asbestos control program. May develop the O&M program. Coordinates all activities. May also administer the respiratory protection program.

**Physical Plant Manager:** (may also be the Asbestos Program Manager) Participates in establishing work practices for cleaning and maintenance activities, and in training custodial and maintenance staff to use them. Assists in implementing the O&M program and in conducting periodic reinspection of the ACM. Ensures that outside contractors follow O&M procedures.

**Communications Person:** (Public Affairs Officer, Nurse, Physician, Industrial Hygienist) Assists in preparation and distribution of information about ACM in the building. Person should be a good speaker and communicator.

**Recordkeeping Person:** (Executive Assistant, Secretary) Responsible for maintaining records.

**OUTSIDE ASSISTANCE**

**EPA Regional Asbestos Coordinator, NESHAP Coordinator and State/Local Government Advisors:** Provide getter-id guidance and answer specific questions.

**OSHA Regional Office:** May he helpful in answering questions about existing regulations, and providing guidance for worker protection.

**Asbestos Consultant(s)*:** (Industrial Hygienists, Health Professionals, Architects, Engineers, and others) May assist in various aspects of the asbestos O&M program, including its development and implementation. May also conduct material inspections and provide work practice recommendations.

**Lawyer:** Provides advice on legal requirements (such as laws and statutes) and liability aspects of the program.

**Asbestos Contractor*:** May provide services for ACM abatement and for building decontamination following a fiber release episode.

*It is important for owners and Asbestos Program Manager's to consider potential "conflict of interest" issues pertaining to those persons or firms used to sample, inspect, assess, analyze, recommend response actions, design response actions, and conduct asbestos response actions.

35



**Figure 2.** A *sample* organization for owners of buildings where services are provided by contract. Shaded boxes indicate outside assistance.

## Owners and Managers Who Contract For Services

### IN-HOUSE STAFF (FIGURE 2)

**Asbestos Program Manager:** Has overall responsibility for the asbestos control program. May develop and implement the O&M program. Establishes training and experience requirements for contractor's workers. Supervises and enforces work practices with assistance of work crew supervisors. Conducts periodic reinspection and responsible for recordkeeping. This person should be properly trained in O&M program development and implementation (see Chapter 5).

### OUTSIDE ASSISTANCE

**EPA Regional Asbestos Coordinator and State/Local Government Advisors:** Provide general guidance and answer specific questions,

**OSHA Regional Office:** May be helpful in answering questions about existing regulations and providing guidance for worker protection.

**Asbestos Consultant(s)\*:** (Industrial Hygienists, Health Professionals, Architects, Engineers, and others) May assist Asbestos Program Manager in various aspects of the asbestos O&M program, including development and implementation. May also conduct the inspection and provide work practices recommendations.

**Lawyer:** Provides advice on legal requirements (laws and statutes) and liability aspects of the program.

**Asbestos Contractor\*:** May provide services for ACM abatement and building decontamination following a fiber release episode.

\*It is important for owners and Asbestos Program Manager's to consider potential "conflict of interest" issues pertaining to those persons or firms used to sample, inspect, assess, analyze, recommend response actions, design response actions, and conduct asbestos response actions.

**APPENDIX D.**

## Additional Assistance and Training

### EPA REGIONAL CONTACTS

Additional assistance can be obtained from your U.S. EPA Regional Asbestos Coordinators, NESHAP Regional Coordinators, and OSHA Regional Offices. Their telephone numbers are listed below

**EPA Region 1:** (CT,ME,MA,NH,RI,VT)

Asbestos Coordinator (617) 565-3835
NESHAP Coordinator (617) 565-3265

**EPA Region II:** (NJ,NY,PR,VI)

Asbestos Coordinator (201) 321-6671
NESHAP Coordinator (212) 264-6770

**EPA Region III:** (DE,DC,MD,PA,VA,WV)

Asbestos Coordinator (215) 597-3160
NESHAP Coordinator (215) 597-6550

**EPA Region IV:** (AL,FL,GA,KY,MS,NC,SC,TN)

Asbestos Coordinator (404) 347-5014
NESHAP Coordinator (404) 347-2904

**EPA Region V:** (IL,IN,MI,MN,OH,WI)

Asbestos Coordinator (312) 886-6003
NESHAP Coordinator (312) 353-2088

**EPA Region VI:** (AR,LA,NM,OK,TX)

Asbestos Coordinator (214) 655-7244
NESHAP Coordinator (214) 655-7229

**EPA Region VII:** (IA,KS,MO,NE)

Asbestos Coordinator (913) 551-7020
NESHAP Coordinator (913) 551-7020

**EPA Region VIII:** (CO,MT,ND,SD,UT,WY)

Asbestos Coordinator (303) 293-1442
NESHAP Coordinator (303) 294-7685

**EPA Region IX:** (AZ,CA,HI,NV,AS,GU)

Asbestos Coordinator (415) 556-5406
NESHAP Coordinator (415) 556-5526

**EPA Region X:** (AK,ID,OR,WA)

Asbestos Coordinator (206) 442-4762
NESHAP Coordinator (206) 442-1757

### OSHA REGIONAL OFFICES

**Region I –** Boston, MA:(617) 223-6710
**Region II –** New York, NY: (212) 944-3432
**Region III –** Philadelphia, PA (215) 596-1201
**Region IV –** Atlanta, GA (404) 347-3573
**Region V –** Chicago, IL: (312) 353-2220
**Region VI –** Dallas, TX: (214) 7674731

**Region VII –** Kansas City, MO (816) 374-5861
**Region VIII –** Denver, CO: (303) 844-3061
**Region IX –** San Francisco, CA: (415) 995-5672
**Region X –** Seattle, WA (206) 442-5930

## Toxic Substances Control Act (TSCA) Assistance Hotline

Copies of the EPA Guidance Documents, Technical Bulletins, and other publications cited here can be obtained by calling the TSCA Assistance Hotline, in Washington, D.C., at: (202) 554-1404.

## Approved Training Centers

Certain training centers and satellite centers were initially funded by EPA to develop asbestos training courses. They and other training providers approved by EPA or states, offer courses for professionals such as asbestos inspectors and management planners involved with ACM detection and control, for asbestos abatement project designers, project supervisors and abatement workers, and others. In general, qualified professionals trained as inspectors and asbestos management planners would be good choices to design an O&M plan. Original training centers are located at the following sites:

Georgia Institute of Technology
GTRI/EDL/ESTD
29 O'Keefe Building
Atlanta, GA 30332
(404) 894-3806

University of Kansas
Asbestos Training Center
6600 College Blvd. Suite 315
Overland Park, KS 66211
(913) 491-0181

Pacific Asbestos
Information Center
University CA/Extension
2223 Fulton St.
Berkeley, CA 94720
(415) 643-7143

Tufts University
Curtis Hall
Asbestos Information Center
474 Boston Avenue
Medford, MA 02155
(617) 381-3531

University of Illinois at Chicago
Midwest Asbestos Information Center
BOX 6998
Chicago, IL 60680
(312) 996-6904

Additional training providers are listed in the *Federal Register* on a regular basis. Call (202) 554-1404 for information. In addition, information on how to receive a copy of an O&M Course produced by an EPA contractor maybe obtained at the same number.

### OTHER ORGANIZATIONS

National Conference of State Legislatures (NCSL)
Denver, CO – (303) 623-7800
National Institute of Building Sciences (NIBS),
Washington, D.C. – (202) 289-7800
American Board of Industrial Hygiene (ABIH),
Lansing, MI – (517) 321-2638
National Institute for Standards and Technology (NIST),
Gaithersburg, MD – (contact for lab accreditation) –
(301) 975-4016

37

**APPENDIX E:**

# Respiratory Protection Recommendations

EPA recommends that the following guidelines be followed for respiratory protection during various custodial and maintenance tasks. These guidelines are issued to cover tasks that do not always create routine fiber levels high enough to trigger OSHA respiratory protection requirements. Therefore, building owners should note they go beyond OSHA requirements.

● **Routine maintenance where contact with ACM is unlikely.** No respiratory protection required. (Air-purifying respirator with high-efficiency filters should be available if needed: half-face or full facepiece).

● **Routine maintenance where there is reasonable likelihood of ACM disturbance.** Air-purifying respirator with high-efficiency filters (half-face or full facepiece).

● **Maintenance or repair involving intentional small-scale disturbance of ACM.** Powered air-purifying respirator with high-efficiency filters, or air-purifying respirator with high-efficiency filters (half-face or full facepiece). If glove bags are used to contain the ACM during disturbance, either half-face or full facepiece air-purifying respirators with high-efficiency filters may be used.

● **Any O&M activity requiring sawing, cutting, drilling, abrading, grinding, or sanding ACM.** (NOTE: specially equipped tools with local exhaust ventilation should be used for these activities. See 29 CFR 1910.) Powered air-purifying respirator with high-efficiency filters, or full facepiece, air-purifying respirator equipped with high-efficiency filters should be used.

