# <u>EXHIBIT 5</u>

EFiled: Dec 06 2024 02:18PM EST
Transaction ID 75157313
Case No. 2023-1182-LWW

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| P-5 GRA, LLC, a Delaware limited liability company, | |
| Plaintiff, | C.A. No. 2023-1182–LWW |
| v. | |
| STEVEN IVANKOVICH, | |
| Defendant, | |
| and | |
| OVERLOOK MANAGING MEMBER LLC, ALLIANCE HTFL GP, L.L.C., PILGRIM CARIBBEAN ISLE LLC, PILGRIM FOREST PARK LLC, each a Delaware limited liability company, | |
| Nominal Defendants. | |

## PLAINTIFF'S MOTION TO SUPPLEMENT THE RECORD ON DEFENDANT'S MOTION TO DISMISS, OR, IN THE ALTERNATIVE, REQUESTING LEAVE TO FILE AN AMENDED COMPLAINT OR THAT <u>DISMISSAL OF THE COMPLAINT BE WITHOUT PREJUDICE</u>

Plaintiff, P-5 GRA, LLC ("Plaintiff"), through its undersigned counsel, hereby moves the Court for an order (i) permitting Plaintiff to supplement the record on Defendant's Motion to Dismiss (Dkt. No 25) to account for recently discovered documents bearing upon key issues, or (ii) in the alternative, requesting leave to file an amendment or that any dismissal of Plaintiff's Verified Complaint be without

prejudice based on good cause shown. In support of this motion, Plaintiff states as follows:

## FACTUAL AND PROCEDURAL BACKGROUND

1.      Plaintiff filed its Verified Complaint on November 21, 2023, in which Plaintiff alleged breaches of contract and of the fiduciary duty of loyalty by Defendant Ivankovich and sought specific performance of the operating agreement of Overlook Managing Member LLC ("Overlook"). These allegations arose from transactions in which real property held by Overlook wholly owned downstream subsidiaries was sold for substantial sums, after which Steven Ivankovich diverted $30 million of the proceeds to an Ivankovich family trust LLC in Florida instead of being up-streamed to Overlook and distributed in accordance with its operating agreement.

2.      On May 3, 2024, Defendant Ivankovich moved to dismiss the Verified Complaint. Ivankovich argued, inter alia, that despite a clear allegation at ¶ 23 of the Verified Complaint to the contrary, the sale of the real property held by Overlook's downstream entities, PILGRIM Forest Park LLC ("Forest Park") and PILGRIM Caribbean Isle LLC ("Caribbean Isle") was not a sale of Overlook's "LLC Assets" as defined in the Overlook operating agreement and that no "Cash Available for Distribution" was generated from those sales at the Overlook level.

3.    At oral argument on November 15, 2024, discussion was had about corporate separateness and Defendant's contention that the Court was unable to assess, on the record before it, whether the entities downstream of Overlook in the organizational structure were required to distribute funds upward to Overlook. The contention was based upon the absence of governing documents of those downstream PILGRIM entities and the provisions that governed the distribution of funds realized from the sale of real property held by them. In fact, Ivankovich, having possession of the exact documents that were withheld from Plaintiff and the Court, containing the precise information to address the Court's inquiry, apparently withheld the pertinent documents from his counsel instead.[1]

4.    Following that discussion at oral argument, Plaintiff was prompted to inquire through other channels (i.e., not through Ivankovich) about the existence of operating agreements for those downstream entities – agreements which Ivankovich executed on behalf of Overlook, without ever telling Plaintiff, providing copies to Plaintiff, or disclosing in the normal course of their business relationship.

5.    On November 26, 2024, Plaintiff finally obtained copies from counsel to the lender that financed the acquisition of the properties held at the PILGRIM level of the organizational structure the operating agreements for the PILGRIM

---

[1] These agreements were also not produced to Plaintiff in the prior books and records action which was discussed at oral argument.

entities downstream of Overlook, most notably those of Forest Park and Caribbean Isle. As expected, they confirm that by clear, unequivocal contractual mandate, all funds, from whatever source, that come in at the PILGRIM level must be distributed to Overlook, its sole "Member." The funds only flow upward from the PILGRIM entities pursuant to their operating agreements to Overlook. There is no circumstance where any transfer from proceeds of a sale of real property at the PILGRIM level should be in any other direction, let alone to a non-Member Florida family trust LLC for the benefit of Ivankovich's family. The A&O Family LLC is not a member of or partner in any entity within the organizational structure.

6.      In each of the operating agreements of Forest Park and Caribbean Isle (attached hereto as **Exhibits A and B**, respectively):

    a.  The "Member" is defined as Overlook. *See* the prefatory paragraph of each agreement.

    b.  "One hundred percent (100%) of the profits, losses, income and deductions of the Company shall be allocated to the Member. The Company may make distributions to the Member from time to time in its discretion." *See* § 5.02 of each agreement.

    c.  "The management of the Company is vested in the Member." *See* § 7.01 of each agreement.

4

    d. A "Dissolution Event" occurs upon "the sale or disposition of all or substantially all of the Company's assets," at which time the "Member shall act as the Liquidator" and "shall sell such of the Company assets as it deems necessary or appropriate" or may instead, after paying debts and liabilities to creditors of the Company, "convey, distribute, and assign all or any part of Company Property to the Member in such form of ownership as shall be determined by the Liquidator." After payments to creditor of the Company, "the balance" of any proceeds goes "to the Member." *See* §§ 9.01, 9.02, 9.03, and 9.04 of each agreement.

    e. The agreement was executed by Ivankovich on behalf of Overlook as the Member. *See* the signature page of each agreement.

7. Moreover, Caribbean Isle and Forest Park are the only members of Alliance HTFL GP, L.L.C. ("Alliance"). *See* the prefatory paragraph of the Amended and Restated Limited Liability Company Agreement of Alliance attached hereto as **Exhibit C**. Under that agreement:

    a. Ivankovich is designated as the Manager. *See* § 9(a).

    b. "The Company's profits and losses shall be allocated to the Members" (i.e., Forest Park and Caribbean Isle). *See* § 15.

    c. "Distributions shall be made to the Members at the times and in the aggregate amounts determined by the Members." *See* § 16.

8.    As the foregoing excerpts (and the newly discovery documents as a whole) make clear, any funds generated from the sale of real property held at the Alliance level (i.e., the Forest Park and Caribbean Isle properties that were sold) could only be distributed to Alliance's members – the Forest Park and Caribbean Isle limited liability companies. From there, those funds could only be distributed to the sole Member of those LLCs – Overlook.

9.    Ultimately, funds from the sale of real property at any level of the organizational structure could only become Cash Available for Distribution by Overlook (which expressly includes "all cash receipts and funds received by the LLC from any of the Pilgrim Entities….") and could only be distributed in the manner provided for by the Operating Agreement, as the same is defined in the Verified Complaint at paragraph 11.

10.    In his roles as Manager of Alliance and Manager of Overlook, Ivankovich caused $30 million in proceeds from the sale of real property at the PILGRIM level to be distributed to A&O Family LLC (essentially a family trust for the benefit of the Ivankovich family) instead of those funds flowing to Overlook as required by all of the relevant agreements.

## ARGUMENT

11.     By this Motion, Plaintiff requests that the Court permit Plaintiff to supplement the record on Defendant's Motion to Dismiss in light of the newly discovered documents which (i) were never provided to Plaintiff, (ii) were in the possession of Defendant all along, (iii) would have been valuable in framing the allegations of the Verified Complaint and in responding to Defendant's Motion to Dismiss or deciding whether to seek an amendment, and (iv) only became known to Plaintiff after oral argument occurred.

12.     "There is no express rule governing motions to reopen the evidentiary record after the close of evidence, but before entry of a final judgment." *In re BGC P'rs, Inc.*, 2021 Del. Ch. LEXIS 274, at *3 (Del. Ch. Nov. 26, 2021) (quoting *Whittington v. Dragon Gp., LLC*, 2012 WL 3089861, at *3 (Del. Ch. July 20, 2012)). However, such a motion is "addressed to the sound discretion of this court", *id*. (citing *Fitzgerald v. Cantor*, 2000 WL 128851, at *1 (Del. Ch. Jan. 10, 2000); *El Paso Nat. Gas Co. v. Amoco Prod. Co.*, 1992 WL 43925, at *10 n.15 (Del. Ch. Mar. 4, 1992)), and "turns on the interests of fairness and justice." *Id*. (quoting *Carlson v. Hallinan*, 925 A.2d 506, 520 (Del. Ch. 2006), *clarified by* 2006 Del. Ch. LEXIS 95, 2006 WL 1510759 (Del. Ch. May 22, 2006)).

13.     While the foregoing cases generally deal with reopening a trial record, Plaintiff is not aware of case law standing for the proposition that the "interests of

fairness and justice" standard that militates in favor of reopening the record after trial cannot also apply here at this early pleading stage of the action.

14.     The Court of Chancery, and the Delaware courts generally, have a strong policy in favor of deciding cases on their merits. *See, e.g.*, *In re Mindbody, Inc., S'holder Litig.*, 2021 Del. Ch. LEXIS 285, at *2 n.8 (Del. Ch. Dec. 9, 2021) ("Admittedly, revisiting a pleading-stage dismissal can result in inefficiencies, but a court need not ignore evidence that discovery reveals and which was unavailable to a plaintiff at the pleading stage. There is a strong public policy that dictates that courts resolve cases on their merits. *See, e.g.*, *Keener v. Isken*, 58 A.3d 407, 409 (Del. 2013) (observing that Delaware has a strong policy in favor of deciding cases on the merits)").

15.     When exercising its discretion in connection with a motion to supplement the record, this Court has considered several factors known as the *Pope* factors. They are:

> 1) whether the evidence has come to the moving party's knowledge since the trial, 2) whether the exercise of reasonable diligence would have caused the moving party to discover the evidence for use at trial, 3) whether the evidence is so material and relevant that it will likely change the outcome, 4) whether the evidence is material and not merely cumulative, 5) whether the moving party has made a timely motion, 6) whether undue prejudice will inure to the nonmoving party and 7) considerations of judicial economy.

*In re BGC P'rs, Inc.*, 2021 Del. Ch. LEXIS 274, at *3-4 (quoting *Pope Invs. LLC v. Benda Pharm., Inc.*, 2010 WL 3075296, at *1 (Del. Ch. July 26, 2010)).

16.    Each of the *Pope* factors weighs in favor of permitting Plaintiff to supplement the record here.

17.    *First*, the evidence, the operating agreements, were in Defendant's possession, custody, and control. Given the arguments advanced in the opening brief, Plaintiff assumes that Defendant was consistent; namely, as he withheld the documents from Plaintiff, he similarly did not disclose the executed PILGRIM operating agreements to counsel for use in the opening brief or reply. With possession of the downstream operating agreements, Plaintiff would have further detailed the contractual language mandating the upstream flow of funds in its Verified Complaint, in determining whether to amend the same, and/or in its response to the Motion to Dismiss. The existence of the Defendant's execution of these documents only came to Plaintiff's knowledge in approximately the past week and only after oral argument on the Motion to Dismiss.

18.    *Second*, Plaintiff had no way of knowing the agreements at issue existed previously, and Plaintiff sought to exercise "reasonable diligence" through the prior books and records proceeding. That action did not cause Plaintiff to discover these Operating Agreements given that Defendant withheld them from production, similar to his failure to produce the tax returns despite a contractual obligation to do so.  The

Defendant's sole decision not to provide these documents frustrated Plaintiff's reasonable diligence, which would have revealed that Overlook was reporting to state and federal taxing authorities under penalty of perjury that funds or real property of the PILGRIM entities were its assets.

