## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
### Miami Division
### www.flsb.uscourts.gov

|  |  |
|---|---|
| In re: | Chapter 11 |
|  | Case No. 24-15755-LMI |
| IVANKOVICH FAMILY LLC, | (Jointly Administered) |
| A&O FAMILY LLC (FL), | 24-15762- LMI |
| A & O FAMILY LLC (IL), | 24-15767- LMI |
| ATLAS P2 MANAGING MEMBER, LLC, | 24-15770- LMI |
| Debtors.[1] | |

_____/

## CREDITOR P-5 GRA, LLC'S OBJECTION TO
## SECOND AMENDED JOINT DISCLOSURE STATEMENT OF
## DEBTORS IN SUPPORT OF DEBTORS' AMENDED JOINT PLAN OF REORGANIZATION

P-5 GRA, LLC ("GRA"), as creditor and interested party in the above captioned jointly administered cases (the "Chapter 11 Cases"), by its undersigned counsel, hereby files this objection (this "Objection") to the *Second Amended Joint Disclosure Statement of Debtors In Support of Debtors' Amended Joint Plan of Reorganization* [ECF No. 289] (the "Amended Disclosure Statement") and reservation of rights, and respectfully states as follows:[2]

### Preliminary Statement

1.      After nearly a year following the commencement of these Chapter 11 Cases, the Debtors' most recently proposed Amended Disclosure Statement and Amended Plan still suffer fatal flaws and should be rejected, for several reasons.

2.      First, the *Debtors' Amended Joint Plan of Reorganization* [ECF No. 290] (the "Amended Plan") remains patently unconfirmable.   As an initial matter, the Debtors appear unable or unwilling to

---

[1] The cases are jointly administered. The last four digits of each Debtor's EIN are as follows: IVANKOVICH FAMILY LLC (4590), A&O FAMILY LLC, a Florida limited liability company (6789), A&O FAMILY LLC, an Illinois limited liability company (6865), and ATLAS P2 MANAGING MEMBER, LLC (8311).

[2] Capitalized terms not defined herein shall have the meaning ascribed to them in the Amended Disclosure Statement.

1

carry out a post-Confirmation process to adjudicate and pay allowed claims post-Confirmation in good faith.  Efforts thus far to mediate the disputed claims of Jeanette Ivankovich and Township Capital, LLC, Township GP Fund II, LP and Township Orlando, LLC have been unsuccessful, despite months of back-and-forth filings and multiple mediation attempts.  GRA's claim was filed on August 15, 2024, and is currently not subject to any formal objection by the Debtors.  However, the Debtors have repeatedly referenced the claim as disputed or objectionable in various communications and, implicitly, through provisions in the Amended Plan.[3]  Yet, the Debtors have not objected to GRA's claim or otherwise attempted to informally resolve whatever their perceived objection may be.  The Debtors have also failed to disclose their estimated value of the ultimately Allowed amount of the GRA claim.[4]  Instead, it appears the Debtors are content to confirm the Amended Plan, wait 60 days following its effective date, and then commence claim litigation - a process that would begin over a year after the GRA claim was filed and over three years after the Debtors improperly took control of sale proceeds owing to GRA.

3.      GRA's concern is not imagined.  For years, it has been the pattern and practice of the individual managing the affairs of the Debtors, Steven Ivankovich, to delay, obstruct and defraud creditors.  One court explicitly found that the Debtors are Steven Ivankovich's alter ego.  *See Jeanette Ivankovich's and Schiller Ducanto's Opposition to Debtors' Motion for Order Authorizing Use of Cash Collateral Re: Wedbush Securities, Inc. and Celadon Financial Group* [ECF No. 225] (referencing preliminary injunction by Illinois Divorce Court finding Steven Ivankovich's companies are his "alter ego"). Furthermore, *another* court found that Steven exercised almost exclusive control over accounts of the Debtors and used "substantial amounts" of sale proceeds that were initially paid to Debtor A & O Family LLC for his own personal purposes. *See Report and Recommendation*, case no. 20-cv-04985 (N.D. Ill. May 14, 2025) [ECF

---

[3] The Amended Plan notes in the Liquidation Analysis that "theoretical litigation claims" have not been quantified in light of the purported "100%" recovery under the Amended Plan.

[4] The Debtors' Amended Disclosure Statement provides no estimation of the potentially Allowed amount of the GRA Claim.  Neither the Liquidation Analysis nor Exhibit B to the Amended Disclosure Statement (Spreadsheet of Allowed Claims) provide clarity on what value the Debtors' ultimately assign the GRA Allowed Claim.

No. 379] (the "Report and Recommendation"), a true and correct copy of which is attached hereto as Exhibit A.[5] That same court noted that Steven was listed as the "beneficial owner" and "primary authorized principal" of a brokerage services account registered to Debtor A & O Family LLC, and that there "were no other persons with authority over the account or who had authority to transact in it." *Id.* at 9. Additionally, the Report and Recommendation contains numerous instances where allegations by Steven Ivankovich were either directly contradicted by evidence or lacked any factual support. *See id.* But the most alarming finding relevant to these Chapter 11 Cases is this: "Steven [Ivankovich] was repeatedly evasive, combative or flippant, and exhibited a level of disrespect for the process that the Special Master rarely has seen in his 46 years of involvement in the legal profession." *Id.* at 12. Consequently, GRA and certain of the remaining creditors of the Debtors lack any confidence that the Debtors, under the control of Steven Ivankovich, will carry out a claims adjudication and payment process under the Amended Plan in good faith. GRA and certain remaining creditors intend to seek relief from this Court to propose their own plan that would remedy these issues by establishing a liquidating trust controlled by an independent fiduciary that will handle post-Confirmation claim allowance and payment. Simply put, GRA and the remaining creditors deserve a fair and impartial claims adjudication and payment process – one that the Amended Plan most certainly cannot provide.

4.     The Amended Plan also includes a number of other faults. First, it incorrectly classifies GRA (and other general unsecured claims) as "Unimpaired" and deemed to accept the Amended Plan without providing for any mechanism allowing for the calculation of any payment of post-petition interest on this 100% recovery plan. Second, the Amended Plan also proposes improper releases in favor of Drs. Anthony Ivankovich and Olga Ivankovich and the exculpation of the Debtors in violation of *Purdue* (as defined and discussed below).

---

[5] *See, e.g.*, Report and Recommendation at 7 (noting several transfers made by Steven Ivankovich for personal purposes related to credit card expenditures, tennis club obligations and yacht fees).

313296933v10

5.      Second, the Amended Disclosure Statement still contains inadequate information regarding the timing and process for the adjudication and payment of claims post-Confirmation. The Amended Disclosure Statement fails to detail when creditors can expect their claims to be adjudicated; Article I of the Amended Disclosure Statement simply provides that holders of Allowed Unsecured Claims will be paid within fourteen days of entry of a final order allowing the claim, but it does not provide when the Reorganized Debtors will seek entry of such orders. Additionally, the Amended Disclosure Statement is concerningly vague when addressing the post-Confirmation management of the Reorganized Debtors. It lists three individuals who will serve as officers and managers of the Reorganized Debtor A&O Family, LLC (FL), but it provides no information as to who will run and manage the three remaining Reorganized Debtors. *See* Amended Disclosure Statement, Article IV.D. Section 7.10 of the Amended Plan seems to indicate that the three remaining Reorganized Debtors will have the same management as Reorganized Debtor A&O Family, LLC (FL), but the Amended Disclosure Statement is unclear. The lack of clarity regarding the Reorganized Debtors' management further fuels GRA's concerns.

### Summary of the GRA Claim

6.      Steven Ivankovich and GRA are sole members of Overlook Managing Member LLC ("Overlook").  Overlook is the sole member of five (5) Delaware limited liability companies who, through various subsidiaries, own, or owned, five (5) multifamily properties located in Texas and Florida.  Three of those properties serve as collateral for the $5,00,000 loan made by the Debtors – the properties commonly referred to as Pilgrim Warwick, Pilgrim Coulter and Pilgrim Windtree (all located in Texas).[6]  The remaining two properties, Pilgrim Caribbean Isle and Pilgrim Forest Park, were sold by Steven Ivankovich prior to the commencement of these Chapter 11 Cases (the "Sale Transaction").   The Sale Transaction and its proceeds are the basis for the GRA proof of claim, which was filed against Debtor A&O Family LLC (FL) on August 15, 2024 and amended on December 30, 2024 for the amount of $4,153,764.00 (the "GRA Claim").

---

[6] *See Order Authorizing Use of Cash Collateral* [ECF No. 177] at ¶ 3.

313296933v10

7.       Specifically, pursuant to the governing operating agreements, proceeds from the sales of the Caribbean Isle and Forest Park properties should have been "up-streamed" from Alliance HTFL Limited Partnership ("HTFL") to the Pilgrim holding company entities, then to Overlook, and then to Overlook's members (*i.e.*, GRA and Steven Ivankovich).  However, that did not happen.  Instead, as detailed in the GRA Claim and Report and Recommendation, Steven Ivankovich absconded with the proceeds of the Sale Transaction, transferring $30 million from a Chase bank account held by HTFL to an account held by Debtor A&O Family LLC.

