# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

| | |
|---|---|
| In re: | Case No.: 24-15755-LMI |
| | Chapter 11 |
| IVANKOVICH FAMILY LLC, | (Jointly Administered) |
| A & O FAMILY LLC (FL), | 24-15762-LMI |
| A & O FAMILY LLC (IL), | 24-15767-LMI |
| ATLAS P2 MANAGING MEMBER, LLC, | 24-15770-LMI |

Reorganized Debtors.

_____/

### REORGANIZED DEBTORS' RESPONSE IN OPPOSITION TO MOTION TO FILE UNTIMELY PROOF OF CLAIM AND RELIEF FROM DISCHARGE PROVISION AND PLAN INJUNCTION
#### Requested Hearing on March 31, 2026 at 9:30 a.m.[1]

Reorganized Debtors file this opposition to the *Motion (I) for Leave to File Proof of Claim After Deadline, Or, In an Abundance of Caution and In the Alternative, (II) For Relief from the Discharge Provision and Plan Injunction* (ECF No. 691) (the "**Motion**") filed by Zhu Zhai Holdings Limited and Peter Pui Tak Lee (together, "**ZZH**").

## INTRODUCTION

ZZH are not, and never have been, creditors of the Debtors. ZZH had no pending prepetition claim or demand, and had lost every prior claim they asserted, against a Debtor. ZZH nevertheless received actual notice of the bankruptcies within two days of the Petition Date. ZZH also received actual notice of the Plan containing the discharge and injunction provisions more than 9 months before confirmation. In addition, ZZH received transcripts of the bankruptcy court action, notice of particular proceedings such as cash collateral, and ample warning of the pendency

---

[1] Reorganized Debtors request that the Motion and this Response in Opposition be set for the hearing on March 31, 2026 at 9:30 a.m. to conserve judicial economy as another hearing is set on the adversary in these cases at that date and time.

and progress of the bankruptcies.  All of the actual notice to ZZH "more than satisfies" due process according to Supreme Court precedent.  Yet, for an entire year and a half in these Chapter 11 cases, ZZH did absolutely nothing to pursue a purported $9 million claim against four solvent, surplus estates.  Why?  Because ZZH had no claim against Debtors, and ZZH knew it.

In February 2025, more than 7 months prior to confirmation, ZZH litigated a two-day trial alongside intervenor and ZZH's contractual privy, Jeanette Ivankovich, who was the most active creditor in these Chapter 11 cases.  At times, the trial revolved around the bankruptcy of Debtors and Debtors' prepetition transactions—effectively seeking rulings that would be stay violations. However, ZZH did not pursue a claim against Debtors at that time.  In May 2025, ZZH prevailed in their collection action as to specific escrowed funds, and the order issued by the Special Master was primarily based on findings relating to the use and control of Debtor A&O IL's accounts (again, in violation of the automatic stay).  However, ZZH did not pursue a claim against Debtors at that time.  In August and September 2025, this Court held a 5-day heavily contested confirmation trial, at which ZZH's contractual privy, Jeanette Ivankovich, strenuously objected but ultimately failed to block confirmation.  Still, ZZH did not file a claim against Debtors.  For years, ZZH did nothing—exactly as a non-creditor would act.   ZZH consciously and intentionally avoided bankruptcy court jurisdiction.

We are at the thirteenth hour.  The Debtors entered multi-million dollar settlements, paid over $16 million up front, and liquidated millions in securities under the confirmed Plan.  Property has been vested in Reorganized Debtors, and non-Debtors have provided security for Plan funding. The confirmed Plan has been substantially consummated.  Millions in mortgages and service contracts have been executed in furtherance of the confirmed Plan.  Real property and personal

property alike has been encumbered by estate and ordinary-course-of-business creditors and Plan Funders.[2]

Well-established case law, as well as the most basic principles of equity and laches preclude ZZH from pursuing a claim against the Reorganized Debtors, or avoiding Plan injunctions and discharge provisions, after ZZH has passively watched these cases from the sidelines for nearly two years. To allow ZZH to now disrupt the finality of the Plan would not only prejudice Reorganized Debtors and their actual creditors, as well as Plan Funders, but would also undermine the very purpose of the bankruptcy process: to provide certainty, closure, and a fair distribution of assets. Binding precedent and equitable principles require denial of the Motion. As this Court pointed out on January 6, 2026, this is "not the first… or even the hundredth time in 20 years" this argument has been made, and "the law is very clear" when "someone had notice of the bankruptcy but did not take it upon themselves to investigate what the deadlines were." *See* transcript attached hereto as **<u>Exhibit 1</u>**, at 95:2-10. Relief must be denied.

## RELEVANT FACTS

### A.    **ZZH Have Never Been Creditors of Debtors**

1.      In 2020, ZZH filed a Complaint (the "**ZZH Complaint**") against Steven Ivankovich ("**Steven**"), in the Northern District of Illinois (the "**Illinois District Court**") under case number 1:20-cv-04985) (the "**ZZH Action**"). *See* ZZH Complaint attached hereto as **<u>Exhibit 2</u>**.

---

[2]    "Plan Funders", as defined in the Plan, includes Drs. Olga and Anthony Ivankovich, A&O FL's subsidiary, Yacht Daddy, LLC, and the title owners of the P-5 properties located in Texas.

2.      The ZZH Action was for enforcement of a guarantee by Steven of debts owed to ZZH, and requested specific performance, a monetary judgment, and a charging order against Steven's distributional interest in Overlook Managing Member, LLC.[3]

3.      None of the Debtors[4], or any of their affiliates, were defendants in the ZZH Action. *See id*.

4.      Although the ZZH Complaint sought multiple forms of relief, ZZH ultimately pursued—and obtained—only a monetary judgment against Steven.[5]  A copy of the motion for final default judgment is attached hereto as **Exhibit 3**.  A copy of the Memorandum Opinion and Order granting judgment for $4,503,842 on August 17, 2021 is attached hereto as **Exhibit 4**.  *See also* Motion, Ex. A.

5.      Post-judgment, on January 20, 2022, ZZH served a citation[6] on Stifel Financial Corp. ("**Stifel**"), which, apparently due to Steven's signatory authority, resulted in the freezing of the Stifel accounts of Debtor IF LLC in the amount of $8,356,534.29 and Debtor Atlas P2's subsidiary, P2 Portfolio Managing Member LLC ("**P2**") in the amount of $944,552.39 (together, the "**Accounts**").  A copy of the citation is attached hereto as **Exhibit 5**.  A copy of Stifel's amended response to the citation is attached hereto as **Exhibit 6**.

---

[3]    Although the Motion cites a Pledge, the Pledge was not foreclosed in the ZZH Action, or apparently in any other action.

[4]    "Debtors" refer to Ivankovich Family LLC ("**IF LLC**"), A&O Family LLC, a limited liability company organized under the laws of Florida ("**A&O FL**"), A&O Family LLC, a limited liability company organized under the laws of Illinois ("**A&O IL**"), and Atlas P2 Managing Member, LLC ("**Atlas P2**").

[5]    *See* ZZH Compl., p. 23. The failure to pursue any other relief sought in the Complaint constituted abandonment of such claims. *See Cribbin v. City of Chicago*, 893 N.E.2d 1016, 1025 (Ill. App. Ct. 2008) (citing *Madison Chemical Corp.*, 202 N.E.2d 123, 125 (Ill. App. Ct. 2008).

[6]    A citation is a court-ordered process in Illinois used by creditors to collect money after obtaining a judgment. *See* 735 ILCS 5/2-1402.

6.      ZZH also served a citation upon Debtor IF LLC.  A copy of the citation is attached hereto as **Exhibit 7.**  IF LLC answered that it had no assets of Steven in its possession.  A copy of the citation is attached hereto as **Exhibit 8.**

7.      And, the Illinois District Court agreed.   The freezes of the Accounts were short-lived because the Illinois District Court ruled <u>three times</u> that ZZH had no right to the funds. On May 9, 2022, the Illinois District Court ruled ZZH had ***not*** shown that the assets held by Stifel, including the Accounts, were that of Steven.  A copy of the order is attached hereto as **Exhibit 9** (the "**First Order Denying Turnover**").  On May 31, 2022, the Illinois District Court again ruled ZZH had ***not*** shown that the assets held by Stifel were that of Steven and ordered Stifel to release the freezes of the Accounts.  A copy of the order is attached hereto as **Exhibit 10** (the "**Second Order Denying Turnover**").  After ZZH filed yet another motion for turnover against IF LLC and P2, again, on December 16, 2022, the Illinois District Court held ZZH were ***not*** entitled to turnover of IF LLC and P2 assets.  A copy of the order is attached hereto as **Exhibit 11** (the "**Third Order Denying Turnover**" and, collectively with the First Order Denying Turnover and Second Order Denying Turnover, the "**Rulings Denying Turnover**").

8.      The Third Order Denying Turnover entered on December 16, 2022, effectively ruled on IF LLC's citation proceedings and, ZZH took no further action against IF LLC until over three years later, on January 2, 2026, when they filed their Motion.

9.      By failing to appeal any of the Rulings Denying Turnover, ZZH abandoned their claims against IF LLC and P2's assets.  And, by virtue of Illinois procedural statute, the citation proceedings against IF LLC expired automatically six months after IF LLC's first appearance, as no extension of proceedings was sought by ZZH.  *See* Ill. S. Ct. R. 277(f); *Shipley v. Hoke*, 22 N.E.3d 469, 488 (Ill. App. 2014) (holding that the failure to request an extension of the proceedings

beyond the default six-month period "doomed" the judgment creditor's right to invoke the citation proceeding rules against the citation respondent).

10.     Although ZZH apparently intended to serve a citation on one of the A&O Family, LLC entities, ZZH never did.  A copy of the citation issued March 22, 2022, and non-service of same, are attached hereto as **Composite Exhibit 12**.  Again, ZZH abandoned any efforts to collect against A&O Family, LLC and took no further collection action against either A&O Family, LLC entity until nearly four years later, on January 2, 2026, when ZZH filed their Motion.

11.     Due to the improper freezing of their accounts and interference with their business, Debtor IF LLC and P2 filed a case asserting damages against ZZH, Stifel, and others, in the Southern District of Florida that was later transferred to the Northern District of Illinois (the "**ZZH Tort Defense**").[7]  In particular, Debtor IF LLC and P2 asserted claims for conspiracy, abuse of process, and intentional interference with business relations.

12.     Therefore, as of the Petition Date, besides for ZZH's unsuccessful attempt to collect their judgment against Debtor IF LLC's Stifel account, ZZH had not filed any case or supplementary proceeding against, or even sent any demand letter to, any of the Debtors.  Attached hereto as **Exhibit 13** is a declaration of Nancy Webber attesting to the fact that Debtors did not receive any demand letter from ZZH.

13.     Indeed, as of the Petition Date, ZZH's actions against Debtor IF LLC would have been barred by res judicata at a minimum, if not violate Federal Rule of Civil Procedure 11, given ZZH's failure to ever appeal the adverse determinations of the Rulings Denying Turnover.

---

[7]     *See Atlas Apartments Acquisitions, LLC et al. v. Stifel Nicolaus & Company, et al.*, Case No. 1:22-cv-06470, Northern District of Illinois.  Attached hereto as **Exhibit 14** is a copy of the docket in the case.

14.     Unsurprisingly then, none of the Debtors' books and records reflect *any* amounts owed to ZZH.  *See* Ex. 13.  Indeed, the opposite was true: based on pending litigation in the ZZH Tort Defense, ZZH potentially **owed** Debtor IF LLC damages due to the improper freeze of the Accounts.

15.     ZZH never contacted the Debtors, Debtors' counsel, or any agents/employees of the Debtors to assert a claim against the Debtors prepetition or post-petition, with the exception of the citations against IF LLC that were resolved adversely to ZZH.

16.     Rather than pursue Debtors, ZZH only attempted to collect on their claims against Steven in the ZZH Action as well as certain escrowed funds that were in the possession of Walker & Dunlop.  In February 2024, Jeanette Ivankovich ("**Jeanette**"), a spousal creditor of Steven with whom this Court is very familiar, intervened in the ZZH Action claiming an interest in the escrowed funds under the same theory as ZZH—that the funds belonged to Steven.  Upon Jeanette's intervention in the ZZH Action, Jeanette took the lead to collect on the disputed funds and ZZH and Jeanette eventually entered into an agreement to split 50/50 the funds held in the Court Registry of the ZZH Action, a copy of which is attached hereto as **Exhibit 15**.