● **Cleanup after a minor asbestos fiber release.** Air-purifying respirator with high-efficiency filters (half-face or full facepiece).

● **Cleanup after a major asbestos fiber release.** Air-supplied respirators, either the "Type C" airline respirator equipped with a backup high-efficiency filter or SCBA (Self-Contained Breathing Apparatus).

The U.S. EPA, in collaboration with NIOSH, has issued a guidance document, "A Guide to Respiratory Protection for the Asbestos Abatement Industry" which recommends levels of respiratory protection for those engaged in large-scale asbestos abatement projects that are beyond routine O&M procedures. Air-supplied self-contained, and "type C" airline respirators are the focus of the EPA/NIOSH document. These respirators allow workers to breathe fresh air supplied through hoses and face masks, and are generally used only by asbestos abatement workers engaged in large-scale asbestos removal projects. They are usually not considered either practical or necessary for most custodial and maintenance jobs.

An industrial hygienist or environmental/occupational health professional should assist workers with respirator selection and fitting, and train them in respirator use. Fit-testing (which means determining whether a particular brand and size of respirator properly fits an individual worker) is essential, since respirators which leak at the face seal provide significantly less protection. OSHA requires fit-testing initially and every six months for employees required to wear a negative pressure respirator for protection against asbestos, or for individuals exposed at or above the OSHA-specified limits.

A respirator's effectiveness is also influenced by how it is handled, cleaned, and stored. Custodial and maintenance staff should clean their respirators after each use, and disinfect their respirators at the end of a day's use. This improves comfort, and also reduces the chances of skin irritation or infection. After cleaning the respirator, custodial and maintenance staff should place the respirator (with the worker's name) in a clean and sanitary location and store the unit in a secure place for future use. Respirators should be visually inspected by the user before and after each use, during cleaning and at least monthly when not in use. Inspection records should be maintained accordingly When the respirator's high-efficiency filters are discarded, they should be disposed of as asbestos waste.

APPENDIX F

## Existing EPA Guidance for Each Step That a Building Owner May Take to Conrol ACM

| Action | Existing EPA Guidance/Regulations* |
|---|---|
| Appoint Asbestos Program Manager and Develop an Organizational Policy. | "Guidance for Controlling Asbestos-Containing Materials in Buildings" ("Purple Book") EPA publication number: 560/5-85-024 |
| Inspect the facility to determine if ACM is present. Take bulk samples of suspect ACM and assess the material's condition. | "Guidance for Controlling Asbestos-Containing Materials in Buildings" ("Purple Book", chapter 2) EPA publication number 560/5-85-024

"Simplified Sampling Scheme for Surfacing Materials" ("Pink Book") EPA publication number: 560/5-85-030a

"Asbestos-Containing Materials in Schools; Final Rule and Notice" (Asbestos Hazard Emergency Response Act, or AHERA). *Federal Register*– October 30, 1987. (sections 763.85 to 763.88)

Model training course materials for accrediting asbestos building inspectors in accordance with AHERA (inspection/assessment materials). |
| Establish an O&M program. | "Purple Book, Chapter 3

AHERA regulations, sections 763.91 and 763.92

EPA Guidance for Service and Maintenance Personnel. EPA publication number 560/5-85-018 |
| Implement and Conscientiously Manage the O&M Program; Assess the Potential for Exposure to Asbestos and Select Response Actions. | "Purple Book", Chapter 4

Model training course materials for accrediting asbestos management planners in accordance with AHERA (assessment materials).

AHERA regulations, section 763.88 and 793.92 |
| Select and Implement Abatement Actions Other Than O&M When Necessary | "Purple Book", Chapter 6

AHERA regulations, section 763.93 (including 763.85 through 763.92)

AHERA regulation, appendix A Determining Completion of Response Actions-Methods.

"Abatement of Asbestos-Containing Pipe Insulation" U.S. EPA Asbestos-ii-Buildings Technical Bulletin 1986-2.

U.S. EPA National Emission Standards for Hazardous Air Pollutants (NESHAP) Regulations (40 CFR 61)

Model training course materials for accrediting asbestos management planners in accordance with AHERA (assessment materials). |

*Most of these guidance materials are available through EPA's TSCA Assistance Hotline, at (202) 554-1404.

**APPENDIX G:**

- Cement Pipes
- Cement Wallboard
- Cement Siding
- Asphalt Floor Tile
- Vinyl Floor Tile
- Vinyl Sheet Flooring
- Flooring Backing
- Construction Mastics (floor tile, carpet, ceiling tile, etc.)
- Acoustical Plaster
- Decorative Plaster
- Textured  Paints/Coatings
- Ceiling Tiles and Lay-in Panels
- Spray-Applied Insulation
- Blown-in Insulation
- Fireproofing Materials
- Taping Compounds (thermal)
- Packing Materials (for wall/floor penetrations)
- High Temperature Gaskets
- Laboratory Hoods/Table Tops
- Laboratory Gloves
- Fire Blankets
- Fire Curtains
- Elevator Equipment Panels

- Elevator Brake Shoes
- HVAC Duct Insulation
- Boiler Insulation
- Breeching Insulation
- Ductwork Flexible Fabric Connections
- Cooling  Towers
- Pipe Insulation (corrugated air-cell, block, etc.)
- Heating and Electrical Ducts
- Electrical Panel Partitions
- Electrical Cloth
- Electric Wiring Insulation
- Chalkboards
- Roofing Shingles
- Roofing Felt
- Base Flashing
- Thermal Paper Products
- Fire Doors
- Caulking/Putties
- Adhesives
- Wallboard
- Joint Compounds
- Vinyl Wall Coverings
- Spackling Compounds

**NOTE:** This list does not include every product/material that may contain asbestos. It is intended as a general guide to show which types of materials may contain asbestos.

**APPENDIX H:**

USEPA. 1984. U.S. Environmental Protection Agency *National Emission Standards for Hazardous Air Pollutants.* 40 CFR 61. April 5, 1984.

USEPA. 1985. U.S. Environmental Protection Agency *Measuring airborne asbestos following an abatement action.* Washington DC: USEPA. EPA 600/4-85-049. ("Silver Book")

USEPA. 1985. U.S. Environmental Protection Agency *Asbestos in buildings: Simplified sampling scheme for surfacing materials.* Washington DC: USEPA. EPA 560/5-85-030A. ("Pink  Book)

USEPA. 1985. U.S. Environmental Protection Agency *Guidance for controlling asbesdos-containing materials in buildings.* Washington DC EPA 560/5-85-024. ("Purple Book")

USEPA. 1985. U.S. Environmental Protection Agency *Asbestos in buildings: Guidance for service and maintenance personnel.* Washington DC: EPA 560/5-85-018. ("Custodial Pamphlet")

USEPA. 1986. U.S. Environmental Protection Agency *Abatement of asbestos-containing pipe insulation.* Washington DC: Technical Bulletin No. 1986-2.

USEPA. 1986. U.S. Environmental Protection Agency *A guide to respiratory protection for the asbestos abatement industry.* Washington DC: EPA  560/OPTS-86-00l.

USEPA. 1987. Asbestos *Abatement Projects; Worker Protection, Final Rule. 40* CFR 763. February 1987.

USEPA. 1987. U.S. Environmental Protection Agency *Asbestos-Containing Materials in Schools; Final Rule and Notice.* 40 CFR 763. *Federal Register,* October 30, 1987.

USEPA. 1988. *EPA Study of Asbestos-Containing Materials in Public Buildings: A Report to Congress.* February 1988.

USEPA. 1989. *Asbestos Ban and Phaseout Rule.* 40 CFR 763.160 to 763.179. *Federal Register* July 12, 1989.

USEPA. 1989. *Guidelines for Conducting the HERA TEM Clearance Test to Determine Completion of an Asbestos Abatement Project.* Washington DC: EPA 560/5-89-001.

USEPA. 1989. *Transmission Electron Microscopy Asbestos Laboratories: Quality Assurance Guidelines.* Washington DC: EPA  560/5-90-002.

U.S. Department of Labor: OSHA Regulations. 29 CFR 1910.1001 – *General Industry Asbestos Standard* and 29 CFR 1926.58 – *Construction Industry Asbestos Standard.* June 1986; Amended, September, 1988.

U.S. Department of Labor: OSHA Regulations. 29 CFR 1910.134 – *Respiratory Protection Standard.* June, 1974.

Keyes, Dale L. and Chesson, Jean. 1989. *A Guide to Monitoring Airborne Asbestos in Buildings.* Environmental Sciences, Inc., 105 E. Speedway Blvd., Tucson, Arizona 85705.