19.      *Third*, the agreements are material and likely to change the outcome because they demonstrate and confirm that all funds received by lower-level entities in the organizational structure must flow upward to Overlook. Defendant Ivankovich was solely responsible for ensuring the funds flowed upward and were deposited into the Overlook bank accounts, which entitled Plaintiff to his pro rata share once Defendant disbursed Cash Available for Distribution.

20.      *Fourth*, as noted above, the agreements are material, and they are not cumulative because they shed additional light on the plausibility of the Verified Complaint's allegations – inter alia, that the proceeds from the sale of the Forest Park and Caribbean Isle properties ultimately belonged to Overlook and that Defendant breached the Operating Agreement and/or his fiduciary duties by acting in his self-interest and transferring substantially all of those proceeds to a family LLC for his benefit in contravention of the agreements' express terms.

21.      *Fifth*, Plaintiff has made this Motion as expeditiously as possible in light of when the agreements were received and the Thanksgiving holiday which fell

between the date on which Plaintiff received the documents and the filing of this Motion.

22.     *Sixth*, no undue prejudice will inure to Defendant, as Defendant was in possession of the documents at issue all along and never provided them to Plaintiff. Moreover, this case is in the initial pleading stages, and allowing Plaintiff to supplement the record will not meaningfully burden Defendant. Defendant will merely be required to address the merits of Plaintiff's claims arising from his brazen wrongdoing.

23.     *Seventh*, allowing Plaintiff to supplement the record does not offend principles of judicial economy. The Motion to Dismiss was just recently taken under advisement before the intervening Thanksgiving holiday, and allowing supplementation of the record serves the stronger interest in resolving cases on their merits.

24.     Accordingly, Plaintiff respectfully requests that it be permitted to supplement the record on Defendant's Motion to Dismiss by submitting the agreements attached hereto which demonstrate the proper flow of funds that Plaintiff described during oral argument but was unable to demonstrate to the Court through the then-available record without the agreements that came into its possession only afterward.

25.    In the alternative, given the gravity of the newly discovered executed downstream operating agreements, Plaintiff seeks leave to file an amended complaint, or Plaintiff respectfully requests that, under the totality of the circumstances, any dismissal be without prejudice.

26.    Pursuant to Court of Chancery Rule 15(a)(5)(B), the Court may dismiss the Verified Complaint without prejudice "for good cause shown."

27.    Here, good cause exists for a dismissal without prejudice.

28.    Plaintiff was forced to frame its complaint, decide whether to amend or oppose the Motion to Dismiss, and argue the Motion to Dismiss, all without the benefit of key documents that (i) were in Defendant's possession all along, and (ii) were not provided to Plaintiff in connection with the prior books and records action or even known by Plaintiff to exist until approximately a week after oral argument had concluded.

29.    Plaintiff unquestionably has meritorious claims, whether directly or derivatively or both, against Defendant for what essentially amounts to the misappropriation and diversion of tens of millions of dollars which should have flowed up from the PILGRIM entities to Overlook for distribution to both Defendant and Plaintiff.

30.    Instead, Plaintiff got *nothing*, while Defendant transferred $30 million to an LLC controlled by his family without any support in any of the upstream or downstream operating agreements.

31.    Newly discovered evidence has been deemed a basis for a finding of good cause in this Court before. *See, e.g.*, *In re Mindbody, Inc., S'holder Litig.*, 2021 Del. Ch. LEXIS 285, at *3-6 (finding under prior Rule 15(aaa) that text messages and deposition testimony which came out in the course of discovery constituted good cause for allowing the Plaintiffs to amend their complaint and reassert claims against a previously dismissed defendant). Good cause has also been found when a plaintiff has simply made a mistake in its complaint, such as suing the wrong slate of corporate directors for breaching their fiduciary duties. *See Park Emples. & Ret. Bd. Emples. Annuity & Benefit Fund of Chi. v. Smith*, 2017 Del. Ch. LEXIS 62, at *4 (Del. Ch. Apr. 18, 2017).

32.    Here, principles of equity and the interests of fairness and justice weigh heavily in favor of allowing Plaintiff to supplement the record and/or allowing Plaintiff to amend its Verified Complaint in light of newly discovered evidence or, in the alternative, dismissing the Verified Complaint without prejudice so that Plaintiff will have an opportunity for its claims to be heard on their merits, whether in this Court or the Superior Court.

Dated: December 6, 2024

Respectfully submitted,

**GELLERT SEITZ BUSENKELL & BROWN, LLC**

*/s/ Bradley P. Lehman*
Michael Busenkell (#3933)
Bradley P. Lehman (#5921)
1201 N. Orange Street, Suite 300
Wilmington, Delaware 19801
(302) 425-5800
mbusenkell@gsbblaw.com
blehman@gsbblaw.com

*Counsel to Plaintiff*

**WORDS:** 2,689 out of 3,000

OF COUNSEL:
Keith A. McKenna, Esq.
(Admitted *pro hac vice*)
McKenna Law
101 Hudson Street, 21st Floor
Jersey City, New Jersey 07302

14

EFiled:  Dec 06 2024 02:18PM EST
Transaction ID 75157313
Case No. 2023-1182-LWW

# EXHIBIT A

## LIMITED LIABILITY COMPANY AGREEMENT
### of
### PILGRIM FOREST PARK LLC

This Limited Liability Company Agreement ("Agreement") of **PILGRIM FOREST PARK LLC**, a Delaware limited liability company ("Company"), is entered into as of the Effective Date by and between the Company and Overlook Managing Member LLC, a Delaware limited liability company ("Member"), for the purpose of setting forth the agreements between the Member and the Company. The terms of the Agreement are as follows.

### ARTICLE I
### Organizational Matters

**Section 1.01.** *Formation.* The Company is formed as a limited liability company pursuant to the provisions of the Act. The rights and obligations of the Member, and the affairs of the Company, shall be governed first by the Mandatory Provisions of the Act, second by the Certificate, third by this Agreement, and fourth by the optional provisions of the Act. In the event of any conflict among the foregoing, the conflict shall be resolved in the order of priority set forth in the preceding sentence.

**Section 1.02.** *Name.* The name of the Company is **PILGRIM FOREST PARK LLC**.

**Section 1.03.** *Registered Office and Registered Agent.* The registered office of the Company in the State of Delaware is located at 1209 Orange Street, Wilmington, Delaware 19801. The name of its registered agent at such address is The Corporation Trust Company. The Company may also maintain offices at such other place or places as the Member deems advisable.

**Section 1.04.** *Term.* The Company began upon the filing of the Certificate with the Delaware Secretary of State, and shall continue through the dissolution and liquidation of the Company.

**Section 1.05.** *Authorized Person.* The Certificate was executed by *Vaughn Iskanian, Esq., of Morris, Manning & Martin, LLP,* as an authorized person of the Company for purposes of filing the Certificate. Pursuant to Section 18-204 of the Act, the Member or any Person designated by the Member shall be authorized persons of the Company from and after the date of filing of the Certificate for purposes of executing all certificates required to be filed with the Secretary of State.

### ARTICLE II
### Definitions

**Section 2.01.** *Definitions.* For purposes of this Agreement, the following capitalized terms shall have the meanings ascribed to them.

**"Act"** means the Delaware Limited Liability Company Act, 6 Del. C. §18-101, *et seq.*, as amended from time to time (or any corresponding provisions of succeeding law).

**"Affiliate"** means, with respect to any Person (i) any individual, corporation, limited liability company, partnership, trust or other legal entity directly or indirectly controlling, controlled by or under common control with such Person, (ii) any officer, director, general partner, member or trustee of such Person or (iii) any individual who is an officer, director, general partner, member or trustee of any Person described in clauses (i) or (ii) of this sentence. For purposes of this definition, the terms "controlling," "controlled by" or "under common control with" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise, or the power to elect at least 50% of the directors, general partners, members or persons exercising similar authority with respect to such Person.

**"Agreement"** means this Limited Liability Company Agreement of PILGRIM FOREST PARK LLC, as amended from time to time, which shall constitute the limited liability company agreement of the Company for all purposes of the Act. Words such as "herein," "hereinafter," "hereof," "hereto" and "hereunder" refer to this Agreement as a whole, unless the context otherwise requires.

**"Certificate"** means the Certificate of Formation, effective on the Effective Date and filed with the Secretary of State of the State of Delaware pursuant to the Act to form the Company, as originally executed and as amended, modified, supplemented or restated from time to time, as the context requires.

**"Company"** means the limited liability company known as PILGRIM FOREST PARK LLC, a Delaware limited liability company, formed pursuant to this Agreement and the Certificate.

**"Effective Date"** means March 29, 2017.

**"Indemnified Person"** means the Member, additional members, any officer of the Company, the employees and agents of the Company, and their respective Affiliates.

**"Liquidator"** means any Person, including the Member, appointed by the Member acting in the capacity of liquidating trustee of the Company.

**"Mandatory Provisions of the Act"** means those provisions of the Act which may not be waived by Members acting unanimously or otherwise.

**"Member"** means the initial member, Overlook Managing Member LLC, a Delaware limited liability company, and any Person admitted as a Member pursuant to the terms of this Agreement. **"Members"** means all such Persons.

**"Person"** means any individual, partnership (whether general or limited), limited liability company, corporation, trust, estate, association, nominee or other entity.

**"Property"** means all real and personal property acquired by the Company, including cash, and any improvements thereto, and shall include both tangible and intangible property.

**"Unit"** means a Unit representing a membership interest in the Company.

## ARTICLE III
### Purpose

**Section 3.01.** *Purpose of the Company.* The Company is formed for the purpose of transacting any and all lawful business for which limited liability companies may be organized under the Act.

## ARTICLE IV
### CAPITAL CONTRIBUTIONS AND OTHER MATTERS

**Section 4.01.** *Capital Contributions.* On or about the Effective Date, the Member has made an initial capital contribution in cash to the Company, in the amount of $100.00. In consideration of its initial capital contribution, the Member has received 100% of the membership interests in and all of the outstanding Units of the Company. The Member may, but shall not be required to, make subsequent capital contributions to the Company.

**Section 4.02.** *Title to Property.* All Property owned by the Company shall be owned by the Company as an entity, and no Member shall have any ownership interest in such Property in its individual name, and each Member's interest in the Company shall be personal property for all purposes.

**Section 4.03.** *Other Matters.* The Member shall not be liable for the debts or any other obligations of the Company, nor shall the Member be required to guarantee any debts, liabilities, contracts or obligations of the Company. The Member shall not be required to lend any funds to the Company.

## ARTICLE V
### PROFIT, LOSS, INCOME AND DEDUCTIONS

**Section 5.01.** *Determination of Profit and Loss.* The profit and loss of the Company shall be determined in accordance with the accounting methods provided for in this Agreement. An accounting shall be made for each taxable year by the Company as soon as possible after the close of each such taxable year to determine the profit or loss of the Company, which shall be credited or debited, as the case may be, to the Member.

**Section 5.02.** *Allocation and Distribution of Profits, Losses, Income and Deductions.* One hundred percent (100%) of the profits, losses, income and deductions of the Company shall be allocated to the Member. The Company may make distributions to the Member from time to time in its discretion.