8.       Subsequent events demonstrate the level of dominion and control exercised by Steven Ivankovich over the Debtors' affairs.  In June 2022, he applied for and opened a Celadon brokerage account registered to A&O Family LLC.  The Report and Recommendation provides as follows regarding the Celadon account:

> On or about June 24, 2022, application was made for a Celadon Brokerage Services Account 1441 registered to A & O Family LLC that listed Steven as the sole "beneficial owner" of the account applicant – that is, the A & O Family LLC (JX 17 at § 2). The application identified Steven as the primary authorized principal and stated that there were no other persons with authority over the account or who had authority to transact in it (*Id.* at §§ 3 and 4). Steven signed the application for the Celadon Account 1441 as its primary authorized principal, and he is the only signatory on the application (*Id.* at § 15).
>
> Steven denied the accuracy of the application for the Celadon Account 1441, and stated that he did not complete it, but that someone else had done so on his behalf (02/25/25 Tr. at 149-151). He also stated that the applicant, A & O Family LLC, was not owned by him but by his father (*Id.* at 261). However, Steven offered no evidence other than his own say-so to support that testimony, and he did not identify anyone else who had authority to transact in the account. Nor did he offer any documentary evidence to support his claim that, contrary to what is in the Celadon application, Steven's father -- and not Steven -- is the controlling owner of the A & O Family LLC that applied for the account.

Report and Recommendation at 9.

9.       The Report and Recommendation goes on to detail how Steven Ivankovich used the ill-gotten sale proceeds to fund lavish personal expenses and payments to his attorneys, noting that such actions "demonstrate his control over all of the relevant accounts and funds in them." *Id.*

> The evidence convincingly shows that Steven exercised complete control over the funds deposited into the Alliance HTFL account and was able to use them for personal (as opposed to Third-Party LLC) purposes as he saw fit.

Within one month of the April 1, 2022 closing, Steven transferred $30,777,000.00 from Chase Account 1602 into two other accounts having nothing to do with the Third-Party LLCs.

*Second,* on April 6, 2022, Steven wire transferred $30 million from Chase Account 1602 to Stifel Nicolaus "Ref: For Further Credit to A & O Family LLC" with an account number ending in 8442 (JX 30(b)). Steven's testimony about this transfer was not credible.

Steven also testified that this transfer was "probably" a return of capital to his father, Anthony, for his investment in the five properties (02/25/25 Tr. at 108), an assertion that was supported by the testimony of Mark Brown, who in 2022 was asset manager of the Third-Party LLCs (02/27/25 Tr. at 278-79, 309), and by a declaration filed by Mr. Brown in a bankruptcy proceeding (JX 41 at ¶ 12). However, neither Steven nor the Third-Party LLCs offered testimony by Anthony Ivankovich to support this assertion, or any documentary evidence that Anthony Ivankovich advanced $30 million for the Third-Party LLCs or asked for it to be returned after the sale of the Florida properties. Again, the unexplained failure to offer evidence to support the assertion of the purpose for the $30 million transfer undermines the credibility of the assertion.

Moreover, subsequent events demonstrate that substantial amounts of the $30 million were then used by Steven for his own purposes. On or about June 24, 2022, application was made for a Celadon Brokerage Services Account 1441 registered to A & O Family LLC that listed Steven as the sole "beneficial owner" of the account applicant – that is, the A & O Family LLC (JX 17 at § 2). The application identified Steven as the primary authorized principal and stated that there were no other persons with authority over the account or who had authority to transact in it (*Id.* at §§ 3 and 4). Steven signed the application for the Celadon Account 1441 as its primary authorized principal, and he is the only signatory on the application (*Id.* at § 15).

Report and Recommendation at 7-9. The foregoing evidence shows that Steven did as he wished with the net proceeds of the April 1, 2022 Sale Transaction, which included free reign to open accounts in the name of one or more Debtors with express intent to hinder, delay, and defraud creditors.

10.    Since the commencement of these Chapter 11 Cases, GRA has sought to obtain discovery related to the GRA Claim, the P-5 Texas properties, the Sale Transaction, and the various assets, accounts, and operations of the Debtors. Through those efforts, on May 3, 2025, the Debtors produced a document entitled "Grant of Economic Interest Agreement," executed by Steven Ivankovich in favor of "Debtor A&O Family, LLC, a Florida limited liability company" (the "Economic Interest Agreement"). The Economic Interest Agreement purports to grant A&O Family, LLC with an financial interest in the P-5 Texas properties in violation of the Overlook operating agreement and other related documents. Specifically, the Economic Interest Agreement functions as an improper amendment to the Overlook operating agreement that

6

adversely affects the interests of a Member—P-5—without having provided any prior notice or obtaining the consent of GRA, which are both required under the Overlook governing documents.

11.     The Economic Interest Agreement, and perhaps other unknown transactions fraudulently constructed by Steven Ivankovich and the Debtors, underscore GRA's need for discovery from the Debtors and third parties, including tax returns for the P-5 Texas properties.  For years, and certainly during the pendency of these Chapter 11 Cases, GRA has sought to obtain those returns and other financial information and reporting related to the P-5 Texas properties.  Curiously, the Debtors claim to have no such returns, despite having funded a $5 million loan to the P-5 Texas Properties and maintaining a lien against their assets.   Upon follow up, counsel for the Debtors responded that he did not represent the P-5 entities and, instead, counsel for GRA should confer with Gary Goldstein.  Counsel for GRA did just that – emailing Mr. Goldstein on May 6, 2025, noting the direction from counsel for the Debtors, and requesting the tax returns and other documents not produced in response to subpoenas, and indicating that relief from this Court would follow if the documents were not produced.   In response, Mr. Goldstein stated: "Go for it...the bankruptcy court has no jurisdiction over any Pilgrim entity…I have nothing more to say on this.  I have not been retained by the Pilgrim entities in this matter."   Counsel for GRA disputes the jurisdictional accusation and has subsequently issued further and supplemental discovery to obtain documents and information relevant to the Amended Plan, including issuing document subpoenas to the Debtors, Steven Ivankovich, and the Debtors' accountants.

12.     Discovery obtained by GRA to date, or the lack of discovery on certain financial issues, coupled with the findings in the Report and Recommendation, depict an ever-changing and intricate financial web of accounts and transfers orchestrated by Steven Ivankovich, with the express or implied consent of the Debtors, and designed to avoid paying creditors.[7] Perhaps this is the reason the Debtors' accountants, CohnReznick, have billed the Debtors' estates over $1.3 million with very little to show for it,

---

[7] *See, e.g.*, Report and Recommendation at 11 and 18 (noting Steven exercised dominion over proceeds by, among other things, transferring funds to his own personal account "without objection" by the Third Party LLCs (as defined therein)).

other than monthly operating reports.   Whatever the motivation, the Debtors and anyone associated with them should not be in control of a claims adjudication process under the Amended Plan.

**Legal Standard**

13.    Section 1125 of the Bankruptcy Code requires a plan's proponent – in this case, the Joint Debtors – before they solicit votes on a plan, to distribute a disclosure statement containing "adequate information," which is defined as:

> information of a kind, and in sufficient detail, as far as reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records . . . that would enable . . . a hypothetical investor of the relevant class to make an informed judgment about the plan . . . and in determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the costs of providing additional information ....

11 U.S.C. § 1125(a)(l).

14.    A disclosure statement is not meant to be persuasive or based on opinion.  *See Bank of the Ozarks v. Coastal Realty Inv., Inc. (In re Coastal Realty Inv., Inc.)*, 2013 Bankr. LEXIS 197, at \*21 (Bankr. S.D. Ga. Jan. 17, 2013) ("Persuasion is not the purpose of a disclosure statement."); *see also In re Egan*, 33 B.R. 672, 675 (Bankr. N.D. Ill. 1983) ("[the disclosure statement] is not intended to be an advertisement or a sales brochure").   Rather, the information must be uncontested, concrete facts from which voting claimants can make their own informed decisions how to vote.  *Id*. at 676 ("Debtors' bare assertion of opinion, without supporting facts, is entirely inappropriate in the Disclosure Statement.").

15.    The burden of whether a disclosure statement meets the statutory requirements of Chapter 11 of the Bankruptcy Code lies with the plan proponents.  *See In re Celebrity Resorts, LLC*, 2010 Bankr. LEXIS 4727, at \*19-20 (Bankr. M.D. Fla. Dec. 28, 2010).  Here, it is the Debtors' burden to demonstrate the Amended Disclosure Statement meets that burden.

16.    In evaluating the adequacy of a disclosure statement, the Court should consider the following factors:

> (1) the events which led to the filing of a bankruptcy petition; (2) a description of the available assets and their value; (3) the anticipated future

8

of the company; (4) the source of information stated in the disclosure statement; (5) a disclaimer; (6) the present condition of the debtor while in Chapter 11; (7) the scheduled claims; (8) the estimated return to creditors under a Chapter 7 liquidation; (9) the accounting method utilized to produce financial information and the name of the accountants responsible for such information; (10) the future management of the debtor; (11) the Chapter 11 plan or a summary thereof; (12) the estimated administrative expenses, including attorneys' and accountants' fees; (13) the collectability of accounts receivable; (14) financial information, data, valuations or projections relevant to the creditors' decision to accept or reject the Chapter 11 plan; (15) information relevant to the risks posed to creditors under the plan; (16) the actual or projected realizable value from recovery of preferential or otherwise voidable transfers; (17) litigation likely to arise in a nonbankruptcy context; (18) tax attributes of the debtor; and (19) the relationship of the debtor with affiliates.

*In re Metrocraft Pub. Servs., Inc.*, 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984); *see also In re Scioto Valley Mort. Co.*, 88 B.R. 168, 169 (Bankr. S.D. Ohio 1988).

## Objection

### A. The Amended Plan Remains Patently Unconfirmable.

17. Pursuant to Section 1125(b) of the Bankruptcy Code, the proponent of a plan may not solicit its acceptance unless there is transmitted to creditors "the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing by the court as containing adequate information." 11 U.S.C. § 1125(b). Implicitly, such adequate information includes a representation that the proposed plan is one that can be confirmed.

18. If there is a defect that renders a plan patently or inherently unconfirmable, the bankruptcy court may consider and resolve that issue at the disclosure statement stage before requiring parties to proceed with solicitation of the plan and a contested confirmation hearing. *See In re American Capital Equipment, LLC*, 688 F.3d 145, 153-54 (3d Cir. 2012); *see also In re United States Brass Corp.*, 194 B.R. 420, 422 (Bankr. E.D. Tex. 1996).