17.     At all times in the ZZH Action and the ZZH Tort Defense, ZZH was represented by sophisticated counsel, including attorneys with significant bankruptcy experience.  Quinn Emanuel Urquhart & Sullivan LLP ("**Quinn Emanuel**") served as counsel in both actions, specifically lawyers Sascha N. Rand and Will Sears, among other Quinn Emanuel attorneys.  Copies of Mr. Rand's and Mr. Sears' Notices of Appearance in the ZZH Tort Defense are attached hereto as **Exhibit 16**.  In particular, Mr. Rand has national recognition in the area of restructuring, having served as special counsel to the debtors in FTX Trading Ltd. and litigation counsel to the FTX Recovery Trust, and has touted "playing a leading role" in the Enron Corp. and Lehman

Brothers Holdings Inc. bankruptcy cases, among others.  A copy of Mr. Rand's biography is attached hereto as **Exhibit 17**.  Suffice to say, the lack of competent bankruptcy counsel was never ZZH's problem.

      B.      **ZZH's Actual, Substantive, and Timely Knowledge of these Chapter 11 Cases**

18.      Despite numerous federal court orders exonerating the entities from Steven's debts, on May 23, 2024, in the pending divorce proceedings[8] of Steven and his wife, Jeanette, entered an order demanding that certain accounts of Debtors IF LLC and A&O Family LLC (though unspecified as to which one), and non-debtor P2, be partially liquidated to pay a support obligation of Steven to Jeanette.[9]

19.      On June 10, 2024 (the "**Petition Date**"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  Therefore, under Local Rule 3003-1(A), the deadline for filing of proof of claim or interest was August 19, 2024 (70 days after the entry of an order for relief).

20.      Two days after the Petition Date, on June 12, 2024, ZZH and Jeanette submitted a Joint Status Report to the Special Master in the JAMS docket of the ZZH Action (the "**ZZH JAMS Docket**").[10]  A copy of the Joint Status Report is attached hereto as **Exhibit 18.**  The Joint Status Report cites to the Debtors' bankruptcies, asserts that Steven "has an interest" in the Debtors, and

---

[8]    The divorce proceeding is pending in the Circuit Court of Cook County, Illinois County Department, Domestic Relations Division as In re: Marriage of Jeanette Ivankovich (Petitioner) and Steven Ivankovich (Respondent), Case No. 2021D9220 (the "**Illinois Divorce Court**").

[9]    The deficiencies of the order were the subject of the adversary proceeding before this Court, which was eventually settled.  *See* Adv. Pro. No. 24-01411-LMI, Docket No. 1.

[10]   Pursuant to Fed. R. Civ. P. 53, a Special Master was appointed, by the Illinois District Court to resolve the dispute as to certain funds escrowed, and then interpled, by Walker & Dunlop after the sale of two of the P5 properties. The parties utilized JAMS to administer the proceeding before the Special Master. Three of the P5 entities (known as the "**Pilgrim Entities**") intervened to establish their claim to the funds, which ZZH and Jeanette opposed.

further highlights that the bankruptcies were all surplus cases, noting that the bankruptcy filing of A&O FL "sets forth assets of $1 Million to $50 Million and liabilities of less than $100,000." The Joint Status Report **attached copies of Debtors' bankruptcy petitions**. A copy of the service list for the ZZH JAMS Docket is attached hereto as **Exhibit 19**.

21. Thus, no later than June 12, 2024, ZZH had actual and direct notice of the details of the bankruptcies of the Debtors: the venue, the case numbers, the type of bankruptcies, the estimated number of creditors, estimated assets, estimated liabilities, and most importantly, the fact that a significant *surplus of millions of dollars* of funds would be available for distribution to unsecured creditors. The Joint Status Report also overtly implies that ZZH and Jeanette *believed* they might have claims against Debtors based on the Debtors' connection to Steven.[11]

22. Any person or entity who believes they are a creditor of debtors that just filed a surplus bankruptcy case need only do one thing: file a claim and wait. In fact, that's exactly what Jeanette did. ZZH did not. Why? Because ZZH are not creditors of the Debtors and ZZH knew they risked sanctions in filing a non-meritorious claim already denied three times by the Rulings Denying Turnover.

23. What followed was a series of strategic choices by ZZH to ignore the bankruptcy cases at every juncture, despite continued actual notices that the bankruptcy cases were advancing towards confirmation, and despite the fact that their co-plaintiff and contractual privy, Jeanette, actively participated at every turn in the bankruptcy cases.

---

[11]    However, Jeanette stood in a different position than ZZH given that on May 23, 2024, she had obtained the order referenced in para. 18, *supra*.

24.     As is evident from the docket in the ZZH Action and ZZH Tort Defense, the

Debtors' bankruptcy cases were regularly brought up, discussed, and included in motions, hearings

and Court rulings:

- **June 12, 2024** – Debtors' bankruptcy petitions were attached to Joint Status Report in ZZH JAMS Docket. *See* **Exs. 18, 19.**  A three-minute search on the internet would have revealed that, by virtue of Local Rule 3003-1(A), the deadline for filing of proof of claim or interest in Debtors' bankruptcies was 70 days from the petition dates, or August 19, 2024.

- **July 3, 2024** – A joint Status Report filed by Plaintiffs in ZZH Tort Defense references that "[o]n June 9, 2024 [*sic*], the Plaintiff Ivankovich Family LLC filed a petition for Chapter 11 relief in the United States Bankruptcy Court for the Southern District of Florida."  A copy of the joint Status Report and the CM/ECF Service of same showing service on Quinn Emanuel, is attached hereto as **Exhibit 20.**  Again, ZZH's counsel could have done a three-minute search on the internet and divined the claims bar date of August 19, 2024, by a clear and unambiguous Local Rule.  Also, a simple search on PACER would have also yielded the claims bar date.

- **September 12, 2024** – A joint Status Report filed by Plaintiffs in ZZH Tort Defense again references bankruptcy and now also the case number of Debtor IF LLC: "Plaintiff Ivankovich Family LLC is a chapter 11 debtor in a case pending in the United States Bankruptcy Court for the Southern District of Florida case #24-15755-LMI."  A copy of the joint Status Report, and the CM/ECF Service of same showing service on Quinn Emanuel,  is attached hereto as **Exhibit 21.**

- **September 19, 2024** – Status Report filed by Plaintiffs in ZZH Tort Defense again references bankruptcy of Plaintiff IF LLC.  A copy of the Status Report, and the CM/ECF Service of same showing service on Quinn Emanuel, is attached hereto as **Exhibit 22.**

- **October 21, 2024** – Motion to Reconsider filed by Pilgrim Entities in ZZH JAMS Docket recites that prepetition, the Pilgrim Entities were funded by Debtor A&O FL, includes all of the case numbers of Debtors and indicates they are being jointly administered, notes that Debtors' funds in bankruptcy are still frozen, that Debtors require a cash collateral order to release funds, and the details on the loan being proposed by Debtor A&O FL as well as a copy of a substantive exhibit to the Debtor A&O FL's cash collateral motion.  A copy of the Motion is attached hereto as **Exhibit 23**.

- **October 28, 2024** – Special Master's Order No. 12 in the ZZH Action, recited the statements made by the Pilgrim Entities as to the loan A&O Family LLC (FL) was seeking approval for in the bankruptcy court, and goes on to make several observations that three of the Debtors' petitions state they each have "assets that far exceed their liabilities", that each of the Debtors "were authorized to continue business operations as debtors-in-possession" and speculates that the Debtors could continue to fund the Pilgrim Entities or obtain bankruptcy approval to do so.  A copy of the Order, and the service list of the Order, is attached hereto as **Exhibit 24**.

- **November 12, 2024** – In the ZZH Action, Jeanette files an exhibit list that includes numerous bank statements of the Debtors.  A copy of the exhibit list is attached hereto as **Exhibit 25**.

- **January 3, 2025** – In the ZZH JAMS Docket, the Pilgrim Entities filed a request for judicial notice of the Debtors' original Plan and disclosure statement, along with a copy of the Debtors' Plan, and an order and transcript from the hearing on the cash collateral motion in the Debtors' bankruptcy.  Copies of the request for judicial notice and the document filed contemporaneously therewith are attached hereto as **Composite Exhibit 26**.[12]  A copy of the ZZH JAMS Docket evidencing the filing of the Debtors' original plan is attached hereto as **Exhibit 27**.

- **February 19, 2025** – ZZH and Jeanette submit a *joint* pre-trial memorandum that recites that "within weeks of [the Illinois Divorce Court's] findings of alter ego [in Jeanette and Steven's divorce proceedings], Steven, as manager of [Debtors] A&O Family LLC and Ivankovich Family LLC, filed Chapter 11 bankruptcy proceedings in the Southern District of Florida to prevent the turnover of funds to Jeanette and Schiller DuCanto & Fleck under Judge Powers' order.  The bankruptcy proceeding is still pending.  The LLCs are solvent."  A copy of the joint pre-trial memorandum is attached hereto as **Exhibit 28**.  This joint pre-trial memorandum is the proverbial "smoking gun" that unquestionably shows that, at the latest, ZZH had actual knowledge of both the Debtors' bankruptcies and the factual basis for their asserted claim by February 19, 2025.  However, ZZH waited nearly a year, until January 2, 2026, to file their Motion—during which period of time every settlement took place, the 5-day contested confirmation hearing occurred, the Plan was confirmed, and the Plan was substantially consummated.

- **February 25, 2025** – In the ZZH Action, Jeanette files an amended exhibit list, again listing numerous bank statements of Debtors as well as a tracing of sale proceeds from two P5 properties, Caribbean Isle and Forest Park.  A copy is attached hereto as **Exhibit 29**.

- **February 25 and 27, 2025** – During a two-day evidentiary proceeding before the Special Master in the ZZH Action, ZZH's co-plaintiff, Jeanette, elicited testimony about Debtors' historical transactions from Steven, specifically inquiring about the $30 million transfer to Debtor A&O IL on April 6, 2022.  Jeanette also elicited testimony from Mark Brown about the cash collateral motion in the bankruptcy, the Debtors' financial advisor's report, Brown's declaration filed in the bankruptcy, and the Debtors' ownership.  Given the extensive testimony elicited about Debtors and Debtors' transactions, Pilgrim Entities' counsel made numerous objections based on the automatic stay, and objected to any actions that might constitute a ruling concerning bankruptcy estate property.  Examples of some of the testimony elicited, and objections to same, are attached hereto as **Exhibit 30**.

- **March 27, 2025 –** ZZH and Jeanette filed a post-hearing memorandum in ZZH Action that details the transfers of P5 proceeds and cites to orders entered by the Illinois Divorce Court

---

[12]    Notably, ZZH <u>does not deny</u> receiving copies of the disclosure statement and Plan, and buries their acknowledgment of this in the last footnote of their Motion.  *See* Motion at 18.

that hold certain of the Debtors to be "alter egos" of Steven (which at the time were both (a) on appeal and (b) being contested contemporaneously in the Debtors' adversary proceeding). Again, ZZH and Jeanette cite to Mark Brown's declaration that was filed in the Debtors' bankruptcies. A copy of the memorandum is attached hereto as **Exhibit 31**.

- **May 14, 2025 –** In the Report and Recommendation ("**R&R**") of the Special Master in the ZZH Action, Special Master Schenkier draws numerous conclusions about the transfers to and from the Debtor A&O IL's accounts, including the $30 million transfer on April 6, 2022. A copy of the R&R is attached to the Motion as Exhibit B. The Special Master notes that the Pilgrim Entities' had objected that *any ruling may interfere with the bankruptcy of the Debtors*, but the Special Master disagrees and states that he can still make a finding as to the frozen funds. *See* R&R at 20.

- **May 27, 2025** – The Pilgrim Entities file an objection to the R&R. They attached an Order of the Delaware Chancery Court that rejected the argument that the sale of the two P5 properties and receipt of proceeds by a downstream entity from Overlook (which downstream entity then transferred $30 million to Debtor A&O IL) required an upstream distribution to Overlook.[13] The Delaware Chancery Court order cited to the Debtors' bankruptcy and analyzed whether the parties and issues overlapped. A copy of the objection is attached hereto as **Exhibit 32**.

25.     As the above events show, from June 12, 2024—two days after the filing of the Debtors' bankruptcy petitions—to May 21, 2025, ZZH was put on actual notice, and had actual and substantial knowledge, of the bankruptcies. Any creditor who believes that they had a claim against solvent Debtors with surplus estates in the millions of dollars would have filed a claim.

26.     All of the references to the bankruptcy cases in the ZZH Action, the ZZH Tort Defense, and the ZZH JAMS Docket evidence that ZZH was amply notified about the key events, deadlines, and status of the bankruptcy cases of the Debtors, even if ZZH did not receive service of the 341 Notice to Creditors.