**<u>SCHEDULE VI-2</u>**

**<u>O&M FOR LEAD-BASED PAINT</u>**

# LEAD-BASED PAINT
# OPERATIONS AND MAINTENANCE
# PROGRAM
### FOR
# COULTER LANDING
# 7208 SOUTHWEST 34TH AVENUE
# AMARILLO, TEXAS 79109

**Issue Date:**  February 27, 2017

# **Table of Contents**

| Section | Page No. |
|---|---|
| **1.0** PURPOSE OF OPERATIONS AND MAINTENANCE PROGRAM | 3 |
| **2.0** LEAD-BASED PAINT OPERATIONS AND MAINTENANCE MANAGER | 4 |
| **3.0** NOTIFICATION | 5 |
| **4.0** SURVEILLANCE | 7 |
| **5.0** WORK CONTROLS/PERMIT SYSTEM | 8 |
| **6.0** WORK PRACTICES/WORKER PROTECTION | 9 |
| **7.0** WORKER TRAINING | 13 |
| **8.0** RECORD KEEPING | 14 |

**Appendices:**

| | |
|---|---|
| Appendix A | Operation & Maintenance Forms |
| Appendix B | Reference Rules and Regulations |

# 1.0    PURPOSE OF OPERATIONS AND MAINTENANCE PROGRAM

The principal objective of the LBP O&M program is to minimize exposure of building occupants to lead originating from LBP.

For purposes of this O&M, all potential LBP is assumed to be LBP unless proven otherwise by laboratory analysis of chip samples or by X-ray fluorescence technology.

This O&M Program has been developed to assist the building personnel to safely perform their job function when working with or near LBP.  The O&M Program should in no way substitute for proper LBP training.  All building personnel, at a minimum, should read this program and be familiar with the basics of the O&M Program.

This O&M Program should be maintained until all LBP is removed from the subject property.

# 2.0 LEAD-BASED PAINT OPERATIONS AND MAINTENANCE MANAGER

An essential component of the LBP O&M program is the appointment of an O&M manager (OMM). The OMM is usually a building engineer, superintendent or facilities manager. This person should be properly qualified, through training and experience, and be actively involved in all LBP-related activities at the property, including inspections, O&M activities and removal and repair of LBP.

The position of Operations and Maintenance Manager (OMM) for the subject property is held by:

| Name | |
|------|--|
| Address | |
| Telephone | |

The OMM's responsibilities can include any of the following:

a) Recording the locations of the LBP on-site.
b) Maintaining and updating the O&M program as needed.
c) Authorizing in advance repair, renovation, maintenance, or installation work to be performed on-site in writing. Authorization documents should be maintained on file.
d) Ensuring that proper procedures and safety precautions are followed for maintenance work involving LBP.
e) When appropriate, enforcing the respiratory protection and medical surveillance program.
f) If necessary, purchasing and maintaining respiratory equipment and other work-related equipment.
g) Maintaining and updating worker training records, and medical and respiratory documentation.
h) Coordinate annual inspections
i) Arrange for the storage, transportation, and disposal of any LBP waste generated during O&M activities.
j) Reporting and documenting any LBP-related emergencies to the building management.
k) Responding to all questions and requests for LBP-related information.

# 3.0    NOTIFICATION

The OMM will inform building occupants/tenants and workers about the location and physical condition of the LBP that they might disturb, and stress the need to avoid disturbing the material.

The purpose of the notification is to avoid the accidental disturbance of LBP and the subsequent release of led dust.

The OMM can inform occupants and building personnel about the presence of LBP by distributing written notices, posting signs or labels in a central location where affected occupants can see them, or holding awareness or information sessions.

Information sessions, if necessary, should be used to reinforce and clarify written notices and signs, and provide an opportunity to answer questions.  All building employees and tenants or outside contractors likely to disturb LBP should be included in the notification program on a continuing basis.  New building employees should be informed about the presence of LBP before they begin work.

Whatever its form, the notification should contain the following points to the extent they reflect building conditions:

a)  The location of LBP in the building
b)  The condition of the LBP.
c)  LBP presents a health hazard when the paint or lead dust from the paint is ingested.
d)  Do not disturb the LBP.
e)  Report any evidence of disturbance, damage, change of condition, or improper action relative to the LBP to:

| OMM Name | |
|---|---|
| Location | |
| Telephone | |

f)  Cleaning and maintenance personnel are taking special precautions during their work to guard against disturbing LBP.
g)  All LBP is inspected at least annually
h)  Additional measures will be taken if needed to protect the health of building occupants.

The Federal Residential Lead-Based Paint Hazard Reduction Act (also known as Title X) also has notification requirements.   To protect families from exposure to lead from paint, dust and soil, Congress passed the Residential Lead-Based Paint Hazard Reduction Act (also known as Title X) in 1992.  Section 1018 of this law directed the Department of Housing and Urban Development (HUD) and the EPA to require the disclosure of known information on lead-based paint and lead-based paint hazards before the sale or lease of most housing constructed

before 1978.  Title X ensures that renters and purchasers of housing constructed prior to 1978 receive the information necessary to protect themselves and their families from lead-based paint hazards.  Adherence to Title X should be implemented as part of this O&M Program.  A link to the full text of Title X is <u>http://www.epa.gov/lead/pubs/titleten.html</u> .

# 4.0   SURVEILLANCE

The LBP on-site will be inspected annually by a qualified trained individual.  The annual inspections can be conducted by the OMM or an outside consultant.  The inspections will include identifying and recording changes in the condition of the LBP, including damage and deterioration, and changes in the use and activity of spaces containing LBP.  Special attention will be given to LBP located in high activity areas that are susceptible to damage and subsequent deterioration, and LBP located in areas occupied by or frequented by children and pregnant women..  If the annual inspections are conducted by an outside consultant, the OMM will accompany the consultant during the inspections.  All annual inspection documentation and reports will be maintained by the OMM.  The Periodical Surveillance Form included in Appendix A can be used to document the inspections.

In addition, building personnel will be trained to recognize damage and changes in the condition of LBP on-site.  Building personnel who notice any changes to the condition of the LBP on-site will notify the OMM immediately.

# 5.0   WORK CONTROLS/PERMIT SYSTEM

All work that can potentially damage LBP should controlled/managed in such a way as to minimize disturbance of LBP and the release of lead dust.  One way to achieve this goal is to use a permitting system consisting of the use of three forms.  Examples of these three forms are included in Appendix A.  The forms can and should be modified to suit the individual parameters of the site, the management team, and the location of the LBP on-site.  The three example forms are as follows:

> <u>Maintenance Work Location Form:</u> This form describes the proposed maintenance work and must be submitted to the OMM before any maintenance work is begun
> <u>Maintenance Work Authorization Form:</u> This form must be approved by the OMM before any maintenance work is begun and dictates the work practices and personal protective equipment/clothing to be used during the maintenance work.
> <u>LBP Maintenance Closure Form:</u> This form will document the methods undertaken to minimize the disturbance of LBP and the release of lead dust (i.e. control methods, protective equipment, etc.)

The OMM should determine if the planned work will disturb any LBP.  If the work is to disturb a suspect or potential LBP area, then a prudent measure is to collect a paint chip sample of the suspect LBP at that time to determine its lead content.  The paint chip sample should be analyzed by an accredited laboratory for lead content.

Copies of all Maintenance Work Location Forms, Maintenance Work Authorization Forms, LBP Maintenance Closure Forms and laboratory lead sample results should be kept on file for future reference.

Implementation of this O&M program should address work conducted by outside contractors. Proposals and work orders from outside contractors should be thoroughly reviewed to ensure that appropriate work practices are followed as related to LBP.

All work that will result in the disturbance of LBP should be conducted in accordance with applicable USEPA, Occupational Safety and Health Administration (OSHA), and/or state and local regulations.

# 6.0   WORK PRACTICES/WORKER PROTECTION

This section will describe special work practices that are designed to avoid or minimize the chances of LBP dust release.

**The work practices and worker protection procedures described in this section (6.0 through 6.4) are only necessary if LBP is to be disturbed.  If the lead content of a material to be disturbed is unknown, then paint chip samples should taken prior to the commencement of work and analyzed for lead content by an accredited laboratory.**

The following are the special practices that need to be taken for LBP found on-site.

| POTENTIAL LBP ON ALL PAINTED SURFACES ON-SITE | |
|---|---|
| Initial and Periodic Cleaning | None required |
| Periodic Surveillance: | Annual |
| Labeling | None |
| Restricted Activities | Any activities that may result in the damage or disturbance of the LBP surfaces |
| | Avoid removing, scrapping, stripping, or sanding the LBP surfaces |
| | If the lead content of a material is not known, a sample of the material should be taken prior to the commencement of work that may disturb the material.  The material should be analyzed by a certified laboratory to determine lead content. |

The O&M Program focuses on a special set of work practices for the custodial, maintenance, and construction staff.  The nature and extent of any special work practices should be tailored to the likelihood that the LBP will be disturbed and that lead dust will be released.  In general, four broad categories of O&M work practices are recognized.  These categories are listed below and are discussed in sub-sections 6.1 through 6.4.

> <u>Worker Protection Programs:</u> These work practices help ensure custodial and maintenance staff are adequately protected from LBP exposure.
> <u>Basic O&M Procedures:</u> These are basic procedures used to perform routine custodial and maintenance tasks that may involve LBP.
> <u>Special O&M Cleaning Techniques:</u> These are special techniques to clean up LBP dust on a routine basis.
> <u>Procedures for Lead Dust Release Episodes:</u> These are procedures used to address the hazards involving the disturbance of moderate to relatively large amounts of LBP and LBP dust.