## ARTICLE VI
## ADMISSION OF ADDITIONAL MEMBERS AND TRANSFER OF UNITS

**Section 6.01.  *Admission of Additional Members.***  The Member may admit additional members to the Company as Member deems appropriate in Member's sole discretion.  In the event the Member determines to admit additional members to the Company, such additional members shall be bound by this Agreement and shall have all rights and powers of a Member under this Agreement, unless otherwise provided or restricted by a Member in Member's sole discretion.  Any of the provisions of this Agreement may be amended or modified to take into account such additional members as agreed by the Member and the additional members.

**Section 6.02.  *Permitted Transfers of Membership Units.***  The Member may transfer all or part of Member's Units as Member deems appropriate in the Member's sole discretion.  Any such transferee shall have all rights and powers of a Member under this Agreement, unless otherwise provided or restricted by Member in Member's sole discretion.

## ARTICLE VII
## MANAGEMENT, LIMITED LIABILITY OF MEMBER, AND INDEMNIFICATION

**Section 7.01.  *Management by the Member.***  The business of the Company shall be managed without designated managers.  The management of the Company is hereby vested in the Member.  Any third person dealing with the Company may rely absolutely upon the act, deed and/or signature of the Member as being the act of the Company and no third person shall be obliged or privileged to inquire into or otherwise ascertain whether the act of the Member has been duly authorized.

**Section 7.02.  *Limitation of Liability.***  Notwithstanding anything herein to the contrary, except as otherwise expressly agreed in writing, Member shall not be personally liable for any debts, liabilities, or obligations of the Company, whether to the Company, to any other Members, or to creditors of the Company if the Member acts in good faith, with the care an ordinary prudent person in a like position could exercise under similar circumstances, and in the manner Member reasonably believes to be in the best interests of the Company.

**Section 7.03.  *Indemnification.***  The Company shall defend, indemnify, and save harmless each Indemnified Person for all loss, liability, damage, cost, or expense (including reasonable attorneys' fees) incurred by reason of any demands, claims, suits, actions, or proceedings arising out of (a) the Indemnified Person's relationship to the Company or (b) such Indemnified Person's capacity as a member, manger, or an officer.  However, the Indemnified Person shall in no event be defended, indemnified, or saved harmless for such loss, liability, damage, cost, or expense as arises out of the theft, fraud, willful misconduct, or gross negligence by such Indemnified Person.

**A.  *Advancement of Expenses.***  Expenses incurred by an Indemnified Person in defending any claim, demand, action, suit or proceeding subject to this Section 7.03 shall be paid by the Company in advance of the final disposition of such action, suit, claim, demand, or proceeding and not less often than monthly, upon receipt of an undertaking by and on behalf of the Indemnified Person.  If it shall be ultimately determined that the Indemnified Person is not

4

entitled to be indemnified as authorized in this Section 7.03, the Indemnified Person shall repay the Company all such amounts advanced by the Company.

        **B.** *Non-Exclusivity.* The indemnification provided by this Section 7.03 shall be in addition to any other rights to which the Indemnified Person may be entitled under any agreement, vote of the members, as a matter of law or equity, or otherwise, and shall inure to the benefit of the successors, assignees, heirs, personal representatives and administrators of the Indemnified Person.

        **C.** *Insurance.* The Company may purchase and maintain insurance, at the Company's expense, on behalf of any Indemnified Person against any liability that may be asserted against or expense that may be incurred by an Indemnified Person in connection with the activities of the Company regardless of whether the Company would have the power to indemnify such Indemnified Person against such liability under the provisions of this Agreement.

### ARTICLE VIII
### Books, Records, Accounting and Taxation

        **Section 8.01.** *Books and Records.* Appropriate books and records with respect to the Company's business shall at all times be kept at the principal office of the Company or at such other places as determined by the Member. Any records maintained by the Company in the regular course of its business may be kept electronically or in any other form or information storage device, provided that the records so kept are convertible into clearly legible electronic or hard copy form within a reasonable period of time.

        **Section 8.02.** *Accounting.* The books of the Company shall be maintained on a cash basis of accounting in accordance with the provisions of this Agreement, and to the extent not inconsistent therewith generally accepted accounting principles for cash basis accounting.

        **Section 8.03.** *Fiscal and Tax Year.* The fiscal year and tax year of the Company shall be the calendar year, unless otherwise determined by the Member.

### ARTICLE IX
### DISSOLUTION AND WINDING UP

        **Section 9.01.** *Dissolution Events.* The Company shall be dissolved and its affairs wound up upon the happening of any of the following: (i) the sale or disposition of all or substantially all of the Company assets, and the distribution of the proceeds thereof to the Member; (ii) the decision by the Member to dissolve; (iii) the occurrence of an event of dissolution, as set forth in the Act, and failure by the Member to continue the Company; (iv) death, divorce, disability, incompetency, bankruptcy, or dissolution of Member; or (iv) the entry by a court of competent jurisdiction of a decree of judicial dissolution.

        **Section 9.02.** *Winding Up.* Upon dissolution under Section 9.01, no further business shall be conducted by the Company except for the taking of such action as shall be necessary for the winding-up of the affairs of the Company and the distribution of its assets to the Member pursuant to the provisions hereof, and thereupon the Member shall act as the Liquidator of the Company within the meaning of the Act and immediately proceed to wind up and terminate the business and affairs of the Company.

**Section 9.03.** *Sale of Company Assets.* Upon dissolution, the Liquidator shall sell such of the Company assets as it deems necessary or appropriate. Provided, upon ensuring the payment and discharge of or making of reasonable provisions for payment and discharge of all of the Company's debts and liabilities to creditors other than the Member, in lieu of the sale of any or all of the Company Property, the Liquidator may convey, distribute and assign all or any part of Company Property to the Member in such form of ownership as shall be determined by the Liquidator to be applicable to the jurisdiction where the Property is located. A full accounting shall be made of the accounts of the Company and of the Company's assets, liabilities and income, from the date of the last accounting to the date of such dissolution.

**Section 9.04.** *Distribution of Assets.* The Liquidator shall apply the proceeds from the liquidation and winding up in the following order of priority: (i) to creditors, including the Members if also a creditor, to the extent permitted by law, in satisfaction of liabilities of the Company; and (ii) the balance, to the Member.

## ARTICLE X
## MISCELLANEOUS

**Section 10.01.** *Amendments.* This Agreement may be amended only in a writing signed by the Member.

**Section 10.02.** *Captions.* All article and section captions in this Agreement are for convenience only. They shall not be deemed part of this Agreement and in no way define, limit, extend or describe the scope or intent of any provisions hereof. Except as specifically provided otherwise, references to "Articles" and "Sections" are to Articles and Sections of this Agreement.

**Section 10.03.** *Pronouns and Plurals.* Whenever the context may require, any pronoun used in this Agreement shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns, pronouns and verbs shall include the plural and vice versa.

**Section 10.04.** *Further Actions.* The parties to this Agreement shall execute and deliver all documents, provide all information and take or refrain from taking action as may be necessary or appropriate to achieve the purposes of this Agreement.

**Section 10.05.** *Binding Effect.* This Agreement shall be binding upon and inure to the benefit of the parties hereto and their successors, legal representatives and permitted assignees.

**Section 10.06.** *Integration.* This Agreement constitutes the entire agreement among the parties hereto pertaining to the subject matter hereof and supersedes all prior agreements and understandings pertaining thereto.

**Section 10.07.** *Waiver.* No failure by any party to insist upon the strict performance of any covenants, duty, agreement or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute waiver of any such breach or any other covenant, duty, agreement or condition.

**Section 10.08.** ***Counterparts.*** This Agreement may be executed in counterparts, all of which together shall constitute an agreement binding on all the parties hereto, notwithstanding that all such parties are not signatories to the original or the same counterpart. Each party shall become bound by this Agreement immediately upon affixing its signature hereto, independently of the signature of any other party.

**Section 10.09.** ***Applicable Law.*** This Agreement shall be construed in accordance with and governed by the laws of the State of Delaware, without regard to its principles of conflicts of laws.

**Section 10.10.** ***Invalidity of Provisions.*** If any provision of this Agreement is or becomes invalid, illegal, or unenforceable in any respect, the validity, legality, an enforceability of the remaining provisions contained herein shall not be affected thereby.

*[Signature appears on following page]*

IN WITNESS WHEREOF, the Member has executed this Agreement effective as of the Effective Date.

**MEMBER**:

**OVERLOOK MANAGING MEMBER LLC**
a Delaware limited liability company

By: _____
Name: Steven Ivankovich
Title: Manager

[Signature Page to LLC Agreement]

EFiled:  Dec 06 2024 02:18PM EST
Transaction ID 75157313
Case No. 2023-1182-LWW

# **EXHIBIT B**

# LIMITED LIABILITY COMPANY AGREEMENT
## of
## PILGRIM CARIBBEAN ISLE LLC

This Limited Liability Company Agreement ("Agreement") of **PILGRIM CARIBBEAN ISLE LLC**, a Delaware limited liability company ("Company"), is entered into as of the Effective Date by and between the Company and Overlook Managing Member LLC, a Delaware limited liability company ("Member"), for the purpose of setting forth the agreements between the Member and the Company.  The terms of the Agreement are as follows.

## ARTICLE I
## Organizational Matters

**Section 1.01. *Formation.*** The Company is formed as a limited liability company pursuant to the provisions of the Act.  The rights and obligations of the Member, and the affairs of the Company, shall be governed first by the Mandatory Provisions of the Act, second by the Certificate, third by this Agreement, and fourth by the optional provisions of the Act.  In the event of any conflict among the foregoing, the conflict shall be resolved in the order of priority set forth in the preceding sentence.

**Section 1.02. *Name.*** The name of the Company is **PILGRIM CARIBBEAN ISLE LLC**.

**Section 1.03. *Registered Office and Registered Agent.*** The registered office of the Company in the State of Delaware is located at 1209 Orange Street, Wilmington, Delaware 19801.  The name of its registered agent at such address is The Corporation Trust Company.  The Company may also maintain offices at such other place or places as the Member deems advisable.

**Section 1.04. *Term.*** The Company began upon the filing of the Certificate with the Delaware Secretary of State, and shall continue through the dissolution and liquidation of the Company.

**Section 1.05. *Authorized Person.*** The Certificate was executed by *Vaughn Iskanian, Esq., of Morris, Manning & Martin, LLP,* as an authorized person of the Company for purposes of filing the Certificate.  Pursuant to Section 18-204 of the Act, the Member or any Person designated by the Member shall be authorized persons of the Company from and after the date of filing of the Certificate for purposes of executing all certificates required to be filed with the Secretary of State.

## ARTICLE II
## Definitions

**Section 2.01. *Definitions.*** For purposes of this Agreement, the following capitalized terms shall have the meanings ascribed to them.

**"Act"** means the Delaware Limited Liability Company Act, 6 Del. C. §18-101, *et seq.*, as amended from time to time (or any corresponding provisions of succeeding law).

**"Affiliate"** means, with respect to any Person (i) any individual, corporation, limited liability company, partnership, trust or other legal entity directly or indirectly controlling, controlled by or under common control with such Person, (ii) any officer, director, general partner, member or trustee of such Person or (iii) any individual who is an officer, director, general partner, member or trustee of any Person described in clauses (i) or (ii) of this sentence. For purposes of this definition, the terms "controlling," "controlled by" or "under common control with" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise, or the power to elect at least 50% of the directors, general partners, members or persons exercising similar authority with respect to such Person.

**"Agreement"** means this Limited Liability Company Agreement of PILGRIM CARIBBEAN ISLE LLC, as amended from time to time, which shall constitute the limited liability company agreement of the Company for all purposes of the Act. Words such as "herein," "hereinafter," "hereof," "hereto" and "hereunder" refer to this Agreement as a whole, unless the context otherwise requires.