19. If the plan is patently unconfirmable on its face, the approval of the disclosure statement must be denied. *See In re Beyond.com Corp.*, 289 B.R. 138, 140 (Bankr. N.D. Cal. 2003) (collecting cases); *In re American Capital Equipment, LLC*, 688 at 154 (3d Cir. 2012) (the Court's equitable powers under 11 U.S.C. § 105 permit the Court to control its own docket and, therefore, to decline to approve a disclosure

9

statement when the plan it supports may not be confirmable).  A plan is patently unconfirmable when confirmation defects cannot be overcome by creditor voting and the confirmation defects relate to matters upon which the material facts are not in dispute or have been fully developed at the disclosure statement hearing.  *Id*. at 154-55.

         i.    *The Amended Plan Deems Claims as Unimpaired Without Allowing for Payment of Post-Petition Interest.*

20.     The Amended Disclosure Statement and Amended Plan incorrectly identify all Allowed Claims and Allowed Equity Interests as "Unimpaired" and "Deemed to Accept".  *See* Amended Disclosure Statement, Article IV.C; *see also* Amended Plan, § 4.01.  The Amended Plan, however, provides that Allowed Claims will be paid in full <u>*without*</u> accounting for the calculation or payment of any post-petition interest.

21.     Although courts have diverged on how post-petition interest may be calculated, there is clear direction that in Chapter 11 cases in which claimants are recovering 100% and thus are deemed "Unimpaired" and deemed to accept the proposed plan, such claimants shall receive post-petition interest on their Allowed Claims.  *See, e.g.*, *In re Cuker Interactive, LLC*, 622 B.R. 67, 71 (Bankr. S.D. Cal. 2020) (finding that "unimpaired" creditors receive post-petition interest if they are deemed to accept the plan); *In re Mullins*, 633 B.R. 1, 16 (Bankr. D. Mass. 2021) (finding and noting that "in solvent debtor cases, the requirement in § 1129(b) that a plan of reorganization be 'fair and equitable' may require the payment of postpetition interest on allowed claims in amounts greater than would be required to satisfy the 'best interests test' of § 1129(a)(7)(A)(ii) and the 'absolute priority rule' set out in § 1129(b)(2)(B)."); *see also In re The Hertz Corp.*, 637 B.R. 781, 801 (Bankr. D. Del. 2021) (holding that unimpaired creditors are entitled to receive post-judgment interest at the federal judgment rate); *In re Ultra Petroleum Corp.*, 624 B.R. 178, 203–04 (Bankr. S.D. Tex. 2020) (holding that creditors must receive post-petition interest at the contract rate).

313296933v10

22.     The Debtors are solvent and commenced these cases only to stay the freezing of estate assets.[8] Given the facts and circumstances of these Chapter 11 Cases, including the Debtors' solvent status and contemplated payment of 100% payment on Claims, the Amended Plan must provide for the payment of post-petition interest on Allowed Claims in order to deem such Claims "Unimpaired" and deeming them to accept the Amended Plan.  If the Debtors are not proposing a plan that contemplates the payment of 100% of Allowed Claims and post-petition interest, then claimants must be deemed Impaired and are entitled to vote on the proposed plan.

ii.     *The Amended Plan Contains Non-Consensual Third-Party Releases in Violation of the Supreme Court's Purdue Decision.*

23.     Although the Amended Plan has limited the breadth of the third-party releases sought to be effectuated in the initial plan, the Amended Plan is still flawed and unconfirmable because it imposes non-consensual third-party releases in violation of the express and definitive ruling of the Supreme Court in *Harrington v. Purdue Pharma L.P.*, 144 S. Ct. 2071, 282-88 (2024) ("*Purdue*").[9]

24.     The following is provided for under Article IX of the Amended Plan:

> **Discharge**. On the confirmation date of this Plan, the Reorganized Debtors will be discharged from any debt that arose before confirmation of this Plan, subject to the occurrence of the Effective Date, to the extent specified in § 1141(d)(1)(A) of the Code, except that the Reorganized Debtors will not be discharged of any debt: (i) imposed by this Plan; (ii) of a kind specified in § 1141(d)(6)(A) if a timely complaint was filed in accordance with Rule 4007(c) of the Federal Rules of Bankruptcy Procedure; (iii) of a kind specified in § 1141(d)(6)(B); or (iv) as specifically permitted pursuant to paragraph 7 of the *Amended Agreed Order Sustaining, in Part, Debtors' Omnibus Objection to Claims of Township Entities* (ECF No. 197).

---

[8] *See Consolidated Chapter 11 Case Management Summary* [ECF No. 12] (explaining reasons for filing chapter 11); *see also* Amended Disclosure Statement, Article V ("The Debtors' collective cash and cash equivalents as proposed under the Plan exceed all alleged claims asserted against the Debtors. Further the Plan seeks to pay all claims in full . . . .").

[9] Although courts continue to analyze *Purdue* in the context of what may (or may not) constitute "consent" in the context of third-party releases (*e.g.*, opt-in or opt-out mechanisms), no such analysis is necessary here.  The Amended Disclosure Statement and Amended Plan do not contemplate seeking any potential form of consent from any party.

**Releases**. On the confirmation date of this Plan, without the need for execution or delivery of any additional documentation or orders of the Bankruptcy Court, and in exchange for valuable consideration of under this Plan, Dr. Anthony Ivankovich and Dr. Olga Ivankovich ("**Released Parties**") will be fully and finally released and forever discharged from any and all claims, actions, causes of action, liabilities, obligations, rights, suits, accounts, covenants, contracts, controversies, agreements, promises, damages, judgments, debts, encumbrances, liens, remedies, and demands, of every kind and nature whatsoever, in law or in equity, which could be brought or asserted by or on behalf of the Debtors against the Released Parties (collectively, "**Released Claims**"). The Released Claims shall expressly exclude any obligations of the Released Parties pursuant to the Plan. For the avoidance of all doubt, the aforementioned Released Claims expressly exclude: (i) any independent claims that any non-debtor can assert against any Released Party, including the existing claims by the Township Entities in the Second Amended Complaint attached as Exhibit "1" to ECF No. 238; and (ii) any claims that a creditor holding an allowed claim against any of the Debtors has the legal right to assert against any other Debtor, including the Township Entities' express rights detailed in the Bankruptcy Court's *Amended Agreed Order Sustaining, In Part, Debtors' Omnibus Objection to Claims of Township Entities* (ECF No. 197).

**Exculpation**. Except as specifically provided in the Plan, neither the Debtors, nor their employees, representatives, members, advisors, attorneys, accountants, financial advisors, or agents, shall have or incur, and are hereby released from, any claim, obligation, cause of action or liability to one another or to any holder of a claim or interest, or any other party in interest, or any of their respective officers, directors, shareholders, members, employees, representatives, advisors, attorneys, accountants, financial advisors, or agents, for any act or omission in connection with, relating to, or arising out of the Chapter 11 Cases from the Petition Date through the Effective Date of this Plan, including: (i) the negotiation and pursuit of confirmation of this Plan, (ii) the consummation of this Plan, (iii) the administration of this Plan, or (iv) the property to be distributed under the Plan, except for their gross negligence, willful misconduct, or actual fraud, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities (if any) under this Plan.

**Injunction**. Except as otherwise specifically provided in the Plan or the Confirmation Order, all entities and persons, and any successor, assigns or representatives of such entities and persons, who have

313296933v10

held, hold, or may hold claims, rights, causes of action, liabilities, equity interests, or any other interests based on any act or omission, transaction, or other activity of any kind or nature related to the Debtors, Debtors in Possession, or the Chapter 11 Cases that occurred prior to the Effective Date ("**Enjoined Claim**"), regardless of the filing, lack of filing, allowance or disallowance of such claim or interest, and regardless of whether such entity or person has voted to accept the Plan, shall be precluded and permanently enjoined on and after the Effective Date from (a) the commencement or continuation in any manner of any claim, action or other proceeding of any kind with respect to any Enjoined Claim, against (i) any assets of the Debtors, (ii) any assets re-vested in the Reorganized Debtors, (iii) the Debtors, Reorganized Debtors, or the Released Parties, (b) the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree or order with respect to any Enjoined Claim, against (i) any assets of the Debtors, (ii) any assets re-vested in the Reorganized Debtors, (iii) the Debtors, Reorganized Debtors, or the Released Parties; (c) the creation, perfection, or enforcement of any encumbrance or lien of any kind with respect to any Enjoined Claim, against (i) any assets of the Debtors, (ii) any assets re-vested in the Reorganized Debtors, (iii) the Debtors, Reorganized Debtors, or the Released Parties; and (d) taking any action whatsoever with respect to any Released Claims against (i) any assets of the Debtors, (ii) any assets re-vested in the Reorganized Debtors, (iii) the Debtors, Reorganized Debtors, or the Released Parties.

25.    The Amended Plan again seeks to force the third-party Releases on voting and non-voting creditors and interest holders regardless of any action (or inaction) they may take.  Similar to other scenarios, which often attempt to at least conjure "consent" in the form of an "opt-out" mechanism, the Amended Plan is premised on the fallacy that inaction can bind that party to the Amended Plan's Releases.

26.    The Amended Plan's Releases do not and *cannot* satisfy the requirements to establish actual consent under applicable law because it does not seek *any* form of consent.[10]  Absent any form of consent, the Amended Plan's third-party Releases are improper and renders the Amended Plan unconfirmable.  *See Harrington v. Purdue Pharma L.P.*, 603 U.S. at 227.

---

[10] *See In re Lavie Care Centers, LLC*, No. 24-55507- PMB, 2024 WL 4988600, at *11 (Bankr. N.D. Ga. Dec. 5, 2024) (discussing what may constitute consent in a post-*Purdue* landscape).