27.     The Debtors did not send ZZH the 341 Notice to Creditors because the Debtors' books and records did not include ZZH (as no formal claim was ever made) and the fact that: (1) ZZH lost against Debtor IF LLC *no fewer than three times* in the Rulings Denying Turnover;

---

[13]    Notably, this ruling, which is final and non-appealable, also completely eliminated ZZH's claim based on the P5 Pledge attached to the Motion, which was a pledge only of distributions from the upstream entity, Overlook.

(2) ZZH had never served a citation on Debtors A&O FL, A&O IL, or Atlas P2; and (3) every other court to consider whether the entities' funds were Steven's (other than the Illinois Divorce Court) had taken the position that they were <u>not</u>.

28.     The history of these cases and the positions taken by ZZH make it clear that ZZH, with full knowledge of this bankruptcy, and with full knowledge of all of the transfers and the orders that ZZH now cites as the basis for their "alter ego" and "fraudulent transfer" claim against Debtors, *see* Motion at ¶ 16, strategically <u>chose</u> not participate in this bankruptcy for a year and a half.

29.     The timing of when ZZH filed the Motion is telling.  After a year and a half of complete silence, ZZH <u>appeared the very next day</u> after the Reorganized Debtors filed their *Notice of Disbursement* (ECF No. 689), which effectively precluded Jeanette from continued vexatious litigation in these bankruptcy cases by paying her claim, albeit disputed, in full.  The timing of the Motion—filed immediately after the final disbursement of non-deferred payments under the Plan—underscores ZZH's prolonged and unjustified delay.

**C.     While ZZH Sat on the Sidelines, Millions of Dollars' of Irreversible Transactions Occurred Pursuant to Settlements and the Confirmed Plan**

30.     ZZH's non-participation in the bankruptcy was not just a natural result of their non-creditor status—it ended up being one of the essential premises upon which all of the transactions and negotiations in this bankruptcy took place.

31.     As of the Petition Date, Debtor A&O FL held over $25 million in cash and securities, A&O IL held $1.7 million in cash and securities, IF LLC held over $2.6 million in cash and securities, and P2 (Debtor Atlas P2's subsidiary) held over $4.6M in cash and securities.

32.     A&O FL also owned an equity interest in an LLC that owned the "Sunseeker" vessel, and had various other illiquid investments that had been funded prepetition for the benefit

of their beneficial owners, Drs. Olga and Anthony Ivankovich—one of which was the P5 Portfolio, a portfolio of multi-family properties located in Florida and Texas.

33.     During the bankruptcy case, Debtor A&O FL sought and obtained approval (over Jeanette's objection) to make a $5 million secured loan to fund payment of property taxes and liens on the three Texas P-5 Portfolio properties in order to avoid tax sales that would have wiped out over $30 million in equity.  *See* Docket Nos. 149, 177.

34.     At the start of the case, the claims against the estates exceeded over $480 million nominally, but were, in the course of the bankruptcy case, settled and negotiated.  By the time of the filing of the first disclosure statement and Plan, Docket Nos. 202, 203, respectively, on December 8, 2024, (a copy of the Plan was provided to ZZH on January 3, 2025, by service on the ZZH JAMS Docket), and based on an analysis of filed claims and negotiations during the first six months of the case, Debtors projected the maximum amount of unsecured claims allowed against the estate would be $10,976,346, the secured claims totaled approximately $12 million, and administrative claims were projected to be $2 million.  *See* Docket No. 203 at 14, 17, 18.  Based on the known claim pool, Debtors proposed to pay all unsecured claims a 100% distribution in full, within 14 days of the allowance of the entry of a final order allowing the claim.  *See* Docket No. 289 at 42.

35.     As the bankruptcy cases progressed, negotiations and litigation continued all the way through, and including, the week of the confirmation hearing which began on August 26, 2025—over a year after the claims bar date.  Indeed, most of the settlements were achieved on or just prior to confirmation and included up-front payments to creditors for discounts on the total claim amount, including:

- A settlement with Royal Bank of Canada ("**RBC**") for $6,130,000.00, to be paid the earlier of 60 days after confirmation or October 27, 2025, as per the *Amended Fourth Plan Supplement*. *See* Docket No. 565.

- A settlement with secured creditors Wedbush Securities, Inc. ("**Wedbush**") and Celadon Financial Group, LLC ("**Celadon**"), to sell securities or transfer them as part of the Plan. *See Celadon Supplement to Debtors' Amended Joint Plan of Reorganization*. *See* Docket No. 549.

- A settlement with disputed, contingent creditor Township Entities, which had asserted a $40 million claim, for a $8,500,000 sum certain discounted payment with $4 million up front and $4.5 million to be paid in December 2027, with default on either payment springing a $12 million consent judgment. *See* Docket No. 415. This settlement required liquidation of securities to pay the claim. *See* Docket Nos. 351, 502.

- A settlement with disputed, contingent creditor P-5 GRA LLC for a $2,000,000 settlement payment to P-5 GRA LLC on 60-day terms, which resolved pending litigation, with an additional claim reserve of $5,000,000 secured by liens on the "Sunseeker" vessel and a $1,351,000 payment to be made on or before December 23, 2027, under certain conditions more specifically identified in the *Fifth Plan Supplement*. *See* Docket No. 599.

36.     For the little that could not be negotiated, namely Jeanette's alleged unsecured claim against the estate, Debtors litigated the claim and ultimately obtained a partial summary judgment that capped Jeanette Ivankovich's maximum unsecured claim amount at approximately $1.7 million. At that point, rather than continue to litigate, Debtors made a reasoned calculation to pay the disputed claim of $1.7 million in the interest of finally closing the bankruptcy estates and moving on to the post-confirmation chapter as Reorganized Debtors.

37.     The above settlements with RBC, Wedbush, Celadon, the Township Entities, P-5 GRA, and litigation and compromise with Jeanette, were substantial in amount, undertaken in the context of the known claims, disputed and undisputed, that had been asserted against the Debtors' estates, and required significant liquidation of assets to effectuate. These are settlements and liquidations that *may never have happened* if ZZH had actually filed a $9 million claim against the estates and somehow prevailed on their claim against the Debtors (despite previously losing their

claim *three times* against IF LLC and the principles of res judicata that would preclude any further pursuit of same).

38.     On September 16, 2025, the Court confirmed the *Debtors' Amended Joint Plan of Reorganization* (Docket No. 652) (as supplemented, the "**Plan**"), which became effective on October 1, 2025 (Docket No. 667) (the "**Confirmation Order**").

39.     Not only the settlements, but the structure of the Plan, relied on the existence of the known, established, disputed and undisputed claim pool:

- The Debtors' confirmed Plan structured all allowed claims against the Debtors to be paid immediately upon allowance, including over $2 million of administrative claims.

- In order to accomplish this, securities were liquidated at a significant loss, property was transferred in reliance of the confirmation process, mortgages were given, and lis pendens were filed, all with substantial attendant costs. These transfers are all irreversible.

- The Debtors, along with the Plan Funders, created two Disputed Claim Reserves to deal with Jeanette's and P-5 GRA LLC's claims. In order to fund these accounts, the Debtors and Plan Funders had to sell and retitle property, including the creation of a lien on the "Sunseeker" yacht, which was never an asset of the Debtors, but was included by the Plan Funders in order to increase the collateral to creditors necessary to fund the confirmed Plan.

- The Fourth Plan Supplement also established the Support Trust for the benefit of Steven's and Jeanette's children, which provides up to $21,000.00 for 7 years and is already funded. *See* Docket No. 565.

- The $5 million loan by A&O FL to the P5 Record Owners was extended for five additional years, and service contracts for renovations were entered into, in order to improve multi-family properties in Texas owned by Debtors' affiliates.

40.     Simply stated, had ZZH asserted their claim pre-confirmation, the Plan and related transactions would have been materially different in light of an unresolved $9 million claim.

41.     At this point, the Plan has been substantially consummated, and there are no remaining assets from which to create a disputed claim reserve for ZZH's claim. If ZZH's claim is now allowed, the Plan simply cannot address it given the commitments made in reliance of the status quo that existed before the Motion was filed.

**D.      The Plan and Confirmation Order Bar ZZH's Claims**

42.      The Plan and the Confirmation Order make it clear that all claims by ZZH against Reorganized Debtors and their property are barred by the discharge and injunction.

43.      Section 9.01 of the confirmed Plan discharges the Debtors and Reorganized Debtors of any obligation pursuant to Section 1141(d) of the Bankruptcy Code, which includes any prepetition claim that ZZH had against the Debtors.

44.      Section 9.04 of the confirmed Plan, in turn, enjoins any party holding a prepetition claim against the Debtors, among others, from the pursuit and collection of such claims against the Debtors and Reorganized Debtors.

45.      In the Confirmation Order, the Court held that the releases, exculpation, and injunctions were "integral to the agreement among the various parties in interest and are important and necessary to the formulation and implementation of the Plan" and that the injunction in particular "is both reasonably and necessary to allow the Debtors, Reorganized Debtors, and the Plan Proponents to complete all obligations under the Plan."  Docket No. 652 at 8.  The Court further held that the failure to include the releases, exculpation provisions and injunction "could seriously impair the Debtors' ability to confirm and implement the Plan in these Chapter 11 cases." *Id*.

46.      The Confirmation Order makes the Plan binding on, *inter alia*, "any and all non-Debtor parties to judicial or administrative proceedings in which the Debtor is a party", "any Holder of a Claim . . . irrespective of . . . whether such Claims . . . have been asserted in a filed proof of Claim . . .  "any Entity that received or may be deemed to have received actual or constructive notice of the Plan," and further incorporates the Plan's discharge and injunction language.  *Id*. at 28.

## JURISDICTION

This Court specifically retained jurisdiction under the Confirmation Order to adjudicate, *inter alia*, the allowance of any claim, the rights of any parties to recover assets pursuant to the Bankruptcy Code, all matters related to the releases and injunctions under the plan, and all post-confirmation claims asserted by Reorganized Debtors as necessary to implement the Plan.  *See* Docket No. 652 at 38–40.  The Eleventh Circuit has confirmed that the bankruptcy court has jurisdiction to enforce its own orders regarding the administration of the estate, and specifically, as to compliance and enforcement of the discharge injunction in the plan.  *See Alderwoods Grp., Inc. v. Garcia*, 682 F.3d 958, 969–971 (11th Cir. 2012).  As the court that controlled the *res* of Debtors' estates, this Court retains jurisdiction after confirmation to effectuate and enforce the discharge injunction against ZZH.  *See id*.

## SUMMARY OF ARGUMENT

ZZH's Motion requesting leave to file a late claim must be denied as (1) ZZH had actual notice of the Debtors' bankruptcies with ample time to file a claim and (2) ZZH have not proven the "excusable neglect" required to show cause to file an untimely claim pursuant to Supreme Court precedent—rather, ZZH's neglect was extreme.  ZZH's alternative relief, for an order that they are not bound by the discharge provision and Plan injunction, should likewise be denied as: (1) they have not been denied any due process as they had actual and substantial knowledge of the bankruptcies, and (2) laches bars such untimely and belated relief.  Moreover, ZZH's bid for relief is foreclosed by the doctrines of laches, unclean hands, and equitable mootness; ZZH's undue delay and questionable conduct not only defeat any claim to equitable relief, but also threaten the settled expectations and finality underpinning the confirmed and substantially consummated Plan.

## ARGUMENT AND INCORPORATED MEMORANDUM OF LAW

**A.    ZZH Should Not Be Granted Leave to Submit an Untimely Proof of Claim**

**1.    ZZH Had Actual Knowledge of the Bankruptcy with Ample Time to File Any Claim, But Failed to Do So**

Pursuant to Bankruptcy Rule 3003, the court "may, for cause, extend the time" to file a proof of claim or interest, including under "to the extent and under the conditions stated in Rule 3002(c)(2), (3), (4), and (7)."[14]    Bankruptcy Rule 3002(c)(7) provides that, upon motion by a creditor, the court may extend the time to file a proof of claim "if the court finds that the notice was insufficient to give the creditor a reasonable time to file."

Here, ZZH had ample time to file a claim in the Debtors' bankruptcies after receiving notice of the petitions.  A mere 2 days after the filing of the petitions, ZZH's attorney had the actual petitions in hand, which provided them, among other things, with the venue of the case, the names and EINS of the Debtors, and the case numbers: in short, all of the information that ZZH needed to know to calculate the claims bar date under Local Rule 3003-1(A) (Filing Proof of Claim or Interest in Chapter 11 Cases): "the deadline for filing a proof of claim or interest required by Bankruptcy Rule 3003(c)(2) shall be 70 days after entry of the order for relief . . . ."  *See* Local Rule 3003-1(A).