# 6.1   WORKER PROTECTION PROGRAM

The Worker Protection Program is only necessary if LBP is to be disturbed, has been disturbed, or if workers are to be exposed to LBP or lead dust from LBP.  If the lead content of a painted surface is unknown, then samples should taken prior to the commencement of work and analyzed for lead content by an accredited laboratory.

The Worker Protection Program includes engineering controls, personal exposure monitoring, medical surveillance, and personal protection.  While engineering controls are the preferred method of worker protection, there are few engineering control options available for O&M

work. There are two essential aspects of personal protection: the use of respiratory protection and the use of protective clothing for workers. These two essential aspects are detailed in subsections 6.1.1 and 6.1.2 below.

### 6.1.1    RESPIRATORY PROTECTION/WORKER PROTECTION PROGRAMS

According to OSHA regulations, a written respiratory protection program is necessary whenever an O&M Program specifies that service workers wear respirators, or where employees are exposed, or are likely to be exposed, to airborne lead dust levels above OSHA's "permissible exposure limits" (0.050 milligrams per cubic meter).

Proper respiratory protection is an integral part of all custodial and maintenance activities involving potential exposure to lead dust. When in doubt about exposure during a certain work operation, building owners should provide respiratory protection to custodial and maintenance workers. OSHA specifies general types of respirators for protection against airborne lead dust during "construction" activities, which include abatement, renovation, maintenance, repair, and remodeling.

When adequate care is taken to prevent or minimize and control dust release, routine, small-scale/short-duration maintenance or custodial tasks are not likely to generate high levels of lead dust compared to large LBP removal projects. Therefore, respirators that filter breathing air may be used in these instances.

The options that may be used include a half- or full-face, negative pressure, air-purifying respirator with replaceable high-efficiency filters; or a half- or full-face powered air-purifying respirator (PAPR) with replaceable high-efficiency filters. This has a battery-powered pump that assists breathing and provides positive pressure in the face piece.

Currently, only respirators approved by NIOSH and the Mine Safety and Health Administration (MSHA) are permitted for use. If they are air purifying respirators, the filtration device(s) must be rated as "high-efficiency."

### 6.1.2    PROTECTIVE CLOTHING/WORKER PROTECTION PROGRAMS

In addition to respirators, some O&M procedures may require workers to wear protective clothing. Most often, protective clothing is disposable and consists of coveralls, a head cover, and foot covers made of a synthetic fabric that does not allow lead dust to pass through. This type of clothing prevents workers' regular clothing from becoming contaminated with lead dust. Contaminated clothing could unknowingly be taken home, creating a possible risk to the worker and the worker's family members.

OSHA and EPA regulations require workers to wear protective clothing whenever they are exposed, or likely to be exposed, to lead dust levels above OSHA's permissible levels. It is important that workers be properly trained in the use, removal, and disposal of protective clothing after use. All O&M activities may not require the use of protective clothing. It is important for the OMM to assess this need on a case-by-case basis.

## 6.2    BASIC O&M PROCEDURES

These procedures are only necessary if LBP has been disturbed or is to be disturbed.  If the lead content of a painted surface is unknown, then samples should taken prior to the commencement of work and analyzed for lead content by an accredited laboratory.

Basic O&M procedures to minimize and/or contain lead dust may include wet methods, use of mini-enclosures, use of portable power tools equipped with special local ventilation attachments, and avoidance of certain activities, such as sawing, sanding, scraping, and drilling LBP.

Special work practices such as wet wiping, area isolation, HEPA vacuuming, and the use of personal protective equipment such as respirators and protective clothing, may be needed where disturbance of LBP is likely.  The need for these practices varies with the situation. These work practices and procedures are intended to ensure that disturbances of any LBP surfaces during O&M activities are minimized, or carried out under controlled conditions when the disturbance is required by the nature of a specific O&M task.

## 6.3    O&M CLEANING PRACTICES

These procedures are only necessary if LBP has been disturbed or is to be disturbed.  If the lead content of a painted surface is unknown, then samples should taken prior to the commencement of work and analyzed for lead content by an accredited laboratory.

Building owners and custodial and maintenance staff should ensure that special O&M cleaning is done correctly.  Proper cleaning is important for the following two reasons:

1) The use of improper techniques to clean up lead dust and debris caused by previous deterioration or damage may result in widespread contamination, and potentially increase lead dust levels in the building.
2) Improper cleaning may cause damage to the LBP, thus releasing more lead dust.

Proper O&M cleaning practices will involve the use of wet cleaning or wet-wiping practices to pick up lead dust.  Dry sweeping or dusting can result in lead dust being recirculated into the building's air and therefore should not be used.  Once wet clothes, rags, or mops have been used to pick up lead dust and debris, they should be properly discarded as lead-contaminated waste, while still wet.  They should not be allowed to dry out, since the collected lead dust might be released later when disturbed.  The use of special vacuum cleaners, commonly referred to as HEPA vacuums, may be preferable to wet cleaning in certain situations.  These vacuums are equipped with filters designed to remove very small particles by filtering those particles from the air passing through the vacuum.  Since the exhaust air from an ordinary vacuum cleaner is not filtered sufficiently, it is possible for tiny lead dust particles to pass through the filter into the building air.

## 6.4    PROCEDURES FOR LEAD DUST RELEASE EPISODES

These procedures are only necessary if LBP has been disturbed.  If the lead content of a material that was disturbed is unknown, then samples should be taken and analyzed for lead content by an accredited laboratory.

Special procedures are generally needed to minimize the spread of lead dust throughout the building after lead dust releases occur, such as the partial collapse of a LBP surface.  These procedures are needed whether the LBP disturbance is intentional or unintentional.  Depending on the severity of the episode, lead abatement consultants and contractors may be needed to develop a strategy for the cleanup operations.

In general, for major lead dust releases, the area should be isolated by closing doors and/or erecting temporary barriers to restrict airflow as well as access to the site.  Signs should be posted, as necessary, adjacent to the lead dust release site to prevent personnel involved in the cleanup operation from inadvertently entering the area.  If lead dust could enter the HVAC system, the system should be modified to prevent dust entry, or should be shut down and sealed off.  The final step should be to employ thorough cleanup procedures to properly control the LBP, careful visual inspection, and final clearance air monitoring to verify satisfactory cleanup.

It is important to recognize that different levels of training are needed for workers involved with lead dust release episodes.  A major release will generally require "lead abatement worker training", rather than the degree of training considered adequate for O&M workers.

## 7.0   WORKER TRAINING

Training is the primary means of educating the maintenance staff in handling LBP in the building and minimizing and/or eliminating potential lead dust release during routine maintenance, repair or renovation work in the building.  Training of the building staff that may come into contact with LBP can include Lead Inspector certification, general awareness training, maintenance worker training, lead abatement training, or other applicable training as dictated by site conditions.  The training must be conducted by a state approved training institution.

# 8.0    RECORD KEEPING

Documentation regarding any LBP-related activities conducted on-site must be maintained and, if applicable, should include the following:

Work records documenting all LBP-related activities, including, but not limited to, repair, enclosure and removal work done on-site must be maintained indefinitely. Copies of work records should also be placed in the files of the workers who performed the work.

Medical records of employees must be maintained for at least 30 years following the termination of employment. If the employer goes out of business without a successor, OSHA must be notified at least 90 days prior to termination of business and the employer must provide for the transfer of records to the secretary of OSHA, if requested. Copies of medical surveillance records should be placed in worker files.

Respiratory Fit Test records shall be maintained for the duration of employment plus 30 years. Copies should be placed in worker files.

Training records shall be maintained for the duration of employment plus 1 year. Copies should be placed in worker files.

Notification of LBP and other LBP-related documents and correspondences with tenants, building personnel, contractors and consultants shall be maintained indefinitely.

LBP survey reports and updates and addendum that reflect the changing condition and amount of LBP on-site should be maintained indefinitely.

A completed original lead-contaminated waste manifest for any disposed LBP material must be maintained indefinitely.

Any personal air sampling results for building personnel performing O&M related work on-site shall be maintained for at least 30 years as per OSHA 29 CFR 1910.20(D)(ii) requirements.

The written O&M Program shall be maintained indefinitely.

## APPENDIX A

The following forms should be utilized under this O&M Program:

- Maintenance Work Location Form
- Maintenance Work Authorization Form
- LBP Maintenance Closure Form
- Periodic Surveillance Form

# EXAMPLE

| MAINTENANCE WORK LOCATION FORM | |
|---|---|
| **Building:** | **Floor/Area:** |
| **Project Start Date:** | **Completion Date:** |
| **Description Of Work:** | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| **Field Sketch Of Affected Area** | |
| | |

Prior to commencement of maintenance work, this form must be submitted to the OMM and an approved Maintenance Work Authorization Form must be obtained.