**"Certificate"** means the Certificate of Formation, effective on the Effective Date and filed with the Secretary of State of the State of Delaware pursuant to the Act to form the Company, as originally executed and as amended, modified, supplemented or restated from time to time, as the context requires.

**"Company"** means the limited liability company known as PILGRIM CARIBBEAN ISLE LLC, a Delaware limited liability company, formed pursuant to this Agreement and the Certificate.

**"Effective Date"** means March 29, 2017.

**"Indemnified Person"** means the Member, additional members, any officer of the Company, the employees and agents of the Company, and their respective Affiliates.

**"Liquidator"** means any Person, including the Member, appointed by the Member acting in the capacity of liquidating trustee of the Company.

**"Mandatory Provisions of the Act"** means those provisions of the Act which may not be waived by Members acting unanimously or otherwise.

**"Member"** means the initial member, Overlook Managing Member LLC, a Delaware limited liability company, and any Person admitted as a Member pursuant to the terms of this Agreement. **"Members"** means all such Persons.

**"Person"** means any individual, partnership (whether general or limited), limited liability company, corporation, trust, estate, association, nominee or other entity.

**"Property"** means all real and personal property acquired by the Company, including cash, and any improvements thereto, and shall include both tangible and intangible property.

**"Unit"** means a Unit representing a membership interest in the Company.

## ARTICLE III
## Purpose

**Section 3.01.** *Purpose of the Company.* The Company is formed for the purpose of transacting any and all lawful business for which limited liability companies may be organized under the Act.

## ARTICLE IV
## CAPITAL CONTRIBUTIONS AND OTHER MATTERS

**Section 4.01.** *Capital Contributions.* On or about the Effective Date, the Member has made an initial capital contribution in cash to the Company, in the amount of $100.00. In consideration of its initial capital contribution, the Member has received 100% of the membership interests in and all of the outstanding Units of the Company. The Member may, but shall not be required to, make subsequent capital contributions to the Company.

**Section 4.02.** *Title to Property.* All Property owned by the Company shall be owned by the Company as an entity, and no Member shall have any ownership interest in such Property in its individual name, and each Member's interest in the Company shall be personal property for all purposes.

**Section 4.03.** *Other Matters.* The Member shall not be liable for the debts or any other obligations of the Company, nor shall the Member be required to guarantee any debts, liabilities, contracts or obligations of the Company. The Member shall not be required to lend any funds to the Company.

## ARTICLE V
## PROFIT, LOSS, INCOME AND DEDUCTIONS

**Section 5.01.** *Determination of Profit and Loss.* The profit and loss of the Company shall be determined in accordance with the accounting methods provided for in this Agreement. An accounting shall be made for each taxable year by the Company as soon as possible after the close of each such taxable year to determine the profit or loss of the Company, which shall be credited or debited, as the case may be, to the Member.

**Section 5.02.** *Allocation and Distribution of Profits, Losses, Income and Deductions.* One hundred percent (100%) of the profits, losses, income and deductions of the Company shall be allocated to the Member. The Company may make distributions to the Member from time to time in its discretion.

## ARTICLE VI
## ADMISSION OF ADDITIONAL MEMBERS AND TRANSFER OF UNITS

**Section 6.01.  *Admission of Additional Members.***  The Member may admit additional members to the Company as Member deems appropriate in Member's sole discretion.  In the event the Member determines to admit additional members to the Company, such additional members shall be bound by this Agreement and shall have all rights and powers of a Member under this Agreement, unless otherwise provided or restricted by a Member in Member's sole discretion.  Any of the provisions of this Agreement may be amended or modified to take into account such additional members as agreed by the Member and the additional members.

**Section 6.02.  *Permitted Transfers of Membership Units.***  The Member may transfer all or part of Member's Units as Member deems appropriate in the Member's sole discretion.  Any such transferee shall have all rights and powers of a Member under this Agreement, unless otherwise provided or restricted by Member in Member's sole discretion.

## ARTICLE VII
## MANAGEMENT, LIMITED LIABILITY OF MEMBER, AND INDEMNIFICATION

**Section 7.01.  *Management by the Member.***  The business of the Company shall be managed without designated managers.  The management of the Company is hereby vested in the Member.  Any third person dealing with the Company may rely absolutely upon the act, deed and/or signature of the Member as being the act of the Company and no third person shall be obliged or privileged to inquire into or otherwise ascertain whether the act of the Member has been duly authorized.

**Section 7.02.  *Limitation of Liability.***  Notwithstanding anything herein to the contrary, except as otherwise expressly agreed in writing, Member shall not be personally liable for any debts, liabilities, or obligations of the Company, whether to the Company, to any other Members, or to creditors of the Company if the Member acts in good faith, with the care an ordinary prudent person in a like position could exercise under similar circumstances, and in the manner Member reasonably believes to be in the best interests of the Company.

**Section 7.03.  *Indemnification.***  The Company shall defend, indemnify, and save harmless each Indemnified Person for all loss, liability, damage, cost, or expense (including reasonable attorneys' fees) incurred by reason of any demands, claims, suits, actions, or proceedings arising out of (a) the Indemnified Person's relationship to the Company or (b) such Indemnified Person's capacity as a member, manger, or an officer.  However, the Indemnified Person shall in no event be defended, indemnified, or saved harmless for such loss, liability, damage, cost, or expense as arises out of the theft, fraud, willful misconduct, or gross negligence by such Indemnified Person.

**A.  *Advancement of Expenses.***  Expenses incurred by an Indemnified Person in defending any claim, demand, action, suit or proceeding subject to this Section 7.03 shall be paid by the Company in advance of the final disposition of such action, suit, claim, demand, or proceeding and not less often than monthly, upon receipt of an undertaking by and on behalf of the Indemnified Person.  If it shall be ultimately determined that the Indemnified Person is not

4

entitled to be indemnified as authorized in this Section 7.03, the Indemnified Person shall repay the Company all such amounts advanced by the Company.

**B. *Non-Exclusivity*.** The indemnification provided by this Section 7.03 shall be in addition to any other rights to which the Indemnified Person may be entitled under any agreement, vote of the members, as a matter of law or equity, or otherwise, and shall inure to the benefit of the successors, assignees, heirs, personal representatives and administrators of the Indemnified Person.

**C. *Insurance*.** The Company may purchase and maintain insurance, at the Company's expense, on behalf of any Indemnified Person against any liability that may be asserted against or expense that may be incurred by an Indemnified Person in connection with the activities of the Company regardless of whether the Company would have the power to indemnify such Indemnified Person against such liability under the provisions of this Agreement.

## ARTICLE VIII
## Books, Records, Accounting and Taxation

**Section 8.01. *Books and Records*.** Appropriate books and records with respect to the Company's business shall at all times be kept at the principal office of the Company or at such other places as determined by the Member. Any records maintained by the Company in the regular course of its business may be kept electronically or in any other form or information storage device, provided that the records so kept are convertible into clearly legible electronic or hard copy form within a reasonable period of time.

**Section 8.02. *Accounting*.** The books of the Company shall be maintained on a cash basis of accounting in accordance with the provisions of this Agreement, and to the extent not inconsistent therewith generally accepted accounting principles for cash basis accounting.

**Section 8.03. *Fiscal and Tax Year*.** The fiscal year and tax year of the Company shall be the calendar year, unless otherwise determined by the Member.

## ARTICLE IX
## DISSOLUTION AND WINDING UP

**Section 9.01. *Dissolution Events*.** The Company shall be dissolved and its affairs wound up upon the happening of any of the following: (i) the sale or disposition of all or substantially all of the Company assets, and the distribution of the proceeds thereof to the Member; (ii) the decision by the Member to dissolve; (iii) the occurrence of an event of dissolution, as set forth in the Act, and failure by the Member to continue the Company; (iv) death, divorce, disability, incompetency, bankruptcy, or dissolution of Member; or (iv) the entry by a court of competent jurisdiction of a decree of judicial dissolution.

**Section 9.02. *Winding Up*.** Upon dissolution under Section 9.01, no further business shall be conducted by the Company except for the taking of such action as shall be necessary for the winding-up of the affairs of the Company and the distribution of its assets to the Member pursuant to the provisions hereof, and thereupon the Member shall act as the Liquidator of the Company within the meaning of the Act and immediately proceed to wind up and terminate the business and affairs of the Company.

**Section 9.03.  *Sale of Company Assets.***  Upon dissolution, the Liquidator shall sell such of the Company assets as it deems necessary or appropriate.  Provided, upon ensuring the payment and discharge of or making of reasonable provisions for payment and discharge of all of the Company's debts and liabilities to creditors other than the Member, in lieu of the sale of any or all of the Company Property, the Liquidator may convey, distribute and assign all or any part of Company Property to the Member in such form of ownership as shall be determined by the Liquidator to be applicable to the jurisdiction where the Property is located.  A full accounting shall be made of the accounts of the Company and of the Company's assets, liabilities and income, from the date of the last accounting to the date of such dissolution.

**Section 9.04.  *Distribution of Assets.***  The Liquidator shall apply the proceeds from the liquidation and winding up in the following order of priority: (i) to creditors, including the Members if also a creditor, to the extent permitted by law, in satisfaction of liabilities of the Company; and (ii) the balance, to the Member.

## ARTICLE X
## <u>MISCELLANEOUS</u>

**Section 10.01.  *Amendments.***  This Agreement may be amended only in a writing signed by the Member.

**Section 10.02.  *Captions.***  All article and section captions in this Agreement are for convenience only.  They shall not be deemed part of this Agreement and in no way define, limit, extend or describe the scope or intent of any provisions hereof.  Except as specifically provided otherwise, references to "Articles" and "Sections" are to Articles and Sections of this Agreement.

**Section 10.03.  *Pronouns and Plurals.***  Whenever the context may require, any pronoun used in this Agreement shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns, pronouns and verbs shall include the plural and vice versa.

**Section 10.04.  *Further Actions.***  The parties to this Agreement shall execute and deliver all documents, provide all information and take or refrain from taking action as may be necessary or appropriate to achieve the purposes of this Agreement.

**Section 10.05.  *Binding Effect.***  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their successors, legal representatives and permitted assignees.

**Section 10.06.  *Integration.***  This Agreement constitutes the entire agreement among the parties hereto pertaining to the subject matter hereof and supersedes all prior agreements and understandings pertaining thereto.

**Section 10.07.  *Waiver.***  No failure by any party to insist upon the strict performance of any covenants, duty, agreement or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute waiver of any such breach or any other covenant, duty, agreement or condition.

**Section 10.08.** ***Counterparts.*** This Agreement may be executed in counterparts, all of which together shall constitute an agreement binding on all the parties hereto, notwithstanding that all such parties are not signatories to the original or the same counterpart. Each party shall become bound by this Agreement immediately upon affixing its signature hereto, independently of the signature of any other party.

**Section 10.09.** ***Applicable Law.*** This Agreement shall be construed in accordance with and governed by the laws of the State of Delaware, without regard to its principles of conflicts of laws.

**Section 10.10.** ***Invalidity of Provisions.*** If any provision of this Agreement is or becomes invalid, illegal, or unenforceable in any respect, the validity, legality, an enforceability of the remaining provisions contained herein shall not be affected thereby.

*[Signature appears on following page]*

IN WITNESS WHEREOF, the Member has executed this Agreement effective as of the Effective Date.