     *iii.*     *The Amended Plan Is Not Proposed In Good Faith.*

27.     Section 1129(a)(3) requires that a chapter 11 plan be "proposed in good faith." 11 U.S.C. § 1129(a)(3). Courts evaluating "good faith" consider whether the plan "(1) fosters a result consistent with the Bankruptcy Code's objectives, (2) the plan has been proposed with honesty and good intentions . . . and (3) there was fundamental fairness in dealing with the creditors." *In re Exide Holdings, Inc*., Civ. No. 20-1402-RGA, 2021 WL 3145612, at *11 (D. Del. July 26, 2021) (quotation marks omitted). Additionally, when an underlying bankruptcy case is filed in bad faith, a corresponding plan cannot satisfy section 1129(a)(3). *See Univ. Creek Plaza v. NY. Life Ins. Co. (In re Univ. Creek Plaza)*, 176 B.R. 1011, 1020 (S.D. Fla. 1995) ("[T]he Court correctly held that University's Plan could not meet the good faith requirement set forth in 11 U.S.C. § 1129(a)(3) since it was determined that University's petition was filed in bad faith."); *see also In re Phx. Piccadilly, Ltd*., 849 F.2d 1393, 1395 (11th Cir. 1988) ("[T]he taint of a petition filed in bad faith must naturally extend to any subsequent reorganization proposal; thus, any proposal submitted by a debtor who filed his petition in bad faith would fail to meet [S]ection 1129's good faith requirement.").

28.     Here, the timing of the commencement of these Chapter 11 Cases, the lack of clarity, information and procedure afforded to the adjudication of claims against the Debtors, the (impermissibly) broad scope of the Discharge, Releases, Exculpation and Injunction under the Amended Plan are clear indicia of the true purpose of these Chapter 11 Cases—to stall and block claims and actions against the Debtors and their alter egos (*e.g.*, Steven Ivankovich, Dr. Anthony Ivankovich and Dr. Olga Ivankovich) by improperly using the Bankruptcy Code as both a sword and a shield.

29.     The Report and Recommendation makes two things abundantly clear: first, Steven Ivankovich exercises substantial, if not complete, control over the Debtors and their assets; second, Steven Ivankovich has used, and will continue to use, his position of control to delay and obstruct payment to rightful creditors of the Debtors.[11] The Debtors cannot credibly argue GRA will receive a fair and impartial

---

[11] *See In re Reader*, 274 B.R. 893, 897 (Bankr. D. Col. 2002) (bankruptcy court relying on "extensive findings" in Special Master's Report and Recommendation); *Fuller v. Givens (In re Givens)*, 634 B.R. 755, 768 (Bankr. E.D. Tenn. 2021) (bankruptcy court reviewing findings and opinions in Special Master's Report and Recommendation).

claim adjudication process.  The individual controlling the Debtors is the very same person who devised and orchestrated a scheme to defraud his real estate partner by improperly transferring an economic interest in P-5 to one of the Debtors in violation of Overlook's governing documents and absconding with proceeds of the Sale Transaction.  Moreover, the Amended Plan does not retain Chapter 5 causes of action, yet it proposes to grant sweeping releases to the Debtors and their equity holders – the same individuals and entities that conspired with Steven Ivankovich in connection with the Sale Transaction and subsequent transfers, or, at a minimum, were complicit in the wrongdoing. The Amended Plan also provides Drs. Olga and Anthony Ivankovich with a first position lien on all assets of the Reorganized Debtors, including avoidance actions, in exchange for up to $15 million in backstop plan funding. *See* Amended Plan, § 7.02. However, the Debtors present no evidence that such backstop plan funding will be needed. In the absence of such evidence, and certainly if no backstop funds are ultimately advanced, it appears that Drs. Olga and Anthony Ivankovich are receiving an improper lien and control over avoidance actions without any real consideration.

**B.  The Amended Disclosure Statement Fails to Provide Adequate Information.**

30.    Although the Amended Disclosure Statement contains broad information and general steps on how the Amended Plan is to be effectuated, it lacks the requisite level of specificity for a creditor to determine whether to approve the Amended Plan.  *See, e.g.*, *Ryan Opers. G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996); *see also Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1998) ("adequate information . . . determined by facts and circumstances of each case"); *In re Civitella*, 14 B.R. 151, 153 (Bankr. E.D. Pa. 1981) ("plan is necessarily predicated on knowledge of assets and liabilities . . . and on factually supported expectations"); *In re Union County Wholesale Tobacco & Candy Co.*, 8 B.R. 442, 443 (Bankr. D.N.J. 1981) ("The standards applying to the adequacy of the disclosure statement, found in § 1125(a), essentially require information sufficient to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance or rejection of the plan.").

31.    For example, the Amended Disclosure Statement does not contain adequate information describing the nature of the litigation pending against "the parent company of P-5 Portfolio" in the Delaware

15

Chancery Court (the "Delaware Action"). Specifically, the Amended Disclosure Statement makes no reference as to the parties to the Delaware Action, their relationship to the Debtors, nor does it provide any level of detail with respect to the underlying allegations and the nature of the causes of action. The Delaware Action arises out of the alleged fraudulent transfer of funds away from the P-5 Portfolio by non-Debtor affiliates to Debtors. The allegations of the Delaware Action and the parties to the dispute must be disclosed with appropriate details as it involves the purportedly wrongful transfer of funds to the Debtors.

32. The failure to adequately disclose the nature of the Delaware Action informs another flaw in the Amended Disclosure Statement – the Debtors' failure to discuss any investigation or analysis that was conducted into possible avoidance actions or third-party claims that may be actionable. While Article III.D. of the Amended Disclosure Statement indicates that the "Debtors do not intend to pursue preference, fraudulent conveyance, or other avoidance action—" there is no reference to any analysis that was undertaken to support such a determination. Although the Debtors appear to assert that the decision not to pursue such claims was made in light of the funding of the Amended Plan and the "100% recovery" on Allowed Claims, such facts cannot absolve the Debtors from their fiduciary duty to pursue viable causes of action held by the estate—or at least conduct an analysis of such potential claims and disclose any findings to creditors and potential parties-in-interest. And as stated above, section 7.02 of the Amended Plan provides Drs. Olga Ivankovich and Anthony Ivankovich with a first position lien on all assets of the Reorganized Debtors, including any avoidance actions. The Amended Disclosure Statement's lack of analysis regarding potential causes of action held by the estate further hints that the Amended Plan seeks to provide Drs. Olga Ivankovich and Anthony Ivankovich with improper control over the avoidance actions.

33. The Amended Disclosure Statement and Amended Plan also fail to provide adequate information concerning the claims adjudication process, which is of paramount importance given that the Amended Plan is a "100% recovery" plan on *Allowed* Claims. The Amended Disclosure Statement and Amended Plan completely lack the most basic of descriptions or framework for how disputed or pending Claims may be addressed following Confirmation. In the absence of such necessary information and

16

disclosures, creditors are forced to guess or assume how their Claim may be adjudicated and when it might ultimately be resolved, both of which will occur *after* solicitation and Confirmation of the Amended Plan.

34.     Relatedly, and as discussed below, the treatment of Claims with respect to the Amended Plan's proposed Discharge and Releases is inadequately addressed in the Amended Disclosure Statement. The Amended Plan seeks to discharge the Debtors "from any debt that arose before confirmation of this Plan." Amended Plan § 9.01. Although section 9.01 carves out, among other things, "any debt . . . imposed by this Plan," it is not clear if that "debt" is limited to the funding obligations or if also includes Claims asserted against the Debtors (or litigation that may involve or implicate the Debtors). The specific carve out of the agreed order regarding the Township Entities serves to only further confuse any party reviewing the Amended Disclosure Statement.

35.     Creditors, such as GRA, who have asserted a Claim against the Debtors and may have pending litigation implicating the Debtors need clarity with respect to how and when their Claims are being addressed. The Amended Disclosure Statement does neither.

## **Reservation of Rights**

36.     GRA reserves all of its rights, claim sand defenses and remedies, including, without limitation the right to amend, modify or supplement this Objection, to seek discovery, to raise additional objections during any hearing on the Amended Disclosure Statement and Amended Plan and to negotiate and document alternative resolutions to this Objection, the Amended Disclosure Statement and Amended Plan, all of which should expressly be preserved.

37.     Nothing contained herein shall constitute a waiver of any of the claims, rights or remedies of GRA, each of which is hereby expressly reserved.

[*Remainder of page intentionally left blank*]

WHEREFORE, GRA respectfully requests that the Court enter an order: (i) sustaining this Objection, (ii) denying approval of the Amended Disclosure Statement, and (iii) providing such other relief that the Court deems appropriate under the circumstances.

Dated:  May 20, 2025

**TROUTMAN PEPPER LOCKE LLP**
777 South Flagler Drive
Suite 215 East Tower
West Palm Beach, FL 33401
T: 561-833-7700
F: 561-655-8719

*/s/ Steven J. Brotman*
Steven H. Brotman
Florida Bar No.: 85750
E: steven.brotman@troutman.com

*Counsel to P-5 GRA, LLC*

18

313296933v10

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on May 20, 2025, a true and correct copy of the foregoing document was served via ECF on all parties who receive service in these Chapter 11 Cases via electronic case filing.