Thus, after receiving actual notice of the bankruptcy, ZZH had 68 days to file a claim (from June 12, 2024 to August 19, 2024).  68 days is more than a reasonable time to file a proof of claim, and indeed, *more time than most of the creditors* in a Chapter 11 bankruptcy case ever receive, given the delay between the petition date and the mailing of the 341 Notice of Meeting of Creditors

---

[14]    Bankruptcy Rules 3002(c)(2) relates to infant and incompetent persons, 3002(c)(3) relates to unsecured claims arising from a judgment, and 3002(c)(4) relate to rejected executory contract or unexpired leases, and are irrelevant in this case.  Nor does ZZH argue in the Motion that any such grounds apply.

("**§341 Notice**") that formally publishes the claims bar date to scheduled creditors.[15]  Thus, while ZZH cries foul in not having received the §341 Notice, the response by this Court should be just as stated by one bankruptcy judge to a non-bankruptcy attorney claiming ignorance of bankruptcy rules setting claim deadlines: "You got a suggestion of bankruptcy.  All you have to do is spend three minutes on the internet, then you know exactly what the deadlines are.  Did you do that?" *Unit Corp. v. Gilmore*, No. 4:21-CV-435, 2022 WL 956226, at *3 (S.D. Tex. Mar. 30, 2022) (denying motion to allow late-filed claims).

Nowhere in the Motion does ZZH actually claim that they did not know of the claims bar date—just that they did not receive the formal §341 Notice.  However, the only knowledge required for a creditor to be bound by the claim bar date "is knowledge of a critical stage of the proceeding from which the bar date can be computed, not of the bar date itself." *Fogel v. Zell*, 221 F.3d 955, 964 (7th Cir. 2000) (citing sources omitted).  ZZH's receipt of the petitions, and the ability of ZZH to calculate the claims bar date from the date of the petitions pursuant to Local Rule 3003-1(A) makes this case analogous to the legions of Chapter 7 and 13 cases where courts hold that knowledge of the bankruptcy petition equates to knowledge of the bar date.  *See, e.g.*, *id.* (reasoning that because the statute requires the bar date in a Chapter 7 bankruptcy be set at 90 days from the first creditors' meeting, which must be held between 20 and 40 days after the petition for bankruptcy is filed, the "cautious creditor who knows only [of] the date of the petition will therefore file his proof of claim within 110 days after that date").

And, the ability of ZZH to have calculated the claims bar date from the petition date, after having actual knowledge of the petition dates, distinguishes the instant cases from cases the Motion cites in support of the relief requested.  *Cf. In re Maya Const. Co.*, 78 F.3d 1395, 1399 (9th Cir.

---

[15]    In this case, such notice was not mailed out by the Clerk until June 22, 2024.  *See* Docket No. 20.

1996) (distinguishing its decision in a Chapter 11 case because Bankruptcy Rules governing Chapters 7 and 13 specified the deadline for filing claims as 90 days from the meeting of creditors, thus, once a creditor received notice of the relevant meeting of creditors date from which the deadline could be calculated, they had effective notice that the proofs of claim were due); *In re Arch Wireless, Inc.*, 534 F.3d 76, 85 (1st Cir. 2008) (citing *Maya Constr.*, 78 F.3d at 1399) ("unlike in Chapter 7 and 13 proceedings where the bar date may be roughly computed based on one's knowledge of the creditors meeting, there is simply no way to 'compute' a bar date in a Chapter 11 proceeding").  Here, there *was* a way to compute the claims bar date, and it could have been done with a three-minute internet search on June 12, 2024, when ZZH unquestionably had copies of the bankruptcy petitions, because the claims bar date was calculable under the Local Rules, just as claims bar dates in Chapter 7 and 13 cases are calculable under the Bankruptcy Rules.

Even if ZZH's attorney somehow failed to convey the Debtors' bankruptcies to their client despite having actual copies of the petitions (which is *not* asserted in the Motion), the notice to ZZH's attorney, who was litigating ZZH's claim in state court at that time, can and should be imputed to ZZH.  *See, e.g.*, *In re Alton*, 837 F.2d 457, 461 (11th Cir. 1988) (notice of bankruptcy served on creditor's attorney sufficient to require creditor to contest dischargeability); *In re Manzanares*, 345 B.R. 773, 785 (Bankr. S.D. Fla. 2006); *In re Seven Oaks Partners, L.P.*, 582 B.R. 828, 837 (D. Conn. 2018), *aff'd sub nom. In re Seven Oaks Partners, LP*, 749 F. App'x 67 (2d Cir. 2019).

 In sum, ZZH had *more* than a reasonable amount of time to file a proof of claim under Bankruptcy Rule 3003(c)(7) but simply did not file one.  ZZH did not file a claim against the Debtors' estates, because ZZH were not and are not creditors, and ZZH knew it.

## 2.      ZZH's Neglect Is Not Excusable

Bankruptcy Rule 9006(b)(1) also permits the late filing of claims in a Chapter 11 bankruptcy if the "failure to act within that period resulted from excusable neglect." *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 389 n. 4 (1993). The Supreme Court has made clear that the determination of whether excusable neglect exists is "is at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission." *Id.* at 395. *Pioneer* set forth four nonexclusive factors for courts to consider when determining what sort of neglect is excusable: (1) the danger of prejudice to the debtor, (2) the length of the delay and its potential impact on judicial proceedings, (3) the reason for the delay, including whether it was within the reasonable control of the movant, and (4) whether the movant acted in good faith. *See id.* "The burden of proving excusable neglect lies with the late-claimant." *Jones v. Chemetron Corp.*, 212 F.3d 199, 205 (3d Cir. 2000); *In re Intelligent Med. Imaging, Inc.*, 262 B.R. 142, 147 (Bankr. S.D. Fla. 2001) (Friedman, J.) (citing *In re Specialty Equipment Companies, Inc.*, 159 B.R. 236, 240 (Bankr. N.D. Ill. 1993)).

Notably, since the *Pioneer* decision, the law is well established that "where a party's actions are deliberate, the party's late filing cannot constitute 'excusable neglect.'" *In re Banco Latino Int'l*, 310 B.R. 780, 785 (S.D. Fla. 2004) (quoting *In re Celotex Corp.*, 232 B.R. 493, 495 (M.D. Fla. 1999)) (collecting sources), *aff'd*, 404 F.3d 1295 (11th Cir. 2005); *In re Graham Bros. Const., Inc.*, 451 B.R. 646, 650 (Bankr. S.D. Ga. 2011) ("a conscious and deliberate decision not to file a proof of claim does not constitute 'neglect' even where the decision ultimately is determined to be faulty"). Thus, neglect is not found where there is "conscious disregard of the

bar date." *In re Mahoney Hawkes*, 272 B.R. 19, 20 (B.A.P. 1st Cir. 2002) (denying late-claimant's claim where "his tardiness was borne of calculation rather than neglect").

ZZH does not dispute their knowledge of the bankruptcy or bar date—only the lack of a formal §341 Notice. Nor does ZZH explain *when* they learned of the bar date, or *why* they decided to wait until after the Reorganized Debtors made their last non-deferred payment under the Plan, triggering the substantial consummation of the Plan and closure of the bankruptcy cases. This is because ZZH "consciously decided not to file a proof of claim for tactical reasons." *In re Graham Bros. Const., Inc.*, 451 B.R. at 650. This is fatal to ZZH's request to submit an untimely claim.

Moreover, even if ZZH contends that they did not have actual knowledge of the claims bar date, an application of the *Pioneer* factors to these bankruptcy cases are clear: there was plenty of neglect, and none of it was excusable. ZZH's intentional delay was prolonged, unexplained, and entirely within their control.

> i.    *The Prejudice to the Reorganized Debtors Is Severe and Existential*

The first factor—prejudice to the Debtors—weighs heavily in favor of denying the Motion. "The establishment of a bar date for filing claims is essential for the efficient administration of a bankruptcy case." *In re Bicoastal Corp.*, 242 B.R. 43, 46 (M.D. Fla. 1998) (citing *In re Bicoastal Corp.*, 124 B.R. 602, 604 (Bankr. M.D. Fla. 1991)). Absent the setting of a claims bar date, a Chapter 11 case "could not be administered to a conclusion." *Id*. (citing *In re Waterman S.S. Corp.*, 59 B.R. 724, 726 (Bankr. S.D.N.Y. 1986)). In *Bicoastal Corp.*, the bankruptcy court held, and the district court affirmed, that the passage of time—one and a half years after a claims bar date—where the debtor was involved in "extensive claims litigation" with "complicated claims" requiring an extensive process was clearly prejudicial to a debtor and the entire estate. *See id*. "Courts have acknowledged that [p]rejudice from a late-filed claim is greater when the creditor's

delay extends into the period in which the plan of reorganization is being negotiated, drafted, filed, or confirmed." *In re Graham Bros. Const., Inc.*, 451 B.R. 646, 652–53 (Bankr. S.D. Ga. 2011) (internal quotations and citations omitted) (finding that the magnitude of the creditors' claim as being equal to the rest of the claim pool, and the fact that Debtor had already been negotiating the plan, would prejudice the Debtor's efforts).

*Bicoastal Corp* is directly applicable to the facts in this case. The Motion was filed approximately a year and a half after the claims bar date, in that time, Debtors were involved in extensive claims litigation, estimation, and negotiation with unsecured creditors, including the Township Entities, P5-GRA LLC, and Jeanette—all of whom had complicated, multi-million dollar claims that were contingent and unliquidated. The Middle District of Florida found the prejudice to the debtors was substantial, and denied relief to file a late claim.

Furthermore, the Debtors' confirmed and substantially consummated Plan provides that unsecured creditors shall be paid 100% of their claims within 14 days of their allowance was *based on the liabilities known to the Debtors* at that time, which were in the range of approximately $11 million. Ultimately, unsecured claims settled closer to $13.5 million, of which approximately $5 million will be paid over time. The Plan is wholly reliant on the Plan Funders' commitments and obligations that have already been made, and cannot now incorporate an additional purported $9 million dollar liability—almost double the total claim pool. As in *Graham Bros. Const.*, the size of ZZH's alleged claim in comparison to the rest of the claim pool, and the fact that the Plan was heavily negotiated (through no less than five complex Plan amendments and supplements designed to produce a confirmable Plan with the support of nearly all creditors), but the Plan has *actually been confirmed* and substantially consummated. Allowing ZZH's late-filed claim at this

juncture would undo the result of years of work, millions of dollars, and hundreds of docket entries labored on by the Debtors, creditors, and the Court at the very end of the case.

ZZH cites to *In re Majorca Isles Master Ass'n, Inc.* in support, however, in that case, a plan had not even been filed and therefore no prejudice could exist. *See* No. 12-19056-AJC, 2014 WL 1323180, at *3 (Bankr. S.D. Fla. Mar. 28, 2014). In the Reorganized Debtors' case, the Plan has not only been filed, but it has already been confirmed and substantially consummated, creating great prejudice to the Reorganized Debtors if undone given the expense and effort of the Chapter 11 process.

Likewise, *In re Premier Membership Servs., LLC*, 276 B.R. 709, 711 (Bankr. S.D. Fla. 2002), is distinguishable as (1) the late-filed disputed claim of $2.7 million represented "a relatively small portion of the total of unsecured claims pending" of over $46 million, (2) nearly all of the claims remained disputed and unresolved at the time the late-filed claim was sought to be allowed, (3) the structure of the Plan, which was a "pot plan" that provided both a floor and a cap on unsecured creditors' recovery, meant that the late-filed claim being treated as timely would not interfere with the other general unsecured creditors' recovery. Here, all of the factual circumstances are exactly the opposite: (1) ZZH's alleged claim of $9 million would result in a more than 50% increase in the current unsecured claim pool of approximately $13 million, (2) all of the claims have been resolved—and nearly all of them have been paid—at the time the Motion was filed, (3) the structure of the Plan will interfere with not just recovery to the two creditors who still have payments due, but also to the viability of the post-confirmation Reorganized Debtors.

ii.    *ZZH's Delay of 18 Months in Asserting Any Claim Against Debtors Is Substantial and Will Significantly Impact the Bankruptcy Proceedings*

The second factor—length of delay and impact on judicial proceedings—weighs in favor of Reorganized Debtors. Lengths of delay of a mere six months after the bar date have been found

substantial.  *See In re Enron Creditors Recovery Corp.*, 370 B.R. 90, 103 (Bankr. S.D.N.Y. 2007) (citing *In re Enron Corp. (Midland),* 298 B.R. 513, 526 (Bankr. S.D.N.Y. 2003), *aff'd*, *Midland Cogeneration Venture Ltd. v. Enron Corp. (In re Enron Corp.)*, 419 F.3d 115 (2d Cir. 2005));  *In re Nortel Networks, Inc.*, 531 B.R. 53, 66 (Bankr. D. Del. 2015) ("six month delay in and of itself constitutes inexcusable neglect").  And, a sixteen-month delay in bankruptcy cases is lengthy by most standards in bankruptcy cases, if not "exceedingly long".  *In re Nat'l Steel Corp*., 316 B.R. 510, 519 (Bankr. N.D. Ill. 2004).