# EXAMPLE

## MAINTENANCE WORK AUTHORIZATION FORM

Authorization is given to proceed with the following maintenance work:

_____          LBP is not present in the vicinity of the maintenance work.

_____          LBP is present, but its disturbance is not anticipated.  However, if conditions change, the Operations and Maintenance Manager will re-evaluate the work request prior to proceeding.

_____          LBP is present and may be disturbed.

If LBP is present, the following work practices shall be employed to avoid or minimize disturbing LBP:

If LBP is present, the following equipment/clothes shall be used/worn to protect workers:

Special practices and/or equipment required:

Authorized by:

_____          _____
    (Operations & Maintenance Manager)                   (Date)

# EXAMPLE

## LBP MAINTENANCE CLOSURE FORM

| | |
|---|---|
| **Building:** | **Area Involved:** |
| **Project Start Date & Time:** | **Completion Date & Time:** |

**Description Of Work:**

**Amount Of LBP Disturbed Or Removed (Square Feet):**

### LBP CONTROL METHODS:

| | |
|---|---|
| Wet Methods | HEPA Vacuum |
| Poly Sheeting | Glove Bags |
| Area Sealed | HVAC Shut Off |
| Warning Signs | HEPA Neg Air Units |

**Persons Performing Work (List By Name):**

### TYPE OF EQUIPMENT WORN

| | |
|---|---|
| Tyvek | Respirators |

**Name And Location Of Waste Disposal Site:**

**Air Sampling:**

### THE FOLLOWING ITEMS ARE TO BE ATTACHED (check those that apply)

| | |
|---|---|
| Permit To Perform Work | Air Sampling Results |
| Landfill Receipts | Other Info. (I.E. Photos) |

| | |
|---|---|
| **Signature Of Abatement Supervisor Or Industrial Hygienist** | **Date** |
| **Signature Of Operations And Maintenance  Manager** | **Date** |

# EXAMPLE

| PERIODIC SURVEILLANCE FORM | | | |
|---|---|---|---|
| Name: | | | |
| **Material:** | **Condition:** | **Location and use** | **Differences from previous inspection** |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

## APPENDIX B

**List of applicable rules and regulations**

Code of Federal Regulations:

**-**Title 29

- Part 1910, Section 134, (respiratory protection).

- Part 1910, Section 2 (Access to Employee Medial Records).

- Part 1910, Section 1200n (Hazardous Communication).

- Part 1910 Section 145 (Specification for Accident Prevention Signs and Tags)

-Title X - Residential Lead-Based Paint Hazard Reduction Act
http://www.epa.gov/lead/pubs/titleten.html

-Local and State Regulations

## <u>SCHEDULE VII</u>

### [FORM OF TENANT DIRECTION LETTER]

**[Borrower Letterhead]**

_____ __, 201_

*[SPECIFY METHOD OF DELIVERY REQUIRED BY NOTICE PROVISION OF LEASE]*

**[TENANT NAME AND NOTICE ADDRESS PER LEASE]**
[_____]
[_____]
[_____]

Re:    Payment Direction Letter for  **[Property Address]**

Dear **[TENANT NAME]**:

    **[NAME OF BORROWER]** ("*Owner*"), the owner of the above captioned property (the "*Property*"), has mortgaged the Property to **WALKER & DUNLOP COMMERCIAL PROPERTY FUNDING, LLC** (together with its successors and assigns, the "*Lender*") and has agreed that all rents and other income due for the Property will be paid directly to a bank selected by Lender.   Therefore, from and after the date hereof (until you are otherwise notified as provided below), all rent to be paid by you under the **[IDENTIFY AGREEMENT/LEASE dated _____]** between you and **[NAME OF LL ON LEASE]** [, as assigned to Owner - *add if applicable*] (the "*Lease*") should be sent as follows:

- by wire or ACH <u>directly</u> to the Clearing Account described on <u>Exhibit A</u> attached hereto and made a part hereof; or

- by check or money order mailed <u>directly</u> to Lockbox described on <u>Exhibit B</u> attached hereto and made a part hereof.

    These payment instructions cannot be withdrawn or modified without the prior written consent of Lender or its agent ("*Servicer*"), or pursuant to a joint written instruction from Borrower and Lender or Servicer.  Until you receive written instructions from Lender or Servicer, continue to send all payments due under the Lease as directed above.  All such payments must be delivered no later than the day on which such amounts are due under the Lease.

If you have any questions concerning this letter, please contact the persons identified for notice purposes in the Lease.  We appreciate your cooperation in this matter.

OWNER:

**[BORROWER SIGNATURE BLOCK]**

<u>EXHIBIT A</u>

<u>CLEARING ACCOUNT FOR WIRE OR ACH PAYMENTS</u>

SMRH:226115730.11

<u>EXHIBIT B</u>

<u>LOCKBOX FOR PAYMENT BY CHECK OR MONEY ORDER</u>

SMRH:226115730.11

## SCHEDULE VIII

## ALLOCATED LOAN AMOUNTS

Caribbean Isle Property:       $38,050,000.00

Coulter Landing Property:      $4,000,000.00

Forest Park Property:          $25,500,000.00

The Warwick Property:          $6,450,000.00

Windtree Property:             $12,000,000.00

## SCHEDULE IX

## APPROVED RENOVATIONS

| Approved Renovations | Portfolio | Caribbean | Forest Park | Warwick | Wind Tree | Coulter |
|---|---|---|---|---|---|---|
| Minimum Units to be Renovated | 487 | 111 | 48 | 100 | 171 | 57 |
| | | | | | | |
| **Renovation Budget** | | | | | | |
| Access / Flooring | 823,450 | 212,520 | 129,438 | 224,048 | 191,084 | 66,360 |
| Kitchen | 1,202,347 | 240,979 | 104,190 | 221,373 | 537,403 | 98,402 |
| Dining Area | 49,960 | 7,392 | 6,392 | 13,376 | 17,112 | 5,688 |
| Living Room | 57,765 | 13,125 | 9,908 | 6,688 | 22,356 | 5,688 |
| Bathrooms | 263,179 | 86,856 | 31,161 | 71,227 | 64,455 | 9,480 |
| Bedrooms | 17,802 | - | 10,387 | - | 7,415 | - |
| Contingency | 120,725 | 28,044 | 14,574 | 26,836 | 41,991 | 9,281 |
| **Subtotal - Before Construction Mgmt. Fees** | **2,535,229** | **588,916** | **306,049** | **563,548** | **881,817** | **194,899** |
| | | | | | | |
| Construction Mgmt. Fees | 253,523 | 58,892 | 30,605 | 56,355 | 88,182 | 19,490 |
| Total Approved Renovations | 2,788,752 | 647,808 | 336,654 | 619,902 | 969,999 | 214,389 |