**MEMBER**:

**OVERLOOK MANAGING MEMBER LLC**
a Delaware limited liability company

By: _____
Name: Steven Ivankovich
Title:   Manager

EFiled:  Dec 06 2024 02:18PM EST
Transaction ID 75157313
Case No. 2023-1182-LWW

# EXHIBIT C

# AMENDED AND RESTATED LIMITED LIABILITY
## COMPANY AGREEMENT OF
### ALLIANCE HTFL GP, L.L.C.

This Amended and Restated Limited Liability Company Agreement (together with the schedules attached hereto, this **"Agreement")** of ALLIANCE HTFL GP, L.L.C. (the **"Company"),** is entered into by PILGRIM CARIBBEAN ISLE LLC and PILGRIM FOREST PARK LLC, each a Delaware limited liability company, as the sole equity members (collectively the **"Members"** and individually a **"Member")**, and **Lisa M. Pierro,** as the Springing Member (as defined on Schedule A hereto). Capitalized terms used and not otherwise defined herein have the meanings set forth on Schedule A hereto.

The Company was organized under the Limited Liability Company Act of Delaware, as it may be amended from time to time (the **"Act"),** through the filing of a Certificate of Formation dated on or about June 15th, 2007, (the **"Certificate")** with the Delaware Secretary of State. Accordingly, the rights and obligations of the Members shall be governed by the provisions of the Act, except as otherwise required by the provisions of this Agreement or the Certificate. This Agreement also contains the provisions governing certain aspects of the management of the affairs of the Company in accordance with the Act.

The Company is subject to that certain Limited Liability Company Agreement dated as of June 27, 2007 (the **"Original Agreement"**).

The Member, by execution of this Agreement, hereby amend and restate the Original Agreement in its entirety and agree that the Company shall hereafter be organized and operated pursuant to and in accordance with the Act and this Agreement, and the Member and the Springing Member hereby agree as follows:

**Section 1.**     **Name.**

The name of the limited liability company formed hereby is ALLIANCE HTFL GP, L.L.C.

**Section 2.**     **Principal Business Office.**

The principal business office of the Company shall be located at 55 E. Monroe, Suite 3610, Chicago, Illinois 60603 or such other location as may hereafter be determined by the Member.

**Section 3.**     **Registered Office.**

The address of the registered office of the Company in the State of Delaware is c/o Corporation Trust Company, 1209 Orange Street, Wilmington, Delaware, 19801.

**Section 4.**     **Registered Agent.**

The name and address of the registered agent of the Company for service of process on the Company in the State of Delaware is Corporation Trust Company.

**Section 5.**     <u>**Members**</u>.

(a)     The mailing address of the Members is set forth on <u>Schedule B</u> attached hereto. The Members shall be admitted to the Company as a members of the Company upon their execution of a counterpart signature page to this Agreement.

(b)     Subject to Section 9(c), the Members may act by written consent.

(c)     Upon the occurrence of any event that causes all Members to cease to be members of the Company (other than (i) upon an assignment by any Member of all of its limited liability company interest in the Company and the admission of the transferee pursuant to <u>Sections 21</u> and <u>23</u>, or (ii) the resignation of a Member and the admission of an additional member of the Company pursuant to <u>Sections 22</u> and <u>23</u>) (a **"Member Cessation Event"**), Springing Member shall, without any action of any Person and simultaneously with the Member Cessation Event, automatically be admitted to the Company as a Special Member and shall continue the Company without dissolution. No Special Member may resign from the Company or transfer its rights as Special Member unless a successor Special Member has been admitted to the Company as Special Member by executing a counterpart to this Agreement. The Special Member shall automatically cease to be a member of the Company upon the admission to the Company of a substitute Member. The Special Member shall be a member of the Company that has no interest in the profits, losses and capital of the Company and has no right to receive any distributions of Company assets. Pursuant to Section 18-301 of the Act, a Special Member shall not be required to make any capital contributions to the Company and shall not receive a limited liability company interest in the Company. A Special Member, in its capacity as Special Member, may not bind the Company. Except as required by any mandatory provision of the Act, a Special Member, in its capacity as Special Member, shall have no right to vote on, approve or otherwise consent to any action by, or matter relating to, the Company, including, without limitation, the merger, consolidation or conversion of the Company. In order to implement the admission to the Company of the Special Member, each person acting as Springing Member shall execute a counterpart to this Agreement. Prior to its admission to the Company as Special Member, each person acting as Springing Member shall not be a member of the Company.

(d)     The Company shall at all times have a Springing Member. No resignation or removal of a Springing Member, and no appointment of a successor Springing Member, shall be effective unless and until such successor shall have executed a counterpart to this Agreement and accepted its appointment as an Independent Manager pursuant to <u>Section 10</u>. In the event of a vacancy in the position of Springing Member, the Member shall, as soon as practicable, appoint a successor Springing Member to fill such vacancy. By signing this Agreement, a Springing Member agrees that, should such Springing Member become a Special Member, such Springing Member will be subject to and bound by the provisions of this Agreement applicable to a Special Member.

**Section 6.**     <u>**Certificates**</u>.

Steven V. Ivankovich is hereby designated as an "authorized person" within the meaning of the Act. The Members, or at the Members' discretion, any other "authorized person" named herein shall execute, deliver and file any other certificates (and any amendments and/or restatements thereof) necessary for the Company to qualify to do business in Delaware or any other jurisdiction in which the Company may wish to conduct business.

2

The existence of the Company as a separate legal entity shall continue until cancellation of the Certificate as provided in the Act.

**Section 7.    Purposes.**

(a)    Notwithstanding anything to the contrary in this Agreement or the Certificate, the purpose to be conducted or promoted by the Company is to engage in the following activities:

> (i)    subject to the terms of the Loan and the Loan Documents and the restrictions contained in Section 9(c) hereof, to:
>
> > (A)    act as the General Partner of the Mortgage Borrower and, on behalf of the Mortgage Borrower, to engage in the acquisition, ownership, development, operation, management, leasing, financing, mortgaging and selling of the real property and any business related thereto or useful in connection therewith; and
> >
> > (B)    engage in any lawful act or activity and to exercise any powers permitted to limited liability companies formed under the laws of the State of Delaware that are related or incidental to and necessary, convenient or advisable for the accomplishment of the above-mentioned purposes.

(b)    The Company, and the Members on behalf of the Company, may enter into and perform the Basic Documents and all documents, agreements, certificates, or financing statements contemplated thereby or related thereto without any further act, vote or approval of any Member or other Person notwithstanding any other provision of this Agreement, the Act or applicable law, rule or regulation.  The foregoing authorization shall not be deemed a restriction on the powers of the Member to enter into other agreements on behalf of the Company.

**Section 8.    Powers.**

Subject to Section 9(c), the Company and the Members, on behalf of the  Company, (i) shall have and exercise all powers necessary, convenient or incidental to accomplish its purposes as set forth in Section 7 and (ii) shall have and exercise all of the powers and rights conferred upon limited liability companies formed pursuant to the Act.

**Section 9.    Management.**

(a)    Management.  Subject to Section 9(c), the business and affairs of the Company shall be managed by or under the direction of the Manager.  The Manager shall be appointed by the Members and shall hold office until a successor is selected and qualified or until such Manager's earlier death, resignation, expulsion or removal.  The Manager need not be a Member.

3

The initial Manager designated by the Member is Steven V. Ivankovich. Unless otherwise restricted by law, the Manager may be removed or expelled, with or without cause, at any time by the Members, and any vacancy caused by any such removal or expulsion may be filled by action of the Members. To the extent of its powers set forth in this Agreement and subject to Section 9(c), the Manager is an agent of the Company for the purpose of the Company's business, and the actions of the Manager taken in accordance with such powers set forth in this Agreement shall bind the Company.

(b)     Powers. Subject to Section 9(c), the Manager shall have the power to do any and all acts necessary, convenient or incidental to or for the furtherance of the purposes described herein, including all powers, statutory or otherwise. Subject to Section 7 and each limitation set forth elsewhere herein or in the Loan Documents, the Manager or any Person appointed by the Manager has the authority to bind the Company.

(c)     Limitations on the Company's Activities.

    (i)     This Section 9(c) is being adopted in order to comply with certain provisions required in order to qualify the Company as a "special purpose" entity.

    (ii)     Notwithstanding anything to the contrary in this Agreement or in the Certificate of Formation, neither the Member, the Manager nor the Company shall, so long as the Loan is outstanding, amend, alter, change or repeal any of Sections 1, 5(b), 5(c, 5(d), the second paragraph of 6, 7, 8, 9, 10, 16, 18, 19, 20(b), 20(f), 21, 22, 23, 24, 25, 26, 27, 29, 30, 31 or 32 or Schedule A of this Agreement (to the extent the terms defined in Schedule A are used in any of the foregoing sections)(the "Special Purpose Provisions", without the written consent of the Lender. Subject to this Section 9(c), the Members reserve the right to amend, alter, change or repeal any provisions contained in this Agreement in accordance with Section 32. In the event of any conflict between any of the Special Purpose Provisions and any other provision of this Agreement or the Certificate, the Special Purpose Provisions shall control.

    (iii)     Notwithstanding any other provisions of this Agreement or the Certificate of Formation, and notwithstanding any provision of law that otherwise so empowers the Company, for so long as the Loan is outstanding, neither the Members nor the Manager nor any other Person shall be authorized or empowered, nor shall they permit the Company or the Mortgage Borrower to, and the Company and the Mortgage Borrower shall not, without the prior unanimous written consent of the Member and the Independent Managers, take any Material Action, provided however, that the Members may vote on, or authorize the taking of, any Material Action with respect to the Company or the Mortgage Borrower, if there are at least two (2) Independent Managers of the Company then serving in such capacity.

(iv)     For so long as the Loan is outstanding, unless the Lender otherwise agrees, the Manager shall cause the Company and the Mortgage Borrower to do or cause to be done all things necessary to preserve and keep in full force and effect their existence, rights (charter and statutory) and franchises; provided, however, that the Company and the Mortgage Borrower shall not be required to preserve any such right or franchise if: (1) the Members shall determine that the preservation thereof is no longer desirable for the conduct of its business and that the loss thereof is not disadvantageous in any material respect to the Company or the Mortgage Borrower, as applicable, and (2) the Rating Agency Condition is satisfied. Notwithstanding anything to the contrary in this Agreement or the Certificate, for so long as the Loan is outstanding, unless the Lender otherwise agrees, the Company for itself and on behalf of the Mortgage Borrower:

(A)     With respect to the Company, shall be organized solely for the purpose of acting as the General Partner of the Mortgage Borrower and taking such actions on behalf of the Mortgage Borrower as are necessary and desirable for acquiring, developing, owning, holding, selling, leasing, transferring, exchanging, managing and operating real property, entering into the Loan Documents with the Lender, refinancing the real property in connection with a permitted repayment of the Loan, and transacting lawful business that is incident, necessary, and appropriate to accomplish the foregoing;

(B)     With respect to the Company, is not engaged and will not engage in any business unrelated to acting as General Partner of the Mortgage Borrower;

(C)     does not have and will not have any assets other than those related to the real property or its general partnership interest in the Mortgage Borrower;

(D)     to the fullest extent permitted by law, has not engaged, sought or consented to and will not engage in, seek or consent to any dissolution, winding up, liquidation, consolidation, merger, sale of all or substantially all of its assets, transfer of its general partnership interest in Mortgage Borrower or amendment of its certificate of formation or operating agreement with respect to the matters set forth in this subsection;

(E)     shall operate in accordance with the provisions of Section 9(c)(iii) hereof;

(F)     intentionally deleted;

(G)     intentionally deleted;