*/s/ Steven J. Brotman*
Steven H. Brotman
Florida Bar No.: 85750
E: steven.brotman@troutman.com

19

# Exhibit A

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ZHU ZHAI HOLDINGS LIMITED and PETER PUI TAK LEE, | ) )  |
| | ) Case No. 20-cv-04985 |
| Plaintiffs/Judgment Creditors, | ) |
| | ) Judge Sharon Johnson Coleman |
| v. | ) |
| | ) Hon Sidney I. Schenkier (Ret.), |
| STEVEN IVANKOVICH, | ) Special Master |
| | ) |
| Defendant/Judgement Debtor. | ) |

**<u>REPORT AND RECOMMENDATION</u>**

Plaintiffs Zhu Zhai Holdings Limited and Peter Pui Tak Lee ("Plaintiffs") filed this action

on August 24, 2020, to recover on a guaranty by Defendant Steven Ivankovich ("Steven") on some

$3 million in loans to entities he controlled: specifically, Atlas Apartment Acquisitions, LLC and

Atlas Residential Holdings, Limited.  After Steven "repeatedly fail[ed] to meet court deadlines and

participate in this lawsuit," the District Judge made an entry of default on July 1, 2021, and then

on August 17, 2021, denied Steven's motion to vacate the entry of default and granted Plaintiffs'

motion for default judgment in the amount of $4,503,842.00 – the loan amount plus interest,

attorneys' fees and costs (doc. # 91:  08/17/21 Mem. Op. and Order at 1).  Steven appealed the

default judgment, and on May 6, 2022, the Seventh Circuit Court of Appeals affirmed the District

Judge's entry of a default judgment, commenting that the default was the consequence of Steven

"ignor[ing] the litigation" (doc. # 196:  05/06/22 Nonprecedential Disposition at 1).

When Steven failed to pay, Plaintiffs issued a number of citations to discover assets.  One

of those citations, served on Walker & Dunlop on January 20 2022 and subsequently amended,

resulted in the disclosure of $1,521,000.00 in funds held in escrow that Walker & Dunlop

represented were "returnable to five (5) different entities in which . . . [Steven] might have a direct

or indirect ownership interest" (doc. # 198: Citation Respondent Walker & Dunlop, LLC's Motion to Compel the Parties to Determine Judgment Debtor's Interest in Escrow Funds or Dismiss Amended Third-Party Citation, at 2-3). The five entities referenced by Walker & Dunlop -- Intervenors Pilgrim Warwick LLC, Pilgrim Coulter LLC, Pilgrim Windtree LLC, Pilgrim Caribbean Isle LLC, and Pilgrim Forest Park LLC (collectively, the "Third-Party LLCs") -- asserted their own interest in those funds, and moved to dismiss the citations (doc. #205). For their part, Plaintiffs sought a turnover of funds (doc. # 202). In an order dated December 16, 2022, the District Judge found that as of that time Plaintiffs had not shown they were entitled to turnover of the funds (doc. # 251: 12/16/22 Order at 4). At the same time, the District Judge denied the request to dismiss the citation, finding that "further proceedings are warranted to determine whether the [Third-Party LLCs] hold [Steven's] assets" (*Id.* at 6). The District Judge directed further discovery on that question (*Id.*).

Further discovery ensued, which was contentious and appears to have generated more heat than light on that question. As a result, on January 19, 2024, the District Judge appointed the undersigned to serve as Special Master "for the purpose of hearing and resolving issues and disputes related to the parties' post-judgment discovery proceedings, as identified in Plaintiffs' pending post-judgment motions, Dkts 276, 285" (doc. # 290: Order Appointing Special Master ("Appointment Order") at ¶ 1). Pursuant to that mandate, the District Judge directed the Special Master to address "issues related to but not limited to the parties' post-judgment discovery proceedings, the discovery produced thus far, and the location and amount of Judgment Debtor Ivankovich's assets" (*Id.*).

Shortly thereafter, on January 31, 2024, Walker & Dunlop moved to deposit the funds subject to the citation in the Court Registry and to receive a declaration that its obligations under

the citation were terminated (doc. # 291).  On February 8, 2024, the District Judge granted that request (doc. # 296), and permitted Walker & Dunlop to deposit in the Court Registry funds totaling $1,494,619.10:  a reduction of $49,929.90 from the amount originally reported as being held in the escrow, to account for attorneys' fees and expenses incurred by Walker & Dunlop in complying with and monitoring the citation (doc. # 291 at 7 n.2).

Plaintiffs allege that those funds on deposit with the District Court are controlled by Defendant, and should be turned over to them to help satisfy the default judgment – no amount of which, according to Plaintiffs, has been paid by Steven or through any other citation that has been served.  For their part, Steven and the Third-Party LLCs assert that those funds belong to the Third-Party LLCs and should be released to them.  To add to the mix, Jeanette Ivankovich ("Jeanette"), who is in a divorce proceeding with Steven, was given leave to intervene on March 19, 2024, and become a party to the proceedings before the Special Master (doc. # 307).  Jeanette agrees with Plaintiffs that the funds are controlled by Steven and not the Third-Party LLCs, but asserts that she has a superior interest to those funds as compared to Plaintiffs.

After a five-month period of discovery (in addition to the lengthy period the parties had for discovery prior to the appointment of the Special Master), and after the continuance of the original hearing date occasioned by Steven and the Third-Party LLCs, the matter was set for an evidentiary hearing to commence on February 25, 2025, and to resume on February 27, 2025.  The Special Master ruled that the issue to be addressed at the hearing was whether the funds on deposit with the Court (a) are an asset of the Steven, which should be held for distribution to Plaintiffs or to Jeanette as would be determined in a later, separate proceeding, or (b) instead should be released to the Third-Party LLCs.

The hearing took place as scheduled on February 25 and 27, 2025.  Prior to the hearing, the parties filed memoranda outlining their positions and supporting authorities (doc. # 351: Plaintiffs' and Jeanette's Consolidated Pre-Hearing Mem.).[1]  At the hearing, the parties called four witnesses to testify, and 37 exhibits were admitted into evidence.  Thereafter, on March 28, 2025, the parties filed post-hearing memoranda:  a consolidated memorandum by Plaintiffs and Jeanette ("Plaintiffs' Memorandum") (doc. # 368), and a consolidated memorandum by Steven and the Third-Party LLCs ("Defense Memorandum") (doc. # 369).  Because the Defense Memorandum raised arguments and authorities not set forth in Defendants' pre-hearing memorandum, the Special Master allowed Plaintiffs and Jeanette to submit a consolidated supplemental memorandum, which they filed on April 8, 2025 ("Plaintiffs' Supplemental Memorandum") (doc. # 378).

The Special Master has carefully considered the evidence and the authorities offered by the parties.  For the reasons set forth below, the Special Master recommends that the frozen funds be turned over to Plaintiffs or Jeanette, as to be determined in a future proceeding.  In Part I below, the Special Master sets forth the relevant factual findings.  In Part II below, the Special Master sets forth the legal principles that, when applied to the facts, leads to the Special Master's recommendation.

## I.

The parties vigorously disagree about the ownership of the funds being held by the District Court as a result of the citation to discover assets served on Walker & Dunlop.  Plaintiffs and Jeanette argue that, under the citation statute, the funds are an asset of Steven's that should be turned over.  Steven and the Third-Party LLCs argue that the funds belong to the Third-Party LLCs

---

[1] Steven and the Third-Party LLCs filed a consolidated  pre-hearing memorandum which is logged on JAMS Access, but it does not appear that they filed the pre-hearing memorandum on the District Court docket.

and should be released to them.  The Special Master summarizes below the relevant evidence that bears on this issue.

## A.

There is no material dispute about how the funds in dispute made their way into the Walker & Dunlop escrow account.  In 2017, Alliance HTTX and Alliance HTFL sought to obtain loans that would be secured by the five properties owned by the Third-Party LLCs.  Pursuant to a loan agreement dated May 2, 2017, Walker & Dunlop extended loans totaling $86 million to Alliance HTTX (for the Texas properties Warwick, Wind Tree and Coulter Landing) and to HTFL (for the Florida properties Caribbean Isle and Forest Park) (TP LLC Ex. 1).[2]  Steven was the guarantor of the loans (*Id.* at 8), and signed the loans as the manager of Alliance HTTX and Alliance HTFL (*Id.* at 125).  At that time, Steven was also the managing member and 93 percent owner of Overlook Managing Member LLC ("Overlook") (JX 38), which in turn was the sole and managing member of each of the Texas and Florida properties (TP LLC Ex. 1A, at ¶ 1).

In June 2019, Walker & Dunlop agreed to refinance the loans to HTTX and HTFL for the properties owned by the Third-Party LLCs in the amount of $97 million (TP LLC Ex. 2A, at 1).  Again, Steven was the guarantor of the loans (TP LLC Ex. 2, at 11 for each loan), and signed the closing statements as the authorized signatory of each of the Third-Party LLCs (TP LLC Ex. 2A, at 4).  As part of the loan agreement, Walker & Dunlop established a cash management (or escrow) account over which it had "sole dominion and control" in order to ensure payment of taxes, insurance, operating costs and debt service (TP LLC Ex. 2, at § 2.6.2(a) for each loan), and thus to protect the properties that were security for the loans.  As a result, neither Steven nor the Third-Party LLCs had access to the funds in cash management account during the pendency of the loans.

---

[2] The Third-Party LLC Exhibits are identified by "TP LLC Ex."; Plaintiffs' exhibits by "PX"; and Jeanette's Exhibits by "JX."

At the time of the closing of the loans, the cash management, or escrow, account appears to have had funds in the amount of $1,143,802.00 (TP LLC Ex. 2A, at 3).

By April 1, 2022, the amount held in the Walker & Dunlop escrow account had grown to $1,544,549.00. On that date, there was a closing on the sale of the two Florida properties which resulted in the payoff of the $97 million dollar loan, and a net balance payable of $35,273,113.47 (JX 30a, at 3, 8). Steven signed the closing statements for each of the properties that were sold as the authorized signatory (*Id.* at 4, 9). On April 1, 2022, the net proceeds of $35,372,113.47 from the sale were deposited in Alliance HTFL's Chase Account ending in 1602 (JX 30(b)).