Courts have recognized the "tremendously adverse impact" on judicial proceedings that a late-filed claim has where a plan has been confirmed, claims have been reviewed and resolved, and distributions made.  *See id.* at 519; *see also In re RS Legacy Corp.*, 577 B.R. 134, 141 (Bankr. D. Del. 2017) (finding the second *Pioneer* factor of delay weighed against excusable neglect where claimant failed to raise her alleged claim until fifteen months after confirmation and $3.6 million in distributions to creditors); *In re Goody's Fam. Clothing, Inc.*, 443 B.R. 5, 16 (Bankr. D. Del. 2010) (noting the creditor's "delay takes on added significance when a plan of reorganization was confirmed in the interim"); *In re Harrell*, 325 B.R. 643, 650 (Bankr. M.D. Fla. 2005) (Funk, J.) (holding that the second *Pioneer* factor militated against excusable neglect because it "would jeopardize Debtors' ability to pay 100% of the timely filed and allowed claims" and the creditor's "failure to participate in the case during this critical 90 day period was tantamount to a decision not to participate"); *In re Intelligent Medical Imaging, Inc*., 262 B.R. 142 (Bankr. S.D. Fla. 2001) (finding that allowing a late-filed claim after confirmation of plan would adversely affect the

administration of the case because it would alter the distribution to creditors who had participated in the plan and undermine the stability of the confirmation process).

Where a plan has been confirmed and implemented, it "should be disturbed only for compelling reasons." *See, e.g.*, *In re UNR Industries, Inc*., 20 F.3d 766, 769 (7th Cir. 1994). Indeed, the Bankruptcy Code's provisions in dramatically curtailing the power of a court to modify a plan after confirmation and substantial consummation recognizes the preservation of "interests bought and paid for in reliance on judicial decisions" and "avoiding the pains that attend any effort to unscramble an egg." *Id.* Even where a plan has not been confirmed, where a proceeding has advanced significantly, allowance of a claim should be denied where "it does great violence" to the debtors' ability to efficiently bring the bankruptcy proceedings to their end. *In re Nortel Networks, Inc.*, 531 B.R. at 66.

In *Nat'l Steel Corp*., the court found that the second *Pioneer* factor weighed heavily in favor of denying leave to file the claim where a creditor who had known about the bankruptcy case sought to file a late claim for millions of dollars sixteen months after the claims bar date, and 15 days after the plan became effective. In particular, the court found that the creditor offered no excuse for waiting five months after the claimant allegedly first learned of its claim to file the motion to allow the untimely claim, and during that time "sat on its hands and did nothing." 316 B.R. at 519. Given the fact the confirmed plan was in effect, claims were being resolved and distributions made, the court found that "[t]o go back at the eleventh hour would undoubtedly have a grossly damaging effect upon the judicial proceedings and the administration of the estates." *Id*.

These bankruptcy cases are strikingly similar to *Nat'l Steel Corp*. In springing their Motion on the Reorganized Debtors at this moment, ZZH waited 18 months from actual notice of the Debtors' bankruptcies, 16 months after the claims bar date, 12 months after receiving the Plan

(which contained the promise of payment in full to allowed claims), ten months after the ZZH Action evidentiary proceeding that revolved around the alleged transfers that form the basis for their claim, and seven months after receiving the order from the Special Master that allegedly forms the basis for their claim. ZZH did nothing during this time but wait, and watch on the sidelines, and *purposely avoid* the bankruptcy court claims process despite being well-lawyered with multiple firms representing them, and being given actual and substantial notice of the bankruptcies and key events therein.

While ZZH "sat on their hands" as the creditor in *Nat'l Steel Corp.*, these bankruptcy proceedings marched on. Debtors proceeded with heavily negotiated Plan treatment, amendments and supplements, and ultimately, a contested confirmation process that was rife with conflict, and extremely expensive due to the efforts of Jeanette, the same creditor ZZH were in privity with and had litigated a two-day trial alongside.

Here, the length of delay was significant, inexcusable, and not coincidental. ZZH waited not just until after negotiations and confirmation, ZZH waited until after Reorganized Debtors and Plan Funders had disbursed over $16 million in reliance on the plan, sold millions of securities, entered into significant settlements with unsecured creditors requiring up-front payments of millions of dollars, and paid disputed claims of approximately $2 million simply to obtain closure of the bankruptcy. This isn't even the "eleventh hour" as it was in *Nat'l Steel Corp.*, this is the thirteenth hour. Where in *Nat'l Steel Corp.*, the creditor filed its motion to allow the claim only 15 days after the effective date, here ZZH waited three months after the effective date, and until after all non-deferred distributions were made under the Plan before filing their Motion.

ZZH's Motion threatens the finality of the plan, and there is simply no way to allow ZZH's claim without completely upending the confirmed plan and jeopardizing the time-deferred

payments to other unsecured creditors, such as Township Entities who are still owed $4.5 million and P-5 GRA who is owed approximately $1.3 million (with a $5 million claim reserve) pursuant to the confirmed Plan and approved settlements with those entities, and who will be paid such remaining portions of their claims in December 2027.  Further, ZZH's claim would obviously be disputed by Reorganized Debtors and therefore significant additional litigation would be undertaken, substantially adding to the costs and time to close the estates, when all that was left for the Court to do (before ZZH filed the Motion) was to enter a final decree and close the case.

Since the delay is significant and allowing ZZH to file a late claim would significantly impact the proceedings, the second *Pioneer* factor weighs in favor of Reorganized Debtors, and denying any late claim by ZZH.

> iii.    ZZH Has Given No Reason for the Delay, and it Was Within ZZH's Control to File a Claim at Any Time in these Bankruptcy Cases (If ZZH Had One)

The third factor—the reasons for the delay—also weighs in favor of denying the Motion. A creditor "must explain the circumstances surrounding the delay in order to supply the Court with sufficient context to fully and adequately address the reason for delay factor and the ultimate determination of whether equities support the conclusion of excusable neglect."  *In re Enron Creditors Recovery Corp.*, 370 B.R. at 103.  "Notice (or lack thereof) *can* be relevant to the reason for a claimant's delay; but it is only relevant to the extent it explains a claimant's ignorance of a claim bar date, and thus offers a "reason for the delay."  *In re Roman Cath. Diocese of Rockville Ctr.*, 659 B.R. 727, 737–38 (S.D.N.Y. 2024) (emphasis in original), *appeal withdrawn sub nom. In re Roman Cath. Diocese of Rockville Ctr., New York*, No. 24-1792, 2024 WL 5279814 (2d Cir. Dec. 23, 2024) (rejecting claimant's notice arguments where there was no evidence in the record when claimant first received notice of the bankruptcy and learned of the bar date and where

claimant delayed filing the claim for a month after signing it, which could not possibility be attributed to any purported lack of notice).

Where "there was a deliberate effort to avoid the jurisdiction of the bankruptcy court", the reason for the delay is not excusable. *In re Graham Bros. Const., Inc.*, 451 B.R. at 653. Nor does "simple ignorance of one's own claim" constitute an excusable reason for delay. *In re Nortel Networks, Inc*., 531 B.R. 53, 66 (Bankr. D. Del. 2015) (internal quotation marks omitted) (citing *Jones v. Chemetron Corp*., 212 F.3d 199, 205 (3d Cir. 2000)). In *Nortel Networks, Inc*., the court noted that the claimants and their lawyers "had all of the facts needed to decide whether to file a claim" well before the bar date, and by their own admission, "waited approximately six months to file the Motion [to allow their late claims] after 'discovering' their potential claims." *Id*. at 66. Such delay was found to be inexcusable.

Here, the reason for ZZH's delay is not explained, and even if it were, such delay would not be excusable. By ZZH's own account, ZZH's purported claim is based on: (1) the order that was entered by the Illinois Divorce Court in Steven and Jeanette's divorce proceeding in May 2024 (without due process to the Debtors) that held that some of the Debtors were an "alter ego" of Steven, (2) the transfers that occurred in April 2022 which were the subject of the February 2025 trial in the ZZH Action, and (3) the order entered by the Special Master in May 2025. *See* Motion at 7, ¶ 16. Thus, by ZZH's own admission, ZZH waited 7 months to file the Motion, after being apprised of all of the bases for their claim. Moreover, this was after ZZH was bombarded with notices of the Debtors' bankruptcies. *See supra*. As in *Nortel Networks*, a six-month delay is inexcusable, especially because if ZZH had even raised their purported claim in May 2025, after the last of the events occurred giving rise to their purported claim, nearly all of the prejudice to

Debtors could have been avoided since Debtors had not yet settled their claims or gone through a 5-day contested confirmation hearing.

Why did ZZH not assert their claim in May 2025?  Because ZZH was actively and strategically avoiding the purview of bankruptcy court jurisdiction.  In May 2025, the Debtors filed a motion for sanctions against Jeanette—an actual contingent and disputed creditor of the estate—for certain actions she took in the ZZH Action.  ZZH does not assert that they were unaware of that motion for sanctions or what was going in the Debtors' bankruptcies at any time.  This is because ZZH made "a deliberate effort to avoid the jurisdiction of the bankruptcy court", as the claimant did in *Graham Bros. Const*, as ZZH preferred instead to pursue the escrowed funds in the ZZH Action, believing that by ignoring the bankruptcy, they could slide under the radar of stay violations.  ZZH had been actively litigating a case alongside Jeanette, the most active creditor in these bankruptcy cases and ZZH's contractual privy.  As the Court commented at the Status Conference on the Motion, when referring to the ZZH Action: "I'm going to go out on a limb and guess that the word bankruptcy came up once in a while."  *See* Ex. 1 at 97:16-17.  Not only is the Court correct, but it is likely the understatement of the century given that the Debtors' Plan was actually filed and served on counsel of record in the ZZH JAMS Docket, and ZZH proceeded to litigate in the face of repeated warnings that they were seeking findings about Debtor A&O IL that would violate the automatic stay.

Therefore the reason for the delay—which some courts have cited as the single most important factor—is completely inexcusable.  ZZH knew of the bankruptcy since June 12, 2024, and knew of every factor underlying the alleged basis for their claim since May 2025.  ZZH had every reason to make the "minimal effort" that would have informed ZZH of the claims bar date

and allowed ZZH to file any purported claim they believed they had, on a timely basis.  *See In re*

*Alton*, 837 F.2d 457, 461 (11th Cir. 1988).

     *iv.*    *ZZH Has Not Acted in Good Faith*

     The fourth factor—the good faith of the movant—also weighs heavily in favor of denying

the Motion.  "[A] tactical decision to pursue the matter in the venue of its choice" does not evidence

good faith.  *In re Graham Bros. Const., Inc*., 451 B.R. at 653.  Indeed, not filing a claim as a

litigation tactic is "bad faith", as a "creditor having actual knowledge of a chapter 11 case may not

lie behind the log and delay seeking an extension of time for filing a claim to the prejudice of the

debtor and other creditors."  *In re Energy Future Holdings Corp.*, 619 B.R. 99, 119 (Bankr. D.

Del. 2020) (citing 9 Collier on Bankruptcy ¶ 3003.03[4] n.44 (16th ed. 2020)) (finding movants

exhibited bad faith by waiting to file claims until after another court's decision, despite knowing

about debtor's bankruptcy process); *In re Texas Tamale Co., Inc.*, 219 B.R. 732, 736 (Bankr. S.D.

Tex. 1998) (finding bad faith where creditor "deliberately waited on asserting his claim in order

to either destroy the debtor's chances of completing its confirmed plan or by harassing the debtor

into exerting resources to defend a claim which should have been brought prior to confirmation or

shortly thereafter").  Even a delay of only 90 days after becoming aware of the case has caused

courts to find a lack of good faith.  *See in re Harrell*, 325 B.R. at 650.

     As admitted by ZZH, they knew of these bankruptcy cases—and every relevant major fact

about them, including most relevantly that they were *surplus* cases—literally *two days* after the

bankruptcies were filed and deliberately chose not to participate in these cases.  ZZH knew that if

they wanted to pursue any purported direct claims against the Debtors, the only way to do so was

to participate in these bankruptcy proceedings.  Nevertheless, ZZH did nothing and continued to

strategically pursue the escrowed funds in the ZZH Action.  And, ZZH was reminded that their

actions came dangerously close to, if not actually, violating the automatic stay by litigating issues relating to the Debtor A&O IL's prepetition transfers in connection with their pursuit of the escrowed funds. At every step in the ZZH Action, ZZH was reminded that the Debtors' bankruptcy cases were marching towards confirmation, including by the filing of judicial notice of the Debtors' Plan and disclosure statement, along with a copy of the Plan, on January 3, 2025, as they tacitly admit in the last footnote of their Motion. By May 2025, when the Special Master issued the R&R (which the Motion asserts "[shows] beyond dispute" that ZZH had an alter ego claim against Debtors, *see* Motion at 7), there should have been no reason for any further delay by ZZH, if ZZH believed it had a claim. Yet, ZZH waited another 7 months—the critical period where Debtors effectively negotiated, confirmed, and substantially consummated their Plan.