# SCHEDULE X

# INITIAL ANNUAL BUDGET

Schedule X

Caribbean Isle Budget Summary 2017

| 2017 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 448 | | | | | | | | | 2017 | Annual |
| | May-17 | Jun-17 | Jul-17 | Aug-17 | Sep-17 | Oct-17 | Nov-17 | Dec-17 | Total | Per Unit |
| **Rental Income** | | | | | | | | | | |
| Market Rent | 408,385 | 408,385 | 415,105 | 415,105 | 415,105 | 419,585 | 419,585 | 419,585 | 3,320,836 | 7,413 |
| Loss To Lease | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | | | |
| Gross Potential Rent | 408,385 | 408,385 | 415,105 | 415,105 | 415,105 | 419,585 | 419,585 | 419,585 | 3,320,836 | 7,413 |
| Physical Vacancy Loss | -23,508 | -18,146 | -17,176 | -17,789 | -17,586 | -18,329 | -19,768 | -21,535 | -153,837 | -343 |
| | | | | | | | | | | |
| Rental Income | 384,876 | 390,238 | 397,929 | 397,316 | 397,518 | 401,256 | 399,817 | 398,049 | 3,167,000 | 7,069 |
| Other Lost Rent | -8,500 | -8,500 | -8,500 | -8,500 | -8,500 | -8,500 | -8,500 | -8,500 | -68,000 | -228 |
| Net Rental Income | 376,376 | 381,738 | 389,429 | 388,816 | 389,018 | 392,756 | 391,317 | 389,549 | 3,099,000 | 6,842 |
| **Other Income** | | | | | | | | | | |
| Other Income | 25,253 | 23,115 | 22,819 | 24,879 | 22,172 | 21,675 | 23,980 | 21,338 | 185,230 | 619 |
| Utility Reimbursements | 18,416 | 18,416 | 17,916 | 17,916 | 17,016 | 17,016 | 17,016 | 17,016 | 140,728 | 471 |
| Other Income | 43,669 | 41,531 | 40,735 | 42,795 | 39,188 | 38,691 | 40,996 | 38,354 | 325,958 | 1,090 |
| Total Income | 420,046 | 423,269 | 430,164 | 431,611 | 428,206 | 431,447 | 432,313 | 427,903 | 3,424,958 | 7,932 |
| | | | | | | | | | | |
| Management Fee | 12,601 | 12,698 | 12,905 | 12,948 | 12,846 | 12,943 | 12,969 | 12,837 | 102,749 | 337 |
| Administrative Expenses | 15,339 | 14,316 | 16,956 | 16,381 | 14,584 | 16,672 | 15,684 | 14,586 | 124,521 | 419 |
| Payroll and Benefits | 47,940 | 47,903 | 49,448 | 47,960 | 47,320 | 48,033 | 46,941 | 46,809 | 382,353 | 1,290 |
| Maintenance Expenses | 21,800 | 23,650 | 27,315 | 22,200 | 20,950 | 21,065 | 19,125 | 20,200 | 176,305 | 574 |
| Utilities | 24,050 | 24,250 | 24,650 | 24,750 | 27,650 | 27,550 | 26,750 | 26,750 | 206,400 | 687 |
| | | | | | | | | | | |
| Total Operating Expenses | 121,731 | 122,818 | 131,274 | 124,239 | 123,350 | 126,264 | 121,470 | 121,183 | 992,328 | 3,422 |
| | | | | | | | | | | |
| Taxes | 34,563 | 34,563 | 34,563 | 34,563 | 34,563 | 34,563 | 34,563 | 34,563 | 276,504 | 926 |
| Insurance | 13,482 | 13,482 | 13,482 | 13,482 | 13,482 | 13,482 | 13,482 | 13,482 | 107,856 | 361 |
| Total Expenses | 169,776 | 170,863 | 179,319 | 172,284 | 171,395 | 174,309 | 169,515 | 169,228 | 1,376,688 | 4,709 |
| | | | | | | | | | | |
| Net Operating Income | 250,270 | 252,407 | 250,845 | 259,326 | 256,811 | 257,138 | 262,798 | 258,675 | 2,048,270 | 3,223 |
| | | | | | | | | | | |
| Capital Expenses | 51,500 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 51,500 | 0 |
| Cash Flow Before Debt Service | 198,770 | 252,407 | 250,845 | 259,326 | 256,811 | 257,138 | 262,798 | 258,675 | 1,996,770 | 3,223 |
| | | | | | | | | | | |
| Interest Expense | 151,862 | 151,862 | 151,862 | 151,862 | 151,862 | 151,862 | 151,862 | 151,862 | 1,214,896 | 4,068 |
| Depreciation/Amortization | 88,755 | 88,755 | 88,755 | 88,755 | 88,755 | 88,755 | 88,755 | 88,755 | 710,040 | 2,377 |
| Net Income | -41,847 | 11,790 | 10,228 | 18,709 | 16,194 | 16,521 | 22,181 | 18,058 | 71,834 | -3,222 |
| | | | | | | | | | | |
| **Partnership Expenses** | | | | | | | | | | |
| Audit Fees | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 13 |
| Incentive Mgmt Fee | 4,200 | 4,233 | 4,302 | 4,316 | 4,282 | 4,314 | 4,323 | 4,279 | 34,250 | 112 |
| Asset Mgmt Fee | 2,100 | 2,116 | 2,151 | 2,158 | 2,141 | 2,157 | 2,162 | 2,140 | 17,125 | 56 |
| Partnership Expenses | 6,301 | 6,349 | 6,452 | 6,474 | 6,423 | 6,472 | 6,485 | 6,419 | 51,374 | 182 |
| Net Cash Flow | -48,148 | 5,441 | 3,775 | 12,235 | 9,771 | 10,049 | 15,696 | 11,640 | 20,460 | -3,404 |

## Coulter Landing Budget Summary 2017

| 2017 144 | May-17 | Jun-17 | Jul-17 | Aug-17 | Sep-17 | Oct-17 | Nov-17 | Dec-17 | 2017 Total | Annual Per Unit |
|---|---|---|---|---|---|---|---|---|---|---|
| **Rental Income** | | | | | | | | | | |
| Market Rent | 88,659 | 88,659 | 90,099 | 90,099 | 90,099 | 91,539 | 91,539 | 91,539 | 722,235 | 5,016 |
| Loss To Lease | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | | | |
| Gross Potential Rent | 88,659 | 88,659 | 90,099 | 90,099 | 90,099 | 91,539 | 91,539 | 91,539 | 722,235 | 5,016 |
| Physical Vacancy Loss | -14,673 | -13,231 | -11,682 | -10,909 | -10,992 | -11,465 | -12,159 | -12,725 | -97,836 | -679 |
| | | | | | | | | | | |
| Rental Income | 73,986 | 75,428 | 78,418 | 79,190 | 79,108 | 80,074 | 79,381 | 78,814 | 624,399 | 4,336 |
| Other Lost Rent | -3,276 | -3,276 | -3,286 | -3,286 | -3,286 | -3,296 | -3,296 | -3,296 | -26,296 | -273 |
| Net Rental Income | 70,710 | 72,152 | 75,132 | 75,905 | 75,822 | 76,779 | 76,085 | 75,518 | 598,103 | 4,063 |
| **Other Income** | | | | | | | | | | |
| Other Income | 5,198 | 5,429 | 6,493 | 5,343 | 5,125 | 5,948 | 4,989 | 4,988 | 43,514 | 456 |
| Utility Reimbursements | 3,300 | 3,300 | 3,300 | 3,300 | 3,300 | 3,300 | 3,300 | 3,300 | 26,400 | 275 |
| Other Income | 8,498 | 8,729 | 9,793 | 8,643 | 8,425 | 9,248 | 8,289 | 8,288 | 69,914 | 731 |
| Total Income | 79,208 | 80,882 | 84,925 | 84,547 | 84,247 | 86,026 | 84,374 | 83,806 | 668,017 | 6,783 |
| | | | | | | | | | | |
| Management Fee | 2,376 | 2,426 | 2,548 | 2,536 | 2,527 | 2,581 | 2,531 | 2,514 | 20,040 | 204 |
| Administrative Expenses | 7,715 | 7,900 | 8,430 | 8,240 | 7,725 | 7,805 | 7,965 | 8,505 | 64,286 | 678 |
| Payroll and Benefits | 16,344 | 16,473 | 17,272 | 16,491 | 16,272 | 16,421 | 16,168 | 16,067 | 131,507 | 1,376 |
| Maintenance Expenses | 12,925 | 10,325 | 12,175 | 9,575 | 9,275 | 11,175 | 9,875 | 9,325 | 84,650 | 947 |
| Utilities | 7,050 | 7,050 | 7,050 | 7,050 | 7,050 | 7,050 | 7,050 | 7,050 | 56,400 | 588 |
| | | | | | | | | | | |
| Total Operating Expenses | 46,411 | 44,174 | 47,474 | 43,892 | 42,849 | 45,032 | 43,589 | 43,462 | 356,883 | 4,258 |
| | | | | | | | | | | |
| Taxes | 8,296 | 8,296 | 8,296 | 8,296 | 8,296 | 8,296 | 8,296 | 8,296 | 66,365 | 691 |
| Insurance | 3,859 | 3,859 | 3,859 | 3,859 | 3,859 | 3,859 | 3,859 | 3,859 | 30,872 | 322 |
| Total Expenses | 58,565 | 56,329 | 59,629 | 56,047 | 55,004 | 57,187 | 55,744 | 55,616 | 454,121 | 5,271 |
| | | | | | | | | | | |
| Net Operating Income | 20,643 | 24,553 | 25,296 | 28,501 | 29,243 | 28,840 | 28,631 | 28,190 | 213,896 | 1,513 |
| | | | | | | | | | | |
| Capital Expenses | 67,095 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 67,095 | 0 |
| Cash Flow Before Debt Service | -46,452 | 24,553 | 25,296 | 28,501 | 29,243 | 28,840 | 28,631 | 28,190 | 146,801 | 1,513 |
| | | | | | | | | | | |
| Interest Expense | 21,082 | 21,082 | 21,082 | 21,082 | 21,082 | 21,082 | 21,082 | 21,082 | 168,656 | 1,757 |
| Depreciation/Amortization | 14,116 | 14,116 | 14,116 | 14,116 | 14,116 | 14,116 | 14,116 | 14,116 | 112,928 | 1,176 |
| Net Income | -81,650 | -10,645 | -9,902 | -6,697 | -5,955 | -6,358 | -6,567 | -7,008 | -134,783 | -1,421 |
| | | | | | | | | | | |
| **Partnership Expenses** | | | | | | | | | | |
| Audit Fees | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 42 |
| Incentive Mgmt Fee | 792 | 809 | 849 | 845 | 842 | 860 | 844 | 838 | 6,680 | 68 |
| Asset Mgmt Fee | 396 | 404 | 425 | 423 | 421 | 430 | 422 | 419 | 3,340 | 34 |
| Partnership Expenses | 1,188 | 1,213 | 1,274 | 1,268 | 1,264 | 1,290 | 1,266 | 1,257 | 10,020 | 143 |
| Net Cash Flow | -82,838 | -11,858 | -11,176 | -7,966 | -7,218 | -7,649 | -7,833 | -8,266 | -144,803 | -1,564 |