5

(H)    is and will pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses) from its assets as the same shall become due, provided it has sufficient cash flow available to do so and it will take all steps a reasonable business of its size and character would take to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size. and character and in light of its contemplated business operations;

(I)    has not failed and will not fail to correct any known material misunderstanding regarding its separate identity;

(J)    has maintained and will maintain its accounts, books and records separate from any other Person and will file its own tax returns, except to the extent that it is required to file consolidated tax returns by law or if otherwise permitted to file a consolidated tax return, its assets and liabilities are clearly and distinctly denoted as separate from those of all other Persons of such consolidated tax return;

(K)    has maintained and will maintain its own books, records, resolutions and agreements as official records;

(L)    other than as provided in the Cash Management Agreement, (i) has not commingled and will not commingle its funds or assets with those of any other Person and (ii) has not participated and will not participate in any cash management system with any other Person;

(M)    has held and will hold its assets in its own name;

(N)    has maintained and will maintain its financial statements, accounting records and other entity documents separate from any other Person and has not permitted and will not permit its assets to be listed as assets on the financial statement of any other entity except as required by GAAP; provided, however, that any consolidated financial statement shall contain a note indicating that its separate assets and liabilities are neither available to pay the debts of the consolidated entity nor constitute obligations of the consolidated entity;

(O)    has paid and will pay its own liabilities and expenses, including the salaries of its own employees, if any, out of its own funds and assets, and has maintained and will maintain a sufficient number of employees in light of its contemplated business operations;

(P)    will hold regular meetings, as appropriate, to conducts its business, has observed and will observe all limited liability company formalities and record keeping;

6

(Q)     has and will have no indebtedness except for that allowed under the Loan Documents;

(R)     has not and will not assume or guarantee or become obligated for the debts of any other Person or hold out its credit as being available to satisfy the obligations of any other Person except as permitted pursuant to the Loan;

(S)     has not (except as permitted under the Loan) and will not acquire obligations or securities of its partners, members or shareholders or any other Affiliate;

(T)     has allocated and will allocate fairly and reasonably any overhead expenses that are shared with any Affiliate, including, but not limited to, paying for shared office space and services performed by any employee of an Affiliate;

(U)     has not pledged and will not pledge its assets for the benefit of any other person or entity, except as allowed under the Loan Documents;

(V)     has held itself out and identified itself and will hold itself out and identify itself as a separate and distinct entity under its own name or in a name franchised or licensed to it by an entity other than an Affiliate of Mortgage Borrower, and not as a division or part of any other Person, except for services rendered under a business management services agreement with an Affiliate that complies with the terms contained in Subsection *(Z)* below, so long as the manager, or equivalent thereof, under such business management services agreement holds itself out as an agent of the Mortgage Borrower;

(W)     has maintained and will maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(X)     has not made and will not make loans to any Person or hold evidence of indebtedness issued by any other Person or entity (other than cash and investment-grade securities issued by an entity that is not an Affiliate of or subject to common ownership with such entity);

(Y)     has not identified and will not identify its partners, members or shareholders, or any Affiliate of any of them, as a division or part of it, and has not identified itself and shall not identify itself as a division of any other Person;

(Z)     has not entered into or been a party to, and will not enter into or be a party to, any transaction with its partners, members, shareholders

7

or Affiliates except (i) in the ordinary course of its business and on terms which are intrinsically fair, commercially reasonable and are no less favorable to it than would be obtained in a comparable arm's-length transaction with an unrelated third party and (ii) in connection with the Loan Agreement;

(AA)   has not and will not have any obligation to, and will not, indemnify its partners, officers, directors, members, as the case may be, unless such an obligation is fully subordinated to the amount due under the Loan Documents and will not constitute a claim against it in the event that cash flow in excess of the amount required to pay the amount due under the Loan Documents is insufficient to pay such obligation;

(BB)   shall cause its Manager(s) to consider the interests of the creditors of the Company in connection with all limited liability company action;

(CC)   shall maintain adequate capital in light of its contemplated business operations;

(DD)   shall continue to maintain at least two (2) Independent Managers;

(EE)   shall operate in accordance with the provisions of Section 9(c)(iii) hereof; and

(FF)    does not and will not have any of its obligations guaranteed by any Affiliate except to Lenders as required under the Loan Agreements and the other Loan Documents.

Failure of the Company, or the Members or the Manager on behalf of the Company, *to* comply with any of the foregoing covenants or any other covenants contained in this Agreement shall not affect the status of the Company as a separate legal entity or the limited liability of the Members.

## Section 10.    **Independent Managers**.

As long as the Loan is outstanding, the Member shall cause the Company at all times to have at least two (2) Independent Managers who will be appointed by the Members. To the fullest extent permitted by law, including Section 18-llOl(c) of the Act, the Independent Managers shall consider only the interests of the Company, the Mortgage Borrower and their respective creditors in acting or otherwise voting on the matters referred to in Sections 9(c)(iii). No resignation or removal of an Independent Manager, and no appointment of a successor Independent Manager, shall be effective until such successor (i) shall have accepted his or her appointment as an Independent Manager by a written instrument, which may be a counterpart signature page to the Management Agreement, and (ii) shall have executed a counterpart to this Agreement as required by Section 5(d)(ii). In the event of a vacancy in the position of Independent Manager, the Members shall, as soon as practicable, appoint a successor Independent Manager. All right, power and authority of the Independent Managers shall be

8

limited to the extent necessary to exercise those rights and perform those duties specifically set forth in this Agreement. Except as provided in the second sentence of this Section 10, in exercising their rights and performing their duties under this Agreement, any Independent Manager shall have a fiduciary duty of loyalty and care similar to that of a director of a business corporation organized under the General Corporation Law of the State of Delaware. No Independent Manager shall at any time serve as trustee in bankruptcy for any Affiliate of the Company.

**Section 11.    Officers.**

(a)    Officers.  The Officers of the Company shall be chosen by the Manager and shall consist of at least a President, a Secretary and a Treasurer. The initial Officers of the Company shall be: Steven V. Ivankovich, President and Treasurer; and Gary Romaniello, Vice President and Secretary. The Manager may also appoint one or more Vice Presidents, Assistant Secretaries and Assistant Treasurers. Any number of offices may be held by the same person. The Manager may appoint such other Officers and agents as it shall deem necessary or advisable who shall hold their offices for such terms and shall exercise such powers and perform such duties as shall be determined from time to time by the Manager. The Officers of the Company shall hold office until their successors are chosen and qualified. Any Officer may be removed at any time, with or without cause, by the affirmative vote of the Manager. Any vacancy occurring in any office of the Company shall be filled by the Manager.

(b)    President.  The President shall be the chief executive officer of the Company, shall preside at all meetings of the Manager, shall be responsible for the general and active management of the business of the Company and shall see that all orders and resolutions of the Manager are carried into effect. The President or any other Officer authorized by the President or the Manager shall execute all bonds, mortgages and other contracts, except: (i) where required or permitted by law or this Agreement to be otherwise signed and executed; (ii) where signing and execution thereof shall be expressly delegated by the Manager to some other Officer or agent of the Company, and (iii) as otherwise permitted in Section 11(c).

(c)    Vice President.  In the absence of the President or in the event of the President's inability to act, the Vice President, if any (or in the event there be more than one Vice President, the Vice Presidents in the order designated by the Managers, or in the absence of any designation, then in the order of their election), shall perform the duties of the President, and when so acting, shall have all the powers of and be subject to all the restrictions upon the President. The Vice Presidents, if any, shall perform such other duties and have such other powers as the Manager may from time to time prescribe.

(d)    Secretary and Assistant Secretary.  The Secretary shall be responsible for filing legal documents and maintaining records for the Company. The Secretary shall attend all meetings of the Manager and record all the proceedings of the meetings of the Company and of the Manager in a book to be kept for that purpose. The Secretary shall give, or shall cause to be given, notice of all meetings of the Member, if any, and special meetings of the Manager, and shall perform such other duties as may be prescribed by the Manager or the President, under whose supervision the Secretary shall serve. The Assistant Secretary, or if there be more than one, the Assistant Secretaries in the order determined by the Manager (or if there be no such determination,

9

then in order of their election), shall, in the absence of the Secretary or in the event of the Secretary's inability to act, perform the duties and exercise the powers of the Secretary and shall perform such other duties and have such other powers as the Manager may from time to time prescribe.

   (e) <u>Treasure and Assistant Treasurer</u>. The Treasurer shall have the custody of the Company funds and securities and shall keep full and accurate accounts of receipts and disbursements in books belonging to the Company and shall deposit all moneys and other valuable effects in the name and to the credit of the Company in such depositories as may be designated by the Manager. The Treasurer shall disburse the funds of the Company as may be ordered by the Manager, taking proper vouchers for such disbursements, and shall render to the President and to the Manager, at its regular meetings or when the Manager so requires, an account of all of the Treasurer's transactions and of the financial condition of the Company. The Assistant Treasurer, or if there shall be more than one, the Assistant Treasurers in the order determined by the Manager (or if there be no such determination, then in the order of their election), shall, in the absence of the Treasurer or in the event of the Treasurer's inability to act, perform the duties and exercise the powers of the Treasurer and shall perform such other duties and have such other powers as the Manager may from time to time prescribe.

   (f) <u>Officers as Agents</u>. The Officers, to the extent of their powers set forth in this Agreement or otherwise vested in them by action of the Manager not inconsistent with this Agreement, are agents of the Company for the purpose of the Company's business and, subject to <u>Section 9(b)</u>, the actions of the Officers taken in accordance with such powers shall bind the Company.

   (g) <u>Duties of Manager and Officers</u>. Except to the extent otherwise modified herein, each Manager and Officer shall have fiduciary duties identical to those of managers and officers of business corporations organized under the General Corporation Law of the State of Delaware.

**Section 12.** **Limited Liability.**

   Except as otherwise expressly provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be the debts, obligations and liabilities solely of the Company, and none of the Members, the Special Member, the Springing Member or the Independent Managers shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member, Special Member, the Springing Member or the Independent Managers of the Company.

**Section 13.** **Capital Contributions.**

   The Members have contributed to the Company property of an agreed value as listed on <u>Schedule B</u> attached hereto. In accordance with Section 9(c), the Special Member shall not be required to make any capital contributions to the Company.

**Section 14.** **Additional Contributions.**

The Members are not required to make any additional capital contribution to the Company. However, the Members may make additional capital contributions to the Company at any time upon the written consent of such Members. Except as provided in <u>Section 27</u> hereof, the

provisions of this Agreement, including this Section 14, are intended to benefit the Members and the Special Member and, to the fullest extent permitted by law, shall not be construed as conferring any benefit upon any creditor of the Company (and except as provided in Section 27, no such creditor of the Company shall be a third-party beneficiary of this Agreement) and the Members and the Special Member shall not have any duty or obligation to any creditor of the Company to make any contribution to the Company or to issue any call for capital pursuant to this Agreement.

**Section 15.    Allocation of Profits and Losses.**

The Company's profits and losses shall be allocated to the Members.

**Section 16.    Distributions.**

Distributions shall be made to the Members at the times and in the aggregate amounts determined by the Members. Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make a distribution to the Members on account of its interest in the Company if such distribution would violate the Act or any other applicable law. Notwithstanding anything to the contrary contained in this Agreement, no distributions shall be made to any Members except in accordance with the Loan Documents

**Section 17.    Books and Records.**

The Manager shall keep or cause to be kept complete and accurate books of account and records with respect to the Company's business. The Manager shall maintain the books of the Company at all times. The Members and their duly authorized representatives shall have the right to examine the Company books, records and documents during normal business hours. The Company's books of account shall be kept using the method of accounting determined by the Manager. The Company's independent auditor, if any, shall be an independent public accounting firm selected by the Manager.