Once the loan was paid off on April 1, 2022, Walker & Dunlop no longer had an interest in the escrowed funds (which had been held for the purpose of protecting the security for the Walker & Dunlop loan), and thus no longer controlled those funds (02/27/25 Tr. at 156). In the normal course, the escrowed funds would have been released to Alliance HTFL (the entity that had owned the Florida properties) (*Id.* at 138). That did not happen because prior to the sale of the Florida properties and pursuant to the default judgment entered against Steven on August 17, 2021, Plaintiffs served Walker & Dunlop with a citation to discover assets on January 20, 2022 (doc. # 124). As a result of the pending citation, Walker & Dunlop froze the escrowed and did not distribute them to Alliance HTFL.

**B.**

The evidence made clear that absent the citation served on Walker & Dunlop, after the April 1, 2022, sale of the Florida properties, the funds that Walker & Dunlop held in escrow would have been "released to the seller" (02/27/25 Tr. at 138) -- as was the case with the net proceeds from the sale. Thus, the Special Master considers the disposition of the sale proceeds to be highly relevant to the control that Steven would have been able to exercise over the escrowed funds had

they been released to the seller and, as with the net sale proceeds, deposited into the Alliance HTFL account. The evidence convincingly shows that Steven exercised complete control over the funds deposited into the Alliance HTFL account and was able to use them for personal (as opposed to Third-Party LLC) purposes as he saw fit.

Steven was an authorized signatory on the Alliance HTFL Chase Account 1602 (JX 9). Within one month of the April 1, 2022, closing, Steven transferred $30,777,000.00 from Chase Account 1602 into two other accounts having nothing to do with the Third-Party LLCs. Those transfers fell into two categories.

*First,* between April 1 and April 29, 2022, Steven made multiple wire transfers totaling $777,000.00 from Chase Account 1602 into the Glencoe Family Dwelling LLC Chase Checking Account 8261 (JX 30(b) and (c)). Steven is a signatory on Chase Account 8261 (JX 8). Prior to those transfers, there was a balance in Chase Account 8261 of only $427.32 (JX 30(c)). During the month of April 2022, Steven made transfers from Chase Account 8261 to pay $197,563.26 on a credit card that Steven and his wife used for personal purposes (02/25/25 Tr. at 38-39 and JX 33); to pay $9,000.00 for rent on property (920 W. George Street) leased as a family residence (JX 24); to make payments of $73,948.23 related to a yacht (Contessa Marine – Octopussy);[3] to pay $50,000,00 in connection with a tennis club; and to pay $18,358.36 to attorneys (Allison Rub Rodriguez and Beerman LLP) Steven had engaged in connection with his divorce proceedings (JX 30(c): entries dated 4/1/22, 4/4/22, 4/5/22, 4/8/22, 4/15/22, 4/18/22, 4/19/22, and 4/29/22). These payments clearly were for Steven's benefit and not for the benefit of the Third-Party LLCs.

---

[3] Steven testified that he has no ownership interest in the yacht, which he stated is owned by an entity that is 100 percent owned by his father, Anthony (02/25/25 Tr. at 141). Given the findings explained below as to Steven's lack of credibility as a witness, the Special Master is skeptical as to this testimony in the absence of Steven or the Third-Party LLCs' offering any evidence to substantiate the ownership. Ownership of the yacht aside, the fact remains that Steven used money from the proceeds of the sale of the Florida properties as he saw fit, and for purposes having nothing to do with the Third-Party LLCs.

*Second,* on April 6, 2022, Steven wire transferred $30 million from Chase Account 1602 to Stifel Nicolaus "Ref: For Further Credit to A & O Family LLC" with an account number ending in 8442 (JX 30(b)). Steven's testimony about this transfer was not credible. Steven testified that he "probably" would not have authorized that transfer (02/25/25 Tr. at 108), and that either Jennifer Traina (the other signatory on Chase Account 1602) or Shanna Willis (Vice President of Asset Management for the management company for the Third-Party LLCs) "could have" authorized the $30 million transfer (*Id.*). However, neither Steven nor the Third-Party LLCs offered testimony from Ms. Traina or documentary evidence that she did so. The failure to offer such evidence within Steven's control undermines his assertion that Ms. Traina authorized the transfer. *Kalmin v. Varan,* 2021 IL App (2021) 200755, at ¶ 41 ("An unfavorable evidentiary presumption also arises if a party, without reasonable excuse, fails to produce evidence under his or her control"). And Ms. Willis -- who is not a signatory on Chase Account 1602 -- testified that she would not have been able to make a $30 million transfer from the Alliance HTFL account "without authorization from Steven Ivankovich" (02/27/25 Tr. at 173). The Special Master finds Ms. Willis's testimony credible. The Special Master further finds that the evidence establishes that Steven transferred the $30 million in funds from the HTFL Chase Account 1602 to the A & O Family Account 8442.

Steven also testified that this transfer was "probably" a return of capital to his father, Anthony, for his investment in the five properties (02/25/25 Tr. at 108), an assertion that was supported by the testimony of Mark Brown, who in 2022 was asset manager of the Third-Party LLCs (02/27/25 Tr. at 278-79, 309), and by a declaration filed by Mr. Brown in a bankruptcy proceeding (JX 41 at ¶ 12). However, neither Steven nor the Third-Party LLCs offered testimony by Anthony Ivankovich to support this assertion, or any documentary evidence that Anthony Ivankovich advanced $30 million for the Third-Party LLCs or asked for it to be returned after the

sale of the Florida properties.  Again, the unexplained failure to offer evidence to support the assertion of the purpose for the $30 million transfer undermines the credibility of the assertion. *See Kalmin*, 2021 IL App (2021) 200755, at ¶ 41.

Moreover, subsequent events demonstrate that substantial amounts of the $30 million were then used by Steven for his own purposes.  On or about June 24, 2022, application was made for a Celadon Brokerage Services Account 1441 registered to A & O Family LLC that listed Steven as the sole "beneficial owner" of the account applicant – that is, the A & O Family LLC (JX 17 at § 2).  The application identified Steven as the primary authorized principal and stated that there were no other persons with authority over the account or who had authority to transact in it (*Id.* at §§ 3 and 4).  Steven signed the application for the Celadon Account 1441 as its primary authorized principal, and he is the only signatory on the application (*Id.* at § 15).

Steven denied the accuracy of the application for the Celadon Account 1441, and stated that he did not complete it, but that someone else had done so on his behalf (02/25/25 Tr. at 149-151).  He also stated that the applicant, A & O Family LLC, was not owned by him but by his father (*Id.* at 261).  However, Steven offered no evidence other than his own say-so to support that testimony, and he did not identify anyone else who had authority to transact in the account.  Nor did he offer any documentary evidence to support his claim that, contrary to what is in the Celadon application, Steven's father -- and not Steven -- is the controlling owner of the A & O Family LLC that applied for the account.

Moreover, actions that Steven subsequently undertook with that account demonstrate his control over all of the relevant accounts and funds in them.  On July 14, 2022, Steven wire transferred $25,417,223.59 from Account 8442 (the account into which he had transferred $30 million of the net proceeds of the sale on April 6, 2022) to the Celadon Account 1441 (JX 30(e)).

Steven denied that he made the transfer, or that the signature on the account transfer form (JX 30(e)) was his (02/25/25 Tr. at 152-57). He stated that this was all directed by his parents, that any "ownership I was given on a temporary basis . . . was to take advantage of my tax losses," and that various other people at various times had authority over the accounts (*Id.* at 158-59). Neither Steven nor the Third-Party LLCs offered any documentary evidence to support this testimony and offered no testimony by Steven's parents or the other individuals whom Steven identified as perhaps having authority to make this transfer. Nor did Steven offer any explanation for why someone else would place his signature on the account transfer form without his authority.

Moreover, what occurred next supports the proposition that Steven authorized the transfer of the funds from Account 8442 to the Celadon Account 1441. Between August 2022 and August 2023, Steven transferred $23,025,000.00 from the Celadon Account 1441 to the Glencoe Family Dwelling Checking Account 8261(JXs 6 and 14).[4] Over that same period and extending into November 2023, Steven paid large sums from Account 8261 to satisfy personal expenses, including:

- numerous credit card payments;

- a payment of $50,000 to a tennis club (JX 6, Statement for August 2022, at 2);

- payments exceeding $1 million in connection with a yacht (*Id.,* Statement for September 2022, at 2-3);

- payments to his divorce lawyers of $26,541.57 in January 2023, $10,858.20 in February 2023, and $43,500.00 in March 2023 (*Id.,* Statements for January 2023, at 2, February 2023, at 3 and March 2023, at 3);

- payments of $165,378.00 in March 2023, $137,701.50 in May 2023, $69,602.05 in June 2023, $164,136.01 in August 2023, $92,737.81 in September 2023, $223,655.29 in October 2023, and $134,010.29 in November 2023 in connection with his yacht crew (*Id.,*

---

[4] In addition, counsel for Steven and the Third-Party LLCs stipulated that "the same amounts that were disbursed out of the Celadon account were deposited into the Chase account . . .,8261, and that the document shows that the deposit came through the U.S. Bank" (02/25/25 Tr. at 199-200).

Statements for March 2023 at 2, May 2023 at 2-3, June 2023 at 2, August 2023 at 2, September 2023 at 2, October 2023 at 2, and November 2023 at 2);

- a payment of $315,000.00 in November 2023 for yacht transport (*Id.,* November 2023 Statement at 2);

- payments of $25,000.00 in March 2023, $25,000.00 in August 2023, and $25,000.00 in September 2023 to Mr. Goldstein and of $47,713.68 in November 2023 to Chuhak Tecson, counsel for the Third-Party LLCs (*Id.,* Statements for March 2023 at 2, August 2023 at 3, September 2023 at 3, and November 2023 at 2);

- a payment of $30,000.00 to Mr. Wanderer, Steven's counsel in this matter, in October 2023 (*Id.,* October 2023 Statement at 2); and

- a payment to Steven's divorce attorney Ms. Rodriguez of $12,898.00 in June 2023 (*Id.,* Statement for June 2023 at 2).