Perhaps most forceful evidence of ZZH's bad faith is the timing of ZZH's Motion: a mere <u>two days</u> after the Reorganized Debtors filed their *Notice of Disbursement* evincing satisfaction of Jeanette's claim. This clearly demonstrates that ZZH sat on their rights, lying in wait until Debtors were on the precipice of exiting bankruptcy.

There was no reason for delay except a tactical decision by ZZH, which is evidence of ZZH's bad faith and further weighs in favor of inexcusable neglect.

### 3.    ZZH Should Be Barred From Filing An Untimely Claim

In sum, the evidence overwhelmingly demonstrates that ZZH's delay in filing their claim is entirely without justification and cannot be excused under bankruptcy law. Courts have made clear that neither lack of formal notice nor mere ignorance is sufficient to explain such a delay— especially when a claimant possesses all relevant facts needed to file the claim. ZZH, by their own admission, waited seven critical months after being fully informed of their claim's basis, despite receiving repeated bankruptcy notices. This was not a matter of oversight, but of deliberate

strategy: ZZH chose to avoid the jurisdiction of the bankruptcy court, presumably to gain tactical advantage. Such conduct cannot be tolerated, as it undermines the integrity of the bankruptcy process and prejudices the Reorganized Debtors, the estates, and the creditors. ZZH's neglect is wholly inexcusable, and even more inexcusable in light of the fact that their contractual privy, Jeanette, fully litigated every issue in this bankruptcy case. The Motion requesting to file an untimely claim should be denied.

**B.      ZZH Should Be Bound By the Discharge Provision and Plan Injunction**

Apparently recognizing that their neglect will not be considered excusable, ZZH pivots to requesting that they not be bound by the discharge provision and plan injunction under the theory of failing to receive proper formal notice. For the reasons below, ZZH were not creditors and were not entitled to the formal notice that they assert they should have received. Moreover, ZZH received ample notice, more than sufficient notice to have appeared in the Debtors' bankruptcy cases and protected their rights: ZZH simply chose not to do so. ZZH's delay and strategic decisions cannot be condoned by this Court, and the relief ZZH requests should be denied.

**1.   ZZH Were Not Creditors and Were Not Entitled to Notice**

Under well-established precedent, ZZH are, at best, unknown creditors with a speculative claim and were not entitled to any notice of the claims bar date.

Bankruptcy law divides creditors into two groups when determining the proper notice to be given of the claims bar date: known and unknown creditors. *See In re Charter Co.*, 125 B.R. 650, 654 (M.D. Fla. 1991). A claimant whose claim is "merely conceivable, conjectural, or speculative" is an unknown creditor who is not entitled to actual notice of the bar date. *Id*. (citing *Tulsa Professional Collection Services, Inc. v. Pope*, 485 U.S. 478 (1988)). Likewise, where the debtor "reasonably believed, or could have reasonably believed," that the creditor abandoned its

claim, then even a debtor's "actual or constructive knowledge of a remote possibility of a claim" would not make the creditor a known creditor. *Id.* (citing *Matter of Chicago, Rock Island & Pacific R.R. Co.*, 788 F.2d 1280, 1283 (7th Cir. 1986); *In re Chicago Pacific Corp.*, 773 F.2d 909, 916 (7th Cir. 1985)).

Moreover, a debtor is not charged with the knowledge of a contingent claim absent a claimant's express statement of its intent to lodge a future claim against the debtor. *See Berk v. Brooks Fashion Stores, Inc. (In re Brooks Fashion Stores, Inc.)*, No. 92 Civ. 1571(KTD), 1994 WL 132280, at *3 (S.D.N.Y. Apr. 14, 1994). Courts have held that an alleged claimant's failure to pursue a claim for years, with no explanation for the delay, is consistent with being a conceivable, or conjectural creditor that is not entitled to notice. *See In re L.F. Rothschild Holdings, Inc.*, No. 92 Civ. 1129(RPP), 1992 WL 200834, at *4 (S.D.N.Y. Aug. 3, 1992).

In *In re Agway, Inc.*, 313 B.R. 31, 39 (Bankr. N.D.N.Y. 2004), a court rejected that a prepetition litigant facing a suit by the debtor's employee was a "known" creditor to debtors. Although it was conceded that the debtors should have known of the prepetition litigation, "from the Debtors' vantage point, at the time they sent out copies of the Bar Date Notice to known creditors, [the creditor's] claim against them was uncertain and speculative" as the creditor did not "notify [Debtor] that it was planning to bring a third-party action." *Id*.

A debtor does not have a "duty to search out each conceivable or possible creditor and urge that person or entity to make a claim against it." *In re Charter Co.*, 125 B.R. at 654. The applicable standard is that "a debtor examine its books and records", and does not require that the debtor extensively investigate "to identify claims which have not yet been asserted against it, determine who *may* hold those claims and then inform those parties about the potential claims, thereby effectively inviting them to assert claims even though those parties themselves have not asserted

a claim or even known about one." *In re CTE 1 LLC*, No. 19-30256 (VFP), 2024 WL 2349620, at

*7 (Bankr. D.N.J. May 21, 2024) (emphasis in original).

    And, ignoring an alleged claim for years has consequences.  In *Charter Co.*, an oil supplier,

PEMEX, disputed the debtors' alleged underpayment on an invoice, and sent debtor a demand for

payment of the difference.  The demand was then completely ignored by both parties for years

until PEMEX sought an enlargement of time to file its claim in debtor's bankruptcy.  The District

Court rejected PEMEX's contention that it was a known creditor and held that "if [the debtor]

reasonably believed, or could have reasonably believed, that PEMEX had abandoned its claim,

then even [the debtor]'s actual or constructive knowledge of a remote possibility of a claim by

PEMEX would not raise PEMEX to the level of a known creditor deserving of actual notice of the

bar date."  125 B.R. at 656 (citations omitted).

    From May 2022 to December 2022, ZZH lost three separate times on their claim against

Debtor IF LLC and Debtor Atlas P2's subsidiary, P2.  The Accounts were unfrozen and the parties

effectively walked away from each other.  From December 2022 to June 2024, ZZH sat on their

hands and did absolutely nothing to pursue the Debtors: ZZH did not serve a single demand,

citation, lawsuit, or any claim on or against the Debtors.  From June 2024 to December 2025, ZZH

continued to sit on their hands while being bombarded with actual and direct notice of the

bankruptcies in their cases.  ZZH let three years go by without even the hint of pursuing a claim

against Debtors.  As in *Charter*, *L.F. Rothschild*, and *Berk*, the lack of any express statement of an

intent to pursue a claim, together with the passage of years since any claim had been asserted

against (only one of) Debtors, makes ZZH, at best, a conjectural or speculative creditor.

    The cases cited by ZZH are entirely inapposite.  In the case of *In re Majorca Isles Master

Ass'n*, Case No. 12–19056–AJC, 2014 WL 1323180 (Bankr. S.D. Fla. 2014), the creditor's debt

was listed on Debtors' financial statements and "there was nothing in the record that suggests the delayed filing of the proof of claim was other than in good faith."  Here, the debt was not in Debtors' financial statements and the timing of ZZH's filing of the proof of claim—a year and a half after receiving notice of the bankruptcy cases and despite the bankruptcy cases being raised to ZZH's attention numerous times in both the ZZH Action and the ZZH Tort Defense —strongly suggests bad faith.  Rather than participating earlier, ZZH let their contractual privy, Jeanette, contest the Debtors' confirmation until the Debtors' bankruptcy cases neared closure and significant distributions to creditors had already been made or committed.

Also cited by ZZH and inapposite here is *Levin v. Maya Constr. (In re Maya Constr. Co.)*, 78 F.3d 1395, 1398 (9th Cir. 1996), in which the creditor had sent a demand letter to the debtor only three months prior to the bankruptcy.  Here, there were zero demand letters sent to any of the Debtors, and not any hint for literally three years that ZZH would attempt to revive their thrice-unsuccessful claim against Debtor IF LLC.

ZZH further cites to *In re Pappalardo*, 210 B.R. 634 (Bankr. S.D. Fla. 1997) and *In re Premier Membership Servs., LLC*, 276 B.R. 709 (Bankr. S.D. Fla. 2002), which are both entirely inapplicable as the debtors there *admitted* that the unserved parties were actual creditors.  Debtors adamantly dispute that ZZH is an actual creditor, especially in light of: (i) the Rulings Denying Turnover, barring their prior claims against IF LLC, (ii) prior federal court rulings that effectively vindicated both IF LLC and P2 from any claims of ZZH, (iii) the lack of any prepetition demand or claim against A&O FL, A&O IL, or Atlas P2, and (iv) a post-petition Delaware Chancery Court ruling that eviscerates any claim of ZZH that the transfer of proceeds to Debtor A&O IL is somehow reachable by a claimant of distributions from Overlook (which ZZH claims to be by the Pledge Agreement).

ZZH completely fail to prove why their claim was "known" and do not cite to any of the Debtors' books or records, or any bankruptcy pleadings, where Debtors admit ZZH have a claim. Although ZZH reference CohnReznick's fee application where ZZH are listed under the category "Potential Claims", ZZH misleadingly take the list out of context.[16] ZZH were listed because ZZH were on the schedules as a party that the Debtors had a "potential claim" *against* and, in fact, were placed immediately under, and grouped with, the other names of entities on Schedule A/B *assets* of Debtor. The creditors of Debtors were listed in a separate section of the CohnReznick conflicts list, categorized as Schedule E/F Creditors. As Debtors have maintained all along, ZZH are not creditors, but rather litigation targets, of Debtor IF LLC.

Indeed, ZZH does not even adequately explain the basis for their allegedly "known" claim, other than a single paragraph vaguely referring to "fraudulent transfers"[17] and "alter ego" claims that they have never asserted against Debtors in any demand letter, claim, or pleading, despite being well aware of the purported factual basis for these alleged claims for months if not years. *See* Motion at ¶ 16. ZZH's allegation that the transfer of P-5 sale proceeds to the Debtors were fraudulent transfers (Motion at ¶ 30), is without any foundation, was never asserted by ZZH as a claim prior to the Motion, and certainly never admitted by Debtors, who have always asserted, including in this case, that the transfers of proceeds were returns of capital investment in P5. Nor does ZZH even explain how they would be entitled to pursue such transfers given that they were not a creditor of the transferor of the P-5 Assets (a downstream entity of Overlook). As made clear

---

[16]    Moreover, CohnReznick specifically disclaimed that the list was for conflicts check only and "should not be relied upon by any party as a list of creditors or for any other purpose." ECF No. 81, at 31, n. 1. Indeed, there are obvious errors in the list such as listing "other" for A&O Family LLC, instead of "Debtor".

[17]    As this Court stated at the status conference, fraudulent transfers belong to the estates. *See* Ex. 1 at 102:1-4.

by the Delaware Chancery Court, a distribution from the downstream entities does not trigger a right to distribution at the Overlook level.  *See* Ex. 32 at 19-20.[18]

The Pledge Agreement cited by ZZH does not form the basis for any claims against Debtors either.  Debtors were not a party, grantor, or grantee, and did not receive any transfer from Steven or Overlook.  Moreover, the Pledge Agreement has never been pursued as the basis for any claim against Debtors, despite ZZH having been well aware of the transfers of the P-5 proceeds for years, and at least since their February 2025 trial.  Even in the Motion, ZZH can still not articulate how the Pledge Agreement forms any claim against Debtors.

Indeed, these bankruptcy cases are much more apposite to *Charter*, *Berk*, *CTE 1 LLC*, and *L.F. Rothschild*, as the Debtors were under no obligation to speculate on ZZH's potential, unasserted future claims against them, whether ZZH would eventually attempt to pursue Debtors despite the fact that ZZH had done nothing for years prior to the Petition Date, and reasonably believed that ZZH had abandoned their previously-asserted and thrice-lost claims against IF LLC and P2 (to the extent they were not already barred by res judicata).

## 2.  ZZH's Knowledge of the Bankruptcies Satisfies Any Due Process Concerns

Even if ZZH could be deemed a "known" creditor of the Debtors, due process is satisfied because ZZH had actual knowledge of the bankruptcy cases, and could calculate the claims bar date from the dates of the petitions.