Forest Park Budget Summary 2017

| 2017 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 188 | | | | | | | | | 2017 | Annual |
| | May-17 | Jun-17 | Jul-17 | Aug-17 | Sep-17 | Oct-17 | Nov-17 | Dec-17 | Total | Per Unit |
| Rental Income | | | | | | | | | | |
| Market Rent | 266,391 | 266,391 | 268,271 | 268,271 | 268,271 | 270,151 | 270,151 | 270,151 | 2,148,048 | 11,426 |
| Loss To Lease | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | | | |
| Gross Potential Rent | 266,391 | 266,391 | 268,271 | 268,271 | 268,271 | 270,151 | 270,151 | 270,151 | 2,148,048 | 11,426 |
| Physical Vacancy Loss | -8,352 | -7,647 | -7,279 | -7,760 | -9,631 | -10,598 | -10,278 | -10,857 | -72,401 | -385 |
| | | | | | | | | | | |
| Rental Income | 258,039 | 258,744 | 260,992 | 260,511 | 258,640 | 259,553 | 259,874 | 259,294 | 2,075,647 | 11,041 |
| Other Lost Rent | -6,143 | -6,143 | -6,163 | -6,163 | -6,163 | -6,183 | -6,183 | -6,183 | -49,328 | -393 |
| Net Rental Income | 251,896 | 252,600 | 254,829 | 254,348 | 252,477 | 253,370 | 253,690 | 253,110 | 2,026,320 | 10,648 |
| Other Income | | | | | | | | | | |
| Other Income | 18,053 | 16,833 | 16,933 | 18,122 | 17,091 | 17,091 | 18,231 | 17,090 | 139,442 | 1,106 |
| Utility Reimbursements | 10,100 | 10,100 | 10,100 | 10,100 | 10,100 | 10,100 | 10,100 | 10,100 | 80,800 | 645 |
| Other Income | 28,153 | 26,933 | 27,033 | 28,222 | 27,191 | 27,191 | 28,331 | 27,190 | 220,242 | 1,751 |
| Total Income | 280,049 | 279,533 | 281,862 | 282,570 | 279,667 | 280,560 | 282,021 | 280,300 | 2,246,562 | 17,854 |
| | | | | | | | | | | |
| Management Fee | 8,401 | 8,386 | 8,456 | 8,477 | 8,390 | 8,417 | 8,461 | 8,409 | 67,397 | 536 |
| Administrative Expenses | 12,056 | 13,454 | 14,192 | 12,306 | 11,981 | 12,542 | 12,581 | 12,331 | 101,443 | 807 |
| Payroll and Benefits | 27,602 | 27,856 | 27,609 | 28,203 | 27,393 | 28,068 | 28,108 | 27,120 | 221,960 | 1,773 |
| Maintenance Expenses | 17,918 | 21,468 | 21,218 | 20,918 | 20,068 | 20,468 | 19,668 | 17,718 | 159,444 | 1,250 |
| Utilities | 25,075 | 25,075 | 25,075 | 25,075 | 25,075 | 25,075 | 25,075 | 25,075 | 200,600 | 1,601 |
| | | | | | | | | | | |
| Total Operating Expenses | 91,053 | 96,239 | 96,550 | 94,979 | 92,907 | 94,570 | 93,893 | 90,653 | 750,844 | 6,086 |
| | | | | | | | | | | |
| Taxes | 46,305 | 49,480 | 49,480 | 49,480 | 46,305 | 46,305 | 46,305 | 46,305 | 379,965 | 3,006 |
| Insurance | 7,866 | 7,866 | 7,866 | 7,866 | 7,866 | 7,866 | 7,866 | 7,866 | 62,928 | 502 |
| Total Expenses | 145,224 | 153,585 | 153,896 | 152,325 | 147,078 | 148,741 | 148,064 | 144,824 | 1,193,737 | 9,594 |
| | | | | | | | | | | |
| Net Operating Income | 134,825 | 125,948 | 127,966 | 130,245 | 132,590 | 131,819 | 133,957 | 135,476 | 1,052,826 | 8,260 |
| | | | | | | | | | | |
| Capital Expenses | 22,450 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 22,450 | 0 |
| Cash Flow Before Debt Service | 112,375 | 125,948 | 127,966 | 130,245 | 132,590 | 131,819 | 133,957 | 135,476 | 1,030,376 | 8,260 |
| | | | | | | | | | | |
| Interest Expense | 105,615 | 105,615 | 105,615 | 105,615 | 105,615 | 105,615 | 105,615 | 105,615 | 844,920 | 6,741 |
| Depreciation/Amortization | 52,385 | 52,385 | 52,385 | 52,385 | 52,385 | 52,385 | 52,385 | 52,385 | 419,080 | 3,344 |
| Net Income | -45,625 | -32,052 | -30,034 | -27,755 | -25,410 | -26,181 | -24,043 | -22,524 | -233,624 | -1,825 |
| | | | | | | | | | | |
| Partnership Expenses | | | | | | | | | | |
| Audit Fees | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 32 |
| Incentive Mgmt Fee | 2,800 | 2,795 | 2,819 | 2,826 | 2,797 | 2,806 | 2,820 | 2,803 | 22,466 | 179 |
| Asset Mgmt Fee | 1,400 | 1,398 | 1,409 | 1,413 | 1,398 | 1,403 | 1,410 | 1,402 | 11,233 | 89 |
| Partnership Expenses | 4,201 | 4,193 | 4,228 | 4,239 | 4,195 | 4,208 | 4,230 | 4,205 | 33,698 | 300 |
| Net Cash Flow | -49,826 | -36,245 | -34,262 | -31,994 | -29,606 | -30,389 | -28,273 | -26,728 | -267,323 | -2,125 |

The Warwick Budget Summary 2017

| 2017 | | | | | | | | | 2017 | Annual | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 152 | | | | | | | | | 2017 | Annual | |
| | May-17 | Jun-17 | Jul-17 | Aug-17 | Sep-17 | Oct-17 | Nov-17 | Dec-17 | Total | Per Unit | |
| Rental Income | | | | | | | | | | | |
| Market Rent | 119,841 | 119,841 | 121,361 | 121,361 | 121,361 | 122,881 | 122,881 | 122,881 | 972,408 | 6,397 | |
| Loss To Lease | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| | | | | | | | | | | | |
| Gross Potential Rent | 119,841 | 119,841 | 121,361 | 121,361 | 121,361 | 122,881 | 122,881 | 122,881 | 972,408 | 6,397 | |
| Physical Vacancy Loss | -8,664 | -7,417 | -7,926 | -8,472 | -9,103 | -10,252 | -11,297 | -11,982 | -75,113 | -494 | |
| | | | | | | | | | | | |
| Rental Income | 111,177 | 112,424 | 113,435 | 112,889 | 112,258 | 112,629 | 111,584 | 110,899 | 897,295 | 5,903 | |
| Other Lost Rent | -2,020 | -2,020 | -2,020 | -2,020 | -2,020 | -2,020 | -2,020 | -2,020 | -16,160 | -159 | |
| Net Rental Income | 109,157 | 110,404 | 111,415 | 110,869 | 110,238 | 110,609 | 109,564 | 108,879 | 881,135 | 5,744 | |
| Other Income | | | | | | | | | | | |
| Other Income | 7,170 | 7,170 | 7,170 | 7,170 | 7,170 | 7,170 | 7,170 | 7,170 | 57,360 | 566 | |
| Utility Reimbursements | 4,120 | 4,120 | 4,120 | 4,120 | 4,120 | 4,120 | 4,120 | 4,120 | 32,960 | 325 | |
| Other Income | 11,290 | 11,290 | 11,290 | 11,290 | 11,290 | 11,290 | 11,290 | 11,290 | 90,320 | 891 | |
| Total Income | 120,447 | 121,694 | 122,705 | 122,159 | 121,528 | 121,899 | 120,854 | 120,169 | 971,455 | 9,382 | |
| | | | | | | | | | | | |
| Management Fee | 3,613 | 3,651 | 3,681 | 3,665 | 3,646 | 3,657 | 3,626 | 3,605 | 29,144 | 281 | |
| Administrative Expenses | 8,428 | 7,968 | 8,043 | 7,468 | 8,143 | 7,768 | 7,513 | 7,818 | 63,149 | 627 | |
| Payroll and Benefits | 18,549 | 19,269 | 19,431 | 18,858 | 19,135 | 19,256 | 19,022 | 18,966 | 152,485 | 1,513 | |
| Maintenance Expenses | 12,105 | 12,355 | 12,605 | 12,355 | 12,855 | 15,755 | 11,405 | 11,655 | 101,090 | 989 | |
| Utilities | 8,835 | 8,835 | 9,835 | 10,835 | 8,835 | 8,835 | 8,835 | 8,835 | 73,680 | 717 | |
| | | | | | | | | | | | |
| Total Operating Expenses | 51,530 | 52,078 | 53,596 | 53,181 | 52,614 | 55,271 | 50,400 | 50,879 | 419,548 | 4,647 | |
| | | | | | | | | | | | |
| Taxes | 17,727 | 17,727 | 17,727 | 17,727 | 17,727 | 17,727 | 17,727 | 17,727 | 141,814 | 1,399 | |
| Insurance | 4,585 | 4,585 | 4,585 | 4,585 | 4,585 | 4,585 | 4,585 | 4,585 | 36,680 | 362 | |
| Total Expenses | 73,842 | 74,389 | 75,907 | 75,493 | 74,926 | 77,583 | 72,712 | 73,190 | 598,042 | 6,409 | |
| | | | | | | | | | | | |
| Net Operating Income | 46,606 | 47,305 | 46,798 | 46,666 | 46,603 | 44,317 | 48,142 | 46,978 | 373,413 | 2,973 | |
| | | | | | | | | | | | |
| Capital Expenses | 79,056 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 79,056 | 0 | |
| Cash Flow Before Debt Service | -32,450 | 47,305 | 46,798 | 46,666 | 46,603 | 44,317 | 48,142 | 46,978 | 294,357 | 2,973 | |
| | | | | | | | | | | | |
| Interest Expense | 31,087 | 31,087 | 31,087 | 31,087 | 31,087 | 31,087 | 31,087 | 31,087 | 248,696 | 2,454 | |
| Depreciation/Amortization | 20,094 | 20,094 | 20,094 | 20,094 | 20,094 | 20,094 | 20,094 | 20,094 | 160,752 | 1,586 | |
| Net Income | -83,631 | -3,876 | -4,383 | -4,515 | -4,578 | -6,864 | -3,039 | -4,203 | -115,091 | -1,067 | |
| | | | | | | | | | | | |
| Partnership Expenses | | | | | | | | | | | |
| Audit Fees | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 39 | |
| Incentive Mgmt Fee | 1,204 | 1,217 | 1,227 | 1,222 | 1,215 | 1,219 | 1,209 | 1,202 | 9,715 | 94 | |
| Asset Mgmt Fee | 602 | 608 | 614 | 611 | 608 | 609 | 604 | 601 | 4,857 | 47 | |
| Partnership Expenses | 1,807 | 1,825 | 1,841 | 1,832 | 1,823 | 1,828 | 1,813 | 1,803 | 14,572 | 180 | |
| Net Cash Flow | -85,438 | -5,701 | -6,224 | -6,347 | -6,401 | -8,693 | -4,852 | -6,005 | -129,662 | -1,247 | |