**Section 18.    Reports.**

(a)    For so long as the Loan is outstanding, as promptly as possible after the end of each fiscal quarter and the end of each fiscal year, the Manager shall cause to be prepared such financial statements and reports as are required to be provided to the Member and/or Lender pursuant to the Loan Documents.

(b)    The Manager shall, after the end of each fiscal year, use reasonable efforts to cause the Company's independent accountants, if any, to prepare and transmit to the Members as promptly as possible any such tax information as may be reasonably necessary to enable the Members to prepare their federal, state and local income tax returns relating to such fiscal year.

**Section 19.**    <u>**Other Business**</u>.

The Manager, Members, the Special Member and any Affiliate of the Member or the Special Member may engage in or possess an interest in other business ventures (unconnected with the Company) of every kind and description, independently or with others. The Company shall not have any rights in or to such independent ventures or the income or profits therefrom by virtue of this Agreement.

**Section 20.**    <u>**Exculpation and Indemnification.**</u>

(a)    Neither the Members nor the Special Member nor any employee or agent of the Company nor any employee, representative, agent or Affiliate of the Members or the Special Member (collectively, the "<u>Covered Persons</u>") shall, to the fullest extent permitted by law, be liable to the Company or any other Person who has an interest in or claim against the Company for any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such Covered Person by this Agreement, except that a Covered Person shall be liable for any such loss, damage or claim incurred by reason of such Covered Person's gross negligence or willful misconduct.

(b)    To the fullest extent permitted by applicable law, a Covered Person shall be entitled to indemnification from the Company for any loss, damage or claim incurred by such Covered Person by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such Covered Person by this Agreement, except that no Covered Person shall be entitled to be indemnified in respect of any loss, damage or claim incurred by such Covered Person by reason of such Covered Person's gross negligence or willful misconduct with respect to such acts or omissions; <u>provided,</u> however, that any indemnity under this <u>Section 20</u> by the Company shall be provided out of and to the extent of Company assets only, and the Members and the Special Member shall not have personal liability on account thereof; and <u>provided</u> further, that so long as the Loan is outstanding, no indemnity payment from funds of the Company (as distinct from funds from other sources, such as insurance) of any indemnity under this <u>Section 20</u> shall be payable from amounts allocable to any other Person pursuant to the Basic Documents.

(c)    To the fullest extent permitted by applicable law, expenses (including legal fees) incurred by a Covered Person defending any claim, demand, action, suit or proceeding shall, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding upon receipt by the Company of an undertaking by or on behalf of the Covered Person to repay such amount if it shall be determined that the Covered Person is not entitled to be indemnified as authorized in this Section 20.

(d)    A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any Person as to matters the Covered Person reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or

12

statements as to the value and amount of the assets, liabilities, or any other facts pertinent to the existence and amount of assets from which distributions to the Member might properly be paid.

(e)    To the extent that, at law or in equity, a Covered Person has duties (including fiduciary duties) and liabilities relating thereto to the Company or to any other Covered Person, a Covered Person acting under this Agreement shall not be liable to the Company or to any other Covered Person for its good faith reliance on the provisions of this Agreement or any approval or authorization granted by the Company or any other Covered Person. The provisions of this Agreement, to the extent that they restrict the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the Members, the Springing Member and the Special Member to replace such other duties and liabilities of such Covered Person.

(f)    Notwithstanding the foregoing provisions, any indemnification set forth herein shall be fully subordinate to the Loan and shall not constitute a claim against the Company in the event that the Company's cash flow is insufficient to pay its obligations.

(g)    The foregoing provisions of this Section 20 shall survive any termination of this Agreement.

Section 21.    Assignments.

(a)    Subject to Sections 22 and 23 and any transfer restrictions contained in the Loan Documents, each Member may assign in whole or in part its limited liability company interest in the Company. Subject to Section 22 and 23, if a Member transfers all of its limited liability company interest in the Company pursuant to this Section 21, the transferee shall be admitted to the Company as a member of the Company upon its execution of an instrument signifying its agreement to be bound by the terms and conditions of this Agreement, which instrument may be a counterpart signature page to this Agreement. Such·admission shall be deemed effective immediately prior to the transfer and, immediately following such admission, the transferor Member shall cease to be a member of the Company. Notwithstanding anything in this Agreement to the contrary, any successor to a Member by merger or consolidation in compliance with the Basic Documents shall, without further act, be the Member hereunder, and such merger or consolidation shall not constitute an assignment for purposes of this Agreement and the Company shall continue without dissolution.

(b)    Notwithstanding anything to the contrary contained in this Agreement for so long as the Loan remains outstanding, the Members shall remain members of the Company.

Section 22.    Resignation.

So long as the Loan is outstanding, no Member may resign, unless it is permitted under the Loan Documents, the Rating Agency Condition is satisfied and an additional member is admitted to the Company pursuant to Section 23. If a Member is permitted to resign pursuant to this Section 22, an additional member of the Company shall be admitted to the Company, subject to Section 23, upon its execution of an instrument signifying its agreement to be bound by the terms and conditions of this Agreement, which instrument may be a counterpart signature page to this Agreement. Such admission shall be deemed effective immediately prior to the resignation and, immediately following such admission, the resigning Member shall cease to be a member of the Company.

13

Section 23.    Admission of Additional Members.

One or more additional members of the Company may be admitted to the Company with the written consent of the Member; provided, however, that, notwithstanding the foregoing, so long as the Loan remains outstanding, no additional Member may be admitted to the Company pursuant to Sections 21, 22 or 23 unless (1) there is a transfer of 100% of the limited liability company interest to a single Person (2) the Rating Agency Condition is satisfied and (3) in compliance with the Loan Documents.

Section 24.    Dissolution.

(a)    Subject to Section 9(c), the Company shall be dissolved, and its affairs shall be wound up upon the first to occur of the following: (i) the termination of the legal existence of the last remaining member of the Company or the occurrence of any other event which terminates the continued membership of the last remaining member of the Company in the Company unless the Company is continued without dissolution in a manner permitted by this Agreement or the Act or (ii) the entry of a decree of judicial dissolution under Section 18-802 of the Act. Upon the occurrence of any event that causes the last remaining member of the Company to cease to be a member of the Company (other than a Member Cessation Event), to the fullest extent permitted by law, the personal representative of such member is hereby authorized to, and shall, within 90 days after the occurrence of the event that terminated the continued membership of such member in the Company, agree in writing (i) to continue the Company and (ii) to the admission of the personal representative or its nominee or designee, as the case may be, as a substitute member of the Company, effective as of the occurrence of the event that terminated the continued membership of the last remaining member of the Company or the Member in the Company.

(b)    Notwithstanding any other provision of this Agreement, the Bankruptcy of any Member or a Special Member shall not cause the Member or Special Member, respectively, to cease to be a member of the Company and upon the occurrence of such an event, the Company shall continue without dissolution.

(c)    Notwithstanding any other provision of this Agreement, each of the Members and the Special Member waives any right it might have to agree in writing to dissolve the Company upon the Bankruptcy of the Member or a Special Member, or the occurrence of an event that causes a Member or a Special Member to cease to be a member of the Company.

(d)    In the event of dissolution, the Company shall conduct only such activities as are necessary to wind up its affairs (including the sale of the assets of the Company in an orderly manner), and the assets of the Company shall be applied in the manner, and in the order of priority, set forth in Section 18-804 of the Act.

(e)    The Company shall terminate when (i) all of the assets of the Company, after payment of or due provision for all debts, liabilities and obligations of the Company shall have been distributed to the Members or the personal representative of the last remaining member in the manner provided for in this Agreement and (ii) the Certificate of Formation shall have been canceled in the manner required by the Act.

14

**Section 25.**     **Waiver of Partition; Nature of Interest.**

Except as otherwise expressly provided in this Agreement, to the fullest extent permitted by law, each of the Members, the Special Member, the Springing Member, and any additional member admitted to the Company hereby irrevocably waives any right or power that such Person might have to cause the Company or any of its assets to be partitioned, to cause the appointment of a receiver for all or any portion of the assets of the Company, to compel any sale of all or any portion of the assets of the Company pursuant to any applicable law or to file a complaint or to institute any proceeding at law or in equity to cause the dissolution, liquidation, winding up or termination of the Company. The Members shall not have any interest in any specific assets of the Company, and the Members shall not have the status of a creditor with respect to any distribution pursuant to Section 16 hereof. The interest of the Members in the Company is personal property.

**Section 26.**     **Tax Status.**

It is intended that the Company shall be disregarded as an entity separate from its Members for federal, state, and local income tax purposes.

**Section 27.**     **Benefits of Agreement; No Third-Party Rights.**

Except for the Lender with respect to Section 9(c)(ii) and the Special Purpose Provisions of this Agreement, none of the provisions of this Agreement shall be for the benefit of or enforceable by any creditor of the Company or by any creditor of the Members or a Special Member. Except for the Lender with respect to Section 9(c)(ii) and the Independent Managers with respect to Section 30, nothing in this Agreement shall be deemed to create any right in any Person (other than Covered Persons) not a party hereto, and this Agreement shall not be construed in any respect to be a contract in whole or in part for the benefit of any third Person (except as provided in Section 30).

**Section 28.**     **Severability of Provisions.**

Each provision of this Agreement shall be considered severable and if for any reason any provision or provisions herein are determined to be invalid, unenforceable or illegal under any existing or future law, such invalidity, unenforceability or illegality shall not impair the operation of or affect those portions of this Agreement which are valid, enforceable and legal.

**Section 29.**     **Entire Agreement.**

This Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof.

15

**Section 30.    <u>Binding Agreement.</u>**

The Members agrees that this Agreement, including, without limitation, the Special Purpose Provisions, constitutes a legal, valid and binding agreement of the Member, and is enforceable against the Members by the Independent Managers, in accordance with its terms. In addition, the Independent Managers shall be intended beneficiaries of this Agreement.

**Section 31.    <u>Governing Law.</u>**

This Agreement shall be governed by and construed under the laws of the State of Delaware (without regard to conflict of laws principles), all rights and remedies being governed by said laws.

**Section 32.    <u>Amendments.</u>**

Subject to <u>Section 9(c)</u>, this Agreement may be modified, altered, supplemented or amended pursuant to a written agreement executed and delivered by the Members. Notwithstanding anything to the contrary in this Agreement, so long as the Loan is outstanding, this Agreement may not be modified, altered, supplemented or amended except: (i) to cure any ambiguity or (ii) to convert or supplement any provision in a manner consistent with the intent of this Agreement.

**Section 33.    <u>Counterparts.</u>**

This Agreement may be executed in any number of counterparts, each of which shall be deemed an original of this Agreement and all of which together shall constitute one and the same instrument.

**Section 34.    <u>Notices.</u>**

Any notices required to be delivered hereunder shall be in writing and personally delivered, mailed or sent by telecopy, electronic mail or other similar form of rapid transmission, and shall be deemed to have been duly given upon receipt (a) in the case of the Company, to the Company at its address in <u>Section 2</u>, (b) in the case of the Members, to the Members at the address listed on <u>Schedule B</u> attached hereto and (c) in the case of either of the foregoing, at such
other address as may be designated by written notice to the other party.

**Section 36.    <u>Effectiveness.</u>**

Pursuant to Section 18-201 (d) of the Act, this Agreement shall be effective as of the date hereof.