**C.**

The foregoing evidence shows that Steven did as he wished with the net proceeds of the April 1, 2022, sale of the Florida properties. He immediately transferred $777,000.00 directly into the Glencoe Family Dwelling Account 8261 and used hundreds of thousands of dollars of those funds for personal (and not Third-Party LLC) expenses. Less than one week later, on April 6, 2022, he transferred $30,000,000.00 of the proceeds into the A & O Family Account 8442, $23,025,000.00 of which through two separate transfers in July and August 2022 he placed into that same Glencoe Family Dwelling Account 8261. And during the period August 2022 through the end of 2023, Steven paid from that account millions of dollar of expenditures for personal purposes and not for the benefit of the Third-Party LLCs.

There is no evidence that the Third-Party LLCs ever complained about Steven removing from the Alliance HTFL account nearly $31 million of the net proceeds from the sale of the Florida properties or asserted that those funds belonged to the Third-Party LLCs and should remain in the Alliance HTFL account. Steven's exercise – without objection – of complete dominion over the proceeds from the sale of the properties shows that he would have done the same with the money

held in the Walker & Dunlop account escrow that would have been released to the Alliance HTFL account (or some other account for the Third-Party LLCs) but for the freeze imposed by the citation in this case.

Finally, while the Special Master has cited above several specific instances where he has found Steven's testimony lacked credibility, it is important to note that a lack of credibility permeated Steven's testimony. Plaintiffs' and Jeanette's post-hearing memorandum catalogues a number of instances beyond those cited above of Steven offering testimony that simply was not believable (Plaintiffs' Post-Hearing Mem. at 4-7), including, for example, testimony in which Steven (a) asserted a lack of familiarity with Walker & Dunlop (02/25/25 Tr. at 55), an entity in which he signed for and guaranteed loans in 2017 and 2019 totaling more than $180 million; and (b) stated that he was not involved in the sale of the Florida properties on April 1, 2022 (*Id.* at 87), even though he signed the closing statements for the sale of each of the properties as the authorized signatory. Steven was repeatedly evasive, combative or flippant, and exhibited a level of disrespect for the process that the Special Master rarely has seen in his 46 years of involvement in the legal profession.

To summarize, the Special Master finds that Steven exercised complete dominion over the disposition of the funds from the sale of the Florida properties, and put much of that money to his personal use. The Special Master further finds that this evidence shows that, but for the freeze of the money held by Walker & Dunlop at the time of the sale of those properties, Steven would have exercised the same dominion over those funds.

## II.

Illinois law allows a judgment creditor to serve citations to discover assets in order to locate "assets belonging to the judgment debtor that [a] third party may have in its possession." *Kalmin,*

2021 IL App. (1st) 200755, at ¶ 34.  The judgment creditor has the burden of showing that a citation respondent "possesses assets belonging to the judgment creditor."  *Id.*  Thus, Plaintiffs and Jeanette have the burden of proving that the frozen funds that were in the possession of Walker & Dunlop were assets belonging to Steven.  The Special Master finds that the Plaintiffs and Jeanette have met that burden.

In so finding, the Special Master is mindful that the provisions of the citation statute are to be "liberally construed," *Kalmin*, 2021 IL App. (1st) 200755, at ¶ 34.  That is so in light of the reality that the citation procedure is invoked because a judgment debtor resists paying a judgment for which it has been held responsible.  *See  Nat'l Life Real Estate Holdings, LLC v. Scarlato,* 2017 IL App. (1st) 161943, at ¶ 22 (2017) (Section 2-1402 is a "means of forestalling the judgment debtor or a third party from frustrating the supplementary proceedings before the judgment creditor has had an opportunity to reach assets, . . . in the possession of [the] debtor or of a third party.")  In line with that liberal construction, the phrase "assets belonging to the judgment debtor" is treated as "very open-ended."  *Nat'l Life Real Estate Holdings,* 2017 IL App. (1st) 161943, at ¶ 36.

In *Scarlato,* the plaintiff had obtained a judgment of nearly $3.5 million against the defendants (including Scarlato), and had served a citation to discover assets against International Bank of Chicago ("IBC") in an effort to collect on that judgment.  Thereafter, the defendants/judgment debtors obtained a $3.5 million loan from IBC, but the loan terms provided that advances on the loan could only be obtained at the request of Scarlato personally or in his capacity as a managing member of entities who were not judgment debtors.  Proceeds of the loan were then disbursed, but none of the proceeds went to Scarlato or to any of the other judgment debtors.  The trial court agreed with IBC's position that the loan proceeds were not Scarlato's assets, and that IBC thus did not violate the citation by disbursing them to third parties.

The appellate court reversed.  The appellate court explained that "even though the loan proceeds were not disbursed to Scarlato, they still *belonged* to him within the meaning of Section 2-1402." *Nat'l Life Real Estate Holdings,* 2017 IL App. (1st) 161943, at ¶ 33 (emphasis in original). That was so in light of the evidence that even though Scarlato did not receive the loan proceeds, the structure of the loan agreement showed that he had "a legal right to access the proceeds of the loan at issue here," and he arguably "could have used the loan proceeds for his own personal use or for payment to [another] entity." *Id.,* ¶¶ 30, 36.  Thus, the appellate court concluded that the loan proceeds belonged to Scarlato within the meaning of the statute and that IBC violated the statute by disbursing the loan proceeds.[5]

While the facts evidencing control here differ from those in play in *Scarlato,* the evidence established that Steven in fact had complete control over the funds held in escrow by Walker & Dunlop upon the closing of the sale of the Caribbean Isle and Forest Park properties in Florida on April 1, 2022, which satisfied all outstanding loans issued by Walker & Dunlop and brought into HTFL more than $35 million.  The satisfaction of the loans extinguished Walker & Dunlop's interest in – and control over – the money that had been held in escrow for insurance, taxes, operating expenses and debt service, as that money was no longer needed to protect Walker & Dunlop's security interest in the properties.  Thus, as of April 1, 2022, Walker & Dunlop had no more right to, or control over, the money in the escrow account than it had in the $35 million payable to HTFL from the sale of the properties.

The evidence shows that immediately upon receipt of the $35 million in sale proceeds that were deposited into the HTFL account, Steven began exercising control over those funds. On April

---

[5] The Special Master notes that the dissent in *Scarlato* disagreed with the conclusion reached by majority, but agreed with the principle that "a loan might be the property of the debtor in a citation proceeding – even where the loan proceeds are not paid directly to the debtor/borrower but distributed to a third party – if the debtor/borrower had the legal right to obtain those funds."  2017 IL App. (1st) 161943, ¶ 56.

6, 2022, Steven wire transferred $30 million of that amount from the HTFL account to the A&O Family LLC Account 8442 for which he was signatory (JXs 30(b) and (e)). During the month of April 2022, Steven made numerous transfers from the HTFL account to the Glencoe Family Dwelling account 8261 totaling $777,000.00 (JX 30(c)). The Third-Party LLCs did not object or assert their ownership of those funds.

Thereafter, in July 2022, Steven transferred more than $25 million from the A&O Family LLC account 8442 to an A & O Family Account with Celadon (Number 1441) – for which he signed he application, is listed as the beneficial owner, and is the sole individual authorized to withdraw funds (JX 17) – and then over the course of 13 months transferred more than $23 million to the Glencoe Family Dwelling Account 8261 (*compare* JXs 6 and 14). This was in addition to the several hundred thousand dollar that Steven spent from the $777,000.00 deposit into the Glencoe Family Dwelling Account 8261 in April 2022.

Moreover, as explained above, the evidence shows that these funds from the sale of the Florida properties that Steven transferred into the Glencoe Family Dwelling Account were often used for personal purposes – such as personal credit card debt, rent for a dwelling, payment for items relating to a boat, and payment for lawyers Steven engaged for his divorce proceedings -- that had nothing to do with the operation of any of the Third-Party LLCs. There is no question but that Steven exercised control over the proceeds from the sale of the Florida properties, and used them as he saw fit.

The Special Master finds that the control that Steven exercised over the proceeds from the sale of the Florida properties is telling evidence as to his control over the funds held in the Walker & Dunlop escrow account. At the time of the closing on the sale of the Florida properties on April 1, 2022, the citation had been served on Walker & Dunlop and the funds in the escrow account

were thus frozen and ***for that reason alone*** were beyond Steven's reach.  Had the citation not been in place, there would have been no restriction on Steven's access to the escrowed funds – just as there was no restriction on his access to the net proceeds from the sale.   The control he exercised over the use of the proceeds from the sale is persuasive evidence showing the control he had (but for the citation proceeding) over the funds from the Walker & Dunlop escrow account as of April 1, 2022.[6]

Steven and the Third-Party LLCs argue that *Scarlato* should not apply, pointing to factual and procedural differences between that case and the situation presented here (Defense Mem. at 14-15).  The Special Master disagrees.  The distinctions relied upon by Steven and the Third-Party LLCs do not detract from the fundamental teaching of *Scarlato* that the touchstone of whether funds held by a third party may be turned over to satisfy a debtor's judgment is whether the funds belong to the debtor, which can be shown by the "legal right to access" the funds.  2017 IL App. (2017) 161943, ¶¶ 30, 33.  The *Scarlato* court did not state that the right to access can only be proven through one path.  Here, the evidence showing Steven's access to and control over the loan proceeds likewise shows his control over the funds in the Walker & Dunlop escrow account once the sale of the Florida properties closed on April 1, 2022.  Neither Steven nor the Third-Party LLCs offered any evidence that the Third-Party LLCs resisted Steven's transfers of $30 million of the sale proceeds into accounts that he controlled, much of which was put to personal use.