Constitutional due process requires only "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."  *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S.

---

[18]  "P-5 [GRA LLC] seems to believe that a subsidiary's sale of assets entitles the parent LLC's members to a cut of the proceeds. The basis for that understanding is unclear. . . . In any event, Delaware law does not support P-5's unbriefed theory."

306, 314 (1950) (citations omitted).  Constitutional requirements are satisfied where, the nature of the notice "convey[s] the required information" and the timing of the notice "afford[s] a reasonable time for those interested to make their appearance."  *Id*. (citations omitted).  In bankruptcy, "[t]he general rule, moreover, is that the only knowledge required is knowledge of a critical stage of the proceeding from which the bar date can be computed, not of the bar date itself."  *Fogel v. Zell*, 221 F.3d 955, 964 (7th Cir. 2000) (citations omitted).

Notably, the compliance with procedural notice mandated by the Bankruptcy Rules is not necessarily required by due process, because where a party receives "*actual* notice of the filing", as same "more than satisfie[s]" due process.  *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260 (2010) (finding that the failure to serve creditor with the requisite summons and complaint required by the bankruptcy rules did not violate due process where creditor had actual notice of the filing and contents of the plan).

The Eleventh Circuit has applied *Espinosa* broadly to hold that "actual notice is sufficient to satisfy due process, even where a debtor violates procedural requirements for supplying notice prescribed by the Bankruptcy Rules."  *In re Le Ctr. on Fourth, LLC*, 17 F.4th 1326, 1336 (11th Cir. 2021).  See also  Therefore, technical compliance with the Bankruptcy Rules is not necessarily required to satisfy constitutional due process.  *See, e.g.*, *In re Sam*, 894 F.2d 778, 781 (5th Cir. 1990) ("the purpose of the notice requirement is satisfied when the creditor has actual knowledge of the case in time to permit him to take steps to protect his rights").  Even prior to *Espinosa*, courts recognized the practical reality that "constitutional scrutiny into how notice was sent . . . does not apply when the complaining party already has actual notice, because the concern that an action is being taken without the party's having had an opportunity to protect itself, the *raison d'etre* for

the constitutional protection, is allayed.  Notice, no matter how serendipitous, is still notice." *In re Fairchild Aircraft Corp.*, 128 B.R. 976, 983 (Bankr. W.D. Tex. 1991).

ZZH's argument that they failed to receive the §341 Notice in the manner prescribed by the Bankruptcy Rules falls flat in light of *Espinosa*.  ZZH had actual knowledge of the Debtors' bankruptcy cases only two days after the petitions were filed, and could calculate the claims bar date based on the Local Rules.  Moreover, ZZH had repeated notice of the Debtors' bankruptcies. Debtor IF LLC and ZZH filed a joint status report, *prior* to the claims bar date, that specifically cited to Debtor IF LLC's bankruptcy in the Southern District of Florida.  Thus not one, but two different sets of ZZH attorneys had actual notice and were filing pleadings that recited and confirmed ZZH's knowledge of the bankruptcy.  The reason why ZZH did not file a claim had nothing to do with notice, and everything to do with that fact that ZZH knew they had no claim against Debtors.

And, ZZH does not actually contend that they had no actual knowledge of any of the key events in this bankruptcy, including the Plan and disclosure statement, or the confirmation hearing. It is not hard to speculate why, given that ZZH's contractual privy, Jeanette, was undoubtedly keeping ZZH apprised of her litigation efforts in the bankruptcy venue.

Although ZZH claims actual knowledge cannot suffice for technical notice, the cases cited by ZZH are distinguishable.  *In re Spring Valley Farms, Inc.*, 863 F.2d 832 (11th Cir. 1989) specifically disclaimed that "[o]ur answer might be different if plaintiffs had actual knowledge of the bar date itself rather than merely a general knowledge of the initiation of bankruptcy proceedings."  *Id*. at 835.  And, *Spring Valley* is arguably no longer good law given the developments of *Espinosa* and *In re Le Ctr. on Fourth, LLC*.  As *In re Le Ctr. on Fourth, LLC* clarified, *Spring Valley* "did not address the question whether receiving actual notice of the bar

date would have satisfied due process." 17 F.4th at 1335. Moreover, in *In re Le Ctr. on Fourth, LLC*, as here, ZZH was provided "with information that went well beyond the mere existence of a bankruptcy proceeding." *Id*. Furthermore, the creditor in *Spring Valley* was, without dispute, a known creditor of the debtor, when ZZH are at best, unknown creditors to the Debtors, as outlined above.[19]

The other cases cited by ZZH, including *In re Arch Wireless, Inc.*, 534 F.3d 76, 80 (1st Cir. 2008), all rely on the Supreme Court's decision in *City of New York v. New York, N. H. & H. R. Co.*, 344 U.S. 293 (1953), which must be construed in light of the Supreme Court's subsequent decision in *Espinosa*. As many courts have observed, *City of New York* was naturally limited by the fact that it was construing what was reasonable notice under section 77 of the then-operative Bankruptcy Act, not the Constitution. *See, e.g.*, *Matter of Sam*, 894 F.2d 778, 781 (5th Cir. 1990) ("City of New York apparently was decided on statutory rather than constitutional grounds.").

In this case, ZZH's actual knowledge of the bankruptcy—from copies of the petitions, the constant references to the bankruptcy in the ZZH Action and ZZH Tort Defense, ZZH's actual receipt of the Plan in January 3, 2025, and the cumulative record of the ZZH Action referenced herein, including the constant references and warnings of stay violations—created more than sufficient notice to "excite" ZZH's attention to assert this claim much sooner. Because ZZH had time to protect their rights and failed to, no due process violation took place, and, because the confirmed Plan is final and binding, ZZH's claims are barred by the Confirmation Order as well.

---

[19]    The Court in *Reliable Elec. Co. v. Olson Const. Co.*, 726 F.2d 620, 620 (10th Cir. 1984), cited by ZZH, also dealt with a known and identifiable creditor to the debtor in that case.

**C.**    **Alternatively, the Court Can Deny the Motion Based on the Equitable Doctrines of Equitable Mootness, Laches, and Unclean Hands**

**1.**    **ZZH's Relief Should Be Denied Under the Doctrine of Equitable Mootness**

In addition to the other reasons to deny ZZH's Motion discussed above, ZZH's requested relief is legally unactionable as it is equitably moot in light of the current status of Reorganized Debtors, and the transactions that have been completed pre- and post-confirmation, pursuant to the substantially consummated, confirmed Plan.

Under the widely recognized and accepted doctrine of "equitable mootness," a request for relief should be dismissed as moot when, "even though effective relief could conceivably be fashioned, implementation of that relief would be inequitable." *In re Cont'l Airlines*, 91 F.3d 553, 558–59 (3d Cir. 1996). Courts apply equitable mootness to decline requests for relief where, "with the passage of time after a judgment in equity and implementation of that judgment, effective relief . . . becomes impractical, imprudent, and therefore inequitable." *In re Arcapita Bank B.S.C.(c)*, No. 13 CIV. 5755 SAS, 2014 WL 46552, at *5 (S.D.N.Y. Jan. 6, 2014) (citing *Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136, 144 (2d Cir. 2005)) (internal quotation marks omitted).

This doctrine of equitable mootness is applied where "reliance on the plan of reorganization makes it imprudent to revise things." *Matter of UNR Indus., Inc.*, 20 F.3d 766, 769 (7th Cir. 1994). As the Seventh Circuit explained, "it is the reliance interests engendered by the plan, coupled with the difficulty of reversing the critical transactions, that counsels against attempts to unwind things." *Id*. at 770. "Every incremental risk of revision . . . puts a cloud over the plan of reorganization, and derivatively over the assets of the reorganized firm. People pay less for assets that may be snatched back or otherwise affected by subsequent events." *Id.* The equitable mootness doctrine reflects a long-term goal that "[b]y protecting the interests of persons who

acquire assets in reliance on a plan of reorganization, a court increases the price the estate can realize *ex ante*, and thus produces benefits for creditors in the aggregate." *Id*.

The doctrine of equitable mootness is presumed to apply where a plan has been substantially consummated. *See Alsohaibi v. Arcapita Bank B.S.C.(c) (In re Arcapita Bank B.S.C.(c))*, Case No. 12–11076, 2014 WL 46552, at *5, (S.D.N.Y. Jan. 6, 2014) (collecting cases). Substantial consummation occurs where there is: (A) a transfer of all or substantially all of the property proposed by the plan to be transferred; (B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and (C) commencement of distribution under the plan. *See* 11 U.S.C. § 1101(2).

In these bankruptcy cases, the Plan became effective on October 1, 2025, and all injunctions, releases, and settlements became operative and binding. Multiple comprehensive multi-million dollar settlements—with RBC, Celadon Financial Group, the Township Entities, and P-5 GRA LLC—were negotiated and approved, and obligations under those settlements have been completed or are substantially underway. In total, over $16 million in payments were made pursuant to the Plan: over $6.1 million to secured creditor RBC, $4 million to Township Entities, $2 million to P-5 GRA LLC, over $2 million in administrative claims, and over $2 million to Jeanette and her counsel in payment of her remaining disputed claim. Two claims reserves were established for specific, identified disputed claims only: (1) the Jeanette/Schiller Disputed Claim Reserve, funded from the Disbursing Agent's access to specific Celadon accounts of P2, IF LLC, and A&O IL; and (2) the P-5 GRA Disputed Claim Reserve of $5,000,000, secured by the GRA Yacht Lien or cash proceeds. The Plan does not contemplate or reserve funds for unknown or unfiled late claims. Several significant asset dispositions have occurred, and liens have been

created, including: (1) the sale of securities in the Debtors' Celadon accounts, (2) a ship mortgage granted on a non-Debtor vessel by Plan Funder, Yacht Daddy, LLC, and (3) a first position lien to Plan Funders Drs. Olga and Anthony Ivankovich on all assets of Reorganized Debtors, to secure up to $15 million in exit financing.  The Plan contains binding release and injunction provisions that became effective on the Effective Date, and which the Court has found were necessary and essential to the Plan.  In sum, the Plan has been substantially consummated under section 1101(2) of the Bankruptcy Code as: (a) substantially all of the property proposed by the Plan to be transferred has been transferred, (b) the Reorganized Debtors have assumed post-petition management, and (c) distributions under the Plan have not only commenced but have been largely completed, with over $16 million paid and only a maximum of $5.8 million remaining to be paid in December 2027, in addition to any claims that may be fulfilled out of the P-5 GRA Disputed Claim Reserve.

Due to the restructuring that occurred both before and after confirmation, the assets of the Debtors have changed significantly.  As a result, Reorganized Debtors A&O IL, IF LLC, and Atlas P2 now lack assets, and Reorganized Debtor A&O FL's assets are encumbered by consensual liens expressly approved in the restructuring and granted in the ordinary course of business.  In short, there is no way to "unscramble the egg" without significantly prejudicing the Reorganized Debtors' business operations and completely upending the reliance interests of the Reorganized Debtors, Plan Funders, and other creditors who have yet to receive the full distribution due under the Plan.  Likewise, ZZH cannot pursue relief from the Plan injunctions as to Plan Funders, including Yacht Daddy, LLC and the P5 record owners, for the same reason they cannot pursue

Reorganized Debtors A&O FL—neither entity would have consented to be a Plan Funder without the protections of the Plan injunctions.

Every single party-in-interest in these bankruptcy cases have relied on the confirmed and substantially consummated Plan in structuring their settlements, property interests, and business affairs. To attempt to unwind even one of these transactions would undermine the entire basis of the Plan and confirmation for at least one interested party affected by such transaction. Each interested party and creditor in this case relied on the entirety of the Plan, and the effect that the Plan had on the other parties. It would disturb all of the parties' expectations now by attempting to either (a) force Reorganized Debtors to immediately pay a $9 million purported claim that there simply isn't sufficient liquid assets to pay, or (b) permit ZZH to proceed with their claims against Reorganized Debtors either in or outside of bankruptcy court, such that Reorganized Debtors would be thrust back into active litigation, imposing significant cost and burden upon Reorganized Debtors, and threatening the vitality and stability of the Plan and the final, future payments under it.

Since the Plan has been substantially consummated, resulting in over $16 million of payments, it would be impractical and imprudent, and therefore inequitable, to attempt to unwind any of the pre- or post-confirmation transactions made in reliance on the Plan, which reversion would be necessary to provide the relief that ZZH seeks. ZZH's request to consider their claim timely, or exclude ZZH from the Plan's discharge and injunction, is therefore equitably moot.