Windtree Budget Summary 2017

| 2017 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 276 | | | | | | | | | 2017 | Annual |
| | May-17 | Jun-17 | Jul-17 | Aug-17 | Sep-17 | Oct-17 | Nov-17 | Dec-17 | Total | Per Unit |
| | | | | | | | | | | |
| Rental Income | | | | | | | | | | |
| Market Rent | 184,799 | 184,799 | 187,559 | 187,559 | 187,559 | 190,319 | 190,319 | 190,319 | 1,503,228 | 5,446 |
| Loss To Lease | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | | | |
| Gross Potential Rent | 184,799 | 184,799 | 187,559 | 187,559 | 187,559 | 190,319 | 190,319 | 190,319 | 1,503,228 | 5,446 |
| Physical Vacancy Loss | -19,349 | -18,678 | -18,131 | -17,309 | -17,866 | -19,199 | -19,610 | -20,019 | -150,160 | -544 |
| | | | | | | | | | | |
| Rental Income | 165,449 | 166,120 | 169,428 | 170,250 | 169,693 | 171,119 | 170,709 | 170,300 | 1,353,068 | 4,902 |
| Other Lost Rent | -6,992 | -6,992 | -7,022 | -7,022 | -7,022 | -7,052 | -7,052 | -7,052 | -56,204 | -305 |
| Net Rental Income | 158,458 | 159,129 | 162,406 | 163,228 | 162,671 | 164,068 | 163,657 | 163,248 | 1,296,864 | 4,598 |
| Other Income | | | | | | | | | | |
| Other Income | 8,493 | 8,253 | 8,265 | 8,525 | 8,250 | 8,048 | 8,291 | 8,038 | 66,162 | 358 |
| Utility Reimbursements | 7,420 | 7,420 | 7,420 | 7,420 | 7,420 | 7,420 | 7,420 | 7,420 | 59,360 | 323 |
| Other Income | 15,913 | 15,673 | 15,685 | 15,945 | 15,670 | 15,468 | 15,711 | 15,458 | 125,522 | 680 |
| Total Income | 174,370 | 174,801 | 178,091 | 179,173 | 178,341 | 179,536 | 179,368 | 178,706 | 1,422,386 | 7,568 |
| | | | | | | | | | | |
| Management Fee | 5,231 | 5,244 | 5,343 | 5,375 | 5,350 | 5,386 | 5,381 | 5,361 | 42,672 | 227 |
| Administrative Expenses | 12,759 | 12,234 | 11,684 | 11,609 | 12,284 | 12,034 | 11,459 | 12,584 | 96,647 | 527 |
| Payroll and Benefits | 31,172 | 30,838 | 31,400 | 30,985 | 31,036 | 30,977 | 30,570 | 30,627 | 247,604 | 1,358 |
| Maintenance Expenses | 14,174 | 12,374 | 12,574 | 12,474 | 12,574 | 11,424 | 10,999 | 11,399 | 97,992 | 559 |
| Utilities | 15,675 | 15,975 | 16,525 | 16,575 | 16,575 | 16,275 | 16,475 | 16,175 | 130,250 | 739 |
| | | | | | | | | | | |
| Total Operating Expenses | 79,011 | 76,665 | 77,525 | 77,018 | 77,819 | 76,096 | 74,884 | 76,146 | 615,165 | 3,767 |
| | | | | | | | | | | |
| Taxes | 15,874 | 15,874 | 15,874 | 15,874 | 15,874 | 15,874 | 15,874 | 15,874 | 126,992 | 690 |
| Insurance | 7,280 | 7,280 | 7,280 | 7,280 | 7,280 | 7,280 | 7,280 | 7,280 | 58,240 | 317 |
| Total Expenses | 102,165 | 99,819 | 100,679 | 100,172 | 100,973 | 99,250 | 98,038 | 99,300 | 800,397 | 4,773 |
| | | | | | | | | | | |
| Net Operating Income | 72,206 | 74,982 | 77,412 | 79,001 | 77,368 | 80,286 | 81,330 | 79,406 | 621,989 | 2,794 |
| | | | | | | | | | | |
| Capital Expenses | 98,403 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 98,403 | 0 |
| Cash Flow Before Debt Service | -26,197 | 74,982 | 77,412 | 79,001 | 77,368 | 80,286 | 81,330 | 79,406 | 523,586 | 2,794 |
| | | | | | | | | | | |
| Interest Expense | 44,580 | 44,580 | 44,580 | 44,580 | 44,580 | 44,580 | 44,580 | 44,580 | 356,640 | 1,938 |
| Depreciation/Amortization | 29,118 | 29,118 | 29,118 | 29,118 | 29,118 | 29,118 | 29,118 | 29,118 | 232,944 | 1,266 |
| Net Income | -99,895 | 1,284 | 3,714 | 5,303 | 3,670 | 6,588 | 7,632 | 5,708 | -65,998 | -410 |
| | | | | | | | | | | |
| Partnership Expenses | | | | | | | | | | |
| Audit Fees | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 22 |
| Incentive Mgmt Fee | 1,744 | 1,748 | 1,781 | 1,792 | 1,783 | 1,795 | 1,794 | 1,787 | 14,224 | 76 |
| Asset Mgmt Fee | 872 | 874 | 890 | 896 | 892 | 898 | 897 | 894 | 7,112 | 38 |

**<u>SCHEDULE 4.1.4</u>**

**<u>GUARANTOR LITIGATION</u>**

None.

**<u>SCHEDULE 4.1.12</u>**

**<u>FINANCIAL INFORMATION EXCEPTIONS</u>**

None.

## **SCHEDULE 4.1.22**

## **INSURANCE CLAIMS**

None.

## **SCHEDULE 4.1.28**

## **EXCEPTIONS TO LEASE REPS**

None.

# SCHEDULE 7.7.3

# COLLATERAL SECURITIES

1. $1mm Ohio State Highway Capital Improvements Series R 5.00% 5/1/25 677521-7D-2  ($1,210,410) AA1 (MOODY) AAA (S&P)
2. $1mm  Pennsylvania St Refunding Second Series 5.00% 1/15/21 70914P-G6-3 ($1,161,910) AA3 (MOODY) AA- (S&P)
3. $1mm Akron Ohio Income Tax Revenue Refunding Various Purpose 5.00% 12/1/27 010056-HK-8 ($1,211,300)  AA+ (S&P)

Schedule 7.7.3