(Signatures on the following page)

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, has duly executed this Amended and Restated Limited Liability Company Agreement as of the 2nd day of April, 2017.

May

MANAGER:

_____
Steven V. Ivankovich

MEMBERS:

PILGRIM CARIBBEAN ISLE LLC

By:     Overlook Managing Member LLC, its sole member

By: _____
Steven Ivankovich, Manager

PILGRIM FOREST PARK LLC

By:     Overlook Managing Member LLC, its sole member

By: _____
Steven Ivankovich, Manager

SPRINGING MEMBER:

Lisa M. Pierro

# AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT OF ALLIANCE HTFL GP, L.L.C.

## SCHEDULE A

A.    Definitions

When used in this Agreement, the following terms not otherwise defined herein have the following meanings:

"Act" has the meaning set forth in the preamble to this Agreement.

"Affiliate" means, with respect to any Person, any other Person: (i) owning beneficially, directly or indirectly, any of the Person's ownership interest; or (ii) directly or indirectly Controlling or Controlled by or under direct or indirect common Control with such Person.

"Agreement" means this Amended and Restated Limited Liability Company Agreement of the Company, together with the schedules attached hereto, as amended, restated or supplemented or otherwise modified from time to time.

"Bankruptcy" means, with respect to any Person, if such Person (i) makes an assignment for the benefit of creditors, (ii) files a voluntary petition in bankruptcy, (iii) is adjudged a bankrupt or insolvent, or has entered against it an order for relief, in any bankruptcy or insolvency proceeding, (iv) files a petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding of this nature, (vi) seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the Person or of all or any substantial part of its properties, (vii) if 120 days after the commencement of any proceeding against the Person seeking reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, if the proceeding has not been dismissed, or if within 90 days after the appointment without such Person's consent or acquiescence of a trustee, receiver or liquidator of such Person or of all or any substantial part of its properties, the appointment is not vacated or stayed, or within 90 days after the expiration of any such stay, the appointment is not vacated, (viii) commences any case, proceeding or other action under any existing or future law of any jurisdiction relating to bankruptcy, insolvency, reorganization or relief of debtors, (ix) institutes proceedings to be adjudicated as bankrupt or insolvent, (x) consents to the institution of bankruptcy or insolvency proceedings, or (xi) takes any action in furtherance of any of the foregoing. The foregoing definition of "Bankruptcy" is intended to replace and shall supersede and replace the definition of "Bankruptcy" set forth in Sections 18-101(1) and 18-304 of the Act.

"Basic Documents" means this Agreement, the Management Agreement, and the Certificate of Formation, and all documents and certificates contemplated thereby or delivered in connection therewith.

"Certificate of Formation" means the Certificate of Formation of the Company filed with the Secretary of State of the State of Delaware on June 15, 2007, as such may be amended or amended and restated from time to time.

"Company" means ALLIANCE HTFL GP, L.L.C., a Delaware limited liability company.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities or general partnership or managing member interests, by contract or otherwise. "Controlling" and "Controlled" shall have correlative meanings. Without limiting the generality of the foregoing, a Person shall be deemed to Control any other Person in which it owns, directly or indirectly, a majority of the ownership interests.

"Covered Persons" has the meaning set forth in Section 20(a).

"Independent Manager" means an individual who, except in his or her capacity as an Independent Manager of the Company, is not, and has not been during the five (5) years immediately before such individual's appointment as an Independent Manager: (i) a stockholder, director, partner, officer or employee of the Company, a direct or indirect beneficial owner of the Company, or their Affiliates; (ii) a customer, creditor, supplier, or a Person affiliated with a customer, creditor or supplier of the Company, as applicable, or their Affiliates; (iii) a Person who Controls (whether directly, indirectly or otherwise) the Company or any of its Affiliates; or (iv) a spouse, parent, sibling, child or other family relative of any Person described by (i), (ii) or (iii) above.

A natural person who satisfies the foregoing definition other than subparagraph (ii) shall not be disqualified from serving as an Independent Manager of the Company if such individual is an Independent Manager provided by a nationally recognized company that provides professional independent directors or managers and it also provides other corporate or company services in the ordinary course of its business. A natural person who is an independent director or manager of a "special purpose entity" affiliated with the Company shall not be disqualified from serving as an Independent Manager of the Company if such individual is an independent director or manager provided by a nationally-recognized company that provides professional independent directors or managers. For purposes of this paragraph, a "special purpose entity" is an entity, whose organizational documents contain restrictions on its activities and impose requirements intended to preserve the Company's separateness that are substantially similar to those of the Company, as applicable, and provide, inter alia, that it: (a) is organized for the limited purpose of owning and operating one or more properties or of being the general partner or member of a special purpose entity organized for the limited purpose of owning and operating one or more properties (an "SPE Borrower"); (b) has restrictions on its ability to incur indebtedness, dissolve, liquidate, consolidate, merge and/or sell assets; (c) may not file voluntarily a bankruptcy petition either on its own behalf or, if it is a general partner or member of an SPE Borrower, on behalf of such SPE Borrower, without the consent of an independent director or manager and (d) shall conduct itself and, if it is a general partner or member of an SPE Borrower, cause the SPE Borrower to conduct itself, in accordance with certain "separateness

covenants", including, but not limited to, the maintenance of its (and the SPE Borrower's) books, records, bank accounts and assets separate from those of any other person or entity.

"Lender" means Walker & Dunlop Commercial Property Funding, LLC, its successors and/or assigns.

"Loan" means the mortgage loan (whether made in one or multiple advances) made by the Lender to the Partnership (the "Mortgage Borrower") pursuant to the loan agreement and other documents evidencing and securing the loan between Mortgage Borrower and Lender ("Loan Documents").

"Management Agreement" means the agreement of the Independent Managers in the form attached hereto as Schedule C. The Management Agreement shall be deemed incorporated into, and a part of, this Agreement.

"Manager" means Steven V. Ivankovich, as the initial Manager of the Company, and includes any Person appointed as a Manager of the Company pursuant to the provisions of this Agreement, each in its capacity as a Manager of the Company.

"Material Action" means to file any insolvency, or reorganization case or proceeding, to institute proceedings to have the Company or the Mortgage Borrower be adjudicated bankrupt or insolvent, to institute proceedings under any applicable insolvency law, to seek any relief under any law relating to relief from debts or the protection of debtors, to consent to the filing or institution of Bankruptcy or insolvency proceedings against the Company or the Mortgage Borrower, to file a petition seeking, or consent to, reorganization or relief with respect to the Company or the Mortgage Borrower under any applicable federal or state law relating to Bankruptcy or insolvency, to seek or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator, custodian, or any similar official of or for the Company or a substantial part of its property, to make any assignment for the benefit of creditors of the Company or the Mortgage Borrower, to admit in writing the Company's or the Mortgage Borrower's inability to pay its debts generally as they become due, or to take action in furtherance of any of the foregoing.

"Member" means any of Pilgrim Caribbean Isle LLC or Pilgrim Forest Park LLC, each a Delaware limited partnership, as the initial members of the Company, and includes any Person admitted as an additional member of the Company or a substitute member of the Company pursuant to the provisions of this Agreement, each in its capacity as a member of the Company; provided, however, the term "Member" shall not include the Special Member or the Springing Member.

"Partnership" means Alliance HTFL Limited Partnership, a Delaware limited partnership.

"Person" means any individual, corporation, partnership, joint venture, limited liability company, limited liability partnership, association, joint stock company, trust, unincorporated organization, or other organization, whether or not a legal entity, and any governmental authority.

"Rating Agency" has the meaning assigned to that term in the Loan Documents.

"Rating Agency Condition" means (i) with respect to any action taken at any time before the loan evidenced and secured by the Loan Documents has been sold or assigned to a securitization trust, that the Lender has consented in writing to such action, and, in addition, (ii) with respect to any action taken at any time after the loan evidenced and secured by the Loan Documents has been sold or assigned to a securitization trust, that each Rating Agency shall have been given written notice thereof, in the manner required by the Loan Documents, and that each of the Rating Agencies shall have notified the Company in writing that such action will not result in a reduction, withdrawal, downgrade or qualification of the then current rating by such Rating Agency of any of the securities issued by such securitization trust.

"Special Member" means, upon such person's admission to the Company as a member of the Company pursuant to Section 5(c), a person acting as Springing Member, in such person's capacity as a member of the Company. A Special Member shall only have the rights and duties expressly set forth in this Agreement.

"Special Purpose Provisions" shall have the meaning given thereto in Section 9(c) of this Agreement.

"Springing Member" means a Person who is not a member of the Company but who has signed this Agreement in order that, upon the conditions described in Section 5(c), such Person can become the Special Member without any delay in order that at all times the Company shall have at least one member.

B.    Rules of Construction

Definitions in this Agreement apply equally to both the singular and plural forms of the defined terms. The words "include" and "including" shall be deemed to be followed by the phrase "without limitation." The terms "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Section, paragraph or subdivision. The Section titles appear as a matter of convenience only and shall not affect the interpretation of this Agreement. All Section, paragraph, clause, Exhibit or Schedule references not attributed to a particular document shall be references to such parts of this Agreement.

**LIMITED LIABILITY COMPANY AGREEMENT**

**OF**

**ALLIANCE HTFL GP, L.L.C.**

**SCHEDULE B**

Member

| Name | Mailing Address | Agreed Value of Capital Contribution | Membership Interest |
|---|---|---|---|
| PILGRIM CARIBBEAN ISLE LLC | 55 E. Monroe, Suite 3610, Chicago, Illinois 60603 | $500.00 | 50% |
| PILGRIM FOREST PARK LLC | 55 E. Monroe, Suite 3610, Chicago, Illinois 60603 | $500.00 | 50% |

**EFiled:  Dec 06 2024 02:18PM EST**
**Transaction ID 75157313**
**Case No. 2023-1182-LWW**

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

P-5 GRA, LLC, a Delaware limited
liability company,

        Plaintiff,

    v.

STEVEN IVANKOVICH,

        Defendant,

   and

OVERLOOK MANAGING MEMBER
LLC, ALLIANCE HTFL GP, L.L.C.,
PILGRIM CARIBBEAN ISLE LLC,
PILGRIM FOREST PARK LLC, each a
Delaware limited liability company,

        Nominal Defendants.

C.A. No. 2023-1182–LWW

## [PROPOSED] ORDER GRANTING PLAINTIFF'S MOTION TO SUPPLEMENT THE RECORD ON DEFENDANT'S MOTION TO DISMISS, OR, IN THE ALTERNATIVE, REQUESTING LEAVE TO FILE AN AMENDED COMPLAINT OR THAT DISMISSAL OF THE <u>COMPLAINT BE WITHOUT PREJUDICE</u>

WHEREAS, Plaintiff having filed its *Motion to Supplement The Record on Defendant's Motion to Dismiss, or, In The Alternative, Requesting Leave to File an Amended Complaint or That Dismissal of The Complaint be Without Prejudice* (the "Motion");

THEREFORE, the Court, having considered the Motion and good cause having been shown:

IT IS HEREBY ORDERED, this ___ day of _____, 2024, as follows:

1.     The Motion is hereby GRANTED;

2.     Plaintiff may supplement the record on Defendant's motion to dismiss with the documents attached to the Motion;

3.     In the alternative, Plaintiff is granted leave to file a verified amended complaint within 10 days from the date of entry of this order;

4.     In the alternative, the verified complaint dated November 21, 2023, is dismissed without prejudice.


_____

Vice Chancellor Lori W. Will