Steven and the Third-Party LLCs resist the conclusion that the escrowed funds belong to Steven by emphasizing that the Walker & Dunlop escrow was established prior to the judgment

---

[6] The fact that the citation was served prior to April 1, 2022, at a time when, under the loan agreement Walker & Dunlop still maintained "sole dominion and control" over the escrowed funds (LLC Ex. 2A, §2.6.2), is of no moment. Section 2-1402(f)(1) applies to assets "belonging to the judgment debtor to which he or she may be entitled or which may thereafter be acquired by or become due to him or her."  As of the closing of the sales on April 1, 2022, Walker & Dunlop no longer had any interest in the escrowed funds which, for the reasons stated above, the Special Master finds came under the control of Steven.

(presumably to show that the escrow account was not a ruse to avoid payment of the judgment) and that Steven "*never* transacted from the escrow accounts at issue" (Defense Mem at 17) (emphasis in original). That argument misses the point that the reason Steven *never* transacted from the escrow account prior to April 1, 2022, is that the Walker & Dunlop loan agreement prevented him from doing so, and that the reason he *never* transacted from the escrow account after that date was the prohibition stemming from the citation. The evidence persuades the Special Master that, but for the issuance of the citation, Steven would have been free to access those funds previously held in escrow and to put them to personal use – just as he did with the proceeds from the sale of the Florida properties.[7]

Steven and the Third-Party LLCs attempt to avoid the import of this evidence by claiming that because the money in the Walker & Dunlop escrow account originated from the 2019 loan and rental income from the properties, that the Third-Party LLCs "clearly hold title" to those funds (Defense Mem. at 1). However, that argument ignores the common-sense principle that "where substantial evidence shows that the paper title cannot be trusted, Illinois courts will consider other factors to determine true ownership of the property in dispute." *United States v. Miller,* 39 F.4th 844, 851 (7th Cir. 2022). The Seventh Circuit drew that principle from *People v. Chicago Title & Trust Co.,* 389 N.E.2d 540, 545 (Ill. S. Ct. 1979), in which the Illinois Supreme Court observed in deciding a land taxation dispute that "[w]hile title may be a factor in determining ownership it is

---

[7] During the hearing, Steven's counsel elicited testimony that even after the closing on the sale of the Florida properties, there were taxes and insurance that remained to be paid (02/27/25 Tr. at 160). Similarly, defense counsel elicited testimony that the Texas properties failed to generate revenue sufficient to cover taxes and insurance, and were able to cover insurance only through monies advanced from the A & O Family Account (02/27/25 at 197-98). To the extent this testimony was elicited to suggest that Steven would not have taken the funds from the escrow even in the absence of the citation – an argument not made in the post-hearing memorandum – the Special Master is unpersuaded. Within one month of the $35 million flowing into HTFL, Steven redirected nearly $31 million which he moved into accounts and used for many personal purposes. Had Steven been concerned about the ability of the Texas properties to make tax and insurance payments, of course, those funds could have remained with HTFL and used to make those payments (*see id*. at 161).

not decisive. Of far greater importance is control of the property and the right to its benefits." In *Miller,* the Seventh Circuit cited other Illinois state court decisions making clear that "[t]he idea that title does not always control ownership extends beyond taxes to other areas in Illinois law as well." 39 F.4th at 851; *see also Levine v. City of Chicago,* 2024 IL App (1st) 231245, ¶ 71 (observing that "control, rather than title, determines ownership").

The evidence here shows that Steven controlled the disposition of the net proceeds from the sale of the Florida properties. By the reasoning of Steven and the Third-Party LLCs, because those proceeds came from the sale of the properties and the funds remaining after payoff of the loans, the Third-Party LLCs also "clearly would hold title" to those proceeds. Yet, without any objection by the Third-Party LLCs or attempt by them to assert ownership, Steven exercised complete dominion over those proceeds and used them as he saw fit – including for many purposes having nothing to do with the Third-Party LLCs but instead for his personal benefit. This evidence leaves no doubt that but for the restraint imposed by the citation, the same would have occurred with respect to the escrowed funds. This is a case where any claim by the Third-Party LLCs to title "cannot be trusted." *Miller,* 39 F.4th at 851. In this proceeding under the citation statute, where the phrase "assets belonging to the judgment debtor" is treated as "very open-ended" standard, *Nat'l Life Real Estate Holdings,* 2017 IL App. (1st) 161943, at ¶ 36, the Special Master finds that the evidence convincingly shows that the escrowed funds are assets that belong to Steven.

## A.

The defense offers several additional arguments in aid of their position that the funds should be returned to the Third-Party LLCs. The Special Master finds them to be without merit.

*First,* Defendants argue that Plaintiffs and Jeanette are improperly seeking to obtain funds of the Third-Party LLCs through a "reverse piercing" of the corporate veil – that is, by seeking to

make the Third-Party LLCs liable for Steven's debt. Steven and the Third-Party LLCs contend that reverse veil piercing is not permitted under Delaware law and, in any event, that Plaintiffs and Jeanette have not established in the evidence a right to any veil piercing (Defense Mem. at 7-13). This is a straw man argument, as Plaintiffs and Jeanette do not seek to pierce the corporate veil in this proceeding, and under Illinois law would not be permitted to attempt to do so. *Pyshos v. Heart-Land Development Co.,* 258 Ill. App. 3d 618, 624 (1st Dist. 1994) ("[W]hat must be alleged to pierce the corporate veil does not fall within the scope of what may be heard in supplementary proceedings"). Moreover, Steven's and the Third-Party LLCs' argument fails at the threshold because it assumes the answer to the very question that the hearing was designed to address: whether the frozen funds are those of the Third-Party LLCs or whether they are Steven's assets within the meaning of the citation statute. As explained above, the evidence convincingly shows that the funds are Steven's assets and therefore there is no occasion to consider any question of piercing the corporate veil. *See Kalmin,* 2021 IL App (1st) 200755, at ¶ 39.[8]

*Second,* Steven and the Third-Party LLCs argue that the most that Plaintiffs and Jeanette would be entitled to receive as Steven's creditors would be a "charging order" against his interest in the funds of the Third-Party LLCs (Defense Mem. at 7). As with the reverse piercing argument, this contention fails because it assumes a fact that has been contradicted by the hearing evidence: that the funds held by Walker & Dunlop were not Steven's assets but were assets of the Third-Party LLCs. There is no occasion here for a "charging order" for distribution of funds by the

---

[8] The Special Master also notes that it is not so clear as Steven and the Third-Party LLCs suggest that reverse veil piercing is not cognizable under Delaware law. *See Manichaean Capital, LLC v. Exela Technologies, Inc.,* 251 A.3d 694, 714 (Del. Ch. Ct. 2021) ("there is a place for a carefully-circumscribed reverse veil-piercing within Delaware law"); *see also Sky Cable, LLC v. Direct TV, Inc.,* 886 F.3d 375, 389 (4th Cir. 2018) (affirmed the application of reverse veil piercing under Delaware law).

Third-Party LLCs that the Special Master has found in fact are assets of Steven's under the citation statute.

*Third,* while not raised in the post-hearing memorandum, Steven and the Third-Party LLCs suggested by certain objections and colloquy during the hearing that a finding that the frozen funds should be turned over would interfere with a pending bankruptcy proceeding (02/25/25 Tr. at 144-45, 181-83). Nothing could be further from the truth. The bankruptcy proceeding referenced involves A & O Family LLC (IL), A & O Family LLC (FL) and Atlas P2 – not the Third-Party LLCs (*see* Special Master's Order No. 12, 10/28/24, doc. # 329, at 4). There is no claim that the frozen funds are assets of any of the entities in bankruptcy, and there has been no assertion that the bankruptcy stay prevents this proceeding from going forth.

*Fourth,* again while not raised in the post-hearing memorandum, Steven and the Third-Party LLCs suggested during the hearing that a prior order by the District Judge precludes a finding that the frozen funds are Steven's assets subject to turnover (02/25/25 Tr. at 143). The Special Master is mindful that the District Judge previously held that, on the state of the record then before her, Plaintiffs had failed to show that funds of the Third-Party LLCs were Steven's assets (doc. # 251: 12/16/22 Order at 4). It appears from the order that the only evidence Plaintiffs offered to support a request to use funds **held by the Third-Party LLCs** to satisfy the judgment was Steven's "near total ownership interest in Overlook . . ., which wholly owns" each of the Third-Party LLCs (*Id.*). The question presented here is different: that is, whether the funds **held by Walker & Dunlop** are funds of the Third-Party LLCs or assets of Steven's.

The District Judge's order plainly did not answer that question. To the contrary, the District Judge denied the request to dismiss the citation issued to Walker & Dunlop. The District Judge rejected the argument that a state court order dismissing a citation against Walker & Dunlop

collaterally estopped Plaintiffs' claim for turnover (doc. # 251: 12/16/22 Order at 5). The District Judge found that further proceedings were warranted to determine whether the Third-Party LLCs held Steven's assets (*Id.* at 6). Those proceedings have now taken place, and the evidence presented at the hearing before the Special Master shows that those funds are Steven's assets, which but for the citation he would have controlled and put to personal use.

## **CONCLUSION**

For the reasons set forth above, the Special Master respectfully recommends that the District Judge (a) rule that the funds held in the Court Registry from the citation to Walker & Dunlop are assets of Steven within the meaning of the citation statute; and (b) direct that further proceedings be conducted to determine whether those funds should be distributed to Plaintiffs or to Jeanette.

Any party may file an objection to this Report and Recommendation within 10 days of this Report and Recommendation being filed (Order Appointing Special Master, 01/19/24, at ¶ 1).

_____

**HON. SIDNEY I. SCHENKIER (RET.)**
**Special Master**
**May 14, 2025**