### 2.    Laches Precludes Allowance of ZZH's Claim

In the alternative, this Court should deny the Motion under the doctrine of laches. Laches bars ZZH's claim because ZZH unreasonably delayed filing their claim for over a year and a half,

despite having actual knowledge of the bankruptcy, severely prejudicing the Debtors and other parties by threatening the finality of the confirmed and substantially consummated Plan.

Laches bars requests to allow late-filed claims where the creditor knew for months or years of the bankruptcy, but took no action to file its claim, regardless of a lack of formal notice required by the rules. *See In re Chicago Pac. Corp.*, 773 F.2d 909, 917 (7th Cir. 1985) (where creditor knew of the bankruptcy and did not file its claim with the court until the eve of plan consummation, the claim was barred by laches). "[E]quity assists the vigilant and diligent, not those who sleep on their rights." *Matter of Pagan*, 59 B.R. 394, 397 (D.P.R. 1986) (claims of known creditors who did not receive formal notice of any kind were nonetheless barred by laches after the creditors waited years to file their claims despite their actual knowledge that debtors were in reorganization). *See, e.g.*, *In re Losada*, 557 B.R. 244, 252 (Bankr. S.D. Fla. 2016) (Isicoff, J.) (finding that the equities were not in favor of a creditor who chose not to file a claim despite clearly having knowledge of the bankruptcy).

The two factors to determine whether laches should be applied to bar the requested relief are: 1) whether the delay in taking the action in question was reasonable under the circumstances; and 2) the prejudice to the party affected by the belated action. *See In re Losada*, 557 B.R. at 252; *In re Barsky*, 85 B.R. 550, 554 (C.D. Cal. 1988) (citing *Brown v. Continental Can Co.*, 765 F.2d 810, 814 (9th Cir. 1985)), *aff'd*, 933 F.2d 1013 (9th Cir. 1991), *and aff'd sub nom. Morgan v. Barsky*, 933 F.2d 1014 (9th Cir. 1991).

As to the first factor, courts have found that the delay in taking action is unreasonable where a creditor who was on inquiry notice of the bankruptcy proceedings "decided to wait it out, and let the proceedings wind down before she would decide whether to make a claim." *In re Barsky*, 85 B.R. at 555. Creditors who have "slept on their rights and behaved in a dilatory

manner" can be found to have acted with unreasonable delay such that they will be barred by laches. *Id*. Likewise, a creditor who has delayed for years in taking action on an alleged claim, regardless of the creditor's claims of lack of notice of the bankruptcies in time to object to confirmation, has engaged in excessive and inexcusable conduct constituting laches. *See In re Hunt*, 146 B.R. 178, 184 (Bankr. N.D. Tex. 1992). In *Barsky*, after learning of the proceedings and receipt of the plan, a creditor waited for two years to make a claim rather than immediately protecting her rights. *See Barsky*, 85 B.R. at 555. The court held that such delay was dilatory conduct that was unreasonable under the circumstances. *See id*. Similarly, in *Hunt*, though the creditor learned of the proceedings a year after reorganization, he failed to file a late proof of claim until two and a half years later. *See* 146 B.R. at 184.

As to the second factor of prejudice, "[t]rustees, creditors, debtors and even bankruptcy judges are entitled to some measure of finality in bankruptcy proceedings." *In re Barsky*, 85 B.R. at 554 (quoting *Matter of Pagan*, 59 B.R. at 397) (internal quotation marks omitted). Indeed, the "bankruptcy laws provide a debtor to undergo a fresh start" and therefore "[a]llowing a dilatory creditor to wait out the proceedings before asserting her rights would significantly prejudice all involved by robbing them of the significant benefit of finality." *Id*.

In this case, as detailed herein, the delay by ZZH is substantial and the prejudice to the Debtors, the Plan Funders, equity, and other creditors is the destruction of the confirmed and substantially consummated Plan. ZZH, despite having full knowledge of these bankruptcy cases as of June 12, 2024, chose to pursue litigation in the ZZH Action. For a year and a half, ZZH did nothing in these bankruptcy cases, despite knowing that they were surplus cases. Even assuming that ZZH only became aware in February 2025 of the basis for their claim, when ZZH and Jeanette filed their joint memorandum in the ZZH Action that expressly noted both the Debtors'

bankruptcies and the theory that Debtors were "alter egos" liable for Steven's debts, ZZH still did nothing for another seven months, waiting until after the Plan was confirmed and the Reorganized Debtors' bankruptcy cases were about to be closed.  It is obvious that ZZH exhibited dilatory conduct and "slept on their rights."

And, the prejudice to the parties of ZZH's delay is severe.  At this point, over $16 million has been disbursed under the confirmed Plan: settlements were negotiated that never would have been agreed to, and disputed claims were paid that never would have been paid, if a $9 million claim had materialized.  To attempt to add a late claim that is nearly 50% of the current unsecured claim pool, and require Reorganized Debtors to pay the claim in accordance with the confirmed Plan, would be simply impossible given the post-confirmation transactions and business that has happened, and any payment to ZZH—or litigation against Reorganized Debtors or Plan Funders— would jeopardize the stability and probability that Reorganized Debtors will be able to pay the time-deferred payments due in December 2027.

Lastly, ZZH and Jeanette's intentional partnership makes the use of laches even more relevant to deny the relief requested in the Motion: since ZZH worked closely with the party most committed to safeguarding creditor interests during the bankruptcy cases, they cannot claim they were unaware or lacked opportunity to be involved in the bankruptcy cases.

ZZH should not be equitably rewarded for their dilatory conduct in waiting years to file a claim, long after the Plan has been confirmed, and now that transactions cannot be unwound. ZZH's claims should be barred by laches.

### 3.    ZZH's Unclean Hands and Stay Violations Preclude Any Equitable Relief

ZZH should be barred from their requested relief due to their unclean hands, as they violated the automatic stay to establish the untimely claim that they now assert against Debtors'

estate, while deliberately avoiding participating in the bankruptcy proceedings and now seek to take advantage of such delay.

The principles of equity govern the exercise of a bankruptcy court's jurisdiction. *See Matter of Garfinkle*, 672 F.2d 1340, 1347 n.7 (11th Cir. 1982) (citing *Bank of Marin v. England*, 385 U.S. 99, 87 S.Ct. 274, 17 L.Ed.2d 197 (1966)). "[E]quitable powers of bankruptcy courts are available only to . . . creditors with clean hands." *In re Uwimana*, 274 F.3d 806, 810 (4th Cir. 2001) (citing *Carolin Corp. v. Miller,* 886 F.2d 693, 698 (4th Cir. 1989)) (internal quotation marks omitted), *abrogated on other grounds by Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 133 S. Ct. 1754, 185 L. Ed. 2d 922 (2013). "[One] who has acted in bad faith, resorted to trickery and deception, or been guilty of fraud, injustice or unfairness will appeal in vain to a court of conscience, even though in his wrongdoing he may have kept himself strictly within the law." *Matter of Garfinkle*, 672 F.2d at 1347 n.7 (quoting *Peninsula Land Co. v. Howard*, 149 Fla. 772, 6 So.2d 384, 389 (1941)). A court may deny relief under the doctrine of unclean hands where there is a "close nexus between a party's unethical conduct and the transactions on which that party seeks relief" to "prevent a party from using the courts to reap the benefits of wrongdoing." *In re Uwimana*, 274 F.3d at 810 (citing *Keystone Driller Co. v. General Excavator Co*., 290 U.S. 240, 245, 54 S.Ct. 146, 78 L.Ed. 293 (1933)).

Here, as detailed above, ZZH stood on the sidelines of this bankruptcy for a year and a half, with actual notice and knowledge of the Debtors' bankruptcies and key events and deadlines. At the same time, ZZH (and Jeanette) pursued factual findings in the ZZH Action to obtain possession of certain escrowed funds, which factual findings involved Debtor A&O IL's prepetition use of its account, and which factual findings ZZH now assert form the basis for their claim against Debtors. *See* Motion at 7 ("In light of the various orders in the . . . [ZZH] District Court Proceeding, it is

beyond dispute that . . . the claims of ZZH and [Peter Pui Tak] Lee against Steve are also claims against the Debtors.")

To the extent that ZZH believe that the orders entered in the ZZH Action during the Debtors' bankruptcies can somehow form the basis for their claim against Debtors (despite no actual claims having been adjudicated against Debtors in the ZZH Action, and Debtors not having been a party to the ZZH Action), ZZH have effectively admitted to a stay violation. This claim by ZZH—that another federal court could make findings during the pendency of these bankruptcies to establish a prepetition claim against Debtors—is exactly why the Pilgrim Entities warned the Special Master of the automatic stay during the February 2025 trial, and one of the reasons why Reorganized Debtors filed, in May 2025, a Motion for Order to Show Cause against Jeanette and her counsel. As further detailed in the Motion, the attempted (or according to ZZH, actual) violations of the automatic stay in seeking relief against the Debtors in the ZZH Action negatively impacted the Debtors' bankruptcy cases and forced the Debtors to take action to enforce the stay, increasing their administrative expenses and the burden on the estates. *See* Docket No. 354. ZZH's stay violations, while they consciously and deliberately avoided submitting a claim in the Debtors' bankruptcies, are conduct that constitutes unclean hands, and precludes the equitable remedies sought in the Motion.

In sum, ZZH's admitted attempts to violate the automatic stay, without ever coming to this Court to assert their claim, should preclude the grant of any equitable relief to ZZH.

## CONCLUSION

ZZH's attempt to file a late claim must be denied. ZZH was not simply neglectful but knowingly and strategically delayed their involvement, despite having clear and timely notice of the bankruptcy proceedings as early as June 2024. For eighteen months, ZZH did nothing, even

as critical deadlines passed and the Debtors' reorganization Plan—benefiting actual creditors and ensuring the Reorganized Debtors' fresh start—was confirmed and carried out.  ZZH's inaction cannot be excused: courts require creditors to act with diligence, and ZZH's deliberate stalling jeopardizes the essential finality that bankruptcy law provides to all stakeholders.

The prejudice to ZZH's delay is severe and irreparable.  Over $16 million has already been disbursed, settlements reached, disputed claims resolved, and the Plan substantially consummated.  Introducing a late $9 million claim at this point would destabilize the financial structure, nearly doubling the unsecured claim pool and making it impossible for the Reorganized Debtors to fulfill their obligations, including payments due in December 2027.  Allowing ZZH's claim now would not only undermine the trust and reliance built into the bankruptcy process but would also unfairly penalize the parties in this case who abided by the Court's Local Rules and deadlines.

Moreover, ZZH cannot seek equitable relief when their actions were anything but equitable.  The doctrine of laches applies here with particular force: ZZH—working closely with Jeanette, who actively safeguarded creditor interests—cannot feign ignorance.  Their intentional delay and lie-in-wait tactics are precisely what the law prohibits, and courts are clear that parties who "sleep on their rights" cannot be rewarded at the expense of others stakeholders with reliance interests.

ZZH's conduct goes beyond mere delay; it constitutes a violation of the automatic stay and a clear case of unclean hands.  While avoiding participation in the bankruptcy, ZZH actively pursued outcomes in separate litigation that they now allege form the basis of their untimely claim.  Such behavior, which increased administrative burdens and costs for all involved, is precisely the wrongdoing that bankruptcy courts refuse to reward.  Only those with "clean hands" are entitled

to request equitable relief, and ZZH's deliberate violations and refusal to appear in the bankruptcies undermine their standing entirely.

In sum, permitting ZZH's untimely claim would unravel the progress achieved, harm those who participated in good faith, and reward a calculated disregard for the rules and fundamental fairness.  The law, the facts, and the equities all demand that the Motion be denied, ZZH's claim barred, and their attempt to circumvent the Plan provisions and injunctions firmly rejected.

**WHEREFORE**, the Reorganized Debtors respectfully request that this Court:

i.      deny the Motion;

ii.     deny ZZH's request to file an untimely claim;

iii.    hold that any claim of ZZH has been discharged and that ZZH is bound by all of the discharge and injunctive provisions of the Plan and Confirmation Order; and

iv.     enter all other relief that is just and proper.


Dated: March 11, 2026                    Respectfully submitted,

                                         By: */s/ Eyal Berger*
                                         Eyal Berger, Esq.
                                         Florida Bar No: 011069
                                         eyal.berger@akerman.com
                                         **AKERMAN LLP**
                                         201 E. Las Olas Blvd., Suite 1800
                                         Fort Lauderdale, Florida  33301
                                         Tel: (954) 463-2700
                                         Fax: (954) 463-2224

                                         *Attorneys for the Reorganized Debtors*

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on March 11, 2026, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day by transmission of Notices of Electronic Filing generated by CM/ECF to those parties registered to receive electronic notices of filing in this case.

By:  /s/ *Eyal Berger*
        Eyal Berger, Esq.